JUDGE RAMOS



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAUL CHILL and SYLVIA CHILL, for the use and benefit of the CALAMOS GROWTH FUND, | |
| Plaintiffs, | Civil No. |
| -v.- | |
| CALAMOS ADVISORS LLC and CALAMOS FINANCIAL SERVICES LLC, | **COMPLAINT** |
| Defendants. | Jury Trial Demanded |



**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 2

III.   PARTIES ............................................................................................................ 2

   A.   Plaintiffs ...................................................................................................... 2

   B.   Defendants ................................................................................................... 2

   C.   Relevant Non-Party Affiliates of Defendants ............................................ 3

IV.    SUBSTANTIVE BACKGROUND ALLEGATIONS .................................... 4

   A.   The Mutual Fund Industry and the Structural Conflict of Interests
      Between Investment Advisers and the Captive Funds Under Their Control ..................... 4

   B.   The Investment Company Act of 1940, as Amended with Section 36(b),
      Addresses this Conflict of Interests by Prohibiting Excessive
      Investment Advisory Fees ............................................................................ 6

   C.   The Fund's Organization and Operations .................................................... 7

   D.   Calamos' Investment Advisory Services to the Fund .................................. 8

   E.   The Calamos Fund Complex, and the Fund's Flagship Presence within It ..................... 11

V.     CALAMOS EXTRACTED EXCESSIVE INVESTMENT ADVISORY FEES
      FROM THE FUND ........................................................................................... 15

   A.   Comparative Fee Structures ....................................................................... 16

     1.   The Investment Advisory Fee Rates Applied to the Fund ........................... 17

     2.   Comparing Fees Charged to Captive Fund and Arm's-Length
        Investment Advisory Clients .................................................................. 19

       a)   Captive Fund Fees vs. Standard Fees Paid by Third-Party
          Institutional Clients for the Same Investment Strategy ......................... 19

       b)   Captive Fund Fees vs. Actual Fees Paid by Third-Party
          Institutional Clients for Identical Portfolio Selection Services ................. 20

     3.   Comparing Fund Fees to Investment Advisory Fees Charged by other
        Investment Advisors to Similar Mutual Funds .......................................... 26

     4.   Comparing Current Fund Fees to Prior Fund Fees ....................................... 27

   B.   Economies of Scale ..................................................................................... 32

     1.   Economies of Scale, Their Role in Excessive Fees, and the Use of  Breakpoints
        to Address these Matters ......................................................................... 33

     2.   The Fund Generated Significant Economies of Scale with Respect to
        Investment Advisory Services, but Calamos Extracted Excessive Fees
        by Failing to Share the Benefits of Such Economies of Scale .................... 36

     3.   Analysis of Fund Breakpoints Further Exposes Calamos' Excessive  Fees
        and Retention of Economy of Scale Benefits .......................................... 38

C.   The Nature and Quality of Services Provided to the Fund's Shareholders ..................... 40

   1.   The *Nature* of the Services Calamos Provided to the Fund under the  IMA ............... 40

   2.   The *Quality* of the Services Calamos Provided to the Fund ........................................ 42

   3.   Comparison of the Nature and Quality of the Services Calamos  Provided
      to the Fund and to Identical Subadvised Funds Further  Indicates That Calamos
      Charged Excessive Fees to the Fund ...................................................................... 44

D.   The Profitability of the Fund to the Advisor.................................................................. 47

E.   Fall-Out Financial Benefits Attributable to the Fund ...................................................... 52

F.   The Care and Conscientiousness of the Fund's Trustees in Approving Investment
    Advisory Fees ................................................................................................... 56

   1.   The Board Approved Substantively Excessive Advisory Fees.................................... 57

   2.   The Board's Deficient Approval Process ................................................................ 57

      a)   Defendants' Domination of the Fund's Trustees ..................................... 59

      b)   Calamos Set Its Own Advisory Fees by Providing  Proposed Fees
         that Fund Trustees Rubber-Stamped.................................................... 66

      c)   The Fund Trustees' Deficient Process for Evaluation and  Determination
         of Advisory Fees ............................................................................. 67

VI.   DEFENDANTS EXTRACTED FURTHER, EXCESSIVE INVESTMENT
    ADVISORY FEES FROM THE FUND IN THE FORM OF DISTRIBUTION FEES... 71

A.   Background:  Mutual Fund Distribution Fees and the
    Circumstances Under Which They May Be Levied ...................................................... 71

B.   The Fund's Distribution Plan, Distribution Fee Rates, and Distribution Fees ................ 72

C.   The Fund's Distribution Fees Were Excessive, Did Not Benefit the Fund,
    and Instead Benefitted Defendants by Allowing Them to Extract Further
    Excessive Fees for Investment Advisory Services .......................................................... 75

   1.   The Fund's Distribution Plan, Distribution Fee Rates, and  Distribution Fees
      Do Not Compensate Defendants for Distribution  Activities,
      but for Investment Advisory Services.................................................................... 76

   2.   To the Extent that Distribution Fees Were Successful, and Contributed
      to Tremendous Increases in Fund AUM between 1999 and 2014,
      Defendants' Investment Advisory Fees Were Never Reduced
      so as to Share Resulting Economy of Scale Benefits ................................................. 77

   3.   To the Extent that Distribution Fees Were Not Successful, as Indicated
      by the Substantial Declines in Fund AUM between 2007 and 2014,
      the Fund Continues to Pay Such Fees Notwithstanding Not Receiving
      Any Benefits ....................................................................................................... 78

   4.   The Distribution Fees Charged in Connection with Distribution of  Class B Shares
      Provided No Benefits, and were Excessive, in Light of the Fact that
      Class B Shares Have Not Been Offered to New Investors  Since 2009 ...................... 79

5. The Absence of Distribution Fees Charged in Connection with Distribution of Class I Shares Further Demonstrates that Distribution Fees Provided No Benefit, and Instead Constituted Additional and Excessive Fees for Investment Advisory Services .............................................................. 80

6. The "Service Fee" Component of the Distribution Fees is Without Benefit, and Excessive, because it Constitutes Duplicative Payment for Services Already Provided by Other Entities ............................................................ 81

7. To the Extent that Distribution Fees Related in Part to "Overhead" Expenses (Personnel, Offices, Equipment), Such Fees Were Duplicative as Overhead was Already Funded through Investment Advisory Fees ..................................................... 82

D. The Care and Conscientiousness of the Fund's Trustees in Approving the Distribution Plan and Distribution Fees ................................................. 82

VII.   THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND ................ 86

VIII.  CAUSES OF ACTION ................................................................................................. 87

IX.    PRAYER FOR RELIEF ............................................................................................... 89

X.     JURY TRIAL DEMANDED ........................................................................................ 90

**List of Tables**

| **Table** | | **Pages** |
|---|---|---|
| Table 1 | The Calamos Fund Complex | 12-13 |
| Table 2 | Calamos' Historical Dependence on the Fund for Fees and AUM | 14 |
| Table 3 | The Fund's Current Advisory Fee Rates | 17 |
| Table 4 | The Advisory Fees Paid by the Fund | 18 |
| Table 5 | Fee Rates Charged to Third-Party Institutional Clients for Identical Portfolio Selection Services | 21 |
| Table 6 | The Fund's Current and Prior Advisory Fee Rates | 27-28 |
| Table 7 | The Fund's Illusory Rate "Reductions" | 31 |
| Table 8 | Fund Fees/Expenses (Year Ended October 31, 2014) | 41 |
| Table 9 | Fund Performance vs. Benchmarks | 43 |
| Table 10 | Fund Performance vs. Peers | 44 |
| Table 11 | Non-Captive Fund Responses to the Quality of Calamos' Investment Advisory Services | 46 |
| Table 12 | Profitability of Fund to Advisor | 48-49 |
| Table 13 | Fall-Out Benefits I:  Estimating Calamos' Additional Fees from Copying the Fund at no Additional Cost | 53 |
| Table 14 | Fall-Out Benefits II:  Sizeable Non-Advisory Fees Extracted from the Fund | 55-56 |
| Table 15 | Fall Out Benefits III:  Calamos Further Benefitted from Related-Party Transactions | 56 |
| Table 16 | Fund Distribution Fee Rates | 73 |
| Table 17 | Annual Distribution Fees Paid by the Fund | 74 |
| Appendix A | Comparison of Portfolios of Fund and Identical Subadvised Funds | Appendix A |

Plaintiffs Saul Chill and Sylvia Chill ("Plaintiffs"), by Plaintiffs' undersigned counsel, bring this action against Calamos Advisors LLC ("Calamos") and Calamos Financial Services LLC ("CFS," and together with Calamos, "Defendants") and allege as follows.  The following allegations are based on knowledge as to Plaintiffs and Plaintiffs' own actions, and on information and belief, based on the investigation of Plaintiffs' counsel, as to all other matters.  Such investigation included, but was not limited to, a review and analysis of documents filed by Calamos and its affiliates with the Securities Exchange Commission ("SEC") concerning inter alia Calamos, Calamos' affiliates, and/or the Calamos Growth Fund, documents filed with the SEC by third parties concerning investment vehicles managed by Calamos, and other matters of public record.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within Defendants' custody and/or control.  Plaintiffs believe that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this derivative action against Defendants on behalf of and for the benefit of the Calamos Growth Fund (the "Fund") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b).

2.    Calamos, as the Fund's investment adviser, manages the Fund's investment portfolio, and receives an annual fee from the Fund for providing it with investment advisory services, as further specified herein.  CFS, as the Fund's distributor, receives annual Distribution Fees from the Fund, as further specified herein.

3.    Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to the investment advisory fees and Distribution Fees paid by the Fund.

4.    Defendants breached that fiduciary duty by receiving investment advisory fees and Distribution Fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants, and could not have been the product of arm's-length bargaining (hereinafter, "excessive" fees).

5.     Plaintiffs bring this action to recover for the Fund the excessive and unlawful investment advisory fees and Distribution Fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of those fees.  Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

6.     No pre-suit demand on the Fund's Board of Trustees is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under Section 36(b) of the ICA.

## II.     JURISDICTION AND VENUE

7.     The claim asserted herein arises under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

8.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5) and 80a-43, and 28 U.S.C. § 1331.

9.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391, because Defendants maintain offices in this district, and/or transact business in this district.

## III.     PARTIES

### A.     Plaintiffs

10.     Plaintiffs Saul Chill and Sylvia Chill ("Plaintiffs"), residents of the State of New York, are shareholders in the Fund and have continuously owned shares in the Fund since July 2005.

### B.     Defendants

11.     Defendant Calamos Advisors LLC ("Calamos") is organized as a limited liability corporation under Delaware law, with principal offices in Naperville, Illinois.  A SEC-registered investment advisor, Calamos provides investment advisory services to registered investment companies such as mutual funds, unregistered investment companies, and private accounts.

Calamos serves the investment advisor for each and every fund, including the Fund, in the Calamos Fund Complex.  As of December 31, 2013, Calamos managed $26.54 billion of client assets on a discretionary basis, of which $22.4 billion (84.5% of Calamos' total assets under management ["AUM"]) rested in Captive Funds in the Calamos Fund Complex.

12.     Defendant Calamos Financial Services LLC ("CFS") is organized as a limited liability corporation under Delaware law, with principal offices in Naperville, Illinois.  A SEC-registered broker-dealer, CFS serves as the sole distributor for each U.S.-domiciled fund, including the Fund, in the Calamos Fund Complex.

### C.     Relevant Non-Party Affiliates of Defendants

13.     Calamos and CFS are wholly-owned subsidiaries of Calamos Investments LLC ("CILLC"), which is in turn owned by Calamos Asset Management, Inc. ("CAMI") and Calamos Family Partners, Inc. ("CFPI").  CFPI controls CAMI through its sole ownership of CAMI's super-voting Class B shares, and John P. Calamos, Sr. owns a controlling interest in CFPI. Calamos and CFS are thus owned and controlled, directly and/or through holding companies, by, *inter alia*, CILLC, CAMI, CFPI and John P. Calamos, Sr.

14.     Calamos Investments LLC ("CILLC") is a corporation organized under Delaware law, with its principal office located in Naperville, Illinois. CILLC operates as a holding company for the primary Calamos-branded operating subsidiaries, including, in addition to Calamos and CFS: (1) Calamos Wealth Management LLC, which provides investment advisory services to high net worth individuals; and (2) Calamos Investments LLP, which provides investment advisory services to non-U.S. investors and clients.  CILLC's sole manager is CAMI.

15.     Calamos Asset Management, Inc. ("CAMI"), a corporation organized under Delaware law, with its principal office located at 2020 Calamos Court, Naperville Illinois 60563, is a holding company that owns a 22.2% economic interest in CILLC (CFPI owns the remaining 77.8%).  A publicly-traded corporation, CAMI has issued two classes of stock: Class A shares, to the public; and 100 'super-voting' Class B shares, solely to CFPI.  These 100 Class B shares provide CFPI with 97.4% voting interest (and effective control) over CAMI, while CAMI's

20.53 million Class A shares provide their holders with an aggregate voting interest of only 2.6%.

16.     Calamos Family Partners, Inc. ("CFPI"), a corporation organized under Delaware law with principal offices located at Naperville, Illinois, is privately-owned by John P. Calamos, Sr. (who holds a controlling interest in CFPI), John P. Calamos, Jr. and their respective trusts. CFPI holds all Class B shares issued by CAMI, through which it exerts effective control over CAMI.

17.     John P. Calamos, Sr.: (1) is Chairman of the Board, Chief Executive Officer and Global Co-Chief Investment Officer of CAMI; and (2) holds a controlling interest in CFPI. Consequently, John P. Calamos, Sr. possesses and exerts effective control over CFPI, CAMI, CILLC, Calamos and CFS.  Furthermore, John P. Calamos, Sr. also serves (1) as a Trustee for each and every fund, including the Fund, in the Calamos Fund Complex, and (2) as Global Co-Chief Investment Officer for the Fund, as well as each and every other fund in the Calamos Fund Complex.  Per Calamos' own Form ADV, "[a]s Co-Chief Investment Officer and a senior member of the investment management team, Mr. Calamos . . . participat[es] in the security selection process for all of our accounts."

18.     CILLC, CAMI, CFPI and John P. Calamos, Sr. are referred to collectively as the "Calamos Control Persons."

## IV.     SUBSTANTIVE BACKGROUND ALLEGATIONS

### A.     The Mutual Fund Industry and the Structural Conflict of Interests Between Investment Advisers and the Captive Funds Under Their Control

19.     As a practical and historical matter, mutual funds have typically been created, established and organized by investment advisory firms, who then provide investment advisory services to such mutual funds in exchange for investment advisory fees.  Additionally and often, affiliates of such investment advisory firms are likewise engaged by such mutual funds to provide further services, including much of the "back office" and/or operational mechanics

4

requisite for mutual fund functioning (such as CFS here, which serves as sole distributor for the Fund and all other U.S.-domiciled Captive Funds in the Calamos Fund Complex). Likewise, persons affiliated with such investment advisers are typically appointed to serve on such mutual funds' boards of directors (such John P. Calamos Sr. here, as detailed in Section V.F *infra*).

20.     As a result of the close ties between such mutual funds and their investment adviser sponsors, and of the peculiar dependence of the former upon the latter, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *See* S. Rep. No. 91-184, at 5 (1969).

21.     More concretely, because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because it shares are bought by investors who rely on that service, *a mutual fund cannot, as a practical matter, sever its relationship with the advisor.*" *Id.* (emphasis added).

22.     The peculiar dependence of mutual funds upon their investment advisor sponsors makes such funds, in effect, "captive" to their investment advisers. Mutual funds established by investment advisor sponsors are hereinafter referred to as "Captive Funds."

23.     Historically, Captive Funds' dependence on and/or loyalty to their investment advisors has allowed investment advisors and their affiliates a decided advantage in negotiating the terms of the contractual relationships between them and the Captive Funds. In essence, because mutual funds cannot (and do not) "walk away" from their investment advisors, mutual funds are forced to accede to the terms and conditions proposed and preferred by their investment advisors.[1] Lacking the normal degree of independence and arm's-length distance, such Captive Funds often remain under the influence of, or into the *de facto* control of, the investment advisor.

24.     Investment advisory fees are one of the principal matters affected by this state of affairs. While it is in the interest of the mutual fund, and mutual fund investors/shareholders, to

---

[1] In theory, a mutual fund *can* "walk away." In practice, however, this almost never happens. "Walking away" is thus not exactly impossible, but rather, as practical matter, so very difficult that it is in effect all but impossible.

secure investment advisory fees that are as low as possible, the investment advisor's interests are the very opposite:  to secure investment advisory fees as high as possible.  Additionally, the influence and/or *de facto* control exerted by the investment adviser over the Captive Fund creates a conflict of interest within the investment advisor itself:  on the one hand, it wishes to secure high fees for itself, but on other hand, to the extent it possesses influence over the Captive Fund, it – at least in theory – should be pressing against itself to negotiate a lower payout of fees.

25.     Historically, such conflicts of interests have generally been resolved in investment advisors' favor and to Captive Funds' detriment.  As a result of such structural factors, Captive Funds have historically paid – and often continue today to pay – relatively high and/or excessive investment advisory fees.

**B.     The Investment Company Act of 1940, as Amended with Section 36(b), Addresses this Conflict of Interests by Prohibiting Excessive Investment Advisory Fees**

26.     In 1940, responding to numerous problems and abuses in the then-lightly regulated mutual fund industry, Congress enacted the ICA in order to create standards of operation and care applicable to investment advisers and their affiliates.  In its "Findings and Declaration of Policy" preamble to the ICA, Congress recognized that "investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interests of [mutual fund shareholders."

27.     Notwithstanding the ICA's initial and various provisions, decades of excessive investment advisory fees extracted from Captive Funds thereafter followed.

28.     Consequently, Congress amended the ICA in 1970, adding a new Section 36 to address the matter of excessive investment advisory fees.  Recognizing the structural conflict of interests possessed by investment advisers with respect to their Captive Funds, Section 36:  (1) imposed a fiduciary duty on investment advisers with respect to the investment advisory fees they charged; and (2) allowed the SEC and/or mutual fund shareholders to bring a federal cause

of action against investment advisors for breach of such fiduciary duties.  Section 36(b) provides, in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

**C.     The Fund's Organization and Operations**

29.     The Fund is an open-end management investment company, also known as a "mutual fund," registered under the ICA.  Like other mutual funds, the Fund is a collective investment vehicle that pools money from investors and invests the money in a portfolio of securities.  The Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund. Each share issued by the Fund represents, and may be redeemed for, a pro rata interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

30.     Like most other mutual funds, the Fund does not have employees or facilities of its own. The Fund's operations are conducted by external service providers pursuant to contracts with the Fund.

31.     Calamos serves as the Fund's investment advisor, and in that capacity is responsible for managing the Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the Fund's investment portfolio.  CFS serves as the Fund's distributor.

32.     Other service providers, including certain of Calamos' affiliates, provide other services to the Fund and its shareholders, such as communicating with shareholders about the Fund, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders. For example, a "transfer agent" provides much of the day-to-day operational services requisite for mutual fund functioning, such as:    (1) receiving and processing mutual fund share purchase and sale/redemption requests; (2) transferring shares; (3) preparing shareholder account statements and confirmations; (4) responding to shareholder inquiries concerning account status, portfolio performance, distributions and share price; and (5) providing shareholders with copies of account histories.   Further fund operating expenses, such as custodial, audit and accounting, legal, compliance and marketing expenses, fall *outside* the investment advisor's domain and are provided by other entities whom the Fund pays separately.

33.     The Fund, together with all other Captive Funds in the Calamos Fund Complex, is overseen by a six-member Board of Trustees (the "Board"), one of whom is John P. Calamos, Sr. The Board is responsible, among other things, for selecting and monitoring the Captive Funds' service providers, including their investment advisor, Calamos, and their distributor, CFS.

**D.     Calamos' Investment Advisory Services to the Fund**

34.     Calamos serves as investment advisor to the Fund pursuant to an Investment Management Agreement between Calamos and the Fund (the "IMA").

35.     The IMA requires Calamos to provide certain investment advisory services to the Fund.  Further discussed herein, these investment advisory services are essentially two-fold:

a.   **Portfolio Selection Services**.  In their largest and core part, such services include researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for

the execution of purchase and sale orders on behalf of the Fund (hereinafter, "Portfolio Selection Services").[2]

    b.  **Other Services**.  The IMA also requires Calamos to provide unspecified administrative services – presumably *not* already provided by other entities that separately provide the Fund with custodial, accounting, bookkeeping, registration, transfer and payment services – in connection with "managing the affairs and investments" of the Fund, (hereinafter, "Other Services").[3]

36.    Fund-related filings with the SEC further detail the Portfolio Selection Services Calamos provides to the Fund, describing both their *means* (the principal investment strategies it employs for the Fund) and their *ends* (the principal investment objectives it seeks to produce for the Fund).

