# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SAUL CHILL and SYLVIA CHILL, for the use and benefit of the CALAMOS GROWTH FUND, | : | |
| | : | No. 15-cv-01014 (ER) |
| Plaintiffs, | : | |
| | : | ECF CASE |
| v. | : | |
| | : | ORAL ARGUMENT REQUESTED |
| CALAMOS ADVISORS LLC and CALAMOS FINANCIAL SERVICES LLC, | : | |
| | : | |
| Defendants. | : | |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
# OF THEIR MOTION TO DISMISS

## DECHERT LLP

Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Jocelyn V. Hanamirian
Melanie MacKay
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:  (212) 698-3500

*Counsel for Defendants Calamos Advisors*
*LLC and Calamos Financial Services LLC*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

RELEVANT FACTUAL BACKGROUND ...................................................................3

    A.    Overview Of The Mutual Fund Structure ................................................3

    B.    Overview Of The Fund And CA .............................................................5

    C.    The Fund's Board Of Trustees ................................................................6

    D.    The Trustees' Considered Review And Approval Of The Fund's
           Management Agreement With CA ...........................................................8

ARGUMENT .................................................................................................................10

I.    CONGRESS AND THE SUPREME COURT HAVE IMPOSED A
     DEMANDING STANDARD ON A SECTION 36(B) PLAINTIFF WHO SEEKS
     TO SECOND-GUESS THE INFORMED BUSINESS JUDGMENT OF A
     MUTUAL FUND'S INDEPENDENT TRUSTEES ..........................................10

II.    PLAINTIFFS FAIL TO ALLEGE ANY PLAUSIBLE BASIS TO OVERTURN
      THE BUSINESS JUDGMENT RENDERED BY THE FUND'S
      INDEPENDENT TRUSTEES WITH RESPECT TO THEIR APPROVAL OF
      CA'S ADVISORY FEE ....................................................................................13

    A.    Plaintiffs Do Not Allege Any Plausible Basis To Question The
           Independence Or Thoroughness Of The Fund's Independent Trustees ...............14

           1.    Plaintiffs Fail To Allege Facts Showing That The Independent
                 Trustees Were Not Independent .............................................15

           2.    Plaintiffs Fail To Allege Facts Showing That The Board Process
                 Was Deficient ........................................................................17

    B.    Plaintiffs' Various Fee Comparisons Do Not Provide A Plausible Basis To
           Upset The Independent Trustees' Business Judgment Concerning CA's
           Advisory Fee ..........................................................................................20

           1.    Plaintiffs' Legally Inapt Comparisons With Fees Paid To CA By
                 Its Institutional Clients .........................................................20

           2.    Plaintiffs' Legally Inapt Comparisons With Subadvisory Fees Paid
                 To CA—Especially Those Paid Well Before Section 36(b)'s One
                 Year Jurisdictional Period ....................................................22

           3.    Plaintiffs' Legally Inapt Comparisons With Advisory Fees Paid To
                 Other Advisers By Other Funds ............................................23

    C.    Plaintiffs' Remaining Allegations Similarly Provide No Plausible Basis To
           Overturn The Informed Business Judgment Of The Fund's Independent
           Trustees ..................................................................................................25

i

1.    Plaintiffs' Legally Deficient Allegations Regarding The Nature and Quality of Services Provided By CA ...................................................25

2.    Plaintiffs' Legally Deficient "Economies Of Scale" Allegations..............26

3.    Plaintiffs' Legally Deficient Profitability Allegations...............................29

4.    Plaintiffs' Legally Deficient "Fall-Out Benefits" Allegations..................30

III.   PLAINTIFFS ALSO FAIL TO ALLEGE ANY PLAUSIBLE BASIS TO OVERTURN THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT WITH RESPECT TO THEIR APPROVAL OF DISTRIBUTION FEES PAID TO CFS ..........................................................................................................................31

A.    Regulatory Framework ............................................................................31

B.    Plaintiffs Fail To Plausibly Allege That CFS Received "Excessive" Distribution Fees..........................................................................................32

CONCLUSION...........................................................................................................34

# TABLE OF AUTHORITIES

CASES

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
    464 F.3d 338 (2d Cir. 2006).......................................................................... passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................1

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................6

*Batra v. Investors Research Corp.*,
    1992 WL 280790 (W.D. Mo. Apr. 2, 1992) ......................................................31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................1

*Burks v. Lasker*,
    441 U.S. 471 (1979).....................................................................................4, 5, 11

*Curd v. SEI Inv. Mgmt. Corp.*,
    No. 13-cv-07219, Dkt. 50 (E.D. Pa. Aug. 28, 2014) ........................................22

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984)...........................................................................................20

*Fitzgerald v. Citigroup, Inc.*,
    2007 WL 582965 (S.D.N.Y. Feb. 23, 2007)..................................................2, 12

*Forsythe v. Sun Life Fin. Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) ...............................................................16

*Gallus v. Ameriprise Fin., Inc.*,
    497 F. Supp. 2d 974 (D. Minn. 2007), *rev'd and remanded*, 561 F.3d 816 (8th Cir.
    2009), *cert. granted, judgment vacated*, 559 U.S. 1046, (2010), and *order reinstated*,
    2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012)..............30

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982)............................................................................ passim

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ....................... passim

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
    2015 WL 965665 (S.D. Ohio Mar. 4, 2015)......................................................13

*Green v. Fund Asset Mgmt., L.P.*,
   286 F.3d 682 (3d Cir. 2002) ................................................................13

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008) ........................................... passim

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ..................................... passim

*In re Am. Mut. Funds Fee Litig.*,
   2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) .........................26, 29, 30

*In re Blackrock Mut. Funds Advisory Fee Litig.*,
   2015 WL 1418848 (D.N.J. Mar. 27, 2015) ...........................................13

*In re Eaton Vance Mut. Funds Fee Litig.*,
   380 F. Supp. 2d 222 (S.D.N.Y. 2005) ................................3, 12, 15, 32

*In re Franklin Mut. Funds Fee Litig.*,
   478 F. Supp. 2d 677 (D.N.J. 2007) .....................................18, 24, 28

*In re Goldman Sachs Mut. Funds*,
   2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ...............................2, 12, 28

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) .........................................2, 12

*In re Salomon Smith Barney Mut. Fund*,
   528 F. Supp. 2d 332 (S.D.N.Y. 2007), *aff'd in relevant part, vacated in part sub nom.*
   *The R.W. Grand Lodge of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund*,
   425 F. App'x 25 (2d Cir. 2011) .............................................17, 28

*In re Scudder Mut. Funds Fee Litig.*,
   2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) .................................. passim

*Jones v. Harris Assocs., L.P.*,
   559 U.S. 335 (2010) ................................................................ passim

*Kalish v. Franklin Advisors, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990) .....................................27, 28, 30

*Kasilag v. Hartford Inv. Fin. Servs. LLC*,
   2012 WL 6568409 (D.N.J. Dec. 17, 2012) .......................................6, 13

*Krantz v. Fidelity Mgmt. & Research Co.*,
   98 F. Supp. 2d 150 (D. Mass. 2000) ...................................................16

*Krinsk v. Fund Asset Mgmt., Inc.*,
   1986 WL 2054 (S.D.N.Y. May 9, 1986) ....................................................................11, 34

*Krinsk v. Fund Asset Mgmt., Inc.*,
   715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ...........................25, 30

*Meyer v. Oppenheimer Mgmt. Corp.*,
   707 F. Supp. 1394 (S.D.N.Y. 1988)....................................................................................30

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   2000 WL 350400 (D. Md. Mar. 20, 2000), *aff'd*, 248 F.3d 321 (4th Cir. 2001)....................16

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ...............................................................................17, 18, 24

*Mintz v. Baron*,
   2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) .................................................................2, 6, 33

*Nesheiwat v. City of Poughkeepsie*,
   2013 WL 620267 (S.D.N.Y. Feb. 13, 2013).............................................................................2

*Reso v. Artisan Partners Ltd. P'ship*,
   2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) .......................................................................13

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
   663 F. Supp. 962 (S.D.N.Y. 1987) .................................................................................30, 34

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   __ F. Supp. 3d. __, 2015 WL 1474984 (S.D.N.Y. Mar. 31, 2015)...........................................2

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)...................................................................................................6

*Strougo v. BEA Assocs.*,
   188 F. Supp.2d 373 (S.D.N.Y. 2002)....................................................................................22

*Strougo v. BEA Assocs.*,
   1999 WL 147737 (S.D.N.Y. Mar. 18, 1999) .....................................................................3, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................................6

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
   1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000)...............3, 13

*Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*,
   2004 WL 1065533 (S.D.N.Y. May 12, 2004), *aff'd sub nom. Amron v. Morgan
   Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006)........................................................14

*Zehrer v. Harbor Capital Advisors, Inc.*,
    2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ...................................................................6, 13

STATUTES

15 U.S.C. § 80a-1 ...........................................................................................................................4

15 U.S.C. § 80a-2 .....................................................................................................................4, 15

15 U.S.C. § 80a-10 .........................................................................................................................4

15 U.S.C. § 80a-15 ................................................................................................................ passim

15 U.S.C. § 80a-22 .......................................................................................................................31

15 U.S.C. § 80a-35 ................................................................................................................ passim

OTHER AUTHORITIES

17 C.F.R. § 270.12b-1 ...................................................................................................................31

Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales
    Charges as Imposed by Investment Companies, Exchange Act Release No. 34-30897,
    57 Fed. Reg. 30985-02 (July 13, 1992) ...............................................................................31

SEC Report on the Public Policy Implications of Investment Company Growth, H.R.
    Rep. No. 89-2337 (1966) .....................................................................................................20

*Mutual Funds and Institutional Accounts: A Comparison*, Investment Company Institute
    (2006), *available at* http://www.ici.org/pdf/ppr_06_mf_inst_comparison.pdf. .....................20

Investment Company Institute, *2015 Investment Company Fact Book* (2015), *available at*
    http://www.ici.org/pdf/2015_factbook.pdf. ...........................................................................4

FINRA Rule 2830 ..........................................................................................................................31

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 .........................................12, 29

## INTRODUCTION

The Investment Company Act of 1940 ("ICA") makes the independent trustees who sit on a mutual fund's board (the "Independent Trustees") primarily responsible for protecting the fund and its shareholders in their dealings with the manager of the fund, *i.e.*, the "adviser."  In the words of the United States Supreme Court, these Independent Trustees function as the "watchdogs" of the relationship between the fund and the adviser.  Respecting this watchdog role, the Supreme Court has ruled that, if the trustees are independent and have engaged in a thorough process to determine the appropriateness of the fee arrangement between the adviser and the fund, courts should not "second-guess" their business judgment.  To the contrary, the Supreme Court has instructed the judiciary to afford deference to such trustee judgments, rather than replace them with judicial evaluations of the "reasonableness" of adviser fees.

