UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAUL CHILL and SYLVIA CHILL, for the
use and benefit of the CALAMOS GROWTH
FUND,

              Plaintiffs,

   v.

CALAMOS ADVISORS LLC and CALAMOS
FINANCIAL SERVICES LLC,

              Defendants.

No. 15-cv-01014 (ER)

ECF CASE

ORAL ARGUMENT REQUESTED

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Defendants and the Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     The Substantially Lower Fees Paid by Other Investors for Comparable
           Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           1.     The Lower Fees Paid by Calamos' Arm's-Length Institutional
                 Clients for Comparable Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           2.     The Lower Fees Paid by Other Mutual Funds for Comparable
                 Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.     Defendants' Realization and Monopolization of Economies of Scale in
           Providing Advisory Services to the Fund as it Grew . . . . . . . . . . . . . . . . . . . . . 8

      D.     The High Profitability of the Fund to Defendants . . . . . . . . . . . . . . . . . . . . . . 10

      E.     The Fall-Out Benefits that Accrued to Defendants . . . . . . . . . . . . . . . . . . . . . 11

      F.     The Nature and Quality of the Services Provided . . . . . . . . . . . . . . . . . . . . . . 11

      G.     The Trustees' Failure to Exercise an Appropriate Level of
           Conscientiousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      H.     The Fund's Distribution Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      THE APPLICABLE PLEADING STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.     THE STANDARD OF LIABILITY UNDER §36(B) . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.    THE COMPLAINT PLAUSIBLY ALLEGES THAT THE CHALLENGED
       ADVISORY FEE WAS EXCESSIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.     The Substantially Lower Fees Paid by Other Investors for Comparable

Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    1.    The Institutional-Fee Comparisons Are Apt. . . . . . . . . . . . . . . . . . . . . . . 19

    2.    Defendants' "Additional Service" Claims At Best Raises Factual
        Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    3.    § 36(b)'s Limitations Period Does Not Preclude Relevant Evidence
        Going Back More Than One Year. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    4.    The Comparisons to Objectively Similar Mutual Funds Are Apt. . . . . . . 23

B.    Defendants' Failure to Share Economies of Scale with the Fund. . . . . . . . . . . . 24

C.    The Nature and Quality of the Services Provided. . . . . . . . . . . . . . . . . . . . . . . . 27

D.    The Profitability of the Fund to the Advisor. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E.    The Fall-Out Benefits that Accrued to Defendants. . . . . . . . . . . . . . . . . . . . . . . 29

F.    The Trustees' Failure to Exercise an Appropriate Level of
    Conscientiousness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.    THE COMPLAINT PLAUSIBLY ALLEGES THAT THE DISTRIBUTION FEES
    WERE EXCESSIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## *CASES*

*Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*,
No. 14-cv-44, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014). . . . . . . . . . . . 1, 20, 26, 32

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Batra v. Investors Research Corp.*,
144 F.R.D. 97 (W.D. Mo. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

*Batra v. Investors Research Corp.*,
1992 WL 280790 (W.D. Mo. Apr. 2, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bell Atlantic Corp. v. Twombly*,
50 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burks v. Lasker*,
441 U.S. 471 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Curd v. SEI Invs. Mgmt. Corp.*,
No. 13-cv-7219, 2015 WL 4243495 (E.D. Pa. July 14, 2015).. . . . . . . . . . . . . . 1, 20, 22

*Curran ex rel. Principal Funds, Inc. v. Principal Mgmt. Corp., LLC*,
No. 09–cv–433, 2010 WL 2889752 (S.D. Iowa June 8, 2010),
*vacated in part on other grounds*,
2011 WL 223872 (S.D. Iowa Jan. 24, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Daily Income Fund v. Fox*,
464 U.S. 523 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dumond v. Mass. Fin. Servs. Co.*,
No. 04-cv-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006). . . . . . . . . . . . . . . . 29, 35

*Forsythe v. Sun Life Fin., Inc.*,
417 F. Supp. 2d 100 (D. Mass. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34

*Gallus v. Ameriprise Fin. Inc.,*
    497 F. Supp. 2d 974 (D. Minn. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
    694 F.2d 923 (2d Cir. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 20, 30

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.,*
    No. 14-cv-414, 2015 WL 965665 (S.D. Ohio Mar. 4, 2015).. . . . . . . . . . . . . . . . *passim*

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Hunt v. Invesco Funds Grp., Inc.,*
    No. 04-cv-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006). . . . . . . . . . . . . . . . *passim*

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.,*
    No. 04-cv-4885, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006). . . . . . . . . . . . . . . . . . 22, 34

*In re Am. Mut. Funds Fee Litig.,*
    No. 04-cv-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009). . . . . . . . . . . . . . . . . . 3

*In re Blackrock Mut. Funds Advisory Fee Litig.,*
    No. 14-cv-1165, 2015 WL 1418848 (D.N.J. Mar. 27, 2015). . . . . . . . . . . . . . . . *passim*

*In re Eaton Vance Mut. Funds Fee Litig.,*
    380 F. Supp. 2d 222 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Federated Mut. Funds Excessive Fee Litig.,*
    No. 04-cv-352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009). . . . . . . . . . . . . . . . *passim*

*In re Franklin Mut. Funds Fee Litig.,*
    478 F. Supp. 2d 677 (D.N.J. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Goldman Sachs Mut. Funds,*
    No. 04-cv2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006).. . . . . . . . . . . . . . . . . . . 27

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    528 F. Supp. 2d 332 (S.D.N.Y. 2007),
    *aff'd in part, vacated in part sub nom,*
    *The R.W. Grand Lodge of F. & A.M. of Pennsylvania v.*
    *Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011). . . . . . . . . . . . . . . 28

*In re Scudder Mut. Fund Litig.*,
    No. 04-cv-1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007). . . . . . . . . . . . . 22, 24, 35

*ING Principal Prot. Funds Derivative Litig.*,
    369 F. Supp. 2d 163 (D. Mass. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n.*,
    655 F.3d 136 (2d Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kalish v. Franklin Advisors, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kasilag v. Hartford Inv. Fin. Servs. LLC*,
    No. 11-cv-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).. . . . . . . . . . . . . . . . *passim*

*Krantz v Fidelity Mgmt. & Research Co.*,
    98 F. Supp. 2d 150 (D. Mass. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F. Supp. 472 (S.D.N.Y. 1988),
    *aff'd*, 875 F.2d 404 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

*Meyer v. Oppenheimer Mgmt. Corp.*,
    707 F. Supp. 1394 (S.D.N.Y.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    No. 98-2162, 2000 WL 350400 (D. Md. Mar. 20, 2000),
    *aff'd*, 248 F.3d 321 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Migdal v. Rowe Price-Fleming Int'l Inc.*,
    248 F.3d 321 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mintz v. Baron*,
    No. 05-cv-4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009). . . . . . . . . . . . . . . . . . 35

*Pfeiffer v. Bjurman, Barry & Assocs.*,
    No. 03-cv-9741, 2004 WL 1903075 (S.D.N.Y. Aug.26, 2004).. . . . . . . . . . . . . . . . 35

*Reso v. Artisan Partners Ltd. P'ship*,
    No. 11-cv-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011). . . . . . . . . . . . 1, 16, 26-28

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
663 F. Supp. 962 (S.D.N.Y. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Sins v. Janus Capital Mgmt.*,
No. 04-cv-1647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006). . . . . . . . . . . 18, 20, 23, 30

*Strigliabotti v. Franklin Resources, Inc.*,
No. 04-cv-883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005). . . . . . . . . . . . . . . . . *passim*

*Strougo v. BEA Assocs.*,
188 F. Supp. 2d 373 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*Wicks v. Putnam Inv. Mgmt., LLC*,
No. 04-cv-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005). . . . . . . . . . . . . . . . . . 35

*Zehrer v. Harbor Capital Advisors, Inc.*,
No. 14-cv-789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014). . . . . . . . . . . . . . . . . *passim*

*Zucker ex rel. AIM Small Cap Growth Fund/A v. AIM Advisors, Inc.*,
371 F. Supp. 2d 845 (S.D. Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Statutes**

15 U.S.C. §80a-35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Authorities**

FINRA Rule 2830. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

SEC Report on the Public Policy Implications of Investment Company Growth,
H.R. Rep. No. 89-2337 (1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Plaintiffs, on behalf of and for the benefit of the Calamos Growth Fund (the "Fund"), respectfully submit this memorandum, together with accompanying Declaration of Mark A. Strauss, in opposition to the motion of defendants Calamos Advisors LLC ("Calamos") and Calamos Financial Services LLC ("CFS," and with Calamos, "Defendants") to dismiss Plaintiffs' Complaint.[1]

## PRELIMINARY STATEMENT

Defendants' motion suffers from three central flaws.

First, Defendants disregard that the Supreme Court, in clarifying §36(b) standards in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010), breathed new life into §36(b) as a robust mechanism for shareholders to challenge excessive mutual fund fees.  Resolving a prior conflict in authority, *Jones* explicitly endorsed fees paid by institutional clients as potentially apt comparisons, rejecting any "categorical rule regarding the comparisons of the fees charged different types of clients," *id*. at 349, which is precisely what Defendants urge here.  *Jones* also rejected the idea that directorial approval of a fee renders it impregnable under §36(b) – which is a central theme of Defendants' brief – and held that approval by directors is not dispositive if there is "additional evidence that the fee exceeds the arm's-length range," *id*. at 352, as Plaintiffs allege here.  *Jones* has led to a series of well-reasoned decisions denying motions to dismiss §36(b) claims based on allegations similar to those here.[2]  Ignoring these apposite precedents, Defendants rely on pre-*Jones* authority.

---

[1] "¶__" refers to paragraphs of the Complaint, Doc. No. 1.  "Br." refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss.  "Strauss Decl." refers to the accompanying Declaration of Mark A. Strauss in Opposition to Defendants' Motion to Dismiss, dated August 13, 2015.

