UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────

SAUL CHILL and SYLVIA CHILL, for the use and
benefit of the CALAMOS GROWTH FUND,

                              Plaintiffs,

                - against -

CALAMOS ADVISORS LLC and CALAMOS
FINANCIAL SERVICES LLC,

                          Defendants.

**OPINION AND ORDER**

15 Civ. 1014 (ER)

────────────────────────────────

Ramos, D.J.:

      Saul Chill and Sylvia Chill ("Plaintiffs") are shareholders in the Calamos Growth Fund

(the "Fund"), a mutual fund advised and managed by Defendant Calamos Advisors LLC

("Calamos"). Plaintiffs bring this action under the Investment Company Act of 1940 (the

"ICA") against Calamos and its affiliate Calamos Financial Services LLC ("CFS") (together with

Calamos, "Defendants"), alleging breach of fiduciary duty with respect to compensation received

by Defendants for investment adviser and distribution services provided to the Fund. Before the

Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure. (Doc. 14). For the reasons set forth below, Defendants' motion is DENIED.

# I. BACKGROUND

### A. The Investment Company Act of 1940

      The ICA, 15 U.S.C. § 80a–1 *et seq.* (2012), regulates investment companies, including

mutual funds. "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of]

securities, and belonging to the individual investors holding shares in the fund." *Burks v. Lasker*,

441 U.S. 471, 480 (1979).  A mutual fund is often created by an investment adviser, which selects the fund's board trustees, manages its investments, provides administrative services, and markets the fund to shareholders, all in exchange for various fees paid out from the assets of the fund itself.  *See Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).  Since the investment adviser is integral to the fund's existence and selects the fund's board, the fund often "cannot, as a practical matter sever its relationship with the adviser.  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Burks*, 441 U.S. at 481 (quoting S. Rep. No. 91–184, at 5 (1969)).

Congress enacted the ICA to check this structural conflict of interest.  First, the statute requires that mutual funds be governed by a board of trustees, at least 40 percent of whom must be independent and disinterested.  *See* 15 U.S.C. §§ 80a–2(19), 80a–10.  The board must negotiate service fees on behalf of the fund and its shareholders, and approve annual contracts with the service providers.  *See* §§ 80a–15(c), 80a–35(a).

Second, and most pertinent to this case, § 36(b) of the ICA "impose[s] upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund, and grant[s] individual investors a private right of action for breach of that duty." *Jones*, 559 U.S. at 340 (citing § 80a–35(b)).  Among other features, § 36(b) of the ICA (i) provides the private right of action but makes it "on behalf of" the fund, (ii) places the burden on the plaintiff to prove that an investment adviser breached its fiduciary duty, and (iii) states that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted."  *See* §§ 80a-35(b), (b)(1), (b)(3).

**B.  Background on the Fund**

Like most mutual funds, the Fund does not have its own employees or facilities, but rather contracts out to external service providers for everything from portfolio management to office space.  *See* Complaint ("Compl.") (Doc. 1) ¶ 30.  Calamos is the Fund's investment adviser and is responsible for "managing the Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the Fund's investment portfolio."  *Id.* at ¶ 31.  CFS serves as the Fund's distributor.  *Id.*  According to Plaintiffs' complaint (the "Complaint"), "operating expenses, such as custodial, audit and accounting, legal, compliance and marketing expenses, fall *outside* the investment adviser's domain and are provided by other entities whom the Fund pays separately."  *Id.* at ¶ 32.

Calamos serves as the Fund's investment adviser pursuant to an Investment Management Agreement (the "IMA").  *Id.* at ¶ 34.  The IMA requires Calamos to provide "investment advisory services," which the Complaint breaks into two categories:  (1) "Portfolio Selection Services," *e.g.*, investment research, decisions on which securities to buy or sell, and arranging the execution of such purchases or sales, and (2) "Other Services," unspecified administrative services including items like facilities and personnel.  *Id.* at ¶ 35.  The fees that the Fund paid to Calamos specifically for investment advisory services ("Advisory Fees") were all paid pursuant to the IMA.  *See id.* at ¶¶ 117–19.  CFS serves as the Fund's distributor and receives separate fees for those services ("Distribution Fees") under a separate agreement.  *Id.* at ¶ 210.

According to the Complaint and public documents filed with the Securities Exchange Commission ("SEC"), the Fund's investment strategy focuses on equities issued by U.S.-based companies that possess large and mid-sized market capitalization (over $1 billion) and that Calamos has identified as offering "the best opportunities for growth."  *Id.* at ¶ 37.

Calamos manages multiple other funds in addition to the Fund (together, the "Calamos Fund Complex"), all of which are overseen by a six-member Board of Trustees (the "Trustees"), responsible for selecting, monitoring, and negotiating with all the service providers contracting with the Calamos Fund Complex.  *Id.* at ¶ 33.

The Calamos Fund Complex consists of the Fund plus twenty-nine other funds, sixteen of which are, like the Fund, U.S.-domiciled and open to new investors.  *Id.* at ¶ 41.  The Calamos Fund Complex's total assets under management ("AUM") totaled $22.4 billion, as of December 31, 2013, which accounted for 84.5% of the total AUM under Calamos' discretionary management at the time, *i.e.*, the net assets of both all of the "captive" funds owned and managed by Calamos *plus* the assets that third-party clients hire Calamos to manage.  *Id.* at ¶ 42.

The Fund, referred to as the "flagship" of the Calamos Fund Complex, has long been Calamos' largest investment vehicle, accounting for 19.6% of all AUM in the Calamos Fund Complex at year-end 2013, and also its largest single source of investment advisory income.  *Id.* at ¶¶ 40, 42.  The Complaint includes a table with data showing that in the last decade the Fund's AUM has hovered between 14% to 45% of the total AUM under Calamos' management, representing 14.82% in 2014, and showing that Advisory Fees have hovered between 15% and 45% of Calamos' total investment advisory income, representing 15.88% in 2014.  *Id.* at ¶ 44.  Plaintiffs allege that Calamos' historical and continued reliance on the Fund for income gives it added incentive to set rates for Advisory Fees and other fees paid by the Fund at excessive levels.  *Id.* at ¶ 46.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court is not, however, required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter...to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of plaintiff's claims.  *Halebian v. Berv*,

644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

### B.  § 36(b) Excessive Fee Claims

"[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.  Courts must look to all pertinent circumstances to determine if fees are excessive, including the factors set forth by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), endorsed by the Supreme Court in *Jones*, 559 U.S. at 344–46.

> The *Gartenberg* Court specifically identified several factors for consideration in weighing "all pertinent" facts: (1) the nature and quality of services provided to the fund shareholders; (2) the profitability of the fund to the advisor-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees.

*In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 Civ. 4318 (LTS), 2015 WL 7301077, at *4 n.3 (S.D.N.Y. Nov 18, 2015) (citing *Gartenberg*, 649 F.2d at 929–32); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 340–41 (2d Cir. 2006).  "At the pleading stage a court need not consider whether all six factors are met, but rather only determine whether the facts as alleged would meet the basic standard as articulated in *Gartenberg*."  *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 539 (S.D.N.Y. 2008) (citing *In re Goldman Sachs Mutual Funds Fee Litig.*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006)).

### III. COUNT ONE: EXCESSIVE ADVISORY FEES

Plaintiffs' first claim is that Calamos has breached its fiduciary duty with respect to the Advisory Fees paid for investment advisory services.  Compl. ¶¶ 269–79.

Plaintiffs allege that all six *Gartenberg* factors weigh in favor of liability.  *First*, the Complaint discusses comparative fee structures by setting forth allegations that the Fund pays fees higher than third-party clients pay Calamos for similar or identical investment advisory services, and higher than comparable mutual funds pay other investment advisers for similar services.  As discussed further below, the Court finds that these allegations add to the plausibility of Plaintiffs' claim that Calamos charged the Fund excessive Advisory Fees.  *Second*, the Complaint describes Calamos' purported failure to pass along benefits reaped from economies of scale to shareholders via reduced fees, but these allegations do not add any plausibility to Plaintiffs' claim.  *Third*, the Complaint alleges that the services Calamos provided to the Fund were of poor quality by demonstrating the Fund's persistent underperformance compared to fund indexes and similar mutual funds.  These allegations make the claim more plausible.  *Fourth*, the Complaint emphasizes the Advisory Fees' role in Calamos' overall profitability, which add only marginally to plausibility.  *Fifth*, the Complaint alleges ways in which Calamos reaps "fall-out" benefits, *i.e.*, ways in which Calamos is able to leverage its relationship with the Fund by offering services funded by fees from the Fund's shareholders to other clients, without sharing the revenue from those other clients with the Fund via reduced fees.  These too add to plausibility, but only marginally.  *Sixth*, and finally, Plaintiffs' successfully buttress the plausibility of their claim by alleging that the Trustees failed to consider or critically assess information that would have revealed that the Advisory Fees were excessive, and failed to negotiate with Calamos to secure lower Advisory Fees.

