**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUL CHILL and SYLVIA CHILL, for the use and benefit of the CALAMOS GROWTH FUND, <br><br>          Plaintiffs, <br><br>    v. <br><br> CALAMOS ADVISORS, LLC, <br><br>          Defendants. | No. 15-cv-01014 (ER) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO PARTIALLY EXCLUDE THE PROPOSED TESTIMONY AND OPINIONS OF**
**DEFENDANT'S EXPERT GLENN HUBBARD**

Ira M. Press
Mark A. Strauss
Andrew McNeela
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
    mstrauss@kmllp.com
    amcneela@kmllp.com

Dated: February 9, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTS ......................................................................................................................................... 3

ARGUMENT ............................................................................................................................... 5

I.      Applicable Legal Standards ............................................................................................. 5

II.     Dean Hubbard's "Total Expense Ratio" Opinions Should be Excluded Because they are Irrelevant and not Helpful to the Trier of Fact ............................................................... 6

III.   Dean Hubbard's "Market Competitiveness" Opinions Should be Excluded Because they are Irrelevant, not Helpful to the Trier of Fact, and Unreliable ................................... 7

CONCLUSION ............................................................................................................................ 13

# TABLE OF AUTHORITIES

## <u>Cases</u>

*In re Am. Mut. Funds Fee Litig.*,
　　No. 04 Civ. 5593, 2009 U.S. Dist. LEXIS 98871 (C.D. Cal., Sept. 16, 2009) ............ 11-12

*In re Am. Mut. Funds Fee Litig.*,
　　No. 04 Civ. 5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom.*
　　*Jelinek v. Capital Research & Mgmt. Co.*, 448 F. Appx. 716 (9th Cir. 2011) .................. 6

*Chill v. Calamos Advisors LLC*,
　　175 F. Supp. 3d 126 (S.D.N.Y. 2016) ............................................................................. 3

*Daily Income Fund, Inc. v. Fox*,
　　464 U.S. 523 (1984) .......................................................................................................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
　　509 U.S. 579 (1993) .......................................................................................................... 6

*Forsythe v. Sun Life Fin., Inc.*,
　　417 F. Supp. 2d 100 (D. Mass. 2006) .............................................................................. 3

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
　　528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ...................... 7-8

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
　　694 F.2d 923 (2d Cir. 1982) .................................................................................... *passim*

*Jones v. Harris Assoc., L.P.*,
　　537 F.3d 728 (7th Cir. 2008) .................................................................................... 10-11

*Jones v. Harris Assocs. L.P.*,
　　527 F.3d 627 (7th Cir. 2008), *vacated and remanded*, 559 U.S. 335 (2010),
　　*and aff'd*, 611 F. Appx. 359 (7th Cir. 2015) .............................................................. 1, 10

*Jones v. Harris Assocs. L.P.*,
　　559 U.S. 335 (2010) ................................................................................................ *passim*

*Kamen v. Kemper Fin. Servs., Inc.*,
　　500 U.S. 90 (1991) ........................................................................................................ 8-9

*Krinsk v. Fund Asset Mgmt., Inc.*,
　　875 F.2d 404 (2d Cir. 1989) ............................................................................................ 3

*Levy v. Alliance Capital Mgmt. L.P.*,
　　No. 98 Civ. 9528, 1999 WL 642920 (2d Cir. Aug. 20, 1999) .......................................... 6

*Meyer v. Oppenheimer Mgmt. Corp.*,
    895 F.2d 861 (2d Cir. 1990) ................................................................................ 6

*Pepper v. Litton*,
    308 U.S. 295 (1939) ........................................................................................... 6

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016) ............................................................................ 5, 6

*In re Rezulin Prod. Liab. Litig.*,
    441 F. Supp. 2d 567 (S.D.N.Y. 2006) ............................................................. 5, 7

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ............................ 11

*The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*,
    425 F. Appx. 25 (2d Cir. 2011) ........................................................................ 6

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................................. 6

**Statutes**

Section 36(b) of the Investment Company Act of 1940,
    15 U.S.C. § 80a-35(b) .......................................................................... *passim*

**Rules**

Fed. R. Evid. 702 ......................................................................................... 5

**Other Authorities**

John C. Coates & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*, 33 Iowa J. Corp. L. 151 (2007) .......................................... 10

A STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962) ........................................... 8

S. Rep. No. 91-184 (1969) ................................................................................ 8, 9

## PRELIMINARY STATEMENT

In *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010), the Supreme Court resolved a split between the Seventh and Second Circuits regarding mutual fund excessive fee claims under Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) ("Section 36(b)"). In *Jones v. Harris Assocs. L.P.*, 527 F.3d 627, 634 (7th Cir. 2008), *vacated and remanded*, 559 U.S. 335 (2010), *and aff'd*, 611 F. Appx. 359 (7th Cir. 2015), the Seventh Circuit – relying on a study of competition in the mutual fund industry by Glenn Hubbard, Dean of the Graduate School of Business at Columbia University – had adopted an oversimplified, market-centric approach.   Specifically, the Seventh Circuit had held that, given the robustness of such competition (per Dean Hubbard), a court should not substitute its judgment of what is "reasonable" for a fee determined by marketplace competition, unless the advisor misled the fund's directors.  *Id*. at 632-35.

This view was inconsistent with that of the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982).  There, the Second Circuit rejected the idea that marketplace rates in the mutual fund industry should be the principal criterion for evaluating excessiveness.  Rather, given the "incestuous relationships between many advisers and their funds" and resulting absence of competition in the market that is relevant – *i.e.*, among advisors for retention by mutual fund boards, as opposed to that among fund companies for shareholders – other factors were more important to evaluating excessiveness.  *Id.* at 929 *et seq.*. Further, the court held, a fee violates 36(b) if it is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining, irrespective of whether the board was misled.  *Id*. at 928.

In *Jones*, the Supreme Court endorsed the Second Circuit's approach in *Gartenberg*, rejecting that of the Seventh Circuit.  559 U.S. at 347 *et seq.*.

Now comes defendant, proffering the expert opinions of the very same Dean Hubbard relied upon by the Seventh Circuit as though *Jones* had been decided the other way.  *See* June 26, 2017 Expert Report of Glenn Hubbard ("Hubbard Report"), attached as Exhibit 1 to the accompanying Declaration of Mark. A Strauss ("Strauss Decl."); *see also* transcript of September 27, 2017 deposition of R. Glenn Hubbard ("Hubbard Tr."), attached as Exhibit 2 to the Strauss Decl.  Specifically, Dean Hubbard opines here that mutual funds are sold in a "competitive market" wherein investors are "sensitive" to fees, and, that, therefore, excessive fees are an impossibility.  *See* Hubbard Report, ¶¶ 38-43, 157 and Appendices C-1 through C-5. He further opines that advisory fee rates are not "economically relevant" because competition in the mutual fund industry operates at the level of the total expense ratio.  *Id.*, ¶¶ 10(i), 44-47, 52, 189-93.  Because, here, the Fund's total expense ratio is in line with those of comparable funds, the Fund's fees are not excessive.  *Id.*, ¶¶ 10(iii), 48-51 and Exs. 4-5 thereto.

These opinions should be excluded because they are not relevant or helpful to the trier of fact and are unreliable.  They represent an attempt to resurrect the approach of the Seventh Circuit – that mutual fund fees can never be excessive because they are set in a market of perfect competition – which the Supreme Court rejected in *Jones*.  They are incompatible with *Gartenberg* and have nothing to do with the legal and factual issues to be resolved in this case.

## FACTS

This is an action under § 36(b) of the Investment Company Act (the "ICA"). Plaintiffs allege that the investment advisory fees charged by Calamos under the IMA are excessive in violation of the statute.[1] Plaintiffs offer the expert testimony of, *inter alia*, Steven Pomerantz, Ph.D., that Fund's advisory fees are excessive. In rebuttal, defendant submits the expert testimony of Glenn Hubbard, Dean of the Graduate School of Business at Columbia University.

Dean Hubbard does not offer an opinion whether the Fund's advisory fees are excessive, *i.e.*, the subject of Dr. Pomerantz's testimony and the issue in this case.[2] Instead, Dean Hubbard sidesteps that issue and considers whether the Fund's **total expense ratio** – of which the advisory fee is a component – is or can be excessive. He concludes that, given competition in the mutual fund industry, excessive mutual fund expense ratios are an impossibility. Hubbard Report, ¶¶ 38-43 and Appendices C-1 through C-5.

