## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
:
SAUL CHILL and SYLVIA CHILL, for       :
the use and benefit of the CALAMOS     :
GROWTH FUND,                           :
                                       :        No. 15-cv-01014 (ER)
    Plaintiffs,                   :
                                       :        ECF CASE
    v.                            :
                                       :        <u>ORAL ARGUMENT REQUESTED</u>
CALAMOS ADVISORS LLC                   :
                                       :
                                       :
    Defendants.                   :
_____:


**DEFENDANT CALAMOS ADVISORS LLC'S OPPOSITION TO
PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE
THE PROPOSED TESTIMONY AND OPINIONS
<u>OF DEFENDANT'S EXPERT GLENN HUBBARD</u>**


**DECHERT LLP**
Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Amanda Tuminelli
Brendan Herrmann
Samantha Rosa
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone:  (212) 698-3500

*Counsel for Defendant Calamos
Advisors LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTS RELEVANT TO HUBBARD'S PROPOSED OPINIONS .............................. 3

I.     HUBBARD'S UNCHALLENGED QUALIFICATIONS ................................. 3

II.    HUBBARD'S UNCHALLENGED OPINIONS ............................................. 5

       A.    Fee Differentials Between Mutual Fund And Institutional Clients Make
             Economic Sense ................................................................................... 5

       B.    The Fund's Since Inception Returns Provide Meaningful Performance
             Information ......................................................................................... 6

       C.    Plaintiffs Misunderstand Economies Of Scale ....................................... 6

       D.    Plaintiffs Ignore Information Affecting Potential Fall-Out Benefits ..................... 6

       E.    Plaintiffs' Damages Models Suffer From Numerous Flaws ................................ 7

III.   PLAINTIFFS' LIMITED *DAUBERT* CHALLENGE ....................................... 7

ARGUMENT ...................................................................................................... 9

I.     LEGAL STANDARD GOVERNING PLAINTIFFS' MOTION ..................... 9

II.    HUBBARD'S EXPENSE RATIO OPINION IS DEMONSTRABLY RELEVANT
       AND HELPFUL IN LIGHT OF PRIOR SECTION 36(B) DECISIONS ANALYZING
       THE SAME INFORMATION ........................................................................ 10

III.   HUBBARD'S OPINION ABOUT THE COMPETITIVE STRUCTURE OF THE
       MUTUAL FUND INDUSTRY IS RELEVANT AND BASED ON RELIABLE
       PRINCIPLES OF ECONOMICS ................................................................. 13

       A.    Plaintiffs Exaggerate The Conclusions Drawn From Hubbard's Opinion ........... 14

       B.    Hubbard Analyzed The Competitive Structure Of The Mutual Fund Industry
             According To Reliable Principles of Economics ................................................. 15

       C.    Plaintiffs Misrepresent The Law And Prior Court Rulings ................................ 17

CONCLUSION.................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
2009 U.S. Dist. LEXIS 98871 (C.D. Cal. Sept. 16, 2009).......................................................18

*In re Am. Mut. Funds Fee Litig.*,
2009 WL 10670616 (C.D. Cal. June 18, 2009) ............................................................2, 12, 18

*In re Am. Mut. Funds Fee Litig.*,
2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek Capital
Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011) .........................................11, 12, 18

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)......................................................................................................9

*Burks v. Lasker*,
441 U.S. 471 (1979)................................................................................................................17

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001)......................................................................................................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2013 WL 5428139 (N.D. Cal. June 20, 2013),
*adopted in full*, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)...............................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)............................................................................................................9, 16

*E.E.O.C. v. Beauty Enters., Inc.*,
2005 WL 6003547 (D. Conn. Mar. 24, 2005) ............................................................................9

*Grand Rivers Enters. Six Nations, Ltd. v. King*,
783 F. Supp. 2d 516 (S.D.N.Y. 2011)......................................................................................17

*Int'l Bus. Machs. Corp. v. BG C Partners, Inc.*,
2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013)...........................................................................16

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010)....................................................................................................... *passim*

*Kasilag v. Hartford Invs. Fin. Servs., LLC*,
2017 WL 773880 (D.N.J. Feb. 28, 2017) ..................................................................... *passim*

*Levy v. Alliance Capital Mgmt. L.P.*,
1999 WL 642920 (2d Cir. Aug 20, 1999)................................................................................12

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
97 F. Supp. 3d 485 (S.D.N.Y. 2015)....................................................................9, 16

*The R.W. Grand Lodge of F. & A.M. of Penn. v. Salamon Bros. All Cap Value Fund*,
425 F. App'x 25 (2d Cir. 2011) .......................................................................12

*In re Salamon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006)................................................................12

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ..................................18

*Sivolella v. AXA Equitable Life Ins. Co.*,
2016 WL 4487857 (D.N.J. Aug. 25, 2016) ......................................................10, 12

*In re Wholesale Grocery Prods. Antitrust Litig.*,
2017 WL 4876277 (D. Minn. Oct. 24, 2017) ........................................................17

## Other Authorities

U.S. Securities and Exchange Commission, SEC Amends Mutual Fund Advertising Rules, Proposes New Rules and Amendments for Fund of Funds Investments, Rel. No. 2013-122 (Sept. 24, 2003), available at https://www.sec.gov/news/press/2003-122.htm ....................................................16

U.S. Securities and Exchange Commission, SEC Adopts Enhanced Mutual Fund Expense and Portfolio Disclosure; Proposes Improved Disclosure of Board Approval of Investment Advisory Contracts and Prohibition on the Use of Brokerage Commissions to Finance Distribution, Rel. No. 2004-16 (Feb. 11, 2004), available at http://www.sec.gov/news/press/2004-16.htm ...........................................16

## PRELIMINARY STATEMENT

Robert Glenn Hubbard, one of the experts proffered by Defendant Calamos Advisors ("CAL"), is a professor of economics and finance and the Dean of Columbia University's Graduate School of Business.  Hubbard has also served for nearly fifteen years as an independent trustee on the board responsible for approving the advisory fees a closed-end investment fund complex, and he co-authored a book on competition in the mutual fund industry.  Plaintiffs do not dispute that Hubbard is eminently qualified to testify to all of the opinions he offers in this case.  Nor could they, as those opinions reflect standard applications of economic principles to CAL's operations in an industry that Hubbard knows extremely well.

