UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAUL CHILL and SYLVIA CHILL, for the use and
benefit of the CALAMOS GROWTH FUND,

Plaintiffs,

- against -

CALAMOS ADVISORS LLC,

Defendant.

---

**OPINION AND ORDER**

15 Civ. 1014 (ER)

<u>Ramos, D.J.:</u>

 Saul Chill and Sylvia Chill ("Plaintiffs") are shareholders in the Calamos Growth Fund

(the "Fund"), a mutual fund advised and managed by Defendant Calamos Advisors LLC

("Calamos"). Plaintiffs bring this action on behalf of and for the benefit of the Fund, pursuant to

the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.* (the "ICA"). Plaintiffs allege

Calamos breached its fiduciary duty with respect to Calamos' receipt of compensation for

investment-adviser services provided to the Fund. Calamos now moves for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 65. In connection with the

motion, both parties have moved, pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579 (1993), to exclude certain expert testimony. In particular, Calamos seeks to exclude

partially the testimony of two of Plaintiffs' expert witnesses, *see* Doc. 88, and Plaintiffs seek to

exclude the testimony of five of Calamos' expert witnesses, *see* Docs. 106, 109, 112, 115, 118.

For the reasons set forth below, Calamos' summary judgment motion is DENIED in part and

GRANTED in part, and the parties' *Daubert* motions are DENIED.

# I.  BACKGROUND

## A.  The Investment Company Act of 1940

The ICA regulates investment companies, including mutual funds.  "A mutual fund is a pool of assets, consisting primarily of portfolio securities, and belonging to the individual investors holding shares in the fund." *Burks v. Lasker*, 441 U.S. 471, 480 (1979).  Typically, a mutual fund is created by a separate entity called an investment adviser, which also selects the fund's board of trustees, manages the fund's investments, provides the fund administrative services, and markets the fund to shareholders, all in exchange for various fees paid out from the fund's assets.  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010); *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).  Because the investment adviser is integral to the fund's existence and selects the fund's board, often the fund "cannot, as a practical matter[,] sever its relationship with the adviser.  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Burks*, 441 U.S. at 481 (quoting S. Rep. No. 91–184, at 5 (1969)).  Consequently, a report commissioned by the U.S. Securities and Exchange Commission ("SEC") found that "investment advisers often charged mutual funds higher fees than those charged [to] the advisers' other clients and further determined that the structure of the industry, even as regulated by the [1940 version of the ICA], had proven resistant to efforts to moderate adviser compensation." *Daily Income Fund*, 464 U.S. at 537 (citing Wharton School Study of Mutual Funds, H.R. Rep. No. 87-2274, at 28–30, 34, 66–67 (1962)).

Thus, in 1970 Congress added Section 36(b) to the ICA to check this structural conflict of interest.  *Id.* at 537–39.  Of note, Section 36(b) adds two requirements to the ICA.  First, the statute requires that mutual funds be governed by a board of trustees, at least 40 percent of whom

must be independent and disinterested.  *See Burks*, 441 U.S. at 482–83; 15 U.S.C. §§ 80a–2(a)(19), 80a–10.  The board of trustees, acting on behalf of the fund, is responsible for negotiating, approving, and periodically evaluating the terms of any investment-management agreements between the fund and its investment adviser(s).  These responsibilities include evaluating and approving any service fees charged to the fund by its investment adviser.  *See* §§ 80a–15(c), 80a–35(a)–(b).

Second, and most pertinent to this case, Section 36(b) "impose[s] upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund, and grant[s] individual investors a private right of action for breach of that duty."  *Jones*, 559 U.S. at 340 (citing § 80a–35(b)).

### B.  The Fund

Calamos is an investment adviser registered under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, and has served as the investment adviser to a variety of clients, including Calamos-sponsored "open-end" mutual funds (like the Fund); Calamos-sponsored "closed-end" funds; private accounts held by institutions and individuals ("institutional" clients); and mutual funds sponsored by other investment advisers, for which Calamos performs sub-advisory services only ("sub-advisory" clients).  Pls.' Counter 56.1, Doc. 148, ¶ 1.[1]  Calamos serves as the investment adviser to sixteen open-end mutual funds, including the Fund, known collectively as the Calamos Investment Trust ("CIT").  *Id.* ¶ 3.  Each fund within the CIT has a different investment objective and strategy.  *Id.*  The Fund has been in operation since 1990, and its investment strategy focuses on equity securities issued by U.S.-based companies that possess large and mid-sized market capitalization (over $1 billion) and that Calamos has identified as

---

[1] Hereinafter, citations to the parties' Rule 56.1 statements in this Opinion incorporate the evidentiary citations contained therein.

offering "the best opportunities for growth." *Id.* ¶ 4; *see also* Compl., Doc. 1, ¶ 37. Plaintiffs have been shareholders in the Fund since July 2005. Pls.' Counter 56.1 ¶ 5.

### C. The Investment Management Agreement

Pursuant to an Investment Management Agreement (the "IMA") entered into on December 13, 2004, Calamos provides investment advisory services to each Fund within the CIT in exchange for an agreed-upon annual fee (the "Advisory Fee"). *See* IMA, Decl. of David A. Kotler in Supp. of Def.'s Mot. for Summ. J. ("Kotler Decl."), Doc. 67, Ex. 40 at 00146341–50. Specifically, the IMA requires Calamos to: "(i) furnish continuously an investment program of each [f]und, (ii) determine . . . what investments shall be purchased, held, sold or exchanged by each [f]und and what portion, if any, of the assets of each [f]und shall be held uninvested, and (iii) make changes on behalf of the [CIT] in the investments of each [f]und," and "also manage, supervise and conduct the other affairs and business of the [CIT] and each [f]und thereof and matters incidental thereto, subject always to the control of the [CIT Board of] Trustees and to the provisions of . . . the [ICA]." *Id.* at 00146341–42. In practice, Calamos either provides those services directly or monitors the provision of those services by contracted third parties. However, in all cases, Calamos ultimately remains responsible for the provision of those services. Pls.' Counter 56.1 ¶¶ 18–21.

Calamos has also entered into another agreement with the CIT funds, namely, the "Financial Accounting Services Agreement" (the "FASA"). *See generally* FASA, Kotler Decl., Ex. 41. Pursuant to the FASA, Calamos performs certain services for the CIT funds, including the Fund, for an additional fee—in this case, approximately one basis point.[2] *Id.*

---

[2] During oral argument regarding Calamos' motion for summary judgment, counsel for Calamos represented that the annual fee paid under the FASA was one basis point. *See* Summ. J. Oral Arg. Tr. at 28:18–29:7, 31:4–9. Counsel for Plaintiffs did not object to this representation.

Notably, during the relevant period,[3] "in evaluating the nature, quality and extent of [Calamos'] services to the Fund (and the other Calamos-sponsored mutual funds)," the CIT Board of Trustees "did not seek to separate out the services [Calamos] provide[d] under the IMA as opposed to the FASA or distinguish whether a particular service [wa]s provided pursuant to one agreement or the other." Pls.' Counter 56.1 ¶ 81.

### D. The Board of Trustees and the Annual 15(c) Process

In accordance with the ICA, the Fund is overseen by the CIT Board of Trustees (hereinafter the "Board"). *Id.* ¶ 22. During all times relevant, the Board has been comprised of a super-majority of "Independent Trustees"—i.e., either five or six trustees that are not "interested," as that term is defined under the ICA, *see* 15 U.S.C. § 80a-2(a)(19)—and one interested trustee, Calamos' Founder, Chairman, and Global Chief Investment Officer, John P. Calamos, Sr. *See* Pls.' Counter 56.1 ¶¶ 23–24. Although the parties dispute the length of their experience in the financial services industry, there is no dispute that the Independent Trustees are, in fact, independent and qualified. *Id.* ¶ 24. Stephen Timbers has been appointed the "Lead Independent Trustee" each year since 2004. *Id.* And at all times relevant, the Independent Trustees were represented and advised by an independent and experienced mutual fund counsel team, headed by Paulita M. Pike, a lawyer currently in the Investment Management practice of the law firm Ropes & Gray LLP. *Id.* ¶¶ 37–39.

Pursuant to the ICA, the Independent Trustees annually engaged in the so-called "15(c) Process," whereby they reviewed and voted to approve the IMA, and thus the Advisory Fees at

---

[3] Under Section 36(b), plaintiffs cannot recover from an investment adviser damages "for any period prior to one year before the action was instituted." *See* 15 U.S.C. § 80a-35(b)(3). Here, in accordance with Section 36(b), Plaintiffs challenge only the Advisory Fees paid by the Fund to Calamos as far back as February 11, 2014—one year prior to the filing of their Complaint. *See* Pls.' Counter 56.1 ¶ 22. The Board, however, approved the Advisory Fee then in effect during the June 2013 Board meeting. *See* June 2013 Board Minutes, Kotler Decl., Ex. 27 at 00503423–27. Thus, unless otherwise stated, the Court considers relevant the period as far back as the June 2013 Board meeting through the present.

issue in this case, during the June Board meetings.  In preparation for the 15(c) Process, the

Board met in person at least quarterly.  *Id.* ¶¶ 29, 37; *see* 15 U.S.C. § 80a-15(c).  In advance of

each meeting, the Board received from Calamos and various third parties a compendium of

written materials.  Pls.' Counter 56.1 ¶ 30.  Those written materials included a ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id.*  The

Board then discussed several topics at the meetings; Calamos and third parties presented data to

the Board; and, while the parties dispute the extent of this, it is undisputed that the Board

engaged Calamos in *some* degree of questioning regarding the Fund's performance, Calamos'

investment philosophy, and the structure of Calamos' investment team.  *Id.* ¶¶ 44–45.

