**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

SAUL CHILL and SYLVIA CHILL, for
the use and benefit of the CALAMOS
GROWTH FUND,

           Plaintiffs,

      v.

CALAMOS ADVISORS LLC,


           Defendants.
_____

No. 15-cv-01014 (ER)

ECF CASE



**DEFENDANT CALAMOS ADVISORS LLC'S PRETRIAL MEMORANDUM**



**DECHERT LLP**
Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Tiffany Engsell
Brendan Herrmann
Samantha Rosa
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone: (212) 698-3500

_Counsel for Defendant Calamos
Advisors LLC_

## <u>TABLE OF CONTENTS</u>

I.  STATEMENT OF THE CASE AT TRIAL......................................................................... 1

II.  STATEMENT OF THE ISSUES REMAINING FOR TRIAL ......................................... 4

    A.  Plaintiffs Cannot Meet Their Burden Of Proving That The Fund's Management Fee "Could Not Have Been The Product Of Arm's-Length Bargaining".................................................................................................................. 4

    B.  The Fees That CAL Charged To Institutional/Subadvisory Clients Cannot Define The "Arm's-Length Bargaining Range" For The Fund's Management Fee .............................................................................................................. 7

    C.  None Of Plaintiffs' Remaining *Gartenberg* Factor Arguments Can Support A Finding That The Fund's Management Fee Is Excessive ................. 10

        1.  The Court Has Already Rejected All Of Plaintiffs' Economies Of Scale And Fall-Out Benefits Arguments ................................................... 10

        2.  Plaintiffs Cannot Prove That CAL's Profitability From Managing The Fund Supports A Finding That The Fund's Management Fee Is Excessive.................................................................................................... 11

        3.  Plaintiffs Cannot Prove That The Fund's Performance Supports A Finding That The Fund's Management Fee Is Excessive....................... 14

        4.  Plaintiffs Cannot Prove That The FASA Supports A Finding That The Fund's Management Fee Is Excessive............................................. 15

III.  SUMMARY OF TRIAL WITNESSES ........................................................................ 18

    A.  CAL's Trial Witnesses........................................................................................ 18

    B.  Plaintiffs And Their Trial Witnesses ................................................................. 20

IV.  RELIEF REQUESTED.................................................................................................. 22

## TABLE OF AUTHORITIES

CASES

*Chill v. Calamos Advisors LLC*,
  2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) .................................................................. *passim*

*Gallus v. Ameriprise Fin., Inc.*,
  497 F. Supp. 2d 974 (D. Minn. 2007), *rev'd and remande*d, 561 F.3d 816 (8th
  Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046, *and order
  reinstated*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010)....................................................9, 12

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ........................13, 17

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982)....................................................................................................5, 8

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
  301 F. Supp. 3d 759 (S.D. Ohio 2018) ......................................................................................9

*In re BlackRock Mut. Funds Advisory Fee Litig.*,
  327 F. Supp. 3d 690 (D.N.J. 2018) ..........................................................................................16

*Jones v. Harris Assocs. L.P.*,
  2007 WL 627640 (N.D. Ill. Feb. 27, 2007), *aff'd*, 527 F.3d 627 (7th Cir.
  2008), *vacated and remanded*, 559 U.S. 335 (2010), *and aff'd*, 611 F. App'x
  359 (7th Cir. 2015)....................................................................................................................9

*Jones v. Harris Assocs. L.P.*,
  559 U.S. 335 (2010)........................................................................................................ *passim*

*Jones v. Harris Assocs. L.P.*,
  611 F. App'x 359 (7th Cir. 2015) ..............................................................................................9

*Kalish v. Franklin Advisers, Inc.*,
  742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ...............................13

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
  2017 WL 773880 (D.N.J. Feb. 28, 2017), *aff'd*, 2018 WL 3913102 (3d Cir.
  Aug. 15, 2018) ....................................................................................................................13, 16

*Krinsk v. Fund Asset Mgmt., Inc.*,
  715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ..................................12

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
  663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987)........................................8, 13

*Sivolella v. AXA Equitable Life Ins. Co.*,
  2016 WL 4487857 (D.N.J. Aug. 25, 2016), *aff'd*, 2018 WL 3359108 (3d Cir.
  July 10, 2018) ................................................................................................................ 12, 13

*Zehrer v. Harbor Capital Advisors, Inc.*,
  2018 WL 1293230 (N.D. Ill. Mar. 13, 2018) ........................................................................ 16

**STATUTES**

15 U.S.C. § 80a-35(b) ....................................................................................................... *passim*

**OTHER AUTHORITIES**

S. Rep. No. 91-184 (1969), reprinted in 1970 U.S.C.C.A.N. 4897 (1970) ................................... 17

## I.      STATEMENT OF THE CASE AT TRIAL

Plaintiffs claim that the management fees that Defendant Calamos Advisors LLC

("CAL") has charged the Calamos Growth Fund (the "Fund") since February 2014 breach

CAL's fiduciary duty under Section 36(b) of the Investment Company Act of 1940 (the "ICA").

