UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SAUL CHILL and SYLVIA CHILL,
for the use and benefit of the
CALAMOS GROWTH FUND,

                Plaintiffs,

            v.                          15 Civ. 1014 (ER)

CALAMOS ADVISORS LLC,

                Defendant.              Trial

------------------------------x

                                        New York, N.Y.
                                        November 30, 2018
                                        9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

KIRBY McINERNEY LLP
        Attorneys for Plaintiffs
BY:  MARK A. STRAUSS
        IRA M. PRESS
        KARINA KOSHARSKYY
        ANDREW M. McNEELA


DECHERT LLP
        Attorneys for Defendant
BY:  MATTHEW L. LARRABEE
        DAVID A. KOTLER
        CATHERINE V. WIGGLESWORTH
        JACLYN S. WHITTAKER



Also Present:  Orie Braun

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.

3          MR. STRAUSS:  Mark Strauss, from McInerney for the

4   plaintiffs.  And with me is my partner, Andrew McNeela and

5   counsel, Karina Kosharskyy, as well as our senior analyst, Orie

6   Braun.

7          MR. LARRABEE:  Good morning, your Honor.  Matthew

8   Larrabee, for defendant Calamos.  With me at counsel table is

9   my partner, David Kotler, and my colleague, Catherine

10  Wigglesworth.

11         THE COURT:  Good morning to you all.

12         Plaintiffs, do you have any other witnesses?

13         MR. STRAUSS:  Yes, your Honor.  We call John M. Lacey,

14  PhD.

15         THE COURT:  Mr. Lacey, please step forward.

16   JOHN M. LACEY,

17      called as a witness by the plaintiffs,

18      having been duly sworn, testified as follows:

19  BY MR. STRAUSS:

20  Q.  Good morning, Dr. Lacey.

21  A.  Good morning.

22  Q.  I just handed you a binder of materials that we may refer

23  to.  It's organized by tab, so I'll just mention the tab

24  number.  Is that okay?

25  A.  Of course.

1   Q.   Okay.  You've been engaged as an expert for litigation work

2   approximately 80 times, correct?

3   A.   Approximately, over 25 years.

4   Q.   And 50 percent or more of your income for the last ten

5   years has come from such expert litigation work, correct?

6   A.   Probably something -- it varies from year to year.  It

7   depends upon my other consulting work in teaching as well.

8   Q.   Okay.  And only one of those cases, apart from this one,

9   were you engaged as an expert involving mutual funds, correct?

10  A.   That's correct.

11  Q.   And that was the Russell case?

12  A.   It was.

13  Q.   And in that one mutual fund case, apart from this one, that

14  you handled as an expert, your opinion had nothing to do with

15  cost allocation, correct?

16  A.   It did not.

17  Q.   And you've never been involved in devising a cost

18  allocation method for a mutual fund adviser, correct?

19  A.   Not for a mutual fund adviser, no.

20  Q.   And you've never been involved in devising a cost

21  allocation method for mutual fund board of trustees, correct?

22  A.   I have not.

23  Q.   And you've never done any consulting work for a mutual fund

24  board of trustees, correct?

25  A.   I have not.  I taught at a large investment company for

1   over 20 years.

2   Q.  And that company that you taught at was Capital Group?

3   A.  The Capital Group.  That's correct.

4   Q.  And there you taught accounting?

5   A.  I taught accounting, yes, and financial statement analysis.

6   Q.  To the firm's investors and employees?

7   A.  To the firm's investors, employees, their accountants, also

8   their computer programmers and such, yes.

9   Q.  But you're not an expert in the operations of the mutual

10  fund industry, correct?

11  A.  I am not.

12  Q.  Okay.  And other than the work you've done in this case

13  you've never actually dealt with cost allocation in the mutual

14  fund context?

15  A.  Not for a mutual fund.  But it's really not different.

16  Q.  Okay.  Let's talk about some terminology.  Let's talk about

17  the distinction between fixed costs and variable costs.

18          Fixed costs are costs that remain constant for a

19  period of time or a level of activity; is that fair to say?

20  A.  That's fair to say, yes.

21  Q.  And variable costs are costs that change with each unit of

22  production or activity, correct?

23  A.  That's also correct.

24  Q.  And in mutual fund advisory services, there are both fixed

25  costs and variable costs, but your opinion is that most costs

1    are fixed costs in mutual fund advisory services, correct?

2    A.   That's correct.

3    Q.   And by fixed, you mean that the costs do not vary

4    proportionally by AUM, correct?

5    A.   The costs are not varied by the assets under management.

6    That's correct.

7    Q.   Okay.  And let's talk about the distinction between direct

8    and indirect costs.  Is it fair to say that a direct cost is a

9    cost that can be feasibly attributed to a particular product or

10   service?

11   A.   Feasibly and economically, yes.

12   Q.   And an indirect cost would be one that you couldn't

13   feasibly or economically assign to a particular product or

14   service, so that you'd have to come up with some way to

15   allocate it for purposes of preparing financial statements?

16   A.   That's correct.  We allocate fixed costs.

17   Q.   Okay.  And in managerial accounting, indirect costs are

18   typically allocated using methods consistent with cause and

19   effect criteria, right?

20   A.   Where there's a cause and effect, we do allocate on that

21   basis.  But there must be a cause and effect.  If there isn't a

22   cause and effect, then we use another method, for example,

23   benefits received.

24   Q.   Okay.  Well, we'll get to that.  But I'd just would like to

25   make sure the Court is understanding what we're talking about

1   with respect to cause and effect.

2           So, what you're saying is that if there is a cause and

3   effect criteria that can be identified, you would use that

4   criteria for cost allocation, right?

5   A.  That's correct, yes.

6   Q.  Okay.  And applying the cause and effect criteria means

7   that you would look for what's known as a cost driver, right?

8   A.  That's a term we use, yes.  What is it that's causing a

9   cost to change.

10  Q.  So, a cost driver is a factor that causes the cost in

11  question to be incurred; is that fair to say?

12  A.  Or to change, yes.

13  Q.  Okay.  And as we said, provided you can identify the cost

14  driver, you'd use the cost driver as a basis for the

15  allocation?

16  A.  Yes, again, if it's economically efficient to do that, we

17  would.

18  Q.  Okay.  Okay.  Let's see if we can agree on an example of a

19  cost driver, so the Court understands exactly what we're

20  talking about.  Let me propose the following:

21          Let's say you wanted to allocate the costs of a human

22  resources department within a company and you wanted to

23  allocate those costs among a company's operational departments.

24  In that case, management might identify headcount as the cost

25  driver of human resources costs, and so allocate the costs by

1    the number of people in each department.

