# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SAUL CHILL and SYLVIA CHILL, for the use and benefit of the CALAMOS GROWTH FUND, | : |
|  | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| v. | : |
|  | : |
| CALAMOS ADVISORS LLC | : |
|  | : |
| Defendant. | : |

No. 15-cv-01014 (ER)

ECF CASE

## **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

KIRBY MCINERNEY LLP
Ira M. Press
Mark A. Strauss
Andrew McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600

Counsel for Plaintiffs

**Table of Contents**

FINDINGS OF FACT ........................................................................................................ 1

I.      BACKGROUND ................................................................................................... 1

    A.   Plaintiffs and Defendant ........................................................................... 1

    B.   CAL, the Fund, the Board and the Independent Trustees .......................... 1

        1.   CAL's Investment Products, Strategies, Organization and Personnel ...... 1

        2.   The Growth Fund, and CAL's All Cap Growth Investment Strategy ......... 5

        3.   The Calamos Investment Trust ................................................................. 7

        4.   CIT's Board of Trustees ........................................................................... 7

        5.   The Independent Trustees' Annual 15(c) Review ..................................... 8

        6.   The Third-Party Performance Reports ...................................................... 8

    C.   The IMA .................................................................................................... 9

    D.   The FASA ................................................................................................ 11

    E.   The Funds' Third-Party Service Providers ............................................... 14

        1.   The Funds' Transfer Agent ..................................................................... 14

        2.   The Funds' Accountant ........................................................................... 15

        3.   The Funds' Custodian ............................................................................. 16

        4.   The Funds' Securities Lending Agents .................................................... 16

        5.   The Funds' Auditor ................................................................................. 17

        6.   The Funds' Counsel ................................................................................ 17

        7.   The Fees the Growth Fund Paid to Third-Party Service Providers .......... 17

    F.   The Sub-Administration Agreement Between State Street and CAL .......... 18

    G.   CAL's Institutional and Subadvisory All Cap Growth Clients ................... 20

        1.   The Other ACG Accounts ....................................................................... 21

        2.   The Other ACG Accounts' Advisory Fee Rates ...................................... 22

        3.   CAL Provided the Growth Fund and the Other ACG Accounts
            with Substantially Identical Portfolio Management Services .................... 24

II.     QUALITY OF SERVICES ................................................................................... 26

    A.   The Fund's Comparative Investment Performance
        under Standard 1-, 3-, 5- and 10-Year Time Frames Was Abysmal ............ 26

    B.   CAL Has Repeatedly Admitted that Performance Was Very Poor ............. 32

    C.   The Growth Fund's Since-Inception Performance, and its Irrelevance ....... 33

    D.   CAL'S Claims Regarding its Purported Efforts to Improve Performance .... 34

    E.   The Board's Fig-Leaf Response to CAL's Continued Poor Performance .... 36

i

F.  The Reaction of the Other ACG Accounts Speaks Directly to the Quality of Services CAL Provided ........................................... 37

G.  The Reaction of the Growth Fund's Shareholders to the Quality of Services Provided is Further Indication that its Fees were Excessive .......................................... 38

III.  COMPARATIVE FEES ........................................................................................ 40

A.  Versus Comparable Mutual Funds .......................................................... 40

B.  Versus CAL's Arm's-Length Institutional/Subadvisory Clients ................. 43

1.  Analysis of Relative Fees ........................................................... 43

a.  The Effective Advisory Fee Rates Payable Under the IMA's Fee Schedule Dwarf Those Payable Under the Other ACG Accounts' Fee Schedules .................. 43

b.  The ACG Accounts CAL Identified as Having High Effective Fee Rates All Had Extremely Low AUM ............................................. 44

2.  CAL's *Ipse Dixit* that the Funds' Higher Advisory Fees were Justified by Greater Services and Risks ............................................ 45

3.  The Uncontroverted Record Evidence Establishes that the Cost of the Greater Services/Risks Bears No Reasonable Relationship to the Fee Differential ............... 47

4.  CAL's Claims Concerning Greater Services Were Substantially Controverted by the Evidence at Trial ........................................... 49

a.  Services CAL Admitted are Inapplicable to the Growth Fund ................ 50

b.  Services Provided Entirely or Substantially by Third-Party Service Providers ........ 50

c.  Services Provided Under, and Compensated by, the FASA .................... 54

d.  Services Handled by Fund Administration at Insignificant Cost .............. 55

e.  Services that CAL Provided Comparably to Fund and non-Fund Clients Alike .......... 56

i.  Client Services:  the Extraordinary Level of Attention Lavished on Institutional/Subadvisory Accounts ......................... 56

ii.  The Growth Fund's Daily Liquidity Requirements did not Result in any Appreciably Greater Work ...................... 59

iii.  CAL's Operations and IT Services Are Comparable Across All Clients ............ 60

iv.  CAL's Compliance Services Are Comparable Across All Clients .................. 60

5.  CAL's Claims Concerning Greater Risks Were Substantially Controverted by the Evidence at Trial ............................................ 62

a.  Legal / Regulatory Risks ................................................. 62

b.  Entrepreneurial / Competitive Risks .................................... 69

IV.  CAL'S METHOD FOR ALLOCATING COSTS MADE ITS LARGER FUNDS APPEAR LESS PROFITABLE ................................................. 70

A.  CAL's 15(c) Profitability Presentations and Cost Allocation Methodology ................. 70

B.  CAL's Profitability Presentations were Inconsistent with Its Actual Operations and Artificially Lowered the Growth Fund's Profitability .......................... 72

1.  Although Advisory Costs are Largely Fixed CAL Allocated Those Costs by AUM
    as if they Were Variable Costs, Eliminating/Masking Economies of Scale ............. 72

2.  CAL's 15(c) Profitability Presentations Over-Allocated Costs to Large Funds,
    Presenting them as Less Profitable than They in Fact Were .................................... 75

3.  CAL's 15(c) Profitability Presentations Under-Allocated Costs to Small Funds,
    Presenting them as Profitable When in Fact They Were Not.................................... 76

4.  CAL's 15(c) Profitability Presentations Allocated Sharply Different Advisory Costs
    to Funds that Have Substantially Similar Advisory Costs ........................................ 79

C.  CAL Did Not use its 15(c) Profitability Analyses for Any Other Purpose,
    and Based its Actual Business Decisions on an Opposite View of Profitability .......... 83

D.  The Mutual Fund Profitability Presentations Were Not "Decision-Useful"
    for the Independent Trustees in Evaluating CAL's Profitability from the Funds.......... 83

E.  Dr. Pomerantz's View of Profitability Hews Closer to CAL's Actual Business
    Conditions ................................................................................................................ 84

V.  THE INDEPENDENT TRUSTEES' LACK OF CARE AND CONSCIENTIOUSNESS .. 86

A.  Greater Services/Risks, and their Costs, as Justification for Higher Advisory Fees ..... 86

B.  The Board's Consideration of FASA Services
    in Approving the IMA's Advisory Fees.......................................................................... 88

C.  The Board's Failure to Distinguish between the Burden/Expense of Providing
    a Service versus the Burden/Expense of Supervising Others who Provide
    the Service in the First Instance .................................................................................... 88

D.  Profitability: Allocation of Expense Between Advisory and Distribution Functions.... 90

E.  The Trustees' Misinformed View Regarding the Purported Burden
    of Providing Daily Liquidity .......................................................................................... 92

F.  The One-Time Fee Waiver and the Board's Annual Unanimous Approval
    of CAL's Advisory Fees ................................................................................................. 92

CONCLUSIONS OF LAW ...................................................................................................... 95

I.  CAL'S WITNESSES WERE INCREDIBLE ...................................................................... 95

A.  Applicable Legal Standard ............................................................................................. 95

B.  Specific Instances of Incredible/Misleading Testimony ................................................ 95

    1.  CAL's Misleading and/or Incomplete Interrogatory Responses ............................... 95

    2.  Mr. Behan's Misleading Testimony Regarding the Powell Trust ............................. 96

    3.  Mr. Jackson's Implausible and Evasive Testimony Regarding *inter alia*
        CAL's Pricing of Litigation Risk and its Involvement in Preparing the
        Funds' Regulatory Filings ........................................................................................ 96

    4.  Mr. Neal's Evasive Testimony and Routine Exaggerations...................................... 98

    5.  Professor Laby's Incredible and Implausible Testimony .......................................... 99

    6.  Mr. Richardson's Evasive and Implausible Testimony............................................. 102

iii

7.    Dean Hubbard's Implausible and Agenda-Driven Testimony ................................. 103

II.    CONCLUSIONS OF LAW WITH RESPECT TO *GARTENBERG* FACTORS:
THE GROWTH FUND'S ADVISORY FEES WERE EXCESSIVE ............................... 104

A.    Applicable Legal Standard ....................................................................... 104

B.    The Quality of CAL's Advisory Services Was Exceedingly Poor
and Supports the Excessiveness of the Growth Fund's Advisory Fee ........................ 106

C.    The Growth Fund's Fees Were Exceedingly High in Relation to *All* Comparators,
Which Further Shows their Excessiveness ......................................................... 112

1.    The Comparison to Peer Mutual Funds ................................................ 112

2.    The Comparison to Other ACG Accounts ............................................ 113

D.    Profitability ............................................................................................. 120

E.    The Independent Trustees did not Exercise the Requisite Care
and Conscientiousness ............................................................................... 124

1.    Applicable Legal Standard Regarding Conscientiousness ......................... 124

2.    The Independent Trustees' Repeated Failure to Act Conscientiously
with Respect to Crucial Matters Relevant to CAL's Fees .......................... 125

F.    The Weight of the *Gartenberg* Factors Shows that CAL's Fees
Were not Rationally Related to the Services Rendered ................................... 128

G.    Damages ................................................................................................. 129

1.    The Damages Period ............................................................................. 130

2.    Damages as the Difference Between the Fee Charged and a
Benchmark Representing an Arm's-Length Fee ....................................... 130

3.    Damages Method 1:  Damages as the Difference between the
Fees Payable under the IMA and under the Standard SMA Schedule .................... 130

4.    Damages Method 2:  Damages as the Difference Between the
Effective Fee Rate Paid by the Growth Fund and the
Weighted Average Rate Paid by CAL's Other ACG Accounts .............................. 131

5.    Damages Method 3:  Damages as the Difference Between the
Advisory Fees Paid by the Fund and the Advisory Fees Paid by Similar Funds ..... 133

CONCLUSION .................................................................................................... 135

Table of Authorities

**Cases**

*In re American Mut. Funds Fee Litig.*,
   No. 04 Civ. 5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ......................................... 108

*In re Blackrock Mut. Fund Advisory Fee Litig.*,
   327 F. Supp. 3d 690 (D.N.J. 2018) ............................................... 107, 108, 126, 129

*Burks v. Lasker*, 441 U.S. 471, 482 (1979) ................................................................... 124

*Chill v. Calamos Advisors LLC*,
   175 F. Supp. 3d 126 (S.D.N.Y. 2016) ................................................................ 106

*Chill v. Calamos Advisors LLC*,
   No. 15 Civ. 1014, 2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ....................................... *passim*

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984) ................................................................ 104, 105

*DeGiorgio v. Fitzpatrick*,
   No. 08 Civ. 6551, 2011 WL 10501908 (S.D.N.Y. Mar. 8, 2011) ......................................... 95

*Forsythe v. Sun Life Fin., Inc.*,
   417 F. Supp. 2d 100 (D. Mass. 2006) ................................................................ 106

*Fox v. Reich & Tang, Inc.*,
   692 F.2d 250 (2d Cir. 1982), *aff'd sub nom. Daily Income Fund*, *Inc. v. Fox*, 464 U.S. 523
   (1984)) ................................................................................................. 100

*Gallus v. Ameriprise Fin., Inc.*,
   497 F. Supp. 2d 974 (D. Minn. 2007) ................................................................ 108

*Gallus v. Ameriprise Fin., Inc.*,
   675 F.3d 1173 (8th Cir. 2012) ................................................................ 126

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982) ................................................ 106, 113, 121, 124

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
   301 F. Supp. 3d 759 (S.D. Ohio 2018) ................................................ 108, 129

*Haimdas v. Haimdas*,
   No. 09 Civ. 2034, 2010 WL 652823 (E.D.N.Y. Feb. 22, 2010) ........................................ 95

*Hernandez v. NJK Contractors, Inc.*,
   09 Civ. 4812, 2015 WL 1966355 (E.D.N.Y. May 1, 2015) ................................................ 95

*Hinton v. Patnaude*,
   92 Civ. 405, 1997 WL 727529 (N.D.N.Y. Oct. 21, 1997) ..................................... 95

*Jones v. Harris Associates L.P.*,
   559 U.S. 335 (2010) ........................................................................................... *passim*

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990) ............................................................ 107, 108

*Kasilag v. Hartford Inv. Fin. Serv., LLC*,
   No. 11 Civ. 1083, 2016 WL 1394347 (D.N.J. Apr. 7, 2016) ........................ 106, 129

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989) ............................................................................. *passim*

*Latin America Music Co., Inc. v. Spanish Broad. Sys., Inc.*,
   254 F. Supp. 3d 584 (S.D.N.Y. 2017) ................................................................. 95

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
   663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ........................ 108, 121

*Sivolella for use & benefit of EQ/Common Stock Index Portfolio v. AXA Equitable Life Ins. Co.*,
   742 Fed.Appx. 604 (3d Cir. 2018) ....................................................................... 108

*United States v. Eastman*,
   16 Cr. 0006, 2016 WL 4357492 (D. Conn. Aug. 15, 2016) .................................... 95

*Weiss v. Temporary Inv. Fund, Inc.*,
   692 F.2d 928 (3d Cir. 1982), *cert. granted, judgment vacated*, 465 U.S. 1001 (1984).......... 100

*Zehrer v. Harbor Cap. Advisors, Inc.*,
   No. 14 Civ. 789, 2018 WL 1293230 (N.D. Ill. Mar. 13, 2018) ............................. 107, 108, 129

**Statutes**

15 U.S.C. § 80a-35(b) ............................................................................................. 105

**Other Authorities**

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4899.......... 104, 105, 122, 123

STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962)............................................. 105

**Glossary**

| | |
|---|---|
| __ Decl. | Refers to the direct testimony from the specified witness, submitted in the form of a sworn declaration |
| __ Dep. | Refers to the deposition transcript of the specified witness for whom the parties submitted deposition designations |
| __ Report | Expert reports submitted by the Parties' experts as their direct testimony |
| 15(c) Board Meetings | Annual Board meeting in June/July at which the Independent Trustees' 15(c) Review is conducted |
| 15(c) Request | Annual letter requesting CAL for information necessary for the Independent Trustees' 15(c) Review |
| 15(c) Response | CAL's annual response to the Independent Trustees' 15(c) Request |
| 15(c) Review | The Independent Trustees' annual review of the Funds' IMA and advisory fees |
| ACG | All Cap Growth |
| ACIM | American Century Investment Management (an investment adviser with its own family of mutual funds, to whom it charged unified management fees) |
| BJR | Business judgment rule |
| Board | the Funds' Board of Trustees |
| CAL | Calamos Advisors LLC |
| Category Comparison | Comparison of performance and fees to broad set of all similarly-classified mutual funds |
| CIT | Calamos Investment Trust |
| Closed End Funds | CAL's closed end mutual funds |
| Deloitte | Deloitte & Touche LLP |
| FASA | Amended and Restated Financial Accounting Services Agreement between CAL and CIT, dated December 13, 2004, |

| | and terminated as of November 1, 2018 |
|---|---|
| Funds | All of CAL's Open and Closed End Funds |
| Funds' Counsel | Independent Trustees' Counsel |
| GAAP | Generally Accepted Accounting Principles |
| Greater Services | The list of services that CAL purportedly provided to the Funds but did not provide to, or to the same extent, to Institutional/Subadvisory Accounts |
| Growth Fund | Calamos Growth Fund |
| ICA | Investment Company Act of 1940 |
| IMA | Investment Management Agreement between CAL and CIT |
| Independent Data Providers | Lipper, Morningstar and Strategic Insight |
| Independent Trustees | the members of the Board apart from Mr. Calamos, Sr. |
| Institutional Accounts | CAL's separately-managed accounts for institutional investors |
| Institutional ACG Accounts | Institutional Accounts who followed CAL's ACG investment strategy |
| JSSF | Joint Statement of Stipulated Facts |
| Lipper Report | Comparative analysis of Funds' fees and performance provided by Lipper, Inc. for 2013 15(c) Review |
| MAP | Managerial Accounting Principles |
| Master Custodian Agreement | Contract between CIT and State Street as the Funds' custodian |
| Master Services Agreement | Contract between CIT and State Street as the Funds' accountant |
| MD Accounts | MD American Growth Fund and MDPIM U.S. Equity Pool |
| MD Rate | Advisory fee rate schedule for the MD Accounts |
| Morningstar Reports | Comparative analyses of Funds' fees and performance provided by Morningstar Inc. for 2014-2016 15(c) Reviews |

| | |
|---|---|
| NAV | Net asset value |
| Nomura | Nomura Currency Fund – U.S. Growth Equity Fund |
| Nomura Rate | Advisory fee rate schedule for Nomura |
| Open End Funds | CAL's open end mutual funds |
| Other ACG Accounts | All of CAL's Institutional ACG Accounts and Subadvisory ACG Accounts |
| Peer Comparison | Comparison of performance and fees to narrower subset of mutual funds deemed more similar in relevant respect to each of the Funds |
| Plaintiffs | Saul and Sylvia Chill |
| Powell Trust | the James B. Powell Restated Revocable Trust |
| Rack Rate | Standard SMA Schedule advisory fee rates |
| SEC | Securities and Exchange Commission |
| SI Reports | Comparative analyses of Funds' fees and performance provided by Strategic Insight for 2017-18 15(c) Reviews |
| Standard SMA Schedule | CAL's publicly-reported, standard advisory fee rate schedule for Institutional ACG Accounts |
| State Street | State Street Bank & Trust:  accountant, custodian, securities lending agent and sub-administrator for the Funds |
| Sub-Administration Agreement | October 1, 2009 Contract between CAL and State Street as sub-administrator |
| Subadvised Accounts | Funds sponsored by other investment advisers for which CAL serves as a subadviser |
| Subadvisory ACG Accounts | Subadvised Accounts who followed CAL's ACG investment strategy |
| Teamsters | Teamsters Pension Fund of Philadelphia |
| Thrivent | Thrivent Financial for Lutherans |
| Tr. | Transcript of trial proceedings |

| | |
|---|---|
| Transfer Agent Servicing Agreement | Contract between CIT and USBFS as the Funds' transfer agent |
| UBP | Union Bancaire Privée |
| USBFS | U.S. Bancorp Fund Services LLC:  transfer agent to the Funds |

# FINDINGS OF FACT

## I.   BACKGROUND

### A.   Plaintiffs and Defendant

1.      Plaintiffs Saul and Sylvia Chill ("Plaintiffs") have been shareholders in the Calamos Growth Fund (the "Growth Fund") at all times since July 2005 through the present. JSSF ¶1.  Plaintiffs filed their complaint on February 14, 2015.  JSSF at ¶2.

2.      Defendant Calamos Advisors LLC ("CAL"), is a limited liability company organized under Delaware law with headquarters in Naperville, Illinois and offices within this judicial district, and an investment adviser registered under the Investment Advisors Act of 1940, that serves as investment adviser to the Growth Fund.  JSSF at ¶¶3, 8.

### B.   CAL, the Fund, the Board and the Independent Trustees

#### 1.   CAL's Investment Products, Strategies, Organization and Personnel

3.      CAL offers certain investment products to its clients, including principally:  (1) open-end U.S.-regulated mutual funds sponsored by CAL, including the Growth Fund (the "Open-End Funds"); (2) closed-end, U.S-regulated Funds sponsored by CAL (the "Closed-End Funds," and together with the Open-End Funds, the "Funds"); (3) separately-managed accounts, predominantly for institutional investors (the "Institutional Accounts"); and (4) funds sponsored by third-party investment advisers for which CAL serves as a subadviser (the "Subadvised Accounts").  JSSF at ¶¶5-7; PX 438 at 4, 10; Pomerantz Report at ¶26.

4.      CAL provides a menu of investment strategies to its advisory clients, including the Funds, the Institutional Accounts and the Subadvised Accounts.  PX 438 at 13-14 ; JX 168 (Funds' Prospectus, describing *inter alia* investment strategies for each of the Funds)  Each investment strategy is characterized by a specific objective, and principal investment characteristics that focus on certain asset classes (equities or stocks, bonds, convertible bonds, or

alternative assets), geographical regions (U.S., international, global, etc.), company sizes (small-, mid-, large- or all-capitalization issuers), and/or investment styles (growth, value, blend).  *Id*. CAL provides each of the Open-End Funds with a different investment strategy, which it also offers to its Institutional Accounts and Subadvised Accounts. *Id*.

5.     During the Relevant Period, CAL organized and operated its investment management operations pursuant to a "team of teams" structure, under which CAL's investment management department was subdivided into approximately six different teams responsible for different groups of investment strategies.  *See e.g.* JX 139 at CA-IT0000071 at 1-19; Behan Decl. at ¶¶32-33, 38-42.  Each investment team was led by specific senior co-portfolio managers (certain of whom also served as members of the below-described Investment Committee), and included additional co-portfolio managers, a dedicated team of research analysts, and dedicated portfolio specialists responsible for client communications.  JX 139 at CA-IT0000071 at 11, 14-19; Becker Decl. at ¶¶40, 43-46.  These teams were responsible for the day-to-day construction, management of oversight of client investment portfolios.  JX 139 at CA-IT0000071 at 9; Becker Decl. at ¶¶40.  Positioned above these teams was CAL's senior Investment Committee – comprised of Mr. Calamos, Sr., four co-chief investment officers serving as heads of various strategy groupings, and CAL's head of trading and risk management – which provided top-down guidance to, and monitored and oversaw, the various investment teams.  JX 139 at CA-IT0000071 at 9-10; Becker Decl. at ¶48.  Supporting all of these teams were shared risk management, trading, and investment operations/infrastructure departments.  JX 139 at CA-IT0000071 at 9, 12; Becker Decl. at ¶¶49-51.

6.     For each calendar year between 2005 and 2015, the total number of investment professionals employed by CAL (as measured at the end of the year) was as follows:

| Year | Total Investment Professionals |
|------|-------------------------------|
| 2005 | 68 |
| 2006 | 75 |
| 2007 | 75 |
| 2008 | 68 |
| 2009 | 65 |
| 2010 | 66 |
| 2011 | 66 |
| 2012 | 53 |
| 2013 | 78 |
| 2014 | 74 |
| 2015 | 67 |

JSSF at ¶107.

7.    In its annual 15(c) Responses to the Independent Trustees, CAL reported the

following average AUM amounts, for each year, for each of its investment product types:

| (in $ millions) | 2017 | 2016 | 2015 | 2014 | 2013 |
|-----------------|------|------|------|------|------|
| **FUNDS AUM** | | | | | |
| Open End Funds | $10,523 | $10,796 | $13,273 | $15,292 | $15,761 |
| Closed End Funds | $6,496 | $6,086 | $6,650 | $6,332 | $5,909 |
| **Total Funds AUM** | $17,019 | $16,882 | $19,923 | $21,624 | $21,670 |
| **INSTITUTIONAL / SUBADVISORY AUM** | | | | | |
| Institutional / Individual / Partnerships | $1,961 | $1,285 | $1,760 | $2,018 | $3,555 |
| Subadvisory | $0 | $1,227 | $1,137 | $672 | $1,032 |
| **Total Institutional / Subadvisory AUM** | $1,961 | $2,512 | $2,897 | $2,690 | $4,587 |
| **OTHER CLIENT AUM** | | | | | |
| **Total Other AUM** | $756 | $1,225 | $1,528 | $1,759 | $2,002 |
| **TOTAL CAL AUM** | | | | | |
| **TOTAL CAL AUM** | $19,736 | $20,619 | $24,348 | $26,073 | $28,259 |

PX 184-A at 653670; PX 176-A at 650495; PX 145-A at 634750; PX 113-A at 502928; PX 61-A

at 519572; PX 32-A at 514135.

8.      Based on the above data, the ratio of the Funds' AUM compared to the Institutional and Subadvised Accounts' AUM during the Relevant Period is as follows:

| Ratio of Total Funds AUM to Total Institutional/Subadvisory AUM | | | | | |
|---|---|---|---|---|---|
| Average, 2013-2017 | 2017 | 2016 | 2015 | 2014 | 2013 |
| 7.0 | 8.7 | 6.7 | 6.9 | 8.0 | 4.7 |

9.      Based on the above data, the Funds' AUM constituted the following percentage of CAL's total AUM during the Relevant Period:

| Total Funds AUM as % of Total CAL AUM | | | | | |
|---|---|---|---|---|---|
| Average, 2013-2017 | 2017 | 2016 | 2015 | 2014 | 2013 |
| 81.9% | 86.2% | 81.9% | 81.8% | 82.9% | 76.7% |

10.     In its annual 15(c) Responses, CAL provided the following estimates of the amount of time certain key individuals spent on Fund-related activities:

| Person | CAL Position / Title | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|
| Mark Mickey | Funds' Chief Compliance Officer | 100% | 100% | 100% | 100% | 100% | 100% |
| John Calamos, Sr. | Chairman; Global Chief Investment Officer | 65% | 65% | 65% | 65% | 65% | 65% |
| Gary Black | co-Chief Investment Officer | n/a | n/a | n/a | 75% | 75% | 75% |
| John Koudounis | CEO | 65% | 50% | n/a | n/a | n/a | n/a |
| Robert Behan | President; Head, Global Distribution | 75% | 75% | 75% | 75% | 75% | n/a |
| James Boyne | President and Chief Operating Officer | n/a | n/a | n/a | n/a | n/a | 50% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Thomas Herman (2017) Nimish Bhatt (2013-16) | Chief Financial Officer | 65% | 65% | 75% | 75% | 75% | 75% |
| J. Christopher Jackson | General Counsel Head, Legal and Compliance department | 60% | 60% | 40% | 40% | 40% | 40% |
| Tammie Lee (2018) Chris Russell (2015-17) Steve Wastek (2013) | VP, Associate Counsel Legal department | 95% | 40% | 75% | 75% | n/a | 70% |
| Curtis Holloway | VP Head, Fund Administration | 85% | 75% | 75% | 75% | 90% | 90% |
| Ben Ernst | VP Manager, Fund Administration | 60% | 60% | 90% | 90% | 90% | 90% |
| David Mangefrida | Senior VP, Head, Tax department | 60% | 40% | 40% | 40% | 20% | 20% |

PX 184-A at 653486, PX 176-A at 650251, PX 145-A at 634346, PX 113-A at 502692, PX 61-A at 519368, PX 32-A at 513992.

### 2. The Growth Fund, and CAL's All Cap Growth Investment Strategy

11. CAL established the Growth Fund in 1990.  JSSF at ¶9.

12. The Growth Fund is managed following CAL's All Cap Growth investment strategy (a/k/a the U.S. Equity Growth strategy, the U.S. Growth strategy, the Growth strategy, and/or ACG).  JSSF at ¶10.

13. The Growth Fund's investment objective is long-term capital growth.  JSSF at ¶12; JX 168 at 3.

14. The Growth Fund's principal investment strategy is a focus on U.S. growth equities/stocks across all market capitalizations (but principally mid- and large-cap). JX 168 at 4.

5

15.     The Growth Fund's AUM and advisory fees for each year from 2007 through 2017 were as follows:

| Year * | Fund Net Assets (as of October 31) | Advisory Fees Paid (as of October 31) |
|---|---|---|
| 2017 | $1,672,427,281 | $15,478,921 |
| 2016 | $1,899,255,253 | $18,919,485 |
| 2015 | $2,726,125,388 | $26,417,079 |
| 2014 | $3,484,476,428 | $31,535,086 |
| 2013 | $4,441,152,831 | $41,109,168 |
| 2012 | $6,391,673,238 | $59,537,152 |
| 2011 | $7,727,002,086 | $70,744,156 |
| 2010 | $8,293,969,972 | $66,325,813 |
| 2009 | $7,988,441,578 | $58,313,737 |
| 2008 | $7,863,206,887 | $109,497,128 |
| 2007 | $17,493,714,892 | $127,528,938 |

JSSF at ¶20.

16.     Under CAL's team-of-teams organization, the Growth Fund (and the Other ACG Accounts) were managed by the U.S. Growth Equity team (also referred to as the U.S. Growth team or the Growth team).  JX 139 at CA-IT0000071 at 14, 16-18; Becker Decl. at ¶¶52-57; Kalis Dep. at 8:16–15:17.

17.     During the Relevant Period, CAL reported to the Board that the following number of investment personnel specifically supported the Growth Fund as members of the U.S. Growth Equity Team:

**Investment**

6

| Date | Personnel Supporting the Growth Fund |
|---|---|
| May 2014 | 22 |
| August 2014 | 24 |
| October 2014 | 24 |
| June 2015 | 18 |
| March 2016 | 18 |
| May 2016 | 18 |
| September 2016 | 13 |
| December 2016 | 13 |
| March 2017 | 13 |

Cronin Report at Ex. 11.

### 3.  The Calamos Investment Trust

18.     The 16 Open-End Funds advised by CAL are organized as separate series within Calamos Investment Trust ("CIT"), a Massachusetts business trust that is registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "ICA") as an open-end investment management company.  JSSF at ¶7.

19.     CAL sponsored and established all of the Funds, and at all times has been their investment adviser pursuant to an Investment Management Agreement ("IMA") between CAL and CIT. JSSF ¶8, ¶58; JX 5.

### 4.  CIT's Board of Trustees

20.     A single Board of Trustees (the "Board") oversees the Funds.  JSSF at ¶25.

21.     During the Relevant Period, the Board was comprised of the following persons:

| | |
|---|---|
| John P. Calamos, Sr. (entire Relevant Period) | Weston W. Marsh (until July 18, 2015) |
| Stephen B. Timbers (entire Relevant Period) | Virginia G. Breen (from 9/2015 to present) |
| John E. Neal (entire Relevant Period) | Theresa Hamacher (from 9/2015 to mid-2017) |
| William R. Rybak (entire Relevant Period) | Lloyd Wennlund (from 7/2018 to present) |
| David D. Tripple (entire Relevant Period) | |

JSSF at ¶23.

### 5. The Independent Trustees' Annual 15(c) Review

22.     ICA Section 15(c) requires the Independent Trustees to conduct an annual review to determine whether to approve continuation of the IMA (the "15(c) Review").  JSSF at ¶37.

23.     In the spring of each year, Independent Trustees request and CAL provides a compendium of materials relevant to the Board's consideration of the Funds' IMA (the "15(c) Request" and the "15(c) Response," respectively).

24.     During the Relevant Period, the Independent Trustees annually voted to approve the IMA at the following Board meetings:  June 21, 2013; June 26, 2014, July 16-17, 2015; June 30/July 1, 2016, June 21, 2017 and June 29, 2018 (the "15(c) Board Meetings").  JSSF at ¶52.

25.     At each of the 15(c) Board Meetings, members of CAL's management made presentations to the Independent Trustees on various portions of the 15(c) Materials.  JSSF at ¶53.  Following these presentations, the Independent Trustees meet in executive session and voted unanimously to approve continuation of the IMA and the Growth Fund's advisory fee rates as provided therein.  JSSF at ¶54-55.

### 6. The Third-Party Performance Reports

26.     As part of their 15(c) Requests, the Independent Trustees received from CAL an independent analysis comparing the Funds' advisory fees and performance, versus those of similar mutual funds.  JSSF at ¶¶46 and 108; PX 184-A at 653367, PX 176-A at 650069, PX 145-A at 634011, PX 113-A at 502387, PX 61-A at 519924, PX 32-A at 513711; Tr. at 149:2-154:12.

27.     Lipper, Inc. provided this analysis for the 2013 15(c) Review (the "Lipper Report" – JX 19); Morningstar Inc. provided analyses for the 2014, 2015 and 2016 15(c) Reviews (the "Morningstar Reports" – respectively, JX 46, JX 88 and JX 130); and Strategic

Insight provided analyses for the 2017 and 2018 15(c) Reviews (the "SI Reports" – JX 175 and JX 186).  JSSF at ¶¶47-49.  Lipper, Morningstar and Strategic Insight are referred to herein as the "Independent Data Providers."

28.     The Independent Data Providers' Reports compared the Growth Fund's performance and fees to those of: (1) mutual funds similarly classified by Lipper or Morningstar (the "Category Comparison"); and (2) a narrower subset of more similar peer funds (the "Peer Comparison").  JSSF at ¶50; JX 19; JX 46; JX 88; JX 130; JX 175; JX 186.

