# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAUL CHILL and SYLVIA CHILL, for the use and benefit of the CALAMOS GROWTH FUND, | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| CALAMOS ADVISORS LLC, | : <br> : |

No. 15-cv-01014 (ER)

ECF CASE

**DEFENDANT CALAMOS ADVISORS LLC'S CORRECTED RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**DECHERT LLP**
Matthew L. Larrabee
David A. Kotler
Catherine V. Wigglesworth
Tiffany Engsell
Brendan Herrmann
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone: (212) 698-3500

*Counsel for Defendant Calamos Advisors LLC*

## TABLE OF CONTENTS

CAL'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT ............................. 1

I.   BACKGROUND ............................................................................................. 1

    A.   Plaintiffs and Defendant ...................................................................... 1

    B.   CAL, the Fund, the Board and the Independent Trustees ...................... 1

        1.   CAL's Investment Products, Strategies, Organization and Personnel ................................................................................. 1

        2.   The Growth Fund, and CAL's All Cap Growth Investment Strategy ............................................................................... 9

        3.   The Calamos Investment Trust ...................................................... 13

        4.   CIT's Board of Trustees ................................................................. 13

        5.   The Independent Trustees' Annual 15(c) Review ................................. 14

        6.   The Third-Party Performance Reports ............................................. 18

    C.   The IMA ............................................................................................ 20

    D.   The FASA .......................................................................................... 23

    E.   The Funds' Third-Party Service Providers ............................................ 27

        1.   The Funds' Transfer Agent ............................................................. 27

        2.   The Funds' Accountant .................................................................. 30

        3.   The Funds' Custodian ................................................................... 31

        4.   The Funds' Securities Lending Agents ............................................. 33

        5.   The Funds' Auditor ...................................................................... 34

        6.   The Funds' Counsel ...................................................................... 34

        7.   The Fees the Growth Fund Paid to Third-Party Service Providers ......... 35

    F.   The Sub-Administration Agreement Between State Street and CAL ................. 36

    G.   CAL's Institutional and Subadvisory All Cap Growth Clients ........................... 40

|       |   | 1. | The Other ACG Accounts | 40 |
|       |   | 2. | The Other ACG Accounts' Advisory Fee Rates | 44 |
|       |   | 3. | CAL Provided the Growth Fund and the Other ACG Accounts with Substantially Identical Portfolio Management Services | 51 |

II. QUALITY OF SERVICES ................................................................. 57

    A.    The Fund's Comparative Investment Performance under Standard 1-, 3-, 5- and 10-Year Time Frames Was Abysmal ........ 59

    B.    CAL Has Repeatedly Admitted that Performance Was Very Poor ..... 69

    C.    The Growth Fund's Since-Inception Performance, and its Irrelevance .... 71

    D.    CAL'S Claims Regarding its Purported Efforts to Improve Performance ...... 75

    E.    The Board's Fig-Leaf Response to CAL's Continued Poor Performance ......... 82

    F.    The Reaction of the Other ACG Accounts Speaks Directly to the Quality of Services CAL Provided .................... 86

    G.    The Reaction of the Growth Fund's Shareholders to the Quality of Services Provided is Further Indication that its Fees were Excessive ............ 90

III. COMPARATIVE FEES .................................................................. 95

    A.    Versus Comparable Mutual Funds .................................. 98

    B.    Versus CAL's Arm's-Length Institutional/Subadvisory Clients ......... 105

        1.    Analysis of Relative Fees ...................................... 105

            a.    The Effective Advisory Fee Rates Payable Under the IMA's Fee Schedule Dwarf Those Payable Under the Other ACG Accounts' Fee Schedules .............. 105

            b.    The ACG Accounts CAL Identified as Having High Effective Fee Rates All Had Extremely Low AUM ........ 113

        2.    CAL's *Ipse Dixit* that the Funds' Higher Advisory Fees were Justified by Greater Services and Risks ............ 114

        3.    The Uncontroverted Record Evidence Establishes that the Cost of the Greater Services/Risks Bears No Reasonable Relationship to the Fee Differential ......... 121

4.      CAL's Claims Concerning Greater Services Were Substantially Controverted by the Evidence at Trial ................................................... 130

         a.     Services CAL Admitted are Inapplicable to the Growth Fund ...................................................................................... 134

         b.     Services Provided Entirely or Substantially by Third-Party Service Providers ...................................................... 135

         c.     Services Provided Under, and Compensated by, the FASA ...... 145

         d.     Services Handled by Fund Administration at Insignificant Cost ...................................................................................... 150

         e.     Services that CAL Provided Comparably to Fund and non-Fund Clients Alike .................................................................. 155

             i.     Client Services:  the Extraordinary Level of Attention Lavished on Institutional/Subadvisory Accounts ....................................................................... 155

             ii.     The Growth Fund's Daily Liquidity Requirements did not Result in any Appreciably Greater Work .......... 169

             iii.     CAL's Operations and IT Services Are Comparable Across All Clients ........................................................ 178

             iv.     CAL's Compliance Services Are Comparable Across All Clients ........................................................ 180

5.      CAL's Claims Concerning Greater Risks Were Substantially Controverted by the Evidence at Trial ................................................... 193

         a.     Legal / Regulatory Risks............................................................ 197

         b.     Entrepreneurial / Competitive Risks ......................................... 215

IV.     CAL'S METHOD FOR ALLOCATING COSTS MADE ITS LARGER FUNDS APPEAR LESS PROFITABLE ........................................................................ 218

    A.     CAL's 15(c) Profitability Presentations and Cost Allocation Methodology ..... 218

    B.     CAL's Profitability Presentations were Inconsistent with Its Actual Operations and Artificially Lowered the Growth Fund's Profitability ............. 223

       1.     Although Advisory Costs are Largely Fixed CAL Allocated Those Costs by AUM as if they Were Variable Costs, Eliminating/Masking Economies of Scale ............................................. 223

2.      CAL's 15(c) Profitability Presentations Over-Allocated Costs to Large Funds, Presenting them as Less Profitable than They in Fact Were ................................................................................................ 232

3.      CAL's 15(c) Profitability Presentations Under-Allocated Costs to Small Funds, Presenting them as Profitable When in Fact They Were Not ............................................................................................ 234

4.      CAL's 15(c) Profitability Presentations Allocated Sharply Different Advisory Costs to Funds that Have Substantially Similar Advisory Costs .................................................................................... 239

C.      CAL Did Not use its 15(c) Profitability Analyses for Any Other Purpose, and Based its Actual Business Decisions on an Opposite View of Profitability ................................................................................... 246

D.      The Mutual Fund Profitability Presentations Were Not "Decision-Useful" for the Independent Trustees in Evaluating CAL's Profitability from the Funds .................................................................................... 247

E.      Dr. Pomerantz's View of Profitability Hews Closer to CAL's Actual Business Conditions .................................................................. 250

V.      THE INDEPENDENT TRUSTEES' LACK OF CARE AND CONSCIENTIOUSNESS ..................................................................... 255

A.      Greater Services/Risks, and their Costs, as Justification for Higher Advisory Fees .......................................................................... 255

B.      The Board's Consideration of FASA Services in Approving the IMA's Advisory Fees ............................................................................ 262

C.      The Board's Failure to Distinguish between the Burden/Expense of Providing a Service versus the Burden/Expense of Supervising Others who Provide the Service in the First Instance ....................................... 265

D.      Profitability: Allocation of Expense Between Advisory and Distribution Functions ............................................................................... 273

E.      The Trustees' Misinformed View Regarding the Purported Burden of Providing Daily Liquidity ................................................................ 278

F.      The One-Time Fee Waiver and the Board's Annual Unanimous Approval of CAL's Advisory Fees ........................................................... 283

CAL'S RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ................. 290

I.     CAL'S WITNESSES WERE INCREDIBLE ................................................. 290

    A.     Applicable Legal Standard ................................................. 290

    B.     Specific Instances of Incredible/Misleading Testimony ................................ 290

          1.     CAL's Misleading and/or Incomplete Interrogatory Responses ........... 290

          2.     Mr. Behan's Misleading Testimony Regarding the Powell Trust ........ 293

          3.     Mr. Jackson's Implausible and Evasive Testimony Regarding *inter alia* CAL's Pricing of Litigation Risk and its Involvement in Preparing the Funds' Regulatory Filings ................................................. 294

          4.     Mr. Neal's Evasive Testimony and Routine Exaggerations ................. 300

          5.     Professor Laby's Incredible and Implausible Testimony ..................... 305

          6.     Mr. Richardson's Evasive and Implausible Testimony ........................ 311

          7.     Dean Hubbard's Implausible and Agenda-Driven Testimony.............. 315

II.    CONCLUSIONS OF LAW WITH RESPECT TO *GARTENBERG* FACTORS: THE GROWTH FUND'S ADVISORY FEES WERE EXCESSIVE .......................... 316

    A.     Applicable Legal Standard ................................................. 316

    B.     The Quality of CAL's Advisory Services Was Exceedingly Poor and Supports the Excessiveness of the Growth Fund's Advisory Fee .................... 320

    C.     The Growth Fund's Fees Were Exceedingly High in Relation to *All* Comparators, Which Further Shows their Excessiveness.................................. 341

          1.     The Comparison to Peer Mutual Funds ............................................. 345

          2.     The Comparison to Other ACG Accounts ............................................ 348

    D.     Profitability ................................................................. 374

    E.     The Independent Trustees did not Exercise the Requisite Care and Conscientiousness ................................................................. 391

          1.     Applicable Legal Standard Regarding Conscientiousness ................... 391

2.       The Independent Trustees' Repeated Failure to Act Conscientiously with Respect to Crucial Matters Relevant to CAL's Fees .............................................................................. 398

F.      The Weight of the *Gartenberg* Factors Shows that CAL's Fees Were not Rationally Related to the Services Rendered ....................................................... 411

G.      Damages .......................................................................................... 412

1.       The Damages Period ............................................................. 413

2.       Damages as the Difference Between the Fee Charged and a Benchmark Representing an Arm's-Length Fee.................................... 414

3.       Damages Method 1:  Damages as the Difference between the Fees Payable under the IMA and under the Standard SMA Schedule........... 415

4.       Damages Method 2:  Damages as the Difference Between the Effective Fee Rate Paid by the Growth Fund and Weighted Average Rate Paid by CAL's Other ACG Accounts ............................. 421

5.       Damages Method 3:  Damages as the Difference Between the Advisory Fees Paid by the Fund and the Advisory Fees Paid by Similar Funds ......................................................................... 428

CONCLUSION ..................................................................................... 435

Defendant Calamos Advisors LLC ("CAL"), by its undersigned counsel, respectfully submits the following Responses to Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

## CAL'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I.   BACKGROUND

#### A.   Plaintiffs and Defendant

*1.     Plaintiffs Saul and Sylvia Chill ("Plaintiffs") have been shareholders in the Calamos Growth Fund (the "Growth Fund") at all times since July 2005 through the present. JSSF ¶1.  Plaintiffs filed their complaint on February 14, 2015.  JSSF at ¶2.*

**RESPONSE:**  Admitted.

*2.     Defendant Calamos Advisors LLC ("CAL"), is a limited liability company organized under Delaware law with headquarters in Naperville, Illinois and offices within this judicial district, and an investment adviser registered under the Investment Advisors Act of 1940, that serves as investment adviser to the Growth Fund.  JSSF at ¶¶3, 8.*

**RESPONSE:**  Admitted.

#### B.   CAL, the Fund, the Board and the Independent Trustees

##### 1.   CAL's Investment Products, Strategies, Organization and Personnel

*3.     CAL offers certain investment products to its clients, including principally:  (1) open-end U.S.-regulated mutual funds sponsored by CAL, including the Growth Fund (the "Open-End Funds"); (2) closed-end, U.S-regulated Funds sponsored by CAL (the "Closed-End Funds," and together with the Open-End Funds, the "Funds"); (3) separately-managed accounts, predominantly for institutional investors (the "Institutional Accounts"); and (4) funds sponsored by third-party investment advisers for which CAL serves as a subadviser (the "Subadvised Accounts").  JSSF at ¶¶5-7; PX 438 at 4, 10; Pomerantz Report at ¶26.*

**RESPONSE:**  Denied as stated.  As set forth in the parties' Joint Statement of Stipulated Facts ("JSSF") (Dkt. 187-1), CAL offers certain investment products to its clients, as set forth in CAL's Form ADVs and CAL mutual fund prospectuses and statements of additional information filed with the Securities and Exchange Commission (the "SEC"), and the investment products offered by CAL include: (1) open-end mutual funds, (2) closed-end funds, (3) UCITS, (4)

institutional accounts, (5) managed accounts, (6) commingled privately placed funds, and (7)

offshore funds.  CAL may also serve as a sub-adviser to investment companies registered under

the Investment Company Act of 1940.[1]

> 4.      *CAL provides a menu of investment strategies to its advisory clients, including the Funds, the Institutional Accounts and the Subadvised Accounts. PX 438 at 13-14 ; JX 168 (Funds' Prospectus, describing inter alia investment strategies for each of the Funds)  Each investment strategy is characterized by a specific objective, and principal investment characteristics that focus on certain asset classes (equities or stocks, bonds, convertible bonds, or alternative assets), geographical regions (U.S., international, global, etc.), company sizes (small-, mid-, large- or all-capitalization issuers), and/or investment styles (growth, value, blend).  Id.  CAL provides each of the Open-End Funds with a different investment strategy, which it also offers to its Institutional Accounts and Subadvised Accounts. Id.*

**RESPONSE:**  Denied as stated.  CAL offers certain investment strategies to the Funds

and to institutional and sub-advisory accounts, as set forth in numerous required documents that

CAL files with the SEC.  CAL has not advised any institutional or sub-advisory clients following

a U.S. All Cap Growth Strategy ("All Cap Growth Clients") since November 2016.[2]

> 5.      *During the Relevant Period, CAL organized and operated its investment management operations pursuant to a "team of teams" structure, under which CAL's investment management department was subdivided into approximately six different teams responsible for different groups of investment strategies.  See e.g. JX 139 at CA-IT0000071 at 1-19; Behan Decl. at ¶¶32-33, 38-42.  Each investment team was led by specific senior co-portfolio managers (certain of whom also served as members of the below-described Investment Committee), and included additional co-portfolio managers, a dedicated team of research analysts, and dedicated portfolio specialists responsible for client communications.  JX 139 at CA-IT0000071 at 11, 14-19; Becker Decl. at ¶¶40, 43-46.  These teams were responsible for the day-to-day construction, management of oversight of client investment portfolios.  JX 139 at CA-IT0000071 at 9; Becker Decl. at ¶¶40.  Positioned above these teams was CAL's senior Investment Committee – comprised of Mr. Calamos, Sr., four co-chief investment officers serving as heads of various strategy groupings, and CAL's head of trading and risk management – which provided top-down guidance to, and monitored and oversaw, the various investment teams.  JX 139 at CA-IT0000071 at 9-10; Becker Decl. at ¶48.  Supporting all of these teams were shared risk management, trading, and investment operations/infrastructure departments.  JX 139 at CA-IT0000071 at 9, 12; Becker Decl. at ¶¶49-51.*

---

[1] JSSF ¶¶ 5-6.

[2] JSSF Ex. 1.

**RESPONSE:**  Denied as stated.  Plaintiffs' assertions and mischaracterizations regarding CAL's investment team are entirely unsupported by the trial evidence.  As Messrs. Behan, Becker and Cronin all explained, without any evidence from Plaintiffs to the contrary, the improvements that CAL made to its investment process and investment team included hiring better quality personnel, restructuring compensation, and redesigning how investment professionals collaborate with each other.[3]  CAL undertook a significant transformation of its investment team—from a vertical structure with a "one-team-one-process" approach to a horizontal structure with a "team-of-teams" approach.[4]  CAL also implemented a series of changes that resulted in members of the broader investment team contributing ideas and insights that benefitted the Fund.  Among many other changes, CAL implemented an Investment Committee, which consisted of CAL's Co-Chief Investment Officers ("Co-CIOs"), Co-Heads of Research and Investments, and co-Portfolio Managers, to increase sharing of investment information among its different teams.[5]

CAL also made significant changes at the senior management level in an attempt to improve the Fund's performance, including hiring Gary Black, who was previously been the CEO and CIO of a successful mutual fund investment adviser, Janus Capital, to replace the Funds' prior Co-CIO and, following Mr. Black's departure, transitioning to a new senior management structure by promoting four portfolio managers to serve as Co-CIOs.  Most

---

[3] Defendant Calamos Advisors LLC's Proposed Findings of Fact and Conclusions of Law ("DFFCL") ¶¶ 106-108; Behan Decl. ¶¶ 43-46; Tr. 107:16-108:4 (Behan); Tr. 64:19-65:25, 66:21-68:7 (Becker); Tr. 656:8-658:15 (Cronin).

[4] DFFCL ¶ 106.

[5] DFFCL ¶¶ 107-108.

recently, CAL replaced the Fund's portfolio manager, Mr. Kalis, with Michael Grant, who had

obtained top-shelf performance with a different Fund that he advises.[6]

CAL made all of these significant and costly changes to its investment team during a

period when both CAL's and the Fund's assets under management, and CAL's overall

profitability, were in continuous decline.[7]

6.     For each calendar year between 2005 and 2015, the total number of investment
professionals employed by CAL (as measured at the end of the year) was as follows:

| Year | Total Investment Professionals |
|------|-------------------------------|
| 2005 | 68 |
| 2006 | 75 |
| 2007 | 75 |
| 2008 | 68 |
| 2009 | 65 |
| 2010 | 66 |
| 2011 | 66 |
| 2012 | 53 |
| 2013 | 78 |
| 2014 | 74 |
| 2015 | 67 |

*JSSF at ¶107.*

---

[6] DFFCL ¶¶ 109-112.

[7] DFFCL ¶ 114.

**RESPONSE:**  Admitted.  However, the trial evidence demonstrates that the overall number of investment personnel neither reflects the quality or quantity of effort devoted to the management of the Fund throughout the Relevant Period (*i.e.*, June 2013 through trial), nor supports Plaintiffs' assertion that CAL's transformation of its portfolio management team and process for the benefit of the Fund's shareholders is some sort of "hoax."  To the contrary, as Messrs. Behan, Becker and Cronin all explained, without any evidence from Plaintiffs to the contrary, CAL's primary focus to improve the quality of the work product generated by its investment personnel was not simply to increase the number of those personnel or their aggregate compensation, but to hire better quality personnel, restructure compensation, and redesign how investment professionals collaborate with each other.[8]  Indeed, as set forth in CAL's Response to Paragraph 5, *supra*, the trial evidence demonstrates that CAL made numerous significant and costly changes to the investment team and investment process, which was not limited to hiring additional personnel to service the Funds.

In short, the number of investment personnel employed by CAL is not the sole measure of the value or the quality of the services CAL provides, and CAL has never argued that it is.  As the Court observed on summary judgment, "sometimes you can add by subtracting . . .  the personnel that were . . . deadwood, if you will."[9]  In addition, Plaintiffs have come forward with no evidence concerning the investment personnel employed by CAL, including any evidence of the level or skill of the personnel who stayed and those who departed, or why those who departed left CAL. As Plaintiffs conceded at trial, through their expert Professor Bullard, CAL's

---

[8] DFFCL ¶¶ 106-108; Behan Decl. ¶¶ 43-46; Tr. 107:16-108:4 (Behan); Tr. 64:19-65:25, 66:21-68:7 (Becker); Tr. 656:8-658:15 (Cronin).

[9] 8/17/18 Tr. 71:10-13.

investment is evidence of both a "de facto" fee reduction and arm's-length bargaining by the

Independent Trustees.[10]

7.      *In its annual 15(c) Responses to the Independent Trustees, CAL reported the following average AUM amounts, for each year, for each of its investment product types:*

| *(in $ millions)* | *2017* | *2016* | *2015* | *2014* | *2013* |
|---|---|---|---|---|---|
| *FUNDS AUM* | | | | | |
| *Open End Funds* | *$10,523* | *$10,796* | *$13,273* | *$15,292* | *$15,761* |
| *Closed End Funds* | *$6,496* | *$6,086* | *$6,650* | *$6,332* | *$5,909* |
| *Total Funds AUM* | *$17,019* | *$16,882* | *$19,923* | *$21,624* | *$21,670* |
| *INSTITUTIONAL / SUBADVISORY AUM* | | | | | |
| *Institutional / Individual / Partnerships* | *$1,961* | *$1,285* | *$1,760* | *$2,018* | *$3,555* |
| *Subadvisory* | *$0* | *$1,227* | *$1,137* | *$672* | *$1,032* |
| *Total Institutional / Subadvisory AUM* | *$1,961* | *$2,512* | *$2,897* | *$2,690* | *$4,587* |
| *OTHER CLIENT AUM* | | | | | |
| *Total Other AUM* | *$756* | *$1,225* | *$1,528* | *$1,759* | *$2,002* |
| *TOTAL CAL AUM* | | | | | |
| *TOTAL CAL AUM* | *$19,736* | *$20,619* | *$24,348* | *$26,073* | *$28,259* |

*PX 184-A at 653670; PX 176-A at 650495; PX 145-A at 634750; PX 113-A at 502928; PX 61-A at 519572; PX 32-A at 514135.*

**RESPONSE:**  CAL's annual 15(c) Responses set forth the above-mentioned AUM

information for the Open-end Funds, Closed-end Funds, Institutional/Individual

client/Partnerships, and Sub-advisory categories.  CAL denies that its 15(c) Responses contained

"Total Funds AUM," "Total Institutional/Subadvisory AUM" or "Total Other AUM" categories.

The "Total CAL AUM" figures set forth in Paragraph 7 include both AUM and assets under

---

[10] DFFCL ¶ 105.

advisement ("AUA"), which are assets for which CAL provides model portfolio design and oversight.

8.   *Based on the above data, the ratio of the Funds' AUM compared to the Institutional and Subadvised Accounts' AUM during the Relevant Period is as follows:*

| Ratio of Total Funds AUM to Total Institutional/Subadvisory AUM | | | | | |
|---|---|---|---|---|---|
| *Average, 2013-2017* | *2017* | *2016* | *2015* | *2014* | *2013* |
| 7.0 | 8.7 | 6.7 | 6.9 | 8.0 | 4.7 |

**RESPONSE:**  The rounded calculations set forth in Paragraph 8 are mathematically accurate, but CAL denies that this derived ratio is relevant to any issue in this case.

9.   *Based on the above data, the Funds' AUM constituted the following percentage of CAL's total AUM during the Relevant Period:*

| Total Funds AUM as % of Total CAL AUM | | | | | |
|---|---|---|---|---|---|
| Average, 2013-2017 | 2017 | 2016 | 2015 | 2014 | 2013 |
| 81.9% | 86.2% | 81.9% | 81.8% | 82.9% | 76.7% |

**RESPONSE:**  The rounded calculations set forth in Paragraph 9 are mathematically accurate, but CAL denies that this derived ratio is relevant to any issue in this case.

10.   *In its annual 15(c) Responses, CAL provided the following estimates of the amount of time certain key individuals spent on Fund-related activities:*

| *Person* | *CAL Position / Title* | *2018* | *2017* | *2016* | *2015* | *2014* | *2013* |
|---|---|---|---|---|---|---|---|
| *Mark Mickey* | *Funds' Chief Compliance Officer* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| *John Calamos, Sr.* | *Chairman; Global Chief Investment Officer* | *65%* | *65%* | *65%* | *65%* | *65%* | *65%* |
| *Gary Black* | *co-Chief Investment Officer* | *n/a* | *n/a* | *n/a* | *75%* | *75%* | *75%* |

| *John Koudounis* | *CEO* | *65%* | *50%* | *n/a* | *n/a* | *n/a* | *n/a* |
|---|---|---|---|---|---|---|---|
| *Robert Behan* | *President; Head, Global Distribution* | *75%* | *75%* | *75%* | *75%* | *75%* | *n/a* |
| *James Boyne* | *President and Chief Operating Officer* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* | *50%* |
| *Thomas Herman (2017) Nimish Bhatt (2013-16)* | *Chief Financial Officer* | *65%* | *65%* | *75%* | *75%* | *75%* | *75%* |
| *J. Christopher Jackson* | *General Counsel Head, Legal and Compliance department* | *60%* | *60%* | *40%* | *40%* | *40%* | *40%* |
| *Tammie Lee (2018) Chris Russell (2015-17) Steve Wastek (2013)* | *VP, Associate Counsel Legal department* | *95%* | *40%* | *75%* | *75%* | *n/a* | *70%* |
| *Curtis Holloway* | *VP Head, Fund Administration* | *85%* | *75%* | *75%* | *75%* | *90%* | *90%* |
| *Ben Ernst* | *VP Manager, Fund Administration* | *60%* | *60%* | *90%* | *90%* | *90%* | *90%* |
| *David Mangefrida* | *Senior VP, Head, Tax department* | *60%* | *40%* | *40%* | *40%* | *20%* | *20%* |

*PX 184-A at 653486, PX 176-A at 650251, PX 145-A at 634346, PX 113-A at 502692, PX 61-A at 519368, PX 32-A at 513992.*

**RESPONSE:** The time estimates set forth in Paragraph 10 are the estimates that CAL

provided in its 15(c) Response in response to the Independent Trustees' request for "the percent

of each person's time spent on Fund activities."[11]  The percentages report an estimate of the

percentage of time spent on Fund activities out of the total time spent by the employee, including

time spent relating to CAL's other investment products (such as UCITS, institutional accounts,

or sub-advisory accounts), in addition to time spent on other internal tasks or corporate

objectives.  The time spent estimates provided in CAL's 15(c) Response are fully consistent with

the fact that CAL provides greater services, and takes on greater risks, with respect to the Funds

than it did with respect to its All Cap Growth Clients.[12]

### 2.    The Growth Fund, and CAL's All Cap Growth Investment Strategy

*11.    CAL established the Growth Fund in 1990.  JSSF at ¶9.*

**RESPONSE:**  Admitted.

*12.    The Growth Fund is managed following CAL's All Cap Growth investment strategy (a/k/a the U.S. Equity Growth strategy, the U.S. Growth strategy, the Growth strategy, and/or ACG).  JSSF at ¶10.*

**RESPONSE:**  The Fund is managed following CAL's All Cap Growth investment

strategy (which is sometimes referred to as the U.S. Equity Growth strategy, the U.S. Growth

strategy, the Growth strategy, and/or ACG).

*13.    The Growth Fund's investment objective is long-term capital growth.  JSSF at ¶12; JX 168 at 3.*

**RESPONSE:**  The Fund's investment objective, as disclosed in Fund filings with the

SEC and in materials sent to Fund shareholders, is long-term capital growth.[13]

*14.    The Growth Fund's principal investment strategy is a focus on U.S. growth equities/stocks across all market capitalizations (but principally mid- and large-cap). JX 168 at 4.*

---

[11] *E.g.*, PX 184-A at CALAMOS_00653486.

[12] DFFCL ¶¶ 162-203.

[13] JSSF ¶ 12.

**RESPONSE:**  As disclosed in the Fund's February 28, 2017 Prospectus, the Fund invests primarily in equity securities issued by U.S. companies, and anticipates that substantially all of its portfolio will consist of securities of companies with large and mid-sized market capitalizations.[14]

15.     *The Growth Fund's AUM and advisory fees for each year from 2007 through 2017 were as follows:*

| Year * | Fund Net Assets (as of October 31) | Advisory Fees Paid (as of October 31) |
|---|---|---|
| 2017 | $1,672,427,281 | $15,478,921 |
| 2016 | $1,899,255,253 | $18,919,485 |
| 2015 | $2,726,125,388 | $26,417,079 |
| 2014 | $3,484,476,428 | $31,535,086 |
| 2013 | $4,441,152,831 | $41,109,168 |
| 2012 | $6,391,673,238 | $59,537,152 |
| 2011 | $7,727,002,086 | $70,744,156 |
| 2010 | $8,293,969,972 | $66,325,813 |
| 2009 | $7,988,441,578 | $58,313,737 |
| 2008 | $7,863,206,887 | $109,497,128 |
| 2007 | $17,493,714,892 | $127,528,938 |

*JSSF at ¶20.*

**RESPONSE:**  Admitted.

16.     *Under CAL's team-of-teams organization, the Growth Fund (and the Other ACG Accounts) were managed by the U.S. Growth Equity team (also referred to as the U.S. Growth*

---

[14] JX 168 at 4.

*team or the Growth team).  JX 139 at CA-IT0000071 at 14, 16-18; Becker Decl. at ¶¶52-57; Kalis Dep. at 8:16–15:17.*

**RESPONSE:**  Denied as stated.  CAL denies, as inconsistent with the trial evidence, that the members of the U.S. Growth Equity team were the sole investment professionals that contributed to the management of the Fund.

As the trial evidence demonstrates, during the Relevant Period, CAL made numerous significant and costly changes to the investment team and investment process, which was not limited to hiring additional personnel to service the Funds.  CAL undertook a significant transformation of its investment team—from a vertical structure with a "one-team-one-process" approach to a horizontal structure with a "team-of-teams" approach.[15]  CAL also implemented a series of changes that resulted in members of the broader investment team contributing ideas and insights that benefitted the Fund.  Among many other changes, CAL implemented an Investment Committee, which consisted of CAL's Co-CIOs, Co-Heads of Research and Investments, and co-Portfolio Managers, to increase sharing of investment information among its different teams.[16]

CAL also made significant changes at the senior management level in an attempt to improve the Fund's performance, including hiring Gary Black, who was previously been the CEO and CIO of a successful mutual fund investment adviser, Janus Capital, to replace the Funds' prior Co-CIO and, following Mr. Black's departure, transitioning to a new senior management structure by promoting four portfolio managers to serve as Co-CIOs.  Most

---

[15] DFFCL ¶ 106.

[16] DFFCL ¶¶ 107-108.

recently, CAL replaced the Fund's portfolio manager, Mr. Kalis, with Michael Grant, who had

obtained top-shelf performance with a different Fund that he advises.[17]

In short, each member of the investment team contributes to the management of each of

the Funds advised by CAL.[18]

17.    *During the Relevant Period, CAL reported to the Board that the following number of investment personnel specifically supported the Growth Fund as members of the U.S. Growth Equity Team:*

| *Date* | *Investment Personnel Supporting the Growth Fund* |
|---|---|
| *May 2014* | *22* |
| *August 2014* | *24* |
| *October 2014* | *24* |
| *June 2015* | *18* |
| *March 2016* | *18* |
| *May 2016* | *18* |
| *September 2016* | *13* |
| *December 2016* | *13* |
| *March 2017* | *13* |

*Cronin Report at Ex. 11.*

**RESPONSE:**  Denied as stated.  Paragraph 17 accurately counts the number of CAL

employees identified in Exhibit 11 of Mr. Cronin's Report.  For the reasons set forth in CAL's

Response to Paragraph 16, *supra*, CAL denies, as inconsistent with the trial evidence, that the

---

[17] DFFCL ¶¶ 109-112.

[18] *See* DFFCL ¶¶ 103-120.

members of the U.S. Growth Equity team were the sole investment professionals that contributed to the management of the Fund.

### 3.    The Calamos Investment Trust

18.    *The 16 Open-End Funds advised by CAL are organized as separate series within Calamos Investment Trust ("CIT"), a Massachusetts business trust that is registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "ICA") as an open-end investment management company.  JSSF at ¶7.*

**RESPONSE:**  Admitted.

19.    *CAL sponsored and established all of the Funds, and at all times has been their investment adviser pursuant to an Investment Management Agreement ("IMA") between CAL and CIT. JSSF ¶8, ¶58; JX 5.*

**RESPONSE:**  Admitted.

### 4.    CIT's Board of Trustees

20.    *A single Board of Trustees (the "Board") oversees the Funds.  JSSF at ¶25.*

**RESPONSE:**  Denied as stated.  The Board of Trustees oversees the Funds.  A unitary board is recommended by the Investment Company Institute ("ICI") as a best practice.  A unitary board allows trustees to become knowledgeable with an entire fund complex and affords the trustees greater access to the adviser.  A unitary board also is efficient because a large fund complex would otherwise be required to hire a significant number of trustees to populate many boards.[19]

21.    *During the Relevant Period, the Board was comprised of the following persons:*

| | |
|---|---|
| *John P. Calamos, Sr. (entire Relevant Period)* | *Weston W. Marsh (until July 18, 2015)* |
| *Stephen B. Timbers (entire Relevant Period)* | *Virginia G. Breen (from 9/2015 to present)* |
| *John E. Neal (entire Relevant Period)* | *Theresa Hamacher (from 9/2015 to mid-2017)* |
| *William R. Rybak (entire Relevant Period)* | *Lloyd Wennlund (from 7/2018 to present)* |

---

[19] Laby Rpt. at 8.

13

| David D. Tripple (entire Relevant Period) | |

*JSSF at ¶23.*

**RESPONSE:**  Admitted.

### 5.    The Independent Trustees' Annual 15(c) Review

*22.    ICA Section 15(c) requires the Independent Trustees to conduct an annual review to determine whether to approve continuation of the IMA (the "15(c) Review").  JSSF at ¶37.*

**RESPONSE:**  Admitted.

*23.    In the spring of each year, Independent Trustees request and CAL provides a compendium of materials relevant to the Board's consideration of the Funds' IMA (the "15(c) Request" and the "15(c) Response," respectively).*

**RESPONSE:**  Denied as stated.  Each year, Independent Trustees' Counsel, on behalf of

the Independent Trustees, sends a letter to CAL requesting certain information deemed

reasonably necessary for the Independent Trustees' 15(c) Review (the "15(c) Request"), and that

after receiving the 15(c) Request, CAL prepares and compiles a compendium of information,

documents and materials in response (the "15(c) Response"), which when finalized is provided

to the Independent Trustees in advance of the Board's June (or July) meeting each year.[20]  As the

trial evidence demonstrates, the Independent Trustees follow a thorough and robust 15(c)

Process that incorporates best practices that have been identified in the mutual fund industry.[21]

*24.    During the Relevant Period, the Independent Trustees annually voted to approve the IMA at the following Board meetings:  June 21, 2013; June 26, 2014, July 16-17, 2015; June 30/July 1, 2016, June 21, 2017 and June 29, 2018 (the "15(c) Board Meetings").  JSSF at ¶52.*

**RESPONSE:**  CAL admits that the Independent Trustees annually voted to approve the

IMA at the above-listed Board meetings, but denies that those Board meetings were in any way

---

[20] JSSF ¶¶ 38-45.

[21] DFFCL ¶¶ 61-90.

limited solely to the consideration of the IMA, as demonstrated by the agendas, written and oral presentations, and minutes from each of those meetings.[22]  Indeed, as the trial evidence demonstrates for each year within the Relevant Period, the Independent Trustees, after engaging in a robust process that involved active dialogue with CAL throughout the year, applied their business judgment in view of the current facts, their industry experience and their institutional knowledge of CAL, to determine that approving the IMA—subject either to a fee waiver and/or to CAL's commitment to continue to invest its resources in an effort to improve the Fund's performance—was in the best interests of Fund shareholders.[23]  Specifically, the trial evidence demonstrates:

•       The 15(c) Process that the Independent Trustees follow to evaluate the IMA is robust and thorough.  As part of their process, the Independent Trustees, with the assistance and advice of Independent Trustees' Counsel, request, receive and review a great deal of relevant information throughout the entire year about the relationship between CAL and the Fund, including (but by no means limited to) each of the *Gartenberg* factors, as well as peer fund performance and fee data from a recognized and independent third party.[24]  The information that CAL provides to the Independent Trustees, both in response to their 15(c) Request and throughout the year, is accurate, complete, consistent with industry practice and more than sufficient for the Independent Trustees' annual review of the IMA.[25]

---

[22] *E.g.*, DFFCL ¶¶ 122-124.

[23] DFFCL ¶ 90.

[24] DFFCL ¶ 83.

[25] DFFCL ¶ 84.

- The Independent Trustees approach the 15(c) Process with their extensive industry experience in mind.[26]  In addition, those Independent Trustees who have served on the Board for many years, like Mr. Neal, approach the 15(c) Process with a historical understanding of CAL's business, including the firm's history of success over an extended time period.[27]

- As a formal matter, CAL's 15(c) Process officially begins when the Independent Trustees, acting through Independent Trustees' Counsel, send CAL their 15(c) Request—a detailed set of written information requests on topics pertinent to the Independent Trustees' annual evaluation of the IMA, which seeks information regarding each *Gartenberg* factor, as well as significant changes to CAL's business and investment process and CAL's compensation philosophy.[28]  CAL's 15(c) Response a written narrative and a compendium of supporting materials, following a process that takes weeks and involves the time and effort of many people across the organization.[29]

- The Independent Trustees actively engage with CAL's 15(c) Response.  Before every June Board meeting, the Independent Trustees and Independent Trustees' Counsel meet in executive session for a final detailed review of CAL's 15(c) Response and to discuss the Independent Trustees' questions and thoughts about these materials.[30]  Then during the full Board meeting, CAL management personnel and third parties (such as Lipper, Morningstar, or

---

[26] DFFCL ¶ 85.

[27] DFFCL ¶ 85.

[28] DFFCL ¶ 86.

[29] DFFCL ¶ 87.

[30] DFFCL ¶ 88.

Strategic Insight) present to the Independent Trustees on a range of topics and answer any of their questions.[31]

- Following the discussion and presentations during the full Board meeting, the Independent Trustees again enter into executive session with only their Counsel present.[32]  The Independent Trustees then reach their decision regarding approval of the IMA.[33]

     *25.*    *At each of the 15(c) Board Meetings, members of CAL's management made presentations to the Independent Trustees on various portions of the 15(c) Materials.  JSSF at ¶53.  Following these presentations, the Independent Trustees meet in executive session and voted unanimously to approve continuation of the IMA and the Growth Fund's advisory fee rates as provided therein.  JSSF at ¶54-55.*

**RESPONSE:**  Denied as stated.  CAL admits that (a) at each of the annual June (or July) Board meetings, members of CAL's management made presentations to the Independent Trustees on various portions of the 15(c) Materials, (b) subsequent to those presentations, the Independent Trustees met with Independent Trustees' Counsel in executive session to discuss and ultimately vote on whether to continue the IMA, and (c) at each of these Board meetings, the Independent Trustees voted unanimously to approve continuation of the IMA.[34]

CAL denies, as inconsistent with the trial evidence, that Paragraph 25 sets forth all of the steps in the 15(c) Process.  Rather, as summarized in CAL's Response to Paragraph 24, the 15(c) Process that the Independent Trustees follow to evaluate the IMA is robust and thorough.  As part of their process, the Independent Trustees, with the assistance and advice of Independent Trustees' Counsel, request, receive and review a great deal of relevant information throughout the entire year about the relationship between CAL and the Fund, engage with that material, and

---

[31] DFFCL ¶ 88.

[32] DFFCL ¶ 89.

[33] DFFCL ¶ 89.

[34] JSSF ¶¶ 53-55; DFFCL ¶¶ 130-142.

annually reach an informed decision that approval of the IMA is in the best interests of the Fund and its shareholders.

### 6.    The Third-Party Performance Reports

*26.    As part of their 15(c) Requests, the Independent Trustees received from CAL an independent analysis comparing the Funds' advisory fees and performance, versus those of similar mutual funds. JSSF at ¶¶46 and 108; PX 184-A at 653367, PX 176-A at 650069, PX 145-A at 634011, PX 113-A at 502387, PX 61-A at 519924, PX 32-A at 513711; Tr. at 149:2-154:12.*

**RESPONSE:**  Denied as stated.  As part of the Independent Trustees' 15(c) Request, they approve CAL's retention of a third-party service provider to conduct an independent comparative analysis of the Funds' advisory fees (among other fees and expenses, including the total expense ratio), and the Funds' performance, versus those of similar or comparable mutual funds as determined by the third-party service provider, and that the Independent Trustees annually received and considered that information.[35]

*27.    Lipper, Inc. provided this analysis for the 2013 15(c) Review (the "Lipper Report" – JX 19); Morningstar Inc. provided analyses for the 2014, 2015 and 2016 15(c) Reviews (the "Morningstar Reports" – respectively, JX 46, JX 88 and JX 130); and Strategic Insight provided analyses for the 2017 and 2018 15(c) Reviews (the "SI Reports" – JX 175 and JX 186).  JSSF at ¶¶47-49.  Lipper, Morningstar and Strategic Insight are referred to herein as the "Independent Data Providers."*

**RESPONSE:**  Denied as stated.  CAL admits that: (i) in connection with CAL's 2013 15(c) Response, the Independent Trustees approved the retention of Lipper, Inc. to provide this independent comparative analysis (the "Lipper Report"); (ii) in connection with CAL's 2014, 2015 and 2016 15(c) Responses, the Independent Trustees approved the retention of Morningstar, Inc. to provide such analyses (the "Morningstar Reports"); and (iii) in connection

---

[35] JSSF ¶¶ 46, 108-09.

with CAL's 2017 and 2018 15(c) Responses, the Independent Trustees approved of the retention

of Strategic Insight to provide such analyses (the "SI Reports").[36]

28.     *The Independent Data Providers' Reports compared the Growth Fund's performance and fees to those of: (1) mutual funds similarly classified by Lipper or Morningstar (the "Category Comparison"); and (2) a narrower subset of more similar peer funds (the "Peer Comparison").  JSSF at ¶50; JX 19; JX 46; JX 88; JX 130; JX 175; JX 186.*

**RESPONSE:**  Denied as stated.  The Morningstar Reports, Lipper Report and SI Reports

compared the performance and fees of the Fund to (1) those of a broader set of all other mutual

funds similarly classified by Lipper or Morningstar (the "Category Comparison"), and also to (2)

those of narrower subsets of other mutual funds deemed more similar in relevant respects to the

Fund (the "Peer Comparison").[37]

29.     *The Independent Trustees considered the Independent Data Providers' Reports to be "very important" to their 15(c) Review.  Tr. at 190:2-6; JSSF at ¶109.  In particular, the Independent Trustees considered the Morningstar Reports to present reliable and unbiased information.  Tr. at 149:9-150:1; Timbers Dep. at 65:2-20.*

**RESPONSE:**  Denied as stated.  CAL admits that:  (i) the Independent Trustees annually

received and considered the Lipper Report, Morningstar Reports, and SI Reports;[38] (ii) as

Mr. Neal testified at trial, the Lipper, Morningstar, and SI information was "very important" to

the Independent Trustees because, among other reasons, "the entire board is paying close

attention to the performance of every one of these funds;"[39] and (iii) that the Lipper,

Morningstar, and SI information was reliable and unbiased.[40]

---

[36] JSSF ¶¶ 47-49; DSSF ¶¶ 88, 258-260.

[37] JSSF ¶ 50.

[38] JSSF ¶ 109.

[39] Tr. 190:5-17 (Neal).

[40] Tr. 149:5-17 (Neal).

### C.    The IMA

*30.    CIT has entered into an IMA dated December 13, 2004, as subsequently amended, appointing CAL as the Funds' investment adviser.  JSSF at ¶58; JX 5.*

**RESPONSE:**  Admitted.

*31.    The services CAL provided under the IMA are set forth in Section 2 of that agreement ("Duties of Manager"), see JX 5 at 146341-43, and are detailed by CAL in "Detailed Service Listings" included in CAL's annual 15(c) Responses.[41]*

**RESPONSE:**  Denied as stated.  The IMA sets forth certain broad parameters for the

services that CAL is to provide.  Moreover, as both of Plaintiffs' experts concede, the IMA

requires CAL to provide, or ensure the provision of, all of the services required to manage the

Funds.[42]  CAL either provides or oversees the provision of all of the services provided to the

Funds, and bears ultimate responsibility for all of the services required for the Funds.[43]

*32.    In particular, CAL is required to "furnish continuously an investment program of each Fund," "determine [] what investments shall be purchased, held, sold or exchanged by each Fund," "make changes on behalf of the Trust in the investments of each Fund," "place all orders for the purchase of and sale of portfolio securities for the account of each Fund with brokers or dealers selected by [CAL]," and "use its best efforts to seek on behalf of the Trust or any Fund thereof the best overall terms available for any transaction."  JX 5 at 146341-42. These services are commonly referred to as Portfolio Management Services.  See Neal Decl. at ¶99; Behan Decl. at ¶¶23, 88; Tr. at 343:7-13.*

**RESPONSE:**  Denied as stated.  The IMA sets forth certain broad parameters for the

services that CAL is to provide, the contents of which speak for themselves.  Moreover, as both

of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all

of the services required to manage the Funds.[44]  CAL either provides or oversees the provision of

---

[41] *PX 184-A at 653575; PX 176-A at 650344; PX 145-A at 634446; PX 113-A at 502799; PX 61-A at 519453; PX 32-A at 514076.*

[42] DFFCL ¶¶ 166-167.

[43] DFFCL ¶¶ 166, 187, 200, 344, 361.

[44] DFFCL ¶¶ 166-167.

all of the services provided to the Funds, and bears ultimate responsibility for all of the services

required for the Funds.[45]

33.     *Section 4 of the IMA requires the Funds (rather than CAL) to bear certain
expenses, including expenses/charges relating to: (i) the Funds' transfer agents, custodians,
accountants, auditors and legal counsel; (ii) the compensation and travel expenses of the
Independent Trustees, and all expenses of Board meetings; (iii) the Funds' registrations with the
SEC and various states and other jurisdictions;  (iv) the preparation and  distribution of the
Funds' prospectuses to  shareholders; and (v) the printing and mailing of the Funds' proxy
statements, quarterly reports, semi-annual reports, annual reports and other communications to
shareholders.  JX 5 at 146343-44.*

**RESPONSE:**  Denied as stated.  Section 3 of the IMA sets out certain expenses that are

borne by the Funds, which include the expenses described in Paragraph 33.  However, CAL is

ultimately responsible for monitoring, supervising, and overseeing the services provided by third

parties to the Funds.[46]

34.     *The IMA also includes the advisory fee schedules that govern the fees each of the
Funds pays CAL to compensate it "[f]or the services and facilities to be provided to each of the
Funds by the Manager [CAL] as provided in Paragraph 2 hereof."  JX 5 at 146344.*

**RESPONSE:**  Denied as stated.  The quoted passage in Paragraph 34 is accurate.

Nonetheless, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure

the provision of, all of the services required to manage the Funds.[47]  CAL either provides or

oversees the provision of all of the services provided to the Funds, and bears ultimate

responsibility for all of the services required for the Funds.[48]

35.     *The Growth Fund's advisory fee schedule, as set forth in the IMA, was as follows
from December 13, 2004 through June 30, 2018:*

---

[45] DFFCL ¶¶ 166, 187, 200, 344, 361.

[46] DFFCL ¶¶ 166, 187, 200, 344, 361.

[47] DFFCL ¶ 166-167.

[48] DFFCL ¶¶ 166, 187, 200, 344, 361.

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Up to and including $500 million | 1.00% |
| Above $500 million up to and including $1 billion | 0.90% |
| Above $1 billion up to and including $6 billion | 0.80% |
| Above $6 billion up to and including $11 billion | 0.78% |
| Above $11 billion up to and including $16 billion | 0.76% |
| Above $16 billion up to and including $21 billion | 0.74% |
| Above $21 billion up to and including $26 billion | 0.72% |
| Above $26 billion | 0.70% |

*JSSF at ¶60; JX 5 at 146348.*

  **RESPONSE:** Admitted.

  36. *The Independent Trustees approved the following revised fee schedule for the Growth Fund, as of July 1, 2018:*

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Up to and including $500 million | 1.00% |
| Above $500 million up to and including $1 billion | 0.90% |
| Above $1 billion up to and including $6 billion | 0.80% |
| Above $6 billion | 0.70% |

*JSSF at ¶61.*

  **RESPONSE:** Admitted.

  37. *The revised fee schedule does not reduce the advisory fees or effective fee rates that the Growth Fund currently pays:  Growth Fund assets are currently below $2 billion, and the advisory fee rates with respect to the first $6 billion of Growth Fund AUM are identical in both the pre- and post-June 30, 2018 advisory fee rate schedules.  Compare JSSF ¶¶60-61.*

  **RESPONSE:** Admitted.

  38. *Between 2013 and 2017, the Growth Fund's effective advisory fee rates were:*

| Year (ending Oct. 31) | Effective Fee Rate (as % of Average Daily Net Assets) |
|---|---|
| 2018 | not available |
| 2017 | 0.89% |
| 2016 | 0.87% |
| 2015 | 0.85% |
| 2014 | 0.84% |
| 2013 | 0.83% |

*JSSF at ¶21.*

**RESPONSE:**  The effective advisory fee rate paid by the Fund for each annual period ended October 31, as stated in the Fund's annual Prospectuses filed with the SEC, was as set forth in Paragraph 38.

### D.    The FASA

*39.    On behalf of the Funds, CIT also entered into an Amended and Restated Financial Accounting Services Agreement with CAL dated December 13, 2004 (the "FASA"). JSSF at ¶62.*

**RESPONSE:**  Admitted.

*40.    Section 2 of the FASA sets forth the specific services/duties CAL owes to the Funds under that agreement.  JSSF at ¶63; JX 6 at 145713-14.  CAL provided the Board with a summary of those services in each of its annual 15(c) Responses during the Relevant Period.[49] According to CAL, it was required to:*

---

[49] *PX 184-A at 653577-78; PX 176-A at 650346; PX 145-A at 634448-49; PX 113-A at 502801; PX 61-A at 519455; PX 32-A at 514075.  The services CAL provided under the FASA did not materially change from April 2012 through November 2018, when CAL and the Funds terminated that agreement. Id.*  **RESPONSE:**  Denied as stated.  The FASA was not amended between April 2012 and its termination on November 1, 2018.  CAL also admits that the many different types of services it provided to the Fund did not materially change between April 2012 and November 1, 2018.  However, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.  DFFCL ¶¶ 166-167.  Thus, even without the FASA, CAL is required either to provide itself or to ensure

*1. Act as Fund Administrator for the Trust and provide the following accounting services to the Trust, including but not limited to:*

> *a. Manage the Trust's expenses and expense payment processing.*
>
> *b. Monitor the calculation of expense accrual amounts for the Trust and make any necessary modifications.*
>
> *c. Coordinate any expense reimbursement calculations and payment.*
>
> *d. Calculate and review yields on the Trust in accordance with rules and regulations of the Securities and Exchange Commission.*
>
> *e. Calculate and review net investment income dividends and capital gain distributions.*
>
> *f. Calculate and review trustee deferred compensation plan accruals and valuations.*
>
> *g. Prepare Form 1099 information statements for Board members and service providers.*
>
> *h. Calculate, track, and report tax adjustments on all assets*
>
> *i. Prepare excise tax and fiscal year distribution schedules*
>
> *j. Prepare tax information required for financial statement footnotes*
>
> *k. Prepare state and federal income tax returns*
>
> *1. Prepare year end dividend disclosure information*
>
> *m. Coordinate the audits for each Trust*
>
> *n. Prepare and review financial reporting statements for each Trust*
>
> *o. Prepare and file required regulatory filings*

---

the provision through third parties of all necessary services for the Funds, including the financial accounting services recited in the FASA. DFFCL ¶ 346. Moreover, following the termination of the FASA, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by CAL has not decreased. The Fund's management fee schedule under the IMA also has not changed. DFFCL ¶ 348.

> *p. Calculate coverage tests and other leverage related reporting as required*
>
> *q. Prepare and distribute press releases for the closed end funds*
>
> *r. Prepare and review annual expense budgets*
>
> *s. Prepare and disseminate vendor survey information*
>
> *t. Prepare and furnish financial information for inclusion in prospectuses or proxy*
>
> *u. Prepare board materials as required*
>
> *v. Consult with the independent accountants, legal counsel, custodian, fund accountant, distributor, and transfer agent in establishing policies of the Trusts*

*PX 184-A, at 653577.*

**RESPONSE:**  Denied as stated.  The referenced language beginning with "1. Act as Fund Administrator for the Trusts …" and ending with "v. … establishing policies of the Trusts" appears in the "Detailed Services Listing" set forth in CAL's annual 15(c) Response. Nonetheless, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.[50]  Thus, even without the FASA, CAL is required either to provide itself or to ensure the provision through third parties of all necessary services for the Funds, including the services recited in the FASA.[51]  Moreover, following the termination of the FASA, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by

---

[50] DFFCL ¶ 166-167.

[51] DFFCL ¶ 346.

CAL has not decreased.[52]  The Fund's management fee schedule under the IMA also has not

changed.[53]

     41.     *The FASA included the following fee schedule that was used to "compensate Calamos for providing the services set forth in this Agreement."*

| Aggregate Funds' AUM | Fee Rate |
|:---:|:---:|
| *First $1 billion* | *0.0175%* |
| *Next $1 billion* | *0.0150%* |
| *AUM > $2 billion* | *0.0110%* |

*JSSF at ¶64; JX 6 at 145720.*

     **RESPONSE:**  Denied as stated.  The fee schedule and quoted language set forth in

Paragraph 41 is contained in the FASA.  However, as both of Plaintiffs' experts concede, the

IMA requires CAL to provide, or ensure the provision of, all of the services required to manage

the Funds.[54]  Thus, even without the FASA, CAL is required either to provide itself or to ensure

the provision through third parties of all necessary services for the Funds, including the services

recited in the FASA.[55]  Moreover, following the termination of the FASA, CAL's obligation to

provide, or ensure the provision of, all of the services that the Funds require has not changed, and

the scope of work performed by CAL has not decreased.  The Fund's management fee schedule

under the IMA also has not changed.[56]

     42.     *Each of the Funds paid its pro-rata share of fees under the FASA based on the proportion of its net assets to total net assets for all the Funds.  JSSF at ¶67.  The effective fee rate for each of the Funds under the FASA was approximately 1.1 basis points.  JSSF at ¶64; JX*

---

[52] DFFCL ¶ 348.

[53] DFFCL ¶ 348.

[54] DFFCL ¶¶ 166-167.

[55] DFFCL ¶ 346.

[56] DFFCL ¶ 348.

*6 at 145720; Tr. at 200:8-9.  During the Relevant Period, the Growth Fund paid the following "financial accounting fees" to CAL pursuant to the FASA:*

| Year | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Financial Accounting Fees | $203,202 | $252,712 | $358,737 | $450,484 |

*JSSF at ¶67.*

**RESPONSE:**  The Fund paid "financial accounting fees" to CAL as set forth in

Paragraph 42.

*43.    Shortly before trial, CAL terminated the FASA as of November 1, 2018 (JSSF at ¶65), and entered into agreements with State Street and Ernst & Young to provide certain of the services previously specified in the FASA.  Tr. at 371:18-25.*

**RESPONSE:**  The FASA was terminated as of November 1, 2018.  CAL also admits that

the Independent Trustees approved agreements with State Street and Ernst & Young to provide a

subset, but not all, of the services set forth in the FASA.  CAL monitors, supervises, and

oversees the services provided by State Street and Ernst & Young.[57]  Moreover, as both of

Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of

the services required to manage the Funds.[58]

> **E.    The Funds' Third-Party Service Providers**
>
> **1.    The Funds' Transfer Agent**

*44.    U.S. Bancorp Fund Services LLC ("USBFS") serves as transfer agent to the Funds pursuant to a January 1, 2014 Transfer Agent Servicing Agreement between USBFS and CIT.  JSSF at ¶71; JX 182.*

**RESPONSE:**  CAL admits that USBFS serves as transfer agent to the Funds pursuant to

a January 1, 2014 Transfer Agent Servicing Agreement between USBFS, CIT and the Calamos

---

[57] DFFCL ¶¶ 166, 187, 200, 344, 361.

[58] DFFCL ¶¶ 166-167.

Advisors Trust.  In addition, CAL monitors, supervises, and oversees the services provided by

USBFS.[59]  Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to provide,

or ensure the provision of, all of the services required to manage the Funds.[60]

> 45.    USBFS' duties are set forth in Sections 2 through 5 of the Transfer Agent
> Servicing Agreement, and Exhibit C and D thereto.  JX 182 at 2-6, 17-19 and 25-26.  As transfer
> agent, USBFS is responsible for, inter alia: (i) keeping records of all mutual fund shareholders;
> opening, maintaining and servicing fund shareholder accounts; and (ii) processing all mutual
> fund share transactions, including purchases, redemptions, dividend payments and
> reinvestments.  JSSF at ¶72; JX 182 at 2-3; Tr. at 359:4-360:24.

**RESPONSE:**  CAL admits that as transfer agent, USBFS is responsible for, *inter alia*:

keeping records of all mutual fund shareholders; opening, maintaining and servicing fund

shareholder accounts; and processing all mutual fund share transactions, including purchases,

redemptions, dividend payments and reinvestment, and that CAL manages, supervises, and

oversees the transfer agent services provided by USBF.[61]  In addition, CAL monitors, supervises,

and oversees the services provided by USBFS.[62]  Moreover, as both of Plaintiffs' experts

concede, the IMA requires CAL to provide, or ensure the provision of, all of the services

required to manage the Funds.[63]

> 46.    Furthermore, as Transfer Agent, USBFS also:  (i) prepares and mails
> shareholder account statements and purchase and redemption confirmations to the Funds'
> shareholders (JX 182 at 2; Tr. at 359:14-19); (ii) mails shareholder reports and prospectuses to
> current shareholders (JX 182 at 2); (iii) prepares and files Form 1099s with respect to dividends
> received by shareholders (JX 182 at 2; Tr. at 360:21-24); (iv) operates an call-in system for
> shareholders to obtain account information, available around the clock (Tr. at 360:25–362:1);
> (v) paid $175,000 to CAL each year toward the $400,000 annual cost to CAL of maintaining
> CAL's separate call center, staffed by approximately 6 CAL employees, until CAL shut it down in
> July 2017 (Tr. at 361:6–362:1); and (vi) provides shareholders and intermediaries with 24 hour,

---

[59] DFFCL ¶¶ 166, 187, 200, 344, 361.

[60] DFFCL ¶¶ 166-167.

[61] JSSF ¶¶ 72-73.

[62] DFFCL ¶¶ 166, 187, 200, 344, 361.

[63] DFFCL ¶¶ 166-167.

*seven day a week web access to their accounts through a hyperlink on CAL's website (Tr. at 362:2-16 and 383:11-20; JX 182 at 3, 17-19).*

**RESPONSE:**  Denied as stated.  CAL admits that Subsections (i)-(iii) paraphrase the language of the Transfer Agent Servicing Agreement.  CAL also admits that Mr. Holloway testified (i) that USBFS operated an automated call-in system; (ii) that USBFS paid $175,000 to CAL to partially cover the cost of the call center operated by CAL until approximately July 2017; and (iii) that USBFS provided shareholders with web access to their account balances accessible through CAL's website, but that shareholders could not transact through that website.[64]  CAL monitors, supervises, and oversees the services provided by USBFS.[65] Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.[66]

47.    *Under the Transfer Agent Servicing Agreement, USBFS also provides certain compliance-related services to CAL, including:  (i) the MARS compliance reporting system, which allows identification of potentially suspicious transactions such as market timing and late trading (Tr. at 362:17–363:7; JX 182 at 3, 25); (ii) anti-money laundering monitoring (Tr. at 363:8-10; JX 182 at 5-6); and (iii) identity theft monitoring (Tr. at 363:11-13; JX 182 at 5-6).*

**RESPONSE:**  The Transfer Agent Servicing Agreement states that USBFS will provide access to the MARS system, and that USBFS would provide certain anti-money laundering and identity theft monitoring as more fully described in the Transfer Agent Servicing Agreement.[67] CAL monitors, supervises, and oversees the services provided by USBFS.[68]  Moreover, as both

---

[64] Tr. 360:25-361:3, 361:23-362:12 (Holloway).

[65] DFFCL ¶¶ 166, 187, 200, 344, 361.

[66] DFFCL ¶¶ 166-167.

[67] *See* JX 182.

[68] DFFCL ¶¶ 166, 187, 200, 344, 361.

of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all

of the services required to manage the Funds.[69]

48.      *USBFS is compensated by CIT/the Funds, and not CAL, for providing the services*
*set forth in the Transfer Agent Servicing Agreement.  JX 182 at 6, 31-35; Tr. at 358:23–359:3.*
*The Growth Fund's share of the fees paid to USBFS is set forth in ¶62 below.*

**RESPONSE:**  Denied as stated.  USBFS is compensated by CIT/the Funds for the

services it provides, at all times subject to CAL's monitoring, oversight and supervision.[70]  The

amount of fees the Fund paid to USBFS is set forth in the JSSF.[71]

## 2.     The Funds' Accountant

49.      *CIT entered into a Master Services Agreement dated March 15, 2004 with State*
*Street Bank & Trust ("State Street").  JSSF at ¶79; JX 4.*

**RESPONSE:**  Admitted.

50.      *State Street's duties under the Master Services Agreement are set forth in*
*Section 1 of that agreement.t.  JX 4 at 1-3.  Under the Master Services Agreement, State Street*
*provides certain administrative and accounting services including: (i) providing daily*
*reconciliation of cash, trades and positions; (ii) maintaining general ledger and capital stock*
*accounts; (iii) preparing daily trial balance; (iv) providing selected general ledger reports; (v)*
*preferred share compliance; calculating total returns; and (vi) providing monthly distribution*
*analysis to the Funds. JSSF at ¶79; JX 4 at 1-3; PX 169-A at 646100.*

**RESPONSE:**  Under the Master Services Agreement, State Street, among other things,

provides certain administrative and accounting services including providing daily reconciliation

of cash, trades and positions; maintaining general ledger and capital stock accounts; preparing

daily trial balance; calculating net asset value; providing selected general ledger reports;

preferred share compliance; calculating total returns; and providing monthly distribution analysis

---

[69] DFFCL ¶ 166-167.

[70] JSSF ¶¶ 73-74; DFFCL ¶¶ 166, 187, 200.

[71] JSSF ¶ 74.

to the Funds.[72]  CAL monitors, supervises, and oversees the services provided by State Street.[73]

Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the

provision of, all of the services required to manage the Funds.[74]

    *51.    State Street is also responsible for calculating the Funds' daily net asset values ("NAV"), and prices/values the securities in the Funds' portfolios. Tr. at 365:22–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100 (State Street is "responsible for daily pricing of all Calamos Funds as well as calculation of the Net Asset Value").*

    **RESPONSE:**  Denied as stated.  As Mr. Holloway testified, State Street is "involved in

the process" of valuing the Fund's portfolio securities, and that State Street "calculate[s] the

NAV" but "we hold ultimate responsibility as the adviser."[75]  CAL monitors, supervises, and

oversees the services provided by State Street.[76]  Moreover, as both of Plaintiffs' experts

concede, the IMA requires CAL to provide, or ensure the provision of, all of the services

required to manage the Funds.[77]

    *52.    State Street is compensated by CIT/the Funds, and not CAL, for serving as the Funds' Accountant under the Master Services Agreement.  Tr. at 365:10-21. The Growth Fund's share of the fees paid to State Street as Fund Accountant is set forth in ¶62 below.*

    **RESPONSE:**  Denied as stated.  State Street is compensated by CIT/the Funds for the

services it provides, at all times subject to CAL's monitoring, oversight and supervision.[78]  The

---

[72] JSSF ¶ 80.

[73] DFFCL ¶¶ 166, 187, 200, 344, 361.

[74] DFFCL ¶ 166-167.

[75] Tr. 365:22-366:3 (Holloway).

[76] DFFCL ¶¶ 166, 187, 200, 344, 361.

[77] DFFCL ¶ 166-167.

[78] JSSF ¶¶ 81-82; DFFCL ¶¶ 166, 187, 200.

31

amount of fees the Fund paid to State Street is set forth in the parties' Joint Statement of

Stipulated Facts.[79]

### 3.    The Funds' Custodian

*53.    State Street also serves as the Funds' Custodian pursuant to a September 11, 2009 Master Custodian Agreement between State Street and CIT.  JSSF at ¶75; JX 11.*

**RESPONSE:**  Admitted.

*54.    State Street's duties as Custodian are set forth in Sections 1 through 14 of the Master Custodian Agreement.  JX 11 at 1-20. Pursuant to that agreement, State Street, among other things:  (i) holds all cash and securities for the Funds (directly or through a book-entry system), delivers and receives payment for securities sold by the Funds, receives and pays for securities purchased by the Funds, and collects income from investments of the Funds (JSSF at ¶76; Tr. at 363:14–364:23); (ii) pays out dividends to the Funds' shareholders and pays out other approved expenses of the Funds (Tr. at 364:10-23); and (iii) provides the Funds with certain pricing services, including automated pricing services and fair valuation services (JSSF at ¶76; JX 11 at 344818).*

**RESPONSE:**  Denied as stated.  Pursuant to the Master Custodian Agreement, State

Street, among other things, holds all cash and securities for the Funds (directly or through a

book-entry system), delivers and receives payment for securities sold by the Funds, receives and

pays for securities purchased by the Funds, collects income from investments of the Funds, and

provides the Funds with certain pricing services, including automated pricing services and fair

valuation services.[80]  CAL also admits that Mr. Holloway testified that the dividends are paid

from the custodian to USBFS which then credits the investor accounts.[81]  CAL monitors,

supervises, and oversees the services provided by State Street.[82]  Moreover, as both of Plaintiffs'

---

[79] JSSF ¶ 82.

[80] JSSF ¶¶ 76-77.

[81] Tr. 364:10-17 (Holloway).

[82] DFFCL ¶¶ 166, 187, 200, 344, 361.

experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.[83]

55.    *State Street is compensated by CIT/the Funds, and not CAL, for serving as the Fund's Custodian Funds.  JSSF at ¶78; JX 11 at 20 and 344817-25; Tr. at 363:25–364:6. The Growth Fund's share of the fees paid to State Street under the Master Custodian Agreement is set forth in ¶62 below.*

**RESPONSE:**  Denied as stated.  State Street is compensated by CIT/the Funds for the services it provides, at all times subject to CAL's monitoring, oversight and supervision.[84]  The amount of fees the Fund paid to State Street is set forth in the parties' Joint Statement of Stipulated Facts.[85]

## 4.    The Funds' Securities Lending Agents

56.    *State Street also provides securities lending services pursuant to a September 18, 2009 Securities Lending Authorization Agreement between State Street and CAL (on behalf of the Funds).  JSSF at ¶94; JX 12; Tr. at 366:7–367:9. Under this agreement, State Street acts administers the Funds' securities lending programs, lending out securities held in Funds' portfolios in order to earn extra income for such Funds.  JSSF at ¶95, Tr. at 366:19–367:6. State Street receives 15% of the securities lending revenue generated as compensation for operating the program.  JX 12 at 237834; Tr. at 366:19–367:6.*

**RESPONSE:**  Denied as stated.  State Street provides securities lending services as one of the Funds' Securities Lending Agents pursuant to a September 18, 2009 Securities Lending Authorization Agreement between State Street and CAL (on behalf of the Funds); under this agreement, State Street acts as a securities lending agent for the Funds, administers a securities lending program on their behalf, and loans out securities held in Funds' portfolios in order to earn extra income for such Funds.[86]  Pursuant to the terms of the Securities Lending

---

[83] DFFCL ¶ 166-167.

[84] JSSF ¶¶ 77-78; DFFCL ¶¶ 166, 187, 200.

[85] JSSF ¶ 82.

[86] JSSF ¶¶ 94-95, 97.

Authorization Agreement, all proceeds collected by State Street on investment of cash collateral or any fee income shall be allocated 85% payable to the Fund(s) and 15% payable to State Street.[87] CAL monitors, supervises, and oversees the services provided by State Street.[88] Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.[89]

### 5.   The Funds' Auditor

*57.   Deloitte & Touche LLLP ("Deloitte") is CIT's independent auditor.  JSSF at ¶90. Deloitte audits and reports on the Funds' annual/semi-annual financial statements.  JSSF at ¶91.*

**RESPONSE:**  Admitted.

*58.   Deloitte's fees for serving as the Funds' auditor are paid directly by the Funds, and not CAL.  Tr. at 367:10-23.  The Growth Fund's share of the fees paid to Deloitte is set forth in ¶62 below.*

**RESPONSE:**  The Fund paid audit fees to Deloitte.  The fees paid to Deloitte are set forth in the parties' Joint Statement of Stipulated Facts.[90]

### 6.   The Funds' Counsel

*59.   Independent Trustees' Counsel also serves as counsel to CIT/the Funds ("Funds' Counsel").  JSSF at ¶32; Tr. at 334:18–335:12.*

**RESPONSE:**  At all times during the Relevant Period, the Independent Trustees have been represented and advised by a mutual fund counsel team headed by Paulita M. Pike ("Independent Trustees' Counsel"), and that Ms. Pike and her team also served as counsel to CIT.[91]  The important role that Independent Trustees' Counsel serves on behalf of the Fund and

---

[87] JX 12 at CALAMOS_00237834.

[88] DFFCL ¶¶ 166, 187, 200, 344, 361.

[89] DFFCL ¶ 166-167.

[90] JSSF ¶ 92.

[91] JSSF ¶ 32.

its shareholders is set forth in CAL's Proposed Findings, and was not disputed or controverted by

Plaintiffs at trial.[92]

60.     *Funds' Counsel, among other things:  assists in preparing, and reviews and comments on, the Funds' regulatory filings.  Tr. at 384:21-23, 315:25–317:17; PX 418; PX 419 at 317471-73.*

<u>**RESPONSE:**</u>  Denied as stated.  CAL admits that (a) it prepares drafts of regulatory

filings, (b) Independent Trustees' Counsel review and comment on certain (but not all)

regulatory filings before they are finalized, and (c) CAL is ultimately responsible for ensuring

that the information in regulatory filings is accurate and complete.  The important role that

Independent Trustees' Counsel serves on behalf of the Fund and its shareholders is set forth in

CAL's Proposed Findings, and was not disputed or controverted by Plaintiffs at trial.[93]

61.     *The legal services provided to the Funds by Funds' Counsel and other legal services providers are paid directly by CIT/the Funds, and not CAL.  Tr. at 384:24–385:1 and 317:6-21; JX 5 at 146344; PX 419.  The Growth Fund's share of the legal fees paid to Fund Counsel and/or other third-party legal services providers is set forth in ¶62 below.*

<u>**RESPONSE:**</u>  The Fund paid legal fees to Funds'/Independent Trustees' Counsel.

**7.     The Fees the Growth Fund Paid to Third-Party Service Providers**

62.     *During the Relevant Period, CAL paid the following fees to above-referenced service providers:*

| *Fees Paid by the Growth Fund to Third Party Service Providers* | | | | | | |
|---|---|---|---|---|---|---|
| *Service Provider* | *Agreement(s)* | *2017* | *2016* | *2015* | *2014* | *Source* |
| *USBFS* | *Transfer Agent Servicing Agreement* | $2,564,319 | $3,184,632 | $4,293,548 | $5,725,138 | *JSSF at ¶74* |

---

[92] DFFCL ¶¶ 61-65.

[93] DFFCL ¶¶ 61-65.

| *State Street* | *Master Custodian Agreement; Master Services Agreement* | $178,129 | $170,441 | $260,495 | $358,831 | *JSSF at ¶82* |
| *Deloitte* | *n/a* | $57,926 | $126,469 | $135,572 | $120,225 | *JSSF at ¶92* |
| *Fund Counsel* | *n/a* | $666,944 | $221,593 | $167,837 | $105,805 | *JSSF at ¶93* |

**RESPONSE:**  Paragraph 62 accurately sets forth the fees paid by the Fund to USBFS,

State Street, Deloitte and Independent Trustees' Counsel.

### F.    The Sub-Administration Agreement Between State Street and CAL

*63.    CAL also entered into a Sub-Administration Agreement with State Street dated October 1, 2009.  JX 183 (Sub-Administration Agreement); PX 488 & 489 (additional letter agreements referenced in Sub-Administration Agreement); JSSF at ¶83.*

**RESPONSE:**  Admitted.

*64.    In its 15c Responses, CAL explained to the Board that the Sub-Administration Agreement operated in part to sub-contract to State Street certain of the services CAL was required to provide under the FASA (and for which CAL was compensated for under the FASA). PX 184-A at 653577;[94] see also Tr. at 224:10–225:11, 356:13-23.*

**RESPONSE:**  Denied as stated.  CAL's annual 15(c) Responses provided a "description

of the financial accounting services rendered by [CAL]" and stated that, "[t]here have been no

significant changes in the services required to be rendered pursuant to the Agreement since April

30, 2012, but certain of these financial accounting services have been sub-contracted to [State

Street[ pursuant to the Sub-Administration Agreement, dated October 1, 2009, between [State

---

[94] *See also PX 176-A at 650346; PX 145-A at 634448; PX 113-A at 502801; PX 61-A at 519455; PX 32-A at 514075.*

Street] and [CAL], all as previously discussed with the Board."[95]   CAL monitors, supervises, and

oversees the services provided by State Street.[96]   Moreover, as both of Plaintiffs' experts

concede, the IMA requires CAL to provide, or ensure the provision of, all of the services

required to manage the Funds.[97]

   *65. In annual reports to the Board, the Funds' Chief Compliance Officer explained
that the services sub-contracted by CAL to State Street via the Sub-Administration Agreement
included 43 functions previously performed by CAL's Fund Administration department,
including the "initial preparation of the [Funds'] financials and other legal documents including
the NQ, NSAR, and NCSR as well as information for prospectus updates."  PX 169-A at 646104-
05; see also Tr. at 315:25–321:23 (Mr. Jackson's testimony regarding State Street's preparation
of regulatory filings).*

   **RESPONSE:**  Denied as stated.  The 2017 Report of the Funds' Chief Compliance

Officer states that "CAL has contracted with [State Street] to perform 43 functions previously

performed by Calamos Fund Administration personnel," that "[t]his includes the initial

preparation of the financials and other legal documents including the NQ, NSAR, and NCSR as

well as information for prospectus updates," and that "[w]ith the implementation of the

Investment Company Reporting Modernization discussed in Section XII [herein], this process

will change."[98]  CAL is ultimately responsible for ensuring that the information in regulatory

filings is accurate and complete.[99]  CAL monitors, supervises, and oversees the services provided

by State Street.[100]  Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to

provide, or ensure the provision of, all of the services required to manage the Funds.[101]

---

[95] *E.g.*, PX 184-A at CALAMOS_00653577.

[96] DFFCL ¶¶ 166, 187, 200, 344, 361.

[97] DFFCL ¶ 166-167.

[98] PX 169-A at CALAMOS_00646105.

[99] Tr. 318:3-8 (Jackson).

[100] DFFCL ¶¶ 166, 187, 200, 344, 361.

[101] DFFCL ¶ 166-167.

66.     The services performed by State Street under the Sub-Administration Agreement *are set forth in Sections 5 of that agreement, JX 183 at 645541-43, and Section 2 of the related letter agreement referenced in the Sub-Administration Agreement, PX 488 at 645534-36; see also JX 183 at 645543 ("The Services shall be provided as further defined by the Parties in the letter agreement regarding the Services of even date herewith.").*

**RESPONSE:**  Denied as stated.  The Sub-Administration contains a Section 5, that the

referenced letter agreement contains a Section 2, and that the quoted language appears in the

Sub-Administration Agreement.  CAL monitors, supervises, and oversees the services provided

by State Street.[102]  Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to

provide, or ensure the provision of, all of the services required to manage the Funds.[103]

67.     Such services included: (i) drafting and preparing certain of the Funds' *regulatory filings in whole, such as quarterly filings on Form NQ (disclosing the securities held in the Funds' portfolios), filings on Form NSAR (disclosing facts concerning Funds' operations, affiliates, service providers, securities holdings, income, expenses and activities), and annual filings on Form N-PX (disclosing the proxy votes CAL submitted in connection with each security held in each of the Funds' portfolios) (JX 183 at 645542; PX 488 at 645503); (ii) drafting and preparing the Funds' semi-annual and annual reports to shareholders on Form N-CSR in near entirety, including all financial information with respect to the Funds (JX 183 at 645542; PX 488 at 645534-35); (iii) drafting and preparing the financial information required for inclusion in the Funds' registration statements on Form N-1A and prospectuses (JX 183 at 645542); (iv) coordinating the Funds' audits (JX 183 at 645542; PX 488 at 645535); (v) preparing and managing the Funds' expense budgets, accruals and payments (JX 183 at 645542; PX 488 at 645535); (vi) performing daily compliance testing required by Section 18 of the ICA concerning the Funds' derivative positions (JX 183 at 645542; PX 488 at 645535); (vii) preparing numerous periodic reports for the Board (JX 183 at 645543; PX 488 at 645536); (viii) assisting CAL in determining the Funds' dividends (JX 183 at 64552); (ix) and assisting CAL's tax department in preparing year-end reports (PX 488 at 645536). Mr. Jackson and Mr. Holloway confirmed State Street's provision of these services as Sub-Administrator. See Tr. at 315:25–321:23, 374:4-14, 377:2-10, 380:11–382:10, 383:21–385:1.*

**RESPONSE:**  Denied as stated.  The Sub-Administration Agreement contains a Section

5 setting forth certain services to be provided by State Street, and the October 1, 2009 letter

agreement contains a Section 2 providing for State Street to provide certain services as part of

---

[102] DFFCL ¶¶ 166, 187, 200, 344, 361.

[103] DFFCL ¶ 166-167.

the Sub-Administration Agreement.  CAL is ultimately responsible for ensuring that the information in regulatory filings is accurate and complete.[104]  CAL monitors, supervises, and oversees the services provided by State Street.[105]  Moreover, as both of Plaintiffs' experts concede, the IMA requires CAL to provide, or ensure the provision of, all of the services required to manage the Funds.[106]

68.     Under the Sub-Administration Agreement, State Street was paid inter alia an annual flat-fee for each Fund it serviced. JSSF at ¶84.  For Open-End Funds, like the Growth Fund, the flat fee was $50,000 per annum.  Id.

**RESPONSE:**  Admitted.

69.     CAL paid State Street's fees under the Sub-Administration Agreement out of its Fund Administration department's operating expenses.  For each year, those fees constituted more than 50% of the Fund Administration department's total operating expenses, which ranged from between $2.6 million and $2.8 million.  Tr. at 222:22–225:17, 356:25–366:14; JX 181 at Ex. B.[107]  The Sub-Administration fees paid by CAL's Fund Administration department for each year are as follows:

| Fees Paid by CAL for Services Provided to all Funds by Sub-Administrator | | | | | |
|---|---|---|---|---|---|
| *Service Provider* | *Fee Type / Fee Agreement* | *2017* | *2016* | *2015* | *2014* | *Source* |
| *State Street* | *Sub-Administration Agreement* | *not disclosed* | *$1,777,000* | *$1,768,000* | *$1,898,000* | *JSSF at ¶86* |

---

[104] Tr. 318:3-8 (Jackson).

[105] DFFCL ¶¶ 166, 187, 200, 344, 361.

[106] DFFCL ¶ 166-167.

[107] *The Fund Administration department's annual operating expenses for 2017 and 2018 were materially the same as its annual expenses during 2014-2016.  Tr. at 224:14-19.*  **RESPONSE:** Denied.  The foregoing assertions are not supported by the cited evidence.  Mr. Helmetag testified that he "believe[s]" that the functional expense for fund administration for 2017 was "materiality the same as the one for 2016," and that the functional expense for 2018 "should be materially the same."  Tr. 224:5-19 (Helmetag).

**RESPONSE:**  Denied as stated.  CAL paid sub-administration fees to State Street in the amounts set forth in Paragraph 69.  CAL denies that it "paid State Street's fees under the Sub-Administration Agreement out of its Fund Administration department's operating expenses," and Plaintiffs provided no evidence to support this assertion.

### G.    CAL's Institutional and Subadvisory All Cap Growth Clients

70.    *During the Relevant Period CAL also offered its All Cap Growth strategy to Institutional Accounts (the "Institutional ACG Accounts") and Subadvised Accounts (the "Subadvisory ACG Accounts," and together with the Institutional ACG Accounts, the "Other ACG Accounts"). JSSF at ¶¶11, 98 and Ex. 1 thereto; JX 181 at 4 & Ex. A. All of the Other ACG Accounts were independent third-parties unaffiliated with CAL. Tr. at 88:5-21.*

**RESPONSE:**  Denied as stated.  At certain times during the Relevant Period, CAL advised (1) investment vehicles, including non-U.S. regulated investment products, sponsored by third-party investment advisers for which CAL served as a subadviser and (2) separately-managed accounts, predominantly for institutional investors, both of which utilized an All Cap Growth strategy (together, "All Cap Growth Clients").[108]  CAL has not advised any All Cap Growth Clients since November 13, 2016.[109]

### 1.    The Other ACG Accounts

71.    *Since January 1, 2012, CAL has had 36 Other ACG Accounts.  JX 181 at Ex. A. Of those 36 Other ACG Accounts, 13 terminated CAL prior to the Relevant Period, and the remaining 23 terminated CAL at various points during the Relevant Period.  Id.  At all times since December 2016, CAL had no Other ACG Accounts.  Id.; JSSF at ¶¶98 and 104; Tr. at 512:6-22; see also Tr. at 584:5-22; Becker Decl. ¶121.*

**RESPONSE:**  Denied as stated.  Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

---

[108] JSSF ¶¶ 98-99 & Ex. 1.

[109] DFFCL ¶¶ 240, 386.

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[110]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[111]

In addition, with specific respect to Plaintiffs' assertions in Paragraph 71, between January 1, 2012 and December 31, 2016, CAL advised a total of 36 All Cap Growth Clients;[112] 13 of the All Cap Growth Clients terminated their accounts with CAL prior to the June 2013 Board meeting; the remaining All Cap Growth Clients terminated their accounts at various points

---

[110] DFFCL ¶¶ 169-203.

[111] DFFCL ¶ 227.

[112] JX 181 ¶ 1 & Ex. A.

prior to November 13, 2016,[113] and CAL has not advised any All Cap Growth Clients since November 13, 2016.[114]

72.    *Five of the 36 Other ACG Accounts were Subadvisory ACG Accounts:  namely, (1) the Nomura Currency Fund – U.S. Growth Equity Fund ("Nomura"); (2) the MD American Growth Fund; (3) the MDPIM US Equity Pool (together with the MD American Growth Fund, the "MD Accounts"); (4) Union Bancaire Privée ("UBP"); and (5) Thrivent Financial for Lutherans ("Thrivent").  JX 8 at 638082; JX 9 at 638122; JX 15 at 622192-94; JX 18 at 638094-97; DX 908 at 638134-38.[115]  The remaining 31 Other ACG Accounts were Institutional ACG Accounts. JX 181 at Ex. A.*

**RESPONSE:**  Denied as stated.  Each of the five referenced All Cap Growth Clients were categorized in CAL's records as sub-advisory accounts.  CAL denies that Nomura, MD American, or Union Bancaire Privée were U.S.-regulated mutual funds subject to the ICA.[116] Moreover, with respect to Thrivent, (a) Plaintiffs did not introduce any evidence about CAL's sub-advisory services to Thrivent, and (b) based on the Thrivent Fund's SEC filings, the actual management fee for that fund was 95 basis points (*i.e.*, higher than the Fund's management fee at any point during the Relevant Period).  In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

73.    *CAL's 31 Institutional ACG Accounts were generally small:  22 had average AUM of less than $5 million; five had average AUM of between $5 million and $25 million; and the remaining four had average AUM of between $25 million and $50 million.  JX 181 at Ex. A.*

---

[113] JSSF ¶¶ 98-99 & Ex. 1.

[114] DFFCL ¶¶ 240, 386.

[115] *Each of these IMAs makes clear that CAL is being retained by another investment adviser to provide certain investment advisory services to a fund or portfolio sponsored and managed by that investment adviser.*  **RESPONSE:**  CAL admits that CAL was retained to provide investment advisory services to Nomura, MD American, Union Bancaire Privee, and Thrivent Financial for Lutherans.  CAL denies that Nomura, MD American, or Union Bancaire Privée were U.S.-regulated mutual funds registered under the ICA.

[116] DFFCL ¶ 170; DX 908 at CALAMOS_00538135.

**RESPONSE:**  Denied.  The average AUM of the institutional accounts invested in CAL's All Cap Growth Strategy is listed in Exhibit 1 to the Joint Statement of Stipulated Facts.[117]  CAL denies Plaintiff's characterization of the size of those accounts as "generally small."

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

74.     *CAL's Subadvisory ACG Accounts were substantially larger than its Institutional ACG Accounts:  Nomura was the largest and had an average AUM of $528.2 million; and the average AUM for each of the two MD Accounts, when added together, was $471.4 million.  Id. Thus, the individual average AUM for Nomura and each of the two MD accounts, when summed, exceeded $1 billion.*

**RESPONSE:**  Denied.  The average AUM of the sub-advisory accounts invested in CAL's All Cap Growth Strategy is listed in Exhibit 1 to the Statement of Stipulated Facts.[118]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

75.     *Accordingly, at all times from January 1, 2012 through October 2016 (when Nomura ceased receiving CAL's ACG advisory services), the assets CAL managed in its Subadvisory ACG Accounts constituted 90% or more of the total assets CAL managed for all the Other ACG Accounts.  JX 181 at Ex. A.  Likewise, after September 2013 (when UBP terminated CAL) and through October 2016 (when Nomura terminated CAL), Nomura and the two MD Accounts constituted by themselves 90% or more of the total assets CAL managed for all Other ACG Accounts.  JX 181 at Ex. A.  Id.*

---

[117] JSSF ¶¶ 98-99 & Ex. 1.

[118] JSSF ¶¶ 98-99 & Ex. 1.

**RESPONSE:**  Denied.  The average AUM of the sub-advisory accounts invested in CAL's All Cap Growth Strategy is listed in Exhibit 1 to the JSSF.[119]

 In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

### 2.     The Other ACG Accounts' Advisory Fee Rates

76.     *The Other ACG Accounts paid advisory fees to CAL based on what the market for institutional advisory/subadvisory services would bear.  Tr. at 88:22-25; Behan Decl. at ¶¶72-73.*

**RESPONSE:**  Denied.  The trial evidence demonstrates that, consistent with the market-based pricing approach followed by investment advisers throughout the asset management industry, CAL sets fees for each of its investment products—including institutional and sub-advisory accounts, as well as mutual funds—with a view towards what its competitor investment advisors charge to their accounts.[120]  CAL denies the assertion in Paragraph 76 to the extent that Plaintiffs suggest that a market-based pricing approach is not used by CAL in setting the Fund's fee or that because the fees charged to CAL's All Cap Growth Clients were set with a view toward the market, that the fees charged to CAL's All Cap Growth Clients define the arm's-length bargaining range for the Fund's management fee.

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

77.     *During most of the Relevant Period, and at all times subsequent to September 2013, CAL's Other ACG Accounts paid advisory fees to CAL under three different advisory fee rate schedules.  JX 181 at Ex. A; Pomerantz Report at ¶¶169-72; Tr. at 554:22-556:15.  These*

---

[119] JSSF ¶¶ 98-99 & Ex. 1.

[120] DFFCL ¶ 214.

*schedules consisted of CAL's standard ACG rate for Institutional Accounts and two individual schedules that were separately negotiated by certain of CAL's Largest ACG clients.*

**RESPONSE:**  Denied.  During the Relevant Period, many of CAL's All Cap Growth Clients operated under one of three different advisory fee schedules.[121]  In addition, Thrivent Financial for Lutherans and Nomura Current Fund – U.S. Growth Equity Fund operated under different fee schedules.[122]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

78.     *During the Relevant Period, CAL publicly reported in its Form ADV a standard advisory fee rate schedule for its institutional separately-managed All Cap Growth accounts (the "Standard SMA Schedule").  JSSF at ¶102; PX 438 at 5-7; Behan Decl. at ¶75. This publicly-reported, standard rate is also known as a "rack rate." Tr. at 533:22–534:14, 575:23–576:9.  It functions as a "manufacturer's suggested retail price." Tr. 575:19–576:9.*

**RESPONSE:**  Denied.  During the Relevant Period, CAL publicly reported in its Form ADV a standard advisory fee rate schedule it offered to institutional accounts invested in the All Cap Growth strategy.  CAL denies that the term "rack rate," which Dr. Pomerantz used to describe the rates in this schedule, is commonly used in the investment management industry or that the fees set forth in the standard advisory fee rate schedule function as a "manufacturer's suggested retail price."  To the contrary, 31 of the 36 All Cap Growth Clients during the Relevant Period paid fee rates under this standard schedule, and thus those clients did not pay fees that were negotiated down from the standard schedule, as Dr. Pomerantz erroneously and without basis suggests would be common practice.[123]

---

[121] JSSF ¶¶ 98-99 & Ex. 1 (referencing Fee Schedules A, B, and C).

[122] *Id.*

[123] Tr. 575:19-576:9 (Pomerantz).

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

79.    *CAL's Standard SMA Schedule was as follows:*

| Rate | AUM Range |
|------|-----------|
| *0.75%* | *First $25 million* |
| *0.70%* | *Next $25 million* |
| *0.65%* | *Next $25 million* |
| *0.50%* | *All assets > $75 million* |

*JSSF at ¶103; PX 438 at 5.*

**RESPONSE:**  Paragraph 79 accurately sets forth CAL's Standard Institutional Rate (as that term is defined in the JSSF) for the All Cap Growth strategy.[124]  However, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

80.    *All 31 of CAL's Institutional ACG Accounts paid advisory fees to CAL pursuant to the Standard SMA Schedule.  JX 181 at Ex. A.*

**RESPONSE:**  CAL's institutional All Cap Growth Clients paid advisory fees pursuant to CAL's Standard Institutional Rate (as that term is defined in the parties' Joint Statement of Stipulated Facts).

81.    *Given the breakpoints in CAL's Standard SMA Schedule, the effective fee rates paid by CAL's 31 Institutional ACG Accounts were a function of their small size.  JX 181 at Ex. A; Behan Decl. at ¶75.  Twenty-seven of CAL's 31 Institutional ACG Accounts had average AUM of less than $25 million (22 had average AUM of less than $5 million), and consequently, under CAL's Standard SMA Schedule, paid effective advisory fee rates of 0.75% – the first*

---

[124] JSSF ¶ 103.

*break-point rate – because they were not large enough to take advantage of the substantially lower rates for progressively higher AUM ranges. JX 181 at Ex. A.*

**RESPONSE:** Denied. CAL's institutional clients during the Relevant Period paid fees according to the Standard Institutional Rate (as defined in the parties' Joint Statement of Stipulated Facts) offered to CAL's All Cap Growth Clients, as disclosed annually in CAL's Form ADV filed with the SEC. The average AUM of and the effective fee rates paid by the institutional accounts invested in CAL's All Cap Growth Strategy is listed in Exhibit 1 to the Statement of Stipulated Facts.[125] Moreover, Plaintiffs' assertion in Paragraph 81 acknowledges that 27 of CAL's All Cap Growth Clients paid a fee of 75 basis points—a fee that Plaintiffs' expert concedes is not materially different from the Fund's management fee during any of the years in the Relevant Period.[126]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

82.      *The remaining four CAL Institutional ACG Accounts had AUM between $25 million and $50 million (Full House Ventures, LTD; Insurance Company of British Columbia; Iolani School; and Teamsters Pension Trust Fund of Philadelphia), and consequently, under CAL's Standard SMA Schedule, paid effective advisory fee rates between 0.75% (the rate that applied to the first $25 million of AUM) and 0.70% (the rate applicable to AUM between $25 million and $50 million). JX 181 at Ex. A.*

**RESPONSE:** Denied. The average AUM of and the effective fee rates paid by the institutional accounts invested in CAL's All Cap Growth Strategy is listed in Exhibit 1 to the Statement of Stipulated Facts.[127] The Insurance Company of British Columbia, the Iolani

---

[125] JSSF ¶¶ 98-99 & Ex. 1.

[126] DFFCL ¶ 236.

[127] JSSF ¶¶ 98-99 & Ex. 1.

School, and Teamsters Pension Trust Fund of Philadelphia paid effective advisory fees rates

between 0.70% and 0.75%. CAL denies that Full House Ventures paid effectives advisory fees

rate between 0.70% and 0.75%; to the contrary, and as the parties stipulated, Full House

Ventures, LTD paid an effective advisory fee rate of 0.78%.[128]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients

set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in

CAL's Response to Paragraph 71, *supra*.

> 83. *If any of the Institutional ACG Accounts had an average AUM equal to the Growth Fund, that client would have paid an effective advisory fee rate of approximately 51 bps under the Standard SMA Schedule – substantially lower than the approximately 85 bps the Growth Fund paid under the IMA. See Section III.B.1, infra; Pomerantz Report at ¶¶169-70.*

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 83 are not supported by any

admissible or credible evidence or by the evidence cited.  Among other things, the evidence cited

does not specify (1) the time period for which average AUM is to be calculated and considered,

or (2) how an effective advisory fee rate of approximately 51 bps was calculated under the

standard fee schedule offered to CAL's All Cap Growth Clients.  Plaintiffs did not come forth

with evidence at trial that the range of fees that could have been produced by an arm's-length

bargain would result in a fee derived under the standard fee schedule for these different products,

or that it would be capped at 51 basis points.[129]  Such a comparison is also economically flawed

because it ignores that institutional accounts and mutual funds are different products offered in

different markets to different clients, and the many different services and risks that are unique to

mutual funds.[130]  In addition, the testimony and opinions of Dr. Pomerantz, who advances this

---

[128] *Id.*

[129] DFFCL ¶ 374.

[130] DFFCL ¶¶ 174-203.

comparison, is entitled to no weight because he does not have the requisite experience in the mutual fund industry to assess the differences in advising a mutual fund as compared with an institutional account or attest to the aptness of subjecting a mutual fund to a standard fee schedule for institutional accounts.[131]  The comparison set forth in Paragraph 83 also is illogical and untenable because if the Fund's fee were set at 51 basis points, it would be lower than the fees paid by 75% of the Fund's peer mutual funds and would result in CAL advising the Fund for virtually zero profit or at a loss.[132]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

*84.     CAL's largest Subadvisory ACG Accounts – namely, Nomura and the two MD Accounts – negotiated advisory fee rates substantially lower than CAL's Standard SMA Schedule.  JX 181 at Ex. A; Pomerantz Report at ¶¶169-70; Tr. at 555:1–556:20; 575:19– 576:17.*

**RESPONSE:**  Denied as stated.  The effective advisory fees of the institutional and sub-advisory accounts invested in CAL's All Cap Growth Strategy are listed in Exhibit 1 to the Statement of Stipulated Facts.[133]  CAL denies Plaintiffs' assertions regarding the "negotiation" or relative size of those fees, and Plaintiffs did not offer any evidence to support their assertions.

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

---

[131] DFFCL ¶¶ 377, 411-14, 430-32.

[132] DFFCL ¶¶ 378, 380.

[133] JSSF ¶¶ 98-99 & Ex. 1.

85.     Nomura paid advisory fees to CAL at a flat rate of 0.45% on all AUM (the
"Nomura Rate").  JX 181 at Ex. A; JX 59; Pomerantz Report at ¶¶169-70.  Nomura's effective
advisory fee rate was thus 0.45%.  Id.

**RESPONSE:**  Nomura previously paid fees under a schedule providing for breakpoints

reducing the advisory fee to 0.40% at $750 million and 0.35% at $1.5 billion.[134]  At Nomura's

request, CAL and Nomura amended the fee schedule to remove those breakpoints such that

Nomura would pay a flat rate of 0.45%.[135]

In any event, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth

Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set

forth in CAL's Response to Paragraph 71, supra.

86.     The two MD Accounts paid advisory fees to CAL under the rate schedule set forth
below (the "MD Rate"), with assets in both of the MD Accounts aggregated for purposes of
calculating investment advisory fees paid by each:

| Rate | AUM Range |
| --- | --- |
| 0.55% | First $100 million |
| 0.45% | Next $100 million |
| 0.325% | All assets > $200 million |

JX 181 at Ex. A; Pomerantz Report at ¶¶169-70; JX 18 at 638106.

**RESPONSE:**  The fee rates are accurately quoted in Paragraph 86.  However, Plaintiffs

failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length

bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to

Paragraph 71, supra.

87.     Under the MD Rate, the MD Accounts, at their average combined AUM of $471.1
million, paid an average effective fee rate of 0.40%.  JX 181 at Ex. A.

---

[134] JX 15 at CALAMOS_00622204.

[135] JX 59 at CALAMOS_00296130.

**RESPONSE:**  Denied.  The effective advisory fees of the institutional and sub-advisory accounts invested in CAL's All Cap Growth Strategy are listed in Exhibit 1 to the Statement of Stipulated Facts.[136]  As the parties stipulated, MD American Growth Fund paid an effective advisory fee rate of 0.43% and MDPIM Equity Pool paid an effective advisory fee rate of 0.39%.[137]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

### 3.      CAL Provided the Growth Fund and the Other ACG Accounts with Substantially Identical Portfolio Management Services

*88.      The Growth Fund and the Other ACG Accounts each followed the All Cap Growth investment strategy, subject to applicable investment guidelines.  JSSF at ¶100.*

**RESPONSE:**  Admitted.  However, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

*89.      CAL provided the Growth Fund and its Other ACG Accounts the same kinds of Portfolio Management Services under their IMAs.  In particular, CAL was required to:  (i) buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities select; (ii) establish and deal through accounts with one or more securities broker-dealers or banks as CAL may select; and (iii) use its best judgment to select broker-dealers to obtain the best price and most favorable execution.  Compare JX 5 at 146341-3 with e.g. JX 8 at 638082-84, JX 15 at 1-3; JX 18 at 1-3; JX 13 at 1-2; JX 14 at 1-2; JX 7 at 1-2; JX 9 at 2-3.*

**RESPONSE:**  Denied.  Although there are certain overlapping portfolio management services that CAL provides to the Fund and to All Cap Growth Clients, the portfolio management services that CAL provides to the Fund are different and greater in scope than those

---

[136] JSSF ¶¶ 98-99 & Ex. 1.

[137] JSSF ¶¶ 98-99 & Ex. 1.

that CAL provides to any of its All Cap Growth Clients.[138]  As Mr. Jackson testified, "when it comes to portfolio management -- right -- of a registered investment company, portfolio managers and the investment adviser need to be very cognizant of the myriad of rules in the '40 Act that have imposed restrictions on your ability to invest in certain types of securities."[139] These differences include, but are not limited to, CAL's obligations as adviser that arise from the numerous rules and regulations governing the manner in which investments may be made and which securities may be selected for investment by the Fund—rules and regulations that do not apply to CAL's All Cap Growth Clients—as well as procedures that CAL must put into place due to the Fund's daily liquidity requirements.[140]  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is inconsistent with the trial record and industry practice.[141]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

90.     *The Growth Fund and the Other ACG Accounts shared the same investment objective:  long-term capital growth. Compare JX 168, at 3 (Fund principal investment objective) with JX 8 at 638090, JX 18 at 638102; see also Kalis Dep.  82:16–83:2.*

**RESPONSE:**  Admitted.  However, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

---

[138] DFFCL ¶ 189.

[139] Tr. 333:9-14 (Jackson).

[140] *Id*. ¶¶ 191-92.

[141] DFFCL ¶¶ 169-223.

91.     *The Growth Fund and the Other ACG Accounts shared the same principal investment strategies.  Compare JX 168, at 4 (Growth Fund principal investment strategies) with JX 7 at 100469 (Iolani guidelines), JX 8 at 638091-92 (MD American Growth Fund guidelines); JX 13 at 638180 and 638185 (Teamsters guidelines), JX 18 at 638102-03 (MDPIM guidelines); Kalis Dep. at 24:13-25, 82:16 – 83:2.*

**RESPONSE:**  Denied.  The Fund and CAL's All Cap Growth Clients shared certain investment strategies.  However, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

92.     *The Growth Fund and the Other ACG Accounts were provided with Portfolio Management Services by the same CAL investment management personnel, including portfolio managers, research analysts, risk managers, and the same trading personnel, who utilized the same methods, research, infrastructure, systems and facilities.  Tr. 80:17-21; Kalis Dep. at 8:16–15:17, 19:19–26:5, 44:21–47:1; Becker Decl. ¶¶16, 40-51; JX 139 at CA-IT 00000071 at 11-18.*

**RESPONSE:**  Denied.  The same investment management personnel provided services to the Fund and to CAL's All Cap Growth Clients.  CAL denies that any similarities in the investment management personnel render any All Cap Growth Client an apt comparator to the Fund.  The trial evidence demonstrating that the portfolio management services that CAL provides to the Fund are different and greater in scope than those that CAL provides to any of its All Cap Growth Clients is summarized in CAL's Response to Paragraph 89, *supra*, which is incorporated as if fully set forth herein.  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is inconsistent with the trial record and industry practice.[142]

---

[142] DFFCL ¶¶ 169-223.

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

93.     *The Growth Fund and the Other ACG Accounts were provided with substantially identical investment portfolios, consisting of substantially the same securities in substantially the same relative proportions.  Kalis Dep. at 25:1–26:5, 28:16–29:13, 80:10–83:2; PX 331; PX 332; PX 334; PX 336; PX 337; Pomerantz Report at ¶¶115-16, 118-19.*

**RESPONSE:**  Denied.  The Fund and CAL's All Cap Growth Clients had similar investment portfolios, subject to individual client restrictions or mutual fund regulatory restrictions, such as daily liquidity requirements for mutual funds that are customarily not present for institutional accounts and other types of clients.  CAL denies that any similarities in investment portfolio renders any All Cap Growth Client an apt comparator to the Fund.  The trial evidence demonstrating that the portfolio management services that CAL provides to the Fund are different and greater in scope than those that CAL provides to any of its All Cap Growth Clients is summarized in CAL's Response to Paragraph 89, *supra*, which is incorporated as if fully set forth herein.  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is entirely inconsistent with the trial record.[143]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

94.     *The portfolio manager for the Growth Fund and the Other ACG Accounts generally bought or sold the same securities in the same relative amounts at the same times for*

---

[143] DFFCL ¶¶ 169-223.

*the Growth Fund and the Other ACG Accounts.  Kalis Dep. at 25:8–26:5, 28:16–29:13; 90:23–92:10; 93:11-18; PX 330; PX 333; PX 335; Pomerantz Report at ¶¶115-16, 120.*

**RESPONSE:**  Denied.  The portfolio management team principally responsible for the All Cap Growth strategy would generally purchase or sell the same securities in approximately the same relative portion of the overall portfolio holdings as the Fund would purchase or sell, subject to individual client restrictions or mutual fund regulatory restrictions, such as daily liquidity requirements for mutual funds that customarily are not present for institutional accounts or other types of clients.  CAL denies that any similarities in the manner in which securities are bought or sold for various clients renders any All Cap Growth Client an apt comparator to the Fund.  The trial evidence demonstrating that the portfolio management services that CAL provides to the Fund are different and greater in scope than those that CAL provides to any of its All Cap Growth Clients is summarized in CAL's Response to Paragraph 89, *supra*, which is incorporated as if fully set forth herein.  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is entirely inconsistent with the trial record.[144]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

95.	*To the extent that there were minor differences in the Growth Fund's and the Other ACG Accounts' portfolios, such differences resulted from variations in investment guidelines particular to certain accounts and/or variations in the timing and amounts of cash flows into or out of the accounts.  Kalis Dep. at 25:1–26:13, 28:16–29:13, 47:25–49:9; PX 334; PX 337; Pomerantz Report at ¶¶121-24.*

---

[144] DFFCL ¶¶ 169-223.

**RESPONSE:**  Denied.  Variations in investment guidelines particular to certain accounts (including regulatory restrictions particular to mutual funds) and/or variations in the timing and amounts of cash flows into and out of accounts could account for differences in the portfolios of the Fund and CAL's All Cap Growth Clients.  CAL denies that any similarities in portfolio holdings renders any All Cap Growth Client an apt comparator to the Fund.  The trial evidence demonstrating that the portfolio management services that CAL provides to the Fund are different and greater in scope than those that CAL provides to any of its All Cap Growth Clients is summarized in CAL's Response to Paragraph 89, *supra*, which is incorporated as if fully set forth herein.  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is entirely inconsistent with the trial record.[145]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

96.     *The Growth Fund's investment performance was substantially similar to the Other ACG Accounts' investment performance. JSSF at ¶101; Pomerantz Report at ¶¶127-36; Kalis Dep. at 25:1-20, 28:3–29:13.  As CAL informed the Board, this was generally true across all of CAL's Funds and the other accounts for whom CAL provided the same investment strategies:*

> *Mr. Bhatt then addressed the hand-out charts comparing the gross performance of the Funds to the gross performance of accounts of other Adviser clients that are managed in a manner similar to the Funds.  Mr. Bhatt explained that the charts reflect that the Funds' performance is virtually the same as that of the Adviser's similar mandates managed for others.  Mr. Calamos noted that, to the extent there are some performance differences, they result from the*

---

[145] DFFCL ¶¶ 169-223.

> *fact that other clients might have slightly different mandates or*
> *investment restrictions.*

*PX 436 at 533440; see also PX 145-A at 634812-29 (comparing performance of certain Funds to "institutional composites" of accounts in the same strategy); PX 61-A at 519556-66 (same).*

**RESPONSE:**  Denied.  Paragraph 96 accurately quotes from the June 2011 Board meeting minutes, and the Fund's investment performance was substantially similar to the investment performance of CAL's other All Cap Growth Clients.  However, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is entirely inconsistent with the trial record, which demonstrates that mutual funds and non-fund accounts are substantially different products and therefore are not apt comparators.[146]

In addition, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the fundamental reasons set forth in CAL's Response to Paragraph 71, *supra*.

## II.  QUALITY OF SERVICES

*97.    As discussed below, by every metric, and by CAL's own admission, CAL's investment performance during the Relevant Period was exceedingly poor.*

**RESPONSE:**  Denied.  As of each annual meeting when the Independent Trustees voted to approve the IMA, the Fund's since-inception annualized return was at least 12.74%, which both ranked between the 2nd and 4th percentiles of its Morningstar category and exceeds the annual returns of all of the Fund's benchmark indices during the same period.[147]  The Fund also has earned positive absolute returns in twelve of the fifteen years leading up through the end of

---

[146] DFFCL ¶¶ 169-223.

[147] DFFCL ¶¶ 96-98; Becker Decl. ¶ 73.

2017.[148]  Moreover, the Fund's since-inception ranking compared to peer mutual funds actually understates the Fund's relative performance because the peer group only includes mutual funds that survived for the entire time period; in particular, Dean Hubbard's analysis shows that only nine of approximately 60 original peer mutual funds at the time of its inception have survived to the present date, and that the Fund has also experienced substantial periods of out-performance even as compared to these nine surviving funds.[149]  While on an absolute basis, the Fund has made money for its shareholders in every year but one during the Relevant Period, the Fund has experienced periods of both strong and poor relative performance, including top-quartile performance during the first two years of the Relevant Period.[150]  However, as Dr. Pomerantz admitted in response to questioning from the Court, the Fund's performance has improved over the last three years.[151]

The Independent Trustees were fully aware of all of the pertinent facts relating to the Fund's performance.  Among other things, the Independent Trustees received performance reports on a monthly basis, as well as Chief Investment Officer Updates ("CIO Updates") and Focus Fund Reports at quarterly Board meetings and an in-depth performance report as part of the yearly 15(c) Process.[152]  Having received such information, the Independent Trustees annually reached a decision on the appropriate course of action to address such performance, including the imposition of a fee waiver from 2013-2014 and insistence on significant

---

[148] DFFCL ¶ 96.

[149] DFFCL ¶ 97.

[150] DFFCL ¶ 98.

[151] DFFCL ¶ 101.

[152] DFFCL ¶¶ 27, 77, 96, 98-99.

investments by CAL in the portfolio management team and investment process in order to improve performance.[153]

### A.   The Fund's Comparative Investment Performance under Standard 1-, 3-, 5- and 10-Year Time Frames Was Abysmal

*98.    The three Independent Data Providers (Lipper, Morningstar, and Strategic Insight), and Plaintiffs' expert Dr. Pomerantz, considered substantially similar and/or identical comparative performance data, applied similar methods, and reached similar conclusions – namely, that the Growth Fund performed worse, at nearly all times and for nearly all time periods considered, than nearly all similar mutual funds.  Pomerantz Report at ¶¶328-39; Tr. at 544:14–547:15, 547:16-552:23; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.*

**RESPONSE:**  Denied as stated.  Dr. Pomerantz and Lipper, Morningstar, and Strategic Insight drew from similar sets of data regarding the universe of potentially relevant mutual funds for the time periods that each of them reviewed.  However, Plaintiffs did not provide any evidence proving that each of the third parties that provided performance comparisons constructed their smaller groups of peer mutual funds in the same way.  Finally, Dr. Pomerantz did not create any performance peer group at all, but instead simply compared the Fund's performance to all mutual funds in the Fund's broader Morningstar Category for which data was available.[154]

CAL denies Plaintiffs' remaining assertions in Paragraph 98 regarding the Fund's allegedly poor performance as not supported by admissible or credible evidence and/or by the evidence cited.  For example, the most recent Fund performance report provided by Strategic Insight to the Board in connection with the June 2018 Board meeting (on the same page cited by Plaintiffs) shows that the Fund performed at the 39th percentile of the 516 other mutual funds in

---

[153] DFFCL ¶¶ 126-142, 143-147.

[154] Pomerantz Rpt. ¶ 331.

Strategic Insight's Custom Performance Universe during the five-year period between March 31, 2013 and March 31, 2018.[155]  This five-year time period is almost identical to the time period that the Court has labeled as "relevant" to this case, "the June 2013 Board meeting through the present."[156]  Accordingly, the most recent performance information for the Fund, as provided to the Independent Trustees by a reputable, third party source, indicates that effectively for the length of the Relevant Period, the Fund outperformed the overwhelming majority of peer mutual funds.  Additionally, the remaining reports by Lipper, Morningstar, and Strategic Insight demonstrate that the Fund experienced periods of overperformance and underperformance, but do not support the assertion that the Fund's performance was not "worse . . . than nearly all similar mutual funds."[157]

99.   *In evaluating the Growth Fund's comparative investment performance, Lipper, Morningstar and Strategic Insight each:*

    a.   *evaluated the Growth Fund's performance over 1-, 3-, 5- and 10-year periods (and did not evaluate "since-inception" performance);*

    b.   *evaluated the Growth Fund's performance using a single "return date" of March 31 (i.e., over 1-, 3-, 5- and 10-year periods ending March 31 of the current year – the most recently-completed fiscal quarter prior to the reports' due date each year for the 15(c) Board Meeting); and*

    c.   *compared and ranked the Growth Fund's performance against both:  (1) the entire "universe" of all similarly-classified mutual funds (Lipper used Lipper classification categories; Morningstar and Strategic Insight both used Morningstar classification categories); and (2) a smaller subset of such similarly-classified funds (the Peer Comparison). [158]*

---

[155] JX 186 at CALAMOS_00653886.

[156] *Chill v. Calamos Advisors LLC*, 2018 WL 4778912, at *3 n.3 (S.D.N.Y. Oct. 3, 2018).

[157] DFFCL ¶ 98.

[158] *JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.*

**RESPONSE:**  Lipper, Morningstar, and Strategic Insight each evaluated the Fund's performance over the periods set forth in Paragraphs 99(a) and 99(b) and compared the Fund's performance against the metrics identified in Paragraph 99(c).  In addition, Lipper evaluated performance over additional two- and four-year periods, in addition to the time periods mentioned immediately above.[159]  Moreover, CAL provided the Independent Trustees with quarterly and monthly performance reports, based on Morningstar data, that evaluated the Fund's performance over a number of time metrics on an absolute basis and relative to the Fund's peers.[160]

100.    The Category Comparison data provided to the Board during the Relevant Period for the Growth Fund showed the following performance, which has been color-coded by quartile, such that red represents the 4th quartile (the worst), orange the 3rd quartile, green the 2nd quartile, and blue the 1st quartile (the best):[161]

## *Category Comparisons*

| *Provider* | *Return Date* | *Ranking* | *1 Year* | *3 Year* | *5 Year* | *10 Year* |
|---|---|---|---|---|---|---|
| *Lipper* | *3/31/2013* | *%* | *[96]* | *[95]* | *[88]* | *[71]* |
| | | *Ordinal* | *504 of 525* | *428 of 450* | *336 of 381* | *179 of 252* |
| *Morningstar* | *3/31/2014* | *%* | *32* | *98* | *63* | *84* |
| | | *Ordinal* | *50 of 157* | *147 of 150* | *89 of 141* | *99 of 118* |
| *Morningstar* | *3/31/2015* | *%* | *60* | *87* | *89* | *91* |

---

[159] JX 19 at CALAMOS_00513361.

[160] DFFCL ¶¶ 80, 96.

[161] *JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.  Lipper provided only ordinal rankings:  the percentile rankings shown were calculated on the basis of Lipper's ordinal rankings.*

| | | | | | | |
|---|---|---|---|---|---|---|
| | | *Ordinal* | *90 of 150* | *126 of 147* | *121 of 137* | *105 of 116* |
| *Morningstar* | *3/31/2016* | *%* | ***87*** | ***67*** | ***97*** | ***100*** |
| | | *Ordinal* | *126 of 146* | *96 of 144* | *135 of 139* | *120 of 121* |
| *Strategic Insight* | *3/31/2017* | *%* | ***89*** | ***88*** | ***96*** | ***91*** |
| | | *Ordinal* | *1294 of 1454* | *1147 of 1306* | *1109 of 1054* | *730 of 800* |
| *Strategic Insight* | *3/31/2018* | *%* | ***69*** | ***91*** | ***80*** | ***96*** |
| | | *Ordinal* | *964 of 1376* | *1101 of 1213* | *874 of 1099* | *745 of 779* |
| *Average* | | *%* | ***72*** | ***88*** | ***86*** | ***89*** |

**RESPONSE:**  Denied as stated.  Plaintiffs have misstated or mischaracterized the referenced documents in several respects, including (but not limited to) that (a) in Strategic Insight's performance analysis as of March 31, 2018, the Fund's one-year performance ranked 946th out of 1,376 mutual funds in the Fund's Morningstar category, not 964th as asserted by Plaintiffs (JX 186 at CALAMOS_00653886), (b) the Lipper Report did not contain the percentile ranking set forth in Paragraph 100, and (c) the cited documents do not contain the "Average" computation that Plaintiffs have added to their chart.  Apart from Plaintiffs' errors in attempting to reproduce the Fund's performance data and their creation of an arbitrary and irrelevant "average" that is not supported by an evidence or testimony, the performance data provided by Lipper, Morningstar, and/or Strategic Insight is accurate, but CAL denies that this data in any

way establishes that the Fund's performance was poor or "worse . . . than nearly all similar

mutual funds."[162]

101.    The Peer Comparison results provided to the Board during the Relevant Period
for the Growth Fund showed the following performance, which has been color-coded by
quartile, such that red represents the 4th quartile (the worst), orange the 3rd quartile, green the
2nd quartile, and blue the 1st quartile (the best):[163]

## Peer Comparisons

| Provider | Return Date | Ranking | 1 Year | 3 Year | 5 Year | 10 Year |
|----------|-------------|---------|--------|--------|--------|---------|
| Lipper | 3/31/2013 | % | [100] | [100] | [100] | [100] |
| | | Ordinal | 9 of 9 | 9 of 9 | 8 of 8 | 8 of 8 |
| Morningstar | 3/31/2014 | % | 10 | 100 | 43 | 65 |
| | | Ordinal | 3 of 23 | 22 of 22 | 9 of 20 | 12 of 18 |
| Morningstar | 3/31/2015 | % | 69 | 91 | 96 | 85 |
| | | Ordinal | 16 of 23 | 21 of 23 | 22 of 23 | 18 of 21 |
| Morningstar | 3/31/2016 | % | 79 | 79 | 100 | 100 |
| | | Ordinal | 12 of 15 | 12 of 15 | 15 of 15 | 15 of 15 |
| Strategic Insight | 3/31/2017 | % | 89 | 85 | 91 | 94 |
| | | Ordinal | 134 of 151 | 116 of 136 | 111 of 122 | 65 of 77 |
| Strategic Insight | 3/31/2018 | % | 24 | 62 | 39 | 78 |
| | | Ordinal | 153 of 622 | 364 of 588 | 204 of 516 | 273 of 348 |
| Average | | % | 62 | 86 | 78 | 87 |

---

[162] DFFCL ¶ 98.

[163] JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and
524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886
and 653891.  Lipper provided only ordinal rankings:  the percentile rankings shown were
calculated on the basis of Lipper's ordinal rankings.

**RESPONSE:** Denied as stated.  Plaintiffs have misstated or mischaracterized the referenced documents in several respects, including (but not limited to) that (a) the Lipper Report did not contain the percentile ranking set forth in Paragraph 101, and (b) the cited documents do not contain the "Average" computation that Plaintiffs have added to their chart.  Apart from Plaintiffs' creation of an arbitrary and irrelevant "average" that is not supported by an evidence or testimony, the performance data provided by Lipper, Morningstar, and/or Strategic Insight is accurate, but CAL denies that this data in any way establishes that the Fund's performance was poor or "worse . . . than nearly all similar mutual funds."[164]  In particular, as explained in CAL's Response to Paragraph 98, the most recent report from Strategic Insight in 2018 shows that the Fund performed at the 39th percentile of the 516 other mutual funds in its peer group throughout the majority of the five-year Relevant Period.[165]

102.   *In evaluating the Growth Fund's comparative investment performance, Dr. Pomerantz: (a) evaluated the Growth Fund's performance over 1-, 3-, 5- and 10-year periods (as did Lipper, Morningstar and Strategic Insight); (b) compared and ranked the Growth Fund's performance against the entire "universe" of funds similarly-classified by Morningstar (as did Morningstar and Strategic Insight); and (c) instead of using a single return date each year (as did Lipper, Morningstar and Strategic Insight), conducted a more comprehensive "rolling" analysis of comparative Growth Fund returns and rankings as of each month end (i.e., 12 return dates each year).  Pomerantz Report at ¶¶330-39; Tr. at 545:5–547:5.*

**RESPONSE:**  Denied.  CAL denies that Dr. Pomerantz conducted a comparative analysis of the Fund's rolling returns "as of each month end."  Dr. Pomerantz did not conduct a comparative analysis of the Fund's rolling returns for each month during the Relevant Period.[166]  Instead, as demonstrated by the cited portions of Dr. Pomerantz's report and the summary graphs

---

[164] DFFCL ¶ 98.

[165] JX 186 at CALAMOS_00653886.

[166] Pomerantz Rpt. ¶¶ 330-348; Tr. 544:14-547:8 (Pomerantz) (discussing PX 623).

provided in Paragraph 103 below, Dr. Pomerantz did not provide any such performance analysis for the months between June 2013 and February 2014 or the months between April 2017 and trial (October 2018).  The months omitted from Dr. Pomerantz's analysis collectively amount to 43% of the Relevant Period.  Moreover, Dr. Pomerantz's testimony and opinions should be entitled to no weight for the reasons identified in DFFCL ¶¶ 401-444.

*103.    The results of Dr. Pomerantz's rolling analysis of comparative investment performance are illustrated in the charts below (one showing the Growth Fund's rolling 1- and 3-year performance rankings, the other showing the Growth Fund's rolling 5- and 10-year performance rankings):*





*Pomerantz Report at ¶335; Tr. at 545:5–547:5.*

**RESPONSE:**  Paragraph 103 accurately reproduces the chart found in Dr. Pomerantz's

Report.  CAL denies that these charts in any way establish that the Fund's performance was poor

or "worse . . . than nearly all similar mutual funds."[167]  Moreover, Dr. Pomerantz's testimony and

opinions should be entitled to no weight for the reasons identified in DFFCL ¶¶ 401-444.

104.    *Dr. Pomerantz's analysis of the Growth Fund's comparative investment*
*performance yields the following average rankings for 1-, 3-, 5- and 10-year returns:*

| Rolling Return Period | *1 Year* | *3 Year* | *5 Year* | *10 Year* |
|---|---|---|---|---|
| *Average Fund Percentile Rank* | *64* | *80* | *91* | *89* |

*Pomerantz Report at ¶335; Tr. at 545:5–547:5.*

---

[167] DFFCL ¶ 98.

**RESPONSE:**  Paragraph 104 accurately reproduces the figures in one of the charts found in Paragraph 335 of Dr. Pomerantz's Report.  CAL denies that these charts set forth any relevant measure of performance, or that they in any way establish that the Fund's performance was poor or "worse . . . than nearly all similar mutual funds."[168]  Moreover, Dr. Pomerantz's testimony and opinions should be entitled to no weight for the reasons identified in DFFCL ¶¶ 401-444.

105.    *The Category Comparison analyses performed by Lipper, Morningstar and Strategic Insight for the Board, and by Dr. Pomerantz for Plaintiffs, all indicate that the Growth Fund's 3-, 5- and 10-year returns, as measured during the Relevant Period, have placed the Growth Fund, on average, in the bottom quartile of its category, often in bottom 10% of such funds, and never in the top half of such funds.[169]*

**RESPONSE:**  Denied as stated.  The Fund's 3-year, 5-year, and 10-year returns, as measured by the Lipper, Morningstar, and Strategic Insight Reports, are set forth in those reports. Plaintiffs' assertion is not supported by admissible or the cited evidence in that Dr. Pomerantz did not conduct a performance analysis that encompasses the entire Relevant Period.[170] Moreover, Plaintiffs' assertion about the performance of the Funds is not supported by the trial evidence.

To the contrary, the evidence shows that the Fund has experienced strong absolute performance, and has experienced both short-term relative outperformance and short-term relative underperformance during the Relevant Period.  In addition, the Fund's since-inception record remains exceptional, having outperformed the Russell 3000 Growth Index, the Russell Midcap Growth Index, and the S&P 500 Index during the same time period.[171]  The Independent

---

[168] DFFCL ¶ 98.

[169] *Pomerantz Report at ¶335; Tr. at 545:5 – 547:15; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.*

[170] Pomerantz Rpt. ¶¶ 330-348; Tr. 544:14-547:8 (Pomerantz) (discussing PX 623).

[171] DFFCL ¶¶ 96-98; Becker Decl. ¶ 73.

Trustees were fully aware of all of the pertinent facts relating to the Fund's performance. Among other things, the Independent Trustees received performance reports on a monthly basis, as well as CIO Updates and Focus Fund Reports at quarterly Board meetings and an in-depth performance report as part of the yearly 15(c) Process.[172]  Having received such information, the Independent Trustees annually reached a decision on the appropriate course of action to address such performance, including the imposition of a fee waiver from 2013-2014 and insistence on significant investments by CAL in the portfolio management team and investment process in order to improve performance.[173]  In fact, Dr. Pomerantz admitted, in response to questioning from the Court, that the Fund's performance has improved over the last three years.[174]

106.    Moreover, as Mr. Neal testified, CAL's Morningstar and Strategic Insight 1-year category rankings (as of March 31st) were progressively worse each year from 2014 through 2017.  Tr. at 161:20-168:11.

**RESPONSE:**  Denied.  Mr. Neal was examined on the Morningstar and Strategic Insight Reports, which as Mr. Neal testified "speak for themselves."[175]  In fact, Dr. Pomerantz admitted, in response to questioning from the Court, that the Fund's performance has improved over the last three years.[176]

In addition, the trial evidence demonstrates that for each year in the Relevant Period, the Independent Trustees applied their business judgment in view of their industry experience, their institutional knowledge of CAL and the current facts (in particular, the Fund's performance in the prior year), to determine that approving the IMA—subject either to a fee waiver and/or to

---

[172] DFFCL ¶¶ 27, 77, 96, 98-99.

[173] DFFCL ¶¶ 126-142, 143-147.

[174] DFFCL ¶ 101.

[175] Tr. 162:24 (Neal).

[176] DFFCL ¶ 101.

CAL's commitment to continue to invest its resources in an effort to improve the Fund's

performance—was in the best interests of Fund shareholders.[177]

107.    *In February 2017, CAL terminated the Growth Fund's then-lead portfolio manager, David Kalis, admittedly because of the Growth Fund's continued "underperform[ance]."  Becker Decl. at ¶¶57, 70, 115; Tr. 168:12-23, 181:3-10, 713:7-22.*

**RESPONSE:**  In February 2017, CAL terminated Mr. Kalis and replaced him with

Mr. Grant, which Mr. Neal testified was, in the opinion of the Independent Trustees, "a

substantial improvement."[178]

### B.    CAL Has Repeatedly Admitted that Performance Was Very Poor

108.    *In their testimony at trial, the Growth Fund's Independent Trustees, and CAL's executives and experts, repeatedly admitted that the Growth Fund's performance during the Relevant Period was poor.  See e.g. Becker Decl. at ¶¶52, 65, 68-70, 107-20 (describing poor performance and efforts made to improve it); Behan Decl. at ¶¶23 ("recent years" included "some stretches of time with quite significant underperformance"), 25, 54-57 (describing actions CAL undertook to improve the Growth Fund's performance, including firing its lead portfolio manager Mr. Kalis), 75; Neal Decl. at ¶71 ("over the last five years, [] the Fund's performance has lagged—and in some instances has significantly lagged—its peer funds and its benchmarks.") and see also id. at ¶¶39, 46, 65, 72, 75 (discussing CAL's efforts to improve the Growth Fund's performance)' Jackson Decl. at ¶¶64 ("[t]hroughout the time period relevant to this this case [], the Independent Trustees requested information and engaged repeatedly in discussions with CAL's management concerning the reasons for the Fund's underperformance and CAL's efforts to improve performance."), 71-72; Tr. at 54:18–58:8, 74:18-21 (Mr. Becker - Growth Fund's performance "had struggled"); 101:9-14 (Mr. Behan – Growth Fund's performance had "struggled"); 149:5–152:10, 157:19-23; 161:20–163:25, 167:3–168:24, 179:14–181:17 (Mr. Neal – during "the last seven or eight years, they've had challenges with their performance."), 195:1-9, 197:21–199:6, 719:12-18 (Dean Hubbard – "You had challenges in performance [] and you had investors leaving."), 728:2-18, 741:14–742:4 (about 10% of mutual funds were, like the Growth Fund, in the bottom quartile with respect to performance but the top quartile with respect to fees), 984:19–987:10 (Professor Laby – Growth Fund was "challenged in some cases in terms of performance"; discussing steps taken in response to challenged performance).*

**RESPONSE:**  Plaintiffs have accurately quoted the selected testimonial excepts set forth

in Paragraph 108, but CAL denies that they "repeatedly admitted that the Growth Fund's

---

[177] DFFCL ¶¶ 90-95, 121-142.

[178] Tr. 168:11-17 (Neal).

performance during the Relevant Period was poor."  To the contrary, the trial evidence

demonstrates that as of each annual meeting when the Independent Trustees voted to approve the

IMA, the Fund's since-inception annualized return was at least 12.74%, which both ranked

between the 2nd and 4th percentiles of its Morningstar category and exceeds the annual returns

of all of the Fund's benchmark indices during the same period.[179]  The Fund also has earned

positive absolute returns in twelve of the fifteen years leading up through the end of 2017.[180]

Moreover, the Fund's since-inception ranking compared to peer mutual funds actually

understates the Fund's relative performance because the peer group only includes mutual funds

that survived for the entire time period; in particular, Dean Hubbard's analysis shows that only

nine of approximately 60 original peer mutual funds at the time of its inception have survived to

the present date, and that the Fund has also experienced substantial periods of out-performance

even as compared to these nine surviving funds.[181]  While on an absolute basis, the Fund has

made money for its shareholders in every year but one during the Relevant Period, the Fund has

experienced periods of both strong and poor relative performance, including top-quartile

performance during the first two years of the Relevant Period.[182]  However, as Dr. Pomerantz

admitted in response to questioning from the Court, the Fund's performance has improved over

the last three years.[183]

 The trial evidence also demonstrates that the Independent Trustees were fully aware of all

of the pertinent facts relating to the Fund's performance.  Among other things, the Independent

---

[179] DFFCL ¶¶ 96-98; Becker Decl. ¶ 73.

[180] DFFCL ¶ 96.

[181] DFFCL ¶ 97.

[182] DFFCL ¶ 98.

[183] DFFCL ¶ 101.

Trustees received performance reports on a monthly basis, as well as CIO Updates and Focus Fund Reports at quarterly Board meetings and an in-depth performance report as part of the yearly 15(c) Process.[184]

The trial evidence further demonstrates that for each year in the Relevant Period, the Independent Trustees applied their business judgment in view of their industry experience, their institutional knowledge of CAL and the current facts (in particular, the Fund's performance in the prior year), to determine that approving the IMA—subject either to a fee waiver and/or to CAL's commitment to continue to invest its resources in an effort to improve the Fund's performance—was in the best interests of Fund shareholders.[185]

### C.   The Growth Fund's Since-Inception Performance, and its Irrelevance

*109.   Defendant presented evidence at trial regarding the Growth Fund's supposedly superior investment returns since its inception in 1990.  Becker Decl. at ¶72.  As Plaintiffs' expert Dr. Pomerantz demonstrated, however, the Growth Fund's since-inception performance is simply the ever-shrinking residue of its above-average performance prior to 2007 – many years before the Relevant Period here.  Pomerantz Rebuttal Report at ¶¶24, 388-98; Tr. at 550:2-551:8.*

**RESPONSE:**  Denied.  As Dr. Pomerantz's analysis, testimony, and demonstratives show, the Fund continued to experience periods of strong relative performance during time periods after 2007, which contributed to the Fund's strong since-inception performance with respect to similar mutual funds.[186]  CAL denies that since-inception performance is irrelevant. First, the Fund's investment objective is long-term capital growth.  The Fund's long-term performance, therefore, is a particularly useful measure of the Fund's success in achieving its

---

[184] DFFCL ¶¶ 27, 77, 96, 98-99.

[185] DFFCL ¶¶ 90-95, 121-142.

[186] PX 624 (indicating that there were periods after 2007 in which the Fund's relative performance increased).

investment objective.[187]   Second, both investors and the Independent Trustees look to since-

inception performance as a long-term measure of the adviser's management of the Fund.  As

Dean Hubbard explained:

> THE COURT: How useful is what I'll call a since-inception analysis
> as these funds get older and older?
>
> THE WITNESS: I would say it has some utility, your Honor, in
> being able to say, over the longest period of time, how has this
> fund's performance compared to other very successful long-lived
> funds?  Because remember, going forward, you're trying to ask, OK,
> what is the investment ability of this fund in the future?  That long
> period is useful in that respect.[188]

110.    *Furthermore, the Growth Fund's since-inception performance likely did not
benefit any Fund investors other than CAL, as it was enjoyed by a mere $300,000 in Growth
Fund assets that were present at Growth Fund inception, which were provided by CAL itself as
"seed capital."  Pomerantz Rebuttal Report at ¶¶388, 391, 107 n.34; Tr. at 549:6-13.*

**RESPONSE:**  Denied.  CAL denies that whether the Fund's full since-inception

performance was experienced by CAL's seed capital is relevant to the Board when assessing

CAL's overall performance record managing the Fund.  In fact, any shareholder investing shortly

around the inception of the Fund and holding his or her shares for the long term would have

enjoyed the benefit of this performance.  Regardless of whether the Fund's substantial

overperformance since inception inured to the benefit of particular shareholders, as Dean

Hubbard explained, since-inception performance is still a relevant criterion for the Board to

consider when predicting the Fund's future performance.[189]

Moreover, Plaintiffs and other investors who have held the Fund since Plaintiffs

purchased their shares in July 2005 have benefited from the Fund's performance.  Between July

---

[187] Hubbard Rpt. ¶ 113.

[188] Tr. 716:20-717:3 (Hubbard).

[189] Tr. 716:20-717:8 (Hubbard).

2005 and March 31, 2017, a hypothetical investor who purchased $10,000 in Fund shares and reinvested his or her dividends would have seen the value of his or her investment more than double to $20,301.[190]  Furthermore, of the 63 similar mutual funds that Dr. Hubbard determined would have been the Fund's peers in July 2005, 31 of those mutual funds have been liquidated, and the Fund outperformed 20 of them prior to their liquidation.[191]

*111.    Dr. Pomerantz analyzed the Growth Fund's since-inception performance from the perspective of the average Growth Fund shareholder by time-weighting the Growth Fund's returns to incorporate the amount of shareholder money invested and when.  He found that the Growth Fund delivered underperformance to the average shareholder since inception. Pomerantz Rebuttal Report at ¶¶366, 392-95.*

**RESPONSE:**  Denied.  CAL denies that Dr. Pomerantz's "time-weight[ed]" returns for the "average Growth Fund shareholder" is relevant to the Board when assessing CAL's overall performance record managing the Fund.  Regardless of whether the Fund's substantial overperformance since inception inured to the benefit of particular shareholders, as Dean Hubbard explained, since-inception performance is still a relevant criterion for the Board to consider.[192]

Moreover, Plaintiffs and other investors who have held the Fund since Plaintiffs purchased their shares in July 2005 have benefited from the Fund's performance.  Between July 2005 and March 31, 2017, a hypothetical investor who purchased $10,000 in Fund shares and reinvested his or her dividends would have seen the value of his or her investment more than double to $20,301.[193]

---

[190] Hubbard Rpt. ¶ 143.

[191] Hubbard Rpt. ¶ 112, Ex. 13.

[192] Tr. 716:20-717:8 (Hubbard).

[193] Hubbard Rpt. ¶ 143.

112.    Additionally, Dr. Pomerantz opined that, because since inception returns can be distorted by one-off, long-ago events, they are not recognized in the industry as a relevant metric for comparing mutual funds.  Tr. at 547:16-549:5.

**RESPONSE:**  Denied.  Plaintiffs' assertion in Paragraph 112 is not supported either by admissible or credible evidence or by the cited testimony.  In the cited testimony, Dr. Pomerantz opined that since-inception performance is not a factor in Morningstar's star rating system, which he testified is a factor used by industry participants to assess the performance of mutual funds.  However, Dr. Pomerantz did not testify as to whether since-inception returns are "recognized in the industry as a relevant metric" by anyone.  In any event, Dr. Pomerantz's testimony and opinions should be entitled to no weight for the reasons set forth in DFFCL ¶¶ 401-444.

113.    Morningstar, a leading independent third-party provider of mutual fund data and research widely used in the investment industry, only incorporates rolling 1-, 3-, 5-, and 10-year performance periods in its mutual fund "Star Rating" methodology.  Tr. at 547:25-548:21. Morningstar does not consider since-inception performance in its fund ranking methodology.  Id.

**RESPONSE:**  Denied as stated.  Morningstar does not report since-inception performance in its "Star Rating" methodology, but it does provide that information to CAL on a monthly basis.[194]  CAL denies that since-inception performance cannot reasonably be considered by the Independent Trustees in their annual evaluation of the Fund's management fee, particularly where, as here, the Trustees were relying in part on their institutional knowledge of CAL's long-term history of delivering successful performance for the Fund's shareholders in applying their business judgment that approving the IMA—subject either to a fee waiver and/or to CAL's commitment to continue to invest its resources in an effort to improve the Fund's performance—was in the best interests of Fund shareholders.

---

[194] Jackson Decl. ¶ 66; e.g., DX 1032 at CALAMOS_00129912; DX 1091 at CALAMOS_00229622; DX 1324 at CALAMOS_00496502.

### D.    CAL'S Claims Regarding its Purported Efforts to Improve Performance

*114.    In light of the Funds' abysmal performance, CAL represented to the Board that it was taking action to improve its advisory services.  This consisted primarily of its claim that – as part of its transition from a vertical to a horizontal investment approach – it would be spending approximately $3 million per year to hire additional personnel in order to improve its investment management team.  Tr. at 165:25-166:3; JX 29 at 512555; JX 139 at CA-IT 00000071 at 1-6. According to CAL, its decision to add 17 investment professionals "would represent a 33% increase in investment management department personnel" from 2012 levels.  Id.*

**RESPONSE:**  Denied.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence.  To the contrary, as Messrs. Behan, Becker and Cronin all explained, without any evidence from Plaintiffs to the contrary, CAL's primary focus to improve the quality of the work product generated by its investment personnel was not simply to increase the number of those personnel or their aggregate compensation, but to hire better quality personnel, restructure compensation, and redesign how investment professionals collaborate with each other.[195]  Indeed, the trial evidence demonstrates each of the following:

- •    CAL made numerous significant and costly changes to the investment team and investment process, which was not limited to hiring additional personnel to service the Funds. CAL undertook a significant transformation of its investment team—from a vertical structure with a "one-team-one-process" approach to a horizontal structure with a "team-of-teams" approach.[196]  CAL also implemented a series of changes that resulted in members of the broader investment team contributing ideas and insights that benefitted the Fund.  Among many other changes, CAL implemented an Investment Committee, which consisted of CAL's Co-CIOs, Co-

---

[195] DFFCL ¶¶ 106-108; Behan Decl. ¶¶ 43-46; Tr. 107:16-108:4 (Behan); Tr. 64:19-65:25, 66:21-68:7 (Becker); Tr. 656:8-658:15 (Cronin).

[196] DFFCL ¶ 106.

Heads of Research and Investments, and co-Portfolio Managers, to increase sharing of investment information among its different teams.[197]

- CAL also made significant changes at the senior management level in an attempt to improve the Fund's performance, including hiring Gary Black, who was previously been the CEO and CIO of a successful mutual fund investment adviser, Janus Capital, to replace the Funds' prior Co-CIO and, following Mr. Black's departure, transitioning to a new senior management structure by promoting four portfolio managers to serve as Co-CIOs. Most recently, CAL replaced the Fund's portfolio manager, Mr. Kalis, with Michael Grant, who had obtained top-shelf performance with a different fund that he advises.[198]

- Between 2012 and 2016, CAL increased its employee compensation from $51 million to $74 million, while CAL's operating income decreased from $128 million to $33 million.[199] CAL also redesigned its compensation structure for investment professionals to tie compensation more closely to the investment performance of the specific products that employees primarily supported.[200]

- The number of investment personnel employed by CAL is not the sole measure of the value or the quality of the services CAL provides, and CAL has never argued that it is. As the Court observed on summary judgment, "sometimes you can add by subtracting . . . the personnel that were . . . deadwood, if you will."[201] In addition, Plaintiffs have come forward with no evidence concerning the investment personnel employed by CAL, including any

---

[197] DFFCL ¶¶ 107-108.

[198] DFFCL ¶¶ 109-112.

[199] Cronin Rpt. Ex. 9.1 (discussed at Tr. 633:9-18, 664:7-13 (Cronin)).

[200] DFFCL ¶ 107.

[201] 8/17/18 Tr. 71:10-13.

evidence of the level or skill of the personnel who stayed and those who departed, or why those

who departed left CAL.

- CAL made all of these significant and costly changes to its investment team

during a period when both CAL's and the Fund's assets under management, and CAL's overall

profitability, were in continuous decline.[202]

- Based on industry practice, CAL's restructuring of its investment team approach

and changes to the team's senior management were reasonable and appropriate measures taken

to enhance the quality of its services, adapt to systemic changes in the investment management

industry, and remain competitive among other investment advisers.[203]

*115.    However, as discussed below, CAL's hiring of additional personnel (i)
represented at most a de minimis investment in the Growth Fund as a general matter, and (ii) is
belied by the fact that CAL's personnel totals did not increase as a result of the CAL's transition
to a horizontal approach (but stayed flat), and CAL substantially decreased the number of
investment professionals specifically tasked with servicing the Growth Fund.*

**RESPONSE:**  Denied.  Plaintiffs' assertions and mischaracterizations regarding CAL's

efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the

reasons set forth in CAL's Response to Paragraph 114, *supra*.

*116.    First, CAL's hiring of additional investment personnel was not specific to the
Growth Fund, or even the Funds, but benefitted all of CAL's clients equally – fund and non-fund
accounts alike.  Tr. at 628:6-24, 671:15-16.  Thus, only a small fraction of CAL's $3 million
annual expense could be reasonably viewed as an investment in the Growth Fund.*

**RESPONSE:**  Denied as stated.  As Mr. Cronin testified, "[t]he benefit of a broader

capability, greater specialization would inure to all clients."[204]  As Mr. Cronin also explained,

CAL transitioned to and followed a horizontal "team-of-teams" structure for its portfolio

---

[202] DFFCL ¶ 114.

[203] DFFCL ¶ 117.

[204] Tr. 628:20-24 (Cronin).

management team, in which research and analysis, decision-making, execution/implementation, portfolio construction, and risk management moved toward the effective coordination of co-committed individuals aligned around a single objective.[205]  As such, each member of the investment team contributes to the management of each of the Funds advised by CAL.[206]

In addition, Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

117.    *Second, despite CAL's claim to the Board that it was increasing its headcount by a whopping 33% to improve performance, it was merely bringing its headcount back to historical levels.  Specifically, prior to CAL's transition to a horizontal investment approach, it averaged approximately 66 investment professionals.  Tr. at 629:21-630:25; 632:8-12; see also Cronin Report at Ex. 10.  Between 2011 and 2012, however, CAL experienced substantial employee turnover resulting in its headcount falling to the low 50s.  Tr. at 630:4-25.[207]*

**RESPONSE:**  Denied as stated.  The number of investment professionals employed by CAL for the calendar years 2005-2015 is set forth in Paragraph 107 of the parties' Joint Stipulation of Facts.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

---

[205] Tr. 645:6-651:19 (Cronin).

[206] DFFCL ¶¶ 103-120.

[207] *Notably, this precipitous decrease occurred before the transition-related change in compensation structure that CAL had predicted might result in departures.  Tr. at 631:1-19.*
**RESPONSE:**  The number of investment professionals employed by CAL decreased between 2011 and 2012.  CAL denies that this decrease was "precipitous" or in any way supports Plaintiffs' assertion that the value or quality of the services CAL provides to the Funds may be measured solely by reference to the number of investment personnel employed by CAL.  CAL incorporates by reference its Response to Paragraph 114.

118.    *When CAL completed its restructuring in 2015[208] – and had made its various additional hires – it had a total of 67 investment professionals, compared to the 66 investment professionals it averaged prior to its transition.  Tr. at 632:19-633:4; Cronin Report at Ex. 10.[209]*

**RESPONSE:**  The number of investment professionals employed by CAL for the calendar years 2005-2015 is set forth in Paragraph 107 of the parties' Joint Stipulation of Facts. CAL denies that it had "completed its restructuring in 2015."  CAL continued to make improvements to its investment team and investment process, including replacing the portfolio manager of the Fund, Mr. Kalis, with Mr. Grant in February 2017.[210]

Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

119.    *Thus, CAL's additional hires did not, in fact, increase its base, and its boasted 33% increase in personnel was merely a function of the fact that CAL's 2012 headcount was abnormally low.  Tr. at 166:8-17; 632:19-633:4; Cronin Report at Ex. 10.*

---

[208] *CAL reported to the Board that its reorganization efforts culminated in 2015.  JX 139 at CA-IT 00000071 at 6.*  **RESPONSE:**  Denied.  This statement is contradicted by the testimony of the sole witness whom Plaintiffs asked about this document at trial, Mr. Neal.  As described by Mr. Neal, the Board did not understand the cited presentation to mean that CAL finished its process of improving the investment team in 2015, but instead that Mr. Black had made changes that he personally had planned to make, and that CAL continued to make structural and personnel changes after Mr. Black's departure in 2015.  Tr. 202:5-203:21 (Neal).

[209] *CAL also claims to have made significant personnel changes as part of its transition, most notably its hiring of Mr. Black to a three-year contract to head the transition, and its subsequent promotion of Mr. Kalis to head the Growth Fund.  CAL did not attempt to retain Mr. Black after his contract expired, see Tr. at 202:18-25; 634:8-14, and ultimately terminated Mr. Kalis due to the continued poor performance of the Growth Fund.  See Tr. at 197:21-198:6; 634:4-22.*  **RESPONSE:**  Denied.  The assertion in the foregoing footnote is unsupported by the evidence cited.  Mr. Black departed CAL after the expiration of his three-year contract, as CAL and Mr. Black had both agreed.  CAL further denies that CAL's hiring of Mr. Black and Mr. Kalis were its "most notabl[e]" personnel changes.  To the contrary, CAL restructured the relationship between and roles of <u>all</u> investment personnel in order to increase specialization and cooperation for the benefit of the Fund and all of CAL's clients.  *E.g.*, Becker Decl. ¶¶ 40-51, 58-63.

[210] *E.g.*, JSSF ¶ 18.

79

**RESPONSE:**  Denied as stated.  The number of investment professionals employed by CAL for the calendar years 2005-2015 is set forth in Paragraph 107 of the parties' Joint Stipulation of Facts.  CAL denies that its "additional hires did not, in fact, increase its base."  In fact, CAL both reduced the number of funds managed by its investment professionals, and experienced a decline in total AUM, reducing the amount of AUM managed by its investment professionals.[211]

In addition, Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

120.    *Notably, what did substantially increase as a result of the transition was the amount of money CAL paid itself, which ballooned from $51 million in total employee compensation in 2012 to $67 million in 2015, despite headcount remaining constant and despite the cost of the additional hires only representing an additional $3 million.  Tr. at 633:5-18; Cronin Report at Ex. 9.1.*

**RESPONSE:**  Denied.  CAL spent $51 million in total employee compensation in 2012 and $67 million in 2015, even though it was experiencing declining revenues and profits during this period.  However, CAL denies that it "paid itself" this money; rather, as the trial evidence makes abundantly clear, these amounts were used to compensate CAL's employees, *i.e.*, the individuals providing services to the Fund for the benefit of Plaintiffs and the Fund's shareholders—and not to CAL itself.  The increase in CAL's employee compensation is entirely consistent with the significant investments in improving the quality of the services provided to the Funds.[212]

---

[211] Tr. 108:12-109:8 (Behan); Behan Decl. ¶¶ 44-47.

[212] *E.g.*, DFFCL ¶¶ 104-107, 109-114.

In addition, Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

*121.   Finally, and most critically, despite CAL's headcount remaining flat during the Relevant Period, CAL actually decreased the number of investment professionals dedicated to the Growth Fund.  Indeed, the total number of individuals specifically assigned to the Growth Fund declined precipitously from 24 investment professionals in July 2014 to 13 investment professionals in May 2017.  Tr. at 637:4-638:9; Cronin Report at Ex. 11.[213]*

**RESPONSE:**  Denied.  Among other things, CAL's U.S. Equity team was not the sole group of professionals contributing to the management of the Fund.  CAL's team-based horizontal approach relied on more decentralized decision-making, in which research and analysis, decision-making, execution/implementation, portfolio construction, and risk management moved toward the effective coordination of co-committed individuals aligned around a single objective.[214]  As such, each member of the investment team contributed to the management of each of the Funds advised by CAL.[215]  The exhibit cited from Mr. Cronin's report as supposed proof of the number of investment professionals specifically assigned to the

---

[213] *Mr. Cronin reached his totals based on "the people that were described in the materials that went to the board as being involved with the fund." Tr. at 636:7-15; Cronin Report at Ex. 11. Moreover, while Mr. Cronin believes that there may have been other investment professionals who assisted the Growth Fund sporadically ("other personnel"), he agreed that the negative trend identified in his report would only be offset if the number of other personnel that assisted the Growth Fund increased substantially over the same time period. Tr. 637:16-637:3. There is no evidence that this occurred.* **RESPONSE:** CAL denies that Mr. Cronin testified that the number of personnel from other teams providing input to the U.S. Growth Equity team would need to "increase[] substantially" in order to "offset" the asserted loss of people on the U.S. Growth Equity team, and denies that Mr. Cronin's expert report identified a "negative trend." To the contrary, Mr. Cronin testified that based on his "review of the portfolio and the holdings within the portfolio, it's evident that" people outside of the U.S. Growth Equity team contributed to the management of the Fund. Tr. 635:20-636:1 (Cronin).

[214] Tr. 645:6-651:19 (Cronin).

[215] DFFCL ¶¶ 103-120.

Fund ignores the testimony by Mr. Cronin that this list was not exhaustive, and that it is "evident" that people outside of the U.S. Growth Equity Team supported the Fund.[216]  Finally, during the Relevant Period, CAL merged or closed the remaining mutual funds (*i.e.*, the Discovery Growth, Mid-Cap Growth, and Focus Growth Funds) previously supported by the U.S. Growth Equity team that also supported the Fund, meaning that on average, the employees on that team were paying more attention to the Fund than before.[217]

In addition, Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence for the reasons set forth in CAL's Response to Paragraph 114, *supra*.

### E.    The Board's Fig-Leaf Response to CAL's Continued Poor Performance

*122.    Mr. Neal testified that, as a result of CAL's short-term and long-term underperformance, the Board asked CAL to agree to an exceedingly modest, 5 basis point reduction of its advisory fee in 2013 (from 83 bp to 78 bp).  According to Mr. Neal, the waiver not only reduced shareholders' investment costs, but also had the salutary benefit of "reinforcing a board's message to the adviser about the seriousness of the challenge and of the Board's interest in maximizing performance."  Neal Decl. at ¶78.  Nonetheless, the Board did not seek a fee reduction at any other time during the Relevant Period, despite CAL's admittedly poor performance.*

**RESPONSE:**  Denied.  The Board imposed a 5-basis point fee waiver on the Fund's management fee at the June 2013 Board meeting, and in subsequent years, the Board required that CAL continue to invest significant resources in an effort to improve the Fund's performance.[218]  Moreover, as Mr. Neal and Mr. Timbers testified, the Board considered whether to impose a fee waiver at each June/July Board meeting in the Relevant Period.[219]  At each such

---

[216] Tr. 635:4-636:5, 649:7-15 (Cronin).

[217] Becker Decl. ¶¶ 64-66; Behan Decl. ¶ 44; Tr. 108:12-109:8 (Behan).

[218] DFFCL ¶¶ 90-95, 103-115, 118, 127-142.

[219] DFFCL ¶ 131.

meeting, after engaging in a robust process that involved active dialogue with CAL throughout the year, applied their judgment in view of the current facts, their extensive industry experience and institutional knowledge of CAL, to determine that approving the IMA—subject to either a fee waiver and/or to CAL's commitment to continue to invest resources in efforts to improve the Fund's performance—was in the best interests of Fund shareholders.[220]

123.  *The explanation Mr. Neal offered at trial was that fee waivers constrain the resources available to an adviser to improve its investment processes/performance, and the Board was mindful to ensure that CAL had available "the resources needed to invest in its business in order to improve the Fund's performance."  Id. at ¶79.  The Board's purported rationale, however, cannot be harmonized with the trial evidence.*

**RESPONSE:**  Denied.  Mr. Neal (and the rest of the Independent Trustees) wished to ensure that CAL had the resources needed to invest in its business in order to improve the Fund's performance.  As Mr. Neal explained more fully:

> Q. When you're trying to decide about a fee waiver or imposing a fee reduction or how long you should keep a fee reduction in place, are there ever any concerns you have to the benefit to shareholders or the harm to shareholders from reducing the fee?
>
> A. Absolutely.  It's definitely part of our thinking because we would like the adviser to be financially successful, so that it can invest in the resources necessary for performance to be well, to be good, to be strong, and by cutting the fee we are cutting the income to the adviser.  And so to our way of thinking, that is a sort of last effort to solve the problem, because in many ways, it's somewhat adding to the problem, because it's limiting the resources the adviser has to produce better returns.  I mean, portfolio managers are not cheap, and good ones are definitely not cheap, so we have to think long and hard about how we approach this.  And by far, our preference is for the adviser to actually improve performance and get more assets in the fund and actually be more successful and make more money.[221]

---

[220] DFFCL ¶ 150.

[221] Tr. 196:10-197:2 (Neal).

Improvements in Fund performance can yield exponentially more benefits for Fund shareholders than a fee waiver.  For example, improvements in the Fund's returns of just 1% would benefit shareholders twenty times as much as a 5 bps fee waiver, even though the 2013 fee waiver of that amount cost CAL over $2 million.[222]

124.    *First, as Mr. Cronin admitted at trial, a reduced fee would not even be a hypothetical constraint on an adviser's ability to improve its investment processes, if the adviser paid for the efforts to improve its own poor performance out of its own profit margins.  Tr. at 619:18-620:17.*

**RESPONSE:**  Denied.  Plaintiffs have mischaracterized Mr. Cronin's testimony.

Mr. Cronin testified that an adviser's willingness to reduce the amount of money paid to senior management could potentially be one factor that would affect a fee waiver's impact on performance, but that the ultimate impact "is dependent on what happens to the overall level of market and management in terms of what money is available in addition to what's spent."[223] Furthermore, as set forth in CAL's Response to Paragraph 123, Mr. Neal also explained how reducing the Fund's fee could impose constraints on CAL's ability to attract talented portfolio managers and, therefore, hinder CAL's ability to improve performance.[224]

125.    *Second, the Board instituted the 5-basis point fee waiver at the same time CAL informed the Board that it was going to spend approximately $3 million per annum on new hires, and there is no evidence that the fee waiver constrained in any way CAL's purported efforts to improve performance.  Tr. at 621:6-18.  Thus, by definition, fee reductions and efforts to improve performance are not mutually exclusive/conflicting options.*

**RESPONSE:**  Denied as stated.  The Board imposed a five-basis point fee waiver from 2013-2014, and during this time CAL also presented to the Board regarding its plan to restructure its investment team.  CAL denies that the existence of this fee waiver means that it is

---

[222] DFFCL ¶ 116.

[223] Tr. 619:18-620:8 (Cronin).

[224] Tr. 196:10-197:2 (Neal).

impossible for a fee waiver to constrain the resources available for significant enhancements to

the adviser's investment team and investment process.  To the contrary, as Mr. Neal explained at

trial:

> Q. When you're trying to decide about a fee waiver or imposing a
> fee reduction or how long you should keep a fee reduction in place,
> are there ever any concerns you have to the benefit to shareholders
> or the harm to shareholders from reducing the fee?
>
> A. Absolutely.  It's definitely part of our thinking because we would
> like the adviser to be financially successful, so that it can invest in
> the resources necessary for performance to be well, to be good, to
> be strong, and by cutting the fee we are cutting the income to the
> adviser.  And so to our way of thinking, that is a sort of last effort to
> solve the problem, because in many ways, it's somewhat adding to
> the problem, because it's limiting the resources the adviser has to
> produce better returns.  I mean, portfolio managers are not cheap,
> and good ones are definitely not cheap, so we have to think long and
> hard about how we approach this.  And by far, our preference is for
> the adviser to actually improve performance and get more assets in
> the fund and actually be more successful and make more money.[225]

*126.    Third, during the Relevant Period CAL's AUM decreased precipitously, with
Growth Fund AUM alone shrinking from over $4 billion to less than $2 billion.  This, in turn,
resulted in CAL's overall operating income decreasing from $128 million in 2012 to $51 million
in 2016 (a decrease in income far greater than the amount of the fee waiver).  Tr. at 664:7-13.
Yet, over that same time period, CAL increased employee compensation by about $40 million per
year.  See id. 633:9-18.  Thus, it is simply not possible that a reduced fee would have constrained
CAL, given that it was able to pay itself $40 million more per year at the same time its income
dropped by a far greater amount due to the performance-based loss of AUM than it would have
declined due to a continued waiver.*

**RESPONSE:**  Denied.  The trial evidence demonstrates that the Fund's AUM and

overall operating income decreased during the Relevant Period at the same time CAL increased

employee compensation.  Indeed, the evidence indicates that between 2012 and 2016, CAL

increased its employee compensation from $51 million to $74 million, while CAL's operating

---

[225] Tr. 196:10-197:2 (Neal).

income decreased from $128 million to $33 million.[226]  However, Plaintiffs' assertion that CAL

"paid itself" through its increased employee compensation is not supported by any admissible or

credible evidence or by the cited testimony; rather, as the trial evidence makes abundantly clear,

these amounts were used to compensate CAL's employees, *i.e.*, the individuals providing

services to the Fund for the benefit of Plaintiffs and the Fund's shareholders—and not to CAL

itself.[227]  The increase in CAL's employee compensation is entirely consistent with CAL's

significant investments in improving the quality of the services provided to the Fund.[228]

>    **F.**    **The Reaction of the Other ACG Accounts Speaks Directly to the Quality of**
>             **Services CAL Provided**

127.    *The uniform reaction of CAL's arm's length ACG clients to CAL's poor*
*performance is telling.  Of the 36 Other ACG Accounts that CAL managed since 2011, all 36*
*terminated CAL by December 2016 and moved their assets elsewhere.  JX 181, Ex. A.*

**RESPONSE:**  Denied as stated.  CAL denies that "all" 36 All Cap Growth Clients that

CAL managed since 2011 "terminated CAL" or "moved their assets elsewhere."  One client with

an All Cap Growth Account, the James B. Powell Trust, closed its institutional account with

CAL in July 2014 because its assets had fallen too far below the account minimum.[229]

Nevertheless, as Dr. Pomerantz conceded in both his expert report and at trial, rather than closing

its account, that client elected to continue its relationship with CAL by investing in the Fund's

institutional share class, for which it (like other investors in that share class) pay the same

---

[226] Cronin Rpt. Ex. 9.1 (discussed at Tr. 633:9-18 (Cronin) and Tr. 664:7-13 (Cronin)).

[227] Tr. 633:14-634:4, 663:22-664:13 (Cronin).

[228] DFFCL ¶¶ 103-115.

[229] DX 1171; PX 487.

management fee as Plaintiffs pay for the Fund's Class A shares—a fee that is higher than the Powell Trust paid as an All Cap Growth client.[230]

Moreover, the decision by CAL's All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as the trial evidence conclusively demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[231]

Finally, Plaintiffs' assertion that the Fund's management fee is excessive because it is higher than fees charged to All Cap Growth Clients under different fee schedules, is not supported by the trial evidence or the Section 36(b) jurisprudence.  Indeed, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[232]

---

[230] Pomerantz Rpt. ¶ 116 n.85; Tr. 510:25-511:11 (Pomerantz); Behan Decl. ¶ 69 (discussing DX 1171); Tr. 115:15-116:13 (Behan).

[231] DFFCL ¶¶ 163, 282, 286-287.

[232] DFFCL ¶¶ 169-203.

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[233]

*128.     Furthermore, at least 24 of those 36 clients – including Nomura and the two MD Accounts, which were CAL's two largest ACG clients – informed CAL that they closed their accounts due to poor performance.  JX 181, Ex. A; Tr. at 83:1-85:7, 87:21-89:17.*

**RESPONSE:**  Denied.  24 of CAL's All Cap Growth Clients cited performance as one reason for closing their accounts.  The evidence also demonstrates, however, that clients often closed their accounts for multiple reasons.[234]  For example, Nomura closed its All Cap Growth sub-advisory account after it purchased another investment adviser that offered a competing growth strategy.[235]

Moreover, for the reasons set forth in CAL's Response to Paragraph 127, *supra*: (a) the decision by CAL's All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive, and (b) Plaintiffs' assertion that the Fund's management fee is excessive because it is higher than fees charged to All Cap Growth Clients under different fee schedules, is not supported by the trial evidence or the Section 36(b) jurisprudence.

---

[233] DFFCL ¶ 227.

[234] JX 181, Ex. A at 2.

[235] Tr. 114:23-115:10 (Behan).

129.    Notably, CAL met with and sought to persuade each of the Other ACG Accounts *not to close their accounts.  Tr. at 89:25-91:20; Behan Decl. at ¶91.  CAL informed each of the Other ACG Accounts of the ACG strategy's supposedly superior since-inception performance and of CAL's efforts to improve the investment management team.  Tr. at 89:25-91:20. None of the Other ACG Accounts, however, found these arguments persuasive enough to remain CAL advisory clients.  JX 181, Ex. A; Tr. at 89:25-91:20.*

**RESPONSE:**  Denied as stated.  As Mr. Behan testified, he "didn't interview every one of these clients,"[236] and simply acknowledged that through the course of their relationship with CAL, each client with an All Cap Growth account would have become familiar with CAL's since-inception performance and efforts to improve the quality of its investment team.[237]  In fact, when Mr. Behan was specifically asked (in testimony not cited in Plaintiffs' Paragraph 129 or anywhere else in their submission) whether "Calamos must have had at least one meeting with each of the clients . . . to try to prevent them from leaving," he was unable to confirm that was true in every case and instead answered, "We may have had a meeting or a call.  Like I said, without going through each record, it's hard to me to testify to that."[238]

Moreover, for the reasons set forth in CAL's Response to Paragraph 127, *supra*: (a) the decision by CAL's All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive, and (b) Plaintiffs' assertion that the Fund's management fee is excessive because it is higher than fees charged to All Cap Growth Clients under different fee schedules, is not supported by the trial evidence or the Section 36(b) jurisprudence.

130.    *The reaction of one such client, the Teamsters Pension Fund of Philadelphia (the "Teamsters"), to CAL's performance is illustrative.  Tr. at 54:2-58:8.  The Teamsters had an investment consultant, of RBC Wealth Management, who informed CAL that "Calamos pales in comparison to its peers relative to performance", that he has "reviewed our performance, etc.,*

---

[236] Tr. 90:6-8 (Behan).

[237] Tr. 89:25-90:20 (Behan).

[238] Tr. 94:15-19 (Behan).

*'ten ways to Sunday' and cannot find a defense", and that he "cannot continue to defend us to the client for risk of his own credibility." Tr. at 54:17-55:21; PX 344 at 430860.*

**RESPONSE:**  Denied as stated.  While Plaintiffs have accurately quoted their selected excerpts from PX 344, their assertion ignores the trial testimony that at the time the notes quoted in Paragraph 130 were taken, the Teamsters did not terminate their All Cap Growth account with CAL and instead chose to continue their account.[239]

Moreover, for the reasons set forth in CAL's Response to Paragraph 127, *supra*: (a) the decision by CAL's All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive, and (b) Plaintiffs' assertion that the Fund's management fee is excessive because it is higher than fees charged to All Cap Growth Clients under different fee schedules, is not supported by the trial evidence or the Section 36(b) jurisprudence.

### G.    The Reaction of the Growth Fund's Shareholders to the Quality of Services Provided is Further Indication that its Fees were Excessive

*131.    The trial record shows also that Growth Fund shareholders were dissatisfied with performance, exiting the Growth Fund in large numbers.  The Growth Fund's AUM peaked at $20 billion in March 2006.  Pomerantz Rebuttal Report at ¶418.  At that time, the Growth Fund had a 2.2% market share within its category of actively-managed Large Growth funds.  Id.  As of December 2016, however, the Growth Fund had lost 91% of its AUM, and its market share had declined to only 0.2% – less than one tenth its market share in 2006.  Id.*

**RESPONSE:**  Denied.  The Fund's AUM has declined during the Relevant Period. However, CAL denies the remaining assertions in Paragraph 131, and specifically denies that the decline in the Fund's AUM shows that shareholders "were dissatisfied with performance" as lacking any support in the evidentiary record.  To the contrary, the trial evidence demonstrates that retail mutual fund investors commonly exit mutual funds for reasons wholly unrelated to

---

[239] Tr. 53:13-22, 56:7-10, 56:25-57:8 (Becker).

fees or performance, such as the increased availability of alternative investment products; in fact, during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[240] Moreover, numerous new investors decided to invest in the Fund during the Relevant Period. Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[241]

*132.    Notably, the Growth Fund's loss of AUM and market share transpired concurrently with its declining performance, suggesting that the AUM loss was caused by shareholder disappointment with the Growth Fund's investment results.  Pomerantz Rebuttal Report at ¶393.*

**RESPONSE:**  Denied.  As Dean Hubbard explained, the mere correlation between the Fund's loss of AUM and a time period that included some periods of underperformance does not mean that all of the Fund's AUM loss can be attributed to underperformance.[242]  Other factors driving the Fund's loss of AUM are readily apparent; during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[243]  Moreover, numerous new investors decided to invest in the Fund during the Relevant Period.  Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[244]

---

[240] DFFCL ¶ 283.

[241] *See* DFFCL ¶ 285.

[242] DFFCL ¶ 283; Tr. 718:1-23 (Hubbard).

[243] DFFCL ¶ 283; Hubbard Rpt. ¶ 140; Tr. 718:5-10 (Hubbard); Behan Decl. ¶ 62.

[244] DFFCL ¶ 285; Hubbard Rpt. ¶ 142; Tr. 706:20-707:1 (Hubbard).

Dr. Pomerantz has done nothing to account for these other determinants of AUM loss identified by Dean Hubbard, or to isolate what portion of the Fund's loss of AUM might have been attributable to underperformance, and has instead simply identified that the temporal correlation exists.[245]

Furthermore, CAL generated strong performance for the Fund at numerous points throughout the period in which the Fund's market share declined.  The Fund has experienced strong absolute performance, and has experienced both short-term relative outperformance and short-term relative underperformance during the Relevant Period, including top-quartile performance during the first two years of the Relevant Period.[246]  In fact, Dr. Pomerantz admitted, in response to questioning from the Court, that the Fund's performance has improved over the last three years.[247]  In addition, the Independent Trustees were fully aware of all of the pertinent facts relating to the Fund's performance.[248]

*133.    The Growth Fund's AUM loss has been greater than that of the actively managed equity fund industry.  Tr. at 688:3-17.*

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 133 are not supported by the cited testimony.  To the contrary, Dean Hubbard testified that he was "not sure [if the Fund's loss of AUM was greater than that of the industry as a whole] because a mutual fund industry covers so many things.  If you're asking me is it greater than other active equity managers, probably."[249]

---

[245] Pomerantz Rebuttal Rpt. ¶¶ 393, 418-19.

[246] DFFCL ¶¶ 96-98; Becker Decl. ¶ 73.

[247] DFFCL ¶ 101.

[248] DFFCL ¶¶ 27, 77, 96, 98-99.

[249] Tr. 688:9-11 (Hubbard).

134.     *The reaction of the Growth Fund's investors as shown by the loss of AUM and market-share evidences shareholders' unhappiness with the quality of the portfolio advisory services offered.  Pomerantz Rebuttal Report at ¶¶418-19.*

**RESPONSE:**  Denied.  The trial evidence demonstrates that retail mutual fund investors commonly exit mutual funds for reasons wholly unrelated to fees or performance, such as the increased availability of alternative investment products; in fact, during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[250]  Moreover, numerous new investors decided to invest in the Fund during the Relevant Period.  Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[251]

135.     *Defendant's expert Dean Hubbard testified that, according to his study of price elasticities of demand in the mutual fund industry, the consequences to an advisor of charging a supra-competitive fee, given its level of performance, would be a loss of AUM and market share.  Tr. at 687:3-17, 691:24-692:12.  For every percent above a competitive level a fee was, an advisor would lose 3% of its market share.  Tr. at 687:21-24.*

**RESPONSE:**  Denied as stated.  Dean Hubbard testified that as a matter of economics, all else being equal and all other factors being held constant:  (i) investors are sensitive to fees and will move their assets from fund to fund based on price differences adjusted for product quality and fund performance; (ii) if a price were too high for the performance received, investors would sell their shares; (iii) the consequence of an adviser's charging a price that was above a competitive level would be a loss of market share and AUM, and (iv) if an adviser charged a fee that was one percent above a competitive level, it would lose three percent of its

---

[250] DFFCL ¶ 283.

[251] DFFCL ¶ 285.

market share.[252]  CAL denies that this testimony implies that the Fund's fee is excessive because, among other reasons, "[a]ll else" is not "equal."  Retail mutual fund investors commonly exit mutual funds for reasons wholly unrelated to fees or performance, such as the increased availability of alternative investment products; in fact, during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[253]  Moreover, numerous new investors decided to invest in the Fund during the Relevant Period.  Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[254]

*136.     Dean Hubbard's price elasticities study involved total expense ratios. Tr. 692-93. Dean Hubbard conceded, however, that market forces act indirectly with respect to fund advisory fees in that a loss of AUM and market share would ensue if advisory fees were so high that they pushed a fund's total expense ratio above a competitive level.  Tr. 692:18-693:11. Here, the Growth Fund's loss of AUM and market share is a result of the fact that the advisory fees were so high that they pushed its total expense ratio to an uncompetitive level given its level of performance.  Pomerantz Rebuttal Report at ¶¶173-77, 418-19, 693-94; Hubbard Report at ¶55 and Ex. 7; Tr. 691:20–693:11.*

**RESPONSE:**  Denied as stated.  Dean Hubbard's research involved expense ratios; he acknowledged that increases to a mutual fund's advisory fee would correspondingly increase a mutual fund's expense ratio, which would cause a decrease in the mutual fund's market share <u>if</u> all other attributes of the mutual fund and all other factors in the market were held constant.[255]  CAL denies the remaining assertions in Paragraph 136 because, among other reasons, "[a]ll else" is not "equal."  Retail mutual fund investors commonly exit mutual funds for reasons wholly

---

[252] Tr. 687:3-24 (Hubbard).

[253] DFFCL ¶ 283.

[254] *See* DFFCL ¶ 285.

[255] Tr. 692:18-693:11 (Hubbard).

unrelated to fees or performance, such as the increased availability of alternative investment products; in fact, during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[256]  Moreover, numerous <u>new</u> investors decided to invest in the Fund during the Relevant Period.  Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[257]

*137.    This conclusion is buttressed by the fact that, as Dean Hubbard admits, the Growth Fund's advisory fees in this case were relatively higher, while its "non-management" or third-party fees were "consistently lower," than those of its peers.  Tr. 693:12–694:13.*

**RESPONSE:**  Denied.  Dean Hubbard testified that the Fund's non-management fees, *i.e.*, fees charged by third-party service providers, were generally lower than those of most of the funds in the Fund's Morningstar category.[258]  CAL denies the remaining assertions in Paragraph 137.  As Dean Hubbard also testified, the Fund's advisory fees relative to most other funds in its Morningstar category "depends on the year and category."[259]  CAL also incorporates by reference its Response to Paragraph 136 as if set forth fully herein.

## III.    COMPARATIVE FEES

*138.    Plaintiffs presented evidence at trial comparing the Growth Fund's advisory fees to: (1) fee rates paid by comparable mutual funds; and (2) fee rates paid to CAL by arm's length, third-party institutional clients to whom CAL provided substantively identical Portfolio Management Services as it did to the Growth Fund (the Other ACG Accounts).  As discussed below, by every metric the Growth Fund's fees were at the highest end of the spectrum and dwarfed the fees paid by CAL's Other ACG Accounts.*

---

[256] DFFCL ¶ 283.

[257] *See* DFFCL ¶ 285.

[258] Tr. 694:6-13 (Hubbard).

[259] Tr. 693:17-22 (Hubbard).

**RESPONSE:**  Denied.  CAL denies that "the Growth Fund's fees were at the highest end of the spectrum" "by every measure."

As set forth in CAL's responses to Paragraphs 139-145, *infra*, Plaintiffs failed to prove that the Fund's management fee is outside the range of fees paid by peer mutual funds.  Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz demonstrates that the Fund's management fee was in the range of fees that similar mutual funds charged their investors—as was the Fund's total expense ratio, which is the price that shareholders actually pay to own the Fund.[260]  In fact, as the Court ruled on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[261]

As set forth in CAL's responses to Paragraphs 146-151, *infra*, the trial evidence refutes Plaintiffs' assertion that "by every metric the Growth Fund's fees were at the highest end of the spectrum and dwarfed the fees paid by CAL's Other ACG Accounts."

And, the trial evidence also refutes Plaintiffs' assertion that CAL provided "substantively identical Portfolio Management Services to the Fund and to All Cap Growth Clients."  To the contrary, as the trial evidence demonstrates:

- Under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the

---

[260] DFFCL ¶¶ 254-62, 269-72.

[261] *Chill*, 2018 WL 4778912, at *16.

trust."[262]   None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for <u>any</u> of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[263]   Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for <u>any</u> of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[264]

•      On the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in <u>each</u> of the following areas:  (a) legal, regulatory and compliance;[265] (b) fund governance services;[266] (c) fund administration services;[267] (d) portfolio management services;[268] and (e) client/shareholder services.[269]   And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and

---

[262] DFFCL ¶¶ 166-167.

[263] DFFCL ¶ 168.

[264] DFFCL ¶¶ 169-172.

[265] DFFCL ¶¶ 174-180.

[266] DFFCL ¶¶ 181-183.

[267] DFFCL ¶¶ 184-188.

[268] DFFCL ¶¶ 189-192.

[269] DFFCL ¶¶ 193-197.

oversight, and with CAL remaining ultimately responsible to the Fund for all of the work

provided by these third party service providers.[270]

### A.      Versus Comparable Mutual Funds

*139.      The advisory fees that CAL charges to the Growth Fund place the Growth Fund at the very highest end of the range of advisory fees charged by other advisers to mutual funds similar in character and size to the Growth Fund, and indicate that the Growth Fund is an outlier among peer funds (in that the Growth Fund pays advisory fees that are far higher than the vast majority of peer funds). Pomerantz Report at ¶¶298-304; Tr. at 560:22–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623.*

**RESPONSE:**  Denied.  CAL denies that the Growth Fund's fee was "at the very highest

end of the range of advisory fees charged by other advisors"; none of the independent third party

service providers (*i.e.*, Lipper, Morningstar, and Strategic Insight) that analyzed the Fund's

management fee have referred to the Fund's fee as an "outlier."  To the contrary, Plaintiffs failed

to prove that the Fund's management fee is outside the range of fees paid by peer mutual funds.

Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and

even Dr. Pomerantz demonstrates that the Fund's management fee was in the range of fees that

similar mutual funds charged their investors—as was the Fund's total expense ratio, which is the

price that shareholders actually pay to own the Fund.[271]  In fact, as the Court ruled on summary

judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to

peer mutual funds by other investment advisors."

Plaintiffs' assertions in Paragraph 139 are based on a concocted comparison of the

Fund's fee to the Fund's peer group, which is the smallest set of comparators provided by

Morningstar, for only three of six years during the Relevant Period.  Plaintiffs misleadingly omit

the peer group data provided by Strategic Insight, which shows that during more recent years

---

[270] DFFCL ¶ 187.

[271] DFFCL ¶¶ 254-62, 269-72.

(2017 and 2018), the Fund's fee has ranked at the 80th and 69th percentile, respectively, even among this limited peer group.[272]  Furthermore, the data provided by Lipper and Morningstar comparing the Fund's fee to a broader set of comparable mutual funds routinely showed that the Fund's fee ranked only between the 70th and 83rd percentile of similar mutual funds during the Relevant Period, and Dr. Hubbard's more refined comparison to similar mutual funds shows that the Fund ranked between the 62nd percentile and the 76th percentile.[273]

140.    *When conducting comparative analysis of mutual fund fees, each of the Independent Data Providers, as well as Dr. Pomerantz, compared the Growth Fund against a peer group of similarly-sized mutual funds (chosen from among the larger set of similarly-categorized funds), because of the general inverse relationship between fund size and fund fees (larger funds typically have lower fees).  Pomerantz Report at ¶¶298-304; Tr. at 562:7–565:1; JX 186 at 653796; JX 175 at 652022; JX 130 at 636387, -97 and -400; JX 88 at 523981, -90 and -93; JX 46 at 520598, -608 and -611; JX 19 at 513361.*

**RESPONSE:**  Denied as stated.  The Independent Data Providers and Dr. Pomerantz compared the Fund's fee to both size-restricted and non-size-restricted groups of similar mutual funds, and both measures showed that the Fund's management fee was in the range of those similar mutual funds.[274]  Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz demonstrates that the Fund's management fee was in the range of fees that similar mutual funds charged their investors—as was the Fund's total expense ratio, which is the price that shareholders actually pay to own the Fund.[275]  As the Court ruled on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[276]  Furthermore, as

---

[272] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[273] DFFCL ¶¶ 260-62.

[274] DFFCL ¶¶ 255-60.

[275] DFFCL ¶¶ 254-62, 269-72.

[276] *Chill*, 2018 WL 4778912, at *16.

Dean Hubbard testified, an actual economic analysis of the relationship between mutual fund

fees and asset size demonstrates that larger funds do not charge lower fees because they are

large, but instead low-fund fees become large due to their lower prices attracting more

investors.[277]  Dr. Pomerantz reverses this causal relationship based on nothing but his own biased

conjecture.[278]

> 141.    *The Peer Comparison analyses conducted by Morningstar and Dr. Pomerantz both show that very few mutual funds paid higher advisory fees than the Growth Fund. Pomerantz Report at ¶¶300-04; Tr. at 562:7–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623.  In Morningstar's peer groups, only one or two funds paid higher advisory fee rates than the Growth Fund each year:  in 2016, only one other fund in the 22-fund peer group paid a higher advisory fee rate; in 2015, only one other fund in the 18-fund peer group; and in 2014, only two other funds in the 17-fund peer group.  Pomerantz Report at ¶304; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623. In Dr. Pomerantz's analysis of all 129 Large Growth mutual funds with net assets between $1 billion and $10 billion, only 9 other funds paid higher fee rates, placing the Growth Fund at the 93rd percentile of its peers.  Pomerantz Report at ¶¶302-04; Tr. at 562:7–563:2.*

**RESPONSE:**  Denied.  CAL denies that "very few mutual funds paid higher advisory

fees than the Growth Fund."  Plaintiffs again misleadingly omit that Strategic Insight's size-

restricted peer group of similar mutual funds places the Fund at the 80th and 69th percentile,

respectively, of its peers in 2017 and 2018.[279]  Dr. Pomerantz's analysis also shows that within

the Fund's broader Morningstar Category of 417 mutual funds, 80 of those mutual funds (20%)

paid fees equal to or higher than the management fee that CAL charged the Fund.[280]  Indeed,

every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even

Dr. Pomerantz demonstrates that the Fund's management fee was in the range of fees that similar

mutual funds charged their investors—as was the Fund's total expense ratio, which is the price

---

[277] Tr. 710:14-711:10 (Hubbard).

[278] Tr. 711:1-7 (Hubbard).

[279] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[280] DFFCL ¶¶ 255-57.

that shareholders actually pay to own the Fund.[281]  As the Court ruled on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[282]

Dr. Pomerantz's conclusion that only 9 out of 129 similar mutual funds paid a fee higher than the Fund's is based on his misguided contention that mutual funds charge lower fees as they become large.  To the contrary, as Dean Hubbard explained, an economic analysis of the relationship between mutual fund fees and asset size demonstrates that larger funds do not charge lower fees because they are large, but instead low-fund fees become large due to their lower prices attracting more investors.[283]

142.     *Of the few other peer mutual funds that paid higher advisory fees according to Morningstar's and Dr. Pomerantz, approximately half are funds advised by American Century Investment Management ("ACIM").  Tr. at 563:13–565:1 (of the nine funds that pay higher fees than the Growth Fund in Dr. Pomerantz's peer analysis, four are ACIM-advised funds); JX 130 at 636413 (in 2016, the only fund in Morningstar's expense peer group that paid higher fees was an ACIM fund); JX 46 at 520623 (in 2014, one of two funds in Morningstar's expense peer group that paid higher fees than the Growth Fund was an ACIM fund).*

**RESPONSE:**  Denied as stated.  CAL does not dispute that the documents cited in Paragraph 142 include an American Century fund in the Fund's peer group.  Plaintiffs did not present any admissible evidence at trial concerning the characteristics of any American Century fund.  Moreover, as Dr. Pomerantz explained, the peer groups constructed by Strategic Insight did not include any American Century fund, yet they nonetheless shows that the Fund's fee was squarely within the range of peers.[284]  Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz demonstrates that the Fund's

---

[281] DFFCL ¶¶ 254-62, 269-72.

[282] *Chill*, 2018 WL 4778912, at *16.

[283] Tr. 710:14-711:10 (Hubbard).

[284] Tr. 564:8-22 (Pomerantz).

management fee was in the range of fees that similar mutual funds charged their investors—as

was the Fund's total expense ratio, which is the price that shareholders actually pay to own the

Fund.[285]  As the Court ruled on summary judgment, "Plaintiffs concede that the Fund's Advisory

Fee is within the range of fees charged to peer mutual funds by other investment advisors."[286]

*143.     However, ACIM-advised funds differ from most other mutual funds in that they pay a unified management fee that covers not only investment advisory services, but also administrative services, transfer agency services, accounting services, custody services and further services and expenses as well (that, in the case of most other mutual funds as well as the Funds, are separately compensated). Tr. at 563:18–564:7. Consequently, ACIM-advised funds are inapt and are often excluded from comparative analyses of advisory fees, because their (higher) unified fees represent payment for advisory and non-advisory services.  Tr. at 563:18– 564:22; see also JX 175 at 652022 (Strategic Insight excludes from its analysis funds with "all-inclusive/unified fee structure").*

**RESPONSE:**  Denied.  Plaintiffs did not present any admissible evidence establishing

the characteristics of American Century funds.  Dr. Pomerantz's claim that the American

Century funds pay a "unified fee" is found nowhere in either his initial expert report or his

rebuttal report, and his unsupported testimony concerning his understanding of the "unified fee"

paid by such funds is not competent to establish the fees paid by such funds.  Moreover,

Plaintiffs' assertion in Paragraph 143 that "ACIM-advised funds are inapt" is belied by the fact

that Dr. Pomerantz included American Century funds in the "Large Growth funds" set forth in

Exhibit 1 to his rebuttal report.  Furthermore, Morningstar, which Plaintiffs describe as an

"Independent Data Provider," clearly decided that those mutual funds provided comparative

insight by including them in the Fund's peer group.  CAL further denies that Morningstar's

inclusion of mutual funds advised by American Century in the Fund's peer group had a material

impact on the Fund's relative management fee compared to its peer group.  As Strategic Insight's

---

[285] DFFCL ¶¶ 254-62, 269-72.

[286] *Chill*, 2018 WL 4778912, at *16.

analysis demonstrates, when CAL was compared to a different peer group according to selection criteria that omitted mutual funds advised by American Century, the Fund's fee was even more comfortably within the range of its peers (*i.e.*, the Fund's percentile ranking decreased).[287]

Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz demonstrates that the Fund's management fee was in the range of fees that similar mutual funds charged their investors—as was the Fund's total expense ratio, which is the price that shareholders actually pay to own the Fund.[288]  As the Court ruled on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[289]

144.    *When ACIM-advised funds are removed from Morningstar's and Dr. Pomerantz's Peer Comparison analyses, the Growth Fund's status as an advisory fee outlier at the very top of the advisory fee range is evident.  Morningstar's expense peer analyses, after ACIM-advised funds are removed, reveal that the Growth Fund either pays the highest advisory fees among its peers (2016), or the second-highest fees (2015 and 2014).  JX 130 at 636413; JX 46 at 520623. And where the Growth Fund placed second, its advisory fees are barely below the highest fee fund (1 basis point in 2015; 3 basis points in 2014) yet far above the third-place finisher (9 basis points in 2015, 12 basis points in 2014).  Id.  In Dr. Pomerantz's analysis, removal of the four ACIM funds from the nine funds that pay higher advisory fees moves the Growth Fund from the 93rd to the 95th percentile among peer funds with respect to advisory fees.  Tr. at 564:1–565:1.*

**RESPONSE:**  Denied.  CAL denies that the removal of mutual funds advised by American Century from the Fund's peer group reveals "the Growth Fund's status as an advisory fee outlier at the very top of the advisory fee range."  On the contrary, Strategic Insight, which provided an independent fee comparison that constructed peer groups that expressly excluded American Century funds, reported percentile rankings of the Fund's management fee relative to

---

[287] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[288] DFFCL ¶¶ 254-62, 269-72.

[289] *Chill*, 2018 WL 4778912, at *16.

its peer group that were significantly lower than Morningstar's analysis.[290]  Similarly, Lipper,
which also did not include mutual funds advised by American Century in the Fund's peer group,
also performed a comparative fee analysis that produced a lower percentile ranking than
Morningstar.[291]

Indeed, every analysis conducted by Lipper, Morningstar, Strategic Insight, Dean
Hubbard, and even Dr. Pomerantz demonstrates that the Fund's management fee was in the
range of fees that similar mutual funds charged their investors—as was the Fund's total expense
ratio, which is the price that shareholders actually pay to own the Fund.[292]  As the Court ruled on
summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees
charged to peer mutual funds by other investment advisors."[293]

145.    *Plaintiffs presented additional trial evidence regarding comparative mutual fund
fees, namely, the testimony of CAL's expert, Dean Hubbard.  Dean Hubbard opined that,
according to his study of price elasticities of demand in the mutual fund industry, the
consequences to an advisor of charging a supra-competitive fee, given its level of performance,
would be a loss of AUM and a loss of market share.  Tr. at 686:15-687:24, 691:20-693:5.  For
every percent above a competitive level that a fund's fees were, Dean Hubbard testified that an
advisor would lose 3% of its market share to competing funds.  Tr. at 687:21-24.  Here, the
Growth Fund lost in excess of 90% of its AUM and a similar proportion of its market share,
since its AUM peaked in March 2006.  Pomerantz Rebuttal Report at ¶418.  This supports the
conclusion that the Growth Fund's fees were excessive.  Id.*

**RESPONSE:**  Denied as stated.  Dean Hubbard, when asked whether "that phenomenon,
declining assets under management at the growth fund, indicate to you the fee was excessive,"
responded "No, it needn't be that at all.  The variable that I mentioned in my book was a net
between gross performance and fees, and then many other characteristics – reputation, complex

---

[290] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[291] DFFCL ¶ 259; JX 19 at CALAMOS_00513361-62.

[292] DFFCL ¶¶ 254-62, 269-72.

[293] *Chill*, 2018 WL 4778912, at *16.

and so on.  So it's one of many variables."[294]  Retail mutual fund investors commonly exit

mutual funds for reasons wholly unrelated to fees or performance, such as the increased

availability of alternative investment products; in fact, during the Relevant Period, the market at

large experienced a large shift in capital from actively-managed mutual funds to passive

strategies or to new products, such as exchange traded funds.[295]  Moreover, numerous <u>new</u>

investors decided to invest in the Fund during the Relevant Period.  Although the Fund

experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received

approximately $1.6 billion in gross inflows between November 2013 and October 2016.[296]  In

fact, as Mr. Becker explained, sophisticated intermediaries such as Wells Fargo and Charles

Schwab continue to this day to place money in the Fund on behalf of their clients after

performing due diligence on CAL.[297]  The trial evidence further demonstrates that the Fund's

loss of AUM does not in any way prove that the fee CAL charged the Fund was excessive.[298]

      **B.**    **Versus CAL's Arm's-Length Institutional/Subadvisory Clients**

           **1.**    **Analysis of Relative Fees**

                  **a.**    **The Effective Advisory Fee Rates Payable Under the IMA's Fee Schedule Dwarf Those Payable Under the Other ACG Accounts' Fee Schedules**

     146.    *During the Relevant Period, three different fee rate schedules governed CAL's Other ACG Accounts (as detailed in Section I.G.2, supra).*

     <u>**RESPONSE:**</u>  Denied.  Plaintiffs' assertion that the Fund's management fee is excessive

because it is higher than fees charged to All Cap Growth Clients under different fee schedules is

---

[294] Tr. 718:12-23 (Hubbard).

[295] DFFCL ¶ 283.

[296] *See* DFFCL ¶ 285.

[297] Tr. 70:1-20 (Becker).

[298] DFFCL ¶¶ 282-87.

not supported by the trial evidence or the Section 36(b) jurisprudence. Indeed, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[299]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[300]

Plaintiffs also failed to prove that the Fund's management fee "dwarfed" the fees paid by CAL's Other ACG Accounts" for each of the following reasons:

---

[299] DFFCL ¶¶ 169-203.

[300] DFFCL ¶ 227.

- First, Plaintiffs' assertion, which comes solely from Dr. Pomerantz, does not in any way account for the differences in services, risks, markets, or products between CAL's mutual fund clients and its institutional and sub-advisory All Cap Growth Clients.[301]

- Second, Plaintiffs' assertion is based on a subset of only nine of CAL's All Cap Growth Clients—six institutional accounts and three sub-advisory accounts—and excludes CAL's remaining 27 All Cap Growth Clients during the Relevant Period.  Of these excluded clients, 21 paid effective fee rates of 75 basis points or more, a rate which Plaintiffs have acknowledged is not materially different than the fee paid by the Fund; indeed, the range of fees paid by these accounts extends up to 82 basis points.[302]  The excluded accounts therefore actually support, rather than refute, the contention that the Fund's fee is within the range that would have been produced by arm's length bargaining, which may explain why Dr. Pomerantz claimed that he had "no idea" what his calculation would have shown if he had corrected it to include all 36 accounts.[303]

- Third, although Plaintiffs' 42-basis paint weighted average effective fee rate is largely driven by fees CAL charged to just two sub-advisory clients, Nomura and MD American, Plaintiffs did no analysis and provided no evidence to show that CAL's roles and responsibilities for those accounts were aptly comparable to CAL's roles and responsibilities as adviser to the Fund; and they did no analysis and provided no evidence about the actual total management fees paid by Nomura and MD American (*i.e.*, total fees paid to the adviser and all sub-advisers) as compared to the management fee paid by Fund investors.[304]  On the contrary, Dr. Pomerantz

---

[301] DFFCL ¶ 235.

[302] DFFCL ¶ 236.

[303] DFFCL ¶ 236.

[304] DFFCL ¶ 237-238.

equivocated about the extent to which Nomura and MD American were comparable, ultimately declaring that because "[t]hese aren't even '40 Act funds" (*i.e.*, funds governed by the ICA), "there's no point at all in comparing" the Fund's management fee to the management fees that MD American and Nomura charged their clients.[305]

- Fourth, the range of fees charged to CAL's All Cap Growth Clients includes the Fund's fee, because certain All Cap Growth Clients, such as the James B. Powell Restated Revocable Trust, moved their investment from a CAL institutional account following the All Cap Growth strategy (at the lower institutional account management fee) into the Fund.[306]  Other prospective clients, such as the City of Seattle, could have chosen to invest with CAL in an institutional account, but voluntarily chose to invest in the Fund and pay the Fund's higher advisory fee.[307]  The existence of sophisticated institutional clients that chose to invest in the Fund, thus paying the Fund's higher management fee, is further compelling evidence that the Fund's fee is within this "arm's-length range."

- Fifth, Dr. Pomerantz's calculation is entirely inapplicable during the years 2017 and 2018—which are included in the Relevant Period in this case—because during those years, CAL had no All Cap Growth Clients.  Thus, as Dr. Pomerantz admitted, today there are no comparable All Cap Growth Clients to consider in his model,[308] which is therefore a complete failure of proof as to CAL's alleged arm's-length fee would have been during those years

In addition, with specific respect to Plaintiffs' assertions in Paragraph 146, the fee that the Fund may have paid under the Standard Institutional Rate is not relevant to any issue in this

[305] DFFCL ¶ 237.

[306] DFFCL ¶ 239.

[307] DFFCL ¶ 239.

[308] DFFCL ¶ 240.

case.  Although CAL's All Cap Growth Clients operated under three different <u>standard</u> advisory

fee schedules during the Relevant Period, clients such as Thrivent Financial for Lutherans and

Nomura Currency Fund – U.S. Growth Equity Fund followed different fee schedules.[309]  In fact

as many as six different fee schedules existed among CAL's All Cap Growth Clients during the

Relevant Period because Nomura previously operated under a different, non-standard fee

schedule that contained breakpoints at $750 million and $1.5 billion.  At Nomura's request, CAL

and Nomura amended the fee schedule to remove those breakpoint such that Nomura would pay

a flat rate.[310]

147.    *Each of these fee rate schedules provided for substantially lower advisory fee*
*rates than those payable under the IMA.  Pomerantz Report at ¶¶169-80.  For example, at asset*
*levels of $2.7 billion, which was the Growth Fund's AUM as of May 2017, those schedules*
*produce effective fee rates of only approximately 33 to 51 basis points, compared to Growth*
*Fund's average effective fee rate of 85 bps.  Pomerantz Report at ¶¶169-76; Tr. at 555:6-*
*556:20.*

**RESPONSE:**  Denied.  The fee that the Fund may have paid under the Standard

Institutional Rate is not relevant to any issue in this case.  Plaintiffs' assertion that the Fund's

management fee is excessive because it is higher than fees charged to All Cap Growth Clients

under different fee schedules is not supported by the trial evidence or the Section 36(b)

jurisprudence for each of the fundamental reasons set forth in CAL's Response to Paragraph 146,

*supra*.

148.    *Dr. Pomerantz further testified that the fee rate disparities are understated in*
*these comparisons because the Standard SMA Rate and the MD Rate fee schedules contemplate*
*AUM levels that are only a fraction of the actual size of the Growth Fund.  Pomerantz Report at*
*¶¶175; Tr. at 555:23-556:16, 558:20-559:17.  For prospective clients possessing AUM similar*
*to the Growth Fund, it is likely that further negotiations with CAL would have occurred,*
*resulting in additional breakpoints offering rate reductions at higher AUM levels, lower effective*

---

[309] JSSF ¶¶ 98-99 & Ex. 1 (referencing Fee Schedules A, B, and C).

[310] *Compare* JX 15 at CALAMOS_00622204, *with* JX 59 at CALAMOS_00296130.

*fee rates and an even greater differential between the fees such clients paid and the fees paid by the Growth Fund.  Id.[311]*

**RESPONSE:**  Denied.  The fee that the Fund may have paid under the Standard SMA

Rate is not relevant to any issue in this case.  CAL denies that Dr. Pomerantz has any

qualifications to speculate as to under what conditions clients' fee schedules would have been

subject to further negotiation or what the outcome of those hypothetical negotiations might

produce since he conceded that he has no direct experience with negotiating management fees

(or a fee for any third-party service provider) on behalf of a mutual fund.[312]  Contrary to

Dr. Pomerantz's speculation, on the only occasion in the record during the Relevant Period when

an All Cap Growth Client negotiated a revision to its fee schedule, Nomura actually eliminated

the breakpoints from its fee schedule.[313]  Furthermore, as Dean Hubbard testified, since mutual

funds are different products than institutional and sub-advisory accounts, "you wouldn't expect

there to be a close price coherence between the two," which makes it entirely unremarkable that

---

[311] *Indeed, IMAs for certain CAL institutional clients invested in equity strategies expressly state that further rate negotiations would occur if assets increase above a contemplated level.  See PX 313 at 645299-305 and 645561-65, at 645564 (IMA of Voluntary Benefit Plan Trust for UAW Retired Employees of Allis-Chalmers Corporation, providing that rates for asset levels above $50 million would be "negotiated"); id. at 645130-41, at 645137 (IMA of Northwest Ohio Area Industries UAW Retirement Income Plan, stating that rates would be "negotiated" for assets exceeding $200 million); id. at 645257-67, at 645262 (IMA of Plumbers & Pipefitters Local No. 142, stating that rates would be "negotiated" for assets exceeding $200 million); id. at 645257-67, at 645262 (IMA of Nord Family Foundation, providing that rates would be "negotiated" for assets exceeding $200 million).* **RESPONSE:**  Denied.  Plaintiffs failed to prove that the simple fact that these contracts provided that they would be further "negotiated" in the event that circumstances arose that were not provided for in the contract means that the outcome of these negotiations would have been reduced fee schedules, as Dr. Pomerantz speculates without basis or expert qualification.  Instead, the trial evidence demonstrates that Nomura negotiated with CAL to amend its subadvisory agreement in a manner that actually would have <u>increased</u> the fee schedule's effective fee at higher asset levels.  *Compare JX 15 at CALAMOS_00622204, with* JX 59 at CALAMOS_00296130.

[312] Tr. 406:8-407:24, 409:17-410:6 (Pomerantz).

[313] *Compare JX 15 at CALAMOS_00622204, with* JX 59 at CALAMOS_00296130.

their different fee schedules produce different prices and are designed to fit different asset ranges.[314]

Plaintiffs' assertion that the Fund's management fee is excessive because it is higher than fees charged to All Cap Growth Clients under different fee schedules is not supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental reasons set forth in CAL's Response to Paragraph 146, *supra*.

*149.     Plaintiffs also presented evidence of the overall effective rate paid by CAL's Other ACG Accounts (i.e., an AUM-weighted average effective fee rate).  Specifically, Plaintiffs showed that, during 2014 and 2015, CAL's Other ACG Accounts paid a weighted average effective fee rate of only 42 basis points – approximately half the effective fee rate paid by the Growth Fund.  Pomerantz Report at ¶¶163-67; Tr. at 572:19-573:13, 575:19-577:5.  Including all of CAL's Other ACG Accounts since June 2013 as listed in CAL's September 2017 interrogatory response (JX 181 at Ex. A) results in an AUM-weighted average fee rate of only 46 basis points.  See Exhibit A hereto (calculation of weighted average effective fee rate paid by all Other ACG Accounts during Relevant Period, based on the data in JX 181 at Ex. A).*

**RESPONSE:**  Denied.  CAL denies that Dr. Pomerantz's weighted average effective fee of 42 basis points is "evidence of the overall effective rate paid by CAL's Other ACG Accounts."  As CAL demonstrated at trial, Dr. Pomerantz's analysis is flawed in numerous respects, including because it (1) does not account for the differences in services, risks, markets, or products between CAL's mutual fund clients and its institutional and sub-advisory All Cap Growth Clients, (2) is based on only nine of CAL's 36 All Cap Growth Clients; (3) is driven almost entirely by the fees paid by Nomura and MD without considering the fees that those advisers charged their funds' shareholders; and (4) does not account for changes in the makeup of CAL's All Cap Growth Clients throughout the Relevant Period, including the lack of any such clients in 2017 and 2018.[315]

---

[314] Tr. 726:10-16 (Hubbard).

[315] DFFCL ¶¶ 233-40.

In particular, despite the fact that Plaintiffs' own exhibits demonstrate that CAL served as only one of multiple sub-advisers for the MD accounts—one of three sub-advisers for the MD American Fund and one of four subadvisers for the MDPIM U.S. Equity Pool—Dr. Pomerantz did not consider this fact as part of his analysis or how CAL's more limited role with respect to the MD accounts versus the Fund might render them inapt comparators.[316]  This is a remarkable oversight given that CAL's sub-advisory agreement for the MD American Fund, which Dr. Pomerantz purported to review, expressly stated that CAL was "appointed to advise on approximately 30% of the assets of MD American Growth Fund with Board approval of a multi-manager structure" rather than the entire fund.[317]

Furthermore, CAL objects to Plaintiffs' attempt to introduce Dr. Pomerantz's new weighted average effective fee of 46 basis points after trial, thereby depriving CAL of any ability to cross-examine him about his purported work.  Dr. Pomerantz had this data available to him to analyze since September 2017, more than a year in advance of trial, which he admitted.[318]  Dr. Pomerantz has previously been reprimanded for using exactly this tactic in *Sivolella*, in which he also attempted to rehabilitate his damages models through updated charts that were "never disclosed at trial or prior to the parties' pre-trial order."[319]  As the *Sivolella* court explained:

> A party cannot cure flaws or inaccuracies in its trial presentation through post-trial submissions by simply submitting new charts and updated calculations.  If the Court were to allow this, Defendants would be deprived of their right to cross-examine Plaintiffs'

[316] PX 345 at CALAMOS_00118411 (explaining the multi-sub-adviser relationship); Tr. 501:18-21, 504:11-505:14 (Pomerantz).

[317] JX 8 at CALAMOS_00638091.

[318] JX 181 at 10; Tr. 596:19-21 (Pomerantz).

[319] *Sivolella v. AXA Equitable Life Ins. Co.*, 2016 WL 4487857, at *70 (D.N.J. Aug. 25, 2016), *aff'd*, 742 F. App'x 604 (3d Cir. 2018).

> witnesses, or offer their own testimony or evidence in rebuttal. The
> right to cross-examine and test the soundness of the calculations is
> particularly important here in light of the large number of errors,
> methodological shortcomings, and basic mistakes demonstrated by
> Plaintiffs' experts [*i.e.*, Dr. Pomerantz] at trial.[320]

This Court should similarly rule that Dr. Pomerantz's strategically untimely analysis "should not

be considered."[321]

In addition, Plaintiffs' assertion that the Fund's management fee is excessive because it is

higher than fees charged to All Cap Growth Clients under different fee schedules is not

supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental

reasons set forth in CAL's Response to Paragraph 146, *supra*.

### b.    The ACG Accounts CAL Identified as Having High Effective Fee Rates All Had Extremely Low AUM

150.    At trial, Defendant argued that most of the Other ACG Accounts paid effective fee
rates far above the AUM-weighted average effective rate computed by Plaintiffs. Tr. 27:14–
28:12, 506:24–509:3. But as demonstrated at ¶81, supra, this is simply a function of the
relatively small sizes of those clients' accounts. Tr. at 557:16-559:4; JX 181 at Ex. A.

**RESPONSE:**  Denied.  Plaintiffs' assertion in Paragraph 150 acknowledges that 27 of

CAL's All Cap Growth Clients paid a fee of 75 basis points—a fee that Plaintiffs' expert

concedes is not materially different from the Fund's management fee during any of the years in

the Relevant Period.[322]  Plaintiffs did not present any admissible and credible evidence at trial

that these accounts would have paid meaningfully lower effective fees at higher levels of AUM.

In addition, Plaintiffs' assertion that the Fund's management fee is excessive because it is

higher than fees charged to All Cap Growth Clients under different fee schedules is not

---

[320] *Id*. at *71.

[321] *Id*. at *70.

[322] DFFCL ¶ 236.

supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental

reasons set forth in CAL's Response to Paragraph 146, *supra*.

*151.    Indeed, in order to validly compare effective fee rates, the Growth Fund's and the Other ACG Accounts' AUM have to be equalized.  In fact, this is the precise calculation that Defendant's own expert, Mr. Richardson, performed in Exhibit 2A of his Report.  There, he determined the effective fee rate that certain of CAL's Other ACG clients would have paid under the "rack rate" if they had the same AUM as the Growth Fund was only 50-51 bps.*

**RESPONSE:**  Denied.  Mr. Richardson's analysis demonstrates that the differential

between the Fund's management fee and CAL's institutional accounts is entirely consistent with

the fee differential across other advisers with large cap growth mutual funds and institutional

accounts.[323]  There is no requirement, whether in the ICA, SEC regulations, or the case law, that

"in order to validly compare effective fee rates, the Growth's Fund's and the Other ACG

Accounts' AUM have to be equalized," nor do Plaintiffs' cite any basis for creating such a

requirement in this case.

In addition, Plaintiffs' assertion that the Fund's management fee is excessive because it is

higher than fees charged to All Cap Growth Clients under different fee schedules, is not

supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental

reasons set forth in CAL's Response to Paragraph 146, *supra*.

### 2.    CAL's *Ipse Dixit* that the Funds' Higher Advisory Fees were Justified by Greater Services and Risks

*152.    Each year during the Relevant Period, CAL represented to the Board, in writing in its annual 15(c) Responses, and orally during the annual 15c Board Meetings,  that the higher advisory fees that it charged to the Funds (versus to its institutional and/or subadvisory clients) reflected, and were explained or justified by: (1) purportedly more extensive advisory services that CAL provided to the Funds, and (2) purportedly greater risks that it assumed when*

---

[323] Tr. 794:8-796:16 (Richardson).

*providing advisory services to the Funds.[324]  Tr. at 125:25–132:7, 261:24–263:15, 291:1–*
*301:23, 308:16–322:17, 372:1–385:10, 908:14–909:11.*

    **RESPONSE:**  Denied.  Plaintiffs' assertion that CAL sought to, or was required to,

"justify" the Fund's management fee relative to its All Cap Growth Clients' fees solely on the

basis of the different and greater services that CAL provides to the Fund than to its All Cap

Growth Clients and the different and greater risks it assumes in advising the Fund than it does in

advising its All Cap Growth Clients, is not supported by the trial evidence or the Section 36(b)

jurisprudence for each of the following fundamental reasons:

    First, each year, specifically in its 15(c) Response and generally throughout the year in

the course of each Board meeting, CAL explained to the Board that it provides different and

greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater

risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c)

Responses included a "Discussion of Management Fee Rates by Product" presentation that both

informed the Independent Trustees of the fees that CAL charged to the Funds and to its

institutional and sub-advisory clients and provided a brief summary overview of the services that

CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

    Second, as the evidence also conclusively demonstrates, the Discussion of Management

Fee Rates by Product presentation was not the sole information that the Independent Trustees

received about such services, nor was it intended to be an exhaustive recitation of all of the many

differences in services and risks.  To the contrary, the Independent Trustees also regularly

receive extensive information at every Board meeting concerning the services CAL provides to

---

[324] *DX 184-P; DX 176-P; DX 145-Q; DX 113-R; DX 61-R; JX 187 [2018 15c Meeting Minutes]
at 654061; JX 180 [2017 15c Meeting Minutes] at 652321; JX 144 [2016 15c Meeting Minutes]
at 636366; JX 111 [2015 15c Meeting Minutes] at 534339; JX 70 [2014 15c Meeting Minutes]
at 534050; JX 31 [2013 15c Meeting Minutes] at 503420.*

the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight of third party service providers, and reports from the Funds' CCO.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[325]

Third, based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[326]  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[327]

Fourth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's

---

[325] DFFCL ¶¶ 56-58.

[326] DFFCL ¶¶ 204-207.

[327] Tr. 177:17-20 (Neal).

institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[328]

Fifth, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

• Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[329]

• No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's

---

[328] DFFCL ¶¶ 242-244.

[329] DFFCL ¶¶ 169-203.

management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[330]

153.    *First, CAL's annual 15(c) Responses included a presentation entitled "Discussion of Management Fee Rates by Product," whose first half contained certain numerical data concerning the advisory fees CAL charged to the Funds and to its other clients, and whose second half consisted of a list of services that CAL purportedly provided to the Funds but not at all, or not to the same extent, to its institutional or subadvisory clients, and of certain purportedly greater costs and risks that CAL assumed in providing its Funds with advisory services (the "Greater Services List"). DX 184-P; DX 176-P; DX 145-Q; DX 113-R; DX 61-R; Tr. at 308:20–309:13. The Greater Services List was virtually identical each year. Id.; see also Tr. at 308:20–309:13. The Greater Services List is reproduced in Exhibit B hereto.*

**RESPONSE:**  Denied. Plaintiffs' assertion that CAL sought to, or was required to, "justify" the Fund's management fee relative to its All Cap Growth Client fees solely on the basis of the different and greater services that CAL provides to the Fund than to its All Cap Growth Clients and the different and greater risks it assumes in advising the Fund than it does in advising its All Cap Growth Clients, is not supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental reasons set forth in CAL's Response to Paragraph 152, *supra*.

154.    *Second, each annual 15(c) Meeting during the Relevant Period, CAL's executives (such as CAL's chief financial officer) reviewed the "Discussion of Management Fee Rates by Product" presentation with the Independent Trustees and discussed the Greater Services List:*

> *Mr. Bhatt reviewed, for each Fund, the differences in rates between the management fees and the Adviser's other types of clients. He then reviewed in detail the factors that distinguish the services received by Funds as registered investment companies from other clients that either do not receive those services or receive them to a substantially lesser degree. Specifically, he discussed services such as the monitoring, supervision and oversight of fund accounting services, fund administration services, tax accounting services, fund distribution and performance reports, among others, as well as the coordination of and management of fund audits and provision of customer support.*

---

[330] DFFCL ¶ 227.

> *He also noted that the Adviser provides and maintains extensive*
> *websites containing fund data; information technology*
> *infrastructure, controls and security; automatic investment*
> *programs; tax reporting services; continuous monitoring to ensure*
> *compliance with the federal securities laws; and that the Adviser*
> *provides necessary services or support in connection with*
> *regulatory examinations and preparation and distribution of fund*
> *regulatory filings.*

*JX 144 at 636366; JX 111 at 534339.*

    **RESPONSE:**  Denied as stated.  CAL admits that Paragraph 154 accurately quotes from the June 2016 Board meeting minutes.  Plaintiffs' assertion that CAL sought to, or was required to, "justify" the Fund's management fee relative to its All Cap Growth Client fees solely on the basis of the different and greater services that CAL provides to the Fund than to its All Cap Growth Clients and the different and greater risks it assumes in advising the Fund than it does in advising its All Cap Growth Clients, is not supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental reasons set forth in CAL's Response to Paragraph 152, *supra*.

    *155.  Third, during the 15(c) Meetings, additional CAL executives, including CAL General Counsel Mr. Jackson, and CAL founder and co-chief investment officer Mr. Calamos, Sr., provided further commentary concerning the purportedly greater risks CAL incurred in providing advisory services to its Funds (versus to other accounts):*

> *Mr. Jackson added that the pricing of each management*
> *agreement with the Funds reflects the fact that the regulatory and*
> *litigation environment affect advisers of mutual funds in more*
> *significant ways than they affect advisers of only private accounts.*
> *Specifically, he noted that the Adviser's concerns with the litigation*
> *risks involved in running a mutual fund are reflected in the pricing*
> *of its contracts. In response to a question, he noted that this*
> *number is necessarily subjective, but that it is reasonable for the*
> *business to price in that risk. This, he explained, is typically one of*
> *the factors (among many others, as discussed by Mr. Bhatt) that*
> *account for different pricing between private accounts and mutual*
> *fund management agreements.  (JX 144 at 636366)*

***

119

> *Mr. Calamos highlighted the entrepreneurial risk associated with
> the fund business and the added risk of liability present in the fund
> versus private wealth or separately managed account business.  He
> noted that the regulatory and litigation risk cannot be quantified
> because there are no explicit expense figures associated with them.
> He stated, however, that they are very real, as the current Chill
> litigation illustrates.  (JX 111 at 534339)*

**RESPONSE:**  Denied.  CAL admits that Paragraph 155 accurately quotes from the July

2015 and June 2016 Board meeting minutes.  Plaintiffs' assertion that CAL sought to, or was

required to, "justify" the Fund's management fee relative to its All Cap Growth Client fees solely

on the basis of the different and greater services that CAL provides to the Fund than to its All

Cap Growth Clients and the different and greater risks it assumes in advising the Fund than it

does in advising its All Cap Growth Clients is not supported by the trial evidence or the Section

36(b) jurisprudence for each of the fundamental reasons set forth in CAL's Response to

Paragraph 152, *supra*.

156.    As reflected nearly verbatim each year in the 15(c) Meeting Minutes, the
*Independent Trustees took into account and credited CAL's above-detailed written and oral
representations concerning the purportedly greater services it provided, and risks it assumed, in
providing advisory services to its Funds as opposed to other advisory clients:*

> *The Board took into account the Adviser's assertion that although,
> generally, the rates of fees paid by institutional clients were lower
> than the rates of fees paid by the Funds, the differences reflected
> the Adviser's greater level of responsibilities and significantly
> broader scope of services regarding the Funds, the more extensive
> regulatory obligations and risks associated with managing the
> Funds, and other financial considerations with respect to creation
> and sponsorship of the Funds. The Board considered factors that
> lead to more expenses for registered funds including but not
> limited to: (i) capital expenditures to establish a fund, (ii) length of
> time to reach critical mass, and the related expenses, (iii) higher
> servicing costs of intermediaries and shareholders, (iv) higher
> redemption rates of assets under management, (v) entrepreneurial*

*risk assumed by the Adviser and (vi) greater exposure to "make whole" errors.[331]*

**RESPONSE:**  Denied.  CAL admits that Paragraph 156 accurately quotes from and/or cites to the referenced Board meeting minutes.  Plaintiffs' assertion that CAL sought to, or was required to, "justify" the Fund's management fee relative to its All Cap Growth Client fees solely on the basis of the different and greater services that CAL provides to the Fund than to its All Cap Growth Clients and the different and greater risks it assumes in advising the Fund than it does in advising its All Cap Growth Clients is not supported by the trial evidence or the Section 36(b) jurisprudence for each of the fundamental reasons set forth in CAL's Response to Paragraph 152, *supra*.

### 3.   The Uncontroverted Record Evidence Establishes that the Cost of the Greater Services/Risks Bears No Reasonable Relationship to the Fee Differential

*157.   Even assuming CAL undertakes additional services and greater risks with respect to advising funds versus non-funds, the cost associated with those greater services and risks comes nowhere close to explaining/accounting for the massive difference in CAL's advisory fees, because it amounts to a maximum of six basis points.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as

---

[331] *JX 187 at 654061; JX 180 at CALMAOS_652321; JX 144 at 636381; JX 111 at 534351; JX 70 at 534050; JX 31 at 503420.*

Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the trust."[332]   None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[333]   Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for any of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[334]

Second, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in each of the following areas:  (a) legal, regulatory and compliance;[335] (b) fund governance services;[336] (c) fund administration services;[337] (d) portfolio management services;[338] and (e) client/shareholder services.[339]   And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and

---

[332] DFFCL ¶¶ 166-167.

[333] DFFCL ¶ 168.

[334] DFFCL ¶¶ 169-172.

[335] DFFCL ¶¶ 174-180.

[336] DFFCL ¶¶ 181-183.

[337] DFFCL ¶¶ 184-188.

[338] DFFCL ¶¶ 189-192.

[339] DFFCL ¶¶ 193-197.

oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[340]

Third, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients. As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange. They're both fruit, but they are totally different fruit. If you are to take a bite of each one, you would get a whole different taste."[341]

Fourth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks. No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks. Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus'

---

[340] DFFCL ¶ 187.

[341] DFFCL ¶¶ 204-207.

advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[342]

Fifth, Plaintiffs' sole proffered basis for its assertion as to the purported "cost associated with those greater services and risks" is the belated and demonstrably erroneous calculation from Dr. Pomerantz. This calculation does not prove anything, and is therefore of no probative value to any issue in this case, because, among other reasons (a) at the time of his deposition, Dr. Pomerantz testified that he had not, and could not, calculate the difference in CAL's costs between managing a mutual fund and advising an institutional or sub-advisory All Cap Growth Client, (b) Dr. Pomerantz does not have the requisite experience in the mutual fund industry to assess the differences in services and risks involved in advising a mutual fund as compared with institutional or sub-advisory accounts, and (c) Dr. Pomerantz conceded that he had zero experience calculating this type of cost differential during his career, and he could not provide any example of an occasion in which a court had ruled that he was qualified to perform this kind of analysis.[343] As Dr. Pomerantz aptly described it, the costs forming the basis for his 6.1 basis point calculation "don't really correspond to anything."[344]

Sixth, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap

---

[342] DFFCL ¶¶ 242-244.

[343] DFFCL ¶¶ 376-377, 379.

[344] DFFL ¶ 379.

Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[345]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[346]

158. *Plaintiffs' expert Dr. Pomerantz showed that if one takes all the functional expenses that conceivably relate to plausible additional services and risks – namely, those for fund administration; legal, compliance, and internal audit; and insurance – and allocate 100% of those expenses to the mutual fund side of CAL's business, and none to the institutional side, they would total 3.6 basis points in 2014, 4.6 basis points in 2015, and 6.1 basis points in 2016. Pomerantz Report at ¶¶221-85; Tr. at 565:2-568:2; JX 181 at Ex. B.*

**RESPONSE:** Denied. Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 157, *supra*.

159. *This analysis is especially conservative because it assumes that no insurance, legal, compliance, or internal audit costs are incurred with respect to CAL's institutional accounts – and, hence, that no such costs are allocable to the institutional part of CAL's business – which the evidence shows is untrue. Tr. at 567:18 – 568:2. For example: (i) CAL's*

---

[345] DFFCL ¶¶ 169-203.

[346] DFFCL ¶ 227.

*general counsel, Mr. Jackson, estimated that he devoted 60% of his time to non-fund client matters during the heart of the Relevant Period (Tr. at 269:24-270:10); (ii) CAL's compliance department has numerous functions which relate to non-fund accounts (Mickey Dep. at 54-55, 112-13, 119-20, 128, 130-31); and (iii) CAL's insurance policies cover liability arising from its advisory activities regardless of the nature of the client. PX 423, PX 424, PX 425, PX 426.*

**RESPONSE:**  Denied.  CAL admits only that it may incur insurance, legal, compliance, and/or internal audit costs with respect to its institutional accounts.  However, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 157, *supra*.

*160.     Conversely, CAL never estimated or otherwise quantified the cost of providing the purported greater risks or services to Board.  See Tr. at 130:19-24; 131:18-132:7, 244:12-245:3, 264:20-265:4; 267:3-6; 268:2-21; 269:2-4, see also Timbers Dep. at 163:13-25, 164:12-165:19; Bhatt Dep. at 205:6-206:5.*

**RESPONSE:**  Denied.  CAL admits that the Independent Trustees' decision to approve the Fund's management fee even though it was higher than the fees CAL charged to its All Cap Growth Clients was <u>not</u> a cost-based decision; it was based on their judgment, informed by the materials they received from CAL and the Independent Trustees' industry experience, that any incremental costs arising out CAL's different and greater services and risks with respect to the Fund do not dictate the Fund's market-based fee.  For this same reason, the Independent Trustees have never asked CAL to quantify the cost of the additional services and risks associated with mutual funds but not with other types of accounts.[347]

---

[347] DFFCL ¶ 209.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 157, *supra*.

161.   *Nor did CAL present any trial evidence controverting Plaintiffs' 3.6 to 6.1 basis point cost-differential calculation.   In fact, CAL retained Mr. Richardson specifically to rebut Dr. Pomerantz regarding the level of services CAL purportedly provided to its non-Fund clients, but Mr. Richardson expressly testified that he:  (i) was not offering any opinion regarding the accuracy of Dr. Pomerantz's cost estimate, Tr. at 754:3-17, and (ii) did not attempt to quantify or estimate the cost/value of the purported greater services or risks (individually or in the aggregate), Tr. at 756:13-16  Moreover, Mr. Richardson admitted that he did not offer the opinion that the purported greater services and risks accounted for the totality of the fee differential between CAL's fund and non-fund clients.  Tr. at 754:25-756:7.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 157, *supra*.

162.    *Instead CAL has variously claimed that that the cost differential is either impossible or difficult quantify.  Compare JX 111 at 534339 (Mr. Calamos claiming to the Board that costs "cannot be quantified") (emphasis added), with JX 181 at ¶8 (interrogatory responses asserting costs not "reasonably susceptible" to quantification) with Tr. at 244:24-245:15, 250:3-251:10 (Mr. Helmetag claiming that cost of incremental services is difficult to quantify).*

**RESPONSE:**  Denied.  CAL admits that the cost of such services and risks are enterprise-wide and not reasonably susceptible of quantification.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of the different and greater services and risks with respect to managing the Fund as compared to its All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 157, *supra*.

163.     *CAL's claim that it cost more to advise its fund clients is also undermined by its Mutual Fund Profitability reports to the Trustees.*

**RESPONSE:**  Denied.  Plaintiffs did not present any evidence to support their assertion

that the use of a cost allocation methodology for purposes of calculating an adviser's profitability

from managing a mutual fund proves anything about the adviser's "per dollar basis" costs of

providing services to a non-mutual fund client.  To the contrary, as Professor Lacey explained,

both in his expert report and at trial, "[t]he purpose here is an allocation to determine the

profitability of the funds."[348]  Furthermore, even if Plaintiffs' unwarranted and unsupported

assertion were credited, it would necessarily mean that CAL's method of calculating profitability

under-allocated costs to the mutual funds, thus increasing their profit margins, which is entirely

inconsistent with Plaintiffs' contention that CAL understated its profitability with respect to the

Fund.

Finally, to the extent that Plaintiffs' accounting, profitability or cost allocation assertions

rely on the testimony of Dr. Pomerantz, those assertions are not supported by any admissible or

credible evidence because Dr. Pomerantz is not in any way qualified to offer any expert opinion

concerning accounting, profitability or cost allocation methodologies.[349]

164.     *Specifically, those reports allocate CAL's indirect expenses between its mutual fund and institutional account "product lines" based on average AUM.  Tr. at 229:13-230:21; JX 145 at 634760-4761; JX 113 at 502938-2939; JX 61 at 519582-9583. This is significant, because it indicates that, per dollar of AUM, the indirect costs of advising mutual funds are equivalent to those of institutional accounts.  Tr. at 568:12-569:18. In other words, CAL's allocation methodology refutes the claim that mutual funds costs more to advise, because CAL assigns the same value/cost to advising its fund and its non-fund clients on a per dollar basis.  Id. Thus, although CAL might spend more total dollars servicing mutual funds, that is simply a function of the larger AUM on the mutual fund side of the business.  Id.  If CAL's fund and non-*

---

[348] Tr. 1025:11-12 (Lacey); *see* Lacey Rpt. ¶ 47 ("[T]he choice of an allocation methodology is not intended to provide information about the extent, nature, or quality of services.).

[349] DFFCL ¶¶ 417-420.

*fund clients had equivalent AUM, CAL would allocate the same amount of indirect costs to each of them.*

**RESPONSE:**  Denied.  CAL admits that in the Mutual Fund Profitability presentation, CAL utilized an "average AUM" methodology to allocate indirect (but not direct) costs.  CAL denies that this allocation methodology "refutes the claim that mutual funds costs more to advise [sic]."  The purpose of the Mutual Fund Profitability presentation is to present the profitability of the mutual funds advised by CAL.  CAL used a reasonable allocation methodology that is consistent with the principles underlying GAAP, is consistent with managerial accounting principles, is decision-useful to the Independent Trustees, and is accepted in the mutual fund industry.[350]  Plaintiffs did not present any evidence to support their assertion that the use of a cost allocation methodology for purposes of calculating an adviser's profitability from managing a mutual fund proves anything about the adviser's "per dollar basis" costs of providing services to a non-mutual fund client.  To the contrary, as Professor Lacey explained, both in his expert report and at trial, "[t]he purpose here is an allocation to determine the profitability of the funds."[351]  Furthermore, even if Plaintiffs' unwarranted and unsupported assertion were credited, it would necessarily mean that CAL's method of calculating profitability under-allocated costs to the mutual funds, thus increasing their profit margins, which is entirely inconsistent with Plaintiffs' contention that CAL understated its profitability with respect to the Fund.

Finally, to the extent that Plaintiffs' accounting, profitability or cost allocation assertions rely on the testimony of Dr. Pomerantz, those assertions are not supported by any admissible or

---

[350] DFFCL ¶¶ 301, 304-307.

[351] Tr. 1025:11-12 (Lacey); *see* Lacey Rpt. ¶ 47 ("[T]he choice of an allocation methodology is not intended to provide information about the extent, nature, or quality of services.).

credible evidence because Dr. Pomerantz is not in any way qualified to offer any expert opinion

concerning accounting, profitability or cost allocation methodologies.[352]

**4.      CAL's Claims Concerning Greater Services Were Substantially
Controverted by the Evidence at Trial**

*165.     CAL's Greater Services claims were substantially controverted by trial evidence,
as summarized in Exhibit B hereto (reproducing CAL's claimed Greater Services and
summarizing relevant evidence concerning each of them). Certain of the claimed Greater
Services were not actually provided to the Growth Fund. See Section III.B.4.a, infra. Many of
the Greater Services were services that CAL performed pursuant to the FASA and was already
compensated for under the FASA, and thus do not justify higher fees under the IMA. See Section
III.B.4.c, infra. Many of the Greater Services were not provided to the Growth Fund by CAL,
but instead by third party service providers in entire or substantial part, with CAL's contribution
largely limited to the Fund Administration department's oversight and monitoring of others'
work. See Section III.B.4.b, infra. Relatedly, many of the Greater Services were performed, or
overseen/monitored, by CAL's Fund Administration department, at minimal expense to CAL.
See Section III.B.4.d, infra. Finally, many of the claimed Greater Services did not appear to be
provided by CAL to any "greater" extent to the Funds (versus to CAL's other clients), but
instead were provided in substantially comparable extent to the Funds and to CAL's non-Funds
clients. See Section III.B.4.e, infra.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of the supposedly limited services that CAL provided to the Fund under the

IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of

these different services fail to support a cognizable Section 36(b) claim for each of the following

fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to

the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as

Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs

to be done" for the Fund and "providing literally all of the necessary services to operate the

trust."[353]  None of CAL's investment management agreements for its 36 All Cap Growth Clients

---

[352] DFFCL ¶¶ 417-420.

[353] DFFCL ¶¶ 166-167.

130

even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for <u>any</u> of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[354]  Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for <u>any</u> of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[355]

     <u>Second</u>, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in <u>each</u> of the following areas:  (a) legal, regulatory and compliance;[356] (b) fund governance services;[357] (c) fund administration services;[358] (d) portfolio management services;[359] and (e) client/shareholder services.[360]  And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[361]

---

[354] DFFCL ¶ 168.

[355] DFFCL ¶¶ 169-172.

[356] DFFCL ¶¶ 174-180.

[357] DFFCL ¶¶ 181-183.

[358] DFFCL ¶¶ 184-188.

[359] DFFCL ¶¶ 189-192.

[360] DFFCL ¶¶ 193-197.

[361] DFFCL ¶ 187.

Third, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients. As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange. They're both fruit, but they are totally different fruit. If you are to take a bite of each one, you would get a whole different taste."[362]

Fourth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks. No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks. Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[363]

---

[362] DFFCL ¶¶ 204-207.

[363] DFFCL ¶¶ 242-244.

<u>Fifth</u>, Plaintiffs' sole proffered basis for their assertion as to the purported "cost associated with those greater services and risks" is the belated and demonstrably erroneous calculation from Dr. Pomerantz.  This calculation does not prove anything, and is therefore of no probative value to any issue in this case, because, among other reasons (a) at the time of his deposition, Dr. Pomerantz testified that he had not, and could not, calculate the difference in CAL's costs between managing a mutual fund and advising an institutional or sub-advisory All Cap Growth Client, (b) Dr. Pomerantz does not have the requisite experience in the mutual fund industry to assess the differences in services and risks involved in advising a mutual fund as compared with institutional or sub-advisory accounts, and (c) Dr. Pomerantz conceded that he had zero experience calculating this type of cost differential during his career, and he could not provide any example of an occasion in which a court had ruled that he was qualified to perform this kind of analysis.[364]  As Dr. Pomerantz aptly described it, the costs forming the basis for his 6.1 basis point calculation "don't really correspond to anything."[365]

<u>Sixth</u>, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the

---

[364] DFFCL ¶¶ 376-377, 379.

[365] DFFL ¶ 379.

pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[366]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients."  Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[367]

### a.  Services CAL Admitted are Inapplicable to the Growth Fund

*166.   Certain of CAL's claimed Greater Services were not provided to the Growth Fund (or any of the Open-End Funds), and related instead only to the Closed-End Funds.  For example, supervision, monitoring and oversight of "financial leverage," related only to the Closed-End Funds, which employed financial leverage, and not to the Open-End Funds, which did not.  Tr. 376:19-377:1, 311:3–312:20; Mickey Dep. at 144:7-11; Olsen Dep. at 37:22-25.*

**RESPONSE:**  Denied.  The record evidence cited in Paragraph 166 does not support the assertion that CAL did not employ financial leverage to the Fund.  Mr. Jackson testified that the Fund may employ financial leverage,[368] and Mr. Mickey testified only that financial leverage primarily related to the closed-end funds without addressing whether it was employed for the

---

[366] DFFCL ¶¶ 169-203.

[367] DFFCL ¶ 227.

[368] Tr. 311:3-20 (Jackson) ("Q.  Do you see the sub-bullet points collateral management and financial leverage? . . . You agree that these services are not directly relevant to the growth funds and primarily relate to the closed-end funds, right?  A.  No.  I'm not sure exactly that is the case. . . . In terms of financial leverage, financial leverage, while we have financial leverage for our closed-end funds, again, pursuant to restrictions imposed by Section 18, depending upon the nature of investments, I wouldn't rule that completely out of growth fund either.").

Fund.[369]  In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund and/or because of CAL's

failure to "justify" the Fund's fee in light of the cost of these different services fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 165, *supra*.

**b.      Services Provided Entirely or Substantially by Third-Party Service Providers**

*167.     The first twelve of the listed Greater Services consisted of CAL's "monitoring, supervision and oversight" of eleven matters, namely:  (1) Fund accounting services, (2) Fund administration services, (3) tax accounting services, (4) Fund distributions, (5) performance reporting, (6) valuation of portfolio securities and NAV pricing; (7) collateral management, (8) financial leverage, (9) Fund expenses and budgets, (10) portfolio accountant, fund custodian, transfer agent and prime broker, and (11) securities lending oversight.  DX 145-Q at 634754.*

**RESPONSE:**  Denied as stated.  CAL admits that it is responsible for monitoring,

supervising, and overseeing the provision of each of the referenced services to the Fund by third

parties.  As the trial evidence also demonstrates: (a) CAL remains responsible to the Fund for the

activities conducted through service providers; (b) CAL is responsible to the Fund for

identifying, monitoring, and working to mitigate risks arising from these service provider

relationships, which includes reviewing and negotiating agreements with service providers,

engaging with service providers on a daily, real-time basis, conducting on-site due diligence of

the provider, and making reports and recommendations to the Board concerning providers; (c)

other CAL personnel outside of the Fund Administration department were also involved in

CAL's oversight activities, including the legal department, the compliance department, and other

departments within CAL; and (d) CAL also remains directly responsible to the Funds in the

---

[369] Mickey Dep. at 144:7-11.

135

event that a service provider does not correctly perform one of its duties or provides below-quality service.[370]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

*168.    With respect to each of the eleven above-identified services that were monitored, supervised and/or overseen by CAL, such services were performed substantively not by CAL, but by various third-party service providers, with CAL merely monitoring, supervising and overseeing the third-party service providers' work.  DX 145-Q at 634754; Tr. at 373:1–378:8; see also Tr. at 204:19–211:22, 910:22–915:7.  CAL's Fund Administration department was responsible for managing these, and all other, activities conducted through third-party service providers.  Tr. at 373:1–378:8; DX 1166.  The expense to CAL of providing such monitoring, supervision and oversight services were the Fund Administration department's operating expenses, which, when allocated among the Funds, were minimal.  See Section III.B.4.d, infra.*

**RESPONSE:**  Denied.  As the trial evidence demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; (c) other CAL personnel outside of the Fund Administration department were also involved in CAL's oversight activities, including the legal department, the compliance department, and other departments within CAL; and (d) CAL also remains directly responsible to

---

[370] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

the Funds in the event that a service provider does not correctly perform one of its duties or provides below-quality service.[371]

In addition Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

169.   *In addition, certain of the non-"monitoring, supervision and oversight" services listed as Greater Services were performed in substantial part not by CAL, but by third-party service providers.*

**RESPONSE:**   Denied.  Plaintiffs have offered no evidence as to what they mean by "non-'monitoring, supervision and oversight' services."  In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

170.   *One of the Greater Services listed by CAL was "provision of around-the-clock customer support."  DX 145-Q at 634754.  This referred to the call-center that CAL operated and staffed with five-six employees during the Relevant Period, to respond to certain calls from Fund shareholders. Tr. at 378:17–379:4, Behan Decl. at ¶¶80-85.  However, the Funds' shareholders' initial and/or primary source of customer support was the Funds' transfer agent, USBFS, which operated an automated call-in system for the Funds' shareholders and which routed a subset of such calls to CAL's call-center. Tr. 360:25–361:19, 378:24–379:23.  CAL's gross cost to operate its call center was $400,000 per year, which was offset by a $175,000 annual payment from USBFS.  Tr. at 361:20–362:1; Behan Decl. at ¶84.  CAL discontinued its call center in July 2017, as the service became less necessary.  Tr. 361:10-15; Behan Decl. at ¶85.*

---

[371] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

**RESPONSE:**  Denied as stated.  The call center was one service provided to Fund shareholders that might be described as "provision of around the clock customer-support" but it was not the only such service.[372]  For instance, CAL also provides 24-hour access to information about clients' investments through its website.[373]  CAL incurred a cost of approximately $400,000 per year to operate the call center, which was only partially reimbursed from USBFS. CAL otherwise denies the Plaintiffs' assertions in Paragraph 170.  Specifically, CAL itself operated a call center to serve its mutual fund clients, but not its institutional or sub-advisory clients, during most of the Relevant Period, until 2017.[374]  Before the Relevant Period, USBFS had operated a similar call center of CAL's behalf, but CAL later decided to perform this service itself in order to provide a higher quality of service.[375]  During much of the Relevant Period, CAL's call center received more than 1,000 calls each month, and CAL client services associates also responded directly to email inquiries from mutual fund shareholder, their financial advisers, and intermediaries.[376]  Moreover, CAL did not entirely discontinue the call center in 2017; rather, CAL decided to transfer responsibility to the call center back to USBFS.[377]  CAL still receives a significant number of direct calls from investors and advisors.[378]

As the trial evidence also demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for

---

[372] DFFCL ¶ 194; Tr. 378:19-23 (Holloway).

[373] DFFCL ¶ 194.

[374] DFFCL ¶ 194; Behan Decl. ¶ 80.

[375] DFFCL ¶ 194; Behan Decl. ¶ 80; JX 24.

[376] DFFCL ¶ 194; Behan Decl. ¶ 81.

[377] Behan Decl. ¶ 85; Tr. 361:10-12 (Holloway).

[378] Behan Decl. ¶ 85.

identifying, monitoring, and working to mitigate risks arising from these service provider

relationships, which includes reviewing and negotiating agreements with service providers,

engaging with service providers on a daily, real-time basis, conducting on-site due diligence of

the provider, and making reports and recommendations to the Board concerning providers; (c)

other CAL personnel outside of the Fund Administration department were also involved in

CAL's oversight activities, including the legal department, the compliance department, and other

departments within CAL; and (d) CAL also remains directly responsible to the Funds in the

event that a service provider does not correctly perform one of its duties or provides below-

quality service.[379]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund under the IMA and/or because

of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different

services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set

forth in CAL's Response to Paragraph 165, *supra*.

171.     *One of the Greater Services listed by CAL was "client service, shareholder and financial advisor communication."  DX 145-Q at 634754.  However, a substantial portion of shareholder communications was performed by the Funds' transfer agent, USBFS, who inter alia – and in addition to the call-center service discussed above – prepared and mailed account statements and purchase/redemption confirmations to the Funds' shareholders.  Tr. at 359:4-19, 379:24–380:10; JX 182 at 2.*

**RESPONSE:**  Denied as stated.  USBFS prepares and mails certain account statements

and purchase and redemption confirmations to shareholders.  CAL denies that these services

constitutes a "substantial portion of shareholder communications."  There are numerous other

shareholder communications and services that CAL provides.[380]  As the trial evidence also

---

[379] DFFCL ¶¶ 187, 200, Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

[380] DFFCL ¶ 194; Behan Decl. ¶¶ 77-87; Holloway Decl. ¶¶ 16, 50(f), 52.

demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; (c) other CAL personnel outside of the Fund Administration department were also involved in CAL's oversight activities, including the legal department, the compliance department, and other departments within CAL; and (d) CAL also remains directly responsible to the Funds in the event that a service provider does not correctly perform one of its duties or provides below-quality service.[381]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

172.   *One of the Greater Services listed by CAL was provision of "extensive websites" that included, among other things, "general account information." DX 145-Q at 634754. 362:2-16. However, this section of CAL's website, was in fact provided and operated by the Funds' transfer agent, USBFS, which maintained the Funds' shareholders' general account information and made it accessible via a transparent hyperlink on CAL's website. Tr. at 362:2-16; JX 182 at 3-4 and 17-19.*

**RESPONSE:**  Denied as stated.  CAL's website is comprised of multiple sections, including information accessible to all members of the public, in additional to a credential-restricted area accessible only to registered investment advisers who typically work on behalf of

---

[381] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

current and prospective mutual fund shareholders.[382]  As the trial evidence demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; (c) other CAL personnel outside of the Fund Administration department were also involved in CAL's oversight activities, including the legal department, the compliance department, and other departments within CAL; and (d) CAL also remains directly responsible to the Funds in the event that a service provider does not correctly perform one of its duties or provides below-quality service.[383]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

173.    *One of the Greater Services listed by CAL was "[p]reparation of regulatory filing and distribution of prospectuses and shareholder reports." DX 145-Q at 634755.  However, all of CAL's regulatory filings with the exception of registration statements/prospectuses – including annual and semi-annual reports on Form N-CSR; quarterly portfolio disclosure reports on Form N-Q; annual proxy voting reports on Form N-PX; and filings on Form N-SAR – were prepared and drafted entirely, or in largest part, by State Street, under the Sub-Administration Agreement. JX 183 at 645542 (Sub-Administration Agreement, §§ 5(a) and 5(c)) and PX 488 at 645534-35 (Sub-Administration Agreement side-letter at §§ 2(a) and 2(c)); Tr. at 317:22–321:23, 380:11-17, 384:6–385:1, 918:18–921:5.  CAL's registration statement/prospectus filings were the responsibility of CAL's legal department, but external Fund Counsel assisted in preparing those filings, and in reviewing other regulatory filings.  Tr.*

---

[382] Behan Decl. ¶ 86.

[383] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

*at 315:25–317:21, 384:21–385:1; PX 418; PX 419 at 317471-73.  For its work on the Funds'*
*regulatory filings, Fund Counsel was separately and directly compensated by the Funds.  Tr. at*
*315:25–317:21, 384:21–385:1; PX 419; JX 5 at 146344 (IMA §3(k)).  Additionally,*
*"distribution of prospectuses and shareholder reports" was performed by third party service*
*providers (USBFS and Broadridge), not CAL, see Tr. at 359:20 – 360:3, and expenses*
*associated with such distribution were paid directly by the Funds, see JX 5 at 146343 (IMA*
*§3(h)) and Tr. at 321:24–322:17, 385:6-10.*

**RESPONSE:**  Denied as stated.  Certain service providers, including State Street, Fund

Counsel, and USBFS, prepare, assist in providing information used in, and/or distribute certain

regulatory filings and shareholder prospectuses and reports subject to CAL's monitoring,

supervision, and oversight.  As the trial evidence demonstrates: (a) CAL remains responsible to

the Fund for the activities conducted through service providers; (b) CAL is responsible to the

Fund for identifying, monitoring, and working to mitigate risks arising from these service

provider relationships, which includes reviewing and negotiating agreements with service

providers, engaging with service providers on a daily, real-time basis, conducting on-site due

diligence of the provider, and making reports and recommendations to the Board concerning

providers; (c) other CAL personnel outside of the Fund Administration department were also

involved in CAL's oversight activities, including the legal department, the compliance

department, and other departments within CAL; and (d) CAL also remains directly responsible to

the Funds in the event that a service provider does not correctly perform one of its duties or

provides below-quality service.[384]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund under the IMA and/or because

of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different

---

[384] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set

forth in CAL's Response to Paragraph 165, *supra*.

     *174.    One of the Greater Services listed by CAL was "continuous monitoring to ensure regulatory compliance" with the ICA and other relevant regulatory provisions.  DX 145-Q at 634755.  However, the Funds' transfer agent, USBFS, provided the Funds (and/or CAL) with certain compliance monitoring services, including monitoring for money-laundering, identity theft, suspicious transactions, late trading and market timing, and provided "blue sky" compliance monitoring with respect to state regulations.  Tr at 362:17 – 363:13; JX 182 at 3-6, 25-26.  Similarly, State Street provided further compliance monitoring services under the Sub-Administration Agreement.  JX 183 at 645542 (Sub-Administration Agreement at §§ 5(e), (k) and (l)); PX 488 at 645535-36 (Sub-Administration Agreement side-letter at §§2(e) and 2(h)(2)).*

     **RESPONSE:**  Denied as stated.  As the trial evidence demonstrates: (a) CAL remains

responsible to the Fund for the activities conducted through service providers; (b) CAL is

responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from

these service provider relationships, which includes reviewing and negotiating agreements with

service providers, engaging with service providers on a daily, real-time basis, conducting on-site

due diligence of the provider, and making reports and recommendations to the Board concerning

providers; (c) other CAL personnel outside of the Fund Administration department were also

involved in CAL's oversight activities, including the legal department, the compliance

department, and other departments within CAL; and (d) CAL also remains directly responsible to

the Funds in the event that a service provider does not correctly perform one of its duties or

provides below-quality service.[385]

     In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund under the IMA and/or because

of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different

---

[385] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

*175.    One of the Greater Services listed by CAL was "automatic investment programs." DX 145-Q at 634755.  However, this service was in fact provided by the Funds' transfer agent, USBFS.  JX 182 at 2 (Transfer Agent Servicing Agreement, §2(g)).*

**RESPONSE:**  Denied as stated.  As the trial evidence demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; (c) other CAL personnel outside of the Fund Administration department were also involved in CAL's oversight activities, including the legal department, the compliance department, and other departments within CAL; and (d) CAL also remains directly responsible to the Funds in the event that a service provider does not correctly perform one of its duties or provides below-quality service.[386]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

*176.    One of the Greater Services listed by CAL was "tax reporting services."  DX 145-Q at 634755.  However, third-party service providers provided certain tax reporting services.*

---

[386] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

*See e.g. JX 182 at 2 (Transfer Agent Servicing Agreement, §§2(m) and 2(o)); PX 488 at 645536 (Sub-Administration Agreement side-letter, §2(h)(1)).*

    **RESPONSE:**  Denied as stated.  As the trial evidence demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; (c) other CAL personnel outside of the Fund Administration department were also involved in CAL's oversight activities, including the legal department, the compliance department, and other departments within CAL; and (d) CAL also remains directly responsible to the Funds in the event that a service provider does not correctly perform one of its duties or provides below-quality service.[387]

    In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 165, *supra*.

### c.    Services Provided Under, and Compensated by, the FASA

    *177.    Many of the claimed Greater Services are services that CAL was required to perform by the FASA, and for which CAL was compensated by the fees set forth in FASA, as CAL itself explained to the Independent Trustees as part of its 15(c) Responses.  See Section II.D, supra.*

---

[387] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

**RESPONSE:**  Denied as stated.  There is nothing about the FASA that even suggests, let alone proves, that the Fund's management fee is excessive, for each of the following independent and fundamental reasons:

First, both of Plaintiffs' experts concede that CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA. And as Professor Bullard further conceded, the services rendered by the adviser that are to be considered under the *Jones/Gartenberg* standard include all of the services that the adviser provides for the fund, whether those services are provided under one or several contracts.[388]

Second, the nature or extent of CAL's services to the Fund as required by the IMA were not reduced or changed in any way by the FASA.  Even without the FASA, CAL would still have the responsibility, under the IMA's provision that CAL is required to "manage, supervise, and oversee the affairs" of the Funds, either to provide itself or to ensure the provision through third parties of all necessary services for the Funds, including the financial accounting services recited in the FASA.  Following the termination of the FASA, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by CAL has not decreased.[389]

Third, during the period of time the FASA was in existence, no one at CAL differentiated between services provided pursuant to the IMA versus services provided pursuant to the FASA, nor did CAL employees review or reference the IMA or the FASA in the course of performing

---

[388] DFFCL ¶¶ 352-353.

[389] DFFCL ¶¶ 344-348.

their day-to-day duties in servicing the Fund.  Rather, at all times, CAL focused on providing all of the services that the Fund requires and that CAL is obligated under the IMA to provide.[390]

Fourth, while the FASA was in place, the Independent Trustees annually reviewed the services CAL provided and the 1.1 basis point fee charged under that agreement.  The Independent Trustees, however, did not consider the IMA or the FASA in isolation.  Rather, as part of the 15(c) Process each year, the Independent Trustees considered the totality of services that CAL provides to the Fund and assessed whether the approval of both agreements was reasonable in light of the total fees charged.  Plaintiffs presented no evidence a trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.[391]

Fifth, Plaintiffs' assertions and arguments with respect to the FASA cannot support a finding that the management fee paid under the IMA is excessive.  Specifically, regardless of how the IMA and FASA and the fees charged under each agreement are evaluated, separately or together, it was reasonable and appropriate for the Board to consider the two contracts together. The correct legal standard requires consideration of substance over form.  There is no legal requirement that a fund's board must consider a fund's management agreement with the adviser separately from the fund's other agreements with that same adviser.  There is similarly no law or ruling holding that it is improper for a Board to consider the totality of services provided by the adviser to the Fund and the total compensation received by the adviser as a whole, regardless of whether those services and compensation are set out in one contract or two.[392]

---

[390] DFFCL ¶ 349.

[391] DFFCL ¶¶ 350-351.

[392] DFFCL ¶¶ 354-361.

147

Sixth, nothing did or should have prevented the Independent Trustees from considering

the total services provided by CAL, and the total compensation paid by the Fund to CAL, when

assessing the Fund's overall relationship with CAL.  The evidence at trial fully reinforced the

Independent Trustees' review of both agreements together.

*178.    The Greater Services included monitoring, supervision and oversight of the
Funds' expenses and budgets. DX 145-Q at 634754.  However, the FASA required CAL to, and
compensated CAL for, managing the Funds' expenses and expense payment processing,
monitoring calculations of expense accruals for the Funds and modifying them as necessary, and
coordinating expense reimbursement calculations and payments.  JX 6 at 145713 (FASA §§2.A-
C); Tr. 312:22–313:6, 368:1–369:14.*

**RESPONSE:**  Denied.  As both of Plaintiffs' experts concede, CAL is required to

provide or arrange for the complete bundle of services required for the Fund as part of its

obligations under the IMA.  Moreover, Plaintiffs' assertions that the Fund's management fee is

excessive based on their unsupported attempt to categorize certain services as being provided

"pursuant to" the FASA fail to support a cognizable Section 36(b) claim for each of the

fundamental reasons set forth in CAL's Response to Paragraph 177, *supra*.

*179.    The Greater Services included coordination and management of the Funds'
audits.  DX 145-Q at 634754.  However, the FASA required CAL to, and compensated CAL for,
coordinating the Funds' audits.  JX 6 at 145714 (FASA §2.E(7)); Tr. 313:7-23, 370:10–371:1.*

**RESPONSE:**  Denied.  As both of Plaintiffs' experts concede, CAL is required to

provide or arrange for the complete bundle of services required for the Fund as part of its

obligations under the IMA.  Moreover, Plaintiffs' assertions that the Fund's management fee is

excessive based on their unsupported attempt to categorize certain services as being provided

"pursuant to" the FASA fail to support a cognizable Section 36(b) claim for each of the

fundamental reasons set forth in CAL's Response to Paragraph 177, *supra*.

*180.    The Greater Services included monitoring, supervision and oversight of tax
accounting services, and provision of tax reporting services.  DX 145-Q at 634754-55.
However, the FASA required CAL to, and compensated CAL for, performing multiple tax
accounting and reporting services, including preparing tax information required for the Funds'*

148

*financial statement footnotes and preparing state and federal income tax returns.  JX 6 at 145713-14 (FASA §§2.E(1)-(4)); Tr. 309:20–310:24, 313:24–314:14, 369:15–370:9.*

**RESPONSE:**  Denied.  As both of Plaintiffs' experts concede, CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA.  Moreover, Plaintiffs' assertions that the Fund's management fee is excessive based on their unsupported attempt to categorize certain services as being provided "pursuant to" the FASA fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 177, *supra*.

*181.    The Greater Services included preparation of the Funds' regulatory filings.  DX 145-Q at 634755.  However, the FASA required CAL to, and compensated CAL for, preparing the Funds' regulatory filings.  JX 6 at 145714 (FASA §§2.E(9)); Tr. 314:15–315:23, 370:10–371:1.*

**RESPONSE:**  Denied.  As both of Plaintiffs' experts concede, CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA.  Moreover, Plaintiffs' assertions that the Fund's management fee is excessive based on their unsupported attempt to categorize certain services as being provided "pursuant to" the FASA fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 177, *supra*.

*182.    The Greater Services included monitoring, supervision and oversight of the Funds' distributions and/or dividends.  DX 145-Q at 634754.  However, the FASA required CAL to, and compensated CAL for, calculating the Funds' dividends and distributions.  JX 6 at 145713 (FASA §§2.E); Tr. 374:4-14.*

**RESPONSE:**  Denied.  As both of Plaintiffs' experts concede, CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA.  Moreover, Plaintiffs' assertions that the Fund's management fee is excessive based on their unsupported attempt to categorize certain services as being provided

"pursuant to" the FASA fail to support a cognizable Section 36(b) claim for each of the

fundamental reasons set forth in CAL's Response to Paragraph 177, *supra*.

### d.   Services Handled by Fund Administration at Insignificant Cost

*183.   Many of the items identified in the Greater Services List are handled by CAL's Fund Administration department. Tr. 372:1-385:10; see also 355:12-367:23.*

**RESPONSE:**  Denied.  CAL's Fund Administration department provides several of the

services identified in the Management Fee Rate by Product presentation, but the Fund

Administration department is not the sole department involved in such services.

Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the

supposedly limited services that CAL provided to the Fund under the IMA and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to

the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as

Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs

to be done" for the Fund and "providing literally all of the necessary services to operate the

trust."[393]  None of CAL's investment management agreements for its 36 All Cap Growth Clients

even suggests that CAL bears anything close to the "moral responsibility" for "providing literally

all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any

evidence to the contrary.[394]  Consistent with its limited contractual responsibilities under its

agreements with those clients, CAL did not provide anywhere near the full panoply of services it

was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no

---

[393] DFFCL ¶¶ 166-167.

[394] DFFCL ¶ 168.

Case 1:15-cv-01014-ER   Document 222   Filed 02/11/19   Page 158 of 442

evidence to show that CAL's limited roles and responsibilities for <u>any</u> of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[395]

<u>Second</u>, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in <u>each</u> of the following areas: (a) legal, regulatory and compliance;[396] (b) fund governance services;[397] (c) fund administration services;[398] (d) portfolio management services;[399] and (e) client/shareholder services.[400]  And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[401]

<u>Third</u>, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an

---

[395] DFFCL ¶¶ 169-172.

[396] DFFCL ¶¶ 174-180.

[397] DFFCL ¶¶ 181-183.

[398] DFFCL ¶¶ 184-188.

[399] DFFCL ¶¶ 189-192.

[400] DFFCL ¶¶ 193-197.

[401] DFFCL ¶ 187.

apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[402]

  <u>Fourth</u>, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in <u>all</u> of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent <u>not</u> to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[403]

  <u>Fifth</u>, as the trial evidence demonstrates, without any contradiction from Plaintiffs: (a) multiple other departments at CAL—including the Marketing, Portfolio Management, Tax, Legal and Compliance, and Distribution departments—provide fund administration services or work regularly with the Fund Administration Department to provide services to the Fund; and (b) CAL did not provide to any of its institutional or sub-advisory All Cap Growth clients <u>any</u> of the fund administration services that CAL provides to the Fund.[404]

---

[402] DFFCL ¶¶ 204-207.

[403] DFFCL ¶¶ 242-244.

[404] DFFCL ¶¶ 184-188; Holloway Decl. ¶¶ 9, 55.

*184.    The Fund Administration department oversees, manages, and supervises the activities of all the Funds' third-party service providers.  Tr. at 358:3-8; DX 1166.  This includes the Funds' custodian, accountant, transfer agent, securities lending agents, and auditor.  Tr. 358:9-367:23; DX 1166.*

**RESPONSE:**  Denied.  The Fund Administration department oversees, manages, and

supervises the Funds' custodian, accountant, transfer agent and securities lending agent, but CAL

denies that the Fund Administration department is not the sole department involved in such

oversight services.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund under the IMA and/or because

of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different

services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set

forth in CAL's Response to Paragraph 183, *supra.*

*185.    The Fund Administration department also, inter alia: coordinates the Funds' audits (Tr. at 367:14-18, 378:7-14); reviews drafts of the Funds' SEC filings, including its semi-annual and annual shareholder reports (Tr. at 380:11-17, 384:6-23), its prospectuses and Form N-SARs and N-Qs (Tr. at 381:2-382:4, 384:6-23); JX 183 at 645542; PX 488 at 645534-35), as well as the financial information portions of its Form N-1As (Tr. at 381:6-382:4); gathers the data that go into the Funds' fact sheets posted on CAL's website (Tr. at 380:18-381:1); coordinates and approves the payment of the Funds' expenses and reimbursements (Tr. 356:2-9, 359:1-3, 364:3-9, 367:19-23, 368:20-369:14) including those associated with the Trustees and Trustee meetings (Tr. at 383:21-384:5); reviews the Funds' budgets (Tr. at 377:2-10); performs all the duties set forth under the FASA with the exception of certain tax-related functions which are handled by CAL's Tax Department (Tr. at 368:16-371:9; JX 6); handles collateral management on behalf of the Funds (Tr. 376:13-21); and manages the back-office relationship with the Funds' prime broker (Tr. at 377:11-24).*

**RESPONSE:**  The Fund Administration department performs the tasks identified in

Paragraph 185, but the Fund Administration department is not the sole department involved in

such services.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the

supposedly limited services that CAL provided to the Fund under the IMA and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in

CAL's Response to Paragraph 183, *supra*.

   186.   *CAL operates the Fund Administration department at insignificant cost.  Its total annual budget is $2.8 million, which covers the compensation paid to the department's six employees as well as the fees paid to State Street under the Sub-Administration Agreement pursuant to which CAL outsources a substantial portion of its fund administration functions.  See ¶¶63-69, supra; Tr. at 356:13-357:17; JX 183; PX 488; PX 489.  The allocable cost to the Growth Fund of the Fund Administration department is 1.6 basis points. Tr. at 565:21-567:5; Pomerantz Report at ¶¶221.b, 227, 239, 282.*

   **RESPONSE:**  Denied.  The Fund Administration department's budget is approximately

$2.8 million, but that figure does not measure the cost of the services the Fund Administration

provides.

   CAL denies that the costs of providing fund administration services to the Fund can be

readily measured or that 1.6 basis points accurately captures those costs, for at least three reasons

that are proven by the trial evidence.  First, the Fund Administration Department's work is

critical to the day-to-day operations of the Fund, and the Fund could not operate without those

services.[405]  Second, the Fund Administration Department's budget does not cover all of the

actual costs of fund administration, because multiple other departments at CAL—including the

Marketing, Portfolio Management, Tax, Legal and Compliance, and Distribution departments—

provide fund administration services or work regularly with the Fund Administration Department

to service the Funds.[406]  Third, aside from the costs of providing fund administration services,

CAL bears risks associated with the provision of fund administration services that are not readily

measured.[407]

---

[405] Holloway Decl. ¶ 54; Tr. 390:5-22 (Holloway).

[406] Holloway Decl. ¶ 9, 55; Tr. 389:4-390:4 (Holloway).

[407] Holloway Decl. ¶ 56; Tr. 391:5-392:4 (Holloway).

Moreover, Dr. Pomerantz admitted that the costs forming the basis for his 6.1 basis points calculation to purportedly account for any greater services provided to the mutual funds versus CAL's non-fund clients, including the 1.6 basis points he assigns to fund administration services, "don't really correspond to anything" and the sums of those costs likewise "don't really correspond to anything."[408]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 183, *supra*.

### e. Services that CAL Provided Comparably to Fund and non-Fund Clients Alike

#### i. Client Services: the Extraordinary Level of Attention Lavished on Institutional/Subadvisory Accounts

*187.    CAL had six to seven times the number of full-time Distribution Department personnel servicing the Funds as servicing institutional/subadvisory clients. Tr. at 96:24-97:2. This proportion, however, parallels the proportion of the Funds' AUM to institutional/subadvisory AUM during the Relevant Period. See ¶8, supra; PX 184-A at 653670; PX 176-A at 650495; PX 145-A at 634750; PX 113-A at 502928; PX 61-A at 519572; PX 32-A at 514135. This indicates that effort and cost per dollar of AUM advised is effectively equivalent for the Funds and for Institutional/Subadvisory Accounts. Similarly, "time spent" data for client services personnel, such as Robert Behan (CAL's global head of distribution) indicates that he spent 75% of his time on Funds-related activities. See ¶10, supra. At the same time, however, the Funds comprised 82% of CAL's total AUM. See ¶9, supra. Thus, the fact that Mr. Behan spent more time on Fund related matters is not a function of those matters requiring more work, but rather reflects the far greater percentage of CAL's AUM from Fund clients. This is further indication that the cost per dollar of AUM to provide the Funds and Institutional/Subadvisory Accounts with client services were substantially similar.*

---

[408] DFFCL ¶ 379.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the trust."[409]  None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[410]  Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for any of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[411]

Second, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in each of the

---

[409] DFFCL ¶¶ 166-167.

[410] DFFCL ¶ 168.

[411] DFFCL ¶¶ 169-172.

following areas:  (a) legal, regulatory and compliance;[412] (b) fund governance services;[413] (c) fund administration services;[414] (d) portfolio management services;[415] and (e) client/shareholder services.[416]  And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[417]

Third, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[418]

Fourth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or

---

[412] DFFCL ¶¶ 174-180.

[413] DFFCL ¶¶ 181-183.

[414] DFFCL ¶¶ 184-188.

[415] DFFCL ¶¶ 189-192.

[416] DFFCL ¶¶ 193-197.

[417] DFFCL ¶ 187.

[418] DFFCL ¶¶ 204-207.

regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in <u>all</u> of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent <u>not</u> to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[419]

     <u>Fifth</u>, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee, or even that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[420]

     <u>Sixth</u>, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison

---

[419] DFFCL ¶¶ 242-244.

[420] DFFCL *¶¶* 169-203.

for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[421]

In addition, with specific respect to Plaintiffs' assertions in Paragraph 187, neither the number of distribution personnel nor the time that Mr. Behan estimated in CAL's 15(c) Responses that he spent on Fund-related activities satisfies Plaintiffs' burden to prove that CAL expended the same amount of effort to provide client services for Fund shareholders as it did for All Cap Growth Clients.  As Mr. Becker explained, CAL is responsible for maintaining relationships with "multiple thousands" of intermediaries and financial advisers "across the country" who work on behalf of mutual fund shareholders, whereas CAL had only 36 All Cap Growth Clients during only a portion of the Relevant Period.[422]  The number of relationships that CAL must maintain and service for mutual fund shareholders greatly exceeds the relative AUM levels to which Plaintiffs refer in Paragraph 187.

188.    *CAL lavishes a high level of attention on its institutional clients.  That attention is at least comparable to, if not more than, that provided to the Funds' shareholders and the Board.*

**RESPONSE:**  Denied.  As Mr. Becker explained, CAL's client services obligations to the "multiple thousands" of intermediaries and financial advisers who work on behalf of mutual fund shareholders required substantially greater effort and required CAL to make itself available at all times to meet the needs of mutual fund shareholders.[423]  Moreover, numerous witnesses testified to the significant amount of time and effort to prepare for Board meetings, including but

---

[421] DFFCL ¶ 227.

[422] Tr. 72:23-73:23 (Becker).

[423] Tr. 37:21-38:5, 72:23-73:23, 74:3-75:4 (Becker).

not limited to the preparation of CAL's 15(c) Response.[424]  In any event, since 2017, CAL has

not had any All Cap Growth Clients, so the entirety of its client services efforts related to the All

Cap Growth investment strategy have been expended on behalf of Fund shareholders.[425]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by

"client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

> *189.    CAL believes that institutional clients have "special communications needs" (Tr. at 39:6-19; PX 387 at 641425) and goes to great lengths to cater to them.  Institutional clients are assigned dedicated client service staff including investment professionals who CAL assures "are always available to respond a client's inquiry."  Tr. at 37:18-38:5; PX 387 at 641425.*

**RESPONSE:**  Denied.  Contrary to Plaintiffs' assertion, when Mr. Becker was asked

about this reference to "special communication needs," he stated, "I would think that what that's

referring to is they [*i.e.*, institutional and sub-advisory clients] could have a differentiated need,

not necessarily that they're special or the word 'special' could mean better.  I wouldn't say that.

I would say different."[426]  Furthermore, Mr. Becker also explained (in the testimony cited by

Plaintiffs) that CAL makes its client services professionals available at all times not only to its

institutional and sub-advisory clients, but also to representatives of the Fund and intermediaries

representing Fund shareholders.[427]  As Mr. Becker said, "I would say we're always available to

---

[424] Jackson Decl. ¶¶ 31-48, 50, 53-54, 61-67, 79-94; Helmetag Decl. ¶¶ 9-13, 17-21; Holloway Decl. ¶¶ 58-63; Becker Decl. ¶¶ 22-28; Tr. 74:18-75:4 (Becker); Tr. 324:22-325:8 (Jackson).

[425] Tr. 73:24-74:2 (Becker).

[426] Tr. 39:6-19 (Becker).

[427] Tr. 37:21-38:5 (Becker).

all of our clients."[428]  In fact, Mr. Becker explained that CAL's efforts to satisfy the

communications needs of intermediaries who represent mutual fund shareholders were

substantially greater than the efforts required to communicate with CAL's institutional clients

since there are "multiple thousands" of financial advisers working for intermediaries "across the

country."[429]  And, CAL has performed no work at all for any All Cap Growth Client since

2017.[430]

   In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by

"client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

   *190.    CAL provides institutional clients with quarterly portfolio reviews customized to
their individual portfolios, e-newsletters with market commentary, firm updates and product
reviews, and regular in-person portfolio reviews with members of the CAL investment team.  Tr.
at 39:20-40:16; PX 387 at 641425.*

   **RESPONSE:**  Denied.  As Mr. Becker explained in the exact testimony cited by

Plaintiffs, CAL provides these same services, such as quarterly portfolio reviews and e-

newsletters, to all clients, including the Fund and intermediaries and financial advisers

representing Fund shareholders.[431]  As Mr. Becker further explained, the process of preparing

materials for CAL's performance reviews was largely automated and dwarfed by the effort

required to prepare information about the Fund for the Board, which involved "a lot of back-and-

---

[428] Tr. 37:21-38:5 (Becker).

[429] Tr. 72:23-73:23 (Becker).

[430] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[431] Tr. 39:20-40:16 (Becker).

forth" with the Board to tailor the materials to its needs, including the Independent Trustees'

desire to focus on the Fund as performance struggled.[432]  This greater burden of providing

performance reporting to the Fund's Board does not event account for CAL's numerous other

reporting obligations to the Board on a wide array of matters necessary for the Fund's

governance, none of which applies to CAL's All Cap Growth Clients.[433]  And, CAL has

performed no work at all for any All Cap Growth Client since 2017.[434]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by

"client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

191.    *CAL's website includes dedicated sections for mutual fund shareholders and
institutional clients.  Tr. 40:17-41:14; PX 387 at 641425; Bhatt Dep. at 214.  The institutional
section of the website provides comparable content as the Funds' shareholders' section, and is
regularly updated with performance information, strategy reviews and CAL's current outlook on
the market.  Tr. 40:17-41:14; PX 387 at 641425; Bhatt Dep. at 214.*

**RESPONSE:**  Denied as stated.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients

alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients

fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in

CAL's Response to Paragraph 187, *supra*.

192.    *CAL offers and hosts videoconferences for institutional clients.  Tr. 41:21-25; PX
387 at 641425.*

---

[432] Tr. 74:3-75:4 (Becker).

[433] Holloway Decl. ¶¶ 58-61; Jackson Decl. ¶¶ 34-54.

[434] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

**RESPONSE:**  Denied.  As Mr. Becker explained in the exact testimony cited by

Plaintiffs, CAL hosts videoconferences for institutional clients, and also offers and hosts the

exact same types of videoconferences for intermediaries that represent Fund shareholders.[435]

And, CAL has performed no work at all for any All Cap Growth Client since 2017.[436]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

*193.    CAL provides institutional clients with responses to due-diligence questionnaires which are frequently extensive.  Tr. at 31:24-32:8, 48:1-17; PX 387; PX 358.  It also provides live, in-person due-diligence meetings for which CAL personnel travel all over the world.  Tr. at 32:14-33:4, 35:7-10.*

**RESPONSE:**  Denied. CAL's due diligence obligations to institutional clients are not

"extensive" compared with the analogous requirements undertaken on behalf of mutual fund

clients.  In addition, when Mr. Becker was asked about travel obligations, he expressly rejected

Plaintiffs' suggestion that his travel was "typically for an institutional client," and responded,

"No.  It's a mix between retail clients and institutional clients."[437]  While Mr. Becker testified

that he and other CAL personnel made certain visits to Nomura, as Mr. Becker explained, it was

simply an obligation "once a year to show up locally."[438]  In addition, with respect to CAL's

obligation to respond to institutional clients' due diligence questionnaires, Mr. Becker explained

---

[435] Tr. 41:21-25 (Becker).

[436] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[437] Tr. 32:24-33:4 (Becker).

[438] Tr. 75:17-20 (Becker).

that the information requested was "pretty standardized,"[439] and it paled in comparison to the efforts that CAL undertook to provide information about the Fund to the Board, as described in CAL's Response to Paragraph 190.  In total, CAL responds to many more due diligence questionnaires sent on behalf intermediaries than it does in response to institutional clients.[440] And, CAL has performed no work at all for any All Cap Growth Client since 2017.[441]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

194.    *For institutional clients that request it – for example, CAL's largest institutional ACG client Nomura – CAL provided monthly performance and positioning commentary, excel portfolio reporting spreadsheets, and ad hoc reports in the case of unexpected new or events. Tr. 35:14-21, 42:5-43:4; PX 387 at 641424-25.*

**RESPONSE:**  Denied.  As Mr. Becker explained, Nomura "was an extreme" example of an institutional client and "the exception to the rule."[442]  However, even in Nomura's case, the requests that CAL received were "pretty standardized" and simply required CAL to confirm that it was invariably complying with Nomura's guidelines.[443]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[444]

---

[439] Tr. 75:5-20 (Becker).

[440] Behan Decl. ¶ 87.

[441] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[442] Tr. 75:5-76:4 (Becker); Becker Decl. ¶ 127.

[443] Tr. 75:5-20 (Becker); Becker Decl. ¶ 128.

[444] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

195.   *CAL assisted with Nomura's own activities to market its Japanese mutual fund, which CAL sub-advised, to Japanese intermediaries and investors.  Tr. 43:8-44:7; PX 387 at 641424-25.  CAL prepared marketing materials for Nomura as well as data analysis to support CAL's macro views and individual company convictions.  Tr. 43:8-44:9; PX 387 at 641424-25. CAL sent several senior executives to Japan to participate in a four-city roadshow.  Tr. 44:10-46:12; PX 387 at 641424.  While in Japan, CAL executive Scott Becker gave an interview on Nomura's behalf to Japanese financial media.  Tr. 45:23-46:1; PX 387 at 641424.*

**RESPONSE:**  Denied.  While CAL assisted Nomura with marketing its Japanese fund, including preparing marketing materials, participating in a road show, and an interview by Mr. Becker to the financial media, CAL performed such services for the Funds as well.[445]  As Mr. Becker explained, the work he performed on behalf of Nomura never exceeded the work that he performed on behalf of mutual fund clients at any point in time.[446]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[447]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

---

[445] Tr. 39:20-40:16, 41:21-25 (Becker).

[446] Becker Decl. ¶ 129.

[447] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

196.    *The Teamsters Pension Fund of Philadelphia, another of CAL's Other ACG Accounts, received "in-depth" monthly performance reports as well as monthly attribution reports from CAL.  Tr. 52:11-53:6.*

**RESPONSE:**  Denied.  CAL admits that the Teamsters Pension Fund of Philadelphia received monthly performance reports and monthly attribution reports.  As Mr. Becker testified, however, such reports were standardized across institutional clients and did not require substantial effort to create or customize.[448]  Moreover, Mr. Becker also created quarterly reports and attribution analyses for the Fund and for each shareholder, as well as narrative information concerning the Fund for current and potential investors as well as Board materials.[449]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

197.    *CAL client service staff is in frequent contact with investment consultants who work for institutional clients.  Tr. 49:20-51:21, 52:11-22; PX 344 at 430863.*

**RESPONSE:**  Denied.  CAL's client service staff's contact with investment consultants who work for institutional clients is not "frequent" as compared to the time and effort that CAL devotes to maintaining relationships with the "multiple thousands" of intermediaries and financial advisers "across the country" who represent mutual fund investors.[450]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[451]

---

[448] Becker Decl. ¶¶ 130-133; Tr. 73:6-21 (Becker).

[449] Becker Decl. ¶¶ 18-20; Tr. 60:17-61:7 (Becker).

[450] Tr. 72:23-73:23 (Becker).

[451] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

198.   *CAL sends representatives to meet with and report to boards of trustees of institutional clients.  Tr.  49:2-10, 55:3-56:6.*

**RESPONSE:**  Denied. CAL admits that from time to time, CAL representatives met with and provided reports to representatives of All Cap Growth Clients.  As Mr. Becker testified, however, such reports were standardized across institutional clients and did not require substantial effort to create or customize.[452]  Moreover, Mr. Becker also created quarterly reports and attribution analyses for the Fund and for each shareholder, as well as narrative information concerning the Fund for current and potential investors as well as Board materials.[453]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[454]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 187, *supra*.

199.   *Institutional clients generally have their own unique investment guidelines, and CAL is required to adjust the portfolios of those clients to comply with their guidelines.  Tr. at 34:1-10, 35:11-13, 47:13-23, 49:2-13, 51:8-52:2.*

---

[452] Becker Decl. ¶¶ 130-133; Tr. 73:6-21 (Becker).

[453] Becker Decl. ¶¶ 18-20; Tr. 60:17-61:7 (Becker).

[454] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

**RESPONSE:**  Denied as stated.  Institutional clients did not impose investment guidelines that were in any way "unique."  To the contrary, CAL would refuse to take on institutional clients who asked for investment guidelines that deviated drastically from the Fund's own guidelines, such that the investment guidelines for CAL's All Cap Growth Clients were "virtually identical to the guidelines that we would do anyway."[455]  To the extent that these investment guidelines actually required CAL to adjust an All Cap Growth Client's portfolio from the Fund's portfolio, this happened "relatively infrequently."[456]  Moreover, in the only example identified by Plaintiffs, CAL simply took the amount of additional money that could not be invested in Apple per a client's guidelines and distributed it pro rata across the clients' remaining investments, such that complying with the guideline required CAL to perform literally no additional work to research or provide a replacement investment.[457]  Given all this, as Mr. Becker explained, these investment guidelines were "quite easy" for the investment team to implement after CAL's operations employees coded them into a system that continuously monitored the guidelines and automatically prevented noncompliance.[458]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[459]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a

---

[455] Tr. 70:21-71:15 (Becker).

[456] Tr. 34:3-10 (Becker).

[457] Tr. 51:17-52:2 (Becker).

[458] Tr. 72:16-22 (Becker).

[459] DFFCL ¶ 197; Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

200.    *For the Funds' shareholders, by contrast, the primary client service provided by CAL was a shareholder call center, manned in the first instance by the transfer agent, which fielded shareholder inquiries.  If they opted, callers could be transferred to a live CAL employee. That option, however, was terminated in July 2017, when the center was closed.  Tr. at 360:25-362:1. Prior to its closing, CAL's call center was staffed by five or six employees, at an annual gross cost to CAL of $400,000, minus $175,000 in reimbursements it received from the transfer agent.  Behan Decl. at ¶84; Tr. at 360:25-362:1.*

**RESPONSE:**  Denied.  Plaintiffs' assertion that the call center constituted "the primary

client service provided by CAL" to Fund shareholders is not supported by the trial evidence.  To

the contrary, as Messrs. Becker and Behan explained, CAL maintained relationships with

thousands of intermediaries and financial advisers for the benefit of mutual fund shareholders,

and CAL's staff responsible for servicing intermediary relationships separately from the call

center is at least six to seven times larger than CAL's staff responsible for servicing institutional

relationships.[460]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by

"client services" that CAL purportedly "lavished" on All Cap Growth Clients fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 187, *supra*.

        ii.      **The Growth Fund's Daily Liquidity Requirements did not Result in any Appreciably Greater Work**

201.    *CAL's Discussion of Management Fee Rates by Product presentations claimed that, because mutual fund shareholders are entitled to buy and redeem shares daily, unlike Institutional Accounts, this resulted in increased turnover, which in turn required  "[m]ore frequent management of cash and portfolio positioning to ensure execution of overall long-term*

---

[460] Tr. 72:23-73:23 (Becker); Tr. 94:25-97:2, 98:12-23 (Behan).

*fund investment strategy" and "[o]ngoing trading activity by adviser personnel required to manage more frequent cash flows." See e.g. JX 184 at 653674.*

**RESPONSE:** Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients. Indeed, as Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the trust."[461] None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[462] Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for any of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[463]

Second, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different,

---

[461] DFFCL ¶¶ 166-167.

[462] DFFCL ¶ 168.

[463] DFFCL ¶¶ 169-172.

greater and more extensive services to the Fund than to its All Cap Growth Clients in <u>each</u> of the following areas:  (a) legal, regulatory and compliance;[464] (b) fund governance services;[465] (c) fund administration services;[466] (d) portfolio management services;[467] and (e) client/shareholder services.[468]  And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[469]

<u>Third</u>, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[470]

<u>Fourth</u>, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which

---

[464] DFFCL ¶¶ 174-180.

[465] DFFCL ¶¶ 181-183.

[466] DFFCL ¶¶ 184-188.

[467] DFFCL ¶¶ 189-192.

[468] DFFCL ¶¶ 193-197.

[469] DFFCL ¶ 187.

[470] DFFCL ¶¶ 204-207.

CAL provided different and greater services and incurred different and greater risks. No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks. Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[471]

Fifth, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

•       Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[472]

•       No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded,

_____

[471] DFFCL ¶¶ 242-244.

[472] DFFCL ¶¶ 169-203.

Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[473]

In addition, with specific respect to Plaintiffs' assertions in Paragraph 201, CAL's Discussion of Management Fee Rates by Product presentation, which was provided in updated form each year as part of CAL's 15(c) Response to the Independent Trustees, explained that, among other differences between mutual funds and CAL's All Cap Growth Clients, "[s]hareholder turnover is significantly higher for mutual funds than for separately managed accounts."[474]  The presentation provided numerous examples of how this substantially greater shareholder turnover "results in increased time, effort and expense by adviser to manage fund portfolios and service clients," some but not all of which are quoted in Paragraph 201.[475]

202.    However, Mr. Kalis, the former head of CAL's ACG strategy, who served as lead portfolio manager for the Growth Fund and for the Other ACG Accounts, testified that daily inflows and outflows in the Growth Fund were so insignificant that they did not require any special attention from the portfolio management team, and did not impose additional work on them.  See Kalis Dep. at 60:4-61:4, 65:4-25, 70:3-72:4, 74:12-77:6.

**RESPONSE:**  Denied.  Mr. Kalis did not testify that "daily inflows and outflows in the Growth Fund were so insignificant that they did not require any special attention from the portfolio management team, and did not impose additional work on them," as Plaintiffs erroneously assert.  Mr. Kalis testified that the portfolio management team made an effort to

---

[473] DFFCL ¶ 227.

[474] *See*, *e.g.*, JX 184 at CALAMOS_00653676.

[475] *See*, *e.g.*, JX 184 at CALAMOS_00653676.

keep sufficient cash on hand such that, on a day-to-day basis, the team was not faced with making additional sales of stocks in the Fund's portfolio in order to accommodate redemptions by Fund shareholders.[476]  However, Mr. Kalis did not testify as to the burden on CAL's portfolio management team required to maintain this cash position, nor did he speak to the burden on CAL's trading, operations, or other teams necessary to accommodate shareholder purchases and redemptions in the Fund.[477]

Furthermore, ensuring Fund liquidity imposes additional burdens on both the portfolio management team and the compliance function.  As Mr. Mickey testified:

> Q. What are 144A securities?
>
> A. 144A securities are securities that were issued in accordance with Rule 144A, and so there's a limited registration at the time of issuance and only a qualified institutional buyer can buy them.  So there is a concern that those may be less liquid than other securities, and we are looking at that to make sure there's adequate liquidity in those securities.  When we do that, we also look at all other securities to make sure that all are liquid.
>
> Q. And 144A securities may be bought for accounts other than the funds, correct?
>
> A. They can be, yes.
>
> Q. Are there similar valuation issues that are handled by CAL compliance with respect to other accounts?
>
> A. Actually, no. 144A refers to the liquidity, and liquidity is strictly a fund issue where you can only have depending on the fund, you know, 15 percent.  Some of our funds have lower guidelines 10 percent in liquid securities. So we look at those – it's strictly a -- institutional accounts don't have limits unless it's by separate as far as how much they can hold in liquid securities.[478]

---

[476] Kalis Dep. 65:14-25, 70:3-15, 71:1-21.

[477] Kalis Dep. 65:14-25, 70:3-15, 71:1-21.

[478] Mickey Dep. 54:8-55:10.

And, CAL has performed no work at all for any All Cap Growth Client since 2017.[479]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra*.

203.    *Meanwhile, the opposite was true for the Other ACG Accounts, where account deposits and withdrawals, although less frequent, typically involved substantial percentages of the money invested.  Kalis Dep. at 74:12-77:6.  In fact, turnover was sharper in the Other ACG Accounts than in the Growth Fund:  by December 2016, all of CAL's Other ACG Accounts had withdrawn 100% of their funds from CAL's management.  JX 181 at Ex. A.*

**RESPONSE:**  Denied.  The trial evidence demonstrates that the amount of effort required by the portfolio management team to manage inflows and outflows for All Cap Growth Clients required much less effort than managing redemptions by Fund shareholders.  As Mr. Kalis testified, there were "[v]ery few" occasions when an inflow or outflow from an All Cap Growth Client's account required the attention of his portfolio management team.[480]  CAL further denies, as unsupported by any trial evidence, that the largely one-time divestments by its All Cap Growth Clients in connection with the closing of their accounts meant that turnover in the assets of those accounts "was sharper" than the continuous management of the Fund's cash position in order to accommodate daily shareholder redemptions and purchases.  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[481]

---

[479] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[480] Kalis Dep. 74:21-75:25.

[481] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra*.

204.    *Moreover, CAL's Subadvisory Accounts – such as Nomura and the MD Accounts (CAL's largest ACG accounts) – were themselves mutual funds with underlying shareholders who were entitled to buy and redeem shares daily.  Tr. at 47:17-23, 58:17-60:10. 503:19-20, 506:1-9; PX 303 at 622241-42; JX 8; JX 15; JX 18.*

**RESPONSE:**  Denied.  Nomura and the MD Accounts were not "themselves mutual funds," and Plaintiffs cite no trial evidence to support their erroneous assertion.  Nomura advised a Cayman Islands fund that was made available primarily to Japanese investors, and the MD Accounts were Canadian funds governed by Canadian law.[482]  As Dr. Pomerantz acknowledged of the MD Accounts, "[t]hese aren't even '40 Act funds" governed by laws and regulations applicable to U.S. mutual funds, and "there's no point at all in comparing" the Fund's fee to the management fees that Nomura and MD American charged their investors.[483]  CAL further denies as unsupported by the evidence cited that CAL had any obligation to provide an investment strategy to the MD Accounts that allowed for daily shareholder purchases and redemptions in those underlying funds or to assist the adviser of the MD Accounts with shareholder

---

[482] Jackson Decl. ¶ 104; JX 15 at CALAMOS_00622192 (providing that the Nomura Currency Fund was a Cayman Islands trust); JX 8 at CALAMOS_00638092 (providing that the MD American Growth Fund would be subject to National Instrument 81-02, a Canadian securities law regulation); JX 18 at CALAMOS_00638094, CALAMOS_00638103 (same for the MDPIM U.S. Equity Pool, and further providing that the MDPIM U.S. Equity Pool was "a Trust governed by the laws of Ontario").

[483] Tr. 503:14-504:3 (Pomerantz).

redemptions.[484]  On the contrary, the sub-advisory agreement governing the MD American Growth Fund expressly provided that CAL would have "no responsibility for the management of the cash assets of the Fund" and that another investment adviser separate from CAL would be responsible "for the provision of investment advisory services of the cash reserves."[485]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[486]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra*.

205.    *To the extent advising the Growth Fund required portfolio management attention due to "turnover" or fund flows, comparable attention was therefore required for CAL's Subadvisory Accounts.  Pomerantz Rebuttal Report at ¶121.*

**RESPONSE:**  Denied.  As set forth in CAL's Response to Paragraph 204, Plaintiffs fail to cite any evidence that CAL had any obligation to assist the adviser of the MD Accounts to facilitate shareholder redemptions and purchases, and the sub-advisory agreement for the MD American Growth Fund expressly provides that another investment adviser separate from CAL was responsible for maintaining that Canadian fund's underlying cash position.[487]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[488]

---

[484] JX 8 at Art. 2; JX 18 at Art. 2.

[485] JX 8 § 2.4 at CALAMOS_00683083, CALAMOS_00638090.

[486] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[487] JX 8 § 2.4 at CALAMOS_00683083, CALAMOS_00638090; JX 18 at Art. 2.

[488] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra*.

### iii.    CAL's Operations and IT Services Are Comparable Across All Clients

*206.    CAL uses the same computers and email servers in advising its fund and non-fund clients, and uses the same IT infrastructure, IT controls and security measures to safeguard fund and non-fund information. Tr. at 144:6-16; see also Bhatt Dep. at 215:11-216:9; Olson Dep. at 110:12-111:4.*

**RESPONSE:**  Denied as stated.  None of Plaintiffs' assertions in Paragraph 206 demonstrate that "CAL's Operations and IT Services Are Comparable Across Clients."  As Mr. Bhatt explained in the same testimony cited by Plaintiffs, CAL may have maintained additional software specifically for its mutual fund operations.[489]  Furthermore, Mr. Olsen testified in the same testimony cited by Plaintiffs that the Fund Administration Department made use of data feeds that were specifically applicable to mutual funds, such as data feeds necessary to integrate information provided by CAL's third-party service providers that performed work only on behalf of mutual funds.[490]  In fact, when Plaintiffs' counsel asked Mr. Olsen whether "there's no aspect of IT security that you know about that pertains exclusively to mutual funds," Mr. Olsen declined to confirm that assertion.[491]  Finally, none of Plaintiffs' assertions about what IT and Operations systems applied to both mutual funds and institutional or sub-advisory clients

---

[489] Bhatt Dep. 215:11-24.

[490] Olsen Dep. 110:12-111:20.

[491] Olsen Dep. 122:4-11.

demonstrates that CAL did not use these systems to devote greater effort and attention to its mutual fund work.

In addition, the trial evidence demonstrates that CAL's infrastructure, including its computer systems, were designed to support the services that CAL provides to the Funds and that CAL's infrastructure would not need to be as robust as it is absent the Funds. As Mr. Neal explained:

> Q. And you don't know the specific cost to CAL of the IT infrastructure and controls it uses in servicing its fund clients, right?
>
> A. The only thing I would say here is as it relates to corporate overhead like this, the majority of CAL's business is the mutual fund business. The minority of it is the institutional and subadviser business. And the mutual fund business, as we pointed out here and as you pointed it out, is extensively more involved. . . . So actually, thinking about their IT as being not primary for the mutual fund would be incorrect. Now, it does benefit both the mutual fund clients and their institutional accounts. So that is also correct.[492]

The fact that those systems are also used to support CAL's All Cap Growth Clients does not establish that the services provided to those clients are comparable. And, CAL has performed no work at all for any All Cap Growth Client since 2017.[493]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "Operations and IT services" that purportedly are "comparable" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra*.

---

[492] Tr. 144:17-145:6 (Neal).

[493] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

iv.     **CAL's Compliance Services Are Comparable Across All Clients**

*207.    CAL's Discussion of Management Fee Rates by Product presentations claimed that mutual funds required legal, regulatory, and compliance services greater than institutional accounts.  JX 184 at 653675.  These services supposedly consisted of "Continuous Monitoring to Ensure Regulatory Compliance" with the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Internal Revenue Code, and responding to "Regulatory examinations."  JX 184 at 653675.*

**RESPONSE:**  Denied as stated.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the trust."[494]  None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[495]  Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no

---

[494] DFFCL ¶¶ 166-167.

[495] DFFCL ¶ 168.

evidence to show that CAL's limited roles and responsibilities for <u>any</u> of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[496]

<u>Second</u>, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in <u>each</u> of the following areas:  (a) legal, regulatory and compliance;[497] (b) fund governance services;[498] (c) fund administration services;[499] (d) portfolio management services;[500] and (e) client/shareholder services.[501]   And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[502]

<u>Third</u>, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an

---

[496] DFFCL ¶¶ 169-172.

[497] DFFCL ¶¶ 174-180.

[498] DFFCL ¶¶ 181-183.

[499] DFFCL ¶¶ 184-188.

[500] DFFCL ¶¶ 189-192.

[501] DFFCL ¶¶ 193-197.

[502] DFFCL ¶ 187.

apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[503]

Fourth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[504]

Fifth, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

• Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the

---

[503] DFFCL ¶¶ 204-207.

[504] DFFCL ¶¶ 242-244.

pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[505]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[506]

Sixth, the trial evidence demonstrates that the regulatory and compliance obligations that CAL owed to the Fund are greater and more numerous than the regulatory and compliance obligations that CAL owed to its All Cap Growth Clients. As Professor Bullard conceded, mutual funds are subject to special rules that do not apply to other types of investment vehicles, including any of CAL's All Cap Growth Clients.[507] Indeed, CAL's management of the Fund requires that it comply with numerous and constantly changing laws, rules, and regulations— including, but not limited to, the entirety of the ICA, many other federal statutory provisions, and numerous SEC rules and regulations—that do not apply at all to its All Cap Growth Clients or apply less extensively.[508] To meet all of the legal, regulatory, and compliance responsibilities incumbent in managing the Fund, CAL creates, implements, and maintains internal processes, procedures, and policies to monitor and ensure the Fund's compliance with the many applicable

---

[505] DFFCL *¶¶* 169-203.

[506] DFFCL ¶ 227.

[507] DFFCL ¶ 174.

[508] DFFCL ¶¶ 174-80; Tr. 333:6-334:13, 343:7-346:6 (Jackson).

rules and regulations governing mutual funds.  These internal processes, procedures, and policies touch upon every CAL department and most aspects of the day-to-day work done by those departments.[509]  None of these extensive and ongoing efforts was required for any of CAL's All Cap Growth Clients.[510]  Plaintiffs did not contest at trial that the Fund is subject to these extensive legal and regulatory requirements and that CAL's other All Cap Growth Clients are not.[511]

In addition, with specific respect to Plaintiffs' assertions in Paragraph 207, CAL's Discussion of Management Fee Rates by Product presentation did not "claim[]" that mutual funds required greater legal, regulatory, and compliance services than institutional accounts.  The presentation listed certain of the legal, regulatory, and compliance services that CAL provides to the Funds that it does not provide, or provides to a lesser extent, to its institutional or sub-advisory clients in order to comply with numerous and constantly changing laws, rules, and regulations—including, but not limited to, the entirety of the ICA, many other federal statutory provisions, and numerous SEC rules and regulations—that do not apply to non-fund clients or apply less extensively.[512]  The greater legal, regulatory, and compliance services that CAL undertakes for the Fund are not limited to those listed in the presentation.

208.    *However, the evidence at trial shows that these services, were either comparable to services provided to institutional clients and/or were provided insignificant expense, often with assistance of third-parties.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients

---

[509] DFFCL ¶ 179.

[510] DFFCL ¶¶ 175-179.

[511] DFFCL ¶ 180.

[512] DFFCL ¶¶ 174-80; Tr. 333:6-334:13, 343:7-346:6 (Jackson).

alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

> *209.    While the Investment Company Act only applies to mutual funds, CAL conceded that compliance with the securities laws and the Internal Revenue Code is necessary irrespective of client type.  Mickey Dep. at 110:11-115:3, 116:7-124:18.*

**RESPONSE:**  Denied.  The cited evidence does not support Plaintiffs' assertions in Paragraph 209.  Mr. Mickey was questioned about, and testified about, certain of CAL's policies that apply to both the mutual funds and to CAL's institutional and sub-advisory accounts. Mr. Mickey did not testify that either the Internal Revenue Code or the "securities laws" apply "irrespective of client type," as Plaintiffs erroneously assert.  The trial evidence demonstrates that the ICA applies only to mutual funds, such as the Fund, and not to CAL's All Cap Growth Clients.[513]  While certain aspects of the Internal Revenue Code and some securities laws apply, as a binary matter, to both mutual funds and CAL's All Cap Growth Clients, the undisputed trial evidence demonstrates that these laws impose significantly more, and greater, burdens on the services that CAL provides to the Fund than to All Cap Growth Clients.[514]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[515]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a

---

[513] DFFCL ¶¶ 176-177.

[514] DFFCL ¶¶ 174-80.

[515] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 207, *supra*.

      210.     *Moreover, even though CAL's institutional accounts did not benefit from the regulatory protections applicable to mutual funds, they nonetheless built similar protective frameworks into their IMAs. Pomerantz Report at ¶¶260-61. For example, CAL was obligated to provide institutional clients with frequent and extensive reporting. JX 8 at 638092; JX 15 at 622194; JX 13 at 638180; PX 360; Tr. at 42:5-43:4, 47:21-48:18, 49:8-15, 52:11-53:12.*

**RESPONSE:** Denied. As demonstrated in CAL's responses to Paragraphs 193-194,

CAL's reporting and due diligence obligations to its All Cap Growth Clients were not

"extensive." Instead, these reporting obligations were largely automated and, even for CAL's

most demanding All Cap Growth Client, "pretty standardized."[516] Furthermore, intermediaries

representing mutual fund investors imposed more frequent due diligence obligations, such that

CAL's reporting obligations performed for representatives of mutual fund clients surpassed its

reporting obligations performed for representatives of All Cap Growth Clients.[517]

      Plaintiffs have not provided any trial evidence to support their implicit assertion that any

reporting obligation required by CAL's All Cap Growth Clients approximated the "regulatory

protections" applicable to the Funds. Among other things, the ICA imposes an extensive

regulatory regime that requires not only reporting to the Independent Trustees and to the SEC,

but also imposes substantive requirements relating to, *inter alia*, the types of securities that may

be owned by the Funds.[518] And, CAL has performed no work at all for any All Cap Growth

Client since 2017.[519]

---

[516] Tr. 73:6-21, 75:5-20 (Becker); Becker Decl. ¶¶ 128 130-33.

[517] Behan Decl. ¶ 87.

[518] *E.g.*, Jackson Decl. ¶¶ 108, 112-113; Tr. 333:6-334:13 (Jackson).

[519] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

*211.   CAL's institutional IMAs also obligated CAL to implement and test compliance procedures and policies regarding all areas of its operations including, inter alia, trading operations, investment management, infrastructure and internal controls.  PX 309 at 372401-08; PX 317 at 464617; PX 338 at 422225-26; Mickey Dep. at 150:23-154:6, 47:6-94:23.*

**RESPONSE:**  Denied.  The cited evidence does not support Plaintiffs' assertion in Paragraph 211.  As an initial matter, Paragraph 211 cites deposition testimony from Mr. Mickey that was not designated by either party for use at trial, and such testimony is therefore inadmissible.  Moreover, Mr. Mickey testified about, *inter alia*, the policies and procedures that CAL implemented and followed in order to comply with Rule 38a-1 under the ICA, a rule that applies to mutual funds but not to non-fund accounts.[520]  CAL does not owes compliance obligations to its All Cap Growth Clients that are similar in kind or scope to the compliance oversight that it provides to the Fund.[521]  None of the due diligence questionnaires cited, including the due diligence questionnaire from Nomura, "obligated" CAL in any way to maintain certain compliance checks, but instead simply inquired about the compliance framework that CAL already maintained and was not required by any particular contractual obligation to those clients.  In fact, for example, CAL's sub-advisory agreement with Nomura provided only that Nomura "may reasonably request . . . reports of compliance monitoring checks and reviews undertaken by the Investment Sub-Adviser," but did not impose any additional compliance

---

[520] Mickey Dep. 151:4-154:5.

[521] DFFCL ¶¶ 174-80.

obligations on CAL unique to Nomura.[522]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[523]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

*212.    CAL was also required to satisfy periodic due diligence requests from institutional clients which included the completion of extensive questionnaires and in-person due-diligence presentations.  Tr. at 31:24-32:23, 36:17-21, 48:1-17; PX 338; PX 351; PX 387; PX3 57; PX 358; PX 345 at 118439-441.*

**RESPONSE:**  Denied.  As similarly demonstrated in CAL's responses to Paragraphs 193-194 and 210, CAL's due diligence obligations to its All Cap Growth Clients were not "extensive."  Instead, these reporting obligations were largely automated and, even for CAL's most demanding All Cap Growth Client, "pretty standardized."[524]  Furthermore, intermediaries representing mutual fund investors imposed more frequent due diligence obligations, such that CAL's reporting obligations performed for representatives of mutual fund clients surpassed its reporting obligations performed for representatives of All Cap Growth Clients.[525]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[526]

---

[522] JX 15 § 3.2 at CALAMOS_00622194.

[523] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

[524] Tr. 73:6-21, 75:5-20 (Becker); Becker Decl. ¶¶ 128 130-33.

[525] Behan Decl. ¶ 87.

[526] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

213.   *At least one institutional client, Nomura, required monthly compliance reports from CAL.  Tr. at 42:5-20; PX 378; PX 303 at 622214-215.*

**RESPONSE:**   Denied as stated.  The monthly compliance reports requested by Nomura were "standardized," and CAL utilized a largely automated process to respond to them.[527] Furthermore, as demonstrated in CAL's Response to Paragraph 211, these due diligence questionnaires did not actually impose any new compliance obligations on CAL, and CAL's sub-advisory agreement with Nomura imposed no such novel compliance obligations.[528]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[529]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

214.   *CAL was required to comply with each institutional clients' unique investment guidelines.  Tr. at 33:5-34:10, 35:11-36:16, 47:13-23, 49:11-13, 51:8-21; PX 344 at 430864; JX 8 at 638091; JX 13 at 638185; PX 303 at 622206-213.*

---

[527] Tr. 73:6-21, 75:5-20 (Becker); Becker Decl. ¶¶ 128 130-33.

[528] JX 15 § 3.2 at CALAMOS_00622194.

[529] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

**RESPONSE:**  Denied as stated.  As demonstrated in CAL's Response to Paragraph 199, these investment guidelines were not in any way "extensive" or "unique."  To the contrary, CAL would refuse to take on institutional clients who asked for investment guidelines that deviated drastically from the Fund's own guidelines, such that the investment guidelines for CAL's All Cap Growth Clients were "virtually identical to the guidelines that we [*i.e.*, CAL] would do anyway."[530]  To the extent that these investment guidelines actually required CAL to adjust an All Cap Growth Client's portfolio from the Fund's portfolio, this happened "relatively infrequently."[531]  Moreover, in the only example Plaintiffs identified, CAL simply took the amount of additional money that could not be invested in Apple per a client's guidelines and distributed it pro rata across the clients' remaining investments, such that complying with the guideline required CAL to perform literally no additional work to research or provide a replacement investment.[532]  In short, the investment guidelines requested by CAL's All Cap Growth Clients were "quite easy" for the investment team to implement after CAL's operations employees coded them into a system that continuously monitored the guidelines and automatically prevented noncompliance.[533]  And, CAL has performed no work at all for any All Cap Growth Client since 2017.[534]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a

---

[530] Tr. 70:21-71:15 (Becker).

[531] Tr. 34:3-10 (Becker).

[532] Tr. 51:17-52:2 (Becker).

[533] Tr. 72:16-22 (Becker).

[534] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 207, *supra*.

215.    *"Regulatory examinations" were rare, as the SEC aspires to, but does not always succeed in, examining investment advisers every three years.  Pomerantz Report at ¶262. Furthermore, Defendant's expert Mr. Richardson acknowledged that the risk of regulatory examinations is one that investment advisors face regardless of client type – whether mutual fund or institutional – and that CAL has not had any regulatory inquiries regarding the Growth Fund in the last five years.  Tr. at 771:16-25.*

**RESPONSE:**  Denied.  The risk posed by regulatory examinations is not the same

"regardless of client type," as Plaintiffs erroneously assert.  As Mr. Jackson explained, many of

the SEC's regulatory priorities are specifically targeted at investment advisers to mutual funds,

rather than institutional or sub-advisory clients.[535]  Moreover, simply because regulatory

examinations do not happen each year does not mean that CAL is not required to be prepared for

a regulatory examination should one occur.  As Mr. Jackson further explained, those regulatory

efforts are constantly evolving in a manner that requires continuous monitoring.[536]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by

"compliance services" that purportedly "are comparable across all clients" fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 207, *supra*.

216.    *Certain compliance functions are the responsibility of the Transfer Agent which is compensated by the Funds separately.  JX 182.  For example, the Transfer Agent is required to provide Anti-Money Laundering and Red Flag Identity Theft Prevention Programs and to engage a third-party auditor to audit its internal controls and compliance with respect to Electronic Services that it provides to shareholders.  JX 182 at § 2(N), 5.  The Transfer Agent is also obligated to operate a compliance system called MARS for the purpose of monitoring*

---

[535] Tr. 349:9-351:5 (Jackson).

[536] Tr. 349:9-25 (Jackson).

*transactions in fund shares for suspicious transactions and to assure compliance with market-timing and late-trading regulations.  JX 182, Ex. D; Tr. at 362:17-363:10.*

**RESPONSE:**  Denied.  The work performed by the transfer agent does not detract from CAL's ultimate responsibility to ensure that all legal and regulatory obligations of the Fund are satisfied.  CAL continuously oversees the transfer agent's operations related to the Fund and has no analogous oversight responsibility for CAL's All Cap Growth Clients.[537]  In fact, CAL's Fund Administration Department, which provides no services on behalf of CAL's All Cap Growth Clients, is responsible for overseeing the exact anti-money laundering obligations described in Paragraph 216, while CAL's compliance department reviews and utilizes the reports generated by MARS.[538]  Furthermore, the Fund's Chief Compliance Officer must oversee all work performed by the transfer agent, along with any third-party service provider, to ensure that the work is being performed in a manner reasonably designed to prevent violations of the securities laws.[539]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by "compliance services" that purportedly "are comparable across all clients" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 207, *supra*.

### 5. CAL's Claims Concerning Greater Risks Were Substantially Controverted by the Evidence at Trial

217.    *The other primary rationale CAL provided to the Board for the higher advisory fees it charged its fund clients versus non-fund clients was that there were greater legal/regulatory risks associated with advising mutual funds.  Tr. at 261:24–301:23.*

---

[537] Jackson Decl. ¶ 109; DFFCL ¶¶ 187, 200.

[538] Holloway Decl. ¶¶ 5, 14(k), 18, 38; Tr. 362:17-24 (Holloway).

[539] DFFCL ¶ 177; Mickey Dep. 14:3-20, 25:13-22, 26:1-19, 151:4-154:5.

*Additionally, CAL's expert witness, Mr. Richardson, testified that there are also purportedly greater entrepreneurial risks associated with advising mutual funds – such as start-up costs and competitive risks – that advisers consider in setting their fees.  Richardson Report at ¶¶19, 67-73; see also JX 111 at 534339 (Mr. Calamos' discussion of purported risks with Board).*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, contrary to Plaintiffs' assertions, the trial evidence demonstrates conclusively that in advising the Fund, CAL took on greater risks than in advising institutional or sub-advisory clients.  As Mr. Jackson testified, CAL's risks from managing the Fund as contrasted with to its All Cap Growth Clients, including Nomura and MD American, are "ubiquitous," "dynamic[,] and ever-changing."[540]  Specifically with respect to the Fund, CAL necessarily bears: (a) increased legal, regulatory and litigation risks; (b) greater operational risks with respect to the Fund because, unlike with respect to its All Cap Growth Clients, CAL bears ultimate responsibility for the services of all of the third-party service providers that it oversees on behalf of the Fund; (c) the greater entrepreneurial risk of whether the mutual fund will ever provide a fair return to the adviser, taking into account both the greater initial costs of launching a mutual fund as compared with other types of investment products and the greater ongoing expenses associated with managing and operating a mutual fund.[541]  Moreover, insurance does not fully cover the greater risks associated with managing the Fund as compared to CAL's All Cap

---

[540] DFFCL ¶ 198.

[541] DFFCL ¶¶ 199-201.

Growth Clients.[542]  The trial evidence also demonstrates that CAL bears these risks even if they have not materialized in the past or cannot be quantified.[543]

Second, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board, among other things, that it assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[544]  Based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[545]  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[546]

Third, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded,

---

[542] DFFCL ¶ 202.

[543] DFFCL ¶ 203.

[544] DFFCL ¶¶ 57, 207.

[545] DFFCL ¶¶ 204-207.

[546] Tr. 177:17-20 (Neal).

Section 36(b) and *Jones* do <u>not</u> require fee parity across an adviser's different clients." Hence, <u>no</u> court has <u>ever</u> held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, <u>every</u> court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[547]

> <u>Fourth</u>, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks. No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in <u>all</u> of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks. Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent <u>not</u> to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[548]

> <u>Fifth</u>, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee for the following fundamental reasons:

- Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous

---

[547] DFFCL ¶¶ 227-229.

[548] DFFCL ¶¶ 242-244.

differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[549]

- No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients."  Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[550]

With specific respect to Plaintiffs' assertions in Paragraph 217, CAL denies that it provided a "primary rationale . . . to the Board for the higher advisory fees it charged its fund clients."

### a.    Legal / Regulatory Risks

218.    *As CAL's General Counsel, Mr. Jackson was responsible for, inter alia, reporting to the Board on the litigation/regulatory risks attendant to advising mutual funds.  The minutes of CAL's 15(c) meeting typify CAL's bid to attribute the Funds' substantially higher advisory fees to these risks:*

> *Mr. Jackson added that the pricing of each management agreement with the funds reflects the fact that the regulatory and litigation environment affects the advisor of mutual funds in more significant ways than they affect advisors of only private accounts. Specifically, he noted that the advisor's concerns with the*

---

[549] DFFCL *¶¶* 169-203.

[550] DFFCL ¶ 227.

> litigation risks involved in running a mutual fund are reflected in
> the pricing of its contracts. In response to a question, he noted
> that this number is necessarily subjective but that it is reasonable
> for the business to price that risk in.

JX 144 at 636366 (emphasis added);[551] Tr. at 261:24-263:15.[552]

**RESPONSE:** Denied. Paragraph 218 accurately quotes from the June 2016 Board meeting minutes, but CAL denies Plaintiffs' assertion in Paragraph 218 concerning "CAL's bid to attribute the Funds' substantially higher advisory fees to these risks." In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

219. Turning first to the general proposition that the regulatory and litigation environments impact mutual fund advisors more than they do advisors of private accounts, Mr. Jackson conceded that his statement was not based on any analyses/studies concerning the frequency of fund-related versus non-fund-related litigation or comparing verdicts or settlements

---

[551] *See also JX 111 at 534339; JX 70 at 534050.*

[552] *Mr. Jackson conceded, however, that CAL had been the subject of prior litigations, and that any out-pocket costs associated with the materialization of those litigation risks – such as paying the deductible on an insurance policy – could be objectively quantified. Tr. at 265:9-15.*
**RESPONSE:** Denied. CAL admits that Mr. Jackson testified that CAL had been sued in prior litigation, but otherwise denies the allegations in this footnote. As Mr. Jackson also testified, in a passage that Plaintiffs neglect to include:

> What I'm saying is there is a real risk to running investment companies that could subject you to increased and enhanced exposure to regulatory and litigation risk. And I base that in part on the fact that in our past we've actually experienced litigations with respect to certain of our funds. So that's the basis. In terms of the cost and expense, in terms of what that would mean, I don't see how what you spent on a prior particular set of litigation with its own facts and circumstances could somehow be used to extrapolate into the future on other litigations.

Tr. 266:8-18 (Jackson).

*in fund-related versus non-fund-related litigation.  See Tr. at 263:16-264:5. Moreover, although Mr. Jackson was one of the primary individuals at CAL responsible for ensuring legal and regulatory compliance, as well as dealing with any related risks that materialized, he testified that he nonetheless spent the clear majority of this time working on non-fund-related matters during the heart of the Relevant Period.  Tr. at 257:14-23; 269:5-270:10, 306:13-22 (admitting he spent only 40% of his time on fund matters); ¶10, supra; see also PX 145-A at 634346, PX 113-A at 502692, PX 61-A at 519368, PX 32-A at 513992.*

**RESPONSE:**  Denied.  CAL has not prepared "analyses/studies concerning the frequency of fund-related versus non-fund-related litigation or comparing verdicts or settlements in fund-related versus non-fund-related litigation" as referenced in Paragraph 219, but it denies that any such "analyses/studies" are in way required under Section 15(c) or Section 36(b), nor is there any evidence or authority from Plaintiffs to the contrary.  CAL also denies that Mr. Jackson spent the "clear majority" of his time working on non-fund-related matters, or that any of his testimony at trial is inconsistent with his Declaration.  At trial, Mr. Jackson testified that he spent approximately 40 percent of his time on fund-related activities in 2014, 2015, and 2016.[553]  As reported in CAL's annual 15(c) Response, however, Mr. Jackson spent a majority of his time on Fund activities in both 2017 and 2018 (approximately 60% in both years).[554]  As such, Mr. Jackson does currently spend the majority of his time on the Funds.  Moreover, Mr. Jackson is not the sole member of the legal department, and the amount of time he spends on Fund-related matters therefore is not a full measure of the time and effort the legal department expends with respect to the Funds.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to

---

[553] Tr. 269:24-270:5 (Jackson).

[554] JX 176 at CALAMOS_00650251; JX 184 at CALAMOS_00653486.

"justify" the Fund's fee in light of the supposed cost of these different risks fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 217, *supra*.

> 220.    Turning to the issue of risk-pricing, Mr. Jackson admitted at trial that CAL never
> *actually calculated/estimated the cost/value of the greater risks it purportedly priced into its IMA*
> *with the Funds.  Specifically, Mr. Jackson testified that (i) he is unaware of anyone at CAL*
> *having calculated, estimated or otherwise reduced to a number the litigation risk that CAL*
> *purportedly priced into the Growth Fund's advisory fees since joining CAL; (ii) he is not aware*
> *of anyone having performed that exercise prior to the time he joined CAL; (iii) he does not know*
> *what portion, if any, of the fee CAL charged the Growth Fund was attributable to the increased*
> *litigation risks, and (iv) to the extent CAL did consider litigation risk in setting the advisory fees*
> *it charged the Growth Fund, he does not know what methodology, if any, CAL employed.  Tr. at*
> *264:20-265:4; 267:3-6; 268:2-21; 269:2-4; see also id. at 135:6 – 136:10 (Mr. Neal's testimony*
> *that CAL never provided the Board with an estimate of the value/cost of litigation risk it*
> *purportedly priced into the Growth Fund's fee structure).*

**RESPONSE:**  Denied.  Mr. Jackson testified that he was not specifically aware of

anyone at CAL having calculated or reduced to a number the increased litigation risk CAL faces

with respect to the Funds and not with respect to institutional or sub-advisory clients.  As

Mr. Jackson further stated:

> All I was saying that as part and parcel of all of the services and
> items that the board takes into account when it is reflecting upon the
> advisory fee that we provide, that it is fair to take into account the
> regulatory environment in which we operate and the litigation
> exposure to which we have.[555]

CAL denies that for purposes of the Independent Trustees' annual evaluation of the IMA, CAL

or the Independent Trustees were required to "calculate[], estimate[] or otherwise reduce to a

number" CAL's litigation risk as Paragraph 220 asserts.  No such "calculat[ion], estimat[ion] or

otherwise reduc[tion] to a number" is in way required under Section 15(c) or Section 36(b), nor

is there any evidence or authority from Plaintiffs to the contrary.

---

[555] Tr. 268:21-269:1 (Jackson).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*221.    CAL, however, maintained several insurance policies during the Relevant Period sufficient to protect against the legal/regulatory risks CAL faced in running its business, Tr. at 261:12-17, and which covered the costs of CAL's prior fund-related litigation.  Tr. at 137:18-138:3; see also Tr. at 289:4-289:23.[556]  Mr. Jackson conceded that the cost of obtaining insurance – the premium plus any deductible – was at least a partial indicator of the value of CAL's legal/regulatory risks.  See Tr. at 271:5-11.  In his estimation, however, it was not a complete indicator because there purportedly are indirect costs associated with such risks that cannot be insured against, such as injury to reputation (the "uninsurable risks").  Tr. at 285:25–289:23.*

**RESPONSE:**  Denied.  CAL maintained certain insurance policies, and the premiums for those insurance policies do not measure the cost of the legal and regulatory risks that CAL faces with respect to the Funds.  As Mr. Jackson testified, among other things, insurance will not cover every expense that may arise if a particular risk were to materialize:

> The insurance policy, as you know, has certain definitions associated with it. This is a claim, and therefore, you have to look at the sum of the insurance policy.  So for example, this policy, I believe, if it's consistent, has approximately 18 enumerated

---

[556] *Mr. Richardson testified that he has never worked for a mutual fund adviser that incurred actual litigation costs that were not covered by insurance.  Tr. at 763:8-18.*  **RESPONSE:** Denied as stated.  CAL admits that Mr. Richardson testified that he had never worked for a mutual fund adviser that incurred actual litigation costs that were not covered by insurance. However, as Mr. Richardson also testified, as a general matter, insurance typically "would cover some of the costs.  There would be a range of things that would not be covered under the insurance policy."  Tr. 763:8-18 (Richardson).  Moreover, as the trial evidence also demonstrates: (a) it is clear as a matter of common sense and the evidence that the cost of premiums CAL pays for insurance policies is not a full measure of its risks, and (b) CAL bears these risks even if they have not materialized in the past or cannot be quantified.  DFFCL ¶¶ 202-203.

exclusions.  So whether or not something is covered or not, you'd have to take a look at the exclusion section.  Then not only that, once you go from the exclusion section, it's got a number of endorsements associated with it that may or may not impact upon various provisions of the policy.[557]

Moreover, insurance does not and cannot cover many types of harm that can result if certain risks borne by CAL were to come to pass.[558]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*222.     Turning first to the cost of those risks that are insurable, the two main policies that protected CAL (and its affiliates) in connection with their mutual fund business during the Relevant Period were the Directors & Officers, Errors and Omissions Liability Policy (the "D&O Policy") and the Fidelity/Blanket Bond.  See Tr. 260:3-261:17; PX 423-31.[559]*

**RESPONSE:**  Denied.  The cited evidence does not support Plaintiffs' assertions in Paragraph 222.  Mr. Jackson testified about the "D&O Policy" and the "Fidelity bond."[560] Mr. Jackson did not characterize these policies as "the two main policies that protected CAL

---

[557] Tr. 277:5-14 (Jackson).

[558] DFFCL ¶¶ 202-03.

[559] *CAL's 15(c) responses also referred to an Independent Directors Liability Policy.  See, e.g., PX 145-A at 634861.  That policy insured the Independent Trustees, not the Calamos entities, and CAL was not responsible for paying any of that policies' premiums.  Tr. 273:2-7.*
**RESPONSE:**  CAL admits that CAL does not pay the premium for the Independent Directors Liability policy.  Tr. 273:2-7 (Jackson).

[560] Tr. 260:3-261:3 (Jackson).

(and its affiliates)." These insurance policies also do not fully cover the various risks faced by CAL.[561]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*223.   The D&O policy broadly insured the Calamos entities (of which there were approximately 10), as well as the Funds, against wrongful acts, negligence, and errors and omissions, see Tr. at 274:1-4, 274:17-275:2 and 278:1-22; PX 423 at 652661-63, and applied to claims brought by private parties as well as governmental and self-regulatory entities, see Tr. 275:7-13; 276:5-277:1, 277:17-25. During the Relevant Period the D&O policy's coverage was increased from $30 to $50 million, its premium ranged between $984,300 and $1.528 million, and its deductible remained constant at $500,000. PX 184-A at 653775, PX 176-A at 650594, PX 145-A at 534861, PX 113-A at 503184, PX 61-A at 519662, PX 32-A at 514326.*

**RESPONSE:**   Denied.   CAL denies that the D&O Policy "broadly insured the Calamos entities . . . as well as the Funds." The D&O Policy does not fully cover the various risks faced by CAL.[562]   As Mr. Jackson testified when he was questioned at trial about this particular policy,

> The insurance policy, as you know, has certain definitions associated with it. This is a claim, and therefore, you have to look at the sum of the insurance policy. So for example, this policy, I believe, if it's consistent, has approximately 18 enumerated exclusions. So whether or not something is covered or not, you'd have to take a look at the exclusion section. Then not only that, once you go from the exclusion section, it's got a number of endorsements associated with it that may or may not impact upon various provisions of the policy.[563]

---

[561] *See* DFFCL ¶¶ 202-03.

[562] DFFCL ¶¶ 202-03.

[563] Tr. 277:5-14 (Jackson).

CAL also denies that the D&O Policy "coverage was increased from 30 million to $50 million;" the D&O Policy's aggregate limit was increased from $30,000,000 in 2013 to $50,000,000 in 2015, and reduced to $40,000,000 in 2018.[564]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

224.   *The D&O policy's annual premium and deductible (the latter of which was only incurred if a claim was submitted) was allocated among the insured entities pursuant to one of two methods, depending on the year at issue. Tr. at 274:5-12; 278:23-279:5, 280:20-281:11. Prior to 2015, CAL allocated its premiums based on recommended allocations from ICI Mutual, the entity that issued the policy. Tr. at 280:20-281:11. For example, ICI Mutual recommended that CAL be allocated $216,546 of the 2014-2015 D&O policies total annual premium. Tr. at 281:12-283:2; PX 86-A at 523548.*

**RESPONSE:**   Denied.   The D&O Policy's annual premium was allocated among the entities insured by that policy, and the deductible would also be allocated depending on the nature of the claim asserted.[565]   CAL denies that CAL "allocated its premiums based on recommended allocations from ICI Mutual."   Instead, Mr. Jackson testified that CAL would "come up with what we believe to be an appropriate allocation methodology," and that CAL would then "get a letter . . . from ICI Mutual that would provide . . . their view" on the allocation.[566]   Moreover, CAL denies that the insurance premiums it pays measure the cost of the

---

[564] PX 184-A at 653775, PX 176-A at 650594, PX 145-A at 534861, PX 113-A at 503184, PX 61-A at 519662, PX 32-A at 514326.

[565] Tr. 274:5-12 (Jackson).

[566] Tr. 280:24-281:5 (Jackson).

risks that CAL faces.  Among other things, insurance does not and cannot cover many types of

harm that can result if certain risks borne by CAL were to come to pass.[567]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited risks that CAL faced with respect to the Fund as compared to its

institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to

"justify" the Fund's fee in light of the supposed cost of these different risks fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 217, *supra*.

*225.     From 2015 to the present, the Calamos entities have been responsible for paying 40% of the annual premium while the Funds were responsible for paying the remaining 60%. 278:23-279:5. The 40% portion of the premium owed by the Calamos entities collectively was then further allocated among each Calamos entity individually.  Tr. at 279:13-17; PX 86-A at 523535-48.  Thus, for example, the annual premium for the 2016 D&O policy – which provided $50 million of coverage -- was $1,419,840.  Under the applicable allocation methodology, the 10 insured Calamos entities were collectively responsible for paying 40% of that amount, or $567,936.  Tr. at 279:25-280:14. And CAL individually was responsible for paying just a fraction of that amount.  Tr. at 280:16-19.  Thus, during the Relevant Period, the annual cost to CAL of insuring against all of the risks covered by the D&O policy was significantly smaller than $567,936.*

**RESPONSE:**  Denied.  CAL and its affiliates paid approximately 40% of the annual

premium for the D&O Policy from 2015 to the present, and the portion of the premium paid by

CAL and its affiliates was further allocated among each entity.  CAL denies that the premium it

paid constituted "the annual cost to CAL of insuring against all of the risks covered by the D&O

policy."  Among other things, insurance does not and cannot cover many types of harm that can

result if certain risks borne by CAL were to come to pass.[568]

---

[567] *See* DFFCL ¶¶ 202-03.

[568] *See* DFFCL ¶¶ 202-03.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

226.    *The Fidelity/Blanket Bond is a regulatory requirement under the ICA and covers a series of risks identified in a section of the policy called "Insuring Agreements."  Tr. at 284:1-21.  The risks covered by that policy include certain legal as well as regulatory risks.  Tr. at 284:22-285:24. The premium for the Fidelity Bond was allocated during the relevant period based on the same methodologies applied to the D&O policy. Thus, for example, ICI Mutual recommended that CAL pay $4,361 of the Fidelity Bond's annual premium for the 2014-2015 policy term.  Tr. 283:3-17.*

**RESPONSE:**  Denied.  The maintenance of the Fidelity Bond is required by Section 17(g) of the ICA.  The assertion that "[t]he premium for the Fidelity Bond was allocated during the relevant period based on the same methodologies applied to the D&O policy" is not supported by the evidence cited.  Mr. Jackson stated that he did not recall the amount of the premium that was "allocated to CAL for this policy term differing materially from ICI's recommendation."[569]  He did not testify that the premium was allocated in the same manner as the D&O Policy.  In addition, the cost of the premium paid for the Fidelity Bond does not provide a measure of the cost of the risks faced by CAL.  Among other things, insurance does not and cannot cover many types of harm that can result if certain risks borne by CAL were to come to pass.[570]

---

[569] Tr. 283:19-22 (Jackson).

[570] DFFCL ¶¶ 202-03.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

227.   *Turning to the purported non-insurable risks CAL faces, Mr. Jackson identified (i) injury to reputation, (ii) interference with business relationships, and (iii) distraction from core business operations, as potential consequences.  See Tr. at 285:25–286:13. However, these potential consequences are either are so remote that they have never previously materialized or resulted in only de minimis expense (that CAL did not even bother to estimate).*

**RESPONSE:**   Denied.  Mr. Jackson testified that examples of risks that CAL faces that are not covered by insurance include injury to reputation, interference with CAL's business relationships, such as intermediaries, and the distraction litigation causes from CAL's normal business activities.[571]  CAL denies the remaining assertions in Paragraph 227.  The fact that a particular risk has not materialized does not mean that it is "remote" or "de minimis."  As Mr. Jackson explained, "we try to . . . anticipate issues that could occur and we seek to address those risks affirmatively before they ever come home to roost, but that takes a lot of time and effort on behalf of the adviser."[572]  Anticipating such risks requires constant vigilance and monitoring on behalf of CAL.[573]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its

---

[571] Tr. 285:25-286:13 (Jackson).

[572] Tr. 349:9-19 (Jackson).

[573] DFFCL ¶¶ 202-203.

institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to

"justify" the Fund's fee in light of the supposed cost of these different risks fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 217, *supra*.

228.    *First, with respect to reputational injury, Mr. Jackson conceded that:  (i) this risk
applies regardless of whether the client is a fund or a non-fund; (ii) CAL has not attempted to
quantify the cost of any reputational injury that might have resulted from its prior litigation; and
(iii) none of CAL's Other ACG Accounts, all of whom terminated their advisory relationship with
CAL, cited CAL's involvement in prior litigation as a reason for doing so.  Tr. at 286:14-287:20;
see also Tr. at 138:3-15 (Mr. Neal's testimony that he did not recall CAL ever informing the
Board that it suffered reputational injury or lost business as a result of prior lawsuits).[574]*

**RESPONSE:**  Denied as stated.  Mr. Jackson testified that injury to reputation "could

be" implicated with respect to non-fund clients, and that "[i]nsofar as I'm personally aware,"

CAL has not "taken any specific studies as to the potential loss incurred by reputational risk

other than to say it's a real risk.[575]  Mr. Jackson also testified that he was not "aware of" CAL's

institutional clients claiming that their decision to terminate their relationship with CAL was

because CAL had been involved in a fund litigation, and that instead, "it's probably more the

---

[574] *Notably, Mr. Richardson testified that the loss of future business is difficult if not impossible
to quantify, and that he did not offer an opinion as to how a Trustee could possibly assess
whether an adviser's fee reasonably accounted for a risk/cost that is unquantifiable.  See Tr. at
767:15-768:5. Additionally, Mr. Richardson does not offer the opinion that it would be
reasonable for CAL's advisory fee to account for the risk of reputational harm resulting from its
own negligence or misconduct.  Tr. at 768:6-10.*  **RESPONSE:**  Denied as stated.
Mr. Richardson testified that the risk of a loss of future sales (*i.e.*, the risk that AUM will not
increase, or not increase as much as it otherwise would) is difficult if not impossible to quantify,
and that "I think that a board and a management team in setting fees would consider all of these
risks even if they're unquantifiable; acknowledge that they exist and say, I need something for
that."  Tr. 767:18-25 (Richardson).  Mr. Richardson was not asked to offer, and is not offering,
the opinion that the advisory fee CAL charges the Fund should account for the risk that CAL
may suffer reputational injury that could result from its own negligence.  Tr. 768:6-10
(Richardson).  In addition, CAL is not required to quantify the risks that it faces in connection
with advising the Funds, nor is it required to "justify" the fee that it charges to the Fund.  DFFCL
¶¶ 203, 209, 227.

[575] Tr. 286:19-25 (Jackson).

clients, because of the litigation,. . . that would shy away from retaining CAL as opposed to necessarily then existing [clients]."[576]  Mr. Jackson also stated, in response to a question:

> Q. Is it fair to say that CAL hasn't done any study on the impact the litigations that have already occurred had on the inflow of new clients to buy into investment products?
>
> A. We haven't done any specific studies to that effect.  The problem that you have is you never would know, necessarily, so you wouldn't even get an opportunity to have those clients come.
>
> Q. Right. It's like an unknown unknown?
>
> A. Right. But I'm a lawyer and I'm not in distribution, so that's not my particular area of expertise.[577]

In addition, the fact that a particular risk has not materialized does not mean that CAL does not face that risk.  As Mr. Jackson explained, "we try to . . . anticipate issues that could occur and we seek to address those risks affirmatively before they ever come home to roost, but that takes a lot of time and effort on behalf of the adviser."[578]  Anticipating such risks requires constant vigilance and monitoring on behalf of CAL.[579]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*

---

[576] Tr. 287:6-13 (Jackson).

[577] Tr. 287:14-23 (Jackson).

[578] Tr. 349:9-19 (Jackson).

[579] *See* DFFCL ¶¶ 202-203.

229. *Second, with respect to potential interference with business relationships,*
*Mr. Jackson stated that he was unaware of any litigation-related injury to goodwill, nor did*
*anyone in CAL's distribution department inform him that any intermediaries refused to work*
*with CAL as a result of litigation. Tr. 287:24-14; see also Tr. at 138:4-139:9 (Mr. Neal's*
*testimony that he does not recall any conversations with CAL regarding injury to goodwill or*
*injury to third-party relationships).*

**RESPONSE:**  Denied.  Mr. Jackson testified that he was "not aware of anything

specifically along [the] lines" of any quantification or estimation of any injury to goodwill as a

result of litigation.[580]  In response to a question about whether he was aware of any business

intermediaries who have refused to be "part of the distribution process" for CAL's products as a

result of litigation, Mr. Jackson testified "I – I wouldn't know that.  That wouldn't be within my,

my personal realm. . . ."[581]  In addition, the fact that a particular risk has not materialized does

not mean that CAL does not face that risk.  As Mr. Jackson explained, "we try to . . . anticipate

issues that could occur and we seek to address those risks affirmatively before they ever come

home to roost, but that takes a lot of time and effort on behalf of the adviser."[582]  Anticipating

such risks requires constant vigilance and monitoring on behalf of CAL.[583]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited risks that CAL faced with respect to the Fund as compared to its

institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to

"justify" the Fund's fee in light of the supposed cost of these different risks fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 217, *supra*.

---

[580] Tr. 287:24-288:4 (Jackson).

[581] Tr. 288:9-11 (Jackson).

[582] Tr. 349:9-19 (Jackson).

[583] DFFCL ¶¶ 202-203.

230.   *Third, there is no evidence in the record that defending this action, or any of CAL's prior lawsuits, materially impacted the ability of CAL's employees to carry out their day-to-day business activities.  See generally Tr. at 288:15-25.*

**RESPONSE:**  Denied.  Mr. Jackson testified:

Q. Now, turning to the risks that litigation could distract CAL employees from their normal business activities, I mean, ***obviously you're here today, so*** --

A. That's a real risk, sir.

Q. Yes, but aside from the observable risk that you see here, taking the time out of your day to come to New York, has CAL attempted to ascertain the cost of that risk in any prior litigations?

A. No. In the prior litigations that we had, we were successful at the motion stage of prevailing in those particular cases.  They did not go to trial.[584]

In fact, no fewer than eight members of CAL's personnel had to prepare for and attend depositions, in addition to two of CAL's Independent Trustees.  In addition, five CAL employees were required to travel to New York and testify at trial.  During all of the time those employees (and other CAL employees) were devoting attention to this case, they were not handling their regular business responsibilities.  Those are but examples of the risk of employees' distraction from business activities that CAL faces from litigation.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

---

[584] Tr. 288:15-25 (Jackson) (emphasis added).

231.    *Turning specifically to regulatory risks, the primary and most significant risk that CAL identified to the Board as a justification for the Funds' higher advisory fees was CAL's greater exposure to "make-whole" errors.  Tr. at 290:16-25; 291:12-29:22; JX 144 at 636381 ("The Board considered factors that lead to more expenses for registered funds including . . . greater exposure to 'make whole' errors."); JX 111 at 534351 (same).  A "make-whole error" is an error that results in losses to fund investors for which CAL or a third-party service provider bears responsibility.  See Bhatt Dep. at 182:16-22; see also Tr. at 210:14-211:4; 290:2-8.  The most significant source of potential make-whole errors is the daily calculation of the Funds' NAV, which is performed by State Street in the first instance.  Tr. at 211:23-212:1, 295:12-18; 292:23-294:2.*

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 231 that "the primary and most significant risk that CAL identified to the Board . . . was CAL's greater exposure to 'make-whole' errors" and that "the most significant source of potential make-whole errors is the daily calculation of the Funds' NAV" are not supported by the evidence cited.  Mr. Jackson testified that "typically, in a mutual fund setting, we're having to, you know, calculate or be responsible for pricing and NAV errors on a daily basis, and you don't have that responsibility with respect to institutional accounts," and that "with respect to our funds, we ultimately need to make sure that, you know, our NAVs are accurate on a daily basis, and you do run the risk, as an adviser, that you may be subject to greater exposure for these types of errors."[585]  CAL bears ultimate responsibility for all of the services provided to the Funds, through third parties or otherwise.[586]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

---

[585] Tr. 293:11-14, 293:24-294:2 (Jackson).

[586] DFFCL ¶ 200.

*232.    However, the record shows that make-whole errors generally, and NAV errors specifically, are: (i) incredibly infrequent, and have been non-existent with respect to the Growth Fund, (ii) are generally de minimis when they do materialize; and (iii) are typically borne by State Street, not CAL.*

**RESPONSE:**  Denied.  CAL incorporates by reference its Responses to Paragraphs 233-234, *infra*.

*233.    Mr. Bhatt testified that large make-whole errors are infrequent and that he did not recall a single large make-whole error since joining CAL in January 2004.  Bhatt Dep. at 10:10-11, 183:14-184:1.  Consistent with his testimony, in December 2013, Mr. Bhatt reported to the Funds' Valuation Committee that CAL had experienced its first NAV error in over two years, and that the total value of that error – which did not impact the Growth Fund – was under $250.  Id. at 299:10-301:18, JX 42 at 533667-68.*

**RESPONSE:**  Denied.  Mr. Bhatt testified that he did not "recall . . . any large errors."[587]  As set forth in the December 2013 Valuation Committee minutes, Mr. Bhatt stated that "State Street under accrued the expense reimbursement due from" CAL and that "as a result, each Fund's NAV was understated," causing net losses for the Dividend Growth Fund of $218.87 and the Mid Cap Growth Fund of $15.41.[588]  CAL denies that the fact that a particular risk has not materialized does not mean that CAL does not face that risk.  As Mr. Jackson explained, "we try to . . . anticipate issues that could occur and we seek to address those risks affirmatively before they ever come home to roost, but that takes a lot of time and effort on behalf of the adviser."[589]  Anticipating such risks requires constant vigilance and monitoring on behalf of CAL.[590]  In fact, CAL's oversight and monitoring services may well be one reason why large errors are infrequent.

---

[587] Bhatt Dep. 183:18-20, 22.

[588] JX 42 at CALAMOS_00533667-668.

[589] Tr. 349:9-19 (Jackson).

[590] DFFCL ¶¶ 202-203.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*234. Similarly, Mr. Jackson explained that NAV errors are infrequent and that since joining CAL in 2010, he did not recall a single make-whole error involving the Growth Fund for which CAL had to pay out of pocket, Tr. at 297:6-16, 301:16-18. And Mr. Neal testified that he too did not recall a single occasion where CAL had to pay Growth Fund shareholders for a make-whole error. Tr. at 212:2-18.[591] Moreover, Mr. Neal confirmed that when a make-whole error does occur, it is typically the responsibility of the third-party service providers at issue, see Tr. at 213:4-9, which are bound by indemnification provisions rendering them liable for losses resulting from the own negligence or wrongful acts. Tr. at 295:19-296:15; JX 183 at 654546-47; JX 4 at 4-5; JX 182 at 8-10; see also Tr. at 766:23-767:2 (Mr. Richardson's testimony regarding indemnification).[592]*

---

[591] *Mr. Jackson conceded that, even if CAL as opposed to State Street was responsible for reimbursing Fund investors for make-whole errors, such errors, depending on their nature, would be covered by the D&O policy. Tr. 297:17–298:6; see also Bhatt Dep. at 183:14-17. Additionally, Mr. Richardson testified that he did not offer the opinion that it would have been reasonable for CAL to include some value in its advisory fees to account for make-whole errors that were the result of its own negligence or misconduct. Tr. at 766:17-22.* **RESPONSE:** Denied. The foregoing assertion mischaracterizes Mr. Jackson's testimony. In response to the question whether "to the extent a make make-whole error occurred and it wasn't one for which a third-party service provider would be liable, that depending on the nature of the error, it could be covered by the D&O policy?," Mr. Jackson testified "***it could be***" and that "if it's a NAV calculation, etc., that's one thing. If it is a trade error, you know, typically a trade error is going to be the responsibility, those are typically adviser, you know, type of errors." Tr. 297:17-298:2 (Jackson). CAL admits that Mr. Richardson testified that he did not "have a view" on whether the advisory fee CAL charged the Fund "should include some value to account for the risk that CAL would make an error through its own negligence." Tr. 766:17-22 (Richardson). In addition, CAL is not required to "justify" the advisory fee it charges the Fund. DFFCL ¶¶ 203, 209, 227.

[592] *Notably, Mr. Richardson provided only one example of a regulatory risk in his expert report, which he conceded was inapplicable to the Growth Fund. Tr. at 763:19-25-764:2.* **RESPONSE:** Denied as stated. Mr. Richardson was asked about a regulatory risk involving the Capital Preservation Fund. Tr. 763:22-25 (Richardson). He was not asked by counsel for Plaintiffs to identify any other examples of regulatory risk.

**RESPONSE:**  Denied as stated.  Mr. Jackson could not recall the last time a NAV error occurred with respect to the Fund for which CAL has paid out of pocket.  As Mr. Jackson explained, however, "the concern is the fact that they may occur, and with striking NAV every day for these particular funds, the specter of an error is always looming, and that's the concern."[593]  The assertion that a make-whole error is "typically the responsibility of the third-party service providers at issue" is not supported by the evidence cited.  CAL bears ultimate responsibility for all of the services provided to the Funds, through third parties or otherwise.[594]  Simply because the contracts with third party service providers provide for those third parties' own liability for errors or failure to perform the necessary services, that does not mean that CAL would not bear any liability for third party errors or failures.  The service providers would not necessarily accept liability under all circumstances, nor does that mean that the Independent Trustees and shareholders would not look to CAL if these service providers do not fulfill their obligations efficiently and correctly.[595]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

---

[593] Tr. 301:18-23 (Jackson).

[594] DFFCL ¶ 200.

[595] Jackson Decl. ¶ 119.

b.        **Entrepreneurial / Competitive Risks**

*235.    Mr. Richardson testified that CAL also purportedly faced greater entrepreneurial and competitive risks as an adviser of mutual funds, which he believes are relevant to the disparity in the fees CAL charged its fund clients versus its non-fund clients.  Richardson Report at ¶¶67-72, 128-32; see also JX 144 at 636381 (2016 15(c) Minutes identifying "capital expenditures to establish a fund" and "length of time to reach critical mass, and related expenses" as cost drivers for mutual funds); Tr. at 98:24–100:11 (Mr. Behan's similar testimony concerning entrepreneurial and competitive risk).*

**RESPONSE:**  Denied.  Mr. Richardson testified that CAL faced greater entrepreneurial and competitive risks, which persist even after mutual funds reach profitability, as an adviser to the Funds than as an adviser to institutional or sub-advisory accounts.[596]

Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*236.    Entrepreneurial risks include an adviser's outlay of start-up capital in sponsoring a fund and its assumption of initial operating losses until the fund reaches profitability.  See Tr. 98:24–100:11, 758:2-9; Richardson Report at ¶¶128, 132.  Mr. Richardson conceded, however, that the Growth Fund was over 25 years old, had already reached profitability, and that CAL had already recouped its start-up costs from sponsoring the Growth Fund.  Tr. at 757:24-19.*

**RESPONSE:**  Denied.  CAL admits that, among other things, entrepreneurial risks include start-up costs such as the money expended by the adviser to sponsor the fund and the assumption of operating losses until the fund reaches profitability.[597]  CAL denies the remaining of Plaintiffs' assertions in Paragraph 236.  First, Paragraph 236 identifies some, but not all, of the sole entrepreneurial risks entailed in advising a fund.  Second, as Mr. Richardson testified, even

---

[596] Tr. 757:24-759:11 (Richardson).

[597] Tr. 758:2-9 (Richardson).

if the Fund has already reached profitability and CAL has recouped its initial capital, "I think entrepreneurial risks continue even after you've obtained a measure of profitability.  You don't know that the fund is always going to be profitable going forward, and not every fund that you launch is going to be profitable."[598]  In fact, the decline in the Fund's AUM, and the profitability of the Fund, is an example of the entrepreneurial risk entailed in advising a mutual fund.[599]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

*237.    Competitive risks encompass the possibility that fund shareholders would switch investment advisers or chose a passively managed index fund (which typically have lower fees). See Richardson Report at ¶70; Tr. at 761:17-25.  Mr. Richardson made clear, however, that he did not offer the opinion that it would have been reasonable for CAL to charge the Growth Fund a fee that added some value for the risks that investors would switch investment advisers due to CAL's poor performance or that investors would opt for an index fund because the Growth Fund's fees were too high.  Tr. at 759:12-762:22.  Further, the same competitive risks exist with respect to non-fund clients:  indeed, all of CAL's Other ACG Accounts switched advisors.*

**RESPONSE:**  Denied.  Mr. Richardson identified "investor preference," *i.e.*, the move of investors from actively-managed funds to passive funds, to be one example of a competitive risk.[600]  Mr. Richardson was not asked to offer, and is not offering, the expert opinion that CAL was entitled to charge the Fund a fee that accounted for the risk that investors would switch to a

---

[598] Tr. 758:24-759:2 (Richardson).

[599] Richardson Rpt. ¶ 70.

[600] Tr. 761:21-25 (Richardson).

passively managed fund.[601]  However, the fact that Mr. Richardson does not offer an opinion on whether an adviser should charge a fee that accounts for the risk that investors would leave the fund does not mean that he disagrees with that proposition or that it is contrary to law.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited risks that CAL faced with respect to the Fund as compared to its institutional and sub-advisory All Cap Growth Clients and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different risks fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 217, *supra*.

## IV.   CAL'S METHOD FOR ALLOCATING COSTS MADE ITS LARGER FUNDS APPEAR LESS PROFITABLE

### A.   CAL's 15(c) Profitability Presentations and Cost Allocation Methodology

*238.    Each of CAL's 15(c) Responses contained a presentation titled "Mutual Fund Profitability," which purported to present the profitability, to CAL, of serving as advisor to each of the Funds, including the Growth Fund.  DX 184-Q, DX 176-Q, DX 145-R, DX 113-S, DX 61-S, DX 32-Q.  These presentations were standardized, differing only in specific numbers, rather than in methods of calculation or manner of presentation.  Id.  For each of the Funds, CAL's profitability is the difference between (1) the revenue CAL received from serving as that Fund's adviser (namely, the advisory fees paid to CAL by that Fund) and (2) the costs CAL incurred to provide that Fund with advisory services, (3) divided by the revenue (which expresses the percentage of Fund-specific advisory revenue that flows to CAL as profit).  DX 184-Q; Lacey Report at ¶¶23, 38.*

**RESPONSE:**  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, on summary judgment, the Court ruled that (a) as a result of the "Mutual Fund Profitability Presentation," for each year within the Relevant Period "the Independent Trustees

---

[601] Tr. 762:10-16 (Richardson).

were fully informed about Calamos' profitability methodology," and (b) Plaintiffs' contention that the Mutual Fund Profitability presentations understated the Fund's profitability is "wholly lacking in merit as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of an 'average AUM' cost-allocation method to analyze profitability—a method Plaintiffs' recognize is commonly accepted within the industry."[602]

Second, as the trial evidence conclusively demonstrates: (a) an adviser's "choice of cost allocation methodology does not affect" whether the advisory fee is excessive, as Professor Bullard concedes; (b) CAL's calculation of its profitability with respect to the Fund, like any other profitability calculation, necessarily involves the exercise of discretionary accounting judgments that may affect the overall result; (c) because there are a range of reasonable and acceptable judgments and methodologies that can be used, and which will produce a range of different but equally reasonable results, there is no one "true" profitability figure; (d) as Professor Lacey testified, without any meaningful contradiction from either of Plaintiffs' experts, CAL's Profitability Presentation employs a systematic and rational approach to provide reasonable, decision-useful information to the Independent Trustees; (e) as the only two qualified accountants at the trial (Mr. Helmetag and Professor Lacey) testified, CAL's manner of calculating Fund-level advisory profitability is consistent both with managerial accounting principles and the principles underlying GAAP; and (f) Plaintiffs did not offer any evidence that CAL's AUM-based cost allocation approach is not consistent with managerial accounting principles or the principles underlying GAAP; indeed, neither of Plaintiffs' experts offer any accounting-grounded opinions (nor could they, given their complete lack of accounting

---

[602] DFFCL ¶¶ 291-92.

qualifications).[603]  In sum, as Dr. Pomerantz freely admitted, CAL is "well within [its] accounting rights as accountants to do what they've done" with respect to the cost allocation methodology it used.[604]

      Third, Plaintiffs provided no admissible and credible evidence that allocation of indirect advisory costs on the basis of AUM is in any way inconsistent with the allocation of fixed costs, or that cost behavior must dictate (or prohibit) any particular cost allocation methodology.  To the contrary, as Professor Lacey explained, without any contradiction from Plaintiffs, where, as here, no cause and effect relationship can be identified, allocation by average AUM is a reasonable cost allocation methodology because it is a reasonable proxy for the benefits the Fund receives.[605]  As Professor Lacey further testified:

> I think what is confused here is the difference between cost behavior and cost allocation.  So, we also have to allocate fixed costs even though the cost doesn't change.  When we're computing the profitability of an apartment or the profit from a particular product -- our ruler, for example -- we have to allocate those fixed costs to the individual products in the individual departments to compute the profitability. So, allocation versus cost behavior.[606]

      Fourth, Plaintiffs' assertion that CAL's accounting methodology is "per se unreasonable" is entirely unsupported by the law or the trial evidence. Putting aside that Professor Bullard is unqualified even to address the subject, his claim has no support in law, regulations, or accounting principles.  Neither *Gartenberg* nor any other Section 36(b) case ever held, nor has the ICA or the SEC ever established a rule requiring, anything other than a reasonable and rational accounting calculation.  Certainly nothing in *Gartenberg* even hints at the idea that

---

[603] DFFCL ¶¶ 295-307.

[604] DFFCL ¶ 306.

[605] Tr. 997:17-23, 999:17-22 (Lacey).

[606] Tr. 1022:15-23 (Lacey).

allocation of indirect costs on the basis of AUM is "per se unreasonable." Plaintiffs' "per se unreasonable" assertion is also directly at odds with the only alternative profitability calculation that Plaintiffs offer, from Dr. Pomerantz, who allocated costs in his model exclusively on the basis of AUM and no additional variables. Professor Bullard claimed that he did not review Dr. Pomerantz's testimony prior to offering his cost allocation opinion at trial, and Plaintiffs made no effort to reconcile the conflicting opinions of their experts.[607]

Fifth, as Plaintiffs have conceded, the profitability figures CAL reported using an average AUM methodology are not materially different from the figures CAL reported using the time-spent methodology with which Plaintiffs take no issue.[608]

Sixth, to the extent that any of Plaintiffs' assertions concerning CAL's accounting, profitability or cost allocation methodology rely on the testimony of Dr. Pomerantz or Professor Bullard, those assertions are not supported by any admissible or credible evidence because neither Dr. Pomerantz nor Professor Bullard is in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[609]

With specific reference to Plaintiffs' assertions in Paragraph 238, CAL admits that each of CAL's 15(c) Responses contained a "Mutual Fund Profitability" presentation that presents a widely-accepted profitability measure calculated as (Revenues – Expenses)/Revenues for each Fund. CAL denies any assertions within Paragraph 238 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

---

[607] DFFCL ¶ 307.

[608] DFFCL ¶ 303.

[609] DFFCL ¶¶ 417-420, 447-449.

239.    *While CAL's advisory revenue with respect to each Fund is directly and easily ascertainable (the advisory fees each Fund paid), the costs CAL incurred to advise each Fund are not ascertainable in a similarly easy and direct manner.  Id.  That is because only a few types of expenses (all of which related to distribution and marketing expenses, and are hence irrelevant to the pre-distribution/marketing profitability required by Gartenberg and at issue here) were "direct expenses" recorded on a Fund-specific basis.  DX 184-Q, at 653680 and 653691; Lacey Report at ¶30; Pomerantz Report at ¶¶408-09.  Instead, all of CAL's advisory expenses (namely employee compensation, general and administrative costs, and client service costs) were "indirect expenses," also termed "joint costs" or "common costs," that could not be easily traced to particular Funds, and that CAL incurred with respect to multiple or all of the Funds (e.g., compensation of investment management personnel who provided services to several Funds; compensation of personnel in other departments, such as Fund Administration, Operations, or Legal and Compliance, which provided services to all of the Funds; rent and utility costs for CAL's shared offices, etc.).  DX 184-Q, at 653680 and 653691; Lacey Report at ¶¶16, 23-25, 30; Pomerantz Report at ¶409, 430-31; Tr. at 234:23–235:11.  Such indirect, jointly-incurred costs must be allocated among the multiple products to which they relate (here, CAL's advisory clients) on a rational basis, in order to report product-specific profits. Lacey Report at ¶¶16-31; Tr. 235:20-25.*

**RESPONSE:**  Denied as stated.  CAL admits that in preparing the Profitability Presentation, CAL is required to account for not only "direct" expenses, but also "indirect" expenses (sometimes called "joint and common" expenses).  An indirect expense is an expense that is incurred but cannot be connected solely to a specific cost object, such as rent, insurance, employee salaries, and utilities such as electricity or gas heat.  It is not possible to trace these expenses to the product(s) and/or fund(s) incurring these costs.  Therefore, some allocation methodology must be selected so that the expense can be attributed to the cost object(s) to which the expense is connected.  A large amount of the advisory expenses are indirect expenses that therefore must be allocated.[610]  CAL denies any assertions within Paragraph 239 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

---

[610] DFFCL ¶¶ 301-306.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*240.    To calculate and present the profitability to CAL of advising each of the Funds, the Mutual Fund Profitability presentations allocated CAL's advisory costs, in their entirety, to each of the Funds on the sole basis of AUM.   DX 184-Q, at 653680.  This cost allocation proceeded in a two-step process.  Id.  In the first, a product-line allocation, CAL started with the total advisory costs CAL incurred in advising all its investment products/clients, and allocated a portion of those total costs to the Funds (as opposed to other clients, such as Subadvisory Accounts and Institutional Accounts) according to the Funds' proportion of CAL's total AUM. DX 184-Q, at 653680-81; Pomerantz Report at ¶¶410-11.  Thus, for example, where the Funds' constituted 86% of CAL's total AUM, CAL allocated 86% of its total advisory costs to the Funds. DX 184-Q, at 653681.  In the second, having allocated advisory costs to the Funds in aggregate, CAL then allocated portions of its aggregate Funds-related advisory costs to each of the Funds, again on the basis of AUM (i.e., each Fund's proportion of the Funds' aggregate AUM).   DX 184-Q, at 653680 and 653691; Pomerantz Report at ¶432.*

**RESPONSE:**  Denied as stated.  CAL admits that as a general proposition, it allocated indirect expenses between the Funds and CAL's other clients on the basis of average AUM, and that CAL then allocated the portion of the indirect expenses allocated to the Funds to each individual fund based on that fund's average AUM.[611]  CAL denies any assertions within Paragraph 240 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

---

[611] DFFCL ¶¶ 301-02, 304-05.

B.    **CAL's Profitability Presentations were Inconsistent with Its Actual Operations and Artificially Lowered the Growth Fund's Profitability**

1.    **Although Advisory Costs are Largely Fixed CAL Allocated Those Costs by AUM as if they Were Variable Costs, Eliminating/Masking Economies of Scale**

*241.    As CAL's profitability expert Professor Lacey concedes, most costs incurred in the provision of advisory services are largely fixed costs, rather than variable costs: i.e., costs that remain relatively constant even as AUM rises or falls, and thus that do not vary in direct proportion to AUM.  Tr. at 996:16–997:6. Because of this, and as Professor Lacey's own cost allocation authorities explain, it is generally acknowledged in the mutual fund industry that advisory costs do not directly track AUM.  Pomerantz Rebuttal Report at ¶248.*

**RESPONSE:**  Denied as stated.  CAL admits that Professor Lacey testified that most costs are fixed costs in mutual fund advisory services, and that advisory costs therefore do not vary proportionately by AUM.[612]  CAL denies any assertions within Paragraph 241 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.  In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*242.    Yet CAL's Mutual Fund Profitability Presentations allocated advisory costs in exactly the opposite manner:  as if all advisory costs varied in perfect and direct proportion to AUM.  DX 184-Q, DX 176-Q, DX 145-R, DX 113-S, DX 61-S, DX 32-Q.  See also Pomerantz Rebuttal Report at ¶¶248-49.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 242 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

---

[612] Tr. 996:24-997:6 (Lacey).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*243.    Such allocation is per se unreasonable, as it allocates costs in a manner diametrically opposite to known facts concerning such costs' actual behavior.  Tr. at 879:14-20; Bullard Rebuttal Report at ¶¶104-05.  See also Pomerantz Rebuttal Report at ¶¶236-93.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 243 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.  Furthermore, Plaintiffs' sole basis for their assertions in Paragraph 243 are the opinions of Dr. Pomerantz and Professor Bullard, both of whom are wholly unqualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[613]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*244.    CAL's actual operating costs, as analyzed by both Plaintiffs' and Defendant's experts, do not evince the direct and proportional relationship to CAL's AUM depicted in CAL's Mutual Fund Profitability Presentations.  Pomerantz Report at ¶¶467-89; Pomerantz Rebuttal Report at ¶247; Cronin Report at Ex. 9.1 (showing total advisory and distribution costs increased as AUM declined) and Ex. 10 (showing investment advisory personnel headcount remaining constant even as AUM declined by 50%, illustrating the relatively fixed nature of this advisory expense).  For example, as the AUM in CAL's Funds declined from $15.3 billion to $13.6 billion (a decline of 13.7%), CAL advisory costs did not decline by a similar 13.7%, but instead fell from $63.0 million to $60.8 million, a decline of only 3.4% (approximately 1/4th the AUM decline).  Pomerantz Report at ¶480. Similarly, as CAL Open-End Fund AUM fell 38.5% from 2011 through 2015, CAL's employee compensation costs fell only 11.3%.  Id., ¶¶468-74. In sum, analysis of CAL's actual operating costs indicates that such costs, or substantial portions thereof, do not perfectly track and/or vary with AUM, but instead, as Professor Lacey conceded, remain substantially fixed even as AUM varies.*

---

[613] DFFCL ¶¶ 417-420, 447-449.

**RESPONSE:** Denied. CAL denies any assertions within Paragraph 244 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

245.    *These same facts (i.e., CAL's own financial results of operations), viewed under a different conceptual terminology, indicate the presence of substantial economies of scale. Pomerantz Report at ¶¶468-89; Pomerantz Rebuttal Report at ¶¶301-05.*

**RESPONSE:** Denied. CAL denies the assertion that the "facts" in Paragraph 245 prove anything at all, let alone prove that CAL's profitability with respect to the Fund in any way suggests that the Fund's fee "could not have been the product of arm's-length bargaining," for all of the reasons set forth in its responses to Paragraph 238, *supra*.

In addition, the Court has already ruled, as a matter of law, that Plaintiffs failed to show the existence of economies of scale—or even to create a fact issue sufficient for trial.[614]  That ruling was based on the same fundamental flaw that Plaintiffs continue to advance in their profitability contention, *i.e.*, that Dr. Pomerantz reached his conclusions about economies of scale without inquiring into whether other factors were the actual <u>caused</u> of the changes in average cost that he supposedly observed.[615]  More particularly, the Court explained that the exact evidence that Plaintiffs seek to rely upon—the mere correlation between changes in assets and costs—fails to establish economies of scale, particularly in light of Dr. Pomerantz's testimony that he did not investigate whether these changes in assets may have been caused by

---

[614] DFFCL ¶ 253.

[615] *Chill*, 2018 WL 4778912, at *19-20.

other factors.[616]  Plaintiffs' assertion is therefore further confirmation that their only alternative profitability model is nothing more than an effort to calculate the purported unshared economies of scale that the Court already has "taken care of" in its summary judgment ruling.[617]

> *246.     As CAL's economics expert Dean Hubbard explains, economies of scale exist where an increase in output causes a reduction in long-run average costs.  Hubbard Report at ¶144.  Conversely, economies of scale are indicated where a decrease in output causes an increase in average costs.  Pomerantz Report at ¶481.  In considering advisory services, AUM is the unit of output.  Id., ¶10(vi).*

**RESPONSE:**  Denied as stated.  CAL admits that Dean Hubbard testified that economies of scale exist when an increase in output <u>causes</u> a reduction in long-run average cost, and that conversely, if an increase in output does not <u>cause</u> a reduction in long-run average cost, then economies of scale do not exist.[618]  CAL denies that the assertions in Paragraph 245 prove anything at all, let alone prove that CAL's profitability with respect to the Fund in any way suggests that the Fund's fee "could not have been the product of arm's-length bargaining," for all of the reasons set forth in its Response to Paragraph 238, *supra*.

In addition, the Court has already ruled, as a matter of law, that Plaintiffs failed to show the existence of economies of scale—or even to create a fact issue sufficient for trial.[619]  That ruling was based on the same fundamental flaw that Plaintiffs continue to advance in their profitability contention, *i.e.*, that Dr. Pomerantz reached his conclusions about economies of scale without inquiring into whether other factors were the actual <u>caused</u> of the changes in average cost that he supposedly observed.[620]  More particularly, the Court explained that the

---

[616] *Chill*, 2018 WL 4778912, at *19-20.

[617] DFFCL ¶ 318.

[618] Hubbard Rpt. ¶¶ 144-149.

[619] DFFCL ¶ 253.

[620] *Chill*, 2018 WL 4778912, at *19-20.

exact evidence that Plaintiffs seek to rely upon—the mere correlation between changes in assets and costs—fails to establish economies of scale, particularly in light of Dr. Pomerantz's testimony that he did not investigate whether these changes in assets may have been caused by other factors.[621] Plaintiffs' assertion is therefore further confirmation that their only alternative profitability model is nothing more than an effort to calculate the purported unshared economies of scale that the Court already has "taken care of" in its summary judgment ruling.[622]

*247.    Professor Lacey's own authorities for cost allocation in the mutual fund industry: (1) acknowledge general agreement that economies of scale exist in the mutual fund industry (see Pomerantz Rebuttal Report at ¶248); (2) relatedly, acknowledge general agreement that advisory costs do not rise in direct proportion to AUM (id.); and (3) criticize AUM-based cost allocation, which allocates costs in direct proportion to AUM, for its tendency to over-allocate costs to large funds (id., ¶¶259, 274).*

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 247 are not supported by the evidence cited.  None of the sources cited in Professor Lacey's Report stands for any of the assertions contained in Paragraph 247.  To the contrary, each such source lists allocation by AUM as a methodology that is recognized in the mutual fund industry as a method for allocating indirect costs.  CAL denies any assertions within Paragraph 247 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*248.    CAL's own results of operations, which Dr. Pomerantz analyzed but Dean Hubbard and Professor Lacey did not, showed consistently that as CAL's AUM declined throughout the Relevant Period, CAL's average advisory costs per unit of AUM increased.*

---

[621] *Chill*, 2018 WL 4778912, at *19-20.

[622] DFFCL ¶ 318.

*Pomerantz Report at ¶¶482 (e.g., from 40 bps to 46 bps from one year to the next) and 468-89 generally; Pomerantz Rebuttal Report at ¶¶301-05.*

**RESPONSE:**  Denied.  CAL admits that its advisory cost per unit of AUM increased during the Relevant Period because at a time when its AUM was declining, CAL was making significant investments in its portfolio management team and investment process, including hiring additional personnel and restructuring compensation, all at a significant cost to CAL.[623] When rejecting Dr. Pomerantz's testimony on this issue on summary judgment, the Court specifically criticized Dr. Pomerantz's failure to account for these personnel changes (or any other factors) and to analyze whether they, rather than changes in AUM, were the <u>cause</u> of CAL's changing average advisory costs.[624]  CAL denies any assertions within Paragraph 248 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*249.    CAL's profitability expert Professor Lacey also concedes that CAL's AUM-based allocations to and between the Funds are oblivious to, and do not take into account, any economies of scale associated with advisory operations. Tr. at 1032:8-25 (". . . we don't consider economies of scale in that allocation process.  It's just not something we do."); see also Pomerantz Rebuttal Report at ¶¶268-70 and 305, and Tr. at 1008:13–1009:22.  Dr. Pomerantz states the same in different and more affirmative words, both in his expert report (Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84 – AUM-based cost allocation "assumed away" any economies of scale and rendered them "invisible") and in his trial testimony (Tr. at 451:2-25, 458:8–459:2 – CAL's cost allocation methodology "neuters the concept of economies of scale [and] makes [it] impossible to be measured, impossible to be analyzed, impossible to evidenced.").*

---

[623] DFFCL ¶¶ 106-114, 313.

[624] *Chill*, 2018 WL 4778912, at *19-20.

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 249 are not supported by the evidence cited.  To the contrary, as Professor Lacey testified at trial, "that concept [of economies of scale] [does not] relate to cost allocation."[625]  CAL denies that the assertions in Paragraph 249 prove anything at all, let alone prove that CAL's profitability with respect to the Fund in any way suggests that the Fund's fee "could not have been the product of arm's-length bargaining," for all of the reasons set forth in its Response to Paragraph 238, *supra*.

In addition, the Court has already ruled, as a matter of law, that Plaintiffs failed to show the existence of economies of scale—or even to create a fact issue sufficient for trial.[626]  That ruling was based on the same fundamental flaw that Plaintiffs continue to advance in their profitability contention, *i.e.*, that Dr. Pomerantz reached his conclusions about economies of scale without inquiring into whether other factors were the actual <u>caused</u> of the changes in average cost that he supposedly observed.[627]  More particularly, the Court explained that the exact evidence that Plaintiffs seek to rely upon—the mere correlation between changes in assets and costs—fails to establish economies of scale, particularly in light of Dr. Pomerantz's testimony that he did not investigate whether these changes in assets may have been caused by other factors.[628]  Plaintiffs' assertion is therefore further confirmation that their only alternative profitability model is nothing more than an effort to calculate the purported unshared economies of scale that the Court already has "taken care of" in its summary judgment ruling.[629]

*250.    By allocating all advisory costs in perfect relation to AUM, in contravention of the manner in which CAL's advisory costs actually behaved (and, put differently, of the*

---

[625] Tr. 1032:11-16 (Lacey).

[626] DFFCL ¶ 253.

[627] *Chill*, 2018 WL 4778912, at *19-20.

[628] *Chill*, 2018 WL 4778912, at *19-20.

[629] DFFCL ¶ 318.

*economies of scale indicated by such cost behavior), CAL's cost allocations in the Mutual Fund Profitability presentations were distorted, particularly for funds at both extremes of the AUM spectrum (i.e., very small funds and very large funds). Pomerantz Report at ¶433 et seq.; Pomerantz Rebuttal Report at ¶236 et seq. Specifically, and as further detailed in Sections IV.B.2-3 below, the Mutual Fund Profitability presentations sharply under-allocated expenses to small funds (thereby making them appear profitable to CAL, when in fact they were not) and sharply over-allocated expenses to large funds, such as the Growth Fund (making them appear less profitable to CAL than they in fact were). Pomerantz Report at ¶433 et seq.*

**RESPONSE:** Denied. CAL denies any assertions within Paragraph 250 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

Furthermore, the Court has already ruled, as a matter of law, that Plaintiffs failed to show the existence of economies of scale—or even to create a fact issue sufficient for trial.[630] That ruling was based on the same fundamental flaw that Plaintiffs continue to advance in their profitability contention, *i.e.*, that Dr. Pomerantz reached his conclusions about economies of scale without inquiring into whether other factors were the actual <u>caused</u> of the changes in average cost that he supposedly observed.[631] More particularly, the Court explained that the exact evidence that Plaintiffs seek to rely upon—the mere correlation between changes in assets and costs—fails to establish economies of scale, particularly in light of Dr. Pomerantz's testimony that he did not investigate whether these changes in assets may have been caused by other factors.[632] Plaintiffs' assertion is therefore further confirmation that their <u>only</u> alternative

---

[630] DFFCL ¶ 253.

[631] *Chill*, 2018 WL 4778912, at *19-20.

[632] *Chill*, 2018 WL 4778912, at *19-20.

profitability model is nothing more than an effort to calculate the purported unshared economies

of scale that the Court already has "taken care of" in its summary judgment ruling.[633]

*251.     At trial, Defendant did not argue that the Funds-specific profitability figures reported in the Mutual Fund Profitability presentations were accurate, and insisted instead that Funds-specific profitability was unknowable.  Tr. at 238:15–239:15, 1010:17–1011:1, 1015:10-19.  Defendant justified the Mutual Fund Profitability presentations instead, primarily, on their systematicity (i.e., all costs allocated on the basis of AUM) and on their practicality (i.e., calculating profitability in such manner was easily accomplished and did not take too much time or effort).  Tr. at 235:16-25, 240:13-242:13, 998:13-17, 1015:2-9, 1020:19–1021:4; Lacey Report at ¶¶20, 24, 83-85.*

**RESPONSE:**  Denied.   CAL denies any assertions within Paragraph 251 suggesting that

the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability

was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each

of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*

### 2.     CAL's 15(c) Profitability Presentations Over-Allocated Costs to Large Funds, Presenting them as Less Profitable than They in Fact Were

*252.     Allocation of advisory costs on the basis of AUM alone over-allocates costs to larger funds, such as the Growth Fund.  Pomerantz Report at ¶433; Pomerantz Rebuttal Report ¶¶259, 274.*

**RESPONSE:**  Denied.  Allocation by AUM by definition allocates more costs to funds

that have larger AUM.[634]  That fact does not mean that allocation by AUM is in any way

inappropriate.  As Professor Lacey also explained, however:

> The allocation method of AUM allocates more cost to funds that
> have larger assets under management.  So, depending upon then the
> revenue that's generated from those funds, it could make the fund
> look less profitable, yes -- and I should say, less profitable than if

---

[633] DFFCL ¶ 318.

[634] Tr. 1003:23-1004:15 (Lacey).

> you allocated an equal amount to each fund, for example. So, when
> you say "less profitable," you have to say less than what.[635]

CAL denies any assertions within Paragraph 252 suggesting that the Mutual Fund Profitability

Presentation was in any way misleading or that CAL's profitability was in any "improperly"

calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each

of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*253.    Indeed, the sources that Professor Lacey cites for his basis that AUM-based cost allocation is "widely accepted" in the mutual fund industry criticize AUM-based cost allocation for this very reason:  that it "tends to make the largest funds less profitable" by over-allocating advisory costs to them.  Tr. 1003:23–1005:25; Pomerantz Rebuttal Report at ¶¶259, 274.*

**RESPONSE:**  Denied.  Allocation by AUM by definition allocates more costs to funds

that have larger assets under management.[636]  That fact does not mean that allocation by AUM is

in any way inappropriate.  As Professor Lacey also explained, however:

> The allocation method of AUM allocates more cost to funds that
> have larger assets under management.  So, depending upon then the
> revenue that's generated from those funds, it could make the fund
> look less profitable, yes -- and I should say, less profitable than if
> you allocated an equal amount to each fund, for example. So, when
> you say "less profitable," you have to say less than what.[637]

CAL denies any assertions within Paragraph 253 suggesting that the Mutual Fund Profitability

Presentation was in any way misleading or that CAL's profitability was in any "improperly"

calculated as unsupported by any trial evidence.

---

[635] Tr. 1003:23-1004:7 (Lacey).

[636] Tr. 1003:23-1004:15 (Lacey).

[637] Tr. 1003:23-1004:7 (Lacey).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

254.    *The over-allocation of costs to larger funds has the same root as the below-discussed under-allocation of costs to smaller funds:  that cost allocation on the basis of AUM ignores economies of scale and the largely fixed nature of advisory costs.  Pomerantz Report at ¶433; see also id. ¶¶382-85; Pomerantz Rebuttal Report at ¶¶236-59, 287-93; Bullard Report at ¶¶64-78.  For mutual fund advisers, additional AUM often require little if any additional costs (e.g., a 10% increase in AUM might entail little or no increase in costs, as extant personnel, systems and infrastructure often suffice to service additional AUM), but cost allocations based on AUM assign additional costs in direct and continuous proportion to additional AUM (e.g., a 10% increase in AUM will entail a 10% increase in allocated costs).  Id.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 254 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

### 3.    CAL's 15(c) Profitability Presentations Under-Allocated Costs to Small Funds, Presenting them as Profitable When in Fact They Were Not

255.    *CAL's Mutual Fund Profitability presentations presented CAL's smaller and smallest Funds not only as uniformly profitable for CAL to advise, but as providing CAL with greater profitability than its largest Funds, such as the Growth Fund.  See e.g. DX 145-R at 634772.[638]*

---

[638] *Specifically, the Pre-Distribution and Marketing "Operating Margin" line item for each of the 21 Open-End Funds is positive.  14 of these 21 Funds had AUM below $200 million (see "Monthly Average AUM" line item at bottom of page).  Of these 14 sub-$200 million Funds, seven had reported profit margins exceeding 50%, while the Growth Fund's profit margin was reported as 47%.* **RESPONSE:**  Denied, as set forth in CAL's Response to Paragraph 255.

**RESPONSE:**  Denied.  CAL admits that the Mutual Fund Profitability presentation reflects the profitability of each of the Funds to CAL, in terms of dollars and reflected as a profit margin percentage, on both a pre- and post-distribution basis.[639]  CAL denies any assertions within Paragraph 255 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

256.    *For example, in 2016 CAL reported to the Board that 14 of its Funds with AUM below $200 million were profitable, and that several of them were more profitable to CAL than the then-$3 billion Growth Fund.  DX 145-R at 634772.  These results are roundly counterfactual, and contradicted inter alia by:*

> a.  *the testimony of CAL executives, such as Mr. Behan, who explained quite bluntly that small funds are typically unprofitable to their advisers until reaching approximately $250 million in AUM, at which point the advisory fees they generate (which are a function of AUM) begin to exceed the advisory costs incurred by their advisers; Tr. 109:9-18; see also id.at 99:19 – 100:11.*

> b.  *the testimony of the Fund's Independent Trustees, such as Mr. Neal, to the same effect, Tr. at 193:8-10;*

> c.  *the testimony of CAL's expert Mr. Richardson, to the same effect, Pomerantz Rebuttal Report at ¶240;*

> d.  *received wisdom concerning mutual fund economics from the mutual fund industry's primary trade association, the Investment Company Institute ("ICI"), to the same effect;[640]*

---

[639] DFFCL ¶¶ 296-98, 313.

[640] *As ICI explains, a mutual fund "typically starts small and may require significant subsidies from its adviser for a number of years until the fund reaches a critical mass," "can take several years [] to achieve a viable size," and "may incur losses during [its] early years, may never reach viable size, and may ultimately need to be closed or merged." (Pomerantz Rebuttal Report*

>      e.  *what CAL repeatedly told the Board outside the 15(c) Review context
>          and/or prior to this action:  namely, that its small funds were unprofitable,
>          and cost CAL more to advise and operate than they paid to CAL in fees;[641]*
>
>      f.  *CAL's real-world managerial decisions to shutter three of its smallest
>          Funds, because they were, and in CAL's view were likely to remain,
>          unprofitable to CAL.[642]*

**RESPONSE:**  Denied.  None of the citations in Paragraph 256 support Plaintiffs'

assertions therein, and none of that evidence is inconsistent with CAL's Mutual Fund

Profitability presentation.

Mr. Behan testified that when a fund is below $150-$250 million, it is "unprofitable from

an economic standpoint."[643]  As CAL's 2016 Mutual Fund Profitability presentation reflected,

nine of the fourteen funds with below $200 million in assets had negative operating margins on a

post-distribution basis.[644]  Mr. Neal testified simply that "we all know that when you start a new

fund, the new fund is a loss to start. . . ."[645]  Similarly, Mr. Richardson offered the opinion that,

---

*at ¶236; Bullard Rebuttal Report at ¶109).*  **RESPONSE:**  Denied, as set forth in CAL's
Response to Paragraph 256.

[641] *PX 432 at 626286 (reporting to Board in 2000 that apart from one Fund, all of CAL's other
Funds, which were then still relatively small, "were not yet profitable to the Adviser."); JX 144
at 636337-38 (Mr. Behan explaining to the Board that CAL recommended liquidating several of
its smallest funds because such funds had "been subsidized since inception," had "failed to
achieve economies of scale," and presented "unlikely prospects of future asset growth"
sufficient to generate advisory fees that outstripped costs). See also Pomerantz Report at ¶445;
Pomerantz Rebuttal Report at ¶241; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at
¶¶106-09.*  **RESPONSE:**  Denied, as set forth in CAL's Response to Paragraph 256.

[642] *JX 144 at 636337-38 (Mr. Behan explaining to the Board that CAL recommended liquidating
several of its smallest funds because such funds had "been subsidized since inception," had
"failed to achieve economies of scale," and presented "unlikely prospects of future asset
growth").  See also Pomerantz Report at ¶445; Pomerantz Rebuttal Report at ¶241, 287-97,
307-09; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at ¶¶106-09.*  **RESPONSE:**
Denied, as set forth in CAL's Response to Paragraph 256.

[643] Tr. 109:14-18 (Behan).

[644] DX 145-R at CALAMOS_00634772.

[645] Tr. 193:9-10 (Neal).

"[s]tarting a mutual fund requires a significant initial capital investment on behalf of the adviser and the assumption of initial operating losses until the fund reaches profitability."[646]  Finally, as CAL explained to the Board, CAL's proposal to close the Discovery Growth Fund and Mid-Cap Growth Fund, and to merge the Focus Growth Fund into the Fund, was motivated by the modest asset growth of each fund since inception, despite significant efforts by CAL to enhance processes, operations and distribution of each of the funds, and because given the three funds' small asset base and unlikely prospects of future asset growth, it was in the best interests of the funds' shareholders that the funds be liquidated.[647]  In addition, liquidating the Discovery Growth Fund and Mid-Cap Growth Fund and reorganizing the Focus Growth Fund into the Fund would enable CAL to allocate additional resources to support the remaining Funds.[648]

CAL denies any assertions within Paragraph 256 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

257.    *The simple fact of the matter recognized by Plaintiffs' and Defendant's experts, CAL and CAL executives, the Independent Trustees, and the mutual fund industry, is that new and/or small mutual funds are unprofitable to their advisers because of the high, initial fixed costs required to operate them, and they only become profitable when they reach sufficient size to generate advisory fees that outweigh such largely fixed costs. ¶256, supra; Pomerantz Rebuttal Report at ¶¶236-49, 277.*

---

[646] Richardson Rpt. ¶ 67.

[647] Tr. 109:19-112:3 (Behan) (discussing DX 146-O); DX 146-O at CALAMOS_00635711-12.

[648] Tr. 109:19-112:3 (Behan) (discussing DX 146-O at CALAMOS_00635711-12, JX 144 at CALAMOS_00636342).

**RESPONSE:**  Denied.  CAL admits that new and/or small mutual funds generally are unprofitable to their adviser, require investment of significant capital from the adviser, and pose significant entrepreneurial risks to the adviser.  CAL denies any assertions within Paragraph 257 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

258.    *CAL's presentations to the Board that the smaller Funds were profitable, are therefore not only inaccurate, but facially implausible.  Bullard Report at ¶¶61-62; Pomerantz Report at ¶¶437 et seq.; Pomerantz Rebuttal Report at ¶¶237-59, 277-93.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 258 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

259.    *The only way CAL could have reported the smaller Funds as profitable was by either masking/misreporting the revenues received from these funds, or by playing games with the allocation of costs (given that profitability is calculated on the basis of these two figures).  Lacey Report at ¶38.  However, because CAL records its revenues on a per-Fund basis, its erroneous profitability determinations must be the result of how CAL allocated costs to such Funds.  DX 145-R, at 634761 (noting that all revenues are "direct" ones).*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 259 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*260.    Consequently, the Mutual Fund Profitability presentations' allocation of advisory costs by AUM under-allocates advisory costs to CAL's smaller Funds.  As explained in Section IV.B.1 supra and further detailed in Section IV.B.4 infra, this under-allocation results from turning a blind eye to the high fixed costs that advisers experience for small funds, which require the same panoply of services as larger funds, and instead employing the systematic fictional allocation of costs as if such costs were entirely variable, rather than largely fixed.  Pomerantz Rebuttal Report at ¶¶236-59, 287-93; Bullard Report at ¶¶57-58.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 259 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

### 4.    CAL's 15(c) Profitability Presentations Allocated Sharply Different Advisory Costs to Funds that Have Substantially Similar Advisory Costs

*261.    The general unreality of CAL's AUM-based cost allocations, and resulting profit levels, with respect to the small Funds (and hence the large Funds as well), is further highlighted when compared to CAL's organizational structure.  See e.g. Bullard Report at ¶¶57-64, 71-74, 77-78; Pomerantz Report at ¶¶433-47; Bullard Rebuttal Report at ¶¶96-109.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 261 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

262.    *The below table reproduces certain cost, profitability and AUM data from the Mutual Fund Profitability presentation included in CAL's 2016 15(c) Response (DX 145-R, at 634772), along with certain additional calculations from such data highlighted in yellow, with respect to the Growth Fund and 3 other similarly-situated Funds:*

| $ in thousands | Growth Fund | Focus Growth | Discovery Growth | Mid Cap Growth |
|---|---|---|---|---|
| **Fund AUM** | | | | |
| Fund AUM | $2,960,060 | $64,841 | $45,110 | $34,669 |
| **CAL Revenue** | | | | |
| Management Fees paid by Fund | $25,636 | $665 | $468 | $363 |
| Management Fees/AUM (fee in basis points) | 0.87% | 1.03% | 1.04% | 1.05% |
| **Allocated CAL Advisory Expenses** | | | | |
| Employee Compensation | $9,407 | $195 | $132 | $99 |
| Client Service | $254 | $16 | $14 | $13 |
| G&A | $3,942 | $90 | $63 | $50 |
| Total Advisory Expenses | $13,602 | $300 | $209 | $162 |
| Expense/AUM (advisory expenses in basis points) | 0.46% | 0.46% | 0.46% | 0.47% |
| Operating Income (Profit) | $12,034 | $365 | $258 | $201 |
| Operating Margin | 47% | 55% | 55% | 55% |
| **Ratio of Growth Fund to Subject Fund…** | | | | |
| AUM | n/a | 46:1 | 66:1 | 85:1 |
| Employee Compensation Expense | n/a | 48:1 | 71:1 | 95:1 |
| Client Service Expense | n/a | 16:1 | 18:1 | 20:1 |
| G&A Expense | n/a | 44:1 | 63:1 | 79:1 |
| Total Advisory Expenses | n/a | 45:1 | 65:1 | 84:1 |

**RESPONSE:**  Denied.  CAL admits that the non-highlighted portion of Paragraph 262 contains figures taken from CAL's 2016 Mutual Fund Profitability presentation.  CAL denies that the highlighted portions of Paragraph 262 prove or mean anything.  Although Plaintiffs provide no citation, the highlighted amounts come from the "work" of Dr. Pomerantz, which is not credible evidence because Dr. Pomerantz is not in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[649]

CAL denies any assertions within Paragraph 262 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.  In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

263.    *Under CAL's team of teams approach, exactly the same investment personnel (the U.S. Growth Equity team) were responsible for the day to day management of the Growth Fund, and each of the above three much smaller Funds:  the Focus Growth Fund, the Mid Cap Growth Fund, and the Discovery Growth Fund (each of which CAL shuttered in 2016 due to their unprofitability).  JX 139 at CA-IT 00000071 at 14-18; JX 144 at 636338; Bullard Report at ¶¶57-61; Pomerantz Report at ¶¶441-43; Pomerantz Rebuttal Report at ¶¶252, 283-87.  The Growth Fund and these other three Funds, were, furthermore, supported by identical trading and risk management personnel, identical other support personnel (e.g., Legal, Fund Administration), and identical facilities and infrastructure.  Id.*

**RESPONSE:**  Denied as stated.  CAL admits that the U.S. Growth Equity team managed the Fund, the Focus Growth Fund, the Mid-Cap Growth Fund, and the Discovery Growth Fund, and that each of these Funds was supported by CAL's trading and risk management personnel, support personnel, and facilities and infrastructure.  However, Plaintiffs' assertions and mischaracterizations regarding CAL's investment team are entirely unsupported by the trial

---

[649] DFFCL ¶¶ 417-420.

evidence.  As Messrs. Behan, Becker and Cronin all explained, without any evidence from Plaintiffs to the contrary, as part of CAL's improvements to its investment team and investment process, CAL hired better quality personnel, restructured compensation, and redesigned how investment professionals collaborate with each other.[650]  CAL made numerous significant and costly changes to the investment team and investment process, which included undertaking a significant transformation of its investment team—from a vertical structure with a "one-team-one-process" approach to a horizontal structure with a "team-of-teams" approach.[651]  CAL also implemented a series of changes that resulted in members of the broader investment team contributing ideas and insights that benefitted the Fund.  Among many other changes, CAL implemented an Investment Committee, which consisted of CAL's Co-CIOs, Co-Heads of Research and Investments, and co-Portfolio Managers, to increase sharing of investment information among its different teams.[652]   As such, all members of the investment team contributed to the management of the Fund.

CAL also made significant changes at the senior management level in an attempt to improve the Fund's performance, including hiring Gary Black, who was previously been the CEO and CIO of a successful mutual fund investment adviser, Janus Capital, to replace the Funds' prior Co-CIO and, following Mr. Black's departure, transitioning to a new senior management structure by promoting four portfolio managers to serve as Co-CIOs.  Most

---

[650] DFFCL ¶¶ 106-108; Behan Decl. ¶¶ 43-46; Tr. 107:16-108:4 (Behan); Tr. 64:19-65:25, 66:21-68:7 (Becker); Tr. 656:8-658:15 (Cronin).

[651] DFFCL ¶ 106.

[652] DFFCL ¶¶ 107-108.

recently, CAL replaced the Fund's portfolio manager, Mr. Kalis, with Michael Grant, who had

obtained top-shelf performance with a different Fund that he advises.[653]

Moreover, CAL denies any assertions within Paragraph 263 suggesting that the Mutual

Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any

way "improperly" calculated as unsupported by any trial evidence.  In addition, Plaintiffs'

assertions that the Fund's management fee is excessive by virtue of CAL's "method for

allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental

reasons set forth in CAL's Response to Paragraph 238, *supra*.

264.    *Notwithstanding this organization, which indicates that the costs CAL incurred in
advising of these four funds were roughly identical, the costs allocated to the Growth Fund in the
Mutual Fund Profitability Presentations sharply diverged from those allocated to the other three
similarly-situated Funds, as shown in the table above.  DX 145-R at 634772.  This was a pure
and direct artifact of CAL's AUM-based cost allocation methodology.  Pomerantz Report at
¶447, 441-43; Pomerantz Rebuttal Report at ¶¶251-52, 283-87; Bullard Report at ¶¶57-64, 71-
74, 77-78.  Specifically, the Mutual Fund Profitability presentations allocated to the Growth
Fund – which was 45 times larger than the Focus Growth Fund, 65 times larger than the
Discovery Growth Fund, and 85 times larger than the Mid Cap Growth Fund – advisory costs
that were respectively, and implausibly, 45, 65 and 85 times larger than those allocated to the
Focus Growth Fund, the Discovery Growth Fund, and the Mid Cap Growth Fund.  DX 145-R at
634772 and table at ¶262, supra; Pomerantz Report at ¶447, 441-43; Bullard Report at ¶¶57-
64, 71-74, 77-78; Pomerantz Rebuttal Report at ¶¶251-52, 283-87.*

**RESPONSE:**  Denied.  CAL admits that it allocated indirect (but not direct) expenses

using an average AUM allocation methodology.  CAL denies any assertions within Paragraph

264 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that

CAL's profitability was in any way "improperly" calculated as unsupported by any trial

evidence.

---

[653] DFFCL ¶¶ 109-112.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

265.    *The data presented at ¶262 supra reveal and further explain four necessary consequences of CAL's allocation of effectively all advisory costs on the sole basis of AUM.*

**RESPONSE:**  Denied.  CAL admits that it allocated indirect (but not direct) expenses on the basis of average AUM.  CAL denies any assertions within Paragraph 265 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

266.    *First, as discussed just above, advisory costs allocated to each Fund were in direct proportion to Fund AUM (and almost entirely unrelated to CAL's actual operations):  if Fund A was 100 times larger than Fund B, it was allocated 100 times the advisory expense as Fund B, even if the actual expenses incurred appeared substantially similar.  Pomerantz Report at ¶¶432-34; Lacey Report at ¶¶57-60; DX 145-R at 634772 (compare AUM ratio to Total Advisory Expenses ratios in the above table).*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 266 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

267.    *Second, each of the Funds was allocated an identical advisory expense per dollar of assets advised (i.e., advisory expenses expressed, like advisory fees, in basis points, as a percentage of Fund AUM).  Pomerantz Report at ¶435; Pomerantz Rebuttal Report at ¶¶254-56; DX 145-R at 634772 (compare expense/AUM in above table:  46-47 basis points for each Fund); Tr. at 1006:1-5.  This is theoretically and practically nonsensical:  theoretically, because*

*economies of scale operate to change per-unit costs (i.e., advisory costs per dollar of AUM) as AUM increases or decreases, and practically, because it ignores the largely fixed nature of advisory costs that, among other things, makes small funds' per-unit advisory costs high (because substantial fixed costs are charged against a small asset base) and large funds' per-unit costs lower (because similar substantial fixed costs are now charged against a much larger asset base).*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 267 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

268.    *Third, as discussed in Section IV.B.3, supra, it presented CAL's smaller and smallest Funds not only as uniformly profitable, but as providing CAL with greater profitability than its largest Funds, such as the Growth Fund.  See Section IV.B.3, supra; DX 145-R at 634772 (50%+ profit margins for each of the small funds; 47% profit margin for the much larger Growth Fund).  The data presented in the table at ¶262 illuminates the explanation for this result.  As the data shows, each of the Funds was allocated an identical level of advisory expenses relative to size (46-47 basis points), but charged different advisory rates relative to size, with smaller Funds charging higher fees (because their smaller AUM did not allow them to achieve fee reductions available at higher AUM ranges), and larger Funds such as the Growth Fund charging lower effective fee rates (because their higher AUM sufficed to trigger advisory fee breakpoints).  Id.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 268 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

269.    *Fourth and relatedly, because each of the Funds was allocated an identical level of advisory expenses relative to size (46-47 basis points) but paid advisory fees to CAL at varying effective fee rates (e.g., the Growth Fund at 87 bps, other smaller Funds at 100 bps, etc.), the variation in CAL's reported profitability from each of the Funds (e.g., 47% for the*

*Growth Fund, 55% for other smaller Funds, etc.) was (1) entirely a product of variations in the Funds' effective advisory fee rates (given constant cost levels), and (2) mostly constrained to a relatively narrow band of reported profit margins.  DX 145-R at 634769 and 634772.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 269 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

270.    *Each of these profitability results is counterfactual and/or nonsensical, for reasons detailed at length by Plaintiffs' experts (Pomerantz Report at ¶¶433-47, 461-98; Pomerantz Rebuttal Report at ¶¶236-59, 276-78, 286-93, 301-09; Bullard Report at ¶¶41-83) and is directly contradicted inter alia by:  the actual record of CAL's actual advisory costs (which show that CAL's advisory costs did not directly track AUM); CAL's real-world managerial decisions based on its real-world, rather than 15(c), considerations of Fund-specific profitability (which show that CAL knew its small Funds to be unprofitable to it); CAL's reports to the Board concerning Fund-specific profitability prior to this litigation (which stated the same); and the testimony of CAL's executives, CAL's experts and the Independent Trustees concerning advisory cost behavior and the profitability to CAL of the Funds (which stated the same).*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 270 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

C.    **CAL Did Not use its 15(c) Profitability Analyses for Any Other Purpose, and Based its Actual Business Decisions on an Opposite View of Profitability**

271.    *CAL did not use its 15(c) profitability presentations/methodology for any other business purpose.  Tr. at 245:24–246:4.*

**RESPONSE:**  Denied as stated.  CAL admits that it prepared its Mutual Fund Profitability presentation solely for use as part of the 15(c) Process.  CAL denies any assertions within Paragraph 271 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

272.    *Rather, when making real-world business decisions with respect to the Funds, such as shutting down three small Funds also managed by the same U.S. Equity Growth team that managed the Growth Fund, CAL based such real-world decisions on an understanding of its Funds-specific profitability (specifically, that such small Funds were unprofitable to CAL) that directly contradicted the profitability figures in the 15(c) Mutual Fund Profitability presentations.  See Sections III.B.3-4, supra; Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 272 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.  The presentation itself shows—rather than contradicts—that these mutual funds were unprofitable at the time CAL liquidated or merged them.  Specifically, the post-distribution operating margins for the Focus Growth Fund and the Mid-Cap Growth Fund were negative (with the Focus Growth Fund ETF as low as negative 78%), and the Discovery Growth Fund's margin had fallen by one-third in only one year to 22%.[654]

---

[654] DX 145-R at CALAMOS_00634770.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*273.     The facts that CAL did not use its 15(c) profitability figures for any other business purposes, and that CAL's real-world business decisions were based on an understanding of Funds-specific profitability that directly contradicted the 15(c) profitability figures, indicate that CAL's 15(c) profitability figures are unreliable.  Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 273 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.  The presentation was consistent with—rather than contradicted by—CAL's business decisions, as explained in CAL's Response to Paragraph 272.[655]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

**D.     The Mutual Fund Profitability Presentations Were Not "Decision-Useful" for the Independent Trustees in Evaluating CAL's Profitability from the Funds**

*274.     Defendant's profitability expert Professor Lacey opined and testified that the Mutual Fund Profitability presentations were "decision-useful" for the Independent Trustees in the context of having to evaluate fund-specific profitability pursuant to Sections 15(c) and 36(b) of the ICA.  Tr. at 1003:9-22, 1015:2-9, 1020:19–1021:18; Lacey Report at ¶¶5, 36-42.*

**RESPONSE:**  Denied as stated.  CAL admits that Professor Lacey testified that the information in the Mutual Fund Profitability presentations was "decision-useful" for the Independent Trustees in connection with their decision to approve the IMA between CAL and

---

[655] DX 145-R at CALAMOS_00634770.

the Funds.  CAL denies that the Independent Trustees have any obligations, whether to evaluate

profitability or otherwise, pursuant to Section 36(b).

*275.    Professor Lacey did explain anywhere in his testimony why the Mutual Fund Profitability presentations were "decision-useful" for the Independent Trustees.  In his report, Professor Lacey bases decision usefulness on the fact that the presentations contained numerical figures for fund-specific revenues and fund-specific costs, which allowed fund-specific profitability to be calculated.  Lacey Report at ¶¶37-39, 41-42; Pomerantz Rebuttal Report at ¶¶310.  However, this basis is all form and no substance:  it remains true no matter the accuracy or integrity of the actual figures provided for revenues or costs.  Id.*

**RESPONSE:**  Denied.  Professor Lacey did explain why the Mutual Fund Profitability

presentations were decision-useful:

> It's a reasonable allocation.  The larger fund gets a larger benefit from the information.  What we're talking about is computing the profitability for the adviser advising a particular fund.  So, it's the profitability the adviser -- we must allocate these common costs, joint costs, to the different funds.  And so, there has to be some mechanism to do so.  And where we don't have the cause and effect relationship, we look at benefits received.  Larger funds receive more benefit.[656]

CAL denies any assertions within Paragraph 275 suggesting that the Mutual Fund Profitability

Presentation was in any way misleading or that CAL's profitability was in any way "improperly"

calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each

of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

*276.    Real-world decisions made by CAL management concerning the life and death of the Fund were made on the basis of a completely different understanding of CAL's profitability Pomerantz Rebuttal Report at ¶¶256-59, 292-93, 296-97 and 306-09.  CAL's Mutual Fund Profitability presentations were not "decision-useful" to the Independent Trustees, because they*

---

[656] Tr. 1006:11-19 (Lacey); *see* Tr. 1002:9-12 ("What we're trying to do is create information that's useful in making a decision.  So, depending upon the decision that the company is going to make, the allocation could be different."), 1015:2-9, 1020:21-1021:18 (Lacey).

*misreported CAL's Fund-specific profitabilities and thereby did not allow the Independent Trustees to fulfill their obligations to evaluate CAL's Funds-specific profitability. Id.*

**RESPONSE:** Denied. CAL denies any assertions within Paragraph 276 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence. As explained in CAL's Response to Paragraph 272, the presentation itself supported—rather than contradicted—CAL's decision to liquidate or merge these mutual funds due to their unprofitability. Specifically, the post-distribution operating margins for the Focus Growth Fund and the Mid-Cap Growth Fund were negative (with the Focus Growth Fund ETF as low as negative 78%), and the Discovery Growth Fund's margin had fallen by one-third in only one year to 22%.[657] These post-distribution margins, rather than the advisory margins required for 15(c) purposes more accurately represent CAL's actual profit from specific mutual funds and are, therefore, the economically relevant criteria for CAL to consider when deciding whether to close a mutual fund.[658]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

### E.   Dr. Pomerantz's View of Profitability Hews Closer to CAL's Actual Business Conditions

*277.   To recalculate Funds-specific profitability in a manner that took CAL's actual advisory economies of scale into account (rather than assuming them away), Dr. Pomerantz (1) estimated those economies by looking at how CAL's overall advisory costs changed in relation to AUM from one year to the next, and (2) applied the observed economies in re-allocating CAL's aggregate Funds-related advisory costs to each of the particular Funds. Pomerantz Report at ¶¶479-92; Pomerantz Rebuttal Report at ¶¶301-05. When such economies were taken into*

---

[657] DX 145-R at CALAMOS_00634770.

[658] Tr. 739:18-740:16 (Hubbard).

*account, CAL's profit margin from the Growth Fund was 71%, rather than the 46% reported to the Board.  Pomerantz Report at ¶492; Tr. at 449:15–450:22.*

**RESPONSE:**  Denied.  Dr. Pomerantz's "view of profitability" literally proves nothing, certainly does not prove that the Fund's management fee is excessive, and is not admissible or credible evidence of CAL's profitability from managing the Fund, for each of the following fundamental reasons:

First, the Court has already ruled, as a matter of law, that Plaintiffs failed to show the existence of economies of scale—or even to create a fact issue sufficient for trial.[659]  That ruling was based on the same fundamental flaw that Plaintiffs continue to advance in their profitability contention, *i.e.*, that Dr. Pomerantz reached his conclusions about economies of scale without inquiring into whether other factors were the actual caused of the changes in average cost that he supposedly observed.[660]  More particularly, the Court explained that the exact evidence that Plaintiffs seek to rely upon—the mere correlation between changes in assets and costs—fails to establish economies of scale, particularly in light of Dr. Pomerantz's testimony that he did not investigate whether these changes in assets may have been caused by other factors.[661]  Plaintiffs' assertion is therefore further confirmation that their only alternative profitability model is nothing more than an effort to calculate the purported unshared economies of scale that the Court already has "taken care of" in its summary judgment ruling.[662]

Second, the trial evidence demonstrates that Dr. Pomerantz's cost allocation model incorporates a flawed and unsupported assumption that the logarithm of CAL's advisory costs is

---

[659] DFFCL ¶ 253.

[660] *Chill*, 2018 WL 4778912, at *19-20.

[661] *Chill*, 2018 WL 4778912, at *19-20.

[662] DFFCL ¶ 318.

linearly related to the logarithm of AUM.  Dr. Pomerantz's reliance on this assumption is

unreasonable and inconsistent with established principles of economics.  Professor Lacey

confirmed that Dr. Pomerantz's linear log-log relationship also has no basis in accounting

principles, explaining "I can't imagine any circumstances in which we would apply that method

as accountants under any circumstance."[663]

Third, Dr. Pomerantz did not offer the opinion that CAL should have used his purported

cost allocation methodology—nor could he identify a single mutual fund adviser that has used

his cost allocation methodology.  In fact, no mutual fund adviser could use Dr. Pomerantz's cost

allocation methodology in the ordinary course of the adviser's business due to its inherent "time-

machine dilemma," to which he could offer no "solution."[664]

Fourth, Plaintiffs' reliance on Dr. Pomerantz's "methodology" is also directly at odds

with the testimony of Plaintiffs' other expert, Professor Bullard, who opined that allocation on

the basis of AUM—which is the sole basis for Dr. Pomerantz's cost allocation approach—is "per

se unreasonable."  Plaintiffs made no effort to reconcile the conflicting opinions of their

experts.[665]

Fifth, regardless of his flawed calculation or the conflict between Plaintiffs' experts,

Dr. Pomerantz did not offer any expert opinion on (i) the maximum level of profitability CAL

should have been permitted to realize under Section 36(b), (ii) the highest profit margin for the

Fund that the Independent Trustees could have conscientiously approved, or (iii) whether the

---

[663] DFFCL ¶¶ 320-327.

[664] DFFCL ¶ 317.

[665] DFFCL ¶ 307.

Independent Trustees would have approved the Fund's fee if CAL had followed his "linear log-log" profitability approach.[666]

Sixth, to the extent that Plaintiffs' accounting, profitability or cost allocation assertions rely on the testimony of Dr. Pomerantz, those assertions are not supported by any admissible or credible evidence because Dr. Pomerantz is not in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[667]

278.    At trial, Defendant sought to discredit Dr. Pomerantz's modeled Fund-specific profitability with respect to its underlying methodology (Tr. at 456:25–469:21) as well as its results (Tr. at 469:22–475:3).

**RESPONSE:**  Denied.  CAL admits that it discredited Dr. Pomerantz's model and alternative profit "model" at trial.  CAL denies all of Plaintiffs' assertions regarding Dr. Pomerantz's "view of profitability" for each of the fundamental reasons set forth in CAL's Response to Paragraph 277, *supra*.

279.    Defendant suggested that Dr. Pomerantz's profitability calculations were "absurd" because they depicted 14 of CAL's 21 Open-End Funds as unprofitable to CAL (i.e., costing CAL more to advise than they paid to CAL in advisory fees).  Tr. at 469:22–475:3; see also Pomerantz Rebuttal Report at ¶¶289-91.[668]

**RESPONSE:**  Denied.  CAL admits that Dr. Pomerantz's profitability calculations are absurd for this reason.  CAL denies all of Plaintiffs' assertions regarding Dr. Pomerantz's "view of profitability" for each of the fundamental reasons set forth in CAL's Response to Paragraph 277, *supra*.

---

[666] DFFCL ¶ 327.

[667] DFFCL ¶¶ 417-420.

[668] *Relatedly, Professor Lacey suggested that allocating costs the Funds in excess of their revenues was nonsensical.  Tr. at 1018:4–1019:24, 1026:20–1029:17.*  **RESPONSE:**  Denied. Professor Lacey testified that he believed "it would just be misleading and confusing to the board to make this allocation" of expenses equally to each fund as Plaintiffs proposed at trial.  Tr. 1027:17-1028:15 (Lacey).

280.    *That result, however, is not absurd, but instead is entirely consistent with Defendant's clear testimony at trial, and Defendant's consistent statements to the Board outside the 15(c) Review context in recent years, that small mutual funds with AUM of approximately $250 million or less are unprofitable to their advisers.  See ¶256, supra.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 280 suggesting that the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability was in any way "improperly" calculated as unsupported by any trial evidence.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

To the extent that Plaintiffs' assertions in Paragraph 280 are a reprise of Paragraph 256 and 257, *supra*, CAL incorporates its Response to Paragraphs 256 and 257 as if fully set forth herein.

281.    *At the time of Dr. Pomerantz's analysis, 14 of CAL's 21 Open-End Funds had AUM of less than $200 million (and 12 AUM of less than $100 million).  DX 145-R, at 634772 (see "Monthly Average AUM" line item at bottom).  CAL's executives (Mr. Behan) and the Growth Fund's trustees (Mr. Neal) well understood, as a matter of common sense, that mutual funds of such size would not be profitable to their advisers.  Tr. 99:19–100:5, 109:9-18, 193:8-10.  Outside the 15(c) Review context, Mr. Behan told the Board that certain of these Funds, which CAL had decided to shut down, were in fact unprofitable to CAL.  See ¶256, supra.*

**RESPONSE:**  Denied.  Since Plaintiffs' assertion is a reprise of Paragraph 256, *supra*, CAL incorporates its responses to that Paragraph and to Paragraph 272 as if fully set forth herein, in particular the facts that the 15(c) materials complained about by Plaintiffs, in fact, showed that nine of CAL's fourteen open-end mutual funds with AUM less than $200 million had negative post-distribution operating margins and that the mutual funds which CAL "had decided to shut down" were among those not profitable on a post-distribution basis.[669]

---

[669] DX 145-R at CALAMOS_00634772.

282.    *Consequently, the results of Dr. Pomerantz's profitability model are not absurd, but entirely consistent with the understandings of CAL's executives, the Fund's Board, the mutual fund industry generally (via its trade association, ICI) and Defendant's experts concerning the economics of the mutual fund industry.  Tr. 99:19–100:5, 109:9-18, 193:8-10; Pomerantz Rebuttal Report at ¶¶236-37, 240-41, 286-93.  Moreover, Dr. Pomerantz has tested his model against other advisers' cost allocations, and has found that it produced cost allocations similar to those made by such other advisers.  Tr. at 469:3-21.*

**RESPONSE:**  Denied.  CAL denies all of Plaintiffs' assertions regarding

Dr. Pomerantz's "view of profitability" for each of the fundamental reasons set forth in CAL's

Response to Paragraph 277, *supra*.  In particular, Dr. Pomerantz's self-serving and

unsubstantiated assertion that he "has tested his model against other advisers' cost allocations,

and has found that it produced cost allocations similar to those made by such other advisers," is

belied by the fact that Dr. Pomerantz offered no data or other information to support this

assertion, nor did he provide any such data in his expert reports or work papers.[670]  Instead, he

claimed that this supposed correlation existed only as a retreat from his original (false) assertion

that "that there are other advisers who do something similar" to his cost-allocation model, after

he admitted that he "can't name anybody" in particular.[671]

283.    *What is absurd, in light of the foregoing, is the profitability CAL reported in the Mutual Fund Profitability Presentations, which depicted all 14 of these sub-$200 million Funds as profitable to CAL, and seven of the 14 as more profitable to CAL than the Growth Fund.  DX 145-R, at 634772 (see Pre-Distribution & Marketing Operating Margin line item: where Growth Fund had profit margin of 47%, seven sub-$200 million Funds had reported profit margins exceeding 50%).  Pomerantz Rebuttal Report at ¶¶286-93.*

**RESPONSE:**  Denied.  CAL denies any assertions within Paragraph 283 suggesting that

the Mutual Fund Profitability Presentation was in any way misleading or that CAL's profitability

was in any way "improperly" calculated as unsupported by any trial evidence.

---

[670] Tr. 469:3-12 (Pomerantz).

[671] Tr. 469:3-12 (Pomerantz).

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "method for allocating costs" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 238, *supra*.

## V.   THE INDEPENDENT TRUSTEES' LACK OF CARE AND CONSCIENTIOUSNESS

### A.   Greater Services/Risks, and their Costs, as Justification for Higher Advisory Fees

*284.   As noted above, during the Relevant Period, CAL premised the difference in the fees it charged its fund clients and non-fund clients on the purportedly greater services and risks attendant to advising mutual funds.  See ¶¶152-56, supra.  However, CAL did not provide, and the Board did not request, any information regarding the actual or estimated cost of the greater services or risks.  Tr. at 130:19-24; 131:18-132:7, 244:12-245:3, 264:20-265:4; 267:3-6; 268:2-21; 269:2-4, see also Timbers Dep. at 163:13-25, 164:12-165:19; Bhatt Dep. at 205:6-206:5.  Moreover, with respect to the numerous services that were provided by third-parties in the first instance and supervised by CAL, Mr. Neal confirmed that CAL never provided, and the Board never requested, an estimate of: (i) the number CAL employees who oversaw the provision of such services; or (ii) how much time they spent doing so.  Tr. at 145:5-16, 141:1-11.*

**RESPONSE:**  Denied.  CAL did not "premise[]" the Fund's advisory fee on the services and risks entailed in advising the Fund that are not entailed in advising CAL's All Cap Growth Clients.

Plaintiffs' assertion that CAL sought to, or was required to, "justify" the Fund's management fee relative to its All Cap Growth Client fees solely on the basis of the different and greater services that CAL provides to the Fund than to its All Cap Growth Clients and the different and greater risks it assumes in advising the Fund than it does in advising its All Cap Growth Clients is not supported by the trial evidence or the Section 36(b) jurisprudence for each of the following fundamental reasons:

First, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater

risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c) Responses included a "Discussion of Management Fee Rates by Product" presentation that both informed the Independent Trustees of the fees that CAL charged to the Funds and to its institutional and sub-advisory clients and provided a brief summary overview of the services that CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

Second, as the evidence also conclusively demonstrates, the Discussion of Management Fee Rates by Product presentation was not the sole information that the Independent Trustees received about such services, nor was it intended to be an exhaustive recitation of all of the many differences in services and risks.  To the contrary, the Independent Trustees also regularly receive extensive information at every Board meeting concerning the services CAL provides to the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight of third party service providers, and reports from the Funds' CCO.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[672]

Third, based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[673]  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the

---

[672] DFFCL ¶¶ 56-58.

[673] DFFCL ¶¶ 204-207.

Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[674]

Fourth, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* do not require fee parity across an adviser's different clients."  Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[675]

Fifth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus'

---

[674] Tr. 177:17-20 (Neal).

[675] DFFCL ¶¶ 227-229.

advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[676]

Sixth, contrary to Plaintiffs' assertions, the trial evidence demonstrates conclusively that in advising the Fund, CAL took on greater risks than in advising institutional or sub-advisory clients. As Mr. Jackson testified, CAL's risks from managing the Fund as contrasted with to its All Cap Growth Clients, including Nomura and MD American, are "ubiquitous," "dynamic[,] and ever-changing."[677] Specifically with respect to the Fund, CAL necessarily bears: (a) increased legal, regulatory and litigation risks; (b) greater operational risks with respect to the Fund because, unlike with respect to its All Cap Growth Clients, CAL bears ultimate responsibility for the services of all of the third-party service providers that it oversees on behalf of the Fund; (c) the greater entrepreneurial risk of whether the mutual fund will ever provide a fair return to the adviser, taking into account both the greater initial costs of launching a mutual fund as compared with other types of investment products and the greater ongoing expenses associated with managing and operating a mutual fund.[678] Moreover, insurance does not fully cover the greater risks associated with managing the Fund as compared to CAL's All Cap Growth Clients.[679] The trial evidence also demonstrates that CAL bears these risks even if they have not materialized in the past or cannot be quantified.[680]

*285.    When questioned as to why the Board never requested a breakdown of the actual or estimated costs of the purportedly greater services, Mr. Timbers tersely responded that CAL's personnel "were on their own managing well," Timbers Dep. at 165:12-15, despite having*

---

[676] DFFCL ¶¶ 242-244.

[677] DFFCL ¶ 198.

[678] DFFCL ¶¶ 199-201.

[679] DFFCL ¶ 202.

[680] DFFCL ¶ 203.

*admitted several times that CAL was not "managing well" and that its continued poor performance was a significant issue, Timbers Dep. at 37:17 – 38:25, 140:14 – 144:7.*

**RESPONSE:**  Denied.  The cited evidence does not support Plaintiffs' assertion in Paragraph 285.  Mr. Timbers stated that the Independent Trustees received CAL's Profitability presentation, that it "seemed all right" and that CAL was "managing well."[681]  Mr. Timbers also testified about the Independent Trustees' oversight of the Fund, including their focus on performance, the implementation of Focus Fund reports, the implementation of the fee waiver in 2013, and the consideration of a fee waiver in 2016.[682]  Moreover, during the Relevant Period, CAL was experiencing declining AUM and declining profits as it invested additional resources in the services being provided to the Funds.[683]  Certainly, nothing in the profitability information the Independent Trustees received suggested that CAL was charging an excessive fee to the Fund.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 284, *supra*.

*286.     Additionally, Mr. Timbers, was also startlingly ignorant of the nature of the services CAL provided to its non-fund clients, as demonstrated by the following testimony:*

> *Q:     And you're familiar with the fact that CAL has institutional clients?*

---

[681] Timbers Dep. 165:8-15.

[682] Timbers Dep. 37:17-38:25, 140:14-141:17, 142:9-144:7.

[683] *E.g.*, DFFCL ¶ 313.

> A:       Yes.
>
> Q:       And CAL has subadvisory clients?
>
> A:       Clients or client, yes.
>
> Q:       OK.  And do you know what services CAL provides to those clients?
>
> A:       I can only guess.
>
> Q:       OK.  So did the advisor ever provide you with any specific information about what services were provided to those clients?
>
> A:       Ever provide?  I don't remember.

Timbers Dep. at 59:10-22 (emphasis added); see also Tr. at 965:15-966:5.

**RESPONSE:**  Denied.  Paragraph 286 accurately quotes Mr. Timbers' deposition testimony, but CAL denies that the testimony "demonstrated" that Mr. Timbers was "ignorant of the nature of the services CAL provided to its non-fund clients."  Mr. Timbers is a former executive of Northern Trust Global Investments, which offers advisory services to both mutual funds and institutional accounts, and has extensive experience in the investment advisory industry.[684]  Mr. Timbers is fully aware of the differences in the services required for the Funds and the services required to advise CAL's All Cap Growth Clients.  As Mr. Timbers went on to testify:

> Q. Okay. Do you recall any discussions amongst the trustees about this [Management Fee Rate by Product] report, any year?
>
> A. Well, yeah, we discussed what other clients of Calamos were paid and what we were paying.
>
> Q. Do you recall the substance of those discussions?
>
> A. That, you know, it's interesting. You know, it's a lot of apples and oranges.  These things that are required by mutual fund by regulation, just by practice are so different from that of an institutional separate

---

[684] DFFCL ¶ 57; Timbers Dep. 12:21-14:3.

> account[].  So, you know, there's some similarities.  I used to say well,
> you know, if you look at an apple and a strawberry, they're both red,
> that's about it.  So -- and that's what I sort of think of this.  There's some
> aspects that overlap and are the same, but there a lot of things that mutual
> funds have to do that subadvisors don't.[685]

As Mr. Timbers further testified, "In terms of cash flow coming in, you don't usually have any

cash coming in on the institutional [ac]counts.  You got all these regulatory filings you have to

do.  You have to maintain daily liquidity.  The reporting's different.  There's all sorts of things

you have to do with a mutual fund which you don't with an institutional [or] subadvisor[y]

[account]."[686]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue

of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly

limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to

"justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to

support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's

Response to Paragraph 284, *supra*.

*287.    With respect to the increased litigation risks that Mr. Jackson described, Mr. Neal admitted that he: (i) was unaware of what methodology, if any, CAL used to price the purported greater litigation risks; (ii) did not know how much of the Growth Fund's advisory fee was attributable to those litigation risks; and (iii) confirmed that CAL never informed the Board of the specific value/cost of the litigation risk that it purportedly priced into the IMA and the Board never asked for that value/cost.  See Tr. at 135:14-136:10; 135:18-25.*

**RESPONSE:**  Denied.  Mr. Neal stated that he did not know what "methodology" CAL

used to "price the risk," that he did not know what portion of the advisory fee "was attributable

to litigation risk," and that to his knowledge, the Independent Trustees did not ask for that

---

[685] Timbers Dep. 111:8-25.

[686] *Id*. 112:12-18.

information.  CAL denies that it was required to reduce to a number the increased litigation risk

it faces, or that such an exercise is even possible.  In addition, Plaintiffs' assertions that the

Fund's management fee is excessive by virtue of the supposedly limited services that CAL

provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with

respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the

supposed cost of these different services and risks, fail to support a cognizable Section 36(b)

claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 284, *supra*.

## B.     The Board's Consideration of FASA Services in Approving the IMA's Advisory Fees

*288.    In determining whether to approve the IMA, and the Growth Fund's advisory fees, the Board did not limit its consideration to the advisory services CAL rendered under that agreement.  Rather, in approving such fees, the Board collectively considered all of the services provided under the IMA and the FASA, see Tr. at 133:6-134:19, despite the fact that:  (i) the IMA and the FASA are separate agreements; (ii) they set forth different specific duties/services; and (iii) and CAL was separately compensated under each agreement for rendering the services identified therein.  See ¶¶30-42, 177-82, supra; JX 5; JX 6; CAL's "Detailed Service Listings" (PX 184-A at 653575-78; PX 176-A at 650344-46; PX 145-A at 634446-49; PX 113-A at 502799-801; PX 61-A at 519453-55; PX 32-A at 514075-77); Tr. at 142:18-143:4.*

**RESPONSE:**  Denied.  As Mr. Neal testified, "the FASA agreement is tax accounting

[and] a few administrative services. . . .  All of the other things would have been done under the

investment management agreement.  And under the investment management agreement, CAL

was responsible for doing all of these services, including what was in the FASA agreement."[687]

More fundamentally, for at least the following reasons, the evidence at trial fully

reinforced each of the following conclusions: (a) nothing did or should have prevented the

Independent Trustees from considering the total services provided by CAL, and the total

compensation paid by the Fund to CAL, when assessing the Fund's overall relationship with

---

[687] Tr. 142:3-10 (Neal).

CAL, and (b) there is nothing about the FASA that *even* suggests, *let alone proves,* that the Fund's management fee is excessive:

First, both of Plaintiffs' experts concede that CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA. And as Professor Bullard further conceded, the services rendered by the adviser that are to be considered under the *Jones/Gartenberg* standard include all of the services that the adviser provides for the fund, whether those services are provided under one or several contracts.[688]

Second, the nature or extent of CAL's services to the Fund as required by the IMA were not reduced or changed in any way by the FASA.  Even without the FASA, CAL would still have the responsibility, under the IMA's provision that CAL is required to "manage, supervise, and oversee the affairs" of the Funds, either to provide itself or to ensure the provision through third-parties of all necessary services for the Funds, including the financial accounting services recited in the FASA.  Following the termination of the FASA, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by CAL has not decreased.[689]

Third, during the period of time the FASA was in existence, no one at CAL differentiated between services provided pursuant to the IMA versus services provided pursuant to the FASA, nor did CAL employees review or reference the IMA or the FASA in the course of performing their day-to-day duties in servicing the Fund.  Rather, at all times, CAL focused on providing all of the services that the Fund requires and that CAL is obligated under the IMA to provide.[690]

---

[688] DFFCL ¶¶ 352-353.

[689] DFFCL ¶¶ 344-348.

[690] DFFCL ¶ 349.

Fourth, while the FASA was in place, the Independent Trustees annually reviewed the services CAL provided and the 1.1 basis point fee charged under that agreement.  The Independent Trustees, however, did not consider the IMA or the FASA in isolation.  Rather, as part of the 15(c) Process each year, the Independent Trustees considered the totality of services that CAL provides to the Fund and assessed whether the approval of both agreements was reasonable in light of the total fees charged.  Plaintiffs presented no evidence a trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.[691]

Fifth, regardless of how the IMA and FASA and the fees charged under each agreement are evaluated, separately or together, it was reasonable and appropriate for the Board to consider the two contracts together.  The correct legal standard requires consideration of substance over form.  There is no legal requirement that a fund's board must consider a fund's management agreement with the adviser separately from the fund's other agreements with that same adviser.  There is similarly no law or ruling holding that it is improper for a Board to consider the totality of services provided by the adviser to the Fund and the total compensation received by the adviser as a whole, regardless of whether those services and compensation are set out in one contract or two.[692]

289.    *The Board's collective assessment also ignored that certain of the FASA services were inapplicable to the Growth Fund, and therefore could not reasonably serve as a basis for the Growth Fund's advisory fees (even assuming collective consideration was appropriate).  See, e.g., Tr. at 371:2-7, 374:4-9 (Mr. Holloway's testimony that services described at Sections 2.E.10-11 of the FASA related only to CAL's Closed-End Funds).*

---

[691] DFFCL ¶¶ 350-351

[692] DFFCL ¶¶ 354-361.

**RESPONSE:**  Denied.  For each of the fundamental reasons set forth in CAL's Response

to Paragraph 288, *supra*, the evidence at trial fully reinforced the following conclusions: (a)

nothing did or should have prevented the Independent Trustees from considering the total

services provided by CAL, and the total compensation paid by the Fund to CAL, when assessing

the Fund's overall relationship with CAL, and (b) there is nothing about the FASA that suggests

that the Fund's management fee is excessive.

### C.   The Board's Failure to Distinguish between the Burden/Expense of Providing a Service versus the Burden/Expense of Supervising Others who Provide the Service in the First Instance

*290.    In determining whether the purportedly greater services justified the Growth
Fund's higher advisory fees, the Board treated those services the same regardless of whether
they were provided by CAL in the first instance or performed by a third-party that CAL
supervised.  See, e.g., Tr. at 176:16-20 (Mr. Neal's testimony that "you go down the list of those
11 items [performed by third-party service providers in the first instance] in our report that we
discussed earlier with other counsel, all make a mutual fund a much more complicated, higher
risk effort by the adviser") (emphasis added); see also Tr. at 911:18-915:7, 920:12-921:5,
927:9-928:13 (Professor Bullard's testimony criticizing the Trustees' failure to properly
distinguish between the veneer of oversight and the actual performance of a task).*

**RESPONSE:**  Denied.  Mr. Neal's trial testimony cited by Plaintiffs in Paragraph 290

has nothing to do with the Independent Trustees' consideration of CAL's different and greater

services and risks with respect to the Fund.

In addition, Plaintiffs' assertion that CAL sought to, or was required to, "justify" the

Fund's management fee relative to its All Cap Growth Client fees solely on the basis of the

different and greater services that CAL provides to the Fund than to its All Cap Growth Clients

and the different and greater risks it assumes in advising the Fund than it does in advising its All

Cap Growth Clients is not supported by the trial evidence or the Section 36(b) jurisprudence for

each of the following fundamental reasons:

First, both of Plaintiffs' experts concede that CAL is required to provide or arrange for

the complete bundle of services required for the Fund as part of its obligations under the IMA.

265

And as Professor Bullard further conceded, the services rendered by the adviser that are to be considered under the *Jones*/*Gartenberg* standard include all of the services that the adviser provides for the fund, whether those services are provided under one or several contracts.[693]

Second, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c) Responses included a "Discussion of Management Fee Rates by Product" presentation that both informed the Independent Trustees of the fees that CAL charged to the Funds and to its institutional and sub-advisory clients and provided a brief summary overview of the services that CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

Third, as the evidence also conclusively demonstrates, the Discussion of Management Fee Rates by Product presentation was not the sole information that the Independent Trustees received about such services, nor was it intended to be an exhaustive recitation of all of the many differences in services and risks.  To the contrary, the Independent Trustees also regularly receive extensive information at every Board meeting concerning the services CAL provides to the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight of third party service providers, and reports from the Funds' CCO.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[694]

---

[693] DFFCL ¶¶ 352-353.

[694] DFFCL ¶¶ 56-58.

Fourth, based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[695]  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[696]

Fifth, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* do not require fee parity across an adviser's different clients.  Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[697]

Sixth, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the

---

[695] DFFCL ¶¶ 204-207.

[696] Tr. 177:17-20 (Neal).

[697] DFFCL ¶¶ 227-229.

different services and risks entailed in managing a mutual fund as compared to an institutional or

sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's

institutional/sub-advisory management fees as a limit on the adviser's mutual fund management

fee, the court reached that conclusion without relying on, or even mentioning, proof that the

adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-

justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus'

advisory agreement nor general concepts of rate regulation, such as those applicable to public

utilities."[698]

  Seventh, contrary to Plaintiffs' assertions, the trial evidence demonstrates conclusively

that in advising the Fund, CAL took on greater risks than in advising institutional or sub-

advisory clients.  As Mr. Jackson testified, CAL's risks from managing the Fund as contrasted

with to its All Cap Growth Clients, including Nomura and MD American, are "ubiquitous,"

"dynamic[,] and ever-changing."[699]  Specifically with respect to the Fund, CAL necessarily

bears: (a) increased legal, regulatory and litigation risks; (b) greater operational risks with respect

to the Fund because, unlike with respect to its All Cap Growth Clients, CAL bears ultimate

responsibility for the services of all of the third-party service providers that it oversees on behalf

of the Fund; (c) the greater entrepreneurial risk of whether the mutual fund will ever provide a

fair return to the adviser, taking into account both the greater initial costs of launching a mutual

fund as compared with other types of investment products and the greater ongoing expenses

associated with managing and operating a mutual fund.[700]  Moreover, insurance does not fully

---

[698] DFFCL ¶¶ 242-244.

[699] DFFCL ¶ 198.

[700] DFFCL ¶¶ 199-201.

cover the greater risks associated with managing the Fund as compared to CAL's All Cap Growth Clients.[701] The trial evidence also demonstrates that CAL bears these risks even if they have not materialized in the past or cannot be quantified.[702]

Eighth, to the extent that Plaintiffs' assertions in Paragraph 290 rely on the testimony of Professor Bullard, those assertions are not supported by any admissible or credible evidence because (a) Professor Bullard lacks any qualification to offer any opinion regarding the Independent Trustees' lack of conscientiousness in their evaluation of certain information CAL provided in its 15(c) Response (notwithstanding that he has managed to reach this same conclusion in every Section 36(b) case in which he has been retained), (b) Professor Bullard's opinions suffer from a lack of methodology and lack the rigor required for expert testimony, and (c) in light of the many flaws in his "factual analysis," Professor Bullard was forced to concede that he has no way of knowing how any Independent Trustee actually considered the information CAL provided, and he disavowed any "opinion on what was in the mind of any trustee."[703]

*291.    For example, Mr. Neal repeatedly cited daily NAV calculations as a significant additional service that CAL provided to the Funds.  See, e.g., Neal Decl. at ¶85 ("I understand that, generally, CAL provides a variety of fund management services to the Fund, including daily pricing and striking the daily NAV.") (emphasis added).  In fact, that service was provided by State Street as the Funds' Accountant, not CAL, and State Street was separately compensated for that service. Tr. at 365:10–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100.*

**RESPONSE:**  Denied.  Mr. Neal identified daily NAV calculations as a service that CAL provided to the Funds, but not to its institutional or sub-advisory clients, and also testified that State Street calculated the daily NAV for the Funds in the first instance.  CAL denies Plaintiffs' assertions in Paragraph 291 because they erroneously suggest that CAL did not have significant

---

[701] DFFCL ¶ 202.

[702] DFFCL ¶ 203.

[703] DFFCL ¶¶ 451-457.

daily responsibilities or face substantial risks in connection with calculating the daily NAV, despite State Street's role.  As Mr. Holloway testified, CAL reviews State Street's work in real time each day, including by monitoring communications with and obtaining pricing information from vendors and providing supplemental pricing information to State Street, and running through a series of tasks on CAL's "Daily Pricing Checklist."[704]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 290, *supra*.

*292.    Similarly, at trial Mr. Neal identified a litany of services that purportedly distinguished the work an investment advisor performs for its fund clients versus non-fund clients.  Tr. at 175:10-176:2; 185:3-19.  As Mr. Neal later conceded, however, these services are primarily provided by third-party service providers who are separately compensated by the Funds, not CAL.  Tr. at 204:19–213:11; see also Tr. at 314:15–321:23 (Mr. Jackson's testimony regarding service providers drafting of regulatory filings in the first instance).  And although Mr. Neal attempted to exaggerate the importance of CAL's involvement – citing CAL's responsibility for negotiating the contracts with the third-party service providers as significant work – he conceded that:  (i) these agreements had been in existence since 1990; (ii) there was nothing novel about these agreements as of the Relevant Period; and (iii) CAL did not provide the Board with information regarding the amount of work CAL expended negotiating these contracts.  Tr. at 207:18-208:18.*

**RESPONSE:**  Admitted in part, denied in part.  CAL admits that Mr. Neal identified numerous services that CAL provides to the Funds but not its institutional or sub-advisory clients, including, among other things,  "servicing customers, custodian transfer agencies outside of service providers, phone representation, daily reporting of any of the daily liquidity

---

[704] DFFCL ¶ 185; DX 1395.

requirements," "requirements of daily reporting of the value of the fund . . . , reporting of your portfolio and what you've invested on a 30-day retroactive basis, the monitoring and evaluation, custodial aspects of securities, transfer agency aspects . . ., and "[t]ax aspect," which is more "complicated" for mutual funds.[705]  CAL also admits that certain of these services are provided by third-party service providers in the first instance, subject to CAL's oversight, monitoring, and review.  CAL denies that Mr. Neal engaged in any form of "exaggeration."  Although Mr. Neal testified that certain third-party service provider agreements had been in place since 1990, he explained that negotiating renewals of such agreements requirements "effort, time and thought" on CAL's part, "because all service providers would like to have a higher fee."[706]  The Independent Trustees are appropriately aware of CAL's efforts in negotiating agreements with third-party service providers, because (1) they receive materials and presentations at Board and Committee meetings throughout the year concerning CAL's continued engagement of those services providers,[707] and (2) the Independent Trustees have decades of experience in the investment management industry and understand how an adviser's relationships with third-party service providers work.[708]  Moreover, while CAL did not provide a breakdown of the amount of time or costs involved in negotiating each service provider agreement, CAL denies that it was required to provide such a "breakdown" as a matter of law, fact, or industry practice.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to

---

[705] Tr. 175:10-176:2; 185:3-19 (Neal).

[706] Tr. 208:10-9.

[707] *E.g.*, DFFCL ¶ 206; Holloway Decl. ¶¶ 61, 61(b), and 63(c).

[708] Holloway Decl. ¶ 48.

"justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 290, *supra*.

*293.     Mr. Neal also testified that CAL shoulders the same burdens, regardless of whether the services at issue were provided by CAL or a third-party service provider.  Neal Decl. at ¶86 ("I also understand, based on my experience and interactions with CAL and annual review of the IMA, that even where a third-party service provider performs such fund administration services, CAL continues to bear the risk and responsibility to the Fund in the event of any performance-related issues.").  But again, this is inaccurate:  all of CAL's third-party service providers are bound by indemnification provisions rendering them responsible for their own negligence of misconduct.  See JX 4 at 4-5; JX 11 at 20-21; JX 182 at 8-10; JX 183 at 645546-47.  In fact, at trial Mr. Neal conceded that the only specific instance of an error resulting in a loss to fund shareholders that he identified was borne 100% by the responsible third-party service provider.  Tr. at 211:23–213:11.*

**RESPONSE:**  Denied.  Mr. Neal, and other witnesses, including Mr. Jackson, testified that even where a third-party service provider may be subject to contractual liability for certain risks, CAL continues to bear risks for the Fund.  While certain service provider agreements may provide for indemnification of CAL in the event of an error made by the service provider, CAL bears ultimate responsibility for all of the services provided to the Funds, through third parties or otherwise.[709]  Simply because the contracts with third party service providers provide for those third parties' own liability for errors or failure to perform the necessary services, that does not mean that CAL would not bear any liability for third party errors or failures.  The service providers would not necessarily accept liability under all circumstances, nor does this mean that the Independent Trustees and shareholders would not look to CAL if these service providers do not fulfill their obligations efficiently and correctly.[710]

---

[709] DFFCL ¶ 200.

[710] Jackson Decl. ¶ 119.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 290, *supra*.

> ### D.    Profitability: Allocation of Expense Between Advisory and Distribution Functions

> *294.    During the Relevant Period, Each of CAL's 15(c) Responses included information concerning the allocation of certain expenses between advisory and distribution functions. A distribution expense is an expense relating to marketing and selling the Funds to investors other than current Funds' shareholders, while an advisory expense is any expense that is not a distribution expense. Tr. at 145:20-146:5.*

**RESPONSE:**  Denied as stated.  CAL admits that CAL's 15(c) Responses each included a Mutual Fund Profitability presentation that explained CAL's allocation methodology and the allocation of expenses to the advisory function versus the distribution function.

Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "allocation of certain expenses between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, on summary judgment, the Court ruled that (a) as a result of the "Mutual Fund Profitability Presentation," for each year within the Relevant Period "the Independent Trustees were fully informed about Calamos' profitability methodology, thoroughly discussed the impact that methodology would have on the profitability figures Calamos reported vis-à-vis alternative methodologies, and formally approved of Calamos' use of that methodology," and (b) Plaintiffs' contention that the Mutual Fund Profitability presentations understated the Fund's profitability is "wholly lacking in merit as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of

an 'average AUM cost-allocation method to analyze profitability—a method Plaintiffs'
recognize is commonly accepted within the industry."[711]

      Second, as the trial evidence conclusively demonstrates: (a) an adviser's "choice of cost
allocation methodology does not affect" whether the advisory fee is excessive, as Professor
Bullard concedes; (b) CAL's calculation of its profitability with respect to the Fund, like any
other profitability calculation, necessarily involves the exercise of discretionary accounting
judgments that may affect the overall result; (c) because there are a range of reasonable and
acceptable judgments and methodologies that can be used, and which will produce a range of
different but equally reasonable results, there is no one "true" profitability figure; (d) as
Professor Lacey testified, without any meaningful contradiction from either of Plaintiffs' experts,
CAL's Profitability Presentation employs a systematic and rational approach to provide
reasonable, decision-useful information to the Independent Trustees; (e) as the only two qualified
accountants at the trial (Mr. Helmetag and Professor Lacey) testified, CAL's manner of
calculating Fund-level advisory profitability is consistent both with managerial accounting
principles and the principles underlying GAAP; and (f) Plaintiffs did not offer any evidence that
CAL's AUM-based cost allocation approach is not consistent with managerial accounting
principles or the principles underlying GAAP; indeed, neither of Plaintiffs' experts offer any
accounting-grounded opinions (nor could they, given their complete lack of accounting
qualifications).[712]  In sum, as Dr. Pomerantz freely admitted, CAL is "well within [its]

---

[711] DFFCL ¶¶ 291-92.

[712] DFFCL ¶¶ 295-307.

accounting rights as accountants to do what they've done" with respect to the cost allocation methodology it used.[713]

Third, Plaintiffs presented no evidence that receiving any additional information about CAL's allocation methodology would have impacted the Independent Trustees' decision to approve the IMA in any way.

Fourth, to the extent that any of Plaintiffs' assertions concerning CAL's accounting, profitability or cost allocation methodology rely on the testimony of Dr. Pomerantz or Professor Bullard, those assertions are not supported by any admissible or credible evidence because neither Dr. Pomerantz nor Professor Bullard is in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[714]

*295.   Mr. Neal testified that he believed CAL's allocation methodology was reasonable, despite not comporting with his understanding of CAL's business.  For example, CAL allocated 100% of its Information Services and G&A expenses to its advisory function, notwithstanding that CAL's distribution-related personnel – which comprised approximately 23% of CAL's total headcount, see Tr. at 254:4-22 – used the same Information Services and resources classified as G&A,[715] see Tr. at 146:14–149:1, 240:13–243:23; see also Bhatt Dep. at 93:11-25; 95:25-96:13, 97:1-6, 19-23; Timbers Dep. at 94:11-21.  Mr. Neal acknowledged that allocating 100% of these costs to advisory was imprecise and that that the Board "could be picky about it" and ask for more information, but decided to simply accept the advisor's representation that the allocation method was reasonable because "we don't need more data . . . we need [] more insight."  Tr. 191:5-192:21.[716]*

---

[713] DFFCL ¶ 306.

[714] DFFCL ¶¶ 417-420, 447-449.

[715] *Information Services includes CAL computer infrastructure and core systems, as well as personnel developing and maintaining CAL's information technology systems and applications; G&A encompassed expenses related to rent, the human resources department, the legal department, etc.  Tr. 147:3-19, 226:11-18, 241:12–242:9.*  **RESPONSE:**  Denied as stated. CAL admits that the Information Services expense categories included indirect (but not direct) expense relating to enterprise services and infrastructure and application development.  CAL also admits that Mr. Neal testified that he believed that G&A concerns corporate overhead.

[716] *Mr. Bhatt testified that he did not recall the Board ever asking questions about the allocation methodology.  See Bhat Dep. at 96:15-97:1.*  **RESPONSE:**  Denied as stated.  CAL admits that at the time of his deposition, Mr. Bhatt did not recall whether the Board had asked questions

**RESPONSE:** Denied.  CAL admits that Mr. Neal testified that he believed that CAL's allocation methodology was reasonable and useful for the Board's decision-making.[717]  As Mr. Neal testified, his "job as an independent trustee is to know the cost to our customer, the shareholder, what is their cost and is that cost reasonable?  And part of our job is to then assess is the profitability, overall profitability, of the adviser reasonable.  And both of those pieces of information we receive every year and make our judgments based on that."[718]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "allocation of expense between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 294, *supra*.

296.   *Mr Timbers similarly acknowledged that (i) CAL's distribution personnel used the same Information Services as its advisory personnel, (ii) he did not know why 100% of that expense was allocated to advisory, (iii) he never asked CAL any questions on that issue because he "didn't get to that level" of detail, and (iv) he did not recall ever discussing these allocations with his fellow Trustees.  Timbers Dep. at 94:18-95:14.  When pressed as to whether he believed it made sense that none of the expense was allocated to distribution, he demurred that "I'm sure [CAL] had a reason," and conceded that he did not even know how the term "distribution" was being used in the context of these allocations.  Timbers Dep. at 95:15-23.*

**RESPONSE:** Denied.  CAL admits that Mr. Timbers testified that he did not ask CAL why the Information Services indirect expense category was allocated entirely to the advisory function, that he did not recall discussing this issue with the other Independent Trustees, and that this information is "not any more important than a lot of other things we look at."[719]  As

---

about CAL's allocation methodology.  Bhatt Dep. 96:15-19.  CAL denies that the cited evidence establishes that the Board did not ask questions about CAL's allocation methodology.

[717] Tr. 148:24-149:1 (Neal).

[718] Tr. 191:16-22 (Neal).

[719] Timbers Dep. 94:18-95:14, 96:5-7.

Mr. Timbers further testified, "all these accountants have their ways of allocating and if it sounds reasonable, it sounds fair, then you're ok."[720]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "allocation of expense between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 294, *supra*.

*297.     Turning to G&A, Mr. Timbers testified that he did not "have an understanding of why a hundred percent was allocated to advisory and none to distribution," and that he never wondered why that was the case or discussed the matter with his fellow Trustees.  Timbers Dep. at 96:18-97:1. When asked if it made sense to him that none of the G&A expenses were allocated to distribution, Mr. Timbers testified that "I'd give them the benefit of the doubt.  If they could explain it, then fine."  Timbers Dep. at 97:2-7.*

**RESPONSE:**  Denied.  CAL admits that Mr. Timbers testified that he did not ask CAL why the General & Administrative indirect expense category was allocated entirely to the advisory function, that he did not recall discussing this issue with the other Independent Trustees, and that this information is "not any more important than a lot of other things we look at."[721] However, as Mr. Timbers further testified, "all these accountants have their ways of allocating and if it sounds reasonable, it sounds fair, then you're ok."[722]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "allocation of expense between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 294, *supra*.

*298.     Mr. Bhatt echoed Mr. Timbers testimony, and stated that he did not recall the Board asking any specific questions regarding the allocation of these expenses.  See Bhatt Dep.*

---

[720] *Id*. 98:6-8.

[721] *Id*. 96:18-97:1, 96:5-7.

[722] *Id*. 98:6-8.

*at 96:15-97:1. Even if the Board had asked questions, however, Mr. Bhatt would have been unable to answer them, even though he was CAL's CFO, because he had no idea why 100% of Information Services and G&A expenses were allocated to distribution.  See Bhatt Dep. at 93:11-94:5; 97:2-6, 97:19-98:5.*

**RESPONSE:**   Denied.  CAL admits that at the time of his deposition, Mr. Bhatt did not recall whether the Board had asked questions about CAL's allocation methodology, and "[could not] remember" and did not know why the Information Services and General & Administrative categories of indirect expense were allocated entirely to the advisory function.[723]  CAL denies that the cited evidence establishes that the Board did not in fact ask questions about CAL's allocation methodology or that Mr. Bhatt did not know the reasoning for CAL's allocation methodology at the time he was employed by CAL.  Plaintiffs also presented no evidence that receiving any additional information about CAL's allocation methodology would have impacted the Independent Trustees' decision to approve the IMA in any way.

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of CAL's "allocation of expense between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 294, *supra*.

### E.     The Trustees' Misinformed View Regarding the Purported Burden of Providing Daily Liquidity

*299.     Both Messrs. Neal and Timbers repeatedly stressed that CAL's provision of daily liquidity for its fund clients was a source of substantial additional work that it was not required to perform in connection with its non-fund clients. Tr. at 171:8-173:17; Timbers Dep. at 112:1-18.*

---

[723] Bhatt Dep. 93:11-94:5, 96:15-97:1-6, 97:19-98:5.

**RESPONSE:**  Denied.  Mr. Neal testified that daily liquidity is a "[v]ery critical aspect of a mutual fund."[724]  CAL denies Plaintiffs' assertion in Paragraph 299 that daily liquidity "did not result in a material amount of additional work."  As Mr. Neal further testified:

> THE COURT: OK. With respect to liquidity --
>
> THE WITNESS: [Institutional accounts] don't need 24 -- daily liquidity.
>
> THE COURT: Because the contract between yourself and the institutional clients indicates how and when they can remove their funds.
>
> THE WITNESS: Yes.  Correct.  Absolutely.  It's predetermined. And the institutional client likes that, because they want their investors, who are investing money for them, to be fully invested. That's the whole point they picked you, because you're a good investor.  Why would they only want you to invest 96 percent of the money and keep 4 percent in cash?  Versus the mutual fund, you better keep some money in cash.  And by law, and the government is right here, they pay close attention to mutual funds' liquidity, and if your asset base is high risk, therefore not liquid, in order to pay redemptions, you might have to sell your assets at a big loss and different value than you told your shareholders the value today is, the NAV.  I mean, that's a real risk in the business, in the mutual fund side of the business, and one of which the government pays close attention and we as a board pay close attention.[725]

Ensuring Fund liquidity imposes additional burdens on both the portfolio management team and the compliance function.  As Mr. Mickey testified:

> Q. What are 144A securities?
>
> A. 144A securities are securities that were issued in accordance with Rule 144A, and so there's a limited registration at the time of issuance and only a qualified institutional buyer can buy them.  So there is a concern that those may be less liquid than other securities, and we are looking at that to make sure there's adequate liquidity in

---

[724] Tr. 172:20 (Neal).

[725] Tr. 187:4-24 (Neal).

those securities.  When we do that, we also look at all other securities to make sure that all are liquid.

Q. And 144A securities may be bought for accounts other than the funds, correct?

A. They can be, yes.

Q. Are there similar valuation issues that are handled by CAL compliance with respect to other accounts?

A. <u>Actually, no. 144A refers to the liquidity, and liquidity is strictly a fund issue</u> where you can only have depending on the fund, you know, 15 percent.  Some of our funds have lower guidelines 10 percent in liquid securities. So we look at those – it's strictly a -- institutional accounts don't have limits unless it's by separate as far as how much they can hold in liquid securities.[726]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 201, *supra.*

　　*300.　　The Trustees' opinions, however, were remarkably ill-informed.  As Mr. Kalis testified the daily liquidity requirement did not result in a material amount of additional work with respect to the Growth Fund.  See ¶202, supra.  Additionally, CAL's two largest Other ACG Accounts were themselves funds that provided their shareholders with daily liquidity, and thus presented CAL, as their subadvisor, with comparable portfolio management work.  See ¶¶204-05, supra.*

　　**RESPONSE:**  Denied.  Mr. Kalis did not testify that "the daily liquidity requirement did not result in a material amount of additional work," as Plaintiffs erroneously assert.  Mr. Kalis testified that the portfolio management team made an effort to keep sufficient cash on hand such that, on a day-to-day basis, the team was not faced with making additional sales of stocks in the

---

[726] Mickey Dep. 54:8-55:10.

Fund's portfolio in order to accommodate redemptions by Fund shareholders.[727]  However, Mr. Kalis did not testify as to the burden on CAL's portfolio management team required to maintain this cash position, nor did he speak to the burden on CAL's trading, operations, or other teams necessary to accommodate shareholder purchases and redemptions in the Fund.[728]

Furthermore, ensuring Fund liquidity imposes additional burdens on both the portfolio management team and the compliance function.  As Mr. Mickey testified:

> Q. What are 144A securities?
>
> A. 144A securities are securities that were issued in accordance with Rule 144A, and so there's a limited registration at the time of issuance and only a qualified institutional buyer can buy them.  So there is a concern that those may be less liquid than other securities, and we are looking at that to make sure there's adequate liquidity in those securities.  When we do that, we also look at all other securities to make sure that all are liquid.
>
> Q. And 144A securities may be bought for accounts other than the funds, correct?
>
> A. They can be, yes.
>
> Q. Are there similar valuation issues that are handled by CAL compliance with respect to other accounts?
>
> A. <u>Actually, no. 144A refers to the liquidity, and liquidity is strictly a fund issue</u> where you can only have depending on the fund, you know, 15 percent.  Some of our funds have lower guidelines 10 percent in liquid securities. So we look at those – it's strictly a -- institutional accounts don't have limits unless it's by separate as far as how much they can hold in liquid securities.[729]

Plaintiffs' particular focus on CAL's two sub-advisory clients is also misplaced because those clients are inapt comparators to the Fund.  Nomura advised a Cayman Islands fund that

---

[727] Kalis Dep. 65:14-25, 70:3-15, 71:1-21.

[728] Kalis Dep. 65:14-25, 70:3-15, 71:1-21.

[729] Mickey Dep. 54:8-55:10.

was made available primarily to Japanese investors, and the MD Accounts were Canadian funds governed by Canadian law.[730]  As Dr. Pomerantz acknowledged of the MD Accounts, "[t]hese aren't even '40 Act funds" governed by laws and regulations applicable to U.S. mutual funds, and, "there's no point at all in comparing" the Fund's fee to the management fees that Nomura and MD American charged their investors. [731]  CAL further denies as unsupported by the evidence cited that CAL had any obligation to provide an investment strategy to the MD Accounts that allowed for daily shareholder purchases and redemptions in those underlying funds or to assist the adviser of the MD Accounts with shareholder redemptions.[732]  On the contrary, the sub-advisory agreement governing the MD American Growth Fund expressly provided that CAL would have "no responsibility for the management of the cash assets of the Fund" and that another investment adviser separate from CAL would be responsible "for the provision of investment advisory services of the cash reserves."[733] And, CAL has performed no work at all for any All Cap Growth Client since 2017.[734]

In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of "services that CAL provided comparably to Fund and non-Fund Clients alike" and/or by the Fund's "daily liquidity requirements" that purportedly "did not result in any appreciably greater

---

[730] Jackson Decl. ¶ 104; JX 15 at CALAMOS_00622192 (providing that the Nomura Currency Fund was a Cayman Islands trust); JX 8 at CALAMOS_00638092 (providing that the MD American Growth Fund would be subject to National Instrument 81-02, a Canadian securities law regulation); JX 18 at CALAMOS_00638094, CALAMOS_00638103 (same for the MDPIM U.S. Equity Pool, and further providing that the MDPIM U.S. Equity Pool was "a Trust governed by the laws of Ontario").

[731] Tr. 503:14-504:3 (Pomerantz).

[732] JX 8 at Art. 2; JX 18 at Art. 2.

[733] JX 8 § 2.4 at CALAMOS_00683083, CALAMOS_00638090.

[734] Becker Decl. ¶ 121; Tr. 73:24-74:2 (Becker).

work" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set

forth in CAL's Response to Paragraph 201, *supra.*

### F.  The One-Time Fee Waiver and the Board's Annual Unanimous Approval of CAL's Advisory Fees

*301.    For each year during the Relevant Period, the Board unanimously approved CAL's advisory fees for the Growth Fund.  The only time the Board requested and approved a decrease in CAL's advisory fees was at the June 2013 15(c) meetings, when it instituted a modest 5 basis point fee-waiver.  See Tr. 155:24-155:4; 159:4-6.  The fee waiver was instituted in response to CAL's short-term and long-term underperformance.  At that time, however, the Board did not set any goals or milestones that CAL had to meet as a precondition to lifting the waiver.  Tr. at 156:5-9, 157:4-8.  In fact, the Board did not set any objective criteria for assessing whether CAL had sufficiently improved its performance, in order to merit a return to its old fee schedule.  JX 31 at 503417-18.*

**RESPONSE:**  Denied.  CAL admits that the Board unanimously approved CAL's

advisory fees for the Fund each year during the Relevant Period, and that the Board instituted a

five basis point fee waiver from June 2013-June 2014.  CAL denies the remaining assertions in

Paragraph 301 on the basis that they are not supported either by the evidence cited or the entirety

of the trial record.

As Mr. Neal testified, without any contrary evidence from Plaintiffs, "[a]t every board

meeting we would've been discussing performance and what the adviser's doing to improve

performance."[735]  As part of their ongoing assessment of CAL's services to the Fund, the

Independent Trustees considered both the Fund's long-term and short-term performance; the

Independent Trustees, with their years of industry experience and their long tenures on the

Board, understood that CAL had delivered excellent long-term performance for the Fund's

shareholders, and they also were fully aware of the Fund's recent periods of relative

underperformance.[736]  But the Independent Trustees also recognized that the Fund's one-year

---

[735] DFFCL ¶ 127.

[736] DFFCL ¶¶ 128-129.

performance varied during the Relevant Period, and their annual judgment to approve the IMA—
as well as their consideration of whether to impose a fee waiver and/or to insist on continued
efforts to improve performance—was made with all of this historical, absolute and relative
performance information in mind.[737]

Moreover, and contrary to Plaintiffs' assertions, the trial record demonstrates that in June
2013, the Independent Trustees reached the judgment—informed by the information they
requested and received from CAL, and considered in light of their extensive industry
experience—to impose a five basis point fee waiver on the Fund's management fee (at a cost to
CAL of about $2.1 million), while also insisting that CAL take meaningful steps to improve the
Fund's performance.[738]   The trial record further demonstrates that for each year since 2014, the
Independent Trustees have reached the judgment—again informed by the information they
requested and received from CAL, and considered in light of their extensive industry
experience—that the proper course has been to insist that CAL continue to take meaningful steps
to improve the Fund's performance.[739]   The trial record also demonstrates, again contrary to
Plaintiffs' assertions, that in their annual evaluation of the IMA in each year after June 2014, the
Independent Trustees considered and balanced the option of imposing additional fee waivers
against taking steps to ensure that CAL made changes designed to improve the Fund's
performance, including that (a) that if they were to impose a fee waiver, they would marginally
increase shareholders' net of fee returns (all else being equal), (b) shareholders had an
opportunity to achieve exponentially greater increases in net-of-fee returns, especially

---

[737] DFFCL ¶ 129.

[738] DFFCL ¶¶ 130, 133-136.

[739] DFFCL ¶¶ 131-132, 137-142.

compounded over time, by CAL improving the Fund's performance, and (c) imposing fee waivers reduces the amount of resources available to CAL to pursue initiatives to improve the Fund's performance, including CAL's restructuring of its investment team.[740]  These considerations led to informed and thoughtful judgments by the Independent Trustees in their annual evaluation and approval of the IMA.[741]  As Professor Bullard properly conceded, CAL's increased expenditures with respect to the services it provides to the Fund, through its significant changes and improvements to its investment team and investment structure, is both a de facto fee decrease for the benefit of the Fund's shareholders and "could play a role in" arm's-length bargaining by the Independent Trustees.[742]

In addition, as Mr. Neal further testified:

> Q. And at the time the board approved the fee waiver in 2013, it did not set any specific goals that CAL needed to meet before the board would consider returning to CAL's pre-fee waiver schedule; is that right?
>
> A. Correct.
>
> Q. And when the board approved the fee waiver, it did not set a time period during which it wanted to see sustained, long-term improvement before it would consider lifting the fee waiver, right?
>
> A. Well, the time period was a year, which was the extension of the contract.
>
> Q. Do you believe a year is sufficient to see sustained long-term improvement?

---

[740] DFFCL ¶¶ 131-132.

[741] DFFCL ¶¶ 126-142; Timbers Dep. 20:18-21:13, 140:14-141:17.

[742] DFFCL ¶ 108.

A. We believe a year is sufficient to see whether the adviser was putting resources necessary to improve performance. You have to start with short-term improvement to get long-term improvement.[743]

302.    *Despite the Board's concerns with CAL's long-term underperformance, it lifted the fee waiver after just one year. Tr. at 155:24–156:4, 158:4-11. Notably, however, the minutes of the 2014 15(c) Meeting do not mention the fee waiver even once, let alone provide any indication that the Board discussed whether the waiver should be continued or the reasons why they restored CAL's fees in full. See JX 70.[744]  Further still, the section of the minutes memorializing the Board's consideration of the IMA does not include any indication that the Board asked a single question specifically about the Growth Fund. JX 70 at 534045-54.*

**RESPONSE:**  Denied.  CAL admits that the Board lifted the fee waiver in 2014.  CAL denies the remaining assertions in Paragraph 302 on the basis that they are not supported either by the evidence cited or the entirety of the trial record.  For example, Plaintiffs' citation to the minutes of the June 2014 meeting does not establish that the Independent Trustees failed to discuss the continuation of the fee waiver or that no questions were asked concerning the Fund.  Among other things, the evidence demonstrates that meeting minutes are not a verbatim transcript of what was discussed to the meeting, and the meeting minutes do not transcribe anything that was discussed in executive session.[745]

---

[743] Tr. 156:5-21 (Neal).

[744] *Mr. Jackson testified that although the minutes of the Board's 15(c) meetings are not verbatim recordings, any discussions concerning material/significant matters would be noted in the corresponding minutes.  Tr. at 259:24-260:2; see also 323:23-324:14.*  **RESPONSE:** Denied as stated.  CAL admits that Mr. Jackson testified that the minutes "aren't verbatim" and "[w]hether they captured everything that occurred within those meetings, again, they're not verbatim," but that in his experience, if a significant or material matter is discussed at a board meeting, it would be reflected in the minutes.  Tr. 259:16-23 (Jackson).  Mr. Jackson also testified that the meeting minutes do not record anything that is discussed in executive session.  Finally, while Mr. Jackson testified that he seeks to ensure that any questions requiring follow-up are recorded in the minutes, not all of the questions asked by the Independent Trustees necessarily are included in the minutes.  For example, questions asked by the Independent Trustees that are adequately answered at the meeting and require no follow-up in future meetings may not necessarily be included in the minutes.  Jackson Decl. ¶ 58; Tr. 323:23-324:14 (Jackson).

[745] Tr. 259:16-23 (Jackson).

286

With respect to the Independent Trustees' annual judgments on behalf of fund shareholders in approving the IMA, CAL incorporates its Response to Paragraph 301 as if fully set forth herein.

*303.    A fee waiver, however, was not the only way to address the issue of whether CAL's performance merited a certain level of fees. Rather, several of CAL's Funds had performance fee arrangements, whereby CAL's fee is either larger or smaller depending on how the fund at issue performs relative to an index/benchmark. Tr. at 158:12-20. According to both Messrs. Neal and Timbers, the Growth Fund's performance was the paramount concern in assessing whether approving CAL's fees was in the best interests of investors. See Tr. at 154:21–155:23, 158:4-11; Timbers Dep. at 38:15-25, 120:13–121:8. Nonetheless, the Board did not ask CAL to consider a performance fee arrangement at any time. Tr. at 158:21-159:6.*

**RESPONSE:**  Denied.  The cited testimony does not support the assertion that "several" of CAL's mutual funds had "performance fee arrangements."  Plaintiffs cite no evidence, and did not prove at trial, that the Fund's fee should have been a "performance fee arrangement," or that such a fee arrangement is common in the industry.

With respect to the Independent Trustees' annual judgments on behalf of fund shareholders in approving the IMA, CAL incorporates its Response to Paragraph 301 as if fully set forth herein.

*304.    Rather, for each year during the Relevant Period (with the sole exception of 2013), the Board did not seek a decrease in CAL's advisory fees or attempt to link its fees to performance, but instead approved the IMA after reaching the formulaic conclusion that it would be "prudent" to allow CAL "more time" to develop its performance record. Tr. 160:9-163:25; 166:21-167:25; JX 70 at 434047-48; JX 111 at 534348; JX 144 at 636377; JX 180 at 652318. The Board did so without setting any performance related goals, notwithstanding that, for each year since 2014, the Growth Fund's one-year Morningstar ranking relative to other comparable funds became progressively worse. Tr. 160:9-163:25; 166:21-167:25.*

**RESPONSE:**  Denied.  As Mr. Timbers testified, while the referenced language in the minutes "might be the same or similar, the story that backs it up is a little different as you go through" each year.[746]  The trial evidence bears this out.

---

[746] Timbers Dep. 158:5-160:22, 161:1-19.

Plaintiffs' belief in the desirability of pre-defined performance goals is also contradicted by the trial evidence.  As Mr. Cronin explained, pre-defined performance targets and specific deadlines are inadvisable and impractical in the investment management industry because of, among other factors, unpredictable future changes in the market.[747]  Mr. Neal further explained that setting specific benchmarks at which the Board would re-evaluate the Fund's performance would not be useful to the Independent Trustees because they receive monthly performance updates and other information that they use to monitor continuously the Fund's performance.[748]

With respect to the Independent Trustees' annual judgments on behalf of fund shareholders in approving the IMA, CAL incorporates its Response to Paragraph 301 as if fully set forth herein.

305.    *The Board's stated rationale for approving the Growth Fund's advisory fees was that CAL was continuing to make changes to its investment team to improve performance.  See, e.g., JX 70 at 534047; JX 111 at 534348; JX 144 at 636377; JX 180 at 652318; see also Timbers Dep. at 140:6 – 144:7.  However, the very changes that supposedly served as a basis for buying CAL more time, such as CAL's termination and replacement of David Kalis who headed the Growth Fund, were themselves occasioned by CAL's continued poor performance.  Tr. at 168:12-24, 181:3-10, 198:1-6.  Moreover, the Board continued to parrot its prudent-to-allow-more-time mantra, well after CAL had reported to the Board that its transition to a horizontal approach – the crown jewel of its efforts to improve performance – had been completed.  Tr. at 164:3-165:21; JX 144 at 636377; JX 180 at 652318.*

**RESPONSE:**  Denied.  With respect to the Independent Trustees' annual judgments on behalf of fund shareholders in approving the IMA, CAL incorporates its Response to Paragraph 301 as if fully set forth herein.  Additionally, as set forth in CAL's Response to Paragraph 118, Plaintiffs' assertion that CAL "completed" its investment team restructuring in 2015 was contradicted by the testimony of the sole witness on whom Plaintiffs tested this theory at trial, Mr. Neal.  As Mr. Neal testified, the Board did not understand the presentation on which

---

[747] Tr. 659:12-660:18 (Cronin).

[748] Tr. 198:18-199:19 (Neal).

Plaintiffs rely to mean that CAL finished its process of improving the investment team in 2015, but instead that Mr. Black had made changes that he personally had planned to make, and that CAL continued to make structural and personnel changes after Mr. Black's departure in 2015.[749]

306.     Finally, the Trustees were not even aware that, at the same time they continued to cut CAL slack year after year, a substantial number of CAL's non-fund clients that had money invested in the same investment strategy as the Growth Fund were unwilling to do so, and terminated their advisory relationships because CAL's performance did not merit the fees charged.  See Tr. at 169:9-170:16.

**RESPONSE:**  Denied.  CAL's 15(c) Responses reported on a yearly basis, *inter alia*, the aggregate AUM of all institutional accounts following a U.S. Equity strategy, which continued to decline until, as of the 2017 15(c) Response and as disclosed to the Independent Trustees, CAL advised no such accounts.[750]  At trial, Mr. Neal testified that "[w]e knew what assets were annually in each of their other categories, by category, not by specific style," and that obtaining information "by client, I don't think that was that critical."[751]

Moreover, the decision by CAL's institutional or sub-advisory All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive. Rather, as the trial evidence conclusively demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[752]

---

[749] Tr. 202:5-203:21 (Neal).

[750] *E.g.*, DX 61-R at CALAMOS_00519573; DX 113-R at CALAMOS_00502929; DX 145-Q at CALAMOS_00634751; DX 176-P at CALAMOS_00650496.

[751] Tr. 170:20-171:2 (Neal).

[752] DFFCL ¶¶ 163, 282, 286-287.

**CAL'S RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

**I.     CAL'S WITNESSES WERE INCREDIBLE**

**A.     Applicable Legal Standard**

307.     In a bench trial, credibility determinations are the province of the presiding judge.  See DeGiorgio v. Fitzpatrick, No. 08 Civ. 6551, 2011 WL 10501908, at *7 (S.D.N.Y. Mar. 8, 2011); Haimdas v. Haimdas, No. 09 Civ. 2034, 2010 WL 652823, at *3 (E.D.N.Y. Feb. 22, 2010).  Grounds for finding a witness incredible include, inter alia, evasive, inconsistent, contradictory or implausible testimony.[753]

**RESPONSE:**  Admitted.

308.     Moreover, if the Court finds that any portion of a witness's testimony was intentionally untruthful or misleading, the Court can elect, under the doctrine of falsus in uno falsus in omnibus, to reject the entirety of the witness's testimony.  Hernandez v. NJK Contractors, Inc., 09 Civ. 4812, 2015 WL 1966355, at *31 (E.D.N.Y. May 1, 2015) (citing United States v. Foster, 9 F.R.D. 367, 389 (S.D.N.Y. 1949)).[754]

**RESPONSE:**  Admitted.

**B.     Specific Instances of Incredible/Misleading Testimony**

**1.     CAL's Misleading and/or Incomplete Interrogatory Responses**

309.     Plaintiffs' First Set of Interrogatories asked CAL to identify, inter alia, all of CAL's Institutional and Subadvised Accounts that followed an ACG strategy – like the Growth Fund – and, for each such account, to identify among other things, whether the account had terminated CAL and the reason(s) given for such termination.  JX 181, at 4.  According to CAL's verified responses, four of its largest Other ACG Accounts – Nomura, Thrivent and the two MD Accounts – did not cite poor performance as one of the reasons they terminated CAL.  JX 181 at Ex. A.  This was untrue:  Mr. Behan testified that all four of those accounts cited poor performance as a reason for termination.  Tr. 82:21-85:7, 91:21-92:15.  Notably, Mr. Behan could not explain why such information was omitted from CAL's interrogatory responses, and

---

[753] See, e.g., Latin America Music Co., Inc. v. Spanish Broad. Sys., Inc., 254 F. Supp. 3d 584, 589-90 (S.D.N.Y. 2017) (witness incredible where he could not recall important details, his testimony directly contradicted prior statements, and he evasively answered questions on cross-examination).

[754] See also United States v. Eastman, 16 Cr. 0006, 2016 WL 4357492, at *6 (D. Conn. Aug. 15, 2016) (applying doctrine of falsus in uno, falsus in omnibus to reject entirety of witness's testimony that was incredible on certain key matters); Hinton v. Patnaude, 92 Civ. 405, 1997 WL 727529, at *2 n.3 (N.D.N.Y. Oct. 21, 1997) ("Falsus in uno, falsus in omnibus has particular applicability to an assessment of [a party's] credibility.") (internal quotation marks omitted).

*simply speculated it may not have been entered into their customer database at the time those
clients terminated their relationships.  See Tr. at 114:23-115:5.*

 **RESPONSE:**  Denied.  CAL's Response to Plaintiffs' First Set of Interrogatories

indicated that Nomura, Thrivent, MD American, and MDPIM U.S. Equity Fund did not cite

performance as a reason for termination because CAL's client relationship management system

does not record that any of these clients cited performance as a reason for termination.

Moreover, none of those clients cited performance as the sole reason for termination, as

Mr. Behan testified.  At trial, Mr. Behan testified that he believed that Nomura cited

"suboptimum performance" as "one reason" that Nomura terminated but Mr. Behan did not

"recall exactly what they said."[755]  Mr. Behan went on to testify:

> Q. Was there some other reason that Nomura also gave you, at the
> time that it left, as to why it was terminating its account with
> Calamos?
>
> A. It did.  So -- so first off, when a client gives you a reason, we
> don't audit the client or we don't -- you know, they sometimes give
> you a number of reasons, so quick and dirty hand thing in the system
> isn't always necessarily as reliable as it may seem. Secondly, with
> Nomura, Nomura had purchased a stake in American Century of 40
> percent. American Century has a competing product at Calamos,
> and by the way, many of us predicted, and rightly so, when we saw
> the news come out, it won't be long, 18 months, and it's kind of
> what happened.[756]

Mr. Behan similarly testified that MD American and MDPIM U.S. Equity Fund cited three

reasons for terminating, one of which was performance, and that Thrivent terminated CAL due to

performance among other reasons.[757]

---

[755] Tr. 83:3-84:8 (Behan).

[756] Tr. 114:23-115:10 (Behan).

[757] Tr. 84:11-85:7 (Behan).

Moreover, the decision by CAL's institutional or sub-advisory All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive. Rather, as the trial evidence conclusively demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[758]

In fact, it is Plaintiffs' witnesses, not CAL's witnesses, who were "in-credible" at trial. During his testimony at trial, Dr. Pomerantz was impeached more than twenty times,[759] and Professor Bullard was impeached no fewer than sixteen times with his prior inconsistent statements.[760]  Notable instances in which Dr. Pomerantz was not forthcoming with the truth until confronted by adverse evidence (most often his own testimony) include: (i) his assertion that he has no bias to correct;[761] (ii) his prior sworn testimony that a mutual fund's past performance is irrelevant to an inquiry of whether its fees are excessive;[762] (iii) his total lack of direct experience in negotiating with an investment adviser (or any third-party service provider) on behalf of a mutual fund;[763] and (iv) the "evident" and "obvious[]" error in his description of

---

[758] DFFCL ¶¶ 163, 282, 286-287.

[759] Tr. 406:23-407:24, 408:24-409:16, 409:17-410:5, 417:1-16, 420:20-421:15, 436:17-437:14, 439:25-440:24, 441:2-24, 444:2-445:13, 447:22-449:8, 456:25-458:2, 458:11-459:2, 463:11-24, 465:18-466:16, 466:17-467:16, 467:17-468:11, 493:9-494:19, 497:4-498:1, 519:18-521:2, 527:13-528:9, 533:3-21 (Pomerantz).

[760] Tr. 803:25-804:24, 807:2-22, 812:4-22, 813:8-814:11, 823:11-824:8, 828:7-829:6, 839:1-18, 847:3-848:6, 854:2-855:10, 857:25-858:15, 869:12-870:23, 875:10-23, 890:5-891:5, 932:14-933:4, 933:16-934:15, 935:9-25 (Bullard).

[761] Tr. 420:20-421:15 (Pomerantz).

[762] Tr. 447:22-449:8 (Pomerantz).

[763] Tr. 409:17-410:6, 406:23-407:25 (Pomerantz).

the new regression model that he created on the eve of trial.[764]  The topics on which Professor

Bullard offered inconsistent testimony included, *inter alia*:  (i) his prior opinions offered in other

cases concerning the conscientiousness of a fund's independent trustees;[765] (ii) the content of his

opinions concerning the conscientiousness of the Independent Trustees in this case;[766] (iii) the

differences between mutual funds and institutional accounts;[767] and (iv) his expertise (or lack

thereof) in the analysis of investment performance.[768]

## 2.    Mr. Behan's Misleading Testimony Regarding the Powell Trust

*310.     Mr. Behan testified that the Jason Powell Trust – one of CAL's Other ACG Accounts – voluntarily chose to close its SMA and invest in the Growth Fund, to take advantage of the purportedly greater services. Behan Decl. at ¶69; Tr. at 115:15–116:13.  Mr. Behan's testimony is flatly inconsistent with CAL's internal communications, which indicate that the Jason Powell Trust had no choice but to close its SMA and transfer its funds into the Growth Fund, or choose a new investment advisor, because it fell below CAL's minimum AUM threshold for SMAs.  PX 487 at 595407.  Mr. Behan's distortion of the facts is particularly telling, given that it dovetailed with one of CAL's key (but legally erroneous) defense narratives: that its advisory fee cannot be excessive, by definition, if CAL can identify just a single institutional client that invested in the Growth Fund.*

**RESPONSE:**  Denied as stated.  CAL did not advise a "Jason Powell Trust."  Mr. Behan

testified that the James B. Powell Restated Revocable Trust closed its institutional account and

chose to invest in the Fund.[769]  As the letter that the Powell Trust sent to CAL stated, "Please

consider this your letter of instruction to terminate my Separately Managed Account 'SMA'

effective immediately.  Please transfer in-kind all eligible assets in my SMA into the Calamos

---

[764] Tr. 592:14-583:15 (Pomerantz).

[765] Tr. 807:2-22.

[766] Tr. 823:11-824:8, 839:1-18.

[767] Tr. 854:2-855:10, 857:25-858:15.

[768] Tr. 933:16-934:13, 935:9-25.

[769] Behan Decl. ¶ 69.

Growth Fund."[770]  As Dr. Pomerantz conceded, the James Powell Trust was free to take its money and go elsewhere, including to a different investment adviser or different fund, but instead chose to remain with CAL and to invest in the Fund.[771]  Finally, Plaintiffs' counsel chose not to assess Mr. Behan's credibility on the issue of the James Powell Trust through cross-examination, but instead attempted to impugn it after the fact with a letter seeking belatedly to admit a new exhibit into evidence that Plaintiffs asserted was inconsistent with Mr. Behan's testimony.[772]  The Court should decline to find Mr. Behan incredible based on unsupported attorney argument that Mr. Behan did not have an opportunity to address during cross-examination.

Moreover, the decision by CAL's institutional or sub-advisory All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive. Rather, as the trial evidence conclusively demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[773]

### 3. Mr. Jackson's Implausible and Evasive Testimony Regarding *inter alia* CAL's Pricing of Litigation Risk and its Involvement in Preparing the Funds' Regulatory Filings

311.  *First, Mr. Jackson's trial declaration – likely drafted by the same person who authored CAL's Interrogatory Responses – repeated the false claim that Nomura and the MD*

---

[770] DX 1171.

[771] Tr. 510:25-511:11 (Pomerantz).

[772] Tr. 116:14-20 (Behan); Dkt. Nos. 192 & 193.

[773] DFFCL ¶¶ 163, 282, 286-287.

*Accounts did not cite performance as one of the reasons why they terminated their advisory relationships with CAL.  Compare Jackson Decl. at ¶104, with Tr. at 82:21-85:7, 91:21-92:15.*

**RESPONSE:**  Denied.  CAL admits that Mr. Jackson testified that neither Nomura nor MD American cited performance as the reason for terminating their accounts.  CAL denies that there is anything inconsistent between Mr. Jackson's Declaration and the testimony at trial.  Mr. Jackson's Declaration contains his testimony based on his own personal knowledge.  Moreover, none of those clients cited performance as the sole reason for termination and each cited other reasons for termination, as Mr. Behan testified.[774]

In addition, the decision by CAL's institutional or sub-advisory All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as the trial evidence conclusively demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[775]

*312.    Second, Mr. Jackson's trial declaration misleadingly claimed that the "clear majority" of his time as General Counsel was spent working on Funds-related matters, which conveniently supported Defendant's narrative regarding the purported time-consuming legal and regulatory burdens attendant to advising Funds.  Jackson Decl. at ¶9.  In fact, however, Mr. Jackson testified that, during the heart of the Relevant Period he spent the "clear majority" of his time working on non-Funds related matters.  See Tr. at 269:24–270:7 (testifying he spent only 40% of his time on Fund matters); ¶10, supra.*

**RESPONSE:**  Denied.  As reported in CAL's annual 15(c) Response, Mr. Jackson spent a majority of his time on Fund activities in both 2017 and 2018 (approximately 60% in both

---

[774] Tr. 84:11-85:7, 114:23-115:10 (Behan).

[775] DFFCL ¶¶ 163, 282, 286-287.

years).[776]  As such, Mr. Jackson does currently spend the majority of his time on the Funds.  This

is entirely consistent with Mr. Jackson's Declaration.[777]  The fact that Mr. Jackson testified at

trial that he spent less than a majority of his time on Fund activities in 2014, 2015, and 2016 does

not contradict his declaration testimony.[778]  Moreover, Mr. Jackson is not the sole member of the

legal department, and the amount of time he spends on Fund-related matters therefore is not a

full measure of the time and effort the legal department expends with respect to the Funds.

> 313.    *Third, as reflected in the minutes of CAL's 15(c) meetings, Mr. Jackson explained
> to the Board that one of the primary reasons the Funds paid higher advisory fees was because
> advising mutual funds purportedly involved greater litigation risk.  See Section III.B.2, supra;
> Tr. at 261:24–301:23.  Mr. Jackson further claimed that while the value CAL assigned to this
> litigation risk was "necessarily subjective," CAL priced that cost into its fee structure.  Id.; JX
> 144 at 636366.  These assertions were false.*

> **RESPONSE:**  Denied.  The minutes of the Board's June 2016 meeting state:

>> Mr. Jackson added that the pricing of each management agreement
>> with the funds reflects the fact that the regulatory and litigation
>> environment affects the adviser of mutual funds in more significant
>> ways than they affect advisers of only private accounts.  Specifically
>> he noted that the advisers concerns with the litigation risks involved
>> in running a mutual fund are reflected in the pricing of its contracts.
>> In response to a question, he noted that this number is necessarily
>> subjective, but added it is reasonable for the business to price that
>> risk in."[779]

Mr. Jackson did not state that that greater litigation risk was "one of the primary reasons the

Funds paid higher advisory fees," as Plaintiffs erroneously assert.  Rather, as Mr. Jackson

testified:

>> What I'm saying is there is a real risk to running investment
>> companies that could subject you to increased and enhanced
>> exposure to regulatory and litigation risk.  And I base that in part on

---

[776] JX 176 at CALAMOS_00650251; JX 184 at CALAMOS_00653486.

[777] Jackson Decl. ¶ 9.

[778] Tr. 262:24-270:7 (Jackson).

[779] JX 44 at CALAMOS_00636366.

the fact that in our past we've actually experienced litigations with respect to certain of our funds. So that's the basis. In terms of the cost and expense, in terms of what that would mean, I don't see how what you spent on a prior particular set of litigation with its own facts and circumstances could somehow be used to extrapolate into the future on other litigations. That's all I'm saying.[780]

Each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board, among other things, that it assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients. In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[781] Based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients and (b) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA.[782]

Moreover, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks. No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in all of those cases in which the court rejected the adviser's

---

[780] Tr. 266:8-18 (Jackson).

[781] DFFCL ¶¶ 57, 207.

[782] DFFCL ¶¶ 204-207.

institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent <u>not</u> to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[783]

*314.    At trial, Mr. Jackson conceded that: (i) he is unaware of anyone at CAL having calculated, estimated or otherwise reduced to a number the litigation risk that CAL purportedly priced into the Growth Fund's advisory fees since joining CAL; (ii) he is not aware of anyone having performed that exercise prior to the time he joined CAL; (ii) he does not know what portion, if any, of the fee CAL charged the Growth Fund was attributable to the increased litigation risks, and (iv) to the extent CAL did consider litigation risk in setting the advisory fees it charged the Growth Fund, he does not know what methodology, if any, CAL employed.  Tr. at 264:20–269:4; see also id. at 135:6–136:10 (Mr. Neal's testimony that CAL never provided the Board with an estimate of the value/cost of litigation risk it purportedly priced into the Growth Fund's fee structure).*

> **RESPONSE:**  Denied.  As Mr. Jackson testified at trial:

> > What I'm saying is there is a real risk to running investment companies that could subject you to increased and enhanced exposure to regulatory and litigation risk.  And I base that in part on the fact that in our past we've actually experienced litigations with respect to certain of our funds.  So that's the basis.  In terms of the cost and expense, in terms of what that would mean, I don't see how what you spent on a prior particular set of litigation with its own facts and circumstances could somehow be used to extrapolate into the future on other litigations.  That's all I'm saying.[784]

Plaintiffs have not provided any evidence quantifying these litigation risks or any methodology by which CAL must have done so.  Each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board, among other things, that it assumes different and greater risks in advising the Funds than it does in

---

[783] DFFCL ¶¶ 242-244.

[784] Tr. 266:8-18 (Jackson); Jackson Decl. ¶¶ 109-113, 116-119.

advising its All Cap Growth Clients.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[785]  Based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients and (b) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA.[786]

Moreover, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in <u>all</u> of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent <u>not</u> to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[787]

---

[785] DFFCL ¶¶ 57, 207.

[786] DFFCL ¶¶ 204-207.

[787] DFFCL ¶¶ 242-244.

315.    Finally, Mr. Jackson misleadingly claimed that CAL prepared the Funds'
*regulatory filings "in the first instance," to once again inflate the amount of work CAL*
*performed for the Funds.  Tr. at 315:25-317:5. Rather, as Mr. Jackson conceded under cross-*
*examination, nearly all of the Funds' regulatory filings were prepared by a third-party service*
*provider in the first instance, and CAL simply reviewed them.  Tr. at 317:22-318:16; 319:13-*
*320:11, 321:3-7; see also 382:1-4.  Moreover, CAL's review function was aided by Fund*
*Counsel, who was paid directly by the Funds for such work.  Tr. at 317:6-11, 18-21; see also JX*
*5 at 146344 (IMA Section 3(k)).*

**RESPONSE:**  Denied.  As Mr. Jackson testified, CAL receives the Form N-SAR with

certain information populated from the Funds' service providers, and that CAL then "has the

responsibility for ensuring that the information in there is accurate and complete."[788]

Mr. Jackson also testified that with respect to certain information contained in Form N-Q or

Form N-CSR, for example, "that information is housed with respect to certain of these service

providers, it only makes sense that you would obtain that information from the service provider.

But then, once you receive the information, that's only the first step that comes internally. . . ."[789]

The fact that CAL receives certain information from service providers that it uses to prepare

regulatory filings, or that it reviews and revises information prepared by service providers, is not

inconsistent with Mr. Jackson's testimony that CAL prepares drafts of the regulatory filings and

shares them with Independent Trustees' counsel.[790]

### 4.    Mr. Neal's Evasive Testimony and Routine Exaggerations

316.    Mr. Neal's trial testimony was frequently evasive, inconsistent with his prior
*sworn statements and testimony on key matters, and marked by bouts of bloviation aimed at*
*exaggerating fund-related services and risks.*

**RESPONSE:**  Denied.

317.    For example, Mr. Neal refused to directly answer whether he differentiated
*between the services provided under the IMA and the FASA in deciding whether to approve*
*CAL's advisory fee under the IMA, see Tr. at 132:22–133:16.  Yet, in a sworn declaration he*

---

[788] Tr. 318:3-8 (Jackson).

[789] Tr. 320:12-321:1 (Jackson).

[790] Tr. 315:25-317:5 (Jackson).

*earlier submitted in this action, he admitted that he considered the services rendered under those agreements "collectively" and did not "attempt to distinguish between what services are provided under the IMA as opposed to the FASA." Tr. at 132:22-134:19 (emphasis added).*

**RESPONSE:**  Denied.  Mr. Neal testified that "[w]e knew which services were provided under the investment management agreement and it's all the services."[791]  As the trial evidence demonstrates, the Independent Trustees did not consider the IMA or the FASA in isolation; rather, as part of the 15(c) Process each year, the Independent Trustees considered the totality of services that CAL provides to the Fund and assessed whether the approval of both agreements was reasonable in light of the total fees charged.[792]  Plaintiffs presented no evidence a trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.

318.    *Mr. Neal was also evasive about the fact that the Board instituted the fee waiver because it was disappointed with CAL's short-term and long-term performance.  See Tr. at 154:21-155:23. The obvious reason for his evasiveness being that the Board reinstated CAL pre-waiver fee schedule after just one year, which by definition is insufficient to address concerns associated with long-term performance.*

**RESPONSE:**  Denied.  Mr. Neal forthrightly testified, "[p]erformance in general was poor and we felt this was a meaningful way to motivate the adviser to put more resources in and improve performance."[793]  Mr. Neal did not attempt to "evade" counsel's question, and counsel's attempt to impeach him with prior consistent deposition testimony does not change that fact.

As Mr. Neal also testified, without any contrary evidence from Plaintiffs, "[a]t every board meeting we would've been discussing performance and what the adviser's doing to improve performance."[794]  As part of their ongoing assessment of CAL's services to the Fund,

---

[791] Tr. 133:6-16 (Neal).

[792] DFFCL ¶¶ 350-351.

[793] Tr. 154:24-155:5 (Neal).

[794] DFFCL ¶ 127.

the Independent Trustees considered both the Fund's long-term and short-term performance; the Independent Trustees, with their years of industry experience and their long tenures on the Board, understood that CAL had delivered excellent long-term performance for the Fund's shareholders, and they also were fully aware of the Fund's recent periods of relative underperformance.[795]  But the Independent Trustees also recognized that the Fund's one-year performance varied during the Relevant Period, and their annual judgment to approve the IMA— as well as their consideration of whether to impose a fee waiver and/or to insist on continued efforts to improve performance—was made with all of this historical, absolute and relative performance information in mind.[796]

Moreover, and contrary to Plaintiffs' assertions, the trial record demonstrates that in June 2013, the Independent Trustees reached the judgment—informed by the information they requested and received from CAL, and considered in light of their extensive industry experience—to impose a five basis point fee waiver on the Fund's management fee (at a cost to CAL of about $2.1 million), while also insisting that CAL take meaningful steps to improve the Fund's performance.[797]  For each year since 2014, the Independent Trustees have reached the judgment—again informed by the information they requested and received from CAL, and considered in light of their extensive industry experience—that the proper course has been to insist that CAL continue to take meaningful steps to improve the Fund's performance.[798]  The trial record also demonstrates, again contrary to Plaintiffs' assertions, that in their annual evaluation of the IMA in each year after June 2014, the Independent Trustees considered and

---

[795] DFFCL ¶¶ 128-129.

[796] DFFCL ¶ 129.

[797] DFFCL ¶¶ 130, 133-136.

[798] DFFCL ¶¶ 131-132, 137-142.

balanced the option of imposing additional fee waivers against taking steps to ensure that CAL made changes designed to improve the Fund's performance, including that (a) that if they were to impose a fee waiver, they would marginally increase shareholders' net of fee returns (all else being equal), (b) shareholders had an opportunity to achieve exponentially greater increases in net-of-fee returns, especially compounded over time, by CAL improving the Fund's performance, and (c) imposing fee waivers reduces the amount of resources available to CAL to pursue initiatives to improve the Fund's performance, including CAL's restructuring of its investment team.[799]  These considerations led to informed and thoughtful judgments by the Independent Trustees in their annual evaluation and approval of the IMA.[800]  As Professor Bullard properly conceded, CAL's increased expenditures with respect to the services it provides to the Fund, through its significant changes and improvements to its investment team and investment structure, is both a de facto fee decrease for the benefit of the Fund's shareholders and "could play a role in" arm's-length bargaining by the Independent Trustees.[801]

319.    *Mr. Neal also frequently exaggerated aspects of the work and risks CAL undertook in advising its fund clients and displayed a remarkably cavalier attitude with respect to the true state of CAL's business operations.  Mr. Neal claimed that 30 to 40 CAL personnel manned its call center for fund investors, Tr. at 186:8-21, when the actual number of employees was approximately 6, Tr. at 379:2-4, and was unaware that CAL shuttered its call center in mid-2017, Tr. at 217:7-10, 361:13-15.*

**RESPONSE:**  Denied.  CAL admits that Mr. Neal testified that CAL had a "30-, 40-person phone bank," and that if the call center was shut down "it was recently."[802]  Plaintiffs

---

[799] DFFCL ¶¶ 131-132.

[800] DFFCL ¶¶ 126-142; Timbers Dep. 20:18-21:13, 140:14-141:17.

[801] DFFCL ¶ 108.

[802] Tr. 186:11-12, 217:7-10 (Neal).

failed to prove that the existence *vel non* of the call center, or the number of people staffing the call center, had any impact on the Independent Trustees' decision to approve the IMA.

*320.    He also intimated that the threat of "make-whole" errors with respect to Growth Fund was significant, because recently there had been a handful of such errors. Tr. at 209:24–212:18. Under questioning, however, Mr. Neal admitted that he was unaware if the errors involved the Growth Fund and, more critically, acknowledged that a third-party servicer provider – and not CAL – bore financial responsibility for those errors. Tr. at 212:2–213:11. In fact, Mr. Neal stated that he could not remember the last time the Growth Fund experienced a make whole error. Tr. at 212:2-18.*

**RESPONSE:**  Denied.  CAL admits that Mr. Neal testified that the risk of a NAV error is significant.  CAL denies that the fact that the Fund has not experienced a NAV error recently means that the risk that CAL faces from such errors is not real or significant.  As Mr. Jackson explained, "we try to . . . anticipate issues that could occur and we seek to address those risks affirmatively before they ever come home to roost, but that takes a lot of time and effort on behalf of the adviser."[803]  Anticipating and planning for such risks requires constant vigilance and monitoring on behalf of CAL.[804]

Each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board, among other things, that it assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[805]  Based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates

---

[803] Tr. 349:9-19 (Jackson).

[804] *See* DFFCL ¶ 203.

[805] DFFCL ¶¶ 57, 207.

both that (a) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients and (b) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA.[806]

Moreover, CAL denies either that it purported to or was required to "justify" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[807]

### 5.     Professor Laby's Incredible and Implausible Testimony

*321.     Professor Laby offered evasive and implausible testimony regarding matters central to his opinions, including the applicability of the business judgment rule ("BJR") and the robustness of the Board's consideration of the nature/scope of the services CAL provided to its non-fund clients compared to the Growth Fund.*

**RESPONSE:**  Denied.

*322.     First, one of the foundational elements of Professor Laby's opinions is that the Board's decision to approve CAL's advisory fees under Section 36(b) is governed by the BJR.*

---

[806] DFFCL ¶¶ 204-207.

[807] DFFCL ¶¶ 242-244.

*See Tr. at 945:5-10, 946:2-4; Laby Report at 8.  Based on this understanding, Professor Laby concluded that the Board's various actions in connection with the fee approval – including its receipt and review of certain information – constituted valid exercises of business judgment. See Laby Report at 1-2, 7-8, 31, 60-61.*

**RESPONSE:**  Denied.  Professor Laby testified that the Board's process for reviewing and approving the IMA was robust and that the Board's decision to approve the IMA on a yearly basis was a valid exercise of business judgment.[808]  Professor Laby did not offer the opinion, and CAL is not relying on any opinion, that the business judgment rule applies such that the Court has no review function with respect to the Independent Trustees' decision-making.  Rather, the decisions of the Independent Trustees are entitled to deference under *Jones*.[809]  Moreover, unlike Professor Bullard, Professor Laby is not offering an opinion regarding the manner in which the Court should interpret prior Section 36(b) case law—a topic that is not the subject of proper expert opinion.

*323.    Yet, despite importuning the Court to likewise apply the BJR, Professor Laby conceded that he: (i) does not offer an opinion on the body of law – state or federal – that supplies the BJR in this case; and (ii) assuming that the appropriate body of law is state law, does not offer an opinion on which state's law would apply.  Tr. at 946:6-25.  Further still, Professor Laby conceded that, in his opinion, there are multiple versions of the BJR which differ in the amount of discretion courts afford a board's decision, see Tr. at 949:11-19,[810] and that he*

---

[808] Laby Rpt. 1, 30-49; Tr. 946:2-5 (Laby).

[809] DFFCL ¶¶ 54-95, 121-132.

[810] *After many attempts to avoid answering the question, Professor Laby conceded that, generally speaking a court's role ceases once it determines that the BJR applies.  Tr. at 947:1-949:14; see also Weiss v. Temporary Inv. Fund, Inc., 692 F.2d 928, 950 (3d Cir. 1982) ("Whereas under the typical state law business judgment rule the disinterested directors' decision exercised in good faith binds the court, under section 36(b) the court must make an independent judgment.").* **RESPONSE:**  Denied.  CAL admits that in response to repeated questioning from Plaintiffs' counsel, Professor Laby testified that "generally speaking when the business judgment rule is applicable, the judicial role typically -- typically ceases," but that "are certainly instances -- and I think this is one of them -- where it certainly may be the case where the court can and often does take some look at the decision, if the business judgment rule applies, even though they are also applying deference or substantial deference to the decision."  Tr. 948:8-949:7 (Laby).  CAL denies that the cited portion of the dissent in *Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928 (3d Cir. 1982) applies in this case; aside from the fact that the cited

*does not have an opinion as to which specific strain of the BJR applies here, see Tr. at 949:20-950:21.*[811]

      **RESPONSE:**  Denied.  CAL admits that Professor Laby is not offering an opinion on what version of the business judgment rule would apply here.  Professor Laby did not offer the opinion, and CAL is not relying on any opinion, that the business judgment rule applies such that the Court has no review function with respect to the Independent Trustees' decision-making.  Rather, the decisions of the Independent Trustees are entitled to deference under *Jones*.[812]  Moreover, unlike Professor Bullard, Professor Laby is not offering an opinion regarding the manner in which the Court should interpret prior Section 36(b) case law—a topic that is not the subject of proper expert opinion.

     *324.    Moreover, eliminating any remaining credibility he had on this issue, Professor Laby conceded that:  (i) the only post-Jones authority*[813] *he cited in support of his opinion*

---

portion is taken from a dissent, the *Weiss* decision was vacated by the Supreme Court.  *Weiss v. Temp. Inv. Fund, Inc.*, 465 U.S. 1001 (1984).

[811] *Notably, Mr. Laby first attempted to testify that he did have an opinion on which of the many purported versions of the BJR applies in this case, prior to being confronted with his contrary deposition testimony.  Tr. at 949:20-950:21.*  **RESPONSE:**  Denied.  In response to a question as to whether he has an opinion "as to which specific strain of the business judgment rule should apply," Professor Laby stated that he "wouldn't necessarily agree with that."  Tr. 949:20-24 (Laby).  At his deposition, Professor Laby stated that he did not "have an opinion sitting here today" on which of the "hundreds, if not thousands, of cases formulating the business-judgment rule" should apply, or "which of these nuanced views is the right view as a normative matter."  Tr. 940:7-19 (Laby).

[812] DFFCL ¶¶ 54-95, 121-132.

[813] *The Supreme Court's decision in Jones does not discuss the BJR or even mention the phrase "business judgment."  See Jones v. Harris Associates L.P., 559 U.S. 335, 338-53 (2010); see also Weiss, 692 F.2d at 953 ("[s]ince the directors' business judgment is to be considered relevant to a section 36(b) claim only to the limited extent that the court must take the directors' views into account, any state law business judgment rule is clearly supplanted.") (Gibbons, C.J., dissenting), cert. granted, judgment vacated, 465 U.S. 1001 (1984) (relying on the reasoning of Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir. 1982), aff'd sub nom. Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984)).*  **RESPONSE:**  CAL admits that while *Jones* does not contain the exact phrase "business judgment," *Jones* counsels that "a measure of deference to a board's judgment may be appropriate in some instances," and that "a court may [not] supplant the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range."  *Jones*, 559 U.S. 335 at 349, 352.  CAL denies that the cited portion of the dissent in *Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928

*regarding the BJR's applicability is a citation to the Frequently Asked Questions section of ICI's website, see Tr. at 954:2-9, Laby Report at 7 n.16;[814] and (ii) he is the co-author of a treatise that takes the position that the BJR is not the applicable standard for assessing the reasonableness of an adviser's fees under ICA. Tr. at 950:22-952:22.[815]*

**RESPONSE:** Denied. CAL admits that Professor Laby is not offering the opinion that the Court should apply the business judgment rule. Professor Laby did not offer the opinion, and CAL is not relying on any opinion, that the business judgment rule applies such that the Court has no review function with respect to the Independent Trustees' decision-making. Rather, the decisions of the Independent Trustees are entitled to deference under *Jones*.[816] Moreover, unlike Professor Bullard, Professor Laby is not offering an opinion regarding the manner in which the Court should interpret prior Section 36(b) case law—a topic that is not the subject of proper expert opinion. Professor Laby also testified that he does not necessarily agree with everything in the treatise that he has co-authored with Professor Tamar Frankel. Professor Laby became co-author of the treatise, which was originally published in 1983, approximately three years ago.

---

(3d Cir. 1982) applies in this case; aside from the fact that the cited passage is taken from a dissent, the *Weiss* decision was vacated by the Supreme Court. *Weiss v. Temp. Inv. Fund, Inc*., 465 U.S. 1001 (1984).

[814] *ICI essentially is a trade association for mutual funds and their advisors. Tr. at 676:11-15.* **RESPONSE:** CAL admits that ICI is the leading association representing regulated funds globally, including mutual funds, exchange-traded funds, closed-end funds, and unit investment trusts in the United States, and similar funds offered to investors in jurisdictions worldwide.

[815] *Although Professor Laby sought to distance himself from that portion of his treatise on the ground that it was the product of his co-author, he has not edited that passage since joining as co-author more than three years ago, or, more critically, in the 14 months following his deposition in this action when this exact passage was brought to his attention. See Tr. at 951:1-12, 952:23-953:19.* **RESPONSE:** The cited testimony does not support the assertion in this foonote. Rather, Professor Laby testified that he did not recall one way or the other whether he had edited this particular passage of the four-volume treatise. Tr. 953:11-19 (Laby) ("Sitting here right now and without my notes, I just can't testify as to whether we changed this particular paragraph.").

[816] *See* DFFCL ¶¶ 54-95, 121-132.

He has been engaged in the process of revising the treatise, but has not yet worked through all four volumes and 4,330 pages of the treatise.[817]

325.    *Second, Professor Laby also offered completely implausible testimony in defense of his opinion that the Trustees – in particular, Lead Independent Trustee Stephen B. Timbers – carefully considered information concerning nature and scope of the services CAL provided to its non-fund clients.  See Tr. at 965:3–968:14. Specifically, at trial Professor Laby was confronted with Mr. Timber's deposition testimony that he "can only guess" about the services CAL provides to its institutional and subadvisory clients, and that he did not recall CAL ever providing specific information regarding such services.  Tr. at 965:15–966:5. Nonetheless, Professor Laby claimed that Mr. Timbers' testimony, in fact, meant that he was certainly aware of the services CAL provided to its non-Fund clients:*

> Q:    *Is [Mr. Timber's] testimony consistent with the careful consideration of the services that CAL provides to, for example, its subadvisory clients?*
>
> A:    *Well, two things.  First of all, it depends on how you interpret these words.  I think it absolutely can be, because in this case, as has been discussed, Mr. Timbers has a great deal of experience in the financial services industry, and when he's asked the question "do you know what services CAL provides to those clients" and he responds "I can only guess," I read it mean, Yes, I can tell, I know what services are being provided.  I don't read that any other way in this case . . . .*

*Tr. at 966:6-16.*

**RESPONSE:**  Denied. CAL admits that Paragraph 325 accurately quotes Professor Laby's testimony at trial, but denies that such testimony is "completely implausible."  As Professor Laby testified, "knowing his background before becoming an independent trustee" (*i.e.*, that "Mr. Timbers had a great deal of experience in the financial services industry"), Professor Laby believed that Mr. Timbers was aware of the services provided to CAL's institutional and sub-advisory clients.[818]  As Professor Laby explained, "I certainly think he is

---

[817] Tr. 952:23-953:19 (Laby).

[818] Tr. 966:9-17 (Laby).

saying I can tell, I know what services are being provided.  And the reason I say that is because of the particular context of his background, as the president and CEO of Zurich Kemper and president and CEO of another investment advisory firm.  This is not somebody who is inexperienced."[819]  In addition, Professor Laby specifically questioned Mr. Neal and Mr. Timbers regarding their knowledge of the differences in services provided to the Funds and to institutional and sub-advisory accounts, and was satisfied "that they truly understood the difference between services provided to fund clients and services provided to nonfund clients."[820]

326.    *Further eroding his credibility, immediately after Professor Laby testified that he viewed Mr. Timber's testimony as being susceptible to only one interpretation – one that is the exact opposite of the literal meaning of the words Mr. Timbers used – Professor Laby then conceded that the testimony was, in fact, potentially ambiguous.  And although Professor Laby claims that he sought to clarify this "potential ambiguity," Tr. at 966:18-25, during his post-deposition, joint telephonic interview of Messrs. Timbers and Neal, the circumstances of that interview are highly irregular and further undermine Professor Laby's testimony.  Specifically, unlike at his deposition, Mr. Timbers was not under oath, and the interview was conducted ex parte and was not recorded.  Tr. at 941:3-942:8, 943:3-5; see also Laby Report at 5.  Making matters worse, Professor Laby destroyed his only complete set of contemporaneous notes of what Mr. Timbers said, because he typed over his interview notes in generating his report.  Tr. at 943:20-944:5, 944:22-945:4.[821]*

**RESPONSE:**  Denied.  CAL admits that Professor Laby conducted a telephonic interview with Mr. Neal and Mr. Timbers, but denies that there was anything "highly irregular" or untoward about that interview.  As Professor Laby explained, he wanted to ask about certain topics raised by Plaintiffs' counsel at Mr. Timbers' and Mr. Neal's depositions that were not

---

[819] Tr. 967:5-10 (Laby).

[820] Tr. 966:18-25, 967:11-16 (Laby).

[821] *Further still, by interviewing Messrs. Timbers and Neal jointly, Professor Laby exacerbated the risk that the witnesses would conform their testimony on key issues, thereby completely undermining whatever utility Mr. Timber's unsworn, hearsay statements to Professor Laby might otherwise have had.*  **RESPONSE:**  Denied.  CAL specifically denies that Mr. Neal or Mr. Timbers would "conform" his testimony or offer false testimony.

fully addressed during the depositions, and to obtain answers to relevant questions that Plaintiffs'
counsel failed to ask.[822]   Certainly, if Professor Laby had not interviewed any Independent
Trustees, Plaintiffs would be making the opposite argument—that Laby's opinions should be
disregarded as unreliable because he did not "verify" them with the Independent Trustees.

   In addition, despite offering baseless opinions impugning the conscientiousness of the
Independent Trustees, neither Dr. Pomerantz nor Professor Bullard sought to speak to or
interview any of the Independent Trustees.

### 6.   Mr. Richardson's Evasive and Implausible Testimony

   *327.   Mr. Richardson provided evasive/implausible testimony concerning several key
issues in this case.*

   **RESPONSE:**   Denied.  Mr. Richardson, an investment professional with over 30 years of
asset management industry experience, including with respect to both mutual funds and
institutional accounts, testified credibly that, *inter alia*, (1) there is an industry-wide fee
differential between prices charged for advising mutual funds and those charged to institutional
or sub-advisory accounts, (2) the range of services provided by advisers to mutual funds is
greater in scope, effort, and risk than services provides to institutional or sub-advisory accounts,
and (3) the fee differential between CAL's management fee for the Fund and for its All Cap
Growth Clients, as well as the different and greater services that CAL provided to the Fund as
compared with its other clients, is consistent with industry practice.

   *328.   First, when questioned about joint consideration of the services CAL provided
under the IMA and FASA, Mr. Richardson denied that the "FASA provides a framework for
Calamos's provision of additional services beyond the provision of investment management
services." Tr. at 751:3-13.  At deposition, however, Mr. Richardson said the opposite, Tr. at
751:14-20, and when confronted with his testimony conceded that "the description of the
services provided under the FASA are not all contained within" the IMA. Tr. at 752:21-25.*

---

[822] Tr. 941:25-942:16 (Laby).

**RESPONSE:**  Denied as stated.  CAL admits that Paragraph 328 accurately quotes Mr. Richardson's testimony.  CAL denies that Mr. Richardson's testimony, which he offered in response to Plaintiffs' counsel's questions about issues of contract interpretation, suggests that the Board should not have considered all of the services that CAL provided to the Fund when evaluating the management fee.  Mr. Richardson, an investment professional with over 30 years of asset management industry experience, is not a lawyer and was not offered by CAL as an expert on contract interpretation.  Moreover, as both of Plaintiffs' experts conceded, CAL is responsible for providing all of the services necessary to operate the Fund pursuant to the IMA, and the FASA did not reduce or change in any way the nature or extent of the services CAL provides to the Fund.[823]  Under the IMA, CAL remains responsible for doing everything necessary to "manage, supervise, and oversee the affairs of the Fund," and it continues today to provide, or oversee the provision of, all services identified in Management Fee Rate by Product presentation even though the FASA is no longer effective.  While the FASA was in place, as part of the 15(c) process each year, the Independent Trustees considered the totality of services that CAL provided to the Fund and assessed whether the approval of both the IMA and the FASA was reasonable in light of the total fees charged.[824]  Plaintiffs have not shown that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA, and there is no legal requirement that a fund's board consider a fund's management agreement with the adviser separately from other agreements with that same adviser.[825]

---

[823] DFFCL ¶ 167.

[824] DFFCL ¶¶ 344-351.

[825] DFFCL ¶¶ 354-361.

329.    Second, Mr. Richardson was also evasive when he was asked to confirm that he *was of the opinion that it was reasonable for CAL to charge an advisory fee under the IMA that took into account services for which it was already being compensated under the FASA.  See Tr. at 753:4-11.  Mr. Richardson, in fact, expressed that exact opinion at deposition.  Tr. at 753:12-754:2.*

**RESPONSE:**  Denied.  Mr. Richardson testified, based upon his 30-plus years of experience in the asset management industry, that "[a]s an asset manager, you think of the services you provide to a mutual fund in total and the fees that you get for that in total."[826]  As noted above, Mr. Richardson, an investment professional with over 30 years of asset management industry experience, is not a lawyer and was not offered by CAL as an expert on contract interpretation.  At his deposition, he was asked about "services that were <u>only being provided pursuant to</u> the FASA,"[827] which is not the case for any of the services that CAL provides to the Fund.  As both of Plaintiffs' experts conceded, CAL is responsible for providing all of the services necessary to operate the Fund pursuant to the IMA, and the FASA did not reduce or change in any way the nature or extent of the services CAL provides to the Fund.[828] Under the IMA, CAL remains responsible for doing everything necessary to "manage, supervise, and oversee the affairs of the Fund," and it continues today to provide, or oversee the provision of, all services identified in Management Fee Rate by Product presentation even though the FASA is no longer effective.  While the FASA was in place, as part of the 15(c) process each year, the Independent Trustees considered the totality of services that CAL provided to the Fund and assessed whether the approval of both the IMA and the FASA was reasonable in light of the total fees charged.[829]  Plaintiffs have not shown that considering the contracts separately would

---

[826] Tr. 753:9-11 (Richardson).

[827] Tr. 753:12-754:2 (Richardson).

[828] DFFCL ¶ 167.

[829] DFFCL ¶¶ 344-351.

have made any difference with respect to the Independent Trustees' approval of the IMA, and

there is no legal requirement that a fund's board consider a fund's management agreement.

    *330.     Finally, Mr. Richardson implausibly testified that even after an adviser had recouped its start-up costs in sponsoring a fund, and the fund had reached profitability, a Board can nonetheless continue to take those entrepreneurial risks into account in perpetuity in determining whether a fee is reasonable. Tr. at 758:2-759:11. He further implausibly testified that it would be reasonable for CAL's advisory fee to account for, inter alia, the risk that investors would switch advisers due to CAL's poor performance. Tr. at 759:21-760:4.[830]*

    **RESPONSE:**  Denied as stated.  CAL admits that Mr. Richardson opined that

entrepreneurial risks continue even after a fund has reached profitability, because it is

unknowable whether the fund is going to continue to be profitable in the future.[831]

Mr. Richardson also opined that it is reasonable for a board to consider a variety of competitive

risks, including, among other things, various reasons why investors might leave a fund.[832]  CAL

denies that any of this testimony is implausible.  Rather, as Mr. Richardson explained in detail in

his report, and Plaintiff's own expert Professor Bullard acknowledged, investment advisers

across the industry take on a whole host of greater risks advising mutual funds than they do with

respect to institutional and sub-advisory clients.[833]  In annually reaching their determination that

approval of the IMA with CAL was in the best interests of the Fund's shareholders, the

Independent Trustees applied their own judgment and industry experience, as well as

---

[830] *Notably, at deposition Mr. Richardson testified that he did not offer that opinion. Tr. at 760:14-25.*  **RESPONSE:**  Denied.  Plaintiffs misconstrue Mr. Richardson's deposition and trial testimony.  At his deposition, Mr. Richardson did not say that he was not offering an opinion on whether "***it would be reasonable for*** CAL's advisory fee to account for, *inter alia*, the risk that investors would switch advisers due to CAL's poor performance," only that he did not have a view on whether "the advisory fee C[AL] receives from the fund ***should*** take into account the risk that investors will switch funds if C[AL] is not performing as well as other investment advisors."  Richardson Dep. at 150:21-151:3.

[831] Tr. 758:24-759:4.

[832] Tr. 760:9-13.

[833] DFFCL ¶ 198.

information provided by CAL, to conclude that CAL bears additional risks and responsibilities to the Fund in connection with servicing the Fund.[834]

### 7.  Dean Hubbard's Implausible and Agenda-Driven Testimony

*331.  Dean Hubbard is a darling of the mutual fund industry's primary trade association, the ICI, see Tr. at 676:2-24, who unsurprisingly offered implausible, evasive, and agenda-driven trial testimony that would literally read Section 36(b) out of existence.*

**RESPONSE:**  Denied.  Plaintiffs' assertion in Paragraph 331 that Dean Hubbard is the "darling of the mutual fund industry's primary trade association" is argumentative and unsupported by the cited evidence, as the evidence cited simply reflects that Dean Hubbard co-authored a single paper that received partial funding from ICI Mutual Insurance Company.[835] CAL further denies as unsupported by any cited evidence that Dean Hubbard's testimony was "implausible, evasive, and agenda-driven" or "would literally read Section 36(b) out of existence."

*332.  Specifically, Dean Hubbard opined that a plaintiff can bring a viable § 36(b) claim only if there was a failure of (i) the competitive process in the mutual fund industry, and (ii) the board process.  Tr. at 745:17-746:2. Critically, however, Dean Hubbard further opined that he had not "seen a failure of the competitive process" in this case or in any of the cases he had studied, and that "given the structural characteristics of the industry, it would be hard to imagine" such a failure.  Tr. at 746:3-9 (emphasis added).  Thus, according to Dean Hubbard, a valid excessive fee case can only be brought based on market conditions that, in his opinion, will never materialize, thereby rendering Section 36(b) a nullity and his testimony utterly implausible.*

**RESPONSE:**  Denied. Plaintiffs' assertion in Paragraph 332 that Dean Hubbard's economic research would "render[] Section 36(b) a nullity" is not supported by the trial evidence.  To the contrary, as Dean Hubbard explained in response to the question from the Court, his testimony about the competitive nature of the mutual fund market applies only to the

---

[834] DFFCL ¶ 209.

[835] Tr. 675:24-676:24 (Hubbard).

present-day mutual fund industry, and he has not opined on whether the economic assessment in the Wharton Report "was right or wrong at the time."[836]  The testimony that Plaintiffs describe as "utterly implausible" amounts to only a common-sense opinion that the mutual fund industry has experienced changes in market conditions, including increased competition.[837]

*333.    Additionally, Dean Hubbard provided misleading testimony when he addressed the issue of the Growth Fund's fees and performance, noting that it was quite common for a fund to be simultaneously in the bottom half of performers and the top half of fee charged, relative to other funds.  Tr. at 711:11-23.  However, when pressed on cross-examination about the fact that the Growth Fund was often in the bottom quarter of performance and the top quarter of fees charged, he admitted that only 10% of funds could boast that combination.  Tr. at 741:14-742:4.*

**RESPONSE:**  Denied.  Dean Hubbard's testimony was neither "misleading" nor inconsistent.  To the contrary, Dean Hubbard testified that a fund would experience above-median fees and below-median performance approximately 25% of the time.[838]  When asked by Plaintiffs, Dean Hubbard testified that his analysis found that a fund was in the top quarter of fees and in the bottom quarter of performance "[a]bout 10 percent of the time.  And, again, when you replicate this across all the different strategies in 6,000 funds, it sounds like a lot to me."[839]  Those factual responses are entirely consistent, and show no attempt to mislead.

## II.    CONCLUSIONS OF LAW WITH RESPECT TO *GARTENBERG* FACTORS: THE GROWTH FUND'S ADVISORY FEES WERE EXCESSIVE

### A.    Applicable Legal Standard

*334.    Congress adopted the Investment Company Act (the "ICA") to regulate investment companies, including mutual funds.  Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  See Jones, 559 U.S. at 338.  "The adviser selects the fund's directors, manages the fund's investments, and provides other services."  Id.  In this sense, a mutual fund is often referred to as "captive" to its adviser.  Id. at 349.  Recognizing that the relationship between an investment adviser and its captive mutual*

---

[836] Tr. 724:4-725:10 (Hubbard).

[837] Tr. 724:4-725:10 (Hubbard).

[838] Tr. 711:11-23 (Hubbard).

[839] Tr. 741:24-742:4 (Hubbard).

*fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the ICA. Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted); see also S. Rep. No. 91-184, at 3 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4899 ("Congress recognized that investment companies and those who entrust their savings to such companies stand in special need of legal protection."). Congress amended the ICA to provide additional protections to shareholders with respect to the fees charged by investment advisers to their captive mutual funds. Among other amendments, Congress added a new Section 36(b), which provides:*

> *[T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund] or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.*

*15 U.S.C. § 80a-35(b). Section 36(b) creates a private right of action for shareholders to enforce the fiduciary duty on behalf of the fund. See id.*

**RESPONSE:** Denied as stated. CAL admits that Paragraph 334 accurately quotes Section 36(b) of the ICA, which creates a private right of action for fund shareholders. As the *Jones* Court also observed, "in recognition of the disinterested directors' role, the Act instructs courts to give board approval of an adviser's compensation 'such consideration . . . as is deemed appropriate under all the circumstances.'"[840] Thus, "[w]here disinterested directors consider all of the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if the court might weigh the factors differently."[841] As explained by a court that granted summary judgment in a Section 36(b) case with a similar premise to the present case (*i.e.*, a fund fee claimed to be excessive because it is higher than the adviser's institutional account fees), Plaintiffs cannot prove their Section 36(b) claim simply by "suggest[ing] that the Board should have had different information than what the Board was

---

[840] *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 336 (2010) (quoting § 80a–35(b)(1)).

[841] *Id.*; DFFCL ¶¶ 143-147.

provided."[842]  And, as explained by another court in ruling on summary judgment that a board's fee approval decision was "entitled to substantial weight," in words that take on even greater meaning at trial, "[i]n general, a plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking."[843]

335.    Section 36(b) reflects Congress's determination that "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  S. Rep. No. 91-184, at 4 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4901.  This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. See A STUDY OF MUTUAL FUNDS, H.R. Rep. No. 87-2274 (1962) ("Wharton Report").[844]  The Wharton Report determined that "investment advisers often charged [their captive] mutual funds higher fees than those charged the advisers' other clients."  Daily Income Fund, 464 U.S. at 537 (citing Wharton Report at 34).  The Wharton Report concluded that the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by [captive] mutual funds."  Wharton Report at 493-94.

**RESPONSE:**  Denied as stated.  CAL admits that Paragraph 355 quotes certain portions of the 1962 report titled "A Study of Mutual Funds" by the University of Pennsylvania's Wharton School of Finance and Commerce (the "Wharton Report").  CAL denies that the concerns identified in the Wharton Report are still in existence today, or that Plaintiffs have provided any evidence to prove otherwise.  As the *Gartenberg* decision itself explained, "Section 36(b) was added to the Act in 1970," and "[i]ts enactment was precipitated as the result of the abuses which Congress had perceived with respect to equity load funds during the 1960's."[845] As Dean Hubbard confirmed, the mutual fund industry today is highly competitive, with low barriers to entry, thousands of entrants, and large numbers of fund failures and movements of

---

[842] DFFCL ¶ 249.

[843] DFFCL ¶ 249; *see id.* ¶¶ 148-153.

[844] *Also available at http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.*

[845] *Gartenberg v. Merrill Lynch Asset Mgmt., Inc*., 528 F. Supp. 1038, 1044 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

assets between competitors.[846]  In addition, the rise of alternative investment products such as

exchange-traded funds means that mutual funds must also compete with other investment

alternatives for investor money.[847]

      *336.    In Jones, the Supreme Court adopted a standard of liability under 36(b) that*
*focuses on the relationship between the adviser's compensation and the services it provides.*
*Specifically, "[t]o face liability under § 36(b), an investment adviser must charge a fee that is so*
*disproportionately large that it bears no reasonable relationship to the services rendered and*
*could not have been the product of arm's length bargaining." Jones, 559 U.S. at 346 (emphasis*
*added).  In applying this standard, courts must consider "all relevant circumstances", including*
*the factors set forth in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir.*
*1982), and "use[] the range of fees that might result from arm's-length bargaining as the*
*benchmark for reviewing challenged fees." Jones, 559 U.S. at 347. See Chill v. Calamos*
*Advisors LLC, 175 F. Supp. 3d 126, 130 (S.D.N.Y. 2016) (citing Jones, 559 U.S. at 344-46).  The*
*Gartenberg factors are "(1) the nature and quality of services provided to fund shareholders; (2)*
*the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale;*
*(5) comparative fee structures; and (6) the independence and conscientiousness of the trustees."*
*Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 114 (D. Mass. 2006) (citing Krinsk v. Fund*
*Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir. 1989) (citing Gartenberg, 694 F.2d at 929–30).*
*These factors are non-exclusive and non-disjunctive, meaning that there is no requirement that a*
*plaintiff present evidence relating to all six factors to prove a violation.  See Jones, 559 U.S. at*
*347.*

      **RESPONSE:**  Denied as stated.  CAL admits that Paragraph 336 accurately sets forth the

*Gartenberg* factors.  However, the *Gartenberg* factors are not the elements of a Section 36(b)

claim.  In *Jones*, the Supreme Court ruled that "to face liability under § 36(b), an investment

adviser must charge a fee that is so disproportionately large that it bears no reasonable

relationship to the services rendered and could not have been the product of arm's length

bargaining."[848]  As the Court further stated:

        [T]he Act instructs courts to give board approval of an adviser's
        compensation "such consideration . . . as is deemed appropriate
        under all the circumstances." § 80a–35(b)(2). . . . From this
        formulation, two inferences may be drawn.  First, a measure of

---

[846] DFFCL ¶ 212; Tr. 705:15-706:4 (Hubbard).

[847] DFFCL ¶¶ 212-215; Tr. 724:21-725:10 (Hubbard).

[848] *Jones*, 559 U.S. at 346.

deference to a board's judgment may be appropriate in some instances.   Second, the appropriate measure of deference varies depending on the circumstances.[849]

Thus, "where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process."[850]

### B.    The Quality of CAL's Advisory Services Was Exceedingly Poor and Supports the Excessiveness of the Growth Fund's Advisory Fee

*337.    At the outset, the quality of services inquiry "'necessarily involves a determination of what services may be permissibly considered.'"   Chill v. Calamos Advisors LLC, No. 15 Civ. 1014, 2018 WL 4778912, at \*20 (S.D.N.Y. Oct. 3, 2018) (quoting Kasilag v. Hartford Inv. Fin. Serv., LLC, No. 11 Civ. 1083, 2016 WL 1394347, at \*15 (D.N.J. Apr. 7, 2016)).   CAL suggests that the totality of the services that it provides with respect to the Growth Fund is relevant irrespective of pursuant to which contract – the IMA or the FASA – those services were provided.*

**RESPONSE:**   Denied as stated.   CAL admits that on summary judgment, the Court ruled that "at the outset, '[t]his inquiry necessarily involves a determination of what services may be permissibly considered.'"[851]   However, for at least the following reasons, the evidence at trial fully reinforced each of the following conclusions: (a) nothing did or should have prevented the Independent Trustees from considering the total services provided by CAL, and the total compensation paid by the Fund to CAL, when assessing the Fund's overall relationship with CAL, and (b) there is nothing about the FASA that even suggests, let alone proves, that the Fund's management fee is excessive:

First, both of Plaintiffs' experts concede that CAL is required to provide or arrange for the complete bundle of services required for the Fund as part of its obligations under the IMA.

---

[849] *Id*. at 348-49.

[850] *Id*. at 351; *see* DFFCL ¶¶ 143-147.

[851] *Chill*, 2018 WL 4778912, at \*20 (quoting *Kasilag v. Hartford Inv. Fin. Serv., LLC*, 2016 WL 1394347, at \*15 (D.N.J. Apr. 7, 2016)).

And as Professor Bullard further conceded, the services rendered by the adviser that are to be considered under the *Jones*/*Gartenberg* standard include all of the services that the adviser provides for the fund, whether those services are provided under one or several contracts.[852]

Second, the nature or extent of CAL's services to the Fund as required by the IMA were not reduced or changed in any way by the FASA.  Even without the FASA, CAL would still have the responsibility, under the IMA's provision that CAL is required to "manage, supervise, and oversee the affairs" of the Funds, either to provide itself or to ensure the provision through third-parties of all necessary services for the Funds, including the financial accounting services recited in the FASA.  Following the termination of the FASA, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by CAL has not decreased.[853]

Third, during the period of time the FASA was in existence, no one at CAL differentiated between services provided pursuant to the IMA versus services provided pursuant to the FASA, nor did CAL employees review or reference the IMA or the FASA in the course of performing their day-to-day duties in servicing the Fund.  Rather, at all times, CAL focused on providing all of the services that the Fund requires and that CAL is obligated under the IMA to provide.[854]

Fourth, while the FASA was in place, the Independent Trustees annually reviewed the services CAL provided and the 1.1 basis point fee charged under that agreement.  The Independent Trustees, however, did not consider the IMA or the FASA in isolation.  Rather, as part of the 15(c) Process each year, the Independent Trustees considered the totality of services

---

[852] DFFCL ¶¶ 352-353.

[853] DFFCL ¶¶ 344-348.

[854] DFFCL ¶ 349.

that CAL provides to the Fund and assessed whether the approval of both agreements was reasonable in light of the total fees charged.  Plaintiffs presented no evidence a trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.[855]

Fifth, regardless of how the IMA and FASA and the fees charged under each agreement are evaluated, separately or together, it was reasonable and appropriate for the Board to consider the two contracts together.  The correct legal standard requires consideration of substance over form.  There is no legal requirement that a fund's board must consider a fund's management agreement with the adviser separately from the fund's other agreements with that same adviser.  There is similarly no law or ruling holding that it is improper for a Board to consider the totality of services provided by the adviser to the Fund and the total compensation received by the adviser as a whole, regardless of whether those services and compensation are set out in one contract or two.[856]

*338.     As the Court determined on summary judgment, however, Plaintiffs are correct that 36(b) requires that "transactions be considered separately and not aggregated." Chill, 2018 WL 4778912, at \*20.[857]*

**RESPONSE:**  CAL admits that Paragraph 338 accurately quotes the Court's summary judgment opinion.  At trial, however, Plaintiffs, through both of their experts conceded that CAL

---

[855] DFFCL ¶¶ 350-351.

[856] DFFCL ¶¶ 354-361.

[857] *See also Zehrer v. Harbor Cap. Advisors, Inc., No. 14 Civ. 789, 2018 WL 1293230, at \*10 (N.D. Ill. Mar. 13, 2018)* ("[T]he legislative history of § 36(b) suggests that the key consideration [in evaluating the nature and quality of the services provided to a fund] is what services were secured by the fee paid.") *(emphasis added); In re Blackrock Mut. Fund Advisory Fee Litig., 327 F. Supp. 3d 690, 726 (D.N.J. 2018)* (denying summary judgment to defendants when parties presented conflicting evidence concerning whether investment adviser provides certain services under the IMA in exchange for the advisory fee at issue, "as opposed to under separate agreements in exchange for separate fees").

is required to provide, or ensure the provision of, <u>all</u> of the services required by the Fund as part of its duties under the IMA.[858]  Moreover, Plaintiffs failed to come forth with any evidence that considering the "transactions" separately would have made any difference to the Independent Trustees' decision to approve the IMA each year within the Relevant Period.  Finally, the FASA was terminated effective November 1, 2018.  Following the termination of the FASA, however, CAL's obligation to provide, or ensure the provision of, all of the services that the Funds require has not changed, and the scope of work performed by CAL has not decreased.  Moreover, the Fund's management fee schedule under the IMA has not changed.[859]

In addition, for all of the reasons set forth in CAL's Response to Paragraph 337, *supra*, the evidence at trial fully reinforced each of the following conclusions: (a) nothing did or should have prevented the Independent Trustees from considering the total services provided by CAL, and the total compensation paid by the Fund to CAL, when assessing the Fund's overall relationship with CAL, and (b) there is nothing about the FASA that even suggests, let alone proves, that the Fund's management fee is excessive.

339.    *As such, only the fees paid under the IMA – and not those under the FASA – are in question.*

**<u>RESPONSE:</u>**  Denied as stated.  CAL admits that Plaintiffs chose to challenge the fee paid by the Fund under the IMA, and not the fee paid under the FASA.  However, for all of the reasons set forth in CAL's Response to Paragraph 337, *supra*, the evidence at trial fully reinforced each of the following conclusions: (a) nothing did or should have prevented the Independent Trustees from considering the total services provided by CAL, and the total compensation paid by the Fund to CAL, when assessing the Fund's overall relationship with

---

[858] DFFCL ¶ 167.

[859] DFFCL ¶¶ 347-348.

CAL, and (b) there is nothing about the FASA that even suggests, let alone proves, that the

Fund's management fee is excessive.

> *340.     Furthermore, the principal measure of the quality of advisory services under 36(b) is investment performance.  See Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990)) ("Given investors' primary objective of making money, the most significant indication of the quality of an investment adviser's services is the fund's performance relative to other funds of the same kind."); see also Timbers Dep. 152:3-11 (explaining that performance is "the primary reason that the shareholders buy the fund," and "I don't know Mr. Chill, but I imagine he bought it because he wanted to make some money and have some good performance doing it").  Indeed, "[i]n evaluating the quality of the services provided to funds, other courts have compared the performance of challenged funds against peer funds." Zehrer v. Harbor Cap. Advisors, Inc., No. 14 Civ. 789, 2018 WL 1293230, at \*11 (N.D. Ill. Mar. 13, 2018) (collecting cases).*

**RESPONSE:**  Denied as stated.  CAL admits that performance is relevant to the Court's

analysis under Section 36(b), but performance is "not a *Gartenberg* factor."[860]  "[A]llegations of

underperformance alone are insufficient to prove that an investment adviser's fees are

excessive."[861]  This is so because "[i]nvesting is not a risk-free endeavor," and "[e]ven the most

knowledgeable advisers do not always perform up to expectations, and investments themselves

involve quite different magnitudes of risk."[862]  In short, "[w]hile underperformance of the mutual

fund may be considered, it is not a *Gartenberg* factor, and courts have been 'wary about

attaching too much significance to a fund's financial performance.'"[863]

In any event, the trial evidence demonstrates that as of each annual meeting when the

Independent Trustees voted to approve the IMA, the Fund's since-inception annualized return

was at least 12.74%, which both ranked between the 2nd and 4th percentiles of its Morningstar

---

[860] *Sivolella*, 2016 WL 4487857, at \*65.

[861] *Amron v. Morgan Stanley Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (quoting *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327–28 (4th Cir. 2001)); *see* DFFCL ¶¶ 288-290.

[862] *Migdal*, 248 F.3d at 327.

[863] *Sivolella*, 2016 WL 4487857, at \*68 (quoting *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007)).

category and exceeds the annual returns of all of the Fund's benchmark indices during the same period.[864]   The Fund also has earned positive absolute returns in twelve of the fifteen years leading up through the end of 2017.[865]   Moreover, the Fund's since-inception ranking compared to peer mutual funds actually understates the Fund's relative performance because the peer group only includes mutual funds that survived for the entire time period; in particular, Dean Hubbard's analysis shows that only nine of approximately 60 original peer mutual funds at the time of its inception have survived to the present date, and that the Fund has also experienced substantial periods of out-performance even as compared to these nine surviving funds.[866]   While on an absolute basis, the Fund has made money for its shareholders in every year but one during the Relevant Period, the Fund has experienced periods of both strong and weak relative performance, including top-quartile performance during the first two years of the Relevant Period.[867]   However, as Dr. Pomerantz admitted in response to questioning from the Court, that the Fund's performance has improved over the last three years.[868]

The trial evidence also demonstrates that the Independent Trustees were fully aware of all of the pertinent facts relating to the Fund's performance.   Among other things, the Independent Trustees received performance reports on a monthly basis, as well as CIO Updates and Focus Fund Reports at quarterly Board meetings and an in-depth performance report as part of the yearly 15(c) Process.[869]   Having received such information, the Independent Trustees annually

---

[864] DFFCL ¶¶ 96-98; Becker Decl. ¶ 73.

[865] DFFCL ¶ 96.

[866] DFFCL ¶ 97.

[867] DFFCL ¶ 98; Tr. 62:14-18 (Becker).

[868] DFFCL ¶ 101.

[869] DFFCL ¶¶ 27, 77, 96, 98-99.

reached a decision on the appropriate course of action to address such performance, including the imposition of a fee waiver from 2013-2014 and insistence on significant investments by CAL in the portfolio management team and investment process in order to improve performance.[870]

341.   Here, the evidence at trial showed that the Growth Fund performed substantially worse, at nearly all times and for nearly all time periods considered, than almost all similar mutual funds. See ¶¶100-05, supra; see also Pomerantz Report at ¶¶328-39; Tr. at 544:14– 547:15, 547:16-552:23; JX 19 at 513361 and 513366-67; JX 46 at 520613 and 520619-20; JX 88 at 523996 and 524002-03; JX 130 at 636404 and 636409-10; JX 175 at 652022 and 652027; JX 186 at 653886 and 653891.

**RESPONSE:**  Denied.  The trial evidence does not support Plaintiffs' pejorative mischaracterizations of the Fund's performance.  Plaintiffs failed to present any evidence contradicting CAL's evidence of the Fund's outstanding since-inception performance on every metric.[871]  And they failed to present any evidence contradicting the Fund's one-year performance between each of the June Board meetings during the Relevant Period.[872]  Indeed, as the Court recognized at trial, and as Dr. Pomerantz acknowledged, "for the last three years," the Fund has experienced a general trend of "improving" performance relative to its peer funds during the one-year periods between the Board's June meetings—*i.e.*, the very same meetings at which the Independent Trustees reached the informed judgment to insist that CAL continue its restructuring and portfolio management efforts to improve the Fund's performance.[873]

The trial evidence also demonstrates that the Independent Trustees were fully aware of all of the pertinent facts relating to the Fund's performance.  Among other things, the Independent Trustees received performance reports on a monthly basis, as well as CIO Updates and Focus

---

[870] DFFCL ¶¶ 126-142, 143-147.

[871] DFFCL ¶ 101.

[872] DFFCL ¶ 101.

[873] DFFCL ¶ 101.

Fund Reports at quarterly Board meetings and an in-depth performance report as part of the

yearly 15(c) Process.[874]  Having received such information, the Independent Trustees annually

reached a decision on the appropriate course of action to address such performance, including the

imposition of a fee waiver from 2013-2014 and insistence on significant investments by CAL in

the portfolio management team and investment process in order to improve performance.[875]

     *342.     These facts separate the instant case from cases in which plaintiffs either could not or did not seriously challenge the fund's performance.  See, e.g., Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 976, 988 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987) (results "were among the best in the industry" such that the fund's performance was never "below the top twenty percent in performance" in the industry).[876]*

**RESPONSE:**  Denied.  To the contrary, no court has held that a fund's

underperformance proves that the fund's fee is excessive under Section 36(b), while numerous

courts have considered (and rejected) that very assertion.  "[A]llegations of underperformance

alone are insufficient to prove that an investment adviser's fees are excessive."[877]  This is so

because "[i]nvesting is not a risk-free endeavor," and "[e]ven the most knowledgeable advisers

do not always perform up to expectations, and investments themselves involve quite different

---

[874] DFFCL ¶¶ 27, 77, 96, 98-99.

[875] DFFCL ¶¶ 126-142, 143-147.

[876] *See also Gallus v. Ameriprise Fin., Inc., 497 F. Supp. 2d 974, 977 (D. Minn. 2007) (investment returns exceeded peers); Krinsk, 875 F.2d at 409 (fund ranked third best out of 56 funds); Kalish, 742 F. Supp. at 1228, aff'd, 928 F.2d 590 (2d Cir. 1991) ("the fund had the highest total return of them all."); In re American Mut. Funds Fee Litig., No. 04 Civ. 5593, 2009 WL 5215755, at \*20-21 (C.D. Cal. Dec. 28, 2009) (outperformed benchmark); Goodman v. J.P. Morgan Inv. Mgmt., Inc., 301 F. Supp. 3d 759, 769 (S.D. Ohio 2018) ("the funds performed better than, and the fees were in line with, other mutual funds of similar scope."); Zehrer, 2018 WL 1293230, at \*11 ("the Funds have performed at least as well as comparable funds."); In re BlackRock Mut. Funds Advisory Fee Litig., 327 F. Supp. 3d 690 (D.N.J. 2018) (performance not challenged); Sivolella for use & benefit of EQ/Common Stock Index Portfolio v. AXA Equitable Life Ins. Co., 742 Fed.Appx. 604, 608 (3d Cir. 2018) ("the Funds at issue performed well").*

[877] *Amron,* 464 F.3d at 344 (quoting *Migdal*, 248 F.3d at 327–28); *see* DFFCL ¶¶ 288-290.

magnitudes of risk."[878]  In short, "[w]hile underperformance of the mutual fund may be

considered, it is not a *Gartenberg* factor, and courts have been 'wary about attaching too much

significance to a fund's financial performance.'"[879]

In addition, as set forth in CAL's responses to Paragraphs 340-341, *supra*, the trial

evidence (a) demonstrates the Fund's outstanding since-inception performance on every metric,

as well as the Fund's progressively-improving relative one-year performance between the three

most recent June meetings during the Relevant Period; (b) does <u>not</u> support Plaintiffs' pejorative

mischaracterizations of the Fund's performance; (c) demonstrates that the Independent Trustees

were fully aware of all of the pertinent facts relating to the Fund's performance; and (d)

demonstrates that after having received such information, the Independent Trustees annually

reached a decision on the appropriate course of action to address such performance, including the

imposition of a fee waiver from 2013-2014 and insistence on significant investments by CAL in

the portfolio management team and investment process in order to improve performance.[880]

343.    *In fact, the trial record is replete with CAL's witnesses' admissions that the
Growth Fund's performance was exceedingly subpar.  See ¶108, supra.*

**RESPONSE:**  Denied.  The trial evidence does not support Plaintiffs' assertions, for all

of the reasons set forth in CAL's Response to Paragraph 108, *supra*.

344.    *Nonetheless, CAL advances two principal contentions regarding performance.*

**RESPONSE:**  Denied.  CAL does not "advance[]" any "contentions" about the Fund's

performance.  Rather, the trial evidence (a) demonstrates the Fund's outstanding since-inception

performance on every metric, as well as the Fund's progressively-improving relative one-year

---

[878] *Migdal*, 248 F.3d at 327.

[879] *Sivolella*, 2016 WL 4487857, at *68 (quoting *Franklin*, 478 F. Supp. 2d at 687).

[880] DFFCL ¶¶ 96-102.

performance between the three most recent June meetings during the Relevant Period; (b) does

not support Plaintiffs' pejorative mischaracterizations of the Fund's performance; (c)

demonstrates that the Independent Trustees were fully aware of all of the pertinent facts relating

to the Fund's performance; and (d) demonstrates that after having received such information, the

Independent Trustees annually reached a decision on the appropriate course of action to address

such performance, including the imposition of a fee waiver from 2013-2014 and insistence on

significant investments by CAL in the portfolio management team and investment process in

order to improve performance.[881]

> 345.    First, it claims that the Growth Fund had supposedly superior "since []
> inception" performance.  Becker Decl. at ¶72.  But CAL does not plausibly explain why the
> Growth Fund's performance in the 1990s, for example, is relevant to assessing the excessiveness
> of CAL's fees 25 years later, when its performance was abysmal.  Indeed, Morningstar, a
> leading independent third-party provider of mutual fund data and research widely used in the
> investment industry, does not consider since-inception performance in its fund ranking
> methodology.  Tr. at 547:16-549:13.

**RESPONSE:**  Denied as stated.  CAL admits that Morningstar does not consider since-

inception performance in its fund ranking methodology, but it does provide that information to

CAL on a monthly basis.[882]  CAL denies that since-inception performance is irrelevant.  To the

contrary, investors look to since-inception performance as a long term measure of the adviser's

management of the Fund.  As Dean Hubbard explained:

> THE COURT: How useful is what I'll call a since-inception analysis
> as these funds get older and older?
>
> THE WITNESS: I would say it has some utility, your Honor, in
> being able to say, over the longest period of time, how has this
> fund's performance compared to other very successful long-lived
> funds? Because remember, going forward, you're trying to ask, OK,

---

[881] DFFCL ¶¶ 96-102.

[882] Jackson Decl. ¶ 66; *e.g.*, DX 1032 at CALAMOS_00129912; DX 1091 at
CALAMOS_00229622; DX 1324 at CALAMOS_00496502.

what is the investment ability of this fund in the future?  That long period is useful in that respect.[883]

In addition, the Fund's since-inception performance can reasonably be considered by the Independent Trustees in their annual evaluation of the Fund's management fee, particularly where, as here, the Trustees were relying in part on their institutional knowledge of CAL's long-term history of delivering successful performance for the Fund's shareholders in applying their business judgment that approving the IMA—subject either to a fee waiver and/or to CAL's commitment to continue to invest its resources in an effort to improve the Fund's performance—was in the best interests of Fund shareholders.

346.    *In fact, as Plaintiffs' expert Dr. Pomerantz demonstrated, the Growth Fund's strong since-inception performance is simply the ever-shrinking residue of its outperformance many years prior to the Relevant Period.  Pomerantz Rebuttal Report at ¶¶24, 388-98; Tr. at 550:25-551:8.*

**RESPONSE:**  Denied.  Dean Hubbard prepared a summary of the Fund's rolling five-year returns showing the Fund's performance from 1990 through the present.  This summary showed that the Fund had an above-median return 11 times out of 22 periods, as compared to the Fund's "best of the best" peers that were able to survive throughout this nearly 30-year period.[884]  He explained that "Plaintiffs' experts have also suggested there was simply a burst in performance at the beginning and then it went away.  That's not what this [calculation] shows you."[885]

347.    *Furthermore, Dr. Pomerantz showed that the Growth Fund's since-inception outperformance likely did not benefit any Fund investors other than CAL, as it was enjoyed by a mere $300,000 in Growth Fund assets that were present at Growth Fund inception and were provided by CAL itself as "seed capital."  Pomerantz Rebuttal Report at ¶¶388, 391, 107 n.34; Tr. at 549:6-13.*

---

[883] Tr. 716:20-717:3 (Hubbard).

[884] Tr. 715:5-716:19 (Hubbard).

[885] Tr. 717:4-19 (Hubbard).

**RESPONSE:**  Denied.  As Dr. Pomerantz's analysis, testimony, and demonstratives show, shareholders who were invested in the Fund before the 10-year period prior to the start of the Relevant Period benefitted from the increase in the value of their investment resulting from the strong performance that CAL achieved for the Fund.[886]  Moreover, Plaintiffs themselves have made real money through their investments in the Fund.  Specifically, $10,000 invested in the Fund's Class A shares in July 2005 (when the Chills first invested in the Fund) would have appreciated to $20,301 (including dividend reinvestments) by March 31, 2017.[887]

348.    Providing a more relevant analysis, Dr. Pomerantz evaluated the Growth Fund's since-inception performance from the perspective of the average Growth Fund shareholder by time-weighting the Growth Fund's returns to incorporate the amount of shareholder money invested and when.  He found that the Growth Fund in fact delivered underperformance to the average shareholder since inception.  Pomerantz Rebuttal Report at ¶¶366, 392-95.

**RESPONSE:**  Denied.  CAL denies that Dr. Pomerantz's "time-weight[ed]" returns for the "average Growth Fund shareholder" is relevant, either to the Board when assessing CAL's overall performance record managing the Fund or to a court considering a Section 36(b) claim. Regardless of whether the Fund's substantial overperformance since inception inured to the benefit of particular shareholders, as Dean Hubbard explained, since-inception performance is still a relevant criterion for the Board to consider in their annual evaluation of the Fund's management fee, particularly where, as here, the Trustees were relying in part on their institutional knowledge of CAL's long-term history of delivering successful performance for the Fund's shareholders in applying their business judgment that approving the IMA—subject either

---

[886] PX 624.

[887] Hubbard Rpt. ¶ 143.

to a fee waiver and/or to CAL's commitment to continue to invest its resources in an effort to improve the Fund's performance—was in the best interests of Fund shareholders.[888]

Moreover, Plaintiffs and other investors who have held the Fund since Plaintiffs purchased their shares in July 2005 have benefited substantially from the Fund's performance. Between July 2005 and March 31, 2017, a hypothetical investor who purchased $10,000 in Fund shares and reinvested his or her dividends would have seen the value of his or her investment more than double to $20,301.[889]   Furthermore, of the 63 similar mutual funds that Dr. Hubbard determined would have been the Fund's peers in July 2005, 31 of those mutual funds have liquidated, and the Fund outperformed 20 of them prior to their liquidation.[890]

*349.   Second, CAL claimed that it invested in and made structural changes to its portfolio management team with the goal of improving performance.  Becker Decl. at ¶¶33-66; Behan Decl. at ¶¶23-63; Tr. 18:19–19:12, 65:8–68:8, 90:13-16, 103:5-108:9, 202:5–203:21, 609:2-23, 617:21–638:18, 647:2–664:13.*

**RESPONSE:**  Denied as stated.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence. To the contrary, as Messrs. Behan, Becker and Cronin all explained, without any evidence from Plaintiffs to the contrary, CAL's primary focus to improve the quality of the work product generated by its investment personnel was not simply to increase the number of those personnel or their aggregate compensation, but to hire better quality personnel, restructure compensation, and redesign how investment professionals collaborate with each other.[891]  Indeed, the trial evidence demonstrates each of the following:

---

[888] Tr. 716:20-717:8 (Hubbard).

[889] Hubbard Rpt. ¶ 143.

[890] Hubbard Rpt. ¶ 112, Ex. 13.

[891] DFFCL ¶¶ 106-108; Behan Decl. ¶¶ 43-46; Tr. 107:16-108:9 (Behan); Tr. 64:19-65:25, 66:21-68:7 (Becker); Tr. 656:8-658:15 (Cronin).

- CAL made numerous significant and costly changes to the investment team and investment process, which was not limited to hiring additional personnel to service the Funds. CAL undertook a significant transformation of its investment team—from a vertical structure with a "one-team-one-process" approach to a horizontal structure with a "team-of-teams" approach.[892]  CAL also implemented a series of changes that resulted in members of the broader investment team contributing ideas and insights that benefitted the Fund.  Among many other changes, CAL implemented an Investment Committee, which consisted of CAL's Co-CIOs, Co-Heads of Research and Investments, and co-Portfolio Managers, to increase sharing of investment information among its different teams.[893]

- CAL also made significant changes at the senior management level in an attempt to improve the Fund's performance, including hiring Gary Black, who was previously been the CEO and CIO of a successful mutual fund investment adviser, Janus Capital, to replace the Funds' prior Co-CIO and, following Mr. Black's departure, transitioning to a new senior management structure by promoting four portfolio managers to serve as Co-CIOs.  Most recently, CAL replaced the Fund's portfolio manager, Mr. Kalis, with Michael Grant, who had obtained top-shelf performance with a different Fund that he advises.[894]

- Between 2012 and 2016, CAL increased its employee compensation from $51 million to $74 million, while CAL's operating income decreased from $128 million to $33 million.[895]  CAL also redesigned its compensation structure for investment professionals to tie

---

[892] DFFCL ¶ 106.

[893] DFFCL ¶¶ 107-108.

[894] DFFCL ¶¶ 109-112.

[895] Cronin Rpt. Ex. 9.1 (discussed at Tr. 633:9-18, 664:7-13 (Cronin)).

compensation more closely to the investment performance of the specific products that employees primarily supported.[896]

- The number of investment personnel employed by CAL is not the sole measure of the value or the quality of the services CAL provides, and CAL has never argued that it is.  As the Court observed on summary judgment, "sometimes you can add by subtracting . . .  the personnel that were . . . deadwood, if you will."[897]  In addition, Plaintiffs have come forward with no evidence concerning the investment personnel employed by CAL, including any evidence of the level or skill of the personnel who stayed and those who departed, or why those who departed left CAL.

- CAL made all of these significant and costly changes to its investment team during a period when both CAL's and the Fund's assets under management, and CAL's overall profitability, were in continuous decline.[898]  Based on industry practice, CAL's restructuring of its investment team approach and changes to the team's senior management were reasonable and appropriate measures taken to enhance the quality of its services, adapt to systemic changes in the investment management industry, and remain competitive among other investment advisers.[899]  In fact, these steps are exactly the types of steps that the SEC has recognized, and Professor Bullard has conceded, a Board could take in response to periods of poor performance.[900]

  *350.  As an initial matter, CAL admitted at trial that its $3 million annual expenditure to hire additional investment personnel was not a Growth Fund-specific initiative, but was*

---

[896] DFFCL ¶ 107.

[897] 8/17/18 Tr. 71:10-13.

[898] DFFCL ¶ 114.

[899] DFFCL ¶ 117.

[900] DFFCL ¶ 118.

*intended to benefit all of CAL's accounts. Tr. at 80:17–81:1, 645:14–646:3; Behan Decl. at ¶30; Tr. at 628:6-24; 671:15-16.  As such, only a fraction of that expenditure could reasonably be assigned to the Growth Fund, and, more critically, in no way justifies or explains the massive fee disparity between the Fund and CAL's institutional clients.*

**RESPONSE:**  Denied.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence, for all of the reasons set forth in CAL's Response to Paragraph 349, *supra*.

Plaintiffs' assertion that CAL was required to "justify or explain" the Fund's fee relative to the fees that CAL charged for different products in different markets and for which CAL provided different and greater services and incurred different and greater risks is entirely wrong as a matter of law.  No court or regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account.  Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks.  Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[901]

351.    *In any event, the evidence shows that CAL did not, in fact, make any material improvements to the investment management team vis-à-vis the Growth Fund.  CAL claimed that it ramped up investment personnel headcount in 2013.  That hiring binge, however, followed substantial employee departures in 2011 and 2012 which had decreased the firm's total number of investment personnel to well below historical numbers.  Tr. at 629:21-630:25; 632:8-12. Thus, the new hires simply restored CAL's personnel total to past levels.  Tr. at 633:5-18; Cronin Report at Ex. 9.1.  In fact, CAL's total investment personnel headcount prior to and after*

---

[901] DFFCL ¶¶ 242-244.

*its transition from a vertical to horizontal investment approach stayed flat. Tr. at 629:21-630:25; 632:8-12.*

**RESPONSE:**  Denied.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence, for all of the reasons set forth in CAL's Response to Paragraph 349, *supra*.

352.    *Critically, CAL's restructuring had a decidedly negative impact on the Growth Fund.  Specifically, the total number of individuals specifically assigned to the Growth Fund declined precipitously, shrinking from 24 investment professionals in July 2014 to only 13 in May 2017.  Tr. at 637:4-638:9; Cronin Report at Ex. 11.  In fact, two years after CAL completed its transition in 2015, see JX 139 at CA-IT0000)71 at 4 and 6, it fired David Kalis due to the fact that the Growth Fund continued to perform miserably. Becker Decl. at ¶¶57, 70, 115; Tr. at 1161:20-168:12, 181:3-10, 713:7-22.  This provides clear evidence that the restructuring -- including the siphoning of personnel away from the Growth Fund -- was not a measure that benefitted the Growth Fund.*[902]

**RESPONSE:**  Denied.  Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence, for all of the reasons set forth in CAL's Response to Paragraph 349, *supra*.

353.    *Moreover, Plaintiffs presented trial evidence showing that CAL's arms-length Other ACG Accounts – which had the same dismissal performance as the Growth Fund – did not view CAL's since-inception performance as a salve, or CAL's restructuring and promises to improve performance as reasonable grounds for continuing their relationship with CAL.*

**RESPONSE:**  Denied.  Plaintiffs' assertions in Paragraph 353 are not supported by any trial evidence.  To the contrary, the trial evidence showed that the decision by CAL's institutional or sub-advisory clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as CAL's experts testified, institutional and sub-

---

[902] *Rather, it appears that the restructuring was actual a front to justify CAL rewarding itself in the form of dramatically higher salaries and compensation.  See Cronin Report at Ex. 9.1.*
**RESPONSE:**  Denied.  Plaintiffs' assertion that CAL "reward[ed] itself" through its increased employee compensation is not supported by any admissible or credible evidence or by the cited testimony; rather, as the trial evidence makes abundantly clear, these amounts were used to compensate CAL's employees, *i.e.*, the individuals providing services to the Fund for the benefit of Plaintiffs and the Fund's shareholders—and not to CAL itself.  DFFCL ¶¶ 104, 107, 113.

advisory accounts are different products that are sold in different markets, and the decision-making criteria that such clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[903]

354.    *Specifically, of the 36 Other ACG Accounts that CAL managed subsequent to 2011, all 36 terminated CAL by December 2016 and moved their assets elsewhere.  JX 181 at Ex. A.  Furthermore, at least 24 of those clients – including Nomura and the two MD Accounts, which together accounted for 90% of CAL's total Other ACG Account AUM during almost all the Relevant Period – informed CAL that the reason they closed their accounts was poor performance.  JX 181, Ex. A; Tr. at 83:1-85:7.*

**RESPONSE:**  Denied as stated.  CAL admits that 24 of its All Cap Growth Clients cited performance as one reason for closing their accounts.  The evidence also demonstrates, however, that clients often closed their accounts for multiple reasons.[904]  For example, Nomura closed its All Cap Growth sub-advisory account after it purchased another investment adviser that offered a competing growth strategy.[905]  In addition, the decision by CAL's institutional or sub-advisory clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as CAL's experts testified, institutional and sub-advisory accounts are different products that are sold in different markets, and the decision-making criteria that such clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[906]

355.    *Notably, CAL sought but was unable to convince those clients to stay despite citing the ACG strategy's supposedly superior since-inception performance and CAL's supposed efforts to improve its investment management team.  Tr. at 89:1-91:20; Behan Decl. at ¶91; JX 181, Ex. A.*

---

[903] DFFCL ¶¶ 163, 282, 286-287.

[904] JX 181, Ex. A at 2.

[905] Tr. 114:23-115:10 (Behan).

[906] DFFCL ¶¶ 163, 282, 286-287.

**RESPONSE:**   Denied as stated.  As Mr. Behan testified, he "didn't interview every one of these clients,"[907] and simply acknowledged that through the course of their relationship with CAL, each client with an All Cap Growth account would have become familiar with CAL's since-inception performance and efforts to improve the quality of its investment team.[908]  In fact, when Mr. Behan was specifically asked (in testimony not cited in Plaintiffs' Paragraph 355 or anywhere else in their submission) whether "Calamos must have had at least one meeting with each of the clients . . . to try to prevent them from leaving," he was unable to confirm that was true in every case and instead answered, "We may have had a meeting or a call.  Like I said, without going through each record, it's hard to me to testify to that."[909]  Moreover, the decision by CAL's institutional or sub-advisory All Cap Growth Clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as the trial evidence demonstrates, mutual funds on the one hand, and institutional/sub-advisory accounts on the other hand, are different products that are sold in different markets, and the decision-making criteria that these clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[910]

*356.    Growth Fund shareholders were also unhappy with performance, exiting in large numbers.  Defendant's expert Dean Hubbard testified that the consequence of an advisor's charging a supra-competitive fee -- i.e., one that was not reasonably related to the advisor's investment performance -- would be a loss of AUM and market share.  Tr. at 687:3-27, 691:24-692:12.  Here, the Growth Fund lost in excess of 90% of its AUM and a similar proportion of its market share since its AUM peaked in March 2006, which is consistent with Plaintiffs' position that the fees were above a competitive level.  Pomerantz Rebuttal Report at ¶418.*

---

[907] Tr. 90:6-8 (Behan).

[908] Tr. 89:25-90:20 (Behan).

[909] Tr. 94:15-19 (Behan).

[910] DFFCL ¶¶ 163, 282, 286-287.

**RESPONSE:**  Denied as stated.  CAL admits that Dean Hubbard testified that as a matter of economics, <u>all else being equal and all other factors being held constant</u>, the consequence of an adviser's charging a price that was above a competitive level would be a loss of market share and AUM.[911]  CAL denies that this testimony implies that the Fund's fee is excessive because, among other reasons, "[a]ll else" is <u>not</u> "equal."  Retail mutual fund investors commonly exit mutual funds for reasons wholly unrelated to fees or performance, such as the increased availability of alternative investment products; in fact, during the Relevant Period, the market at large experienced a large shift in capital from actively-managed mutual funds to passive strategies or to new products, such as exchange traded funds.[912]  Moreover, numerous <u>new</u> investors decided to invest in the Fund during the Relevant Period.  Although the Fund experienced meaningful net outflows of AUM between 2013 and 2018, the Fund also received approximately $1.6 billion in gross inflows between November 2013 and October 2016.[913]

Dr. Pomerantz has done nothing to account for these other determinants of AUM loss identified by Dean Hubbard, or to isolate what portion of the Fund's loss of AUM might have been attributable to underperformance, and has instead simply identified that the temporal correlation exists.[914]  Furthermore, CAL generated strong performance for the Fund at numerous points throughout the period in which the Fund's market share declined, which Dr. Pomerantz also did not mention, let alone reconcile with his opinion.

*357.    Accordingly, the trial evidence shows that the Growth Fund's performance was exceedingly poor.  Hence, the Gartenberg "quality of the services" factor weighs heavily in favor of the excessiveness of CAL's fees.*

---

[911] Tr. 687:3-24 (Hubbard).

[912] DFFCL ¶ 283.

[913] DFFCL ¶ 285.

[914] Pomerantz Rebuttal Rpt. ¶¶ 393, 418-19.

**RESPONSE:**  Denied.  As set forth in CAL's responses to Paragraphs 340-341, the trial evidence (a) demonstrates the Fund's outstanding since-inception performance on every metric, as well as the Fund's progressively-improving relative one-year performance between the three most recent June meetings during the Relevant Period; (b) does not support Plaintiffs' pejorative mischaracterizations of the Fund's performance; (c) demonstrates that the Independent Trustees were fully aware of all of the pertinent facts relating to the Fund's performance; and (d) demonstrates that after having received such information, the Independent Trustees annually reached a decision on the appropriate course of action to address such performance, including the imposition of a fee waiver from 2013-2014 and insistence on significant investments by CAL in the portfolio management team and investment process in order to improve performance.[915]  In addition, for all of the reasons set forth in CAL's Response to Paragraph 349, *supra*, Plaintiffs' assertions and mischaracterizations regarding CAL's efforts to improve the Fund's performance are entirely unsupported by the trial evidence.  Against this backdrop, it is particularly appropriate for the Court to defer to the considered judgments of the Independent Trustees about how to balance the costs and benefits of fee reductions and investments in Fund performance.

Moreover, the trial evidence showed that the decision by CAL's institutional or sub-advisory clients to close their accounts with CAL does not in any way prove that the Fund's fee was excessive.  Rather, as CAL's experts testified, institutional and sub-advisory accounts are different products that are sold in different markets, and the decision-making criteria that such clients apply regarding their accounts are often different, and more sensitive to recent performance, than mutual fund investors.[916]

---

[915] DFFCL ¶¶ 96-102.

[916] DFFCL ¶¶ 163, 282, 286-287.

And finally*,* since Plaintiffs did not submit any evidence at trial disputing that CAL provides (either directly or indirectly) high-quality administrative, legal and compliance, and other non-portfolio management services essential to run the Fund, the remaining evidence in the record does nothing to demonstrate that the overall nature and quality of services CAL provided to the Fund were poor.[917]

In sum, Plaintiffs have failed to meet their burden of showing that the Fund's performance supports their claim that the Fund's fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[918]

### C.   The Growth Fund's Fees Were Exceedingly High in Relation to *All* Comparators, Which Further Shows their Excessiveness

*358.   On summary judgment, the Court cautioned Plaintiffs that they would be unable to prevail at trial by demonstrating "solely that the challenged Advisory Fees are higher, even much higher, than those charged to Calamos' comparable institutional and sub-advisory clients; nor can Plaintiffs prevail by demonstrating solely that the Fees are higher, even much higher, than those charged by third parties to peer funds." Chill, 2018 WL 4778912, at \*17 (emphasis in original).  At trial, Plaintiffs established excessiveness based on **both** comparisons. See ¶¶138-51, supra.*

**RESPONSE:**  Denied.  Paragraph 358 accurately quotes the Court's summary judgment opinion, but CAL denies both that Plaintiffs have accurately stated the law and that they have met their burden of proving the "excessiveness" of the Fund's fee.

Plaintiffs' assertion that they can "establish excessiveness" simply by proving that the Fund's fee is higher than the fees charged to CAL's All Cap Growth Clients is wrong as a matter of law.  In allowing Plaintiffs to proceed beyond summary judgment on this theory, the Court instructed that Plaintiffs needed to prove at trial that the fees CAL charges to its All Cap Growth

---

[917] DFFCL ¶ 290.

[918] *Jones*, 559 U.S. at 346.

Clients are an apt comparator to the Fund's management fee under *Jones*, or else the Court "must reject such a comparison."[919]  As the Court's summary judgment opinion further recognizes, *Jones* makes clear that a plaintiff relying on fee comparisons to institutional/sub-advisory clients must prove <u>each</u> of the following: (a) "a large disparity in fees" between the Fund and the All Cap Growth Clients; (b) that such fee disparity "cannot be explained by the different services," and (c) "[by] other evidence that the fee is outside the arm's-length range."[920]  Plaintiffs have completely failed to meet this *Jones* requirement.

Plaintiffs failed to prove that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[921]

Plaintiffs also failed to prove a "large disparity in fees" between the Fund and CAL's All Cap Growth Clients, for all of the following reasons:

- First, Dr. Pomerantz's calculation is based on a subset of only nine of CAL's All Cap Growth Clients—six institutional accounts and three sub-advisory accounts—and excludes CAL's remaining 27 All Cap Growth Clients during the Relevant Period.  Of these excluded clients, 21 paid effective fee rates of 75 basis points or more, a rate which Plaintiffs have

---

[919] *Chill*, 2018 WL 4778912, at *16 (emphasis added).

[920] *Id.*

[921] DFFCL ¶¶ 169-203.

acknowledged is not materially different than the fee paid by the Fund; indeed, the range of fees paid by these accounts extends up to 82 basis points.[922] The excluded accounts therefore actually support, rather than refute, the contention that the Fund's fee is within the range that would have been produced by arm's length bargaining, which may explain why Dr. Pomerantz claimed that he had "no idea" what his calculation would have shown if he had corrected it to include all 36 accounts.[923]

- Second, although Plaintiffs' 42-basis paint weighted average effective fee rate is largely driven by fees CAL charged to just two sub-advisory clients, Nomura and MD American, Plaintiffs did no analysis and provided no evidence to show that CAL's roles and responsibilities for those accounts were aptly comparable to the CAL's roles and responsibilities as adviser to the Fund; and they did no analysis and provided no evidence about the actual total management fees paid by Nomura and MD American (*i.e.*, total fees paid to the adviser and all sub-advisers) as compared to the management fee paid by Fund investors.[924] On the contrary, Dr. Pomerantz equivocated about the extent to which Nomura and MD American were comparable, ultimately declaring that because "[t]hese aren't even '40 Act funds" (*i.e.*, funds governed by the ICA), "there's no point at all in comparing" the Fund's management fee to the management fees that Nomura and MD American charged their clients.[925]

- Third, the range of fees charged to CAL's All Cap Growth Clients includes the Fund's fee, because certain All Cap Growth Clients, such as the James B. Powell Restated Revocable Trust, moved their investment from a CAL institutional account following the All

---

[922] DFFCL ¶ 236.

[923] DFFCL ¶ 236.

[924] DFFCL ¶ 237-238.

[925] DFFCL ¶ 237.

343

Cap Growth strategy (at the lower institutional account management fee) into the Fund.[926]  Other prospective clients, such as the City of Seattle, could have chosen to invest with CAL in an institutional account, but voluntarily chose to invest in the Fund and pay the Fund's higher advisory fee.[927]  The existence of sophisticated institutional clients that chose to invest in the Fund, thus paying the Fund's higher management fee, is further compelling evidence that the Fund's fee is within this "arm's-length range."

- Fourth, Dr. Pomerantz's calculation is entirely inapplicable during the years 2017 and 2018—which are included in the Relevant Period in this case—because during those years, CAL had no All Cap Growth Clients.  Thus, as Dr. Pomerantz admitted, today there are no comparable All Cap Growth Clients to consider in his model,[928] which is therefore a complete failure of proof as to CAL's alleged arm's-length fee would have been during those years.

Finally, Plaintiffs failed to prove by "other evidence that the fee is outside the arm's-length range."  No regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.  As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients."  Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee.  Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[929]  Plaintiffs also have failed to prove by any evidence either (a) what the arm's-length bargaining range for the Fund's

---

[926] DFFCL ¶ 239.

[927] DFFCL ¶ 239.

[928] DFFCL ¶ 240.

[929] DFFCL ¶ 227.

management is, or (b) that the Fund's fee "could not have been the product of arm's-length bargaining." As such, under *Jones*, simply establishing that CAL charged different fees to different clients for different products cannot support a finding that the Fund's management fee is excessive under Section 36(b). Plaintiffs' assertion that they "established excessiveness" based on comparisons of the Fund's management fee to the fees charged by peer mutual funds is also refuted by the trial evidence. As set forth in CAL's responses to Paragraphs 139-145, *supra*, the trial evidence demonstrates that the analyses conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz, all show that the Fund's management fee was within the range of fees that similar mutual funds pay to their advisers according to every measure.[930] Thus, as the Court appropriately observed on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[931]

### 1. The Comparison to Peer Mutual Funds

*359. Plaintiffs' peer mutual fund comparison showed that the fees that CAL charges the Growth Fund are not just a bit higher or above average, but at the very highest end of the range of advisory fees paid by mutual funds similar in character and size. Pomerantz Report at ¶¶298-304; Tr. at 560:22–565:1; JX 130 at 636413; JX 88 at 524006; JX 46 at 520623.*

**RESPONSE:** Denied. CAL denies that the Growth Fund's fee was "at the very highest end of the range of advisory fees" paid by peer funds. As set forth in CAL's responses to Paragraphs 139-145, *supra*, the trial evidence demonstrates that the analyses conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz all show that the Fund's management fee was within the range of fees that similar mutual funds pay to their

---

[930] DFFCL ¶¶ 254-62.

[931] *Chill*, 2018 WL 4778912, at *16.

advisers according to every measure.[932]  Thus, as the Court appropriately observed on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[933]

Plaintiffs' statement in Paragraph 359 is based on a comparison of the Fund's fee to the Fund's peer group, which is the smallest set of comparators provided by Morningstar, for only three of six years during the Relevant Period.  Plaintiffs misleadingly omit the peer group data provided by Strategic Insight, which shows that during more recent years (2017 and 2018), the Fund's fee has ranked at the 80th and 69th percentile, respectively, even among this limited peer group.[934]  Furthermore, the data provided by Lipper and Morningstar comparing the Fund's fee to a broader set of comparable mutual funds routinely showed that the Fund's fee ranked only between the 70th and 83rd percentile of similar mutual funds during the Relevant Period, and Dr. Hubbard's more refined comparison to similar mutual funds shows that the Fund ranked between the 62nd percentile and the 76th percentile.[935]

*360.    At trial, CAL noted that several peer funds had higher fees.  As the Court determined on summary judgement, however, nowhere in Jones does the Supreme Court state that an investment adviser's fees are not excessive unless they are the absolute highest fee charged by any investment adviser.  See Chill, 2018 WL 4778912, at \*17.  To the contrary, both Jones and Gartenberg make clear that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." Jones, 559 U.S. at 344 (emphasis added) (quoting Gartenberg, 694 F.2d at 928).  Indeed, the Supreme Court in Jones explained that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." Jones, 559 U.S. at 350-51. The Second Circuit in Gartenberg similarly expressed skepticism at such comparisons, noting that "if rates*

---

[932] DFFCL ¶¶ 254-262.

[933] *Chill*, 2018 WL 4778912, at \*16.

[934] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[935] DFFCL ¶¶ 260-62.

346

*charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in § 36(b)." Gartenberg, 694 F.2d at 929.*

**RESPONSE:** Denied as stated. CAL admits that Paragraph 360 accurately quotes

certain isolated sections of the *Jones* and *Gartenberg* opinions. CAL denies that Plaintiffs have

come forth with any admissible and credible evidence showing that the Fund's fee is beyond the

range of what would have been negotiated at arm's-length.

*361.     Furthermore, approximately half of the handful of funds that charge higher fees than the Growth Fund are advised by ACIM. Tr. at 563:13–565:1; JX 130 at 636413; JX 46 at 520623. Because ACIM charges a "unified" fee, i.e., incorporating transfer agency, accounting, custodial and other services for which the Growth Fund is separately charged, those fees do not provide an apt comparison. Tr. at 563:18–564:7. Subtracting the ACIM funds, the Growth Fund paid the highest advisory fees among its peers in 2016 and the second-highest in 2015 and 2014. JX 130 at 636413 JX 46 at 520623. Removal of the ACIM funds from Dr. Pomerantz's Peer Comparison analysis places the Growth Fund in the 95th percentile among peer funds with respect to advisory fees. Tr. at 564:1–565:1.*

**RESPONSE:** Denied. CAL admits that the documents cited in Paragraph 361 include

an American Century fund in the Fund's peer group. However, Plaintiffs failed to prove that

Morningstar's inclusion of mutual funds advised by American Century in the Fund's peer group

had a material impact on the Fund's relative management fee compared to its peer group or on

the Independent Trustees' approval of the IMA. Indeed, as Strategic Insight's analysis

demonstrates, when CAL was compared to a different peer group according to selection criteria

that omitted mutual funds advised by American Century, the Fund's fee was even more

comfortably within the range of its peers (*i.e.*, the Fund's percentile ranking decreased).[936] As

the Court observed on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is

within the range of fees charged to peer mutual funds by other investment advisors."[937]

---

[936] DFFCL ¶ 259; JX 175 at CALAMOS_00652022; JX 186 at CALAMOS_00653886.

[937] *Chill*, 2018 WL 4778912, at *16.

Moreover, Plaintiffs did not present any admissible or credible evidence at trial concerning the characteristics of those American Century funds. Dr. Pomerantz's claim that the American Century funds pay a "unified fee" is found nowhere in either his initial expert report or his rebuttal report, and his unsupported testimony concerning his understanding of the "unified fee" paid by such funds is not competent to establish the fees paid by such funds. Moreover, Plaintiffs' assertion in Paragraph 361 that American Century funds are not an "apt comparison" is belied by the fact that Dr. Pomerantz included American Century funds in the "Large Growth funds" set forth in Exhibit 1 to his rebuttal report. Moreover, Morningstar, which Plaintiffs describe as an "Independent Data Provider," clearly decided that those mutual funds provided comparative insight by including them in the Fund's peer group.

362.    *Accordingly, the trial evidence shows that, compared to peer mutual funds, the fees of the Growth Fund were extremely high, at all relevant times at nor near the top of the range.  Hence, this aspect of the comparative fee structures Gartenberg factor weighs in favor of a finding of fee excessiveness.*

**RESPONSE:**  Denied.  As set forth in CAL's responses to Paragraphs 139-145, *supra*, the trial evidence demonstrates that the analyses conducted by Lipper, Morningstar, Strategic Insight, Dean Hubbard, and even Dr. Pomerantz all show that the Fund's management fee was within the range of fees that similar mutual funds pay to their advisers according to every measure.[938]  Thus, as the Court appropriately observed on summary judgment, "Plaintiffs concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other investment advisors."[939]

## 2.    The Comparison to Other ACG Accounts

363.    *Plaintiffs' Other ACG Account comparison showed that the fees that CAL charges the Growth Fund are approximately double those charged to the Other ACG Accounts.  See*

---

[938] DFFCL ¶¶ 254-62.

[939] *Chill*, 2018 WL 4778912, at *16.

*¶¶146-51, supra.  For example, at asset levels of $2.7 billion (the Growth Fund's AUM as of May 2017) the fee schedules for the Other ACG Accounts produced effective fee rates of only approximately 33 to 51 basis points.  Pomerantz Report at ¶¶169-76; Tr. at 555:6-556:16. The Growth Fund's effective fee rate at that time was 85 basis points.  Pomerantz Report at ¶¶170.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, under the IMA, CAL is required to provide greater and more extensive services to the Fund than to its institutional and sub-advisory All Cap Growth Clients.  Indeed, as Dr. Pomerantz agreed, CAL is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and "providing literally all of the necessary services to operate the trust."[940]  None of CAL's investment management agreements for its 36 All Cap Growth Clients even suggests that CAL bears anything close to the "moral responsibility" for "providing literally all of the necessary services" for any of its All Cap Growth Clients, nor did Plaintiffs offer any evidence to the contrary.[941]  Consistent with its limited contractual responsibilities under its agreements with those clients, CAL did not provide anywhere near the full panoply of services it was required to and in fact did provide in managing the Fund; and, at trial, Plaintiffs provided no evidence to show that CAL's limited roles and responsibilities for any of CAL's All Cap Growth Clients were in any way different than as uniformly described by CAL's witnesses.[942]

---

[940] DFFCL ¶¶ 166-167.

[941] DFFCL ¶ 168.

[942] DFFCL ¶¶ 169-172.

Second, on the other hand, consistent with both its "moral responsibility" under the IMA and industry practice, the trial evidence demonstrates unequivocally that CAL provides different, greater and more extensive services to the Fund than to its All Cap Growth Clients in each of the following areas:  (a) legal, regulatory and compliance;[943] (b) fund governance services;[944] (c) fund administration services;[945] (d) portfolio management services;[946] and (e) client/shareholder services.[947]   And, this is true regardless of whether CAL provides the service itself, or whether the service is provided by a third party at all times subject to CAL's monitoring, supervision and oversight, and with CAL remaining ultimately responsible to the Fund for all of the work provided by these third party service providers.[948]

Third, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Funds than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."[949]

---

[943] DFFCL ¶¶ 174-180.

[944] DFFCL ¶¶ 181-183.

[945] DFFCL ¶¶ 184-188.

[946] DFFCL ¶¶ 189-192.

[947] DFFCL ¶¶ 193-197.

[948] DFFCL ¶ 187.

[949] DFFCL ¶¶ 204-207.

Fourth, Plaintiffs failed to prove that the fees paid by CAL's All Cap Growth Clients set the arm's-length bargaining range for the Fund's fee, or even that any All Cap Growth Client is an apt comparator to the Fund, nor could they in light of the overwhelming trial evidence that (a) there are numerous differences in services and risks between managing the Fund and advising any of the All Cap Growth Clients, (b) a mutual fund and an institutional or sub-advisory account are different products that are sold in different markets to predominantly different types of clients, and (c) the pricing differential between the Fund and CAL's All Cap Growth Clients is entirely consistent with industry practice and reflects forces of market competition.[950]

Fifth, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* "do[] not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's management fee. Indeed, every court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[951]

Sixth, Plaintiffs also failed to prove that the Fund's management fee is "approximately double those charged to the Other ACG Accounts" for each of the following reasons:

- Plaintiffs' assertion, which comes solely from Dr. Pomerantz, does not in any way account for the differences in services, risks, markets, or products between CAL's mutual fund clients and its institutional and sub-advisory All Cap Growth Clients.[952]

---

[950] DFFCL ¶¶ 169–203.

[951] DFFCL ¶ 227.

[952] DFFCL ¶ 235.

- Plaintiffs' assertion is based on a subset of only nine of CAL's All Cap Growth Clients—six institutional accounts and three sub-advisory accounts—and excludes CAL's remaining 27 All Cap Growth Clients during the Relevant Period.  Of these excluded clients, 21 paid effective fee rates of 75 basis points or more, a rate which Plaintiffs have acknowledged is not materially different than the fee paid by the Fund; indeed, the range of fees paid by these accounts extends up to 82 basis points.[953]  The excluded accounts therefore actually support, rather than refute, the contention that the Fund's fee is within the range that would have been produced by arm's length bargaining, which may explain why Dr. Pomerantz claimed that he had "no idea" what his calculation would have shown if he had corrected it to include all 36 accounts.[954]

- Although Plaintiffs' 42-basis paint weighted average effective fee rate is largely driven by fees CAL charged to just two sub-advisory clients, Nomura and MD American, Plaintiffs did no analysis and provided no evidence to show that CAL's roles and responsibilities for those accounts were aptly comparable to the CAL's roles and responsibilities as adviser to the Fund; and they did no analysis and provided no evidence about the actual total management fees paid by Nomura and MD American (*i.e.*, total fees paid to the adviser and all sub-advisers) as compared to the management fee paid by Fund investors.[955]  On the contrary, Dr. Pomerantz equivocated about the extent to which Nomura and MD American were comparable, ultimately declaring that because "[t]hese aren't even '40 Act funds" (*i.e.*, funds governed by the ICA),

---

[953] DFFCL ¶ 236.

[954] DFFCL ¶ 236.

[955] DFFCL ¶¶ 237-238.

"there's no point at all in comparing" the Fund's management fee to the management fees that Nomura and MD American charged their clients.[956]

- The range of fees charged to CAL's All Cap Growth Clients includes the Fund's fee, because certain All Cap Growth Clients, such as the James B. Powell Restated Revocable Trust, moved their investment from a CAL institutional account following the All Cap Growth strategy (at the lower institutional account management fee) into the Fund.[957]  Other prospective clients, such as the City of Seattle, could have chosen to invest with CAL in an institutional account, but voluntarily chose to invest in the Fund and pay the Fund's higher advisory fee.[958] The existence of sophisticated institutional clients that chose to invest in the Fund, thus paying the Fund's higher management fee, is further compelling evidence that the Fund's fee is within this "arm's-length range."

- Dr. Pomerantz's calculation is entirely inapplicable during the years 2017 and 2018—which are included in the Relevant Period in this case—because during those years, CAL had no All Cap Growth Clients.  Thus, as Dr. Pomerantz admitted, today there are no comparable All Cap Growth Clients to consider in his model,[959] which is therefore a complete failure of proof as to CAL's alleged arm's-length fee would have been during those years.

   364.    *Plaintiffs also presented evidence of the AUM-weighted average aggregate effective rate paid CAL's Other ACG Accounts – specifically, 42 basis points, which is approximately half the effective fee rate of the Growth Fund.  Pomerantz Report at ¶¶163-67; Tr. at 572:6-573:13, 575:23-577:11.*

---

[956] DFFCL ¶ 237.

[957] DFFCL ¶ 239.

[958] DFFCL ¶ 239.

[959] DFFCL ¶ 240.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Separately and independently, Dr. Pomerantz's 42 basis point calculation is rife with errors and entitled to no weight for all of the reasons set forth in CAL's responses to Paragraphs 146 and 363, *supra*.

> 365.   *CAL points to Other ACG Accounts that had effective fee rates far above the AUM-weighted average.  Tr. at 27:14–28:12, 506:24–509:3.  As Dr. Pomerantz explained, however, this is simply a function of the relatively small sizes of those clients' accounts.   See ¶¶81 and 150, supra; Tr. at 557:14-559:17; see also JX 181 at Ex. A.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

In addition, Dr. Pomerantz presented no evidence, other than his own speculation, that the 21 All Cap Growth Clients that paid effective fees of 75 basis points or more and that Dr. Pomerantz excluded from his calculation "are very small relationships that have probably not

negotiated much, if at all, off of the SMA fee schedule."[960]  Moreover, Plaintiffs' assertion

acknowledges that 27 of CAL's All Cap Growth Clients paid a fee of 75 basis points—a fee that

Dr. Pomerantz concedes is not materially different from the Fund's management fee during any

of the years in the Relevant Period.[961]

      In contrast, the 42 basis point weighted average effective fee rate is largely driven by fees

CAL charged to just two sub-advisory clients, Nomura and MD American, but Dr. Pomerantz

did not do any investigation of the comparability of Nomura or MD American to the Fund.[962]

     *366.   CAL suggests that any comparison to the Other ACG Accounts is per se inapt.  As
the Court determined on summary judgment, however, the Supreme Court in Jones "explicitly
rejected a categorical rule prohibiting comparisons to institutional-client fees and instead
instructed courts to give those comparisons 'the weight that they merit in light of the similarities
and differences between the services that the clients in question require.'"  Chill, 2018 WL
4778912, at *16 (quoting Jones, 559 U.S. at 349-50).  Indeed, Jones specifically identifies
comparisons to "fees that might result from arm's-length bargaining" – i.e., non-captive
institutional client fees – as "the benchmark for reviewing challenged fees."  Jones, 559 U.S. at
347.*

     **RESPONSE:**  Denied.  Paragraph 366 selectively quotes isolated portions of the Court's

summary judgment ruling and the *Jones* decision.  However, Plaintiffs' effort to rewrite *Jones* by

asserting that "non-captive institutional client fees" <u>necessarily</u> serve as "the benchmark for

reviewing challenged fees" is flatly wrong.  *Jones* held no such thing.  This argument incorrectly

stiches together selected words from different sections of the *Jones* opinion to concoct a "fee

parity" standard that *Jones* directly rejects.  There is no place in *Jones* where the Court even

suggests that fees paid by non-mutual fund clients is "the" "benchmark for reviewing challenged

fees."  Indeed, Plaintiffs' selective excerpting from *Jones* omits a critical passage—*Jones* refers

---

[960] Tr. 557:18-20 (Pomerantz).

[961] DFFCL ¶ 236.

[962] DFFCL ¶ 237.

to "the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees," not a litmus test based on a different client's fee agreement.[963]  Nor can Plaintiffs' formulation be reconciled with *Jones*' explicit recognition that Section 36(b) does not "necessarily ensure fee parity between mutual funds and institutional clients."[964]  To the contrary, *Jones* flatly rejects "any categorical rule regarding the comparisons of fees charged by different types of clients."[965]  And further, as the Court recognized on summary judgment, *Jones* makes clear that Plaintiffs needed to prove at trial that the fees CAL charges to its All Cap Growth Clients are an apt comparator to the Fund's management fee under *Jones*, or else the Court "must reject such a comparison."[966]

Moreover, Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

367.    *The core advisory services that investment advisors provide – namely, portfolio management services (investment research, selection and management) – were, here, provided in substantively identical fashion to the Growth Fund and the Other ACG Accounts.  See ¶¶88-96. Consequently, to the extent any service differences exist, they relate to services other than core portfolio management services.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee

---

[963] *Jones*, 559 U.S. at 347 (emphasis added).

[964] *Id.* at 350.

[965] *Id*. at 349.

[966] *Chill*, 2018 WL 4778912, at *16 (emphasis added).

schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Although there are certain overlapping portfolio management services that CAL provides to the Fund and its All Cap Growth Clients, the portfolio management services that CAL provides to the Fund are different and greater in scope than those that CAL provides to any of its All Cap Growth Clients.[967]  These differences include, but are not limited to, CAL's obligations as adviser that arise from the numerous rules and regulations governing the manner in which investments may be made and which securities may be selected for investment by the Fund—rules and regulations that do not apply to CAL's All Cap Growth Clients—as well as measurements that CAL must put into place due to the Fund's daily liquidity requirements.[968]  In fact, the trial evidence demonstrates that for two of CAL's largest All Cap Growth Clients, the MD Accounts, CAL was only one of several sub-advisers responsible for managing only part of the underlying fund, thereby further limiting the scope even of CAL's portfolio management duties.[969]  Moreover, Plaintiffs' exclusive focus on portfolio management services to the exclusion of many other kinds of different, greater, and more extensive services that CAL provides to the Fund than to its All Cap Growth Clients is entirely inconsistent with the trial

---

[967] DFFCL ¶ 189.

[968] *Id.* ¶¶ 191-92.

[969] PX 345 at CALAMOS_00118411; JX 8 at CALAMOS_00638091; Tr. 501:18-21, 504:11-505:14 (Pomerantz).

record, which demonstrates that mutual funds and non-fund accounts are substantially different products and therefore are not apt comparators.[970]

368.    *Nonetheless, CAL argues that the Other ACG Account comparison is inapt because CAL supposedly provides a greater level of services and undertakes a greater set of risks with respect to the Fund.  On summary judgment, however, the Court indicated that Plaintiffs had successfully raised a triable issue as to whether such differences in services or risks "exist and are material, as opposed to de minimis."  Chill, 2018 WL 4778912, at \*16.  And at trial, Plaintiff conclusively demonstrated that such differences were immaterial, or resulted in de minimis additional costs/work, such that fee differential was so disproportionately large that it did not bear a reasonable relationship to the services rendered.*

**RESPONSE:**  Denied.  CAL admits that Paragraph 368 accurately quotes from the Court's summary judgment opinion.  However, Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

369.    *Dr. Pomerantz's uncontroverted testimony and analysis show that the purported greater services and risks entailed no more than 3.6 to 6.1 basis points of cost, an amount that was immaterial and does not begin to explain the massive, 40-plus basis point fee disparity. Specifically, Plaintiffs' expert Dr. Pomerantz showed that even if one allocated 100% of the expenses conceivably related to the claimed services and risks to the mutual fund side of CAL's business and none to the institutional side, those costs would total only 3.6 basis points in 2014, 4.6 basis points in 2015, and 6.1 basis points in 2016.  Tr. at 565:255-568:2; Pomerantz Report at ¶¶221-85; see also JX 181 at Ex. B.  Notably, CAL did not present any evidence at trial controverting Plaintiffs' 3.6-to-6.1 basis point cost-differential calculation.  Nor did CAL, at any time during the Relevant Period, attempt to quantify or estimate the cost of the purported greater services or risks. See ¶¶160-62, supra. Rather, CAL has claimed variously that that the cost differential of the supposedly greater services and risks was impossible, or at least difficult, to quantify.  JX 111 at 534339; JX 181 at ¶8; Tr. at 244:24-245:15, 250:3-251:10.*

---

[970] DFFCL ¶¶ 159-251.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.  Furthermore, Dr. Pomerantz's 6.1 basis point purported cost differential is by no means "uncontroverted," as Plaintiffs assert, but instead was so thoroughly undermined at trial that Dr. Pomerantz was forced to admit that the supposed costs he calculated "don't really correspond to anything."[971]

370.    *Moreover, the other evidence adduced at trial shows that the services in question are delivered at insignificant expense or under separate contracts for independent consideration or are not in fact "greater" but are comparable to or, in some instances, less than, services that CAL furnishes its Other ACG Accounts.  See ¶¶187-216, supra.  Furthermore, the purportedly greater risks are largely illusory or insured against at minor cost to CAL.  See ¶¶217-37, supra.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

371.    *Many of the services are handled by the Growth Fund's independently paid third-party service providers.  See ¶¶167-76, supra.  For example:*

---

[971] DFFCL ¶¶ 376-377, 379.

    a.  *USBFS, as the Funds' Transfer Agent, handles automatic reinvestment programs, provides tax reporting services, processes mutual fund share transactions and dividends, prepares and mails transaction confirmations and account statements, operates a call-in system to handle shareholder inquiries, provides shareholder account web access, and furnishes anti-money laundering, identity-theft and suspicious trading compliance services, JSSF at ¶72; JX 182 at 2-3, 5-6, 17-19 and 25; Tr. at 359:4–363:13, 383:11-20;*

    b.  *State Street, as the Funds' Accountant, calculates the Funds' NAV and prices/values the securities in the Funds' portfolios, Tr. at 365:22–366:3; JSSF at ¶79; JX 4 at 2; PX 169-A at 646100; and*

    c.  *State Street, as the Funds' Sub-Administrator, prepares most of the Funds' regulatory filings, JX 183 at 645542 (Sub-Administration Agreement, §§ 5(a) and 5(c)) and PX 488 at 645534-35 (Sub-Administration Agreement side-letter at §§ 2(a) and 2(c)); Tr. at 317:22–321:23, 380:11-17, 384:6–385:1, 918:18–921:5.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, as the trial evidence demonstrates: (a) CAL remains responsible to the Fund for the activities conducted through service providers; (b) CAL is responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service provider relationships, which includes reviewing and negotiating agreements with service providers, engaging with service providers on a daily, real-time basis, conducting on-site due diligence of the provider, and making reports and recommendations to the Board concerning providers; and

(c) CAL also remains directly responsible to the Funds in the event that a service provider does

not correctly perform one of its duties or provides below-quality service.[972]

372.     Moreover, to the extent CAL itself performs any of the purportedly greater
services, they are virtually all handled by CAL's Fund Administration department, Tr. 372:1-
385:10; see also 355:12-367:23, which has a mere six employees and a total annual budget of
only $2.8 million, Tr. at 356:25-357:17; JX 183; PX 488; PX 489, the allocable cost of which to
the Growth Fund is only 1.6 basis points, Tr. at 565:2-567:5; Pomerantz Report at ¶¶221.b, 227,
239, 282.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee

schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as

compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the

Fund's fee in light of the supposed cost of these different services/risks, all fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 363, *supra*.

CAL admits that the Fund Administration department's budget is approximately $2.8

million, but denies that that figure provides a measure of the cost of the fund administration

services that CAL provides.  Indeed, Plaintiffs' assertion that the costs of providing fund

administration services to the Fund can be readily measured or that 1.6 basis points accurately

captures those costs is refuted by the trial evidence, for at least four reasons.  First, the Fund

Administration Department's work is critical to the day-to-day operations of the Fund, and the

Fund could not operate without those services.[973]  Second, the Fund Administration

Department's budget does not cover all of the actual costs of fund administration, because

multiple other departments at CAL—including the Marketing, Portfolio Management, Tax,

---

[972] DFFCL ¶¶ 187, 200; Tr. 389:4-390:4 (Holloway); Holloway Decl. ¶¶ 9, 55.

[973] Holloway Decl. ¶ 54.

Legal and Compliance, and Distribution departments—provide fund administration services or

work regularly with the Fund Administration Department to service the Funds.[974]  Third, aside

from the costs of providing fund administration services, CAL bears risks associated with the

provision of fund administration services that are not readily measured.[975]  Fourth,

Dr. Pomerantz admitted that the costs forming the basis for his 6.1 basis points calculation to

purportedly account for any greater services provided to the mutual funds versus CAL's non-

fund clients, including the 1.6 basis points he assigns to fund administration services, "don't

really correspond to anything" and the sums of those costs likewise "don't really correspond to

anything."[976]

373.    Plaintiffs also presented evidence that CAL lavishes attention on its Other ACG
Accounts that is at least comparable to, if not more than, the attention afforded to the Growth
Fund.  See ¶¶187-200, supra.  This included dedicated client service representatives who were
in frequent touch with such clients and extensive and customized and in-depth communication
and reporting, Tr. at 34:1-14, 35:7-10, 37:10-38:5; 39:6-40:16, 42:9-45:14, 49:2-15, 52:11-
53:12; 55:22-56:24 ; PX 387 at 641425; PX 344 at 430863; a dedicated portion of the website,
Tr. 40:9-41:14; Bhatt Dep. at 214; videoconferences, Tr. 41:15-25; PX 387 at 641425;
responses to due-diligence requests including live meetings for which CAL personnel travel the
world, Tr. at 32:14-23; PX 387; PX 358; and compliance with unique investment guidelines, Tr.
at 34:1-10, 35:11-13, 47:13-16, 49:11-13, 51:8-52:2.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee

schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as

compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the

Fund's fee in light of the supposed cost of these different services/risks, all fail to support a

---

[974] Holloway Decl. ¶ 55.

[975] Holloway Decl. ¶ 56.

[976] DFFCL ¶ 379.

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Plaintiffs' factual assertions in Paragraph 373 are a reprise of their earlier assertions in Paragraphs 187-200; CAL therefore incorporates its responses to Paragraphs 187-200 as if fully set forth herein.  As explained in those responses, among other things, Plaintiffs' assertions that CAL "lavishes" greater client services on its All Cap Growth Clients than Fund shareholders ignore the relationships that CAL maintains with the "multiple thousands" of intermediaries and financial advisers "across the country" who work on behalf of mutual fund shareholders.[977]

374.    *CAL's Head of Distribution Robert Behan testified that CAL had six to seven times the number of full-time personnel servicing its Funds as compared to institutional clients. Tr. 94:25-97:2. This ratio, however, was completely in line with the proportion of Funds' AUM to institutional/subadvisory AUM at CAL.  See ¶8, supra.  Accordingly, per dollar of AUM, client service costs were substantially similar.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Plaintiffs' factual assertions in Paragraph 374 are a reprise of their earlier assertions in Paragraph 187; CAL therefore incorporates its Response to Paragraphs 187 as if fully set forth herein.

375.    *At trial, CAL claimed that because mutual fund shareholders are entitled to buy and redeem shares daily, the "turnover" and cash flows associated with managing the portfolio*

---

[977] Tr. 72:23-73:23 (Becker).

*of a mutual fund results in advisory responsibilities that supposedly do not apply to institutional accounts.  See e.g. JX 184 at 653674.  As purported examples, CAL cited "[m]ore frequent management of cash and portfolio positioning to ensure execution of overall long-term fund investment strategy" and "[o]ngoing trading activity by adviser personnel required to manage more frequent cash flows."  Id.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of the "Discussion of Management Fee Rates by Product" presentation within CAL's 15(c) Response for each of the following reasons:

First, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c) Responses included a "Discussion of Management Fee Rates by Product" presentation that both informed the Independent Trustees of the fees that CAL charged to the Funds and to its institutional and sub-advisory clients and provided a brief summary overview of the services that CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

Second, as the evidence also conclusively demonstrates, the Discussion of Management Fee Rates by Product presentation was not the sole information that the Independent Trustees received about such services, nor was it intended to be an exhaustive recitation of all of the many

364

differences in services and risks.  To the contrary, the Independent Trustees also regularly

receive extensive information at <u>every</u> Board meeting concerning the services CAL provides to

the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight

of third party service providers, and reports from the Funds' CCO.  In addition, the Independent

Trustees have 150+ years of collective experience in the asset management industry—including

senior management positions at leading investment advisers who offer both mutual funds and

institutional products.[978]

 <u>Third</u>, based on both this directly on-point experience and the information they receive,

the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the

information they believe they need about CAL's All Cap Growth Clients when they annually

vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in

services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[979]  As

Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the

Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an

apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a

bite of each one, you would get a whole different taste."[980]

 <u>Fourth</u>, CAL denies either that it purported to or was required to "justify" the Fund's fee

relative to the fees that CAL charged for different products in different markets and for which

CAL provided different and greater services and incurred different and greater risks.  No court or

regulator has ever held that an adviser must provide a cost breakdown that quantifies all of the

---

[978] DFFCL ¶¶ 57, 207.

[979] DFFCL ¶¶ 204-207.

[980] Tr. 177:17-20 (Neal).

different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. Indeed, in all of those cases in which the court rejected the adviser's institutional/sub-advisory management fees as a limit on the adviser's mutual fund management fee, the court reached that conclusion without relying on, or even mentioning, proof that the adviser provided a cost breakdown of its different services and risks. Nor can Plaintiffs' cost-justification requirement be reconciled with Congress's clear intent not to "require[] a 'cost-plus' advisory agreement nor general concepts of rate regulation, such as those applicable to public utilities."[981]

Additionally, Plaintiffs' factual assertions in Paragraph 375 are a reprise of their earlier assertions in Paragraph 201; CAL therefore incorporates its Response to Paragraph 201 as if fully set forth herein.

376. *However, Mr. Kalis, the former head of CAL's ACG strategy, who served as lead portfolio manager for the Growth Fund and for the Other ACG Accounts, testified that, daily inflows and outflows in the Growth Fund were so insignificant that they did not require any special attention from the portfolio management team, and did not impose additional work on them. Kalis Dep. at 70:3-72:4.*

**RESPONSE:** Denied. Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra.*

---

[981] DFFCL ¶¶ 242-244.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 376 are a reprise of their earlier assertions in Paragraph 202; CAL therefore incorporates its Response to Paragraph 202 as if fully set forth herein.

377.    *Meanwhile, the opposite was true for the Other ACG Accounts, where account deposits and withdrawals, although less frequent, typically involved substantial percentages of the money invested.  Kalis Dep. at 74:12-76:25.  In fact, turnover was sharper in the Other ACG Accounts than in the Growth Fund:  by December 2016, all CAL's Other ACG Accounts had withdrawn 100% of their funds from CAL's management.  JX 181 at Ex. A.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 377 are a reprise of their earlier assertions in Paragraph 203; CAL therefore incorporates its Response to Paragraph 203 as if fully set forth herein.

378.    *Moreover, CAL's Subadvisory Accounts – such as Nomura and the MD Accounts – were themselves mutual funds with underlying shareholders who were entitled to buy and redeem shares daily.  Tr. at 47:17-23, 58:17-60:10. 503:19-20, 506:1-9; PX 303 at 622241-42;*

*JX 8; JX 15; JX 18.  Accordingly, to the extent advising the Growth Fund entailed special or additional portfolio management attention due to "turnover" or fund flows, comparable attention was required for those Subadvisory Accounts.  Pomerantz Rebuttal Report at ¶121.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra.*

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra.*

Additionally, Plaintiffs' factual assertions in Paragraph 378 are a reprise of their earlier assertions in Paragraphs 204-205; CAL therefore incorporates its Response to Paragraphs 204-205 as if fully set forth herein.

*379.     Plaintiffs also presented evidence that Other ACG Accounts received comparable compliance and information technology services as the Fund.  Mickey Dep. at 110:11-115:3, 116:7-124:18; Pomerantz Report at ¶¶260-61.  For example, CAL was obligated to provide Other ACG Account clients with frequent and extensive performance reporting.  JX 8 at 638092; JX 15 at 622194; JX 13 at 638180; PX 360; Tr. at 42:5-43:4, 47:24-48:17, 49:11-15, 52:7-53:12.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 379 are a reprise of their earlier assertions in Paragraphs 209-210; CAL therefore incorporates its Response to Paragraphs 209-210 as if fully set forth herein.

*380.    CAL's institutional IMAs also obligated CAL to implement and test compliance procedures and policies regarding all areas of its operations including, inter alia, trading operations, investment management, infrastructure and internal controls.  PX 309 at 372401-08; PX 317 at 464617; PX 338 at 422225-26; Mickey Dep. at 150:23-154:6, 47:6-94:23.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 380 are a reprise of their earlier assertions in Paragraph 211; CAL therefore incorporates its Response to Paragraph 211 as if fully set forth herein.

381.    Additionally, Plaintiffs presented evidence that the supposedly additional risks were insured against at insignificant cost to CAL, or were born by third-parties, not CAL.  See ¶¶217-37, supra; see also Tr. at 274:5-12, 278:23-283:2; PX 184-A at 653775, PX 176-A at 650594, PX 145-A at 534861, PX 113-A at 503184, PX 61-A at 519662, PX 32-A at 514326; PX 86-A at 523535-48.  Moreover, the evidence shows that the risks CAL claims were not insurable are mere phantoms that have not previously materialized and have not resulted in any costs that CAL has even bothered to quantify or estimate.  See ¶¶217-37, supra.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee

schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as

compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the

Fund's fee in light of the supposed cost of these different services/risks, all fail to support a

cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response

to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the

substance and import of "Discussion of Management Fee Rates by Product" presentation within

its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 381 are a reprise of their earlier

assertions in Paragraphs 217-237; CAL therefore incorporates its Response to Paragraphs 217-

237 as if fully set forth herein.

382.    For example, the testimony established that "make whole errors"– one of the main supposed risks that CAL cited to the Trustees – were extremely rare and when they occurred were small and the responsibility of State Street, resulting in no out-of-pocket losses to CAL.  Tr. at 211:23-212:1, 213:4-9, 295:12-18, 292:23-294:2, 295:19 - 296:15, 297:6-298:6, 301:16-18, 766:23-767:2; Bhatt Dep. at 10:10-11, 183:14-184:1; JX 183 at 654546-47; JX 4 at 4-5; JX 182 at 8-10.

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee

schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as

370

compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 383 are a reprise of their earlier assertions in Paragraphs 232-234; CAL therefore incorporates its Response to Paragraphs 232-234 as if fully set forth herein.

*383.    As for entrepreneurial risks, CAL's expert Mr. Richardson conceded that such risks no longer existed with respect to the Growth Fund because CAL more than recouped its start-up costs during the Growth Fund's 25 years in operation.  Tr. at 757:24-758:19.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

Moreover, the trial evidence directly refutes Plaintiffs' assertions concerning the substance and import of "Discussion of Management Fee Rates by Product" presentation within its 15(c) Response for each of the reasons set forth in CAL's Response to Paragraph 375, *supra*.

Additionally, Plaintiffs' factual assertions in Paragraph 383 are a reprise of their earlier assertions in Paragraphs 235-236; CAL therefore incorporates its Response to Paragraph 235-236 as if fully set forth herein.

> *384.     Finally, Plaintiffs presented additional evidence at trial that CAL allocated indirect expenses between its mutual fund and institutional account "product lines" based on average AUM.  Tr. at 229:7-230:21; JX 145 at 634760-4761; JX 113 at 502938-2939; JX 61 at 519582-9583.  Plaintiffs' expert Dr. Pomerantz testified that CAL's use of average AUM as the allocation methodology between product lines indicates that, per dollar of AUM (which is how fees are charged), the indirect costs of advising mutual funds are equivalent to those of institutional accounts.  Tr. at 568:4-569:18. As Dr. Pomerantz testified, this implicitly admits that CAL's mutual funds do not cost more on a per dollar of AUM basis to advise than its institutional clients, but, rather, cost the same as those clients.  Id.  Indeed, CAL had no incentive to under-allocate expenses to its mutual fund product line.  Although CAL might spend more total dollars servicing its mutual funds, that is simply because of the proportionally larger amount of AUM on the mutual fund side of the business.  Id.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

The trial evidence demonstrates that in the Mutual Fund Profitability presentation, CAL utilized an "average AUM" methodology to allocate indirect (but not direct) costs.  CAL denies that this allocation methodology "refutes the claim that mutual funds costs more to advise [*sic*]."  As Professor Lacey explained, "the choice of an allocation methodology is not intended to provide information about the extent, nature, or quality of services."[982]  The purpose of the

---

[982] Lacey Rpt. ¶ 47.

Mutual Fund Profitability presentation is to present the profitability of the mutual funds advised by CAL. CAL used a reasonable allocation methodology that is consistent with the principles underlying GAAP, is consistent with managerial accounting principles, is decision-useful to the Independent Trustees, and is accepted in the mutual fund industry.[983]

Plaintiffs did not present any evidence to support their assertion that the use of a cost allocation methodology for purposes of calculating an adviser's profitability from managing a mutual fund proves anything about the adviser's "per dollar basis" costs of providing services to a non-mutual fund client. To the contrary, as Professor Lacey explained, both in his expert report and at trial, "[t]he purpose here is an allocation to determine the profitability of the funds."[984] Furthermore, even if Plaintiffs' unwarranted and unsupported assertion were credited, it would necessarily mean that CAL's method of calculating profitability under-allocated costs to the mutual funds, thus increasing their profit margins, which is entirely inconsistent with Plaintiffs' contention that CAL understated its profitability with respect to the Fund.

Finally, to the extent that Plaintiffs' accounting, profitability or cost allocation assertions rely on the testimony of Dr. Pomerantz, those assertions are not supported by any admissible or credible evidence because Dr. Pomerantz is not in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[985]

*385.    Accordingly, this is not a case in which "the services rendered are [so] sufficiently different that a comparison is not probative". Jones, 559 U.S. at 350. Rather, Plaintiffs established by a preponderance of evidence at trial that the "large disparity in fees... cannot be explained by the different services", Jones, 559 U.S. at 350 n.8, because the services and risks are comparable and involve, at most, insignificant additional expense to CAL. As*

---

[983] DFFCL ¶¶ 301, 304-307.

[984] Tr. 1025:11-12 (Lacey).

[985] DFFCL ¶¶ 417-420.

*such, the Other ACG Account fee comparison too weighs in favor of a finding of fee excessiveness.*

**RESPONSE:** Denied, for all of the reasons set forth in CAL's Responses to Paragraph 358-384, *supra*.

### D. Profitability

*386. Plaintiffs presented evidence at trial that CAL materially understated the profitability of the Growth Fund by allocating effectively all advisory costs on the sole basis of AUM. Bullard Report at ¶¶61-62; Pomerantz Report at ¶¶437 et seq. By applying this methodology, CAL's 15(c) Profitability Presentations over-allocated costs to CAL's largest funds, including the Growth Fund, and presented them as less profitable then they in fact were, while under-allocating costs to the smaller funds which were therefore depicted as more profitable than they were. Pomerantz Report at ¶433; Pomerantz Rebuttal Report ¶¶259, 274; Tr. at 1003:23–1005:25; Pomerantz Rebuttal Report at ¶¶259, 274.*

**RESPONSE:** Denied. Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the following fundamental reasons:

First, on summary judgment, the Court ruled that (a) as a result of the "Mutual Fund Profitability Presentation," for each year within the Relevant Period "the Independent Trustees were fully informed about Calamos' profitability methodology, thoroughly discussed the impact that methodology would have on the profitability figures Calamos reported vis-à-vis alternative methodologies, and formally approved of Calamos' use of that methodology," and (b) Plaintiffs' contention that the Mutual Fund Profitability presentations understated the Fund's profitability is "wholly lacking in merit as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of an 'average AUM' cost-allocation method to analyze profitability—a method Plaintiffs' recognize is commonly accepted within the industry."[986]

---

[986] DFFCL ¶¶ 291-92.

Second, as the trial evidence conclusively demonstrates: (a) an adviser's "choice of cost allocation methodology does not affect" whether the advisory fee is excessive, as Professor Bullard concedes; (b) CAL's calculation of its profitability with respect to the Fund, like any other profitability calculation, necessarily involves the exercise of discretionary accounting judgments that may affect the overall result; (c) because there are a range of reasonable and acceptable judgments and methodologies that can be used, and which will produce a range of different but equally reasonable results, there is no one "true" profitability figure; (d) as Professor Lacey testified, without any meaningful contradiction from either of Plaintiffs' experts, CAL's Profitability Presentation employs a systematic and rational approach to provide reasonable, decision-useful information to the Independent Trustees; (e) as the only two qualified accountants at the trial (Mr. Helmetag and Professor Lacey) testified, CAL's manner of calculating Fund-level advisory profitability is consistent both with managerial accounting principles and the principles underlying GAAP; and (f) Plaintiffs did not offer any evidence that CAL's AUM-based cost allocation approach is not consistent with managerial accounting principles or the principles underlying GAAP; indeed, neither of Plaintiffs' experts offer any accounting-grounded opinions (nor could they, given their complete lack of accounting qualifications).[987]  In sum, as Dr. Pomerantz freely admitted, CAL is "well within [its] accounting rights as accountants to do what they've done" with respect to the cost allocation methodology it used.[988]

Third, Plaintiffs provided no admissible and credible evidence that allocation of indirect advisory costs on the basis of AUM is in any way inconsistent with the allocation of fixed costs,

[987] DFFCL ¶¶ 295-307.

[988] DFFCL ¶ 306.

or that cost behavior must dictate (or prohibit) any particular cost allocation methodology.  To the contrary, as Professor Lacey explained, without any contradiction from Plaintiffs, where, as here, no cause and effect relationship can be identified, allocation by average AUM is a reasonable cost allocation methodology because it is a reasonable proxy for the benefits the Fund receives.[989]  As Professor Lacey further testified:

> I think what is confused here is the difference between cost behavior and cost allocation.  So, we also have to allocate fixed costs even though the cost doesn't change. When we're computing the profitability of an apartment or the profit from a particular product -- our ruler, for example -- we have to allocate those fixed costs to the individual products in the individual departments to compute the profitability. So, allocation versus cost behavior.[990]

<u>Fourth</u>, Plaintiffs' assertion that CAL's accounting methodology is "per se unreasonable" is entirely unsupported by the law or the trial evidence.  Putting aside that Professor Bullard is unqualified even to address the subject, his claim has no support in law, regulations, or accounting principles.  Neither *Gartenberg* nor any other Section 36(b) case ever held, nor has the ICA or the SEC ever established a rule requiring, anything other than a reasonable and rational accounting calculation.  Certainly nothing in *Gartenberg* even hints at the idea that allocation of indirect costs on the basis of AUM is "per se unreasonable."  Plaintiffs' "per se unreasonable" assertion is also directly at odds with the only alternative profitability calculation that Plaintiffs offer, from Dr. Pomerantz, who allocated costs in his model exclusively on the basis of AUM and no additional variables.  Professor Bullard claimed that he did not review

---

[989] Tr. 997:17-23, 999:17-22 (Lacey).

[990] Tr. 1022:15-23 (Lacey).

Dr. Pomerantz's testimony prior to offering his cost allocation opinion at trial, and Plaintiffs made no effort to reconcile the conflicting opinions of their experts.[991]

Fifth, as Plaintiffs have conceded, the profitability figures CAL reported using an average AUM methodology are not materially different from the figures CAL reported using the time-spent methodology with which Plaintiffs take no issue.[992]

Sixth, Plaintiffs' proposed findings and conclusions confirm that their only alternative profitability model is nothing more than an effort to calculate the purported unshared economies of scale that the Court already has "taken care of" in its summary judgment ruling.[993]

Seventh, the trial evidence also demonstrates that Dr. Pomerantz's cost allocation model incorporates a flawed and unsupported assumption that the logarithm of CAL's advisory costs is linearly related to the logarithm of AUM.  Dr. Pomerantz's reliance on this assumption is unreasonable and inconsistent with established principles of economics.  Professor Lacey confirmed that Dr. Pomerantz's linear log-log relationship also has no basis in accounting principles, explaining "I can't imagine any circumstances in which we would apply that method as accountants under any circumstance."[994]

Eighth, Dr. Pomerantz did not offer the opinion that CAL should have used his purported cost allocation methodology—nor could he identify a single mutual fund adviser that has used his cost allocation methodology.  In fact, no mutual fund adviser could use Dr. Pomerantz's cost

---

[991] DFFCL ¶ 307.

[992] DFFCL ¶ 303.

[993] DFFCL ¶ 318; *Chill*, 2018 WL 4778912, at *17-19.

[994] DFFCL ¶¶ 320-327.

allocation methodology in the ordinary course of the adviser's business due to its inherent "time-machine dilemma," to which he could offer no "solution."[995]

      <u>Ninth</u>, regardless of his flawed calculation or the conflict between Plaintiffs' experts, Dr. Pomerantz did <u>not</u> offer any expert opinion on (i) the maximum level of profitability CAL should have been permitted to realize under Section 36(b), (ii) the highest profit margin for the Fund that the Independent Trustees could have conscientiously approved, or (iii) whether the Independent Trustees would have approved the Fund's fee if CAL had followed his "linear log-log" profitability approach.[996]

      <u>Tenth</u>, to the extent that any of Plaintiffs' assertions concerning accounting, profitability or cost allocation methodologies rely on the testimony of Dr. Pomerantz or Professor Bullard, those assertions are not supported by any admissible or credible evidence because neither Dr. Pomerantz nor Professor Bullard is in any way qualified to offer any expert opinion concerning accounting, profitability or cost allocation methodologies.[997]

      <u>Eleventh</u>, Plaintiffs' profitability assertions fail under settled Section 36(b) jurisprudence:

      •      "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."[998]  As Judge Pollack explained in rejecting the second Section 36(b) lawsuit brought in *Gartenberg*, "determin[ing] whether the fees are so excessive

---

[995] DFFCL ¶ 317.

[996] DFFCL ¶ 327.

[997] DFFCL ¶¶ 417-420, 447-449.

[998] DFFCL ¶ 335.

that they could not reflect the results of arm's-length bargaining . . . is not resolved by indulging carping criticism of the degree of precision involved in measuring [the adviser's] costs."[999]

• Section 36(b) courts also have long recognized "the impossibility of arriving at an exact profitability figure," that cost allocation "is an art rather than a science," and that "different, albeit rational, methodologies lead to widely disparate results."[1000]  Neither *Gartenberg* nor any other Section 36(b) case ever held, nor has the ICA or the SEC ever established a rule requiring, anything other than a reasonable and rational accounting calculation.[1001]  Indeed, no court in a Section 36(b) case has ever held that "profitability" means anything other than profitability calculated by accountants in accordance with accounting principles—which is precisely what CAL did here, and what Plaintiffs have not done.[1002]

• Section 36(b) courts considering allocation methodologies analogous to that used by CAL have uniformly found them to be acceptable in rejecting the plaintiffs' claim at trial.[1003]

• And finally, CAL's pre-distribution profitability with respect to the Fund (ranging from 29% to 55%) is well within the range of profitability that courts have found to be reasonable in prior Section 36(b) cases.[1004]

As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to

---

[999] *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984)

[1000] DFFCL ¶ 339.

[1001] DFFCL ¶ 339.

[1002] DFFCL ¶ 340.

[1003] DFFCL ¶ 338.

[1004] DFFCL ¶ 342.

the Fund proves that the Fund's management fee could not have been the product of arm's-length bargaining.

*387.     Plaintiffs additionally presented the testimony of their expert Dr. Pomerantz that a more accurate profitability model showed that CAL's profit margin from the Growth Fund was 71%, rather than the 46% CAL reported.  Pomerantz Report at ¶492; Tr. at 449:15–450:22.*

**RESPONSE:**  Denied.  As set forth in CAL's Response to Paragraph 386, Dr. Pomerantz's "view of profitability" literally proves nothing, certainly does not prove that the Fund's management fee is excessive, and is not admissible or credible evidence of CAL's profitability from managing the Fund.  In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386, *supra*.  As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

*388.     CAL responded with the testimony of their expert Professor Lacey claiming that cost allocation by AUM alone was consistent with GAAP and "decision-useful." Tr. at 1003:9-22, 1015:2-9, 1020:19–1021:18; Lacey Report at ¶¶5, 36-42.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386.  As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 388 are a reprise of their earlier assertions in Paragraph 274; CAL therefore incorporates its Response to Paragraph 274 as if fully set forth herein.

*389.    However, courts have consistently made clear that for Section 36(b) purposes, an adviser's allocation methodology cannot be untethered from economic reality/actual costs. Indeed, the "profitability" factor initially was articulated by the Second Circuit in Gartenberg as "the adviser-manager's cost in providing the service . . ."  694 F.2d at 930 (emphasis added). Courts have insisted on allocation methods that at least represent attempts to approximate the advisor's actual costs with respect to the fund at issue.*

**RESPONSE:**  Denied.  Neither *Gartenberg* nor any other Section 36(b) case ever held, nor has the ICA or the SEC ever established a rule requiring, anything other than a reasonable and rational accounting calculation.  Neither the plain language of *Gartenberg*, nor any other reading of the decision, imposes any different cost accounting requirements, let alone one of "actual costs."

In addition, Plaintiffs insist on talking about "the cost in providing the service" as if this awkward articulation means something other than the adviser's profits.  However, Section 36(b) cases assessing adviser profits do just that—measure the adviser's costs in order to calculate profits earned on the advisory fees.  The *Gartenberg* district court focused on the adviser's profitability, which the Second Circuit specifically noted in its affirmance.[1005]  Moreover, in *Jones*—the controlling law here—the Supreme Court expressly referred to this *Gartenberg* factor as "the profitability of the fund to the adviser."[1006]

---

[1005] *Gartenberg v. Merrill Lynch Asset Mgmt*., 694 F.3d 923, 930 (2d Cir. 1982) (discussing district court finding on adviser profitability); *id*. at 933 (observing that "the record fails to show that the Manager's profits were so disproportionately large as to amount to a breach of fiduciary duty").

[1006] *Jones*, 559 U.S. at 344 n.5.

As established case law since *Gartenberg* holds, this assessment of profitability depends on mutual fund cost allocations that are "art rather than a science" and "different, albeit rational, methodologies lead to widely disparate results."  Moreover, Section 36(b) courts have long recognized "the impossibility of arriving at an exact profitability figure."[1007]  As the trial evidence showed, CAL's profit calculation approach is consistent with GAAP and managerial accounting principles; is systematic, rational, and decision-useful as those standards require; and therefore produces results that in fact do reflect CAL's profits from managing the Fund.[1008]  For similar reasons, Section 36(b) courts considering analogous allocation methodologies have uniformly found them to be acceptable in rejecting the plaintiffs' claim at trial.[1009]

On summary judgment, the Court ruled that (a) as a result of the "Mutual Fund Profitability Presentation," for each year within the Relevant Period "the Independent Trustees were fully informed about Calamos' profitability methodology," and (b) Plaintiffs' contention that the Mutual Fund Profitability presentations understated the Fund's profitability is "wholly lacking in merit as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of an 'average AUM' cost-allocation method to analyze profitability—a method Plaintiffs' recognize is commonly accepted within the industry."[1010]

---

[1007] *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 489-90 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *accord Schuyt v. Rowe Price Prime Reserve Fund, Inc*., 663 F. Supp. 962, 978 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ("There are many acceptable ways to allocate common costs, each of which leads to significantly different results.").

[1008] DFFCL ¶¶ 305-306, 338-339.

[1009] *Sivolella*, 2016 WL 4487857, at *51 (finding that "the cost allocation method based on revenue"—which is analogous to allocation based on AUM—"is consistent with accounting principles"); *see also Gallus v. Ameriprise Fin., Inc*., 497 F. Supp. 2d 974, 981 (D. Minn. 2007), *rev'd and remanded*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046 (2010), *and order reinstated*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (11th Cir. 2012).

[1010] DFFCL ¶¶ 291-92.

Moreover, as the trial evidence conclusively demonstrates: (a) an adviser's "choice of cost allocation methodology does not affect" whether the advisory fee is excessive, as Professor Bullard concedes; (b) CAL's calculation of its profitability with respect to the Fund, like any other profitability calculation, necessarily involves the exercise of discretionary accounting judgments that may affect the overall result; (c) because there are a range of reasonable and acceptable judgments and methodologies that can be used, and which will produce a range of different but equally reasonable results, there is no one "true" profitability figure; (d) as Professor Lacey testified, without any meaningful contradiction from either of Plaintiffs' experts, CAL's Profitability Presentation employs a systematic and rational approach to provide reasonable, decision-useful information to the Independent Trustees; (e) as the only two qualified accountants at the trial (Mr. Helmetag and Professor Lacey) testified, CAL's manner of calculating Fund-level advisory profitability is consistent both with managerial accounting principles and the principles underlying GAAP; and (f) the Profitability Presentation, *inter alia*, sets forth the methodology that CAL uses to calculate the adviser's profitability with respect to the Fund.[1011]

In addition, as Plaintiffs have conceded, the profitability figures CAL reported using an average AUM methodology are not materially different from the figures CAL reported using the time-spent methodology with which Plaintiffs take no issue.[1012]

   390.   In *Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y.), aff'd, 835 F.2d 45 (2d Cir. 1987)*, the dispute was between two different time-spent methods, one of which was developed by the advisor at the board's request using an independent firm. *Id.* at 997. *The court selected the method that it determined "presented a more accurate picture of the actual costs incurred by the adviser."  Id.  Similarly, in Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404 (2d Cir. 1989), the court expressed concern that the cost-allocation method be "rational" "lest the fund subsidize the costs" of other investment products advised by the*

---

[1011] DFFCL ¶¶ 297, 299-300, 305-306, 330.

[1012] DFFCL ¶ 303.

*defendant and ended up combining methods to approximate a true figure of profitability in its analysis. Id. at 410.*

      **RESPONSE:**  Denied.  Plaintiffs' assertion that *Schuyt* was a case deciding between two time spent methods is not accurate.  As the opinion actually holds, multiple different cost allocations are reasonable, and joint and common costs need to be allocated by <u>some</u> method rather than simply omitted from the fund's costs.  Contrary to Plaintiffs' description, the dispute in *Schuyt* was actually about choosing between one method for calculating profitability that did not allocate joint and common costs and one method that did.[1013]  These methods were referred to in the court's opinion, respectively, as the "incremental-cost method" and the "full-cost method."[1014]  The court rejected the incremental-cost method, which "attempts to calculate the addition to a firm's total cost that results from its provision of a particular product or service," because it "vastly underestimate[s] the actual cost to the Adviser of servicing the Fund" due to the method's failure to include <u>any</u> joint or common costs.[1015]

      In addition, Plaintiffs' assertion that the court elected a cost allocation method that "presented a more accurate picture of the actual costs incurred by the adviser" is wrong.  The court did exactly the opposite.  After rejecting the "incremental-cost method" and examining several different "full-cost methods" that used different mechanisms to allocate joint and common costs, the court chose not to engage in the minutiae of weighing the validity of the assumptions underlying each mechanism and explained that the Board did not do so either.[1016]

---

[1013] *Schuyt*, 663 F. Supp. at 977.

[1014] *Id.*

[1015] *Id.*

[1016] *Id.* at 978 & n.47.

Instead, the court adopted the method the adviser presented to the Board after determining that it was "reasonable" and among the "many acceptable ways to allocate costs."[1017]

In *Krinsk*, the district court "recognize[d] the impossibility of arriving at an exact profitability figure," that cost allocation "is an art rather than a science," and that "different, albeit rational, methodologies lead to widely disparate results."[1018]  The Second Circuit affirmed the district court's decision in "rejecting [Plaintiff] Krinsk's theories and crediting the testimony of Merrill Lynch's expert [on profitability]."[1019]  As the Second Circuit observed, the plaintiff's application of his alternative profitability formula "was flawed . . . by a speculative approach and lack of crucial figures."[1020]  Moreover, Plaintiffs' "formula would reduce the Fund's advisory fee to a level far below that of any other mutual fund."[1021]  The Second Circuit held that this "unreasonable result of applying this formula casts suspicion on the formula itself."[1022]  Plaintiffs' alternative profitability calculation likewise relies on a "speculative approach" (*i.e.*, Dr. Pomerantz's assumed "log-log" relationship), and also creates an "unreasonable result" that "casts suspicion" on the calculation itself.  Thus, the *Krinsk* case supports CAL's position, not Plaintiffs'.

Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the

---

[1017] *Id.* at 978.

[1018] *Krinsk*, 715 F. Supp. at 489.

[1019] *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989).

[1020] *Id.*

[1021] *Id.*

[1022] *Id.*

fundamental reasons set forth in CAL's Response to Paragraph 386.  As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

*391.    Likewise, on summary judgment in this case, the Court indicated that the relevant issue was not whether there was a per se rule requiring a specific cost allocation method – which CAL's expert conceded there is not, Tr. at 1000:3-24 – but whether the AUM method "best reflects the Fund's true profitability to Calamos . . ."  Chill, 2018 WL 4778912, at \*21 n.15.*

**RESPONSE:**  Denied.  CAL admits that on summary judgment, the Court stated, "Calamos also notes that 'there is simply no per se rule as to how [it] must allocate indirect costs,' Def.'s Reply at 13, but this argument does not bear on the questions whether (1) Calamos' cost allocation method best reflects the Fund's true profitability to Calamos and (2) whether the profits realized by Calamos weigh in favor of a conclusion that Calamos' Advisory Fees are excessive."[1023]  However, on summary judgment, the Court ruled that (a) as a result of the "Mutual Fund Profitability Presentation," for each year within the Relevant Period "the Independent Trustees were fully informed about Calamos' profitability methodology," and (b) Plaintiffs' contention that the Mutual Fund Profitability presentations understated the Fund's profitability is "wholly lacking in merit as it rests almost entirely on Plaintiffs' disapproval of Calamos' use of an 'average AUM' cost-allocation method to analyze profitability—a method Plaintiffs recognize is commonly accepted within the industry."[1024]  Moreover, as the trial evidence conclusively demonstrates: (a) an adviser's "choice of cost allocation methodology does not affect" whether the advisory fee is excessive, as Professor Bullard concedes; (b) CAL's

---

[1023] *Chill*, 2018 WL 4778912, at \*21 n.15.

[1024] DFFCL ¶¶ 291-92.

calculation of its profitability with respect to the Fund, like any other profitability calculation, necessarily involves the exercise of discretionary accounting judgments that may affect the overall result; (c) because there are a range of reasonable and acceptable judgments and methodologies that can be used, and which will produce a range of different but equally reasonable results, there is no one "true" profitability figure; (d) as Professor Lacey testified, without any meaningful contradiction from either of Plaintiffs' experts, CAL's Profitability Presentation employs a systematic and rational approach to provide reasonable, decision-useful information to the Independent Trustees; (e) as the only two qualified accountants at the trial (Mr. Helmetag and Professor Lacey) testified, CAL's manner of calculating Fund-level advisory profitability is consistent both with managerial accounting principles and the principles underlying GAAP; and (f) Plaintiffs did not offer any evidence that CAL's AUM-based cost allocation approach is not consistent with managerial accounting principles or the principles underlying GAAP; indeed, neither of Plaintiffs' experts offer any accounting-grounded opinions (nor could they, given their complete lack of accounting qualifications).[1025]  In sum, as Dr. Pomerantz freely admitted, CAL is "well within [its] accounting rights as accountants to do what they've done" with respect to the cost allocation methodology it used.[1026]

        In addition, Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386, *supra*.  As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have

---

[1025] DFFCL ¶¶ 295-307.

[1026] DFFCL ¶ 306.

entirely failed to meet their burden of establishing that CAL's profitability with respect to the

Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

392.    *Here, Plaintiffs established that the AUM method is not rational or accurate and grossly distorts the Growth Fund's profitability to CAL because it makes costs per dollar of AUM constant across the complex regardless of fund size, thereby assuming away the economic benefits of scale.  Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84; Tr. at 451:2-25, 458:8–459:2.  Indeed, CAL's expert Professor Lacey admitted that the method does not consider economies of scale.  Tr. at 1032:8-25.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method

for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section

36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386.

As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have

entirely failed to meet their burden of establishing that CAL's profitability with respect to the

Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 392 are a reprise of their earlier

assertions in Paragraphs 249-250; CAL therefore incorporates its Responses to Paragraphs 249-

250 as if fully set forth herein.

393.    *Allocating by AUM flies in the face of the law under 36(b) and the reality of how CAL's costs actually behave.  In amending Section 36(b), Congress stated that its intent was to ensure that investors "share equitably ... in the economies available as a result of the growth and general acceptance of mutual funds."  S. REP. NO. 91-184, at 6 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4901.  Plaintiffs presented evidence that CAL's costs were relatively constant and did not rise or fall proportionately with AUM, which is consistent with observations of the industry.  Tr. at 996:16–997:6; Pomerantz Rebuttal Report at ¶¶248, 468-89.  As CAL's profitability expert Professor Lacey concedes, most costs incurred in the provision of advisory services are largely fixed costs, rather than variable.  Tr. at 996:16–997:6. Allocating by AUM, however, counterfactually treats such costs as entirely variable and unaffected by scale. Tr. at 879:14-20; Bullard Rebuttal Report at ¶¶104-05, 248, 259, 274.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method

for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386. As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 393 are a reprise of their earlier assertions in Paragraphs 241-245; CAL therefore incorporates its Responses to Paragraphs 241-245 as if fully set forth herein.

*394.    This led to absurd results. For example, CAL's profitability presentations depicted smaller funds that CAL admittedly closed because they "failed to achieve economies of scale" and were money-losing (JX 144 at 636337-38) as highly profitable and in fact more so than the Growth Fund.  JX 144 at 636337-38; see also Pomerantz Report at ¶433-45; Pomerantz Rebuttal Report at ¶241; Bullard Report at ¶¶62-63, 97; Bullard Rebuttal Report at ¶¶106-09. This was due to the fact that CAL implausibly assigned up to 85 times more costs to those Funds than to the Growth Fund – based on their smaller AUM – despite the fact that those Funds utilized the same investment personnel, systems, and processes as the Growth Fund.  DX 145-R at 634772 and table at ¶262, supra; Pomerantz Report at ¶447, 441-43; Bullard Report at ¶¶57-64, 71-74, 77-78; Pomerantz Rebuttal Report at ¶¶287, 292-93.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386. As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 394 are a reprise of their earlier assertions in Paragraphs 256, 257, and 262-264; CAL therefore incorporates its Responses to Paragraph 256, 257, and 262-264 as if fully set forth herein.

*395.    At trial, CAL did not argue that the Funds-specific profitability figures reported in the Mutual Fund Profitability presentations were accurate but instead insisted that fund-specific profitability was unknowable.  Tr. at 238:15–239:15, 1010:17–1011:1, 1015:10-19. CAL justified AUM cost allocation not on its accuracy but on its purported ease of use.  Tr. at 235:16-25, 240:13-242:13, 998:13-17, 1015:2-9, 1020:19–1021:4; Lacey Report at ¶¶20, 24, 83-85.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method

for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section

36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386.

As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have

entirely failed to meet their burden of establishing that CAL's profitability with respect to the

Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 395 are a reprise of their earlier

assertions in Paragraph 251; CAL therefore incorporates its responses to Paragraph 251 as if

fully set forth herein.

*396.    Plaintiffs further presented evidence that allocation by AUM was not useful to the Independent Trustees.  Pomerantz Rebuttal Report at ¶¶296-97.  As indicated above, 36(b) charges fund trustees with the task of ensuring that investors "share equitably ... in the economies available as a result of the growth and general acceptance of mutual funds."  S. REP. NO. 91-184, at 6 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4901.  AUM allocation makes those economies invisible, and thus makes it impossible for the Independent Trustees to discharge their duty.  Pomerantz Report at ¶¶433, 436, 462-64, 479, 482-84; Tr. at 451:2-25, 458:8–459:2.*

**RESPONSE:**  Denied.  CAL Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method

for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section

36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386.

As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have

entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

Additionally, Plaintiffs' factual assertions in Paragraph 392 are a reprise of their earlier assertions in Paragraphs 249 and 335; CAL therefore incorporates its Responses to Paragraph 249 and 335 as if fully set forth herein.

*397.   Thus, the trial evidence shows that the Growth Fund was extremely profitable to CAL, and in fact had a high level of profitability far in excess of what CAL reported to the Trustees.  Hence, the profitability Gartenberg factor weighs in favor of fee excessiveness.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of (a) CAL's profitability from managing the Fund, and/or (b) CAL's method for calculating such profitability in its 15(c) Response, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 386. As a matter of both settled law and the overwhelming weight of the trial record, Plaintiffs have entirely failed to meet their burden of establishing that CAL's profitability with respect to the Fund proves that the Fund's management fee could not have been negotiated at arm's-length.

### E.   The Independent Trustees did not Exercise the Requisite Care and Conscientiousness

#### 1.   Applicable Legal Standard Regarding Conscientiousness

*398.   The ICA "interposes disinterested directors as 'independent watchdogs,'" Jones, 559 U.S. at 348 (quoting Burks v. Lasker, 441 U.S. 471, 482 (1979)), charged with serving as a "'check upon the management,'" Id. at 352 (quoting Burks, 441 U.S. at 484).  In order to exercise the conscientiousness required by Gartenberg, a Board must, inter alia, actually consider all "relevant factors," and the adviser must supply "material information" pertinent to those factors.  Id. at 351; see also Gartenberg, 694 F.2d at 930 (to discharge their duty, trustees must be "fully informed about all facts bearing on the adviser-manger's services and fees").*

**RESPONSE:**  Denied as stated.  CAL admits that *Jones* states that the ICA "interposes disinterested directors as 'independent watchdogs' of the relationship between a mutual fund and its adviser," and that "the [ICA] requires advisers to furnish all information 'reasonably . . .

necessary to evaluate the terms' of the adviser's contract, 15 U.S.C. § 80a–15(c). . . ."[1027]  While

the *Gartenberg* factors may bear on the care and conscientiousness of the Independent Trustees,

they are not the elements of a Section 36(b) claim; Plaintiffs may not prevail without proving,

through admissible and credible evidence, that the Fund's fee "is so disproportionately large that

it bears no reasonable relationship to the services rendered <u>and could not have been the product

of arm's length bargaining</u>."[1028]

As Professor Bullard acknowledged, the decision of whether to approve an IMA is not

only committed to the Independent Trustees' business judgment, but the Trustees have both

substantial discretion and broad leeway in evaluating the Fund's fees and performance.[1029]  The

trial evidence demonstrates that the Independent Trustees exercised that "substantial discretion

and broad leeway" to reach to "business judgment" that approval of the IMA for each of the

years in the Relevant Period, subject either to a fee waiver and/or to CAL's commitment to

continue to invest resources in an effort to improve performance, was in the best interests of the

Fund and its shareholders.[1030]

*399.   Thus, as Defendant's expert witness, Professor Laby, explained:  "the
independent trustees ha[d] the responsibility to request information regarding the topics that
reasonably bear on the services Calamos provides to the [G]rowth [F]und, including the
services that Calamos provides to other clients," Tr. at 959:12-25, which in turn required CAL
to provide "high-quality information" regarding those subjects, Tr. at 960:1-7.*

**RESPONSE:**  Denied as stated.  CAL admits that Professor Laby stated in his report that

"The Independent Trustees have the responsibility to request information regarding the topics

that reasonably bear on the services Calamos provides to the Growth Fund, including the

---

[1027] *Jones*, 559 U.S. at 348.

[1028] *Id.* at 346.

[1029] DFFCL ¶ 148.

[1030] DFFCL ¶ 90.

services that Calamos provides to other clients."[1031]   CAL also admits that Professor Laby testified that *Gartenberg* contemplates the Board's receipt and review of high-quality information.[1032]

Plaintiffs failed to prove that the materials the Board receives are of anything less than high quality.  For example, the trial evidence demonstrates that as part of their 15(c) Process, the Independent Trustees annually received a comprehensive report from an independent and industry-recognized third party regarding the performance of the Fund in comparison to its peers over a variety of time periods.[1033]  In addition, at every regular Board meeting the Independent Trustees received and in-person presentations from CAL's CIO(s), and regular "Focus Fund" presentations providing even more detail about the Fund's performance.[1034].  Also throughout the Relevant Period, CAL regularly both provided updates to the Board on the organizational changes at the company and discussed its ongoing changes and enhancements to the portfolio management and research teams (such as hiring and promoting key individuals, taking steps to improve the quality of the portfolio investment and research team, reorganizing its investment approach, and revising the compensation structure for the portfolio management team).[1035]

Although Professor Bullard offered the opinion that the Independent Trustees were not conscientious in considering either the Fund's performance or CAL's efforts to improve that performance, he reached this opinion without considering more than seventy-five percent of the

---

[1031] Laby Rpt. 38.

[1032] Tr. 960:1-7 (Laby).

[1033] DFFCL ¶ 122.

[1034] DFFCL ¶ 122.

[1035] DFFCL ¶ 123.

materials that the Independent Trustees received from CAL concerning those very topics.[1036] And, his professed reliance on Plaintiffs' counsel to bring additional relevant materials to his attention failed to result in him considering <u>even one</u> of the nearly two dozen CIO reports and Focus Fund presentations that CAL delivered to the Independent Trustees during the Relevant Period, <u>all</u> of which concerned the Fund's performance and CAL's efforts to improve that performance.[1037]

In addition, as concerns CAL's different and greater services/risks in managing the Fund as compared to its All Cap Growth Clients, the trial evidence also demonstrates that for each of the following reasons, the Independent Trustees received high quality materials that, when combined with their extensive industry experience, enabled them to make an informed decision in the interests of the Fund's shareholders:

<u>First</u>, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c) Responses included a "Discussion of Management Fee Rates by Product" presentation that both informed the Independent Trustees of the fees that CAL charged to the Funds and to its institutional and sub-advisory clients and provided a brief summary overview of the services that CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

<u>Second</u>, as the evidence also conclusively demonstrates, the Discussion of Management Fee Rates by Product presentation was not the sole information that the Independent Trustees

---

[1036] DFFCL ¶ 125.

[1037] DFFCL ¶ 125.

received about such services, nor was it intended to be an exhaustive recitation of all of the many differences in services and risks. To the contrary, the Independent Trustees also regularly receive extensive information at <u>every</u> Board meeting concerning the services CAL provides to the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight of third party service providers, and reports from the Funds' CCO. In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[1038]

<u>Third</u>, based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[1039] As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange. They're both fruit, but they are totally different fruit. If you are to take a bite of each one, you would get a whole different taste."[1040]

*400.    As described more fully below, the facts of this case make clear that the Board did not act as an independent check when it approved CAL's advisory fees, but instead credulously accepted without challenge CAL's assertions at face value on key issues. See Tr. at 908:14-909:11; 912:23-915:7; 920:12-921:5; 927:9-928:13.*

---

[1038] DFFCL ¶¶ 56-58, 207.

[1039] DFFCL ¶¶ 204-207.

[1040] Tr. 177:17-20 (Neal).

**RESPONSE:**  As the Court recognized on summary judgment, "[u]ltimately, '[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process'" and should not "supplant the judgment of disinterested directors."[1041]

Under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee are "entitled to considerable weight" and "commensurate deference" and should not be "supplanted."  The trial evidence established that the Independent Trustees' independence, qualifications and experience, Board practice, and 15(c) Process compare very favorably to those that nine different courts, in rejecting Section 36(b) claims over the past three decades, have consistently recognized as the earmarks of an independent and diligent board, acting with care and conscientiousness.[1042]

The trial evidence further confirmed that for each year within the Relevant Period, the Independent Trustees, after engaging in a robust process that involved active dialogue with CAL throughout the year, applied their judgment in view of the current facts, their extensive industry experience and institutional knowledge of CAL, to determine that approving the IMA—subject to either a fee waiver and/or to CAL's commitment to continue to invest resources in efforts to improve the Fund's performance—was in the best interests of Fund shareholders.  Indeed, as Professor Bullard also acknowledged, a Board reasonably can conclude that it would be in the best interests of a fund and its shareholders to require the adviser to take the very steps that CAL took in an effort to improve the Fund's performance—*i.e.*, hiring a new portfolio manager for the fund, moving to a team approach of portfolio management, and increasing the adviser's

---

[1041] DFFCL ¶ 145.

[1042] DFFCL ¶¶ 146-147.

investment research capacity. These are also exactly the types of steps that the SEC has suggested that a Board may take to address fund performance challenges. There is <u>no</u> Section 36(b) case in which a court discarded such uncontroverted trial evidence of a board constantly seeking to strike a balance between fees and performance improvements for the benefit of fund shareholders.[1043]

The trial record in this case also confirms that Plaintiffs have failed to prove that the Fund's management fee "<u>could not have been</u> the product of arm's-length bargaining," as *Jones* requires for any plaintiff to state a Section 36(b) claim.[1044] The trial evidence actually demonstrated precisely the opposite—that the Fund's management fee <u>is</u> "the product of arm's-length bargaining" by the Independent Trustees on behalf of the Fund shareholders <u>throughout</u> the Relevant Period—which necessarily means that Plaintiffs have failed to meet their burden of proving that fee "could not have been" such a product.

Plaintiffs conceded at trial, through Professor Bullard, that the fee reduction that the Independent Trustees achieved in June 2013, through their imposition of a five basis point fee waiver on the Fund's management fee, <u>is</u> evidence of arm's-length negotiation by the Independent Trustees. Thus, for the period between June 2013 and June 2014, the only trial evidence is that of arm's-length bargaining by the Independent Trustees.[1045]

There is also equally undisputed evidence of the Independent Trustees' arm's-length bargaining for the entire remainder of the Relevant Period. Plaintiffs, again through Professor Bullard, conceded that Independent Trustees can obtain a fee reduction in ways other than

---

[1043] DFFCL ¶¶ 150-151.

[1044] DFFCL ¶ 154.

[1045] DFFCL ¶¶ 154-155.

through a fee waiver—such as by CAL increasing expenditures with respect to the services that it provides to the Fund.  As Professor Bullard unambiguously and succinctly concluded, CAL's increased expenditures with respect to the services it provides to the Fund is "a de facto fee reduction" for the benefit of the Fund's shareholders.  That is precisely what did happen here, in every year of the Relevant Period.  Professor Bullard further conceded that the Independent Trustees' approval of a series of changes by CAL designed to increase investment performance for the Fund "could play a role in arm's-length negotiation."[1046]  That again is precisely what did happen here, in every year of the Relevant Period.[1047]

Finally, to the extent that Plaintiffs' assertions rely on the testimony of Professor Bullard, those assertions are not supported by any admissible or credible evidence because (a) Professor Bullard lacks any qualification to offer any opinion regarding the Independent Trustees' lack of conscientiousness in their evaluation of certain information CAL provided in its 15(c) Response (notwithstanding that he has managed to reach this same conclusion in every Section 36(b) case in which he has been retained), (b) Professor Bullard's opinions suffer from a lack of methodology and lack the rigor required for expert testimony, and (c) in light of the many flaws in his "factual analysis," Professor Bullard was forced to concede that he has no way of knowing how any Independent Trustee actually considered the information CAL provided, and he disavowed any "opinion on what was in the mind of any trustee."[1048]

### 2.   The Independent Trustees' Repeated Failure to Act Conscientiously with Respect to Crucial Matters Relevant to CAL's Fees

401.    *First, Mr. Neal testified that in deciding whether to approve CAL's advisor fees, the Trustees were required to: (i) assess whether the purportedly greater services and risks*

---

[1046] DFFCL ¶ 105.

[1047] DFFCL ¶¶ 156-157.

[1048] DFFCL ¶¶ 451-457.

*described by Messrs. Bhatt and Jackson at CAL's 15(c) meetings justified the higher fees CAL charged its Fund client; and (ii) ensure that the services CAL provided to the Growth were provided at a reasonable cost. Tr. at 129:16-24; 174:5-14. Importantly, Mr. Neal further explained that the purportedly greater services and risks would not justify/explain the greater advisory fee CAL charged its Fund clients versus its non-fund clients if that fee differential is "excessive from what it costs them to [] actually do the work." Tr. at 136:16-24 (emphasis added).*

**RESPONSE:**   Denied.  CAL admits that Mr. Neal testified that his responsibilities as an Independent Trustee included (a) ensuring that the services CAL provided to the Fund were provided at reasonable cost, and (b) determining whether Fund's management fee was reasonable in view of the differences in services and risks in advising the Fund, among many other things.[1049]  Mr. Neal also testified that factors that could indicate to him that the difference in the fees an adviser charges to its mutual funds and to non-fund clients "are too large to be explained by different levels of services and risks" would include "per the industry if their fees were substantially higher than their competitors," which would mean "one they would be out of the business because they couldn't sell the product; and two, it would be excessive from what it cost them to actual actually do the work."[1050]

As the Court recognized on summary judgment, "[u]ltimately, '[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process'" and should not "supplant the judgment of disinterested directors."[1051]

Under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee are "entitled to considerable weight," "commensurate deference," and should not be

---

[1049] Tr. 129:16-24 (Neal).

[1050] Tr. 136:16-24 (Neal).

[1051] DFFCL ¶ 145.

"supplanted."  The trial evidence established that the Independent Trustees' independence, qualifications and experience, Board practice, and 15(c) Process compare very favorably to those that nine different courts, in rejecting Section 36(b) claims over the past three decades, have consistently recognized as the earmarks of an independent and diligent board, acting with care and conscientiousness.[1052]

As specifically concerns the Independent Trustees' consideration of CAL's different services/risks in managing the Fund as compared to its All Cap Growth Clients, the trial evidence demonstrates that the Independent Trustees acted with care and conscientiousness in reaching an informed decision:

First, each year, specifically in its 15(c) Response and generally throughout the year in the course of each Board meeting, CAL explained to the Board that it provides different and greater services to the Fund than to its All Cap Growth Clients, and assumes different and greater risks in advising the Funds than it does in advising its All Cap Growth Clients.  CAL's 15(c) Responses included a "Discussion of Management Fee Rates by Product" presentation that both informed the Independent Trustees of the fees that CAL charged to the Funds and to its institutional and sub-advisory clients and provided a brief summary overview of the services that CAL provided to the Fund that were not required for institutional or sub-advisory accounts.

Second, as the evidence also conclusively demonstrates, the Discussion of Management Fee Rates by Product presentation was not the sole information that the Independent Trustees received about such services, nor was it intended to be an exhaustive recitation of all of the many differences in services and risks.  To the contrary, the Independent Trustees also regularly receive extensive information at every Board meeting concerning the services CAL provides to

---

[1052] DFFCL ¶¶ 146-147.

the Fund that are not required for All Cap Growth Clients, such as fund administration, oversight of third party service providers, and reports from the Funds' CCO.  In addition, the Independent Trustees have 150+ years of collective experience in the asset management industry—including senior management positions at leading investment advisers who offer both mutual funds and institutional products.[1053]

Third, based on both this directly on-point experience and the information they receive, the trial evidence therefore demonstrates both that (a) the Independent Trustees have all of the information they believe they need about CAL's All Cap Growth Clients when they annually vote to approve the IMA, and (b) the Independent Trustees fully understand the differences in services and risks entailed in advising the Fund versus CAL's All Cap Growth Clients.[1054]  As Mr. Neal explained, and as the overwhelming weight of the trial evidence confirms, the Independent Trustees and CAL viewed the Fund and the All Cap Growth Clients to be "like an apple and an orange.  They're both fruit, but they are totally different fruit.  If you are to take a bite of each one, you would get a whole different taste."

In addition, Plaintiffs' assertions that the Fund's management fee is excessive (a) because it is higher than fees charged to All Cap Growth Clients under different fee schedules, (b) by virtue of CAL's supposedly limited services/risks with respect to the Fund as compared to its All Cap Growth Clients, and/or (c) by virtue of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services/risks, all fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 363, *supra*.

*402.    As the record makes clear, however, the Trustees failed to satisfy the precise standard that Mr. Neal described and that the law requires.  Indeed, despite the fact that CAL affirmatively posited the greater services and risks as the purported basis for the fee differential,*

---

[1053] DFFCL ¶¶ 56-58, 207.

[1054] DFFCL ¶¶ 204-207.

*CAL did not provide, and the Board did not request, any data concerning the cost/value of the purportedly greater services, or the number or employees that provided such services or the time/effort that they expended. See ¶¶284-87; see also Tr. at 959:12-25 (Board duty bound to request information regarding services rendered to non-fund clients). Nor did CAL provide, or the Board request, any data concerning the cost/value of the greater risks that CAL purportedly priced into the Growth Fund's advisory fee. See ¶¶284-87, 313-14. In fact, Mr. Jackson and the Independent Trustees were wholly ignorant of: (i) whether CAL actually priced that risk into the IMA, and (ii) assuming that it did, CAL's methodology for doing so, or the portion/percentage of the Growth Fund's fees that were attributable that risk. See ¶¶313-14.[1055]*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-401, *supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee are "entitled to considerable weight," "commensurate deference," and should not be "supplanted."  Indeed, the trial evidence established each of the following:

- The Independent Trustees' independence, qualifications and experience, Board practice, and 15(c) Process compare very favorably to those that nine different courts, in rejecting Section 36(b) claims over the past three decades, have consistently recognized as the earmarks of an independent and diligent board, acting with care and conscientiousness.[1056]

---

[1055] *Cf. In re BlackRock , 327 F. Supp. 3d at 716-21 (Board acted conscientiously in considering difference in fees  between fund and non-fund clients where the Board was provided with and reviewed a detailed qualitative analysis of how the services differed and "the estimated cost of providing the listed services") (emphasis added); Gallus v. Ameriprise Fin., Inc.,  675 F.3d 1173, 1180 (8th Cir. 2012) (Board decision entitled to less deference when trustees were not apprised of all relevant information regarding fee discrepancy).*

[1056] DFFCL ¶¶ 146-147.

•        The Independent Trustees acted with care and conscientiousness in their consideration of CAL's different services/risks in managing the Fund as compared to its All Cap Growth Clients.

•        For each year within the Relevant Period, the Independent Trustees, after engaging in a robust process that involved active dialogue with CAL throughout the year, applied their judgment in view of the current facts, their extensive industry experience and institutional knowledge of CAL, to determine that approving the IMA—subject to either a fee waiver and/or to CAL's commitment to continue to invest resources in efforts to improve the Fund's performance—was in the best interests of Fund shareholders.

Accordingly, the trial record in this case demonstrates that the Fund's management fee <u>is</u> "the product of arm's-length bargaining" by the Independent Trustees on behalf of the Fund shareholders <u>throughout</u> the Relevant Period—which necessarily means that Plaintiffs have failed to meet their burden of proving that fee "could not have been" such a product

*403.      Thus, at the time the Trustees approved CAL's fees, there was no way they could have known whether the fee differential was "excessive from what it costs them to [] actually do the work," Tr. at 136:16-24 (emphasis added), because, as Mr. Neal conceded, the Trustees had no idea whether the value of those greater services and risks was 1 basis point, 5 basis points, 10, basis points, or something else.  See ¶¶160-62, 220, 287 and 313-14, supra; see also Tr. at 908:14-909:11 (Professor Bullard's testimony that Trustees cannot simply rely on their prior experience in order to abjure responsibility for independently assessing validity of the advisor's explanation for higher fees).[1057]*

**<u>RESPONSE:</u>**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the

---

[1057] *See also Chill, 2018 WL 4778912, at *12 ("Calamos cannot persuasively maintain that the Trustees found irrelevant the disparity in fee rates charged to the Fund vis-à-vis Calamos' institutional and sub-advisory clients due to differences in services and risks, yet at the same time maintain that the Trustees need not have received actual evidence detailing the differences in services and risks.").*

IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons

set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402,

*supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee

are "entitled to considerable weight," "commensurate deference," and should not be

"supplanted."

*404.    Even more damning, Mr. Timbers, the Lead Independent Trustee, was not even
aware of the nature of the services CAL provided to its non-fund clients, testifying that he "could
only guess."  See ¶286, supra; see also Tr. at 959:12-25 (Professor Laby's testimony that the
Board was responsible for requesting information regarding the "services that Calamos
provides to other clients.").  And, as Professor Laby agreed, a Board member cannot be said "to
have carefully examined the services CAL provided to its non-fund clients if he or she does not
understand or is unaware of the services provided to the non-fund clients."  Tr. at 964:20-965:1.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of the supposedly limited services that CAL provided to the Fund under the

IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons

set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402,

*supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee

are "entitled to considerable weight," "commensurate deference," and should not be

"supplanted."

Finally, to the extent that Plaintiffs' assertions in Paragraph 404 are a reprise of

Paragraph 286, *supra*, CAL incorporates its Response to Paragraph 286 as if fully set forth

herein.

> 405.    *Second, the record is clear that, in approving CAL's advisory fees under the IMA, the Board impermissibly considered in the aggregate the services CAL provided under the IMA and the FASA, despite the fact that CAL is separately compensated under each distinct agreement.  See ¶¶288 and 317; Chill, 2018 WL 4478912, at \*13 ("The Court agrees with Plaintiffs that Section 36(b) requires that transaction be considered separately and not aggregated") (internal quotation marks omitted) (collecting cases).*

**<u>RESPONSE:</u>**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of the supposedly limited services that CAL provided to the Fund under the

IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons

set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402,

*supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee

are "entitled to considerable weight," "commensurate deference," and should not be

"supplanted."

The trial record also confirms that there is nothing about the FASA that suggests that the

Fund's management fee is excessive, for the following reasons:

<u>First</u>, both of Plaintiffs' experts concede that CAL is required to provide or arrange for

the complete bundle of services required for the Fund as part of its obligations under the IMA.

And as Professor Bullard further conceded, the services rendered by the adviser that are to be

considered under the *Jones*/*Gartenberg* standard include all of the services that the adviser

provides for the fund, whether those services are provided under one or several contracts.[1058]

      <u>Second</u>, the nature or extent of CAL's services to the Fund as required by the IMA were

not reduced or changed in any way by the FASA.  Even without the FASA, CAL would still

have the responsibility, under the IMA's provision that CAL is required to "manage, supervise,

and oversee the affairs" of the Funds, either to provide itself or to ensure the provision through

third-parties of all necessary services for the Funds, including the financial accounting services

recited in the FASA.  Following the termination of the FASA, CAL's obligation to provide, or

ensure the provision of, all of the services that the Funds require has not changed, and the scope

of work performed by CAL has not decreased.[1059]

      <u>Third</u>, during the period of time the FASA was in existence, no one at CAL differentiated

between services provided pursuant to the IMA versus services provided pursuant to the FASA,

nor did CAL employees review or reference the IMA or the FASA in the course of performing

their day-to-day duties in servicing the Fund.  Rather, at all times, CAL focused on providing all

of the services that the Fund requires and that CAL is obligated under the IMA to provide.[1060]

      <u>Fourth</u>, while the FASA was in place, the Independent Trustees annually reviewed the

services CAL provided and the 1.1 basis point fee charged under that agreement.  The

Independent Trustees, however, did not consider the IMA or the FASA in isolation.  Rather, as

part of the 15(c) Process each year, the Independent Trustees considered the totality of services

that CAL provides to the Fund and assessed whether the approval of both agreements was

---

[1058] DFFCL ¶¶ 352-353.

[1059] DFFCL ¶¶ 344-348.

[1060] DFFCL ¶ 349.

reasonable in light of the total fees charged. Plaintiffs presented no evidence a trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.[1061]

Plaintiffs' assertions and arguments with respect to the FASA cannot support a finding that the management fee paid under the IMA is excessive. Specifically, regardless of how the IMA and FASA and the fees charged under each agreement are evaluated, separately or together, it was reasonable and appropriate for the Board to consider the two contracts together. The correct legal standard requires consideration of substance over form. There is no legal requirement that a fund's board must consider a fund's management agreement with the adviser separately from the fund's other agreements with that same adviser. There is similarly no law or ruling holding that it is improper for a Board to consider the totality of services provided by the adviser to the Fund and the total compensation received by the adviser as a whole, regardless of whether those services and compensation are set out in one contract or two.[1062] And, Plaintiffs presented no evidence at trial that considering the contracts separately would have made any difference with respect to the Independent Trustees' approval of the IMA.

In sum, nothing did or should have prevented the Independent Trustees from considering the total services provided by CAL, and the total compensation paid by the Fund to CAL, when assessing the Fund's overall relationship with CAL.

*406. Third, the Board failed to critically evaluate the difference in burden/expense of providing a service in the first instance versus overseeing its performance by a third-party. See ¶¶290-93, supra; see also Tr. at 920:12-921:5 (Professor Bullard's testimony that the "veneer of oversight" versus performing a task in the first instance are "completely different levels of service"). Rather, the Board repeatedly gave CAL the same credit for supervising work performed by third-parties as if CAL had done the work itself, and credited CAL for bearing risks/costs that were, in fact, borne by those third-party service providers. See ¶¶290-93, supra.*

---

[1061] DFFCL ¶¶ 350-351.

[1062] DFFCL ¶¶ 354-361.

*Indeed, as Professor Bullard explained, Mr. Neal's Declaration and testimony perfectly encapsulate the Board's failure in this regard:*

> *And that really goes to my point about [Mr. Neal's Declaration] paragraph 91, which shows a lack of discernment between the actual services provided by Calamos and the costs it incurs and the[] services provided by other parties. He was viewing [NAV] pricing errors as something that is a cost being incurred by Calamos, but at the same time it was being paid by a third party. And those positions, I just can't reconcile.*

*Tr. at 928:7-13 (emphasis added).*

**RESPONSE:** Denied. Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402, *supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee are "entitled to considerable weight," "commensurate deference," and should not be "supplanted."

Additionally, to the extent that Plaintiffs' assertions in Paragraph 406 are a reprise of Paragraphs 290-293, *supra*, CAL incorporates its Response to Paragraphs 290-293 as if fully set forth herein.

Finally, to the extent that Plaintiffs' assertions rely on the testimony of Professor Bullard, those assertions are not supported by any admissible or credible evidence because (a) Professor Bullard lacks any qualification to offer any opinion regarding the Independent Trustees' lack of conscientiousness in their evaluation of certain information CAL provided in its 15(c) Response

(notwithstanding that he has managed to reach this same conclusion in every Section 36(b) case

in which he has been retained), (b) Professor Bullard's opinions suffer from a lack of

methodology and lack the rigor required for expert testimony, and (c) in light of the many flaws

in his "factual analysis," Professor Bullard was forced to concede that he has no way of knowing

how any Independent Trustee actually considered the information CAL provided, and he

disavowed any "opinion on what was in the mind of any trustee."[1063]

*407.   Fourth, the Board's decision to lift the fee waiver after just one-year (despite being dissatisfied with CAL short-term and long-term performance) without setting any objective criteria by which to assess whether CAL's performance had improved sufficiently to merit lifting the waiver, and its failure to seek lower advisory fees in any other years (such as through a performance fee arrangement), demonstrates an utter lack of care and conscientiousness.  See ¶¶301-06, supra.  Further, despite the fact that the Growth Fund's performance became increasingly negative after the Board lifted the fee waiver, see Tr. at 161:20-168:6, the Independent Trustees credulously accepted CAL's explanation that it was taking steps to improve performance – steps occasioned by its repeated failures – and concluded every year that it would be prudent to allow CAL more time to develop its performance record, without setting any standards.  Tr. at 846:17-847:2 (Professor Bullard's testimony that Board could conclude that more time was appropriate if it applied a "consistent objective standard in that respect").*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is

excessive by virtue of the supposedly limited services that CAL provided to the Fund under the

IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services

and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons

set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402,

*supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee

---

[1063] DFFCL ¶¶ 451-457.

are "entitled to considerable weight," "commensurate deference," and should not be "supplanted."

Additionally, to the extent that Plaintiffs' assertions in Paragraph 407 are a reprise of Paragraphs 301-306, *supra*, CAL incorporates its Response to Paragraphs 301-306 as if fully set forth herein.

Finally, to the extent that Plaintiffs' assertions rely on the testimony of Professor Bullard, those assertions are not supported by any admissible or credible evidence because (a) Professor Bullard lacks any qualification to offer any opinion regarding the Independent Trustees' lack of conscientiousness in their evaluation of certain information CAL provided in its 15(c) Response (notwithstanding that he has managed to reach this same conclusion in every Section 36(b) case in which he has been retained, (b)  Professor Bullard's opinions suffer from a lack of methodology and lack the rigor required for expert testimony, and (c) in light of the many flaws in his "factual analysis," Professor Bullard was forced to concede that he has no way of knowing how any Independent Trustee actually considered the information CAL provided, and he disavowed any "opinion on what was in the mind of any trustee."[1064]

*408.    Fifth, in considering the Funds' profitability, the Board blindly accepted CAL decision to allocate 100% of its IT Services and G&A expenses to advisory, and none to distribution, notwithstanding that distribution personnel constitute 23% of CAL's total head-count and utilize the same IT Services and G&A resources as CAL's advisory personnel.  See ¶¶294-98, supra.  In fact, rather than acting as an independent check on CAL, Mr. Timbers testified that he had no idea how CAL arrived at these allocations and stated that he simply gave CAL the benefit of the doubt.  See ¶297, supra.*

**RESPONSE:**  Denied.  Plaintiffs' assertions that the Fund's management fee is excessive by virtue of the supposedly limited services that CAL provided to the Fund under the IMA, the supposedly limited risks that CAL assumed with respect to the Fund, and/or because of

---

[1064] DFFCL ¶¶ 451-457.

410

CAL's failure to "justify" the Fund's fee in light of the supposed cost of these different services and risks, fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Responses to Paragraphs 284 and 313-314 as if fully set forth herein.

Moreover, for all of the reasons set forth in CAL's Responses to Paragraph 399-402, *supra*, under *Jones*, the Independent Trustees' annual approvals of the Fund's management fee are "entitled to considerable weight," "commensurate deference," and should not be "supplanted."

Additionally, to the extent that Plaintiffs' assertions in Paragraph 408 are a reprise of Paragraphs 294-298, *supra*, CAL incorporates its Response to Paragraphs 294-298 as if fully set forth herein. Specifically, Plaintiffs' assertions that the Fund's management fee is excessive or that the Independent Trustees lacked conscientiousness by virtue of CAL's "allocation of expense between advisory and distribution functions" fail to support a cognizable Section 36(b) claim for each of the fundamental reasons set forth in CAL's Response to Paragraph 294, *supra*.

409.    *Accordingly, this Gartenberg factor weighs in favor of the Plaintiffs.*

**RESPONSE:**   Denied, for all of the reasons set forth in CAL's responses to Paragraphs 401-408, *supra*.

### F.    The Weight of the *Gartenberg* Factors Shows that CAL's Fees Were not Rationally Related to the Services Rendered

410.    *Accordingly, in sum, Plaintiffs have presented trial evidence not only that CAL charged non-arm's-length fees to the Growth Fund and derived excessive profits from the Growth Fund, but that "the quality of services provided to the [Growth] Fund was poor to such an extent that the [Growth] Fund's Advisory Fees were excessive." Chill, 2018 WL 4778912, at *20. In particular, the evidence presented by Plaintiffs at trial establishes "three facts that readily distinguish this case from others applying Section 36(b): Calamos charged more than most other investment advisers; the Fund performed worse than most comparable mutual funds; and all comparable non-captive clients that could leave Calamos did leave Calamos." Id. Those facts "separate the instant case from cases in which plaintiffs either could not seriously challenge a fund's fee placement relative to its peer group or could not seriously challenge the fund's performance." Id. (citing See Goodman, 301 F. Supp. 3d at 781; Zehrer, 2018 WL 1293230, at *11; In re Blackrock, 327 F. Supp. 3d at 272 n.37; Kasilag, 2016 WL*

*1394347, at \*16).  Hence, Plaintiffs have succeeded in proving a "unique ensemble of facts",
Chill, 2018 WL 4778912, at \*20, establishing that the Growth Fund's fee "is so
disproportionately large that it bears no reasonable relationship to the services rendered and
could not have been the product of arm's length bargaining."  Jones, 559 U.S. at 346.*

**RESPONSE:**  Denied, for all of the reasons set forth in CAL's Responses to Paragraphs

334-409, *supra*.  Plaintiffs have failed to prove that the Fund's fee is "so disproportionately

large" that it "could not have been the product of arm's length bargaining."  Indeed, after four

years of litigation, Plaintiffs still have presented literally no logically-coherent, factually-

supported, legally-viable basis upon which the Court can be the first to hold an adviser liable

under Section 36(b).  To override the business judgment of the Independent Trustees on this trial

record would place the Court squarely in the position of acting as the very "super-trustee" that

*Jones* makes clear is not the role of courts.  Plaintiffs' claim should be dismissed with prejudice

and judgment entered in favor of CAL.

### G.    Damages

*411.    Plaintiffs presented three alternative measures of damages, each of which is a
valid basis for determining the level of compensation due from Defendant.  Pomerantz Report at
¶¶503-17; Tr. at 569:20–579:7.  Dr. Pomerantz presented these three damage calculations in
his initial report (Pomerantz Report at ¶¶503-17), and provided updated damages calculations
at trial (Tr. at 569:20–579:7), based on (1) more comprehensive expense data provided by
Defendant subsequent to Dr. Pomerantz's report (Tr. at 565:2–568:2), and (2) on extending the
time period covered by the calculations beyond March 2017 (the end date in Dr. Pomerantz's
initial May 2017 Report) and until October 2018 (Tr. at 571:17-22).  These updated damages
calculations are attached as Exhibit C hereto.*

**RESPONSE:**  Denied.  CAL admits that Dr. Pomerantz purported to provide three

damage calculations, and that he provided for the first time new damages calculations at trial

based on information CAL had provided to Plaintiffs over a year before trial.

CAL denies that any of Plaintiffs' "alternative measures of damages" is "a valid basis for

determining the level of compensation due from Defendant."  Any cognizable damage claim in a

Section 36(b) case <u>must</u> measure actual economic harm, *i.e.*, the difference between the fee the

adviser actually charged the fund and the upper limit of what an arm's-length bargain could produce.  In this way, the liability and damage cases are melded together; liability is established only when the actual fee exceeds the range of an arm's length bargain, and the excessive portion of that fee constitutes damages.[1065]

Plaintiffs' case failed to meet this foundational tenet in multiple ways:  First, Plaintiffs' only expert to opine on damages, Dr. Pomerantz, never intended to measure damages in this way; to the contrary, as Dr. Pomerantz conceded, none of his damages models were based on the upper bound of the range of fees that CAL and the Fund could have arrived at through arm's-length bargaining.  Second, far from integrating their liability and damages cases at trial, Plaintiffs sought to divorce them.  Third, Dr. Pomerantz's damages theories served largely to highlight the failures in Plaintiffs' liability proof.  Fourth, Dr. Pomerantz's three damage models suffer from independent conceptual, economic and mathematical flaws that render them unreliable.[1066]

Given that Plaintiffs' entire damages case rested on Dr. Pomerantz and his flawed models, they have no cognizable damages case at all, which provides yet another independent basis for a judgment in favor of CAL.[1067]

### 1.     The Damages Period

*412.     Damages in this action are limited to the period from February 2014 (one year prior to complaint filing) through October 2018 (the "Damages Period").  Pomerantz Report at ¶503; Tr. at 569:20–579:7.*

---

[1065] DFFCL ¶¶ 391-396.

[1066] DFFCL ¶¶ 365-390.

[1067] DFFCL ¶¶ 397-400.

**RESPONSE:** Denied. CAL admits that Paragraph 412 accurately states the applicable damages period, except that the parties agreed that any otherwise-recoverable damages, to the extent any such damages exist and are proven, would be reduced by one month in light of Plaintiffs' earlier request to extend the discovery period.

### 2. Damages as the Difference Between the Fee Charged and a Benchmark Representing an Arm's-Length Fee

*413. Defendant's expert Dean Hubbard testified that the appropriate measure of damages in a 36(b) case is the difference between the fee charged and an arm's length benchmark. Tr. at 700:2-702:18. Plaintiffs' expert Dr. Pomerantz agreed (Tr. at 569:21-570:7), and presented damages calculated with reference to three possible such benchmarks (Tr. at 569:20–579:7).*

**RESPONSE:** Denied. CAL denies Plaintiffs' mischaracterization of Dean Hubbard's description of an appropriate measure of damages in this case. Dean Hubbard explained during his deposition that damages would need to be based on "a benchmark of what a competitive value would be," and he explained at trial that "the competitive benchmark means the outer bounds of an arm's-length bargain."[1068]

CAL denies that any of Plaintiffs' alternative measures of damages are a valid basis for determining the level of compensation due from CAL. Any cognizable damage claim in a Section 36(b) case must measure actual economic harm, *i.e.*, the difference between the fee the adviser actually charged the fund and the upper limit of what an arm's-length bargain could produce. In this way, the liability and damage cases are melded together; liability is established only when the actual fee exceeds the range of an arm's length bargain, and the excessive portion of that fee constitutes damages.[1069]

---

[1068] Tr. 700:2-16, 701:6-16 (Hubbard).

[1069] DFFCL ¶¶ 391-396.

Plaintiffs' case failed to meet this foundational tenet in multiple ways: First, Plaintiffs' only expert to opine on damages, Dr. Pomerantz, never intended to measure damages in this way; to the contrary, as Dr. Pomerantz conceded, none of his damages models were based on the upper bound of the range of fees that CAL and the Fund could have arrived at through arm's-length bargaining. Second, far from integrating their liability and damages cases at trial, Plaintiffs sought to divorce them. Third, Dr. Pomerantz's damages theories served largely to highlight the failures in Plaintiffs' liability proof. Fourth, Dr. Pomerantz's three damage models suffer from independent conceptual, economic and mathematical flaws that render them unreliable.[1070]

Given that Plaintiffs' entire damages case rested on Dr. Pomerantz and his models, they have no cognizable damages case at all, which provides yet another independent basis for a judgment in favor of CAL.[1071]

### 3. Damages Method 1: Damages as the Difference between the Fees Payable under the IMA and under the Standard SMA Schedule

*414. Plaintiff's first measure of damages calculates excessive fees as the difference between (1) fees paid by the Growth Fund under the IMA fee schedule, as assessed monthly based on the Growth Fund's monthly average AUM, and (2) the fees the Growth Fund would have paid under the Standard SMA Schedule (Pomerantz Report ¶¶504(a), 505-08; Tr. at 577:14–578:3; PX 438 at 5), minus (3) a 6.1 bps adjustment for the estimated maximum possible cost of additional services that CAL provided to the Funds but not to Other ACG Accounts (Tr. at 565:2–568:2), in order to present an apples to apples comparison of the services provided (Tr. at 571:23–572:22).*

**RESPONSE:** Denied. CAL admits that Paragraph 414 sets forth Dr. Pomerantz's description of his first measure of damages. Plaintiffs' Damages Method 1 is not a coherent or viable damages calculation for at least nine different and independent reasons:

---

[1070] DFFCL ¶¶ 365-390.

[1071] DFFCL ¶¶ 397-400.

<u>First</u>, this damages model is completely divorced from Plaintiffs' liability case.  Any cognizable damage claim in a Section 36(b) case <u>must</u> measure actual economic harm, *i.e.*, the difference between the fee the adviser actually charged the fund and the upper limit of what an arm's-length bargain could produce.  In this way, the liability and damage cases are melded together; liability is established only when the actual fee exceeds the range of an arm's length bargain, and the excessive portion of that fee constitutes damages.[1072]  However, Plaintiffs made no effort to prove at trial that the range of fees that could have been produced by an arm's-length bargain ended at 51 basis points.[1073]

<u>Second</u>, as Dr. Pomerantz conceded, <u>all</u> of the institutional All Cap Growth Clients paid effective fee rates under this same fee schedule that were "significantly more" than this 51 basis points, undermining his assumed ceiling on the Fund's fee.[1074]

<u>Third</u>, this damages model does not comport with any sensible theory of liability.  If CAL were to charge the Fund the fee dictated by Dr. Pomerantz's Damages Method 1, the Fund's fee would be lower than the fees paid by more than 75% of the Fund's peer mutual funds.  Plaintiffs offered no evidence or explanation of any kind to reconcile their damages model with the necessary implication that the maximum non-excessive fee that CAL could charge the Fund would need to be lower than 75% of its peers.[1075]

<u>Fourth</u>, as presented in Dr. Pomerantz's expert reports, his Damages Method 1 is economically flawed because it ignores <u>all</u> of the different characteristics of mutual funds on the

---

[1072] DFFCL ¶¶ 391-396.

[1073] DFFCL ¶ 374.

[1074] DFFCL ¶ 375.

[1075] DFFCL ¶ 378.

one hand and institutional and sub-advisory clients on the other hand.  Put simply, it assumes that the many different services and risks unique to the Fund discussed above simply do not exist.[1076]

Fifth, Dr. Pomerantz's supposed 6.1 bps "adjustment for the maximum possible cost of additional services provided to the Growth Fund" does not represent an accurate measure of the difference in CAL's costs between providing services to the Fund and CAL's All Cap Growth Clients.  Dr. Pomerantz's belated and demonstrably erroneous calculation does not prove anything, and is therefore of no probative value to any issue in this case, because, among other reasons (a) at the time of his deposition, Dr. Pomerantz testified that he had not, and could not, calculate the difference in CAL's costs between managing a mutual fund and advising an institutional or sub-advisory All Cap Growth Client, (b) Dr. Pomerantz does not have the requisite experience in the mutual fund industry to assess the differences in services and risks involved in advising a mutual fund as compared with institutional or sub-advisory accounts, and (c) Dr. Pomerantz conceded that he had zero experience calculating this type of cost differential during his career, and he could not provide any example of an occasion in which a court had ruled that he was qualified to perform this kind of analysis.[1077]  As Dr. Pomerantz aptly described it, the costs forming the basis for his 6.1 basis point calculation "don't really correspond to anything."[1078]

Sixth, this model also is senseless at another level.  Dr. Pomerantz acknowledged that the sum total of all of the costs of all of the services provided to the Fund he referenced in this late addition to his damages opinions (i.e., the cost of the services that Dr. Pomerantz believes to be

---

[1076] DFFCL ¶ 376.

[1077] DFFCL ¶¶ 376-377, 379.

[1078] DFFL ¶ 379.

common to the Fund and to CAL's All Cap Growth Clients, without including the 6.1 basis

points of costs Dr. Pomerantz believes apply only to the Fund), would be approximately 65 basis

points.  Yet he is capping CAL's fee under this model at 51 basis points, which of course is less

than his total calculated costs.  It is therefore not surprising that he struggled at trial to explain

how his supposed 6.1 basis point differential based on the CAL's costs for providing greater

services to the Fund could be accurate.[1079]

      Seventh, Dr. Pomerantz's model is also nonsensical because the results would eliminate

all, or substantially all, of the profit CAL earns from advising the Fund.  Dr. Pomerantz and

Plaintiffs ignored this issue entirely and made no effort to contradict in the slightest Dean

Hubbard's analysis showing that, if CAL were to charge the Fund the fee dictated by

Dr. Pomerantz's Damages Method l 1, CAL's pre-distribution operating margin would be much

lower, if not negative and its post-distribution margin would be substantially negative.[1080]

      Eighth, Dr. Pomerantz's Damages Method 1 must be rejected because it is necessarily a

cost-plus pricing model that Section 36(b) does not endorse and that does not make economic

sense in the mutual fund industry.  In the apt words of Dean Hubbard: this damages model is

"necessarily cost-plus pricing.  That is exactly what it is."[1081]  In addition, no regulator or Court

has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees.

As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* do <u>not</u> require

fee parity across an adviser's different clients."  Hence, <u>no</u> court has <u>ever</u> held that institutional

or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define

---

[1079] DFFCL ¶ 379.

[1080] DFFCL ¶ 380.

[1081] DFFCL ¶ 381.

the arm's-length bargaining range for a fund's management fee.  Indeed, <u>every</u> court to consider

the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings

stage) has rejected this effort.[1082]

  <u>Ninth</u>, Dr. Pomerantz's opinion setting forth this damages model should be excluded,

because (a) he lacks the qualifications necessary to determine the comparability of the Fund to

CAL's institutional and sub-advisory All Cap Growth Clients, as his calculation requires to be

true, and (b) his methodology is fatally flawed and therefore unreliable.  Dr. Pomerantz is not

qualified to dismiss out of hand the differences in services and risks between managing a mutual

fund and advising an institutional or sub-advisory client, nor is he qualified to compare the scope

of portfolio management services provided to mutual funds versus institutional or sub-advisory

clients.[1083]  In addition his comparison of these fees to the Fund's fee is also infected by his bias

against mutual fund advisers.  Rather than critically assessing the aptness of comparing these

types of investment products or providing any kind of economic explanation, Dr. Pomerantz's

only explanation for this industry-wide fee differential—long-standing and "prevalent abuse"

across the mutual fund industry—demonstrates that Dr. Pomerantz's calculation suffers from

negative bias and is not an objective, professional opinion arrived at by using any sort of reliable

methodology.[1084]

  *415. The Growth Fund paid an average effective fee rate of 0.87% under the IMA fee schedule during the Damages Period, but would have paid an average effective fee rate of 0.51% under the Standard SMA Schedule.  Tr. at 571:23–572:22.  Under this calculation, the difference between the two is 0.36% (36 basis points), which is then reduced by 6.1 basis points (to adjust for the maximum possible cost of additional services provided to the Growth Fund) to yield a damages measure of approximately 0.30% (30 basis points). Id. Applied on a monthly basis*

---

[1082] DFFCL ¶¶ 227-229.

[1083] DFFCL ¶¶ 430-432.

[1084] DFFCL ¶¶ 433-435.

*throughout the Damages Period to the Growth Fund's monthly average AUM, this adjusted differential yields aggregate damages of $32.7 million.  Id.*

**RESPONSE:**  Denied.  CAL admits that Paragraph 415 sets forth the process Dr. Pomerantz claims to have followed to create his first measure of damages.  Plaintiffs' Damages Method 1 is not a valid damages calculation for at least nine different and independent reasons, as demonstrated in CAL's Response to Paragraph 414, which is incorporated as if fully set forth herein.

416.    *This measure of damages, which takes the Standard SMA Schedule as the measure, or benchmark, of rates negotiated at arm's length, is a conservative one, because it does not take into account the substantially lower advisory fee rates paid by CAL's largest Other ACG Accounts most comparable in size (and services) to the Growth Fund.  See e.g. Tr. at 571:23–574:13, 575:19–576:17.  The Standard SMA Schedule was the governing rate for 31 of CAL's 36 Other ACG Accounts (indeed, for all 31 Institutional ACG Accounts), but those accounts were all comparatively small, and only 10% or less of the aggregate money CAL managed for the Other ACG Accounts paid advisory fees set by the Standard SMA Schedule.  See ¶¶75, 78-82, supra.  The Standard SMA Schedule did not contemplate AUM ranges substantially in excess of $75 million (Tr. at 577:14–578:3; PX 438 at 5).  Other ACG Accounts with AUM substantially in excess of $75 million, however, proved able to negotiate different and lower advisory fee rates for themselves (Tr. at 572:19–573:13):  specifically, CAL's largest Other ACG Accounts (Nomura and the two MD Accounts, which accounted for 90% or more of CAL's total Other ACG Account AUM for most of the Relevant Period (see ¶¶84-87, supra)).*

**RESPONSE:**  Denied.  Plaintiffs' assertion that the Fund's comparatively larger AUM would have allowed it to negotiate a lower management fee than the Standard SMA Schedule provides is based solely on the speculation of Dr. Pomerantz, who conceded that he has no direct experience with negotiating management fees (or a fee for any third-party service provider) on behalf of a mutual fund.[1085]  Plaintiffs' Damages Method 1 is not a valid damages calculation for at least nine different and independent reasons, as demonstrated in CAL's Response to Paragraph 414, which is incorporated as if fully set forth herein.

---

[1085] DFFCL ¶¶ 412-413; Tr. 406:8-407:24, 409:17-410:6 (Pomerantz).

### 4. Damages Method 2:  Damages as the Difference Between the Effective Fee Rate Paid by the Growth Fund and Weighted Average Rate Paid by CAL's Other ACG Accounts

*417.    Plaintiffs' second measure of damages calculates excessive fees in a manner identical to the first measure, except that instead of using the Standard SMA Schedule as the benchmark for an arm's-length advisory fee, it uses the AUM-weighted average effective fee rate actually paid by CAL's Other ACG Accounts (Pomerantz Report at ¶¶504(b), 509-11), similarly adjusted for the maximum possible cost of any service differentials.  Tr. at 572:19–574:13, 575:19–577:12.*

**RESPONSE:**  Denied.  Plaintiffs' Damages Method 2 is not a coherent or viable damages calculation for at least ten different and independent reasons:

First, this damages model is completely divorced from Plaintiffs' liability case.  Any cognizable damage claim in a Section 36(b) case must measure actual economic harm, *i.e.*, the difference between the fee the adviser actually charged the fund and the upper limit of what an arm's-length bargain could produce.  In this way, the liability and damage cases are melded together; liability is established only when the actual fee exceeds the range of an arm's length bargain, and the excessive portion of that fee constitutes damages.[1086]  However, at no point during trial did Plaintiffs offer evidence that an arm's-length bargain for the Fund's fee would not extend beyond 42 basis points.  There is good reason for this disconnect, as it was undisputed at trial that under this model, the Fund's fee would be lower than more than 75% of the fees paid by peer mutual funds.[1087]

Second, Dr. Pomerantz based this calculation on only nine of CAL's All Cap Growth Clients (six institutional accounts and three sub-advisory accounts), despite the fact that, as the parties stipulated before trial, CAL had 36 All Cap Growth Clients during the Relevant Period.  Plaintiffs made no effort at trial to explain or correct for this error, for the likely reason, as

---

[1086] DFFCL ¶¶ 391-396.

[1087] DFFCL ¶ 383.

Dr. Pomerantz admitted, that adding the missing 27 accounts—all of which paid fees higher than 42 basis points and the majority of which paid 75 basis points—would have raised his calculated fee ceiling and reduced damages.[1088]

       Third, Dr. Pomerantz did not do any kind of analysis to determine whether any of CAL's All Cap Growth Clients—including the two sub-advisory clients, Nomura and MD American, who were charged the lowest fees—were actually comparable to the Fund.  Removing those two sub-advisory accounts alone would have increased his calculated average fee to more than 70 basis points.[1089]

       Fourth, Dr. Pomerantz did not re-calculate his weighted average effective fee to account for the fact that CAL's mix of All Cap Growth Clients changed throughout the Relevant Period. Indeed, Dr. Pomerantz's 42 basis point calculation is entirely inapplicable for 2017 and 2018—i.e., nearly two-fifths of the Relevant Period—because during those years, CAL had no All Cap Growth Clients.[1090]

       Fifth, Dr. Pomerantz's weighted average effective fee also ignores a particularly important fact: that some of CAL's former All Cap Growth Clients that could have opened institutional accounts instead chose to invest in the Fund and pay the same management fee as Plaintiffs.  These facts speak directly to the range of an arm's-length bargain and are directly at odds with a fee ceiling of 42 basis points.[1091]

       Sixth, Dr. Pomerantz also adjusted this damages model to include the same 6.1 additional basis points discussed above that purportedly represent the additional costs that CAL incurs to

---

[1088] DFFCL ¶ 384.

[1089] DFFCL ¶ 385.

[1090] DFFCL ¶ 386.

[1091] DFFCL ¶ 387.

manage the Fund over its All Cap Growth Clients. Dr. Pomerantz's "6.1 bps adjustment" does not represent an accurate measure of the difference in CAL's costs between providing services to the Fund and to CAL's All Cap Growth Clients. Dr. Pomerantz's belated and demonstrably erroneous calculation does not prove anything, and is therefore of no probative value to any issue in this case, because, among other reasons (a) at the time of his deposition, Dr. Pomerantz testified that he had not, and could not, calculate the difference in CAL's costs between managing a mutual fund and advising an institutional or sub-advisory All Cap Growth Client, (b) Dr. Pomerantz does not have the requisite experience in the mutual fund industry to assess the differences in services and risks involved in advising a mutual fund as compared with institutional or sub-advisory accounts, and (c) Dr. Pomerantz conceded that he had zero experience calculating this type of cost differential during his career, and he could not provide any example of an occasion in which a court had ruled that he was qualified to perform this kind of analysis.[1092]  As Dr. Pomerantz aptly described it, the costs forming the basis for his 6.1 basis point calculation "don't really correspond to anything."[1093]

Seventh, Dr. Pomerantz acknowledged that the sum total of all of the costs of all of the services provided to the Fund he referenced in this late addition to his damages opinions (*i.e.*, the cost of the services that Dr. Pomerantz believes to be common to the Fund and to CAL's All Cap Growth Clients, without including the 6.1 basis points of costs Dr. Pomerantz believes apply only to the Fund), would be approximately 65 basis points. Dr. Pomerantz offered no sensible explanation for why the 42 basis point fee average that his model would require CAL to charge would be lower than his 65 basis point cost calculation. Obviously, and as Dr. Pomerantz

---

[1092] DFFCL ¶¶ 376-377, 379.

[1093] DFFL ¶ 379.

conceded, CAL would lose significant amounts of money advising All Cap Growth Clients if, as Dr. Pomerantz's trial calculations suggested, it charged those clients only 42 basis points for services that cost CAL 65 basis points to provide.[1094]

Eighth, this damages model, like Dr. Pomerantz's other models, makes no better economic sense looked at from the business of managing the Fund. Plaintiffs made no effort to respond to Dean Hubbard's analysis showing that this maximum 42 basis point fee would mean that CAL's pre-distribution operating margin would be quite low, and its post-distribution operating margin frequently negative. Put simply, the fee that Dr. Pomerantz considers to be a "competitive benchmark" "would imply that the fund had to become virtually the cheapest and lose money to be able to meet a competitive standard."[1095]

Ninth, ultimately Dr. Pomerantz's Damages Method 2 is based on a cost-plus pricing model that does not make any economic sense in the mutual fund industry and that both the legislative history and the case law under Section 36(b) explicitly prohibit. In the apt words of Dean Hubbard: this damages model is "necessarily cost-plus pricing. That is exactly what it is." In addition, no regulator or Court has ever concluded that institutional or sub-advisory fees serve as a ceiling on mutual fund fees. As both Dr. Pomerantz and Professor Bullard conceded, Section 36(b) and *Jones* do not require fee parity across an adviser's different clients." Hence, no court has ever held that institutional or sub-advisory accounts are an apt comparison for a mutual fund such that their fees can define the arm's-length bargaining range for a fund's

---

[1094] DFFCL ¶ 388.

[1095] DFFCL ¶ 389.

management fee.  Indeed, <u>every</u> court to consider the issue on the merits (as opposed to having to credit plaintiffs' allegations at the pleadings stage) has rejected this effort.[1096]

  <u>Tenth</u>, Dr. Pomerantz's opinion setting forth this damages model should be excluded, because (a) he lacks the qualifications necessary to determine the comparability of the Fund to CAL's institutional and sub-advisory All Cap Growth Clients, as his calculation requires to be true, and (b) his methodology is fatally flawed and therefore unreliable.  Dr. Pomerantz is not qualified to dismiss out of hand the differences in services and risks between managing a mutual fund and advising an institutional or sub-advisory client, nor is he qualified to compare the scope of portfolio management services provided to mutual funds versus institutional or sub-advisory clients.[1097]  In addition, his comparison of these fees to the Fund's fee is also infected by his bias against mutual fund advisers.  Rather than critically assessing the aptness of comparing these types of investment products or providing any kind of economic explanation, Dr. Pomerantz's only explanation for this industry-wide fee differential—long-standing and "prevalent abuse" across the mutual fund industry—demonstrates that Dr. Pomerantz's calculation suffers from negative bias and is not an objective, professional opinion arrived at by using any sort of reliable methodology.[1098]

  *418. CAL charged the Growth Fund an average effective fee rate of 0.87% under the IMA fee schedule during the Damages Period, but charged its Other ACG Accounts a weighted average effective fee rate of 0.42% (the overall effective fee rate paid by all Other ACG Account AUM in the aggregate).  Tr. at 572:19–574:13, 576:10-16.  The difference between the two is 0.45% (45 basis points), which after a 6.1 basis point reduction to adjust for the maximum possible cost of additional services provided to the Growth Fund yields a damages measure of approximately 0.39% (39 basis points).  Tr. at 572:19–573:5. Applied on a monthly basis*

---

[1096] DFFCL ¶¶ 227-229, 381.

[1097] DFFCL ¶¶ 430-432.

[1098] DFFCL ¶¶ 433-435.

*throughout the Damages Period to the Growth Fund's monthly average AUM, this adjusted differential yields aggregate damages of $42.3 million.  Id.*

**RESPONSE:**  Denied.  CAL denies that it "charged its Other ACG Accounts a weighted average effective fee rate of 0.42%."  Plaintiffs' Damages Method 2 is not a valid damages calculation for at least nine different and independent reasons, as demonstrated in CAL's Response to Paragraph 417, which is incorporated as if fully set forth herein.

*419.     This second damages measure is arguably superior to the first because the competitive benchmark used (i.e., the measure of the arm's-length fee for the relevant services) is the **actual effective fee rate paid, on an overall basis, by CAL's Other ACG Accounts** (discounted for any service differentials).  Tr. at 573:6–574:13.*

**RESPONSE:**  Denied.  CAL denies Plaintiffs' assertion that Plaintiffs' Damages Method 2 is "arguably superior" to Damages Method 1 because that assertion is premised on Plaintiffs' unsupported and erroneous assertions that Damages Method 2: (1) incorporates "the actual affective fee rate paid, on an overall basis, by CAL's Other ACG Accounts," and (2) "discount[s] for any service differentials" between the Fund and CAL's All Cap Growth Clients.  Plaintiffs' Damages Method 2 is not a valid damages calculation for at least ten different and independent reasons, as demonstrated in CAL's Response to Paragraph 417, which is incorporated as if fully set forth herein.

*420.     Dean Hubbard's theoretical criticism of this damages measure – that it depends on and can vary according to the precise mix of CAL's Other ACG Accounts at any given time (Hubbard Report at ¶¶201-02) – recasts the measure's strength (that it represents the actual overall effective fee rate actually paid by CAL's actual Other ACG Accounts) as its flaw.  Tr. at 573:14–574:13.*

**RESPONSE:**  Denied.  CAL denies that the susceptibility of Damages Method 2 to variations in CAL's All Cap Growth Clients constitutes "the measure's strength."  The validity of Dean Hubbard's criticism is illustrated by the fact that when creating Damages Method 2, Dr. Pomerantz did not even adjust his weighted average effective fee rate as that fee rate changed

during the Relevant Period in response to CAL's changing mix of clients, which caused the effective fee rate for all clients to increase above 42 basis points.[1099]

CAL also denies that Plaintiffs' Damages Method 2 is a coherent and viable measure of damages for at least ten different and independent reasons, as demonstrated in CAL's Response to Paragraph 417, which is incorporated as if fully set forth herein.

421.    *Defendant argues that the weighted average effective fee rate of 0.42% calculated by Dr. Pomerantz has insufficient basis, and is potentially inaccurate, because it was calculated on the basis of information from only nine Other ACG Accounts, including the Nomura and MD Accounts responsible for 90% or more of total Other ACG Account assets during most of the Relevant Period, rather than from information from all 36 Other ACG Accounts that CAL has had at any time after January 1, 2012 (Tr. at 582:16–584:10; see also id. at 498:11–500:10, 507:2–508:23).*[1100]

**RESPONSE:**  Denied as stated.  CAL also denies that Plaintiffs' Damages Method 2 is a coherent and viable measure of damages for at least ten different and independent reasons, as demonstrated in CAL's Response to Paragraph 417, which is incorporated as if fully set forth herein.

422.    *In fact, a comprehensive weighted average fee rate paid by all Other ACG Accounts during the Relevant Period is calculable from the Other ACG Account data Defendant first provided in its September 2017 interrogatory response (JX 181 at Ex. A), subsequent to Dr. Pomerantz's May 2017 initial report (Pomerantz Report):  that weighted average is 0.46%. See Exhibit A hereto.*

**RESPONSE:**  Denied.  CAL objects to Plaintiffs' attempt to introduce this new analysis by Dr. Pomerantz after trial, thereby depriving CAL of any ability to cross-examine him about his purported work.  Dr. Pomerantz had this data available to him to analyze since September

---

[1099] Tr. 586:13-587:22 (Pomerantz).

[1100] *Many of the 36 Other ACG Accounts (specifically, 13 of the 36) had terminated CAL prior to the Relevant Period.  See ¶71, supra; Tr. at 583:10–584:4.*  **RESPONSE:**  CAL denies that 13 of the Other ACG Accounts terminated CAL prior to the Relevant Period.  Seven of these 13 accounts identified by Plaintiffs terminated CAL on June 27, 2013, which was after the June 21, 2013 meeting at which the Board approved the Fund's IMA and, therefore, within the Relevant Period.  *Compare* JX 181 at Ex. A, *with* JX 31.

2017, more than a year in advance of trial, which he admitted at trial.[1101]  Dr. Pomerantz was

previously reprimanded for using exactly this tactic in *Sivolella*, in which he also attempted to

rehabilitate his flawed damages models through updated charts that were "never disclosed at trial

or prior to the parties' pre-trial order."[1102]  As the *Sivolella* court explained:

> A party cannot cure flaws or inaccuracies in its trial presentation
> through post-trial submissions by simply submitting new charts and
> updated calculations.  If the Court were to allow this, Defendants
> would be deprived of their right to cross-examine Plaintiffs'
> witnesses, or offer their own testimony or evidence in rebuttal.  The
> right to cross-examine and test the soundness of the calculations is
> particularly important here in light of the large number of errors,
> methodological shortcomings, and basic mistakes demonstrated by
> Plaintiffs' experts [*i.e.*, Dr. Pomerantz] at trial.[1103]

The Court should similarly rule that Dr. Pomerantz's strategically untimely analysis "should not

be considered."[1104]

Even if this untimely testimony were permitted, it would not cure any of the flaws with

Plaintiffs' "Damages Method 2" for all of the reasons set forth in CAL's Responses to

Paragraphs 417-421, *supra*.

### 5.   Damages Method 3:  Damages as the Difference Between the Advisory Fees Paid by the Fund and the Advisory Fees Paid by Similar Funds

*423.   Plaintiff's third measure of damages calculates excessive fees as the difference
between (1) fees paid by the Growth Fund under the IMA fee schedule, as assessed monthly
based on the Growth Fund's monthly average AUM, and (2) based on Dr. Pomerantz's analysis
of the effective advisory fee rates and AUM of approximately 417 similarly-classified mutual
funds, the model-predicted advisory fee payable by a mutual fund the size of the Growth Fund
(Pomerantz Report at ¶¶504(c), 512-17); Tr. at 574:14–575:6, 593:31–594:20).  Here, unlike in
Plaintiffs' first and second damages measures, no service differential adjustment is used or*

---

[1101] JX 181 at 10; Tr. 596:19-21 (Pomerantz).

[1102] *Sivolella*, 2016 WL 4487857, at *70.

[1103] *Id.* at *71.

[1104] *Id.* at *70.

*needed, as the Growth Fund's advisory fees are compared against those paid by other mutual funds, rather than those paid by institutional or subadvisory clients. Tr. at 575:1-4.*

**RESPONSE:**  Denied.  CAL denies that Plaintiffs' Damages Method 3 measures "excessive fees."  Dr. Pomerantz's Damages Method 3 does not provide a coherent basis for calculating cognizable Section 36(b) damages.

First, this damages model is completely divorced from Plaintiffs' liability case.  Any cognizable damage claim in a Section 36(b) case must measure actual economic harm, *i.e.*, the difference between the fee the adviser actually charged the fund and the upper limit of what an arm's-length bargain could produce.  In this way, the liability and damage cases are melded together; liability is established only when the actual fee exceeds the range of an arm's length bargain, and the excessive portion of that fee constitutes damages.[1105]  However, Damages Method 3 would require a finding that not only does CAL charge a fee that exceeds the range of an arm's-length bargain, but so too do more than 57% of the hundreds of other advisers in the Fund's Morningstar Category.[1106]  Plaintiffs made no effort at trial to show that this fee level is the upper end of the range of an arm's-length bargain; indeed, they never tried to establish liability on the basis of any particular peer fund ranking.[1107]

Second, Dr. Pomerantz's regression model underlying Damages Method 3 uses AUM as the only variable that predicts mutual fund fees, despite the fact that Dean Hubbard explained that numerous other explanatory variables would impact the fee paid by a particular fund.[1108]

---

[1105] DFFCL ¶¶ 391-396.

[1106] DFFCL ¶ 369.

[1107] DFFCL ¶ 369.

[1108] DFFCL ¶ 264.

Due to this limitation, more than <u>82%</u> of variation of mutual fund fees is left unexplained and unaccounted for by Dr. Pomerantz's regression.[1109]

      <u>Third</u>, this damages model also reflected sloppy work that makes it unreliable.  For example, Dr. Pomerantz did not apply a confidence interval to his regression calculation.  If this single flaw in his model is corrected, the Fund's actual fee is within the range predicted by his regression, *i.e.*, the Fund's fee is statistically not different than his model would predict, preventing a finding of either liability or damages on that basis.  In addition, although Dr. Pomerantz incorrectly described this model in his expert report as a comparison to a "median rate," this model has nothing to do with a "median rate."[1110]

      Given these fundamental and pervasive flaws with Damages Method 3, even Dr. Pomerantz admitted that this damages model is "less meritorious" than his other damages models.[1111]

      *424.    Damages calculated by this measure aggregate to approximately $29 million (Tr. at 575:5-6):  the Growth Fund's average advisory fee during the Relevant Period was 0.87%, while the average model-predicted advisory fee (based on Dr. Pomerantz's analysis of those paid by similar funds) was 0.61%, yielding an average differential of 0.26% (26 basis points) and aggregate damages of $28.975 million.*

      <u>**RESPONSE:**</u>  Denied.  CAL denies that Plaintiffs' Damages Method 3 is a coherent and viable measure of damages for the reasons demonstrated in CAL's Response to Paragraph 423, which is incorporated as if fully set forth herein.

      *425.    Defendant's criticisms of this damages calculation all center on the validity and explanatory power of the Dr. Pomerantz's model-predicted fee of 0.61%.  Tr. at 522:6–527:6, 532:5–533:15; 733:18–736:7; Hubbard Report at ¶¶203-04.  However, as Dean Hubbard explains, all these criticisms can be resolved by substituting, in place of Dr. Pomerantz's model-predicted fee, the median fee paid by mutual funds of similar size and character. Tr. at 734:22–*

---

[1109] DFFCL ¶ 266.

[1110] DFFCL ¶¶ 370-371.

[1111] DFFCL ¶ 369.

*735:1. Here, Dr. Pomerantz, as well as each of the Independent Data Providers, has also calculated median advisory fee paid by funds of similar size and character:  0.63%, according to Dr. Pomerantz (Pomerantz Report at ¶302); according to Morningstar, 0.62% (in its 2016 report), 0.60% (in its 2015 report), and 0.62% (in its 2014r report) (see JX 130 at 636413; JX 88 at 524006; JX 46 at 520623); and according to Strategic Insight, 0.74% (in its 2018 report) and 0.69% (in its 2017 report) (see JX 186 at 653890; JX  175 at 652026).  The average of all these median fee observations is 0.65%.*

**RESPONSE:**  Denied.  Plaintiffs' statement in Paragraph 425 blatantly misrepresents the testimony of Dean Hubbard, who said that Dr. Pomerantz's use of the term "median" fee to describe the regression model that Dr. Pomerantz used to create Damages Method 3 was an "obvious" descriptive error that reflected Dr. Pomerantz's repeated inability to accurately describe the analysis that he conducted.[1112]  No good faith reading of Dean Hubbard's testimony can support Plaintiffs' assertion that Dean Hubbard's numerous additional criticisms of Plaintiffs' Damages Method 3—separate and apart from Dr. Pomerantz's incorrect use of the word "median"—can be remedied simply by replacing Dr. Pomerantz's regression with the median fee for the Fund's Morningstar Category.[1113]  To the contrary, this supposed remedy would not address at all Dr. Hubbard's criticism that Dr. Pomerantz's Damages Method 3 would impose purported damages on more than half of the mutual funds in the Fund's Morningstar Category.[1114]

Plaintiffs' statement in Paragraph 425 also misstates the median fee for the data set that Dr. Pomerantz used to calculate Damages Method 3.  Dr. Pomerantz did not calculate a median fee for the set of 417 mutual funds used to create the regression model that is the basis of his Damages Method 3, but the underlying data set in his work papers reflects that the median of

---

[1112] Tr. 734:22-735:1 (Hubbard).

[1113] Tr. 735:1-736:7 (Hubbard).

[1114] Tr. 735:1-4 (Hubbard); DFFCL ¶ 369.

these mutual funds' fees would be 0.70%—not 0.63%.  Instead, 0.63% represents the average fee

charged by mutual funds in Dr. Pomerantz's smaller, size-restricted group of 129 mutual funds,

not the set of mutual funds that actually formed the basis for Dr. Pomerantz's Damages Method

3.[1115]  In keeping with Plaintiffs'—through Dr. Pomerantz's—loose use of statistical terms, the

portion of Dr. Pomerantz's report on which Plaintiffs rely actually reports the average fee for this

different, more limited data set of mutual funds; Dr. Pomerantz's work papers reflect that the

median fee for this group would actually be 0.64%.[1116]  CAL also denies that Plaintiffs' assertion

in Paragraph 425 accurately states the median fees that Morningstar and Strategic Insight

reported for the Fund's Morningstar Category, which was the group of mutual funds that

Dr. Pomerantz used to create Damages Method 3, but instead reports the median fees for the

Fund's more limited peer group, which is based on much fewer mutual funds.  The category

medians reported by Morningstar were systematically higher in each year than the medians

Plaintiffs reported above: 0.69% (in 2014), 0.69% (in 2015), and 0.68% (in 2016).[1117]  Strategic

Insight did not report a median advisory fee for all mutual funds in the Fund's Morningstar

Category.[1118]

　　　　CAL also denies that Plaintiffs' Damages Method 3 is a coherent and viable measure of

damages for the reasons demonstrated in CAL's Response to Paragraph 423, which is

incorporated as if fully set forth herein.

---

[1115] Pomerantz Rpt. ¶ 302.

[1116] *Id.*

[1117] JX 46 at CALAMOS_00520623; JX 88 at CALAMOS_00524006; JX 130 at
CALAMOS_00636413.

[1118] JX 175 at CALAMOS_00652022 – 026, JX 186 at CALAMOS_00953886 – 890.

426.    *If this damages calculation is revised to replace Dr. Pomerantz's model-predicted fee (0.61%) with this actual median fee (0.65%), damages would decrease slightly, and Defendants' objections would be erased.*

**RESPONSE:**  Denied.  CAL objects to Plaintiffs' attempt to introduce this new analysis by Dr. Pomerantz after trial, thereby depriving CAL of any ability to cross-examine him about his purported work.  Dr. Pomerantz was previously reprimanded for using exactly this tactic in *Sivolella*, in which he also attempted to rehabilitate his flawed damages models through updated charts that were "never disclosed at trial or prior to the parties' pre-trial order."[1119]  As the *Sivolella* court explained:

> A party cannot cure flaws or inaccuracies in its trial presentation through post-trial submissions by simply submitting new charts and updated calculations.  If the Court were to allow this, Defendants would be deprived of their right to cross-examine Plaintiffs' witnesses, or offer their own testimony or evidence in rebuttal.  The right to cross-examine and test the soundness of the calculations is particularly important here in light of the large number of errors, methodological shortcomings, and basic mistakes demonstrated by Plaintiffs' experts [*i.e.*, Dr. Pomerantz] at trial.[1120]

The Court should similarly rule that Dr. Pomerantz's strategically untimely analysis "should not be considered."[1121]

Even if this untimely testimony were permitted, it would not cure any of the flaws with Plaintiffs' "Damages Method 3" for all of the reasons set forth in CAL's Responses to Paragraph 423, *supra*.

427.    *Plaintiffs view this third damages calculation as inferior to the first two, because, unlike the fee benchmarks employed in the first two damages calculations, which were based on fees indisputably negotiated at arm's-length between CAL and the unaffiliated institutions comprising the Other ACG Accounts, the advisory fees paid by other mutual funds may not be products of, or indicative of, normal arm's-length bargaining, and may be affected by the same*

---

[1119] *Sivolella*, 2016 WL 4487857, at *70.

[1120] *Id*. at *71.

[1121] *Id*. at *70.

*absence of normal arm's-length bargaining that affects the Growth Fund.  Tr. at 533:3-15,*
*575:7-18, 578:4–579:8; Pomerantz Report at ¶517.  Hence, the advisory fees paid by other*
*mutual funds may not be a valid or accurate benchmark for the range of advisory fees negotiated*
*at arm's-length.  Id.*

**RESPONSE:**  Denied.  CAL admits that Dr. Pomerantz has on multiple occasions

acknowledged that his Damages Method 3 "has less merit" than his other damages models.[1122]

CAL denies that Plaintiffs' Damages Method 3 is a coherent and viable measure of damages for

the reasons demonstrated in CAL's Response to Paragraph 423, which is incorporated as if fully

set forth herein.

---

[1122] Pomerantz Rpt. ¶ 514; Pomerantz Rebuttal Rpt. ¶ 486; DFFCL ¶ 369.

**CONCLUSION**

428.    *The trial evidence establishes that CAL's advisory fees are excessive under Jones, Gartenberg and Section 36(b) of the ICA.  Accordingly, the Court should render a verdict in favor of Plaintiffs and award damages in an amount the Court determines is merited under the circumstances.*

**RESPONSE:**  Denied.  Plaintiffs have failed to prove that the Fund's fee is "so disproportionately large" that it "could not have been the product of arm's length bargaining." Indeed, after four years of litigation, Plaintiffs still have presented literally no logically-coherent, factually-supported, legally-viable basis upon which the Court can be the first to hold an adviser liable under Section 36(b).  To override the business judgment of the Independent Trustees on this trial record would place the Court squarely in the position of acting as the very "super-trustee" that *Jones* makes clear is not the role of courts.  Plaintiffs' claim should be dismissed with prejudice and judgment entered in favor of CAL.


  Dated: February 8, 2019

                                                              DECHERT LLP

                                                               */s/ David A. Kotler*
                                                              Matthew L. Larrabee
                                                              David A. Kotler
                                                              Catherine V. Wigglesworth
                                                              Tiffany Engsell
                                                              Brendan Herrmann
                                                              Three Bryant Park
                                                              1095 Avenue of the Americas
                                                              New York, NY  10036-6797
                                                              Telephone: (212) 698-3500

                                                              *Counsel for Defendant*
                                                              *Calamos Advisors LLC*