37.    According to the Fund's March 1, 2014 Prospectus, the Fund's "investment objective" is "long-term capital growth."  Calamos seeks this objective through "principal investment strategies" that focus on: (1) "equity securities issued by U.S. companies"; (2) possessing "large and mid-sized market capitalizations" (defining the former as market

---

[2] *See e.g.* the December 13, 2004 Amended and Restated Management Agreement between Calamos and the Calamos Investment Trust, for provision of investment advisory services to Captive Funds including the Fund, at paragraph 2(a) ("The Manager, at its own expense, shall furnish the following services and facilities to the Trust: (a) INVESTMENT PROGRAM. The Manager will (i) furnish continuously an investment program of each Fund, (ii) determine (subject to the overall supervision and review of the Board of Trustees of the Trust (the "Trustees")) what investments shall be purchased, held, sold or exchanged by each Fund and what portion, if any, of the assets of each Fund shall be held uninvested, and (iii) make changes on behalf of the Trust in the investments of each Fund.") and paragraph 2d ("(d) PORTFOLIO TRANSACTIONS. The Manager shall place all orders for the purchase and sale of portfolio securities for the account of each Fund with brokers or dealers selected by the Manager, although the Trust will pay the actual brokerage commissions on portfolio transactions . . .").

[3] *See id*. at paragraph 2a ("The Manager will also manage, supervise and conduct the other affairs and business of the Trust and each Fund thereof and matters incidental thereto, subject always to the control of the Trustees and to the provisions of the Declaration of Trust and By-laws and the 1940 Act"); paragraph 2b ("OFFICE SPACE AND FACILITIES. The Manager shall furnish the Trust office space in the offices of the Manager, or in such other place or places as may be agreed upon from time to time, and all necessary office facilities, simple business equipment, supplies, utilities, and telephone service for managing the affairs and investments of the Trust. These services are exclusive of the necessary services and records of any dividend disbursing agent, transfer agent, registrar or custodian, and accounting and bookkeeping services to be provided by the custodian."); and paragraph 2c ("PERSONNEL. The Manager shall provide all necessary executive and clerical personnel for administering the affairs of the Trust and shall compensate the Trustees and all personnel and officers of the Trust if such persons are also employees of the Manager or its affiliates,").

capitalization of $25 billion and up, and the latter as market capitalization of $1-$25 billion); that (3) in Calamos' opinion, "offer the best opportunities for growth." Notwithstanding the above representations that Fund investments will focus on equity issued by large- and mid-sized corporations, the Fund can also invest in – and has historically also invested in – "small, unseasoned companies." *See e.g.* August 1, 2003 Fund Prospectus.

38.    To identify those companies that "offer the best opportunities for growth," Calamos, per its most recent Form ADV (dated March 31, 2014) employs "a proprietary investment process that uses sophisticated quantitative models and fundamental analysis to go beyond traditional securities analysis." As Calamos further details:

> Grounded in academic theory, our approach also relies on real world experience to determine the economic enterprise value of a company. Using this process, we are able to value all securities within a corporate structure.
>
> **Assess Business Value**. We analyze businesses as if it we are going to buy the whole company, reviewing financial statements to fully understand both sides of the ledger. For example, recasting financial statements to a cash basis allows us to remove certain distortions created by GAAP and measure free cash flow to accurately assess business value. Additionally, we determine return on capital and balance sheet quality to help gauge the company's financial strength. Only after determining the actual cash flow, its sustainability, credit risk, and the rate at which the company will likely grow, are we then able to apply a valuation to the business, taking into account the level of risk.
>
> **Assess Security Value**. Once we understand the business value, we seek to determine the value of each security, whether equity, convertible, or corporate bond. Since stock and bond values are both derived from the same set of cash flows, the risks for both are highly dependent on each other, and their valuations are closely linked. We focus each type of security's upside and downside potential based on the probable range of outcomes, taking into consideration the business risk, the competitive positioning, and the seniority of the security relative to the rest of the company's capital structure.
>
> **Assess Investment Opportunities**. By understanding all aspects of a company's capital structure, we assess the value of any

> security issued by that company and its potential opportunity. To help maintain a consistent risk/reward profile, we seek to dynamically allocate assets to adapt to the market cycle. At times, we may overweight or underweight sectors. Our disciplined process is applied to our investment strategies, applying risk controls at the macroeconomic, sector and portfolio level. Each holding is subject to rigorous testing and is actively monitored to help achieve the appropriate balance of risk and reward.

See Calamos March 31, 2014 Form ADV Part 2A (hereinafter, "Form ADV"), at 11-12.

39.     To develop and effect this investment strategy for the Fund, Calamos employs a "team approach to portfolio management," led by Calamos' two Global Co-Chief Investment Officers (John P. Calamos, Sr. and Gary D. Black) [4] together with co-Portfolio Managers for the Fund (Nick Niziolek, Jon Vacko, Dennis Cogan, John Hillenbrand, David Kalis and Steve Klouda), and further supported by a "team of investment professionals" and "sector analysts making recommendations based upon fundamental research." *See e.g.* Form ADV at 11; March 1, 2014 Prospectus at 6 and November 13, 2014 Prospectus Supplement at 1.

### E.     The Calamos Fund Complex, and the Fund's Flagship Presence within It

40.     As detailed below, the Fund is and has long been the single largest investment vehicle managed by Calamos, and the single largest source of Defendants' investment advisory income.  Calamos and its affiliates, as well as reports in the financial media, frequently refer to the Fund as Calamos' "flagship."

41.     In addition to the Fund, Calamos provides investment advisory services to 16 further U.S.-domiciled, open-end Captive Funds, 5 offshore open-end Captive Funds, 6 closed-end funds, 1 exchange-traded fund, and 1 variable-annuity-oriented fund (that copies the portfolio of one U.S.-domiciled Captive Fund), all of which bear Calamos' name (collectively,

---

[4]   John P. Calamos, Sr. and Gary D. Black, as Calamos' Co-Chief Investment Officers, lead Calamos' Investment Committee, whose members include "a select group" of Calamos' "senior investment professionals."   The Investment Committee:  (1) establishes "top-down global macroeconomic views;" (2) evaluates "sector, thematic and geographic positioning across strategies;" (3) oversees risk management across strategies; (4) monitors and evaluates investment performance; and (5) evaluates and recommends enhancements to the investment process. *See* Form ADV at 11.  The Investment Committee includes, among its other members, Jon Vacko and Nick Niziolek (co-portfolio managers for the Fund, and co-heads of research for Calamos), and Steve Klouda and John Hillenbrand (co-portfolio managers for the Fund).

with the Fund, the "Calamos Fund Complex").  Table 1 below lists all of the funds that, per Calamos and its affiliates, constitute the Calamos Fund Complex.

## Table 1
## <u>The Calamos Fund Complex</u>

| Fund / Series | Trust / Sponsor | $ AUM* | Strategy | Start |
|---|---|---|---|---|
| **OPEN-END FUNDS** | | **16,128** | | |
| *U.S.-Domiciled* | | **15,707** | | |
| Growth Fund | Calamos Investment Trust | 4,394 | Equity | 1990 |
| Value Fund | Calamos Investment Trust | 112 | Equity | 2002 |
| Focus Growth Fund | Calamos Investment Trust | 78 | Equity | 2003 |
| International Growth Fund | Calamos Investment Trust | 937 | Equity | 2005 |
| Global Equity Fund | Calamos Investment Trust | 305 | Equity | 2007 |
| Evolving World Growth Fund | Calamos Investment Trust | 564 | Equity | 2008 |
| Discovery Growth Fund | Calamos Investment Trust | 50 | Equity | 2010 |
| Dividend Growth Fund | Calamos Investment Trust | 35 | Equity | 2013 |
| Mid Cap Growth Fund | Calamos Investment Trust | 30 | Equity | 2013 |
| Emerging Market Equity Fund | Calamos Investment Trust | 10 | Equity | 2013 |
| Growth and Income Fund | Calamos Investment Trust | 3,412 | Lower-volatility Equity | 1988 |
| Global Growth and Income Fund | Calamos Investment Trust | 608 | Lower-volatility Equity | 1996 |
| Convertible Fund | Calamos Investment Trust | 1,236 | Convertible | 1985 |
| Market Neutral Income Fund | Calamos Investment Trust | 3,476 | Alternative | 1990 |
| Long/Short Fund | Calamos Investment Trust | 57 | Alternative | 2013 |
| High Income Fund | Calamos Investment Trust | 255 | Fixed Income | 1999 |
| Total Return Bond Fund | Calamos Investment Trust | 148 | Fixed Income | 2007 |
| *Offshore (Ireland-domiciled UCITS)* | | **421** | | |
| Growth Fund | Calamos Global Funds plc | 58 | Equity | 2007 |
| Global Equity Fund | Calamos Global Funds plc | 89 | Equity | 2007 |
| Emerging Markets Fund | Calamos Global Funds | 117 | Equity | 2011 |

| | plc | | | |
|---|---|---|---|---|
| Global Convertible Opportunities Fund | Calamos Global Funds plc | 145 | Lower-volatility Equity | 2007 |
| Global High Income Fund | Calamos Global Funds plc | 12 | Fixed Income | 2012 |
| **CLOSED-END FUNDS** | | **6,266** | | |
| Convertible Opportunities and Income Fund | Convertible Opportunities and Income Fund | 1,250 | Enhanced Fixed Income | 2002 |
| Convertible and High Income Fund | Convertible and High Income Fund | 1,409 | Enhanced Fixed Income | 2003 |
| Global Dynamic Income Fund | Global Dynamic Income Fund | 835 | Enhanced Fixed Income | 2007 |
| Dynamic Convertible and Income Fund | Dynamic Convertible and Income Fund | 0 | Enhanced Fixed Income | 2014 |
| Strategic Total Return Fund | Strategic Total Return Fund | 2,599 | Total Return | 2004 |
| Global Total Return Fund | Global Total Return Fund | 173 | Total Return | 2005 |
| **EXCHANGE-TRADED FUNDS (ETF)** | | **26** | | |
| Calamos Focus Growth ETF | Calamos ETF Trust | 26 | Equity | 2014 |
| **VARIABLE ANNUITY-ORIENTED FUNDS** | | **28** | | |
| Growth and Income Portfolio | Calamos Advisors Trust | 28 | Lower-volatility Equity | 1999 |
| **TOTAL CALAMOS FUND COMPLEX** | | **22,448** | | |

\*  (\$ millions; as of Dec. 31, 2013)

42.    The \$22.4 billion of AUM in the Calamos Fund Complex account for the lion's share (84.5%) of total AUM under Calamos' discretionary management (as of December 31, 2013, \$26.5 billion).  The Fund is and has long been the largest of the funds in the Calamos Fund Complex.  At year-end 2013, Fund's \$4.4 billion of net assets accounted, by themselves, for: (1) 27.2% of Calamos' total Captive Fund AUM; (2) 19.6% of all AUM in the Calamos Fund Complex; and (3) 16.6% of all Calamos-managed assets.

43.    Given Calamos' sharp dependence on the Calamos Fund Complex for assets to manage, and, as further demonstrated herein, Calamos' extraction of *higher* investment advisory fees from the Captive Funds in the Calamos Fund Complex than from arm's length clients for its investment advisory services, Calamos' investment advisory fee income is in largest part derived from the Captive Funds in the Calamos Fund Complex.  Moreover, as the Fund is the largest in

the Calamos Fund Complex, the higher investment advisory fees that Calamos can extract from Captive Funds in the Calamos Fund Complex are in substantial part those extracted from the Fund in particular.

44.   Table 2 below so illustrates, detailing Calamos' historical and continuing dependence on the Fund in particular, which has long provided Calamos with (1) its single largest source of AUM, and (2) its single largest stream of investment advisory fee income. Indeed, throughout the prior decade, as Table 2 reveals, the advisory fees that the Fund paid to Calamos generally constituted between 20% and 40% of *all* investment advisory fees received by Calamos.

**Table 2**
**Calamos' Historical Dependence on the Fund for Fees and AUM**

| Year | Calamos Total AUM * ($ millions) | Growth Fund AUM ** | Growth Fund AUM as % of Total | | Calamos Total Investment Management Fees * ($ millions) | Advisory Fees Paid by Fund ** | Fund Fees as % of Total Advisory Fees |
|---|---|---|---|---|---|---|---|
| 2014 | $23,506 | $3,484,476,428 | 14.82% | | $198.539 | $31,535,086 | 15.88% |
| 2013 | $26,543 | $4,441,152,831 | 16.73% | | $212.398 | $41,109,168 | 19.35% |
| 2012 | $30,580 | $6,391,673,238 | 20.90% | | $255.823 | $59,537,152 | 23.27% |
| 2011 | $32,777 | $7,727,002,086 | 23.57% | | $366.553 | $70,744,156 | 19.30% |
| 2010 | $35,414 | $8,293,969,972 | 23.42% | | $238.308 | $66,325,813 | 27.83% |
| 2009 | $32,714 | $7,988,441,578 | 24.42% | | $200.790 | $58,313,737 | 29.04% |
| 2008 | $24,040 | $7,863,206,887 | 32.71% | | $274.174 | $109,497,576 | 39.94% |
| 2007 | $46,208 | $17,493,714,892 | 37.86% | | $325.395 | $127,528,938 | 39.19% |
| 2006 | $44,725 | $20,018,314,729 | 44.76% | | $329.383 | $133,121,436 | 40.42% |
| 2005 | $43,805 | $14,466,574,480 | 33.02% | | $284.951 | $90,988,486 | 31.93% |
| 2004 | $37,975 | $8,545,210,059 | 22.50% | | $210.725 | $43,944,860 | 20.85% |
| 2003 | $23,840 | $2,649,212,755 | 11.11% | | $109.052 | $18,008,981 | 16.51% |
| 2002 | $12,892 | $1,499,182,129 | 11.63% | | $62.594 | $6,471,941 | 10.34% |
| 2001 | no data | $207,026,972 | no data | | $37.578 | $1,121,470 | 2.98% |
| 2000 | no data | $50,130,207 | no data | | $26.937 | $246,083 | 0.91% |
| 1999 | no data | $15,652,835 | no data | | no data | $126,233 | no data |

\* For year ending December 31 (source:  CAMI Forms 10-K)

\*\* For 2007 onwards, for year ended October 31; for prior years, year ended March 31
   (source:  Fund Annual Reports)

14

45.     The same is true with respect to the Distribution Fees paid by the Fund, as further detailed in Section VI, *infra*.   The Distribution Fees, like the investment advisory fees, are assessed as a percentage of Fund AUM.   However, unlike the investment advisory fees, whose rates vary from Captive Fund to Captive Fund within the Calamos Fund Complex, the Distribution Fee rates charged to all Captive Funds, including the Fund, are identical.   Hence, given the unvarying Distribution Fee rates among the Calamos Captive Funds, the share of Defendants' total distribution fee income extracted from the Fund parallels the Fund's prominent share of Captive Fund AUM and total Calamos-advised AUM.

46.     Defendants' historical dependence on the Fund as the single largest source and driver of investment advisory fees, Distribution Fees (and other fees accruing to Defendants as "fall out benefits" of their relationship with the Fund, as further alleged herein) have made Defendants particularly focused on setting and maintaining Fund advisory fees and Distribution Fees at excessive levels.   Any reductions to the rates charged to the Fund, particularly, would have an outsize effect on Defendants' – and the Calamos Control Persons' – fee income and profits.   Precisely for this reason and as further detailed herein, Fund advisory fee and Distribution Fee rates have been maintained at excessive levels by Defendants, and the very few changes to those rates that Defendants have allowed during the prior two decades have either (1) functioned to *raise* the fees extracted from the Fund, or (2) created an *appearance* of rate reductions, while in reality doing little or nothing to actually reduce rates.

## V.     CALAMOS EXTRACTED EXCESSIVE INVESTMENT ADVISORY FEES FROM THE FUND

47.     Since the ICA was amended through Section 36, judicial standards have evolved to determine whether or not investment advisory fees were excessive and/or breached fiduciary duties.   These standards are addressed *seriatim* in Sections V.A-F below.

A.   **Comparative Fee Structures**

48.   According to its most recent Form ADV, Calamos, as of December 31, 2013, provided investment advisory services for over 2,000 clients/accounts.  More than 90% of these (approximately 1,875) are "managed accounts" for individual investor clients, who are provided with Calamos-designed portfolios through managed account programs operated by more than one dozen broker-dealers.  Notwithstanding the large *number* of these managed accounts, their *size* is quite small, totaling only $1.1 billion, or approximately 4% of total Calamos AUM.  The lion's share of Calamos AUM derive from two other sources: (1) the Captive Funds in the Calamos Fund Complex (which number less than 30, but account for 84% of Calamos AUM); and (2) third-party *institutional* clients / accounts (which number approximately 140, with aggregate AUM of $3.1 billion, representing 12% of total Calamos AUM).

49.   The identities of most such clients, and the investment advisory fees charged by Calamos to most such clients, are matters within the peculiar knowledge and exclusive control of Calamos and its affiliates, and are not publicly available.   Notwithstanding, Plaintiffs' investigation has identified multiple current and former Calamos institutional clients, and the investment advisory fees they paid to Calamos for investment advisory services.  As set forth below, such publicly-available information shows:

      a.   Calamos extracted higher investment advisory fees from the Fund, a Captive Fund, than from third-party, arm's length institutional clients; even where

      b.   The investment advisory services Calamos provided to such clients were substantively similar – *and in some cases effectively identical* – to those Calamos provided to the Fund.

50.   Upon information and belief, discovery concerning Calamos' other investment advisory clients and the fees charged to them will produce further evidence demonstrating the same.

16

### 1.     The Investment Advisory Fee Rates Applied to the Fund

51.     The IMA requires the Fund to pay Calamos an investment management fee calculated as a percentage of the Fund's average AUM (payable on a monthly basis, based on average AUM during the month).   As is customary, the investment management fee rates include multiple "breakpoints" -- discrete percentages applied to discrete AUM ranges (*e.g.*, 1% on the first $500 million of assets; 0.90% on the next $500 million; and 0.80% on all assets in excess of $1 billion) that typically decrease the rates applied to higher AUM ranges.

52.     Table 3 below sets forth the Fund's currently operative advisory fee rates (which have remained constant since August 1, 2004):

**Table 3**
**The Fund's Current Advisory Fee Rates**

| Average Net Assets in Fund | Current Rates (since August 1, 2004) |
|---|---|
| first $500 million | 1.00% |
| $500 million - $1 billion | 0.90% |
| $1 billion  - $6 billion | 0.80% |
| $6 billion -  $11 billion | 0.78% |
| $11 billion - $16 billion | 0.76% |
| $16 billion - $21 billion | 0.74% |
| $21 billion - $26 billion | 0.72% |
| > $26 billion | 0.70% |

53.     Pursuant to the above fee schedule, the Fund, paid investment advisory fees to Calamos of $31.535 million for the fiscal year ended October 31, 2014, and $41.109 million for the fiscal year ended October 31, 2013.  The latter amount represented an effective investment advisory fee rate of 83 basis points, or 0.83% (the weighted average of the rates paid by the Fund

17

on each level of AUM -- *i.e.*, 1.00% on the first $500 million, 0.90% on the next $500 million, and 0.80% on all further assets) (the "blended rate").

54.    Table 4 below sets forth the annual investment advisory fees paid by the Fund from 1999 onwards, in absolute dollar figures and in blended rates:

**Table 4**

## The Advisory Fees Paid by the Fund

| Year * | Fund Net Assets (End of Year) | Advisory Fees Paid | Blended Rate (as % of Average Daily Net Assets) |
|---|---|---|---|
| 2014 | $   3,484,476,428 | $   31,535,086 | Data not available |
| 2013 | $   4,441,152,831 | $   41,109,168 | 0.83% |
| 2012 | $   6,391,673,238 | $   59,537,152 | 0.82% |
| 2011 | $   7,727,002,086 | $   70,744,156 | 0.81% |
| 2010 | $   8,293,969,972 | $   66,325,813 | 0.81% |
| 2009 | $   7,988,441,578 | $   58,313,737 | 0.82% |
| 2008 | $   7,863,206,887 | $   109,497,576 | 0.80% |
| 2007 | $   17,493,714,892 | $   127,528,938 | 0.79% |
| 2006 | $   20,018,314,729 | $   133,121,436 | 0.79% |
| 2005 | $   14,466,574,480 | $   90,988,486 | 0.80% |
| 2004 | $   8,545,210,059 | $   43,944,860 | 0.83% |
| 2003 | $   2,649,212,755 | $   18,008,981 | 0.87% |
| 2002 | $   1,499,182,129 | $   6,471,941 | 0.96% |
| 2001 | $   207,026,972 | $   1,121,470 | 1.00% |
| 2000 | $   50,130,207 | $   246,083 | 1.00% |
| 1999 | $   15,652,835 | $   126,233 | 1.00% |

\* From 2007-2014, fiscal year ended October 31; for prior years, fiscal year ended March 31

**Sources:**
Net Assets and Dollar Fee data in Fund Annual Reports on Forms N-CSR, N-30D
Effective Fee data in Fund Prospectuses on Form 485B

### 2. Comparing Fees Charged to Captive Fund and Arm's-Length Investment Advisory Clients

#### a) Captive Fund Fees vs. *Standard* Fees Paid by Third-Party Institutional Clients for the Same Investment Strategy

55.  As detailed below, Calamos provides certain third-party institutional clients with (1) investment advisory services substantially similar to, and/or identical to, those it provides to the Fund, but (2) charges such independent, third-party institutional clients substantially lower investment advisory fees than those it extracts from the Fund.