Here, the Independent Trustees of the Calamos Growth Fund (the "Fund"), after an intensive and rigorous process guided by sophisticated independent counsel, arrived at what they concluded was a reasonable fee arrangement with the Fund's adviser, Calamos Advisors LLC ("CA").  Nevertheless, Plaintiffs seek to recover on the grounds that the fees paid to CA were "excessive" in violation of Section 36(b) of the ICA.  To state this claim, Plaintiffs must do more than allege, in a conclusory fashion, that the fees the Fund paid to CA were too high.  Rather, they must allege <u>facts</u> satisfying a strict standard adopted by the Supreme Court for overturning the "considerable weight" to be given to judgment of the Independent Trustees.  Plaintiffs must allege specific facts showing that despite the scrutiny given to advisory fees by the Independent Trustees, CA nevertheless was permitted to charge "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[1]  Consistent with the Supreme Court's decisions in *Twombly* and *Iqbal*, Plaintiffs cannot state a Section 36(b) claim satisfying this demanding *Jones* standard

---

[1]      *Jones v. Harris Assocs., L.P.*, 559 U.S. 335, 345-46 (2010).

based on "mere conclusory statements," "threadbare recitals of the elements of a cause of action," or "plead[ing] facts that are merely consistent with a defendant's liability."[2]

Plaintiffs here make no plausible factual allegations showing that the Fund Board's decision should be overturned because the advisory fee that they negotiated is so far beyond what "could" have been negotiated that it is excessive under *Jones*.  Rather than offer factual allegations about the fee, the Board's deliberations, or even the market for aptly comparable services, Plaintiffs advance overwrought policy critiques of the entire mutual fund industry, legally inapt comparisons between services rendered to a retail mutual fund (such as the Fund) and those provided to an institutional account or as sub-adviser, and conclusory assertions that the Fund grew over time but did not reduce its fees that are just the sort of allegations that courts in this Circuit have consistently dismissed for more than 30 years.  Equally clearly, allegations that CA's advisory fee is higher than some in the industry, or that Fund performance lagged competitors in some periods—all while ignoring the Fund's outstanding long-term performance—are woefully short of the mark.  Indeed, given the indisputable fact that the Independent Trustees considered this information about relative performance and fees—and made considered business decisions based on this information, including obtaining a fee break for the Fund in 2013-14—these allegations serve only to highlight the fatal defects in Plaintiffs' approach to their claims.  Under a clear line of Second Circuit and Southern District cases—all of which have been infused with even greater vitality following the Supreme Court's clarification in *Jones* of the minimum requirements of a viable Section 36(b) claim—Plaintiffs' "old wine in an old bottle" allegations are fully ripe for Rule 12(b)(6) dismissal.[3]

---

[2]     *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, __ F. Supp. 3d. __, 2015 WL 1474984, at *3 (S.D.N.Y. Mar. 31, 2015) (Ramos, J.) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 551, 555 (2007)); *Nesheiwat v. City of Poughkeepsie*, 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013) (Ramos, J.).

[3]     *E.g.*, *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006); *Mintz v. Baron*, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008); *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Fitzgerald v. Citigroup, Inc.*, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds*, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2006 WL 74439

Similarly, Plaintiffs fail to set forth a plausible basis to overturn the Independent Trustees' business judgment in approving a "Rule 12b-1" plan for the Fund that includes payment of distribution fees to defendant Calamos Financial Services LLC ("CFS").  Indeed, Plaintiffs make no specific allegations about the distribution fees paid to CFS, the services rendered or procured by CFS in exchange for those fees, the costs to CFS, or the benefits to the Fund.  Thus, Plaintiffs have not pled a basis that would allow for the conclusion that the distribution fees paid to CFS are excessive and fall outside the range that an arms-length negotiation could have produced.

In short, Plaintiffs' Complaint contains no factual allegations supporting a plausible inference that either CA's advisory fee or CFS's distribution fee fall outside of the range that informed businesspersons bargaining at arm's length could possibly have reached.  Plaintiffs' effort to have this Court supplant the business judgment of the Fund's informed and indisputably Independent Trustees in approving these fees therefore should be rejected at the outset.  The Complaint should be dismissed.[4]

## <u>RELEVANT FACTUAL BACKGROUND</u>

### A.    Overview Of The Mutual Fund Structure

A mutual fund is a "pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund."[5]  Unlike other entities, a mutual fund "has no employees in the traditional sense."[6]  Rather, it is externally managed and relies on third parties "to invest fund assets and carry out other business activities."[7]

---

(S.D.N.Y. Jan. 11, 2006); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005), *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000); *Strougo v. BEA Assocs.*, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999).

[4]    Plaintiffs do not allege the number of Fund shares they presently own or owned at any time since first purchasing Fund shares in 2005.  *See* Compl. ¶ 10.  However, Plaintiffs are the first and only of the Fund's tens of thousands of shareholders since its inception in 1990 to file an "excessive fee" claim with respect to the Fund's advisory or distribution fees.

[5]    *Jones*, 559 U.S. at 338.

Typically, "[a] separate entity called an investment adviser creates the mutual fund . . . ."[8] The investment adviser, who must register with the SEC, has "overall responsibility for directing the fund's investments and handling its business affairs."[9]  In return for managing the fund, an adviser receives a fee, often calculated as a percentage of the net assets of the fund.[10]

Mutual funds are regulated by the ICA.[11]  In enacting the ICA, Congress recognized that contractually delegating management of a mutual fund to an external adviser poses the risk of conflicts between the fund and its adviser.[12]  Accordingly, the ICA requires mutual funds to be independent from, and disinterested with respect to, their investment advisers in multiple ways, including as concerns approval of the adviser's written agreement with the fund.[13]  This independence requirement is the "cornerstone of the ICA's effort to control conflicts of interest within mutual funds."[14]

The ICA requires a mutual fund to have a board of directors or trustees.[15]  A central aspect of the ICA's statutory scheme is its requirement that at least 40 percent of a mutual fund's board members be independent (sometimes referred to as "disinterested").[16]  Fund trustees who meet the statutory definition of independence are presumed to be independent by the ICA.[17]  As

---

[6]     Investment Company Institute, *2015 Investment Company Fact Book* (2015) at 245, *available at* http://www.ici.org/pdf/2015_factbook.pdf.

[7]     *Id.*

[8]     *Jones,* 559 U.S. at 338.

[9]     *2015 Investment Company Fact Book* at 247.

[10]    *See id.* at 276.

[11]    *See* 15 U.S.C. § 80a-1 et seq.

[12]    *Burks v. Lasker,* 441 U.S. 471, 481 (1979).

[13]    *Id.* at 482; 15 U.S.C. §§ 80a-10(a-b), 80a-15(a-c).

[14]    *Burks*, 441 U.S. at 482.

[15]    15 U.S.C. § 80a-10(a).

[16]    *Id.*  The standards for independence under the ICA are set forth in 15 U.S.C. § 80a-2(a)(19).

[17]    *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("the 40 Act contains an express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested").

the Supreme Court has explained, the ICA recognizes that the mutual fund's independent trustees serve as "independent watchdogs" who "furnish an independent check upon the management of investment companies."[18]  The ICA therefore gives the Independent Trustees "a host of special responsibilities," including that "they must review and approve the contracts of the investment adviser annually, and a majority of these directors must approve an adviser's compensation."[19]  In performing these statutory responsibilities with respect to their review and approval of the adviser's agreement, it is the Trustees' duty to "request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate" the fund's agreement with its adviser.[20]

### B.    Overview Of The Fund And CA

The Fund, which has been in existence since 1990, pursues its investment objective of providing long-term capital growth to its shareholders by investing primarily in equities issued by U.S. companies.[21]  The Fund is overseen by a six-member Board of Trustees, five of whom are statutorily independent under the ICA.[22]

Since the Fund's inception, CA has provided investment advisory services to the Fund pursuant to a Management Agreement that is reviewed and approved yearly by the Fund's Board of Trustees, including by a separate vote of a majority of the Fund's Independent Trustees as required by the ICA.[23]  CA's duties under the Management Agreement include furnishing an investment program for the Fund; providing portfolio selection services such as researching potential investments, deciding which securities to purchase or to sell from the Fund's portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund; and

---

[18]    *Burks,* 441 U.S. at 484 (internal quotation marks omitted).

[19]    *Jones*, 559 U.S. at 340 (internal citations and quotations omitted).

[20]    15 U.S.C. § 80a-15(c).

[21]    Compl. ¶¶ 37, 100.

[22]    Compl. ¶ 33.

[23]    *See* 15 U.S.C. § 80a-15(c).

management and supervision with regard to other affairs and business of the Fund including the provision of office space.[24]  CA also is responsible for certain regulatory obligations and risks in managing the Fund, and incurs costs associated with technology, infrastructure, and regulatory compliance.[25]  CA is solely responsible for the services it provides to the Fund.[26]

In exchange for these services, the Fund pays CA an advisory fee, calculated as a percentage of the Fund's average daily net assets and specified in the Management Agreement. As disclosed in the Fund's SEC filings, the Fund currently pays an advisory fee of 0.84%, or 84 basis points.[27]  In addition, CA has agreed to a series of "breakpoints" in its fee schedule, which would result in a reduction of the advisory fee as assets of the Fund reach certain specified levels.[28]  Finally, CA also agreed to waive a portion of its advisory fee if the expense ratio for the Fund would otherwise exceed a certain percentage specified in the Management Agreement.[29]

### C.      The Fund's Board Of Trustees

As noted above, the Fund is overseen by a six-member Board of Trustees, five of whom are statutorily "independent" under the ICA.  Moreover, as the Fund's public filings and

---

[24]      Compl. ¶ 35.