[2] *See e.g. Curd v. SEI Invs. Mgmt. Corp*., No. 13-cv-7219, 2015 WL 4243495 (E.D. Pa. July 14, 2015); *In re Blackrock Mut. Funds Advisory Fee Litig.*, No. 14-cv-1165, 2015 WL 1418848 (D.N.J. Mar. 27, 2015); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, No. 14-cv-414, 2015 WL 965665 (S.D. Ohio Mar. 4, 2015); *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14-cv-789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014); *Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp*., No. 14-cv-44, 2014 WL 5426908 (S.D. Iowa Sept. 10, 2014); *Kasilag v. Hartford Inv. Fin. Servs. LLC*, No. 11-cv-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012); *Reso v. Artisan Partners Ltd. P'ship*, No. 11-cv-873, 2011 WL 5826034 (E.D. Wis. Nov. 18,

(continued...)

Second, Defendants conflate the burden of *proof* on summary judgment or at trial with the *pleading* standard on a motion to dismiss.   Indeed, virtually all of the cases that Defendants cite involved the question of adequate proof on a § 36(b) claim.   However, at the pleading stage, Plaintiffs must simply allege facts sufficient to plausibly support an inference that the challenged fee was disproportionately large, not present proof.

Third, Defendants repeatedly rely on their own self-serving hearsay purportedly giving a contrary version of the facts.   Obviously, however, this conflicts with 12(b)(6) standards, under which Plaintiffs' well-pled allegations are entitled to be taken as true.   At best, Defendants' attempt to contest the accuracy of the allegations raises fact issues that cannot be resolved at this stage.

As set forth below, the Complaint more than adequately satisfies the applicable pleading standards in light of *Jones*.   The Complaint plausibly alleges that other investors – including Defendants' own institutional clients – paid substantially lower fees for similar investment advisory services.   Economies of scale were achieved, but Defendants monopolized those benefits without sharing any with the Fund.   The quality of Defendants' services was poor, resulting in the Fund's substantially underperforming both its benchmark and similar mutual funds.   Meanwhile, Defendants reaped outsize profit margins, among the highest in the industry.   Defendants also earned lucrative fall-out benefits in the form of revenues derived from other clients and fees from ancillary services provided via affiliates.

_____

[2](...continued)
2011); *Curran ex rel. Principal Funds, Inc. v. Principal Mgmt. Corp., LLC*, No. 09–cv–433, 2010 WL 2889752 (S.D. Iowa June 8, 2010), *vacated in part on other grounds*, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011).

The Board also lacked conscientiousness, and, hence, under *Jones*, is entitled to little or no deference.  The Board approved Fund fees based on incomplete, inaccurate and/or misleading information supplied by Calamos, and failed to obtain more accurate and/or unbiased information from other sources.  The Board's approval lacked factual basis and was counterfactual in important respects.  The Board uncritically accepted unfounded rationalizations offered by Defendants for the higher fee charged to the Fund as compared to Defendants' institutional clients.  The Board failed to determine whether the Fund actually received any additional services, as Defendants claimed, or whether any such services justified the fee disparity.  Moreover, the Board failed to determine whether the Fund's breakpoints actually saved the Fund any money (they did not).

In sum, the Complaint easily satisfies the standards of 12(b)(6) under *Jones*, and Defendants' reliance on pre-*Jones* and/or post-12(b)(6) authority[3] is unavailing.

## STATEMENT OF FACTS

### A.    Defendants and the Fund

Defendant Calamos serves as investment adviser, and Defendant CFS as distributor, to the Fund (and to all other captive funds in the Calamos Fund Complex).  ¶¶ 2, 11-12, 31.

Calamos' duties as Fund investment advisor are set forth in the Investment Management Agreement ("IMA") between Calamos and the Fund.  ¶¶34-35, 117-19 (quoting IMA); Strauss Decl. Ex. A [IMA]. These duties are two-fold:  (1) researching potential investments and deciding which

---

[3]  *See, e.g., Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002) (motion to dismiss after discovery treated as motion for summary judgment); *Kalish v. Franklin Advisors, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394 (S.D.N.Y.1988); *In re Am. Mut. Funds Fee Litig.*, No. 04-cv-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009); *Schuyt v. Rowe Price Prime Reserve Fund, Inc*., 663 F.Supp. 962 (S.D.N.Y. 1987).

securities to buy for or sell from the Fund's portfolio ("Portfolio Selection Services") (¶¶ 35-39, 117-18); and (2) further services, such as (a) compliance (maintaining books and records), and (b) reporting to Fund shareholders and the Fund's Board on Fund performance ("Other Services") (¶¶35, 119).  Additional services – such as back-office, oversight and marketing/communication functions – are provided separately, by other service providers, pursuant to other contracts for such services, or are expensed directly to the Fund.  ¶¶32, 111-14.

The IMA sets forth the fee rates that the Fund is obligated to pay Calamos for such investment advisory services.  *See* ¶¶ 51-54, 79-88 (extensive detail and analysis of rates and fees, from 1999-2014).  During the fiscal year ended October 31, 2014, the Fund paid $31.535 million to Calamos in investment advisory fees; an effective rate of 0.83% of Fund AUM.  ¶¶ 53-54, 115.

The Fund, Calamos' "flagship" investment product, has long been the single largest source of Defendants' investment advisory and distribution fees. ¶¶40-46.  Consequently, Defendants have a particularly heightened interest in maintaining Fund fees at levels as high as possible.  ¶ 46.

**B.     The Substantially Lower Fees Paid by Other Investors for Comparable Services**

    **1.     The Lower Fees Paid by Calamos' Arm's-Length Institutional Clients for Comparable Services**

In addition to providing advisory services to the captive funds in the Calamos Fund Complex (¶¶40-46), Calamos also, at the beginning of 2014,  provided advisory services to approximately 140 non-captive institutional clients on an arm's-length basis (¶48),[4] including *inter alia*: (1) institutions that maintain "separate accounts" (¶¶55-60), and (2) other investment advisers retaining Calamos

---

[4]  Their identities, and the fees they paid for the services they received, are largely matters within Defendants' peculiar knowledge and exclusive control.  ¶¶49, 61.  However, disclosure requirements applying to certain clients – particularly, investment advisors who retain Calamos as a subadvisor to provide investment advisory services to other funds – sometimes enable their identification.  ¶¶62, 132.

to provide subadvisory services to other funds (¶¶61-71).  Calamos' "Standard Fee Schedules" for

separate accounts (¶57), and Calamos' contracts with particular institutional clients (¶¶62, 65), detail

the fees Calamos charges to such clients, which range from 0.51% to 0.65% (versus the 0.83%

advisory fee charged to the Fund).  ¶¶58-59, 63-64.[5]  The Fund's fees are 28%-66% higher than those

paid by such arm's-length, non-captive clients, even though the services Calamos provided to these

clients were substantially identical to those it provided to the Fund.  ¶¶56-57, 59, 65-71.

Calamos maintains 18 different "Standard Fee Schedules" for separate account clients,

depending on the investment strategy provided.  Strauss Decl., Ex. B; ¶¶56-57.[6]  Many of these

strategies, as Calamos itself explains, are "substantially similar to those employed by our Mutual

Funds."  ¶66.  The particular "Standard Fee Schedule" identified in the Complaint is for provision

of Calamos' "Growth" investment strategy – *i.e.*, the same strategy provided to the Fund. ¶¶56-57,

66.  Indeed, Calamos itself further specifies that for "certain" clients, Calamos "replicate[s] the

Calamos Growth Fund strategy and portfolio holdings of the Growth Fund."   ¶66.   Therefore,

---

[5]  The Complaint contains a scrivener's error that overstates the fees Calamos charged to its institutional clients (and thus *understates* the difference between the fees charged to the Fund and to such clients).  This error can be seen by comparing the "Standard Fee Schedule" for provision of Calamos' "Growth" strategy (¶57, reproduced from Calamos' Form ADV) with its referenced source document (Strauss Decl. Ex. B [Form ADV], at 5).  The Form ADV indicates that the rate charged on all AUM above $75 million is 0.50%; the Complaint erroneously transcribed that rate as 0.60%.  *Id.*  Correcting this error results in the following changes to the fee comparison calculations set forth in ¶¶58-59: (1) under such schedule, an institutional client with AUM equal to the Fund would pay $22.12 million in fees, represented a blended rate of 0.51%, rather than $26.439 million in fees, representing a blended rate of 0.60% (¶58); and (2) the Fund pays investment advisory fees that are 65.70%, rather than 38.63%, greater than those charged as a "standard" matter to institutional clients receiving the Growth strategy (¶59).

[6]  Notably, these 18 strategies offered to separate accounts map, essentially on a 1-to-1 basis, to the 17 different captive funds in the Calamos Fund Complex.  *Compare* ¶41 (listing the funds) with Straus Decl. Ex. B, at 5-7 (listing the strategies).  This is because Calamos' separate account offerings include portfolios that copy those of the captive funds, including the Fund.  ¶¶65-66.

5

institutional clients for Calamos' Growth strategy (1) pay lower fees, while (2) receiving advisory services that are comparable to – if not identical to – those provided to the Fund.  ¶¶55-60, 66.

Further facts – including Calamos' actual contracts with two arm's-length, non-captive institutional clients, and the services provided to such clients under such contracts – so confirm. ¶¶61-71.  These two clients, Genworth and Thrivent, retained Calamos as a "subadvisor" to provide "subadvisory" services to funds for whom Genworth and Thrivent served as investment advisers (¶¶62 and n.5, 65(a) and n.6, 70 and n.10).  Notwithstanding the "subadvisory" *label* appended to the contracts and services, the subadvisory services, as specified in the subadvisory contracts that Calamos signed, were substantially identical to the advisory services that Calamos was required to provide to the Fund under the IMA.  *Compare* ¶35 and n.3 (quoting IMA) with ¶¶65(a) and n.6, 70 and n.10 (quoting subadvisory contracts).