## A.  The Fund's Investment Advisory Fees

The Complaint (¶ 52, Tbl. 3) alleges that the following rates are currently in place:

| Average Net Assets in Fund | Current Rates[1] (since August 1, 2004) |
|---|---|
| $0 - $500 million | 1.00% |
| $500 million - $1 billion | .90% |
| $1 billion - $6 billion | .80% |
| $6 billion - $11 billion | .78% |
| $11 billion – $16 billion | .76% |
| $16 billion - $21 billion | .74% |
| $21 billion - $26 billion | .72% |
| Over $26 billion | .70% |

The Complaint (¶ 54, Tbl. 4) also includes historical data on the total amount of Advisory

Fees paid and the annual effective fee rate:

| Fiscal Year[2] | Fund Net Assets (End of Year) | Advisory Fees Paid | Blended Rate (as % of Average Daily Net Assets) |
|---|---|---|---|
| 2014 | $ 3,484,476,428 | $ 31,535,086 | 0.83%[3] |
| 2013 | $ 4,441,152,831 | $ 41,109,168 | 0.83% |
| 2012 | $ 6,391,673,238 | $ 59,537,152 | 0.82% |
| 2011 | $ 7,727,002,086 | $ 70,744,156 | 0.81% |
| 2010 | $ 8,293,969,972 | $ 66,325,813 | 0.81% |
| 2009 | $ 7,988,441,578 | $ 58,313,737 | 0.82% |
| 2008 | $ 7,863,206,887 | $ 109,497,576 | 0.80% |
| 2007 | $ 17,493,714,892 | $ 127,528,938 | 0.79% |
| 2006 | $ 20,018,314,729 | $ 133,121,436 | 0.79% |
| 2005 | $ 14,466,574,480 | $ 90,988,486 | 0.80% |
| 2004 | $ 8,545,210,059 | $ 43,944,860 | 0.83% |
| 2003 | $ 2,649,212,755 | $ 18,008,981 | 0.87% |
| 2002 | $ 1,499,182,129 | $ 6,471,941 | 0.96% |
| 2001 | $ 207,026,972 | $ 1,121,470 | 1.00% |
| 2000 | $ 50,130,207 | $ 246,083 | 1.00% |
| 1999 | $ 15,652,835 | $ 126,233 | 1.00% |

---

[1] These rates are marginal:  The Fund pays a 1.00% fee on the first $500 million in AUM, a .90% fee on AUM between $500 million and $1 billion, a .80% fee on AUM between $1 billion and $6 billion, etc.  Compl. ¶ 79.

[2] From 1999 to 2006, the fiscal year ended March 31, and from 2007 to 2014, the fiscal year ended October 31. Compl. ¶ 54.

[3] The Complaint states that this particular rate is not yet available.  Plaintiffs' brief, however, claims that the rate is .83%.  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. 21) at 4. Defendants' brief cites the Fund's SEC filings, which state that the current rate is .84%.  Defendant's Memorandum of Law in Support of Their Motion to Dismiss (Doc. 15) at 6.

### B. Comparative Fee Structures

The first *Gartenberg* factor that the Complaint addresses is comparative fee structures. Plaintiffs compare the rates for the Fund's Advisory Fees to two categories:  (1) fee rates paid to Calamos by third-party institutional clients, and (2) fee rates paid by comparable mutual funds to other investment advisers.  All told, these allegations create a plausible inference that the Fund is paying substantially more in Advisory Fees than other Calamos clients and other mutual funds, while receiving only the same type and quality of investment services in return.

#### *(1) Institutional Clients*

Plaintiffs first allege that the Advisory Fees are higher than the advisory fees that third-party institutional clients (the "institutional clients") pay to Calamos for similar or identical investment services.

According to the Complaint, Calamos maintains approximately 140 accounts for institutional clients, totaling an aggregate $3.1 billion AUM, or 12% of total Calamos AUM. Compl. ¶ 48.[4]  Unlike the funds that are constituted by Calamos (such as the Fund), institutional clients can generally shop around for different investment advisers and competitively negotiate their fees, and thus Plaintiff alleges that the excessiveness of the Advisory Fees is evident from the fact that they are higher than the fees negotiated at arm's length with institutional clients, even though the "investment advisory services Calamos provided to such clients were substantive similar—*and in some cases effectively identical*—to those Calamos provided to the Fund."  *Id.* at ¶ 49.

First, the Complaint includes a "Standard Fee Schedule" that Calamos offers to institutional clients for a "Growth" investment strategy—the same strategy provided to the

---

[4] In comparison, the "captive" combined (including the Fund) account for 84% of Calamos AUM, while "managed accounts" for individual investors make up the remaining 4% of Calamos AUM.  Compl. ¶ 48.

Fund—which sets forth fee rates as follows:  .75% for AUM up to $25 million, .70% for AUM

from $25–50 million, .65% for AUM from $50–75 million, and .50% for AUM over $75 million.

*Id.* at ¶¶ 56–57.[5]  Assuming a particular institutional-client fund held $4.394 billion AUM, as the

Fund did as of December 31, 2013, the institutional client would pay $22.12 million in advisory

fees annually, for an effective rate of .51%, compared to the $36.652 million and .83% rate paid

by the Fund.  *Id.* at ¶ 58; *see also* Plaintiffs' Memorandum of Law in Opposition to Defendants'

Motion to Dismiss ("Pls.' Opp'n") (Doc. 21) at 5 n.5.

Second, while Calamos does not disclose its current institutional clients and the actual

fees they paid, the Complaint does identify the fees previously paid by two specific institutional

clients that contracted with Calamos for so-called "subadvisor" services, *i.e.*, these two clients

were investment advisors for their own captive funds, and contracted with Calamos to "sub-

advise" them on how to manage their own funds.  Compl. ¶¶ 61–62 & n.5.  The Complaint

alleges that Genworth Financial Wealth Management ("Genworth") and Thrivent Financial

("Thrivent") (together, the "subadvisor clients") received "*identical* Portfolio Selection Services"

but paid significantly less in fees:  Again assuming $4.394 billion in AUM, Plaintiffs allege that

Genworth would have paid $27.462 million in fees for a .625% effective rate, and Thrivent

would have paid $28.561 million for a .65% effective rate.  *Id.* at ¶¶ 62–63.

The Complaint also lays out allegations that the investment services that Calamos

provided to the subadvisor clients, and to institutional clients more broadly, were substantially

similar or identical to the services provided to the Fund, notwithstanding the higher fees charged

to the latter.  Comparing the IMA with the contracts executed by the subadvisor clients, Plaintiffs

---

[5] Although the Complaint states that the rate for AUM over $75 million is .60%, Plaintiff identified and corrected this error by reference to Calamos Advisors LLC's Form ADV, attached to Plaintiff's opposition brief.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. 21) at 5 n.5 (citing Declaration of Mark A. Strauss (Doc. 22), Ex. B ("Form ADV"), at 5).

allege that subadvisor-client funds "(1) feature 'investment objectives' and 'principal investment strategies' word-for-word identical to the Fund's; (2) deployed the very same Calamos personnel responsible for managing the Fund's investments; (3) held substantially the same securities, in substantially the same proportions, as the Fund; and (4) performed identically to each other and to the Fund."  Pls.' Opp'n at 6 (citing Compl. ¶ 65).  Plaintiffs also point to statements in Calamos' Form ADV demonstrating that Calamos would try to "replicate" the Fund's investment strategy and portfolio holdings for those clients seeking similar investments by use of "an optimization technique" by executing "identical trades at identical times for the Fund and its copied portfolios."  Compl. ¶ 66 (citing Declaration of Mark A. Strauss (Doc. 22), Ex. B ("Form ADV"), at 23).  The Complaint thus concludes that, despite the fact that the Fund paid more in fees on a relative basis, Calamos provided its institutional clients with Portfolio Selection Services that "were not merely *similar* to those provided to the Fund, but *identical*," and caused both the Fund and its institutional clients to "buy or sell the same securities at the same time for the same reasons."  *Id.* at ¶ 67.  Plaintiffs also allege that the IMA and the contracts with the subadvisor clients provided for substantially similar administrative, compliance, and reporting services, and in some cases services for the subadvisor clients that were *more* extensive than those provided to the Fund.  *Id.* at ¶ 70 & n.5.  Finally, Plaintiffs allege that all other services that Calamos or its affiliates provided to the Fund, *i.e.*, services *other than* investment advisory services, were "provided pursuant to separate contracts for separate compensation (*e.g.*, distribution fees, service fees, accounting fees)," *id.* at ¶ 71.

Calamos objects to the legal applicability of comparisons to fees paid by institutional clients.  *First*, as a general attack, Calamos argues that allegations comparing captive-Advisory Fees to institutional-client fees do not make a § 36(b) claim more plausible under *Jones* unless

they show "a large disparity in fees that cannot be explained by the different services" provided

and that is accompanied by "other evidence that the fee is outside the arm's length range."

Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Defs.' Br.") (Doc.

15) at 21 (quoting *Jones*, 559 U.S. at 350 n.8).  And according to Calamos, Plaintiffs here "fail to

allege a plausible basis for their conclusory assertion" that Calamos provided services to

institutional clients that were substantially similar or identical to the services provided the Fund.

*Id.*; Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss ("Defs.'

Rep.") (Doc. 23) at 8 (arguing that Plaintiffs did not "allege any facts demonstrating" identical

nature of services provided).