Specifically, according to Dean Hubbard, "mutual funds are sold in a competitive market" wherein investors are "sensitive" to the total expense ratios, not components thereof such as advisory fees. Hubbard Report, ¶¶ 38, 42. He explains that this is because "investors buy an integrated bundle of service" when they invest in mutual funds, and it "makes economic sense

---

[1] In *Jones v. Harris Assocs., L.P.*, 559 U.S. 335 (2010), the Supreme Court established that "[t]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346. In determining whether the *Jones* standard is met, courts are required to consider "all relevant circumstances", including the factors set forth in *Gartenberg*, 694 F.2d 923. *Jones*, 559 U.S. at 347. *See Chill v. Calamos Advisors LLC*, 175 F. Supp. 3d 126, 130 (S.D.N.Y. 2016) (*citing* 559 U.S. at 344-46). The *Gartenberg* factors are "(1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 114 (D. Mass. 2006) (*citing Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (*citing Gartenberg*, 694 F.2d at 929-30)).

[2] Dean Hubbard does purport to evaluate the Fund's "management fees." *See* Hubbard Report, ¶¶ 10(iv), 52-57 and Exs. 6-7 thereto. However, he defines that term to include not just the advisory fee but other, "administrative" expenses charged to the Fund. *See id.* at Ex. 6 n.1.

for a potential investor to compare the funds' 'expense ratios,' which represent the fees that investors pay in exchange for the integrated bundle of services received." *Id*., ¶¶ 44-45.   Hence, Dean Hubbard opines, a fund's total expense ratio – and not its advisory fee on a standalone basis – "is the economically relevant fee" when evaluating the value proposition of a mutual fund. *Id*., ¶¶ 44-47.

Moreover, according to Dean Hubbard, if a mutual fund attempted to charge an above-market total expense ratio, it would result in investors switching to other funds and a decline in AUM and profits, eventually driving the advisor out of business.   Hubbard Report, ¶¶ 41-42. Competitive forces thus operate to "constrain" total expense ratios and "prevent[] mutual fund advisors from earning fees that are disproportionately high", according to Dean Hubbard.   *Id*., ¶ 41.   Further, given such market forces, it would be "difficult to imagine how" an advisory fee could be excessive. Hubbard Tr. at 41:7-18.   As he avers, "as you constrain the total expense ratio, that also has an effect on the advisor.   If the advisor tried to charge a fee that pushed its total expense ratio out of line, the elasticities I estimate in the book would suggest that would be disciplined very harshly."   Hubbard Tr. at 33:16 – 34:4; *see id*. at 39:11-15 and 41:16-18 ("That will have effects on an advisory fee.   I can't overprice"; "The economic consequences for a firm of being uncompetitive in an industry with thousands of funds and hundreds of sellers are pretty swift.").

Competitive forces similarly operate to foreclose the possibility that economies of scale are not adequately shared, in Dean Hubbard's opinion.   "Because demand for mutual funds is sensitive to fees and because mutual funds must compete for investors, cost savings – including cost savings realized through economies of scale – will be passed on to investors."   Hubbard Report, ¶ 157.

Dean Hubbard goes on to evaluate the competitiveness of the Fund's total expense ratio, opining that it is consistent with those of the Fund's peers, as would be expected in a competitive market, and, hence, is not excessive.  Hubbard Report, ¶¶ 10(iii), 48-51 and Exs. 4-5 thereto.

## ARGUMENT

### I.     Applicable Legal Standards

The standard for the admissibility of expert testimony is established by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based upon sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods, and
>
> (d) the expert has reliably applied the principles and methods.

Under Rule 702, an expert with "specialized knowledge [that] will help the trier of fact may testify so long as that testimony is based on sufficient facts or data and is the product of reliable principles and methods that the witness has "reliably applied ... to the facts of the case." *In re Pfizer Inc. Sec. Litig*., 819 F.3d 642, 658 (2d Cir. 2016) (internal quotations and citations omitted).  To meet this requirement, the proffered testimony must, at minimum "'fit' the factual dispute at issue – in other words, it must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  *In re Rezulin Prod. Liab. Litig.*, 441 F. Supp. 2d 567, 576 (S.D.N.Y. 2006).  Moreover, "[t]he proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task

at hand.'" *Pfizer*, 819 F.3d at 658 (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993)).