Critically here, Hubbard will testify at trial that (i) from an economic perspective, the total expense ratio[1] for a mutual fund is the relevant fee for purposes of investors comparing fees in the marketplace, and (ii) the competitive nature of the mutual fund marketplaces puts constraints on the total expense ratio that may be charged for a mutual fund.[2]  Plaintiffs do not argue on this motion that these straight-forward observations are incorrect as a matter of fact or economics; indeed, they can hardly do so, particularly because they have no qualified witness to offer even addressing these topics.  Plaintiffs nonetheless seek to exclude this evidence on grounds it is irrelevant and unhelpful to the Court.  But Plaintiffs' contention is contradicted by a uniform body of Section 36(b) case law, including the very case on which they continuously rely, in which Hubbard was allowed to provide trial testimony on these precise issues.[3]  Contrary to Plaintiffs' repeated misrepresentations to the contrary, that court rejected a *Daubert* challenge to essentially the same opinions Plaintiffs contest here and held that "the case law plainly

---

[1] "Expense ratio" is a term that refers to the total aggregate of all fees (aside from load fees) paid by an investor investing in a mutual fund.  As Hubbard explains in his report, the expense ratio represents the amount of money that a mutual fund investor actually pays for the complete, integrated bundle of services that the mutual fund receives.  Expert Report of Glenn Hubbard ("Hubbard Rpt.") (Strauss Decl. Ex. 1 to Hubbard Brief) ¶ 44.  The expense ratio includes as one of its components the "advisory fee" or "management fee," which refers to only the portion of the total aggregate fee that investors pay specifically for the investment adviser's investment-selection services.  *Id.* ¶ 45.

[2] Hubbard will also testify (if necessary) to fundamental economic errors Plaintiffs' experts have made in addressing Fund performance, institutional account fees, economies of scale, fall out benefits, and damages.  *See* Section A, *infra*.  Plaintiffs do not seek to exclude these opinions.

[3] Plaintiffs' Memorandum of Law in Support of Motion to Partially Exclude the Proposed Testimony and Opinions of Defendant's Expert Glenn Hubbard ("Hubbard Br.") at 6, 11-12.

supports the consideration of economic factors, including comparisons of expense ratios and the existence of competition in the marketplace, in section 36(b) cases.  No cases cited by Plaintiffs holds otherwise."[4]

Hubbard's opinions are unquestionably relevant to the legal inquiry required to assess Plaintiffs' Section 36(b) claim, as set forth in the Supreme Court's decision in *Jones*.  According to *Jones*, this Court must reject Plaintiffs' claim that CAL's fees charged to the Growth Fund (the "Fund") were excessive unless Plaintiffs can prove that fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[5]  The first and potentially outcome-determinative step of this test is for the Court to determine "the degree of deference that is due a board's decision to approve an adviser's fees."[6]  The Supreme Court made clear that the board's approval of the adviser's fee is a business decision that, when properly informed, "does not call for judicial second-guessing" by courts that "are not well suited to make such precise calculations."[7]

Here, the Fund's Independent Trustees asked for, received and considered information about the Fund and its total expenses, as compared to the Fund's peers.  Common sense dictates that Hubbard's opinions on key economic issues relevant to the business decision made by the Fund's Board—specifically, the total expenses paid by the Fund's investors and the nature of the market in which the Fund was sold—would be relevant and helpful as the Court assesses the robustness of the Board's decision-making process.  Moreover, Plaintiffs' relevance arguments are belied by their own repeated descriptions of the marketplace—contained in almost every substantive pleading filed with this Court dating back to their complaint—purporting to describe how competitive forces in the mutual fund industry create opportunities for pervasive excessive

---

[4] *In re Am. Mut. Funds Fee Litig.*, 2009 WL 10670616, at *7 (C.D. Cal. June 18, 2009).

[5] *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010).

[6] *Id* at 351-52.

[7] *Id.* at 352-53.

fees.[8]  The fact that Hubbard has a different perspective on the market than Plaintiffs hardly renders his view irrelevant; to the contrary, it makes it all the more important as an aid for the Court to form a balanced view.

Finally, Plaintiffs attempt to evade the plain relevance of Hubbard's opinions by manufacturing a misleading argument that the Supreme Court in *Jones* considered Hubbard's opinions and rejected them.  Not so.  It is true that the Court reversed the Seventh Circuit's formulation of a new Section 36(b) standard in an opinion which had cited an article that Hubbard co-authored about the effects of market competition in the mutual fund industry.  But that is a very far cry from barring economics or Hubbard from all future cases under Section 36(b).  In the first instance, Hubbard was not an expert in that case, his actual expert opinions were never at issue before the Seventh Circuit or the Supreme Court, and the Supreme Court did not even mention his article.  More importantly, the Court in *Jones* nowhere held that market forces, competition or total expense ratios are irrelevant under Section 36(b), and instead held that courts should not "rely <u>too heavily</u>" on comparisons with fees charged by other advisers in the market, as Plaintiffs themselves admit.[9]  The conclusion that testimony on such subjects is relevant is further reinforced by the post-*Jones* cases admitting evidence on these issues, including Hubbard's expert opinion.  Plaintiffs' motion should be denied in its entirety.