The 15(c) Process formally begins when the Independent Trustees, through their counsel,

submit a "detailed set of written information requests to [Calamos] on topics pertinent to the

Independent Trustees' annual review and consideration of the IMA."  *Id.* ¶ 49.  This submission

is commonly referred to as the "15(c) Request."  *Id.*  Among the information sought through the

15(c) Request is information relating to the so-called *Gartenberg* factors, which courts and the

SEC have deemed relevant to the 15(c) Process.  *Id.* ¶ 50; *see also Gartenberg v. Merrill Lynch

Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982). [4]  Such information included:  (a) "[t]he nature,

quality, and extent of the services provided" by Calamos to the Fund; (b) "the profitability to

[Calamos] and its affiliates from their relationship with the Fund"; (c) whether and, if so, to what

extent Calamos was "realizing and/or sharing economies of scale with Fund shareholders"; (d)

---

[4] The *Gartenberg* factors are discussed more fully *infra*.

"[h]ow the Fund's management fee structure compares with those of other similar funds"; (e) an analysis of any "fall-out" benefits to Calamos (i.e., the collateral benefits that accrued to Calamos "as a result of its relationship with the Fund"); (f) "the investment performance of the Fund, as well as performance information for comparable funds and other clients of [Calamos] following comparable strategies"; and (g) "the fees and other expenses paid by the Fund, as well as fee information for other clients of [Calamos], (i.e., for sub-advisory and institutional clients) who follow a strategy similar to the Fund." Pls.' Counter 56.1 ¶¶ 50–51.

Calamos typically takes ███████████ to respond to the 15(c) Request, although the parties dispute how much of that time is spent actively preparing responses. *Id.* ¶ 53. Ultimately, Calamos' response—commonly referred to as the "15(c) Response"—consists of hundreds of pages of information provided to the Independent Trustees approximately ██████ prior to the June Board meeting. *Id.* Following a review of the information, the Independent Trustees, through their counsel, periodically request supplemental information, which Calamos must then provide. *Id.* ¶ 54. The Independent Trustees also receive detailed information from independent third-party service providers regarding the performance of and fees charged to the Fund, and the performance of and fees charged to numerous comparable mutual funds. *Id.* ¶ 55.

### E.  The Specific Information Provided to the Independent Trustees

Based on the considerations set forth below, each year the Independent Trustees approved the IMA and the Advisory Fee the Fund paid to Calamos.

1. *Comparative Fee Structures*

The table below reflects the breakpoint-based,[5] marginal Advisory-Fee schedule charged to the Fund throughout the relevant period. The Advisory Fee is set "as a percentage of the Fund's total assets under management ("AUM"), and decreases as the total AUM increases." *Id.* ¶ 103.

| Average Net Assets in Fund | Annual Fee |
|---|---|
| $0 – $500 million | 1.00% |
| $500 million – $1 billion | .90% |
| $1 billion – $6 billion | .80% |
| $6 billion – $11 billion | .78% |
| $11 billion – $16 billion | .76% |
| $16 billion – $21 billion | .74% |
| $21 billion – $26 billion | .72% |
| Over $26 billion | .70% |

Although the Advisory Fee has remained unchanged during the relevant period, the Fee as a percentage of the Fund's total AUM has increased because the Fund's total AUM have decreased each year since 2013. *Id.* ¶ 104.

The annual effective Advisory Fee paid by the Fund to Calamos during the relevant period ranged from 80 to 86.9 basis points, generally fluctuating because of changes to the Fund's AUM. *Id.* ¶ 107. The lone exception came in 2014, when the Independent Trustees approved a five-basis-point waiver to that year's Advisory Fee, reducing the Fee to 78 basis points from 83. *Id.* ¶ 107 n. 158. The Fund's Advisory Fee annually was ███████████

---

[5] "Breakpoints" are staggered reductions in marginal fee rates that accompany marginal increases in assets under management. Breakpoints are used to reflect the reduced marginal cost of providing investment advisory services to a growing pool of assets, allowing shareholders to reap some economy-of-scale benefits via reduced fees.

[REDACTED] [6] *Id.* Indeed, during the relevant period, the Fund's Advisory Fee

[REDACTED] *Id.*

Each year, Calamos also presented to the Independent Trustees a document [REDACTED]

[REDACTED] *Id.* ¶ 110. This presentation included, among other things, a comparison of the Fund's Advisory Fee to the standard range of fees Calamos charged its institutional and sub-advisory clients following the same broad investment strategy. *Id.* Although Calamos provided the institutional and sub-advisory clients with the same investment strategy as the Fund, Calamos charged them fees that were [REDACTED]

[REDACTED] *Id.* ¶ 111. Calamos also provided the Independent Trustees information concerning the differences in services, costs, and risks entailed in advising the Fund as compared to advising Calamos' institutional and sub-advisory clients. *Id.* ¶ 109.

### 2. *Nature and Quality of Services, i.e., Performance of the Fund*

The Independent Trustees also received information from Calamos revealing that the Fund's performance was poor, in both relative and absolute terms, as compared to its own benchmark and as compared to its peer funds. *Id.* ¶ 87. For example, at least from 2014 to 2016, the Fund placed overwhelmingly in [REDACTED]

[REDACTED] Def.'s Resp. to Pls.' Statement of Additional Material Facts ¶ 385; *id.* App. D. During only one short period did the Fund perform better than [REDACTED] *Id.* [REDACTED]

[REDACTED]

---

[6] [REDACTED]

[REDACTED]

████████████████████████████████████████████████████████

████████████████████ *Id.* ¶¶ 184, 412; *id.* Appx. A.

During the relevant period, Calamos informed the Trustees of certain investments it was making to improve the Fund's performance. For example, purportedly in an effort to place increased focus and resources to its management of the Fund, Calamos closed or reorganized certain other Calamos-sponsored funds. Pls.' Counter 56.1 ¶ 47(c). Calamos also informed the Board of its efforts to improve the quality of the portfolio research and investment team and to restructure its investment approach. *Id.* ¶ 90. As part of its effort to strengthen performance, in February 2017 Calamos terminated and replaced the Fund's lead portfolio manager. *Id.* ¶ 47(d).

### 3. *Profitability and Economies of Scale*

During the relevant period, the Trustees were well aware of Calamos' pre- and post-distribution profit margin for both the Fund and the other Calamos-sponsored funds. *Id.* ¶ 131.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

Each year, the Independent Trustees also asked Calamos for information concerning whether it believed it had experienced, or in the future is likely to experience, economies of

scale;[7] whether it has shared any economies of scale with the Fund; and whether (and, if so, to what extent) more breakpoints should be added to the IMA to account for any realized economies of scale.  Pls.' Counter 56.1 ¶ 141; *see also, e.g.*, Calamos' 2014 15(c) Response, Kotler Decl., Ex. 3 at 00519137–38.  In response to these requests, Calamos consistently informed the Trustees that it ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.* What's more, Calamos consistently maintained that it is ████████████████████ ████████████████████████████████ Calamos' 2014 15(c) Response at 00519138; *see also* Pls.' Counter 56.1 ¶ 144.

For each of the years during the relevant period, the Independent Trustees' board minutes reflect that the Trustees considered whether the Fund's Advisory-Fee schedule, including the breakpoints contained therein, was appropriate in light of the potential economies of scale realized by Calamos.  Pls.' Counter 56.1 ¶¶ 145, 147.  And in at least some of the years, the board minutes reflect that the Trustees considered the benefits accruing to shareholders from Calamos' investments into the Fund's infrastructure and investment processes. *See, e.g.*, *id.* at ¶ 148.

---

[7] "Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale."  *Migdal v. Rowe Price–Fleming Int'l, Inc.*, 248 F.3d 321, 326–27 (4th Cir. 2001) (citing *Fogel v. Chestnutt*, 668 F.2d 100, 111 (2d Cir. 1981)).

4. *Fall-Out Benefits*

Each year, Calamos informed the Independent Trustees of the potential "fall-out benefits" it enjoyed—i.e., the additional, non-fund sources of revenue accruing to Calamos as a result of its relationship with the Fund. *Id.* ¶¶ 150–154.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed this action on February 11, 2015, pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b). Compl., Doc. 1, ¶ 2. In their Complaint, Plaintiffs challenged both the Advisory Fees paid to Calamos and the distribution fees paid to the Fund's distributor, Calamos Financial Services LLC ("CFS").[8] *Id.* On June 12, 2015, Calamos moved to dismiss both claims. Doc. 14. On March 28, 2016, the Court denied that motion. Doc. 26. The parties conducted discovery over the next 18 months.