Following the Court's summary judgment ruling significantly narrowing the scope of this case,[1]

that claim now rests on one central contention: CAL should be prohibited from charging the

Fund higher fees than those that CAL charged to former institutional and subadvisory clients

who invested in its "All Cap Growth" strategy.  Indeed, there is no longer any doubt that

Plaintiffs would have the Court use the fees that CAL charged to those former institutional and

subadvisory clients as the ceiling on the "arm's-length bargaining range" for the Fund's

management fee.[2]  There are three separate reasons why this contention, like those that the Court

has already rejected, must fail.

First, Plaintiffs cannot meet their "heavy burden" under *Jones* to prove, by a

preponderance of the admissible trial evidence (as opposed to the allegations and inferences that

sufficed earlier), that the Fund's management fee "could not have been the product of arm's-

length bargaining."[3]  To satisfy this "heavy burden," Plaintiffs must prove that no independent

and qualified board, acting in good faith—all of which are beyond dispute for the Calamos

Funds' Independent Trustees—could possibly have reached the judgment to approve the Fund's

management fee.  Plaintiffs will have not one piece of trial evidence, from any witness or

document, supporting this proposition, which is understandable since it is beyond dispute that the

---

[1] 10/9/18 Tr. at 1:13-15.

[2] *Chill v. Calamos Advisors LLC*, 2018 WL 4778912, at *15 (S.D.N.Y. Oct. 3, 2018) (citing 8/17/18 Tr. at 45:10-46:3).

[3] *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346, 354 (2010) (emphasis added).

Fund's fee was within the range of fees charged by its peers.  Furthermore, the trial evidence will demonstrate conclusively that the Independent Trustees could, and in fact did, annually reach a reasoned and reasonable judgment, in the best interests of Fund shareholders, to approve CAL's management fee.  The Independent Trustees did so armed with knowledge of the relevant facts about CAL's fees and services for the Fund and CAL's other clients, guided by their decades of asset management industry experience, and with appropriate consideration of CAL's significant and costly efforts to deliver improved performance by restructuring its investment team.

Second, Plaintiffs will offer no evidence that would or should compel this Court to be the first since Section 36(b) was enacted to limit a mutual fund's fees to those charged to these other clients.  To the contrary, the trial evidence from both CAL's fact and expert witnesses will confirm what the Court acknowledged during the summary judgment hearing: courts in Section 36(b) cases for decades have consistently rejected precisely this argument, because a mutual fund is a different product that requires the adviser to perform different and greater services and to take on different and greater risks.[4]  That is why the pricing pattern that Plaintiffs complain about has been the industry and market norm for decades, directly undermining Plaintiffs' claim that the Fund's Independent Trustees got it all wrong.  Thus, it is no surprise that Plaintiffs rely on a calculated fee ceiling that is an arbitrary arithmetic manipulation of fee data from a small handful of these clients—far from the analysis that would establish the limit of an arm's-length bargain.  In fact, those clients agreed to a range of fees, with that range including the same fee charged to the Fund.

Third, none of Plaintiffs' remaining *Gartenberg*-factor challenges can support a finding that CAL's management fee is excessive under Section 36(b):

---

[4] *See* 8/17/18 Tr. 47:1-5.

- <u>CAL's profitability from managing the Fund</u>: Following the Court's recognition on summary judgment that CAL's method of calculating 15(c) profitability was "fully disclosed" and "thoroughly discussed" by the Independent Trustees, their decision to approve that methodology is entitled to deference and should not be overturned absent some remarkably compelling evidence.  But as the Court also has already recognized, CAL's methodology is accepted within the mutual fund industry, and the trial evidence will show that CAL's method is also (i) fully consistent with the principles underlying GAAP and managerial accounting, and (ii) resulted in a profit margin calculation that is far below the margins that courts have held do not support a Section 36(b) claim.  Plaintiffs, on the other hand, will have no evidence from any witness who is qualified to testify about accounting, and their litigation-invented, "linear log-log" profit mathematics should be rejected for any number of reasons, not the least of which is that it bears no relationship to accounting or to any profitability calculation ever accepted by any court in a Section 36(b) case.

- <u>The Fund's performance</u>: The trial evidence will show that Plaintiffs' gross overgeneralizations and pejorative mischaracterizations of the Fund's performance as "extremely poor" or "bottom-of-the-barrel"[5] are not accurate and would not inform a true arm's-length bargain.   To the contrary: the Fund's since-inception performance is undeniably outstanding; its short-term performance during the Relevant Period has had periods of both relative over-performance and under-performance; and in all events, the Fund has earned substantial returns for its shareholders on an absolute basis—including for Plaintiffs, who have more than doubled their money invested in the Fund.

---

[5] Pls.' SJ Opp. (Dkt. 76) at 22; Pomerantz Rpt. ¶ 312, 355, (previously submitted as Ex. 2 to CAL's Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witnesses (Dkt. 90)).