2    A.   That would be a feasible way to do that, yes.

3    Q.   Okay.  And that would be an example of using a cost driver?

4    A.   It would.

5    Q.   Okay.  Good.  And as you mentioned, it's your opinion that

6    if a cost driver can't be identified, then you'd look to

7    another method of allocation called "benefits received," right?

8    A.   That's one of the other methods, yes.

9    Q.   So, that's one of the other methods?

10   A.   That's correct.

11   Q.   All right.  And it's your opinion that, in the case of

12   Calamos's indirect costs, it isn't feasible or economical to

13   identify a cost driver, so we're forced to -- or it's

14   appropriate to look to the benefits-received approach, right?

15   A.   Calamos made their choice, and I think it's an appropriate

16   choice, yes.

17   Q.   And it's your opinion that assets under management, AUM, is

18   a reasonable proxy to the benefits received by each fund

19   because the bigger the fund the more benefit that it derives;

20   is that fair to say?

21   A.   That's fair to say.  They derive a benefit from the

22   information that they receive, yes.

23   Q.   Okay.  And it's further your opinion that allocating by AUM

24   is widely accepted as a cost methodology in the mutual fund

25   industry, correct?

1    A.  It is accepted, yes, and as I understand, widely accepted.

2    It's mentioned in the documents that I refer to in my report.

3    Q.  Okay.  But you would also agree that allocating costs

4    requires judgment, and that judgment may reasonably differ

5    between competent accountants, correct?

6    A.  It can, of course.

7    Q.  And that different companies, or sometimes even different

8    subunits within the same company, may reasonably allocate costs

9    differently, right?

10   A.  Yes.

11   Q.  And you would agree that, generally speaking, there is no

12   single or single best, or correct method to allocate expenses

13   under GAAP or managerial accounting principle?

14   A.  There is no single best method.  It depends on the facts

15   and circumstances and the judgment of management.

16   Q.  And you would agree that, with respect to profitability

17   reports furnished to mutual fund boards, there is no specific

18   method that's required by GAAP or any other authoritative

19   accounting standard of which you're aware of, right?

20   A.  There there's no specific method, no.  It should meet our

21   general standards, but there's no specific method.

22   Q.  And you would agree that neither the Investment Company Act

23   or SEC require any particular cost allocation methodology?

24   A.  Not of which I am aware.

25   Q.  And, in fact, in footnote 67 of your report, you cite three

1   industry sources that identify a number of other cost

2   allocation methods, apart from AUM, that are used in connection

3   with profitability reports given to mutual fund boards,

4   correct?

5   A.  I cite those.  I don't recall the footnote number, but yes.

6   Q.  Okay.  And the sources that you cite mention, for example,

7   methods like trade execution and fund flows, as methods that

8   are used in the industry?

9   A.  I believe those were included.

10  Q.  And one of your sources, in fact, says that there are a

11  "Hundred different ways from Tuesday that you can create these

12  allocation methodologies and most often we'll see multiple

13  methodologies included."

14          Correct?

15  A.  It may say that.  I don't recall specifically.

16  Q.  Well, let's take a look just to make sure the Court is

17  clear.  Let's look at tab G of your binder, which is a document

18  marked PX-764 for identification.  And if I could ask you to

19  please turn to numbered page ten.  The last ten, sir.  Let me

20  know when you're there.

21  A.  Okay.

22  Q.  If I can have you focus on the third paragraph, the second

23  sentence.  You see it says there, "And we did talk about time

24  and effort, but there's" -- do you see that?

25  A.  I do.

1  Q.  Okay.  So, it says, "And we did talk about time and effort,

2  but there's a hundred different ways from Tuesday that you can

3  create these allocation methodologies and most often we'll see

4  multiple methodologies included."

5          I read that correctly?

6  A.  You did.

7  Q.  Okay.  Good.  And in your view, trade execution could be an

8  acceptable method, correct?

9  A.  It depends on the circumstances.  What we're trying to do

10 is create information that's useful in making a decision.  So,

11 depending upon the decision that the company is going to make,

12 the allocation could be different.

13 Q.  Okay.  But it could be -- trade execution could be an

14 acceptable method?

15 A.  Potentially.

16 Q.  And simple allocation by fund could be a valid method too,

17 right?

18 A.  It could be, again, depending upon the circumstances.

19         Are we finished with this?

20 Q.  Yes.  We're finished with that exhibit, yes.

21         THE COURT:  What is simple allocation by fund?

22         THE WITNESS:  If you have five funds that are being

23 managed by the investment manager, then the indirect costs, the

24 costs that one can attribute to a particular fund, could be

25 just divided by five.  And an equal amount could be assigned to

1    each of the funds.

2              But, if you have funds that are of vastly different

3    size, then you're going to allocate a very large cost to one of

4    the funds that has a small size, for example, and generates a

5    small amount of revenue for the investment adviser and would

6    show a big loss for that fund by definition.

7              THE COURT:  Thank you.

8    BY MR. STRAUSS:

9    Q.  And you mentioned usefulness, right?

10   A.  Decision usefulness is our overriding criteria.  We want

11   information useful to the users of the information, the

12   managers, the users of financial statements.  That's overriding

13   criteria, yes.

14   Q.  One of the overriding criteria in selecting a cost

15   allocation methodology is that you should pick a method so that

16   the resulting financial reports are useful to the decision

17   makers for whatever type of decision they're trying to make,

18   right?

19   A.  That's correct, yes.

20   Q.  And the method that you select should align with the

21   decision maker's needs, right?

22   A.  Yes.

23   Q.  Do you agree that using AUM tends to make a larger fund in

24   mutual fund complexes appear less profitable?

25   A.  The allocation method of AUM allocates more cost to funds

1  that have larger assets under management.  So, depending upon

2  then the revenue that's generated from those funds, it could

3  make the fund look less profitable, yes -- and I should say,

4  less profitable than if you allocated an equal amount to each

5  fund, for example.

6           So, when you say "less profitable," you have to say

7  less than what.  And so, as we said, if there were five funds

8  and you allocated an equal amount to each of the five funds --

9  one of the funds is very large, one of the funds is very

10  small -- then allocating based upon AUM would mean that the

11  profit for the larger fund would be lower than if you allocated

12  an equal amount to that fund.  But, by the same token, the

13  profit for the smaller fund would then be potentially a large

14  loss because you've allocated a large amount there.  So, when

15  you say "less," it's less than what?

16  Q.  Right.  And you gave the by-fund example, but it could be

17  less than other methods as well, right?