29.     The Independent Trustees considered the Independent Data Providers' Reports to be "very important" to their 15(c) Review.  Tr. at 190:2-6; JSSF at ¶109.    In particular, the Independent Trustees considered the Morningstar Reports to present reliable and unbiased information.  Tr. at 149:9-150:1; Timbers Dep. at 65:2-20.

## C.     The IMA

30.     CIT has entered into an IMA dated December 13, 2004, as subsequently amended, appointing CAL as the Funds' investment adviser.  JSSF at ¶58; JX 5.

31.     The services CAL provided under the IMA are set forth in Section 2 of that agreement ("Duties of Manager"), *see* JX 5 at 146341-43, and are detailed by CAL in "Detailed Service Listings" included in CAL's annual 15(c) Responses.[1]

32.      In particular, CAL is required to "furnish continuously an investment program of each Fund," "determine [] what investments shall be purchased, held, sold or exchanged by each Fund," "make changes on behalf of the Trust in the investments of each Fund," "place all orders for the purchase of and sale of portfolio securities for the account of each Fund with brokers or dealers selected by [CAL]," and "use its best efforts to seek on behalf of the Trust or any Fund

---

[1] PX 184-A at 653575; PX 176-A at 650344; PX 145-A at 634446; PX 113-A at 502799; PX 61-A at 519453; PX 32-A at 514076.

thereof the best overall terms available for any transaction." JX 5 at 146341-42. These services are commonly referred to as Portfolio Management Services. *See* Neal Decl. at ¶99; Behan Decl. at ¶¶23, 88; Tr. at 343:7-13.

33.     Section 4 of the IMA requires the Funds (rather than CAL) to bear certain expenses, including expenses/charges relating to: (i) the Funds' transfer agents, custodians, accountants, auditors and legal counsel; (ii) the compensation and travel expenses of the Independent Trustees, and all expenses of Board meetings; (iii) the Funds' registrations with the SEC and various states and other jurisdictions;  (iv) the preparation and  distribution of the Funds' prospectuses to  shareholders; and (v) the printing and mailing of the Funds' proxy statements, quarterly reports, semi-annual reports, annual reports and other communications to shareholders.  JX 5 at 146343-44.

34.     The IMA also includes the advisory fee schedules that govern the fees each of the Funds pays CAL to compensate it "[f]or the services and facilities to be provided to each of the Funds by the Manager [CAL] as provided in Paragraph 2 hereof." JX 5 at 146344.

35.     The Growth Fund's advisory fee schedule, as set forth in the IMA, was as follows from December 13, 2004 through June 30, 2018:

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Up to and including $500 million | 1.00% |
| Above $500 million up to and including $1 billion | 0.90% |
| Above $1 billion up to and including $6 billion | 0.80% |
| Above $6 billion up to and including $11 billion | 0.78% |
| Above $11 billion up to and including $16 billion | 0.76% |
| Above $16 billion up to and including $21 billion | 0.74% |
| Above $21 billion up to and including $26 billion | 0.72% |
| Above $26 billion | 0.70% |

JSSF at ¶60; JX 5 at 146348.

36.     The Independent Trustees approved the following revised fee schedule for the Growth Fund, as of July 1, 2018:

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Up to and including $500 million | 1.00% |
| Above $500 million up to and including $1 billion | 0.90% |
| Above $1 billion up to and including $6 billion | 0.80% |
| Above $6 billion | 0.70% |

JSSF at ¶61.

37.     The revised fee schedule does not reduce the advisory fees or effective fee rates that the Growth Fund currently pays:  Growth Fund assets are currently below $2 billion, and the advisory fee rates with respect to the first $6 billion of Growth Fund AUM are identical in both the pre- and post-June 30, 2018 advisory fee rate schedules.  *Compare* JSSF ¶¶60-61.

38.     Between 2013 and 2017, the Growth Fund's effective advisory fee rates were:

| Year (ending Oct. 31) | Effective Fee Rate (as % of Average Daily Net Assets) |
|---|---|
| 2018 | not available |
| 2017 | 0.89% |
| 2016 | 0.87% |
| 2015 | 0.85% |
| 2014 | 0.84% |
| 2013 | 0.83% |

JSSF at ¶21.

**D.     The FASA**

39.     On behalf of the Funds, CIT also entered into an Amended and Restated Financial Accounting Services Agreement with CAL dated December 13, 2004 (the "FASA").  JSSF at ¶62.

11

40.     Section 2 of the FASA sets forth the specific services/duties CAL owes to the Funds under that agreement.  JSSF at ¶63; JX 6 at 145713-14.  CAL provided the Board with a summary of those services in each of its annual 15(c) Responses during the Relevant Period.[2] According to CAL, it was required to:

1. Act as Fund Administrator for the Trust and provide the following accounting services to the Trust, including but not limited to:
   a. Manage the Trust's expenses and expense payment processing.
   b. Monitor the calculation of expense accrual amounts for the Trust and make any necessary modifications.
   c. Coordinate any expense reimbursement calculations and payment.
   d. Calculate and review yields on the Trust in accordance with rules and regulations of the Securities and Exchange Commission.
   e. Calculate and review net investment income dividends and capital gain distributions.
   f. Calculate and review trustee deferred compensation plan accruals and valuations.
   g. Prepare Form 1099 information statements for Board members and service providers.
   h. Calculate, track, and report tax adjustments on all assets
   i. Prepare excise tax and fiscal year distribution schedules
   j. Prepare tax information required for financial statement footnotes
   k. Prepare state and federal income tax returns
   l. Prepare year end dividend disclosure information
   m. Coordinate the audits for each Trust
   n. Prepare and review financial reporting statements for each Trust
   o. Prepare and file required regulatory filings
   p. Calculate coverage tests and other leverage related reporting as required
   q. Prepare and distribute press releases for the closed end funds
   r. Prepare and review annual expense budgets
   s. Prepare and disseminate vendor survey information

---

[2] PX 184-A at 653577-78; PX 176-A at 650346; PX 145-A at 634448-49; PX 113-A at 502801; PX 61-A at 519455; PX 32-A at 514075.  The services CAL provided under the FASA did not materially change from April 2012 through November 2018, when CAL and the Funds terminated that agreement.  *Id.*

> t. Prepare and furnish financial information for inclusion in
>   prospectuses or proxy
> u. Prepare board materials as required
> v. Consult with the independent accountants, legal counsel,
>   custodian, fund accountant, distributor, and transfer
>   agent in establishing policies of the Trusts

PX 184-A, at 653577.

41.     The FASA included the following fee schedule that was used to "compensate

Calamos for providing the services set forth in this Agreement."

| Aggregate Funds' AUM | Fee Rate |
|---|---|
| First $1 billion | 0.0175% |
| Next $1 billion | 0.0150% |
| AUM > $2 billion | 0.0110% |

JSSF at ¶64; JX 6 at 145720.

42.     Each of the Funds paid its pro-rata share of fees under the FASA based on the

proportion of its net assets to total net assets for all the Funds.  JSSF at ¶67.  The effective fee

rate for each of the Funds under the FASA was approximately 1.1 basis points.  JSSF at ¶64; JX

6 at 145720; Tr. at 200:8-9.  During the Relevant Period, the Growth Fund paid the following

"financial accounting fees" to CAL pursuant to the FASA:

| Year | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Financial Accounting Fees | $203,202 | $252,712 | $358,737 | $450,484 |

JSSF at ¶67.

43.     Shortly before trial, CAL terminated the FASA as of November 1, 2018 (JSSF at

¶65), and entered into agreements with State Street and Ernst & Young to provide certain of the

services previously specified in the FASA.  Tr. at 371:18-25.

E.    **The Funds' Third-Party Service Providers**

1.    **The Funds' Transfer Agent**

44.    U.S. Bancorp Fund Services LLC ("USBFS") serves as transfer agent to the Funds pursuant to a January 1, 2014 Transfer Agent Servicing Agreement between USBFS and CIT.  JSSF at ¶71; JX 182.

45.    USBFS' duties are set forth in Sections 2 through 5 of the Transfer Agent Servicing Agreement, and Exhibit C and D thereto.  JX 182 at 2-6, 17-19 and 25-26.  As transfer agent, USBFS is responsible for, *inter alia*: (i) keeping records of all mutual fund shareholders; opening, maintaining and servicing fund shareholder accounts; and (ii) processing all mutual fund share transactions, including purchases, redemptions, dividend payments and reinvestments. JSSF at ¶72; JX 182 at 2-3; Tr. at 359:4-360:24.

46.    Furthermore, as Transfer Agent, USBFS also:  (i) prepares and mails shareholder account statements and purchase and redemption confirmations to the Funds' shareholders (JX 182 at 2; Tr. at 359:14-19); (ii) mails shareholder reports and prospectuses to current shareholders (JX 182 at 2); (iii) prepares and files Form 1099s with respect to dividends received by shareholders (JX 182 at 2; Tr. at 360:21-24); (iv) operates an call-in system for shareholders to obtain account information, available around the clock (Tr. at 360:25–361:1); (v) paid $175,000 to CAL each year toward the $400,000 annual cost to CAL of maintaining CAL's separate call center, staffed by approximately 6 CAL employees, until CAL shut it down in July 2017 (Tr. at 361:6–362:1); and (vi) provides shareholders and intermediaries with 24 hour, seven day a week web access to their accounts through a hyperlink on CAL's website (Tr. at 362:2-16 and 383:11-20; JX 182 at 3, 17-19).

47.    Under the Transfer Agent Servicing Agreement, USBFS also provides certain compliance-related services to CAL, including:  (i) the MARS compliance reporting system,

which allows identification of potentially suspicious transactions such as market timing and late trading (Tr. at 362:17–363:7; JX 182 at 3, 25); (ii) anti-money laundering monitoring (Tr. at 363:8-10; JX 182 at 5-6); and (iii) identity theft monitoring (Tr. at 363:11-13; JX 182 at 5-6).

48.     USBFS is compensated *by CIT/the Funds*, and not CAL, for providing the services set forth in the Transfer Agent Servicing Agreement.  JX 182 at 6, 31-35; Tr. at 358:23–359:3. The Growth Fund's share of the fees paid to USBFS is set forth in ¶62 below.

### 2. The Funds' Accountant

49.     CIT entered into a Master Services Agreement dated March 15, 2004 with State Street Bank & Trust ("State Street").  JSSF at ¶79; JX 4.

50.     State Street's duties under the Master Services Agreement are set forth in Section 1 of that agreement.t.  JX 4 at 1-3.  Under the Master Services Agreement, State Street provides certain administrative and accounting services including: (i) providing daily reconciliation of cash, trades and positions; (ii) maintaining general ledger and capital stock accounts; (iii) preparing daily trial balance; (iv) providing selected general ledger reports; (v) preferred share compliance; calculating total returns; and (vi) providing monthly distribution analysis to the Funds. JSSF at ¶79; JX 4 at 1-3; PX 169-A at 646100.

51.     State Street is also responsible for calculating the Funds' daily net asset values ("NAV"), and prices/values the securities in the Funds' portfolios.  Tr. at 365:22–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100 (State Street is "responsible for daily pricing of all Calamos Funds as well as calculation of the Net Asset Value").

52.     State Street *is compensated by CIT/the Funds*, and not CAL, for serving as the Funds' Accountant under the Master Services Agreement.  Tr. at 365:10-21. The Growth Fund's share of the fees paid to State Street as Fund Accountant is set forth in ¶62 below.

### 3.  The Funds' Custodian

53.     State Street also serves as the Funds' Custodian pursuant to a September 11, 2009 Master Custodian Agreement between State Street and CIT.  JSSF at ¶75; JX 11.

54.     State Street's duties as Custodian are set forth in Sections 1 through 14 of the Master Custodian Agreement.  JX 11 at 1-20. Pursuant to that agreement, State Street, among other things:  (i) holds all cash and securities for the Funds (directly or through a book-entry system), delivers and receives payment for securities sold by the Funds, receives and pays for securities purchased by the Funds, and collects income from investments of the Funds (JSSF at ¶76; Tr. at 363:14–364:23); (ii) pays out dividends to the Funds' shareholders and pays out other approved expenses of the Funds (Tr. at 364:10-23); and (iii) provides the Funds with certain pricing services, including automated pricing services and fair valuation services (JSSF at ¶76; JX 11 at 344818).

55.     State Street is *compensated by CIT/the Funds*, and not CAL, for serving as the Fund's Custodian Funds.  JSSF at ¶78; JX 11 at 20 and 344817-25; Tr. at 363:25–364:6. The Growth Fund's share of the fees paid to State Street under the Master Custodian Agreement is set forth in ¶62 below.

### 4.  The Funds' Securities Lending Agents

56.     State Street also provides securities lending services pursuant to a September 18, 2009 Securities Lending Authorization Agreement between State Street and CAL (on behalf of the Funds).  JSSF at ¶94; JX 12; Tr. at 366:7–367:9. Under this agreement, State Street acts administers the Funds' securities lending programs, lending out securities held in Funds' portfolios in order to earn extra income for such Funds.  JSSF at ¶95, Tr. at 366:19–367:6.  State Street receives 15% of the securities lending revenue generated as compensation for operating the program.  JX 12 at 237834; Tr. at 366:19–367:6.

### 5.  The Funds' Auditor

57.   Deloitte & Touche LLLP ("Deloitte") is CIT's independent auditor.  JSSF at ¶90.
Deloitte audits and reports on the Funds' annual/semi-annual financial statements.  JSSF at ¶91.

58.   Deloitte's fees for serving as the Funds' auditor *are paid directly by the Funds*,
and not CAL.  Tr. at 367:10-23.  The Growth Fund's share of the fees paid to Deloitte is set forth
in ¶62 below.

### 6.  The Funds' Counsel

59.   Independent Trustees' Counsel also serves as counsel to CIT/the Funds ("Funds'
Counsel").  JSSF at ¶32; Tr. at 334:18–335:12.

60.   Funds' Counsel, among other things:  assists in preparing, and reviews and
comments on, the Funds' regulatory filings.  Tr. at 384:21-23, 315:25–317:17; PX 418; PX 419
at 317471-73.

61.   The legal services provided to the Funds by Funds' Counsel and other legal
services providers *are paid directly by CIT/the Funds*, and not CAL.  Tr. at 384:24–385:1 and
317:6-21; JX 5 at 146344; PX 419.  The Growth Fund's share of the legal fees paid to Fund
Counsel and/or other third-party legal services providers is set forth in ¶62 below.

### 7.  The Fees the Growth Fund Paid to Third-Party Service Providers

62.   During the Relevant Period, CAL paid the following fees to above-referenced
service providers:

| Fees Paid by the Growth Fund to Third Party Service Providers | | | | | | |
|---|---|---|---|---|---|---|
| Service Provider | Agreement(s) | 2017 | 2016 | 2015 | 2014 | Source |
| USBFS | Transfer Agent Servicing Agreement | $2,564,319 | $3,184,632 | $4,293,548 | $5,725,138 | JSSF at ¶74 |

| State Street | Master Custodian Agreement; Master Services Agreement | $178,129 | $170,441 | $260,495 | $358,831 | JSSF at ¶82 |
| Deloitte | <u>n/a</u> | $57,926 | $126,469 | $135,572 | $120,225 | JSSF at ¶92 |
| Fund Counsel | <u>n/a</u> | $666,944 | $221,593 | $167,837 | $105,805 | JSSF at ¶93 |

### F.    The Sub-Administration Agreement Between State Street and CAL

63.    CAL also entered into a Sub-Administration Agreement with State Street dated October 1, 2009.  JX 183 (Sub-Administration Agreement); PX 488 & 489 (additional letter agreements referenced in Sub-Administration Agreement); JSSF at ¶83.

64.    In its 15c Responses, CAL explained to the Board that the Sub-Administration Agreement operated in part to sub-contract to State Street certain of the services CAL was required to provide under the FASA (and for which CAL was compensated for under the FASA). PX 184-A at 653577;[3] *see also* Tr. at 224:10–225:11, 356:13-23.

65.    In annual reports to the Board, the Funds' Chief Compliance Officer explained that the services sub-contracted by CAL to State Street via the Sub-Administration Agreement included 43 functions previously performed by CAL's Fund Administration department, including the "initial preparation of the [Funds'] financials and other legal documents including the NQ, NSAR, and NCSR as well as information for prospectus updates."  PX 169-A at 646104-05; *see also* Tr. at 315:25–321:23 (Mr. Jackson's testimony regarding State Street's preparation of regulatory filings).

---

[3] *See also* PX 176-A at 650346; PX 145-A at 634448; PX 113-A at 502801; PX 61-A at 519455; PX 32-A at 514075.

66.     The services performed by State Street under the Sub-Administration Agreement are set forth in Sections 5 of that agreement, JX 183 at 645541-43, and Section 2 of the related letter agreement referenced in the Sub-Administration Agreement, PX 488 at 645534-36; *see also* JX 183 at 645543 ("The Services shall be provided as further defined by the Parties in the letter agreement regarding the Services of even date herewith.").

67.     Such services included: (i) drafting and preparing certain of the Funds' regulatory filings in whole, such as quarterly filings on Form NQ (disclosing the securities held in the Funds' portfolios), filings on Form NSAR (disclosing facts concerning Funds' operations, affiliates, service providers, securities holdings, income, expenses and activities), and annual filings on Form N-PX (disclosing the proxy votes CAL submitted in connection with each security held in each of the Funds' portfolios) (JX 183 at 645542; PX 488 at 645535); (ii) drafting and preparing the Funds' semi-annual and annual reports to shareholders on Form N-CSR in near entirety, including all financial information with respect to the Funds (JX 183 at 645542; PX 488 at 645534-35); (iii) drafting and preparing the financial information required for inclusion in the Funds' registration statements on Form N-1A and prospectuses (JX 183 at 645542); (iv) coordinating the Funds' audits (JX 183 at 645542; PX 488 at 645535); (v) preparing and managing the Funds' expense budgets, accruals and payments (JX 183 at 645542; PX 488 at 645535); (vi) performing daily compliance testing required by Section 18 of the ICA concerning the Funds' derivative positions (JX 183 at 645542; PX 488 at 645535); (vii) preparing numerous periodic reports for the Board (JX 183 at 645543; PX 488 at 645536); (viii) assisting CAL in determining  the Funds' dividends (JX 183 at 64552); (ix) and assisting CAL's tax department in preparing year-end reports (PX 488 at 645536). Mr. Jackson and Mr.

Holloway confirmed State Street's provision of these services as Sub-Administrator. *See* Tr. at 315:25–321:23, 374:4-14, 377:2-10, 380:11–382:10, 383:21–385:1.

68.     Under the Sub-Administration Agreement, State Street was paid *inter alia* an annual flat-fee for each Fund it serviced. JSSF at ¶84.  For Open-End Funds, like the Growth Fund, the flat fee was $50,000 per annum.  *Id*.

69.     CAL paid State Street's fees under the Sub-Administration Agreement out of its Fund Administration department's operating expenses.  For each year, those fees constituted more than 50% of the Fund Administration department's total operating expenses, which ranged from between $2.6 million and $2.8 million.  Tr. at 222:22–225:17, 356:25–366:14; JX 181 at Ex. B.[4]   The Sub-Administration fees paid by CAL's Fund Administration department for each year are as follows:

| Fees Paid by CAL for Services Provided to all Funds by Sub-Administrator | | | | | | |
|---|---|---|---|---|---|---|
| Service Provider | Fee Type / Fee Agreement | 2017 | 2016 | 2015 | 2014 | Source |
| State Street | Sub-Administration Agreement | not disclosed | $1,777,000 | $1,768,000 | $1,898,000 | JSSF at ¶86 |

### G.     CAL's Institutional and Subadvisory All Cap Growth Clients

70.     During the Relevant Period CAL also offered its All Cap Growth strategy to Institutional Accounts (the "Institutional ACG Accounts") and Subadvised Accounts (the "Subadvisory ACG Accounts," and together with the Institutional ACG Accounts, the "Other ACG Accounts"). JSSF at ¶¶11, 98 and Ex. 1 thereto; JX 181 at 4 & Ex. A. All of the Other ACG Accounts were independent third-parties unaffiliated with CAL. Tr. at 88:5-21.

---

[4] The Fund Administration department's annual operating expenses for 2017 and 2018 were materially the same as its annual expenses during 2014-2016.  Tr. at 224:14-19.

### 1.   The Other ACG Accounts

71.     Since January 1, 2012, CAL has had 36 Other ACG Accounts.  JX 181 at Ex. A. Of those 36 Other ACG Accounts, 13 terminated CAL *prior* to the Relevant Period, and the remaining 23 terminated CAL at various points during the Relevant Period.  *Id.*  At all times since December 2016, CAL had no Other ACG Accounts.  *Id.*; JSSF at ¶¶98 and 104; Tr. at 512:6-22; *see also* Tr. at 584:5-22; Becker Decl. ¶121.

72.     Five of the 36 Other ACG Accounts were Subadvisory ACG Accounts:  namely, (1) the Nomura Currency Fund – U.S. Growth Equity Fund ("Nomura"); (2) the MD American Growth Fund; (3) the MDPIM US Equity Pool (together with the MD American Growth Fund, the "MD Accounts"); (4) Union Bancaire Privée ("UBP"); and (5) Thrivent Financial for Lutherans ("Thrivent").  JX 8 at 638082; JX 9 at 638122; JX 15 at 622192-94; JX 18 at 638094-97; DX 908 at 638134-38.[5]  The remaining 31 Other ACG Accounts were Institutional ACG Accounts. JX 181 at Ex. A.

73.     CAL's 31 Institutional ACG Accounts were generally small:  22 had average AUM of less than $5 million; five had average AUM of between $5 million and $25 million; and the remaining four had average AUM of between $25 million and $50 million.  JX 181 at Ex. A.

74.     CAL's Subadvisory ACG Accounts were substantially larger than its Institutional ACG Accounts:  Nomura was the largest and had an average AUM of $528.2 million; and the average AUM for each of the two MD Accounts, when added together, was $471.4 million.  *Id.* Thus, the individual average AUM for Nomura and each of the two MD accounts, when summed, exceeded $1 billion.

---

[5] Each of these IMAs makes clear that CAL is being retained by another investment adviser to provide certain investment advisory services to a fund or portfolio sponsored and managed by that investment adviser.

75. Accordingly, at all times from January 1, 2012 through October 2016 (when Nomura ceased receiving CAL's ACG advisory services), the assets CAL managed in its Subadvisory ACG Accounts constituted 90% or more of the total assets CAL managed for all the Other ACG Accounts. JX 181 at Ex. A. Likewise, after September 2013 (when UBP terminated CAL) and through October 2016 (when Nomura terminated CAL), Nomura and the two MD Accounts constituted by themselves 90% or more of the total assets CAL managed for all Other ACG Accounts. JX 181 at Ex. A. *Id.*

### 2. The Other ACG Accounts' Advisory Fee Rates

76. The Other ACG Accounts paid advisory fees to CAL based on what the market for institutional advisory/subadvisory services would bear. Tr. at 88:22-25; Behan Decl. at ¶¶72-73.

77. During most of the Relevant Period, and at all times subsequent to September 2013, CAL's Other ACG Accounts paid advisory fees to CAL under three different advisory fee rate schedules. JX 181 at Ex. A; Pomerantz Report at ¶¶169-72; Tr. at 554:22-556:15. These schedules consisted of CAL's standard ACG rate for Institutional Accounts and two individual schedules that were separately negotiated by certain of CAL's Largest ACG clients.

78. During the Relevant Period, CAL publicly reported in its Form ADV a standard advisory fee rate schedule for its institutional separately-managed All Cap Growth accounts (the "Standard SMA Schedule"). JSSF at ¶102; PX 438 at 5-7; Behan Decl. at ¶75. This publicly-reported, standard rate is also known as a "rack rate." Tr. at 533:22–534:14, 575:23–576:9. It functions as a "manufacturer's suggested retail price." Tr. 575:19–576:9.

79. CAL's Standard SMA Schedule was as follows:

| Rate | AUM Range |
|------|-----------|
| 0.75% | First $25 million |
| 0.70% | Next $25 million |

|         |                        |
|---------|------------------------|
| 0.65%   | Next $25 million       |
| 0.50%   | All assets > $75 million |

JSSF at ¶103; PX 438 at 5.

80.     All 31 of CAL's Institutional ACG Accounts paid advisory fees to CAL pursuant to the Standard SMA Schedule.  JX 181 at Ex. A.

81.     Given the breakpoints in CAL's Standard SMA Schedule, the effective fee rates paid by CAL's 31 Institutional ACG Accounts were a function of their small size.  JX 181 at Ex. A; Behan Decl. at ¶75.  Twenty-seven of CAL's 31 Institutional ACG Accounts had average AUM of less than $25 million (22 had average AUM of less than $5 million), and consequently, under CAL's Standard SMA Schedule, paid effective advisory fee rates of 0.75% – the first break-point rate – because they were not large enough to take advantage of the substantially lower rates for progressively higher AUM ranges.  JX 181 at Ex. A.

82.     The remaining four CAL Institutional ACG Accounts had AUM between $25 million and $50 million (Full House Ventures, LTD; Insurance Company of British Columbia; Iolani School; and Teamsters Pension Trust Fund of Philadelphia), and consequently, under CAL's Standard SMA Schedule, paid effective advisory fee rates between 0.75% (the rate that applied to the first $25 million of AUM) and 0.70% (the rate applicable to AUM between $25 million and $50 million).  JX 181 at Ex. A.

83.     If any of the Institutional ACG Accounts had an average AUM equal to the Growth Fund, that client would have paid an effective advisory fee rate of approximately 51 bps under the Standard SMA Schedule – substantially lower than the approximately 85 bps the Growth Fund paid under the IMA.  *See* Section III.B.1, *infra*; Pomerantz Report at ¶¶169-70.

84.    CAL's largest Subadvisory ACG Accounts – namely, Nomura and the two MD Accounts – negotiated advisory fee rates substantially lower than CAL's Standard SMA Schedule.  JX 181 at Ex. A; Pomerantz Report at ¶¶169-70; Tr. at 555:1–556:20; 575:19–576:17.

85.    Nomura paid advisory fees to CAL at a flat rate of 0.45% on all AUM (the "Nomura Rate").  JX 181 at Ex. A; JX 59; Pomerantz Report at ¶¶169-70.  Nomura's effective advisory fee rate was thus 0.45%.  *Id*.

86.    The two MD Accounts paid advisory fees to CAL under the rate schedule set forth below (the "MD Rate"), with assets in both of the MD Accounts aggregated for purposes of calculating investment advisory fees paid by each:

| Rate | AUM Range |
|------|-----------|
| 0.55% | First $100 million |
| 0.45% | Next $100 million |
| 0.325% | All assets > $200 million |

JX 181 at Ex. A; Pomerantz Report at ¶¶169-70; JX 18 at 638106.

87.    Under the MD Rate, the MD Accounts, at their average combined AUM of $471.1 million, paid an average effective fee rate of 0.40%.  JX 181 at Ex. A.

### 3.    CAL Provided the Growth Fund and the Other ACG Accounts with Substantially Identical Portfolio Management Services

88.    The Growth Fund and the Other ACG Accounts each followed the All Cap Growth investment strategy, subject to applicable investment guidelines.  JSSF at ¶100.

89.    CAL provided the Growth Fund and its Other ACG Accounts *the same* kinds of Portfolio Management Services under their IMAs.  In particular, CAL was required to:  (i) buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities select; (ii) establish and deal through accounts with one or more securities broker-dealers or banks as CAL may select; and (iii) use its best judgment to select broker-dealers to obtain the best price and

24

most favorable execution.  *Compare* JX 5 at 146341-3 with e.g. JX 8 at 638082-84, JX 15 at 1-3; JX 18 at 1-3; JX 13 at 1-2; JX 14 at 1-2; JX 7 at 1-2; JX 9 at 2-3.

90.    The Growth Fund and the Other ACG Accounts shared *the same* investment objective:   long-term capital growth.  *Compare* JX 168, at 3 (Fund principal investment objective) *with* JX 8 at 638090, JX 18 at 638102; *see also* Kalis Dep.  82:16–83:2.

91.    The Growth Fund and the Other ACG Accounts shared *the same* principal investment strategies.  *Compare* JX 168, at 4 (Growth Fund principal investment strategies) *with* JX 7 at 100469 (Iolani guidelines), JX 8 at 638091-92 (MD American Growth Fund guidelines); JX 13 at 638180 and 638185 (Teamsters guidelines), JX 18 at 638102-03 (MDPIM guidelines); Kalis Dep. at 24:13-25, 82:16 – 83:2.

92.    The Growth Fund and the Other ACG Accounts were provided with Portfolio Management Services by *the same* CAL investment management personnel, including portfolio managers, research analysts, risk managers, and *the same* trading personnel, who utilized *the same* methods, research, infrastructure, systems and facilities.  Tr. 80:17-21; Kalis Dep. at 8:16–15:17, 19:19–26:5, 44:21–47:1; Becker Decl. ¶¶16, 40-51; JX 139 at CA-IT 00000071 at 11-18.

93.    The Growth Fund and the Other ACG Accounts were provided with *substantially identical* investment portfolios, consisting of substantially the *same securities* in substantially *the same* relative proportions.  Kalis Dep. at 25:1–26:5, 28:16–29:13, 80:10–83:2; PX 331; PX 332; PX 334; PX 336; PX 337; Pomerantz Report at ¶¶115-16, 118-19.

94.    The portfolio manager for the Growth Fund and the Other ACG Accounts generally bought or sold the *same* securities in the *same* relative amounts at the *same* times for the Growth Fund and the Other ACG Accounts.  Kalis Dep. at 25:8–26:5, 28:16–29:13; 90:23–92:10; 93:11-18; PX 330; PX 333; PX 335; Pomerantz Report at ¶¶115-16, 120.

95.     To the extent that there were minor differences in the Growth Fund's and the Other ACG Accounts' portfolios, such differences resulted from variations in investment guidelines particular to certain accounts and/or variations in the timing and amounts of cash flows into or out of the accounts.  Kalis Dep. at 25:1–26:13, 28:16–29:13, 47:25–49:9; PX 334; PX 337; Pomerantz Report at ¶¶121-24.

96.     The Growth Fund's investment performance was *substantially similar* to the Other ACG Accounts' investment performance. JSSF at ¶101; Pomerantz Report at ¶¶127-36; Kalis Dep. at 25:1-20, 28:3–29:13.  As CAL informed the Board, this was generally true across all of CAL's Funds and the other accounts for whom CAL provided the same investment strategies:

> Mr. Bhatt then addressed the hand-out charts comparing the gross performance of the Funds to the gross performance of accounts of other Adviser clients that are managed in a manner similar to the Funds.  Mr. Bhatt explained that the charts reflect that the Funds' performance is virtually the same as that of the Adviser's similar mandates managed for others.  Mr. Calamos noted that, to the extent there are some performance differences, they result from the fact that other clients might have slightly different mandates or investment restrictions.

PX 436 at 533440; *see also* PX 145-A at 634812-29 (comparing performance of certain Funds to "institutional composites" of accounts in the same strategy); PX 61-A at 519556-66 (same).

## II.   QUALITY OF SERVICES

97.     As discussed below, by every metric, and by CAL's own admission, CAL's investment performance during the Relevant Period was exceedingly poor.

### A.      The Fund's Comparative Investment Performance under Standard 1-, 3-, 5- and 10-Year Time Frames Was Abysmal

98.     The three Independent Data Providers (Lipper, Morningstar, and Strategic Insight), and Plaintiffs' expert Dr. Pomerantz, considered substantially similar and/or identical

comparative performance data, applied similar methods, and reached similar conclusions – namely, that the Growth Fund performed worse, at nearly all times and for nearly all time periods considered, than nearly all similar mutual funds.  Pomerantz Report at ¶¶328-39; Tr. at 544:14–547:15, 547:16-552:23; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.