56.  The Fund, per Calamos' own designation, is part of Calamos' equity-based strategies, which include both growth and value disciplines, as well as different market-capitalization and geographic ranges.  Specifically, the Fund's strategy is U.S. equity "all cap" (albeit, primarily large- and mid-cap) growth.

57.  Calamos offers these strategies not only to the Fund and other Captive Funds, but to third-party institutional clients managed as "separate accounts."  *See* Form ADV at 5-8, 13-14.  When offering such third-party institutions investment portfolios based on growth investment strategies (be they "All Cap, Mid Cap, [or] Large Cap"), Calamos employs the following "standard fee schedule:"

### Calamos "Standard Fee Schedule"
### Separate Accounts, All-Cap Growth Investment Strategies

| AUM | Fees |
| --- | --- |
| $0 - $25 million | 0.75% |
| $25-$50 million | 0.70% |
| $50-$75 million | 0.65% |
| >$75 million | 0.60% |

*See* Form ADV at 5.

58.  Were Calamos to provide its services to the Fund at the same "standard" rate charged to third-party institutional clients, the Fund would pay significantly smaller sums to Calamos than it currently does under its Captive Fund fee schedule.  For example, using the

19

Fund's $4.394 billion AUM at December 31, 2013 for illustrative purposes:  (1) third-party institutional clients provided by Calamos with a $4.394 billion growth portfolio would, under Calamos' "standard" separate account schedule, pay $26.439 million in annual investment advisory fees, amounting to a blended rate of 0.60%, for Calamos' services; while (2) the Fund, under its Captive Fund fee schedule, would pay $36.652 million, amounting to a blended rate of 0.83%, for Calamos' services.

59.     The Fund therefore pays investment advisory fees that are 38.63% greater than those charged as "standard" matter to (1) third-party institutional clients, for (2) the same investment strategy.

60.     The Fund's overpayment may be even more extreme than indicated by Calamos' "standard" fee schedule for institutional accounts.  As Calamos acknowledges in its Form ADV, certain of its institutional clients may not actually be paying the "standard" fees displayed in the Form ADV, but rather fees *lower* than those adverted as "standard."  *See* Form ADV at 7.

### b)     Captive Fund Fees vs. *Actual* Fees Paid by Third-Party Institutional Clients for *Identical* Portfolio Selection Services

61.     Although Calamos does not disclose the identity of its third-party institutional clients, Plaintiffs' investigation has identified certain such clients.  Concrete case studies of fees paid by these *actual* third-party institutional clients, including as detailed below clients who received *substantially identical* Portfolio Selection Services as those provided to the Fund, further indicate that the fees Calamos extracted from the Fund are excessive.

62.     Table 5 below lists third-party institutional clients that:  (1) not only contracted for and received investment advisory services from Calamos; but (2) as detailed below, received apparently *identical* Portfolio Selection Services to those Calamos provided to the Fund. [5]  The

---

[5] The information in Table 3 was extracted from:  (1) SEC filings made by the financial institutions sponsoring the Calamos-subadvised funds; and (2) Calamos' actual investment advisory contracts with respect to such funds.  The funds listed in Table 5, were, in effect discrete "sub-funds" or "portfolios" within larger investment vehicles registered and operating as open-ended investment companies, creating in effect a "fund of fund" structure.  At the level of the "master fund" (identified as the "Sponsor" in the Table), investors invested in the "master fund" and allocated such investments among the offered discrete sub-funds or portfolios.  The master fund's investment advisor (identified as the "Advisor" in the Table) provided investment advisory services to the master fund, which included selection and supervision of the sub-funds and portfolios offered, as well as of sub-advisors to such sub-

provision of *identical* such services, as further detailed below, makes this comparison an especially apt, apples-to-apples one.

**Table 5**

**Fee Rates Charged to Third-Party Institutional Clients for Identical Portfolio Selection Services**

| Fund | Sponsor | Advisor | Sub-advisor | Calamos Fee Rate (% AUM) | Fee Payable ( @ $4.394 Billion AUM) |
|---|---|---|---|---|---|
| **Genworth Calamos Growth Fund** | Genworth Variable Insurance Trust | Genworth Financial Wealth Mgmt. | Calamos | 0.625% | $27,462,500 |
| **Thrivent Partner All Cap Growth Portfolio** | Thrivent Series Fund, Inc. | Thrivent Financial | Calamos | 0.65% | $28,561,000 |

63.     Table 5 above demonstrates that investment advisory fees that arm's-length institutional clients paid to Calamos were substantially lower than the fees Calamos extracted from the Fund, notwithstanding Calamos' provision of *identical* Portfolio Selection Services in all cases.  The Fund, under its Captive Fund fee schedule, would pay $36.652 million in fees based on its $4.394 billion of assets, amounting to a blended rate of 0.83%, for Calamos' services. Calamos' arm's-length institutional clients, however, negotiated more favorable rates for themselves, so that for the same AUM ($4.394 billion) they would have paid (a) $27.462 million, or a 0.625% blended rate (Genworth), or (b)  $28.561 million, or a 0.65% blended rate (Thrivent).

---

funds and portfolios.  At the level of the sub-fund or portfolio (identified as the "Fund" in the Table), the investment advisor provided investment advisory services to each of the sub-funds or portfolios in one of two ways: either (1) providing such services itself, or (2) selecting, retaining and supervising a sub-advisor, hired by the advisor, to provide investment advisory services.  In either case, the investment adviser received investment advisory fees from the Fund and/or Sponsor.  In the latter case, the sub-advisor received investment advisory fees from the investment advisor, with whom it had contracted to provide investment advisory services.  The funds listed in the Table were funds where Calamos had been retained as sub-advisor to provide investment advisory services.

64. The Fund therefore pays investment advisory fees that are (a) 33.46% greater than those charged to Genworth, and (b) 28.33% greater than those charged to Thrivent. The excessive fees extracted from the Fund, as evidenced by this comparison, are substantial – and all the more so in light of the fact that the Portfolio Selection Services received by the Fund, Genworth and Thrivent were *identical*.

65. In fact, the funds identified in Table 5 above (the "Identical Subadvised Funds") were merely *de facto* extensions or copies of the Fund, spun off or replicated by Calamos into different legal vehicles with different fee structure overlays:

a. **As (1) Advisor to the Fund, and (2) Sub-Advisor to the Identical Subadvised Funds, Calamos was Charged with Providing Portfolio Selection Services**. SEC filings relating to the Identical Subadvised Funds, and their actual investment sub-advisory agreements with Calamos, show that although each of the Identical Subadvised Funds had retained an affiliate of the sponsor as its investment advisor, in all cases the actual Portfolio Selection Services were subcontracted out by such nominal investment advisor to Calamos through investment sub-advisory agreements with Calamos.[6]

b. **As (1) Advisor to the Fund, and (2) Sub-Advisor to the Identical Subadvised Funds, Calamos Pursued Identical Investment Objectives and Used Identical Investment Strategies**. The stated "Investment

---

[6] For example: (1) for the Genworth Calamos Growth Fund, Calamos was obligated to "conduct an ongoing program of investment, evaluation and, if appropriate, sale and reinvestment" of fund assets, and "to purchase, hold and sell investments . . . and monitor such investments on a continuous basis.") (per the August 19, 2008 sub-advisory agreement between Genworth Financial Wealth Management, Inc. and Calamos); and (2) for the Thrivent Partners All Cap Growth Portfolio, Calamos was obligated to "(i) furnish continuously an investment program for the Portfolio, and (ii) determine from time to time what investments shall be purchased, sold or exchanged and what portion of the assets of the Portfolio shall be held uninvested." (per the April 30, 2008 sub-advisory agreement between Thrivent Financial for Lutherans and Calamos). Notably, and as alleged further below, Calamos was obligated under both the above sub-advisory agreements not merely to provide Portfolio Selection Services, but also – likewise similar to its investment advisory duties to the Fund – to provide substantial Other Services (including maintaining books and records, and provision of regular formal and informal reporting to Boards and/or other bodies tasked with oversight of investment operations). *See e.g.* April 30, 2008 sub-advisory agreement with Thrivent, at Clauses VIIII and IX, and August 19, 2008 sub-advisory agreement with Genworth, at sections 2(i), (j), (k), (m) and (n).

Objective" and "Principal Investment Strategies" for each of the Identical Subadvised Funds was substantively – and often exactly – identical to the Fund's stated investment objective and investment strategies (as set forth in Section IV.D, *supra*)   For example, the stated "Investment Objective" of the Identical Subadvised Funds was exactly identical ("long-term capital growth" through equity investments in, primarily, U.S. large-cap and mid-cap companies) to the Fund's (*see* Section IV.D, *supra*).  Likewise, the Identical Subadvised Funds' "Principal Investment Strategies" and related disclosures of underlying investment methodology duplicated, in substance and form, those adverted for the Fund (set forth in Section IV.D, *supra*).[7]  Calamos thus managed the Identical Subadvised Funds with the same means, methods, and goals as the Fund.

c. **As (1) Advisor to the Fund, and (2) Sub-Advisor to the Identical Subadvised Funds, Calamos Deployed Identical Personnel to Perform its Investment Advisory Services**.  Unsurprisingly, given that the Fund and the Identical Subadvised Funds shared identical investment objectives and principal investment strategies, the Calamos personnel in charge of providing investment advisory services to the Fund were exactly the same as the Calamos personnel in charge of providing investment advisory services to the Identical Subadvised Funds.[8]

d. **The Identical Subadvised Funds Held Substantially the Same Securities as the Fund, in Substantially the Same Proportions.**  Again unsurprisingly, given that identical personnel at Calamos operated identical investment strategies in pursuit of identical investment objectives, the Identical

---

[7] Specifically, *see*, for example: (1) the April 30, 2010 Prospectus for the Genworth Calamos Growth Fund, at pp. 3, 4 and 90; and (2) the April 29, 2010 Prospectus for the Thrivent Partner All Cap Growth Fund, at pp. 82-83, 163.
[8] Specifically, *see*, for example: (1) the April 30, 2010 Prospectus for the Genworth Calamos Growth Fund, at pp. 6 and 90; and (2) the April 29, 2010 Prospectus for the Thrivent Partner All Cap Growth Fund, at p. 84.

Subadvised Funds held substantially the same securities as did the Fund, in substantially the same proportions.  *See e.g.* Appendix A hereto (comparing Fund and Identical Subadvised Fund holdings).[9]

e. **The Performance of the Subadvised Pattern Funds Was Substantially Similar to that of the Fund.**  Finally, as a result of the foregoing, the Identical Subadvised Funds performed, in large part, similarly to each other and to the Fund.  This similarity was likewise the result of the fact that all these funds were commonly managed by identical Calamos personnel using identical strategies to make identical investments in pursuit of identical goals.

66.    Indeed, Calamos itself admits, in its Form ADV:  (1) that "certain clients seek strategies substantially similar to those employed by our Mutual Funds"; (2) that, for such clients seeking a strategy similar to the Fund, Calamos will endeavor "to replicate the Calamos Growth Fund strategy and portfolio holdings of the Growth Fund"; (3) how, as practical matters make 100% exact replication of the Fund impracticable, Calamos uses "an optimization technique" to best replicate the Fund; with the result that (4)  such clients' portfolios will therefore be similar to, if not exactly the same as, the Fund's portfolio, and consequently performance can likewise "vary from that of the Growth Fund."  *See* Form ADV at 23.  Indeed, Calamos also admits that, in cases such as the above where it replicates the Fund for other clients, Calamos conducts identical trades at identical times for the Fund and its copied portfolios.  *Id.*

---

[9] Calamos explains the origins of such marginal differences between the Fund and copies of it made for other clients in its Form ADV, at p. 23 ("For example, it is extremely difficult, if not impossible, to replicate the Calamos Growth Fund strategy and portfolio holdings of the Growth Fund for smaller accounts. In these circumstances, we seek to use an optimization technique whereby we first determine the securities to be bought or sold by the Growth Fund and then determine whether such transactions should be replicated for the other client accounts. In considering the appropriateness of the security in this optimization process, we consider, among other things, cash availability, suitability of the investment based on the account size and current portfolio, attributes, account specific guidelines, objectives and other account specific factors. Clients who seek substantially similar strategies as those employed by the Growth Fund should recognize that (i) with respect to replicated transactions, their transactions will generally be executed after those of the Growth Fund, and as a result, the prices at which their securities transactions are executed may be more or less favorable than the Growth Fund, (ii) their account will not hold all the same securities, or securities in the same percentages, as the Growth Fund, and (iii) their account's performance will likely vary from that of the Growth Fund.").

67.     In sum, with respect to the above-identified Identical Subadvised Funds (and like but as-yet unidentified further separate account clients that obtained copies of the Fund), the Portfolio Selection Services provided by Calamos were not merely *similar* to those provided to the Fund, but *identical*.  Calamos caused the Fund and the Identical Subadvised Funds to buy or sell the same securities at the same times for the same reasons.

68.     Consequently, given the identity in Portfolio Selection Services provided to the Fund and the Identical Subadvised Funds, comparison of the fees charged for such services is relevant, valid and apt.  The Portfolio Selection Services provided are identical, but the fees paid for such services, as Table 5 demonstrates, are different.

69.     The higher investment advisory fees charged to and paid by the Fund cannot be attributed to any additional, further or more extensive non-Portfolio Selection Services that Calamos provides to the Fund but not to the Identical Subadvised Funds (*e.g.*, Other Services).

70.     To the contrary, Calamos' further obligations under the investment sub-advisory agreements for the Identical Subadvised Funds appear similar to its further (though not explicitly specified) obligations under the Fund's IMA.   In both cases (explicit in the sub-advisory agreements and implicit in the IMA), Calamos' Other Services consisted in large part of similar (1) administrative and compliance functions – such as maintaining books and records; and (2) reporting functions – such as providing periodic reports on funds' portfolios and performance to fund investors, sponsors or boards.   Indeed, the terms of investment sub-advisory agreements with the Identical Subadvised Funds indicate that the Other Services Calamos owed to such clients were perhaps *more* extensive than those owed to the Fund.[10]

---

[10] For example:  (1) pursuant to its sub-advisory agreement with Thrivent, Calamos was required to "make available in person to the Board and to Adviser personnel of Sub-adviser as the Board or Adviser may reasonably request to review the investments and the investment program of the Portfolio and the services provided by Sub-adviser hereunder;" and (2) pursuant to its sub-advisory agreement with Genworth, Calamos was required "From time to time as the Advisor, and any consultants designated by the Advisor, or the Trust may request, [to] furnish the requesting party reports on portfolio transactions and reports on Sub-Advisor Assets held in the portfolio, all in such detail as the Advisor, its consultant(s) or the Trust may reasonably request.  The Sub-Advisor will provide the Advisor with information (including information that is required to be disclosed in the Prospectus) with respect to the portfolio managers responsible for Sub-Advisor Assets, any changes in the portfolio managers responsible for Sub-Advisor Assets, any changes in the ownership or management of the Sub-Advisor, or of material changes in the control of the Sub-Advisor.  The Sub-Advisor will promptly notify the Advisor of any

25

71.     Lastly, insofar as Calamos or its affiliates provide further services to the Fund *beyond* the investment advisory services discussed above, those services are provided pursuant to separate contracts for separate compensation (*e.g.*, distribution fees, service fees, accounting fees), in addition to and separate from the investment advisory fees paid to Calamos under the IMA.

### 3.     Comparing Fund Fees to Investment Advisory Fees Charged by other Investment Advisors to Similar Mutual Funds

72.     Comparison of Fund advisory fees with the advisory fees paid by comparable mutual funds pursuing comparable investment strategies further indicates that the advisory fees extracted from the Fund are excessive.

73.     The Fund is categorized, by Bloomberg, as a U.S. large-cap growth fund.

74.     There are 246 other mutual funds so-categorized by Bloomberg.  The average investment advisory fee paid by those funds is 0.66%.  The 0.83% advisory fee currently extracted from the Fund by Calamos significantly exceeds this average:  Calamos' fee is 25% greater than this category average.

75.     A more precise and apt comparison, however, is to compare the Fund to its closest peers:  namely, the subset of U.S. large cap growth funds whose large size ($1 billion of net assets or more) more closely approximates that of the Fund, and allows for significant economies of scale in provision of investment advisory services (as further detailed in Section V.B, *infra*).  Of the aforementioned 246 U.S. large cap growth funds, 90 have assets of $1 billion or more.  The average investment advisory fee among these 90 funds is 0.59% (*i.e.*, less than the 0.66% average discussed in the prior paragraph, which took into account advisory fees charged to smaller funds operating in the absence of economies of scale).  The 0.83% fee currently extracted from the Fund by Calamos significantly exceeds this more apt 0.59% average:

---

pending investigation, material litigation, administrative  proceeding or any other significant  regulatory  inquiry. Upon reasonable request, the Sub-Advisor will make available its officers and employees to meet with the Trust's Board of Trustees to review the Sub-Advisor Assets."

Calamos' fee is 40.68% larger than the average investment advisory fee charged to U.S. large-cap growth funds of similar size.

76.     Indeed, among the 90 $1 billion+ U.S. large cap growth funds, *only 6 pay investment advisory fees higher than those paid by the Fund*.  Stated conversely, 91% of comparable $1 billion+ U.S. large cap growth funds pay investment advisory fees lower than those extracted from the Fund.

77.     The above comparisons constitute further *prima facie* evidence that the Fund's advisory fees are excessive, as they are far above the average investment advisory fees paid by similar funds, and in fact are so far above the average to make the Fund an outlier on the advisory fee scale.

78.     While the above comparison indicates that Fund advisory fees are excessive, it tends to understate the measure to which such fees are excessive.  This is because many of the comparator mutual funds are likewise captive funds with respect to their investment advisers, and thus subject to like extraction of inflated advisory fees.  Hence, the degree to which Fund advisory fees are excessive may be even greater than indicated by the above comparison (as many comparator fund advisory fees may also be excessive).

**4.     Comparing Current Fund Fees to Prior Fund Fees**

79.     Table 6 below compares (1) the Fund's currently operative advisory fee rates (in effect and unchanged since August 2004), with (2) previously-operative rates (a) between August 2000 and August 2004, and (b) prior to August 2000.

**Table 6**
**The Fund's Current and Prior**
**Advisory Fee Rates**

| | Investment Advisory Fee/Rate | | |
|---|---|---|---|
| **Average Net Assets in Fund** | **Rates prior to August 1, 2000** | **Rates, August 1, 2000 - August 1, 2004** | **Current Rates (since August 1, 2004)** |

| first $150 million | 1.00% | 1.00% | 1.00% |
|---|---|---|---|
| first $500 million | 0.75% | 1.00% | 1.00% |
| $500 million - $1 billion | 0.75% | 0.90% | 0.90% |
| $1 billion - $6 billion | 0.75% | 0.80% | 0.80% |
| $6 billion - $11 billion | 0.75% | 0.80% | 0.78% |
| $11 billion - $16 billion | 0.75% | 0.80% | 0.76% |
| $16 billion - $21 billion | 0.75% | 0.80% | 0.74% |
| $21 billion - $26 billion | 0.75% | 0.80% | 0.72% |
| > $26 billion | 0.75% | 0.80% | 0.70% |

80.     Remarkably, and as detailed below, the two changes to the Fund's advisory fee rates during the prior 15 years – first in August 2000, then in August 2004 – did nothing to lower the investment advisory fee rates applied to the Fund, but rather *increased* them from their pre-August 2000 levels.

81.     This is all the more remarkable, and unreasonable, given the significant economies of scale in Fund investment advisory operations that Calamos experienced during this time (further detailed in Section V.B, *infra*) as a result of the Fund's sizeable asset growth. Between March 31, 2001, when Fund net assets stood at $207.0 million, and December 31, 2013, when Fund net assets stood at $4.394 billion, the size of the Fund increased by more than 2,100%. Fundamental economies of scale in providing investment advisory services mean that the cost to Calamos to provide its investment advisory services did not increase at the same rate that assets did. Yet notwithstanding such economy of scale fundamentals – and indeed, sharply contradicting them – the investment advisory fees extracted from the Fund rose *faster* than the Fund's size: for fiscal 2001, the Fund paid $1.121 million in advisory fees, while for fiscal 2013, the Fund paid $41.109 million in advisory fees, an increase of 3,666%. In short, investment

28

advisory fee increases, rather than lagging the rate of asset growth, instead nearly *doubled* it. This unreasonable outcome was the direct product of, and made possible by, the advisory fee rates applied to the Fund, as set forth in Table 6 above.  These rates did *not* operate to share the economy of scale benefits, resulting from the increase in the Fund's size, with the Fund, but instead allowed Calamos to monopolize such benefits and retain them for itself.