[25]      Calamos Funds Annual Report (Oct. 31, 2014) ("2014 Annual Report") at 232, attached as Ex. 1 to the Declaration of David A. Kotler ("Kotler Decl.").

[26]      This is in direct contrast to the recent spate of "manager of managers" lawsuits in which the adviser is alleged to delegate much of its advisory responsibilities to subadvisers.  *See, e.g.*, *Zehrer v. Harbor Capital Advisors, Inc.*, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) (alleging that adviser delegated substantially all duties to subadviser yet retained significant portion of advisory fee); *Kasilag v. Hartford Inv. Fin. Servs. LLC*, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) (same).

[27]      *See* Form N-1A Registration Statement, Calamos Investment Trust (Mar. 1, 2015) at 35, attached as Ex. 2 to the Kotler Decl.  On motions to dismiss, courts appropriately review "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Here, those documents include prospectuses, statements of additional information ("SAIs"), Morningstar data, investment management agreements, annual and semiannual reports, and other public filings.  *See Mintz v. Baron*, 2009 WL 735140, at *3 n.3 (S.D.N.Y. Mar. 20, 2009) (Section 36(b) case) (judicially noticing SEC filings); *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-26 (2d Cir. 2008) (media reports and regulatory filings); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (court can rely on "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

[28]      *See* Compl. ¶¶ 51-52.

[29]      *See* 2014 Annual Report at 148 (Kotler Decl. Ex. 1).

6

disclosures confirm, the Independent Trustees are highly qualified and have extensive experience in the mutual fund and asset management fields.[30]

The Independent Trustees in turn are advised by their own counsel, Paulita Pike and the law firm of Ropes & Gray LLP.[31]  Counsel for the Independent Trustees is also independent from CA and CFS as required by the ICA.[32]

The Fund's Annual Report—which was reviewed by the Fund's and the Independent Trustees' counsel, filed with the SEC, and provided to the Fund's shareholders—makes clear that the Independent Trustees have a track record of rigorous oversight over CA.  For example, in 2013, in consideration of the then-recent underperformance of the Fund, the Independent Trustees requested and received a five basis point waiver in CA's advisory fee.[33]  The Independent Trustees did so with the understanding that they would continue to monitor the Fund's performance, and based on the judgment that CA's portfolio management team, which had recently experienced material turnover, should be given additional time to develop its performance record.[34]

This business judgment by the Fund's Trustees is borne out by the long-term performance of the Fund.  Indeed, as set forth in the Fund's public disclosures, the Fund's outstanding performance since inception is in the top three percent for mutual funds in its category.[35]  The Fund's performance compared to certain other short-term benchmarks has been

---

[30]     The Independent Trustees are Stephen B. Timbers (Trustee since 2004; Lead Independent Trustee since 2005); John E. Neal (Trustee since 2001); Weston W. Marsh (Trustee since 2002); William R. Rybak (Trustee since 2002); and David D. Tripple (Trustee since 2006).  Their individual qualifications are summarized in the Fund's 2014 Annual Report at 237 (Kotler Decl. Ex. 1).

[31]     *See, e.g.*, Biography, Ropes & Gray LLP, https://www.ropesgray.com/biographies/p/paulita-pike.aspx.  Ms. Pike was a partner at K&L Gates LLP until April 2015.  Following Ms. Pike's recent move to Ropes & Gray LLP, that firm assumed representation of the Independent Trustees.

[32]     *See* 2014 Annual Report at 230 (Kotler Decl. Ex. 1).

[33]     *See* Calamos Funds Annual Report (Oct. 31, 2013) ("2013 Annual Report") at 202, attached as Ex. 3 to the Kotler Decl.

[34]     *Id.*

[35]     2014 Annual Report at 230 (Kotler Decl. Ex. 1).

favorable as well.  For example, compared to a smaller peer group of comparable funds selected by Morningstar, the Fund's one-year performance was in the top tenth percentile of such funds and its five-year performance was also above the mean of this peer group.[36]

> ### D.     The Independent Trustees' Considered Review And Approval Of The Fund's Management Agreement With CA

In accordance with the ICA, the Board holds an annual in-person meeting to consider whether to renew the Management Agreement between CA and the Fund.[37]  In connection with this meeting, the Board requests and receives extensive information relating to CA's services and Fund performance.  Indeed, CA is subject to a statutorily-imposed duty "to furnish[] such information as may reasonably be necessary to evaluate the terms of" its Management Agreement with the Fund.[38]  For instance, in connection with the 2014 meeting, the Board received and reviewed a substantial amount of information from both CA and independent third-parties (*e.g.*, Morningstar) provided in response to detailed requests submitted by the Independent Trustees and their independent counsel.  The information the Board requested included information regarding the investment performance of the Fund as compared to other comparable funds and clients of CA, CA's fees and expenses as compared to those of CA's others clients and other "peer group" mutual fund advisers, and the profitability to CA of its relationship with the Fund.[39]  In addition, the Board took into account "the knowledge gained from the Board's meetings with [CA] throughout the years," as well as the extensive information the Independent Trustees received throughout the year about the Fund, including information regarding the Fund's performance compared with similar mutual funds and information regarding the quality of CA's investment management and other services.[40]

---

[36]      *Id.*

[37]      *Id.*

[38]      15 U.S.C. § 80a-15(c).

[39]      2014 Annual Report at 230, 232 (Kotler Decl. Ex. 1).

[40]      *Id.* at 230.

In the course of their consideration of the Management Agreement, the Independent

Trustees were advised by their own counsel and, in addition to meetings with management of

CA, they met separately in executive session with their counsel.[41]  During their deliberations,

including at the in-person meeting specifically required by the ICA,[42] the Independent Trustees

evaluated this voluminous information and reached the following conclusions regarding the

appropriateness of CA's advisory fee for the Fund:

- **The Nature, Extent, and Quality of the Services Provided to the Fund.**
Among other factors, the Trustees took into account CA's long-term history of managing the
Fund (as well as the other Calamos funds); the consistency of CA's investment approach; the
background and experience of CA's investment personnel responsible for managing the Fund;
and CA's performance as administrator of the Fund, including, among other things, in the areas
of brokerage selection, trade execution, compliance and shareholder communications.  The
Board also reviewed CA's resources and key personnel involved in providing investment
management services to the Fund.  The Board concluded that the nature, extent and quality of the
services provided by CA to the Fund was appropriate and that the Fund was likely to continue to
benefit from services provided under its management agreement with CA.[43]

- **Fund Performance**.  Among other factors, the Trustees considered the Fund's
investment performance over various time periods, including how the Fund performed compared
to the median performance of a group of comparable funds selected by Morningstar (the
"Category").  The Board considered that the Fund underperformed its Category median for
several time periods, although it outperformed its Category median for the one-year period, and
that the Fund's performance since inception is in the top three percent of the funds in its
Category.  The Board determined that it would be prudent to allow the portfolio management
team additional time to develop its performance record.[44]

- **Cost of Services Provided and Profits Realized by Adviser**.  Among other
factors, the Trustees evaluated the Fund's actual management fee rate compared to the median
management fee rate for other similar mutual funds, and also reviewed CA's management fee
rates for its institutional accounts and for sub-advised funds.  Specifically, the Board took into
account CA's assertion that although, generally, the rates of fees paid by institutional clients
were lower than the rates of fees paid by the Fund, the differences reflected CA's greater level of
responsibilities and significantly broader scope of services regarding the Fund, the more
extensive regulatory obligations and risks associated with managing the Fund, and other
financial considerations with respect to the Fund.  The Board also considered CA's costs in
serving as the Fund's investment adviser and manager, including costs associated with
technology, infrastructure and compliance necessary to manage the Fund.  The Board also
reviewed information on CA's profitability in serving as the Fund's investment manager and of

---

[41]      *Id.*

[42]      *See* 15 U.S.C. § 80a-15(c) (requiring votes to be "cast in person at a meeting called for the
purpose of voting on such approval").

[43]      2014 Annual Report at 230 (Kotler Decl. Ex. 1).

[44]      *Id.*

CA and its affiliates in all of their relationships with the Fund.  The Board further considered CA's expense cap, under which the Fund's Class A total annual expenses are capped at 1.75%.[45]

- **Economies of Scale**.  Among other factors, the Trustees considered whether the Fund's management fee shares with shareholders potential economies of scale.  The Board recognized that breakpoints in the Fund's fee schedule could result in the sharing of economies of scale as Fund assets increase, as well as CA's agreement to reimburse the Fund for a portion of its expenses if a Fund's expense ratio otherwise would exceed a certain level.[46]

- **Other Benefits Derived from Adviser's Relationship with the Fund.**  The Board also considered other benefits that accrue to CA and its affiliates from their relationship with the Fund.[47]

Based on the foregoing, the Independent Trustees concluded that the continuation of the Management Agreement with CA—including the 84 basis-point advisory fee charged by CA, subject to the breakpoints and fee waiver—was in the best interest of the Fund and its shareholders.  In so doing, the Board respected the choice of the thousands of shareholders, who freely invested in the Fund with full knowledge and disclosure of CA's advisory fee, to have their investments managed by CA.

## ARGUMENT

**I.    CONGRESS AND THE SUPREME COURT HAVE IMPOSED A DEMANDING STANDARD ON A SECTION 36(B) PLAINTIFF WHO SEEKS TO SECOND-GUESS THE INFORMED BUSINESS JUDGMENT OF A MUTUAL FUND'S INDEPENDENT TRUSTEES**

While Section 36(b) imposes a fiduciary duty on investment advisers "with respect to the receipt of compensation for services,"[48] Congress expressly created a "narrowly circumscribed right of action for damages" that, among other things (i) places the burden of proving the breach of fiduciary duty on the plaintiff, (ii) limits the potential recovery to the amount of allegedly excessive fees (*i.e.*, no lost profits or consequential damages), and (iii) limits the period of retroactive recovery to the one year prior to the filing of the complaint.[49]  In enacting Section 36(b), Congress struck a "careful balance between the interest in enabling shareholders to police investment advisory fees and the interest in minimizing nuisance litigation."[50]  As the Supreme

---

[45]      *Id.* at 232.