Under both the IMA and subadvisory contracts, the requisite services in primary and largest part were Portfolio Selection Services.  ¶117; ¶¶35-38, 61-70, 110-19.  The Portfolio Selection Services provided to the Fund and to these clients were not merely similar, but substantially *identical*.  ¶¶65-68.  The Genworth and Thrivent funds which Calamos subadvised (the "Identical Subadvised Funds"): (1) featured "investment objectives" and "principal investment strategies" word-for-word identical to the Fund's (¶65(b)); (2) deployed the very same Calamos personnel responsible for managing the Fund's investments (¶65(c)); (3) held substantially the same securities, in substantially the same proportions, as the Fund (¶65(d)); and (4) performed identically to each other and to the Fund (¶65(e)).  Put simply, Genworth and Thrivent were two of the "certain" clients for whom Calamos "replicate[d] the Calamos Growth Fund strategy and portfolio holdings of the Growth Fund."  ¶¶65-66.

6

In much smaller part, the requisite services under both the IMA and the subadvisory contracts also covered "Other Services," including maintaining books and records and compliance/reporting functions (*e.g.*, periodic communications with clients concerning Calamos' Portfolio Section Services). ¶¶35(b), 69-70, 119.  Calamos' contractual obligations to perform Other Services were substantially identical with respect to the Fund and the Identical Subadvised Funds.  *Id*.  If anything, the contractual obligations concerning Other Services owed to the Identical Subadvised Funds were more onerous than those owed to the Fund.  ¶70.

Although mutual funds such as the Fund require many services that non-fund clients do not, these additional services are *not investment advisory services provided by investment advisers under investment advisory contracts*, but rather a variety of services provided by other service providers pursuant to separate contracts with the Fund.  ¶¶32, 71, 111-14.  These additional services therefore do not and cannot account for the higher advisory fees that Calamos charged to the Fund: the Fund separately paid other providers for such services.  *Id*.

## 2.    The Lower Fees Paid by Other Mutual Funds for Comparable Services

The Complaint also proffers a systematic analysis comparing Fund fees against (1) advisory fees paid by comparable mutual funds (*i.e.*, those pursuing a similar investment focus and strategy);[7] and (2) advisory fees paid by a smaller subset of the above-specified mutual funds whose larger size (exceeding $1 billion AUM) makes them all the more comparable to the Fund (¶¶72-78).

Of the more than 7,000 U.S.-domiciled mutual funds, 246, including the Fund, are categorized by Bloomberg as U.S. large cap growth funds (¶¶73-74).  These 246 funds, identified

---

[7]  Mutual funds are differentiated by the asset classes they invest in (for example, equity or debt), the geographic markets they focus on (the U.S., emerging markets, Asia, etc.), the size of the companies they invest in (large cap, mid cap, small cap), and other investment focii or disciplines (e.g., growth or value).

in Ex. C to the Strauss Decl., feature comparable investment strategies per the above-mentioned parameters (*i.e.*, they all seek to invest in stocks issued by large, U.S. companies deemed to possess the best growth prospects).  The average advisory fee paid by these 246 funds is 0.66% (¶74).  The fee charged to the Fund, 0.83%, is 25% higher than that average.  *Id.*

To take into account possible economies of scale that allow large funds to charge lower rates (and require smaller funds to charge higher rates), the comparison was further delimited to only those funds of similarly large size (AUM exceeding $1 billion).  ¶75; *see also* Strauss Decl. at Ex. D (identifying subset of 90 funds and their fees).  The average advisory fees charged to these 90 larger funds was 0.59% (*i.e.*, less than the abovementioned 0.66% average).  *Id.*  The fees Calamos charged to the Fund, 0.83%, were thus more than 40% larger than the average fees charged to all mutual funds featuring investment strategies and size similar to the Fund's.  *Id.*   In fact, only 6 of these 90 most comparable mutual funds paid higher investment advisory fees than the Fund. ¶¶ 76-78.

### C.    Defendants' Realization and Monopolization of Economies of Scale in Providing Advisory Services to the Fund as it Grew

As Fund AUM increased more than 15-fold, from $207 million in 2001 to $3.48 billion at the end of 2014, Calamos' advisory fees grew at an even *steeper* rate: rising nearly 30-fold from $1.1 million to $31.5 million. ¶54; *see also* ¶106.  Such growth was accompanied by sizeable economies of scale (¶¶101-05).  For example, the number of investments held by the Fund in 2014 (87) barely exceeded the number in 2001 (81); and the number of portfolio managers providing investment advisory services to the Fund was similarly constant (¶¶104-05).  In economy of scale language, as it cost Calamos little more to provide advisory services to the Fund in 2014, when Fund AUM stood

at $3.48 billion, than it did in 2001, when Fund AUM were only $207 million, the marginal cost of providing advisory services for such additional AUM approached zero.[8]

Rather than meaningfully reduce advisory fee rates on such AUM to reflect the marginal advisory costs, the Fund's fee schedules allowed Calamos to charge high fee rates on such AUM and thereby monopolize, rather than share, the economy of scale benefits generated by the Fund's large size (¶¶79-88, 107-09).   As the Fund's growth began to generate economies of scale after 1999, the Fund adopted two new fee schedules: first in August 2000, which remained in effect through July 2004, and again in August 2004, which remains in effect today (¶79 at Table 6).   Remarkably, although both the 2000 and 2004 amendments added new fee breakpoints, neither reduced the Fund's fees.   ¶¶80-86, 108-09.[9]   Instead, they allowed Calamos to extract advisory fees from the

---

[8] Further allegations confirm that the Fund's growth did not require Calamos to produce additional services in the measure of such growth. For example, at year-end 2014, nearly half of the value of the Fund's assets (then, $3.48 billion) derived from mere asset value appreciation ($1.72 billion) – a factor requiring *zero* additional provision of investment advisory services (¶¶102 and 92-93(a)).   Likewise, although the Fund's $1.76 billion of shareholders' paid-in capital indicated that the Fund had many investors in 2014 (certainly, many more than in 2001), the additional services required to cope with such influx were *not investment advisory services*, but rather various back-office services provided by other service providers (¶¶103 and 93(b)-(c)).

[9] The practical effect of the three rate schedules (pre-2000; 2000-2004; and 2004 onwards) operative during the Fund's sharp AUM growth from 1999 to 2014 is demonstrated for multiple Fund AUM scenarios at ¶84 at Table 7, and further elaborated at ¶¶ 83-85 and 108-09.  The August 2000 fee schedule *increased* advisory fees: although it instituted new fee breakpoints, the new rates charged at all new fee breakpoints were *higher* than the pre-2000 rates.   ¶¶82, 84 and Table 7.  The August 2004 rate schedule, operative today: (1) kept rates the *same* with respect to the Fund's first $6 billion of AUM, and (2) added a series of new, late-breaking and widely-spaced breakpoints (decreasing in 0.02% increments for every further $5 billion of AUM after the first $6 billion).  ¶79 at Table 6. Their effect was not merely infinitesimal (a 0.10% rate reduction over a $20 billion increase in AUM), but entirely theoretical (as Fund AUM fall short of triggering even the first of these new breakpoints). ¶¶79, 83-85, 108-09.

Fund at *higher* rates than ever before.  *Id.*[10]  As a result, Calamos did not merely monopolize economy of scale benefits but, over time, made its monopoly extraction more punitive.  ¶106.

### D.    The High Profitability of the Fund to Defendants

The precise profit that Calamos generates through providing advisory services to the Fund is not publicly disclosed or ascertainable, and is known and knowable only to Defendants (¶141).  Information that *is* publicly available – from Defendants' parent company's financial statements and the Fund's annual reports – plausibly indicates that such profits are not merely above average, but unusually – and likely extraordinarily – high (¶¶136-45).

First, Calamos' *overall* profit margins are among the highest exhibited by any investment adviser (¶137), averaging 39.6% over the last decade (¶¶138-39, 143).  Second, Calamos' *Fund-specific* profit margins appear to be even higher (¶¶142; 140-45).  For example, as economies of scale indicate that many of Calamos' smaller captive funds appear to operate at a loss and that the Fund, Calamos' largest, operates at the greatest profit, overall profit margins mask (1) even higher profits from Fund, offset (2) by losses from other advisory operations (¶¶141-42; *see also* ¶¶41-44).  Third, particularized facts: (a) demonstrate that Calamos disproportionately derives advisory fee income from the Fund (¶¶41-44; 143); (b) demonstrate that the Fund was, by far and at all times, the largest single driver of Calamos' revenues; and (c) indicate that the Fund's contribution to overall profits exceeds its contributions to revenues and AUM (¶¶144-45; *see also* ¶¶147-53).

---

[10]    The 0.83% fees the Fund now pays under currently operative rates, when its large size generates significant economies of scale in the provision of investment advisory services (¶¶101-06), are substantially *higher* than the 0.76% fees it would pay under pre-2000 rates (operative when the Fund's small size provided no such economies). ¶84.

### E.   The Fall-Out Benefits that Accrued to Defendants

"Fall-out benefits" refers to any income, profits or other benefits accruing to an investment adviser by virtue of its investment advisory relationship to a fund, separate and distinct from investment advisory fees paid by the fund. ¶147. Here, Defendants enjoyed three distinct "fall-out" benefits that would not have accrued to them but for Calamos' relationship to the Fund (¶¶ 148-53).[11]

First, by providing copies of the Fund to institutional clients (such as the Identical Subadvised Funds), Calamos generated further streams of advisory income – based on work and infrastructure paid for by the Fund – at little or no additional cost. *See* ¶¶149-151; 61-67. Second, the windfall profits generated by the Fund allowed Calamos to launch new captive funds, subsidize them as they initially operated at a loss (absent which subsidy such funds could not be launched or maintained), and thereby generate further new advisory income streams (¶152; *see also* ¶¶41, 142). Third, in addition to investment advisory fees, Calamos and CFS extracted sizeable further annual fees from the Fund – including distribution fees and "financial accounting fees" – thereby gaining yet further income streams as a result of providing the Fund with investment advisory services. ¶153. In each case, particularized allegations estimate, detail, and/or provide indication of the value of such benefits. *See*, respectively, ¶¶151, 41, 153.