   None of these challenges are availing at this stage.  *Jones* explicitly rejected a categorical

rule prohibiting comparisons to institutional-client fees and instead instructed courts to give

those comparisons "the weight that they merit in light of the similarities and differences between

the services that the clients in question require."  *Jones*, 559 U.S. at 349–50.  As described

above, the Complaint pleads facts, including (i) specific comparisons between the IMA and the

subadvisor-client contracts and prospectuses, and (ii) direct quotations from Calamos' Form

ADV, that make it plausible that institutional clients pay lower fees for near-identical services,

for example by alleging that the Fund and institutional-client funds hold similar proportions of

assets and employ the same Calamos personnel for management.  *See In re Blackrock Mut.*

*Funds Advisory Fee Litig.*, No. 14 Civ. 1165 (FLW), 2015 WL 1418848, at *5 (D.N.J. Mar. 27,

2015) (sustaining allegation supported by comparison of fund IMAs to subadvisor agreements

and prospectuses showing "substantially same type of investment advisory services,"

"substantially the same types of securities for both the Funds and the Sub–Advised Funds," and

"the same portfolio managers…research, analysis, technology, and other resources"); *Goodman*

*v. J.P. Morgan Invest. Mgmt., Inc.*, No. 14 Civ. 414 (GLF), 2015 WL 965665, at *5 (S.D. Ohio

Mar. 4, 2015) (sustaining fee comparison to subadvised funds where plaintiffs pleaded "that the

services provided to and resources involved in all of the funds are substantially the

same…because it is the work done and not the label given to the work that will likely and

ultimately prove dispositive of Plaintiffs' claims," and further concluding that "prospectus

disclosures and involvement by the same portfolio managers and investment professionals

support the similarity allegations").[6]  Plaintiffs also allege that services required by the Fund but

not institutional clients are provided via separate contracts and not via the IMA, and thus should

not be reflected by higher investment advisory fees.  *See In re Davis*, 2015 WL 7301077, at *5

(rejecting defendants' contention on a motion-to-dismiss that services to subadvisor clients are

different because "Plaintiffs affirmatively allege that Defendants provide their additional services

to the Fund pursuant to separate contracts and for separate compensation, and that any additional

services that are not separately compensated are not materially significant additional cost items

for Defendants"); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11 Civ. 1083 (RMB), 2012 WL

6568409, at *5 (D.N.J. Dec. 17, 2012) (sustaining complaint's allegation of an "'apples-to-

apples' fee comparison, because the Funds have separate agreements covering those services that

set them apart from the institutional clients").  Taken as a whole, the Complaint sufficiently

alleges that the Fund is paying a higher fee-rate than Calamos' institutional clients for basically

---

[6] *See also Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, No. 11 Civ.  873 (JPS), 2011 WL 5826034, at *8 (E.D. Wis. Nov. 18, 2011); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04 Civ. 352 (DSC), 2009 WL 5821045, at *6–7 (W.D. Pa. Sept. 30, 2009); *Sins v. Janus Capital Mgmt., LLC*, No. 04 Civ. 01647 (WDM), 2006 WL 3746130, at *3 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Grp., Inc.*, No. 04 Civ. 02555 (KPE), 2006 WL 1581846, at *3 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. 04 Civ. 11458 (GAO), 2006 WL 149038, at *2–3 (D. Mass. Jan. 19, 2006); *Strigliabotti v. Franklin Res., Inc.*, No. 04 Civ. 00883 (SI), 2005 WL 645529, at *3–4 (N.D. Cal. Mar. 7, 2005).

the same services.[7]  *See In re Davis*, 2015 WL 7301077, at \*5; *In re Blackrock*, 2015 WL

1418848, at \*6; *Goodman*, 2015 WL 965665, at \*4.

     *Second*, Calamos argues that the cases cited in Plaintiffs' brief involve inapplicable

"factual predicates" and thus do not support a denial of Calamos' motion to dismiss.  Defs.' Rep.

at 3.  One set of cases involve so-called "manager of managers" structures in which defendant-

advisers allegedly subcontract out the bulk of advisory services to other entities, yet retain the

bulk of the fees.  There is nothing inherently inapt about these cases, however—they are merely

a subset of the more general category of cases in which plaintiffs allege that advisory fees are in

excess of the services actually provided.  *Cf. Curd ex rel. SEI Int'l Equity Fund v. SEI

Investments Mgmt. Corp.*, No. 13 Civ. 7219 (ABB), 2015 WL 4243495, at \*5 (E.D. Pa. July 14,

2015) (analyzing "manager of managers structure as part of the "nature and quality of services"

factor).  The plaintiffs in the manager-of-managers cases may very well find it easier to plead

that fees are out of proportion to services, but those cases in no way serve to undermine the

plausibility of Plaintiffs' allegations here.  Additionally, Calamos' argument faulting Plaintiffs'

---

[7] Calamos disputes the similarity of these services by pointing to statements in the Fund's Annual Report indicating that the Trustees found the difference in fee rates reflected actual differences in services rendered.  Defs.' Br. at 21–22.  This challenge to the factual accuracy of Plaintiffs' allegations is not appropriate at the motion-to-dismiss stage. *See, e.g.*, *In re Davis*, 2015 WL 7301077, at \*5 ("Although Defendants may ultimately be able to demonstrate that Plaintiffs' subadvisory fee benchmark is inapt, the issue is not ripe for resolution on the pleadings."); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, No. 14 Civ. 414 (GLF), 2016 WL 759654, at \*8 (S.D. Ohio Feb. 26, 2016) (holding that challenge to alleged similarity of service "involves assigning the comparison services and fees the weight they are due, a task that depends on evidence and that is ill suited for a decision on a motion to dismiss"); *In re Blackrock*, 2015 WL 1418848, at \*5 (holding that "the ultimate weight" of comparison between respective services and fees was "not before the Court" on a motion to dismiss).  The Court notes, however, that it holds only that the Complaint's allegations make the similarity of services *plausible*.  The allegations in the Complaint will not suffice at the summary judgment stage without detailed evidence comparing services and fees.  *See Goodman*, 2016 WL 759654, at \*8 ("Context matters in these types of cases, and simply comparing a laundry list of services does little to inform this Court of the nature of those services and whether different services indeed warrant significantly greater fees."); *see also In re Blackrock*, 2015 WL 1418848, at \*8.

reliance on cases involving "fund of fund" structures, *i.e.*, mutual funds that invest exclusively in other mutual funds, is unpersuasive for the same reason.  Defs.' Rep. at 3 n.6.

Calamos also tries to leverage the ICA's limitation on damages, which restricts a plaintiff from recouping excessive fees levied more than a year before the date the complaint was filed. *See* § 80a-35(b)(3) ("No award of damages shall be recoverable for any period prior to one year before the action was instituted.").  Specifically, Calamos contends that the statutory damages restriction renders meaningless Plaintiffs' allegations comparing the Advisory Fees to fees that subadvisors paid prior to February 11, 2014, in this case, allegations in the Complaint describing the subadvisor client's fees and services from 2007 to 2011.  *See* Defs.' Br. at 22–23; Defs.' Rep. at 3 & n.7.  But the Complaint plausibly alleges the existence of 140 institutional clients *currently* receiving services from Calamos, including clients receiving subadvisor services, and it sets forth a standard rate schedule that is *currently* in place for an investment strategy nearly identical to the Fund's.  Indeed, as Calamos itself notes, the Fund's Annual Report explains that the Trustees reviewed "management fee rates for [Calamos'] institutional accounts and sub-advised funds."  Defs.' Rep. at 6.  And although the specific examples of past subadvisor clients do not add to the plausibility of the § 36(b) claim as much as specific contemporaneous examples would, they are not valueless, especially because these particular examples were allegedly governed by the same fee-rate structure and provision of services currently in place.  It is, in other words, entirely plausible that discovery will reveal evidence of fee payments and services for institutional and subadvisor clients during the one-year statutory period similar to that of the examples cited.  The Complaint's lack of current, client-specific examples does not undermine the plausibility of its allegations.

Moreover, the cases on which Calamos relies do not set a stringent prohibition on year-old allegations, do not speak to comparative fee structures, and thus do not serve to defeat the allegations at issue here.  In *In re AllianceBernstein Mutual Fund Excessive Fee Litigation*, the district court held that plaintiff's economy-of-scale allegations that included only three months of the relevant statutory period were contradicted by the Fund's Annual Report revealing shrinking AUM during eight months of the statutory period, and thus could not alone support a plausible inference of excessive fees during the statutory period without "dramatic extrapolation."  No. 04 Civ. 4885 (SWK), 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006).  Contrary to Calamos' characterization, that case did not set down a categorical rule against factual allegations dating to before the one-year statutory period, but merely stated that the relevancy of those allegations to the overall plausibility of the plaintiff's claim was weakened by virtue of their lack of timeliness. *See id.* ("Though it may be possible in certain circumstances to demonstrate the existence of excessive fees by using statistical trends that do not fall squarely within the applicable one-year time period, the Investment Adviser Defendants are correct in asserting that this approach weakens Plaintiffs' economies of scale argument considerably.").  The other case Calamos cites, *In re Scudder Mutual Funds Fee Litigation*, merely adopts *In re AllianceBernstein*'s language without any additional analysis, and similarly relies on the one-year statutory period as a metric for assessing the plausibility of the allegations rather than as an evidentiary ban.  No. 04 Civ. 1921 (DAB), 2007 WL 2325862, at *14–18 (S.D.N.Y. Aug. 14, 2007).  To the extent these two cases purport to prohibit courts from considering evidence of economies of scale dating back more than a year prior to the filing of the complaint, Plaintiffs cite to a plethora of cases that explicitly do just that.  Pls.' Opp'n at 22–23 (citing seven cases discussing historical trends in considering allegations of economies of scale).

Nor would a categorical prohibition on evidence more than a year old make much sense, especially where, like here, the same fee rates (and likely the same range of services) have been approved by the Fund's Trustees since 2004.  There is no logical basis for excluding, as a hypothetical example, 2014 emails from a fund trustee questioning excessive fees in a case challenging those same exact fees brought in 2016.  *See Hunt v. Invesco Funds Grp., Inc.*, No. 04 Civ. 2555 (KPE), 2006 WL 1751900, at *1 (S.D. Tex. June 22, 2006) (allowing discovery for a period of five years prior to the filing of Plaintiffs' complaints).  As Plaintiffs rightly point out, Calamos does not even abide by such a strict evidentiary prohibition when it urges this Court to consider the Fund's long-term performance dating back to 1990 in evaluating the quality of provided services.  *See* Pls.' Opp'n at 23 (citing Defs.' Br. at 26).  The Court thus declines Defendants' invitation to ignore all of Plaintiffs' allegations, including comparative fee structures, that invoke facts dating earlier than § 36(b)'s one-year statutory period.  *See Redus-Tarchis v. N.Y. Life Inv. Mgmt. LLC*, No. 14 Civ. 7991 (WHW), 2015 WL 6525894, at *8–9 (D.N.J. Oct. 28, 2015) (finding as "more persuasive" the cases that "have accepted economies of scale allegations based on AUM growth outside the one-year statutory period.").