## II.    Dean Hubbard's "Total Expense Ratio" Opinions Should be Excluded Because they are Irrelevant and not Helpful to the Trier of Fact

Because they have nothing to do with the legal or factual issues in this case, Dean Hubbard's "total expense ratio" opinions should be excluded.  Plaintiffs only challenge the Fund's advisory fees, not the total expense ratio or any other components thereof.  Only the advisory fees are in dispute.

Indeed, Section 36(b) "does not require plaintiffs to establish that the fees charged by [a defendant are] excessive in the aggregate.  Plaintiffs may challenge a particular fee and may prevail on their Section 36(b) claim if they show that such a fee was disproportionate to the services rendered in exchange for that fee." *In re Am. Mut. Funds Fee Litig*., No. 04 Civ. 5593, 2009 WL 5215755, at *44 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co*., 448 F. Appx. 716 (9th Cir. 2011) (relying on Second Circuit law).[3]

This accords with *Jones*, which makes clear that the fiduciary duties of advisors as to the receipt of compensation are "transaction"-based.  *Jones*, 559 U.S. at 335 ("The essence of the test is whether or not under all the circumstances ***the transaction*** carries the earmarks of an arm's length bargain.") (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)) (emphasis

---

[3] *See Meyer v. Oppenheimer Mgmt. Corp*., 895 F.2d 861, 866 (2d Cir. 1990) (noting that advisory and Rule 12b-1 fees "are for entirely different services, namely advice on the one hand and sales and distribution on the other" and should not be "aggregated" to determine merits of Section 36(b) claim); *Levy v. Alliance Capital Mgmt. L.P.*, No. 98 Civ. 9528, 1999 WL 642920, at *2 (2d Cir. Aug. 20, 1999) ("[P]ayments of each type must be examined for reasonableness separately, not aggregated and then considered as a whole."); *see also The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 F. Appx. 25, 31 (2d Cir. 2011) (rejecting district court's "total" fee approach and remanding "for reconsideration of Plaintiffs' section 36(b) claim regarding the transfer agent fees.").

added).   Here, the transaction in question is the IMA, the agreement pursuant to which the challenged advisory fees were charged.

Further, Congress created Section 36(b) to provide a right of action as to fees paid to the fund's investment adviser and its affiliates, and not to fees paid unaffiliated third parties that are also included in the total expense ratio.  That the total expense ratio may be "economically relevant" to investors shopping for mutual funds, does not make it relevant to a Section 36(b) claim.  The relevant inquiry is whether the advisory fees are excessive on a standalone basis. Neither Dean Hubbard nor defendant can recharacterize plaintiffs' claims based on what they think an investor would find important.

Accordingly, Dean Hubbard's proffered "total expense ratio" testimony does not "'fit' the factual dispute at issue" and is not "'sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute.'"  *Rezulin*, 441 F. Supp. 2d at 576.

## III.  Dean Hubbard's "Market Competitiveness" Opinions Should be Excluded Because they are Irrelevant, not Helpful to the Trier of Fact, and Unreliable

Dean Hubbard's "market competitiveness" opinions similarly should be excluded. Rather than analyze the facts under the applicable legal standards, the opinions amount to an attempt to topple and replace those standards with an alternative approach, namely, one based on the idea that mutual fund fees can never be excessive because they are set in a market of perfect competition.  Thereunder, "the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them,[] the 'price charged by advisers to those funds establishes the free and open market level for fiduciary compensation,' [] the 'market price . . . serves as a standard to test the fairness of the investment advisory fee,' and [] a fee is fair if it 'is in harmony with the broad and prevailing market choice available to the investor.'"  *Gartenberg*, 694 F.2d at 929 (quoting *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,

528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982)).   That approach, however, has been rejected by Congress as well as the Second Circuit in *Gartenberg* and the Supreme Court in *Jones*.