<u>FACTS RELEVANT TO HUBBARD'S PROPOSED OPINIONS</u>

## I.   HUBBARD'S UNCHALLENGED QUALIFICATIONS

Hubbard currently serves as a professor of economics and finance at both Columbia University's undergraduate college and Graduate School of Business, and he has served as the Dean of the Graduate School of Business since 2004.[10]  Throughout his career, Hubbard has worked as either a professor or visiting professor at Northwestern University, Harvard University, and the University of Chicago.[11]  He has also served the U.S. government throughout

---

[8] *See, e.g.*, Plaintiffs' Complaint ("Compl.") ¶¶ 19-28; Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pls. SJ Opp.") at 4-5.

[9] Hubbard Br. 11.

[10] Hubbard Rpt. ¶ 1, App'x A-1.

[11] *Id.* ¶ 1.

3

his career, including currently as a member of the Federal Reserve Bank of New York's Panel of Economic Advisers and previously as the Chairman of the President's Council of Economic Advisers from 2001 to 2003 and as Deputy Assistant Secretary of the U.S. Treasury Department from 1991 to 1993.[12]  He is also a Research Associate at the National Bureau of Economic Research.[13]  Over the course of his academic career, Hubbard has authored more than 100 publications and has acted as a referee for numerous peer-reviewed economics journals.[14]  He has co-authored one of the two foundational textbooks routinely assigned to undergraduate economics students, which is now in its seventh edition.[15]

In addition to his academic work in economics and finance generally, Hubbard has served as an independent trustee on the board overseeing a complex of closed-end funds for approximately 14 years.[16]  He has drawn on both his academic research and practical experience in co-authoring a book on mutual funds entitled *The Mutual Fund Industry: Competition and Investor Welfare*.[17]  The extensive research underlying this book overlaps in large part with the opinions that Hubbard has offered in this case, including the competitive structure of the mutual fund industry, investor sensitivity to mutual fund pricing, and economies of scale.[18]

Hubbard has been retained as an economic and financial expert in numerous cases, including seven other Section 36(b) cases.[19]  His testimony has never been excluded,[20] and he recently provided trial testimony for the prevailing investment adviser defendant in *Kasilag v.*

---

[12] *Id.* ¶ 3, App'x A-1.

[13] *Id.* ¶ 1.

[14] *Id.* ¶ 2, App'x A-1.

[15] *Id.* App'x A-1.  *See* R. Glenn Hubbard & Anthony Patrick O'Brien, Economics (7th ed. 2018).

[16] Hubbard Rpt. App'x A-1; Deposition Transcript of R. Glenn Hubbard ("Hubbard Dep.") 20:2-22 (Strauss Decl. Ex. 2 to Hubbard Br.).

[17] Hubbard Rpt. ¶ 2.

[18] *Id.*

[19] Hubbard Rpt. App'x A-2; Hubbard Dep. 14:18-23.

[20] Hubbard Dep. 16:23-17:7.

*Hartford Invs. Fin. Servs., LLC*.[21]  Unsurprisingly Plaintiffs have not wasted effort moving to strike Hubbard's opinions based on lack of qualifications.

## II.    HUBBARD'S UNCHALLENGED OPINIONS

A significant portion of Hubbard's work in this case has been focused on addressing fundamental errors of economics made by Plaintiffs' experts in addressing various *Gartenberg* factors, testimony he will offer at trial if necessary.  Plaintiffs have <u>not</u> moved to exclude any of the following such opinions, which are offered here as context for the Court in evaluating the small subset of opinions (involving expense ratios and competition in the mutual fund industry) Plaintiffs hope to avoid at trial.

### A.    Fee Differentials Between Mutual Fund And Institutional Clients Make Economic Sense

Hubbard has responded to Plaintiffs' fixation on the difference between the fees CAL charges to the Fund and the fees it charges to institutional clients as "proof" that CAL's fees are excessive.[22]  Plaintiffs' expert Steve Pomerantz in particular focuses on these differences in analyzing ██████████████████████████████████████████████████ ██████.[23]  Hubbard, however, has concluded that such a comparison is fundamentally flawed and does not make economic sense because (1) ████████████████████████████ ████████████████████████████, and (2) ██████████████████ ████████████████████████, accepted economic research offers numerous examples of competitive forces creating different market prices for the same product when that product is sold to different customer groups.[24]  Hubbard's opinion offers an economic rationale for these different markets for advisory services that is entirely consistent with the framework

---

[21] 2017 WL 773880 (D.N.J. Feb. 28, 2017).  *See* Hubbard Rpt. App'x A-2.

[22] *Id.* ¶ 10(v).  *See* Compl. ¶¶ 48-71.

[23] May 11, 2017 Expert Report of Steve Pomerantz, PhD ¶¶ 159-76, 505-11 (Tuminelli Decl. Ex. 2 to CAL's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witnesses ("CAL *Daubert* Br.")).

[24] Hubbard Rpt. ¶ 10(v).

identified in *Jones*, including the Court's ruling that Section 36(b) "does not necessarily ensure fee parity between mutual funds and institutional clients."[25]

### B.    The Fund's Since Inception Returns Provide Meaningful Performance Information

Hubbard has explained that Plaintiffs' and their experts' assessment of the Fund's investment performance, which prioritizes certain time periods to the exclusion of others, is inapt.[26] Specifically, Plaintiffs' steadfast refusal to acknowledge the Fund's unusually strong since-inception returns, or to consider how CAL's changes to its investment management process and personnel have impacted the Fund's returns, ignores economically relevant data.[27]

### C.    Plaintiffs Misunderstand Economies Of Scale

Hubbard also explains that Plaintiffs' and their experts' assertion that CAL ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████.[28] ████████████████████████████ ████████████████████████████████████████████.[29] On top of this foundational error, Plaintiffs' analysis ████████████████████████████ ignores well-established economic research that concludes that economies of scale are generally exhausted at low levels of assets and do not (██████████████) exist at a constant level for all asset levels.[30]

### D.    Plaintiffs Ignore Information Affecting Potential Fall-Out Benefits

Hubbard opines that Plaintiffs' assertion that ████████████████████████████████ ████████████████████████████████████████████████████████

---

[25] *Jones*, 559 U.S. at 350.