On April 10, 2017, Plaintiffs voluntarily dismissed CFS with prejudice (and, consequently, any challenge to distribution fees), pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. *See* Stipulation of Voluntary Dismissal with Prejudice, Doc. No. 53. On October 13, 2017, Calamos filed the instant motion for summary judgment. Doc. 65. On December 15, 2017, Calamos moved to exclude the opinions and testimony of Plaintiffs' two expert witnesses. Doc. 88. On February 9, 2018, Plaintiffs moved to exclude the opinions and testimony of Calamos' five experts. *See* Docs. 106, 109, 112, 115, 118. This Court held oral argument on August 17, 2018.

---

[8] CFS is an affiliate of Calamos and serves as the Fund's distributor—that is, "the exclusive agent to sell and distribute shares of the [Fund]." Pls.' Counter 56.1 ¶ 2. Whereas the Fund paid Advisory Fees to Calamos pursuant to the IMA, the Fund paid CFS "distribution fees" pursuant to a separate agreement.

## III. DAUBERT MOTIONS

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

"As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 589). In interpreting Rule 702, district courts, under *Daubert*, may consider, depending on the case, the following non-exhaustive list of factors to determine whether evidence is sufficiently reliable: "[1] whether a theory or technique had been and could be tested, [2] whether it had been subjected to peer review, [3] what its error rate was, and [4] whether scientific standards existed to govern the theory or technique's application or operation." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "the Supreme Court held that the trial judge's gatekeeping obligation applies not only to testimony based on 'scientific' knowledge, as in *Daubert*, but also to testimony based on 'technical' or 'other specialized' knowledge." *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004).

"*Daubert* and its progeny," however, "do not apply straightforwardly in the context of bench trials." *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09 Civ. 7199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014). In jury trials, *Daubert* requires trial judges to serve in a "gatekeeping" role by "assur[ing] that the specialized testimony is reliable and relevant" to "help the *jury* evaluate that foreign experience." *Kumho Tire Co.*, 526 U.S. at 141, 149 (emphasis added). In bench trials, however, "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804 (GEL), 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009). Because of this distinction, "[w]hen the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 09 Civ 5935, 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (internal quotation marks and citation omitted); *see also Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977) ("[O]rdinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them . . . .").

Calamos seeks to exclude the opinions and testimony of two of Plaintiffs' experts, and Plaintiffs seek to exclude the opinions and testimony of five of Calamos' experts. The Court will deny, at this point, all of these challenges. "When the fact-finder is the court," as is the case here, "expert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." *Royal & Sun All. Ins. PLC*, No. 09 C 5935, 2011 WL 3874878, at *2. If, after live testimony, the Court concludes that any of the experts lack the proper qualifications or

offer unreliable opinions, the Court will give those opinions little or no weight in its decision. *Cf. In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."); *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (same); *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (same).

For the reasons set forth above, Plaintiffs' and Calamos' motions to exclude the testimony and expert opinions are DENIED.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is initially responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### B. Governing Law for Section 36(b) Excessive Fee Claims

As noted above, Congress added Section 36(b) to the ICA "because it concluded that . . . shareholders should not have to 'rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (quoting *Daily Income Fund*, 464 U.S. at 540). Consequently, Section 36(b) provides in relevant part that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b).

"[T]o face liability under [Section] 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Associates L.P.*, 559 U.S. 335, 346 (2010) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923,

928 (2d Cir. 1982)). Courts must look to all pertinent facts to determine whether fees are excessive, including the factors set forth by the Second Circuit in *Gartenberg*:

> The *Gartenberg* Court specifically identified several factors for consideration in weighing "all pertinent" facts: (1) the nature and quality of services provided to the fund shareholders; (2) the profitability of the fund to the advisor-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees.

*In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 Civ. 4318 (LTS), 2015 WL 7301077, at *4 n.3 (S.D.N.Y. Nov. 18, 2015) (citing *Gartenberg*, 694 F.2d at 929–32); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 340–41 (2d Cir. 2006).

Recognizing the important role disinterested trustees serve as "independent watchdogs" of the mutual funds they oversee, Congress through the ICA "instructs courts to give board approval of an adviser's compensation 'such consideration . . . as is deemed appropriate under all the circumstances.'" *Jones*, 559 U.S. at 348 (quoting 15 U.S.C. § 80a-35(b)(2)). To that end, *Jones* makes clear that "the standard for fiduciary breach under [Section] 36(b) does not call for judicial second-guessing of informed board decisions." *Id.* at 352. Indeed, *Jones* instructs courts to refrain from "supplant[ing] the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range." *Id.* Put differently:

> [I]f the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently. This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

*Jones*, 559 U.S. at 351 (emphasis added) (internal quotation marks and citations omitted). Ultimately, "[w]here a board's process for negotiating and reviewing investment-adviser

compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Id.* at 351 (citation omitted). Likewise, "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Id.* In the end, a court must focus on both procedure *and* substance. *Id.*

Here, Calamos contends that summary judgment is warranted because the undisputed evidence shows that: (1) the Independent Trustees engaged annually in a robust 15(c) Process and reached an informed and conscientious decision in approving Calamos' Advisory Fee, entitling the Trustees' judgment to substantial deference; and (2) there are no genuine disputes of fact with respect to the remaining *Gartenberg* factors. Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s S.J. Mot."), Doc. 66, at 18.

Plaintiffs, for their part, maintain that triable issues of fact exist with respect to each *Gartenberg* factor and with respect to the extent of deference owed, if any, to the Independent Trustees' approval of the Advisory Fees. *See generally* Pls.' Mem. of Law in Opp. to Def.'s Mot. For Summ. J. (Pls.' S.J. Opp.), Doc. 76.

Below, the Court addresses the parties' arguments in turn.

## V. DEFERENCE TO BOARD APPROVAL

The Court begins by "calibrating the degree of deference" owed to the Independent Trustees' approval of the Advisory Fees. *Jones*, 559 U.S. at 352; *accord Zehrer v. Harbor Cap. Advisors, Inc.*, No. 14 C 00789, 2018 WL 1293230 (N.D. Ill. Mar. 13, 2018) ("The first phase of review is to calibrate the degree of deference that should be given to the Board's decision to approve the fees." (internal quotation marks and alterations omitted)).

Calamos argues that the "the indisputable evidence in this case shows that the business judgment to annually approve the IMA was reached following a robust process by the Fund's

independent and qualified trustees, and it is thus entitled to 'considerable weight' and 'commensurate deference' under *Jones*." Def's S.J. Mot. at 17 (quoting *Jones*, 559 U.S. at 351).[9] Plaintiffs, on the other hand, while not challenging the independence or qualifications of the Independent Trustees, contend that the Trustees' approval of the Advisory Fees is entitled to minimal deference because they were not "fully informed about all the facts" and "did not exercise care and conscientiousness" with respect to any of the *Gartenberg* factors. Pls.' S.J. Opp. at 27.

After reviewing the procedure and substance of the Independent Trustees' 15(c) Process, and in light of the *Gartenberg* factors, the Court concludes that deficiencies surrounding the Trustees' evaluation of the Advisory Fees preclude the Court from affording the Trustees' judgment substantial deference as a matter of law—at least at this stage of the litigation. Accordingly, the Court DENIES Calamos' motion for summary judgment insofar as it urges the Court to afford substantial deference as a matter of law to the Trustees' judgment.

## A. Alleged Deficiencies Involving the Trustees' Evaluation of Comparative Fee Structures

According to Plaintiffs, the Trustees' process for evaluating comparative fee structures was deficient in several respects.

### 1. *Fees Paid by Comparable Clients*

*First*, Plaintiffs contend that the Trustees received deficient information from Calamos regarding the fees paid by Calamos' comparable institutional and sub-advisory clients. As the basis for their argument, Plaintiffs point out that the Independent Trustees specifically requested

---

[9] Calamos acknowledges that the Court's determination of deference owed to the Independent Trustees is not dispositive in this case, given the sliding-scale nature of the inquiry. *See* Def.'s S.J. Mot. at 5 ("[Calamos] is *not* arguing that the Independent Trustees' evaluation of the Fund's management fee[s] in and of itself, immunizes the fees from any scrutiny.").

from Calamos a ████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Pls.' Counter 56.1 ¶ 108.  Plaintiffs contend that Calamos

responded to this request by furnishing "misleading" information, given that: ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ Pls.' S.J. Opp. at 28.  Plaintiffs argue that

Calamos' presentation rendered impossible a true comparison of the fees paid by Calamos'

comparable institutional and sub-advisory clients, and obscured the fact that ████████████

██████████████████████████████████████████████████

████████████████████████████ According to Plaintiffs, █████████████

██████████████████████████████████████████

██████████████████████████ *Id.* at 28–29.

Plaintiffs' objection to Calamos' response on this ground is unfounded.  It is true that

Calamos did not provide the Trustees a ███████████████████████████████

███████████████████████████████████████████████████

██████████████████████████ However, contrary to Plaintiffs' protestations, Calamos

provided much more than the fee ranges of comparable clients.  Indeed, Calamos provided the

Independent Trustees with the effective fee rate for the Fund, as well as an aggregate effective

fee rate for *all* of Calamos' institutional and sub-advisory clients with AUMs over $25 million.