- The FASA: There is simply nothing about the existence of the Financial Accounting Services Agreement ("FASA") that suggests, let alone proves, that CAL's management fee under the Investment Management Agreement ("IMA") is excessive.  Plaintiffs have no evidence, or legal support, that establishes the Independent Trustees acted inappropriately in considering and approving the IMA and the FASA together, given that they are two contracts between CAL and the Funds for the provision of undeniably overlapping services.  To the contrary, the trial evidence will demonstrate that the Independent Trustees were eminently reasonable in their consideration of "substance over form."  Indeed, the trial evidence will confirm that prior to, during the existence of, and now following the recent termination of the FASA (effective November 1, 2018), CAL's "moral responsibility" under the IMA to ensure that the Fund receives all of the services necessary for its operation (as already conceded by Plaintiffs' expert[6]) has not changed one iota.

In sum, there is no path by which Plaintiffs can meet their burden of proving that CAL's management fee for any of the years in question was "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[7]  Judgment in favor of CAL following the trial is warranted.

## II.    STATEMENT OF THE ISSUES REMAINING FOR TRIAL

### A.    Plaintiffs Cannot Meet Their Burden Of Proving That The Fund's Management Fee "Could Not Have Been The Product Of Arm's-Length Bargaining"

As just noted, the ultimate question that must be answered in a Section 36(b) case is whether the Fund's management fee is "so disproportionately large that it bears no reasonable

---

[6] Pomerantz Dep. 268:19-269:5 (previously submitted as Ex. 50 to CAL's Motion for Summary Judgment (Dkt. 67)).

[7] *Chill*, 2018 WL 4778912, at *8 (citing *Jones*, 559 U.S. at 346).

relationship to the services rendered and <u>could not have been the product of arm's-length</u> <u>bargaining</u>."[8]  To answer this question, the Second Circuit has explained that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances."[9]  In other words, as the Supreme Court recognized in *Jones*, "the range of fees that might result from arm's-length bargaining [i]s the benchmark for reviewing challenged fees."[10]  And, Plaintiffs bear the burden of proof under Section 36(b)—one that Justice Thomas has appropriately described as a "heavy burden."[11]

Under these settled judicial pronouncements, for Plaintiffs to prevail at trial, they must <u>prove</u> that <u>no</u> arm's-length bargain could have resulted in the Fund's management fee—meaning that <u>no</u> reasonable independent and qualified Board, acting in good faith on behalf of the Fund's shareholders, <u>could have</u> approved the Fund's management fee.  Put differently, the evidence at trial clearly establishing that these Independent Trustees, or some other independent and qualified fund board acting in good faith, could readily have approved the Fund's management fee necessarily means that the fee "<u>could have been</u>" the product of arm's-length bargaining— and therefore it <u>cannot</u> give rise to liability under Section 36(b).

Plaintiffs have no evidence that the Fund's management fee is beyond the arm's-length bargaining range.  They have been forced to concede, as the Court found at summary judgment, that the fee is within the range of fees charged by peer funds.[12]  And they will have no evidence

---

[8] *Id.* (citing *Jones*, 559 U.S. at 346) (emphasis added).

[9] *Gartenberg v. Merrill Lynch Asset Mgmt., Inc*., 694 F.2d 923, 928 (2d Cir. 1982); *see Jones*, 559 U.S. at 347.

[10] *Jones*, 559 U.S. at 347.

[11] *Id*. at 354.

[12] *Chill*, 2018 WL 4778912, at *16.

that an arm's-length bargain could not result in an advisory fee that is higher than fees charged to other clients for different services (a reality that is both sound as a matter of economics and fully consistent with industry practice).  To the contrary, Plaintiffs' expert has already conceded that another independent/qualified board could have reached the judgment to approve the Fund's management fee, which means that Plaintiffs necessarily cannot prove that no fund board could have reached that determination.

But trial will reveal far more than Plaintiffs' failures of proof.  The evidence will overwhelmingly show that the Independent Trustees are not only independent and qualified,[13] but they followed a robust process, were advised by highly regarded independent counsel, and brought to bear more than 150 combined years of asset management industry experience.  This includes their substantial industry knowledge about the differences between what it takes to run a mutual fund and to advise an institutional account or serve as a sub-adviser—knowledge that informs their evaluation of the information that CAL provides throughout the year.  In reaching their annual determination to approve the IMA, the trial evidence will further show that the Independent Trustees gave careful thought each year about how best to serve shareholder interests in calibrating a balance between potential fee reductions and requiring CAL to undertake major investments in enhancing Fund performance.  In short, Plaintiffs will be unable to prove that these Independent Trustees' approval of the Fund's management fee "could not have been the product of arm's-length bargaining."