18  A.  It could be, yes, or it could be more.

19  Q.  And, in fact, one of the sources that you cite mentions

20  this, right?  Mentions the speech of the AUM method?

21  A.  It does.  That statement is in that document, as I recall,

22  yes.

23  Q.  Let's just identify it just so the Court is clear.

24           If you could turn, please, to tab E of your binder,

25  which is a document marked PX-762 for identification.  Let me

1   know when you're there.  And it's titled: *Profitability*

2   *Benchmarks and Contract Renewal*.

3           Do you see that?

4   A.  I do see that.

5   Q.  If I could have you turn please to the second page of that

6   exhibit.  And if you could focus on the second paragraph from

7   the bottom, the fourth sentence, which starts with the word

8   "generally."

9           Do you see that?

10  A.  Yes.

11  Q.  Okay.  It says, "Generally there are five bases of

12  allocation:  One, asset-based, which tends to make the largest

13  funds less profitable."  And then it goes on.  Right?

14  A.  I see that.  Yes.

15  Q.  Okay.  Great.  And do you agree that the AUM method tends

16  to make larger funds appear to be less profitable than under

17  other potential methods, as you've discussed, because, while

18  most costs in advisory services are fixed, which you

19  acknowledged, allocating by AUM means that you're assigning

20  proportionately more cost to larger funds than smaller ones,

21  right?

22  A.  But by definition, because we're assigning based on AUM,

23  yes, you assign a larger cost to funds that have larger AUM,

24  which means then that you would have a lower profit than if you

25  assign, for example, an equal amount of each fund.

1   Q.  And, in fact, AUM -- the AUM method makes costs per dollar

2   of AUM constant across the complex regardless of fund size, at

3   least with respect to indirect costs, right?

4   A.  Now, just to be clear, when you say "makes the costs," it

5   allocates that amount of cost to the funds.

6   Q.  Okay.  That's fair enough.  And did you consider whether

7   the AUM method's tendency to make larger funds appear to be

8   less profitable than other methods would reduce that method's

9   decision usefulness to a mutual fund board of directors in

10  determining whether to approve the adviser's fees?

11  A.  I don't think it makes it less at all.  It's a reasonable

12  allocation.  The larger fund gets a larger benefit from the

13  information.  What we're talking about is computing the

14  profitability for the adviser advising a particular fund.  So,

15  it's the profitability the adviser -- we must allocate these

16  common costs, joint costs, to the different funds.  And so,

17  there has to be some mechanism to do so.  And where we don't

18  have the cause and effect relationship, we look at benefits

19  received.  Larger funds receive more benefit.  And as

20  consequence, we allocate larger costs to them.  But that's what

21  we do commonly here.  We do it in many industries.  It's a

22  common method we use in accounting and appropriate in this

23  case, I think.

24  Q.  Well, suppose I told you two things.  I'm going to add a

25  couple things into the mix, okay?  Suppose I told you first

1    that the United States Congress, in amending the Investment

2    Company Act, expressed a desire that mutual fund investors

3    should share equitably in the economies available as a result

4    of the growth of mutual funds.  And I further told you that the

5    supreme court of the United States has said that one of the

6    decisions that mutual fund boards are responsible for making in

7    determining whether to approve an adviser's fees is whether the

8    fee structure adequately shares those economies with investors,

9    as opposed to allowing the investor to keep a disproportionate

10   amount of those funds for itself.

11          In your opinion, would those factors impact the

12   decision usefulness of the AUM method?

13   A.  What we're talking about here is allocating the cost of the

14   advisory services to the different funds.  But we're talking

15   about computing the profitability of the adviser in advising

16   those funds.  So, that's the focus here.  How much is the

17   adviser making by advising each of these funds?  So, there is a

18   total cost that is incurred by the adviser in giving this

19   advice.

20          So, let me give you an example.  When I taught at the

21   Capital Group, one of my students who is an investment adviser,

22   an analyst.  His focus was analyzing the Korean auto industry.

23   So, his days were spent analyzing the Korean auto industry.  We

24   know what his pay was for doing that.  We know what the actual

25   cost of his time was.  But then that advice that he created,

1    the information that he generated, was used by all of the funds

2    that the Capital Group advised.  So, what we're talking about

3    is how do we allocate his costs to those different funds in

4    computing the profitability of the adviser to that fund.

5            And so, if we have a fund that's a very large fund and

6    then can use his services to manage this large fund, then we

7    allocate a larger part of his costs to that fund and for a

8    small fund, which can only use his services in a small way.  So

9    the equity here is in that ability to use his information by

10   these different funds.

11           So, it's an equitable method of allocating this cost.

12   And I think that's the bottom line.

13   Q.  Could you explain how the use of the AUM method is a

14   aligned with the need of the board to evaluate whether the

15   economy is available as a result of the size of the Calamos

16   Growth Fund are being adequately shared with investors?

17   A.  Well, the economies of scale is a consequence of them

18   having these advisers that they use for all of these different

19   funds.  So, because they have a lot of funds, they can employ

20   these advisers, and it's efficient.  So, that total cost then

21   is allocated to the individual funds.  So, the fact that they

22   have this economy means that the total cost, the actual cost,

23   is lower.  And then we allocate that actual cost.

24   Q.  So, you're suggesting that the economy only derives from

25   the fact that there are multiple funds?

1    A.  The larger -- that the economy is because they're buying a

2    lot of information here.

3    Q.  Couldn't the economy result from the fact that one of the

4    funds -- for instance, the Calamos Growth Fund -- is extremely

5    large compared to the other funds?

6    A.  Yes.  The total fund is going to then mean that their

7    economy's the sale for this fund group, if you will.

8    Q.  So, in your view, the economies of scale comes into play

9    only with respect to the entire group and not with respect to a

10   particular fund?

11   A.  Well, it does come into play in the entire group, and then

12   we allocate the cost.

13   Q.  So, you would agree that the use of the AUM methodology

14   doesn't allow any visibility into the economies for a

15   particular fund?

16   A.  Well, this is an allocation.  Particular funds don't incur

17   these costs.  It's a cost incurred by the management company

18   itself.  And then those costs are allocated.  We allocate rent

19   on a square footage basis.  If we have one apartment that has a

20   smaller number of square feet, we don't say, oh, we're going to

21   charge a higher rent per square foot for that other apartment.

22   We just don't do that.

23   Q.  And you don't do that in managerial accounting?

24   A.  No, we don't.

25   Q.  Would you agree that managerial accounting is somewhat

1   inapt with respect to the purposes that I just described --

2   with respect to the needs that I just described from the

3   supreme court and the congress?