99.     In evaluating the Growth Fund's comparative investment performance, Lipper, Morningstar and Strategic Insight each:

a.   evaluated the Growth Fund's performance over 1-, 3-, 5- and 10-year periods (and did not evaluate "since-inception" performance);

b.   evaluated the Growth Fund's performance using a single "return date" of March 31 (*i.e.*, over 1-, 3-, 5- and 10-year periods ending March 31 of the current year – the most recently-completed fiscal quarter prior to the reports' due date each year for the 15(c) Board Meeting); and

c.   compared and ranked the Growth Fund's performance against both:  (1) the entire "universe" of all similarly-classified mutual funds (Lipper used Lipper classification categories; Morningstar and Strategic Insight both used Morningstar classification categories); and (2) a smaller subset of such similarly-classified funds (the Peer Comparison). [6]

100.    The Category Comparison data provided to the Board during the Relevant Period for the Growth Fund showed the following performance, which has been color-coded by quartile,

---

[6] JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.

such that red represents the 4th quartile (the worst), orange the 3rd quartile, green the 2nd quartile, and blue the 1st quartile (the best):[7]

## Category Comparisons

| Provider | Return Date | Ranking | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|---|---|
| Lipper | 3/31/2013 | % | [96] | [95] | [88] | [71] |
| | | Ordinal | 504 of 525 | 428 of 450 | 336 of 381 | 179 of 252 |
| Morningstar | 3/31/2014 | % | 32 | 98 | 63 | 84 |
| | | Ordinal | 50 of 157 | 147 of 150 | 89 of 141 | 99 of 118 |
| Morningstar | 3/31/2015 | % | 60 | 87 | 89 | 91 |
| | | Ordinal | 90 of 150 | 126 of 147 | 121 of 137 | 105 of 116 |
| Morningstar | 3/31/2016 | % | 87 | 67 | 97 | 100 |
| | | Ordinal | 126 of 146 | 96 of 144 | 135 of 139 | 120 of 121 |
| Strategic Insight | 3/31/2017 | % | 89 | 88 | 96 | 91 |
| | | Ordinal | 1294 of 1454 | 1147 of 1306 | 1109 of 1054 | 730 of 800 |
| Strategic Insight | 3/31/2018 | % | 69 | 91 | 80 | 96 |
| | | Ordinal | 964 of 1376 | 1101 of 1213 | 874 of 1099 | 745 of 779 |
| Average | | % | 72 | 88 | 86 | 89 |

101. The Peer Comparison results provided to the Board during the Relevant Period for the Growth Fund showed the following performance, which has been color-coded by quartile,

---

[7] JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891. Lipper provided only ordinal rankings: the percentile rankings shown were calculated on the basis of Lipper's ordinal rankings.

such that red represents the 4th quartile (the worst), orange the 3rd quartile, green the 2nd quartile, and blue the 1st quartile (the best):[8]

## Peer Comparisons

| Provider | Return Date | Ranking | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|---|---|
| Lipper | 3/31/2013 | % | [100] | [100] | [100] | [100] |
| | | Ordinal | 9 of 9 | 9 of 9 | 8 of 8 | 8 of 8 |
| Morningstar | 3/31/2014 | % | 10 | 100 | 43 | 65 |
| | | Ordinal | 3 of 23 | 22 of 22 | 9 of 20 | 12 of 18 |
| Morningstar | 3/31/2015 | % | 69 | 91 | 96 | 85 |
| | | Ordinal | 16 of 23 | 21 of 23 | 22 of 23 | 18 of 21 |
| Morningstar | 3/31/2016 | % | 79 | 79 | 100 | 100 |
| | | Ordinal | 12 of 15 | 12 of 15 | 15 of 15 | 15 of 15 |
| Strategic Insight | 3/31/2017 | % | 89 | 85 | 91 | 94 |
| | | Ordinal | 134 of 151 | 116 of 136 | 111 of 122 | 65 of 77 |
| Strategic Insight | 3/31/2018 | % | 24 | 62 | 39 | 78 |
| | | Ordinal | 153 of 622 | 364 of 588 | 204 of 516 | 273 of 348 |
| Average | | % | 62 | 86 | 78 | 87 |

102.    In evaluating the Growth Fund's comparative investment performance, Dr. Pomerantz: (a) evaluated the Growth Fund's performance over 1-, 3-, 5- and 10-year periods (as did Lipper, Morningstar and Strategic Insight); (b) compared and ranked the Growth Fund's performance against the entire "universe" of funds similarly-classified by Morningstar (as did Morningstar and Strategic Insight); and (c) instead of using a single return date each year (as did Lipper, Morningstar and Strategic Insight), conducted a more comprehensive "rolling" analysis

---

[8] JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.   Lipper provided only ordinal rankings:   the percentile rankings shown were calculated on the basis of Lipper's ordinal rankings.

of comparative Growth Fund returns and rankings as of each month end (*i.e.*, 12 return dates each year).   Pomerantz Report at ¶¶330-39; Tr. at 545:5–547:5.

103.   The results of Dr. Pomerantz's rolling analysis of comparative investment performance are illustrated in the charts below (one showing the Growth Fund's rolling 1- and 3- year performance rankings, the other showing the Growth Fund's rolling 5- and 10-year performance rankings):





Pomerantz Report at ¶335; Tr. at 545:5–547:5.

104.   Dr. Pomerantz's analysis of the Growth Fund's comparative investment performance yields the following average rankings for 1-, 3-, 5- and 10-year returns:

| Rolling Return Period | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| Average Fund Percentile Rank | **64** | **80** | **91** | **89** |

Pomerantz Report at ¶335; Tr. at 545:5–547:5.

105.   The Category Comparison analyses performed by Lipper, Morningstar and Strategic Insight for the Board, and by Dr. Pomerantz for Plaintiffs, all indicate that the Growth Fund's 3-, 5- and 10-year returns, as measured during the Relevant Period, have placed the

Growth Fund, on average, in the bottom quartile of its category, often in bottom 10% of such funds, and *never* in the top half of such funds.[9]

106.    Moreover, as Mr. Neal testified, CAL's Morningstar and Strategic Insight 1-year category rankings (as of March 31st) were progressively worse each year from 2014 through 2017.  Tr. at 161:20-168:11.

107.    In February 2017, CAL terminated the Growth Fund's then-lead portfolio manager, David Kalis, admittedly because of the Growth Fund's continued "underperform[ance]."  Becker Decl. at ¶¶57, 70, 115; Tr. 168:12-23, 181:3-10, 713:7-22.

**B.    CAL Has Repeatedly Admitted that Performance Was Very Poor**

108.    In their testimony at trial, the Growth Fund's Independent Trustees, and CAL's executives and experts, repeatedly admitted that the Growth Fund's performance during the Relevant Period was poor.  *See e.g.* Becker Decl. at ¶¶52, 65, 68-70, 107-20 (describing poor performance and efforts made to improve it); Behan Decl. at ¶¶23 ("recent years" included "some stretches of time with quite significant underperformance"), 25, 54-57 (describing actions CAL undertook to improve the Growth Fund's performance, including firing its lead portfolio manager Mr. Kalis), 75; Neal Decl. at ¶71 ("over the last five years, [] the Fund's performance has lagged—and in some instances has significantly lagged—its peer funds and its benchmarks.") and *see also id*. at ¶¶39, 46, 65, 72, 75 (discussing CAL's efforts to improve the Growth Fund's performance)' Jackson Decl. at ¶¶64 ("[t]hroughout the time period relevant to this this case [], the Independent Trustees requested information and engaged repeatedly in discussions with CAL's management concerning the reasons for the Fund's underperformance and CAL's efforts to improve performance."), 71-72; Tr. at 54:18–58:8, 74:18-21 (Mr. Becker -

---

[9]Pomerantz Report at ¶335; Tr. at 545:5 – 547:15; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.

Growth Fund's performance "had struggled"); 101:9-14 (Mr. Behan – Growth Fund's performance had "struggled"); 149:5–152:10, 157:19-23; 161:20–163:25, 167:3–168:24, 179:14–181:17 (Mr. Neal – during "the last seven or eight years, they've had challenges with their performance."), 195:1-9, 197:21–199:6, 719:12-18 (Dean Hubbard – "You had challenges in performance [] and you had investors leaving."), 728:2-18, 741:14–742:4 (about 10% of mutual funds were, like the Growth Fund, in the bottom quartile with respect to performance but the top quartile with respect to fees), 984:19–987:10 (Professor Laby – Growth Fund was "challenged in some cases in terms of performance"; discussing steps taken in response to challenged performance).

### C. The Growth Fund's Since-Inception Performance, and its Irrelevance

109. Defendant presented evidence at trial regarding the Growth Fund's supposedly superior investment returns since its inception in 1990. Becker Decl. at ¶72. As Plaintiffs' expert Dr. Pomerantz demonstrated, however, the Growth Fund's since-inception performance is simply the ever-shrinking residue of its above-average performance prior to 2007 – many years before the Relevant Period here. Pomerantz Rebuttal Report at ¶¶24, 388-98; Tr. at 550:2-551:8.

110. Furthermore, the Growth Fund's since-inception performance likely did not benefit any Fund investors other than CAL, as it was enjoyed by a mere $300,000 in Growth Fund assets that were present at Growth Fund inception, which were provided by CAL itself as "seed capital." Pomerantz Rebuttal Report at ¶¶388, 391, 107 n.34; Tr. at 549:6-13.

111. Dr. Pomerantz analyzed the Growth Fund's since-inception performance from the perspective of the average Growth Fund shareholder by time-weighting the Growth Fund's returns to incorporate the amount of shareholder money invested and when. He found that the Growth Fund delivered *underperformance* to the average shareholder since inception. Pomerantz Rebuttal Report at ¶¶366, 392-95.

33

112.    Additionally, Dr. Pomerantz opined that, because since inception returns can be distorted by one-off, long-ago events, they are not recognized in the industry as a relevant metric for comparing mutual funds.  Tr. at 547:16-549:5.

113.    Morningstar, a leading independent third-party provider of mutual fund data and research widely used in the investment industry, only incorporates rolling 1-, 3-, 5-, and 10-year performance periods in its mutual fund "Star Rating" methodology.  Tr. at 547:25-548:21. Morningstar does not consider since-inception performance in its fund ranking methodology.  *Id.*

### D.    CAL'S Claims Regarding its Purported Efforts to Improve Performance

114.    In light of the Funds' abysmal performance, CAL represented to the Board that it was taking action to improve its advisory services.  This consisted primarily of its claim that – as part of its transition from a vertical to a horizontal investment approach – it would be spending approximately $3 million per year to hire additional personnel in order to improve its investment management team.  Tr. at 165:25-166:3; JX 29 at 512555; JX 139 at CA-IT 00000071 at 1-6. According to CAL, its decision to add 17 investment professionals "would represent a 33% increase in investment management department personnel" from 2012 levels.  *Id.*

115.    However, as discussed below, CAL's hiring of additional personnel (i) represented at most a *de minimis* investment in the Growth Fund as a general matter, and (ii) is belied by the fact that CAL's personnel totals *did not increase* as a result of the CAL's transition to a horizontal approach (but stayed flat), and CAL substantially *decreased* the number of investment professionals specifically tasked with servicing the Growth Fund.

116.    First, CAL's hiring of additional investment personnel was not specific to the Growth Fund, or even the Funds, but benefitted *all of CAL's clients equally* – fund and non-fund accounts alike.  Tr. at 628:6-24, 671:15-16.  Thus, only a small fraction of CAL's $3 million annual expense could be reasonably viewed as an investment in the Growth Fund.

117.    Second, despite CAL's claim to the Board that it was increasing its headcount by a whopping 33% to improve performance, it was merely bringing its headcount back to historical levels.  Specifically, prior to CAL's transition to a horizontal investment approach, it averaged approximately 66 investment professionals.  Tr. at 629:21-630:25; 632:8-12; *see also* Cronin Report at Ex. 10.  Between 2011 and 2012, however, CAL experienced substantial employee turnover resulting in its headcount falling to the low 50s.  Tr. at 630:4-25.[10]

118.    When CAL completed its restructuring in 2015[11] – and had made its various additional hires – it had a total of 67 investment professionals, compared to the 66 investment professionals it averaged prior to its transition.  Tr. at 632:19-633:4; Cronin Report at Ex. 10.[12]

119.    Thus, CAL's additional hires did not, in fact, increase its base, and its boasted 33% increase in personnel was merely a function of the fact that CAL's 2012 headcount was abnormally low.  Tr. at 166:8-17; 632:19-633:4; Cronin Report at Ex. 10.

120.    Notably, what did substantially increase as a result of the transition was the amount of money CAL paid itself, which ballooned from $51 million in total employee compensation in 2012 to $67 million in 2015, despite headcount remaining constant and despite the cost of the additional hires only representing an additional $3 million.  Tr. at 633:5-18; Cronin Report at Ex. 9.1.

---

[10] Notably, this precipitous decrease occurred *before* the transition-related change in compensation structure that CAL had predicted might result in departures.  Tr. at 631:1-19.

[11] CAL reported to the Board that its reorganization efforts culminated in 2015.  JX 139 at CA-IT 00000071 at 6.

[12] CAL also claims to have made significant personnel changes as part of its transition, most notably its hiring of Mr. Black to a three-year contract to head the transition, and its subsequent promotion of Mr. Kalis to head the Growth Fund.  CAL did not attempt to retain Mr. Black after his contract expired, *see* Tr. at 202:18-25; 634:8-14, and ultimately terminated Mr. Kalis due to the continued poor performance of the Growth Fund.  *See* Tr. at 197:21-198:6; 634:4-22.

121.    Finally, *and most critically*, despite CAL's headcount remaining flat during the Relevant Period, CAL actually *decreased* the number of investment professionals dedicated to the Growth Fund.  Indeed, the total number of individuals *specifically assigned* to the Growth Fund declined precipitously from 24 investment professionals in July 2014 to 13 investment professionals in May 2017.  Tr. at 637:4-638:9; Cronin Report at Ex. 11.[13]

### E.    The Board's Fig-Leaf Response to CAL's Continued Poor Performance

122.    Mr. Neal testified that, as a result of CAL's short-term and long-term underperformance, the Board asked CAL to agree to an exceedingly modest, 5 basis point reduction of its advisory fee in 2013 (from 83 bp to 78 bp).  According to Mr. Neal, the waiver not only reduced shareholders' investment costs, but also had the salutary benefit of "reinforcing a board's message to the adviser about the seriousness of the challenge and of the Board's interest in maximizing performance."  Neal Decl. at ¶78.  Nonetheless, the Board did not seek a fee reduction at any other time during the Relevant Period, despite CAL's admittedly poor performance.

123.    The explanation Mr. Neal offered at trial was that fee waivers constrain the resources available to an adviser to improve its investment processes/performance, and the Board was mindful to ensure that CAL had available "the resources needed to invest in its business in order to improve the Fund's performance."  *Id.* at ¶79.  The Board's purported rationale, however, cannot be harmonized with the trial evidence.

---

[13] Mr. Cronin reached his totals based on "the people that were described in the materials that went to the board as being involved with the fund."  Tr. at 636:7-15; Cronin Report at Ex. 11. Moreover, while Mr. Cronin believes that there may have been other investment professionals who assisted the Growth Fund sporadically ("other personnel"), he agreed that the negative trend identified in his report would only be offset if the number of other personnel that assisted the Growth Fund increased substantially over the same time period.  Tr. 637:16-637:3.  There is no evidence that this occurred.

124.     *First*, as Mr. Cronin admitted at trial, a reduced fee would not even be a hypothetical constraint on an adviser's ability to improve its investment processes, if the adviser paid for the efforts to improve *its own poor performance out of its own profit margins*.  Tr. at 619:18-620:17.

125.     *Second*, the Board instituted the 5-basis point fee waiver *at the same time* CAL informed the Board that it was going to spend approximately $3 million per annum on new hires, and there is no evidence that the fee waiver constrained in any way CAL's purported efforts to improve performance.  Tr. at 621:6-18.  Thus, by definition, fee reductions and efforts to improve performance are not mutually exclusive/conflicting options.

126.     *Third*, during the Relevant Period CAL's AUM decreased precipitously, with Growth Fund AUM alone shrinking from over $4 billion to less than $2 billion.  This, in turn, resulted in CAL's overall operating income decreasing from $128 million in 2012 to $51 million in 2016 (a decrease in income far greater than the amount of the fee waiver).  Tr. at 664:7-13.  Yet, over that same time period, CAL increased employee compensation by about *$40 million per year*.  *See id.* 633:9-18.  Thus, it is simply not possible that a reduced fee would have constrained CAL, given that it was able to pay itself $40 million more per year at the same time its income dropped by a far greater amount due to the performance-based loss of AUM than it would have declined due to a continued waiver.

### F.     The Reaction of the Other ACG Accounts Speaks Directly to the Quality of Services CAL Provided

127.     The uniform reaction of CAL's arm's length ACG clients to CAL's poor performance is telling.  Of the 36 Other ACG Accounts that CAL managed since 2011, *all 36 terminated* CAL by December 2016 and moved their assets elsewhere.  JX 181, Ex. A.

128.    Furthermore, at least 24 of those 36 clients – including Nomura and the two MD Accounts, which were CAL's two largest ACG clients – informed CAL that they closed their accounts due to poor performance.  JX 181, Ex. A; Tr. at 83:1-85:7, 87:21-89:17.

129.    Notably, CAL met with and sought to persuade each of the Other ACG Accounts not to close their accounts.  Tr. at 89:25-91:20; Behan Decl. at ¶91.  CAL informed each of the Other ACG Accounts of the ACG strategy's supposedly superior since-inception performance and of CAL's efforts to improve the investment management team.  Tr. at 89:25-91:20. None of the Other ACG Accounts, however, found these arguments persuasive enough to remain CAL advisory clients.  JX 181, Ex. A; Tr. at 89:25-91:20.

130.    The reaction of one such client, the Teamsters Pension Fund of Philadelphia (the "Teamsters"), to CAL's performance is illustrative.  Tr. at 54:2-58:8.  The Teamsters had an investment consultant, of RBC Wealth Management, who informed CAL that "Calamos pales in comparison to its peers relative to performance", that he has "reviewed our performance, etc., 'ten ways to Sunday' and cannot find a defense", and that he "cannot continue to defend us to the client for risk of his own credibility."  Tr. at 54:17-55:21; PX 344 at 430860.

### G.    The Reaction of the Growth Fund's Shareholders to the Quality of Services Provided is Further Indication that its Fees were Excessive

131.    The trial record shows also that Growth Fund shareholders were dissatisfied with performance, exiting the Growth Fund in large numbers.  The Growth Fund's AUM peaked at $20 billion in March 2006.  Pomerantz Rebuttal Report at ¶418.  At that time, the Growth Fund had a 2.2% market share within its category of actively-managed Large Growth funds.  *Id.*  As of December 2016, however, the Growth Fund had lost 91% of its AUM, and its market share had declined to only 0.2% – less than one tenth its market share in 2006.  *Id.*

132.   Notably, the Growth Fund's loss of AUM and market share transpired concurrently with its declining performance, suggesting that the AUM loss was caused by shareholder disappointment with the Growth Fund's investment results.   Pomerantz Rebuttal Report at ¶393.

133.   The Growth Fund's AUM loss has been greater than that of the actively managed equity fund industry.  Tr. at 688:3-17.

134.   The reaction of the Growth Fund's investors as shown by the loss of AUM and market-share evidences shareholders' unhappiness with the quality of the portfolio advisory services offered.  Pomerantz Rebuttal Report at ¶¶418-19.

135.   Defendant's expert Dean Hubbard testified that, according to his study of price elasticities of demand in the mutual fund industry, the consequences to an advisor of charging a supra-competitive fee, given its level of performance, would be a loss of AUM and market share. Tr. at 687:3-17, 691:24-692:12.   For every percent above a competitive level a fee was, an advisor would lose 3% of its market share.  Tr. at 687:21-24.

136.   Dean Hubbard's price elasticities study involved total expense ratios. Tr. 692-93. Dean Hubbard conceded, however, that market forces act indirectly with respect to fund advisory fees in that a loss of AUM and market share would ensue if advisory fees were so high that they pushed a fund's total expense ratio above a competitive level.  Tr. 692:18-693:11.  Here, the Growth Fund's loss of AUM and market share is a result of the fact that the advisory fees were so high that they pushed its total expense ratio to an uncompetitive level given its level of performance.  Pomerantz Rebuttal Report at ¶¶173-77, 418-19, 693-94; Hubbard Report at ¶55 and Ex. 7; Tr. 691:20–693:11.

137.    This conclusion is buttressed by the fact that, as Dean Hubbard admits, the Growth Fund's advisory fees in this case were relatively higher, while its "non-management" or third-party fees were "consistently lower," than those of its peers.  Tr. 693:12–694:13.

## III.    COMPARATIVE FEES

138.    Plaintiffs presented evidence at trial comparing the Growth Fund's advisory fees to: (1) fee rates paid by comparable mutual funds; and (2) fee rates paid to CAL by arm's length, third-party institutional clients to whom CAL provided substantively identical Portfolio Management Services as it did to the Growth Fund (the Other ACG Accounts).   As discussed below, by every metric the Growth Fund's fees were at the highest end of the spectrum and dwarfed the fees paid by CAL's Other ACG Accounts.

### A.    Versus Comparable Mutual Funds

139.    The advisory fees that CAL charges to the Growth Fund place the Growth Fund at the very highest end of the range of advisory fees charged by other advisers to mutual funds similar in character and size to the Growth Fund, and indicate that the Growth Fund is an *outlier* among peer funds (in that the Growth Fund pays advisory fees that are far higher than the vast majority of peer funds).   Pomerantz Report at ¶¶298-304; Tr. at 560:22–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623.

140.    When conducting comparative analysis of mutual fund fees, each of the Independent Data Providers, as well as Dr. Pomerantz, compared the Growth Fund against a peer group of *similarly-sized* mutual funds (chosen from among the larger set of similarly-categorized funds), because of the general inverse relationship between fund size and fund fees (larger funds typically have lower fees).   Pomerantz Report at ¶¶298-304; Tr. at 562:7–565:1; JX 186 at 653796; JX 175 at 652022; JX 130 at 636387, -97 and -400; JX 88 at 523981, -90 and -93; JX 46 at 520598, -608 and -611; JX 19 at 513361.

141.    The Peer Comparison analyses conducted by Morningstar and Dr. Pomerantz both show that very few mutual funds paid higher advisory fees than the Growth Fund.  Pomerantz Report at ¶¶300-04; Tr. at 562:7–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623. In Morningstar's peer groups, only one or two funds paid higher advisory fee rates than the Growth Fund each year:  in 2016, only one other fund in the 22-fund peer group paid a higher advisory fee rate; in 2015, only one other fund in the 18-fund peer group; and in 2014, only two other funds in the 17-fund peer group.  Pomerantz Report at ¶304; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623. In Dr. Pomerantz's analysis of *all* 129 Large Growth mutual funds with net assets between $1 billion and $10 billion, only 9 other funds paid higher fee rates, placing the Growth Fund at the 93rd percentile of its peers.  Pomerantz Report at ¶¶302-04; Tr. at 562:7–563:2.

142.    Of the few other peer mutual funds that paid higher advisory fees according to Morningstar's and Dr. Pomerantz, approximately half are funds advised by American Century Investment Management ("ACIM").  Tr. at 563:13–565:1 (of the nine funds that pay higher fees than the Growth Fund in Dr. Pomerantz's peer analysis, four are ACIM-advised funds); JX 130 at 636413 (in 2016, the only fund in Morningstar's expense peer group that paid higher fees was an ACIM fund); JX 46 at 520623 (in 2014, one of two funds in Morningstar's expense peer group that paid higher fees than the Growth Fund was an ACIM fund).

143.    However, ACIM-advised funds differ from most other mutual funds in that they pay a *unified* management fee that covers not only investment advisory services, but also administrative services, transfer agency services, accounting services, custody services and further services and expenses as well (that, in the case of most other mutual funds as well as the Funds, are separately compensated).  Tr. at 563:18–564:7. Consequently, ACIM-advised funds

41

are inapt and are often excluded from comparative analyses of advisory fees, because their (higher) unified fees represent payment for advisory *and non-advisory services*.  Tr. at 563:18–564:22; *see also* JX 175 at 652022 (Strategic Insight excludes from its analysis funds with "all-inclusive/unified fee structure").

144.    When ACIM-advised funds are removed from Morningstar's and Dr. Pomerantz's Peer Comparison analyses, the Growth Fund's status as an advisory fee outlier at the very top of the advisory fee range is evident.  Morningstar's expense peer analyses, after ACIM-advised funds are removed, reveal that the Growth Fund either pays the highest advisory fees among its peers (2016), or the second-highest fees (2015 and 2014).  JX 130 at 636413; JX 46 at 520623. And where the Growth Fund placed second, its advisory fees are barely below the highest fee fund (1 basis point in 2015; 3 basis points in 2014) yet far above the third-place finisher (9 basis points in 2015, 12 basis points in 2014).  *Id*.  In Dr. Pomerantz's analysis, removal of the four ACIM funds from the nine funds that pay higher advisory fees moves the Growth Fund from the 93rd to the 95th percentile among peer funds with respect to advisory fees.  Tr. at 564:1–565:1.

145.    Plaintiffs presented additional trial evidence regarding comparative mutual fund fees, namely, the testimony of CAL's expert, Dean Hubbard.  Dean Hubbard opined that, according to his study of price elasticities of demand in the mutual fund industry, the consequences to an advisor of charging a supra-competitive fee, given its level of performance, would be a loss of AUM and a loss of market share.  Tr. at 686:15-687:24, 691:20-693:5.  For every percent above a competitive level that a fund's fees were, Dean Hubbard testified that an advisor would lose 3% of its market share to competing funds.  Tr. at 687:21-24. Here, the Growth Fund lost in excess of 90% of its AUM and a similar proportion of its market share,

since its AUM peaked in March 2006.  Pomerantz Rebuttal Report at ¶418.  This supports the conclusion that the Growth Fund's fees were excessive.  *Id.*

### B.   Versus CAL's Arm's-Length Institutional/Subadvisory Clients

#### 1.   Analysis of Relative Fees

##### a.   The Effective Advisory Fee Rates Payable Under the IMA's Fee Schedule Dwarf Those Payable Under the Other ACG Accounts' Fee Schedules

146.    During the Relevant Period, three different fee rate schedules governed CAL's Other ACG Accounts (as detailed in Section I.G.2, *supra*).

147.    Each of these fee rate schedules provided for substantially lower advisory fee rates than those payable under the IMA.  Pomerantz Report at ¶¶169-80.  For example, at asset levels of $2.7 billion, which was the Growth Fund's AUM as of May 2017, those schedules produce effective fee rates *of only approximately 33 to 51 basis points*, compared to Growth Fund's average effective fee rate *of 85 bps*.  Pomerantz Report at ¶¶169-76; Tr. at 555:6-556:20.

148.    Dr. Pomerantz further testified that the fee rate disparities are understated in these comparisons because the Standard SMA Rate and the MD Rate fee schedules contemplate AUM levels that are only a fraction of the actual size of the Growth Fund.  Pomerantz Report at ¶¶175; Tr. at 555:23-556:16, 558:20-559:17.  For prospective clients possessing AUM similar to the Growth Fund, it is likely that further negotiations with CAL would have occurred, resulting in additional breakpoints offering rate reductions at higher AUM levels, lower effective fee rates and an even greater differential between the fees such clients paid and the fees paid by the Growth Fund.  *Id.*[14]

---

[14] Indeed, IMAs for certain CAL institutional clients invested in equity strategies expressly state that further rate negotiations would occur if assets increase above a contemplated level.  *See* PX 313 at 645299-305 and 645561-65, at 645564 (IMA of Voluntary Benefit Plan Trust for UAW Retired Employees of Allis-Chalmers Corporation, providing that rates for asset levels above

149.    Plaintiffs also presented evidence of the overall effective rate paid by CAL's Other ACG Accounts (*i.e.*, an AUM-weighted average effective fee rate).  Specifically, Plaintiffs showed that, during 2014 and 2015, CAL's Other ACG Accounts paid a weighted average effective fee rate of only 42 basis points – approximately half the effective fee rate paid by the Growth Fund.  Pomerantz Report at ¶¶163-67; Tr. at 572:19-573:13, 575:19-577:5.  Including all of CAL's Other ACG Accounts since June 2013 as listed in CAL's September 2017 interrogatory response (JX 181 at Ex. A) results in an AUM-weighted average fee rate of only 46 basis points.  *See* Exhibit A hereto (calculation of weighted average effective fee rate paid by all Other ACG Accounts during Relevant Period, based on the data in JX 181 at Ex. A).

### b.    The ACG Accounts CAL Identified as Having High Effective Fee Rates All Had Extremely Low AUM

150.    At trial, Defendant argued that most of the Other ACG Accounts paid effective fee rates far above the AUM-weighted average effective rate computed by Plaintiffs.  Tr. 27:14–28:12, 506:24–509:3.  But as demonstrated at ¶81, *supra*, this is simply a function of the relatively small sizes of those clients' accounts.   Tr. at 557:16-559:4; JX 181 at Ex. A.

151.    Indeed, in order to validly compare effective fee rates, the Growth Fund's and the Other ACG Accounts' AUM have to be equalized.  In fact, this is the precise calculation that Defendant's own expert, Mr. Richardson, performed in Exhibit 2A of his Report.  There, he determined the effective fee rate that certain of CAL's Other ACG clients would have paid under the "rack rate" if they had the same AUM as the Growth Fund was *only* 50-51 bps.

---

$50 million would be "negotiated"); *id*. at 645130-41, at 645137 (IMA of Northwest Ohio Area Industries UAW Retirement Income Plan, stating that rates would be "negotiated" for assets exceeding $200 million); *id*. at 645257-67, at 645262 (IMA of Plumbers & Pipefitters Local No. 142, stating that rates would be "negotiated" for assets exceeding $200 million); *id*. at 645257-67, at 645262 (IMA of Nord Family Foundation, providing that rates would be "negotiated" for assets exceeding $200 million).

### 2. CAL's *Ipse Dixit* that the Funds' Higher Advisory Fees were Justified by Greater Services and Risks

152.     Each year during the Relevant Period, CAL represented to the Board, in writing in its annual 15(c) Responses, and orally during the annual 15c Board Meetings,  that the higher advisory fees that it charged to the Funds (versus to its institutional and/or subadvisory clients) reflected, and were explained or justified by: (1) purportedly more extensive advisory services that CAL provided to the Funds, and (2) purportedly greater risks that it assumed when providing advisory services to the Funds.[15]  Tr. at 125:25–132:7, 261:24–263:15, 291:1–301:23, 308:16–322:17, 372:1–385:10, 908:14–909:11.

153.     First, CAL's annual 15(c) Responses included a presentation entitled "Discussion of Management Fee Rates by Product," whose first half contained certain numerical data concerning the advisory fees CAL charged to the Funds and to its other clients, and whose second half consisted of a list of services that CAL purportedly provided to the Funds but not at all, or not to the same extent, to its institutional or subadvisory clients, and of certain purportedly greater costs and risks that CAL assumed in providing its Funds with advisory services (the "Greater Services List").   DX 184-P; DX 176-P; DX 145-Q; DX 113-R; DX 61-R; Tr. at 308:20–309:13. The Greater Services List was virtually identical each year.  *Id.*; *see also* Tr. at 308:20–309:13. The Greater Services List is reproduced in Exhibit B hereto.

154.     Second, each annual 15(c) Meeting during the Relevant Period, CAL's executives (such as CAL's chief financial officer) reviewed the "Discussion of Management Fee Rates by Product" presentation with the Independent Trustees and discussed the Greater Services List:

---

[15] DX 184-P; DX 176-P; DX 145-Q; DX 113-R; DX 61-R; JX 187 [2018 15c Meeting Minutes] at 654061; JX 180 [2017 15c Meeting Minutes] at 652321; JX 144 [2016 15c Meeting Minutes] at 636366; JX 111 [2015 15c Meeting Minutes] at 534339; JX 70 [2014 15c Meeting Minutes] at 534050; JX 31 [2013 15c Meeting Minutes] at 503420.

> Mr. Bhatt reviewed, for each Fund, the differences in rates between the management fees and the Adviser's other types of clients. He then reviewed in detail the factors that distinguish the services received by Funds as registered investment companies from other clients that either do not receive those services or receive them to a substantially lesser degree. Specifically, he discussed services such as the monitoring, supervision and oversight of fund accounting services, fund administration services, tax accounting services, fund distribution and performance reports, among others, as well as the coordination of and management of fund audits and provision of customer support. He also noted that the Adviser provides and maintains extensive websites containing fund data; information technology infrastructure, controls and security; automatic investment programs; tax reporting services; continuous monitoring to ensure compliance with the federal securities laws; and that the Adviser provides necessary services or support in connection with regulatory examinations and preparation and distribution of fund regulatory filings.

JX 144 at 636366; JX 111 at 534339.