82.    First, the August 2000 change to the Fund's advisory fee rates operated to *increase*, without exception, the investment advisory fees that Calamos could extract from the Fund in all scenarios.

a.  Prior to August 2000, Calamos took as advisory fees: (1) 1% of the first $150 million of Fund assets, and (2) 0.75% of all further Fund assets in excess of $150 million.  After the August 2000 rate change (and until August 2004), Calamos: (1) continued to take 1% of the first $150 million of Fund assets, as before; but (2) *extracted invariably higher percentages on Fund assets in excess of $150 million*:  namely, taking as fees (a) 1% of assets between $150 million and $500 million (rather than 0.75%, as before); (b) 0.90% of assets between $500 million and $1 billion (rather than 0.75%, as before); and (c) 0.80% on all assets in excess of $1 billion (rather than 0.75%, as before).

b.  The practical effect of the August 2000 change was thus to *increase* investment advisory fees payable to Calamos in every possible scenario where Fund assets exceeded $150 million.

c.  To illustrate, using the Fund's $4.394 billion of net assets of December 31, 2013 as a base for calculations (*i.e.*, assuming it constituted the Fund's average daily net assets for the year), the Fund would have paid an annual investment advisory fee of (1) $33.33 million, under the pre-August 2000 rate schedule, and (2) $36.652 million under the post-August 2000 rate schedule – an increase of 10%.

29

83.     Second, the most recent change to the Fund's advisory fee rate schedule, in August 2004, created only an *appearance* of reduced investment advisory fees (by instituting a series of rate reductions applicable to Fund assets in excess of $6 billion), without achieving the same in substance.

    a.     As the August 2004 rate reductions applied only to assets in excess of $6 billion, the practical effect of these "reduced" rates for the Fund currently – given that Fund net assets have fallen substantially short of $6 billion in recent years – is $0.  As Fund assets do not exceed $6 billion, the post-August 2004 advisory fee rate schedule is *exactly the same* as the prior advisory fee rate schedule, operative since August 2000 (both extracting fees of 1.00% on the first $500 million, 0.90% on the next $500 million, and 0.80% on all remaining assets).  And as noted above, that latter advisory fee rate schedule (*i.e.*, operative from August 2000 to August 2004) itself constituted an *increase* in advisory fee rates as compared to the rate schedule operative prior to August 2000.  In other words, under the currently operative advisory fee rate schedule, the Fund *now* pays advisory fees at *higher* rates than under the rate schedule in effect prior to August 2000.

    b.     Moreover, the rate "reductions" for Fund assets in excess of $6 billion, aside from being wholly theoretical (given that Fund assets do not exceed $6 billion), are – in the event they were actually to apply – reductions only in appearance, rather than substance (as further detailed in Section V.B, *infra*).  This is due to two basic facts concerning the structuring and implementation of such reduced rates:  first, the reductions are themselves very small (from 0.80% to 0.78% to 0.76%, etc.); and second, as each reduction is applied to a very large swathe of assets before a further rate reduction applies ($5 billion at a time:  0.78% rates for assets between $6-$11 billion; 0.76% rates for assets

between $11-$16 billion, etc.), the reductions (themselves already small) are further limited and slowed in effect.

84.    Table 7 below illustrates the practical (non)effects of the so-structured rate "reductions," calculating Fund advisory fees (in both absolute dollars and blended rates) at various Fund asset levels:

**Table 7**
**The Fund's Illusory Rate "Reductions"**

| | | Fund AUM Scenarios | | |
|---|---|---|---|---|
| | | as of Dec. 31, 2013<br>$4.394 billion | Example 2<br>$21 billion | Example 3<br>$26 billion |
| **Fees under Current Rate Schedule** | $ | $           36,652,000 | $           159,000,000 | $           195,000,000 |
| | % | 0.83% | 0.76% | 0.75% |
| **Fees under August 2000-2004 Rate Schedule** | $ | $           36,652,000 | $           161,900,000 | $           201,900,000 |
| | % | 0.83% | 0.77% | 0.78% |
| **Fees under pre-August 2000 Rate Schedule** | $ | $           33,330,000 | $           157,875,000 | $           195,375,000 |
| | % | 0.76% | 0.75% | 0.75% |

85.    As Table 7 demonstrates, the rate "reductions" implemented as part of the August 2004 changes to Fund advisory fee rates: (a) often do not constitute any reductions at all; (b) largely still leave fees/rates higher than under the pre-August 2000 advisory fee rate schedule; and (c) are, in the remote instances they are achieved, vanishingly small.

   a.    For example, at the Fund's recent and current sub-$6 billion net asset levels, advisory fees under the current "reduced rate" schedule are exactly the same as those produced under the prior, August 2000-2004 schedule (and are substantially *higher* than those produced per the pre-August 2000 schedule).

   b.    Second, because the reductions are so small and occur so slowly, their practical effect is minimal.  As a result, fees/rates under the current schedule

*still exceed* those payable per the pre-August 2000 rate schedule for all Fund net asset scenarios below $26 billion.

c.   Third, although the reductions under the current "reduced rate" schedule do allow for fee reductions, versus the prior August 2000-2004 rate schedule, in the event that Fund assets exceed $6 billion (which they do not), these reductions are so small as to be reductions in name only.  For example, even when Fund assets rise to $21 billion, the blended rate under the current schedule is 0.76%, while the blended rate under the prior schedule is 0.77%.

86.   In sum, comparison of the Fund's currently-applicable advisory fee rates with the two immediately-preceding rate schedules reveals that the Fund's current advisory fee rate schedule, notwithstanding that it *appears* to provide for reduced advisory fees, in practice does not.

87.   As reducing advisory fees is a simple matter, the currently operative advisory fee rate schedule's *failure* to achieve such reductions appears not to be a matter of mistake or oversight, but rather a matter of design.  The currently-operative advisory fee rate schedule appears to be precisely calibrated to produce only the *appearance* of reduced fees, without actually producing any substantive fee reductions.

88.   This constitutes yet further evidence that Calamos extracts excessive investment advisory fees from the Fund.  Specifically, it demonstrates that Calamos did not make logical or good-faith efforts to reduce investment advisory fees so as to share its economy of scale benefits, but instead appeared to endeavor to maintain its current and excessive fee levels under cover of empty rate "reductions."

**B.   Economies of Scale**

89.   As detailed below, Calamos retained and monopolized – rather than shared with the Fund – economy of scale benefits in its provision of investment advisory services to the Fund, yielding fees that (1) were (and remain) grossly disproportionate to the investment advisory services provided, (2) were (and remain) excessive, (3) could not have been the product

of an arm's-length bargain, and (4) violate § 36(b). Calamos' acceptance of such excessive fees was (and remains) a breach of its fiduciary and other duties to the Fund.

**1.      Economies of Scale, Their Role in Excessive Fees, and the Use of Breakpoints to Address these Matters**

90.     Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services to clients such as the Fund. Economies of scale are created when AUM increase more quickly than the cost of advising and managing those assets. Such economies of scale exist at the individual fund level, at the fund complex level, and also on a more comprehensive basis, encompassing an investment advisor's entire scope of operations, including administrative expenses and advisory services provided to other institutional clients.

91.     Here, as discussed below, the Fund provides Calamos with significant economy of scale benefits at each of these levels: the Fund, the Calamos Fund Complex, and Calamos' wider investment advisory operations, such as those provided to the Identical Subadvised Funds.

92.     A simple example of economies of scale arises where AUM increases are due purely to market forces: *i.e.*, an increase in the *value* of a fund's assets, even as such assets remain constant in amount and kind (1,000 shares of stock rising in value from $10,000 to $20,000). In this event, the investment advisor services the additional assets at *zero* additional variable cost – there is no change in the securities held in the portfolios or the number of shareholders in the fund – but takes in twice its former fees.

93.     More generally, however, the cost of providing Portfolio Selection Services may be $X for the first $500 million of AUM but a mere fraction of $X for the next $5 billion. Although the particular amounts of AUM and particular differential costs may vary, the principle holds generally and arises from multiple economy of scale factors.

a.  First and as mentioned immediately above, AUM increases are often due in large part to mere asset appreciation, rather than to increases in the number or kind of assets (thus necessitating no additional provision of advisory services).

33

b. Second, AUM can increase by virtue of existing fund holders purchasing more fund shares, which likewise produces no changes to the composition of the fund's portfolio or to the number of fund shareholders, and thus requires no additional provision of investment advisory services.

c. Third, AUM can increase when *new* investors purchase fund shares, but even in this event the additional *investment advisory* costs are *de minimis* as: (1) the additional dollars contributed by new shareholders are simply invested in the same core portfolio of securities already produced by prior investment advisory services; and (2) the additional *administrative* costs of adding new shareholders are borne by other parties (*e.g.*, transfer agents) pursuant to other contracts.

d. Fourth and most basically, the work required to operate a mutual fund does not increase proportionately with the assets under management.  While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.*, salaries for research, trading and portfolio management personnel sufficient to manage an entire portfolio; offices to house them; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs for provision of further investment advisory services for further AUM are much smaller, and often negligible or nonexistent.

94.    Put simply, it does not cost an investment advisor ten times as much to render services to a $2 billion fund as a $200 million fund.  At some point (a point exceeded by the Fund, holding $3-$5 billion of net assets during recent years), the additional cost to provide advisory services to each additional dollar in the Fund (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches or equals zero.

95.    The existence of economies of scale in the mutual fund industry has been confirmed by the SEC and the Governmental Accounting Office (the "GAO"), both of whom conducted in-depth studies of mutual fund fees and concluded that economies of scale exist in the provision of investment advisory services.  *See SEC Division of Investment Management Report:  Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials, and the Ranking Member, Committee on Commerce, House of Representatives* (2000) ("GAO Report"), at 9.  These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders.  *See e.g.* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001).

96.    Indeed, the legislative history of Section 36(b) recognizes that an investment advisor's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), *as reprinted in* 1970 U.S. Code Cong. & Ad. News, at 4901-02.

97.    Likewise, as further detailed in Section VI.A *infra*, regulatory approval for the levy of distribution fees was preconditioned on the existence of such economies of scale: because distribution fees would ostensibly operate to increase a mutual fund's size, they would lead to economies of scale that would allow for reductions in investment advisory fees (that, in theory, could offset or more than offset the distribution fees).

98.    However, while mutual fund economies of scale are provided by (and therefore belong to) the mutual fund itself, mutual fund investment advisors can and often do monopolize

the benefits of such economies of scale by continuing to charge high investment advisory fee rates on AUM even as AUM rise substantially.  As these fees become increasingly untethered to the costs of providing such services, they become excessive.

99.     To address the matter, share economy of scale benefits, and avoid taking excessive fees, investment advisors now frequently employ a declining rate structure in which the percentage of AUM taken as an investment advisory fee declines at higher AUM levels.  This is done by providing a schedule of AUM "breakpoints" (*e.g.*, $500 million, $1 billion, $5 billion, etc.) at which investment advisory fee rates on AUM above such breakpoints decrease.  For example, per the above breakpoint schedule, one rate (the highest) will be applied as the fee for all assets up to $500 million; another, lower rate will be applied as the fee for assets between $500 million and $1 billion; and a third rate, lower still, as the fee for assets between $1 billion and $5 billion.  Such breakpoint-adjusted fee schedules reflect (but do not mirror) the cost efficiencies and economies of scale in the management of mutual fund portfolios as mutual funds' AUM grow.

### 2.     The Fund Generated Significant Economies of Scale with Respect to Investment Advisory Services, but Calamos Extracted Excessive Fees by Failing to Share the Benefits of Such Economies of Scale

100.    The Fund is acknowledged by Calamos, its affiliates, investment professionals and the financial press as Calamos' flagship.  As detailed in Section IV.E *supra*, it is by far the largest of all the funds in the Calamos Fund Complex; by far the largest of all of Calamos' Captive Funds; and by far the largest single contributor to Calamos' investment advisory fee stream.  Since its founding in 1990, the Fund's AUM has grown from zero to now exceed $3 billion.  Almost all of that growth occurred in the prior 15 years, as the Fund grew from approximately $207 million of net assets (as of March 31, 2001) to $3.484 billion of net assets (as of October 31, 2014).  Indeed, during much of this time, Fund net assets exceeded $7 billion (2004-2011), and during 2006 reached $20 billion.

101.    While the size of the Fund has grown dramatically, it does not appear – as detailed below – that the *amount* of the investment advisory services provided to the Fund by Calamos, or the *cost* to Calamos of providing such services, has undergone any similar increase. Instead, what did experience a similar increase was Calamos' advisory fees.

102.    First, a substantial portion of the Fund's growth in AUM is the result of pure appreciation of assets values.  As of October 31, 2014 (the end of the most recent fiscal year for which information is available), of the Fund's $3.484 billion in net assets, approximately $1.759 billion represented Fund shareholders' "paid-in capital", while approximately $1.725 billion represented "undistributed earnings" and "unrealized gains" from investing such paid-in capital. In sum, nearly half of the Fund's current size is a function of asset value appreciation:  a factor that requires zero additional provision of investment advisory services.

103.    Second, while the $1.725 billion of shareholder "paid-in capital" indicates that the Fund has many shareholders, the additional services required to cope with such influx of shareholders and shareholder funds are by and large *not* investment advisory services, but rather various administrative and "back office" services provided by other service providers (*e.g.*, transfer agents) for separate fees set through separate contracts.

104.    Third, the number of securities held in the Fund's portfolio has remained relatively small and constant, even as the Fund experienced dramatic asset growth between 2001 and 2014.  At the end of fiscal 2001, the Fund had 81 different equity investments and total assets of $207 million; while at the end of fiscal 2014, the Fund had 87 different equity investments and total assets of $3.484 billion.  Such relative constancy in the number of positions held by the Fund suggests that the research, management and oversight associated with providing the investment advisory services was little changed even as Fund AUM grew dramatically.

105.    Fourth, the number of individual portfolio managers that Calamos discloses as responsible for managing the Fund has held largely constant.  For example Fund Prospectuses listed 8 Fund portfolio managers in 2014; 9 in 2012; and 11 in 2010.

106.    Notwithstanding such indicators that the investment advisory services provided by Calamos did not grow in the same proportion as Fund AUM, and if anything remained largely constant, the investment advisory *fees* received from the Fund by Calamos: (1) have grown dramatically, and (2) increased in proportion with – and even faster than – the increase in Fund assets.  As Table 4 above shows, the investment advisory blended fee rate that Calamos extracted from the Fund has hovered, at all times between 2004 and 2013, within a couple of basis points of 0.81% of Fund net assets (*i.e.*, ranging from 0.79% at the low end to 0.83% at the high end). Similarly, as Table 4 also shows, although Fund net assets increased by a factor of 20 between the end of fiscal 2001 ($207.0 million) and fiscal 2013 ($4.441 billion), Fund advisory fees increased during the same period at an even *steeper* rate – rising nearly forty-fold from $1.121 million in fiscal 2001 to $41.109 million in fiscal 2013.[11]  That Calamos' investment advisory fees increased faster than Fund assets indicates that Calamos monopolized all economy of scale benefits for itself rather than sharing them with the Fund.

### 3.    Analysis of Fund Breakpoints Further Exposes Calamos' Excessive Fees and Retention of Economy of Scale Benefits

107.    As discussed above, mutual fund advisory fees are typically set through rate schedules that feature multiple breakpoints.  These are supposed to reflect the fundamental economy of scale reality that, as Fund assets increase beyond certain points, the marginal cost of providing investment advisory services to such additional assets decreases, at times to zero. Breakpoints allow mutual funds and their shareholders to *share* in such economy of scale benefits, in the form of reduced fees.  Absent such breakpoints, these benefits would be monopolized by the investment advisor, who would reap windfall profits by continuing to receive high marginal fees even as its marginal costs approached zero.

108.    As also discussed above, although the Fund's current advisory fee rate schedule, operative since August 2004, features multiple breakpoints (set forth at Table 3, *supra*), these

---

[11] The higher blended rates for fiscal 2001 and fiscal 2002 are artifacts of the Fund's smaller size during those times, which made the blended rate largely a function of the high rates applied at initial asset breakpoints (*e.g.*, higher rates for assets under $500 million, and for assets between $500 million and $1 billion).

breakpoints create only an appearance of fee reductions while doing little or nothing to actually reduce fees.  *See* Section V.A.4, *supra*.   This was a function of two factors:

a. **Tiny Rate Reductions at Each Breakpoint**.  As the Fund's breakpoint schedule shows, the new rate reductions instituted in August 2004 were invariably *tiny*:  each merely 2 basis points (i.*e.*, 0.02%).   Five such breakpoints were thus required in order to drop advisory fee rates by a mere 0.1%.

b. **Wide Spacing of Breakpoints over Large Asset Ranges**.  The August 2004 breakpoint rate reductions were not only tiny (per above), but took effect (a) late, and (b) slowly.  The first breakpoint reduction from the rates previously operative took effect only when Fund assets exceeded $6 billion (rates on assets in excess of $6 billion fell from 0.80% to 0.78%). Each successive breakpoint reduction was implemented only when Fund assets increased by a further $5 billion (*e.g.*, when Fund assets rose to exceed $11 billion, rates on assets in excess of $11 billion fell from 0.78% to 0.76%).

109.   These two factors emptied the Fund's breakpoints of practical effect.   In theoretical sum, operating to reduce advisory fee rates by a mere 10 basis points (0.1%) over an AUM range of $25 billion, they still permit excessive and unreasonable fees and rates to be charged on assets throughout this AUM range.   And as a practical matter, the Fund's current size makes these rate reductions theoretical, as the Fund's current sub-$6 billion size does not suffice to trigger such rate reductions (given their wide spacing over large AUM ranges).  Yet even were the Fund large enough to qualify for the promised rate reductions, they would still do almost nothing to reduce advisory fees (given the tiny reductions in rates) – as demonstrated in Table 7, *supra*.

### C. The Nature and Quality of Services Provided to the Fund's Shareholders

#### 1. The *Nature* of the Services Calamos Provided to the Fund under the IMA

110. To illuminate the particular investment advisory services Calamos provided to the Fund under the IMA, three distinctions are necessary:

a. First, the investment advisory services Calamos provided to the Fund under the IMA must be distinguished from all *non-investment advisory* services procured by/for the Fund under separate agreements.

b. Second, the services Calamos provided to the Fund under the IMA must be distinguished from any further services Calamos provided to the Fund *outside* those contracted for through the IMA.

c. Third and last, the multiple services Calamos provided to the Fund under the IMA – namely, Portfolio Selection Services and Other Services – must be distinguished from each either.

111. Mutual funds require many different services for their operation, almost all of which are provided by entities *other than* the investment advisor pursuant to separate agreements between such entities and the Fund.

112. The Fund's SEC filings detail these services, their providers, and their cost to the Fund. These include distribution services (provided by CFS, as distributor, per a separate distribution agreement), securities custody services (provided by State Street Bank and Trust Company, as custodian), accounting services (also provided by State Street, as well as by Calamos under a discrete "financial accounting services" agreement), transfer agent services (provided by US Bancorp Fund Services, LLC, as transfer agent), audit services (provided by Deloitte & Touche LLP), legal services (provided by K&L Gates LLP), shareholder reporting services (*e.g.*, printing and mailing costs), the services of Fund Directors, compliance-related services, etc.

113.    *None of the above-detailed services are investment advisory services provided under the IMA.*  All (save the "financial accounting services" provided by Calamos) are provided by various other entities (custodians, transfer agents, auditors, counsel, distributors, etc.), including affiliates of Calamos such as CFS, pursuant to separate agreements with such entities, for which such entities are paid fees.

114.    Calamos thus provides the Fund with a specifically-delimited set of services. These include, in addition to Calamos' "investment advisory services" under the IMA, certain additional "financial accounting services," for which the Fund separately reimburses Calamos pursuant to a separate "financial accounting services" agreement.

115.    The Fund's fees and expenses for fiscal 2014 are set forth in Table 8 below.

**Table 8**
**Fund Fees/Expenses (Year Ended October 31, 2014)**

| Type of Fee/Expense | Amount Paid | | % of total expenses | Provider / Payee |
|---|---|---|---|---|
| Investment Advisory Fees | $ | 31,535,086 | 56.92% | Calamos |
| Financial Accounting Services Fees | $ | 450,484 | 0.81% | Calamos |
| Distribution Fees | $ | 15,880,984 | 28.66% | CFS |
| Transfer Agent Fees | $ | 5,725,138 | 10.33% | US Bancorp |
| All Other Fees and Expenses | $ | 1,813,938 | 3.27% | various |
| Total Expenses | $ | 55,405,630 | 100.00% | |

Source:  Fund Annual Reports on Form N-CSR

116.    As Table 8 shows: (1) investment advisory services provided by Calamos are the single largest source of the Fund's total expenses, alone accounting for nearly 57% of total expenses; (2) investment advisory services constitute in effective entirety Calamos' income from the Fund (in comparison to which the additional "financial accounting services" are *de minimis*); and (3) as further discussed in Sections V.E and VI *infra*, the substantial distribution fees paid to CFS, accounting for 28.66% of all Fund expenses, mean that Defendants are the Fund's primary payees, accounting for 86.4% of all Fund fees.