[46]      *Id.* at 234.

[47]      *Id.*

Court has recognized, "the structure and purpose of the ICA indicate that Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interests of the funds' shareholders."[51]

Reflecting this Congressional intent, the Supreme Court has held that to state a Section 36(b) claim, a plaintiff must demonstrate—and therefore its complaint must plausibly allege—that "[an investment] advisor [received] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[52]  Merely alleging that fees are "unreasonable" is legally insufficient.[53]

The Supreme Court has further made clear that where (as here) a board comprised of a majority of independent trustees evaluates advisory fees pursuant to a robust process, the Court must accord the board's informed decision "commensurate deference" and thereby refrain from "supplant[ing] the judgment of disinterested directors apprised of all relevant information."[54] Indeed, if "the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently."[55]  As the *Jones* Court explained: "[I]t would have been paradoxical for Congress to have been willing to rely largely upon [boards of directors as] 'watchdogs' to protect

---

[48]     15 U.S.C. § 80a-35(b).

[49]     *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1044 n.6, 1067 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982); 15 U.S.C. § 80a-35(b)(3).

[50]     *Krinsk v. Fund Asset Mgmt., Inc.*, 1986 WL 2054, at *4 (S.D.N.Y. May 9, 1986).

[51]     *Burks*, 441 U.S. at 484-85.

[52]     *Jones*, 559 U.S. at 335, 346-47.

[53]     *Jones*, 559 U.S. 340-41.  *See Gartenberg*, 528 F. Supp. at 1045 n.7 ("Congress has twice declined to pass legislation which would have imposed a 'reasonableness' standard.").

[54]     *Jones*, 559 U.S. at 351-52.

[55]     *Id*. at 351.

11

shareholder interests and yet, where the 'watchdogs' have done precisely that, require that they be totally muzzled."[56]

Based on Plaintiffs' pre-motion correspondence, they seem prepared to argue that they have stated a claim because their complaint checks off each of the six so-called *Gartenberg* factors.[57]  This legal theory, if asserted, would be erroneous, as merely invoking the *Gartenberg* factors does not satisfy the test enunciated by the Supreme Court in *Jones*.  The factors enumerated in *Gartenberg* (nearly 30 years before *Jones*) represent a non-exhaustive list of items a court might consider—along with all other relevant circumstances—in assessing a defendant's compliance with Section 36(b)'s ultimate "excessive fee" standard.[58]  But as a rubric for review, the *Gartenberg* factors do not establish the Section 36(b) standard, and they do not equate to the elements of a Section 36(b) claim.  Rather, the averments underlying any factor must plausibly implicate the *Jones* rule:  Do the allegations credibly suggest the fee is beyond what an arm's-length negotiation could produce?

Moreover, even prior to the Supreme Court's *Jones* decision, the Second Circuit and courts of this District were especially vigilant in analyzing and dismissing Section 36(b) claims at the motion to dismiss stage, consistently refusing to permit plaintiffs with "largely groundless claim[s] to simply take up the time of a number of people, . . . representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence."[59]  *Jones*, in conjunction with the *Twombly/Iqbal* decisions

---

[56]      *Id*. at 348-49 (alterations in original).  *Accord* S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, at 4902 (Section 36(b) "is not intended to authorize a court to substitute its business judgment for that of the mutual fund's Board of Directors in the area of management fees.").

[57]      Letter Response in Opposition to Motion, Dkt. 11, at 2 (May 14, 2015) (stating the *Gartenberg* factors in support of the sufficiency of Plaintiffs' complaint); May 21, 2015 Transcript at 14:22-23 (suggesting that by "running through" the *Gartenberg* factors, Plaintiffs have adequately stated a claim).

[58]      *See Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929-32 (2d Cir. 1982).

[59]      *Amron*, 464 F.3d at 346 (affirming dismissal of complaints).  *See, e.g., Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008); *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Fitzgerald v. Citigroup, Inc.*, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds*, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp.

requiring plaintiffs to plead a plausible basis for relief, only <u>raised</u> the pleading bar for a Section 36(b) plaintiff.[60]

## II. PLAINTIFFS FAIL TO ALLEGE ANY PLAUSIBLE BASIS TO OVERTURN THE BUSINESS JUDGMENT RENDERED BY THE FUND'S INDEPENDENT TRUSTEES WITH RESPECT TO THEIR APPROVAL OF CA'S ADVISORY FEE

Against this settled legal backdrop, Plaintiffs seek to state a Section 36(b) claim by relying on a series of allegations that either (i) amount to nothing more than tired criticisms of the mutual fund industry (even going so far as to charge that <u>all</u> mutual funds may pay excessive advisory fees[61]) that courts consistently reject[62] and that have nothing to do with CA or the Fund, (ii) rely on dated allegations regarding the advisory fee charged by CA over the 25 year life of

---

2d 222 (S.D.N.Y. 2005), *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000); *Strougo v. BEA Assocs.*, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999).

[60]     Plaintiffs' Complaint is devoid of the distinguishing theories asserted in other recent Section 36(b) cases in which motions to dismiss have been denied, but to which Plaintiffs apparently will hitch their wagon notwithstanding this critical distinction. *E.g.*, *In re Blackrock Mut. Funds Advisory Fee Litig.*, 2015 WL 1418848 (D.N.J. Mar. 27, 2015) (alleging that, within the statutory one-year period, adviser provided same services as both adviser and subadviser yet charged lower fees as subadviser); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 2015 WL 965665 (S.D. Ohio Mar. 4, 2015) (same); *Zehrer v. Harbor Capital Advisors, Inc.*, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) (alleging that adviser delegated substantially all duties to subadviser yet retained significant portion of advisory fee); *Kasilag v. Hartford Inv. Fin. Servs. LLC*, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) (same); *Reso v. Artisan Partners Ltd. P'ship*, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) (alleging that advisor provided *de minimis* services and paid very few costs).

[61]     *See* Compl. ¶¶ 22, 25. *Accord id.* ¶ 78 (claiming that the Fund's "comparator mutual funds are likewise captive funds with respect to their investment advisers, and thus subject to like extraction of inflated advisory fees").

[62]     *See Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004), *aff'd sub nom. Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006) (holding that "generalities about deficiencies in the securities industry," and "speculation, inference and generalized observations about the securities industry from public figures," are insufficient to state a Section 36(b) claim); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 1999 WL 511411, at *4 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000) (rejecting argument in which plaintiff "decried the inadequate level of oversight over investment advisers provided by independent directors in today's mutual fund industry"; "plaintiff's complaints are better posed to Congress or the regulatory bodies supervising the industry—we are constrained to apply the laws as written and cannot take action where Congress and the SEC have not done so."); *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682, 685-86 (3d Cir. 2002) (plaintiffs must allege and prove an actual breach of fiduciary duty in order to prevail on their claims).

the Fund which, even if accepted, say nothing about the alleged excessiveness of the fees paid to CA during the relevant one year prior to the filing of the Complaint, (iii) adopt the flawed circular reasoning that the fees necessarily must have been excessive because other advisers charged lower fees or because the Fund underperformed relative to its benchmarks over certain times cherry-picked by Plaintiffs, or (iv) bizarrely assert that the Fund failed to share economies of scale during a period when the Fund's assets declined.

At bottom, Plaintiffs fail to provide any factual allegations that would support a plausible inference that CA's advisory fee is outside of the range that informed businesspersons bargaining at arm's length could possibly have reached and provide no basis for the Court to upset the informed business judgment of the Fund's indisputably independent trustees.  This failure is fatal to their Complaint.

### A.   Plaintiffs Do Not Allege Any Plausible Basis To Question The Independence Or Thoroughness Of The Fund's Independent Trustees

The detailed and deliberate process in which the Independent Trustees engaged with respect to their review and approval of the Fund's management agreement with CA and its distribution agreement with CFS, as summarized above—including but not limited to their in-person meeting held specifically for the purpose of deciding whether to approve the Management Agreement—is described in the Fund's annual report filed with the SEC and distributed to Plaintiffs and all Fund shareholders.  Plaintiffs provide no plausible basis to conclude that while engaging in their review and approval of those agreements, the Fund's Independent Trustees were anything but independent and thorough.  Accordingly, as required by *Jones*, the Independent Trustees' business judgment with respect to CA's fees is entitled to "considerable weight."  And in the absence of any other relevant—let alone plausible—factual allegations showing that the fee charged by CA is beyond what could have been bargained at arm's-length, that "considerable weight" dooms Plaintiffs' claim.

### 1. Plaintiffs Fail To Allege Facts Showing That The Independent Trustees Were Not Independent

As concerns the independence of the Fund's six member Board of Trustees, five of the Trustees (or 83% of the Board) are statutorily "independent" under the ICA, and are therefore presumed to be independent by the ICA.[63]  Plaintiffs do not even attempt to allege otherwise, nor could they.  Instead, Plaintiffs offer a series of assertions that can quickly be rejected.  For example, Plaintiffs argue that <u>because</u> the Independent Trustees approved CA's Management Agreement they must not be independent.[64]  This quintessentially circular argument that "do[es] not go beyond asserting that the Trustees had approved transactions that are alleged to have been wrongful," not only ignores the statutory presumption of independence accorded to the Fund's Independent Trustees, but it has been rejected by courts time and again at the pleadings stage.[65]  Similarly, Plaintiffs' suggestion that the Independent Trustees are not independent because they receive compensation for their services,[66] does nothing to alter the statutory presumption of independence or to provide a plausible basis for a Section 36(b) claim—as numerous courts also have concluded.[67]

---

[63]  15 U.S.C. § 80a-2(a)(9); *see Amron*, 464 F.3d at 344 ("the 40 Act contains an express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested").

[64]  *See, e.g.*, Compl. ¶ 181.