### F.   The Nature and Quality of the Services Provided

Portfolio Selection Services are the primary component of the advisory services Calamos provided to the Fund (and to its arm's-length clients). ¶¶117-19; *see also* ¶¶34-39, 61-71, 110-19.

---

[11] They also provided the Calamos Control Persons with further fall-out benefits as result of numerous related party transactions, through which Defendants were provided (by related parties) with room and board. ¶154.

The primary metric used by Calamos, the Fund's Board, Fund investors and institutional clients to judge the services provided is investment performance (absolute and comparative).  ¶118.

Calamos itself (¶¶ 121-22), mutual fund industry analyst Morningstar (¶¶ 123-26), and Calamos' clients (¶¶127-35) agree that quality has been poor. The Fund, over each of the most recent 1, 3, 5 and 10 periods, significantly underperformed all relevant benchmarks (¶¶122, 124). Morningstar assigns the Fund its lowest rating (one star out of five), indicating that the Fund falls within the bottom 10% of its category (¶¶124-26).  Calamos' *non-captive* clients deemed Calamos' investment advisory services so poor that they did exactly what Calamos' captive funds, such as the Fund, cannot:  terminate Calamos, and retain other investment advisors instead (¶¶127-35).

G.      **The Trustees' Failure to Exercise an Appropriate Level of Conscientiousness**

On June 26, 2014, the Board approved the advisory contracts and advisory fees for all funds in the Calamos Fund complex, including the Fund (¶¶166 *et seq*.).  Notwithstanding such approval, and no matter the amount of deference accorded it, the Fund's fees were excessive (¶¶156-59).

All available information concerning the Board's approval process indicates, however: (1) that the Board's approval was based on incomplete, inaccurate and/or misleading information provided by Calamos; (2) that the Board's approval was in important respects without factual basis, and at times counterfactual; (3) that, in uncritically accepting such information and failing to obtain more accurate and/or unbiased information from other sources, the Trustees lacked adequate conscientiousness in considering and approving the Fund's fees, and (4) consequently, that the Court need not grant significant deference to such approval (¶¶157-88, 160-205).

While full details concerning the approval process remain within Defendants' peculiar knowledge and exclusive control (¶197), the Board's approval process was described in the Fund's

Annual Report ("AR") (¶¶189-90), which provides particularized factual foundation for Plaintiffs' allegations concerning the Trustees and the Board (¶¶167, 169-78, 189-97), particularly when set against Plaintiffs' particularized factual allegations concerning the other *Gartenberg* factors (*ibid.* and *see also* ¶¶198-203).  For example:

- **Fee Comparisons / Nature of Services Provided**.  Although noting that Calamos charged higher advisory fees to the Fund (and other captive funds) than to arm's-length clients, the Trustees credited "the Adviser's assertion" that the Fund received additional advisory services (¶170). Such assertion, however, appears to have been incorrect and/or misleading: the services, as detailed pleadings here indicate, were substantially identical.  *Id*.

- **Quality of Services**.  Likewise, although noting that the Fund paid *higher* advisory fees than peer mutual funds, but *underperformed* such funds throughout the prior *decade*, the Trustees approved the Fund's higher fees for one more year because "it would be prudent to allow the portfolio management team additional time to develop its record."(¶¶171-72). Given the decade-long record of underperformance already established, this was baseless (¶172(a)).  Likewise, the Trustees' only other stated justification – that Calamos had agreed to cap expenses for one class of Fund shareholders – ignored that: (a) expenses for other shareholders were *not* capped, (b) even with the cap, the Fund's fees *still exceeded* those of the peer funds, and (c) *that the cap had not functioned to reduce Calamos' advisory fees by even single penny* (¶172(b)).

- **Economies of Scale**.  Similarly, although noting that Trustees purportedly considered the "potential" economies of scale and whether the Fund's fees functioned to share them (¶175), such consideration appears to have been cursory, and/or based on incomplete or misleading information (¶176).  For example, although the Trustees "recognized" generally that the Fund's fee breakpoints "*could* result in the sharing of economies of scale" (¶176(a)) (emphasis added), the Trustees apparently failed to consider facts indicating that the breakpoints did not actually produce such results and instead allowed Calamos to monopolize economy of scale benefits (¶176(b)).  Likewise, the Trustees again credited Calamos for having agreed to the above-mentioned expense cap, even as they ignored that the cap had not functioned to reduce advisory fees at all (¶176(c)).

- **Fall-out Benefits**.  Again, although noting that the Trustees purportedly reviewed fall-out benefits, the information provided to the Trustees, and/or their consideration, appears to have been incomplete, cursory and flawed (¶¶177-78).  For example, the *single* benefit that the Trustees considered – directed brokerage – was smaller than,

13

and had no relation to, the three sets of fall-out benefits pled in particularized detail here (¶¶177-78; *see also* ¶¶147-53).

These detailed allegations indicate that the Trustees lacked appropriate conscientiousness in their consideration and approval of the Fund's advisory fees, insofar as they relied substantially upon, and appear to have uncritically accepted, incomplete, inaccurate and/or biased information supplied to them by Calamos.

Moreover, when combined with further allegations – including the sharp contrast between the actions taken by Calamos' arm's-length clients[12] and the Fund's Trustees,[13] notwithstanding Calamos' provision to both of identical services of identical quality at identical times – they provide plausible indication that the Trustees merely rubber-stamped the fees that Defendants proposed (¶161(b)-(c); ¶¶179 *et seq*.), without taking any action to reject (let alone negotiate) Calamos' proposed advisory fees (¶¶161(b), 181-85, 200, 202), or to consider or solicit from other investment advisors provision of superior services at better cost (¶¶181-87, 198-204; *see also* ¶¶127-35).

## H.    The Fund's Distribution Fees

In 2014, the Fund paid $15.881 million in distribution fees (¶213), assessed at differing rates to differing classes of Fund shareholders (¶210-12).  However, these distribution fees not only *failed*

---

[12] Calamos' arm's-length clients: (1) evaluated multiple advisors, and negotiated Calamos' retention and fees at arm's-length; (2) obtained fee rates much lower than those to which the Trustees agreed (including far sharper and steeper fee breakpoints than those to which the Trustees agreed), even as the Portfolio Selection Services and/or investment advisory services they received were identical to those received by the Fund; and (3) in light of the poor quality of the services they received, terminated Calamos and engaged other advisors instead.  ¶¶127-35; 181-87, 198-204.

[13] By contrast, during the same time, the Trustees not only (1) continued to retain Calamos as the Fund's investment advisor, but (2) approved fee schedules that allowed Calamos to charge *higher* rates even as the Fund grew in size; and (3) kept such schedules and high fees in effect notwithstanding the poor quality of the services provided *at all times during the prior 10 years*.  ¶¶127-35; 181-87, 198-204.

14

to benefit the Fund by leading to reduced advisory fees as Fund AUM grew (¶¶221-26),[14] but in fact functioned as an *additional* and excessive layer of *advisory* fees (routed through Calamos' affiliate CFS) with little or no connection to any distribution efforts (¶¶217-19; 232-42), or to the (lack of) results produced by any such efforts (¶¶227-31).  Moreover, the distribution fees were also excessive in that they purported to pay for services *already provided to, and paid separately for by, the Fund* (¶¶243-48).

All available information concerning the Board's approval of the Fund's distribution fees indicates that Trustees failed to employ adequate conscientiousness in their evaluation and approval of such fees (¶¶249-63), insofar as the Trustees' evaluations and conclusions are demonstrably counterfactual (¶¶254-61, 263) and/or without basis in relevant fact (¶¶262).

## ARGUMENT

## I.    THE APPLICABLE PLEADING STANDARD

To survive a motion to dismiss, a complaint must plead sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678. All facts alleged in the complaint are assumed to be true and all reasonable inferences drawn in plaintiff's favor.  *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n.*, 655 F.3d 136, 141 (2d Cir. 2011).

---

[14] Regulatory approval for distribution fees was conditioned on their theoretical promise to (more than) pay for themselves by (1) aiding AUM growth, thereby (2) generating economies of scale in the provision of advisory services, which (3) would be shared with fund shareholders through consequent reductions in advisory fees (¶¶205-09; 215-16).

## II.      THE STANDARD OF LIABILITY UNDER §36(B)

"[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.  To determine if a fee meets this standard, courts look to all relevant factors, including those set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), and adopted by the Supreme Court in *Jones*. *Id*. at 344–46.  The *Gartenberg* factors are, "(1) the nature and quality of the services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees."  *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 114 (D. Mass. 2006) (*citing Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir.1989) (*citing Gartenberg*, 694 F.2d at 929–30)).

"'The plaintiff need not address all of the *Gartenberg* factors to survive a motion to dismiss if, when taken as a whole, the complaint demonstrates a plausible claim for relief under § 36(b).'" *In re Blackrock*, 2015 WL 1418848, at *4; (*quoting Kasilag*, 2012 WL 6568409, at *2 (*citing Reso*, 2011 WL 5826034, at *5–6 (collecting cases))).  "In other words, a plaintiff 'may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee.'" *In re Blackrock*, 2015 WL 1418848, at *4 (*quoting Curran*, 2010 WL 2889752, at *9); *see Goodman,* 2015 WL 965665, at *5 ("[T]he issue is whether, taken as a whole, Plaintiffs' complaint pleads sufficient facts about the fees paid to Defendant and their

16

relationship to the services rendered to present a plausible claim that the fees are disproportionately large.").