### (2) Other Mutual Funds

Plaintiffs next compare the Advisory Fees to fees paid by comparable mutual funds pursuing similar investment strategies (the "peer mutual funds").  Specifically, the Complaint states that .66% is the average fee rate paid by the 246 peer mutual funds categorized as a U.S. large-cap growth fund (like the Fund),[8] compared to the .83% rate paid by the Fund.  Compl. ¶¶ 73–74.  Moreover, among the ninety of those 246 peer mutual funds that have assets of $1 billion or more (like the Fund), those ninety pay an average rate of .59%, and only six of the ninety pay

---

[8] These funds "all seek to invest in stocks issued by large, U.S. companies deemed to possess the best growth prospects."  Pls.' Opp'n at 8.

rates higher than those paid by the Fund.  *Id.* at ¶¶ 75–76.  These allegations make Plaintiffs' §

36(b) claim moderately more plausible.

Calamos challenges this comparison on essentially three grounds.  Defs.' Br. at 23–24;

Defs.' Rep. at 9.  The first ground is that the Trustees reviewed the very information alleged in

the Complaint before approving the Advisory Fees, but that response says little about whether or

not the Advisory Fees are excessive.  *See Jones*, 559 U.S. at 351 (noting that "a fee may be

excessive even if it was negotiated by a board in possession of all relevant information").  The

second ground is that the Complaint does not sufficiently allege that the Fund and the peer funds

are truly comparable.  But, at this stage, the fact that the Advisory Fees were at the very high end

compared to rates paid by similarly-categorized U.S. large cap funds adds at least a modicum of

plausibility to the allegation that the Fund paid excessive fees.  *Cf. Jones v. Harris Assocs. L.P.*,

611 F. App'x 359, 361 (7th Cir. 2015) ("*Jones II*") (explaining that fees "produced by bargaining

at other mutual-fund complexes…tells us the bargaining range" and that evidence demonstrating

lower fees along with comparable services "would imply that arm's length bargaining would

produce a lower fee"); *Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*,

No. 14 Civ. 44 (JAJ), 2014 WL 5426908, at *7 (S.D. Iowa Sept. 10, 2014) (crediting allegation

comparing defendant's fees to single other comparable fund); *In re Federated*, 2009 WL

5821045, at *7 (crediting alleged comparison to "all the 266 large open-ended funds evaluated

by Morningstar").  The third ground is that comparisons to peer mutual funds do not constitute

"*prima facie* evidence of excessive fees," which is both correct and beside the point at the

motion-to-dismiss stage, where Plaintiffs are not required to produce evidence and, more

importantly, where comparisons to peer funds are only one of a number of allegations that Plaintiffs offer to support the plausibility of their § 36(b) claim.[9]

Overall, the Complaint's allegations describing comparative fee structures provide ample basis for the Court to find it plausible that the Advisory Fees are excessive, both because the fees are higher than those paid by other Calamos clients who are able to engage in arm's-length bargaining, and because the fees are higher than those paid by many comparable mutual funds, even those, like the Fund, that may not be able to bargain competitively.

## C. Economies of Scale

Plaintiffs next allege that the Advisory Fees are excessive because they have not been reduced to reflect savings that Calamos has earned from the Fund's increasing economies of scale, *i.e.*, marginal AUM increases that are not accompanied by marginal increases in management and advertising costs.  Compl. ¶¶ 89–90.  "Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these

---

[9] Calamos seeks to position the Second Circuit as categorically opposed to peer mutual-fund comparisons, but that argument distorts the case law beyond recognition.  *See Amron*, 464 F.3d at 345 (holding that sole allegation comparing fee to "industry mean" was "inadequate" because it "conveniently omitt[ed] where [the fund's rate] fell on the distribution of fees" and made only a specific comparison to one other mutual fund "known for its emphasis on keeping costs low"); *Gartenberg*, 694 F.2d at 929 ("We do not suggest that rates charged by other adviser-managers to other similar funds are not a factor to be taken into account.").  Likewise, while the Supreme Court in *Jones* cited the Second Circuit in *Gartenberg* when cautioning against "rely[ing] too heavily on comparisons with fees charged to mutual funds by other advisers," 559 U.S. at 350, the Court's reasoning was that such fees "may not be the product of negotiations conducted at arm's length"—in other words, caution is warranted because such comparisons could be to fees that are themselves excessive.  This warning has more purchase in response to a defendant's use of a below-average fee as a shield rather than, as is the case here, a plaintiff's use of an above-average fee as a sword.  *Cf. Jones v. Harris Associates L.P.*, 537 F.3d 728, 732 (7th Cir. 2008) ("The governance structure that enables mutual fund advisers to charge exorbitant fees is industry-wide, so [comparisons to fees charged by other mutual funds advisers] would if widely followed allow those fees to become the industry's floor.") (Posner, J., dissenting from denial of rehearing *en banc*); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411–12 (2d Cir. 1989) (cautioning against weighing too heavily the district court's finding that defendant's fees were "among the lowest of any mutual fund in the industry").

economies of scale." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326–27 (4th Cir. 2001) (citing *Fogel v. Chestnutt,* 668 F.2d 100, 111 (2d Cir. 1981)).

Generally, the Complaint alleges that while Fund AUM and Advisory Fees have grown over the past fifteen years, neither "the *amount* of the investment advisory services provided to the Fund by Calamos" nor "the *cost* to Calamos of providing such services[] has undergone any similar increase." *Id.* at ¶¶ 100–01. Plaintiffs specifically allege as follows:  (i) "nearly half of the Fund's current size is a function of asset value appreciation…that require[s] zero additional provision of investment advisory services," (ii) the additional services required by an increasing number of shareholders "are by and large *not* investment advisory services" paid for by the Advisory Fees, but rather are administrative services "provided by other service providers…for separate fees set through separate contracts," (iii) because the number of discrete equity investments owned by the Fund has only increased from 81 in 2001 to 87 in 2014, "the research, management and oversight associated with providing the investment advisory services was little changed even as Fund AUM grew dramatically," and (iv) the number of individual portfolio managers responsible for managing the Fund has remained "largely consistent," dropping from eleven managers in 2010 to eight in 2014. *Id.* at ¶¶ 102–05.

Despite these alleged economies of scale, Plaintiffs maintain that Calamos has not passed along the concomitant savings through reductions in Advisory Fees over time.  Plaintiffs note that while Fund AUM "increased by a factor of 20" from 2001 to 2013 (from $207 million to $4.441 billion), total Advisory Fees increased "nearly forty-fold" during that same time period (from $1.121 million to $41.109 million).  *Id.* at ¶ 106.

Plaintiffs also allege that Calamos has not engaged in a typical strategy that investment advisors use to pass on economy-of-scale benefits to shareholders—the use of meaningful fee

breakpoints.  Breakpoints are staggered reductions in marginal fee rates that accompany

marginal AUM increases, and they are meant to reflect the reduced marginal cost of providing

investment advisory services to a growing pool of assets, allowing shareholders to reap some

economy-of-scale benefits via reduced fees.  *Id.* at ¶ 107.  According to the Complaint, however,

the breakpoints introduced into the Fund's fee-rate schedule in 2000 and again in 2004 (the

"2000 breakpoints" and "2004 breakpoints," respectively) "create[d] only an appearance of fee

reductions while doing little or nothing to actually reduce fees."  *Id.* at ¶ 108.

The below chart, taken from the Complaint (¶ 79, Tbl. 6), shows the Fund's fee-rate

structures before, during, and after the 2000 and 2004 breakpoints, including the current rates:

| Average Net Assets in Fund | Rates prior to August 1, 2000 | Rates from August 1, 2000 to August 1, 2004 | Current Rates (since August 1, 2004) |
|---|---|---|---|
| First $150 million | 1.00% | 1.00% | 1.00% |
| First $500 million | | | |
| $500 million - $1 billion | | .90% | .90% |
| $1 billion - $6 billion | | | .80% |
| $6 billion - $11 billion | .75% | | .78% |
| $11 billion - $16 billion | | .80% | .76% |
| $16 billion - $21 billion | | | .74% |
| $21 billion - $26 billion | | | .72% |
| Over $26 billion | | | .70% |

As Plaintiffs argue, and as the chart plainly shows, the 2000 breakpoints actually *increased* the

rates charged to the Fund because all AUM amounts over $150 million were newly subject to

.80%, .90% or 1.00% rates, instead of the blanket .75% rate prior to August 1, 2000.  Compl. ¶

82.  Furthermore, according to Plaintiffs, the 2004 breakpoints had no "practical effect" because

the reductions between each breakpoint were both uniformly "tiny" and spread out across too

wide a range of AUM to make any difference, effectively operating to reduce rates "by a mere 10

basis points (0.1%) over an AUM range of $25 billion."  *Id.* at ¶¶ 108–09.