Indeed, Section 36(b) reflects Congress's determination that "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. Rep. No. 91-184, at 4 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4901.   This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. *See* A STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962) ("Wharton Report").[4]   The Wharton Report determined that "investment advisers often charged [their captive] mutual funds higher fees than those charged the advisers' other clients." *Daily Income Fund*, *Inc. v. Fox*, 464 U.S. 523, 537 (1984) (*citing* Wharton Report at 34).   The Wharton Report concluded that the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by [captive] mutual funds."   Wharton Report at 493-94.

Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress thus enacted protections for mutual fund shareholders in the ICA.  *Daily Income Fund,* 464 U.S. at 536-38) (quotation marks and citations omitted); *see also* S. Rep. No. 91-184, at 3 ("Congress recognized that investment companies and those who entrust their savings to such companies stand in special need of legal protection.").   Section 36(b) reflects Congress's conclusion that "shareholders should not have to rely solely on the fund's

---

[4] Also available at http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

directors to assure reasonable adviser fees . . ."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (internal quotation marks and citation omitted).  Congress established Section 36(b) as a "mechanism by which the fairness of" those fees "could be tested in court."  S. Rep. No. 91-184, at 5.

In *Gartenberg*, the Second Circuit rejected the district court's reliance on prices charged by advisors of similar funds in a world of supposed perfect competition as the principal factor in evaluating fee fairness.  As the Second Circuit stated:

> If rates charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in § 36(b).  Congress, however, recognized that because of the potentially incestuous relationships between many advisers and their funds, other factors may be more important in determining whether a fee is so excessive as to constitute a "breach of fiduciary duty."  These include the adviser-manager's cost in providing the service, the nature and quality of the service, the extent to which the adviser-manager realizes economies of scale as the fund grows larger, and the volume of orders which must be processed by the manager.  The legislative history of § 36(b) makes clear that Congress "intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation."

*Gartenberg*, 694 F.2d at 929-30 (quoting S. Rep. No. 91-184).

Further, the Second Circuit indicated that the district court's market-based approach erroneously failed to distinguish between competition among mutual funds for shareholders and that among advisors for retention by mutual fund boards.  *Id.* at 929.  "Competition between money market funds for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business.  The former may be vigorous even though the latter is virtually non-existent.  Each is governed by different forces."  *Id.*.  This distinction is of particular importance because "[a] fund cannot move easily from one

adviser-manager to another."  *Id*.  Hence, "[r]eliance on prevailing industry advisory fees will not satisfy § 36(b)."  *Id*..

In *Jones*, the Supreme Court held similarly.  559 U.S. at 350-51.  There, the Seventh Circuit had declined to follow *Gartenberg* on the ground it "relies too little on markets." *Jones*, 527 F.3d at 634.  Instead, it relied on Dean Hubbard's study of the mutual fund market to hold that, given the supposed robustness of competition in the industry, an allegation of excessive fees under Section 36(b) cannot survive unless the adviser misled the fund's board.  *See id*., 527 F.3d at 634 ("Mutual funds come much closer to the model of atomistic competition than do most other markets.  Judges would not dream of regulating the price of automobiles, which are produced by roughly a dozen large firms; why then should 8,000 mutual funds seem 'too few' to put competitive pressure on advisory fees?  A recent, careful study concludes that thousands of mutual funds are plenty, that investors can and do protect their interests by shopping, and that regulating advisory fees through litigation is unlikely to do more good than harm" (citing John C. Coates & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*, 33 Iowa J. Corp. L. 151 (2007)).

Dissenting from the denial of rehearing *en banc*, Judge Posner faulted the panel's position as based "mainly on an economic analysis that is ripe for reexamination."  *Jones v. Harris Assoc., L.P*., 537 F.3d 728, 730-31 (7th Cir. 2008).  As Judge Posner stated:

> Competition in product and capital markets can't be counted on to solve the problem because the same structure of incentives operates on all large corporations and similar entities, including mutual funds. Mutual funds are a component of the financial services industry, where abuses have been rampant, as is more evident now than it was when Coates and Hubbard wrote their article.

*Id*. at 730.   Among other things, Judge Posner questioned whether high adviser fees actually drive investors away.  *Id.*, at 731.