[26] Hubbard Rpt. ¶ 10(vi).

[27] *Id.*

[28] *Id.* ¶¶ 10(vii), 161-82.

[29] *Id.* ¶¶ 152, 166.

[30] *Id.* ¶ 10(vii).  Hubbard's opinions are fully supported by academic research recently submitted to the Court (oddly enough) by Pomerantz, ostensibly as evidence of his expertise and the reliability of his litigation-driven model. Pomerantz claims his model was based on these articles, even though they directly contradict his assumptions.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Steve Pomerantz ("Pls. Pomerantz Opp.") at 15-16; Supplemental Declaration of Steve Pomerantz ¶ 2 (Attach. 1 to Pls. Pomerantz Opp.); CAL's Reply Memorandum of Law in Further Support of Its Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witnesses at 16.

.[31]  Specifically, Pomerantz did not examine ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.[32]

### E.    Plaintiffs' Damages Models Suffer From Numerous Flaws

Finally, Hubbard explained that none of Pomerantz's four damages models measures the economic harm alleged to have been suffered by the Fund's investors.[33]  Although the flaws in Pomerantz's models include both technical and theoretical errors, some of the most significant flaws stem from his (and Plaintiffs') misunderstanding of the foundational economic concepts identified above.[34]

## III.   PLAINTIFFS' LIMITED *DAUBERT* CHALLENGE

In contrast to the majority of Hubbard's opinions that Plaintiffs acknowledge are admissible, they have moved to exclude two related economic opinions.  In the first of these opinions, Hubbard explains that the Fund's total expense ratio is the economically relevant cost to investors considering competing mutual funds.  Hubbard's second opinion is that the market for mutual funds exhibits the classic features of a competitive market.  The competitive nature of the market places constrains on mutual fund fees, and investor demand for mutual funds is sensitive to fees.  Plaintiffs do not dispute either of these latter points.[35]

As Hubbard explains, within the market for mutual funds, a fund's expense ratio is the fee that is relevant as a matter of economics for an investor shopping among mutual funds.[36]  The expense ratio (which includes a fund's management fee) accounts for the full bundle of services

---

[31] Hubbard Rpt. ¶ 10(viii).

[32] *Id.* ¶¶ 10(viii), 186.

[33] *Id.* ¶¶ 10(ix), 189-90.

[34] *See id.* ¶¶ 189-200.  Pomerantz's damages calculations fail to recognize, for example, that mutual fund advisers charge a composite expense ratio for the integrated bundle of services they provide to their affiliated funds, and the advisory services provided to mutual funds versus institutional accounts do not necessarily exist in the same market. *Id.* ¶¶ 189-93, 196-97.

[35] To the contrary, their expert agrees.  Deposition Transcript of Mercer Bullard ("Bullard Dep.") 239:4-10, 211:2-8 (Tuminelli Decl. Ex. 4 to CAL *Daubert* Br.).

[36] *Id.* ¶ 10(i).

that investment advisers provide for their affiliated mutual funds (either directly or through engagements with third-party service providers), so an economically rational comparison of the cost of purchasing different mutual funds would be based on the expense ratio.[37]  In addition, because the number and types of component fees in the total expense ratio varies among different advisers, the total expense ratio is a more easily-comparable fee metric.[38]  For the time period relevant to this case, Hubbard determined ███████████████████████████ █████████████████████████████████████.[39]

Based on both well-established principles of economics and his specialized research of mutual funds, Hubbard also has concluded that mutual funds are sold in a competitive market.[40] Specifically, in Hubbard's opinion: mutual funds are sold in a market where prospective investors have thousands of funds to choose from and face minimal costs to exit one fund and purchase another.[41]  The number of available funds is constantly in flux because the industry exhibits comparatively low barriers to entry.[42]  The assets managed throughout the entirety of this market are not concentrated within a few fund complexes, but are instead dispersed across the myriad of available funds.[43]  As a result of these (and other) prototypical features of a competitive market, mutual funds cannot in the long run charge fees to investors that are disproportionately high relative to the quality of services they provide, and investment advisers, in turn, cannot in the long run charge above-market fees.[44]  Put simply, market competition constrains the ability of an investment adviser to charge fees that are not commensurate with the quality of its integrated bundle of services, at the risk of losing investors to existing or new

---

[37] *Id.* ¶ 10(ii).

[38] *Id.* ¶¶ 10.ii, 44-47 (and SEC documents cited therein).  For example, some advisers may charge a separate administrative fee for administrative services, while other advisers may not charge a separate fee and instead include all such services under the management fee charged.

[39] *Id.* ¶ 10(iii).  Hubbard further concluded that ███████████████████████████████████████ ██████████████████████.

[40] *Id.* ¶ 38.

[41] *Id.* ¶ 40, App'x C-1 ¶¶ 5-6, 14-16 App'x C-2, C-5.

[42] *Id.* App'x C-1 ¶¶ 9-12, App'x C-3 to C-4.

[43] *Id.* App'x C-1 ¶¶ 7-8, App'x C-2.