*See* Pls.' Counter 56.1 ¶ 110(d)–(e).  Moreover, this information reveals that in 2015, for

example, the Fund paid an effective fee rate of ▮ basis points; institutional clients paid an

average effective fee rate of ▮ basis points; and sub-advisory accounts paid an average effective

fee rate of ▮ basis points.  *See* Calamos' 2016 15(c) Response, Decl. of Mark A. Strauss in Opp.

to Def's Mot. for Summ. J. ("Strauss Decl."), Doc. 77, Ex. 14 at 00535107–09.  Thus, the

Trustees were well aware that Calamos' comparable institutional and sub-advisory clients were

paying fees ▮▮▮▮▮▮▮▮▮▮▮  Pls.' S.J. Opp. at 28.  That the information was

displayed in a different format does not amount to a "deficien[cy]" or "with[o]ld[ing]" of

"important information" that would require the Court to "take a more rigorous look at" the

Trustees' determination.  *Jones*, 559 U.S. at 351.  Consequently, Plaintiffs' contention that the

Independent Trustees were misled with respect to whether Calamos adequately compared the

Fund's Advisory Fee to the fees paid by institutional and sub-advisory clients is unavailing.

Moreover, deposition testimony relied upon by Plaintiffs make clear that the Independent

Trustees placed little stock in the comparative fee data they received because they believed that

an analysis of the fee disparities did not account for the differences in services Calamos provided

to the Fund vis-á-vis Calamos' institutional and sub-advisory clients.  For example, during his

deposition, Independent Trustee John Neal testified that comparative data on the fees charged to

the Fund and Calamos' institutional clients mattered very little to him:





* * *

Dep. of Independent Trustee John Neal ("Neal Dep."), Strauss Decl., Ex. 47 at 114:10–21,

115:3–8. Independent Trustee Stephen B. Timbers testified in a similar fashion:



Dep. of Independent Trustee Stephen B. Timbers ("Timbers Dep."), Strauss Decl., Ex. 49 at

120:25–121:8.

In sum, Calamos presented the Independent Trustees with sufficient information to

evaluate the disparity in fees between the Fund and Calamos' institutional and sub-advisory

clients. Indeed, Plaintiffs conceded as much during oral argument:

> THE COURT: Well, again, I'm just trying to understand all of this, but as I understand it, the effective rate for the Fund was 85 [basis points], correct?
>
> PLAINTIFFS: Correct.

THE COURT: And the effective rate for institutional clients was ██, according to [Calamos'] chart?

PLAINTIFFS: The effective rate for all of the institutional clients, it's not clear whether that's an average, whether that's a weighted average, and that pertains to all the institutional clients that they had across all strategies. It's not broken out for the [Fund] and it is not clear what the total AUM that was on.

THE COURT: But even taking all of that, I mean, ████████████████ ██████

PLAINTIFFS: Correct.

THE COURT: And the effective rate for the sub-advised funds was ██ That then, even given all of your caveats, ██████████████

PLAINTIFFS: Correct.

THE COURT: So, if nothing else, the Independent Trustees knew, even with the incomplete information, that the Fund was paying substantially more than the other clients.

PLAINTIFFS: That is correct.

Summ. J. Oral Arg. Tr. at 59:7–60:4.

## 2. *Service and Risk Differences Between Clients*

*Second*, Plaintiffs contend that the Trustees were given misleading and incomplete information with respect to alleged service and risk differences that justified the fee disparity. As Plaintiffs tell it, the disparity in fees Calamos charges to the Fund vis-à-vis fees charged to comparable institutional and sub-advisory clients is unjustified because the portfolio management services provided to the Fund, institutional clients, and sub-advisory clients alike are virtually identical and constitute the "single most important service performed for actively managed mutual funds." Pls.' S.J. Opp. at 7 (quoting John P. Freeman et al., *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test*, 61 OKLA. L. REV. 83, 84 (2008)); *id.* at 30. Because Calamos did not provide the Trustees with *any* quantitative or

23

qualitative information (other than its say-so) justifying its receipt of higher fees from the Fund vis-à-vis Calamos' institutional and sub-advisory clients, Plaintiffs argue that the Trustees had no basis to conclude the Advisory Fees were warranted. *Id.* at 30. Put differently, Plaintiffs assert that the Trustees displayed a lack of conscientiousness during their evaluation given that they failed to inquire into why the Fund pays ██████████████ of Calamos' other clients for what Plaintiffs assert are *de minimis* additional services.

In response, Calamos notes that Plaintiffs' own experts concede that the services and risks that Calamos undertakes for the Fund do differ, at least to some extent, from those Calamos undertakes with respect to its other clients; and the same experts further concede that *Jones* does not require fee parity between funds. *See* Def.'s S.J. Mot. at 27 n.122 (citing Dep. of Mercer E. Bullard ("Bullard Dep.") 74:5–12, 423:24–424:21, 433:19–434:24; Dep. of Steve Pomerantz ("Pomerantz Dep.") 279:16–24, 280:21–281:8, 312:10–313:5); *see also* Def.'s Reply, Doc. 91, at 11 n.49 (same). However, those admissions, standing alone, do not end the Court's inquiry.

Tellingly, Calamos does not point the Court to record evidence indicating the Independent Trustees engaged in a robust review of the differences in services rendered to the Fund vis-à-vis Calamos' non-Fund clients; nor does Calamos point to evidence demonstrating that the Trustees were conscientious in their review of the little information they received. Rather, Calamos relies almost exclusively on the same three slides from the ██████████ ████████████████████ presentation it provided to the Trustees, which contains a █████████████████████████████████ and appears virtually verbatim in every annual 15(c) Response. *See* Pls.' Counter 56.1 ¶ 112 n.178, 182, 184–185,

187–188; *id.* ¶ 189. Such information hardly establishes that the Trustees' consideration of the differences in services and risk was robust.[10]

By contrast, and just by way of example, in *In re BlackRock Mutual Funds Advisory Fee Litigation*, the district court there concluded that a board's comparative analysis of services provided to a fund and sub-advisory funds was entitled to substantial deference. --- F.3d ---, No. 14-1165 (FTW) (TJB), 2018 WL 3075916, at *17–20 (D.N.J. June 21, 2018). In reaching that conclusion, the district court noted that the board considered "[f]ee [c]omparison [m]emoranda" that included a comprehensive checklist of the various services provided to the fund, detailed qualitative analysis of how the services provided to the fund *differed* from those provided to Blackrock's sub-advisory funds, and "provided the estimated costs of providing the listed services in separate presentations to the Board." *Id.* at *19.

Here, while the ICA "does not necessarily ensure fee parity between mutual funds and institutional clients," *Jones*, 559 U.S. at 350, the lack of evidence indicating that the Independent Trustees conscientiously considered the differences in services and risk between the Fund and Calamos' other clients suggests that the Trustees' 15(c) Process was deficient in its evaluation of the Advisory Fees. In pushing for summary judgment, Calamos cannot persuasively maintain

---

[10] Calamos also correctly notes that Plaintiffs' expert, Mercer Bullard, approvingly cites a 2006 publication of the Investment Company Institute, which explains that "[m]utual funds and institutional accounts are very different investment products" because they "operate under different legal and regulatory structures, and have different business risks." Def.'s Reply at 12 n.50 (quoting Investment Company Institute, "Mutual Funds and Institutional Accounts: A Comparison," (2006), at 1 (available at https://www.ici.org/pdf/ppr_06_mf_inst_comparison.pdf)). Of course, the aforementioned statement is neither novel nor controversial. *See Jones*, 559 at 350 n.8 ("[A] showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services."). What *is* novel and controversial, however, is the notion seemingly advanced by Calamos—that Section 36(b) allows for Independent Trustees to rely *solely* on their business judgment and intuition in approving the Fund's Advisory Fees, without regard to any sort of comparative data between the Fund's fees and non-Fund fees in light of the *actual* differences in risks incurred and services rendered by Calamos. Accepting such a view would render Section 36(b) purposeless, given that Congress could have simply prescribed dispositive deference to board approval of advisory fees. Moreover, this view runs counter to the accepted fact that "scrutiny of investment adviser compensation by a *fully informed* mutual fund board is the cornerstone of the [ICA's] effort to control conflicts of interest within mutual funds." *Jones*, 559 U.S. at 348 (emphasis added) (internal quotation marks and alteration omitted).

that the Trustees found irrelevant the disparity in fee rates charged to the Fund vis-à-vis Calamos' institutional and sub-advisory clients due to differences in services and risks, yet at the same time maintain that the Trustees need not have received *actual evidence* detailing the differences in services and risks. *Cf. Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1180 (8th Cir. 2012) (affording "less deference" to board's approval of advisory fee when board of directors "was not apprised of *all relevant information* regarding the fee discrepancy between Ameriprise's mutual fund and institutional clients" (emphasis added)).

### 3. *Insufficient Consideration of Data*

*Third*, and finally, Plaintiffs contend that the Independent Trustees did not conscientiously consider the peer fund information proffered by Calamos. Specifically, Plaintiffs take issue with the Trustees' observation that the Advisory Fees were ███████ ███████ relative to its peers. Pls.' S.J. Opp. at 31 (citation omitted). It appears that Plaintiffs would have preferred the Trustees to recognize that "the Fund's fees stand out at the highest end of the range relative to its peer," and not simply ████████████ *Id.* The Court finds Plaintiffs' argument on this point unavailing. It is undisputed that the Trustees were provided detailed fee comparison data from industry-recognized, third-party sources; and it is undisputed that the data indicated the Fund's fee placement relative to its peers. *See* Pls.' Counter 56.1 ¶¶ 87, 94–100, 105–107, 114–25.