Against this backdrop, CAL also notes the critical differences in Plaintiffs' burden at summary judgment and at trial.  Specifically, while the Court's summary judgment statement that the "unique ensemble of facts" presented there, "if proven at trial, could lead a rational [fact-

---

[13] *Id.* at *3.

finder] to conclude" that the Fund's fee is beyond the range of arm's-length bargaining,[14] is an appropriate consideration on summary judgment, the sentiment is essentially the polar opposite of Plaintiffs' burden of proof at trial: even if Plaintiffs could prove that "ensemble" at trial, which they cannot,[15] the question now is whether <u>any</u> board of independent and qualified trustees acting in good faith could nonetheless have approved the Fund's fee in light of that "ensemble." Absent proof that <u>no</u> reasonable board could possibly have reached that judgment, there is no claim.  Put differently, a claim based on mere proof that a rational factfinder <u>might</u> have reached a different conclusion than an independent/qualified board could have reached would run squarely afoul of *Jones*' admonitions "that the standard for fiduciary breach under §36(b) does not call for judicial second-guessing of informed board decisions," and "[t]hus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently."[16]

### B.      The Fees That CAL Charged To Institutional/Subadvisory Clients Cannot Define The "Arm's-Length Bargaining Range" For The Fund's Management Fee

The Court's ruling on summary judgment that the Independent Trustees acted conscientiously in considering the Fund's fee compared to the fees paid by CAL's institutional

---

[14] *Id*. at *20.

[15] Plaintiffs will be unable to prove these facts at trial, most notably because (i) the Fund's performance was <u>not</u> at all times at the "bottom of the barrel," as Plaintiffs have misleadingly asserted, (ii) institutional accounts are so materially different from a mutual fund that the closing of those accounts should have no bearing on whether an independent/qualified board could possibly have approved the Fund's management fee, and (iii) the Fund's management fee is concededly within the range of peer funds, and its total expense ratio (which reflects the total expenses that Fund shareholders actually pay) is also within that peer group range.

[16] *Jones*, 559 U.S. at 351, 352.

and subadvisory clients following the same strategy[17] means that the Trustees' judgment in approving the Fund's fee despite full knowledge that CAL charged lower fees to its other clients is entitled to some measure of deference.  Plaintiffs are nonetheless expected to persist in their claim that those institutional/subadvisory fees define the limits of any arm's-length bargain for the Fund.  This core aspect of Plaintiffs' claim also will fail, both on the settled law and on the trial record.

As the Court has observed, Plaintiffs cannot merely point to the difference in fees that CAL charges to its different clients for different products to show that the Fund's fee is excessive.[18]  The Court's observation is well grounded: no Section 36(b) court has ever held that institutional or subadvisory accounts are actually an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  To the contrary, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort:

- Starting with the trial ruling in *Gartenberg* itself, the court rejected the plaintiff's argument "that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds," because "[t]he nature and extent of the services required by each type of fund differ sharply."[19]

- In the trial ruling in *Schuyt*, the court found that the plaintiffs failed to "legitimately compare the fees charged to the Fund to the fees charged to counsel clients" because they failed to take into account the different services provided to those types of clients.[20]

- In the summary judgment ruling in *Jones*, the court found that the plaintiffs had failed to "proffer[] evidence that would tend to show that Harris provided pension

---

[17] *Chill*, 2018 WL 4778912, at *10.

[18] *Id*. at *17.

[19] *Gartenberg*, 694 F.2d at 930 n.3.

[20] *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 974 n.38 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987).

funds (and other non-public clients) with the same sort of services that it provided to the [mutual] funds, or that it incurred the same costs when serving different types of clients."[21]

- In the summary judgment ruling in *Gallus*, the court rejected the plaintiffs' comparison of the fund's fee to institutional account fees, because "even if comparing mutual fund fees to non-mutual fund fees is relevant, Plaintiffs have not demonstrated that the services provided to the different types of funds are comparable."[22]

- In the summary judgment ruling in *Goodman*, the court found that the "risk undertaken and scale of services are different" to advise a mutual fund than to subadvise such a fund.[23]

These holdings are fully applicable to this case, as the overwhelming weight of the trial evidence here, just like in these other cases, will show that mutual funds are different products from institutional and subadvisory accounts, with different fees, different services and different risks. CAL's trial witnesses will explain these differences in detail, including the greater services required to manage the Fund in every aspect—from portfolio management, to fund administration, to legal and compliance, to shareholder servicing, to the myriad of unique risks that arise from operating a highly regulated mutual fund. These additional and greater services and risks, which reflect the ineluctable fact that mutual funds and institutional/subadvisory accounts are simply different products, belie Plaintiff's contention that the fees paid by CAL's institutional or subadvisory accounts can define the arm's-length bargaining range for the Fund.

---

[21] *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 361 (7th Cir. 2015); *see Jones v. Harris Assocs. L.P.*, 2007 WL 627640, at *8 (N.D. Ill. Feb. 27, 2007), *aff'd*, 527 F.3d 627 (7th Cir. 2008), *vacated and remanded*, 559 U.S. 335 (2010), *and aff'd*, 611 F. App'x 359 (7th Cir. 2015).

[22] *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982 (D. Minn. 2007), *rev'd and remanded*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046 , *and order reinstated*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010).