4   A.   Absolutely not.  We do this all the time.  This is not

5   unique to the mutual fund industry.  This is standard practice

6   in accounting.  I teach this in every class that I teach, is

7   allocation.  It's what we do.  It's our stock and trade, part

8   of the fabric of accounting.  This is what we do, and it's a

9   reasonable way to approach this, in my opinion.

10  Q.   But suppose that the need described by congress and the

11  supreme court is to evaluate these economies on a single-fund

12  basis and -- well, let's just suppose that.  Let's suppose that

13  what's been described by congress and the supreme court is a

14  need by the board to evaluate the economies of a single fund.

15  And as you mentioned, most costs in advisory services are

16  fixed.

17          Wouldn't the use of the AUM method present a distorted

18  view of the profitability of the fund?

19  A.   Absolutely not.  It's an appropriate method.  The costs

20  aren't bought individually -- or the services aren't bought

21  individually by fund.  So there isn't a cost for a fund, like

22  my student who evaluated the Korean auto industry and then all

23  of his efforts are used by all the funds.  It isn't paid by a

24  fund for his efforts.  The results of his efforts are then used

25  by all the funds.  So, we allocate his costs accordingly and

1   appropriately.

2   Q.  Okay.  Let's get back to your assertion that allocation by

3   AUM is widely accepted.

4           What do you mean by "widely?"

5   A.  Well, what I mean is that I saw it as one of the methods --

6   it was I believe the second method listed among those that were

7   in the cites that I gave in my report.  And that's the basis

8   for my statement.

9   Q.  Okay.  So, you don't know what percentage of mutual funds

10  actually use the AUM method?

11  A.  I don't believe that's knowable.  I don't think that's

12  public information.

13  Q.  Okay.

14          MR. STRAUSS:  No further questions right now.  Thank

15  you.

16  DIRECT EXAMINATION

17  BY MR. KOTLER:

18  Q.  Good morning, Professor Lacey.

19  A.  Good morning.

20  Q.  Mr. Strauss gave you a chance to talk a little bit about

21  your background.  But could you please briefly walk the Court

22  through your accounting background, perhaps starting with

23  academia?

24  A.  I'd be happy to.  So, I have a bachelor's degree in

25  accounting from USC, an MBA in quantitative business analysis

1   also from USC, and a PhD in accounting information systems --

2   minors in that -- from UCLA.

3          I began my teaching career at University of Southern

4   California, USC.  I taught there for a few years and I moved to

5   UCLA.  Taught there for a few years.  And I taught at

6   California State University at Long Beach for many years, large

7   state school in California, second largest in our state.

8          Prior to my academic career, I worked as a controller

9   of a manufacturing company.  We manufactured micrometers

10  rotors, calipers, other measuring tools.  And I worked for a

11  large CPA firm in their national office, answering complex

12  questions from our offices around the world.  And then I began

13  my academic career.

14  Q.  Have you ever had occasion to teach outside of the academic

15  setting?  I know you mentioned that you taught at Capital

16  Group.  Anything beyond that?

17  A.  Yes.  As well as my academic profile, I also do some

18  executive teaching.  I taught for the Capital Group for 20

19  years.  I teach at Union Bank.  I teach the financial analysts

20  for the L.A. Society of Financial Analysts.  I've been doing

21  those things for over 20 years.  I also teach accounting to

22  judges through both federal judicial center and the National

23  Judicial College.  And I've done that for over 20 years as well

24  and taught over 3,000 judges accounting over the years.

25         I'd love to have you in my class one day, your Honor.

1          THE COURT:  How successful have your efforts been?

2          THE WITNESS:  Hopefully, successful.  It's a program

3    sponsored by the American CPAs along with these judicial

4    education organizations.  In the morning I spend four hours

5    teaching accounting to the judges.  Then in the afternoon, we

6    do a case study where the judges are broken up into groups and

7    they act as a board of directors for a company that has

8    recently gone public.  They're then asked to answer five

9    accounting questions where judgment and estimation is involved.

10   Then at the end of the day, we get together and compare notes

11   on how the groups of judges have done.

12         And interestingly, over the 25 years that we've done

13   the program, only once have two sets of judges come to see me

14   in these five.  So, the estimates and judgments that are

15   required here -- and none of the answers are wrong, it's just

16   that they're different estimates and judgments that are

17   employed by the judges.  So, it's a really fun program.  I love

18   doing it.

19   Q.  Have you ever been responsible for devising or implementing

20   a cost allocation method for any company?

21   A.  Yes.  At the manufacturing company where I worked, we did

22   this as part of our normal practice.  So, yes.

23   Q.  Just generally about accounting, kind of a threshold

24   question:  Is it your opinion that calculating profitability is

25   an exercise in accounting?

1   A.  It is.  I teach it in every class that I teach.  We teach

2   it in the judicial programs as well.  And in every class that I

3   teach at the university, I start with an example of a lemonade

4   stands.  On the very first day we talk about the fellow who

5   picks lemons from his tree in the backyard and sells on the

6   weekend, and at the end of 45 minutes, no one can agree on how

7   much money he made.  I do that on the very first day.  So,

8   people walk into the classroom thinking I'm going to add a

9   column of numbers and come up with an.  And the point is that

10  we do have to exercise judgment and make estimates in all of

11  what we do as accountants.

12  Q.  One other term to define, because it is in some of the

13  materials.  What is a joint and common cost?

14  A.  A joint and common cost is a cost that benefits different

15  components.  So, for example, a joint cost in the oil industry

16  would be the cost of crude oil.  So, from the crude oil, we

17  make diesel, we make gasoline and such.

18          Common cost would be a cost that is shared by

19  different departments, for example.  So, the rent would be the

20  common cost at a law firm.  And that common cost could then be

21  allocated to different departments of the law firm, the

22  intellectual property department, the hacks department.  Then

23  we would allocate that common cost to them.

24  Q.  Is that similar -- Mr. Strauss had asked you about indirect

25  costs.  Are joint and common costs similar to indirect costs?

1    A.  They're examples of indirect costs, that's correct.

2    Q.  In doing a cost allocation approach, does materiality play

3    a role?

4    A.  Materiality also plays a role.  The ultimate goal here is

5    to help managers make better decisions or the readers of

6    financials taken.  So, we want the information to be useful to

7    them.  If it's something that isn't going to make a difference,

8    isn't enough to matter, then it may not be worth doing.  We

9    look at the cost of doing it versus the benefit of doing it.

10   Q.  The plaintiffs and their experts have used the term "actual

11   cost" in describing or criticizing the Calamos profitability

12   methodology.