155.    Third, during the 15(c) Meetings, additional CAL executives, including CAL General Counsel Mr. Jackson, and CAL founder and co-chief investment officer Mr. Calamos, Sr., provided further commentary concerning the purportedly greater risks CAL incurred in providing advisory services to its Funds (versus to other accounts):

> Mr. Jackson added that the pricing of each management agreement with the Funds reflects the fact that the regulatory and litigation environment affect advisers of mutual funds in more significant ways than they affect advisers of only private accounts. Specifically, he noted that the Adviser's concerns with the litigation risks involved in running a mutual fund are reflected in the pricing of its contracts. In response to a question, he noted that this number is necessarily subjective, but that it is reasonable for the business to price in that risk. This, he explained, is typically one of the factors (among many others, as discussed by Mr. Bhatt) that account for different pricing between private accounts and mutual fund management agreements.  (JX 144 at 636366)

> ***

> Mr. Calamos highlighted the entrepreneurial risk associated with the fund business and the added risk of liability present in the fund versus private wealth or separately managed account business.  He noted that the regulatory and litigation risk cannot be quantified because there are no explicit expense figures associated with them. He stated, however, that they are very real, as the current *Chill* litigation illustrates.  (JX 111 at 534339)

46

156.    As reflected nearly verbatim each year in the 15(c) Meeting Minutes, the Independent Trustees took into account and credited CAL's above-detailed written and oral representations concerning the purportedly greater services it provided, and risks it assumed, in providing advisory services to its Funds as opposed to other advisory clients:

> The Board took into account the Adviser's assertion that although, generally, the rates of fees paid by institutional clients were lower than the rates of fees paid by the Funds, the differences reflected the Adviser's greater level of responsibilities and significantly broader scope of services regarding the Funds, the more extensive regulatory obligations and risks associated with managing the Funds, and other financial considerations with respect to creation and sponsorship of the Funds. The Board considered factors that lead to more expenses for registered funds including but not limited to: (i) capital expenditures to establish a fund, (ii) length of time to reach critical mass, and the related expenses, (iii) higher servicing costs of intermediaries and shareholders, (iv) higher redemption rates of assets under management, (v) entrepreneurial risk assumed by the Adviser and (vi) greater exposure to "make whole" errors.[16]

### 3.  The Uncontroverted Record Evidence Establishes that the Cost of the Greater Services/Risks Bears No Reasonable Relationship to the Fee Differential

157.    Even assuming CAL undertakes additional services and greater risks with respect to advising funds versus non-funds, the cost associated with those greater services and risks comes nowhere close to explaining/accounting for the massive difference in CAL's advisory fees, because it amounts to a maximum of six basis points.

158.    Plaintiffs' expert Dr. Pomerantz showed that if one takes all the functional expenses that conceivably relate to plausible additional services and risks – namely, those for fund administration; legal, compliance, and internal audit; and insurance – and allocate 100% of those expenses to the mutual fund side of CAL's business, *and none to the institutional side*, they

---

[16] JX 187 at 654061; JX 180 at CALMAOS_652321; JX 144 at 636381; JX 111 at 534351; JX 70 at 534050; JX 31 at 503420.

would total 3.6 basis points in 2014, 4.6 basis points in 2015, and 6.1 basis points in 2016. Pomerantz Report at ¶¶221-85; Tr. at 565:2-568:2; JX 181 at Ex. B.

159.     This analysis is especially conservative because it assumes that no insurance, legal, compliance, or internal audit costs are incurred with respect to CAL's institutional accounts – and, hence, that no such costs are allocable to the institutional part of CAL's business – which the evidence shows is untrue.  Tr. at 567:18 – 568:2.   For example: (i) CAL's general counsel, Mr. Jackson, estimated that he devoted 60% of his time to non-fund client matters during the heart of the Relevant Period (Tr. at 269:24-270:10); (ii)   CAL's compliance department has numerous functions which relate to non-fund accounts (Mickey Dep. at 54-55, 112-13, 119-20, 128, 130-31); and (iii)   CAL's insurance policies cover liability arising from its advisory activities regardless of the nature of the client.  PX 423, PX 424, PX 425, PX 426.

160.     Conversely, CAL never estimated or otherwise quantified the cost of providing the purported greater risks or services to Board.  *See* Tr. at 130:19-24; 131:18-132:7, 244:12-245:3, 264:20-265:4; 267:3-6; 268:2-21; 269:2-4, *see also* Timbers Dep. at 163:13-25, 164:12-165:19; Bhatt Dep. at 205:6-206:5.

161.     Nor did CAL present any trial evidence controverting Plaintiffs' 3.6 to 6.1 basis point cost-differential calculation.   In fact, CAL retained Mr. Richardson specifically to rebut Dr. Pomerantz regarding the level of services CAL purportedly provided to its non-Fund clients, but Mr. Richardson expressly testified that he:  (i) *was not* offering any opinion regarding the accuracy of Dr. Pomerantz's cost estimate, Tr. at 754:3-17, and (ii) did not attempt to quantify or estimate the cost/value of the purported greater services or risks (individually or in the aggregate), Tr. at 756:13-16   Moreover, Mr. Richardson admitted that he *did not* offer the

opinion that the purported greater services and risks accounted for the totality of the fee differential between CAL's fund and non-fund clients.  Tr. at 754:25-756:7.

162.    Instead CAL has variously claimed that that the cost differential is either impossible or difficult quantify.  *Compare* JX 111 at 534339 (Mr. Calamos claiming to the Board that costs "*cannot* be quantified") (emphasis added), *with* JX 181 at ¶8 (interrogatory responses asserting costs not "reasonably susceptible" to quantification) *with* Tr. at 244:24-245:15, 250:3-251:10 (Mr. Helmetag claiming that cost of incremental services is difficult to quantify).

163.    CAL's claim that it cost more to advise its fund clients is also undermined by its Mutual Fund Profitability reports to the Trustees.

164.    Specifically, those reports allocate CAL's indirect expenses between its mutual fund and institutional account "product lines" *based on average AUM*.  Tr. at 229:13-230:21; JX 145 at 634760-4761; JX 113 at 502938-2939; JX 61 at 519582-9583. This is significant, because it indicates that, per dollar of AUM, the indirect costs of advising mutual funds are equivalent to those of institutional accounts.  Tr. at 568:12-569:18. In other words, CAL's allocation methodology refutes the claim that mutual funds costs more to advise, because CAL assigns the same value/cost to advising its fund and its non-fund clients on a per dollar basis.  *Id*. Thus, although CAL might spend more total dollars servicing mutual funds, that is simply a function of the larger AUM on the mutual fund side of the business.  *Id.*  If CAL's fund and non-fund clients had equivalent AUM, CAL would allocate *the same* amount of indirect costs to each of them.

### 4.  CAL's   Claims   Concerning   Greater   Services   Were   Substantially Controverted by the Evidence at Trial

165.    CAL's Greater Services claims were substantially controverted by trial evidence, as summarized in Exhibit B hereto (reproducing CAL's claimed Greater Services and

summarizing relevant evidence concerning each of them). Certain of the claimed Greater Services were not actually provided to the Growth Fund. *See* Section III.B.4.a, *infra*. Many of the Greater Services were services that CAL performed pursuant to the FASA and was already compensated for under the FASA, and thus do not justify higher fees under the IMA. *See* Section III.B.4.c, *infra*. Many of the Greater Services were not provided to the Growth Fund *by CAL*, but instead by third party service providers in entire or substantial part, with CAL's contribution largely limited to the Fund Administration department's oversight and monitoring of others' work. *See* Section III.B.4.b, *infra*. Relatedly, many of the Greater Services were performed, or overseen/monitored, by CAL's Fund Administration department, at minimal expense to CAL. *See* Section III.B.4.d, *infra*. Finally, many of the claimed Greater Services did not appear to be provided by CAL to any "greater" extent to the Funds (versus to CAL's other clients), but instead were provided in substantially *comparable* extent to the Funds and to CAL's non-Funds clients. *See* Section III.B.4.e, *infra*.

### a.    Services CAL Admitted are Inapplicable to the Growth Fund

166.    Certain of CAL's claimed Greater Services were not provided to the Growth Fund (or any of the Open-End Funds), and related instead only to the Closed-End Funds. For example, supervision, monitoring and oversight of "financial leverage," related only to the Closed-End Funds, which employed financial leverage, and not to the Open-End Funds, which did not. Tr. 376:19-377:1, 311:3–312:20; Mickey Dep. at 144:7-11; Olsen Dep. at 37:22-25.

### b.    Services Provided Entirely or Substantially by Third-Party Service Providers

167.    The first twelve of the listed Greater Services consisted of CAL's "monitoring, supervision and oversight" of eleven matters, namely: (1) Fund accounting services, (2) Fund administration services, (3) tax accounting services, (4) Fund distributions, (5) performance

reporting, (6) valuation of portfolio securities and NAV pricing; (7) collateral management, (8) financial leverage, (9) Fund expenses and budgets, (10) portfolio accountant, fund custodian, transfer agent and prime broker, and (11) securities lending oversight.  DX 145-Q at 634754.

168.   With respect to each of the eleven above-identified services that were monitored, supervised and/or overseen by CAL, such services were performed substantively not by CAL, but by various third-party service providers, with CAL merely monitoring, supervising and overseeing the third-party service providers' work.  DX 145-Q at 634754; Tr. at 373:1–378:8; *see also* Tr. at 204:19–211:22, 910:22–915:7.  CAL's Fund Administration department was responsible for managing these, and all other, activities conducted through third-party service providers.  Tr. at 373:1–378:8; DX 1166.  The expense to CAL of providing such monitoring, supervision and oversight services were the Fund Administration department's operating expenses, which, when allocated among the Funds, were minimal.  *See* Section III.B.4.d, *infra*.

169.   In addition, certain of the non-"monitoring, supervision and oversight" services listed as Greater Services were performed in substantial part not by CAL, but by third-party service providers.

170.   One of the Greater Services listed by CAL was "provision of around-the-clock customer support."  DX 145-Q at 634754.  This referred to the call-center that CAL operated and staffed with five-six employees during the Relevant Period, to respond to certain calls from Fund shareholders. Tr. at 378:17–379:4, Behan Decl. at ¶¶80-85.  However, the Funds' shareholders' initial and/or primary source of customer support was the Funds' transfer agent, USBFS, which operated an automated call-in system for the Funds' shareholders and which routed a subset of such calls to CAL's call-center.   Tr. 360:25–361:19, 378:24–379:23.   CAL's gross cost to operate its call center was $400,000 per year, which was offset by a $175,000 annual payment

from USBFS.  Tr. at 361:20–362:1; Behan Decl. at ¶84.  CAL discontinued its call center in July

2017, as the service became less necessary.  Tr. 361:10-15; Behan Decl. at ¶85.

171.    One of the Greater Services listed by CAL was "client service, shareholder and

financial advisor communication."   DX 145-Q at 634754.   However, a substantial portion of

shareholder communications was performed by the Funds' transfer agent, USBFS, who *inter alia*

– and in addition to the call-center service discussed above – prepared and mailed account

statements and purchase/redemption confirmations to the Funds' shareholders.  Tr. at 359:4-19,

379:24–380:10; JX 182 at 2.

172.    One of the Greater Services listed by CAL was provision of "extensive websites"

that included, among other things, "general account information." DX 145-Q at 634754.  362:2-

16.  However, this section of CAL's website, was in fact provided and operated by the Funds'

transfer agent, USBFS, which maintained the Funds' shareholders' general account information

and made it accessible via a transparent hyperlink on CAL's website.  Tr. at 362:2-16; JX 182 at

3-4 and 17-19.

173.    One of the Greater Services listed by CAL was "[p]reparation of regulatory filing

and distribution of prospectuses and shareholder reports."   DX 145-Q at 634755.  However, all

of CAL's regulatory filings with the exception of registration statements/prospectuses –

including annual and semi-annual reports on Form N-CSR; quarterly portfolio disclosure reports

on Form N-Q; annual proxy voting reports on Form N-PX; and filings on Form N-SAR – were

prepared and drafted entirely, or in largest part, by State Street, under the Sub-Administration

Agreement. JX 183 at 645542 (Sub-Administration Agreement, §§ 5(a) and 5(c)) and PX 488 at

645534-35 (Sub-Administration  Agreement side-letter at   §§  2(a) and 2(c)); Tr. at 317:22–

321:23, 380:11-17, 384:6–385:1, 918:18–921:5.  CAL's registration statement/prospectus filings

were the responsibility of CAL's legal department, but external Fund Counsel assisted in preparing those filings, and in reviewing other regulatory filings. Tr. at 315:25–317:21, 384:21–385:1; PX 418; PX 419 at 317471-73. For its work on the Funds' regulatory filings, Fund Counsel was separately and directly compensated by the Funds. Tr. at 315:25–317:21, 384:21–385:1; PX 419; JX 5 at 146344 (IMA §3(k)). Additionally, "distribution of prospectuses and shareholder reports" was performed by third party service providers (USBFS and Broadridge), not CAL, *see* Tr. at 359:20 – 360:3, and expenses associated with such distribution were paid directly by the Funds, *see* JX 5 at 146343 (IMA §3(h)) and Tr. at 321:24–322:17, 385:6-10.

174. One of the Greater Services listed by CAL was "continuous monitoring to ensure regulatory compliance" with the ICA and other relevant regulatory provisions. DX 145-Q at 634755. However, the Funds' transfer agent, USBFS, provided the Funds (and/or CAL) with certain compliance monitoring services, including monitoring for money-laundering, identity theft, suspicious transactions, late trading and market timing, and provided "blue sky" compliance monitoring with respect to state regulations. Tr at 362:17 – 363:13; JX 182 at 3-6, 25-26. Similarly, State Street provided further compliance monitoring services under the Sub-Administration Agreement. JX 183 at 645542 (Sub-Administration Agreement at §§ 5(e), (k) and (l)); PX 488 at 645535-36 (Sub-Administration Agreement side-letter at §§2(e) and 2(h)(2)).

175. One of the Greater Services listed by CAL was "automatic investment programs." DX 145-Q at 634755. However, this service was in fact provided by the Funds' transfer agent, USBFS. JX 182 at 2 (Transfer Agent Servicing Agreement, §2(g)).

176. One of the Greater Services listed by CAL was "tax reporting services." DX 145-Q at 634755. However, third-party service providers provided certain tax reporting services.

*See e.g.* JX 182 at 2 (Transfer Agent Servicing Agreement, §§2(m) and 2(o)); PX 488 at 645536 (Sub-Administration Agreement side-letter, §2(h)(1)).

###### c.   Services Provided Under, and Compensated by, the FASA

177.    Many of the claimed Greater Services are services that CAL was required to perform by the FASA, and for which CAL was compensated by the fees set forth in FASA, as CAL itself explained to the Independent Trustees as part of its 15(c) Responses.  *See* Section II.D, *supra*.

178.    The Greater Services included monitoring, supervision and oversight of the Funds' expenses and budgets. DX 145-Q at 634754.  However, the FASA required CAL to, and compensated CAL for, managing the Funds' expenses and expense payment processing, monitoring calculations of expense accruals for the Funds and modifying them as necessary, and coordinating expense reimbursement calculations and payments.  JX 6 at 145713 (FASA §§2.A-C); Tr. 312:22–313:6, 368:1–369:14.

179.    The Greater Services included coordination and management of the Funds' audits. DX 145-Q at 634754.  However, the FASA required CAL to, and compensated CAL for, coordinating the Funds' audits.  JX 6 at 145714 (FASA §2.E(7)); Tr. 313:7-23, 370:10–371:1.

180.    The Greater Services included monitoring, supervision and oversight of tax accounting services, and provision of tax reporting services.  DX 145-Q at 634754-55.  However, the FASA required CAL to, and compensated CAL for, performing multiple tax accounting and reporting services, including preparing tax information required for the Funds' financial statement footnotes and preparing state and federal income tax returns.  JX 6 at 145713-14 (FASA §§2.E(1)-(4)); Tr. 309:20–310:24, 313:24–314:14, 369:15–370:9.

181.    The Greater Services included preparation of the Funds' regulatory filings.  DX 145-Q at 634755.  However, the FASA required CAL to, and compensated CAL for, preparing

the Funds' regulatory filings.  JX 6 at 145714 (FASA §§2.E(9)); Tr. 314:15–315:23, 370:10–371:1.

182.    The Greater Services included monitoring, supervision and oversight of the Funds' distributions and/or dividends.  DX 145-Q at 634754.  However, the FASA required CAL to, and compensated CAL for, calculating the Funds' dividends and distributions.  JX 6 at 145713 (FASA §§2.E); Tr. 374:4-14.

### d.    Services Handled by Fund Administration at Insignificant Cost

183.    Many of the items identified in the Greater Services List are handled by CAL's Fund Administration department.  Tr. 372:1-385:10; *see also* 355:12-367:23.

184.    The Fund Administration department oversees, manages, and supervises the activities of all the Funds' third-party service providers.  Tr. at 358:3-8; DX 1166.  This includes the Funds' custodian, accountant, transfer agent, securities lending agents, and auditor.  Tr. 358:9-367:23; DX 1166.

185.    The Fund Administration department also, *inter alia*: coordinates the Funds' audits (Tr. at 367:14-18, 378:7-14); reviews drafts of the Funds' SEC filings, including its semi-annual and annual shareholder reports (Tr. at 380:11-17, 384:6-23), its prospectuses and Form N-SARs and N-Qs (Tr. at 381:2-382:4, 384:6-23); JX 183 at 645542; PX 488 at 645534-35), as well as the financial information portions of its Form N-1As (Tr. at 381:6-382:4); gathers the data that go into the Funds' fact sheets posted on CAL's website (Tr. at 380:18-381:1); coordinates and approves the payment of the Funds' expenses and reimbursements (Tr. 356:2-9, 359:1-3, 364:3-9, 367:19-23, 368:20-369:14) including those associated with the Trustees and Trustee meetings (Tr. at 383:21-384:5); reviews the Funds' budgets (Tr. at 377:2-10); performs all the duties set forth under the FASA with the exception of certain tax-related functions which are handled by CAL's Tax Department (Tr. at 368:16-371:9; JX 6); handles collateral

55

management on behalf of the Funds (Tr. 376:13-21); and manages the back-office relationship with the Funds' prime broker (Tr. at 377:11-24).

186.    CAL operates the Fund Administration department at insignificant cost.  Its total annual budget is $2.8 million, which covers the compensation paid to the department's six employees as well as the fees paid to State Street under the Sub-Administration Agreement pursuant to which CAL outsources a substantial portion of its fund administration functions.  *See* ¶¶63-69, *supra*; Tr. at 356:13-357:17; JX 183; PX 488; PX 489.   The allocable cost to the Growth Fund of the Fund Administration department is 1.6 basis points. Tr. at 565:21-567:5; Pomerantz Report at ¶¶221.b, 227, 239, 282.

> **e.    Services that CAL Provided Comparably to Fund and non-Fund Clients Alike**
>
> **i.    Client Services:  the Extraordinary Level of Attention Lavished on Institutional/Subadvisory Accounts**

187.    CAL had six to seven times the number of full-time Distribution Department personnel servicing the Funds as servicing institutional/subadvisory clients.  Tr. at 96:24-97:2. This   proportion,   however,   parallels   the   proportion   of   the   Funds'   AUM   to institutional/subadvisory AUM during the Relevant Period.  *See* ¶8, *supra*; PX 184-A at 653670; PX 176-A at 650495; PX 145-A at 634750; PX 113-A at 502928; PX 61-A at 519572; PX 32-A at 514135.  This indicates that effort and cost *per dollar of AUM advised* is effectively equivalent for the Funds and for Institutional/Subadvisory Accounts.  Similarly, "time spent" data for client services personnel, such as Robert Behan (CAL's global head of distribution) indicates that he spent 75% of his time on Funds-related activities.  *See* ¶10, *supra*.  At the same time, however, the Funds comprised 82% of CAL's total AUM.  *See* ¶9, *supra*.  Thus, the fact that Mr. Behan spent more time on Fund related matters is not a function of those matters requiring more work, but rather reflects the far greater percentage of CAL's AUM from Fund clients.  This is further

indication that the cost *per dollar of AUM* to provide the Funds and Institutional/Subadvisory Accounts with client services were substantially similar.

188.    CAL lavishes a high level of attention on its institutional clients.  That attention is at least comparable to, if not more than, that provided to the Funds' shareholders and the Board.

189.    CAL believes that institutional clients have "special communications needs" (Tr. at 39:6-19; PX 387 at 641425) and goes to great lengths to cater to them.  Institutional clients are assigned dedicated client service staff including investment professionals who CAL assures "are *always available* to respond a client's inquiry."  Tr. at 37:18-38:5; PX 387 at 641425.

190.    CAL provides institutional clients with quarterly portfolio reviews customized to their individual portfolios, e-newsletters with market commentary, firm updates and product reviews, and regular in-person portfolio reviews with members of the CAL investment team.  Tr. at 39:20-40:16; PX 387 at 641425.

191.    CAL's website includes dedicated sections for mutual fund shareholders and institutional clients.  Tr. 40:17-41:14; PX 387 at 641425; Bhatt Dep. at 214.  The institutional section of the website provides comparable content as the Funds' shareholders' section, and is regularly updated with performance information, strategy reviews and CAL's current outlook on the market.  Tr. 40:17-41:14; PX 387 at 641425; Bhatt Dep. at 214.

192.    CAL offers and hosts videoconferences for institutional clients.  Tr. 41:21-25; PX 387 at 641425.

193.    CAL provides institutional clients with responses to due-diligence questionnaires which are frequently extensive.  Tr. at 31:24-32:8, 48:1-17; PX 387; PX 358.  It also provides live, in-person due-diligence meetings for which CAL personnel travel all over the world.  Tr. at 32:14-33:4, 35:7-10.

194.    For institutional clients that request it – for example, CAL's largest institutional ACG client Nomura – CAL provided monthly performance and positioning commentary, excel portfolio reporting spreadsheets, and ad hoc reports in the case of unexpected new or events.  Tr. 35:14-21, 42:5-43:4; PX 387 at 641424-25.

195.    CAL assisted with Nomura's own activities to market its Japanese mutual fund, which CAL sub-advised, to Japanese intermediaries and investors.  Tr. 43:8-44:7; PX 387 at 641424-25.  CAL prepared marketing materials for Nomura as well as data analysis to support CAL's macro views and individual company convictions.  Tr. 43:8-44:9; PX 387 at 641424-25. CAL sent several senior executives to Japan to participate in a four-city roadshow.  Tr. 44:10-46:12; PX 387 at 641424.  While in Japan, CAL executive Scott Becker gave an interview on Nomura's behalf to Japanese financial media.  Tr. 45:23-46:1; PX 387 at 641424.

196.    The Teamsters Pension Fund of Philadelphia, another of CAL's Other ACG Accounts, received "in-depth" monthly performance reports as well as monthly attribution reports from CAL.  Tr. 52:11-53:6.

197.    CAL client service staff is in frequent contact with investment consultants who work for institutional clients.  Tr. 49:20-51:21, 52:11-22; PX 344 at 430863.

198.    CAL sends representatives to meet with and report to boards of trustees of institutional clients.  Tr.  49:2-10, 55:3-56:6.

199.    Institutional clients generally have their own unique investment guidelines, and CAL is required to adjust the portfolios of those clients to comply with their guidelines.  Tr. at 34:1-10, 35:11-13, 47:13-23, 49:2-13, 51:8-52:2.

200.    For the Funds' shareholders, by contrast, the primary client service provided by CAL was a shareholder call center, manned in the first instance by the transfer agent, which

fielded shareholder inquiries.  If they opted, callers could be transferred to a live CAL employee. That option, however, was terminated in July 2017, when the center was closed.  Tr. at 360:25-362:1. Prior to its closing, CAL's call center was staffed by five or six employees, at an annual gross cost to CAL of $400,000, minus $175,000 in reimbursements it received from the transfer agent.  Behan Decl. at ¶84; Tr. at 360:25-362:1.

### ii. The Growth Fund's Daily Liquidity Requirements did not Result in any Appreciably Greater Work

201.    CAL's Discussion of Management Fee Rates by Product presentations claimed that, because mutual fund shareholders are entitled to buy and redeem shares daily, unlike Institutional Accounts, this resulted in increased turnover, which in turn required   "[m]ore frequent management of cash and portfolio positioning to ensure execution of overall long-term fund investment strategy" and "[o]ngoing trading activity by adviser personnel required to manage more frequent cash flows."  *See e.g.* JX 184 at 653674.

202.    However, Mr. Kalis, the former head of CAL's ACG strategy, who served as lead portfolio manager for the Growth Fund and for the Other ACG Accounts, testified that daily inflows and outflows in the Growth Fund were so insignificant that they did not require any special attention from the portfolio management team, and did not impose additional work on them.  *See* Kalis Dep. at 60:4-61:4, 65:4-25, 70:3-72:4, 74:12-77:6.

203.    Meanwhile, the opposite was true for the Other ACG Accounts, where account deposits and withdrawals, although less frequent, typically involved substantial percentages of the money invested.  Kalis Dep. at 74:12-77:6. In fact, turnover was sharper in the Other ACG Accounts than in the Growth Fund:  by December 2016, all of CAL's Other ACG Accounts had withdrawn 100% of their funds from CAL's management.  JX 181 at Ex. A.

204.    Moreover, CAL's Subadvisory Accounts – such as Nomura and the MD Accounts (CAL's largest ACG accounts) – were themselves mutual funds with underlying shareholders who were entitled to buy and redeem shares daily.  Tr. at 47:17-23, 58:17-60:10. 503:19-20, 506:1-9; PX 303 at 622241-42; JX 8; JX 15; JX 18.

205.    To the extent advising the Growth Fund required portfolio management attention due to "turnover" or fund flows, comparable attention was therefore required for CAL's Subadvisory Accounts.  Pomerantz Rebuttal Report at ¶121.

### iii.    CAL's Operations and IT Services Are Comparable Across All Clients

206.    CAL uses the same computers and email servers in advising its fund and non-fund clients, and uses the same IT infrastructure, IT controls and security measures to safeguard fund and non-fund information.  Tr. at 144:6-16; *see also* Bhatt Dep. at 215:11-216:9; Olson Dep. at 110:12-111:4.

### iv.    CAL's Compliance Services Are Comparable Across All Clients

207.    CAL's Discussion of Management Fee Rates by Product presentations claimed that mutual funds required legal, regulatory, and compliance services greater than institutional accounts.  JX 184 at 653675.   These services supposedly consisted of "Continuous Monitoring to Ensure Regulatory Compliance" with the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Internal Revenue Code, and responding to "Regulatory examinations."  JX 184 at 653675.

208.    However, the evidence at trial shows that these services, were either comparable to services provided to institutional clients and/or were provided insignificant expense, often with assistance of third-parties.

60

209.    While the Investment Company Act only applies to mutual funds, CAL conceded that compliance with the securities laws and the Internal Revenue Code is necessary irrespective of client type.  Mickey Dep. at 110:11-115:3, 116:7-124:18.

210.    Moreover, even though CAL's institutional accounts did not benefit from the regulatory protections applicable to mutual funds, they nonetheless built similar protective frameworks into their IMAs.  Pomerantz Report at ¶¶260-61.  For example, CAL was obligated to provide institutional clients with frequent and extensive reporting.  JX 8 at 638092; JX 15 at 622194; JX 13 at 638180; PX 360; Tr. at 42:5-43:4, 47:21-48:18, 49:8-15, 52:11-53:12.

211.    CAL's institutional IMAs also obligated CAL to implement and test compliance procedures and policies regarding all areas of its operations including, *inter alia*, trading operations, investment management, infrastructure and internal controls.  PX 309 at 372401-08; PX 317 at 464617; PX 338 at 422225-26; Mickey Dep. at 150:23-154:6, 47:6-94:23.

212.    CAL was also required to satisfy periodic due diligence requests from institutional clients which included the completion of extensive questionnaires and in-person due-diligence presentations.  Tr. at 31:24-32:23, 36:17-21, 48:1-17; PX 338; PX 351; PX 387; PX3 57; PX 358; PX 345 at 118439-441.

213.    At least one institutional client, Nomura, required monthly compliance reports from CAL.  Tr. at 42:5-20; PX 378; PX 303 at 622214-215.

214.    CAL was required to comply with each institutional clients' unique investment guidelines.  Tr. at 33:5-34:10, 35:11-36:16, 47:13-23, 49:11-13, 51:8-21; PX 344 at 430864; JX 8 at 638091; JX 13 at 638185; PX 303 at 622206-213.

215.    "Regulatory examinations" were rare, as the SEC aspires to, but does not always succeed in, examining investment advisers every three years.   Pomerantz Report at ¶262.

Furthermore, Defendant's expert Mr. Richardson acknowledged that the risk of regulatory examinations is one that investment advisors face regardless of client type – whether mutual fund or institutional – and that CAL has not had any regulatory inquiries regarding the Growth Fund in the last five years.  Tr. at 771:16-25.

216.    Certain compliance functions are the responsibility of the Transfer Agent which is compensated by the Funds separately.  JX 182.  For example, the Transfer Agent is required to provide Anti-Money Laundering and Red Flag Identity Theft Prevention Programs and to engage a third-party auditor to audit its internal controls and compliance with respect to Electronic Services that it provides to shareholders.  JX 182 at § 2(N), 5.  The Transfer Agent is also obligated to operate a compliance system called MARS for the purpose of monitoring transactions in fund shares for suspicious transactions and to assure compliance with market-timing and late-trading regulations.  JX 182, Ex. D; Tr. at 362:17-363:10.

## 5. CAL's Claims Concerning Greater Risks Were Substantially Controverted by the Evidence at Trial

217.    The other primary rationale CAL provided to the Board for the higher advisory fees it charged its fund clients versus non-fund clients was that there were greater legal/regulatory risks associated with advising mutual funds.    Tr. at 261:24–301:23. Additionally, CAL's expert witness, Mr. Richardson, testified that there are also purportedly greater entrepreneurial risks associated with advising mutual funds – such as start-up costs and competitive risks – that advisers consider in setting their fees.  Richardson Report at ¶¶19, 67-73; *see also* JX 111 at 534339 (Mr. Calamos' discussion of purported risks with Board).

### a.    Legal / Regulatory Risks

218.    As CAL's General Counsel, Mr. Jackson was responsible for, *inter alia*, reporting to the Board on the litigation/regulatory risks attendant to advising mutual funds.  The minutes of

CAL's 15(c) meeting typify CAL's bid to attribute the Funds' substantially higher advisory fees to these risks:

> Mr. Jackson added that the pricing of each management agreement with the funds reflects the fact that the regulatory and litigation environment affects the advisor of mutual funds in more significant ways than they affect advisors of only private accounts. Specifically, he noted that the advisor's concerns with the litigation risks involved in running a mutual fund *are reflected in the pricing of its contracts*. In response to a question, he noted that *this number is necessarily subjective but that it is reasonable for the business to price that risk in*.

JX 144 at 636366 (emphasis added);[17] Tr. at 261:24-263:15.[18]

219. Turning first to the general proposition that the regulatory and litigation environments impact mutual fund advisors more than they do advisors of private accounts, Mr. Jackson conceded that his statement *was not* based on any analyses/studies concerning the frequency of fund-related versus non-fund-related litigation or comparing verdicts or settlements in fund-related versus non-fund-related litigation. *See* Tr. at 263:16-264:5. Moreover, although Mr. Jackson was one of the primary individuals at CAL responsible for ensuring legal and regulatory compliance, as well as dealing with any related risks that materialized, he testified that he nonetheless spent the clear majority of this time working on *non-fund*-related matters during the heart of the Relevant Period. Tr. at 257:14-23; 269:5-270:10, 306:13-22 (admitting he spent only 40% of his time on fund matters); ¶10, *supra*; *see also* PX 145-A at 634346, PX 113-A at 502692, PX 61-A at 519368, PX 32-A at 513992.

---

[17] *See also* JX 111 at 534339; JX 70 at 534050.

[18] Mr. Jackson conceded, however, that CAL had been the subject of prior litigations, and that any out-pocket costs associated with the materialization of those litigation risks – such as paying the deductible on an insurance policy – could be objectively quantified. Tr. at 265:9-15.

220.    Turning to the issue of risk-pricing, Mr. Jackson admitted at trial that CAL never actually calculated/estimated the cost/value of the greater risks it purportedly priced into its IMA with the Funds.  Specifically, Mr. Jackson testified that (i) he is unaware of anyone at CAL having calculated, estimated or otherwise reduced to a number the litigation risk that CAL purportedly priced into the Growth Fund's advisory fees since joining CAL; (ii) he is not aware of anyone having performed that exercise prior to the time he joined CAL; (iii) he does not know what portion, *if any*, of the fee CAL charged the Growth Fund was attributable to the increased litigation risks, and (iv) to the extent CAL did consider litigation risk in setting the advisory fees it charged the Growth Fund, he does not know what methodology, if any, CAL employed.  Tr. at 264:20-265:4; 267:3-6; 268:2-21; 269:2-4; *see also id.* at 135:6 – 136:10 (Mr. Neal's testimony that CAL never provided the Board with an estimate of the value/cost of litigation risk it purportedly priced into the Growth Fund's fee structure).