41

117.     Therefore, the particular services Calamos provides to the Fund boil down to the "investment advisory services" specified in the IMA, in exchange for which it is paid its investment advisory fees.  In their largest and core part, such services are Portfolio Selection Services:  namely, researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund.  *See e.g.* IMA at Clause 2 ("The Manager will (i) furnish continuously an investment program of each Fund, (ii) determine (subject to the overall supervision and review of the Board of Trustees of the Trust (the "Trustees")) what investments shall be purchased, held, sold or exchanged by each Fund and what portion, if any, of the assets of each Fund shall be held uninvested, and (iii) make changes on behalf of the Trust in the investments of each Fund.").

118.     Calamos' Portfolio Selection Services – *specifically* -- are the primary metric on which Calamos, Fund investors, and the Fund's Board judge Calamos' performance of its IMA-specified duties, as Fund SEC filings and quarterly and/or annual "Investment Team Discussion[s]" and "Quarterly Commentaries" penned and provided by Calamos make clear.

119.     The IMA also requires Calamos to perform certain Other Services.  Yet these services remain unspecified in the IMA, in contrast to the specified Portfolio Selection Services, indicating their secondary importance.  *See* IMA at Clause 2 (". . .  The Manager will also manage, supervise and conduct the other affairs and business of the Trust and each Fund thereof and matters incidental thereto, subject always to the control of the Trustees").  On information and belief, such Other Services consist in  large part of (a) compliance-related functions and (b) reporting to Fund shareholders and/or the Board on Fund performance (*i.e.*, on Calamos' performance of its Portfolio Selection Services).

### 2.     The *Quality* of the Services Calamos Provided to the Fund

120.     The Portfolio Selection Services provided by Calamos to the Fund are of low quality, are inferior to the services provided by other mutual fund investment advisers, and have caused the Fund's investment portfolio to perform poorly.

121.   Like other mutual funds, the Fund reports its investment performance relative to one or several benchmarks.  At all relevant times, the Fund's benchmarks have been: (1) the Russell 3000 Growth Index; (2) the S&P 500 Index; and (3) the Russell Midcap Growth Index.

122.   The Fund's investment performance has fallen substantially short of each and every one of its benchmarks for each of the 1-, 3-, 5-, and l0-year periods ended September 30, 2014, as shown in Table 9 below:

**Table 9**
**Fund Performance vs. Benchmarks**
**(returns through 9/30/2014)**

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **Calamos Growth Fund** | 9.00% | 15.23% | 10.99% | 6.11% |
| **Russell 3000 Growth Index** | 17.87% | 22.41% | 16.43% | 8.95% |
| **S&P 500 Index** | 19.73% | 22.99% | 15.70% | 8.11% |
| **Russell Midcap Growth Index** | 14.43% | 22.74% | 17.12% | 10.24% |

Source:  Calamos "Quarterly Commentary" for Fund

123.   Morningstar also reports Fund investment performance relative to that of other mutual funds that Morningstar has determined are comparable to the Fund.  Morningstar categorizes the Fund as a "Large Growth" fund, and as demonstrated in Table 10 below, the Fund's investment performance has likewise fallen substantially short of the average investment performance among comparable mutual funds for each of the 1-, 3-, 5-, and l0-year periods ended September 30, 2014:

43

**Table 10**
**Fund Performance vs. Peers**
(returns through 9/30/2014)

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **Calamos Growth Fund** | 9.00% | 15.23% | 10.99% | 6.11% |
| **Morningstar Large Growth Category** | 16.24% | 21.28% | 14.60% | 8.26% |

124. Morningstar assigns mutual funds, including the Fund, a rating of 1 to 5 "stars" based on risk-adjusted returns for each of the most recent 3-, 5-, and l0-year periods. The top l0% of funds within each Morningstar category (*e.g.*, Large Growth) receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars, and the bottom 10% receive 1 star. Morningstar also assigns each fund an "overall" rating.

125. Morningstar currently assigns the Fund 1 star for each of the 3-, 5- and 10-year periods, and also assigns the Fund 1 star overall, indicating Morningstar's evaluation that the Fund consistently falls in the bottom 10% of its category.

126. Morningstar also judges Fund fees, including if not limited to investment advisory fees, to be "high."

**3.     Comparison of the Nature and Quality of the Services Calamos Provided to the Fund and to Identical Subadvised Funds Further Indicates That Calamos Charged Excessive Fees to the Fund**

127. The investment advisory services that Calamos provided to the Fund are substantially similar – in nature and quality – to the investment advisory services that Calamos provided to third-party, arm's length investment advisory clients, such as to the Identical Subadvised Funds.

128. As detailed above, Calamos provided the Identical Subadvised Funds with the same two categories of investment advisory services:  Portfolio Selection Services and Other Services.  As detailed above, the Other Services provided to the Identical Subadvised Funds – namely, periodic reporting functions concerning fund portfolio and performance, and book-keeping functions – were substantially similar to the Other Services that Calamos provided to the

Fund.  Moreover, and as detailed above, the Portfolio Selection Services that Calamos provided to the Identical Subadvised Funds were *identical* to the Portfolio Selection Services provided to the Fund.

129.    Consequently, the *quality* of the Portfolio Selection Services that Calamos delivered to arm's length investment advisory clients, such as the Identical Subadvised Funds, was of similar and/or identical low quality as those Calamos delivered to the Fund.  Because the Identical Subadvised Funds and other Calamos investment advisory accounts were *de facto* copies of the Fund, the Identical Subadvised Funds and other like Calamos investment advisory accounts experienced the same poor performance as the Fund.

130.    However, although the investment advisory services delivered to the Fund and to the Identical Subadvised Funds and other like Calamos investment advisory accounts were similar and often effectively identical, there are two matters where the experiences of the Fund and non-Captive Fund investment advisory clients of Calamos diverge.

131.    First, the Identical Subadvised Funds and other non-Captive Fund Calamos clients paid materially lower fees than the Fund did in order to receive the same, relatively poor investment advisory services.  *See* Sections V.A.2-3, *supra*.

132.    Second, and as demonstrated in Table 11 below, non-Captive Fund clients, including the Identical Subadvised Funds and similar funds for which Calamos provided investment advisory services, responded very differently than the Fund to their receipt of such relatively poor investment services.  As non-Captive clients, they were free to, and did, "walk away:" they ended their relationships with Calamos, and instead retained new and different investment sub-advisors to provide them with (better) investment advisory services.

**Table 11**

**Non-Captive Fund Responses
to the Quality of Calamos' Investment Advisory Services**

| Fund | Sponsor / Advisor | Old Subadvisor | Calamos Termination Date | New Subadvisor |
|---|---|---|---|---|
| **Genworth Calamos Growth Fund** | Genworth Variable Insurance Trust / Genworth Financial Wealth Management | Calamos | 2011 | Fidelity |
| **Thrivent Partner All Cap Growth Portfolio** | Thrivent Series Fund / Thrivent Financial | Calamos | 2013 | Thrivent Financial |
| **Strategic Partners New Era Growth Fund** | Prudential Investment Portfolios 3 / Prudential Investments | Calamos and TCW | 2007 | Jennison Associates LLC |
| **SP Mid Cap Growth Fund** | Prudential Series Funds / Prudential Investments | Calamos | 2007 | Neuberger Berman Asset Mgmt. |

133.    Certain of the above-mentioned non-Captive Fund clients made clear that they terminated Calamos due to the poor quality of the Portfolio Selection Services they received. *See e.g.* Annual Report on Form N-CSR for Strategic Partners New Era Growth Fund, filed May 4, 2007, at 4 ("During this period, Calamos Investments and TCW Investment Management Company managed the Fund's portfolio. On March 2, 2007, the Fund was merged into the Jennison Mid-Cap Growth Fund. The Fund's poor return over the reporting period was due to both asset managers, but Calamos' negative return had the greater impact. Almost every one of the overall Fund's risk exposures compared with its benchmark hurt its performance.").

134.    The Fund's reaction, however, has differed from that of Calamos' arm's-length, non-Captive Fund clients.  The Fund not only continues to retain Calamos to provide it with

investment advisory services, but continues to pay substantially higher fees than those negotiated and paid by Calamos arm's-length, non-Captive Fund clients.  Whereas during the 2007-2014 period Calamos' non-Captive Fund clients responded to the poor quality of Calamos' investment advisory services by terminating such services and refusing to pay Calamos any further, the Fund's response during the same period to the same poor quality was far more mild.  The Fund not only continued its retention of Calamos as investment advisor, but continued such retention with the same unreasonably high and excessive rates and fees as before.

135.    The Fund's continued retention of Calamos and excessive fee payments to Calamos, even in light of the poor quality of the services received (which caused many Calamos non-Captive Fund investment advisory clients to walk away), are vivid illustration of the Fund's captivation by Calamos.

### D.        The Profitability of the Fund to the Advisor

136.    Calamos enjoys substantial profits from the (excessive) investment advisory fees it extracts from the Fund.

137.    First, as CAMI is a publicly-traded company, CAMI has disclosed detailed financial statements since going public in 2004.  These financial statements show that, over the past decade, Calamos has operated as one of the most profitable of all asset management firms. Specifically, and as further detailed in Table 12 below, CAMI has reported operating margins that have averaged 39.6%, among the highest reported by any publicly-traded asset manager. Indeed, Standard & Poors, in a recent report on the asset management industry, observed that Calamos' profitability "remains among the strongest of our rated asset managers."[12]

138.    Table 12 below presents CAMI's reported AUM, investment advisory fee revenue, total revenue, operating income and gross margins for each year between 2004 and

---

[12] *See Standard & Poors*, "Industry Report Card:  Global Asset Managers Benefited From Improving Market Conditions in the Third Quarter, But Performance Could be Mixed in 2013," at Table 1 (available at http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245346052085).

2013, juxtaposed with further data as to investment advisory fees and other fees paid to Calamos by the Fund during each of those years.

**Table 12**
**Profitability of Fund to Advisor**

| | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|
| **CALAMOS DATA** | | | | | |
| Average AUM | $25,300 | $27,382 | $33,365 | $35,693 | $32,249 |
| Fee Rate (bps) | 78.5 | 77.6 | 76.7 | 74.7 | 73.9 |
| Advisory Fee  Revenue | $198.539 | $212.398 | $255.823 | $266.553 | $238.308 |
| Total Revenue | $250.962 | $269.130 | $326.676 | $352.321 | $326.039 |
| Operating Income | $61.190 | $77.886 | $119.804 | $140.349 | $126.501 |
| Margin | 24.4% | 28.9% | 36.7% | 39.8% | 38.8% |
| **FUND DATA** | | | | | |
| Fund Advisory Fees | $31.535 | $41.109 | $59.537 | $70.744 | $66.326 |
| Fund Distribution Fees | $15.881 | $18.846 | $26.423 | $31.206 | $34.980 |
| Financial Accounting Fees | $0.450 | $0.579 | $0.832 | $0.993 | $0.933 |
| Total Fees from Fund | $47.866 | $60.534 | $86.792 | $102.943 | $102.239 |
| **FUND CONTRIBUTION** | | | | | |
| Fund Advisory Fees as % of Total Advisory Fees | 15.9% | 19.4% | 23.3% | 26.5% | 27.8% |
| Fund Fees as % of Total Revenue | 19.1% | 22.5% | 26.6% | 29.2% | 31.4% |

| | 2009 | 2008 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| **CALAMOS DATA** | | | | | |
| Average AUM | $27,359 | $37,066 | $44,769 | $45,680 | $39,973 |
| Fee Rate (bps) | 73.4 | 74.0 | 72.7 | 72.1 | 71.3 |
| Advisory Fee  Revenue | $200.790 | $274.174 | $325.395 | $329.383 | $284.951 |
| Total Revenue | $281.738 | $391.589 | $473.477 | $485.172 | $417.567 |
| Operating Income | $98.058 | $159.097 | $173.093 | $231.028 | $206.094 |
| Margin | 34.8% | 40.6% | 36.6% | 47.6% | 49.4% |
| **FUND DATA** | | | | | |
| Fund Advisory Fees | $58.314 | $109.498 | $127.529 | $133.121 | $90.988 |
| Fund Distribution Fees | $32.176 | $64.214 | $75.229 | $77.590 | $52.842 |
| Financial Accounting Fees | $0.822 | $1.562 | $1.827 | $1.905 | $1.304 |
| Total Fees from Fund | $91.312 | $175.274 | $204.585 | $212.616 | $145.134 |

| FUND CONTRIBUTION | | | | | |
|---|---|---|---|---|---|
| **Fund Advisory Fees as % of Total Advisory Fees** | 29.0% | 39.9% | 39.2% | 40.4% | 31.9% |
| **Fund Fees as % of Total Revenue** | 32.4% | 44.8% | 43.2% | 43.8% | 34.8% |

**Sources:**

Calamos-related data taken from CAMI annual reports on Forms 10-K (years ended Dec. 31)

Fund-related data taken from Fund annual reports on Form N-CSR (fiscal years ended Oct. 31
  [2007 onwards], Mar. 31 [2005-2006])

139.    As Table 12 above shows, Calamos' average operating margin during the ten year period from 2004-2013 was 39.6%.  During this time, as Table 12 also shows, fees paid by the Fund drove these profits.  Fund advisory fees were the single largest component of Calamos advisory fees (and advisory fees were the single largest component of Calamos revenues), accounting each year for between 20% and 40% of total Calamos advisory fee income.  Moreover, when additional Fund payments to Defendants (distribution fees to CFS and financial accounting fees to Calamos) are considered, *fee income from the Fund generally accounted for 25%-33% of Calamos' total annual revenues, and on multiple occasions approached 50% of Calamos' annual revenues*.

140.    Indeed, all available facts indicate that the Fund provides Calamos with an even *greater* share of its income or profits than of its revenues.

141.    Calamos does not disclose its expenses on a fund-by-fund basis, but instead reports only aggregate expense figures for the entirety of its operations.  Were Calamos to disclose investment advisory expenses among the funds in the Calamos Fund Complex accurately – *i.e.*, not in proportion to their AUM, but rather in a manner that directly reflected the actual costs to provide each fund's investment advisory services – the Fund would be revealed, on information and belief, to be by far the most profitable of all the funds in the Calamos Fund Complex.

142.    Indeed, it is likely that the many of the other funds in the Calamos Fund Complex – due to their small AUM size, small resulting fee stream, and the high initial/fixed costs for provision of investment advisory services – are *not* profitable at all, and that their continued operation is made possible and subsidized by the large profits extracted from the Fund.  For example, 12 of 30 Captive Funds identified by Calamos to be part of the Calamos Fund Complex have less than $100 million in AUM, and the relatively small fee streams from such funds likely do not provide Calamos with fees equal to the high initial costs required to provide investment advisory services.  *See* Table 1, *supra* (listing funds in the Calamos Fund Complex and the net assets held in each fund).

143.    Second, as Tables 2, 4-6 and 12 above indicate, Calamos is able to extract higher fees from the Fund than from (a) its arm's length investment advisory clients, and (b) its other Captive Funds.  For example, comparison of Table 4 *supra* (showing the blended investment advisory fee rate paid the Fund for the prior 15 years) with Table 12 above (showing *inter alia* the average blended rate across all of Calamos' investment advisory operations) shows that the investment advisory fee rates paid by the Fund each year (ranging mostly from 0.79% to 0.83%) are *higher* than the average rates paid across Calamos' investment advisory operations (ranging from 0.69% to 0.78%). This in turn indicates that Calamos' overall investment advisory income is disproportionately derived from the Fund.  *See e.g.* Table 2, *supra* (showing, generally, that the Fund's share of Calamos' total advisory fees *exceeds* its share of total Calamos AUM). Again,  in light of its large size and the resultant economies of scale, as well as the far smaller size of many other investment accounts managed by Calamos and their high/initial fixed costs, it appears that the Fund is not only substantially profitable for Calamos, but that its profits may underwrite Calamos' ability to offer further investment advisory services.

144.    Third, as detailed in Section V.B, *supra*, the Fund produces significant economies of scale with respect to the investment advisory costs it requires, but these economies of scale are monopolized by Calamos through a fee structure that operates in effect as if such economies of scale did not exist.  Although Calamos' investment advisory fee rates include multiple AUM

breakpoints at which advisory rates are reduced, the rate reductions are so tiny, and spaced so widely apart, as to be wholly inconsequential.  This indicates both that management of the Fund is tremendously profitable for Calamos, in part through its monopolization of economy of scale benefits, and that such profits are the result of Calamos charging and extracting excessive fees.

145.    Fourth, as detailed in the following section concerning "fall out benefits," the Fund, by serving as the original which Calamos can endlessly copy at almost no additional cost (*e.g.*, for Identical Subadvised Funds and other similar accounts modeled on the Fund), provides Calamos with *further* income and profits from the investment advisory fee streams Calamos can collect from offering such Fund copies.

146.    Fifth and lastly, evidence produced in the course of prior excessive fee litigations further indicates that investment advisors enjoy substantial and on occasion extremely high profit margins on large funds such as the Fund.

   a.   In excessive fee litigation relating to five large funds managed by Fidelity Management and Research Co. ("Fidelity"), evidence indicated that Fidelity's pre-tax profit margins on such funds ranged between 72% and 86%.  *See Bennett v. Fidelity Management & Research Co*., NO. 1:04-cv-11651-MLW (D. Mass.), at Dkt. No. 268 ("Plaintiffs' Supplemental Brief Regarding Summary Judgment"), at 19.

   b.   In excessive fee litigation relating to funds managed by Oppenheimer Management Corp., pre-tax profit margins rose as high as 89%.  *See Meyer v. Oppenheimer Mgmt. Corp*., 707 F. Sup. 1394, 1401 (S.D.N.Y. 1988).

   c.   In excessive fee litigation relating to funds managed by Capital Research & Management Co., pre-tax profit margins ranged from 35% to 44%.  *See Am. Mutual Funds Fee Litig*., 2009 US Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009), at *68-71.

   d.   In excessive fee litigation relating to funds managed by T. Rowe Price, pre-tax profit margins were estimated to be between 57% and 77.3%.  *See Schuyt v.*

*Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978-79 (S.D.N.Y. 1987)

**E.      Fall-Out Financial Benefits Attributable to the Fund**

147.     "Fall-out benefits" refer to income, profits or other benefits accruing to an investment advisor that would not have occurred but for the existence of its captive mutual fund(s).  Where an investment manager gains substantial fall-out benefits (over and above direct investment advisory fees) by virtue of a fund or funds it manages, consideration of such benefits is also relevant for any determination as to whether investment advisory fees were excessive.

148.     Here, the Fund afforded Calamos multiple and substantial fall-out benefits.

149.     First, as detailed in Section V.A.3 *supra* and as admitted by Calamos itself, Calamos employs the Fund as an original model that it *copies* for other clients, including the Identical Subadvised Funds and other client accounts patterned after the Fund.  But Calamos incurs little or no additional investment advisory costs for such copies.  All the infrastructure, research and personnel required to furnish investment advisory services to such "copycat" clients were already provided and paid for by investment advisory fees extracted from the Fund itself. Calamos is thus able to capture for itself a sizeable additional fee stream – namely, the investment advisory fees paid by clients for whom Calamos copied the advisory services originally developed and provided to the Fund – that would not have existed but for the Fund.

150.     Indeed, the fact that *the Fund* had already paid for the development of these investment advisory services allowed Calamos to offer copies to arm's-length clients *at rates far lower than those it charged to the Fund* (as the marginal costs to Calamos of providing such copied services were close to zero).  The Fund thus not only made such services possible, but also made them *marketable*:  more attractive to Calamos' non-Captive Fund clients by virtue of the lower fees Calamos was able to offer them.

151.     Table 13 below, estimating aggregate AUM in such Fund copies and the investment advisory fees enjoyed by Calamos on such Fund copies, provides some indication of the possible size of these fall-out benefits.  As Table 13 indicates, these fall-out benefits may

have added $4.38 million of pure profit fee income during 2013, and in prior years $8-$30 million per year.