[65]  *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2006 WL 74439, *3 (S.D.N.Y. Jan. 11, 2006) (holding that courts must apply ICA's statutory presumption of director independence, and endorsing approach of the Third and Fourth Circuits, "dismissing claims that fail to unambiguously demonstrate director domination by an investment adviser."); *Hoffman*, 591 F. Supp. 2d at 540-41 (express presumption of director independence not overcome by claims that fail to allege specific facts as to why a board member would lack independence, and which fail to give any information about what other fund directors do to review fund expenses, so that the Court may compare the relative independence of the directors at issue); *Forsythe v. Sun Life Fin. Inc.*, 417 F. Supp. 2d 100, 111 (D. Mass. 2006) (holding that directors remained independent where there were no "particularized allegations, beyond the mere fact of approval, that the Trustee Defendants were actively involved in the wrongfulness of any actions.").  *See ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 172 (D. Mass. 2005) ("Simply because the Board of Trustees approved the fee contracts at issue does not render the independent trustees 'interested.'").

[66]  Compl. ¶ 164.

[67]  *Amron*, 464 F.3d at 345 (allegations regarding compensation and benefits received by fund directors are "insufficient as a matter of law" to allege lack of director independence and conscientiousness); *see, e.g., In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d at 240 ("The fact that a defendant appointed a board member is insufficient to establish that the board member is interested,

Lacking any factual basis on which to undermine the presumed independence of the Independent Trustees, Plaintiffs resort to baseless attacks on their conscientiousness.[68]  These assertions not only lack any factual support, but provide no reason or rationale for rejecting the Independent Trustees' judgment.[69]  As but one egregious example, Plaintiffs make the absurd claim that information provided by CA for the Independent Trustees' review is "self-serving" and that the Independent Trustees' consideration of this information evidences their lack of independence and good faith.[70]  Yet as the *Jones* Court recognized, the ICA itself <u>requires</u> that the Trustees request this information from CA, that CA provide this information to the Trustees, and that the Trustees consider this information as part of their review of CA's Management Agreement.[71]  At bottom, Plaintiffs' allegation that the Independent Trustees are not independent consists of the circular argument that they are not independent because they approved the Management Agreement, supported by nothing more than Plaintiffs' *ipse dixit*.  This is not the stuff of plausible allegations required by *Jones* or *Twombly/Iqbal*.

---

even if the position provides the board member with compensation."); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 2000 WL 350400, at *3 (D. Md. Mar. 20, 2000), *aff'd*, 248 F.3d 321 (4th Cir. 2001) ("[P]roof that the disinterested directors had even a *significant* financial incentive to curry favor with the funds and their investment advisers would not *sustain a claim* under § 36(b); *a fortiori*, therefore, such allegations do not *state a claim* under § 36(b).") (emphasis in original); *Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 157 (D. Mass. 2000) ("[D]irectors' well-compensated multiple board membership is insufficient to rebut the statutory presumption against control without other indicia of control").

[68]     *E.g.*, Compl. ¶¶ 88, 161(c), 180-204, 254, 263.

[69]     Plaintiffs provide no factual support whatsoever for their remarkable allegation that the June 26, 2014 meeting of the Trustees was "significantly impacted, and ultimately controlled, by [CA]" and John P. Calamos, Sr. (Compl. ¶167).  Plaintiffs should be directed to provide the Rule 11 basis for all of their *ad hominem* attacks on Mr. Calamos and the entire Board of Trustees.

[70]     Compl. ¶¶ 161, 170.

[71]     *Jones*, 559 U.S. at 348 (citing 15 U.S.C. § 80a-15(c)).  *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 331 (4th Cir. 2001) ("assertions that the directors were dependent on the investment advisers for information sheds no light on the question of whether the directors are disinterested.  One would expect any conscientious director to request information from management and staff on the day-to-day operations for which they are responsible.  The ICA itself approves this very practice.").

### 2. Plaintiffs Fail To Allege Facts Showing That The Board Process Was Deficient

Plaintiffs also fail to plead any facts plausibly suggesting that the Board's process was anything other than thorough and robust.  Rather, Plaintiffs merely re-deploy the circular argument that the process must have been infirm because, after all, the Trustees approved the Management Agreement.  In service of that assertion, they make the same sort of allegations that have been routinely rejected in other cases.

For instance, Plaintiffs assert that the Board could not have been acting conscientiously when it approved CA's advisory fees because the Funds purportedly underperformed their primary benchmarks for certain periods.[72]  This assertion is unavailing.  As an initial matter, this allegation proves far too much because, if accepted, it would mean that trustees for every fund below the benchmark are not acting conscientiously in approving an unchanged advisory fee.  In addition, a fund's advisory fee is not excessive—and a Board process is not deficient—simply because the fund underperformed a benchmark.[73]  As the Fourth Circuit has recognized in rejecting this very assertion, "[a]ccepting plaintiffs' invitation to permit discovery here because the funds underperformed would make it possible for other plaintiffs to state a claim in limitless actions filed under Section 36(b)."[74]

In a last-ditch effort to impugn the Board's process, Plaintiffs aver that the Board would not have approved the Management Agreement if only they had obtained "unbiased facts" of the "sort" collected in the Complaint, *e.g.*, that CA purportedly was generating substantial profits due to retaining economies of scale (notwithstanding the economic impossibility of that allegation as the Fund's AUM declined), or if CA had not provided "incomplete and/or biased

---

[72]    Compl. ¶¶ 121-23, 125, 202.

[73]    *See, e.g.*, *Amron*, 464 F.3d at 344 (affirming Rule 12(b)(6) dismissal; allegations that a fund "lost money" do not state a Section 36(b) claim because "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive"); *In re Salomon Smith Barney Mut. Fund*, 528 F. Supp. 2d 332, 337-38 (S.D.N.Y. 2007), *aff'd in relevant part, vacated in part sub nom. The R.W. Grand Lodge of F. & A.M. of Pa. v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011) (refusing to "extrapolate deficient service from allegedly sub-standard investment returns").

[74]    *Migdal*, 248 F.3d at 327-28; *see also id.* ("An under-achieving fund one year may be an overachieving fund the next.).

information" regarding its fees, services, and profitability.[75]  These allegations border on the frivolous.

To begin with, they are totally conclusory and circular.  In essence, Plaintiffs work backwards—they claim that, because CA's advisory fees were allegedly excessive, the Board process must have been flawed.  But if this allegation suffices, then every plaintiff could call into question the <u>process</u> of every board in the country by simply disagreeing with the board's ultimate <u>conclusion</u>.  As such, investors could question a board's process without alleging a single fact about the independence of the board, the materials the board reviewed, or the expertise of the board members.  Such a result would be completely at odds with the statutory scheme, which both gives significant deference to the board and is designed to protect advisers from ill-founded suits.[76]

Moreover, although confusingly crafted, the Complaint actually contains no allegations of relevant facts.  It does not, for instance, identify any pertinent information that the Board did not receive.  Rather, it alleges that the Board did not receive "unbiased" information—whatever that means—because the Board approved the Management Agreement.  Yet the Board requested—and CA was statutorily compelled to furnish—"such information as may reasonably be necessary to evaluate the terms of" the Management Agreement.[77]  This statutory power places the Board in, if anything, an even better position than in a typical arms'-length transaction, when parties are free to withhold or obscure relevant information at their discretion.

Notably, Plaintiffs are unable to point to any evidence that the Board should have considered, but did not, when reviewing the Management Agreement.  Even more troubling, Plaintiffs' insinuation is contrary to the Fund's publicly-filed documents, which describe in

---

[75]      Compl. ¶¶ 170-78.

[76]      *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (allowing plaintiffs to state a Section 36(b) claim based on allegations that could apply to a significant portion of mutual fund complexes would "violate a stated intent of the drafters of the 1970 amendments [to the ICA], which was to 'prevent the harassment of investment advisors by ill-founded or nuisance law suits, the so-called strike suit.'") (quoting H.R. Rep. 1382, 91st Cong., 2d Sess., 8 (1970)).

[77]      15 U.S.C. § 80a-15(c).

detail the type of information that the Board reviewed when considering approval of the

Management Agreement, including:

- The quality of CA's investment management and other services;

- The quality and sophistication of CA's investment management personnel;

- CA's operations and financial condition;

- CA's brokerage practices and investment strategies;

- The level of advisory fees that CA charge the Funds compared with the fees charged to comparable mutual funds (which information was collected and provided by unaffiliated third party Morningstar);

- The Fund's overall fees and operating expenses compared with similar mutual funds (also provided by Morningstar);

- The level of CA's profitability from its Fund-related operations;

- CA's compliance systems;

- The level of CA's policies on and compliance procedures for personal securities transactions;

- CA's reputation, expertise and resources in domestic and/or international financial markets; and

- The Fund's performance compared with similar mutual funds.[78]

\* \* \* \* \*

In sum, Plaintiffs' allegations regarding the Board are devoid of facts, contrary to the

public documents, and circular.  As such, they fail to call into question the independence of the

Independent Trustees or the process the Board followed.  Therefore, "considerable weight"

should be given to the Independent Trustees' business judgment approving the Fund's fee

arrangements with CA.

---

[78]     *See* 2014 Annual Report at 230-34 (Kotler Decl. Ex. 1).

**B.      Plaintiffs' Various Fee Comparisons Do Not Provide A Plausible Basis To Upset The Independent Trustees' Business Judgment Concerning CA's Advisory Fee**

Plaintiffs next proffer a number of different so-called "comparisons" by which they seek to allege that CA's advisory fee is legally "excessive" because it is higher than (i) the fee charged by other advisers to purportedly similar mutual funds, (ii) the fee that CA charges to its institutional (*i.e.,* non-mutual fund) clients, and (iii) the fee that CA long ago charged to subadvise mutual funds sponsored and advised by someone other than CA.  Consistent with the confirmation in *Jones* that "inapt" fee comparisons are not a legally sufficient basis to support a Section 36(b) claim, each of Plaintiffs' fee comparisons has been rejected repeatedly as a matter of law—and should be rejected again here.