## IV.    THE COMPLAINT PLAUSIBLY ALLEGES THAT THE CHALLENGED ADVISORY FEE WAS EXCESSIVE

### A.    The Substantially Lower Fees Paid by Other Investors for Comparable Services

Defendants provided the same or substantially the same investment advisory services to arm's-length, institutional clients at materially lower fees. ¶¶34-39; 110-19; ¶¶61-71.  The Fund paid fees of 0.83%.  The institutional clients – specifically, Genworth, Thrivent, and the "separate accounts" serviced under the Standard Fee Schedule – paid only 0.51%-0.65%. ¶¶57-63.

The alleged similarity of the investment advisory services provided to the arm's-length clients is supported by detailed facts. ¶¶65-70.  The services were furnished to both the Fund and the institutional clients by the same investment personnel, who utilized the same research and who simply replicated the Fund's portfolio in the institutional accounts. ¶¶65-66.  Those accounts had the same investment objectives and strategies as the Fund, were invested in the same stocks in the same proportions, and performed identically to the Fund (ex-fees).  *Id.*  Comparison of the Genworth and Thrivent agreements to the IMA also confirms that the duties owed to those institutional clients were substantially the same. ¶¶65(a) n.6 and 70 n.10.

Similar mutual funds also were charged substantially lower fees.  ¶¶72-78.  In all 90 mutual funds similar in size and investment style to the Fund, the average fee was only 0.59%.  ¶¶73-75.  Only six funds paid fees higher than that paid by the Fund. ¶76.

These allegations more than adequately give rise to a plausible inference that the challenged fee was excessive.[15]  *See, e.g., In re Blackrock*, 2015 WL 1418848, at *5-6, 8 (where funds paid "as much as 106% higher fees for BlackRock advisory services than the Sub–Advised Funds pay for the same or substantially the same services, Plaintiffs' allegations support the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for BlackRock's advisory services").

Courts routinely sustain fee-comparison allegations less detailed than those here.  *See Hunt v. Invesco Funds Grp., Inc.,* No. 04-cv-2555, 2006 WL 1581846, at *3 (S.D. Tex. June 5, 2006) (allegation that "investment managers charge fund shareholders higher fees than other clients for equivalent advisory services" was "indicative of a disproportionate relationship between fees and service"); *Kasilag*, 2012 WL 6568409, at *3 (allegation that defendant charged less to other clients for "essentially the same investment management services" raised plausible inference of excessive fees under § 36(b)); *Goodman*, 2015 WL 965665, at *5 (same where plaintiffs pled a "notable disparity in the fees obtained for servicing the three funds with which they are involved and the subadvised funds, while concurrently pleading that the services provided to and resources involved in all of the funds are substantially the same").[16]

---

[15]  Defendants bloviate about how "devoid of facts" and "conclusory" the Complaint supposedly is.  Br. at 1, 2, 13, 18-19, 21, 25, 28, 33.  Obviously, this is untrue.  Defendants simply ignore the facts, and employ hyperbole, lacking valid arguments.

[16]  *See Reso*, 2011 WL 5826034, at *8 (allegations that lower fees were charged for similar services "give rise to the inference that [defendant] has comparatively over-charged the funds in this case."); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-cv-352, 2009 WL 5821045, at *6-7 (W.D. Pa. Sept. 30, 2009) (denying motion to dismiss where complaint alleged defendant provided same advisory services to arm's-length clients for substantially lower fees); *Sins v. Janus Capital Mgmt.*, No. 04-cv-1647, 2006 WL 3746130, at *3 (D. Colo. Dec. 15, 2006) (same where plaintiff alleged that defendant "provides identical services to third parties at a lower cost, which would indicate a disparity"); *Curran*, 2010 WL 2889752, at
(continued...)

18

### 1.      The Institutional-Fee Comparisons Are Apt

Defendants urge that fees paid by institutional clients can never be "apt" under *Jones* because mutual funds supposedly require services not apposite to institutional clients.  Br. at 20-22.

This, however, blatantly misreads *Jones*.  Resolving a prior conflict in authority, *Jones* explicitly endorsed fees paid by institutional clients as potentially apt comparisons, rejecting any "categorical rule regarding the comparisons of the fees charged different types of clients," which is what Defendants urge. [17]  The Court held that "courts may give such comparisons [to institutional clients] the weight that they merit in light of the similarities and differences between the services that the clients in question require . . . ."  *Jones*, 559 U.S. at 344-46.  The Court stressed the appropriateness of comparisons to "fees that might result from arm's length bargaining [*e.g.*, those paid by institutional clients] as the benchmark for reviewing challenged fees."  *Id*. at 347.  The Court also made clear that whenever "plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range . . . trial [will] be appropriate."  *Id*. at 350 n.8.

Following *Jones*, courts routinely sustain comparisons to fees paid by institutional clients where, as here, the services were allegedly similar.[18]  *See, e.g., In re Blackrock*, 2015 WL 1418848,

---

[16](...continued)
*9 (allegation that defendant "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support reasonable inference of excessive fee).

[17]  Previously, numerous courts, including in this District, had disallowed as inapt comparisons to fees paid by institutional clients.  As the Court noted in *Jones*, the Second Circuit in *Gartenberg* itself had rejected a comparison between the fees that the adviser in that case charged a money market fund and the fees that it charged a pension fund.  559 U.S. at 350 (*citing Gartenberg*, 694 F.2d, at 930 n. 3.).

[18]  Defendants similarly urge that fees paid by "subadvisory" clients such as Genworth and Thrivent are categorically inapt.  Br. at 22-23.  Following *Jones*, however, courts routinely sustain comparisons to
(continued...)

at *5-6, 8 (sustaining § 36(b) claim where analysis of sub-advisory client agreements in complaint showed that "BlackRock employs substantially the same investment strategies and invests in substantially the same types of securities for both the Funds and the [subadvisory clients]."); *Kasilag*, 2012 WL 6568409, at *3 (comparison of institutional client agreements with fund's IMA demonstrated "overlap between the two, and the difference between their fees for 'substantially the same' services."); *Goodman*, 2015 WL 965665, at *5 (sustaining institutional fee comparison, as "it is the work done and not the label given to the work that will likely and ultimately prove dispositive of Plaintiffs' claims.").[19]

Defendants also erroneously ignore that, in this case, the additional services required by the Fund – namely, distribution, custodial, transfer agent, audit, legal, and compliance/oversight – were not services provided under the IMA or compensated through the challenged fee.  ¶¶32, 71, 110-19. Rather, those services were provided by *others* (including Defendants' affiliates) under separate

---

[18](...continued)
subadvisory fees.  *See Goodman*, 2015 WL 965665, at *5 (sustaining subadvisory comparison, as "it is the work done and not the label given to the work that will likely and ultimately prove dispositive of Plaintiffs' claims."); *In re Blackrock,* 2015 WL 1418848, at *5 ("Plaintiffs' fee comparison is appropriate, as they have alleged that BRIM, in its capacity as a sub-adviser to the Sub-Advised Funds, provides the same or substantially the same investment advisory services as all the Defendants provide to the Funds."); *In re Federated*, 2009 WL 5821045, at *7 ("Defendants have entered into sub-adviser arrangements in the open market that provide for advisory fees at substantially lower percentages of average net assets. . . . Defendants thus are able to provide a comparable service on the open market for a fraction of the cost . . ."); *Sins*, 2006 WL 3746130, at * 1, 3-4 (same); *Curd*, 2015 WL 4243495 (sustaining subadvisory fee comparisons); *Zehrer*, 2014 WL 6478054, at *4 (same); *Am. Chems*., 2014 WL 5426908, at *5, 7 (same), *Kasilag*, 2012 WL 6568409, at *3 (same), *Curran*, 2010 WL 2889752 at *8-9.

[19] Defendants' reliance on *Gartenberg* and *Strougo v. BEA Assocs*., 188 F. Supp. 2d 373, 385 (S.D.N.Y. 2002), is unavailing.  To the extent those decisions suggested that institutional fee comparisons were categorically inappropriate, they are no longer good law in light of *Jones*.

contracts with the Fund, and billed to the Fund *in addition to* the challenged fee.  *Id.*[20]  Hence, the comparison to the institutional fees is apples-to-apples.

### 2.    Defendants' "Additional Service" Claims At Best Raises Factual Issues

Defendants next seek to disprove Plaintiffs' allegations that the investment advisory services provided to the institutional clients were similar.  Br. at 21-22.  Pointing to the AR – which refers to supposed additional "responsibilities," "obligations," and "risks" associated with managing the Fund – as purported evidence that the Fund received "additional services," Defendants urge that Plaintiffs' allegations are thus proven "false."  *Id.*

This fails.  Plaintiffs' well-pled allegations – which, as indicated above, are supported by detailed facts consisting primarily of Defendants' own documents – are entitled to be presumed as true, with all reasonable inferences drawn in Plaintiffs' favor.  *See Interpharm*, 655 F.3d at 141. Defendants' attempt to disprove these allegations by referencing their own self-serving hearsay at best raises factual issues.[21]  *See, e.g., In re Blackrock*, 2015 WL 1418848, at *5 (attempt to dispute similarity of service allegations "is a merit-based argument that is better suited for summary judgment"); *Goodman*, 2015 WL 965665, at *5 ("Defendant offers as an explanation for the fee arrangements that it has a more limited role in servicing the subadvised funds, but this is essentially

---

[20] Defendants quote the SEC Report on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966) (the "SEC Report"), out of context in maintaining that mutual funds require "'certain services'" inapposite to advisors' institutional clients.  Br. at 20.  The SEC Report was comparing mutual funds with "internally managed investment companies," not institutional clients.  *Id.* at 11.