In contrast to the comparative fee structures already discussed, Calamos has a stronger

argument that economy-of-scale allegations do not make it more plausible that the Advisory Fees

were excessive.  The historical fee-rate data provided by Plaintiffs show a 20 basis point *drop*

from 1999 to 2006, the only time period during which AUM actually grew.  Since then, AUM

has declined practically every year while the fee rate has increased by only 4 basis points at

most.  Simply put, there is nothing in the Complaint to suggest that the fee rates paid in 2014

were particularly high because Calamos failed to pass along scale benefits *in that particular*

*year*—if discovery does uncover a failure to pass along such benefits, it appears that such failure

would have to be a persistent, systematic feature of the Fund basically since its inception.[10]

        To be sure, the Complaint does include some factual allegations that suggest the

operational costs of providing investment advisory services have basically remained stable over

time, but these allegations tend to overstate AUM growth and understate fee-rate decreases.  *See*

Compl. ¶¶ 100–05.  Put simply, it is far from clear at this point whether Plaintiffs will be able "to

show the 'per unit cost of performing Fund transactions decreased as the number of transactions

increased.'"  *Mintz v. Baron*, No. 05 Civ. 4904 (LTS), 2009 WL 735140, at *3 (S.D.N.Y. Mar.

20, 2009) (quoting *Amron*, 464 F.3d at 345).  On the other hand, there is a recent slew of cases in

which federal courts have found allegations similar to those here as sufficient, including

allegedly inadequate breakpoints.  *See Redus-Tarchis*, 2015 WL 6525894, at *10–11; *In re*

*Blackrock*, 2015 WL 1418848, at *6–7 (collecting cases); *Sins*, 2006 WL 3746130, at *3.

        Again, were these allegations standing alone, they would not state a plausible claim for

relief under § 36(b).  But Plaintiffs are not required to plead facts demonstrating that each of the

*Gartenberg* factors is independently satisfied in order to survive a motion to dismiss.  *See Zehrer*

---

[10] Calamos here again revives its argument that Plaintiffs cannot rely on facts dating from prior to a year before the complaint was filed.  Defs.' Br. at 23.  The Court has already rejected this argument, as explained above.  *See Redus-Tarchis*, 2015 WL 6525894, at *8–9 (finding as "more persuasive" the cases that "have accepted economies of scale allegations based on AUM growth outside the one-year statutory period" because "[a] manager for a fund that grows one year and then remains the same size continues to enjoy economies of scale even without further growth").

*v. Harbor Capital Advisors, Inc.*, No. 14 Civ. 789 (JHL), 2014 WL 6478054, at *4 (N.D. Ill.

Nov. 18, 2014) (concluding that while economy-of-scale allegations "alone may not be sufficient

to survive a motion to dismiss, they support [plaintiff's] claim that the fees are disproportionate

to the services rendered and are not the product of arm's length bargaining").  Plaintiffs'

economy-of-scale allegations thus weigh slightly, but not decisively, in Calamos' favor.

### D.  Nature and Quality of Services

Regarding the *nature* of services, the Complaint contains allegations that describe in

essence five categories of services provided to the Fund's shareholders:  (1) Portfolio Selection

Services, which are the bulk of the investment advisory services provided by Calamos under the

IMA; (2) Other Services, the remaining portion of investment advisory services provided by

Calamos under the IMA; (3) financial accounting services, which are provided by Calamos and

paid for by the Fund under a services agreement that is separate and apart from the IMA; (4)

Distribution Services provided by CFS under a distribution agreement that is separate and apart

from the IMA; and (5) various other operational services[11] not provided by Calamos or its

affiliates.  Compl. ¶¶ 110–19.  Referring to data from the Fund's Annual Report, Plaintiffs allege

that investment advisory services, funded by Advisory Fees, accounted for 56.92% of the Fund's

total annual expenses in 2014—by far the largest category of Fund expenditures—and that

Distribution Fees paid to CFS accounted for another 28.66%.  *Id.* at ¶¶ 115–16.  Calamos is thus

the Fund's "primary payees, accounting for 86.4% of all Advisory Fees."  *Id.* at ¶ 116.[12]

---

[11] These include: securities custody services, accounting services, transfer agent services, audit services, legal services, shareholder reporting services, services to Fund Directors, and compliance-related services.  Compl. ¶ 112.

[12] Financial accounting service fees paid to Calamos account for .81% of the Fund's annual expenditures.  Compl. ¶ 115.

The Complaint cites to the IMA to support its description of Portfolio Selection Services as "researching potential investment, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund."  *Id.* at ¶ 117 (citing IMA at Clause 2).[13]  Plaintiffs also allege, based on SEC filings and documents prepared by Calamos, that Portfolio Selection Services are the "primary metric on which Calamos, Fund investors, and the Fund's Board judge Calamos' performance of its IMA-specified duties."  *Id.* at ¶ 118.

Plaintiffs allege that the services provided to the Fund by Calamos are deficient in three ways.  *First*, Plaintiffs alleges data showing that the Fund has "substantially" underperformed all three of its critical benchmarks—the Russell 3000 Growth Index, the S&P 500 Index, and the Russell Midcap Growth Index—consistently over the course of one-year, three-year, five-year, and ten-year periods.  *Id.* at ¶¶ 121–22.[14]  *Second*, according to the investment research firm Morningstar, Inc. ("Morningstar"), the Fund has consistently underperformed compared to other mutual funds that are, like the Fund itself, "Large Growth" funds, once again over one-, three-,

---

[13] The Other Services that make up the remainder of the IMA's investment advisory services "remain unspecified in the IMA, in contrast to the specified Portfolio Selection Services," but Plaintiffs allege on information and belief that they "consist in large part of (a) compliance-related functions and (b) reporting to Fund shareholders and/or the Board on Fund performance." Compl. ¶ 119.

[14] The Complaint (¶ 122, Tbl. 9) includes the following table comparing the Fund's performance versus the performance of its benchmark, as of September 30, 2014:

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| Calamos Growth Fund | 9.00% | 15.23% | 10.99% | 6.11% |
| Russell 300 Growth Index | 17.87% | 22.41% | 16.43% | 8.95% |
| S&P 500 Index | 19.73% | 22.99% | 15.70% | 8.11% |
| Russell Midcap Growth Index | 14.43% | 22.74% | 17.12% | 10.24% |

five-, and ten-year periods.  *Id.* at ¶ 123.[15]  Plaintiffs also allege that Morningstar currently puts the Fund in the bottom 10% of the Morningstar Large Growth Category based on its risk-adjusted returns for each of the three-, five-, and ten-year periods, and rates as "high" the Fund's total fees (including but not limited to the Advisory Fees for investment advisory services).  *Id.* at ¶¶ 124–26.  *Third*, Plaintiffs allege that some of Calamos' institutional and subadvisor clients responded to the allegedly poor service quality in a manner that the Fund, as a captive fund, may not:  by firing Calamos and retaining new investment advisors.  *Id.* at ¶¶ 127–32; *see also id.* at ¶ 133 (citing report from Strategic Partners New Era Growth Fund that termination of Calamos' services in part to "Calamos' negative return").

Calamos argues that allegations that focus on the Fund's performance are inadequate because they do not take into account "the number of [Calamos] employees providing advisory functions, or the tenure, experience, and skill of the investment professionals."  Defs,' Br. at 25. The absence of such allegations is not decisive, however, nor are they necessarily more probative of service quality than the Fund's actual performance—it seems axiomatic that a mutual fund's persistent underperformance vis-à-vis its peers is the best barometer of the services it receives. Indeed, Calamos tries to stretch the proposition that allegations of underperformance *standing alone* do not establish fee excessiveness into the much broader proposition that plaintiffs can never use performance allegations as a proxy for service quality.  *Id.* at 25–26; Defs.' Rep. at 9. But courts typically consider allegations of underperformance when determining whether a

---

[15] The Complaint (¶ 123, Tbl. 10) includes the following table comparing the Fund's performance against the average performance of Morningstar's Large Growth Category, as of September 30, 2014:

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| Calamos Growth Fund | 9.00% | 15.23% | 10.99% | 6.11% |
| Morningstar Large Growth Category | 16.24% | 21.28% | 14.60% | 8.26% |

plaintiff has pleaded sufficient facts about a fund's service quality.  *See, e.g.*, *Jones II*, 611 F.

App'x at 361 (adopting district court finding that "the fees could not be called disproportionate

in relation to the value of [the adviser's] work, as the funds' returns (net of fees) exceeded the

norm for comparable investment vehicles"); *In re Federated*, 2009 WL 5821045, at *6

(sustaining allegations of poor service quality describing Morningstar ratings and performance

comparisons to "similar and related groups of funds"); *cf. Amron*, 464 F.3d at 344 (faulting one

complaint for failing "to allege the Fund's performance is appreciably worse than comparable

funds" and describing another complaint as "less deficient, in part because it notes that over 80%

of the S & P Fund's peers outperformed it").  Here, the Complaint contains both allegations of

underperformance compared to large indexes and peer mutual funds, alleges that the Fund's

Board, Calamos, institutional clients, and Morningstar all consider performance to be the critical

metric of service quality, and alleges that other clients receiving similar investment advisory

services terminated Calamos for the poor quality of those services.  Together, these allegations

make it at least plausible that evidence will demonstrate that Calamos provides the Fund with

low-quality investment advisory services relative to the fees charged.[16]

### E.  Profitability

Although precise, Fund-specific profit data is not publically available, the Complaint

nevertheless sets forth a series of factual allegations seeking to demonstrate the likelihood that

Calamos generates significant profits from the Fund.

---

[16] Calamos' arguments (i) that the Trustees adequately took underperformance into account by negotiating a five basis point reduction of the Advisory Fees for the year ending June 30, 2014, and (ii) that the allegations did not properly capture what is actually good Fund performance are both factual disputes best left for summary judgment or the trier of fact.  Defs.' Br. at 26; Defs.' Rep. at 9.