Resolving the circuit split, the Supreme Court sided with *Gartenberg*.  It held that, "to face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.  Moreover, it instructed courts to look to all relevant factors, *viz.* those set forth in *Gartenberg*.  *Id*.  Further, "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers.  These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length."  *Id*. at 350-51 (*citing* 537 F.3d at 731-732 (Judge Posner's above-cited dissent) and *Gartenberg*, 694 F.2d at 929).

Consistent with the foregoing, courts reject the type of "competition" opinions proffered by Dean Hubbard in 36(b) cases as incompatible with the relevant legal framework.  In *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987), the defendants argued that the market for comparative mutual fund fees was dispositive of excessiveness.  Like Dean Hubbard here, their expert opined that excessive fees are impossible because the mutual fund market is competitive.  *Id*. at 974 n.39.  The court rejected the relevancy of the testimony as the expert "did not deal . . . with the factors suggested by [*Gartenberg*] but rather . . . did an economic as opposed to a legal analysis."  *Id*.  The court found that expert's "testimony regarding competition in the market for advisory services to be directly contradicted by the views of the Second Circuit in *Gartenberg*."  *Id*. at 974.

Similarly, in *In re Am. Mut. Funds Fee Litig.*, No. 04 Civ. 5593, 2009 U.S. Dist. LEXIS 98871 (C.D. Cal., Sept. 16, 2009), the court rejected proffered opinions of Dean Hubbard.  As the court stated:

> Dr. Hubbard testified that the mutual fund industry has evolved since *Gartenberg* was decided, and that, in sum and substance, market forces help ensure that

investment advisers do not charge excessive fees, regardless of the fee structure permitted by a mutual fund's board, because investors will "vote with their feet" if assessed high fees. According to Dr. Hubbard, the [funds] could not have experienced substantial growth from 2003 to 2008 if [the advisor] were charging excessive fees.  The Court rejects this view.

. . . . *Gartenberg* recognized that evidence of comparative fee structures, though relevant, is of minimal probative value in a section 36(b) inquiry "because of the potentially incestuous relationships between many advisers and their funds." 694 F.2d at 929-30. Thus, *Gartenberg* expressly rejected the notion that the principal factor to be considered when determining whether a fee is excessive is the price charged by other investment advisers. *Id*. at 929. Certainly, conscientious investors may take fees into account when choosing a mutual fund in which to invest. However, Dr. Hubbard fails to distinguish between competition for investors among mutual fund companies, and competition among investment advisers for fund business. This distinction is of particular importance because "[a] fund cannot move easily from one adviser-manager to another." *Gartenberg*, 694 F.2d at 929.  Further, *Gartenberg* expressly recognized this distinction, stating that competition among funds "for shareholder business does not support an inference that competition must therefore also exist between adviser-managers for fund business. ***The former may be vigorous even though the latter is virtually non-existent. Each is governed by different forces. Reliance on prevailing industry advisory fees will not satisfy § 36(b)***." *Id*. (emphasis added).

In addition, upon questioning by the Court, Dr. Hubbard acknowledged that "switching costs," such as capital gains taxes, front- and back-end loads, and the like may prevent investors who pay excessive fees from switching mutual funds, because rational investors will choose to pay excessive fees rather than switch mutual funds if the cost of changing funds exceeds the amount of fees . . . And while tax-deferred vehicles such as 401(k) accounts and individual retirement accounts may eliminate some switching costs, many such accounts provide few fund options to investors, thereby hindering competition. Additionally, the Court was not presented with sufficiently specific evidence to evaluate meaningfully Dr. Hubbard's claim that "market discipline" forces mutual fund companies to keep fees down even if all investors are not fee sensitive, because individual investors will ride the coattails of the "marginal investors" who are fee sensitive. Accordingly, although the Court has considered how the expense ratios of the funds at issue compare to peer funds, the Court concludes that such evidence is of minimal probative value.

*Id*. at *49-51.

Likewise, Dean Hubbard's testimony should be excluded here.

## CONCLUSION

For the foregoing reasons, the "total expense ratio" and "market competition" testimony of Dean Hubbard should be excluded.

Dated: February 9, 2018                    **KIRBY MCINERNEY LLP**

<u>/s/ Mark A. Strauss</u>
Mark A. Strauss
Ira M. Press
Andrew McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: mstrauss@kmllp.com
      ipress@kmllp.com
      amcneela@kmllp.com

*Counsel for Plaintiffs*