[44] *Id.* ¶¶ 41, 42.

competing mutual funds.[45]  As a result of this feedback among the investment adviser, mutual fund customers, and competing advisers, an adviser's decision to charge above-market fees would "eventually drive the company out of business."[46]  "[T]he fund would eventually fail."[47]

## ARGUMENT

Plaintiffs have tethered their *Daubert* motion to spurious arguments about the relevance and helpfulness of Hubbard's opinions that are contradicted by the very cases they cite.  Given that Plaintiffs recognize their inability to contest Hubbard's qualifications on mutual fund economics and finance, and given that Hubbard's opinions are based on unassailable applications of established economic principles to an industry he knows well, the Court should deny Plaintiffs' motion in its entirety.

## I.    LEGAL STANDARD GOVERNING PLAINTIFFS' MOTION

CAL respectfully refers the Court to the discussion of the legal standards governing a *Daubert* motion set forth in CAL's Motion to Exclude the Testimony and Opinions of Plaintiffs' Experts Dr. Steven Pomerantz and Mercer Bullard.  Of particular note on this motion, when determining reliability, the court must assess only "the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."[48]  The requirement that the expert's testimony "assist the trier of fact" "goes primarily to relevance."[49]  The relevance of an expert's testimony is determined using the same broad, familiar standard from Fed. R. Evid. 401, "whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[50]

---

[45] *Id.* ¶ 41.

[46] *Id.*

[47] *Id*.

[48] *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  *See also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*., 97 F. Supp. 3d 485, 503 (S.D.N.Y. 2015) (quoting *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 595 (1993)); *E.E.O.C. v. Beauty Enters., Inc*., 2005 WL 6003547, at *5 (D. Conn. Mar. 24, 2005).

[49] *Daubert*, 509 U.S. at 591.

[50] *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (alteration in original).

Given that Plaintiffs have staked essentially their entire motion on the relevance and/or helpfulness of Hubbard's opinions, an understanding of the substantive legal standard for Plaintiffs' Section 36(b) claim under *Jones* is also important.  As described above, the ultimate inquiry is whether CAL's advisory fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[51]  The Court does not, however, assess the quantitative reasonableness of the fees, as the Supreme Court has recognized that Section 36(b) "does not call for judicial second-guessing" by courts that "are not well suited to make such precise calculations."[52]  Accordingly, the Court must first determine "the degree of deference that is due a board's decision to approve an adviser's fees."[53]  "Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process" and not rewrite the results of the business decision made by the fund's board.[54]

## II.    HUBBARD'S EXPENSE RATIO OPINION IS DEMONSTRABLY RELEVANT AND HELPFUL IN LIGHT OF PRIOR SECTION 36(B) DECISIONS ANALYZING THE SAME INFORMATION

Hubbard's opinion regarding the Fund's expense ratio is unquestionably relevant to this case.  Plaintiffs' own case law recognizes that expense ratios, which represent the fees that mutual fund investors actually pay, are an appropriate subject of expert testimony.  Furthermore, the evidence in this case demonstrates that the Fund's Independent Trustees actually considered the expense ratio during their deliberations.  As a result, expense ratios are relevant to this Court's assessment of the rigor of the Independent Trustees' deliberations and its decision of how much deference to give the Independent Trustees' business decision to approve the Fund's investment management agreement ("IMA") with CAL.[55]  Such testimony would also be helpful

---

[51] *Jones*, 559 U.S. at 346.

[52] *Id.* at 352-53.

[53] *Id* at 351-52.

[54] *Id.* at 351.

[55] *See Jones*, 559 U.S. at 352; *Sivolella v. AXA Equitable Life Ins. Co*., 2016 WL 4487857, at *65 (D.N.J. Aug. 25, 2016) (admitting expert testimony on expense ratios).

and relevant to the Court's determination as to whether the approved fee is consistent with *Jones'* ultimate "arm's-length bargain" standard.

Plaintiffs expressly concede that expense ratios are "'economically relevant' to investors shopping for mutual funds."[56]  It stands easily to reason that an attribute "economically relevant" to mutual fund investors would similarly be "economically relevant" for a fund's independent trustees to take into account.  The court in *Kasilag*, which reached trial following *Jones*, made this unremarkable logical connection, explaining that "a board negotiating a fee with an eye toward arm's-length bargaining might well consider the overall fee backdrop against which they are negotiating."[57]  Here, the Fund's Independent Trustees in fact did consider the Fund's expense ratio during their deliberations and deemed it relevant to their analysis of whether to approve the Fund's advisory fee ██████████████████████████████████████ ████████████████████████████.[58]  It would be a bizarre outcome to preclude a qualified expert from testifying—on relevance grounds—on the economics governing issues that the Fund's investors and its Board of Trustees admittedly consider important in evaluating the Fund and its cost relative to the services CAL provides.

Given this backdrop, it is not surprising that Plaintiffs cannot cite any precedent supporting their argument.  In fact, Plaintiffs' case law itself demonstrates that expert witnesses—and Hubbard in particular—may testify about expense ratios at trial.  The very case on which Plaintiffs principally rely expressly held that Hubbard was entitled to testify about expense ratios at trial because "the case law plainly supports the consideration of economic factors, including comparisons of expense ratios and the existence of competition in the

---

[56] Hubbard Br. 7.

[57] *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 2017 WL 773880, at *12 n.28 (D.N.J. Feb. 28, 2017).  *Accord In re American Mutual Funds*, 2009 WL 5215755, at *54 (admitting Hubbard's opinions regarding the nature and economic relevance of expense ratios; such testimony can assist the court in assessing, among other things, whether the Board's consideration of expense ratio data and other information "provided sufficient factual detail and explanatory background to allow the Unaffiliated Directors to fulfill their responsibilities to Fund shareholders.").