\* \* \*

In sum, the Court concludes that Plaintiffs have produced evidence to raise a genuine dispute of material fact with respect to the care and conscientiousness of the Independent Trustees' evaluation process. In particular, the Trustees' process in evaluating comparative fee structures, while thorough in several respects, exhibited material deficiencies in other respects.

Accordingly, at this stage in the litigation the Court is unable to afford, as a matter of law, substantial deference to the Trustees' approval of the Fund's Advisory Fees.

### B. Alleged Deficiencies Involving the Trustees' Evaluation of Profitability

Plaintiffs contend that the Independent Trustees' review of the Fund's profitability was deficient because Calamos' presentations on this point materially understated the Fund's profitability. Pls.' S.J. Opp. at 30–31. The Court finds this contention wholly lacking in merit, as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of an ████████████ cost-allocation method to analyze profitability—a method Plaintiffs recognize is commonly accepted within the industry. *See* Pomerantz Dep. 208:21–209:19 (recognizing ███████████████ for cost allocation). Moreover, as discussed above, *see supra* Part I.E.3, the Independent Trustees were fully informed about Calamos' profitability methodology, thoroughly discussed the impact that methodology would have on the profitability figures Calamos reported vis-à-vis alternative methodologies, and formally approved of Calamos' use of that methodology, *see* Pls.' Counter 56.1 ¶¶ 131–36. As another court aptly stated, "Plaintiffs may disagree with the [Trustees'] evaluation of the information, but that disagreement does not raise a triable issue of fact regarding the [Trustees'] diligence where it is undisputed that plaintiffs' preferred method was considered and rejected." *Zehrer*, 2018 WL 1293230, at *9.

### C. Alleged Deficiencies Involving the Trustees' Evaluation of Economies of Scale

Plaintiffs next allege that the Trustees' evaluation of economies of scale was deficient. In particular, Plaintiffs contend that Calamos' presentations to the Trustees, in which it maintained that any economies of scale realized were shared adequately with the Fund's shareholders (through breakpoints, for example) lacked any quantitative basis. Pls.' S.J. Opp. at 32. The Court disagrees.

While Plaintiffs take issue with the Trustees accepting Calamos' economies-of-scale representations, Plaintiffs cannot seriously contend that the Trustees failed to engage in a robust review of the myriad data they received from Calamos. Nor can Plaintiffs seriously contend that Calamos withheld important information from the Trustees. Moreover, while Plaintiffs make much of the fact that ███████████████████████████████████ ███████ computations quantifying economies of scales potentially realized by Calamos, *id.* at 33, the Court finds the Trustees' actions (or lack thereof) unremarkable, given the Trustees' knowledge that the Fund's AUM had been *declining* steadily, year after year.

Plaintiffs further contend that Calamos misled the Independent Trustees when it told them that, to the extent it realized economies of scale, such economies were shared adequately with the Fund's shareholders through "significant investments" to the Fund's portfolio management and research teams. Specifically, Plaintiffs suggest that Calamos' representations were lies per se because ████████████████████████████████ ███ *Id.* at 33. The Court disagrees. For one thing, the addition of personnel is one of many types of "significant investments" that can be made by an investment adviser to its research and management teams, not the *only* type. Moreover, even assuming Plaintiffs' claim of downsizing to be true, the Trustees could very well have concluded that Calamos "added by subtracting" with respect to personnel and reorganization, so to speak. Therefore, on this point, Plaintiffs fail to show either a deficiency in the Trustees' evaluation of economies of scale or a withholding of material information by Calamos.

### D. Alleged Deficiencies Involving the Trustees' Evaluation of the Nature and Quality of Calamos' Services

Plaintiffs challenge the Independent Trustees' evaluation of the nature and quality of services provided to the Fund. Specifically, Plaintiffs contend that the Trustees' evaluation failed to distinguish the services Calamos furnished pursuant to the IMA from the services it furnished pursuant to the FASA. *Id.* at 33–34. As one Independent Trustee acknowledged, the Trustees ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Decl. of John Neal, Kotler Decl., Ex. 71 at ¶ 17. Plaintiffs note that the Advisory Fee is provided in exchange for work done pursuant to the IMA, and Calamos receives an additional fee for services provided pursuant to the FASA. Consequently, Plaintiffs contend the Trustees should have analyzed the nature of services provided in support of the IMA only, and should not have "bundled" those services with services funded through the FASA.

In response, Calamos contends that "the IMA itself obligates [Calamos] to provide *all* of the services required by the Fund, regardless of their classification by Plaintiffs."[11] Def.'s S.J. Mot. at 33. Calamos notes further that the Advisory Fee for services pursuant to the IMA is 80 times greater than the FASA fee. *Id.* In Calamos' view, given the small size of the FASA fee relative to the Advisory Fee, as well as Calamos' obligation to provide all services required by the Fund even absent FASA, the Trustees acted appropriately in failing to distinguish the services rendered pursuant to each contract. *Id.* at 33–34.

The Court agrees with Plaintiffs that "[Section] 36(b) requires that transactions be considered separately and not aggregated." Pls.' S.J. Opp. at 34; *accord Zehrer*, 2018 WL

---

[11] Plaintiffs dispute this assertion.

1293230, at *10 ("[T]he legislative history of § 36(b) suggests that the key consideration [in evaluating the nature and quality of the services provided to a fund] is what services were secured *by the fee paid*." (emphasis added)); *In re Blackrock*, 2018 WL 3075916, at *25 (denying summary judgment to defendants when parties presented conflicting evidence concerning whether investment adviser provides certain services under the IMA in exchange for the advisory fee at issue, "as opposed to under separate agreements in exchange for separate fees"); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083 (RMB/KMW), 2017 WL 773880, at *19 (D.N.J. Feb. 28, 2017) ("This is a challenge of the investment management fee that Defendants collected; that fee was paid pursuant to the IMAs. As such, the Court will consider all services provided under the IMAs *for that fee*, whether Defendants performed them or hired others to fulfill their obligations." (emphasis added)), *aff'd*, No. 17-1653, 2018 WL 3913102 (3d Cir. Aug. 15, 2018). Moreover, Plaintiffs have proffered evidence suggesting the Trustees failed to consider the excessiveness *vel non* of the Advisory Fees in light of the services provided pursuant to those fees. *See supra* Part V.A. Consequently, the Court concludes that Plaintiffs, at the very least, have raised genuine questions of material fact with respect to whether the Independent Trustees exhibited a lack of conscientiousness when it evaluated Calamos' services in a "bundled" fashion.

Plaintiffs also challenge the Trustees' evaluation of the quality of services Calamos provided to the Fund, but do not allege either that Calamos withheld pertinent information on this point from the Trustees or that the Trustees failed to consider Calamos' performance data. Accordingly, the Court deems proper the Trustees' process as to this factor.

### E. Alleged Deficiencies Involving the Trustees' Evaluation of Fall-Out Benefits

Plaintiffs contend that the Independent Trustees' evaluation of fall-out benefits "suffered from nondisclosure." Pls.' S.J. Opp. at 34. In particular, Plaintiffs contend that Calamos failed to disclose "any information about the main fall-out benefit received—the millions of dollars in fees generated by cloning the Fund's portfolio for the [institutional and sub-advisory accounts that were invested in the same investment strategy]." *Id.* Plaintiffs further contend that the Trustees displayed a lack of conscientiousness when it did not inquire about this potential fall-out benefit.

The Court disagrees. As Calamos points out, revenues from advising institutional and sub-advisory clients do not constitute a fall-out benefit "under any definition utilized in a Section 36(b) case, as confirmed by the rejection of precisely this same argument in *Gallus*." Def.'s Reply at 15; *see also Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 981 (D. Minn. 2007), *rev'd and remanded on other grounds*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046 (2010), *and order reinstated sub nom. Gallus v. Am. Exp. Fin. Corp.*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012). Moreover, Plaintiffs do not dispute that Calamos proffered, and the Trustees considered, several other fall-out benefits Calamos may have accrued by virtue of its relationship to the Fund. *See* Pls.' Counter 56.1 ¶¶ 150–54. With these facts in mind, the Court cannot find error in the Independent Trustees' evaluation of this *Gartenberg* factor.

### F. Other Alleged Deficiencies in the Rule 15(c) Process

In addition to purported deficiencies in the Trustees' evaluation of the *Gartenberg* factors, Plaintiffs contend that the Trustees also failed to negotiate with Calamos. This argument can be easily dismissed. It is well settled that Section 36(b) does not require negotiation between

a board of trustees and fund investment adviser. *See, e.g.*, *Zehrer*, 2018 WL 1293230 at *7 ("Even if the Board might have driven a harder bargain, the legal standard does not require that."); *In re BlackRock*, 2018 WL 3075916, at *16 ("Plaintiffs' arguments regarding the Board's process for negotiating fees are unavailing, because the ICA does not impose a duty on the board of directors of a mutual fund to negotiate the lowest possible advisory fee as compensation for an investment adviser's services, and thus, the Board's purported failure to secure the lowest fees for the Funds' shareholders provides no basis for undermining the Board's decision to approve BRA's Advisory's Fee.")