[23] *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 770 (S.D. Ohio 2018).

Rather, this is precisely the sort of "inapt comparison" that *Jones* cautions that a court "must be wary" of making.[24]

### C. None Of Plaintiffs' Remaining *Gartenberg* Factor Arguments Can Support A Finding That The Fund's Management Fee Is Excessive

To meet their burden at trial, Plaintiffs cannot simply cobble together allegations relating to various *Gartenberg* factors, which themselves are not elements of a Section 36(b) claim. Instead, as demonstrated above, Plaintiffs must answer the ultimate question by proving that the fee could not have been the product of arm's-length bargaining. Properly viewed in the context of a Section 36(b) trial, the *Gartenberg* factors are a means for a court to reality check the Independent Trustees' judgment in approving a management fee.

Here, none of Plaintiffs' *Gartenberg* factor arguments calls into question the Independent Trustees' judgment to approve the fee and taken together they actually reinforce that judgment.

#### 1. The Court Has Already Rejected All Of Plaintiffs' Economies Of Scale And Fall-Out Benefits Arguments

The Court has already ruled in CAL's favor as to economies of scale and fall-out benefits, both in terms of the Independent Trustees' care and conscientiousness in considering information on these topics, and in substantively holding that Plaintiffs' evidence failed even to present a triable issue as to the excessiveness of the Fund's management fee.[25] In short, after three years of effort, Plaintiffs were unable to come forward with evidence for either of these factors that could undermine the Board's judgment. There are thus no issues remaining for trial as to these two factors.

---

[24] *Jones*, 559 U.S. at 349-50. *Accord id.* at 350 n.8 (recognizing that "a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services") (emphasis added).

[25] *Chill*, 2018 WL 4778912, at *13-14, 17-19, 21.

> ### 2.    Plaintiffs Cannot Prove That CAL's Profitability From Managing The Fund Supports A Finding That The Fund's Management Fee Is Excessive

In its summary judgment ruling, the Court held that the Independent Trustees' consideration of CAL's profitability from managing the Fund is entitled to at least "appreciable weight," because, as the Court appropriately found: (i) CAL's ███████████ cost allocation methodology is "a method Plaintiffs recognize is commonly accepted within the industry," and (ii) the Independent Trustees were "fully informed" about CAL's cost allocation methodology, "thoroughly discussed" CAL's use of that methodology as compared to other alternatives, and "formally approved" of CAL's use of that methodology.[26]  Indeed, CAL's profitability calculations provided to the Independent Trustees showed profit margins that were moderate or low by industry standards, ██████████████████████████████████████████, and that were far below profit margins held not to be excessive by courts in other cases brought under Section 36(b).  Even Plaintiffs do not argue that CAL's profit margin indicates the Fund fee was excessive.

Consequently, at trial, Plaintiffs must somehow overcome the deference due to the Independent Trustees in approving this method and prove that CAL somehow actually realized extraordinary profits from managing the Fund that would support a finding that CAL's management fee was excessive.  Plaintiffs cannot meet this burden at trial for any number of reasons.

First, the trial evidence—from CAL's controller and from CAL's accounting expert— will be that CAL's profit calculation approach is consistent with GAAP and managerial accounting principles; is systematic, rational, and decision-useful as those standards require; and

---

[26] *Id*. at *12, 14.

therefore produces results that in fact do reflect CAL's profits from managing the Fund.  For similar reasons, Section 36(b) courts considering analogous allocation methodologies have uniformly found them to be acceptable in rejecting the plaintiffs' claim at trial.[27]

Second, as CAL's witnesses will also explain, the fact that application of several reasonable cost allocation approaches could result in several different profit margins does <u>not</u> mean that any one of those reasonable approaches results in something other than a "true" profit margin.  It is for this reason that Section 36(b) courts have long recognized "the impossibility of arriving at an exact profitability figure," that cost allocation "is an art rather than a science," and that "different, albeit rational, methodologies lead to widely disparate results."[28]  Neither *Gartenberg* nor any other Section 36(b) case ever held, nor has the ICA or the SEC ever established a rule requiring, anything other than a reasonable and rational accounting calculation.

Third, Plaintiffs will have no trial evidence of any alternative accounting methodology that CAL purportedly should have applied, nor will they have a witness even remotely qualified to testify about any accounting concept.  This failure is critical because the question that *Gartenberg* asks regarding the adviser's profitability in managing the fund is, logically and legally, a quintessential accounting question.  Indeed, no court in a Section 36(b) case has ever held that "profitability" means anything other than profitability calculated by accountants in

---

[27] *See Sivolella v. AXA Equitable Life Ins. Co.*, 2016 WL 4487857, at *51 (D.N.J. Aug. 25, 2016) (finding "the cost allocation method based on revenue"—███████████████████████—"is consistent with accounting principles"), *aff'd*, 2018 WL 3359108 (3d Cir. July 10, 2018); *see also Gallus*, 497 F. Supp. 2d at 981.