13       Are there such actual costs that are out there?

14   A.  Well, we can, for example, talk about the actual costs of

15   my students at Capital.  How much did they pay him for his

16   salary?  But that actual cost is for his salary.  We then have

17   to take that cost and allocate it to different funds that used

18   his services.  So, while we know the actual cost of his

19   paycheck, we then have to allocate.

20   Q.  With respect to the Calamos cost allocation methodology,

21   let's pull up -- we have a demonstrative in DX-1507.  It is the

22   last page of the demonstrative, I believe.

23       Is this a demonstrative that you are familiar with,

24   Professor Lacey?

25   A.  It is.

1    Q.  And can you just give us an explanation?  We've been

2    talking about it.  But can you perhaps explain what is depicted

3    here?

4    A.  So, the left-hand box at the top is the direct advisory

5    costs.  So those are costs that are incurred by a particular

6    fund.  So, if we look down -- incurred by the adviser on behalf

7    of a particular fund.  So, for example, if we look at down

8    below, fund A, we would see advisory revenue from fund A.  So,

9    that's revenue the adviser would get from services to fund A.

10   And then below there we have the direct advisory costs for fund

11   A.  So, that may be some information that was obtained

12   specifically for fund A, for example, and fund B and fund C.

13        Then, on the right, we see indirect advisory costs.

14   So, those would be costs like my student who is servicing many

15   funds with his information.  So, we take that indirect advisory

16   cost and we allocate it first to the institutional accounts,

17   and then to the fund.  So, we carve it up into two pieces, if

18   you will.

19        So, part of that indirect advisory cost that is

20   allocable to the funds, we then allocate between fund A, fund B

21   and fund C.  So we see down below direct advisory cost,

22   allocated advisory cost.  So, that's the place where we use

23   this allocation.  We're taking those indirect costs, first we

24   allocate them to the funds, then we allocate to the -- pardon

25   me.

1          First we allocate between the funds in the

2    institutional accounts, then we allocate that portion that

3    we've allocated the funds down to, to the individuals funds

4    themselves.

5          THE COURT:  Let me ask you a question about your

6    Korean automotive industry analyst.  And let's say that you

7    were working for a complex or you're working for a company that

8    has a complex of funds.  And a very large fund, maybe say a

9    large cap U.S. stock fund, and a much smaller fund within that

10   complex could be an international automotive or production or

11   manufacturing stocks.  So, obviously your Korean analyst would

12   be much more valuable to that much smaller fund.

13         How would you allocate his costs between say those

14   two?

15   A.  Well, we would actually allocate the costs of all of the

16   advisers.  So, for example, another of my students focused on

17   specialty retail.  So, he analyzed the GAAP, for example.  And

18   that was his principal focus.  Another of my students analyzed

19   the oil and gas industry.  So, we wouldn't allocate the

20   individual advisers and analysts, we'd rather allocate the

21   entire group.  So, there would be some that would maybe benefit

22   one fund more than another, others would benefit a different

23   fund more than the other.  So, we don't allocate the individual

24   advisers but, rather, the group of advisers.

25         THE COURT:  And that would be done -- that's typically

1    what would be done under this model.

2              THE WITNESS:  Yes.

3    BY MR. KOTLER:

4    Q.  I think we actually have a demonstrative reflective of that

5    point.  Let's pull up page two of the demonstratives.

6              Professor Lacey, can you explain what is reflected on

7    this page?

8    A.  So, this is an example of how the AUM assets under

9    management allocation approach works.  So, say, we have fund A

10   that has $10 billion of assets under management, and fund B

11   that has a hundred million; so, a hundred times as much for

12   fund A.  And let's say that the management company can buy

13   additional information that will benefit these funds and

14   they're going to pay $10 million for this investment research

15   information.  So, they pay $10 million for the investment

16   research information.  This would be all the analysts and folks

17   at the fund.  Then we look at the expected return from this

18   additional research that they buy, it's one percent.  So, fund

19   A would get an expected return of a hundred million dollars for

20   additional research.  Fund B, again, would get the one percent

21   additional return.  So, they would get about a million dollars

22   of benefit from this additional research.

23             So, on the assets under management approach of

24   allocation, we would allocate the $10 billion out of

25   10,100,000,000, that percentage of the cost to fund A.

1    $9 million, $9,900,000 here.  And fund A, because their benefit

2    is a million dollars, we'd allocate $99,000 to fund B.  So, the

3    additional net to fund A would be 90 million, and the

4    additional net to fund B would be 900,000.  So, that's the

5    amount that we would allocate to each.

6             And if you turn to the next slide --

7    Q.  Yes.  Let's turn to demonstrative three.

8    A.  -- if instead we used an equal amount to allocate to each

9    fund, for example, again, the benefit would be a hundred

10   million for fund A, 1 million for fund B.  And if the

11   $10 million cost of these analysts was allocated evenly between

12   fund A and fund B, we'd allocate 5 million to each, fund A

13   would show a $95 million return, and fund B would show a loss

14   of $5 million.  Well, fund B wouldn't pay $5 million for this

15   additional research because you're not getting that benefit.

16   So, the idea is that we're allocating the cost based on the

17   benefit that these funds receive from that cost.

18            So, to back up again, what we're doing here is

19   computing the profitability of the adviser for their advising

20   each of the funds.  So, because fund A gets a much bigger

21   benefit from the advice that they're giving, then fund A is

22   going to show a larger part of the cost for fund A in computing

23   the profitability of the manager in serving each of these

24   funds.

25            THE COURT:  And I take it that a necessary aspect of

1  this calculation is the expected return from research?

2          THE WITNESS:  That's correct.  So, that is part of the

3  computation.  And the idea is that this investment management

4  team is providing information and investment recommendations to

5  all of the funds.  And so, that information will then be used

6  by all of the funds.

7  BY MR. KOTLER:

8  Q.  You were asked some questions earlier about GAAP, generally

9  accepted accounting principles.  First of all, are you familiar

10  with the concepts of GAAP?

11  A.  I am.  Besides my teaching at the university and my

12  executive teaching, I've also served on many committees in our

13  profession.  One of those committees is one of the committees

14  that wrote accounting standards, part of generally accepted

15  accounting principles.  I actually worked on three -- voted on

16  three standards involving investment companies.  So, generally

17  accepted accounting principles are those principles that

18  companies follow when they prepare financial statements.

19  Q.  Do you have an opinion as to how Calamos's allocation

20  methodology relates to GAAP?

21  A.  This methodology that Calamos uses is consistent with

22  generally accepted accounting principles.

23  Q.  Why is that?

24  A.  First of all, it should be decision-useful.  It should also

25  be systematic and rational.  So, a systematic and rational

1   allocation, that's what we say in our literature specifically.