221.    CAL, however, maintained several insurance policies during the Relevant Period sufficient to protect against the legal/regulatory risks CAL faced in running its business, Tr. at 261:12-17, and which covered the costs of CAL's prior fund-related litigation.  Tr. at 137:18-138:3; *see also* Tr. at 289:4-289:23.[19]  Mr. Jackson conceded that the cost of obtaining insurance – the premium plus any deductible – was at least a partial indicator of the value of CAL's legal/regulatory risks.  *See* Tr. at 271:5-11.  In his estimation, however, it was not a complete indicator because there purportedly are indirect costs associated with such risks that cannot be insured against, such as injury to reputation (the "uninsurable risks").  Tr. at 285:25–289:23.

---

[19] Mr. Richardson testified that he has never worked for a mutual fund adviser that incurred actual litigation costs that were not covered by insurance.  Tr. at 763:8-18.

222.    Turning first to the cost of those risks that are insurable, the two main policies that protected CAL (and its affiliates) in connection with their mutual fund business during the Relevant Period were the Directors & Officers, Errors and Omissions Liability Policy (the "D&O Policy") and the Fidelity/Blanket Bond.  *See* Tr. 260:3-261:17; PX 423-31.[20]

223.    The D&O policy broadly insured the Calamos entities (of which there were approximately 10), as well as the Funds, against wrongful acts, negligence, and errors and omissions, *see* Tr. at 274:1-4, 274:17-275:2 and 278:1-22; PX 423 at 652661-63, and applied to claims brought by private parties as well as governmental and self-regulatory entities, *see* Tr. 275:7-13; 276:5-277:1, 277:17-25.  During the Relevant Period the D&O policy's coverage was increased from $30 to $50 million, its premium ranged between $984,300 and $1.528 million, and its deductible remained constant at $500,000.  PX 184-A at 653775, PX 176-A at 650594, PX 145-A at 534861, PX 113-A at 503184, PX 61-A at 519662, PX 32-A at 514326.

224.    The D&O policy's annual premium and deductible (the latter of which was only incurred if a claim was submitted) was allocated among the insured entities pursuant to one of two methods, depending on the year at issue.  Tr. at 274:5-12; 278:23-279:5, 280:20-281:11.  Prior to 2015, CAL allocated its premiums based on recommended allocations from ICI Mutual, the entity that issued the policy.  Tr. at 280:20-281:11. For example, ICI Mutual recommended that CAL be allocated $216,546 of the 2014-2015 D&O policies total annual premium.  Tr. at 281:12-283:2; PX 86-A at 523548.

225.    From 2015 to the present, the Calamos entities have been responsible for paying 40% of the annual premium while the Funds were responsible for paying the remaining 60%.

---

[20] CAL's 15(c) responses also referred to an Independent Directors Liability Policy.  *See, e.g.*, PX 145-A at 634861.  That policy insured the Independent Trustees, not the Calamos entities, and CAL was not responsible for paying any of that policies' premiums.  Tr. 273:2-7.

278:23-279:5. The 40% portion of the premium owed by the Calamos entities collectively was then further allocated among each Calamos entity individually.  Tr. at 279:13-17; PX 86-A at 523535-48.  Thus, for example, the annual premium for the 2016 D&O policy – which provided $50 million of coverage -- was $1,419,840.  Under the applicable allocation methodology, the 10 insured Calamos entities were collectively responsible for paying 40% of that amount, or $567,936.  Tr. at 279:25-280:14. And CAL individually was responsible for paying just a fraction of that amount.  Tr. at 280:16-19.  Thus, during the Relevant Period, the annual cost to CAL of insuring against all of the risks covered by the D&O policy was significantly smaller than $567,936.

226.    The Fidelity/Blanket Bond is a regulatory requirement under the ICA and covers a series of risks identified in a section of the policy called "Insuring Agreements." Tr. at 284:1-21. The risks covered by that policy include certain legal as well as regulatory risks.  Tr. at 284:22-285:24.   The premium for the Fidelity Bond was allocated during the relevant period based on the same methodologies applied to the D&O policy. Thus, for example, ICI Mutual recommended that CAL pay $4,361 of the Fidelity Bond's annual premium for the 2014-2015 policy term.  Tr. 283:3-17.

227.    Turning to the purported non-insurable risks CAL faces, Mr. Jackson identified (i) injury to reputation, (ii) interference with business relationships, and (iii) distraction from core business operations, as potential consequences.  *See* Tr. at 285:25–286:13. However, these potential consequences are either are so remote that they have never previously materialized or resulted in only *de minimis* expense (that CAL did not even bother to estimate).

228.    *First*, with respect to reputational injury, Mr. Jackson conceded that:  (i) this risk applies regardless of whether the client is a fund or a non-fund; (ii) CAL has not attempted to

quantify the cost of any reputational injury that might have resulted from its prior litigation; and (iii) none of CAL's Other ACG Accounts, all of whom terminated their advisory relationship with CAL, cited CAL's involvement in prior litigation as a reason for doing so.  Tr. at 286:14-287:20; *see also* Tr. at 138:3-15 (Mr. Neal's testimony that he did not recall CAL ever informing the Board that it suffered reputational injury or lost business as a result of prior lawsuits).[21]

229.    *Second*, with respect to potential interference with business relationships, Mr. Jackson stated that he was unaware of any litigation-related injury to goodwill, nor did anyone in CAL's distribution department inform him that any intermediaries refused to work with CAL as a result of litigation. Tr. 287:24-14; *see also* Tr. at 138:4-139:9 (Mr. Neal's testimony that he does not recall any conversations with CAL regarding injury to goodwill or injury to third-party relationships).

230.    *Third*, there is no evidence in the record that defending this action, or any of CAL's prior lawsuits, materially impacted the ability of CAL's employees to carry out their day-to-day business activities.  *See generally* Tr. at 288:15-25.

231.    Turning specifically to regulatory risks, the primary and most significant risk that CAL identified to the Board as a justification for the Funds' higher advisory fees was CAL's greater exposure to "make-whole" errors.  Tr. at 290:16-25; 291:12-29:22; JX 144 at 636381 ("The Board considered factors that lead to more expenses for registered funds including . . . greater exposure to 'make whole' errors."); JX 111 at 534351 (same).  A "make-whole error" is

---

[21]  Notably, Mr. Richardson testified that the loss of future business is difficult if not impossible to quantify, and that he did not offer an opinion as to how a Trustee could possibly assess whether an adviser's fee reasonably accounted for a risk/cost that is unquantifiable.  *See* Tr. at 767:15-768:5. Additionally, Mr. Richardson *does not* offer the opinion that it would be reasonable for CAL's advisory fee to account for the risk of reputational harm resulting from its own negligence or misconduct.  Tr. at 768:6-10.

an error that results in losses to fund investors for which CAL or a third-party service provider bears responsibility.  *See* Bhatt Dep. at 182:16-22; *see also* Tr. at 210:14-211:4; 290:2-8.  The most significant source of potential make-whole errors is the daily calculation of the Funds' NAV, which is performed by State Street in the first instance.  Tr. at 211:23-212:1, 295:12-18; 292:23-294:2.

232.    However, the record shows that make-whole errors generally, and NAV errors specifically, are: (i) incredibly infrequent, and have been non-existent with respect to the Growth Fund, (ii) are generally *de minimis* when they do materialize; and (iii) are typically borne by State Street, *not CAL*.

233.    Mr. Bhatt testified that large make-whole errors are infrequent and that he did not recall a *single large make-whole error since joining CAL in January 2004*.  Bhatt Dep. at 10:10-11, 183:14-184:1.  Consistent with his testimony, in December 2013, Mr. Bhatt reported to the Funds' Valuation Committee that CAL had experienced its first NAV error *in over two years*, and that the total value of that error – which did not impact the Growth Fund – was under $250.  *Id*. at 299:10-301:18, JX 42 at 533667-68.

234.    Similarly, Mr. Jackson explained that NAV errors are infrequent and that since joining CAL in 2010, he did not recall *a single* make-whole error involving the Growth Fund for which CAL had to pay out of pocket, Tr. at 297:6-16, 301:16-18.  And Mr. Neal testified that he too did not recall a single occasion where CAL had to pay Growth Fund shareholders for a make-whole error.  Tr. at 212:2-18.[22]  Moreover, Mr. Neal confirmed that when a make-whole

_____

[22] Mr. Jackson conceded that, even if CAL as opposed to State Street was responsible for reimbursing Fund investors for make-whole errors, such errors, depending on their nature, would be covered by the D&O policy.  Tr. 297:17–298:6; *see also* Bhatt Dep. at 183:14-17.  Additionally, Mr. Richardson testified that he did not offer the opinion that it would have been

error does occur, it is typically the responsibility of the third-party service providers at issue, *see* Tr. at 213:4-9, which are bound by indemnification provisions rendering them liable for losses resulting from the own negligence or wrongful acts.  Tr. at 295:19-296:15; JX 183 at 654546-47; JX 4 at 4-5; JX 182 at 8-10; *see also* Tr. at 766:23-767:2 (Mr. Richardson's testimony regarding indemnification).[23]

### b.    Entrepreneurial / Competitive Risks

235.    Mr. Richardson testified that CAL also purportedly faced greater entrepreneurial and competitive risks as an adviser of mutual funds, which he believes are relevant to the disparity in the fees CAL charged its fund clients versus its non-fund clients.  Richardson Report at ¶¶67-72, 128-32; *see also* JX 144 at 636381 (2016 15(c) Minutes identifying "capital expenditures to establish a fund" and "length of time to reach critical mass, and related expenses" as cost drivers for mutual funds); Tr. at 98:24–100:11 (Mr. Behan's similar testimony concerning entrepreneurial and competitive risk).

236.    Entrepreneurial risks include an adviser's outlay of start-up capital in sponsoring a fund and its assumption of initial operating losses until the fund reaches profitability.  *See* Tr. 98:24–100:11, 758:2-9; Richardson Report at ¶¶128, 132.  Mr. Richardson conceded, however, that the Growth Fund was over 25 years old, had already reached profitability, and that CAL had already recouped its start-up costs from sponsoring the Growth Fund.  Tr. at 757:24-19.

237.    Competitive risks encompass the possibility that fund shareholders would switch investment advisers or chose a passively managed index fund (which typically have lower fees).  *See* Richardson Report at ¶70; Tr. at 761:17-25.  Mr. Richardson made clear, however, that he

---

reasonable for CAL to include some value in its advisory fees to account for make-whole errors that were the result of its own negligence or misconduct.  Tr. at 766:17-22.

[23] Notably, Mr. Richardson provided *only one example* of a regulatory risk in his expert report, which he conceded was inapplicable to the Growth Fund.  Tr. at 763:19-25-764:2.

did not offer the opinion that it would have been reasonable for CAL to charge the Growth Fund

a fee that added some value for the risks that investors would switch investment advisers due to

CAL's poor performance or that investors would opt for an index fund because the Growth

Fund's fees were too high.  Tr. at 759:12-762:22.  Further, the same competitive risks exist with

respect to non-fund clients:  indeed, all of CAL's Other ACG Accounts switched advisors.

## IV. CAL'S METHOD FOR ALLOCATING COSTS MADE ITS LARGER FUNDS APPEAR LESS PROFITABLE

### A. CAL's 15(c) Profitability Presentations and Cost Allocation Methodology

238.   Each of CAL's 15(c) Responses contained a presentation titled "Mutual Fund

Profitability," which purported to present the profitability, to CAL, of serving as advisor to each

of the Funds, including the Growth Fund.  DX 184-Q, DX 176-Q, DX 145-R, DX 113-S, DX 61-

S, DX 32-Q.  These presentations were standardized, differing only in specific numbers, rather

than in methods of calculation or manner of presentation.  *Id*.  For each of the Funds, CAL's

profitability is the difference between (1) the revenue CAL received from serving as that Fund's

adviser (namely, the advisory fees paid to CAL by that Fund) and (2) the costs CAL incurred to

provide that Fund with advisory services, (3) divided by the revenue (which expresses the

percentage of Fund-specific advisory revenue that flows to CAL as profit).  DX 184-Q; Lacey

Report at ¶¶23, 38.

239.   While CAL's advisory revenue with respect to each Fund is directly and easily

ascertainable (the advisory fees each Fund paid), the costs CAL incurred to advise each Fund are

not ascertainable in a similarly easy and direct manner.  *Id*.  That is because only a few types of

expenses (all of which related to distribution and marketing expenses, and are hence irrelevant to

the pre-distribution/marketing profitability required by *Gartenberg* and at issue here) were

"direct expenses" recorded on a Fund-specific basis.  DX 184-Q, at 653680 and 653691; Lacey

70

Report at ¶30; Pomerantz Report at ¶¶408-09.  Instead, *all* of CAL's *advisory* expenses (namely employee compensation, general and administrative costs, and client service costs) were "indirect expenses," also termed "joint costs" or "common costs," that could not be easily traced to particular Funds, and that CAL incurred with respect to multiple or all of the Funds (*e.g.*, compensation of investment management personnel who provided services to several Funds; compensation of personnel in other departments, such as Fund Administration, Operations, or Legal and Compliance, which provided services to all of the Funds; rent and utility costs for CAL's shared offices, etc.).  DX 184-Q, at 653680 and 653691; Lacey Report at ¶¶16, 23-25, 30; Pomerantz Report at ¶409, 430-31; Tr. at 234:23–235:11.  Such indirect, jointly-incurred costs must be allocated among the multiple products to which they relate (here, CAL's advisory clients) on a rational basis, in order to report product-specific profits. Lacey Report at ¶¶16-31; Tr. 235:20-25.

240.    To calculate and present the profitability to CAL of advising each of the Funds, the Mutual Fund Profitability presentations allocated CAL's advisory costs, in their entirety, to each of the Funds on the sole basis of AUM.    DX 184-Q, at 653680.  This cost allocation proceeded in a two-step process.  *Id*.  In the first, a product-line allocation, CAL started with the total advisory costs CAL incurred in advising *all* its investment products/clients, and allocated a portion of those total costs to the Funds (as opposed to other clients, such as Subadvisory Accounts and Institutional Accounts) according to the Funds' proportion of CAL's total AUM. DX 184-Q, at 653680-81; Pomerantz Report at ¶¶410-11.  Thus, for example, where the Funds' constituted 86% of CAL's total AUM, CAL allocated 86% of its total advisory costs to the Funds.  DX 184-Q, at 653681.  In the second, having allocated advisory costs to the Funds in aggregate, CAL then allocated portions of its aggregate Funds-related advisory costs to each of

the Funds, again on the basis of AUM (*i.e.*, each Fund's proportion of the Funds' aggregate AUM).  DX 184-Q, at 653680 and 653691; Pomerantz Report at ¶432.

**B.     CAL's Profitability Presentations were Inconsistent with Its Actual Operations and Artificially Lowered the Growth Fund's Profitability**

**1.     Although Advisory Costs are Largely Fixed CAL Allocated Those Costs by AUM as if they Were Variable Costs, Eliminating/Masking Economies of Scale**

241.    As CAL's profitability expert Professor Lacey concedes, most costs incurred in the provision of advisory services are largely fixed costs, rather than variable costs:  *i.e.*, costs that remain relatively constant even as AUM rises or falls, and thus that do not vary in direct proportion to AUM.  Tr. at 996:16–997:6. Because of this, and as Professor Lacey's own cost allocation authorities explain, it is generally acknowledged in the mutual fund industry that advisory costs do *not* directly track AUM.  Pomerantz Rebuttal Report at ¶248.

242.    Yet CAL's Mutual Fund Profitability Presentations allocated advisory costs *in exactly the opposite manner*:  as if all advisory costs varied in perfect and direct proportion to AUM.  DX 184-Q, DX 176-Q, DX 145-R, DX 113-S, DX 61-S, DX 32-Q.  *See also* Pomerantz Rebuttal Report at ¶¶248-49.

243.    Such allocation is per se unreasonable, as it allocates costs in a manner diametrically opposite to known facts concerning such costs' actual behavior.  Tr. at 879:14-20; Bullard Rebuttal Report at ¶¶104-05.  *See also* Pomerantz Rebuttal Report at ¶¶236-93.

244.    CAL's actual operating costs, as analyzed by both Plaintiffs' and Defendant's experts, do not evince the direct and proportional relationship to CAL's AUM depicted in CAL's Mutual Fund Profitability Presentations.  Pomerantz Report at ¶¶467-89; Pomerantz Rebuttal Report at ¶247; Cronin Report at Ex. 9.1 (showing total advisory and distribution costs increased as AUM declined) and Ex. 10 (showing investment advisory personnel headcount remaining

constant even as AUM declined by 50%, illustrating the relatively fixed nature of this advisory expense). For example, as the AUM in CAL's Funds declined from $15.3 billion to $13.6 billion (a decline of 13.7%), CAL advisory costs did not decline by a similar 13.7%, but instead fell from $63.0 million to $60.8 million, a decline of only 3.4% (approximately 1/4[th] the AUM decline). Pomerantz Report at ¶480. Similarly, as CAL Open-End Fund AUM fell 38.5% from 2011 through 2015, CAL's employee compensation costs fell only 11.3%. *Id.*, ¶¶468-74. In sum, analysis of CAL's actual operating costs indicates that such costs, or substantial portions thereof, do not perfectly track and/or vary with AUM, but instead, as Professor Lacey conceded, remain substantially fixed even as AUM varies.

245. These same facts (*i.e.*, CAL's own financial results of operations), viewed under a different conceptual terminology, indicate the presence of substantial economies of scale. Pomerantz Report at ¶¶468-89; Pomerantz Rebuttal Report at ¶¶301-05.

246. As CAL's economics expert Dean Hubbard explains, economies of scale exist where an increase in output causes a reduction in long-run average costs. Hubbard Report at ¶144. Conversely, economies of scale are indicated where a decrease in output causes an increase in average costs. Pomerantz Report at ¶481. In considering advisory services, AUM is the unit of output. *Id.*, ¶10(vi).

247. Professor Lacey's own authorities for cost allocation in the mutual fund industry: (1) acknowledge general agreement that economies of scale exist in the mutual fund industry (*see* Pomerantz Rebuttal Report at ¶248); (2) relatedly, acknowledge general agreement that advisory costs do not rise in direct proportion to AUM (*id.*); and (3) criticize AUM-based cost allocation, which allocates costs in direct proportion to AUM, for its tendency to over-allocate costs to large funds (*id.*, ¶¶259, 274).

248.    CAL's own results of operations, which Dr. Pomerantz analyzed but Dean Hubbard and Professor Lacey did not, showed consistently that as CAL's AUM declined throughout the Relevant Period, CAL's average advisory costs per unit of AUM increased. Pomerantz Report at ¶¶482 (*e.g.*, from 40 bps to 46 bps from one year to the next) and 468-89 generally; Pomerantz Rebuttal Report at ¶¶301-05.

249.    CAL's profitability expert Professor Lacey also concedes that CAL's AUM-based allocations to and between the Funds are oblivious to, and do not take into account, any economies of scale associated with advisory operations.  Tr. at 1032:8-25 (". . . we don't consider economies of scale in that allocation process.  It's just not something we do."); *see also* Pomerantz Rebuttal Report at ¶¶268-70 and 305, and Tr. at 1008:13–1009:22.  Dr. Pomerantz states the same in different and more affirmative words, both in his expert report (Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84 – AUM-based cost allocation "assumed away" any economies of scale and rendered them "invisible") and in his trial testimony (Tr. at 451:2-25, 458:8–459:2 – CAL's cost allocation methodology "neuters the concept of economies of scale [and] makes [it] impossible to be measured, impossible to be analyzed, impossible to evidenced.").

250.    By allocating all advisory costs in perfect relation to AUM, in contravention of the manner in which CAL's advisory costs actually behaved (and, put differently, of the economies of scale indicated by such cost behavior), CAL's cost allocations in the Mutual Fund Profitability presentations were distorted, particularly for funds at both extremes of the AUM spectrum (*i.e.*, very small funds and very large funds).  Pomerantz Report at ¶433 *et seq.*; Pomerantz Rebuttal Report at ¶236 *et seq.*  Specifically, and as further detailed in Sections IV.B.2-3 below, the Mutual Fund Profitability presentations sharply under-allocated expenses to

small funds (thereby making them appear profitable to CAL, when in fact they were not) and sharply over-allocated expenses to large funds, such as the Growth Fund (making them appear less profitable to CAL than they in fact were). Pomerantz Report at ¶433 *et seq*.

251.    At trial, Defendant did not argue that the Funds-specific profitability figures reported in the Mutual Fund Profitability presentations were accurate, and insisted instead that Funds-specific profitability was unknowable. Tr. at 238:15–239:15, 1010:17–1011:1, 1015:10-19. Defendant justified the Mutual Fund Profitability presentations instead, primarily, on their systematicity (*i.e..,* all costs allocated on the basis of AUM) and on their practicality (*i.e.*, calculating profitability in such manner was easily accomplished and did not take too much time or effort). Tr. at 235:16-25, 240:13-242:13, 998:13-17, 1015:2-9, 1020:19–1021:4; Lacey Report at ¶¶20, 24, 83-85.

### 2. CAL's 15(c) Profitability Presentations Over-Allocated Costs to Large Funds, Presenting them as Less Profitable than They in Fact Were

252.    Allocation of advisory costs on the basis of AUM alone over-allocates costs to larger funds, such as the Growth Fund. Pomerantz Report at ¶433; Pomerantz Rebuttal Report ¶¶259, 274.

253.    Indeed, the sources that Professor Lacey cites for his basis that AUM-based cost allocation is "widely accepted" in the mutual fund industry criticize AUM-based cost allocation for this very reason: that it "tends to make the largest funds less profitable" by over-allocating advisory costs to them. Tr. 1003:23–1005:25; Pomerantz Rebuttal Report at ¶¶259, 274.

254.    The over-allocation of costs to larger funds has the same root as the below-discussed under-allocation of costs to smaller funds: that cost allocation on the basis of AUM ignores economies of scale and the largely fixed nature of advisory costs. Pomerantz Report at ¶433; *see also id*. ¶¶382-85; Pomerantz Rebuttal Report at ¶¶236-59, 287-93; Bullard Report at

¶¶64-78.  For mutual fund advisers, additional AUM often require little if any additional costs (*e.g.*, a 10% increase in AUM might entail little or no increase in costs, as extant personnel, systems and infrastructure often suffice to service additional AUM), but cost allocations based on AUM assign additional costs in direct and continuous proportion to additional AUM (*e.g.*, a 10% increase in AUM will entail a 10% increase in allocated costs).  *Id*.

### 3. CAL's 15(c) Profitability Presentations Under-Allocated Costs to Small Funds, Presenting them as Profitable When in Fact They Were Not

255.    CAL's Mutual Fund Profitability presentations presented CAL's smaller and smallest Funds not only as uniformly profitable for CAL to advise, but as providing CAL with greater profitability than its largest Funds, such as the Growth Fund.  *See e.g*. DX 145-R at 634772.[24]

256.    For example, in 2016 CAL reported to the Board that 14 of its Funds with AUM below $200 million were profitable, and that several of them were more profitable to CAL than the then-$3 billion Growth Fund.   DX 145-R at 634772.   These results are roundly counterfactual, and contradicted *inter alia* by:

> a.    the testimony of CAL executives, such as Mr. Behan, who explained quite bluntly that small funds are typically unprofitable to their advisers until reaching approximately $250 million in AUM, at which point the advisory fees they generate (which are a function of AUM) begin to exceed the advisory costs incurred by their advisers; Tr. 109:9-18; *see also id.*at 99:19 – 100:11.

---

[24]  Specifically, the Pre-Distribution and Marketing "Operating Margin" line item for each of the 21 Open-End Funds is positive.  14 of these 21 Funds had AUM below $200 million (*see* "Monthly Average AUM" line item at bottom of page).  Of these 14 sub-$200 million Funds, seven had reported profit margins exceeding 50%, while the Growth Fund's profit margin was reported as 47%.

b.  the testimony of the Fund's Independent Trustees, such as Mr. Neal, to the same effect, Tr. at 193:8-10;

c.  the testimony of CAL's expert Mr. Richardson, to the same effect, Pomerantz Rebuttal Report at ¶240;

d.  received wisdom concerning mutual fund economics from the mutual fund industry's primary trade association, the Investment Company Institute ("ICI"), to the same effect;[25]

e.  what CAL repeatedly told the Board outside the 15(c) Review context and/or prior to this action:  namely, that its small funds were unprofitable, and cost CAL more to advise and operate than they paid to CAL in fees;[26]

f.  CAL's real-world managerial decisions to shutter three of its smallest Funds, because they were, and in CAL's view were likely to remain, unprofitable to CAL.[27]

---

[25] As ICI explains, a mutual fund "typically starts small and may require significant subsidies from its adviser for a number of years until the fund reaches a critical mass," "can take several years [] to achieve a viable size," and "may incur losses during [its] early years, may never reach viable size, and may ultimately need to be closed or merged." (Pomerantz Rebuttal Report at ¶236; Bullard Rebuttal Report at ¶109).

[26] PX 432 at 626286 (reporting to Board in 2000 that apart from one Fund, all of CAL's other Funds, which were then still relatively small, "were not yet profitable to the Adviser."); JX 144 at 636337-38 (Mr. Behan explaining to the Board that CAL recommended liquidating several of its smallest funds because such funds had "been subsidized since inception," had "failed to achieve economies of scale," and presented "unlikely prospects of future asset growth" sufficient to generate advisory fees that outstripped costs). *See also* Pomerantz Report at ¶445; Pomerantz Rebuttal Report at ¶241; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at ¶¶106-09.

[27] JX 144 at 636337-38 (Mr. Behan explaining to the Board that CAL recommended liquidating several of its smallest funds because such funds had "been subsidized since inception," had "failed to achieve economies of scale," and presented "unlikely prospects of future asset growth"). *See also* Pomerantz Report at ¶445; Pomerantz Rebuttal Report at ¶241, 287-97, 307-09; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at ¶¶106-09.

257.    The simple fact of the matter recognized by Plaintiffs' and Defendant's experts, CAL and CAL executives, the Independent Trustees, and the mutual fund industry, is that new and/or small mutual funds are unprofitable to their advisers because of the high, initial *fixed* costs required to operate them, and they only become profitable when they reach sufficient size to generate advisory fees that outweigh such largely fixed costs. ¶256, *supra*; Pomerantz Rebuttal Report at ¶¶236-49, 277.

258.    CAL's presentations to the Board that the smaller Funds were profitable, are therefore not only inaccurate, but facially implausible.  Bullard Report at ¶¶61-62; Pomerantz Report at ¶¶437 *et seq*.; Pomerantz Rebuttal Report at ¶¶237-59, 277-93.

259.    The only way CAL could have reported the smaller Funds as profitable was by either masking/misreporting the revenues received from these funds, or by playing games with the allocation of costs (given that profitability is calculated on the basis of these two figures). Lacey Report at ¶38.   However, because CAL records its revenues on a per-Fund basis, its erroneous profitability determinations must be the result of how CAL allocated costs to such Funds.  DX 145-R, at 634761 (noting that all revenues are "direct" ones).

260.    Consequently, the Mutual Fund Profitability presentations' allocation of advisory costs by AUM under-allocates advisory costs to CAL's smaller Funds.  As explained in Section IV.B.1 *supra* and further detailed in Section IV.B.4 *infra*, this under-allocation results from turning a blind eye to the high fixed costs that advisers experience for small funds, which require the same panoply of services as larger funds, and instead employing the systematic fictional allocation of costs as if such costs were entirely variable, rather than largely fixed.  Pomerantz Rebuttal Report at ¶¶236-59, 287-93; Bullard Report at ¶¶57-58.

#### 4. CAL's 15(c) Profitability Presentations Allocated Sharply Different Advisory Costs to Funds that Have Substantially Similar Advisory Costs

261.     The general unreality of CAL's AUM-based cost allocations, and resulting profit levels, with respect to the small Funds (and hence the large Funds as well), is further highlighted when compared to CAL's organizational structure.  *See e.g.* Bullard Report at ¶¶57-64, 71-74, 77-78; Pomerantz Report at ¶¶433-47; Bullard Rebuttal Report at ¶¶96-109.

262.     The below table reproduces certain cost, profitability and AUM data from the Mutual Fund Profitability presentation included in CAL's 2016 15(c) Response (DX 145-R, at 634772), along with certain additional calculations from such data highlighted in yellow, with respect to the Growth Fund and 3 other similarly-situated Funds:

| $ in thousands | Growth Fund | Focus Growth | Discovery Growth | Mid Cap Growth |
|---|---|---|---|---|
| **Fund AUM** | | | | |
| Fund AUM | $2,960,060 | $64,841 | $45,110 | $34,669 |
| **CAL Revenue** | | | | |
| Management Fees paid by Fund | $25,636 | $665 | $468 | $363 |
| Management Fees/AUM (fee in basis points) | 0.87% | 1.03% | 1.04% | 1.05% |
| **Allocated CAL Advisory Expenses** | | | | |
| Employee Compensation | $9,407 | $195 | $132 | $99 |
| Client Service | $254 | $16 | $14 | $13 |
| G&A | $3,942 | $90 | $63 | $50 |
| Total Advisory Expenses | $13,602 | $300 | $209 | $162 |
| Expense/AUM (advisory expenses in basis points) | 0.46% | 0.46% | 0.46% | 0.47% |
| Operating Income (Profit) | $12,034 | $365 | $258 | $201 |
| Operating Margin | 47% | 55% | 55% | 55% |
| **Ratio of Growth Fund to Subject Fund…** | | | | |
| AUM | n/a | 46:1 | 66:1 | 85:1 |
| Employee Compensation Expense | n/a | 48:1 | 71:1 | 95:1 |
| Client Service Expense | n/a | 16:1 | 18:1 | 20:1 |
| G&A Expense | n/a | 44:1 | 63:1 | 79:1 |

79

| Total Advisory Expenses | n/a | 45:1 | 65:1 | 84:1 |
|---|---|---|---|---|

263.     Under CAL's team of teams approach, *exactly the same* investment personnel (the U.S. Growth Equity team) were responsible for the day to day management of the Growth Fund, and each of the above three much smaller Funds:  the Focus Growth Fund, the Mid Cap Growth Fund, and the Discovery Growth Fund (each of which CAL shuttered in 2016 due to their unprofitability).  JX 139 at CA-IT 00000071 at 14-18; JX 144 at 636338; Bullard Report at ¶¶57-61; Pomerantz Report at ¶¶441-43; Pomerantz Rebuttal Report at ¶¶252, 283-87.  The Growth Fund and these other three Funds, were, furthermore, supported by identical trading and risk management personnel, identical other support personnel (*e.g.*, Legal, Fund Administration), and identical facilities and infrastructure.  *Id.*

264.     Notwithstanding this organization, which indicates that the costs CAL incurred in advising of these four funds were roughly *identical*, the costs allocated to the Growth Fund in the Mutual Fund Profitability Presentations sharply diverged from those allocated to the other three similarly-situated Funds, as shown in the table above.  DX 145-R at 634772.  This was a pure and direct artifact of CAL's AUM-based cost allocation methodology.  Pomerantz Report at ¶447, 441-43; Pomerantz Rebuttal Report at ¶¶251-52, 283-87; Bullard Report at ¶¶57-64, 71-74, 77-78.  Specifically, the Mutual Fund Profitability presentations allocated to the Growth Fund – which was 45 times larger than the Focus Growth Fund, 65 times larger than the Discovery Growth Fund, and 85 times larger than the Mid Cap Growth Fund – advisory costs that were respectively, and implausibly, 45, 65 and 85 times larger than those allocated to the Focus Growth Fund, the Discovery Growth Fund, and the Mid Cap Growth Fund.  DX 145-R at 634772 and table at ¶262, *supra*; Pomerantz Report at ¶447, 441-43; Bullard Report at ¶¶57-64, 71-74, 77-78; Pomerantz Rebuttal Report at ¶¶251-52, 283-87.

265.    The data presented at ¶262 *supra* reveal and further explain four necessary consequences of CAL's allocation of effectively all advisory costs on the sole basis of AUM.