**Table 13**
**Fall-Out Benefits I:**
**Estimating Calamos' Additional Fees**
**from Copying the Fund at no Additional Cost**

| Year | Calamos Total AUM * | Growth Fund AUM * | Growth Fund AUM as % of Total * | Calamos AUM - Separate Accounts * | AUM in Copies of Fund (estimate) ** | Fees and Profits from Fund Copies (estimate) *** |
|------|------|------|------|------|------|------|
| 2014 | $ 23,506 | $ 3,300 | 14.04% | $ 2,505 | $ 352 | $2.24 |
| 2013 | $ 26,543 | $ 4,394 | 16.55% | $ 4,149 | $ 687 | $4.38 |
| 2012 | $ 30,580 | $ 5,792 | 18.94% | $ 7,251 | $ 1,373 | $8.76 |
| 2011 | $ 32,777 | $ 7,052 | 21.52% | $ 7,732 | $ 1,664 | $10.61 |
| 2010 | $ 35,414 | $ 9,005 | 25.43% | $ 8,062 | $ 2,050 | $13.07 |
| 2009 | $ 32,714 | $ 8,640 | 26.41% | $ 8,234 | $ 2,175 | $13.86 |
| 2008 | $ 24,040 | $ 6,700 | 27.87% | $ 6,542 | $ 1,823 | $11.62 |
| 2007 | $ 46,208 | $ 16,100 | 34.84% | $ 11,373 | $ 3,963 | $25.26 |
| 2006 | $ 44,725 | $ 17,100 | 38.23% | $ 11,021 | $ 4,214 | $26.86 |
| 2005 | $ 43,805 | $ 18,100 | 41.32% | $ 11,561 | $ 4,777 | $30.45 |
| 2004 | $ 37,975 | $ 13,800 | 36.34% | $ 10,700 | $ 3,888 | $24.79 |

(all $ numbers above in millions)
*    For year ending December 31 (source:  CAMI Forms 10-K; 2014 data from Fund Fact Sheet and CAMI press release)
**   Assuming Fund Copies account for same share of Separate Accounts as Fund's share of Total AUM
*** Assuming Fund Copy fees at average fee rate of Identical Subadvised Funds

152.    Second, the outsize fees and profits that Calamos extracted from the Fund subsidized Calamos' operation of many other Captive Funds in the Calamos Fund Complex, allowing Calamos to offer further, different products to investors desirous of investment strategies distinct from those of the Fund – and thereby gain new clients, increased AUM and increased fees. As alleged above in Section V.D, *supra*, the Fund's large size, the attendant economies of scale for Calamos in providing investment advisory services to it, and Calamos'

monopolization of economy of scale benefits made the Fund the most profitable of all of Calamos' enterprises.  Most other Captive Funds in the Calamos Fund Complex, however, stood at the opposite operational pole:  their small size and small attendant investment advisory fee streams made it difficult for Calamos to recoup the high initial/fixed costs of providing them with investment advisory services.  Consequently, the excessive fees taken from the Fund and the large profits accruing to Calamos from such Fund-derived fees underwrote Calamos' ability to continue to operate the other Captive Funds in the Calamos Funds Complex -- and to receive from them further investment advisory income.  Absent the Fund, it is not certain that Calamos would be able to continue to operate these other Captive Funds, or to receive the further fees it generated from doing so.

153.    Third, as detailed in Table 14 below, Calamos did not merely extract investment advisory fees from the Fund, but also, by virtue of the Fund's nature as a Captive Fund, obtained *further* fees from further services that were (a) ancillary to investment advisory services but (b) still required for mutual fund operation.  These additional non-advisory fee fees included: (1) distribution fees, payable to CFS, and (2) so-called "financial accounting fees," payable to Calamos.  Such additional fees, as Table 14 shows, were quite sizeable (ranging from nearly $20 million to nearly $80 million per year), and constituted a material portion of Calamos' total fee stream from the Fund (typically, between 31% and 37%).  But for Calamos' captivity of the Fund through serving as the Fund's investment advisor, Calamos and CFS would not have enjoyed any of these fees, which thus constitute fall-out benefits to Defendants and the Calamos Control Persons.

**Table 14**
# Fall-Out Benefits II:
## Sizeable Non-Advisory Fees Extracted from the Fund

| | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|
| **Fund Advisory Fees** | $ 31,535 | $ 41,109 | $ 59,537 | $ 70,744 | $ 66,326 |
| **Fund Distribution Fees** | $ 15,881 | $ 18,846 | $ 26,423 | $ 31,206 | $ 34,980 |
| **Financial Accounting Fees** | $ 451 | $ 579 | $ 832 | $ 993 | $ 933 |
| **Total Fees from Fund** | $ 47,867 | $ 60,534 | $ 86,792 | $ 102,943 | $ 102,239 |
| **Non-Advisory Fees as % of Total Fees** | 33.18% | 32.09% | 31.40% | 31.28% | 35.13% |

| | 2009 | 2008 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| **Fund Advisory Fees** | $ 58,314 | $ 109,498 | $ 127,529 | $ 133,121 | $ 90,988 |
| **Fund Distribution Fees** | $ 32,176 | $ 64,214 | $ 75,229 | $ 77,590 | $ 52,842 |
| **Financial Accounting Fees** | $ 822 | $ 1,562 | $ 1,827 | $ 1,905 | $ 1,304 |
| **Total Fees from Fund** | $ 91,312 | $ 175,274 | $ 204,585 | $ 212,616 | $ 145,134 |
| **Non-Advisory Fees as % of Total Fees** | 36.14% | 37.53% | 37.66% | 37.39% | 37.31% |

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **Fund Advisory Fees** | $ 43,945 | $ 18,008,981 | $ 6,471,941 | $ 1,121,470 | $ 246,083 |
| **Fund Distribution Fees** | $ 25,636 | $ 10,017,350 | $ 3,239,981 | $ 447,052 | $ 120,179 |
| **Financial Accounting Fees** | n/a | | | | |
| **Total Fees from Fund** | $ 69,581 | $ 28,026,331 | $ 9,711,922 | $ 1,568,522 | $ 366,262 |
| **Non-Advisory Fees as % of Total Fees** | 36.84% | 35.74% | 33.36% | 28.50% | 32.81% |

**Sources:**

Fund annual reports on Form N-CSR and N-30D (fiscal years ended Oct. 31 [2007 onward], Mar. 31 [prior years])

154.    Fourth, and lastly, Calamos has accrued yet further fall-out benefits for its affiliates through a remarkable array of related-party transactions through which Defendants secure various overhead-related services – such as office space and food service – from yet further Calamos affiliates, which are paid for providing such services.  Table 15 below, which lists only a fraction of such related-party transactions disclosed in CAMI's proxy statements, shows that Calamos affiliates extract $6.511 million per year in further payments for providing Defendants with, in effect, room and board:

**Table 15**
**Fall Out Benefits III:**
**Calamos Further Benefitted from Related-Party Transactions**

| Provider | Controlled by… * | Service | Annual Cost |
|---|---|---|---|
| Calamos Court LLC | Calamos Property Holdings | rent, corporate HQ | $   3,600,000 |
| 1111 Warrenville Road LLC | Calamos Property Holdings | rent, office space | $      712,000 |
| Calamos Court Annex LLC | Calamos Property Holdings | rent, dining facility in corporate HQ | $      300,000 |
| CityGate Centre I LLC | Calamos Property Holdings | rent, office space | $      943,000 |
| CF Restaurant Enterprises LLC | Calamos Family Partners | lunch service | $      956,000 |

\*  Calamos Property Holdings is owned by John P. Calamos Sr. and Jr. and their respective trusts)

Source:  CAMI Proxy on Form DEF 14A, filed April 14, 2014

F.    **The Care and Conscientiousness of the Fund's Trustees in Approving Investment Advisory Fees**

155.    Mutual fund investment advisory fees are "set" (reviewed, evaluated and approved) by nominally-independent mutual fund trustees on an annual basis.

156.    Evaluation of whether or not fund trustees have approved excessive investment advisory fee involves examination of two analytically distinct, but related, matters:

a.    *procedure* (the process through which the fee was evaluated and approved), and

b.  *substance* (the fee itself, apart from the procedure that produced it).

157.   A fee can be excessive in substance wholly apart from whether the procedure used in setting it was sufficient or defective.  Where the fee-setting process appears deficient, indications that the fee is substantively excessive are accorded all the more weight.

158.   Here, the Fund's investment advisory fees were excessive in substance, and the process through which the Fund's trustees "set" such fees was deficient.

### 1.   The Board Approved Substantively Excessive Advisory Fees

159.   Matters of process or procedure aside, the investment advisory fees approved by the Fund trustees were excessive, in substance and result, for the reasons set forth in Sections V.A-E *supra*.

160.   Upon information and belief, as detailed below, the Board's approval of substantively excessive fees stemmed in part from a deficient process for the consideration, evaluation and approval of proposed and/or appropriate advisory fees for the Fund.

### 2.   The Board's Deficient Approval Process

161.   Notwithstanding that nominally-independent mutual fund trustees must annually approve, and in this limited sense thus "set," investment advisory fees, as a practical matter, investment advisors are largely responsible for setting their Captive Fund investment advisory fees, by virtue of exerting effective control over the fee-setting process.  Such effective control typically arises from three factors:

a.  **Domination of the Trustees**.  First, the investment advisor can influence which trustees are appointed to a fund's board, and such trustees therefore owe their board positions (and associated remuneration and benefits) to the investment advisor.  Second, fund complex structure and practice intensify this conflict, because trustees typically serve on the boards of all captive funds in a fund complex (and thus receive yet higher remuneration and benefits).  Third, more immediately, fund boards often include as members – or leaders – senior executives of the investment advisor, whose presence on the board and

57

participation in board meeting and deliberations allows them to exert effective control over their own fees.

b. **Control Over the Investment Advisory Fees Proposed**. Mutual fund boards do not propose the investment advisory fees they set. Rather, in the first instance, the investment advisory fees set before fund boards for consideration and approval are ones proposed by the investment adviser itself. In all but extremely rare circumstances, mutual fund boards approve or "rubber stamp" the fees proposed by the investment advisor. As a practical matter and due in part to the factors listed immediately above and below, the investment advisor's fee "proposal" functions as the *de facto* fee determination.

c. **Domination of the Information Considered by Trustees in the Fee Approval Process**. Typically, in order to evaluate the investment advisor's proposal for advisory fees, fund boards consider and evaluate further information relevant to such evaluation, *most of which is provided in self-serving manner by investment advisor itself*. Often, the provision and consideration of such information is used less as part of a good faith effort to set non-excessive fees, but rather as part of a ritual meant to set excessive fees *immunized from legal challenge*. Such further information includes:

      i. **Investment Advisory Fees for Comparable/Peer Mutual Funds**. Fund boards consider information as to the investment advisory fees charged to other and/or peer mutual funds (often termed a "Lipper" report or a "15(c)" report): such information is often produced by an independent third party (Lipper) and is often supplemented with further, similar information from the investment advisor itself. However, as most peer mutual funds are

themselves captive funds, such information is contaminated by such captive funds' structural bias to excessive fees, thereby whitewashing excessive fees into purportedly "normal" or "average" ones.

ii. **Excessive Fee Factors.** Fund boards are also provided, *by the investment advisor*, with further information purportedly relating to the very factors detailed here relating to reasonableness, or lack thereof, of investment advisory fees (*e.g.*, comparative fee structures; economies of scale; profitability of fund to the investment advisor; etc.), which courts, including the Supreme Court, have enshrined as operative indicators of excessive fees. But neither the provision of such information by the investment advisor, on the one hand, nor its consideration by fund boards, on the other hand, necessarily suffices to produce a sufficient or appropriate fee-setting process. First, the information provided by the investment advisor is often neither complete nor objective, but instead partial and self-serving, thereby depriving fund board members of relevant and material information for determination of a non-excessive fee. Second, the board's consideration of such information, coupled with its failure to demand more full, accurate or objective information from the investment advisor, can itself be flawed.

a) **Defendants' Domination of the Fund's Trustees**

162.   The Fund has had, at all relevant times, six trustees:   John P. Calamos, Sr. (serving as Chairman of the Board of Trustees); Weston W. Marsh; John E. Neal; William

Rybak; Stephen B. Timbers; and David D. Tripple (the "Trustees").  The latter five Trustees are nominally independent.  John P. Calamos, Sr., however – Calamos' founder, Chairman, CEO and controlling person – is not independent.  To the contrary, in the context of setting rates for advisory fees (as well as other fees detailed herein payable to Calamos and/or its affiliates), Mr. Calamos possesses a strong and direct interest in setting and/or approving high and/or excessive fee rates.

163.    Once nominated and elected to the Board, the Trustees never stand for re-election, but instead enjoy "life" terms (as limited by resignation, removal, death or mandatory retirement upon reaching 75 years of age).  All current Trustees possess lengthy tenures on the Fund's Board, ranging from 8 years (Mr. Tripple) to 26 years (Mr. Calamos).

164.    All of the Fund Trustees, in addition to serving on the Fund's Board, also serve on the boards all other Captive Funds in the Calamos Fund Complex.  Each of the Trustees received compensation of at least $142,000 (during the fiscal year ended October 31, 2013) in connection with serving as trustees for the Captive Funds in the Calamos Fund Complex.

165.    Fund Trustees meet four times a year to oversee all of the funds in the Calamos Fund Complex. This includes approving investment advisory and other services contracts for each Captive Fund, as well as other oversight responsibilities, including, among others, monitoring each Captive Fund's compliance with federal and state law and its stated investment policies, overseeing the daily pricing of each Captive Fund's security holdings, and approving each Captive Fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

166.    Most recently, during the course of a single June 26, 2014 meeting, the Trustees decided to approve the proposed and currently operative investment advisory fee rates for the Fund and for all other Captive Funds in the Calamos Fund Complex.

167.    The June 26, 2014 meeting of the Trustees was significantly impacted, and ultimately controlled, by Calamos.  It was led by the Trustees' Chairman, John P. Calamos, Sr., who as Calamos' founder and controlling person has a direct interest in setting, maintaining and

approving high fees.  *See e.g.* Fund Annual Report for fiscal 2014 on Form N-CSR, at 230.  The Trustees' decision to continue to approve excessive Calamos fees was largely based on "a substantial amount of information *provided by the Adviser*" (*i.e.*, Calamos) as well as on "meeting with management of the Adviser" and on "knowledge gained from the Board's meetings with the Adviser throughout the years."  *Id.* (emphasis added).

168.    Calamos' provision of information on which the Trustees' fee decision was based, as well as its direct influence over the Trustees through face to face meetings – both currently, historically, and through the constant presence of John P. Calamos, Sr. among the Trustees – allowed Calamos to influence and effectively control the Trustees' fee evaluation.

169.    Such domination can be seen in the Trustees' often counterintuitive fee reasoning and conclusions, as set forth in the Fund's 2014 Annual Report.

170.    For example, although the Trustees noted that the investment advisory rates charged by Calamos to non-Captive Funds were *lower* than those Calamos charged to its Captive Funds (consistent with the factual allegations presented here), the Trustees credited and accepted "the Adviser's assertion that although, generally, the rates of fees paid by institutional clients were lower than the rates of fees paid by the Funds, the differences reflected the Adviser's greater level of responsibilities and significantly broader scope of services regarding the Funds, the more extensive regulatory obligations and risks associated with managing the Funds, and other financial considerations with respect to the Funds [that] lead to more expenses for registered funds."  *See e.g.* Fund 2014 Annual Report, at 232.  This "Adviser's assertion" was biased, and failed to provide the Board with the further, unbiased facts of the sort detailed here, indicating exactly the opposite – namely, that Calamos' services to non-Captive Fund clients were largely the same as those provided to Captive Funds, that Calamos services to the Fund allowed Calamos substantial profits resulting from economy of scale benefits flowing from the Fund's size, etc.

171.    Likewise, although the Board noted (1) that the Fund had significantly *underperformed* its peers during throughout the prior decade (*id*. at 230), while (2) paying *higher*

investment advisory fees than those paid by (better-performing) peer funds ("the Fund's management fee rate and total expense ratio are higher than the respective medians of the Fund's Expense Group" – *id*. at 232), the Board nevertheless concluded that the Fund should continue to pay high fees for poor performance. In doing so, the Board "determined that it would be prudent to allow the portfolio management team additional time to develop its performance record" (*id*. at 230), and noted that Calamos operated for the Fund under an expense cap ("the Board took into account the Adviser's expense cap") that capped total expenses for one class of Fund shares to 1.75% (*id*. at 232).

172. The Board's above-detailed reasoning is counter-intuitive, without basis, and apparently biased.

    a. First, the Board's conclusion that it would be "prudent to allow [Calamos] additional time to develop its performance records" ignores the facts that (a) Calamos' performance record with respect to the Fund is *already developed*, and (b) this developed performance record shows that the Fund, for a very long time, under the same management from the same Calamos portfolio managers guided by the same investment methods and objectives, has consistently and substantially underperformed. In other words, it does not appear that anything has changed so that "additional time . . . to develop [a] performance record" would be needed here.

    b. Second, the Board's approval of fees *higher* than those paid by comparable, peer mutual funds (for worse performance), based in part on the existence of an expense cap that functioned to cap expenses at 1.75% for one class of Fund shares, ignores: (a) that expenses were not similarly capped for other classes of Fund shares (for which expenses could rise to as much as 2.5%), (b) more importantly, that expenses with such cap were *still* higher than for comparable mutual funds, and (c) most importantly, that such cap *did not reduce the fees that the Fund paid to Calamos for investment advisory services by a single*

*penny*. *See e.g.*, March 1, 2014 Fund Statement of Additional Information ("SAI"), at 39 (showing that for each of the most recent 3 years, the Fund's expense cap had not functioned to require Calamos to pay back a single penny of the full investment advisory fees it received from the Fund).[13]  The expense cap is thus a red herring:  it is wholly irrelevant, and does not in any way alter the concrete and basic facts (higher actual fees, for substantial underperformance) that the Board banished through rhetorical invocation of the expense cap.

173.   Likewise, with respect to the "costs of services provided and profits realized by the advisor" factor, the Trustees purportedly "reviewed information on the profitability of the Adviser in serving as each Fund's investment manager and of the Adviser and its affiliated in all their relationships with each Fund," as well as "the annual report of the Adviser's parent company."  *See* 2014 Annual Report, at 232.  (As discussed next, the Trustees also purportedly reviewed information with respect to "economies of scale" and benefits flowing to the Adviser from such economies of scale [*id*. at 234]).

174.   However, it appears that consideration of this factor was cursory, incomplete, flawed and/or biased, in part due to Calamos' provision of incomplete and/or biased information:

a.   First, there is no further indication as to *what* such information revealed to the Trustees -- apart from their ultimate conclusion to approve investment advisory fees.  *See e.g.* 2014 Annual Report at 234 ("After its review of all the matters addressed, including those outlined above, the Board concluded that the rate of management fee paid by each Fund to the Adviser, in light of the nature and quality of the services provided, was reasonable and in the best interest of Fund shareholders").

---

[13] As explained in the March 1, 2014 SAI, "[E]ach of the Funds paid *total* advisory fees and was reimbursed by Calamos Advisors for expenses in excess of applicable expense limitations. . .  Payments were as follows."  *Id* (emphasis added).  The following table in the March 1, 2014 SAI shows that the Fund paid "total advisory fees" during each of the prior 3 years, while receiving no "reimburse[ments] by Calamos Advisors for expenses in excess of applicable expense limitations" – *i.e*., that actual expenses did not exceed state expense caps.

b.  Second, as detailed in Sections V.B and V.D, *supra*, this very information in fact shows that Calamos generated sizeable profits from providing investment advisory services, and that its profits from providing such services to the Fund were highest of all.

c.  Third, when such information is viewed not in isolation but in proper and relevant comparative context (by comparing Calamos' reported profit levels to those of other asset managers), such information indicates that Calamos' investment advisory fees were excessive (given that Calamos' profit levels were among the highest of all asset managers). *See* Section V.D, *supra*. It appears that the Board was not provided with such latter information, and more generally that the Board failed to properly consider and evaluate information concerning the profitability to Calamos of providing investment advisory services to the Fund.

175.  Likewise, Fund SEC filings asserted that the Trustees, in approving the IMA and the Fund's advisory fees, reviewed "economies of scale" and whether Captive Fund fee levels reflected such economies of scale. *See* 2014 Annual Report, at 234 ("The Board considered whether each Fund's management fee shares with shareholders potential economies of scale that may be achieved by the Adviser.").

176.  However, it appears that consideration of this factor was cursory, incomplete, flawed and/or biased, in part due to Calamos' provision of incomplete and/or biased information.

a.  For example, the Board simply concluded that the presence of breakpoints in the advisory fee rate schedules *could* share economies of scale with Fund shareholders ("The Board recognized that breakpoints in the fee schedule for each Fund could result in the sharing of economies of scale as Fund assets increase.").

b.  While as a general matter breakpoints *could* share economies of scale benefits, close examination of the relevant facts – as set forth in Section V.B.3, *supra* --

shows that, as specific and practical matter, the breakpoints applicable to the Fund's investment advisory fee rates did *not* result in any such sharing of economy of scale benefits with Fund shareholders, but rather allowed Calamos to monopolize such benefits for itself (and thereby gain windfall profits).

c.  The Board's *only* additional evaluation of such economies of scale was to invoke the expense cap that purportedly limited Calamos' investment advisory fees.  *See* 2014 Annual Report at 234 ("The Board also considered the Adviser's agreement to reimburse each Fund for a portion of its expenses if a Fund's expense ratio otherwise would exceed a certain level.").  But the expense cap was doubly irrelevant, as:  (1) it had nothing to do with economies of scale, and, (2) as detailed above, it did not actually operate to reduce Fund fees for investment advisory services or any other services.

177.  Finally, in approving the IMA and the Fund's advisory fees, the Trustees also reviewed the "fall-out benefits" factor.  *See* 2014 Fund Annual Report at 234 ("The Board also considered other benefits that accrue to the Adviser and its affiliates from their relationship with the Funds").