**1.      Plaintiffs' Legally Inapt Comparisons With Fees Paid To CA By Its Institutional Clients**

As the Supreme Court long ago recognized, when Congress enacted Section 36(b) in 1970 it was well aware that advisers often charge institutional clients, *i.e.*, large accounts that are not shareholders of the mutual fund but instead contract directly with the adviser (such as pension funds), lower fees than mutual funds—and that they did so because institutional clients require fewer services as compared to mutual funds.[79]  As the SEC's Report to Congress prior to enactment of Section 36(b) explained, advisers charge mutual funds higher fees because "[p]ublicly held mutual funds require certain services that are not needed by other purchasers of investment advice."[80]  Thus, comparisons between fees paid by institutional clients and those paid by mutual funds "can be highly misleading because of the dissimilarities between mutual funds and institutional accounts," including (but by no means limited to) differences in services provided, applicable legal/regulatory structures and business risks.[81]  Indeed, the Supreme Court expressed considerable skepticism that such a comparison can even support a Section 36(b)

---

[79]      *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 537 (1984).

[80]      SEC Report on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 at 11 (1966); *see id.* at 116, 120-21.

[81]      *Mutual Funds and Institutional Accounts: A Comparison*, Investment Company Institute at 1,4, 6 (2006) (the "Comparison Study"), *available at* http://www.ici.org/pdf/ppr_06_mf_inst_comparison.pdf.

claim unless a plaintiff can show "a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range."[82]

With these recognized distinctions in mind, the *Jones* Court explicitly found that the ICA does <u>not</u> require "fee parity" between an adviser's mutual fund and institutional clients.[83]  Thus, the *Jones* Court expressly rejected a Section 36(b) plaintiff's attempt to establish that a mutual fund advisory fee is necessarily excessive because it is higher than the fee charged by the adviser to its institutional clients.[84]  In reaching this conclusion, the Court instructed that such a fee comparison is legally inapt—and "must [be] reject[ed]"—where the advisory services provided to the mutual fund and to the institutional clients differ in type or degree.[85]

Nevertheless, as if *Jones* and the long-recognized differences in advisory services provided to a mutual fund and to institutional clients did not exist, Plaintiffs' Complaint rests heavily on allegations that CA's advisory fee is excessive because it is higher than the fee paid to CA by its institutional clients.[86]  But Plaintiffs fail to allege a plausible basis for their conclusory assertion that the advisory services provided by CA to the Fund and to its institutional clients "were not merely *similar* to those provided to the Fund, but *identical*."[87]

This lack of any facts is no accident, because Plaintiffs' assertion is demonstrably false; indeed, it flies in the face of the statements in the Fund's Annual Report that as part of their review and approval of CA's Management Agreement, the Trustees "reviewed CA's management fee rates for its institutional separate accounts" and took into account that the differences in those rates "reflected [CA's] greater level of responsibilities and significantly broader scope of services regarding the Funds, the more extensive regulatory obligations and

---

[82]     *Jones*, 559 U.S. at 350 n.8.

[83]     *Jones*, 559 U.S. at 350.

[84]     *Id*. at 349-50; *accord Gartenberg*, 694 F.2d at 930 n.3.

[85]     *Jones*, 559 U.S. at 350 ("If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison."); *accord Gartenberg*, 694 F.2d at 930 n.3.

[86]     *E.g.*, Compl. ¶¶ 57-71.

[87]     Compl. ¶ 67 (emphasis in original).

21

risks associated with managing the Funds, and other financial considerations with respect to the Funds."[88]  There is thus no basis at all, let alone a plausible allegation, for rejecting the decision reached by the Fund's Trustees—5/6 of whom indisputably are statutorily "independent"—to approve the advisory fee paid by the Fund to CA after consideration of the very issues about which Plaintiffs complain.  The series of cases rejecting precisely this type of legally "inapt" fee comparison—culminating in *Jones*—was not wrongly decided.[89]

> **2.  Plaintiffs' Legally Inapt Comparisons With Subadvisory Fees Paid To CA—Especially Those Paid Well Before Section 36(b)'s One Year Jurisdictional Period**

Plaintiffs next seek to compare the advisory fee paid by the Fund to CA in 2014 to the subadvisory fee that other fund complexes paid to CA for a smaller subset of services at various points between 2007 and 2011.  This purported comparison is legally inapt under *Jones*, *Gartenberg* and the cases cited above due to the inherent differences between the work performed and risks undertaken by advisers and subadvisers.  More fundamentally, it also fails as a matter of law because allegations regarding fees paid anywhere between three and seven years prior to Section 36(b)'s jurisdictional period cannot plausibly support a claim that a fee paid during the jurisdictional period is (or is not) excessive.[90]

Section 36(b)(3) could not be clearer that the only *ex post* fees at issue are those charged in the one year prior to the filing of the complaint.[91]  Hence, courts in this District have rejected

---

[88]     2014 Annual Report at 232 (Kotler Decl. Ex. 1).

[89]     *E.g.*, *Gartenberg*, 694 F.2d at 930 n.3 ("The nature and extent of the services required by each type of fund differ sharply."); *Strougo v. BEA Assocs.*, 188 F. Supp.2d 373, 384 (S.D.N.Y. 2002) ("Strougo has presented evidence that [the adviser] has a different fee structure for its institutional clients. It has been held that relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients.").

[90]     This comparison also fails because Plaintiffs make no mention of the total advisory fee paid to the adviser of the funds that CA sub-advised—perhaps because Plaintiffs seek to ignore that at least one of those advisory fees was higher than the advisory fee paid by the Fund to CA.  *See* Thrivent Series Fund Inc. Prospectus (April 29, 2010) at 82, 182 (advisory fee of 0.95% compared to CA's 2010 advisory fee of 0.83%), attached as Ex. 4 to the Kotler Decl.

[91]     15 U.S.C. § 80a-35(b)(3); *see Curd v. SEI Inv. Mgmt. Corp.*, No. 13-cv-07219, Dkt. 50 n.1 (E.D. Pa. Aug. 28, 2014) (granting motion to dismiss untimely Section 36(b) claim).

attempts to rely on allegations or evidence from earlier periods to create an inference that the most recent prior year's fees were excessive.[92]  Indeed, as Judge Kram recognized in dismissing precisely this attempt by a Section 36(b) plaintiff, the legislative history of Section 36(b) itself militates against reliance on allegations outside the jurisdictional period, even at the pleading stage:  "Congress sharply limited recovery under Section 36(b) to a one-year time period because it wanted to create a limited mechanism with which to test and rectify advisory fees in the mutual fund industry.  Legislative insistence in restricting the applicable time period disinclines the Court to make factual extrapolations or speculative inferences in Plaintiffs' favor."[93]

Thus, the Court can and should reject outright Plaintiffs' heavy reliance on subadvisory fees that CA received as far back as 2007 (or advisory fees that CA received as far back as 2004).[94]

### 3. Plaintiffs' Legally Inapt Comparisons With Advisory Fees Paid To Other Advisers By Other Funds

Plaintiffs repeatedly seek to compare the advisory fees paid by the Fund to CA with the advisory fees other funds pay to other advisers.[95]  This attempted comparison fails for three separate reasons.

First, Plaintiffs ignore that the Independent Trustees received fee comparison information from Morningstar (an independent source no less) and, as the Fund's Annual Report confirms, they considered this information in their analysis and approval of CA's fee.

Second, Plaintiffs offer no plausible allegations to suggest that their suggested comparisons to other funds or other advisory fees are legally apt under *Jones*.

---

[92]     *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *16-17 ("Plaintiffs' argument that statistics from other years provide a necessary context to the relevant fee allegations is without merit."); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2006 WL 74439, at *2 & n.3 (S.D.N.Y. Jan. 11, 2006).

[93]     *In re AllianceBernstein*, 2006 WL 74439, at *2 & n.3 (citation omitted).

[94]     *E.g.*, Compl. ¶¶ 61-71, 79-88, 127-33.

[95]     Compl. ¶¶ 72-78.

Third, even assuming *arguendo,* that the unspecified funds and advisers Plaintiffs

identify are "comparable," the notion that this comparison constitutes *prima facie* evidence of

excessive fees is legally deficient.  As the Second Circuit long ago recognized, "[r]eliance on

prevailing industry advisory fees will not satisfy § 36(b)."[96]  Hence, in *Amron*, the Second

Circuit affirmed the Rule 12(b)(6) dismissal of a Section 36(b) complaint that relied on the

assertion that the advisory fee was excessive because it was above the industry mean.[97]  And

then in *Jones*, the Supreme Court confirmed that "courts should not rely too heavily on

comparisons with fees charged to mutual funds by other advisers."[98]  Thus, far from constituting

*prima facie* evidence of excessive fees, Plaintiffs' comparison of CA's fees to those charged by

other investment advisers to other mutual funds, absent any plausible allegations demonstrating

the similarity of the services provided by those other advisers to those other mutual funds, is at

best "of limited value."[99]

\*     \*     \*     \*     \*

Finally, it bears mention that Plaintiffs do not, and cannot, allege that the advisory fees

paid to CA by the Fund were in any way hidden or inaccurately disclosed.  Thus, Plaintiffs paid

no more in fees than what they voluntarily agreed to pay, after full disclosure, each year since

they first purchased their shares in 2005.  After freely investing in the Fund, Plaintiffs were in no

way prevented from redeeming their Fund shares and investing their money elsewhere if they

believed that CA's fees were too high.[100]  In the absence of any plausible allegations that CA's

---

[96]     *Gartenberg*, 694 F.2d at 929.

[97]     *Amron*, 464 F.3d at 345 (allegation that expense ratio was above industry mean failed to state claim).  *Accord Migdal*, 248 F.3d at 327 (comparison to funds that charge lower fees and have better performance does not establish that fees are excessive); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687 (allegation that fund "ranked 18[] out of 50 in terms of total fees charged" was "insufficient to state a claim under § 36(b)").

[98]     *Jones*, 559 U.S. at 350.

[99]     *In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *17.

[100]     *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 498 (S.D.N.Y. 1988), *aff'd,* 875 F.2d 404 (2d Cir. 1989) (finding fee not excessive because, inter alia, "the existence of the fee is fully disclosed to potential [] participants").

24

fees are legally "excessive," the decision of the Fund's shareholders—including even Plaintiffs, who have owned the Fund since 2005—to continue to entrust their investments to CA at the fully disclosed fee/expense levels approved by the Fund's Independent Trustees should be respected.