[21] Notably, the Annual Report is devoid of detail, asserting only that the higher level of fees "reflected [CA's] greater level of responsibilities and significantly broader scope of services regarding the Funds, the more extensive regulatory obligations and risks associated with managing the Funds, and other financial considerations with respect to the Funds."  Br. at 21-22.  What, if any, additional, otherwise-uncompensated *services* Defendants provided to fulfill those "responsibilities" or "obligations," or to mitigate those "risks," is not indicated.

an evidence-dependent contention that cannot be afforded dispositive force in today's motion-to-dismiss context."); *Zehrer,* 2014 WL 6478054, at *4 (dispute regarding similarity of services "is better suited for summary judgment"); *Kasilag,* 2012 WL 6568409, at *3 (same).

### 3. § 36(b)'s Limitations Period Does Not Preclude Relevant Evidence Going Back More Than One Year

Defendants next urge that the Genworth and Thrivent fees are inapt because they supposedly were paid in 2007 and 2011, *i.e.,* prior to §36(b)'s one-year limitations period.  Br. at 22-23.

The law is absolutely clear, however, that the limitations period does not bar otherwise relevant evidence going back more than one year.  *See Batra v. Investors Research Corp*., 144 F.R.D. 97, 98-99 (W.D. Mo. 1992) (refusing to limit discovery to one-year period in §36(b) action, as "[t]he court is unaware of any case law or statute which provides that the limitations period establishes the time boundaries for relevant evidence."); *Hunt*, 2006 WL 1581846, at *8 (compelling discovery prior to one-year period; "That Plaintiffs can only recover damages for this one-year period does not mean, however, that evidence relating to any time outside of this period is irrelevant.").[22]

Courts routinely rely on facts preceding the one-year period in § 36(b) cases.  *See, e.g., Goodman*, 2015 WL 965665, at *3 (sustaining economy-of-scale allegations based on AUM and fee data going back six years); *Curd*, 2015 WL 4243495, at *5 (same based on seventeen years of data);

---

[22]  To the extent *In re Scudder Mut. Fund Litig.*, No. 04-cv-1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) and *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,04-cv-4885, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) suggest otherwise, as Defendants contend, those decisions are no longer good law in light of *Jones*, which, as indicated above, rejected any "categorical rule regarding the comparisons of the fees charged . . . [,]" and held that "courts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require . . . ." *Jones*, 559 U.S. at 349-50.  Furthermore, the pre-limitations period evidence in *In re Scudder* and *In re AllianceBernstein* did not involve fees charged to the advisor's institutional clients.  *See* 2006 WL 74439, at *2;  2007 WL 2325862 at *16-17.

*In re Blackrock*, 2015 WL 1418848, at *1 (six years); *In re Federated*, 2009 WL 5821045, at *7 (same); *Strigliabotti v. Franklin Resources, Inc.*, No. 04-cv-883, 2005 WL 645529, at *3 (N.D. Cal. Mar. 7, 2005) (twenty years); *Sins*, 2006 WL 3746130, at *3 (nineteen years); *Hunt*, 2006 WL 1581846, at *2 (eight years).

Indeed, Defendants themselves insist the Court consider facts predating the one-year period. Boasting about the supposed high quality of their advisory services, Defendants point to the Fund's "long-term performance . . . since inception," which was in 1990. Br. at 26 (claiming that the Fund's "performance since inception places it in the top three percent of funds in its Category."). Defendants fault the Morningstar data cited in the Complaint for going back only 10 years, which Defendants suggest is an insufficient length of time to evaluate their performance. *Id*.

Furthermore, the challenged fee rate has not changed since 2004 (¶¶ 52-54), and nothing suggests the fees paid by Genworth or Thrivent were not in line with those charged to institutional clients for similar services during the one-year period, or that Genworth's or Thrivent's fees would have increased had those clients not terminated Defendants for poor performance. *See, e.g., Zehrer*, 2014 WL 6478054, at *5 ("Although Harbor Capital faults Zehrer for not using 2013 fee data, it does not make any claim that the fees for 2013 are not in line with the fees from 2012."). At minimum, any relevance objections with respect to those client fees are unripe at the 12(b)(6) stage.

### 4.    The Comparisons to Objectively Similar Mutual Funds Are Apt

Defendants next contend that comparisons to other mutual funds' fees are inapt. Br. at 23-24.

Plaintiffs, however, did not indiscriminately compare the Fund to the entire mutual fund industry, as Defendants erroneously suggest. Rather, of the 7,000+ mutual funds tracked by Bloomberg, Plaintiffs only analyzed other large-cap growth funds with more than $1 billion in AUM,

23

*i.e.*, objectively similar funds. ¶¶72-78.  Courts routinely sustain comparisons to objectively similar

mutual funds.  *See, e.g.*, *Kasilag*, 2012 WL 6568746, at *4-5 (comparison to funds selected for

similarity); *In re Federated*, 2009 WL 5821045, at *7 (reasoned comparison to funds of similar size);

*Hunt*, 2006 WL 1581846, at *3 (comparison to "peer mutual funds").[23]  Notably, Defendants offer

no basis to suppose that the mutual funds or the services provided by their advisors were dissimilar.[24]

Defendants assert that *Jones* cautioned against relying "too heavily" on comparisons to other

mutual funds.  Br. at 24 (*quoting Jones*, 559, U.S. at 350).  The Court's rationale, however, was that

fees paid by other mutual funds "may not be the product of negotiations conducted at arms length,"

and, hence, may themselves be excessive.  *Jones*, 559 U.S. at 350-51.  The Court did not suggest that

advisory services amongst similar funds differed, or that comparisons to other mutual funds could

not be relied upon to show § 36(b) violations.

### B.  Defendants' Failure to Share Economies of Scale with the Fund

The Complaint alleges that economies of scale were achieved, but that Defendants

monopolized those benefits without sharing any with the Fund.  Fees grew faster than AUM –

exactly the opposite of what Congress intended.[25]  ¶¶54, 96, 106.  Specifically, Fees ballooned at

---

[23] Defendants' reliance on *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006), *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321 (4th Cir. 2001) and *In re Scudder* 2007 WL 2325862 is misplaced.  In *Amron*, the plaintiff simply cited industry-wide fee averages.  In *Migdal*, 248 F.3d at 327, the plaintiff's arbitrary selection of mutual funds was "not particularly meaningful."  Likewise, in *In re Scudder*, 2007 WL 2325862, at *17, the plaintiff compared only low-fee funds.

[24] Defendants urge that lower fees paid by similar mutual funds is not "*prima facie* evidence" of a §36(b) violation.  Obviously, however, evidence is not required at this stage.

[25] "Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale."  *In re Federated*, 2009 WL 5821045, at *8 (quoting *Migdal*, 248 F.3d at 326–27).

(continued...)

24

double the rate of AUM from 2001 to 2014, with no proportional increase in Defendants' work, responsibilities, or costs.  ¶¶101-06.  Defendants continued to employ the same number of portfolio managers, and to invest in approximately the same number of stocks.  ¶¶104-05.  AUM rose because of asset appreciation (due to a rising stock market), not additional investment advisory work.  ¶102.

Meanwhile, the Fund's breakpoints were counterproductive or illusory.  ¶¶79-86, 107-09.  The August 2000 schedule was regressive – fee rates on assets in excess of $150 million *increased*.  ¶¶79, 82.  The August 2004 schedule introduced breakpoints on assets in excess of $6 billion, but this is of no utility because the Fund only has assets of $ 3.5 billion. ¶83.  In both dollars and rates (assuming current asset levels), the Fund's fee burden was higher in 2014 than in 2000. ¶¶84-85.

These facts more than adequately allege a failure to share economies of scale.  *See, e.g., In re Blackrock*, 2015 WL 1418848, at *7 (allegations that "the increase in investment advisory fees paid by the Fund was not accompanied by a proportionate increase in the work or cost by BlackRock," that "the breakpoints set forth in the fee schedules fail to provide the Funds with an appropriate share of the benefit of economies of scale, in large part because the fee schedule reduces the fee by too small of an amount and spaces the breakpoints too far apart to provide any meaningful benefit," and that "the increase in the Funds' AUMs produced benefits to BlackRock that were up to 8.5 times greater than the benefits received by the Funds" were sufficient).  Courts sustain less thorough pleadings.[26]

---

[25](...continued)
Congress intended that mutual funds use "breakpoints" – the point at which a fee rate decreases when net assets increase – to pass on to shareholders the benefits realized from economies of scale.  *Kasilig*, 2012 WL 6568409.  *See also* ¶96, quoting S. Rep. No. 91-184, at 5-6.

[26] *See Goodman*, 2015 WL 965665, at *3 (holding mere allegation that economies of scale were generated
(continued...)

Defendants urge that no economies of scale could have existed because AUM decreased during the one-year limitations period.  Br. at 26-27.  Courts, however, look at multiple year periods when evaluating economies of scale, which is logical given that such benefits generally only arise over longer periods.  *See, e.g., Goodman*, 2015 WL 965665, at *3 (sustaining economy-of-scale allegations based on fee and AUM data going back six years).[27]

Defendants urge that the Complaint is inadequately specific because it does not allege the "actual transaction costs at issue" or what the advisory services cost to render.  Br. 27-28.   At the pleading stage, however, this level of specificity is not required.  *See In re Blackrock*, 2015 WL 1418848, at *7 ("Plaintiffs need not establish that BlackRock failed to pass along economies of scale at this stage of the proceedings; rather, Plaintiffs need to allege sufficient factual content to draw a reasonable inference that BlackRock failed to do so").[28]

---

[26](...continued)
as AUM grew sufficient at 12(b)(6) stage); *Zehrer*, 2014 WL 6478054, at *11, (allegation that defendant "received 'economies of scale' benefits as the Fund grew that were not passed on to the Fund"); *Reso*, 2011 WL 5826034, at *9 (allegation that fee was "reduced only slightly over the course of amassing a large amount of assets," but that the defendant did "not suffer significant additional expenditures over the course of that expansion."); *Curran*, 2010 WL 2889752, at *9 (allegation that breakpoints were "immaterial"); *Kasilag*; 2012 WL 6568409, at *5-6 (allegation that breakpoints failed to meaningfully reduce fees); *Hunt*, 2006 WL 1581846, at *3 (allegation that AUM growth was generated by asset appreciation rather than additional investment).