Plaintiffs first allege that Calamos' parent company has publicly reported operating margins averaging 39.6% from 2004 to 2013, "among the highest reported by any publicly-traded asset manager," and that a report by Standard & Poors characterized Calamos' profitability as "among the strongest of…rated asset managers."  Compl. ¶¶ 137–39 & n.12.  Plaintiffs next allege that, based on the public data, the Fund is arguably Calamos' most significant client in that:  (i) Advisory Fees paid by the Fund "were the single largest component" of Calamos' total advisory-fee income, accounting each year for 20% to 40% of total advisory-fee income, (ii) advisory-fee income was "the single largest component" of Calamos' revenues, and (iii) the total fees paid by the Fund to Calamos for all services accounted each year for between 25% to 33% of Calamos' total annual revenues.  *Id.* at ¶ 139.  Finally, Plaintiffs allege, on information and belief, that the Fund is "by far the most profitable of all funds in the Calamos Fund Complex" and that other small funds in the Calamos Fund Complex are, based on their small AUM size, small fee stream, and high fixed costs, likely losing money and are only "made possible and subsidized by the large profits extracted from the Fund," which in turn are only possible due to excessive advisory fees, monopolized economies of scale, and fall-out benefits.[17]  *See id.* at ¶¶ 141–45.

Calamos faults Plaintiffs for failing to "attempt to quantify" the profit specifically "attributable to advising the Fund," as opposed to Calamos' other funds and clients.  Defs.' Br. at 29.  But Plaintiffs cannot control the way Calamos publically reports its financials, and discovery will plainly produce all the pertinent information in assessing the profitability factor.  *See Krantz v. Fid. Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D. Mass. 2000) (crediting plaintiff's argument that "he cannot make more specific allegations about the Two Funds and must rely on

---

[17] *See supra* III.F for discussion of fall-out benefits.

aggregate numbers because defendants are not publicly owned corporations and more specific financial information is not available prior to discovery").

Calamos also cites to cases that have found insufficient allegations of profit margins far above 39.6%. Defs.' Br. at 29–30. This ignores Plaintiff' allegations, which the Court must accept as true, that the Fund is particularly profitable relative to all of Calamos' other funds and is the most responsible for Calamos' overall profit margins, which are among the industry's highest. Pls.' Opp'n at 28. Plaintiffs' profitability allegations thus make it at least plausible that discovery will reveal Fund profits out of proportion to the services provided, a sign that the Advisory Fees may be excessive. *See Reso*, 2011 WL 5826034, at *9 (sustaining allegation that "the funds in this case account for a larger portion of [investment adviser's] profits than the respective share they account for of [investment adviser's] total managed assets").

### F. Fall-Out Benefits

Fall-out benefits refer to any income, profits, or other benefits that accrue to an investment adviser, above and beyond investment advisory fees, that would not have accrued *but for* that adviser's role in managing an investment fund. Compl. ¶ 147; *see also Hoffman*, 591 F. Supp. 2d at 538 n.30 ("'Fall-out' benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund.") (citing *Levy v. Alliance Capital Mgmt. L.P.*, No. 97 Civ. 4672 (DC), 1998 WL 744005, at *2 (S.D.N.Y. Oct. 26, 1998)). The essence of fall-out benefits in the context of a § 36(b) claim is that, as a fiduciary, an investment adviser should share with the Fund revenue generated through ventures only made possible by the fiduciary relationship by reducing fees.

The Complaint alleges that Calamos enjoyed four distinct fall-out benefits. First, Plaintiffs allege that Calamos was able to market the investment strategies and services

originally generated for the Fund to other institutional clients at much lower costs and more competitive rates, essentially reaping additional advisory fees for little-to-no additional work. Compl. ¶¶ 149–51.  Second, Plaintiffs theorize that the outsized profits generated by the Fund allowed Calamos to subsidize the launch of new captive funds, capturing new clients and generating new streams of investment advisory fees.  *Id.* at ¶ 152.  Third, Plaintiffs provide data on the Distribution Fees paid to CFS and the financial accounting fees paid to Calamos, alleging that these fee streams would not have occurred but for the formation of the Fund, and that these streams combined generated $20 million to $80 million annually from 2000 to 2014, typically making up 31% to 37% of Calamos' total fee stream from the Fund.  *Id.* at ¶ 153.  Finally, the Complaint includes a few examples of what Plaintiffs allege to be many "related-party transactions through which Defendants secure various overhead-related services—such as office space and food service—from yet further Calamos affiliates, which are paid for providing such services."  *Id.* at ¶ 154.  Plaintiffs allege that Calamos affiliates extract $6.511 million annually in further payments for providing Calamos itself "with, in effect, room and board."  *Id.*

Calamos disputes that these allegations speak to benefits that accrued *but for* its role as the Fund's investment adviser, but that argument, at best, raises factual issues inapt for resolution here.  *Cf.* Defs.' Br. at 30 & n.126 (supporting argument with citations only to a summary judgment case and a case that did not address plaintiff's § 36(b) claim).  Further, Calamos' argument that the Complaint belies Plaintiffs' position that Calamos would copy and resell the Fund's strategy to other clients, Defs.' Rep. at 10, is unconvincing given that it relies on an allegation that explicitly states that Calamos endeavors to best "replicate" the Fund's strategy and portfolio holdings using an "optimization technique," Compl. ¶¶ 65-66 & n.9.

Without additional evidence, the Court cannot determine whether the benefits identified by Plaintiffs are in fact relevant to the excessiveness of the Advisory Fees.  For now, however, these allegations are sufficient.  *See Sins*, 2006 WL 3746130, at *3 (crediting allegation of "savings effected by reselling investment services, which could support an inference that fees are disproportionate to services provided"); *Dumond v. Mass. Fin. Servs. Co.*, No. 04 Civ. 11458 (GAO), 2006 WL 149038, at *3 (D. Mass. Jan. 19, 2006) (crediting allegations of "indirect compensation" that was kept for the adviser instead of used to reduce fees, including growing "transfer agency and custodian fees due to increases in the assets of the funds and number of shareholders," and "the ability to resell investment advisory services paid for by the MFS Funds at virtually no additional cost").

**G.  Trustees' Independence and Conscientiousness**

Under *Jones*, "a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance."  559 U.S. at 351 (citing 15 U.S.C. § 80a–35(b)(2)). "Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process."  *Id.* (citation omitted).  "Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently."  *Id.*  "In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome."  *Id.*

The Complaint focuses squarely on the Trustees' lack of conscientiousness,[18] specifically the alleged ways in which they failed to consider factors probative of excessive Advisory Fees and failed to critically assess Calamos' rationalization of those fees:

- While the Trustees accepted Calamos' assertion that the Fund's total fees were higher than fees paid by institutional clients because the Fund required more expensive services and entailed "more extensive regulatory obligations and risks associated with managing the Fund," Plaintiffs allege that the Trustees failed to make the service comparisons included in the Complaint that would have revealed otherwise, including failing to examine whether investment advisory services provided to institutional clients are materially different from, or less costly than, the services provided to the Fund.  Compl. ¶¶ 170, 196.

- Despite acknowledging that the Fund's fee rates were high and its performance poor compared to peer mutual funds, the Trustees determined that "it would be prudent" to give Calamos "additional time to develop its performance record" and noted the fact that the Fund operated under certain class-specific expense caps (*i.e.*, one class of Fund shares had its expenses capped at 1.75%, while the rest were capped at 2.5%).  *Id.* at ¶¶ 171–72.  But Plaintiffs allege that these statements lacked reason because Calamos already had over a decade to "develop its performance record," during which time the Fund still underperformed "consistently and substantially," and because the expense caps did not reduce the Fund's fees "by a single penny" over the previous three years, during which time the Fund's expenses were still higher than peer mutual funds.  *Id.* at ¶ 172.

- Plaintiffs allege that the Trustees failed to compare Calamos' reported profit levels to those of other asset managers, a comparison that would have shown the alleged extent and excessiveness of the Fund's profitability for Calamos.  *Id.* at ¶ 174.

- In reviewing whether Calamos was sharing potential economies of scale with Fund shareholders via reduced fees, the Trustees allegedly only referred to the breakpoints that Plaintiffs disparage as useless, and to the expense caps, which Plaintiffs allege "had nothing to do with economies of scale, and…did not actually operate to reduce Advisory Fees…."  *Id.* at ¶ 176.

- The Trustees allegedly did not consider any of the four fall-out benefits that Plaintiffs describe in the Complaint.  *Id.* at ¶¶ 177–78.

---

[18] Plaintiffs do not argue that the Trustees were not independent or disinterested.  Pls.' Opp'n at 34 n.36.  This does not preclude the possibility that fees were excessive, however.  *See Jones*, 559 U.S. at 352 (warning that courts "may [not] supplant the judgment of disinterested directors apprised of all relevant information, *without additional evidence that the fee exceeds the arm's-length range*") (emphasis added); *Daily Income Fund*, 464 U.S. at 540 ("Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board.") (citation omitted).  The Court further holds that the Complaint's allegations that Calamos and its affiliated Trustees "dominated" and "unduly influenced" the independent Trustees are purely conclusory and thus do not make Plaintiffs' § 36(b) allegations any more plausible.  *See, e.g.*, Compl. ¶¶ 167–68, 192.

- Plaintiffs allege that none of the public records indicate that the Trustees have ever rejected or negotiated down the advisory fees proposed by Calamos—aside from the two "cosmetic" breakpoints introduced in 2000 and 2004—essentially serving as a "rubber-stamp" for Calamos-proposed fee rates.  *Id.* at ¶¶ 181–84.  The natural result, according to Plaintiffs, is that the Fund pays higher fees than institutional clients that contract with Calamos after a competitive selection process and arm's-length negotiations.  *Id.* at ¶¶ 185–87.

- Plaintiffs allege that the Trustees failed to negotiate a "most favored nation" provision into the IMA, "which would require that the fee rate paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services."  *Id.* at ¶ 201.