[58] Deposition Transcript of Jack Neal 163:21-166:2 (Strauss Decl. Ex. 47 to Pls. SJ Opp.); Deposition Transcript of Stephen Timbers 42:24-45:1 (Strauss Decl. Ex. 49 to Pls. SJ Opp.); June 2016 Board Minutes at CALAMOS_00636368, CALAMOS_00636381-82 (Kotler Decl. Ex. 37 to CAL's Motion for Summary Judgment).

marketplace, in section 36(b) cases.  No cases cited by Plaintiffs holds otherwise."[59]

Furthermore, the exact post-trial decision that Plaintiffs cite demonstrates that the court <u>admitted</u>

extensive evidence of the funds' expenses ratios at trial and discussed post-trial the expense ratio

data considered by the independent trustees.[60]

While Plaintiffs apparently argue that the Supreme Court in *Jones* decided *sub silentio* to

forever deem expense ratios irrelevant to a Section 36(b) analysis—simply by using the word

"transaction"—that claim borders on the frivolous.[61]  In the only two Section 36(b) trials held

since *Jones* was decided, neither court discerned this supposed sweeping prohibition, as both

admitted evidence of expense ratios at trial.[62]  In *Kasilag*, the evidence comparing expense ratios

came from Hubbard, whose testimony was admitted, as noted above, over the objections of the

plaintiffs in that case.[63]  Nothing in *Jones* has changed the previously-existing law allowing

Hubbard to explain the economic relevance of expense ratios to the Court.

---

[59] *In re Am. Mut. Funds Fee Litig.*, 2009 WL 10670616, at *7 (C.D. Cal. June 18, 2009).

[60] *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *25-27, *54 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).  The remainder of the cases relied on by Plaintiffs do not reject the applicability of expense ratios to a board of trustee's or court's analysis of advisory fees. Instead, these cases hold that the plaintiffs may not state a claim under Section 36(b) where the advisory fee is reasonable but the funds' fees in the aggregate are allegedly too expensive.  *See* Hubbard Br. 6 n.3 (citing *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) ("If the fee for each service viewed separately is not excessive in relation to the service rendered, then the sum of the two is also permissible."); *Levy v. Alliance Capital Mgmt. L.P.*, 1999 WL 642920, at *2 (2d Cir. Aug 20, 1999) (" [P]ayments of each type must be examined for reasonableness separately, not aggregated and then considered as a whole.")).

Plaintiffs misstate the "'total' fee approach" applied by the district court in their final remaining case.  Hubbard Br. 6 n.3.  That court simply held that the plaintiffs could not state a Section 36(b) claim based on allegations that the investment adviser misappropriated a portion of the advisory fees where the plaintiffs could not show that the "total" advisory fee was excessive.  *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 602-03 (S.D.N.Y. 2006).  Neither the district court nor the Second Circuit considered or rejected the relevance of expense ratios, and the Second Circuit affirmed that district court's dismissal of the advisory fee claim—the only claim to which the district court's supposed "'total' fee approach" applied.  *The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25, 30 (2d Cir. 2011).

[61] Hubbard Br. 6 ("This accords with *Jones*, which makes clear that the fiduciary duties of advisors as to the receipt of compensation are 'transaction'-based.").  Nor does Plaintiffs' observation that their claim is only about the Fund's advisory fee change anything.  The Fund's total expense ratio—which includes the advisory fee as its largest component—is a relevant economic consideration for investors, the Independent Trustees and the Court in assessing the advisory fee.  *See Jones*, 559 U.S. at 347 ("*Gartenberg* insists that all relevant circumstances be taken into account.").

[62] *Sivolella*, 2016 WL 4487857, at *64-65 (describing expense ratio data considered by the funds' board of trustees and further expense ratio comparisons presenting by the defendants' expert at trial and concluding that *Gartenberg's* comparative fee factor weighed against the plaintiffs' claims); *Kasilag*, 2017 WL 773880, at *12 (describing expense ratio comparisons presented by Hubbard at trial).

[63] *Kasilag*, 2017 WL 773880, at *12.

CAL has not argued that expense ratios are the only legally relevant fee, nor that they divest the Court of the ultimate need to consider the Fund's advisory fees.  Hubbard has simply opined, based on his expertise as an economist and a mutual fund independent trustee, that a fund's total expense ratio is economically relevant for a board of trustees to consider when deciding whether to approve the IMA with the adviser, which governs important components of those total fees.  Plaintiffs do not, and cannot, contend that a fund board is precluded from considering such information; to the contrary, their own expert agrees that fund trustees may be required to do so.[64]  And, as Plaintiffs challenge neither Hubbard's qualifications nor the reliability of his opinion concerning expense ratios, there is no basis for the exclusion of this opinion.  The Court can easily determine the helpfulness of this information in light of the full body of evidence presented and assign it whatever weight the Court sees fit in any post-trial decision.  The Court should therefore deny this branch of Plaintiffs' *Daubert* motion.

## III.   HUBBARD'S OPINION ABOUT THE COMPETITIVE STRUCTURE OF THE MUTUAL FUND INDUSTRY IS RELEVANT AND BASED ON RELIABLE PRINCIPLES OF ECONOMICS

Hubbard's opinion that mutual funds are sold in a competitive market is reliable and will be helpful to the Court in considering the Independent Trustees' decision to approve the Fund's fee.  Plaintiffs' arguments to the contrary take issue with an opinion entirely different than the opinion Hubbard has actually offered in this case and are based on the fiction that the Supreme Court rejected Hubbard's opinions in *Jones*, which did not hold that competition among mutual funds for investors is *per se* irrelevant to courts or independent trustees.  Plaintiffs neglect (again) to inform the Court that the only case they cite which truly deals with Hubbard's actual opinion demonstrates that his expertise is, in reality, admissible.  Plaintiffs' arguments should be rejected.

---

[64] Bullard Dep. 212:2-22 ("[C]ommon law fiduciary duties . . . might require an independent look at the expense ratio as apart from the fees paid under separate contracts to the advisor.") (Tuminelli Decl. Ex. 4 to CAL's *Daubert* Br.).