*  *  *

For the reasons aforementioned, the Court concludes that the Trustees' evaluation of the Advisory Fees, while robust and informed in many respects, suffered from material deficiencies in process and substance. Consequently, while the Court will afford appreciable weight to the Trustees' consideration and subsequent approval of the Advisory Fees, the Court nonetheless "must take a more rigorous look at the outcome." *Jones*, 559 U.S. at 351.

## VI. THE *GARTENBERG* FACTORS

As mentioned above, the touchstone of Section 36(b) liability is whether Calamos' Advisory Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. *See Jones*, 559 U.S. at 346. In making this assessment, courts are to take into consideration "all pertinent facts," including facts relevant to the *Gartenberg* factors. *Id.* at 344–45. "Given the inherently fact-sensitive nature of the *Gartenberg* analysis, of those few cases that have reached the summary judgment stage with regard to § 36(b) claims, even fewer courts have granted summary judgment." *In re Blackrock*, 2018 WL 3075916, at *21. Ultimately, because the Court finds

triable issues of material fact with respect to comparative fee structures, the nature and quality of services provided to the Fund, and the Fund's profitability, Calamos' summary judgment motion will be denied.

### A. Comparative Fee Structures

The first *Gartenberg* factor that Calamos addresses is comparative fee structures. On this factor, Calamos offers three reasons why Plaintiffs have failed to produce a genuine issue of material fact tending to show that the Fund's Advisory Fee is excessive. Def.'s S.J. Mot. at 23, 28–29. None is persuasive.

*First*, Calamos contends that there is no triable issue of material fact relating to comparative fee structures because Plaintiffs have "refused" to define the arm's-length bargaining range for the Fund's Advisory Fee. In response, Plaintiffs argue that *Jones* and *Gartenberg* make clear that plaintiffs challenging excessive fees under Section 36(b) do not need to point to a numerical range of fees per se to establish whether the challenged fee is so disproportionately large that it could not have been the product of arm's length bargaining. The Court agrees. *See Jones,* 559 U.S. at 352 ("In reviewing compensation under § 36(b), the Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining."). Therefore, to the extent Calamos contends that Plaintiffs must proffer a number (or a range of numbers) above which the Advisory Fee is excessive per se, the Court expressly rejects such contention. And, in any event, Plaintiffs *do* posit a range of fees to compare with the Fund's Advisory Fee. Specifically, Plaintiffs cite the fees charged to Calamos' institutional and sub-advisory clients—or, as described by Plaintiffs, Calamos' "non-captive, arm's length clients"—as the "benchmark for reviewing challenged fees." *See* Pls.' S.J. Opp. at 11 (citing *Jones*, 559 U.S. at 347); Resps. & Objs. to Pls.' Interrogs., Doc. 77, Ex. 59 at 4. For example,

Plaintiffs point to discovery produced by Calamos indicating that Calamos charged those clients

███████████████████████████████████████████████████████████████

*See* Summ. J. Oral Arg. Tr. at 45:10–46:3; *see also* Pls.' Statement of Additional Material Facts,

Doc. 77, ¶¶ 217–20. From the outset of the lawsuit, Plaintiffs have maintained that the gross

disparities in fees charged to Calamos' "captive" funds vis-à-vis its "non-captive" clients

utilizing comparable investment strategies and services reflect a lack of arm's-length bargaining

with the former. Plaintiffs' reliance on fees charged to Calamos' other clients to establish a

benchmark for reviewing the Advisory Fee is thus proper at this stage in the litigation. Of

course, at trial Plaintiffs will still bear the burden of proving that their benchmark *is* probative to

the question whether Fund's Advisory Fee is excessive.

　　*Second*, while Calamos concedes that the Fund's Advisory Fee is higher than the fee it

typically charges its institutional and sub-advisory clients, Calamos argues that it provides a

greater level of services and undertakes a greater set of risks with respect to the Fund, making a

fee comparison between the Fund and Calamos' non-Fund clients "inapt" in this case. Def.'s

S.J. Mot. at 29. What is more, Calamos point to a bevy of case law rejecting comparisons

between mutual funds and non-mutual fund clients. *Id.* at 30 (citing *Kalish v. Franklin Advisers,*

*Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Krinsk v.*

*Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 486 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir.

1989); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 974 n.38 (S.D.N.Y.

1987, *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Gallus*, 497 F. Supp. 2d at 982); *see also Goodman v.*

*J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 770–74 (S.D. Ohio 2018).

　　Calamos' argument has some merit. In *Gartenberg*, for example, the Second Circuit

rejected comparisons between fees charged by an adviser to a money market fund versus fees it

charged to a pension fund, noting that "[t]he nature and extent of the services required by each type of fund differ sharply," and crediting the district court's conclusion that the pension fund in question "d[id] not face the myriad of daily purchases and redemptions throughout the nation which must be handled by the [money market fund]." 694 F.2d at 930 n.3. Similarly, the Supreme Court in *Jones* noted that "[c]omparisons with fees charged to institutional clients . . . will not doom any fund to trial" absent evidence by plaintiffs showing "a large disparity in fees that cannot be explained by the different services *in addition to other evidence* that the fee is outside the arm's length range." 559 U.S. at 350 n.8 (emphasis added) (internal quotation marks and citation omitted). Thus, Calamos is correct insofar as it asks this Court to reject fee comparisons between the Fund and non-Fund clients given the differences in services provided and risks undertaken by Calamos.

The flaw in Calamos' argument, however, is that the difference in services and risks are *disputed*, and Plaintiffs have produced sufficient evidence raising a triable fact as to whether such differences in services exist and are material, as opposed to *de minimis*. Naturally, Plaintiffs maintain that there are triable issues of fact related to whether Calamos' claimed service and risks differences are "illusory." Pls.' S.J. Opp. at 7. And Plaintiffs have produced voluminous evidence in support. For example, Plaintiffs produced evidence suggesting the administrative and legal services provided to the Fund by Calamos are furnished pursuant to FASA, not the IMA; the non-Fund clients actually received more "shareholder services" from Calamos than the Fund received; and the "entrepreneurial risks" undertaken by Calamos in managing the Fund are negligible. *See* Pls.' S.J. Opp. at 10, 13–14.

Moreover, as noted in this Court's previous opinion on Calamos' motion to dismiss, the Supreme Court in *Jones* explicitly rejected a categorical rule prohibiting comparisons to

institutional-client fees and instead instructed courts to give those comparisons "the weight that they merit in light of the similarities and differences between the services that the clients in question require." *Jones*, 559 U.S. at 349–50. And, unlike the instant dispute, the myriad cases cited by Calamos in which courts rejected comparisons between mutual funds and non-funds involve findings made either following a bench trial, *see, e.g.*, *Kalish*, 742 F. Supp. at 1249, or where differences in services and risks were uncontroverted, *see, e.g.*, *Goodman*, 301 F. Supp. 3d at 770–72.

Of course, if at trial the Court determines that "the services rendered are sufficiently different that a comparison is not probative" then the Court "must reject such a comparison." *Jones*, 559 U.S. at 350. However, this fact-intensive inquiry concerning disputed facts is best reserved for trial. *See In re Blackrock*, 2018 WL 3075916, at *26 ("Finally, Defendants' argument that BRA's and BRIM's subadvisory services are not comparable, because of the different entrepreneurial, reputational, legal, and regulatory risks assumed by BRA, is too fact intensive to be decided on summary judgment."); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083 (RMB/KMW), 2016 WL 1394347, at *18 (D.N.J. Apr. 7, 2016) (declining to award summary judgment to defendant investment adviser on comparative fees factor because "[i]f a jury were to find that th[e challenged] fee exceeded an arm's length fee . . . in combination with resolving other factual disputes in Plaintiffs' favor, such findings could override the substantial deference given to the Board's result").

*Third,* and finally, Calamos argues that the Fund's Advisory Fees cannot be deemed excessive under any set of circumstances because they fall within the range of fees assessed by funds in their peer group. Def.'s S.J. Mot. at 28. In response, Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment

advisors but nevertheless argue that "the Fund's fees stand out at the highest end of the range" and therefore urge the Court not to place much stock in this comparison. Pls.' S.J. Opp. at 14. The Court agrees with Plaintiffs insofar as they argue that fee placement among peers is not dispositive.

Nowhere in *Jones* does the Supreme Court state that an investment adviser's fees are insulated from review if the fees fall within the range charged by third-party investment advisers to comparable third-party funds. To the contrary, both *Jones* and *Gartenberg* make clear that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length *in the light of all of the surrounding circumstances.*" *Jones*, 559 U.S. at 344 (emphasis added) (quoting *Gartenberg*, 694 F.2d at 928). Indeed, the Supreme Court in *Jones* explained that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Jones*, 559 U.S. at 350–51. The Second Circuit in *Gartenberg* similarly expressed skepticism at such comparisons, noting that "if rates charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in § 36(b)." *Gartenberg*, 694 F.2d at 929; *see also id.* at 929–30 (expressly rejecting the district court's conclusions that "[t]he market price . . . serves as a standard to test the fairness of the investment advisory fee" in part because "the existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds"). Here, the placement of the Fund's Advisory Fee vis-à-vis the Fund's peer group hardly comprises all the surrounding circumstances relevant. Consequently, while the Court "do[es] not suggest that rates charged by other adviser-managers to other similar funds are

not a *factor* to be taken into account," *id.* (emphasis added), the Court rejects Calamos' argument insofar as it asks this Court to afford dispositive weight to the placement of the Advisory Fee among the range of fees charged by other advisers to other funds.