[28] *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 489–90 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989).  *Accord Schuyt*, 663 F. Supp. at 978 ("There are many acceptable ways to allocate common costs, each of which leads to significantly different results.").

accordance with accounting principles[29]—which is precisely what CAL did here, and what Plaintiffs have not done.

Fourth, Plaintiffs will have no accounting evidence of their own to measure CAL's profitability from managing the Fund.  Plaintiffs' expert's concoction—which relies on a mathematical model of his own devising—is unsupported by any principle of accounting, generates results driven by an assumed "linear log-log" relationship between AUM and costs that is found in no accounting textbook (or any other textbook in any other field) and has never been accepted by any court in any Section 36(b) case.  It also suffers from a host of other unsolvable flaws.  Plaintiffs do not even attempt to contend that CAL was required to have used their expert's non-accounting, litigation invention in calculating its profitability from managing the Fund, for good reason: as trial will explain, it would have been impossible for CAL or any operating business to apply in the ordinary course.

Fifth, even if Plaintiffs could offer an alternative profit calculation approach, they will have no trial evidence establishing that CAL's profit margin suggests that the Fund's management fee is excessive, as both of their experts have disclaimed any opinion as to what would constitute an excessive level of profitability for purposes of proving a Section 36(b) claim.

---

[29] *E.g.*, *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 2017 WL 773880, at *15 (D.N.J. Feb. 28, 2017) (rejecting Section 36(b) claim; relying on "GAAP and other accounting authorities" for purposes of assessing Defendants' cost allocation methodology), *aff'd*, 2018 WL 3913102 (3d Cir. Aug. 15, 2018); *Sivolella*, 2016 WL 4487857, at *56 (rejecting Section 36(b) claim; holding adviser's accounting methodology as used to calculate 15(c) profitability was adequate, after considering trial testimony from accounting experts); *Schuyt*, 663 F. Supp. at 967 n.15 (rejecting Section 36(b) claim; finding that adviser's cost accounting system used to calculate 15(c) profitability); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1232 (S.D.N.Y. 1990) (rejecting Section 36(b) claim; finding that "accounting" was used to allocate indirect expenses), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1051 (S.D.N.Y. 1981) (rejecting Section 36(b) claim; finding that accounting used to calculate profitability), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

### 3.      Plaintiffs Cannot Prove That The Fund's Performance Supports A Finding That The Fund's Management Fee Is Excessive

While the Court has already granted summary judgment concerning the care and conscientiousness exercised by the Independent Trustees in assessing information regarding the Fund's performance,[30] the trial evidence will further demonstrate how seriously both CAL and the Independent Trustees focused on the Fund's performance, particularly the periods of short-term underperformance that the Fund experienced prior to and during the Relevant Period.

This trial evidence—which will come from an independent, qualified and experienced Independent Trustee, from senior CAL witnesses, and from an expert witness with extensive industry experience in managing an investment team through structural changes—will show that CAL has undertaken a series of complex, transformative, and costly changes to its investment management structure, all of which are intended to improve the quality of services provided to the Fund through improved performance.  In implementing these changes, CAL, among many other things, increased the quality and quantity of its investment team—including by making difficult decisions to change senior leadership positions—while also increasing its compensation spend for its enhanced team and implementing a new "team of teams" structure that fostered both increased specialization and increased collaboration on research and sharing ideas across the entire investment team.

Moreover, as the trial evidence will demonstrate, Plaintiffs' self-serving narrative that the Fund perpetually and grossly underperformed is a fiction.  In actual fact, the Fund's short-term performance throughout the Relevant Period—which is a highly relevant measure to Independent Trustees looking for indications of the impact of the changes implemented to CAL's portfolio

---

[30] *Chill*, 2018 WL 4778912, at *14.

management team and process—had periods of relative over-performance.  In addition, the

Fund's since-inception performance remains exceptional, and the Fund has earned real money

for investors (for instance, during their period of investment in the Fund, Plaintiffs have more

than doubled their money).  The trial evidence will confirm that through their consideration of

the actual facts (as opposed to Plaintiffs' rhetoric), the Independent Trustees annually made a

reasonable decision to approve the IMA while also permitting CAL the time needed to develop

its restructured investment team and revised investment process.

> **4.    Plaintiffs Cannot Prove That The FASA Supports A Finding That
> The Fund's Management Fee Is Excessive**

Plaintiffs' arguments with respect to the FASA between CAL and the Funds also cannot

support a finding that the management fee paid under the IMA is excessive.  Specifically,

<u>regardless</u> of how the IMA and FASA are evaluated, separately or together, CAL's management

fee is not rationally capped by the fees CAL charges its other clients for different services.

Having said that, it <u>was</u> appropriate for the Board to consider the two contracts together.