2   And also, we look at the cost, benefit, relationship and

3   materiality.  So, those are all elements of our judgment in

4   deciding whether a principle is generally accepted.

5   Q.  Do you have an opinion as to whether the Calamos allocation

6   methodology is consistent with managerial accounting

7   principles?

8   A.  Yes.  And it is.  Managerial accounting principles -- so,

9   we have two courses, financial accounting and managerial

10  accounting.  Financial accounting focuses more on preparing

11  financial statements for outside users of information, banks,

12  investors, those types of folks.  Management accounting focuses

13  more on the use of information by management.  Both access the

14  same database of information, but the focus is different in

15  terms of the way the information is organized and reported.

16  And this would be consistent with managerial accounting as

17  well, useful to the board in making the decision that they're

18  making.

19  Q.  Thank you.  I want to turn now to some of the opinions that

20  plaintiffs' experts have offered.  One of the plaintiffs'

21  experts has suggested that, for purposes of a mutual fund

22  profitability calculation, the cost allocation must hew to

23  cause and effect criteria.

24       Is that an opinion that you agree with?

25  A.  Well, where there's a cause and effect criteria, we can use

1    that criteria.  But if there isn't, then we have to have some

2    other method of allocation.  There isn't a cause and effect

3    criteria here, so we must come to some other method.  And the

4    method that is employed here is assets under management, which

5    is appropriate.  If there is a cause and effect, then fine, but

6    that's not what we have here.  This is appropriate.

7    Q.  Mr. Strauss asked you some questions about whether fixed or

8    variable costs somehow need to be allocated differently.

9         Do you have an opinion with respect to that?

10   A.  Well, we generally don't need to allocate variables.  We

11   can associate them with a particular cost object, we call it.

12   So, for example, at the manufacturing company where I worked,

13   we made rulers out of steel.  So, the steel in the ruler was a

14   variable cost.

15        Fixed costs do need to be allocated.  And I think what

16   is confused here is the difference between cost behavior and

17   cost allocation.  So, we also have to allocate fixed costs even

18   though the cost doesn't change.  When we're computing the

19   profitability of an apartment or the profit from a particular

20   product -- our ruler, for example -- we have to allocate those

21   fixed costs to the individual products in the individual

22   departments to compute the profitability.  So, allocation

23   versus cost behavior.

24   Q.  Plaintiffs' experts have also opined that Calamos's

25   allocation -- or a portion, I should say, of certain joint and

1   common costs associated with IT and general and administrative

2   entirely to the advisory function, as opposed to split between

3   the advisory and distribution function, was improper.

4          Do you agree with that?

5          MR. STRAUSS:  Objection, your Honor.  I do not believe

6   that the professor offered an opinion on that in his report.

7          THE COURT:  Overruled.

8          THE WITNESS:  I disagree.

9          This allocation process that we've talked about, we're

10  trying to allocate for a particular purpose.  I mentioned that

11  we look at the materiality of the decision.  Mr. Helmetag

12  testified here that the focus is on the advisory group.  So,

13  for the IT information, for example, the focus was on the

14  advisory group.  They used a large amount of computing power

15  and technology by the advisers.  There were some, as he

16  suggested, iPads that were used by the distribution folks.

17  Those would have been direct costs.  The iPads, for example,

18  that I saw in the accounting information, that would be

19  deducted.  So, even though there wasn't an allocation of the IT

20  costs, the direct costs were charged.

21         Similarly, the general administrative large costs

22  there was the rent.  And as Mr. Helmetag testified, many of the

23  distribution people didn't even occupy rented space.  So, it's

24  a judgment call by the accountants about how to make that

25  allocation.  And their judgment was that they would allocate

1    that cost to an adviser.

2    Q.  Was it significant in your view that the apportionments

3    were disclosed to decision-maker?

4    A.  The whole process was transparent to the board.  And the

5    amount, according to Mr. Helmetag's computation, was not

6    material.  So, those are the things that we look to do decide

7    if it was appropriate under generally accepted accounting

8    principles for example.

9    Q.  Plaintiffs' experts have suggested that the Calamos cost

10   allocation methodology is in conflict with Calamos's assertion

11   that the funds are more expensive to manage because the

12   allocation assigns the same advisory costs per dollar to the

13   funds as it does to the institutional accounts.

14        Do you agree with that contention?

15   A.  I don't.  We use different allocations for different

16   purposes.

17        Mr. Kotler if we could pull the exhibit back up, the

18   first page of my demonstrative?

19   Q.  I would be happy to.

20   A.  I beg your pardon.  It's the last page.

21   Q.  Yes.  Page four.

22   A.  So, what we're talking about here is these indirect

23   advisory costs to be allocated.  And the question is:  How do

24   we allocate those indirect advisory costs between the

25   institutional accounts and the funds?  So, before we allocate

1   the indirect costs to these individual funds, we first allocate

2   part to the institutional accounts.

3          So, the criticism here is that the same allocation

4   methodology is used here for the funds in the institutional

5   account.  And if we allocated more cost to the funds, which is

6   what's being suggested, then the costs of the allocated

7   advisory amount down here would be greater, which means that

8   the profits would actually be lower for the advice to the

9   individual funds by the adviser.  So, it would actually reduce

10  the profit if that allocation was made.

11         And that's not the purpose here.  The purpose here is

12  an allocation to determine the profitability of the funds.

13  Could it have been done with some other methodology?  Yes.  But

14  would it affect the decision?  No.

15  Q.   Turning to Dr. Pomerantz, were you aware that Dr. Pomerantz

16  has calculated an alternative profit margin for the fund?

17  A.   I am.

18  Q.   Do you agree with Dr. Pomerantz's methodology in arriving

19  at his profit margin?

20  A.   Absolutely not.  I've never seen anything like that in my

21  40-year career teaching accounting and practicing accounting.

22  It is nothing that I've ever seen before.  And it doesn't -- we

23  -- in accounting, we have a basic tie to a transaction.

24  There's some exchange between how we allocate that.  And Dr.

25  Pomerantz's method seems to need information from the future

1   that we don't have.  I can't imagine how I would apply that

2   method in practice.

3   Q.  One last question.  In your opinion, is Dr. Pomerantz's

4   assumed log-log relationship, one of the hundred ways to

5   Tuesday, that would be a reasonable way to allocate costs?

6           MR. STRAUSS:  Your Honor, once again, the witness

7   hasn't offered any opinions on this subject matter in his

8   report, so I object.

9           THE COURT:  Overruled.

10          THE WITNESS:  No.  I can't imagine any circumstance in

11  which we would apply that method as accountants under any

12  circumstance.