266.    First, as discussed just above, advisory costs allocated to each Fund were in direct proportion to Fund AUM (and almost entirely unrelated to CAL's actual operations):  if Fund A was 100 times larger than Fund B, it was allocated 100 times the advisory expense as Fund B, even if the actual expenses incurred appeared substantially similar.  Pomerantz Report at ¶¶432-34; Lacey Report at ¶¶57-60; DX 145-R at 634772 (compare AUM ratio to Total Advisory Expenses ratios in the above table).

267.    Second, each of the Funds was allocated an identical advisory expense per dollar of assets advised (*i.e.*, advisory expenses expressed, like advisory fees, in basis points, as a percentage of Fund AUM).  Pomerantz Report at ¶435; Pomerantz Rebuttal Report at ¶¶254-56; DX 145-R at 634772 (compare expense/AUM in above table:  46-47 basis points for each Fund); Tr. at 1006:1-5.  This is theoretically and practically nonsensical:  theoretically, because economies of scale operate to *change* per-unit costs (*i.e.*, advisory costs per dollar of AUM) as AUM increases or decreases, and practically, because it ignores the largely fixed nature of advisory costs that, among other things, makes small funds' per-unit advisory costs high (because substantial fixed costs are charged against a small asset base) and large funds' per-unit costs lower (because similar substantial fixed costs are now charged against a much larger asset base).

268.    Third, as discussed in Section IV.B.3, *supra*, it presented CAL's smaller and smallest Funds not only as uniformly profitable, but as providing CAL with greater profitability than its largest Funds, such as the Growth Fund.  *See* Section IV.B.3, *supra*; DX 145-R at 634772 (50%+ profit margins for each of the small funds; 47% profit margin for the much larger

Growth Fund).  The data presented in the table at ¶262 illuminates the explanation for this result. As the data shows, each of the Funds was allocated an identical level of advisory expenses relative to size (46-47 basis points), but charged different advisory rates relative to size, with smaller Funds charging higher fees (because their smaller AUM did not allow them to achieve fee reductions available at higher AUM ranges), and larger Funds such as the Growth Fund charging lower effective fee rates (because their higher AUM sufficed to trigger advisory fee breakpoints).  *Id.*

269.    Fourth and relatedly, because each of the Funds was allocated an identical level of advisory expenses relative to size (46-47 basis points) but paid advisory fees to CAL at varying effective fee rates (*e.g.*, the Growth Fund at 87 bps, other smaller Funds at 100 bps, etc.), the variation in CAL's reported profitability from each of the Funds (*e.g.*, 47% for the Growth Fund, 55% for other smaller Funds, etc.) was (1) entirely a product of variations in the Funds' effective advisory fee rates (given constant cost levels), and (2) mostly constrained to a relatively narrow band of reported profit margins.  DX 145-R at 634769 and 634772.

270.    Each of these profitability results is counterfactual and/or nonsensical, for reasons detailed at length by Plaintiffs' experts (Pomerantz Report at ¶¶433-47, 461-98; Pomerantz Rebuttal Report at ¶¶236-59, 276-78, 286-93, 301-09; Bullard Report at ¶¶41-83) and is directly contradicted *inter alia* by:  the actual record of CAL's actual advisory costs (which show that CAL's advisory costs did not directly track AUM); CAL's real-world managerial decisions based on its real-world, rather than 15(c), considerations of Fund-specific profitability (which show that CAL knew its small Funds to be unprofitable to it); CAL's reports to the Board concerning Fund-specific profitability prior to this litigation (which stated the same); and the

testimony of CAL's executives, CAL's experts and the Independent Trustees concerning advisory cost behavior and the profitability to CAL of the Funds (which stated the same).

### C.   CAL Did Not use its 15(c) Profitability Analyses for Any Other Purpose, and Based its Actual Business Decisions on an Opposite View of Profitability

271.   CAL did not use its 15(c) profitability presentations/methodology for any other business purpose.  Tr. at 245:24–246:4.

272.   Rather, when making real-world business decisions with respect to the Funds, such as shutting down three small Funds also managed by the same U.S. Equity Growth team that managed the Growth Fund, CAL based such real-world decisions on an understanding of its Funds-specific profitability (specifically, that such small Funds were unprofitable to CAL) that directly contradicted the profitability figures in the 15(c) Mutual Fund Profitability presentations. *See* Sections III.B.3-4, *supra*; Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.

273.   The facts that CAL did not use its 15(c) profitability figures for any other business purposes, and that CAL's real-world business decisions were based on an understanding of Funds-specific profitability that directly contradicted the 15(c) profitability figures, indicate that CAL's 15(c) profitability figures are unreliable.  Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.

### D.   The Mutual Fund Profitability Presentations Were Not "Decision-Useful" for the Independent Trustees in Evaluating CAL's Profitability from the Funds

274.   Defendant's profitability expert Professor Lacey opined and testified that the Mutual Fund Profitability presentations were "decision-useful" for the Independent Trustees in the context of having to evaluate fund-specific profitability pursuant to Sections 15(c) and 36(b) of the ICA.  Tr. at 1003:9-22, 1015:2-9, 1020:19–1021:18; Lacey Report at ¶¶5, 36-42.

275.    Professor Lacey did explain anywhere in his testimony why the Mutual Fund Profitability presentations were "decision-useful" for the Independent Trustees.  In his report, Professor Lacey bases decision usefulness on the fact that the presentations contained numerical figures for fund-specific revenues and fund-specific costs, which allowed fund-specific profitability to be calculated.  Lacey Report at ¶¶37-39, 41-42; Pomerantz Rebuttal Report at ¶¶310.  However, this basis is all form and no substance:  it remains true no matter the accuracy or integrity of the actual figures provided for revenues or costs.  *Id*.

276.    Real-world decisions made by CAL management concerning the life and death of the Fund were made on the basis of a completely different understanding of CAL's profitability Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.  CAL's Mutual Fund Profitability presentations were not "decision-useful" to the Independent Trustees, because they misreported CAL's Fund-specific profitabilities and thereby did not allow the Independent Trustees to fulfill their obligations to evaluate CAL's Funds-specific profitability.  *Id*.

### E.    Dr. Pomerantz's View of Profitability Hews Closer to CAL's Actual Business Conditions

277.    To recalculate Funds-specific profitability in a manner that took CAL's actual advisory economies of scale into account (rather than assuming them away), Dr. Pomerantz (1) estimated those economies by looking at how CAL's overall advisory costs changed in relation to AUM from one year to the next, and (2) applied the observed economies in re-allocating CAL's aggregate Funds-related advisory costs to each of the particular Funds.  Pomerantz Report at ¶¶479-92; Pomerantz Rebuttal Report at ¶¶301-05.  When such economies were taken into account, CAL's profit margin from the Growth Fund was 71%, rather than the 46% reported to the Board.  Pomerantz Report at ¶492; Tr. at 449:15–450:22.

278.   At trial, Defendant sought to discredit Dr. Pomerantz's modeled Fund-specific profitability with respect to its underlying methodology (Tr. at 456:25–469:21) as well as its results (Tr. at 469:22–475:3).

279.   Defendant suggested that Dr. Pomerantz's profitability calculations were "absurd" because they depicted 14 of CAL's 21 Open-End Funds as unprofitable to CAL (*i.e.*, costing CAL more to advise than they paid to CAL in advisory fees).  Tr. at 469:22–475:3; *see also* Pomerantz Rebuttal Report at ¶¶289-91.[28]

280.   That result, however, is not absurd, but instead is entirely consistent with Defendant's clear testimony at trial, and Defendant's consistent statements to the Board outside the 15(c) Review context in recent years, that small mutual funds with AUM of approximately $250 million or less are unprofitable to their advisers.  *See* ¶256, *supra*.

281.   At the time of Dr. Pomerantz's analysis, 14 of CAL's 21 Open-End Funds had AUM of less than $200 million (and 12 AUM of less than $100 million). DX 145-R, at 634772 (*see* "Monthly Average AUM" line item at bottom).  CAL's executives (Mr. Behan) and the Growth Fund's trustees (Mr. Neal) well understood, as a matter of common sense, that mutual funds of such size would not be profitable to their advisers.  Tr. 99:19–100:5, 109:9-18, 193:8-10.  Outside the 15(c) Review context, Mr. Behan told the Board that certain of these Funds, which CAL had decided to shut down, were in fact unprofitable to CAL.  *See* ¶256, *supra*.

282.   Consequently, the results of Dr. Pomerantz's profitability model are not absurd, but entirely consistent with the understandings of CAL's executives, the Fund's Board, the mutual fund industry generally (via its trade association, ICI) and Defendant's experts concerning the economics of the mutual fund industry.  Tr. 99:19–100:5, 109:9-18, 193:8-10;

---

[28] Relatedly, Professor Lacey suggested that allocating costs the Funds in excess of their revenues was nonsensical.  Tr. at 1018:4–1019:24, 1026:20–1029:17.

Pomerantz Rebuttal Report at ¶¶236-37, 240-41, 286-93.  Moreover, Dr. Pomerantz has tested his model against other advisers' cost allocations, and has found that it produced cost allocations similar to those made by such other advisers.  Tr. at 469:3-21.

283.    What is absurd, in light of the foregoing, is the profitability CAL reported in the Mutual Fund Profitability Presentations, which depicted all 14 of these sub-$200 million Funds as profitable to CAL, and seven of the 14 as more profitable to CAL than the Growth Fund.  DX 145-R, at 634772 (*see* Pre-Distribution & Marketing Operating Margin line item:  where Growth Fund had profit margin of 47%, seven sub-$200 million Funds had reported profit margins exceeding 50%).  Pomerantz Rebuttal Report at ¶¶286-93.

## V.   THE INDEPENDENT TRUSTEES' LACK OF CARE AND CONSCIENTIOUSNESS

### A.    Greater Services/Risks, and their Costs, as Justification for Higher Advisory Fees

284.    As noted above, during the Relevant Period, CAL premised the difference in the fees it charged its fund clients and non-fund clients on the purportedly greater services and risks attendant to advising mutual funds.  *See* ¶¶152-56, *supra*.  However, CAL did not provide, and the Board did not request, *any* information regarding the actual or estimated cost of the greater services or risks.  Tr. at 130:19-24; 131:18-132:7, 244:12-245:3, 264:20-265:4; 267:3-6; 268:2-21; 269:2-4, *see also* Timbers Dep. at 163:13-25, 164:12-165:19; Bhatt Dep. at 205:6-206:5.  Moreover, with respect to the numerous services that were provided by third-parties in the first instance and supervised by CAL, Mr. Neal confirmed that CAL never provided, and the Board never requested, an estimate of: (i) the number CAL employees who oversaw the provision of such services; or (ii) how much time they spent doing so.  Tr. at 145:5-16, 141:1-11.

285.     When questioned as to why the Board never requested a breakdown of the actual or estimated costs of the purportedly greater services, Mr. Timbers tersely responded that CAL's personnel "were on their own managing well," Timbers Dep. at 165:12-15, despite having admitted several times that CAL *was not* "managing well" and that its continued poor performance was a significant issue, Timbers Dep. at 37:17 – 38:25, 140:14 – 144:7.

286.     Additionally, Mr. Timbers, was also startlingly ignorant *of the nature of the services* CAL provided to its non-fund clients, as demonstrated by the following testimony:

> Q:     And you're familiar with the fact that CAL has institutional clients?
>
> A:     Yes.
>
> Q:     And CAL has subadvisory clients?
>
> A:     Clients or client, yes.
>
> Q:     OK.  And do you know what services CAL provides to those clients?
>
> A:     I can only guess.
>
> Q:     OK.  So did the advisor ever provide you with any specific information about what services were provided to those clients?
>
> A:     Ever provide?  I don't remember.

Timbers Dep. at 59:10-22 (emphasis added); *see also* Tr. at 965:15-966:5.

287.     With respect to the increased litigation risks that Mr. Jackson described, Mr. Neal admitted that he: (i) was unaware of what methodology, if any, CAL used to price the purported greater litigation risks; (ii) did not know how much of the Growth Fund's advisory fee was attributable to those litigation risks; and (iii) confirmed that CAL never informed the Board of the specific value/cost of the litigation risk that it purportedly priced into the IMA and the Board never asked for that value/cost.  *See* Tr. at 135:14-136:10; 135:18-25.

**B.     The Board's Consideration of FASA Services in Approving the IMA's Advisory Fees**

288.    In determining whether to approve the IMA, and the Growth Fund's advisory fees, the Board did not limit its consideration to the advisory services CAL rendered under that agreement.   Rather, in approving such fees, the Board *collectively considered* all of the services provided under the IMA and the FASA, *see* Tr. at 133:6-134:19, despite the fact that:  (i) the IMA and the FASA are separate agreements; (ii) they set forth different specific duties/services; and (iii) and CAL *was separately compensated under each agreement* for rendering the services identified therein.  *See* ¶¶30-42, 177-82, *supra*; JX 5; JX 6; CAL's "Detailed Service Listings" (PX 184-A at 653575-78; PX 176-A at 650344-46; PX 145-A at 634446-49; PX 113-A at 502799-801; PX 61-A at 519453-55; PX 32-A at 514075-77); Tr. at 142:18-143:4.

289.    The Board's collective assessment also ignored that certain of the FASA services were inapplicable to the Growth Fund, and therefore could not reasonably serve as a basis for the Growth Fund's advisory fees (even assuming collective consideration was appropriate).  *See*, *e.g.*, Tr. at 371:2-7, 374:4-9 (Mr. Holloway's testimony that services described at Sections 2.E.10-11 of the FASA related only to CAL's Closed-End Funds).

**C.     The Board's Failure to Distinguish between the Burden/Expense of Providing a Service versus the Burden/Expense of Supervising Others who Provide the Service in the First Instance**

290.    In determining whether the purportedly greater services justified the Growth Fund's higher advisory fees, the Board treated those services the same regardless of whether they were provided by CAL in the first instance or performed by a third-party that CAL supervised. *See*, *e.g.,* Tr. at 176:16-20 (Mr. Neal's testimony that "you go down the list of those 11 items [performed by third-party service providers in the first instance] in our report that we discussed earlier with other counsel, all make a mutual fund a much more complicated, higher risk effort *by*

*the adviser*") (emphasis added); *see also* Tr. at 911:18-915:7, 920:12-921:5, 927:9-928:13 (Professor Bullard's testimony criticizing the Trustees' failure to properly distinguish between the veneer of oversight and the actual performance of a task).

291.   For example, Mr. Neal repeatedly cited daily NAV calculations as a significant additional service that *CAL provided* to the Funds.  *See, e.g.*, Neal Decl. at ¶85 ("I understand that, generally, *CAL provides* a variety of fund management services to the Fund, including daily pricing and *striking the daily NAV*.") (emphasis added).   In fact, that service was provided by State Street as the Funds' Accountant, not CAL, and State Street was separately compensated for that service.  Tr. at 365:10–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100.

292.   Similarly, at trial Mr. Neal identified a litany of services that purportedly distinguished the work an investment advisor performs for its fund clients versus non-fund clients.  Tr. at 175:10-176:2; 185:3-19.  As Mr. Neal later conceded, however, these services are primarily provided by third-party service providers who are separately compensated by the Funds, not CAL.  Tr. at 204:19–213:11; *see also* Tr. at 314:15–321:23 (Mr. Jackson's testimony regarding service providers drafting of regulatory filings in the first instance).  And although Mr. Neal attempted to exaggerate the importance of CAL's involvement – citing CAL's responsibility for negotiating the contracts with the third-party service providers as significant work – he conceded that:  (i) these agreements had been in existence since 1990; (ii) there was nothing novel about these agreements as of the Relevant Period; and (iii) CAL did not provide the Board with information regarding the amount of work CAL expended negotiating these contracts.  Tr. at 207:18-208:18.

293.   Mr. Neal also testified that CAL shoulders the same burdens, regardless of whether the services at issue were provided by CAL or a third-party service provider.  Neal Decl.

at ¶86 ("I also understand, based on my experience and interactions with CAL and annual review of the IMA, that even where a third-party service provider performs such fund administration services, *CAL continues to bear the risk and responsibility to the Fund in the event of any performance-related issues*."). But again, this is inaccurate: all of CAL's third-party service providers are bound by indemnification provisions rendering them responsible for their own negligence of misconduct. *See* JX 4 at 4-5; JX 11 at 20-21; JX 182 at 8-10; JX 183 at 645546-47. In fact, at trial Mr. Neal conceded that the only specific instance of an error resulting in a loss to fund shareholders that he identified *was borne 100% by the responsible third-party service provider*. Tr. at 211:23–213:11.

### D. Profitability: Allocation of Expense Between Advisory and Distribution Functions

294. During the Relevant Period, Each of CAL's 15(c) Responses included information concerning the allocation of certain expenses between advisory and distribution functions. A distribution expense is an expense relating to marketing and selling the Funds to investors other than current Funds' shareholders, while an advisory expense is any expense that is not a distribution expense. Tr. at 145:20-146:5.

295. Mr. Neal testified that he believed CAL's allocation methodology was reasonable, despite not comporting with his understanding of CAL's business. For example, CAL allocated 100% of its Information Services and G&A expenses to its advisory function, notwithstanding that CAL's distribution-related personnel – which comprised approximately 23% of CAL's total headcount, *see* Tr. at 254:4-22 – used the same Information Services and resources classified as G&A,[29] *see* Tr. at 146:14–149:1, 240:13–243:23; *see also* Bhatt Dep. at 93:11-25; 95:25-96:13,

---

[29] Information Services includes CAL computer infrastructure and core systems, as well as personnel developing and maintaining CAL's information technology systems and applications;

97:1-6, 19-23; Timbers Dep. at 94:11-21.  Mr. Neal acknowledged that allocating 100% of these costs to advisory was imprecise and that that the Board "could be picky about it" and ask for more information, but decided to simply accept the advisor's representation that the allocation method was reasonable because "we don't need more data . . . we need [] more insight."  Tr. 191:5-192:21.[30]

296.    Mr Timbers similarly acknowledged that (i) CAL's distribution personnel used the same Information Services as its advisory personnel, (ii) he did not know why 100% of that expense was allocated to advisory, (iii)  he never asked CAL any questions on that issue because he "didn't get to that level" of detail, and (iv)  he did not recall ever discussing these allocations with his fellow Trustees.  Timbers Dep. at 94:18-95:14.  When pressed as to whether he believed it made sense that none of the expense was allocated to distribution, he demurred that "I'm sure [CAL] had a reason," and conceded that he did not even know how the term "distribution" was being used in the context of these allocations.  Timbers Dep. at 95:15-23.

297.    Turning to G&A, Mr. Timbers testified that he did not "have an understanding of why a hundred percent was allocated to advisory and none to distribution," and that he never wondered why that was the case or discussed the matter with his fellow Trustees.  Timbers Dep. at 96:18-97:1. When asked if it made sense to him that none of the G&A expenses were allocated to distribution, Mr. Timbers testified that "I'd give them the benefit of the doubt.  If they could explain it, then fine."  Timbers Dep. at 97:2-7.

---

G&A encompassed expenses related to rent, the human resources department, the legal department, etc.  Tr. 147:3-19, 226:11-18, 241:12–242:9.

[30]  Mr. Bhatt testified that he did not recall the Board ever asking questions about the allocation methodology.  *See* Bhat Dep. at 96:15-97:1.

298.     Mr. Bhatt echoed Mr. Timbers testimony, and stated that he did not recall the Board asking any specific questions regarding the allocation of these expenses.  *See* Bhatt Dep. at 96:15-97:1. Even if the Board had asked questions, however, Mr. Bhatt would have been unable to answer them, even though he was CAL's CFO, because he had no idea why 100% of Information Services and G&A expenses were allocated to distribution.  *See* Bhatt Dep. at 93:11-94:5; 97:2-6, 97:19-98:5.

E.     **The Trustees' Misinformed View Regarding the Purported Burden of Providing Daily Liquidity**

299.     Both Messrs. Neal and Timbers repeatedly stressed that CAL's provision of daily liquidity for its fund clients was a source of substantial additional work that it was not required to perform in connection with its non-fund clients. Tr. at 171:8-173:17; Timbers Dep. at 112:1-18.

300.     The Trustees' opinions, however, were remarkably ill-informed.  As Mr. Kalis testified the daily liquidity requirement *did not* result in a material amount of additional work *with respect to the Growth Fund*.  *See* ¶202, *supra*.   Additionally, CAL's two largest Other ACG Accounts were themselves funds that provided their shareholders with daily liquidity, and thus presented CAL, as their subadvisor, with comparable portfolio management work.  *See* ¶¶204-05, *supra.*

F.     **The One-Time Fee Waiver and the Board's Annual Unanimous Approval of CAL's Advisory Fees**

301.     For each year during the Relevant Period, the Board unanimously approved CAL's advisory fees for the Growth Fund.  The only time the Board requested and approved a decrease in CAL's advisory fees was at the June 2013 15(c) meetings, when it instituted a modest 5 basis point fee-waiver.  *See* Tr. 155:24-155:4; 159:4-6.  The fee waiver was instituted in response to CAL's short-term *and long-term* underperformance.   At that time, however, the Board did not set any goals or milestones that CAL had to meet as a precondition to lifting the

waiver.  Tr. at 156:5-9, 157:4-8.  In fact, the Board did not set *any objective criteria* for assessing whether CAL had sufficiently improved its performance, in order to merit a return to its old fee schedule.  JX 31 at 503417-18.

302.    Despite the Board's concerns with CAL's long-term underperformance, it lifted the fee waiver after just one year.  Tr. at 155:24–156:4, 158:4-11.  Notably, however, the minutes of the 2014 15(c) Meeting do not mention the fee waiver *even once*, let alone provide any indication that the Board discussed whether the waiver should be continued or the reasons why they restored CAL's fees in full.  *See* JX 70.[31]  Further still, the section of the minutes memorializing the Board's consideration of the IMA does not include any indication that the Board asked *a single question* specifically about the Growth Fund.  JX 70 at 534045-54.

303.    A fee waiver, however, was not the only way to address the issue of whether CAL's performance merited a certain level of fees. Rather, several of CAL's Funds had performance fee arrangements, whereby CAL's fee is either larger or smaller depending on how the fund at issue performs relative to an index/benchmark.  Tr. at 158:12-20.  According to both Messrs. Neal and Timbers, the Growth Fund's performance was the paramount concern in assessing whether approving CAL's fees was in the best interests of investors.  *See* Tr. at 154:21–155:23, 158:4-11; Timbers Dep. at 38:15-25, 120:13–121:8.  Nonetheless, the Board did not ask CAL to consider a performance fee arrangement *at any time*.  Tr. at 158:21-159:6.

304.    Rather, for each year during the Relevant Period (with the sole exception of 2013), the Board did not seek a decrease in CAL's advisory fees or attempt to link its fees to performance, but instead approved the IMA after reaching the formulaic conclusion that it would

---

[31] Mr. Jackson testified that although the minutes of the Board's 15(c) meetings are not *verbatim* recordings, any discussions concerning material/significant matters would be noted in the corresponding minutes.  Tr. at 259:24-260:2; *see also* 323:23-324:14.

be "prudent" to allow CAL "more time" to develop its performance record.  Tr. 160:9-163:25; 166:21-167:25; JX 70 at 434047-48; JX 111 at 534348; JX 144 at 636377; JX 180 at 652318. The Board did so without setting any performance related goals, notwithstanding that, for each year since 2014, the Growth Fund's one-year Morningstar ranking relative to other comparable funds became progressively worse.  Tr. 160:9-163:25; 166:21-167:25.

305.    The Board's stated rationale for approving the Growth Fund's advisory fees was that CAL was continuing to make changes to its investment team to improve performance.  *See, e.g.*, JX 70 at 534047; JX 111 at 534348; JX 144 at 636377; JX 180 at 652318; *see also* Timbers Dep. at 140:6 – 144:7.   However, the very changes that supposedly served as a basis for buying CAL more time, such as CAL's termination and replacement of David Kalis who headed the Growth Fund, were themselves occasioned by CAL's *continued poor performance*.   Tr. at 168:12-24, 181:3-10, 198:1-6.   Moreover, the Board continued to parrot its prudent-to-allow-more-time mantra, well after CAL had reported to the Board that its transition to a horizontal approach – the crown jewel of its efforts to improve performance – *had been completed*.  Tr. at 164:3-165:21; JX 144 at 636377; JX 180 at 652318.

306.    Finally, the Trustees *were not even aware* that, at the same time they continued to cut CAL slack year after year, a substantial number of CAL's non-fund clients that had money invested in the same investment strategy as the Growth Fund were unwilling to do so, and terminated their advisory relationships because CAL's performance did not merit the fees charged.  *See* Tr. at 169:9-170:16.

# CONCLUSIONS OF LAW

## I.   CAL'S WITNESSES WERE INCREDIBLE

### A.   Applicable Legal Standard

307.   In a bench trial, credibility determinations are the province of the presiding judge. *See DeGiorgio v. Fitzpatrick,* No. 08 Civ. 6551, 2011 WL 10501908, at *7 (S.D.N.Y. Mar. 8, 2011); *Haimdas v. Haimdas*, No. 09 Civ. 2034, 2010 WL 652823, at *3 (E.D.N.Y. Feb. 22, 2010).   Grounds for finding a witness incredible include, *inter alia*, evasive, inconsistent, contradictory or implausible testimony.[32]

308.   Moreover, if the Court finds that any portion of a witness's testimony was intentionally untruthful or misleading, the Court can elect, under the doctrine of *falsus in uno falsus in omnibus,* to reject the entirety of the witness's testimony.   *Hernandez v. NJK Contractors, Inc.*, 09 Civ. 4812, 2015 WL 1966355, at *31 (E.D.N.Y. May 1, 2015) (citing *United States v. Foster*, 9 F.R.D. 367, 389 (S.D.N.Y. 1949)).[33]

### B.   Specific Instances of Incredible/Misleading Testimony

#### 1.   CAL's Misleading and/or Incomplete Interrogatory Responses

309.   Plaintiffs' First Set of Interrogatories asked CAL to identify, *inter alia*, all of CAL's Institutional and Subadvised Accounts that followed an ACG strategy – like the Growth Fund – and, for each such account, to identify among other things, whether the account had

---

[32] *See, e.g., Latin America Music Co., Inc. v. Spanish Broad. Sys., Inc.*, 254 F. Supp. 3d 584, 589-90 (S.D.N.Y. 2017) (witness incredible where he could not recall important details, his testimony directly contradicted prior statements, and he evasively answered questions on cross-examination).

[33] *See also United States v. Eastman*, 16 Cr. 0006, 2016 WL 4357492, at *6 (D. Conn. Aug. 15, 2016) (applying doctrine of *falsus in uno, falsus in omnibus* to reject entirety of witness's testimony that was incredible on certain key matters); *Hinton v. Patnaude*, 92 Civ. 405, 1997 WL 727529, at *2 n.3 (N.D.N.Y. Oct. 21, 1997) ("*Falsus in uno, falsus in omnibus* has particular applicability to an assessment of [a party's] credibility.") (internal quotation marks omitted).

terminated CAL and the reason(s) given for such termination.  JX 181, at 4.  According to CAL's verified responses, *four of its largest* Other ACG Accounts – Nomura, Thrivent and the two MD Accounts – did not cite poor performance as one of the reasons they terminated CAL.  JX 181 at Ex. A.  This was untrue:  Mr. Behan testified that all four of those accounts cited poor performance as a reason for termination.  Tr. 82:21-85:7, 91:21-92:15.  Notably, Mr. Behan could not explain why such information was omitted from CAL's interrogatory responses, and simply speculated it may not have been entered into their customer database at the time those clients terminated their relationships.  *See* Tr. at 114:23-115:5.

### 2.    Mr. Behan's Misleading Testimony Regarding the Powell Trust

310.    Mr. Behan testified that the Jason Powell Trust – one of CAL's Other ACG Accounts – voluntarily chose to close its SMA and invest in the Growth Fund, to take advantage of the purportedly greater services. Behan Decl. at ¶69; Tr. at 115:15–116:13.  Mr. Behan's testimony is flatly inconsistent with CAL's internal communications, which indicate that the Jason Powell Trust had no choice but to close its SMA and transfer its funds into the Growth Fund, or choose a new investment advisor, because it fell below CAL's minimum AUM threshold for SMAs.  PX 487 at 595407.  Mr. Behan's distortion of the facts is particularly telling, given that it dovetailed with one of CAL's key (but legally erroneous) defense narratives: that its advisory fee cannot be excessive, by definition, if CAL can identify just a single institutional client that invested in the Growth Fund.

### 3.    Mr. Jackson's Implausible and Evasive Testimony Regarding *inter alia* CAL's Pricing of Litigation Risk and its Involvement in Preparing the Funds' Regulatory Filings

311.    *First*, Mr. Jackson's trial declaration – likely drafted by the same person who authored CAL's Interrogatory Responses – repeated the false claim that Nomura and the MD

Accounts did not cite performance as one of the reasons why they terminated their advisory relationships with CAL.  *Compare* Jackson Decl. at ¶104, *with* Tr. at 82:21-85:7, 91:21-92:15.

312.    *Second*, Mr. Jackson's trial declaration misleadingly claimed that the "clear majority" of his time as General Counsel was spent working on Funds-related matters, which conveniently supported Defendant's narrative regarding the purported time-consuming legal and regulatory burdens attendant to advising Funds.  Jackson Decl. at ¶9.  In fact, however, Mr. Jackson testified that, during the heart of the Relevant Period he spent the "clear majority" of his time working on *non*-Funds related matters.   *See* Tr. at 269:24–270:7 (testifying he spent only 40% of his time on Fund matters); ¶10, *supra*.

313.    *Third*, as reflected in the minutes of CAL's 15(c) meetings, Mr. Jackson explained to the Board that one of the primary reasons the Funds paid higher advisory fees was because advising mutual funds purportedly involved greater litigation risk.  *See* Section III.B.2, *supra*; Tr. at 261:24–301:23.  Mr. Jackson further claimed that while the value CAL assigned to this litigation risk was "necessarily subjective," *CAL priced that cost into its fee structure*.  *Id*.; JX 144 at 636366.  These assertions were false.

314.    At trial, Mr. Jackson conceded that: (i) he is unaware of anyone at CAL having calculated, estimated or otherwise reduced to a number the litigation risk that CAL purportedly priced into the Growth Fund's advisory fees since joining CAL; (ii) he is not aware of anyone having performed that exercise prior to the time he joined CAL; (ii) he does not know what portion, *if any*, of the fee CAL charged the Growth Fund was attributable to the increased litigation risks, and (iv) to the extent CAL did consider litigation risk in setting the advisory fees it charged the Growth Fund, he does not know what methodology, if any, CAL employed.  Tr. at 264:20–269:4; *see also id.* at 135:6–136:10 (Mr. Neal's testimony that CAL never provided the

Board with an estimate of the value/cost of litigation risk it purportedly priced into the Growth Fund's fee structure).

315.    *Finally*, Mr. Jackson misleadingly claimed that CAL prepared the Funds' regulatory filings "*in the first instance*," to once again inflate the amount of work CAL performed for the Funds.  Tr. at 315:25-317:5.  Rather, as Mr. Jackson conceded under cross-examination, nearly all of the Funds' regulatory filings were prepared by a third-party service provider in the first instance, and CAL simply reviewed them.  Tr. at 317:22-318:16; 319:13-320:11, 321:3-7; *see also* 382:1-4.  Moreover, CAL's review function was aided by Fund Counsel, who *was paid directly by the Funds for such work*.  Tr. at 317:6-11, 18-21; *see also* JX 5 at 146344 (IMA Section 3(k)).

### 4.    Mr. Neal's Evasive Testimony and Routine Exaggerations

316.    Mr. Neal's trial testimony was frequently evasive, inconsistent with his prior sworn statements and testimony on key matters, and marked by bouts of bloviation aimed at exaggerating fund-related services and risks.

317.    For example, Mr. Neal refused to directly answer whether he differentiated between the services provided under the IMA and the FASA in deciding whether to approve CAL's advisory fee under the IMA, *see* Tr. at 132:22–133:16.  Yet, in a sworn declaration he earlier submitted in this action, he admitted that he considered the services rendered under those agreements "*collectively*" and did not "*attempt to distinguish between what services are provided under the IMA as opposed to the FASA*."  Tr. at 132:22-134:19 (emphasis added).

318.    Mr. Neal was also evasive about the fact that the Board instituted the fee waiver because it was disappointed with CAL's short-term *and* long-term performance.  *See* Tr. at 154:21-155:23. The obvious reason for his evasiveness being that the Board reinstated CAL pre-

waiver fee schedule after just one year, which by definition is insufficient to address concerns associated with long-term performance.