178.  However, it appears that consideration of this factor was cursory, incomplete, flawed and/or biased, in part due to Calamos' provision of incomplete and/or biased information.

a.  It appears that the only such benefit that the Board considered related to commissions paid to brokerages in exchange for receiving research products and services.  *Id*.  Consequently, it appears that the Board was provided with insufficient information on this factor, and/or failed to properly evaluate it.

b.  As detailed above in Section V.E, *supra*, the Fund provided Calamos with sizeable fall-out benefits that the Board appears not to have been informed of or considered, including: (1) the ability to spin-off copies of the Fund to non-Captive Fund clients, to make such copies more marketable by offering them

at lower fees, and thereby to generate additional millions of dollars per year in advisory fees at little or no additional cost; (2) the ability to subsidize creation of other Captive Funds offering different investment strategies, in order to attract further investors and grow AUM and fees; (3) and the receipt of numerous further fee streams to Calamos and its affiliates for provision of further services that, absent the Fund's captivity to Calamos, would not have been provided by Calamos, including numerous related-party arrangements through Calamos and its affiliates profited.

179.    Notwithstanding such above-mentioned Trustee approval, Fund advisory fee rates are now and have long been excessive, as detailed above in Sections V.A-E, *supra*.

180.    The long tenure of the Fund Trustees, coupled with (1) their persistent lack of action throughout their tenure to restrain Calamos from extracting excessive investment advisory fees, and (2) the strong role played by Calamos itself and John P. Calamos, Sr. in the process through which the Trustees consider and evaluate advisory fees, indicate that the Fund Trustees are effectively dominated and controlled by Calamos.

**b)    Calamos Set Its Own Advisory Fees by Providing
Proposed Fees that Fund Trustees Rubber-Stamped**

181.    The Fund Trustees have consistently approved, year after year, the investment advisory fees proposed by Calamos.  There is no indication that the Fund Trustees have taken any action, either in the most recent fiscal year or in any of the preceding ones, to reject the advisory fees proposed by Calamos, or to act in any way to reduce or alter such investment advisory fees.

182.    This stands in contradistinction to the record presented by Calamos' non-Captive Fund, arm's-length investment advisory clients, who, during the same time, not only negotiated lower investment advisory fees from Calamos for similar and often identical services, but on multiple occasions also terminated Calamos' investment advisory services altogether in light of poor investment advice/performance.

183.    The Fund Trustees' rubber-stamping has allowed Calamos to continue to maintain and enjoy excessive investment advisory fees from the Fund for many years.  Indeed, and as detailed above, not only have the investment advisory fee rates that Calamos extracts from the Fund remained almost exactly the same over the years, but the few changes to such rates – minor modifications to the breakpoint schedule proposed by Calamos over the years – appear to have been designed to produce only cosmetic, rather than substantive, fee reductions.

184.    In effect, Calamos has itself determined the investment advisory fees to which the Fund is subject.

185.    In contrast, Calamos' fees for providing investment advisory services to the Identical Subadvised Funds were determined by negotiations between two sophisticated financial institutions: Calamos on the one hand and the sponsors of the Identical Subadvised Funds on the other.  The Identical Subadvised Funds' sponsors negotiate at arm's length with Calamos regarding the fees paid to Calamos for providing investment advisory services to the Identical Subadvised Funds.  By negotiating lower fees with Calamos, the Identical Subadvised Funds' sponsors increase the amount of their retained profits.

186.    Likewise in contrast, the Identical Subadvised Funds' sponsors select investment advisers through a competitive selection process, with multiple candidates submitting proposals. The negotiations include exchanges of proposals and counterproposals, resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

187.    The Fund, as a Captive Fund, and the Board, as dominated by Calamos, do not engage in any similar such process.  No other proposals from other investment advisors were solicited, submitted or evaluated, and Calamos' sole fee proposals are approved in rubber-stamp fashion without reductions achieved through negotiations or counterproposals.

c)      **The Fund Trustees' Deficient Process for Evaluation and Determination of Advisory Fees**

188.    The Fund's Board is required to approve the IMA and the fees paid by the Fund under the IMA on an annual basis.  ICA §15(c) requires investment advisers to furnish

documents and other information in order for fund trustees to make informed and independent decisions when evaluating investment advisory contracts, and gives trustees the authority to demand such information from advisers. *See* 15 U.S.C. § 80a-15(e).

189.    Notwithstanding public disclosures in SEC filings relating to the Fund (such as the above-examined 2014 Annual Report) as to the information Calamos furnished and the information the Board requested and considered as part of the fee approval process, the process was deficient, as detailed in ¶¶ 167-78 *supra*.

190.    Such disclosures do not reflect Defendants' efforts to engage in a good-faith process designed to guard against taking excessive investment advisory fees, but rather reflect Defendants' efforts to shield from legal challenge a deficient process designed to ensure taking excessive investment advisory fees.

191.    In particular, Calamos did not provide the Fund Trustees with sufficient, complete, and/or accurate information needed to fulfill their obligations, a factor demonstrating that the fee setting process lacked good faith and integrity, in violation of ICA § 36(b).

192.    The Fund Trustees appear in all practical respects to be dominated and unduly influenced by Defendants in reviewing the fees paid by the Fund and its shareholders, in part because all information received by the Fund Trustees is packaged and presented by Defendants.

193.    In approving the IMA, the Board relied on information and analyses prepared by Calamos and designed to support Calamos' rationalization for the fees charged to the Fund. The Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to the investment advisory fees, or critically assessed Calamos' rationalization for those fees.

194.    Upon information and belief, Calamos has not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by Calamos and/or its affiliates to other accounts; the economies of scale enjoyed or fallout benefits received by Calamos and its affiliates; and the profitability of the Fund to Calamos (and how to evaluate the profitability data in light of economies of scale).

195.    Upon information and belief, it appears that the Fund Trustees rarely, if ever, question any information or recommendations provided by Calamos, and Calamos has made misleading representations to the Fund Trustees, including representations regarding the services Calamos provides to the Fund as compared to other accounts, representations regarding Calamos' economies of scale in providing services to the Fund, and representations regarding Calamos' profitability.

196.    The Board has uncritically accepted Calamos' representations that the lower fees paid by other clients reflect differences in the services provided to those clients. The Board has not appropriately examined whether the investment advisory services provided to those clients are materially different from the services provided to the Fund under the IMA, or the extent of any such differences. Nor has the Board considered appropriate information about the cost of providing any additional services required by the IMA to assess whether the difference in fees is warranted by any such differences in the services provided.

197.    While the evidence needed to establish the truth of these allegations remains within the peculiar knowledge and exclusive control of Calamos and its affiliates, publicly-available facts support these allegations. *See e.g.*, ¶¶ 167-78, *supra*.

198.    First, as detailed above at Section V.A.4 and Table 6, the operative investment advisory fee rates proposed by Calamos and approved by the Board have stayed effectively the same for many years (last changing in 2004, and, prior to that, in 2000).

199.    Second, relatedly, the only changes to advisory fee rates proposed by Calamos and approved by Fund Trustees have been, as detailed above, changes that functioned to *increase*, rather than decrease, fees, and changes seemingly designed to create an appearance of fee reductions without achieving the same in substance.  *See* Section V.A.4, *supra*.

200.    Third, throughout this time, there is no indication that the Board did anything other than rubber-stamp the investment advisory fees that Calamos proposed.  There is no indication that the Board ever rejected advisory fees proposed by Calamos, or negotiated for or demanded lower advisory fees.  To the contrary, the only change in fees during this time appears

69

to have been the deceptive fee "reduction" mentioned immediately above and proposed by Calamos itself.

201.    Fourth, even as the Board rubber-stamped the excessive investment advisory fees Calamos proposed year after year, numerous arm's-length clients procured *identical* advisory services from Calamos for substantially lower fees.  *See* Section V.A.2-3, *supra*.  Relatedly, the Board has never negotiated a "most favored nation" provision into the IMA, which would require that the fee rate paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services.

202.    Fifth, even as the Board has continued to approve the same, excessive investment advisory fees to Calamos, Calamos' investment advice has produced poor investment performance.  The Board has not taken appropriate action to address the fact that Fund shareholders are therefore paying excessive investment advisory fees for inferior investment advisory results.   The Board has neither solicited proposals from other advisers to provide investment advisory services to the Fund, nor negotiated a performance adjustment into the IMA (to reduce fee rates during periods when the Fund underperforms its benchmark), nor negotiated any waiver or reimbursement of investment advisory fees in response to the Fund's poor investment performance relative to its benchmark and comparable mutual funds.

203.    By contrast, as detailed in Section V.C.3 and Table 11 *supra*, many of Calamos' arm's-length clients have taken decisive steps to address the poor quality of Calamos' investment advisory services, including terminating Calamos and retaining different investment advisors to provide them with investment advisory services.

204.    All the foregoing, taken together, indicates that the processes through which Calamos and the Board set the Fund's investment advisory fees were materially deficient.

## VI.    DEFENDANTS EXTRACTED FURTHER, EXCESSIVE INVESTMENT ADVISORY FEES FROM THE FUND IN THE FORM OF DISTRIBUTION FEES

### A.    Background:  Mutual Fund Distribution Fees and the Circumstances Under Which They May Be Levied

205.    Distribution fees include fees paid for marketing and selling fund shares, such as compensation for brokers and others who sell fund shares, and payments for advertising, the printing and mailing of prospectuses and sales literature.

206.    Prior to 1980, the use of mutual fund assets (which are owned by the mutual fund shareholders) to sell new mutual fund shares was prohibited.  As the SEC explained, levying marketing expenses upon current mutual fund shareholders, to pay expenses associated with efforts in marketing mutual fund shares to *other* investors (*i.e.*, potential new investors in the mutual fund), provided current fund shareholders with no cognizable benefits or returns on such use of their capital:

> [T]he cost of selling purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

"Statement on the Future Structure of the Securities Markets," Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7 (Feb. 2, 1972).

207.    The mutual fund industry thereafter lobbied the SEC to change its position on such marketing expenses, in substantial part by arguing that funding such marketing efforts would benefit existing fund shareholders.  Specifically, in comment letters and proposed distribution plans, the mutual fund industry argued that efforts to market a mutual fund would (1) allow the fund to increase its AUM, and that such AUM increases (2) would generate economies of scale that would allow mutual fund investment advisors to provide the same quality and nature of services to mutual fund shareholders at lower costs.  Put simply, such distribution fees would purportedly "pay for themselves" by leading, per "trickle down" economics, to lower investment advisory fees.

71

208.    Accepting the argument that asset growth (spurred by marketing efforts) would lead through economies of scale to offsetting reductions in advisory fees, the SEC tentatively approved Rule 12b-1, 17 C.F.R. §270.12b-1, authorizing their payment.  Such fees are now commonly referred to as "12b-1 fees."

209.    However, to prevent investment advisors from extracting excessive distribution fees or additional compensation for advisory fees clothed in the form of 12b-1 fees, the SEC attached numerous conditions to using of fund assets to pay distribution expenses.  The SEC requires, *inter alia*, that  mutual fund boards: (1) annually review the distribution plans; (2) request and evaluate "such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued" (17 C.F.R. §240.12b-1(d)); (3) maintain minutes of their deliberations concerning such distribution plans; and (4) conclude, in context of "their fiduciary duties under state law and under sections 36(a) and (b) (15 U.S.C. §80a-35(a) and (b)) of the [ICA], that there is reasonable likelihood that the plan will benefit the company and its shareholders" (17 C.F.R. §270.12b-1(e)).

**B.    The Fund's Distribution Plan, Distribution Fee Rates, and Distribution Fees**

210.    The Fund, together with all other Captive Funds in the Calamos Fund Complex, operates under a distribution plan (the "Distribution Plan") pursuant to which:  (a) CFS acts as sole distributor of the Fund (and all other Captive Funds); and (b) CFS receives Distribution Fees, paid by the Fund per the following Distribution Fee Rates levied annually on investors in different classes of the Fund's shares:

**Table 16**

**Fund Distribution Fee Rates**

| Share Class | "Distribution Fees" | "Service Fees" | Total Distribution Fees |
|---|---|---|---|
| Class A | 0.25% (distribution and service) | | 0.25% |
| Class B | 0.75% | 0.25% | 1.00% |
| Class C | 0.75% | 0.25% | 1.00% |
| Class R | 0.25% | 0.25% | 0.50% |
| Class I | 0% | 0% | 0% |

211.     According to the Fund's Distribution Plan, the bifurcated "Distribution Fees" and "Service Fees" represent, respectively:

   a.   "Distribution Fees" -- "compensation for expenses incurred by the Distributor for the promotion and distribution of the Class [] shares of the Fund making the payment, including, but not limited to the printing of prospectuses and reports used for sales purposes, advertisements, expenses of preparation and printing of sales literature and other distribution-related expenses, including any Class [] Distribution Fees paid to securities dealers and others who have executed selling group agreements with the Distributor.";

   b.   "Service Fees" – "compensation for personal services provided by the Distributor to shareholders of the Fund making the payment, including answering inquiries from clients of the Distributor and other shareholders regarding such Fund; assisting clients in changing account designations and addresses; assisting clients in processing purchase and redemption transactions; investing client cash account balances automatically in shares of such Fund; such other services as such Fund may request, to the extent the

Distributor is permitted to render such services by applicable statute, rule, or regulation; and payment of Service Fees to Service Agents."

212.   The Distribution Fee Rates set forth in Table 16, *supra*, have remained constant and unchanging since at least 1999 – not only for the Fund, but for every other Captive Fund in the Calamos Fund Complex.

213.   Table 17 below sets forth the actual, annual Distribution Fees paid by the Fund between 1999 and 2014, pursuant to the above-detailed Distribution Fee Rates:

**Table 17**
**Annual Distribution Fees Paid by the Fund**

| Fiscal Year | Fund AUM ($ thousands) | Distribution Fees ($ thousands) | Effective Distribution Fee Rate |
|---|---|---|---|
| 2014 | $ 3,484,476 | $ 15,881 | 0.46% |
| 2013 | $ 4,441,153 | $ 18,846 | 0.42% |
| 2012 | $ 6,391,673 | $ 26,423 | 0.41% |
| 2011 | $ 7,727,002 | $ 31,206 | 0.40% |
| 2010 | $ 8,293,970 | $ 34,980 | 0.42% |
| 2009 | $ 7,988,442 | $ 32,176 | 0.40% |
| 2008 | $ 7,863,207 | $ 64,214 | 0.82% |
| 2007 | $ 17,493,715 | $ 75,229 | 0.43% |
| 2006 | $ 20,018,315 | $ 77,590 | 0.39% |
| 2005 | $ 14,466,574 | $ 52,842 | 0.37% |
| 2004 | $ 8,545,210 | $ 25,636 | 0.30% |
| 2003 | $ 2,649,213 | $ 10,017 | 0.38% |
| 2002 | $ 1,499,182 | $ 3,240 | 0.22% |
| 2001 | $ 207,027 | $ 447 | 0.22% |
| 2000 | $ 50,130 | $ 120 | 0.24% |
| 1999 | $ 15,653 | $ 56 | 0.36% |

**Source:**
Fund Annual Reports on Forms N-CSR and N-30D

C.      **The Fund's Distribution Fees Were Excessive, Did Not Benefit the Fund, and Instead Benefitted Defendants by Allowing Them to Extract Further Excessive Fees for Investment Advisory Services**

214.      In theory, 12b-1 fees such as the Distribution Fees should be used to grow the Fund's size so that per-share operating expenses are reduced, with resulting economies of scale passed on to Fund investors in the form of reduced investment advisory fees (that, in theory, offset or more than offset the Distribution Fees).  In practice, however, and as detailed below, Defendants' Distribution Fees were untethered to actual distribution activities, did not result in economies of scale being passed on to the Fund and/or Fund shareholders, and did not cause any decrease in the Fund's expenses per share over time.  The Distribution Plan and Distribution Fees were thus entirely without benefit to the Fund and/or Fund shareholders.  To the contrary, they constituted in intent and effect another (excessive) layer of fees to Defendants for the provision of investment advisory services.

215.      Distribution fees have served only Defendants, just as the SEC feared when, prior to permitting them under Rule 12b-1, it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).

216.      Indeed, the particular situation prevailing here – with respect to Defendants, the Fund, and the Distribution Plan and Distribution Fees – is consonant with the SEC's findings in a more general study of 12b-1 fees conducted subsequent to Rule 12b-1's enabling of such fees.  A 2004 report, authored by SEC economist Dr. Lori Walsh, found that distribution plans, even where they did spur mutual fund AUM growth, did not produce any benefits that trickled down *to mutual fund investors*:

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire

amount of the fee.  This study confirms these results using a more recent dataset…

**In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth**.  This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans… **Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees**.

Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans:  An Examination of Fund Flows, Expenses and Returns*, SEC, at pp. 4 and 18 (2004) (emphasis added).[14]

> 1. **The Fund's Distribution Plan, Distribution Fee Rates, and Distribution Fees Do Not Compensate Defendants for Distribution Activities, but for Investment Advisory Services**

217.    The Distribution Fees paid by the Fund, purportedly to fund distribution efforts, have little or no connection to any distribution efforts or activities (such as number of shares sold).  Instead, they are based on the Fund AUM, which is: (a) in substantial part, a function of Calamos' performance of investment advisory services, and (b) the same foundation upon which Calamos' investment advisory fees are set.

218.    Indeed, Defendants' parent-company affiliates so concede.  *See e.g.* CAMI Form 10-K, at 27 (listing, as the top three drivers of Distribution Fees, (1) the "total value of our assets under management," (2) the "total composition of our assets under management by share class," (3) "market appreciation or depreciation").

219.    Defendants' purported Distribution Fees thus constitute another – and entirely excessive – layer of fees for Defendants' investment advisory services.  In intent and effect, Defendants, through the Distribution Plan and in the form of Distribution Fees, extract additional compensation for Calamos' investment advisory services, thereby resulting in further excessive fees paid to them.

---

[14] Available at:  http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.

220.    This can be clearly seen in that portion of the purported Distribution Fees paid to Defendants derived from "market appreciation," which proceeds wholly apart from any distribution activity and thus constitutes additional and excessive compensation for advisory services.  As of October 31, 2014, of the Fund's $3.484 billion of AUM, $1.759 billion (50.49% of Fund AUM) constituted shareholders' paid-in capital, while the remainder, $1.751 billion (49.51% of Fund AUM) was the result of market appreciation.  Therefore, at least 49.51% of the Distribution Fees paid by the Fund were entirely unrelated to any distribution-related activities or efforts, and instead constituted additional, wholly excessive fees paid to Calamos for investment advisory services.

> **2.     To the Extent that Distribution Fees Were Successful, and Contributed to Tremendous Increases in Fund AUM between 1999 and 2014, Defendants' Investment Advisory Fees Were Never Reduced so as to Share Resulting Economy of Scale Benefits**

221.    Between 1999 and 2014, Fund AUM skyrocketed from $15.6 million to $3.484 billion:  leaving the Fund, as of October 31, 2014, more than 220 times larger than it was 15 years earlier, in 1999.  *See* Table 17, *supra*.  Indeed, during the first half of this period, from 1999 to 2006/2007, Fund AUM increased by a factor or more than 1,000, rising from $15.6 million to briefly exceed $20 billion in late 2006 and early 2007.  *Id.*

222.    It is possible that the Fund's Distribution Plan and Distribution Fees contributed to such staggering AUM growth.

223.    The principal regulatory justification for allowing the levy of distribution fees generally (*see* Section VI.A, *supra*), and the *stated* justification of the Board here for approving the Fund's Distribution fees (*see* Section VI.D., *infra*), are the same:  namely, that to the extent such fees result in increased AUM, they can benefit mutual fund shareholders by creating economies of scale that allow mutual fund investment advisers to lower their investment advisory fee rates, thus offsetting the distribution fees.

224.    Notwithstanding the Fund's tremendous AUM growth between 1999 and 2014 (and/or between 1999 and 2006/2007), *Defendants did not reduce the investment advisory fee*

*rates imposed on the Fund.  See* Section V.C.4, *supra* (detailing the three different investment advisory fee rate schedules operative during this period).  To the contrary, Defendants' advisory fee rates were *increased* in August 2000, and changed again in August 2004 in a manner that: (1) created only the appearance of fee reductions; and (2) left Fund advisory fee rates still higher than those operative prior to August 2000.

225.    Therefore, to the extent that Fund Distribution Fees aided in the Fund's tremendous AUM growth, and created substantial economies of scale in Fund operations, including provision of investment advice as detailed in Section V.B, *supra*, Defendants monopolized the benefits of such economies of scale for themselves and did nothing to share them with the Fund and/or Fund shareholders (*e.g.*, in the form of reduced investment advisory fees reflecting newfound economies of scale).  *See* Section V.B, *supra*.

226.    Consequently, the Distribution Fees paid by the Fund were entirely without benefit to the Fund and Fund shareholders, as all benefits were retained solely by and for Defendants, and were therefore excessive in entirety.

> **3.    To the Extent that Distribution Fees Were Not Successful, as Indicated by the Substantial Declines in Fund AUM between 2007 and 2014, the Fund Continues to Pay Such Fees Notwithstanding Not Receiving Any Benefits**

227.    More recently, between 2007 and 2014, Fund AUM suffered substantial and constant declines, falling from more than $20 billion as of October 2006 to less than $3.5 billion as of October 2014.  *See* Table 17, *supra*.