**C.   Plaintiffs' Remaining Allegations Similarly Provide No Plausible Basis To Overturn The Informed Business Judgment Of The Fund's Independent Trustees**

The remainder of Plaintiffs' Complaint generically alleges in scattershot fashion that various other *Gartenberg* factors establish that the fee paid to CA by the Fund is legally excessive.  Yet Plaintiffs nowhere synthesize those disparate allegations into a cognizable claim that the management fee exceeds that which could have been bargained at arms' length. Plaintiffs cannot state a Section 36(b) claim by conclusorily attempting to check off the box for each *Gartenberg* factor.[101]

**1.   Plaintiffs' Legally Deficient Allegations Regarding The Nature and Quality of Services Provided By CA**

While Plaintiffs maintain that CA's fees are too high, they do not even attempt to allege that the quality of CA's services is unsatisfactory.  For instance, the Complaint is devoid of allegations concerning the number of CA employees providing advisory functions, or the tenure, experience, and skill of the investment professionals that are employees of CA.  The absence of any allegations regarding the services rendered by CA is fatal to a Section 36(b) claim, which must plausibly allege that the advisory fee was so disproportionately large that it bears no reasonable relationship <u>to the services rendered</u>.

Instead, Plaintiffs contend that because the Fund underperformed certain benchmarks, the services provided by CA necessarily were of poor quality.[102]  As noted above, the Second Circuit has rejected precisely such post-hoc reasoning, even at the motion to dismiss stage, because

---

[101]     *See, e.g.*, *Amron*, 464 F.3d at 344.

[102]     Compl. ¶¶ 120-126.

"[a]llegations of underperformance alone are insufficient to prove that an investment advisor's fees are excessive."[103]

Even in making their legally-deficient attempt to substitute the Fund's performance for plausible allegations regarding the nature and quality of CA's services to the Fund, Plaintiffs studiously ignore that the Independent Trustees have paid close attention to the Fund's performance over the past several years, including that for the investment advisory year ending June 30, 2014, the Independent Trustees and CA negotiated a five basis point reduction of the advisory fee with the understanding that the Independent Trustees would continue closely to monitor the Fund's performance.[104]  Plaintiffs further ignore the Fund's long-term performance; consistent with the Fund's investment objective of providing long-term growth, since inception, the Fund not only has out-performed the S&P 500 Index, the Russell 3000 Growth Index, and the Russell Midcap Growth Index, but its performance since inception places it in the top three percent of funds in its Category.[105]

**2.      Plaintiffs' Legally Deficient "Economies Of Scale" Allegations**

Plaintiffs' allegations that CA enjoyed economies of scale that it failed to share with the Fund's shareholders fail for two independent reasons: (i) the size of the Fund <u>decreased</u> during the one year prior to the filing of Plaintiffs' Complaint, thus rebutting the very premise of Plaintiffs' economies of scale allegations; and (ii) Plaintiffs do not plausibly allege the existence of economies of scale, let alone that they were not shared.

<u>Plaintiffs inexplicably ignore that the Fund decreased in size during the jurisdictional period</u>: The very "concept of 'economies of scale' assumes that as a mutual fund increases in

---

[103]      *Amron*, 464 F.3d at 344 (citation omitted) (dismissing complaint where plaintiffs "failed to allege any facts pertinent to the relationship between fees and services").  *See In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *48 (C.D. Cal. Dec. 28, 2009) (rejecting Section 36(b) claim where, "[a]side from performance, Plaintiffs failed to offer any evidence about the nature and quality of other advisory services provided by [the adviser] (*e.g.,* executive, administrative, compliance, bookkeeping, etc.)").

[104]      *See* 2013 Annual Report at 202 (Kotler Decl. Ex. 3).

[105]      2014 Annual Report at 4, 230 (Kotler Decl. Ex. 1).

size, its operational costs decrease."[106]  As Plaintiffs' Complaint correctly recognizes, the Fund's

assets under management decreased by as much as 20%—from more than $4 billion to $3.2

billion—in the one year preceding the filing of the Complaint.[107]  Plaintiffs nowhere explain how

CA realized any economies of scale while the size of the Fund decreased so precipitously.

Indeed, taking Plaintiffs' allegations as true, the decreasing size of the Fund would result in

increased "per-unit" costs (i.e., as a percentage of assets under management)—costs that CA

refrained from passing on to the Fund's shareholders.  This is the exact opposite of a failure to

share economies of scale that could conceivably support a Section 36(b) claim.

 Plaintiffs fail to plausibly allege the existence of economies of scale: Even if, contrary to

reality, the Fund had grown in size during the relevant period, Plaintiffs would still be required to

set forth facts showing both that economies of scale were realized and that any scale economies

were not adequately shared.[108]  To meet their pleading burden, therefore, "Plaintiffs must make a

substantive allegation regarding the actual transaction costs at issue and whether the costs per

investor increased or decreased as the assets under management grew."[109]  Absent plausible

allegations to this specific effect, "there is no way to determine whether any economy of scale

even existed that could have been passed on to investors or whether there is another explanation

for the statistics chosen by Plaintiffs."[110]  Thus, where (as here) a complaint points only to the

size of the fees, but makes "no allegations regarding the costs of performing fund transactions or

---

[106] *Kalish v. Franklin Advisors, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990).

[107] *Compare* Compl. ¶ 44 (reporting Growth Fund AUM of $4.4 billion as of 12/31/13) *with* Calamos Growth Fund Fact Sheet at 2 (Mar. 31, 2015) (reporting net assets of $3.2 billion), *available at* www.calamos.com/FundInvestor/MutualFunds/~/Media/documents/product-literature/factsheet/calamos-growth-fund-mutual-fund-fact-sheet.ashx, attached as Ex. 5 to the Kotler Decl.  While Plaintiffs point to increases in the size of the Fund in the mid-2000s, they seek to ignore that the size of the Fund has steadily declined from 2010 to the present.  Indeed, the data Plaintiffs themselves cite demonstrates that the Fund has lost more than $5 billion in assets under management in the last five years. Compl. ¶ 44.

[108] *See Kalish*, 742 F. Supp. at 1239, 1241; *accord In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *16 (granting motion to dismiss because, *inter alia*, "Plaintiffs do not explain how, but merely presume that, economies of scale were achieved.").

[109] *Hoffman*, 591 F. Supp. 2d at 540.

[110] *Id.*

the relationship between such costs and the number of transactions performed," plaintiffs have failed to meet their pleading burden.[111]

In spite of this settled law, Plaintiffs' Complaint baldly states that "the Fund provides [CA] with significant economy of scale benefits at each [] level[]:  the Fund, the Calamos Fund Complex, and [CA's] wider investment advisory operations."[112]  Yet Plaintiffs rest their conclusory assertion on nothing more than "simple example[s]" of how economies of scale **can** arise, generalized statements by the SEC and the GAO, "academic research," and their *ipse dixit* that economies of scale exist *a fortiori* because growth in AUM due to appreciation of asset values does not require additional provision of investment advisory services.[113]  These allegations say nothing regarding "the actual transaction costs at issue," and therefore do not pass legal muster in this Circuit.[114]  Indeed, "[i]f plaintiffs were allowed to state a § 36(b) claim based upon such paltry allegations, then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA."[115]

<u>Plaintiffs fail to plausibly allege that any economies of scale were not shared</u>: Even if Plaintiffs had adequately alleged the existence of economies of scale (which they have not), Plaintiffs have nevertheless failed to allege that those economies of scale were not shared with the Fund's shareholders.  Courts have recognized that "economies of scale can be shared with fund shareholders in a number of ways," including through the use of breakpoints, fee waivers,

---

[111]     *Amron*, 464 F.3d at 345 (affirming dismissal of complaint where plaintiffs "point to the size of the . . . advisory fees, but make no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed").  *Accord Kalish*, 742 F. Supp. at 1238 ("Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized.  The courts reject that argument."); *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").

[112]     Compl. ¶ 91.

[113]     Compl. ¶¶ 92-93, 95, 101-106.

[114]     *Hoffman*, 591 F. Supp. 2d at 540.  *Accord Gartenberg*, 528 F. Supp. at 1055; *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d at 339.

[115]     *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687.

setting initial low fees, or making additional investments to enhance shareholder services.[116] Here, CA indisputably instituted a series of breakpoints to share any economies of scale as the size of the Fund grows.  Plaintiffs' charge that these breakpoints were set unreasonably high[117] is "not sufficient to establish a failure to pass along economies of scale since the allegation does not address the Defendants' alleged increase in economies of scale but merely the compensation structure of the fund as originally set."[118]

Furthermore, Plaintiffs ignore that, as disclosed in the Fund's Annual Report, the Fund's Trustees explicitly considered the existence of economies of scale during their review of the CA Management Agreement, considered the breakpoints put in place for the Fund, and considered CA's commitment to reimburse expenses if the expense ratio for the Fund otherwise would exceed a certain level.[119]  Taking these considerations into account, the Independent Trustees concluded that the fee was appropriate in light of any economies of scale and that the approval of the Management Agreement would be in the best interest of the Fund.  Plaintiffs have failed to allege facts that would provide a plausible basis to overturn this considered business judgment.

### 3.    Plaintiffs' Legally Deficient Profitability Allegations

Plaintiffs next attempt to support their Section 36(b) claim by alleging that CA's overall operating margins "have averaged 39.6%" over a ten year period.[120]  As a threshold matter, Plaintiffs' allegation fails because they do not even attempt to quantify the amount of this profit attributable to advising the Fund, as opposed to CA's other funds and investment clients.

Moreover, in enacting Section 36(b), Congress made clear that "the investment adviser is entitled to make a profit," and that "[n]othing in the bill is intended to imply otherwise."[121]  In

---

[116]    *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *52.

[117]    Compl. ¶¶ 79-86, 107-09.

[118]    *Hoffman*, 591 F. Supp.2d at 540.

[119]    *See* 2014 Annual Report at 234 (Kotler Decl. Ex. 1).

[120]    Compl. ¶¶ 137, 139.