[27]  *See Curd*, 2015 WL 4243495, at *5 (seventeen years); *In re Blackrock*, 2015 WL 1418848, at *1 (six years); *In re Federated*, 2009 WL 5821045, at *7 (same); *Strigliabotti*, 2005 WL 645529, at *3 (twenty years); *Sins*, 2006 WL 3746130, at *3 (nineteen years); *Hunt*, 2006 WL 1581846, at *2 (eight years).

[28]  *See Krantz v Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D. Mass. 2000) (sustaining §36(b) claims after noting that "[w]hen the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion, less specificity of pleading may be required pending discovery"); *Am. Chems.*, 2014 WL 5426908 at, *6-7 (generalized economy-of-scale allegations "meet Rule 8's liberal pleading standard.").

26

Defendants urge that Plaintiffs' allegations simply are wrong because the Fund had breakpoints through which any economies of scale were shared.  Br. at 28-29.  At best, however, this improperly seeks to disprove the well-pled allegations, raising factual issues.  *See* cases cited at Point IV.A.2, *supra*.  Furthermore, the law is clear that the mere existence of breakpoints does not defeat a §36(b) claim where, as here, the complaint plausibly alleges that those breakpoints provided no meaningful benefit. ¶¶79-86 and 107-09; *In re Blackrock*, 2015 WL 1418848, at *6 (sustaining claim where plaintiff alleged that "breakpoints set forth in the fee schedules fail to provide the Funds with an appropriate share of the benefit of economies of scale, in large part because the fee schedule reduces the fee by too small of an amount and spaces the breakpoints too far apart to provide any meaningful benefit of economies of scale"); *Kasilag*, 2012 WL 6568409, at *5-6 (same, where "fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of the economies of scale."); *Zehrer*, 2014 WL 6478054, at *1, 4 (same); *Reso*, 2011 WL 5826034, at *1, 3, 9 (same).[29]

## C.     The Nature and Quality of the Services Provided

The Complaint alleges that Defendants provided substantially the same advisory services to institutional clients at materially lower fees, ¶¶34-39, 61-71, 110-19, and, additionally, that the Fund substantially underperformed both its benchmark and comparable mutual funds (¶¶120-35).

These "nature and quality" allegations satisfactorily allege that the fee was disproportionately large.  *See* cases cited in note 16, *supra*.

---

[29]  Defendants' reliance on *In re Goldman Sachs Mut. Funds*, 04-cv2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006), and *In re Franklin Mut. Funds Fee Litig*., 478 F. Supp. 2d 677, 687 (D.N.J. 2007), is unavailing. Those cases were pre-*Jones*, and did not involve allegations that the breakpoints adopted by the fund provided illusory benefit.

27

Defendants urge that performance is not an appropriate metric for assessing "quality."  Br. at 25.[30]  The Complaint, however, alleges that performance was *the* most important metric to all relevant parties, including the Fund's Board, Morningstar, Calamos, and Defendants' institutional clients.  ¶¶118, 171; 120-35.[31]  Indeed, Genworth and Thrivent terminated Defendants because of poor performance.  ¶¶132-34.

### D.      The Profitability of the Fund to the Advisor

Calamos' overall profit margins of nearly 40% were among the industry's highest. ¶¶137-39. Additionally, it can be inferred from publicly available information that the margin earned from the Fund was even higher (¶¶141-43), especially in light of Fund-related economies of scale. ¶¶100-06. Indeed, the data suggest that the Fund was the largest component Calamos' profits, and that the Fund provided Calamos with an even greater share of its profits than its revenues. ¶¶139-45.

These allegations of Calamos' profitability suffice.  Courts routinely sustain less detailed pleadings.  *See In re Federated*, 2009 WL 5821045, at *5-7 (sustaining complaint based in part on allegation that fund was "the most profitable equity mutual fund in the Federated Mutual Fund Complex," and noting that the advisor's consolidated financial reporting "mask[ed] the fact that a large fund with higher fees [] may be providing disproportionate compensation for the lower fees and/or lower profitability of smaller mutual funds within [defendant's] Fund Complex."); *Reso*, 2011

---

[30] Defendants cite *Amron*, which held that "[a]llegations of underperformance *alone* are insufficient to prove that an investment advisor's fees are excessive."*Amron*, 464 F.3d at 344 (emphasis added); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007), *aff'd in part, vacated in part sub nom, The R.W. Grand Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011).  Here, however, Plaintiffs do not rely on alleged underperformance "alone."

[31] Defendants argue that the Morningstar performance data cited in the Complaint, which only goes back 10 years, fails to capture the Fund's performance since inception in 1990.  Br. at 26.  At best, however, this raises relevance issues not appropriate for resolution on a 12(b)(6) motion.

WL 5826034, at *9 (allegation that "the funds in this case account for a larger portion of Artisan's profits than the respective share they account for of Artisan's total managed assets" adequately established that advisor "reaps too great a benefit from the funds in this case.").[32]

Defendants urge that Plaintiffs' profitability allegations are inadequately specific because they do not "quantify" the precise dollar amounts involved.  Br. at 29-30.  The specificity demanded by Defendants, however, is not required at this stage.  *See Krantz,* 98 F. Supp. 2d at 159 (generalized profitability allegations adequate as "defendants are not publicly owned corporations and more specific financial information is not available prior to discovery."); *Hunt*, 2006 WL 1581846, at *4 (allegation that AUM increased by twenty times while fees increased by fifty percent was "sufficiently specific" to establish profitability factor at the pleading stage).  Defendants do not dispute that the Complaint provides as much detail as the publicly-available information permits. (¶140; *see also* ¶¶138-45).

### E.    The Fall-Out Benefits that Accrued to Defendants

 Fall-out benefits accrued to Defendants in three forms: (i) revenues from institutional clients for whom Defendants replicated the Fund's investment strategy, (ii) revenues from other captive funds advised by Defendants which were in effect subsidized by the Fund, and (iii) non-advisory fees earned from the Fund by Defendants' affiliates.  ¶¶147-54.

These allegations draw clear "but for" connections tying these benefits to Calamos' role as the Fund's investment advisor, and, hence, suffice.  *See, e.g., Dumond v. Mass. Fin. Servs. Co.*, No.

---

[32] *See also Strigliabotti*, 2005 WL 645529, at *3 (profitability factor satisfied by allegation that advisor earned "excess profits resulting from economies of scale"); *Hunt*, 2006 WL 1581846, at *4 (same by allegation that "the funds are enormously profitable to Defendants, given Morningstar's finding that, from 1989 through 2004, assets under Defendants' management increased by twenty times, while fees increased by fifty percent.").

04-cv-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006), at *3 (allegation that defendants were able to "resell [to other clients] investment advisory services paid for by the MFS Funds at virtually no additional cost" adequately established fall-out benefits); *Strigliabotti*, 2005 WL 645529, at *3 (same); *Sins*, 2006 WL 3746130, at *3 (same).

In arguing otherwise, Defendants proffer only *ipse dixit*. Br. at 30-31.[33]   Although Defendants also urge that the fall-out benefits were disclosed to and considered by the Board (Br. at 30), this conflates fall-out benefits with board conscientiousness, an independent *Gartenberg* factor.  *See* Point IV.F, *infra*.  Moreover, the *relevant* fall-out benefits were *not* disclosed to or considered by the Board, which only considered "directed brokerage" benefits. ¶¶177-78. Defendants cannot obtain dismissal by seeking to disprove Plaintiffs' well-pled allegations through reference to their own self-serving hearsay.  *See, e.g., In re Blackrock*, 2015 WL 1418848, at *5 (attempt to dispute allegations by referring to claims in SEC filings "is a merit-based argument that is better suited for summary judgment"); *Goodman*, 2015 WL 965665, at *5 (same); *Zehrer,* 2014 WL 6578054, at *4 (same); *Kasilag*, 2012 WL 6568409, at *3 (same).

F.      **The Trustees' Failure to Exercise an Appropriate Level of Conscientiousness**

The Board also lack conscientiousness, and hence, under *Jones*, is not entitled to any deference.   The Board approved the fee based on incomplete, inaccurate and/or misleading

---

[33] Defendants' reliance on *Batra v. Investors Research Corp*., 1992 WL 280790 (W.D. Mo. Apr. 2, 1992) is misplaced.  *Batra* merely dismissed common law claims for conversion and breach of fiduciary duty on procedural grounds, while leaving §36(b) claims untouched. *Id*. at *1, 2 and 6.   Indeed, in later proceedings,§36(b) claims predicated on exactly such fall-out benefits were *sustained*. *See Batra v. Investors Research Corp*., 144 F.R.D. 97, 99 (W.D. Mo. 1992). And in *Gallus v. Ameriprise Fin. Inc*., 497 F. Supp. 2d 974 (D. Minn. 2007), the court simply held that the plaintiffs had failed on summary judgment to offer adequate evidence that such benefits existed, not that any such revenues would not comprise fall-out benefits as Defendants erroneously suggest.

information supplied by Calamos, failing to obtain more accurate and/or unbiased information from other sources. ¶¶167-78, 189-96.  As a result, the decision was without factual basis or counterfactual in important respects. ¶¶169-78, 193-96.  The Board uncritically accepted Defendants' unfounded rationalizations for the higher fee charged to the Fund as compared to Defendants' institutional clients.  ¶¶170, 194-96. The Board failed to determine whether the Fund actually received additional services, or whether any such services justified the fee disparity.  *Id*.