- The Trustees have allegedly never solicited proposals from other investment advisors, negotiated performance-based fee adjustments into the IMA, or negotiated waiver or reimbursement provisions in response to the Fund's poor performance.  *Id.* at ¶ 202.

- Based on information and belief only, Plaintiffs allege that Calamos provided incomplete disclosures and "misleading representations" to the Trustees, who subsequently failed to question or critically assess the information and representations.  *Id.* at ¶¶ 193–95.

Calamos argues that these allegations merely employ the "circular argument" that the Trustees' lacked conscientiousness because they approved Advisory Fees that were disproportionate to the low quality of services provided.  Defs.' Br. at 17–18.  Calamos is right that many of the above allegations fault the Trustees for failing to consider the very facts that Plaintiffs marshal to state their claim, but this is not a fault *per se*—even a complaint with overwhelming allegations of excessive fees would surely seek to deny the Trustees deference in the same exact manner.  *Cf. Kasilag*, 2012 WL 6568409, at *7 (sustaining allegations of lack of board conscientiousness based largely on failure to properly consider other *Gartenberg* factors); *Reso*, 2011 WL 5826034, at *7 (same).  Indeed, it would be difficult to say that deference is owned to a board that failed to make proper services comparisons to other funds and clients, punted on action to address sustained poor performance, ignored comparative profitability, assumed that economies-of-scale benefits were being passed along based solely on the existence

of breakpoints, overlooked certain fall-out benefits, and, most importantly, served merely as a passive receptor of information instead of an active and aggressive negotiator, approving Calamos' initial offers, resting on a decade-old breakpoint structure, and missing opportunities to bring competitive forces to bear by shopping for other offers or putting in most-favored nation provisions. Compl. ¶¶ 170–95.[19] Plaintiffs have a long way to go to actually proving these allegations, but they suffice at this early stage. *See In re Blackrock*, 2015 WL 1418848, at *7 (finding plausible inference of rubber-stamping based on allegations that board "failed to consider whether the lower fees purportedly paid by other clients reflect differences in the services rendered to those funds," approved monopolized economies of scale, did not "solicit[] proposals from other investment advisers," did not negotiate a "most favored nation" provision, and relied solely on information "designed to support BlackRock's rationalization for the advisory fees charged to the Fund"); *Goodman*, 2015 WL 965665, at *3, 5 (sustaining allegations that board relied on information that "supported Defendant's rationale for the charged fees," "did not consider information or analyses reflecting the interests of the funds or the shareholders," and did not negotiate before approving fees, even where those allegations "contain[ed] relatively few details"); *Am. Chems.*, 2014 WL 5426908, at *6 (sustaining allegations that board was not given "adequate information regarding the services Defendants provided in exchange for advisory fees[;] fees charged and services provided by competitors with similar fund structures; fees and services Defendants provide to other clients; and

---

[19] These allegations rebut Calamos' hyperbolic argument that Plaintiffs do not "identify any pertinent information that the Board did not receive" and were "unable to point to any evidence that the Board should have considered, but did not, when reviewing the [IMA]." Defs.' Br. at 18. And once again, although Calamos argues that Plaintiffs' allegations are wrong because the Trustees actually did review all pertinent information, and that the Trustees have subsequently shown conscientiousness by negotiating a further fee concession addressing Fund performance, these are factual issues that the Court cannot at this juncture. Defs.' Br. at 18–19; Defs.' Rep. at 6–7.

economies of scale, among other things").[20]  The Court notes in particular that Plaintiffs allege

that the public records do not indicate *any* actual bargaining or negotiating by the Trustees with

respect to fees, an allegation that, if proven true, would strip the Board's decision of deference

*even if* the Trustees engaged in a thorough review of all the information Calamos provided them.

*Cf. Jones*, 559 U.S. at 351 (holding that deference is due where a board's process "for

*negotiating* and reviewing investment-adviser compensation is robust") (emphasis added)

(citation omitted); *Gartenberg*, 694 F.2d at 930 (identifying as "important factors" not only the

trustees' "expertise" and whether they are "fully informed," but also "the extent of care and

conscientiousness with which they perform their duties").

In short, *Jones*'s instruction that courts afford "considerable weight" to robust board

determinations very well may end up applying in this case.  But the Complaint, taking all of its

non-conclusory allegations as true, plausibly alleges that it may not.  *See In re Blackrock*, 2015

WL 1418848, at *7 (sustaining board-failure allegations "[e]ven if it is debatable whether the

Consolidated Complaint sets forth allegations of board failure that, alone, would support a

plausible claim"); *Goodman*, 2015 WL 965665, at *5 ("[Excessive-fee counts] survive here even

if it is debatable whether the complaint sets forth allegations of board failure that could not by

themselves support plausible claims."); *Kasilag*, 2012 WL 6568409, at *7 ("While these

allegations are certainly not dispositive of the *Gartenberg* analysis, when taken together they

create an inference that the board of directors may not have adequately considered important

facts when approving HIFSCO's management fees.") (citation omitted).

---

[20] Instead of providing cases in which similar allegations were held to not suffice at the pleading stage, Calamos cites only to (i) cases in which mere allegations of fund underperformance or director compensation were held insufficient to overcome the ICA's statutory presumption of independence, (ii) cases stating that the ICA requires directors to review the information furnished by fund advisers, and (iii) cases discussing fund performance as a proxy for service quality, not board conscientiousness.  *See* Defs.' Br. at 15–17 nn.65, 67, 71, 73–74.

### H.  Conclusion on Advisory Fees

Plaintiffs have plausibly alleged that the Advisory Fees were "so disproportionately large" that they bore "no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.  The claim is plausible in light of Plaintiffs' allegations describing (1) comparative fee structures, (2) the quality of services provided, and (3) the Trustees' purported lack of conscientiousness.  Additionally, allegations of (4) the Fund's profitability and (5) the potential fall-out benefits accruing to Calamos both make Plaintiffs' claim marginally more plausible, but (6) the supposed failure to pass along benefits from economies of scale do not.  While some *Gartenberg* factors fare better than others, the allegations, taken as a whole, adequately state a § 36(b) claim based on excessive Advisory Fees.[21]

It is worth noting that Calamos' briefs highlight a number of pre-*Jones* cases from this District that dismissed § 36(b) claims and that, Calamos argues, require the Court do the same here.  *See* Defs.' Br. at 12 n.59 (collecting cases).  Unsurprisingly, however, the complaints in those cases bear little resemblance to the instant Complaint.  *See, e.g.*, *Amron*, 464 F.3d at 342–43 (quoting the district court's description of the complaints at issue as "conspicuously" missing "any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants," relying mainly "on speculation, inference and generalized

---

[21] *See In re Blackrock*, 2015 WL 1418848, at *8 ("While the *Gartenberg* factors serve as a lens through which to consider the totality of the facts alleged in the Plaintiffs' Consolidated Complaint, it is not a requirement to establish these factors at this stage; rather, the appropriate consideration is whether the alleged facts demonstrate a plausible claim for relief under Section 36(b)….While Plaintiffs' evidence is not overwhelming, they have pled sufficient facts about the advisory fees paid to BlackRock, and their relationship to the services rendered, to present a plausible claim that the fees are disproportionately large.  This is not to say that the Defendants' arguments lack merit, or that the Court finds it likely that Plaintiffs will be able to meet the onerous standard for liability under Section 36(b).  At this stage of the proceedings, however, the Court's duty is not to challenge or otherwise test the strength of the allegations within the Consolidated Complaint…."); *Curd*, 2015 WL 4243495, at *4 (collecting cases stating that not all *Gartenberg* allegations need be independently sufficient, standing alone, for complaint to survive motion to dismiss).

observations about the securities industry from public figures," and "endeavor[ing] to avoid this shortfall by asserting that specific factual allegations are impossible without discovery").[22] Moreover, the one case on-point decided in this District post-*Jones* denied defendant's motion to dismiss. *See In re Davis*, 2015 WL 7301077, at *5. That case joins a growing number of recent decisions from federal courts, cited throughout this opinion and in Plaintiffs' brief, denying motions to dismiss complaints that raised allegations similar to those in the instant Complaint. *See, e.g.*, Pls.' Opp'n at 1 n.2 (collecting cases); *see also Redus-Tarchis*, 2015 WL 6525894, at *10–11.[23] That said, it is worth repeating the obvious, that the 12(b)(6) analysis always entails an individualized determination based on the particular complaint before the court.

Defendants' motion to dismiss count one of the Complaint is DENIED.

---

[22] *See also, e.g.*, *Mintz*, 2009 WL 735140, at *3 (dismissing complaint that alleged only that no services had been provided subsequent to the fund's closing, which was plainly contradicted by public filings, and was "silent with respect to facts addressing the five remaining *Gartenberg* factors"); *Hoffman*, 591 F. Supp. 2d at 539 (dismissing complaint that "offer[ed] no allegations about the actual services provided by the funds," did not make any specific allegations about profitability or fall-out benefits, and explicitly acknowledged that investment advisers and subadvisers perform distinct services); *In re Scudder*, 2007 WL 2325862, at *14–18 (dismissing complaint that failed to allege Fund-specific performance metrics in comparison to peer funds and alleged only that performance went up over past four years; failed to allege how fall-out benefits created excessive fees; presumed the existence of, and failure to pass on, economies of scale with only conclusory allegations; and only compared fee rates to four peer mutual funds without comparison to all peer funds); *In re Goldman Sachs*, 2006 WL 126772, at *9) (dismissing complaint that did not allege any facts about investment advisory fees).