### A.      Plaintiffs Exaggerate The Conclusions Drawn From Hubbard's Opinion

Plaintiffs have distorted Hubbard's opinion concerning the competitive structure of the mutual fund industry to the point where they are aimlessly attacking a straw man and asking the Court to exclude an opinion that has not been rendered.  Hubbard opined in his report that mutual funds cannot in the long run charge fees to investors that are disproportionately high relative to the quality of services they provide.[65]  In other words, above-market fees admittedly can exist, but they are unlikely to persist in the long term because market forces would cause the adviser to "████████████████████████████████████████████."[66]  Plaintiffs cannot attack the relevance or helpfulness of these straight-forward observations, in light of the Fund's long track record, so they exaggerate them to make them appear (falsely) inconsistent with the law.

Specifically, Plaintiffs have twisted Hubbard's report to mean "that mutual funds can never be excessive because they are set in a market of perfect competition."[67]  Hubbard, however, definitively rejected this interpretation at his deposition,[68] and instead acknowledged that ████████████████████████████████████████████████.[69]  He further acknowledged that ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.[70]  Since Plaintiffs have directed their helpfulness/relevance argument at an opinion that does not exist, the Court should also deny this portion of Plaintiffs' *Daubert* motion without further consideration.

Plaintiffs not only misstate the substance of Hubbard's opinion on industry competition, but they further also misleadingly suggest that courts have rejected the validity of this supposed "opinion."  Plaintiffs first assert that this Court must exclude Hubbard's opinion because the

---

[65] Hubbard Rpt. ¶¶ 41-42.

[66] *Id.* ¶ 41.

[67] Hubbard Br. 7.

[68] Hubbard Dep. 41:7-18.

[69] *Id.* 42:11-12.

[70] *Id.* 32:4-18.

Supreme Court reversed an appellate decision that cited an article that Hubbard co-authored.[71] That cannot possibly be the law under *Daubert*. The Seventh Circuit in *Jones* made its own judgments about the legal importance of market competition—adopting its own analysis, which differed in several respects from (and at most extrapolated in part from) Hubbard's co-authored article—ultimately ruling that competition in the mutual fund industry created a conclusive presumption that mutual fund fees are not excessive under Section 36(b) unless a plaintiff could prove that the fund's independent trustees were affirmatively misled.[72] Hubbard was not an expert in that case and his expert opinions were never at issue. Moreover, although the Supreme Court in *Jones* rejected the Seventh Circuit's legal standard, it never ruled that competition among mutual funds falls outside the broad scope of "all relevant factors" that the ICA requires courts to consider or that independent trustees may not consider competition when deliberating about a fund's advisory fee.[73] And the Court in *Jones* never mentioned, let alone criticized or rejected, any work of any kind by Hubbard. Finally, the expert opinions Hubbard does offer in this case are distinct from those views the Seventh Circuit attributed to the co-authored article it cited prior to the Supreme Court's opinion.[74] Plaintiffs' recounting the procedural history of *Jones* therefore adds nothing to their failed *Daubert* analysis.

### B. Hubbard Analyzed The Competitive Structure Of The Mutual Fund Industry According To Reliable Principles of Economics

Plaintiffs make the conclusory assertion (in their section heading) that Hubbard's opinion that mutual funds are sold in a competitive market is "[u]nreliable," but nowhere do they explain or even argue that Hubbard's methodology is unreliable in any way.[75] Instead, Plaintiffs appear

---

[71] Hubbard Br. 10.

[72] *Id.*

[73] *Jones*, 559 U.S. at 349, 350-51. The Supreme Court's focus on the relative lack of competition among advisers for mutual funds also adds nothing to any *Daubert* argument here. Again, as noted above, Hubbard is <u>not</u> opining that market competition precludes excessive fees and has no opinion at all in this case on the legal standard the Court should employ in considering the economic facts. *See also infra* at III.C.

[74] The fact that Hubbard at that time questioned the efficacy and efficiency of court proceedings as a vehicle to regulate mutual fund fees is not particularly shocking, since it is a questions court themselves still grapple with; regardless, those views are certainly not grounds for precluding him from offering different opinions here.

[75] *Compare* Hubbard Br. 7 ("Dean Hubbard's 'Market Competitiveness' Opinions Should be Excluded Because they are Irrelevant, not Helpful to the Trier of Fact, and Unreliable"), *with id.* 7-12 (containing no argument as to reliability).

to try to undermine the importance of Hubbard's testimony by way of long passages of argument and citations to other commentaries on mutual fund industry competition, like the Wharton Report, which was published more than half a century ago, a time before the internet, 401(k) plans, or SEC regulations regarding fee and performance disclosures came into existence.[76] Even if Plaintiffs' preferred sources were at odds with Hubbard's proffered opinions in this case, this is not a valid basis to contest the admissibility of an expert opinion. With respect to relevance, Plaintiffs' long economic arguments about the industry directly undercut their arguments; indeed, it reduces their position to the indefensible proposition that only their own view of mutual fund economics is relevant. And as for reliability, "[t]he focus of a court's reliability inquiry 'must be solely on principles and methodology, not on the conclusions they generate.'"[77] Plaintiffs have wholly abandoned any arguments against Hubbard's methodology at this stage and, therefore, must be content to "challenge the conclusions drawn by [Hubbard] at trial,"[78] should one be necessary.