Nonetheless, the problematic nature of comparative fee data strikes both ways. Hence, Plaintiffs will be hard-pressed to prevail at trial merely by demonstrating *solely* that the challenged Advisory Fees are higher, even much higher, than those charged to Calamos' comparable institutional and sub-advisory clients; nor can Plaintiffs prevail by demonstrating *solely* that the Fees are higher, even much higher, than those charged by third parties to peer funds. It is neither the province nor the duty of federal courts to "assess the fairness or reasonableness of advisers' fees; the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation." *Paskowitz v. Prospect Cap. Mgmt. L.P.*, 232 F. Supp. 3d 498, 501 (S.D.N.Y. 2017) (quoting *Jones v. Harris. Assocs. L.P. (Jones II)*, 611 F. App'x 359, 360 (7th Cir. 2015)). Consequently, as mentioned above, at trial Plaintiffs must do more than simply establish a disparity in fees assessed to peer funds to prove a Section 36(b) violation.

### B. Economies of Scale

"[T]o show economies of scale, [P]laintiff[s] [bear] the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989). Here, Plaintiffs contend that triable issues of fact exist with respect to economies of scale realized by Calamos. Specifically, Plaintiffs contend that Calamos' conclusion that it did not realize economies of scale rests on a flawed assumption—namely, ██████████████████████████████████████

██████████████████████████████████ Pls.' S.J. Opp. at 18. To support their view, Plaintiffs

38

rely on a logarithmic model tendered by their expert Steve Pomerantz, which purports to show that "over the entire Damages Period, Calamos passed on cost savings to Fund investors of nearly ████████, but retained nearly ████████ in cost savings for itself."  Pomerantz Report at 225.  Pomerantz also opines that "[e]ven though the Fund has decreased in size, it still enjoys enormous economies of scale" resulting from its historic growth.  Pomerantz ultimately concludes, "As a result, the benefits of economies of scale in Calamos' costs accrue to Calamos at extremely high profits, with net margins far exceeding those identified in the 15c Profitability Presentations."  *Id.* at 227.

Calamos asserts that Pomerantz's model is insufficient alone to create a triable issue of fact because:  (1) the Fund decreased in size each year within the relevant period, and therefore economies of scale could not exist; (2) Plaintiffs fail to produce evidence tending to prove that the per unit cost of performing Fund transactions decreased as the number of transactions increased; and (3) even assuming economies of scale were realized, Plaintiffs fail to establish why the existing breakpoints contained within the Fund's fee schedules inadequately shared the cost savings.  After considering both sides, the Court agrees with Calamos that Plaintiffs have produced deficient proof as to economies of scale.

At the outset, the Court notes that although the Fund shrank in size throughout the relevant damages period here, this fact alone does not foreclose Plaintiffs' argument that ████████████████████████████████████████████████████████ ████████████████████ Pls.' S.J. Opp. at 19.  While Section 36(b) provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted," 15 U.S.C. § 80a-35(b), "recognizing that statistical trends outside the one-year period may, in some instances, demonstrate excessive fees within the relevant time period, various

courts have permitted plaintiffs to present evidence of economies of scale beyond the one-year period preceding the commencement of a § 36(b) action," *In re Blackrock*, 2018 WL 3075916, at *30 (citation omitted) (collecting cases). The Court agrees with the logic of this approach. In this case, Plaintiffs' expert Steve Pomerantz points to the historic growth of the Fund and contends that Calamos has shared only ▓▓▓▓▓▓ of the approximately ▓▓▓▓▓▓ of savings resulting from economies of scale with the Fund's shareholders. *See* Pls.' S.J. Opp. at 18–20. Such a fact, if proven, would be material to the question whether Calamos' Advisory Fees are excessive given the economies of scales realized. For that reason, whereas the Court agrees with Calamos' statement that "it belies common sense to conclude that a fund with a rapidly declining AUM during the Relevant Period actually realized any meaningful *new* economies of scale during that period," Def.'s S.J. Mot. at 25 n.117 (emphasis added), this statement is a red herring—totally irrelevant to Plaintiffs allegation that Calamos continues to benefit from *old* economies of scale unshared with the Fund, *see* Pls.' S.J. Opp. at 19. [12]

That being said, the Court concludes that Plaintiffs have failed to produce admissible evidence showing that the per-unit cost of performing Fund transactions decreased as the number of transactions increased. It is well settled that "economies of scale cannot be inferred solely from the fact that operating expenses declined at a time when the at-issue fund's assets grew." *In re Blackrock*, 2018 WL 3075916, at *30 (citing *Kalish*, 742 F. Supp. at 1238). "Such an inference . . . would disregard th[e] fact that 'costs can change for many reasons other than economies of scale,' such as technological changes, falling input prices, or a change in the level of service provided by an adviser." *Id.* (quoting *In re Am. Mut. Funds Fee Litig.*, No. CV 04-

---

[12] However, the Court notes, "Though it may be possible in certain circumstances to demonstrate the existence of excessive fees by using statistical trends that do not fall squarely within the applicable one-year time period, . . . this approach weakens Plaintiffs' economies of scale argument considerably." *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885 (SWK), 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006).

5593 GAF (RNBx), 2009 WL 5215755, at *28 (C.D. Cal. Dec. 28, 2009)). Rather, "to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew." *Hoffman v. UBS-AG*, 591 F. Supp. 522, 540 (S.D.N.Y. 2008).

In *In re American Mutual Funds Fee Litigation*, for example, the district court there found an expert's economies of scale analyses "inadequate" and his conclusions "materially flawed" in part because the expert "did not undertake any analyses to determine whether any other factors may have caused or contributed to the decrease in [the investment adviser]'s costs." 2009 WL 5215755, at *28–29. Similarly, in *Krinsk*, the Second Circuit approved of the district court's finding that a Section 36(b) plaintiff "failed to sustain his burden of proof" with respect to showing unshared economies of scale because "the fact that expenses . . . declined at a time when the Fund size grew . . . . does not establish that such decline was necessarily due to economies of scale." 875 F.2d at 411 (internal quotation marks and citation omitted). Finally, in *In re Blackrock*, while the district court there found that plaintiffs had sustained their burden of raising a triable issue of fact on the economies of scale factor, the court nonetheless reminded plaintiffs that "it will be Plaintiffs' burden at trial to show that any disproportionality between the Funds' asset growth and operating expenses is attributable to economies of scale, rather than other cost savings unrelated to scale economies." 2018 WL 3075916, at *34.

In the instant matter, Plaintiffs' own expert concedes that he did not undertake any of the necessary analyses required to demonstrate that Calamos achieved quantifiable economies of scale in advising the Fund. Specifically, Pomerantz concedes that he did not conduct the requisite per-unit analysis to demonstrate economies of scale, and he concedes that he did not

"exclude external factors that could have resulted in the disproportionate growth rates between" the Fund's operating expenses and the Fund's AUM, *In re Blackrock*, 2018 WL 3075916, at *33:

| | |
|---|---|
| CALAMOS: | Okay. Are you aware of any proof that the plaintiffs have put together to identify or quantify economies of scale in the Calamos growth fund other than the contents of your reports? |
| POMERANTZ: | I—I don't know what else exists. |

* * *

| | |
|---|---|
| CALAMOS: | In any event, I think you've been clear on this, you did not do any analysis of economies of scale using other measures of costs such as total long run average cost, correct? |
| POMERANTZ: | That's – that's – I'd say that's correct. |

* * *

| | |
|---|---|
| CALAMOS: | The point of your analysis was to prove how these advisory costs, the ones we just covered, varied with fund assets or fund size? |
| POMERANTZ: | No. . . . My intention was to take the data that exists in the report and say assuming that this data is—is accurate, what the total costs were, what the total assets were, what that was—what would happen if I tried to allocate assets using standard metrics, . . . . I'm not testing anything. . . . I'm taking the data that's in the profitability report and I am calibrating the standard cost to asset relationship model to it to calculate how it would allocate costs. |
| CALAMOS: | Based on assets? |
| POMERANTZ: | If you just used assets as the driver. |
| CALAMOS: | Right. . . . So did you investigate whether any factors other than changes in assets caused changes in Calamos advisory costs from 2014 to 2015? |
| POMERANTZ: | No. I'm basically looking at what is it that assets would explain. |
| CALAMOS: | Did you investigate how, for example, the organization of Calamos's investment team differed between those two years? |

POMERANTZ:    I mean I'm vaguely familiar with lots of organizational changes. In fact, the data seems to suggest that costs for the professionals involved in the process went up but that—that's obviously not a complete picture because we do see total costs going down.

CALAMOS:    But any changes in the investment team didn't have an impact on your analysis of the relationship between assets and costs, right?