The law on whether a fund board can or should, or cannot or should not, consider the

adviser's management agreement separately from an administration/accounting agreement

between the adviser and a fund is significantly different than presented to the Court by Plaintiffs

on summary judgment.  There is nothing in the text of the ICA, in any SEC pronouncement, or in

any case, that establishes a requirement for a fund's board to consider a fund's management

agreement with the adviser separately from the fund's administrative agreement with the same

adviser.  There is similarly no law or ruling holding that it is improper for a Board to consider the

totality of services provided by the adviser to the Fund and the total compensation received by

the adviser, whether in one contract or two.

Plaintiffs have pointed to three cases that they claim stand for the proposition that a Board must consider any agreements between the Fund and its adviser separately.  Plaintiffs' cases actually say no such thing.  Their first two cases concern an adviser who (i) itself performs some services for the fund, and (ii) also sub-contracts with a sub-adviser to perform other, non-overlapping services for the fund.  In those cases, the court addressed a different issue—*i.e.*, whether, in reviewing the adviser's management agreement, the Board (and later the court) could consider all of the services that the adviser provided to the fund both directly and indirectly through its contract with the sub-adviser.[31]  In that context, those courts held that the Board (and the court) properly could consider all of the services provided to the fund, whether directly by the adviser or by the third-party subadviser subject to the adviser's oversight.  In the third of Plaintiffs' cases, the summary judgment ruling in *BlackRock*, the court merely found that the difference in services that the adviser provided to the funds and the lesser services provided to subadvised accounts under the relevant facts was "too fact intensive to be decided on summary judgment."[32]  The *BlackRock* court certainly did not hold that a board's collective consideration of the adviser's two agreements with the funds was improper.

With Plaintiffs' inapposite authority properly set aside, the correct legal standard does require consideration of substance over form.  As the legislative history of Section 36(b) itself states, courts must consider "all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has

---

[31] *Zehrer v. Harbor Capital Advisors, Inc.*, 2018 WL 1293230, at *10 (N.D. Ill. Mar. 13, 2018) (finding that "the combined [investment advisory] services should be considered against the entire advisory fee"); *Kasilag*, 2017 WL 773880, at *19 ("[T]he Court will consider all services provided under the IMAs for that fee, whether Defendants performed them or hired others to fulfill their obligations.").

[32] *In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690 (D.N.J. 2018).

properly acted as a fiduciary in relation to such compensation."[33]  In the most analogous case, *Gartenberg* itself, the adviser had an advisory agreement with the fund and the adviser's affiliate had a shareholder servicing agreement with the fund.  The *Gartenberg* court held that it should consider not only the adviser's services provided under the advisory agreement, but also the affiliate's services provided under the shareholder services agreement.  As the court recognized:

> Nothing in Section 36(b) obligates this Court, in assessing the fairness of the investment advisory compensation, to restrict its vision only to those services performed directly by [the adviser].  Indeed, the statute recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another.[34]

As such, the *Gartenberg* court held that it was appropriate to consider the totality of services provided by the adviser and its affiliates under both agreements, concluding that it is "entirely proper for the fiduciary to consider the totality of the values placed at the disposal of the shareholders in appraising the fairness of the compensation, or else form would be substituted for substance."[35]  As the court further recognized, such an approach arises out of the "equitable nature" of the court's task under Section 36(b): "That the courts are not required blindly to adhere to corporate organization when there is no reason to do so also follows from the equitable nature of their task under Section 36(b).  Equity has traditionally refused to be hemmed in by rigid boundaries; on the contrary, equitable powers are inherently flexible."[36]

The *Gartenberg* court's concerns about elevating form over substance are directly pertinent to Plaintiffs' arguments here.  Imagine if the FASA fee was 10 basis points instead of

---

[33] S. Rep. No. 91-184, at 13 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4910 (1970) (emphasis added).

[34] *Gartenberg*, 528 F. Supp. at 1049.

[35] *Id*. at 1052.

[36] *Id*. at 1049.

1, and the IMA fee was 76 basis points instead of 85.  That structure should not change the calculus under Section 36(b), as it does not affect the substance, *i.e.*, it would not have affected the Fund or the total compensation paid to CAL one whit.  Indeed, under these facts Plaintiffs almost certainly would have been screaming that the two contracts and two fees had to be bundled together when assessing their Section 36(b) claim.

Here, nothing did or should have prevented the Independent Trustees from considering the total services provided by CAL, and the total fees paid by the Fund, when assessing the Fund's relationship with CAL in a holistic fashion.  The evidence at trial will fully reinforce this conclusion, as it will show that (i) under the IMA, CAL is ultimately responsible for providing all services need to run the Fund, (ii) the two contracts have overlapping reach, (iii) CAL's business was logically run by function, not contract, and (iv) Plaintiffs have no evidence that considering the contracts separately would have made any difference to the approval of Fund's fee or any other issue of significance to this case.  Indeed, the trial evidence will confirm that prior to, during the existence of, and now following the recent termination of the FASA, CAL's duty as adviser to ensure that the Fund receives all of the services necessary for its operation has not changed one iota.

## III.   SUMMARY OF TRIAL WITNESSES

### A.   CAL's Trial Witnesses

CAL anticipates that it will present live testimony from six fact witnesses and five expert witnesses.