13          MR. KOTLER:  Thank you, your Honor.  I have no further

14  questions.

15          THE COURT:  Redirect -- or recross.

16          MR. STRAUSS:  Karina, please pull up the

17  demonstrative.

18  RECROSS EXAMINATION

19  BY MR. STRAUSS:

20  Q.  Taking a look at the demonstrative introduced today, this

21  is the page that shows the allocation of funds by even

22  allocation, right?  And this is the by-fund method that we were

23  talking about before, right?

24  A.  It is, yes.

25  Q.  And you're saying that if you allocate by fund rather than

1  proportionally by assets, fund B is going to be unprofitable,

2  right?

3  A.  What we're talking about here is the profit that the

4  adviser earns from advising funds A, B, C.

5  Q.  Okay.

6  A.  So, this demonstrates that the fund, if it was paying this

7  amount for the services, would -- it would be unprofitable.

8  Q.  It would be unprofitable to the adviser?

9  A.  Yes.  The cost would be higher and could be unprofitable to

10  the adviser.  It just depends on the total mix.  But, yes.

11  Q.  Okay.  But in your hypothetical, it's unprofitable?

12  A.  It's unprofitable.

13  Q.  All right.  It could be different if the amounts were

14  different, but it would be less profitable than the other fund

15  in any event, correct?

16  A.  It would be.

17  Q.  Okay.  And my question is:  Why is that a problem?  I mean,

18  isn't it common for business ventures to start out being

19  unprofitable and only become profitable later on after they

20  grow in size?

21  A.  The problem isn't whether it's profitable or unprofitable.

22  The problem is the reasonableness of the cost.  What we do is

23  try to allocate in some rational method, some systematic and

24  rational method.  And if you look at the benefit that's being

25  received by these funds, it's so vastly different.  How would

1   you possibly say that you would allocate half the cost of fund

2   B?  Fund B would never agree to a $10 million fee for something

3   that would benefit them only a million dollars.

4          Another thing is, what if fund B goes away?  What

5   would happen then?  If fund B went away, would that mean that

6   fund A -- the management company wouldn't still obtain this

7   information?  Well, they'd still obtain the information.  There

8   would still be that cost.  The question is just how we allocate

9   it between fund A and fund B.

10         So, if we look at the loss on fund A and fund A goes

11  away, that doesn't mean that the company is going to increase

12  its profits by a loss.  It's just a part of the cost has been

13  allocated to fund B.  And if fund B went away, there would no

14  longer be that allocation.  I think it would just be misleading

15  and confusing to the board to make this allocation.

16  Q.  Let's look at it from the point of view of the shareholders

17  of fund A, the $10 million fund.  Suppose that fund B is small

18  because it was only recently started by the adviser and so it

19  hasn't amassed a large amount of assets yet.

20         Why should the shareholders of fund A subsidize the

21  adviser's efforts to incubate fund B until it's large enough to

22  cover its costs?

23  A.  They're not subsidizing.  There's no money that's involved

24  here paying back and forth between the two.  It's just:  How do

25  we allocate the costs?  That's all it is.  There isn't a dollar

1    difference in the amount spent.  If you show that fund B is

2    losing money, and then fund B goes away, money is still going

3    to be spent.

4    Q.  But isn't the purpose of these profitability reports to

5    justify a higher fee on fund A on the basis of its level of

6    profitability, given the way these costs are allocated?  Isn't

7    that indirectly forcing the shareholders of fund A to shoulder

8    these startup costs of the adviser?

9    A.  No.  I don't understand that to be the case at all.  The

10   idea is we're supposed to report the profitability of the

11   adviser for its services to each of these funds.  There isn't

12   some subsidy that's being paid between the funds, it's just

13   computing the profitability of the funds to the adviser.

14   That's all.

15        And allocating a disproportionately large amount here

16   certainly to fund B and less to fund A, that just doesn't make

17   sense, Mr. Strauss.

18   Q.  Your point of view is that when it comes to mutual fund

19   complexes, the principle is from each according to his

20   visibility, to each according to his needs?

21   A.  Essentially, yeah.  This is a common method.  It's not

22   unique to mutual fund companies.  So, if we allocate rent, we

23   allocate it based on square footage.  And we'd look at what's

24   the rent for the facility.  So, department B has a thousand

25   square feet, so we allocate 1,000 out of the 10,000 square feet

1    to department A.  We don't say, oh, department A is a smaller

2    department, and we're going to allocate more cost per square

3    foot to department A because they're a smaller department and

4    rents are higher for smaller spaces and how much more would

5    they be.  We just don't do that.  It's just not something we do

6    as accountants.

7    Q.  Well, in your square footage example, if the apartments are

8    larger and occupies more square footage, then that's a cost

9    driver, correct?

10   A.  Right.  And I'm talking about on a per-square-foot basis.

11   So, what you're suggesting is that you should charge more per

12   unit here because this is smaller.  So, should we charge more

13   per square foot for rent because they're occupying a smaller

14   space?  We just don't do that, Mr. Strauss, we don't.

15   Q.  It's just practice not to do that?

16   A.  It doesn't make sense to do that, in my opinion.

17   Q.  You agree that the method is for each according to

18   visibility to each according to needs?

19   A.  I don't.  I don't even know quite what that means.

20   Q.  Well, let's say that fund B, the smaller fund, used to be

21   similarly sized as fund A, but its performance was terrible and

22   so it declined in size, investors sold their shares, and it

23   declined.

24        Why should the shareholders of fund A assume the

25   responsibility for this business failure?

1    A.  Well, all of these funds are using this information.  So,

2    to what use can they put the information?  A smaller fund can't

3    put it to a greater use as the larger fund.  So, we allocate a

4    greater cost to the larger fund that can put it to a larger

5    use.  That's simple.  Why the fund is big or small doesn't

6    matter.  To what use can they put the information?

7    Q.  Is that fair to the shareholders of fund A, who are

8    splitting the costs with this small fund?

9    A.  The costs are not being split.  What we're talking about is

10   an allocation of the cost.  The cost is there.  We're just

11   taking -- so, there's an amount that's paid, and we carve it up

12   and assign it to these different funds.  That's all.  There

13   isn't some different cost.  There is a cost that is assigned

14   and allocated.

15   Q.  The process doesn't have anything to do with the fairness

16   to the shareholders of fund A, correct?  The process of

17   allocating the cost doesn't have anything to do with fairness

18   to the shareholder of fund A, correct?

19   A.  What we're talking about here is this 15(c) process which

20   is computing the profitability of the fund by servicing the

21   different -- pardon me.  Computing the profitability to the

22   adviser for servicing these different funds.  That's what this

23   is about.  It isn't charging the funds different amounts.