319.    Mr. Neal also frequently exaggerated aspects of the work and risks CAL undertook in advising its fund clients and displayed a remarkably cavalier attitude with respect to the true state of CAL's business operations.  Mr. Neal claimed that 30 to 40 CAL personnel manned its call center for fund investors, Tr. at 186:8-21, when the actual number of employees was approximately 6, Tr. at 379:2-4, and was unaware that CAL shuttered its call center in mid-2017, Tr. at 217:7-10, 361:13-15.

320.    He also intimated that the threat of "make-whole" errors with respect to Growth Fund was significant, because recently there had been a handful of such errors.  Tr. at 209:24–212:18.  Under questioning, however, Mr. Neal admitted that he was unaware if the errors involved the Growth Fund and, more critically, acknowledged that a third-party servicer provider – *and not CAL* – bore financial responsibility for those errors.  Tr. at 212:2–213:11.  In fact, Mr. Neal stated that he could not remember the last time the Growth Fund experienced a make whole error.  Tr. at 212:2-18.

### 5.    Professor Laby's Incredible and Implausible Testimony

321.    Professor Laby offered evasive and implausible testimony regarding matters central to his opinions, including the applicability of the business judgment rule ("BJR") and the robustness of the Board's consideration of the nature/scope of the services CAL provided to its non-fund clients compared to the Growth Fund.

322.    *First*, one of the foundational elements of Professor Laby's opinions is that the Board's decision to approve CAL's advisory fees under Section 36(b) is governed by the BJR. *See* Tr. at 945:5-10, 946:2-4; Laby Report at 8.  Based on this understanding, Professor Laby concluded that the Board's various actions in connection with the fee approval – including its

receipt and review of certain information – constituted valid exercises of business judgment. *See* Laby Report at 1-2, 7-8, 31, 60-61.

323.   Yet, despite importuning the Court to likewise apply the BJR, Professor Laby conceded that he: (i) does not offer an opinion on the body of law – state or federal – that supplies the BJR in this case; and (ii) assuming that the appropriate body of law is state law, does not offer an opinion on which state's law would apply.  Tr. at 946:6-25.  Further still, Professor Laby conceded that, in his opinion, there are multiple versions of the BJR which differ in the amount of discretion courts afford a board's decision, *see* Tr. at 949:11-19,[34] and that he does not have an opinion as to which specific strain of the BJR applies here, *see* Tr. at 949:20-950:21.[35]

324.   Moreover, eliminating any remaining credibility he had on this issue, Professor Laby conceded that:  (i) the only post-*Jones* authority[36] he cited in support of his opinion regarding the BJR's applicability is a citation to the Frequently Asked Questions section of ICI's website, *see* Tr. at 954:2-9, Laby Report at 7 n.16;[37] and (ii) he is the co-author of a treatise that

---

[34] After many attempts to avoid answering the question, Professor Laby conceded that, generally speaking a court's role ceases once it determines that the BJR applies.  Tr. at 947:1-949:14; *see also Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928, 950 (3d Cir. 1982) ("Whereas under the typical state law business judgment rule the disinterested directors' decision exercised in good faith binds the court, under section 36(b) the court must make an independent judgment.").

[35] Notably, Mr. Laby first attempted to testify that he did have an opinion on which of the many purported versions of the BJR applies in this case, prior to being confronted with his contrary deposition testimony.  Tr. at 949:20-950:21.

[36] The Supreme Court's decision in *Jones* does not discuss the BJR or even mention the phrase "business judgment."  *See Jones v. Harris Associates L.P.*, 559 U.S. 335, 338-53 (2010); *see also Weiss*, 692 F.2d at 953 ("[s]ince the directors' business judgment is to be considered relevant to a section 36(b) claim only to the limited extent that the court must take the directors' views into account, any state law business judgment rule is clearly supplanted.") (Gibbons, C.J., dissenting), *cert. granted*, *judgment vacated*, 465 U.S. 1001 (1984) (relying on the reasoning of *Fox v. Reich & Tang, Inc.*, 692 F.2d 250 (2d Cir. 1982), *aff'd sub nom. Daily Income Fund*, *Inc. v. Fox*, 464 U.S. 523 (1984)).

[37] ICI essentially is a trade association for mutual funds and their advisors.  Tr. at 676:11-15.

takes the position that the BJR *is not the applicable standard* for assessing the reasonableness of an adviser's fees under ICA.  Tr. at 950:22-952:22.[38]

325.    *Second*, Professor Laby also offered completely implausible testimony in defense of his opinion that the Trustees – in particular, Lead Independent Trustee Stephen B. Timbers – carefully considered information concerning nature and scope of the services CAL provided to its non-fund clients.  *See* Tr. at 965:3–968:14.  Specifically, at trial Professor Laby was confronted with Mr. Timber's deposition testimony that he "can only guess" about the services CAL provides to its institutional and subadvisory clients, and that he did not recall CAL ever providing specific information regarding such services.  Tr. at 965:15–966:5.  Nonetheless, Professor Laby claimed that Mr. Timbers' testimony, in fact, meant that he was certainly aware of the services CAL provided to its non-Fund clients:

> Q:    Is [Mr. Timber's] testimony consistent with the careful consideration of the services   that CAL provides to, for example, its subadvisory clients?
>
> A:    Well, two things.  First of all, it depends on how you interpret these words.  *I think it absolutely can be*, because in this case, as has been discussed, Mr. Timbers has a   great deal of experience in the financial services industry, and when he's asked the question "do you know what services CAL provides to those clients" and he       responds "I can only guess," I read it mean, *Yes, I can tell, I know what services are being provided.  I don't read that any other way in this case* . . . .

Tr. at 966:6-16.

326.    Further eroding his credibility, immediately after Professor Laby testified that he viewed Mr. Timber's testimony as being susceptible to only one interpretation – one that is the

---

[38] Although Professor Laby sought to distance himself from that portion of his treatise on the ground that it was the product of his co-author, he has not edited that passage since joining as co-author more than three years ago, or, more critically, in the 14 months following his deposition in this action when this exact passage was brought to his attention.  *See* Tr. at 951:1-12, 952:23-953:19.

exact opposite of the literal meaning of the words Mr. Timbers used – Professor Laby then conceded that the testimony was, in fact, potentially ambiguous.   And although Professor Laby claims that he sought to clarify this "potential ambiguity," Tr. at 966:18-25, during his post-deposition, joint telephonic interview of Messrs. Timbers and Neal, the circumstances of that interview are highly irregular and further undermine Professor Laby's testimony.  Specifically, unlike at his deposition, Mr. Timbers was not under oath, and the interview was conducted *ex parte* and was not recorded.  Tr. at 941:3-942:8, 943:3-5; *see also* Laby Report at 5.  Making matters worse, Professor Laby destroyed his only complete set of contemporaneous notes of what Mr. Timbers said, because he typed over his interview notes in generating his report.  Tr. at 943:20-944:5, 944:22-945:4.[39]

### 6.      Mr. Richardson's Evasive and Implausible Testimony

327.    Mr. Richardson provided evasive/implausible testimony concerning several key issues in this case.

328.    *First*, when questioned about joint consideration of the services CAL provided under the IMA and FASA, Mr. Richardson denied that the "FASA provides a framework for Calamos's provision of additional services beyond the provision of investment management services." Tr. at 751:3-13.  At deposition, however, Mr. Richardson said the opposite, Tr. at 751:14-20, and when confronted with his testimony conceded that "the description of the services provided under the FASA are not all contained within" the IMA. Tr. at 752:21-25.

329.    *Second*, Mr. Richardson was also evasive when he was asked to confirm that he was of the opinion that it was reasonable for CAL to charge an advisory fee under the IMA that

---

[39] Further still, by interviewing Messrs. Timbers and Neal jointly, Professor Laby exacerbated the risk that the witnesses would conform their testimony on key issues, thereby completely undermining whatever utility Mr. Timber's unsworn, hearsay statements to Professor Laby might otherwise have had.

took into account services for which it was already being compensated under the FASA.  *See* Tr. at 753:4-11.  Mr. Richardson, in fact, expressed that exact opinion at deposition.  Tr. at 753:12-754:2.

330.   Finally, Mr. Richardson implausibly testified that even after an adviser had recouped its start-up costs in sponsoring a fund, and the fund had reached profitability, a Board can nonetheless continue to take those entrepreneurial risks into account in perpetuity in determining whether a fee is reasonable.  Tr. at 758:2-759:11. He further implausibly testified that it would be reasonable for CAL's advisory fee to account for, *inter alia*, the risk that investors would switch advisers *due to CAL's poor performance*.  Tr. at 759:21-760:4.[40]

### 7.   Dean Hubbard's Implausible and Agenda-Driven Testimony

331.   Dean Hubbard is a darling of the mutual fund industry's primary trade association, the ICI, *see* Tr. at 676:2-24, who unsurprisingly offered implausible, evasive, and agenda-driven trial testimony that would literally read Section 36(b) out of existence.

332.   Specifically, Dean Hubbard opined that a plaintiff can bring a viable § 36(b) claim only if there was a failure of (i) the competitive process in the mutual fund industry, and (ii) the board process.  Tr. at 745:17-746:2. Critically, however, Dean Hubbard further opined that he had not "seen a failure of the competitive process" in this case or in any of the cases he had studied, and that "given the structural characteristics of the industry, *it would be hard to imagine*" such a failure.  Tr. at 746:3-9 (emphasis added).  Thus, according to Dean Hubbard, a valid excessive fee case can only be brought based on market conditions that, in his opinion, will never materialize, thereby rendering Section 36(b) a nullity and his testimony utterly implausible.

---

[40] Notably, at deposition Mr. Richardson testified that he did not offer that opinion.  Tr. at 760:14-25.

333.    Additionally, Dean Hubbard provided misleading testimony when he addressed the issue of the Growth Fund's fees and performance, noting that it was quite common for a fund to be simultaneously in the *bottom half* of performers and the *top half* of fee charged, relative to other funds.  Tr. at 711:11-23.  However, when pressed on cross-examination about the fact that the Growth Fund was often in the *bottom quarter* of performance and the *top quarter* of fees charged, he admitted that only 10% of funds could boast that combination.  Tr. at 741:14-742:4.

## II.   CONCLUSIONS OF LAW WITH RESPECT TO *GARTENBERG* FACTORS:   THE GROWTH FUND'S ADVISORY FEES WERE EXCESSIVE

### A.    Applicable Legal Standard

334.    Congress adopted the Investment Company Act (the "ICA") to regulate investment companies, including mutual funds.  Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  *See Jones*, 559 U.S. at 338.  "The adviser selects the fund's directors, manages the fund's investments, and provides other services."  *Id*.  In this sense, a mutual fund is often referred to as "captive" to its adviser.  *Id*. at 349.  Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the ICA.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted); *see also* S. Rep. No. 91-184, at 3 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4899 ("Congress recognized that investment companies and those who entrust their savings to such companies stand in special need of legal protection.").  Congress amended the ICA to provide additional protections to shareholders with respect to the fees charged by investment advisers to

their captive mutual funds.  Among other amendments, Congress added a new Section 36(b), which provides:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund] or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  Section 36(b) creates a private right of action for shareholders to enforce the fiduciary duty on behalf of the fund.  *See id.*

335.    Section 36(b) reflects Congress's determination that "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."   S. Rep. No. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.  This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. *See* A STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962) ("Wharton Report").[41]   The Wharton Report determined that "investment advisers often charged [their captive] mutual funds higher fees than those charged the advisers' other clients."   *Daily Income Fund*, 464 U.S. at 537 (citing Wharton Report at 34).  The Wharton Report concluded that the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by [captive] mutual funds."   Wharton Report at 493-94.

336.    In *Jones*, the Supreme Court adopted a standard of liability under 36(b) that focuses on the relationship between the adviser's compensation and the services it provides.  Specifically, "[t]o face liability under § 36(b), an investment adviser must charge a fee that *is so disproportionately large that it bears no reasonable relationship to the services rendered* and

---

[41] Also available at http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added).   In applying this standard, courts must consider "all relevant circumstances", including the factors set forth in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc*., 694 F.2d 923 (2d Cir. 1982), and "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347. *See Chill v. Calamos Advisors LLC*, 175 F. Supp. 3d 126, 130 (S.D.N.Y. 2016) (*citing Jones*, 559 U.S. at 344-46). The *Gartenberg* factors are "(1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 114 (D. Mass. 2006) (*citing Krinsk v. Fund Asset Mgmt., Inc*., 875 F.2d 404, 409 (2d Cir. 1989) (*citing Gartenberg*, 694 F.2d at 929–30)).   These factors are non-exclusive and non-disjunctive, meaning that there is no requirement that a plaintiff present evidence relating to all six factors to prove a violation.  *See Jones*, 559 U.S. at 347.

### B.   The Quality of CAL's Advisory Services Was Exceedingly Poor and Supports the Excessiveness of the Growth Fund's Advisory Fee

337.   At the outset, the quality of services inquiry "'necessarily involves a determination of what services may be permissibly considered.'"  *Chill v. Calamos Advisors LLC*, No. 15 Civ. 1014, 2018 WL 4778912, at *20 (S.D.N.Y. Oct. 3, 2018) (quoting *Kasilag v. Hartford Inv. Fin. Serv., LLC*, No. 11 Civ. 1083, 2016 WL 1394347, at *15 (D.N.J. Apr. 7, 2016)).  CAL suggests that the totality of the services that it provides with respect to the Growth Fund is relevant irrespective of pursuant to which contract – the IMA or the FASA – those services were provided.

338.    As the Court determined on summary judgment, however, Plaintiffs are correct that 36(b) requires that "transactions be considered separately and not aggregated." *Chill*, 2018 WL 4778912, at *20.[42]

339.    As such, only the fees paid under the IMA – and not those under the FASA – are in question.

340.    Furthermore, the principal measure of the quality of advisory services under 36(b) is investment performance.  *See Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990) (*citing Krinsk*, 875 F.2d at 409) ("Given investors' primary objective of making money, the most significant indication of the quality of an investment adviser's services is the fund's performance relative to other funds of the same kind."); *see also* Timbers Dep. 152:3-11 (explaining that performance is "the primary reason that the shareholders buy the fund," and "I don't know Mr. Chill, but I imagine he bought it because he wanted to make some money and have some good performance doing it").  Indeed, "[i]n evaluating the quality of the services provided to funds, other courts have compared the performance of challenged funds against peer funds." *Zehrer v. Harbor Cap. Advisors, Inc.*, No. 14 Civ. 789, 2018 WL 1293230, at *11 (N.D. Ill. Mar. 13, 2018) (collecting cases).

341.    Here, the evidence at trial showed that the Growth Fund performed substantially worse, at nearly all times and for nearly all time periods considered, than almost all similar mutual funds.  *See* ¶¶100-05, *supra*; *see also* Pomerantz Report at ¶¶328-39; Tr. at 544:14–

---

[42] *See also Zehrer v. Harbor Cap. Advisors, Inc.*, No. 14 Civ. 789, 2018 WL 1293230, at *10 (N.D. Ill. Mar. 13, 2018) ("[T]he legislative history of § 36(b) suggests that the key consideration [in evaluating the nature and quality of the services provided to a fund] is what services were secured *by the fee paid.*") (emphasis added); *In re Blackrock Mut. Fund Advisory Fee Litig.*, 327 F. Supp. 3d 690, 726 (D.N.J. 2018) (denying summary judgment to defendants when parties presented conflicting evidence concerning whether investment adviser provides certain services under the IMA in exchange for the advisory fee at issue, "as opposed to under separate agreements in exchange for separate fees").

547:15, 547:16-552:23; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.

342.    These facts separate the instant case from cases in which plaintiffs either could not or did not seriously challenge the fund's performance.  *See*, *e.g.*, *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 976, 988 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) (results "were among the best in the industry" such that the fund's performance was never "below the top twenty percent in performance" in the industry).[43]

343.    In fact, the trial record is replete with CAL's witnesses' admissions that the Growth Fund's performance was exceedingly subpar.  *See* ¶108, *supra*.

344.    Nonetheless, CAL advances two principal contentions regarding performance.

345.    *First*, it claims that the Growth Fund had supposedly superior "since [] inception" performance.  Becker Decl. at ¶72.  But CAL does not plausibly explain why the Growth Fund's performance in the 1990s, for example, is relevant to assessing the excessiveness of CAL's fees 25 years later, when its performance was abysmal.  Indeed, Morningstar, a leading independent third-party provider of mutual fund data and research widely used in the investment industry,

---

[43] *See also Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 977 (D. Minn. 2007) (investment returns exceeded peers); *Krinsk*, 875 F.2d at 409 (fund ranked third best out of 56 funds); *Kalish*, 742 F. Supp. at 1228, *aff'd*, 928 F.2d 590 (2d Cir. 1991) ("the fund had the highest total return of them all."); *In re American Mut. Funds Fee Litig.*, No. 04 Civ. 5593, 2009 WL 5215755, at *20-21 (C.D. Cal. Dec. 28, 2009) (outperformed benchmark); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 769 (S.D. Ohio 2018) ("the funds performed better than, and the fees were in line with, other mutual funds of similar scope."); *Zehrer*, 2018 WL 1293230, at *11 ("the Funds have performed at least as well as comparable funds."); *In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690 (D.N.J. 2018) (performance not challenged); *Sivolella for use & benefit of EQ/Common Stock Index Portfolio v. AXA Equitable Life Ins. Co.*, 742 Fed.Appx. 604, 608 (3d Cir. 2018) ("the Funds at issue performed well").

does not consider since-inception performance in its fund ranking methodology.  Tr. at 547:16-549:13.

346.    In fact, as Plaintiffs' expert Dr. Pomerantz demonstrated, the Growth Fund's strong since-inception performance is simply the ever-shrinking residue of its outperformance many years *prior to* the Relevant Period.  Pomerantz Rebuttal Report at ¶¶24, 388-98; Tr. at 550:25-551:8.

347.    Furthermore, Dr. Pomerantz showed that the Growth Fund's since-inception outperformance likely did not benefit any Fund investors other than CAL, as it was enjoyed by a mere $300,000 in Growth Fund assets that were present at Growth Fund inception and were provided by CAL itself as "seed capital."  Pomerantz Rebuttal Report at ¶¶388, 391, 107 n.34; Tr. at 549:6-13.

348.    Providing a more relevant analysis, Dr. Pomerantz evaluated the Growth Fund's since-inception performance from the perspective of the average Growth Fund shareholder by time-weighting the Growth Fund's returns to incorporate the amount of shareholder money invested and when.  He found that the Growth Fund in fact delivered underperformance to the average shareholder since inception.  Pomerantz Rebuttal Report at ¶¶366, 392-95.

349.    *Second*, CAL claimed that it invested in and made structural changes to its portfolio management team with the goal of improving performance.  Becker Decl. at ¶¶33-66; Behan Decl. at ¶¶23-63; Tr. 18:19–19:12, 65:8–68:8, 90:13-16, 103:5-108:9, 202:5–203:21, 609:2-23, 617:21–638:18, 647:2–664:13.

350.    As an initial matter, CAL admitted at trial that its $3 million annual expenditure to hire additional investment personnel was not a Growth Fund-specific initiative, but was intended to benefit *all* of CAL's accounts. Tr. at 80:17–81:1, 645:14–646:3; Behan Decl. at ¶30;

Tr. at 628:6-24; 671:15-16.  As such, only a fraction of that expenditure could reasonably be assigned to the Growth Fund, and, more critically, in no way justifies or explains the massive fee disparity between the Fund and CAL's institutional clients.

351.    In any event, the evidence shows that CAL did not, in fact, make any material improvements to the investment management team *vis-à-vis* the Growth Fund.  CAL claimed that it ramped up investment personnel headcount in 2013.  That hiring binge, however, followed substantial employee departures in 2011 and 2012 which had decreased the firm's total number of investment personnel to well below historical numbers.  Tr. at 629:21-630:25; 632:8-12. Thus, the new hires simply restored CAL's personnel total to past levels.  Tr. at 633:5-18; Cronin Report at Ex. 9.1.  In fact, CAL's total investment personnel headcount prior to and after its transition from a vertical to horizontal investment approach stayed flat.  Tr. at 629:21-630:25; 632:8-12.

352.    Critically, CAL's restructuring had a decidedly negative impact on the Growth Fund.  Specifically, the total number of individuals specifically assigned to the Growth Fund declined precipitously, shrinking from 24 investment professionals in July 2014 to only 13 in May 2017.  Tr. at 637:4-638:9; Cronin Report at Ex. 11.  In fact, two years after CAL completed its transition in 2015, *see* JX 139 at CA-IT0000)71 at 4 and 6, it fired David Kalis due to the fact that the Growth Fund continued to perform miserably. Becker Decl. at ¶¶57, 70, 115; Tr. at 1161:20-168:12, 181:3-10, 713:7-22.  This provides clear evidence that the restructuring -- including the siphoning of personnel *away from the Growth Fund* -- was not a measure that benefitted the Growth Fund.[44]

---

[44] Rather, it appears that the restructuring was actual a front to justify CAL rewarding itself in the form of dramatically higher salaries and compensation.  *See* Cronin Report at Ex. 9.1.

353.     Moreover, Plaintiffs presented trial evidence showing that CAL's arms-length Other ACG Accounts – which had the same dismissal performance as the Growth Fund – did not view CAL's since-inception performance as a salve, or CAL's restructuring and promises to improve performance as reasonable grounds for continuing their relationship with CAL.

354.     Specifically, of the 36 Other ACG Accounts that CAL managed subsequent to 2011, all 36 terminated CAL by December 2016 and moved their assets elsewhere.  JX 181 at Ex. A.  Furthermore, at least 24 of those clients – including Nomura and the two MD Accounts, which together accounted for 90% of CAL's total Other ACG Account AUM during almost all the Relevant Period – informed CAL that the reason they closed their accounts was poor performance.  JX 181, Ex. A; Tr. at 83:1-85:7.

355.     Notably, CAL sought but was unable to convince those clients to stay despite citing the ACG strategy's supposedly superior since-inception performance and CAL's supposed efforts to improve its investment management team.  Tr. at 89:1-91:20; Behan Decl. at ¶91; JX 181, Ex. A.

356.     Growth Fund shareholders were also unhappy with performance, exiting in large numbers.  Defendant's expert Dean Hubbard testified that the consequence of an advisor's charging a supra-competitive fee -- *i.e.*, one that was not reasonably related to the advisor's investment performance -- would be a loss of AUM and market share.  Tr. at 687:3-27, 691:24-692:12.  Here, the Growth Fund lost in excess of 90% of its AUM and a similar proportion of its market share since its AUM peaked in March 2006, which is consistent with Plaintiffs' position that the fees were above a competitive level.  Pomerantz Rebuttal Report at ¶418.

357.     Accordingly, the trial evidence shows that the Growth Fund's performance was exceedingly poor.  Hence, the *Gartenberg* "quality of the services" factor weighs heavily in favor of the excessiveness of CAL's fees.

### C.  The Growth Fund's Fees Were Exceedingly High in Relation to *All* Comparators, Which Further Shows their Excessiveness

358.     On summary judgment, the Court cautioned Plaintiffs that they would be unable to prevail at trial by demonstrating "*solely* that the challenged Advisory Fees are higher, even much higher, than those charged to Calamos' comparable institutional and sub-advisory clients; nor can Plaintiffs prevail by demonstrating *solely* that the Fees are higher, even much higher, than those charged by third parties to peer funds."  *Chill*, 2018 WL 4778912, at *17 (emphasis in original).  At trial, Plaintiffs established excessiveness based on **both** comparisons. *See* ¶¶138-51, *supra*.

### 1.  The Comparison to Peer Mutual Funds

359.     Plaintiffs' peer mutual fund comparison showed that the fees that CAL charges the Growth Fund are not just a bit higher or above average, but at the very highest end of the range of advisory fees paid by mutual funds similar in character and size.  Pomerantz Report at ¶¶298-304; Tr. at 560:22–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623.

360.     At trial, CAL noted that several peer funds had higher fees.  As the Court determined on summary judgement, however, nowhere in *Jones* does the Supreme Court state that an investment adviser's fees are not excessive unless they are the absolute highest fee charged by any investment adviser.  *See Chill*, 2018 WL 4778912, at *17.  To the contrary, both *Jones* and *Gartenberg* make clear that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Jones*, 559 U.S. at 344 (emphasis added) (quoting

112

*Gartenberg*, 694 F.2d at 928).  Indeed, the Supreme Court in *Jones* explained that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Jones*, 559 U.S. at 350-51. The Second Circuit in *Gartenberg* similarly expressed skepticism at such comparisons, noting that "if rates charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in § 36(b)." *Gartenberg*, 694 F.2d at 929.

361.    Furthermore, approximately half of the handful of funds that charge higher fees than the Growth Fund are advised by ACIM.  Tr. at 563:13–565:1; JX 130 at 636413; JX 46 at 520623.  Because ACIM charges a "unified" fee, *i.e.*, incorporating transfer agency, accounting, custodial and other services for which the Growth Fund is separately charged, those fees do not provide an apt comparison.  Tr. at 563:18–564:7. Subtracting the ACIM funds, the Growth Fund paid the highest advisory fees among its peers in 2016 and the second-highest in 2015 and 2014. JX 130 at 636413 JX 46 at 520623.  Removal of the ACIM funds from Dr. Pomerantz's Peer Comparison analysis places the Growth Fund in the 95th percentile among peer funds with respect to advisory fees.  Tr. at 564:1–565:1.

362.    Accordingly, the trial evidence shows that, compared to peer mutual funds, the fees of the Growth Fund were extremely high, at all relevant times at nor near the top of the range.  Hence, this aspect of the comparative fee structures *Gartenberg* factor weighs in favor of a finding of fee excessiveness.

## 2.    The Comparison to Other ACG Accounts

363.    Plaintiffs' Other ACG Account comparison showed that the fees that CAL charges the Growth Fund are approximately double those charged to the Other ACG Accounts. *See* ¶¶146-51, *supra*.  For example, at asset levels of $2.7 billion (the Growth Fund's AUM as of

May 2017) the fee schedules for the Other ACG Accounts produced effective fee rates of only approximately 33 to 51 basis points.  Pomerantz Report at ¶¶169-76; Tr. at 555:6-556:16.  The Growth Fund's effective fee rate at that time was 85 basis points.  Pomerantz Report at ¶¶170.

364.    Plaintiffs also presented evidence of the AUM-weighted average aggregate effective rate paid CAL's Other ACG Accounts – specifically, 42 basis points, which is approximately half the effective fee rate of the Growth Fund.  Pomerantz Report at ¶¶163-67; Tr. at 572:6-573:13, 575:23-577:11.

365.    CAL points to Other ACG Accounts that had effective fee rates far above the AUM-weighted average.  Tr. at 27:14–28:12, 506:24–509:3.  As Dr. Pomerantz explained, however, this is simply a function of the relatively small sizes of those clients' accounts.  *See* ¶¶81 and 150, *supra*; Tr. at 557:14-559:17; *see also* JX 181 at Ex. A.

366.    CAL suggests that any comparison to the Other ACG Accounts is *per se* inapt.  As the Court determined on summary judgment, however, the Supreme Court in *Jones* "explicitly rejected a categorical rule prohibiting comparisons to institutional-client fees and instead instructed courts to give those comparisons 'the weight that they merit in light of the similarities and differences between the services that the clients in question require.'"  *Chill*, 2018 WL 4778912, at *16 (quoting *Jones*, 559 U.S. at 349-50).  Indeed, *Jones* specifically identifies comparisons to "fees that might result from arm's-length bargaining" – *i.e.*, non-captive institutional client fees – as "the benchmark for reviewing challenged fees."  *Jones*, 559 U.S. at 347.

367.    The core advisory services that investment advisors provide – namely, portfolio management services (investment research, selection and management) – were, here, provided in substantively identical fashion to the Growth Fund and the Other ACG Accounts.  *See* ¶¶88-96.

Consequently, to the extent any service differences exist, they relate to services other than core portfolio management services.

368.    Nonetheless, CAL argues that the Other ACG Account comparison is inapt because CAL supposedly provides a greater level of services and undertakes a greater set of risks with respect to the Fund.  On summary judgment, however, the Court indicated that Plaintiffs had successfully raised a triable issue as to whether such differences in services or risks "exist and are material, as opposed to *de minimis*." *Chill*, 2018 WL 4778912, at *16.  And at trial, Plaintiff conclusively demonstrated that such differences were immaterial, or resulted in de *minimis* additional costs/work, such that fee differential was so disproportionately large that it did not bear a reasonable relationship to the services rendered.

369.    Dr. Pomerantz's uncontroverted testimony and analysis show that the purported greater services and risks entailed no more than 3.6 to 6.1 basis points of cost, an amount that was immaterial and does not begin to explain the massive, 40-plus basis point fee disparity. Specifically, Plaintiffs' expert Dr. Pomerantz showed that even if one allocated 100% of the expenses conceivably related to the claimed services and risks to the mutual fund side of CAL's business *and none* to the institutional side, those costs would total only 3.6 basis points in 2014, 4.6 basis points in 2015, and 6.1 basis points in 2016.  Tr. at 565:255-568:2; Pomerantz Report at ¶¶221-85; *see also* JX 181 at Ex. B.  Notably, CAL did not present any evidence at trial controverting Plaintiffs' 3.6-to-6.1 basis point cost-differential calculation.  Nor did CAL, at any time during the Relevant Period, attempt to quantify or estimate the cost of the purported greater services or risks. *See* ¶¶160-62, *supra*. Rather, CAL has claimed variously that that the cost differential of the supposedly greater services and risks was impossible, or at least difficult, to quantify.  JX 111 at 534339; JX 181 at ¶8; Tr. at 244:24-245:15, 250:3-251:10.

370.     Moreover, the other evidence adduced at trial shows that the services in question are delivered at insignificant expense or under separate contracts for independent consideration or are not in fact "greater" but are comparable to or, in some instances, less than, services that CAL furnishes its Other ACG Accounts.  *See* ¶¶187-216, *supra*.  Furthermore, the purportedly greater risks are largely illusory or insured against at minor cost to CAL.  *See* ¶¶217-37, *supra*.

371.     Many of the services are handled by the Growth Fund's independently paid third-party service providers.  *See* ¶¶167-76, *supra*.  For example:

  a.  USBFS, as the Funds' Transfer Agent, handles automatic reinvestment programs, provides tax reporting services, processes mutual fund share transactions and dividends, prepares and mails transaction confirmations and account statements, operates a call-in system to handle shareholder inquiries, provides shareholder account web access, and furnishes anti-money laundering, identity-theft and suspicious trading compliance services, JSSF at ¶72; JX 182 at 2-3, 5-6, 17-19 and 25; Tr. at 359:4–363:13, 383:11-20;

  b.  State Street, as the Funds' Accountant, calculates the Funds' NAV and prices/values the securities in the Funds' portfolios, Tr. at 365:22–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100; and

  c.  State Street, as the Funds' Sub-Administrator, prepares most of the Funds' regulatory filings, JX 183 at 645542 (Sub-Administration Agreement, §§ 5(a) and 5(c)) and PX 488 at 645534-35 (Sub-Administration Agreement side-letter at §§ 2(a) and 2(c)); Tr. at 317:22–321:23, 380:11-17, 384:6–385:1, 918:18–921:5.

372.    Moreover, to the extent CAL itself performs any of the purportedly greater services, they are virtually all handled by CAL's Fund Administration department, Tr. 372:1-385:10; *see also* 355:12-367:23, which has a mere six employees and a total annual budget of only $2.8 million, Tr. at 356:25-357:17; JX 183; PX 488; PX 489, the allocable cost of which to the Growth Fund is only 1.6 basis points, Tr. at 565:2-567:5; Pomerantz Report at ¶¶221.b, 227, 239, 282.

373.    Plaintiffs also presented evidence that CAL lavishes attention on its Other ACG Accounts that is at least comparable to, if not more than, the attention afforded to the Growth Fund. *See* ¶¶187-200, *supra*. This included dedicated client service representatives who were in frequent touch with such clients and extensive and customized and in-depth communication and reporting, Tr. at 34:1-14, 35:7-10, 37:10-38:5; 39:6-40:16, 42:9-45:14, 49:2-15, 52:11-53:12; 55:22-56:24 ; PX 387 at 641425; PX 344 at 430863; a dedicated portion of the website, Tr. 40:9-41:14; Bhatt Dep. at 214; videoconferences, Tr. 41:15-25; PX 387 at 641425; responses to due-diligence requests including live meetings for which CAL personnel travel the world, Tr. at 32:14-23; PX 387; PX 358; and compliance with unique investment guidelines, Tr. at 34:1-10, 35:11-13, 47:13-16, 49:11-13, 51:8-52:2.