228.    Throughout this time, the Fund's Distribution Plan was constantly renewed, and the Fund continued to pay very sizeable Distribution Fees, totaling, remarkably, $376.5 million between 2006 and 2014.  *Id*.

229.    The severe diminution of Fund AUM in recent years indicates that the Distribution Plan, and any and all distribution efforts funded by the Distribution Fees, was largely *unsuccessful*.  Fund AUM did not grow, but rather, between 2006 and 2014, shrank by 83%.

230.   To the extent that the Distribution Fees were meant to spark AUM growth (which in turn would produce economy of scale benefits that could be shared with the Fund and Fund investors), such Distribution Fees, at all times from 2007 onwards, did not function to produce their stated or purported benefits.  During this period, Fund AUM, rather than growing, shrank by 83%, even as the Distribution Plan was renewed each year and provided Defendants with a stunning $376.5 million of Distribution Fees.

231.   Such Distribution Fees thus have been entirely without benefit to the Fund and or Fund shareholders, and have therefore been excessive in their entirety.

**4.   The Distribution Fees Charged in Connection with Distribution of Class B Shares Provided No Benefits, and were Excessive, in Light of the Fact that Class B Shares Have Not Been Offered to New Investors Since 2009**

232.   In 2009, the Fund and/or Defendants discontinued issuance and sale of Class B shares to new investors.  At all times from 2009 onwards, the only Class B shares issued were ones to (1) Fund Class B shareholders of record, who (2) requested that Fund dividends and distributions be reinvested (into new Class B shares).  This remaining trickle of Class B share purchases thus occurs automatically and without any effort, as a result of dividend/distribution reinvestment programs.

233.   Consequently, Defendants' continued levying of a 1% Distribution Fee Rate on the Fund with respect to Fund Class B shares is wholly without basis or benefit to the Fund or Fund shareholders, and constitutes instead additional and excessive extraction of fees for investment advisory services.

234.   First, given that Defendants and/or the Fund have discontinued issuance of Class B shares, and thus no longer desire to issue or sell such shares, a Distribution Plan with respect to Class B shares is fundamentally useless (if not counterproductive).

235.   Second, given the discontinuance of Class B share issuance and sale to new investors, and that the only issuance of Class B shares occurs automatically as a result of dividend/distribution reinvestments by long-term Fund Class B shareholders, there does not

appear to be any occasion for promotional efforts with respect to such shares.  Notwithstanding, the Fund continues to pay for purported promotional efforts with respect to such shares.

236.   Third, for this further reason and as alleged above in V.C.1, *supra*, the Distribution Fees with respect to Fund Class B shares constituted in effect the extraction of additional and excessive fees for investment advisory services.  This is all the more evident with respect to Fund Class B shares in light of the fact that there were no promotional or distribution efforts being made with respect to Class B shares.

> **5.     The Absence of Distribution Fees Charged in Connection with Distribution of Class I Shares Further Demonstrates that Distribution Fees Provided No Benefit, and Instead Constituted Additional and Excessive Fees for Investment Advisory Services**

237.   The Distribution Plan itself further underscores the absence of any benefit to the Fund and/or Fund shareholders.

238.   Specifically, the Fund issues a class of institutional shares (Class I shares), the purchase of which requires a minimum initial investment of at least $1 million.  Holders of such institutional Class I shares pay no Distribution Fees at all.

239.   The existence of this "Distribution Fee-free" class of shares further demonstrates that the Fund's Distribution Plan conferred no benefit to the Fund or Fund investors, should never have been adopted or continued year after year, and that the Distribution Fees levied with respect to the Fund's other share classes are excessive in their entirety.

240.   First, if the economies of scale created by additional assets (including those prompted by the Distribution Fees) were shared with the Fund as required by the enabling rule, then the institutional holders of the Class I shares would be eager to pay them and obtain their benefit.  But this class of shares was created to meet the demands of institutional investors who, understanding that payment of such fees benefits only Defendants, *refused* to purchase Fund shares obligating them to pay Distribution Fees.  The unwillingness of institutional investors to tolerate or pay any Distribution Fees indicates that such fees confer little or no benefit on the Fund or Fund investors, and instead only add to excessive fees charged by Defendants for

investment advisory services.  Similarly, the absence of Distribution Fees in connection with Class I shares further demonstrates the above-detailed ability of Calamos' *institutional* clients to negotiate for, demand and obtain lower fees (*see* Section V.A.2, *supra*).

241.    Second, the absence of Distribution Fees on Class I shares further discredits Defendants' insistence that such fees are for promotional or distribution efforts purportedly aimed at increasing Fund AUM.

       a. As purchase of Class I shares requires a large minimum initial investment (at least $1 million), Class I shares do more than any other Fund share classes to further Defendants' stated goal:  namely, increasing Fund AUM so as to benefit the Fund.

       b. Consequently, taking such goal at face value, the Class I shares should feature *higher* Distribution Fees than any other Fund share classes, so as to motivate the sale of, and/or fund efforts to sell, such particularly-effective Class I shares.

       c. Instead, precisely the opposite occurs:  Class I shares, though doing more to increase Fund AUM than other share classes, feature *lower* Distribution Fees than all other Fund share classes – in fact, no Distribution Fees at all.

242.    The absence of Distribution Fees with respect to Class I shares, where such fees would in theory be highest, thus further indicates that the Distribution Fees with respect to all other Fund share classes are excessive in their entirety.

**6.    The "Service Fee" Component of the Distribution Fees is Without Benefit, and Excessive, because it Constitutes Duplicative Payment for Services Already Provided by Other Entities**

243.    Defendants' above-detailed explanation of the "services" that are purportedly being paid for by and through the "Service Fee" component of the Distribution Fees (*see* Section VI.B, *supra*) further indicates that the Distribution Fees are without benefit, excessive, and constitute further excessive payment for investment advisory services.

244.     Many of the "services" covered by the "Service Fee" appear to be services already provided to the Fund and/or Fund shareholders by parties other than Defendants, including the Fund's transfer agent (U.S. Bancorp Fund Services, LLC) and/or the Fund's Custodian (State Street Bank and Trust Company, which also provided the Fund with numerous "administrative and accounting services").   These services are already paid for, by the Fund, through separate agreements with such parties.

245.     Consequently, there is no need to pay Defendants for such services.

246.     The "Service Fee" component of the Distribution Fees, therefore, does not appear to be payment for services performed or rendered by Defendants.   Instead, bereft of any such basis, it constitutes a disguised, additional extraction by Defendants of fees for the Other Services component of Calamos' investment advisory services.

> ### 7.   To the Extent that Distribution Fees Related in Part to "Overhead" Expenses (Personnel, Offices, Equipment), Such Fees Were Duplicative as Overhead was Already Funded through Investment Advisory Fees

247.     To the extent that Distribution Fees were meant to fund, or in fact funded, CFS' overhead expenses, such Distribution Fees were duplicative and/or excessive.

248.     A substantial part of CFS' purported overhead expenses was already covered by Calamos' overhead expenses, given that Calamos and CFS were housed in the same offices, used the same equipment, and also shared overlapping personnel.

### D.   The Care and Conscientiousness of the Fund's Trustees in Approving the Distribution Plan and Distribution Fees

249.     Despite the fact that the Fund and/or its shareholders have enjoyed no benefits from the Distribution Plan, notwithstanding payment of sizeable Distribution Fees, and despite the fact that the Distribution Plan has allowed Defendants to extract additional and excessive compensation from the Fund, the Board has approved and continues to approve, year after year, continuation of the Distribution Plan in violation of both Rule 12b-1 and § 36(b).

250.    The Board's most recent approval of Distribution Fees for the Fund (and all other Captive Funds in the Calamos Fund Complex) was based on the below-stated determination:

> The Trust's board of trustees has determined that the Plan could be a significant factor in the growth and retention of Fund assets, resulting in a more advantageous expense ratio . . . [C]ontinuing growth in the Funds' size would be in the shareholders' best interests because increased size would allow the Funds to realize certain economies of scale in their operations and would likely reduce the proportionate share of expenses borne by each shareholder. Even in the case of a Fund that is closed to new investors, the payment of ongoing compensation to a financial intermediary for providing services to its customers based on the value of their Fund shares is likely to provide the shareholders with valuable services and to benefit the Fund by promoting shareholder retention and reduced redemptions. The board of trustees therefore determined that it would benefit the Fund to have monies available for the direct distribution and service activities of CFS, as the Funds' distributor, in promoting the continuous sale of the Funds' shares. The board of trustees, including the non-interested trustees, concluded, in the exercise of their reasonable business judgment and in light of their fiduciary duties, that there is a reasonable likelihood that the Plan will benefit the Funds and their shareholders.

*See* Fund SAI as of March 1, 2014, at p. 49.

251.    Although the above-stated Board approval of Fund Distribution Fees tracks the Rule 12b-1 requirements in surface form, it appears, as detailed below, that such approval was deficient in both process (*i.e.*, evaluation of relevant facts) and result (approval of excessive Distribution Fees), for substantially the same reasons set forth in Section V.F.2, *supra*.

252.    As detailed below, there are substantial contradictions between (a) the purported reasons proffered by the Board to support its approval of Distribution Fees; and (b) relevant facts concerning the Fund, its AUM, and the investment advisory fees and Distribution Fees it paid.

253.    These contradictions indicate that Board approval is not based on relevant facts, but instead is based on and results from the Board's domination by Defendants.   Such domination results at least in part from the fact that in approving the Fund's Distribution Plan and Distribution Fees, information received by the Board is packaged and presented by

Defendants, and the Board relied on information and analyses prepared by Defendants and designed to support Defendants' rationalization for the fees charged to the Fund.

254.    Relatedly, these contradictions also indicate that Defendants did not provide the Fund Trustees with sufficient, complete, and/or accurate information needed to fulfill their obligations, a factor demonstrating that the fee setting process lacked good faith and integrity, in violation of ICA § 36(b).

255.    First, the Board's approval of the Distribution Plan and Distribution Fees was based on the above-stated theory that they would promote Fund AUM growth, which would produce economies of scale, which could then be shared with Fund investors in the form of reduced fees, thereby benefiting the Fund and Fund investors.  ("The Trust's board of trustees has determined that the Plan could be a significant factor in the growth and retention of Fund assets, resulting in a more advantageous expense ratio . . .  [C]growth in the Funds' size would be in the shareholders' best interests because increased size would allow the Funds to realize certain economies of scale in their operations and would likely reduce the proportionate share of expenses borne by each shareholder . . .  The board of trustees [] concluded, in the exercise of their reasonable business judgment and in light of their fiduciary duties, that there is a reasonable likelihood that the Plan will benefit the Funds and their shareholders").

256.    While this theory is exactly the one underlying regulatory permission to levy 12b-1 fees, all relevant facts *contradict*, rather than conform to or confirm, this theory.

a.    To the extent that the Distribution Plan and Distribution Fees actually worked to spark Fund AUM growth, the resulting economies of scale were monopolized by Defendants, whose investment advisory fee rates were never reduced, and the Distribution Fees thus provided no benefits that trickled down to the Fund and/or Fund shareholders.  *See* Section VI.C.2, *supra*.

b.    To the extent that the Distribution Plan and Distribution Fees failed to work, as indicated by substantial declines in Fund AUM during recent years, they

likewise provided no benefit to the Fund and/or Fund shareholders.  *See* Section VI.C.3, *supra*.

257.   Either and/or both ways, no matter whether the Distribution Plan and Distribution Fees worked or failed to increase Fund AUM, the Fund and Fund shareholders enjoyed no benefits whatsoever.

258.   Consequently, the Board's determination "that there is a reasonable likelihood that the Plan will benefit the Funds and their shareholders" is without any factual basis, and is contradicted by all available facts.  The only basis for such determination thus appears to be either the Board's domination by Defendants, or a deficient approval process based on incomplete information or misinformation provided by Defendants.

259.   Second, this conclusion is further reinforced by the Board's counterfactual determination that Distribution Fees were warranted even for Captive Funds that were *closed* to new investors, and would benefit investors in such funds ("Even in the case of a Fund that is closed to new investors, the payment of ongoing compensation to a financial intermediary for providing services to its customers based on the value of their Fund shares is likely to provide the shareholders with valuable services and to benefit the Fund . . .").

260.   As discussed in Section VI.C.4, *supra*, with respect to the analogous situation presented by the discontinuance of issuance and sale of Fund Class B shares, a distribution plan for a fund or share class closed to new investors is, at best, fundamentally without basis.  As new investments from new investors are prohibited, distribution plans and distribution fees are entirely unnecessary, and are unaccompanied by any actual distribution efforts.  And at worst, a distribution plan in such circumstances would be counterproductive, as closure of a fund or a fund share class marks an attempt to *restrain* mutual fund AUM growth, while distribution plans seek exactly the opposite objective.

261.   Consequently, the Board's determination that distribution plans for mutual funds closed to new investment are "likely to provide the shareholders with valuable services and to benefit the [f]und[s]" is also without any factual basis, and is contradicted by all available facts.

85

The only basis for such determination thus appears to be either the Board's domination by Defendants, or a deficient approval process based on incomplete information or misinformation provided by Defendants.

262.    It appears that the Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to the Distribution Plan and Distribution Fees, or critically assessed Defendants' rationalizations for them.  Upon information and belief, Defendants have not provided, and the Board has not considered, adequate information regarding, among other things: the distribution activities actually undertaken; the efficacy of such distribution efforts; the duplicative and/or unnecessary payments embedded in the Distribution Fees; the economies of scale enjoyed by Defendants; and the degree to which such economy of scale benefits are actually shared with the Fund and/or Fund shareholders.

263.    Ultimately, the above-detailed representations in Fund SEC filings purportedly relating to Board approval of the Fund's Distribution Plan and Distribution Fees do not reflect Defendants' efforts to engage in a good-faith process designed to guard against taking excessive investment advisory fees (including fees clothed in the form of Distribution Fees), but rather, instead, reflect Defendants' efforts to shield from legal challenge a deficient process designed to ensure their taking of excessive Distribution Fees and/or investment advisory fees.

## VII.    THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND

264.    Investment advisory fees and Distribution Fees are paid to Defendants out of the Fund's assets. Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolio by like amount.

265.    Additionally, the payment of excessive investment advisory fees and Distribution Fees to Defendants harms the Fund on a going forward basis because the Fund loses investment returns and profits that it could have earned on the amounts paid out as fees to Defendants.

266.    The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees and Distribution Fees paid to Defendants.

267.    During the Fund's most recent complete fiscal year, ended October 31, 2014, the Fund paid to Defendants: (1) $31.535 million in investment advisory fees; and (2) $15.881 million in Distribution Fees.

268.    Foregoing factual allegations indicate that a substantial portion of both the investment advisory fees and the Distribution Fees are excessive fees.   Specifically, approximately 25%-40% of Defendants' investment advisory fees appear to be excessive fees, *see* Sections V.A.2-3, *supra*, as do 50%-100% of Defendants' Distribution Fees, *see* Section VI.C, *supra*.

## VIII.   CAUSES OF ACTION

### COUNT I

### ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY
### (EXCESSIVE INVESTMENT ADVISORY FEES)

269.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

270.    Plaintiffs assert this count, on behalf of and for the benefit of the Fund, against Defendant Calamos.

271.    Defendant is the investment adviser to the Fund.

272.    Under Section 36(b), Defendant owes a fiduciary duty to the Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

273.    Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

274.    Defendant has received and continues to receive excessive investment advisory fees attributable to Defendant's retention and monopolization of substantial economies of scale benefits – and further "fall-out" benefits – in connection with Defendant's provision of

investment advisory services to the Fund, and has not shared any such benefits with the Fund and/or Fund shareholders.

275.     The investment advisory fees charged by Defendant to the Fund are and have been grossly excessive in light of the true cost of providing those services to the Fund.

276.     In charging and receiving such excessive fees and failing to put the interests of the Fund and/or Fund shareholders such as Plaintiffs ahead of its own interests, Defendant has breached its statutory fiduciary duties to the Fund and/or Fund shareholders.

277.     As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

278.     Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Fund to Defendant and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

279.     Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiffs seek rescission of the IMA and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IMA.

## COUNT II

### ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY
### (EXCESSIVE RULE 12B-1 DISTRIBUTION FEES AND EXTRACTION OF ADDITIONAL COMPENSATION FOR INVESTMENT ADVISORY SERVICES)

280.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

281.     Plaintiffs assert this count, on behalf of and for the benefit of the Fund, against Defendants Calamos and CFS.

282.   The distribution and servicing fees charged and received by Defendant CFS were designed to, and did, extract additional compensation for Calamos' advisory services, in violation of Defendants' fiduciary duties under Section 36(b).

283.   Although the distribution and servicing fees may have contributed to the growth of Fund assets, all ensuing economies of scale resulting from increased Fund AUM benefitted only Defendants, rather than the Fund or Plaintiffs.

284.   Defendants failed to furnish information needed by the Board to make an informed determination concerning continuation and/or approval of the Distribution Plan and the Distribution Fees provided for therein.

285.   In failing to pass along economies of scale from Distribution Fees, and in continuing to assess Distribution Fees pursuant to the Distribution Plan despite the fact that no benefits inured to the Fund and/or Plaintiffs, Defendants have violated and continue to violate the ICA, and have breached and continue to breach their fiduciary duties to the Fund and/or Plaintiffs in violation of Section 36(b).  Such violations arise both from the flawed Distribution Fee determination process and from the resulting, substantial and excessive Distribution Fees approved and levied.

286.   Plaintiffs seek, pursuant to Section 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including the "amount of compensation or payments received from" the Fund, or, pursuant to Section 47(b) of the ICA, rescission of the contracts.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of the Fund, as follows:

        a.   Declaring that Defendants violated Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), through receipt of excessive investment advisory fees and Distribution Fees from the Fund;

b.   Permanently enjoining Defendants from further violations of Section 36(b);

c.   Awarding compensatory damages against Defendants, including repayment to the Fund of all unlawful and excessive investment advisory fees and Distribution Fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

d.   Rescinding the IMA and the Distribution Plan pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment advisory fees and Distribution Fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

e.   Awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

f.   Such other and further relief as the Court may deem just and proper.

## X.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   February 11, 2015                    **KIRBY McINERNEY LLP**

By:   _Ira Press_____
Ira Press
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiffs' Counsel*

90

# Appendix A:
# Comparison of Portfolios of Fund and Identical Subadvised Funds

## Genworth Calamos Growth Fund (as of 12/31/2009)

| | Sector | % of Net Assets | Holdings | % of Net Assets |
|---|---|---|---|---|
| 1 | Information Technology | 36.0% | Google | 4.5% |
| 2 | Energy | 16.7% | Apple | 4.4% |
| 3 | Consumer Discretionary | 12.0% | Amazon.com | 3.6% |
| 4 | Industrials | 11.7% | National-Oilwell Varco | 2.2% |
| 5 | Health Care | 7.3% | Bucyrus International | 2.0% |
| 6 | Financials | 6.7% | United Technologies | 1.8% |
| 7 | Materials | 4.6% | Devon Energy | 1.7% |
| 8 | Telecom | 1.5% | Baidu.com | 1.6% |
| 9 | Consumer Staples | 0.6% | America Movil | 1.5% |
| 10 | Cash, Equivalents, Other | 2.9% | CME Group | 1.5% |

## Thivent Partners All Cap Growth Fund (as of 12/31/2009)

| | Sector | % of Net Assets | Holdings | % of Net Assets |
|---|---|---|---|---|
| 1 | Information Technology | 36.5% | Apple | 4.7% |
| 2 | Energy | 17.3% | Google | 4.6% |
| 3 | Consumer Discretionary | 11.9% | Amazon.com | 3.8% |
| 4 | Industrials | 11.3% | Devon Energy | 2.5% |
| 5 | Health Care | 7.2% | National Oilwell Varco | 2.2% |
| 6 | Financials | 6.5% | Bucyrus International | 1.9% |
| 7 | Materials | 4.4% | United Technologies | 1.6% |
| 8 | Telecom | 1.5% | Marvell Technology | 1.5% |
| 9 | Consumer Staples | 0.7% | Cameron International | 1.5% |
| 10 | Short Tern Investments | 1.3% | Baidu.com | 1.5% |

## Calamos Growth Fund (as of 10/31/2009)

| | Sector | % of Net Assets | Holdings | % of Net Assets |
|---|---|---|---|---|
| 1 | Information Technology | 33.4% | no top-10 asset disclosure | |
| 2 | Energy | 17.3% | no top-10 asset disclosure | |
| 3 | Industrials | 13.4% | no top-10 asset disclosure | |
| 4 | Consumer Discretionary | 10.1% | no top-10 asset disclosure | |
| 5 | Health Care | 7.6% | no top-10 asset disclosure | |
| 6 | Financials | 6.7% | no top-10 asset disclosure | |
| 7 | Materials | 5.0% | no top-10 asset disclosure | |
| 8 | Telecom | 2.0% | no top-10 asset disclosure | |
| 9 | Consumer Staples | 1.5% | no top-10 asset disclosure | |
| 10 | Cash, Equivalents, Other | 3.0% | no top-10 asset disclosure | |