[121]    S. Rep. No. 91-184, at 5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902.  *Accord Gartenberg,* 573 F. Supp. at 1316 ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b).").

accordance with Congress' intent, courts consistently have rejected the assertion that levels of profitability far above those alleged here by Plaintiffs support a Section 36(b) claim.[122]

### 4.    Plaintiffs' Legally Deficient "Fall-Out Benefits" Allegations

Fall-out benefits are "indirect profits to [the adviser] attributable in some way to the existence of the Fund."[123]  Thus, to support a Section 36(b) claim on this basis, a plaintiff must plausibly allege the existence of benefits to the adviser that would not have been realized <u>but for</u> the adviser's role as adviser to the fund.[124]  Plaintiffs do not meet this standard.

As a threshold matter, Plaintiffs cannot dispute that the fees and profits CA earned from any fall-out benefits (to the extent they did exist) or even the supposed "related-party transactions" between CA and other entities owned or controlled by CA were fully disclosed to, and considered by, the Fund's Trustees.

Moreover, Plaintiffs do not allege facts showing the existence of any fall-out benefits that CA would not have received but for its position as Fund adviser.  To the contrary, the fall-out benefits Plaintiffs allege are either (i) not connected to CA's role as adviser to the Fund, or (ii) from separate fees for separate services provided to the Fund.  For example, while Plaintiffs allege that the Fund had already paid for the development of the investment strategy employed by CA, and that CA therefore was able to charge other clients lower rates for employing the same strategy,[125] courts have rejected this very same allegation as failing to satisfy the "but for" test for fall-out benefits.[126]

---

[122]    *See Kalish*, 742 F. Supp. at 1237 (allegation that adviser "just plain made too much money" could not support a 36(b) claim); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax margins up to 89%); *see also In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50 (operating margin ranging from 52% to 36%); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978-79 (S.D.N.Y. 1987) (estimated pre-tax margins up to 66.8% and post-tax margins up to 38.6%).

[123]    *Krinsk*, 715 F. Supp. at 494.

[124]    *See id.* at 495; *Gartenberg*, 694 F.2d at 932.

[125]    Compl. ¶ 150.

[126]    *See, e.g.*, *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 981 (D. Minn. 2007), *rev'd and remanded*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046, (2010), and *order reinstated*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012)

## III.    PLAINTIFFS ALSO FAIL TO ALLEGE ANY PLAUSIBLE BASIS TO OVERTURN THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT WITH RESPECT TO THEIR APPROVAL OF DISTRIBUTION FEES PAID TO CFS

### A.    Regulatory Framework

Pursuant to the ICA and SEC Rule 12b-1, a fund can spend a percentage of its assets on distribution (*e.g.*, "advertising, compensation of underwriters, dealers, and sales personnel, the printing . . . and mailing of sales literature") pursuant to a written plan describing all material aspects of the proposed financing of distribution (a.k.a. a "Rule 12b-1 Plan").[127]  As with a fund's investment management agreement, the fund's Rule 12b-1 plan and the written agreement with its distributor (here, CFS) must be reviewed and approved on a yearly basis at an in-person meeting by the majority of a fund's independent trustees.[128]

While Rule 12b-1 does not itself impose any limit on the type or amount of distribution fees that a fund may pay, the National Association of Securities Dealers ("NASD"), predecessor to the Financial Industry Regulatory Authority ("FINRA"), enacted a rule, approved by the SEC, that regulates the amount of Rule 12b-1 fees that a broker-dealer member can receive.[129]  Among other provisions, this rule provides that a fund's "asset-based sales charge," defined as a fee "paid to finance sales or sales promotion expenses" that is "deducted from the net assets" of the fund, cannot exceed 0.75% of the average annual net assets of the fund.[130]  The rule also provides that a fund's "service fee" for "personal service and/or the maintenance of shareholder

---

(finding assertion that "Defendants receive an enormous fall-out benefit in being able to resell the services that Defendants have already provided to the Funds to institutional clients" failed to state a claim); *Batra v. Investors Research Corp.*, 1992 WL 280790, at *1 (W.D. Mo. Apr. 2, 1992) (dismissing case where plaintiff alleged that investment adviser "engages in duplicate transactions for the clients with identical portfolios and collects substantial fees from these clients without reducing [the investment company's] fees (the fall-out benefits)").

[127]     17 C.F.R. § 270.12b-1(a)(2).

[128]     *Id.* § 270.12b-1(b).

[129]     *See* 15 U.S.C. § 80a-22(b)(1); Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Exchange Act Release No. 34-30897, 57 Fed. Reg. 30985-02 (July 13, 1992).

[130]     FINRA Rule 2830(b)(8), (b)(8)(a), (d)(2)(E)(i).

accounts," such as responding to customer inquiries and providing information regarding their investments, cannot exceed 0.25% per annum of the fund's average annual net assets.[131]

### B.     Plaintiffs Fail To Plausibly Allege That CFS Received "Excessive" Distribution Fees

CFS, as the distributor for the Fund, is charged with a variety of duties including marketing the Fund's shares, employing brokers, and selling shares to investors.[132]  CFS also bears all expenses of personnel, office space, office facilities and equipment in connection with such services.[133]  As also disclosed in the Fund's SEC filings, in exchange for these services, the Fund pays a distribution fee to CFS under the terms of a duly adopted Rule 12b-1 Plan; the amount of the fee varies according to the class of Fund shares at issue, but is within the limits of the aforementioned NASD rule.[134]

Nevertheless, Plaintiffs purport to bring a claim under Section 36(b) that the Rule 12b-1 distribution fees paid by the Fund to CFS are excessive in violation of the ICA.  As with the Fund's investment advisory fee, to state a claim that Rule 12b-1 distribution fees are excessive under Section 36(b), Plaintiffs must allege that these fees are so "so disproportionately large" that they bear "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[135]  However, Plaintiffs nowhere allege any plausible facts to overturn the Independent Trustees' business judgment in approving the payment of distribution fees to CFS pursuant to the Fund's Rule 12b-1 Plan.  Instead, their allegations consist of (i) challenges to the propriety of Rule 12b-1 fees generally,[136] and (ii) further unsupported attacks on the independence and business judgment of the Board of Trustees.[137]

---

[131]     FINRA Rule 2830(b)(9).

[132]     *See* Compl. ¶ 205.

[133]     2014 Annual Report at 149 (Kotler Decl. Ex. 1).

[134]     *Id.*

[135]     *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d at 237.

[136]     *See* Compl. ¶¶ 214-216, 227-242,

[137]     *See* Compl. ¶¶ 249-263.

Courts have repeatedly rejected these very same efforts to state a Section 36(b) claim based on Rule 12b-1 fees paid to the fund's distributor.

For example, Plaintiffs' contention that the distribution fees paid to CFS violate the ICA because "the amounts paid by the Fund are based on the entire asset base regardless of whether any additional shares are sold," has been dismissed as a matter of law as a basis for a Section 36(b) claim.[138]   Likewise, insinuations that the Independent Trustees were not independent and therefore "did not properly review the funds' fee plans" also has been held not to support a Section 36(b) claim.[139]   Plaintiffs' allegation that CFS necessarily fails to share any economies of scale because any increase in the Fund's asset base necessarily results in a corresponding increase in the Rule 12b-1 fees is also legally insufficient.[140]

Finally, Plaintiffs wholly ignore that the distribution fees paid by the Fund include numerous pass-through expenses.[141]   Thus, the distribution fees received are not pure profit for CFS, as the Complaint misleadingly suggests.[142]   Rather, much of the distribution fee is used to pay pass-through distribution expenses of the Fund, *e.g.*, brokerage commissions, educational materials, and the like.   Plaintiffs' conclusory allegations regarding the total amount and profitability of the distribution fees paid to CFS therefore grossly mischaracterizes the actual finances of these fees.[143]

---

[138]     *Krinsk*, 875 F.2d at 413; *accord In re Scudder Mut. Funds Fee Litig.*, 2007 WL 2325862, at *4 (allegation that "investors never benefitted from the revenue-sharing arrangements or from any other aspects of the distribution plan" and that as a result "any Rule 12b-1 fees charged to the Funds were inherently excessive" did not state a claim); *compare* Compl. ¶ 217.

[139]     *Hoffman*, 591 F. Supp. 2d at 529 (rejecting Section 36(b) claim with respect to distribution fees based on allegation that directors "were not independent"); *compare* Compl. ¶¶ 251-53, 258-59, 261-62.

[140]     *Mintz*, 2009 WL 735140, at *3; *compare* Compl. ¶¶ 221-26.

[141]     *See, e.g.*, 2014 Annual Report at 149 (CFS "assumed all expenses of personnel, office space, office facilities and equipment incidental to [distribution] service") (Kotler Decl. Ex. 1).

[142]     *E.g.*, Compl. ¶¶ 267-68.

[143]     Plaintiffs also overreach by seeking recovery of purported lost profits and consequential damages, as well as by requesting a jury trial.  Even if the Complaint could survive a motion to dismiss, Plaintiffs are prohibited under Section 36(b) from recovering "lost investment returns" (Compl. ¶ 5, § IX) or any other consequential damages incurred as a result of the allegedly excessive advisory fees.  *See* 15 U.S.C. § 80a-35(b)(3) ("Any award of damages against such recipient shall be limited to the *actual damages* resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety.


Dated:  June 12, 2015                         Respectfully submitted,

                                              DECHERT LLP

                                              <u>/s/ Matthew L. Larrabee</u>
                                              Matthew L. Larrabee
                                              David A. Kotler
                                              Catherine V. Wigglesworth
                                              Jocelyn V. Hanamirian
                                              Melanie MacKay
                                              1095 Avenue of the Americas
                                              New York, NY  10036-6797
                                              Telephone:  (212) 698-3500

                                              *Counsel for Defendants Calamos Advisors*
                                              *LLC and Calamos Financial Services LLC*

---

<u>payments received</u>. . .") (emphasis added).  Similarly, the law is clear that Plaintiffs are not entitled to a jury trial on a Section 36(b) claim that is inherently equitable in nature.  *See, e.g.*, *Krinsk*, 875 F.2d at 414 (denying jury trial because § 36(b) claims are equitable in nature, even where plaintiff claims to seek "damages"); *Schuyt*, 835 F.2d at 46 (affirming grant of motion to strike jury demand for plaintiff's Section 36(b) claims)).