Moreover, the Board failed to determine whether the Fund's breakpoints actually saved the Fund any money (they did not), and approved fees allowing Defendants to monopolize economies of scale.  ¶¶175-76.  Additionally, the Board also failed to compare the profit margins earned from the Fund by Calamos with those of competing asset managers or of Calamos generally. ¶¶173-74.[34]

These allegations raise a plausible inference of rubber-stamping.  ¶¶198-203; *In re Blackrock*, 2015 WL 1418848, at *7 (allegation that board "failed to consider whether the lower fees purportedly paid by other clients reflect differences in the services rendered to those funds," and that "truly independent or conscientious directors would not have approved of the economies of scale enjoyed by BlackRock, would have solicited proposals from other investment advisers, would have negotiated a 'most favored nation' provision into the IMAs, and would not have solely relied upon information and analyses that were prepared by Blackrock or designed to support BlackRock's rationalization for the advisory fees charged to the Fund" were "sufficient . . . [to] allow for an inference of rubber-stamping by the Boards.").[35]

---

[34] Moreover, the Board failed to solicit competing proposals from other potential advisors, to include a "most favored nation" clause in the IMA, or to negotiate with Calamos with respect to the fee. ¶¶181-87, 198-203.

[35] *See Reso*, 2011 WL 5826034, at *6-7 (allegation that funds paid "a much higher rate than other funds (continued...)

In *Goodman*, the court sustained rubber-stamping allegations far less detailed than those here:

> Although the complaint contains relatively few details regarding the level of oversight afforded the approved fee rates, factual allegations of rubber-stamping for an affiliated fund are there.  The allegations of a flawed negotiation or oversight process would inform the amount of deference given to the board's approval and consideration of all of the relevant factors that will decide the merits of the claims involved.  In other words, the [claims] survive here even if it is debatable whether the complaint sets forth allegations of board failure that could not by themselves support plausible claims.

*Goodman*, 2015 WL 965665, at *5.

Defendants urge throughout their brief that the approval of the fee by the Fund's independent directors somehow renders it impregnable to attack.  *See* Br. at 1-3, 7-10, 11-13, 14-19, 21-22, 26, 29, 30, 32.  In *Jones*, however, the Court rejected precisely this idea, making clear that approval by even fully-informed and conscientious directors is *not* dispositive where, as here, there is "additional evidence that the fee exceeds the arm's-length range."  *Id.*  As the Court stated:

> A fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'"  *Id. citing Gartenberg, supra*, at 928.   Additionally, "where the . . . adviser withheld important information, the court must take a more rigorous

---

[35](...continued)
managed by Artisan, and also account for a disproportionately large amount of Artisan's profits, despite the similar nature of services provided to each by Artisan" established rubber-stamping); *Hunt*, 2006 WL 1581846, at *4 (allegation that board "failed to find that the distribution plans or fees would benefit the shareholders by generating savings from economies of scale" showed lack of conscientiousness at pleading stage); *Am. Chems*., 2014 WL 5426908 at, *6-7 ("Plaintiff alleges that Defendants likely did not provide the board with adequate information regarding the services Defendants provided in exchange for advisory fees, fees charged and services provided by competitors with similar fund structures; fees and services Defendants provide to other clients; and economies of scale, among other things. Plaintiff alleges it would benefit from discovery on this point . . . Finally, Plaintiff claims that Defendants are able to retain such a high portion of this fee in part because the [board] is not sufficiently independent and conscientious in reviewing these fees. The Court finds that these allegations meet Rule 8's liberal pleading standard.").

> look at the outcome.  When an investment adviser fails to disclose
> material information to the board, greater scrutiny is justified because
> the withheld information might have hampered the board's ability to
> function as 'an independent check upon the management."

*Id. citing Burks v. Lasker*, 441 U.S. 471, 484 (1979).

Similarly, in *Daily Income Fund v. Fox*, 464 U.S. 523, 536-41 (1984), the Court stated that "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board. . . .  This policy choice strongly indicates that Congress intended security holder . . . actions under § 36(b) . . . to act as independent checks on excessive fees." *Id*. at 541.  The Court additionally noted that Senate Report had explicitly stated that "directorial approval of the adviser's contract" would "'not be controlling in determining whether or not the fee encompassed a breach of fiduciary duty.'" *Id*. at 540 (*quoting* S. Rep. No. 91-184, at p. 15 (1969), U.S.Code Cong. & Admin.News, p. 4910).

Next, Defendants seek to disprove the conscientiousness allegations, citing the supposed Board deliberations as described in the AR.  Br. at 14, 18-19.  This, however, again improperly asks the Court to engage in a "factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion." *Curran*, 2010 WL 2889752, at *9; *see id*. ("in regard to Plaintiffs' allegations that the Board of Directors . . . lacked conscientiousness . . . , Defendants ask the Court to review 'publicly disclosed detailed explanations of the steps taken in setting fees' and 'credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM funds. . . . Defendants' arguments . . . raising what appear to be fact-intensive inquiries, suggests that resolution of the § 36(b) claim . . . is unlikely even at the summary judgment stage of litigation."); *In re*

*Blackrock*, 2015 WL 1418848, at *7 (that defendant "takes issue" with conscientiousness allegations" does not entitle defendant to 12(b)(6) dismissal).[36]

## V.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE DISTRIBUTION FEES WERE EXCESSIVE

The Complaint alleges that the Distribution Fees were excessive, not reasonably related to the services performed, had little or no connection to any distribution efforts, and failed to lead to reductions to the advisory fee (¶¶ 217-19; 232-42).  The "service fee" and "overhead" components duplicated payments already expensed to the Fund (¶¶ 243-48).  The fees charged in connection with the Class B Shares had no legitimate function since that class had not been offered to new investors since 2009 (¶¶ 232-36).

These facts are adequate.  Courts sustain less detailed allegations.  In *Curran*, the court held that the plaintiffs "have met their burden by alleging that fees collected by [the advisor] for its distribution services surpassed the value of those services, and that the manner in which those fees were assessed did not correspond to the type of services performed but, rather, resemble fees collected for advisory services."  *Curran*, 2010 WL 2889752, at *11 (emphasis added); *see also Strigliabotti*, 2005 WL 645529 at *3-4, 6 (sustaining §36(b) claim where distribution fees "were

---

[36]  Defendants contend that Plaintiffs fail to show that the independent trustees did not satisfy the statutory standards for disinterestedness.  Br. at 15-16.  The Complaint, however, does not allege those standards were unmet.  Defendants' reliance on cases involving independence, *see, e.g., In re Eaton Vance Mut. Funds Fee Litig.,* 380 F. Supp. 2d 222, 240 (S.D.N.Y. 2005); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2006 WL 74439, at *3; *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540-41 (S.D.N.Y 2008); *Forsythe v. Sun Life Fin. Inc.*, 417 F. Supp. 2d 100, 111 (D. Mass. 2006); *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 172 (D. Mass. 2005); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, No. 98-2162, 2000 WL 350400, at *3 (D. Md. Mar. 20, 2000), *aff'd*, 248 F.3d 321 (4th Cir. 2001), do not make contact with lack of conscientiousness, which is what is alleged here.

designed to, and did, extract additional compensation for Defendants' advisory services" and where Defendants had failed "to pass along economies-of-scale benefits from the distribution fees.").[37]

Defendants suggest that the Distribution Fees complied with the FINRA Rule 2830(b)(9) cap. Br. at 31-32. Compliance with such rule, however, does not insulate Defendants from liability under § 36(b).[38] *See Pfeiffer*, 2004 WL 1903075, at *5; *Zucker ex rel. AIM Small Cap Growth Fund/A v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 850 (S.D. Tex. 2005) ("Rule 2830 is designed not to preempt § 36(b). . . . It does not follow . . . that if charges conform to Rule 2830, they are not excessive for purposes of § 36(b). Although compliance with Rule 2830 is necessary, it is *not* necessarily sufficient to insulate one from § 36 liability.") (citations omitted).[39]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:  August 13, 2015  **KIRBY McINERNEY LLP**

By:  /s/ Ira M. Press
Ira M. Press

---

[37] *See, e.g.*, *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03-cv-9741, 2004 WL 1903075, at *4 (S.D.N.Y. Aug.26, 2004) (plaintiff pled § 36(b) violation through receipt of "excessive promotion, distribution and servicing fees" by alleging that "increased Rule 12b–1 fees were not 'reasonably related' to the services it performed for the Fund. It is unnecessary for the plaintiff to set forth evidentiary details to support this allegation . . ."); *Hunt*, 2006 WL 1581846, at *4, 6 (sustaining generalized §36(b) claims relating to distribution fees); *Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-cv-10988, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005) (same); *Dumond*, 2006 WL 149038, at *3-4 (same).

[38] Defendants also argue that the Complaint merely attacks the "propriety of Rule 12b-1 fees generally" without including Fund-related specifics. Br. at 32-33. Obviously, however, this simply disregards the Fund-specific allegations. ¶¶210-13, 217-63.

[39] Defendants' reliance on *In re Scudder*, 2007 WL 2325862 *Hoffman*, 591 F.Supp. 2d 522 and *Mintz v. Baron*, No. 05-cv-4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) is misplaced. *In re Scudder*, 2007 WL 2325862 *14-15, and *Hoffman*, 591 F. Supp. 2d at 539, involved claims that distribution fees were used for improper purposes, *i.e.*, soft dollar payments, not that the distribution fees were excessive in violation of § 36(b). In *Mintz*, 2009 WL 735140, at *3, fund's AUM increased. Here, the AUM shrank.

Mark A. Strauss
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiffs' Counsel*