[23] The Court also finds it notable that, apart from one summary order from the Second Circuit affirming a district court's pre-*Jones* dismissal from 2007 without analysis, *The R.W. Grand Lodge of F. & A.M. of Pennsylvania v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25, 30 (2d Cir. 2011), Defendants have not identified any other case from the nearly six-year period post-*Jones* that dismisses a §36(b) claim on the pleadings.

**IV. COUNT TWO:  EXCESSIVE DISTRIBUTION FEES**

Plaintiffs second claim, also brought under § 36(b), alleges that Calamos and CFS have charged the Fund excessive Distribution Fees.  Compl. ¶¶ 280–86.

Generally, mutual funds pay out fees from their own assets to brokers who market and sell fund shares, and to other providers for services such as advertising and printing and mailing prospectuses and sales literature.  *Id.* at ¶ 205.  These fees are commonly referred to as distribution fees or "12b-1 fees," after Rule 12b-1, 17 C.F.R. § 270.12b-1 (2015), *i.e.*, the rule issued by the SEC that approved of the use of mutual fund assets to pay for marketing expenses.  Compl. ¶ 208.  Rule 12b-1 requires mutual fund boards to review distribution plans and fees submitted by investment advisors and to determine on an annual basis whether the "plan will benefit the company and its shareholders."  *Id.* at ¶ 209 (quoting § 270.12b-1(e)).  In theory, effective distribution services should grow the Fund's AUM, lower per-share operating costs, and result in economies of scale that can be passed to shareholders via reduced fees.  *Id.* at ¶ 214.

The Fund and all other captive funds within the Calamos Fund Complex are alleged to operate under the same plan (the "Distribution Plan"), with CFS serving as the sole distributor.  *Id.* at ¶ 210.  The rates for the Fund's Distribution Fees, levied annually on investors in different classes of Fund shares, are alleged in the Complaint (¶ 210, Tbl. 16) as follows:

| Share Class | "Distribution Fees" | "Service Fees" | Total Distribution Fees |
|---|---|---|---|
| Class A | .25% (distribution and service) | | .25% |
| Class B | .75% | .25% | 1.00% |
| Class C | .75% | .25% | 1.00% |
| Class R | .25% | .25% | .50% |
| Class I | 0% | 0% | 0% |

"Distribution Fees" as the term is used in the above table are those fees that are incurred by CFS in promoting and distributing shares.  *Id.* at ¶ 211(a).  "Service Fees" as the term is used in the above table are those fees that the Distribution Plan attributes to compensation for more back-

office-type expenses incurred by CFS, including answering client and shareholder inquiries, ministerial and recordkeeping tasks, assisting clients in purchase and redemption transactions, and other services of this ilk. *See id.* at ¶ 211(b). Together, these two categories of fees add up to the total Distribution Fees that Plaintiffs allege are excessive. Plaintiffs further allege that rates for the Distribution Fees have remained constant since the Fund's creation in 1999. *Id.* at ¶ 212. In 2014, the rate schedule resulted in Distribution Fees totaling $15.88 million, representing .46% of Fund AUM. *Id.* at ¶ 213.

"An action alleging that Rule 12b–1 expenses resulted in excessive compensation to a mutual fund's investment adviser is properly brought under Section 36(b) of the ICA." *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741 (DLC), 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004); *see also Krinsk*, 875 F.2d at 412 ("Under Rule 12b-1, the investment company directors are held to the fiduciary standards of section 36 when they consider whether to implement or continue a distribution plan, such as the 12b-1 plan at issue here."). A distribution fee is thus excessive if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones*, 559 U.S. at 344 (quoting *Gartenberg*, 694 F.2d at 928).

Plaintiffs first allege that Distribution Fees are excessive because they are pegged to Fund AUM and thus in large part reflect market appreciation, rather than exclusively reflecting actual distribution services resulting in additional paid-in capital. Compl. ¶¶ 217–20. Plaintiffs repeat their allegations that large increases in AUM over time have created economies of scale— generated in part by services funded by Distribution Fees—that have not been used to reduce Advisory Fees. *Id.* at ¶¶ 225–26. They also make the (somewhat inconsistent) allegation that although Fund AUM has shrunk significantly from 2007 to 2014, implying low quality and

unsuccessful distribution services, the Trustees have still approved the same exact Distribution

Plan each year, forcing the shareholders to essentially pay something for nothing.  *Id.* at ¶¶ 227–

31.  Plaintiffs add that (i) the Fund has discontinued new sales of Class B shares to new investors

since 1999, yet still pays a 1% levy for distribution services that appear non-existent, and (ii) the

fact that the Distribution Plan levies *no* Distribution Fees on investors in Class I shares—

institutional clients required to invest at least $1 million—both shows that these clients refused to

pay such fees out of a recognition that the services they funded were of little value, and discredits

the insistence that the point of Distribution Fees is to fund services that most effectively increase

AUM.  *Id.* at ¶¶ 232–42.  Finally, Plaintiffs allege that certain services funded by the Distribution

Fees—the "Service Fees" described above, and the extent to which Distribution Fees fund CFS's

overhead expenses—are already paid for via other agreements with Calamos affiliates or third

parties, rendering those portions of the Distribution Fees purely excessive.  *Id.* at ¶¶ 243–48.

Like their critique of the Trustees' approval of Advisory Fees, Plaintiffs also attack the

Trustees' approval of the Distribution Fees as lacking rigor and a factual basis, because:  (1) The

Trustees premised their approval on the potential for benefits to accrue to Fund shareholders, but

Distribution Fees served only to fund either services that increased AUM but did not result in

decreased fees based economies of scale, or  services that failed to increase AUM and thus did

not result in any benefits to shareholders; and (2) the Trustees had no basis for their conclusory

statement that Distribution Fees paid out of funds closed to new investors could somehow still

provide any actual value to shareholders.  *Id.* at ¶¶ 249–61.  Plaintiffs conclude that the Trustees

did not effectively review or critically assess CFS's justifications for its fees.  *Id.* at ¶¶ 261–62.

If all of these allegations are taken as true, it is sufficiently plausible that the Distribution

Fees are significantly in excess of the actual services being provided.  *See Kenny v. Pac. Inv.*

*Mgmt. Co.*, No. 14 Civ. 1987 (RSM), slip op. at 11–12 (W.D. Wa. Aug. 26, 2015) (sustaining

"thin" allegations describing duplicative services, failure to pass on economies of scale, and fees

based on net assets rather than "distribution activity"); *Curran v. Principal Mgmt. Corp., LLC*,

No. 09 Civ. 433 (RWP), 2010 WL 2889752, at *11 (S.D. Iowa June 8, 2010) (holding that

Plaintiffs' "brief" allegations "have met their burden by alleging that fees collected by PFD for

its distribution services surpassed the value of those services, and that the manner in which those

fees were assessed did not correspond to the type of services performed but, rather, resemble fees

collected for advisory services"), *order vacated in part on different grounds on reconsideration*,

2011 WL 223872 (S.D. Iowa Jan. 24, 2011); *Pfeiffer*, 2004 WL 1903075, at *4 (S.D.N.Y. Aug.

26, 2004) (sustaining allegations asserting "in essence that BB & A's increased Rule 12b–1 fees

were not 'reasonably related' to the services it performed for the Fund," because it was

"unnecessary for the plaintiff to set forth evidentiary details to support this allegation, or to

support those elements of the *Gartenberg* test that may apply to promotion, distribution and

service fees").

CFS maintains that Plaintiffs' claim should be dismissed because, first, the allegation that

the Distribution Fees are based on AUM when they should be based only on paid-in capital is

prohibited as a matter of law, Defs.' Br. at 33, but that argument relies only on cases that say no

such thing.  *See Krinsk*, 875 F.2d at 413 (describing such a claim as "cognizable under section

36(b)"); *In re Scudder*, 2007 WL 2325862, at *14–15 (dismissing 12b-1 fee allegations because

they challenged the propriety of defendant's use of the fees, not the excessiveness of the fees

relative to services provided).  CFS also makes the same challenge to Plaintiffs' economy-of-

scale allegations as Calamos made regarding Advisory Fees, Defs.' Br. at 33, and while the

Court reiterates its concern with the lack of specific details regarding transaction costs and

volume discussed above, this is not enough on its own to justify dismissal of Plaintiffs' claims. CFS's argument that some Distribution Fees are used "to pay pass-through distribution expenses of the Fund" like "brokerage commissions" and "educational materials," *id.*, raise factual disputes about profitability and the value of distribution services provided that are not resolvable here. And once again, while the Court agrees with CFS that Plaintiffs have not made out plausible allegations that the Trustees were not independent, that defect alone does not suffice to make it *per se* implausible that the Distribution Fees were excessive.[24]

Defendants' motion to dismiss count two of the Complaint is DENIED.


**V. CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The parties are directed to appear for an initial pretrial conference on **May 6, 2016, at 11:45 AM**. The Clerk of the Court is respectfully directed to terminate the motion (Doc. 14).

It is SO ORDERED.

Dated:   March 28, 2016
         New York, New York

                                          Edgardo Ramos, U.S.D.J.

---

[24] To the extent CFS argues that Plaintiffs' claim should be dismissed because the Distribution Fees do not exceed the fee maximums imposed by FINRA Rule 2830, the Court agrees with Plaintiffs that distribution fees can comply with that rule yet still be excessive under § 36(b). *See Pfeiffer*, 2004 WL 1903075, at *5 ("The defendants heavily rely on the argument that, because the Plan caps its Rule 12b–1 fees at 0.25% of the Fund's average daily net assets—or one-fourth less than the maximum asset-based charge allowed by the SEC—the fees are *per se* reasonable. The defendants cite no case law for this proposition. Should the plaintiff succeed in showing that the fees were excessive when measured against the services rendered, the defendant will not be able to defeat that showing by arguing that they could have charged even more.").