Putting aside Plaintiffs' failure to legitimately challenge Hubbard's methodology, the Court can easily see that his methodology was reliable and based on sound economic analysis. Hubbard outlined in his report well-established factors that expert economists universally agree are relevant for determining whether a market is competitive,[79] and he proceeded to explain his analysis of each of these factors in turn.[80] He drew from third-party data provided by ████

---

[76] *See* Hubbard Br. 8 (citing A STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962)); *compare, e.g.*, U.S. Securities and Exchange Commission, SEC Amends Mutual Fund Advertising Rules, Proposes New Rules and Amendments for Fund of Funds Investments, Rel. No. 2013-122 (Sept. 24, 2003), available at https://www.sec.gov/news/press/2003-122.htm; U.S. Securities and Exchange Commission, SEC Adopts Enhanced Mutual Fund Expense and Portfolio Disclosure; Proposes Improved Disclosure of Board Approval of Investment Advisory Contracts and Prohibition on the Use of Brokerage Commissions to Finance Distribution, Rel. No. 2004-16 (Feb. 11, 2004), available at http://www.sec.gov/news/press/2004-16.htm.

[77] *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 503 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).

[78] *Int'l Bus. Machs. Corp. v. BG C Partners, Inc.*, 2013 WL 1775437, at *17 (S.D.N.Y. Apr. 25, 2013). *See also id.* ("In determining the admissibility of expert testimony under Fed. R. Evid. 702, district courts may consider the purported expert's expertise and the reliability and relevance of their testimony, but should do so 'without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.'" (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002))).

[79] Hubbard Rpt. App'x C-1 ¶ 4. These factors "████████████████████████████████████████████████." *Id.*

[80] *Id.* App'x C-1 ¶¶ 5-17.

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████.[81]  He further applied a measure ███████████████████████

█████████████████████████████████████████████

██████████████████████████████████.[82]  Finally, Hubbard drew from his prior research on

mutual fund investors' price elasticities to show that ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████.[83] "

█████████████████████████████████████████████

████████████."[84]  Although Plaintiffs may "███████████████████████████

█████████████████████████████████████████

██████████████."[85]

### C.    Plaintiffs Misrepresent The Law And Prior Court Rulings

As with Hubbard's expense ratio opinions, Plaintiffs misrepresent the law with respect to

the relevance of competition in the mutual fund industry and past courts' rulings on the

admissibility of Hubbard's opinion on that subject.  CAL does not dispute that courts recognize a

distinction between competition among mutual funds for investors and competition among

mutual funds for investment advisers.[86]  CAL's point is that both are relevant under *Jones*;

indeed, the market dynamics Plaintiffs focus on are one reason the Supreme Court has turned to

independent trustees as the central "watchdog" over mutual fund shareholder interests.[87]  Within

---

[81] *Id.* App'x C-1 ¶¶ 5-6, 9-12, App'x C-2 to C-4.

[82] *Id.* App'x C-1 ¶¶ 7-8, App'x C-2.  Other courts have validated the reliability of experts' using the DOJ's and FTC's Herfindahl-Hirschman Index to reach opinions about the competitive structure of specific markets.  *In re Wholesale Grocery Prods. Antitrust Litig.*, 2017 WL 4876277, at *8 (D. Minn. Oct. 24, 2017); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5428139, at *3 (N.D. Cal. June 20, 2013) (Special Master R&R), *adopted in full*, 2013 WL 5391159, at *9 (N.D. Cal. Sept. 24, 2013).

[83] Hubbard Rpt. ¶¶ 14-17, App'x C-5.

[84] *Grand Rivers Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 527-28 (S.D.N.Y. 2011).

[85] *Id.* at 527-28.

[86] *See* Hubbard Br. 9-11.

[87] *Jones*, 559 U.S. at 353; *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

17

that framework, there is unquestionably room for independent trustees to consider competitive pressures from investor choices when reaching their business decision of whether to approve an advisory fee, and a court may correspondingly educate itself about that competition to assess the independent trustees' decision.[88]  Plaintiffs' own cases acknowledge that market forces created by the competition among mutual funds for investors may discipline the fees advisers charge their funds by, for example, pressuring the advisers to share with investors savings from economies of scale.[89]  Hubbard discusses this exact aspect of market competition in his report, and it informs his opinion that ███████████████████████████████

██████.[90]  The plain relevance of competitive forces explains why, as noted above, even the one case which Plaintiffs quote at length to assert that Hubbard's competition opinion "should be excluded" instead denied a *Daubert* motion directed at Hubbard.[91]  The Court should likewise admit Hubbard's opinion here and assign to it the weight the Court chooses during any eventual trial, should one occur.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to partially exclude Hubbard's proposed testimony and opinions should be denied in its entirety.

---

[88] *Jones*, 559 U.S. at 349, 350-51.

[89] *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 971 n.32 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) (citing S. Rep. No. 184, 91st Cong., 1st Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 4902)).  Plaintiffs misleadingly cite *Schuyt* for the proposition that other courts have excluded the kind of opinions offered by Hubbard at the *Daubert* stage.  Not so.  In fact the court admitted the economic testimony at trial and evaluated its weight after trial.  *Schuyt*, 663 F. Supp. at 974 n.39.

[90] Hubbard Rpt. ¶ 157.  The *In re American Mutual Funds* court discounted the probative value of Hubbard's opinion that the growth in the size of the fund at issue meant that the adviser was not charging excessive fees.  2009 U.S. Dist. LEXIS 98871, at *49-51 (C.D. Cal. Sept. 16, 2009).  Yet that ruling says nothing about the opinions Hubbard is seeking to offer in this case, *i.e.*, the effect of the mutual fund market on the total fee charged by an adviser.  Hubbard Rpt. ¶¶ 41-42.  Further, the court expressly *credited* Hubbard's opinions about economies of scale in its post-trial decision.  *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *72.

[91] *See supra* p.11 (quoting *In re Am. Mut. Funds Fee Litig.*, 2009 WL 10670616, at *7).

Dated:  March 12, 2018

DECHERT LLP

Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Amanda Tuminelli
Brendan Herrmann
Samantha Rosa
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:  (212) 698-3500

*Counsel for Defendant*
*Calamos Advisors LLC*