POMERANTZ:    *Well, I'm looking—I'm looking at the assets and I'm looking at the total costs. Numbers that I—I think are accurate and I believe. And I'm—and I'm asking the question how—how can these varying assets levels explain the cost data that's being provided.*

CALAMOS:    I—I appreciate that. I accept that. I'm not arguing with that. *What I'm driving at is there are other factors that could have impacted costs at Calamos in 2014 and 2015. I'm trying to get at did you investigate the possible impact of these other factors. That's the thrust of these questions.*

POMERANTZ:    I'd say the answer is *no.*

Pomerantz Dep. 329:2–9, 333:13–20, 334:9–337:23 (emphasis added).

To prove economies of scale, Plaintiffs must show that the costs per investor decreased as the assets under management grew, and such a showing cannot be predicated *solely* from the fact that expenses increased at a slower rate than the Fund's assets. As stated aptly in *In re Blackrock*, "[a]bsent such information . . . 'there is no way to determine whether any economy of scale even existed that could have been passed on to investors or whether there is another explanation for the statistics' identified by the plaintiff." *In re Blackrock*, 2018 WL 3075916, at *30 (quoting *Hoffman*, 591 F. Supp. at 540). Pomerantz's expert report and corresponding deposition testimony suggest that he did not consider such information. Moreover, aside from Pomerantz's opinions, Plaintiffs proffer no additional evidence demonstrating economies of

scales realized by Calamos. Accordingly, summary judgment will be granted to Calamos on this factor.[13]

## C.  Nature and Quality of Services

The Court turns next to the nature and quality of services offered by Calamos to the Fund. The Court concludes that there are triable issues of fact related to this *Gartenberg* factor for two reasons. First, at the outset, "[t]his inquiry necessarily involves a determination of what services may be permissibly considered." *Kasilag*, 2016 WL 1394347, at \*15. And as mentioned above, *see supra* Part V.D, Plaintiffs contend that the proper services to be considered are only those furnished to the Fund pursuant to the IMA, for which Calamos receives the Advisory Fee, and not those furnished pursuant to the FASA, for which Calamos is paid pursuant to a separate fee schedule. Calamos disagrees. Because the true nature of the services performed pursuant to the IMA—that is, the contract giving rise to the Advisory Fees challenged in this case—"remains relatively nebulous and wrangled-over, viewing the facts in the light most favorable to Plaintiffs suggests that summary judgment on this factor is inappropriate." *Kasilag*, 2016 WL 1394347, at \*16.

In addition, Plaintiffs have marshalled sufficient evidence to raise a triable issue of material fact about whether the quality of services provided to the Fund was poor to such an extent that the Fund's Advisory Fees were excessive. "In evaluating the quality of the services provided to funds, other courts have compared the performance of challenged funds against peer funds." *Zehrer*, 2018 WL 1293230, at \*11 (collecting cases). In so doing here, the Court finds that uncontroverted evidence reveals three facts that readily distinguish this case from others

---

[13] Because of Plaintiffs' failure of proof as to Calamos' realization of economies of scale, the Court need not consider whether there is a triable issue of fact concerning whether Calamos adequately shared any economies of scales it realized.

applying Section 36(b):  Calamos charged more than most other investment advisers; the Fund performed worse than most comparable mutual funds; and ████████████████████████ ████████████████████████  *See supra* Part I.E.2.  These facts separate the instant case from cases in which plaintiffs either could not seriously challenge a fund's fee placement relative to its peer group or could not seriously challenge the fund's performance.  *See Goodman*, 301 F. Supp. 3d at 781; *Zehrer*, 2018 WL 1293230, at *11; *In re Blackrock*, 2018 WL 3075916, at *21 n.37; *Kasilag*, 2016 WL 1394347, at *16.  Such a unique ensemble of facts, if proven at trial, could lead a rational factor to conclude that the challenged Advisory Fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.

### D.  Profitability

Plaintiffs contend that there are triable issues of facts regarding the Fund's profitability.  Specifically, Plaintiffs take issue with Calamos' method of calculating profitability—a so-called "indirect cost allocation methodology" in which Calamos analyzes its profitability using an ████████████████  approach that allocates indirect expenses to each fund in the CIT based on ████████  *See, e.g.*, Strauss Decl., Ex. 14, at 00535117–18.  According to Plaintiffs, ████ ████████████████████████████████████████████ ████████████████████████████████████  Pls.' S.J. Opp. at 15.  As an example of ████ ████████████████████████  produced by Calamos' methodology, Plaintiffs point out that ████████████████████████████████████ ████████████████████████████  *Id.*; *see also* Calamos' 2016 15(c) Response, Strauss Decl., Ex.

14 at 00535128.[14]  Plaintiffs argue that there are alternative cost allocation methods available

that demonstrate that Calamos receives materially higher profitability rates than those reported to

the Independent Trustees.  Pls.' S.J. Opp. at 16.  Plaintiffs rely on a model created by their expert

Steve Pomerantz that reflects that the Fund had profitability rates of 71%, and not the █████

reflected by previous reports submitted to the Independent Trustees by Calamos.  *Id.*

    In addition, Plaintiffs contend that Calamos' methodology ███████████████████



███████████████████████  All told, Plaintiffs cite

these arguments, and several others, to support its assertion that the Fund's true profitability to

Calamos tends to reveal the excessiveness of the Advisory Fees.

    Calamos disagrees.  But aside from arguing that this Court simply defer to the

Independent Trustees' approval of this allocation method, Calamos provides little in the form of

argument as to why Plaintiffs' alternative profitability figures and evidence of reporting flaws do

not raise a triable dispute of material fact as to profitability.[15]  *See* Def.'s S.J. Mot. at 30–31;

Def.'s Reply at 13–14.  This is not enough to dispel the issues of material fact with respect to

profitability.

    That being said, the Court notes that it agrees with Plaintiffs expert Mercer Bullard, who

concedes that "an advisor's profitability is a poor measure of the excessiveness of its fees

<hr/>

[14] Plaintiffs seem to refer to Calamos' "Focus Growth ETF" relative to the Fund, as opposed to Calamos' "Focus Growth Fund."  *See* Strauss Decl., Ex. 14, at 00535128 (showing Fund expenses for employee compensation and benefits as $9,407,000 versus $89,000 for the "Focus Growth ETF" and $195,000 for "Focus Growth").

[15] Calamos also notes that "there is simply *no* per se rule as to how [it] must allocate indirect costs," Def.'s Reply at 13, but this argument does not bear on the questions whether (1) Calamos' cost allocation method best reflects the Fund's true profitability to Calamos and (2) whether the profits realized by Calamos weigh in favor of a conclusion that Calamos' Advisory Fees are excessive.

because there is no necessary correlation between the two." *See* Bullard Dep. 302:2–7. Moreover, it is well settled that arguing Calamos "just plain made too much money . . . is not an acceptable approach" to proving breach of fiduciary duty under Section 36(b). *Kalish*, 742 F. Supp. at 1237. Indeed, "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50. Nevertheless, a fund's profitability to its adviser is at least *one* measure to take into account when evaluating the excessiveness of the Fund's Advisory Fee. *See Jones*, U.S. 559 at 344 n.5. Accordingly, Plaintiffs will have their day in court to submit evidence on the "fact-intensive nature of the profitability inquiry." *In re Blackrock*, 2018 WL 3075916, at *37. However, given this Court's conclusion regarding economies of scale, *see supra* Part VI.B, at trial Plaintiffs will be unable to rely solely on the argument that the Fund was realizing economies of scale unaccounted for.

### E. Fall-Out Benefits

Plaintiffs contend that there are triable issues of facts regarding Calamos' receipt of fall-out benefits because the reports Calamos furnished ███████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████ Pls.' S.J. Opp. at 23. However, as mentioned above, Plaintiffs have pointed to no authorities that consider such fees as fall-out benefits. Nor is it plain to the Court that such fees constitute fall-out benefits. Accordingly, no triable issues of material facts have been raised on this point.

### F. Trustees' Independence and Conscientiousness

For the reasons stated above, *see supra* Part V, the Court concludes that there are triable issues of fact related to the deference owed to the Trustees' judgment.

## VII.  CONCLUSION

In sum, the Court concludes that genuine disputes of material fact exist regarding the *Gartenberg* factors related to comparative fee structures, profitability, the nature and quality of services provided to the Fund, and the conscientiousness and care of the Trustees' evaluation of the Advisory Fees.  Consequently, the Court cannot say as a matter of law that Plaintiffs have failed to raise a genuine dispute as to whether Calamos "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.

For the foregoing reasons, Calamos' motion for summary judgment is GRANTED insofar as Calamos seeks to establish that Plaintiffs have failed to raise triable issues of fact related to economies of scale and fall-out benefits, and DENIED insofar as Calamos seeks judgment as a matter of law on the other *Gartenberg* factors and Section 36(b) liability generally. Moreover, the parties' *Daubert* motions are DENIED, as set forth above.  The Clerk of the Court is respectfully directed to terminate the summary judgment motion, Doc. 65, and the *Daubert* motions, Docs. 88, 106, 109, 112, 115, 118.

It is SO ORDERED.

Dated:    September 30, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.