CAL's fact witnesses are expected to be:

(i) Scott Becker, a Senior Portfolio Specialist, who has been employed by CAL for over 15 years and is extremely knowledgeable about the Fund's performance;

(ii) Robert Behan, CAL's current President, who has more than 30 years of experience dealing with mutual fund and institutional account investors and their advisers;

(iii) Christian Helmetag, CAL's Controller and a registered CPA with an extensive accounting background, who applied CAL's profit methodology throughout the relevant period;

(iv) Curtis Holloway, CAL's Head of Fund Administration, who has more than 20 years of experience in the area of mutual fund administration and whose operations at CAL focus exclusively on services solely provided to mutual fund investors, not institutional clients;

(v) J. Christopher Jackson, CAL's General Counsel, who also has over 30 years of asset management industry experience and particular knowledge of the relevant legal, regulatory, and contractual issues raised by CAL's business; and

(vi) John Neal, who has served as an Independent Trustee of the Calamos Funds since 2001 and who has extensive asset management industry experience, including as President of the Kemper Funds Group, where he managed both the mutual fund and the institutional account businesses.[37]

CAL's expert witnesses are expected to be:

(i) Kevin Cronin, an asset management industry professional with more than 25 years of experience, including in implementing transformative changes to a firm's investment team structure and process, who will testify that CAL's decision to improve the quality of the services it provided to the Fund through a costly, multi-year reorganization of its investment approach and management team was a reasonable way to benefit the Fund.

---

[37] In addition to CAL's live witnesses, CAL will present testimony from five additional witnesses via deposition designations: (i) Stephen Timbers, the Lead Independent Trustee of the Board; (ii) Nimish Bhatt, who served as CAL's Chief Financial Officer through June 2016, (iii) Mark Mickey, the Funds' Chief Compliance Officer, (iv) David Kalis, who was a portfolio manager for the Fund from approximately December 2014 through February 2017, and (v) Derek Olson, who is Chief of Operations and oversees the middle office function at CAL.

(ii) David Richardson, another asset management industry professional with more than 30 years of industry experience, who will testify that across the asset management industry the range of services provided by mutual fund advisers is greater in scope, effort, and risk than services provided to institutional or subadvisory accounts, and that CAL's fee differential between the Fund and its institutional/subadvisory accounts is entirely consistent with other advisers.

(iii) R. Glenn Hubbard, the Dean of the Graduate School of Business at Columbia University and a Professor of Economics, who will testify that the Fund's management fee and total expense ratio are within the range of the Fund's peers, and that Plaintiffs' contention that the Fund's management fee is limited by the fees CAL charged to institutional/subadvisory clients does not make any economic sense.

(iv) John Lacey, a Professor of Accountancy at California State University Long Beach who also has taught accounting to federal judges for more than 20 years, who will testify that CAL's method for calculating its profitability for managing the Fund is consistent with the principles underlying GAAP and managerial accounting, is systematic, rational, and decision-useful, and therefore is reasonable and adequate for the Independent Trustees' annual review of the IMA.

(v) Arthur Laby, a Professor of Law at Rutgers Law School and who previously worked for the SEC, who will testify that the Board's quality, independence, and structures are strong, and that their 15(c) review process is robust in all material respects.

## B. Plaintiffs And Their Trial Witnesses

Plaintiffs themselves apparently are not going to be called to testify at trial.  This tactical decision no doubt reflects that they have been content to keep all of their shares in the Fund for

13 years, without any personal complaint or concern about the level of CAL's management fee.[38]

CAL anticipates that Plaintiffs will call many if not all of CAL's witnesses adversely during their case, but beyond that will rest their claim entirely on Dr. Steven Pomerantz, a mathematician, and Mercer Bullard, a law professor.   During the trial or thereafter, all of the opinions proffered by these witnesses should be excluded, or at a minimum disregarded as having no persuasive weight, for the reasons set forth in CAL's previously-filed *Daubert* motions as well as those that will be evident following the trial cross-examination of these witnesses.

---

[38] Plaintiff Saul Chill, who was the sole Plaintiff to testify in this case, testified that as of the time of his deposition (October 26, 2016), Mr. Chill had never sold, or even thought about selling, any of the Fund shares that he has held since 2005.  Moreover, at no point prior to his deposition—including as of February 2015, when he filed his Complaint—did Mr. Chill (i) do anything to investigate any of the fees charged by CAL, (ii) know what a management fee was, or (iii) know what fee(s) his lawsuit challenges as excessive.  In fact, he never thought CAL's fee was excessive until his counsel suggested the idea.

## IV.   RELIEF REQUESTED

Judgment in CAL's favor at the conclusion of this trial will be warranted.

Dated: November 5, 2018

DECHERT LLP

Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Tiffany Engsell
Brendan Herrmann
Samantha Rosa
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone: (212) 698-3500

*Counsel for Defendant*
*Calamos Advisors LLC*

22