24              (Continued on next page)

25

1   BY MR. STRAUSS:

2   Q.  And in your view, that process, that 15(c) process, doesn't

3   have anything to do with the fairness of the shareholders of,

4   in your example, fund A?

5   A.  I didn't say that.  What we want is a reasonable allocation

6   here, which is what I believe we have.

7           MR. STRAUSS:  No further questions.  Thank you.

8           THE COURT:  I have a couple of questions.  Actually, a

9   high-level question, and I don't know if it's going to make you

10  cringe, but obviously you're familiar with the concept of

11  economies of scale.  In a very general way, the law requires

12  that mutual funds benefit from economies of scales that are

13  obtained by their advisers.  How does that concept relate to

14  cost allocation, or does it?

15          THE WITNESS:  It doesn't.  We don't deal with

16  economies of scale and cost allocation.  I've never taught it

17  when I've taught cost accounting.  If you look at the Horngren

18  text, which is our biggest, most widely used accounting text,

19  it doesn't have any mention of cost allocation and economies of

20  scale.

21          There is an economy of scale for the organization as a

22  whole.  As they grow, there are economies of scale, but now as

23  we're taking that total cost and allocating it, we don't

24  consider economies of scale in that allocation process.  It's

25  just not something that we do.

1          THE COURT:  Mr. Kotler.

2          MR. KOTLER:  Nothing further, your Honor.

3          THE COURT:  Sir, you may step down.

4          THE WITNESS:  Thank you so much.  Nice to be in your

5    courtroom.

6          (Witness excused)

7          MR. McNEELA:  We have no further witnesses, your

8    Honor.

9          THE COURT:  Mr. Larrabee.

10          MR. LARRABEE:  I think we're all concluded, your

11    Honor.

12          THE COURT:  Very well.  We're done.  What else can we

13    do today?  Is there anything left for me to do?

14          Why don't you tell me the schedule going forward.

15          MR. KOTLER:  That was No. 1 on my list, but at this

16    point I don't think I have the ability to tell your Honor but,

17    rather, to make inquiry.

18          One of the things we've discussed with plaintiffs'

19    counsel is the schedule for proposed findings and conclusions

20    of law.  We had previously agreed, and I think it was included

21    in our discussion at the pretrial conference, on January 11 for

22    each side to submit proposed findings and conclusions of law.

23    We thought we would propose a date two weeks thereafter for

24    responses to proposed findings and conclusions, if your Honor

25    would think that's appropriate.

1           THE COURT:  That's fine by me.

2           MR. KOTLER:  So January 25, and then we wanted to make

3    inquiry as to a date and time for closing arguments.

4           THE COURT:  And you want to do closing arguments after

5    the submissions, correct?

6           MR. KOTLER:  Yes, your Honor.

7           THE COURT:  If you're going to be done by January 25?

8           MR. KOTLER:  Yes.

9           THE COURT:  When do you want to come in after that?

10   Two weeks, three weeks?

11          MR. KOTLER:  We were thinking somewhere in the two- to

12   three-week range would be appropriate.

13          THE COURT:  OK.  Let's do three weeks.

14          I'm going to be in part 1 for two weeks out and three

15   weeks out, which means I have to put all other business aside.

16   Can we go into week four?

17          MR. KOTLER:  Of course, your Honor.

18          MR. McNEELA:  Your Honor, if I may?

19          If we're going to put it out four weeks in terms of

20   when we argue, would it be possible to get slightly more time

21   than two weeks?  I know I'm just raising this now, but given

22   the scheduling if it's OK with defense, could we do three weeks

23   out?

24          MR. KOTLER:  Fine.

25          THE COURT:  Fine.

1          THE DEPUTY CLERK:  February 20 at 2 p.m.

2          MR. McNEELA:  And just to be clear, your Honor, it

3    would be one additional week from January 25, it would be early

4    February, seven days, approximately, from January 25 for the

5    responses?

6          THE COURT:  Ms. Rivera will give you a date.

7          MR. McNEELA:  Thank you.

8          THE COURT:  One week after January 25.

9          THE DEPUTY CLERK:  February 1.

10          MR. McNEELA:  And would it be possible, once we review

11    the record, to confer and make requests for, perhaps, page

12    extensions if we believe we need more than the standard

13    allotment?

14          THE COURT:  I'm expecting that request.

15          MR. McNEELA:  Thank you, your Honor.

16          MR. KOTLER:  Two or three other minor things.  We've

17    discussed with plaintiffs' counsel, reviewing the transcript

18    and preparing an errata sheet, which we will do jointly and

19    submit that to the court reporting service.

20          THE COURT:  You have no one to blame but yourselves.

21          MR. KOTLER:  Oh, absolutely.  Actually, I blame them,

22    but we'll do that and provide it within the next couple of

23    weeks.  We would also request the opportunity to review the

24    transcript for confidentiality.  I'm not expecting very much,

25    if anything, given the open nature of the proceedings,

1  obviously, but we just wanted to have the opportunity to review

2  the transcript, and we'll confer with plaintiffs' counsel on

3  that.

4        My last thing is we will hand up to your Honor a bound

5  set of the various demonstratives and slides and pullouts that

6  were used with our witnesses, all of which we will provide to

7  plaintiffs' counsel as well.

8        THE COURT:  Very well.  Thank you very much.

9        Let me just say, obviously, I look forward to

10 receiving your submissions and hearing you at oral argument,

11 that this has been an extraordinarily well-tried case.  I want

12 to thank counsel for both sides and your supporting staffs for

13 your courtesies to the bench.  I was very impressed by the fact

14 that you were all so very well prepared with the demonstratives

15 and the binders, etc.  The technology appeared to work well

16 from what I was able to tell, and you were all very well

17 prepared with the appropriate pages in the depositions and the

18 videos, etc.  It was all expertly -- expertly -- choreographed,

19 so I thank you very much for that.

20       Thank you very much for being prompt every day and at

21 the end of breaks.  That's always very useful to the Court, and

22 I hope it's been useful to you all.

23       With that, happy holidays.

24       MR. LARRABEE:  I have just one more comment.  I do

25 know the trial was extremely difficult for the court reporters,

1    and we all bear some responsibility for that, and I know how

2    hard they've worked and we really appreciate it.

3           THE COURT:  Very well.  Have wonderful holiday, folks.

4    I'll see you in the new year.

5           (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JOHN M. LACEY

Direct By Mr. Kotler . . . . . . . . . . . .1012
Recross By Mr. Strauss . . . . . . . . . . .1027