374.    CAL's Head of Distribution Robert Behan testified that CAL had six to seven times the number of full-time personnel servicing its Funds as compared to institutional clients. Tr. 94:25-97:2. This ratio, however, was completely in line with the proportion of Funds' AUM to institutional/subadvisory AUM at CAL. *See* ¶8, *supra*. Accordingly, per dollar of AUM, client service costs were substantially similar.

375.    At trial, CAL claimed that because mutual fund shareholders are entitled to buy and redeem shares daily, the "turnover" and cash flows associated with managing the portfolio of

a mutual fund results in advisory responsibilities that supposedly do not apply to institutional accounts.  *See e.g.* JX 184 at 653674.  As purported examples, CAL cited "[m]ore frequent management of cash and portfolio positioning to ensure execution of overall long-term fund investment strategy" and "[o]ngoing trading activity by adviser personnel required to manage more frequent cash flows."  *Id.*

376.    However, Mr. Kalis, the former head of CAL's ACG strategy, who served as lead portfolio manager for the Growth Fund and for the Other ACG Accounts, testified that, daily inflows and outflows in the Growth Fund were so insignificant that they did not require any special attention from the portfolio management team, and did not impose additional work on them.  Kalis Dep. at 70:3-72:4.

377.    Meanwhile, the opposite was true for the Other ACG Accounts, where account deposits and withdrawals, although less frequent, typically involved substantial percentages of the money invested.  Kalis Dep. at 74:12-76:25.  In fact, turnover was sharper in the Other ACG Accounts than in the Growth Fund:  by December 2016, all CAL's Other ACG Accounts had withdrawn 100% of their funds from CAL's management.  JX 181 at Ex. A.

378.    Moreover, CAL's Subadvisory Accounts – such as Nomura and the MD Accounts – were themselves mutual funds with underlying shareholders who were entitled to buy and redeem shares daily.  Tr. at 47:17-23, 58:17-60:10. 503:19-20, 506:1-9; PX 303 at 622241-42; JX 8; JX 15; JX 18.  Accordingly, to the extent advising the Growth Fund entailed special or additional portfolio management attention due to "turnover" or fund flows, comparable attention was required for those Subadvisory Accounts.  Pomerantz Rebuttal Report at ¶121.

379.    Plaintiffs also presented evidence that Other ACG Accounts received comparable compliance and information technology services as the Fund.   Mickey Dep. at 110:11-115:3,

116:7-124:18;  Pomerantz Report at ¶¶260-61.   For example, CAL was obligated to provide Other ACG Account clients with frequent and extensive performance reporting.  JX 8 at 638092; JX 15 at 622194; JX 13 at 638180; PX 360; Tr. at 42:5-43:4, 47:24-48:17, 49:11-15, 52:7-53:12.

380.    CAL's institutional IMAs also obligated CAL to implement and test compliance procedures and policies regarding all areas of its operations including, *inter alia*, trading operations, investment management, infrastructure and internal controls.  PX 309 at 372401-08; PX 317 at 464617; PX 338 at 422225-26; Mickey Dep. at 150:23-154:6, 47:6-94:23.

381.    Additionally, Plaintiffs presented evidence that the supposedly additional risks were insured against at insignificant cost to CAL, or were born by third-parties, *not CAL*.  *See* ¶¶217-37, *supra*; *see also* Tr. at 274:5-12, 278:23-283:2; PX 184-A at 653775, PX 176-A at 650594, PX 145-A at 534861, PX 113-A at 503184, PX 61-A at 519662, PX 32-A at 514326; PX 86-A at 523535-48.   Moreover, the evidence shows that the risks CAL claims were not insurable are mere phantoms that have not previously materialized and have not resulted in any costs that CAL has even bothered to quantify or estimate.  *See* ¶¶217-37, *supra*.

382.    For example, the testimony established that "make whole errors"– one of the main supposed risks that CAL cited to the Trustees – were extremely rare and when they occurred were small and the responsibility of State Street, resulting in no out-of-pocket losses to CAL.  Tr. at 211:23-212:1, 213:4-9, 295:12-18, 292:23-294:2, 295:19 - 296:15, 297:6-298:6, 301:16-18, 766:23-767:2; Bhatt Dep. at 10:10-11, 183:14-184:1; JX 183 at 654546-47; JX 4 at 4-5; JX 182 at 8-10.

383.    As for entrepreneurial risks, CAL's expert Mr. Richardson conceded that such risks no longer existed with respect to the Growth Fund because CAL more than recouped its start-up costs during the Growth Fund's 25 years in operation.  Tr. at 757:24-758:19.

384.    Finally, Plaintiffs presented additional evidence at trial that CAL allocated indirect expenses between its mutual fund and institutional account "product lines" based on average AUM.  Tr. at 229:7-230:21; JX 145 at 634760-4761; JX 113 at 502938-2939; JX 61 at 519582-9583.  Plaintiffs' expert Dr. Pomerantz testified that CAL's use of average AUM as the allocation methodology between product lines indicates that, per dollar of AUM (which is how fees are charged), the indirect costs of advising mutual funds are equivalent to those of institutional accounts.  Tr. at 568:4-569:18. As Dr. Pomerantz testified, *this implicitly admits that CAL's mutual funds do not cost more on a per dollar of AUM basis to advise than its institutional clients, but, rather, cost the same as those clients*.  *Id.*   Indeed, CAL had no incentive to under-allocate expenses to its mutual fund product line.  Although CAL might spend more total dollars servicing its mutual funds, that is simply because of the proportionally larger amount of AUM on the mutual fund side of the business.  *Id.*

385.    Accordingly, this is not a case in which "the services rendered are [so] sufficiently different that a comparison is not probative".  *Jones*, 559 U.S. at 350.  Rather, Plaintiffs established by a preponderance of evidence at trial that the "large disparity in fees… cannot be explained by the different services", *Jones*, 559 U.S. at 350 n.8, because the services and risks are comparable and involve, at most, insignificant additional expense to CAL.  As such, the Other ACG Account fee comparison too weighs in favor of a finding of fee excessiveness.

**D.    Profitability**

386.    Plaintiffs presented evidence at trial that CAL materially understated the profitability of the Growth Fund by allocating effectively all advisory costs on the sole basis of AUM.  Bullard Report at ¶¶61-62; Pomerantz Report at ¶¶437 *et seq*.  By applying this methodology, CAL's 15(c) Profitability Presentations over-allocated costs to CAL's largest funds, including the Growth Fund, and presented them as less profitable then they in fact were,

while under-allocating costs to the smaller funds which were therefore depicted as more profitable than they were.  Pomerantz Report at ¶433; Pomerantz Rebuttal Report ¶¶259, 274; Tr. at 1003:23–1005:25; Pomerantz Rebuttal Report at ¶¶259, 274.

387.    Plaintiffs additionally presented the testimony of their expert Dr. Pomerantz that a more accurate profitability model showed that CAL's profit margin from the Growth Fund was 71%, rather than the 46% CAL reported.  Pomerantz Report at ¶492; Tr. at 449:15–450:22.

388.    CAL responded with the testimony of their expert Professor Lacey claiming that cost allocation by AUM alone was consistent with GAAP and "decision-useful." Tr. at 1003:9-22, 1015:2-9, 1020:19–1021:18; Lacey Report at ¶¶5, 36-42.

389.    However, courts have consistently made clear that for Section 36(b) purposes, an adviser's allocation methodology cannot be untethered from economic reality/actual costs. Indeed, the "profitability" factor initially was articulated by the Second Circuit in *Gartenberg* as "the adviser-manager's cost *in providing the service* . . ."  694 F.2d at 930 (emphasis added). Courts have insisted on allocation methods that at least represent attempts to approximate the advisor's actual costs with respect to the fund at issue.

390.    In *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987), the dispute was between two different time-spent methods, one of which was developed by the advisor at the board's request using an independent firm.  *Id*. at 997.  The court selected the method that it determined "presented a more accurate picture of the actual costs incurred by the adviser."  *Id*.  Similarly, in *Krinsk v. Fund Asset Mgmt., Inc*., 875 F.2d 404 (2d Cir. 1989), the court expressed concern that the cost-allocation method be "rational" "lest the fund subsidize the costs" of other investment products advised by the

defendant and ended up combining methods to approximate a true figure of profitability in its analysis. *Id*. at 410.

391.    Likewise, on summary judgment in this case, the Court indicated that the relevant issue was not whether there was a *per se* rule requiring a specific cost allocation method – which CAL's expert conceded there is not, Tr. at 1000:3-24 – but whether the AUM method "best reflects the Fund's true profitability to Calamos . . ." *Chill*, 2018 WL 4778912, at *21 n.15.

392.    Here, Plaintiffs established that the AUM method is not rational or accurate and grossly distorts the Growth Fund's profitability to CAL because it makes costs per dollar of AUM constant across the complex regardless of fund size, thereby assuming away the economic benefits of scale.  Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84; Tr. at 451:2-25, 458:8–459:2.   Indeed, CAL's expert Professor Lacey admitted that the method does not consider economies of scale.  Tr. at 1032:8-25.

393.    Allocating by AUM flies in the face of the law under 36(b) and the reality of how CAL's costs actually behave.  In amending Section 36(b), Congress stated that its intent was to ensure that investors "share equitably … in the economies available as a result of the growth and general acceptance of mutual funds."   S. REP. NO. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.   Plaintiffs presented evidence that CAL's costs were relatively constant and did not rise or fall proportionately with AUM, which is consistent with observations of the industry.  Tr. at 996:16–997:6; Pomerantz Rebuttal Report at ¶¶248, 468-89.  As CAL's profitability expert Professor Lacey concedes, most costs incurred in the provision of advisory services are largely fixed costs, rather than variable.  Tr. at 996:16–997:6. Allocating by AUM, however, counterfactually treats such costs as entirely variable and unaffected by scale. Tr. at 879:14-20; Bullard Rebuttal Report at ¶¶104-05, 248, 259, 274.

394.    This led to absurd results. For example, CAL's profitability presentations depicted smaller funds that CAL admittedly closed because they "failed to achieve economies of scale" and were money-losing (JX 144 at 636337-38) as highly profitable and in fact more so than the Growth Fund.  JX 144 at 636337-38; *see also* Pomerantz Report at ¶433-45; Pomerantz Rebuttal Report at ¶241; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at ¶¶106-09.  This was due to the fact that CAL implausibly assigned up to 85 times more costs to those Funds than to the Growth Fund – based on their smaller AUM – despite the fact that those Funds utilized the same investment personnel, systems, and processes as the Growth Fund.  DX 145-R at 634772 and table at ¶262, *supra*; Pomerantz Report at ¶447, 441-43; Bullard Report at ¶¶57-64, 71-74, 77-78; Pomerantz Rebuttal Report at ¶¶287, 292-93.

395.    At trial, CAL did not argue that the Funds-specific profitability figures reported in the Mutual Fund Profitability presentations were accurate but instead insisted that fund-specific profitability was unknowable.  Tr. at 238:15–239:15, 1010:17–1011:1, 1015:10-19.  CAL justified AUM cost allocation not on its accuracy but on its purported ease of use.  Tr. at 235:16-25, 240:13-242:13, 998:13-17, 1015:2-9, 1020:19–1021:4; Lacey Report at ¶¶20, 24, 83-85.

396.    Plaintiffs further presented evidence that allocation by AUM was not useful to the Independent Trustees.  Pomerantz Rebuttal Report at ¶¶296-97.  As indicated above, 36(b) charges fund trustees with the task of ensuring that investors "share equitably … in the economies available as a result of the growth and general acceptance of mutual funds."  S. REP. NO. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.  AUM allocation makes those economies invisible, and thus makes it *impossible* for the Independent Trustees to discharge their duty.  Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84; Tr. at 451:2-25, 458:8–459:2.

397.    Thus, the trial evidence shows that the Growth Fund was extremely profitable to CAL, and in fact had a high level of profitability far in excess of what CAL reported to the Trustees.  Hence, the profitability *Gartenberg* factor weighs in favor of fee excessiveness.

**E.    The Independent Trustees did not Exercise the Requisite Care and Conscientiousness**

**1.    Applicable Legal Standard Regarding Conscientiousness**

398.    The ICA "interposes disinterested directors as 'independent watchdogs,'" *Jones*, 559 U.S. at 348 (quoting *Burks v. Lasker*, 441 U.S. 471, 482 (1979)), charged with serving as a "'check upon the management,'" *Id.* at 352 (quoting *Burks*, 441 U.S. at 484).  In order to exercise the conscientiousness required by *Gartenberg*, a Board must, *inter alia*, actually consider all "relevant factors," and the adviser must supply "material information" pertinent to those factors.  *Id.* at 351; *see also Gartenberg*, 694 F.2d at 930 (to discharge their duty, trustees must be "fully informed about all facts bearing on the adviser-manger's services and fees").

399.    Thus, as Defendant's expert witness, Professor Laby, explained:    "the independent trustees ha[d] the responsibility to request information regarding the topics that reasonably bear on the services Calamos provides to the [G]rowth [F]und, including the services that Calamos provides to other clients," Tr. at 959:12-25, which in turn required CAL to provide "high-quality information" regarding those subjects, Tr. at 960:1-7.

400.    As described more fully below, the facts of this case make clear that the Board did not act as an independent check when it approved CAL's advisory fees, but instead credulously accepted without challenge CAL's assertions at face value on key issues.  *See* Tr. at 908:14-909:11; 912:23-915:7; 920:12-921:5; 927:9-928:13.

### 2.     The Independent Trustees' Repeated Failure to Act Conscientiously with Respect to Crucial Matters Relevant to CAL's Fees

401.     *First*, Mr. Neal testified that in deciding whether to approve CAL's advisor fees, the Trustees were required to: (i) assess whether the purportedly greater services and risks described by Messrs. Bhatt and Jackson at CAL's 15(c) meetings *justified the higher fees* CAL charged its Fund client; and (ii) ensure that the services CAL provided to the Growth were provided *at a reasonable cost*.  Tr. at 129:16-24; 174:5-14.   Importantly, Mr. Neal further explained that the purportedly greater services and risks *would not* justify/explain the greater advisory fee CAL charged its Fund clients *versus* its non-fund clients if that fee differential is "excessive from what it *costs them to* [] *actually do the work*."  Tr. at 136:16-24 (emphasis added).

402.     As the record makes clear, however, the Trustees failed to satisfy the precise standard that Mr. Neal described and that the law requires.  Indeed, despite the fact that CAL affirmatively posited the greater services and risks as the purported basis for the fee differential, CAL did not provide, and the Board did not request, *any data* concerning the cost/value of the purportedly greater services, or the number or employees that provided such services or the time/effort that they expended.   *See* ¶¶284-87; *see also* Tr. at 959:12-25 (Board duty bound to request information regarding services rendered to non-fund clients).   Nor did CAL provide, or the Board request, *any data* concerning the cost/value of the greater risks that CAL purportedly priced into the Growth Fund's advisory fee.  *See* ¶¶284-87, 313-14.  In fact, Mr. Jackson and the Independent Trustees were wholly ignorant of: (i) whether CAL actually priced that risk into the

IMA, and (ii) assuming that it did, CAL's methodology for doing so, or the portion/percentage of the Growth Fund's fees that were attributable that risk. *See* ¶¶313-14.[45]

403.    Thus, at the time the Trustees approved CAL's fees, there was no way they could have known whether the fee differential was "excessive from what it costs them to [] actually do the work," Tr. at 136:16-24 (emphasis added), because, as Mr. Neal conceded, the Trustees had no idea whether the value of those greater services and risks was 1 basis point, 5 basis points, 10, basis points, or something else. *See* ¶¶160-62, 220, 287 and 313-14, *supra*; *see also* Tr. at 908:14-909:11 (Professor Bullard's testimony that Trustees cannot simply rely on their prior experience in order to abjure responsibility for independently assessing validity of the advisor's explanation for higher fees).[46]

404.    Even more damning, Mr. Timbers, the Lead Independent Trustee, was not even aware *of the nature* of the services CAL provided to its non-fund clients, testifying that he "could only guess." *See* ¶286, *supra*; *see also* Tr. at 959:12-25 (Professor Laby's testimony that the Board was responsible for requesting information regarding the "services that Calamos provides to other clients."). And, as Professor Laby agreed, a Board member cannot be said "to have

---

[45] *Cf. In re BlackRock* , 327 F. Supp. 3d at 716-21 (Board acted conscientiously in considering difference in fees  between fund and non-fund clients where the Board was provided with and reviewed a detailed qualitative analysis of how the services differed and "*the estimated cost of providing the listed services*") (emphasis added); *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1180 (8th Cir. 2012) (Board decision entitled to less deference when trustees were not apprised of all relevant information regarding fee discrepancy).

[46] *See also Chill*, 2018 WL 4778912, at *12 ("Calamos cannot persuasively maintain that the Trustees found irrelevant the disparity in fee rates charged to the Fund vis-à-vis Calamos' institutional and sub-advisory clients due to differences in services and risks, yet at the same time maintain that the Trustees need not have received *actual evidence* detailing the differences in services and risks.").

carefully examined the services CAL provided to its non-fund clients if he or she does not understand or is unaware of the services provided to the non-fund clients." Tr. at 964:20-965:1.

405.     *Second*, the record is clear that, in approving CAL's advisory fees under the IMA, the Board impermissibly considered in the aggregate the services CAL provided under the IMA *and the FASA*, despite the fact that CAL is separately compensated under each distinct agreement.  *See* ¶¶288 and 317; *Chill*, 2018 WL 4478912, at *13 ("The Court agrees with Plaintiffs that Section 36(b) requires that transaction be considered separately and not aggregated") (internal quotation marks omitted) (collecting cases).

406.     *Third*, the Board failed to critically evaluate the difference in burden/expense of providing a service in the first instance versus overseeing its performance by a third-party.  *See* ¶¶290-93, *supra*; *see also* Tr. at 920:12-921:5 (Professor Bullard's testimony that the "veneer of oversight" versus performing a task in the first instance are "completely different levels of service").   Rather, the Board repeatedly gave CAL the *same credit* for supervising work performed by third-parties as if CAL had done the work itself, and credited CAL for bearing risks/costs that were, in fact, borne by those third-party service providers.  *See* ¶¶290-93, *supra*. Indeed, as Professor Bullard explained, Mr. Neal's Declaration and testimony perfectly encapsulate the Board's failure in this regard:

> And that really goes to my point about [Mr. Neal's Declaration] paragraph 91, which shows a lack of discernment between the actual services provided by Calamos and the costs it incurs and the[] services provided by other parties. *He was viewing [NAV] pricing errors as something that is a cost being incurred by Calamos, but at the same time it was being paid by a third party. And those positions, I just can't reconcile.*

Tr. at 928:7-13 (emphasis added).

407.     *Fourth*, the Board's decision to lift the fee waiver after just one-year (despite being dissatisfied with CAL short-term and long-term performance) without setting *any objective*

*criteria* by which to assess whether CAL's performance had improved sufficiently to merit lifting the waiver, and its failure to seek lower advisory fees in any other years (such as through a performance fee arrangement), demonstrates an utter lack of care and conscientiousness. *See* ¶¶301-06, *supra*.   Further, despite the fact that the Growth Fund's performance became increasingly negative after the Board lifted the fee waiver, *see* Tr. at 161:20-168:6, the Independent Trustees credulously accepted CAL's explanation that it was taking steps to improve performance – steps occasioned by its repeated failures – and concluded every year that it would be prudent to allow CAL more time to develop its performance record, without setting any standards.   Tr. at 846:17-847:2 (Professor Bullard's testimony that Board could conclude that more time was appropriate if it applied a "consistent objective standard in that respect").

408.   *Fifth*, in considering the Funds' profitability, the Board blindly accepted CAL decision to allocate 100% of its IT Services and G&A expenses to advisory, *and none to distribution*, notwithstanding that distribution personnel constitute 23% of CAL's total head-count and utilize the same IT Services and G&A resources as CAL's advisory personnel.   *See* ¶¶294-98, *supra*.   In fact, rather than acting as an independent check on CAL, Mr. Timbers testified that he had no idea how CAL arrived at these allocations and stated that he simply gave CAL the benefit of the doubt. *See* ¶297, *supra.*

409.   Accordingly, this *Gartenberg* factor weighs in favor of the Plaintiffs.

**F.    The Weight of the *Gartenberg* Factors Shows that CAL's Fees Were not Rationally Related to the Services Rendered**

410.   Accordingly, in sum, Plaintiffs have presented trial evidence not only that CAL charged non-arm's-length fees to the Growth Fund and derived excessive profits from the Growth Fund, but that "the quality of services provided to the [Growth] Fund was poor to such an extent that the [Growth] Fund's Advisory Fees were excessive." *Chill*, 2018 WL 4778912, at

*20.  In particular, the evidence presented by Plaintiffs at trial establishes "three facts that readily distinguish this case from others applying Section 36(b): Calamos charged more than most other investment advisers; the Fund performed worse than most comparable mutual funds; and all comparable non-captive clients that could leave Calamos *did* leave Calamos." *Id*.  Those facts "separate the instant case from cases in which plaintiffs either could not seriously challenge a fund's fee placement relative to its peer group or could not seriously challenge the fund's performance." *Id*. (citing *See Goodman*, 301 F. Supp. 3d at 781; *Zehrer*, 2018 WL 1293230, at *11; *In re Blackrock*, 327 F. Supp. 3d at 272 n.37; *Kasilag*, 2016 WL 1394347, at *16).  Hence, Plaintiffs have succeeded in proving a "unique ensemble of facts", *Chill*, 2018 WL 4778912, at *20, establishing that the Growth Fund's fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.

### G.   Damages

411.    Plaintiffs presented three alternative measures of damages, each of which is a valid basis for determining the level of compensation due from Defendant.  Pomerantz Report at ¶¶503-17; Tr. at 569:20–579:7.  Dr. Pomerantz presented these three damage calculations in his initial report (Pomerantz Report at ¶¶503-17), and provided updated damages calculations at trial (Tr. at 569:20–579:7), based on (1) more comprehensive expense data provided by Defendant subsequent to Dr. Pomerantz's report (Tr. at 565:2–568:2), and (2) on extending the time period covered by the calculations beyond March 2017 (the end date in Dr. Pomerantz's initial May 2017 Report) and until October 2018 (Tr. at 571:17-22).  These updated damages calculations are attached as Exhibit C hereto.

### 1. The Damages Period

412. Damages in this action are limited to the period from February 2014 (one year prior to complaint filing) through October 2018 (the "Damages Period"). Pomerantz Report at ¶503; Tr. at 569:20–579:7.

### 2. Damages as the Difference Between the Fee Charged and a Benchmark Representing an Arm's-Length Fee

413. Defendant's expert Dean Hubbard testified that the appropriate measure of damages in a 36(b) case is the difference between the fee charged and an arm's length benchmark. Tr. at 700:2-702:18. Plaintiffs' expert Dr. Pomerantz agreed (Tr. at 569:21-570:7), and presented damages calculated with reference to three possible such benchmarks (Tr. at 569:20–579:7).

### 3. Damages Method 1: Damages as the Difference between the Fees Payable under the IMA and under the Standard SMA Schedule

414. Plaintiff's first measure of damages calculates excessive fees as the difference between (1) fees paid by the Growth Fund under the IMA fee schedule, as assessed monthly based on the Growth Fund's monthly average AUM, and (2) the fees the Growth Fund would have paid under the Standard SMA Schedule (Pomerantz Report ¶¶504(a), 505-08; Tr. at 577:14–578:3; PX 438 at 5), minus (3) a 6.1 bps adjustment for the estimated maximum possible cost of additional services that CAL provided to the Funds but not to Other ACG Accounts (Tr. at 565:2–568:2), in order to present an apples to apples comparison of the services provided (Tr. at 571:23–572:22).

415. The Growth Fund paid an average effective fee rate of 0.87% under the IMA fee schedule during the Damages Period, but would have paid an average effective fee rate of 0.51% under the Standard SMA Schedule. Tr. at 571:23–572:22. Under this calculation, the difference between the two is 0.36% (36 basis points), which is then reduced by 6.1 basis points (to adjust

for the maximum possible cost of additional services provided to the Growth Fund) to yield a damages measure of approximately 0.30% (30 basis points). *Id.* Applied on a monthly basis throughout the Damages Period to the Growth Fund's monthly average AUM, this adjusted differential yields aggregate damages of $32.7 million. *Id.*

416.    This measure of damages, which takes the Standard SMA Schedule as the measure, or benchmark, of rates negotiated at arm's length, is a conservative one, because it does not take into account the substantially lower advisory fee rates paid by CAL's largest Other ACG Accounts most comparable in size (and services) to the Growth Fund.  *See e.g.* Tr. at 571:23–574:13, 575:19–576:17.  The Standard SMA Schedule was the governing rate for 31 of CAL's 36 Other ACG Accounts (indeed, for all 31 Institutional ACG Accounts), but those accounts were all comparatively small, and only 10% or less of the aggregate money CAL managed for the Other ACG Accounts paid advisory fees set by the Standard SMA Schedule.  *See* ¶¶75, 78-82, *supra*.  The Standard SMA Schedule did not contemplate AUM ranges substantially in excess of $75 million (Tr. at 577:14–578:3; PX 438 at 5).  Other ACG Accounts with AUM substantially in excess of $75 million, however, proved able to negotiate different and lower advisory fee rates for themselves (Tr. at 572:19–573:13):  specifically, CAL's largest Other ACG Accounts (Nomura and the two MD Accounts, which accounted for 90% or more of CAL's total Other ACG Account AUM for most of the Relevant Period (*see* ¶¶84-87, *supra*)).

### 4.    Damages Method 2:  Damages as the Difference Between the Effective Fee Rate Paid by the Growth Fund and Weighted Average Rate Paid by CAL's Other ACG Accounts

417.    Plaintiffs' second measure of damages calculates excessive fees in a manner identical to the first measure, except that instead of using the Standard SMA Schedule as the benchmark for an arm's-length advisory fee, it uses the AUM-weighted average effective fee rate actually paid by CAL's Other ACG Accounts (Pomerantz Report at ¶¶504(b), 509-11), similarly

adjusted for the maximum possible cost of any service differentials.   Tr. at 572:19–574:13, 575:19–577:12.

418.   CAL charged the Growth Fund an average effective fee rate of 0.87% under the IMA fee schedule during the Damages Period, but charged its Other ACG Accounts a weighted average effective fee rate of 0.42% (the overall effective fee rate paid by all Other ACG Account AUM in the aggregate).   Tr. at 572:19–574:13, 576:10-16.   The difference between the two is 0.45% (45 basis points), which after a 6.1 basis point reduction to adjust for the maximum possible cost of additional services provided to the Growth Fund yields a damages measure of approximately 0.39% (39 basis points).   Tr. at 572:19–573:5. Applied on a monthly basis throughout the Damages Period to the Growth Fund's monthly average AUM, this adjusted differential yields aggregate damages of $42.3 million. *Id*.

419.   This second damages measure is arguably superior to the first because the competitive benchmark used (*i.e.*, the measure of the arm's-length fee for the relevant services) is the **actual effective fee rate paid, on an overall basis, by CAL's Other ACG Accounts** (discounted for any service differentials). Tr. at 573:6–574:13.

420.   Dean Hubbard's theoretical criticism of this damages measure – that it depends on and can vary according to the precise mix of CAL's Other ACG Accounts at any given time (Hubbard Report at ¶¶201-02) – recasts the measure's strength (that it represents the *actual* overall effective fee rate *actually* paid by CAL's *actual* Other ACG Accounts) as its flaw.  Tr. at 573:14–574:13.

421.   Defendant argues that the weighted average effective fee rate of 0.42% calculated by Dr. Pomerantz has insufficient basis, and is potentially inaccurate, because it was calculated on the basis of information from only nine Other ACG Accounts, including the Nomura and MD

Accounts responsible for 90% or more of total Other ACG Account assets during most of the Relevant Period, rather than from information from all 36 Other ACG Accounts that CAL has had at any time after January 1, 2012 (Tr. at 582:16–584:10; *see also id*. at 498:11–500:10, 507:2–508:23).[47]

422.   In fact, a comprehensive weighted average fee rate paid by all Other ACG Accounts during the Relevant Period is calculable from the Other ACG Account data Defendant first provided in its September 2017 interrogatory response (JX 181 at Ex. A), subsequent to Dr. Pomerantz's May 2017 initial report (Pomerantz Report):  that weighted average is 0.46%.  *See* Exhibit A hereto.

### 5.   Damages Method 3:  Damages as the Difference Between the Advisory Fees Paid by the Fund and the Advisory Fees Paid by Similar Funds

423.   Plaintiff's third measure of damages calculates excessive fees as the difference between (1) fees paid by the Growth Fund under the IMA fee schedule, as assessed monthly based on the Growth Fund's monthly average AUM, and (2) based on Dr. Pomerantz's analysis of the effective advisory fee rates and AUM of approximately 417 similarly-classified mutual funds, the model-predicted advisory fee payable by a mutual fund the size of the Growth Fund (Pomerantz Report at ¶¶504(c), 512-17); Tr. at 574:14–575:6, 593:31–594:20).  Here, unlike in Plaintiffs' first and second damages measures, no service differential adjustment is used or needed, as the Growth Fund's advisory fees are compared against those paid by *other mutual funds*, rather than those paid by institutional or subadvisory clients.  Tr. at 575:1-4.

424.   Damages calculated by this measure aggregate to approximately $29 million (Tr. at 575:5-6):  the Growth Fund's average advisory fee during the Relevant Period was 0.87%, while the average model-predicted advisory fee (based on Dr. Pomerantz's analysis of those paid

---

[47] Many of the 36 Other ACG Accounts (specifically, 13 of the 36) had terminated CAL prior to the Relevant Period.  *See* ¶71, *supra*; Tr. at 583:10–584:4.

by similar funds) was 0.61%, yielding an average differential of 0.26% (26 basis points) and aggregate damages of $28.975 million.[48]

425.     Defendant's criticisms of this damages calculation all center on the validity and explanatory power of the Dr. Pomerantz's model-predicted fee of 0.61%.  Tr. at 522:6–527:6, 532:5–533:15; 733:18–736:7; Hubbard Report at ¶¶203-04.   However, as Dean Hubbard explains, all these criticisms can be resolved by substituting, in place of Dr. Pomerantz's model-predicted fee, the *median* fee paid by mutual funds of similar size and character. Tr. at 734:22–735:1. Here, Dr. Pomerantz, as well as each of the Independent Data Providers, has also calculated median advisory fee paid by funds of similar size and character:  0.63%, according to Dr. Pomerantz (Pomerantz Report at ¶302); according to Morningstar, 0.62% (in its 2016 report), 0.60% (in its 2015 report), and 0.62% (in its 2014r report) (*see* JX 130 at 636413; JX 88 at 524006; JX 46 at 520623); and according to Strategic Insight, 0.74% (in its 2018 report) and 0.69% (in its 2017 report) (*see* JX 186 at 653890; JX  175 at 652026).  The average of all these median fee observations is 0.65%.

426.     If this damages calculation is revised to replace Dr. Pomerantz's model-predicted fee (0.61%) with this actual median fee (0.65%), damages would decrease slightly, and Defendants' objections would be erased.

427.     Plaintiffs view this third damages calculation as inferior to the first two, because, unlike the fee benchmarks employed in the first two damages calculations, which were based on fees indisputably negotiated at arm's-length between CAL and the unaffiliated institutions comprising the Other ACG Accounts, the advisory fees paid by other mutual funds may not be products of, or indicative of, normal arm's-length bargaining, and may be affected by the same absence of normal arm's-length bargaining that affects the Growth Fund.  Tr. at 533:3-15, 575:7-

18, 578:4–579:8; Pomerantz Report at ¶517.  Hence, the advisory fees paid by other mutual funds may not be a valid or accurate benchmark for the range of advisory fees negotiated at arm's-length.  *Id*.

## CONCLUSION

428.    The trial evidence establishes that CAL's advisory fees are excessive under *Jones, Gartenberg* and Section 36(b) of the ICA.  Accordingly, the Court should render a verdict in favor of Plaintiffs and award damages in an amount the Court determines is merited under the circumstances.

Dated: January 18, 2019

**KIRBY MCINERNEY LLP**

/s/ Mark A. Strauss
Ira M. Press
Mark A. Strauss
Andrew McNeela
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
      mstrauss@kmllp.com
      amcneela@kmllp.com

*Counsel for Plaintiffs*