UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAUL CHILL and SYLVIA CHILL, for the use
and benefit of the CALAMOS GROWTH FUND,

Plaintiffs,

– against –

CALAMOS ADVISORS LLC,

Defendant.

---

**OPINION AND ORDER**

15 CIV. 1014 (ER)

Ramos, D.J.:

This opinion considers whether a mutual fund investment adviser breached the "fiduciary duty with respect to the receipt of compensation for services" that is imposed by § 36(b) of the Investment Company Act of 1940 (the "ICA") (codified at 15 U.S.C. § 80a-35(b)).

Plaintiffs Saul Chill and Sylvia Chill are shareholders in of the Calamos Growth Fund (the "Fund"), a mutual fund. Statement of Stipulated Facts ("SSF") ¶ 1, Doc. 187-1. Defendant Calamos Advisors LLC ("Calamos") serves as investment advisor to the Fund pursuant to an Investment Management Agreement (the "IMA") between Calamos and the Fund. *Id.* ¶ 58. The IMA requires Calamos to provide certain investment advisory services to the Fund in exchange for an annual investment advisory fee. *Id.* ¶ 60.

Plaintiffs filed the present suit in February 2015 on behalf of and for the benefit of the Fund, pursuant to § 36(b) of the ICA. Compl. ¶ 1, Doc. 1. Plaintiffs claim that Calamos received, and continues to receive, "excessive" investment advisory fees from the Fund, in violation of its fiduciary duty under § 36(b). *Id.* ¶¶ 3–4.

The Court granted partial summary judgment to Calamos in September 2018, concluding that Plaintiffs had failed to raise triable issues of fact related to two of the six so-called

"*Gartenberg* factors" traditionally considered by courts in § 36(b) cases. *See Chill v. Calamos Advisors LLC*, No. 15 Civ. 1014 (ER), 2018 WL 4778912, at *21 (S.D.N.Y. Oct. 3, 2018); *see also Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982). Specifically, the Court concluded that Plaintiffs had failed to raise triable issues of fact regarding the extent to which Calamos realized and shared "fall-out" benefits and economies of scale. *Chill*, 2018 WL 4778912 at *21.

In that same opinion, the Court declined to rule on the parties' motions to exclude certain expert testimony from the record. *Id.* The Court explained that if, after hearing live testimony at trial, it concluded that an expert was unqualified to opine on a particular topic or offered unreliable or unhelpful opinions, then the Court would afford those opinions little or no weight in evaluating the merits of Plaintiffs' claim. *Id.* at *6–7.

The Court commenced a bench trial on November 19, 2018 that lasted two weeks. Because of the Court's pre-trial rulings, the evidence introduced at trial centered on whether the compensation received by Calamos was excessive in light of the four remaining "*Gartenberg* factors" — namely, (1) the nature and quality of services provided to the Fund and its shareholders; (2) the profitability of the Fund to Calamos; (3) comparative fee structures (in other words, a comparison of the fees paid to Calamos by the Fund with those paid by similar funds); and (4) the care and conscientiousness of the Fund's board of trustees in evaluating adviser compensation. The Court also considered all other pertinent facts.

Shortly after trial, the parties submitted proposed findings of facts and conclusions of law. *See* Docs. 217–22. Closing arguments were held in February 2019. For the reasons explained below, the Court concludes that Plaintiffs have failed to prove that Calamos breached its duty under § 36(b). Accordingly, Plaintiffs' claim is DISMISSED.

# I.     THE INVESTMENT COMPANY ACT OF 1940

Congress adopted the ICA to regulate investment companies, including mutual funds. *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010). "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Id.* (quoting *Burks v. Lasker*, 441 U.S. 471, 480 (1979)) (alteration in original). Typically, a mutual fund is created by a separate entity called an investment advisor, which also selects the fund's board of trustees, manages the fund's investments, provides the fund with administrative services, and markets the fund to shareholders — all in exchange for various fees paid by the fund to the investment advisor. *Jones*, 559 U.S. at 338.

"Because the [investment] generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (internal quotation marks omitted). "Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Burks*, 441 U.S. at 481 (quoting S. Rep. No. 91-184, at 5 (1969)).

To lessen "the potential for abuse inherent in the structure of investment companies," *id.* at 480, Congress, through passage of the ICA, established a regulatory scheme for the industry that limited who may be on a fund's board of directors and required that any contract between advisors and a fund be approved by the board and shareholders. *See Fox*, 464 U.S. at 536–37.

As the Supreme Court detailed in *Jones*, the growing popularity of mutual funds as an investment vehicle in the 1950s and 1960s sparked studies and reports centered on the ICA's effectiveness (or lack thereof) in protecting shareholders. 559 U.S. at 339. One Securities and

Exchange Commission ("SEC") report found that mutual fund advisors often charged higher fees to captive funds than to their other clients, despite the best efforts of the then-current version of the ICA. *See Fox*, 464 U.S. at 537.

Congress thereafter set out to remedy the perceived inadequacies in the ICA and bolster shareholder protection. To that end, Congress amended the ICA in two primary ways with the Investment Company Amendments Act of 1970 ("ICAA"), Pub. L. No. 91-547, 84 Stat. 1413 (1970).

*First*, in an effort to control conflicts of interest within mutual funds, Congress amended the ICA to require that at least 40% of an investment company's board be composed of members who are not "interested persons" in the company, as defined by the ICA. ICAA § 5 (codified at 15 U.S.C. § 80a–10(a)); *see also Burks*, 441 U.S. at 482. This "stricter" requirement strengthened the prior version of the ICA, which required that only 40% of the board not be officers or employees of the company or "affiliated persons" of the company's advisor. *See id.* (citing the Investment Company Act of 1940, ch. 686, 54 Stat. 789, 806 (1940)). Congress also added a requirement that the outside members of the board not be "interested persons" — a much "broader category than the previously identified group of persons 'affiliated' with the advisor," *Fox*, 464 U.S. at 538 (citing 15 U.S.C. §§ 80a-2(a); 80a-15(c)). The ICA assigns "a host of special responsibilities" to the disinterested board members. *Jones*, 559 U.S. at 340 (citation omitted). Of note, the disinterested board members "review and approve the contracts of the investment annually, and a majority of these [members] must approve an adviser's compensation." *Id.* (internal quotation marks and citation omitted).

*Second*, Congress added § 36(b) to the ICA. Section 36(b) "imposed upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund and granted

individual investors a private right of action for breach of that duty." *Jones*, 559 U.S. at 340

(citing 84 Stat. 1429, codified at § 80a-35(b) (internal citations removed)).  Notably, "[i]n

contrast to its approach in other aspects of the 1970 amendments, . . .  Congress decided *not* to

rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the

increased disinterestedness of the board."  *Fox*, 464 U.S. at 540 (emphasis added).

"The 'fiduciary duty' standard contained in § 36(b) represent[s] a delicate compromise."

*Jones*, 559 U.S. at 340.  Specifically, § 36(b) reflects Congress desire to adopt "a different

method of testing management compensation that [is] more favorable to shareholders than the

previously available remedies," yet stringent enough to "not permit a compensation agreement to

be reviewed in court for 'reasonableness.'"  *Id.* (citation and some internal quotation marks

omitted).

"Congress added § 36(b) to the ICA in 1970 because it concluded that . . . shareholders

should not have to 'rely solely on the fund's directors to assure reasonable adviser fees,

notwithstanding the increased disinterestedness of the board.'"  *Kamen v. Kemper Fin. Servs.,*

*Inc.*, 500 U.S. 90, 108 (1991) (quoting *Fox*, 464 U.S. at 540).  Thus, the ICA allows shareholders,

like Plaintiffs, to file suit on behalf of the company for breach of the investment adviser's

fiduciary duty with respect to compensation received from the company.  *Id.*

## II.    LEGAL STANDARD

To succeed on their § 36(b) claim, Plaintiffs must demonstrate by a preponderance of the

evidence that the advisory fee charged to the Fund by Calamos during the relevant period[1] was

---

[1] Under § 36(b), Plaintiffs cannot recover damages from Calamos "for any period prior to one year before the action was instituted."  15 U.S.C. § 80a-35(b)(3).  Here, in accordance with § 36(b), Plaintiffs challenge the advisory fees paid by the Fund to Calamos as far back as February 11, 2014 — one year prior to the filing of their complaint.  *See* Pls.' Resp. to Def.'s Statement of Material Facts Not in Dispute, ¶ 22, Doc. 79.  But the advisory fee then in effect was approved during a June 2013 board of trustees meeting.  *See* Kotler Decl. in Support of Def.'s Mot. for Summ.

"so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (citing *Gartenberg*, 694 F.2d at 928). The ICA requires courts to consider all relevant factors in evaluating an advisory fee. *Id.* at 349. The Supreme Court has approved a focus on the following six factors analyzed in *Gartenberg* when considering whether a fee is "so disproportionately large": "[1] the nature and quality of services provided to fund shareholders; [2] the profitability of the fund to the advisor-manager; [3] fall-out benefits; [4] economies of scale; [5] comparative fee structures; and [6] the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (citing *Gartenberg*, 694 F.2d at 929–30); *accord Jones*, 559 U.S. at 344 n.5.

While courts are the ultimate arbiters of whether an advisory fee is excessive, "the structure and purpose of the ICA indicate that Congress entrusted to the independent directors of investment companies . . . primary responsibility for looking after the interests of the funds' shareholders." *Burks*, 441 U.S. at 484–85; *see also Jones*, 559 U.S. at 348 (noting that the ICA "interposes disinterested directors as 'independent watchdogs' of the relationship between a mutual fund and its advisor" (quoting *Burks*, 441 U.S. at 484)). Consequently, "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 559 U.S. at 352. For this reason, the Supreme Court has instructed courts to refrain from "supplant[ing] the judgment of disinterested directors apprised of all relevant information, without *additional* evidence that the fee exceeds the arm's-length range." *Id.* (emphasis added). Put differently:

> [I]f the disinterested directors considered the relevant factors, their decision

---

J., Ex. 27 at 00503387–428, Doc. 67. Thus, unless otherwise stated, the Court considers "relevant" the period as far back as the June 2013 board meeting through the present. *See* SSF ¶ 22.

to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently. This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

*Id.* at 351 (internal quotation marks and citations omitted). Ultimately, "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Id.* Likewise, "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Id.* In the end, courts must focus on both procedure *and* substance, *id.*, and bestow "such consideration . . . as is deemed appropriate under all the circumstances" to board approval of an adviser's compensation, *id.* at 348 (quoting 15 U.S.C. § 80a-35(b)(2)).

With these precepts in mind, the Court turns to the facts and merits of Plaintiffs' suit.

## III.    FINDINGS OF FACT

### A.  The Parties

Plaintiffs Saul and Sylvia Chill have been shareholders of the Fund at all times since July 2005. SSF ¶ 1.

Defendant Calamos is an investment adviser registered under the ICA, organized under Delaware law as a limited liability company, and headquartered in Naperville, Illinois. *Id.* ¶ 3. Calamos offers certain investment products to its clients, including open-end mutual funds, closed-end funds, undertakings for collective instruments in transferable securities ("UCITS"), institutional accounts, managed accounts, commingled privately placed funds, and offshore funds. *Id.* ¶¶ 5–6.

### B. The Fund

Calamos has established sixteen Open-End Funds and has at all times sponsored them and served as their investment advisor. *Id.* ¶¶ 7–8. The sixteen Open-End Funds are organized as a separate series within Calamos Investment Trust ("CIT"), a Massachusetts business trust registered with the SEC as an open-end investment management company under the ICA. *Id.* ¶ 7. The Open-End Funds continuously offer shares to the public that can be purchased or redeemed at any time. Def.'s Proposed Findings of Fact and Conclusions of Law ("DPF") ¶ 22, Doc. 218.

One such Open-End Fund is *the* Fund (that is, the Calamos Growth Fund). Pls.' Resps. to Def.'s Proposed Findings of Fact and Conclusions of Law ("Pls.' Resps.") ¶ 18, Doc. 220.[2] Calamos established the Fund in 1990. SSF ¶ 9. The Fund, like other mutual funds, has no employees. Pls.' Resps. ¶ 23. Instead, it contracts with Calamos to provide, directly or indirectly, almost all of the services necessary to operate the Fund under the ICA and other federal laws and regulations. DPF ¶ 23.

The Fund is managed following Calamos' "All Cap Growth" investment strategy. SSF ¶ 10. The All Cap Growth strategy is sometimes referred to as the "U.S. Equity Growth" strategy, the "U.S. Growth" strategy, the "Growth" strategy, or simply "ACG." *Id.* In addition to the Fund, Calamos offers its All Cap Growth investment strategy to: (1) non-U.S. investors, through the U.S. Growth Fund UCITS; (2) institutional investors, through separately managed accounts; (3) investment vehicles sponsored by other investment advisors for whom Calamos serves as a sub-advisor; and (4) managed accounts. *Id.* ¶ 11.

---

[2] All references to the parties' proposed findings of facts and conclusions of law (or responses to the opposing party's proposed findings and conclusions) incorporate the evidentiary citations therein.

The Fund's investment objective, as disclosed in its filings with the SEC and in materials sent to Fund shareholders, is long-term capital growth. *Id.* ¶ 12. The Fund's benchmarks, as disclosed in its filings with the SEC and in materials sent to shareholders, have at various times included the Russell 3000 Growth Index and the Russell Midcap Growth Index. *Id.* ¶ 13.

Calamos, like investment advisors across the industry, does not price the services it provides to the Fund — or any other account — on a "cost-plus" basis. DPF ¶ 214. In other words, it does not price the services that it provides by first determining the cost required to offer the service and then adding some pre-determined profit figure to that cost. *Id.* Instead, Calamos prices the services it provides to the Fund by referring to the market rates that its competitor investment advisors charge to peer mutual funds. Calamos' market-based approach for setting mutual fund prices is consistent with the pricing approach followed by other investment advisors in the asset management industry. *Id.*

### C. The CIT Board

The CIT Board of Trustees (the "Board") oversees each of the Funds within CIT, including the Fund. SSF ¶ 25. During the relevant period, the Board was comprised of the following persons: John P. Calamos, Sr.; Stephen B. Timbers; John E. Neal; William R. Rybak; David D. Tripple; Weston W. Marsh (until July 2015); Virginia G. Breen (from September 2015 through the present); Theresa Hamacher (from September 2015 through mid-2017); and Lloyd Wennlund (from July 2018 through the present). *Id.* ¶ 23. All of the directors except for John Calamos are "Independent Trustees" — that is, trustees who are not "interested" as defined under the ICA. *Id.* ¶ 22; Pls.' Resps. ¶ 55.

There is no genuine dispute surrounding the Independent Trustees' independence or qualifications. Each of the Independent Trustees has over twenty-five years of experience in the

financial services industry, including board and senior executive positions with a number of investment advisors who advise both mutual funds and institutional accounts. Pls.' Resps. ¶ 57. Each year since 2004, the Board has appointed Stephen Timbers as Lead Independent Trustee. SSF ¶ 26.

The Independent Trustees also comprised three different standing committees of the Board — that is, the Audit, Valuation, and Governance Committees. *Id.* ¶ 24. The Board's Audit and Valuation Committees met quarterly; the Governance Committee met twice a year. *Id.* ¶ 29. Each year since 2001, the Board has appointed John Neal as Chair of the Board's Audit Committee. *Id.* ¶ 27.

During the relevant period, the Board held in-person meetings four times per year — typically in March, June or July, September, and December — with additional meetings held telephonically as needed. *Id.* ¶¶ 28, 30. The Board also received monthly performance reports from Calamos concerning the Fund. *Id.* ¶ 31.

In advance of each regular Board meeting, the Independent Trustees received hundreds of pages of written materials for their review. Pls.' Resps. ¶ 76. These written materials covered a wide variety of subjects including: fund performance; quarterly performance reports on service providers; financial reports; reports on services provided by Calamos to the Funds; shareholder and client services updates; compliance reports; and information on industry, legal, and regulatory developments. *Id.*

With respect to fund performance, at each Board meeting Calamos delivered a Chief Investment Officer Update on its business and the Fund, including an overview of the Fund's performance history over a series of short-, medium-, and long-term periods, as well as a global outlook of the market. *Id.* ¶ 77. The Independent Trustees also regularly received a "Focus

Fund" report from Calamos containing more detailed information regarding the Fund's holdings, performance, and outlook, as well as in-person presentations from the Fund's portfolio manager. *Id.*

During the relevant period, the Independent Trustees were fully aware of the Fund's long-term history of success and its more recent performance challenges relative to its peer funds and its benchmarks. *Id.* ¶ 92. Throughout each year, the Independent Trustees considered a variety of measurements of the Fund's performance: (1) on an absolute basis, (2) relative to benchmarked indices, and (3) relative to peer funds. *Id.* The Trustees also considered Calamos' long-term history of managing the Fund, including the fact that the Fund has been in existence for nearly thirty years — which is unusual longevity for a mutual fund — and that the Fund's "since-inception" performance remains strong. *Id.*

The Independent Trustees annually requested and considered extensive information concerning the nature, quality, and extent of Calamos' services to the Fund. *Id.* ¶ 78. In addition, Calamos employees regularly prepared and presented reports and presentations at every Board meeting on the many services that Calamos provided to the Fund. *Id.* They also informally conferred with the Independent Trustees concerning the Fund's struggles with performance. *Id.* ¶ 93.

### D. Service Agreements with Calamos, Calamos Affiliates, and Third-Party Providers

CIT has entered into agreements with Calamos, certain of Calamos' affiliates, and various third-party service providers unaffiliated with Calamos to provide the Funds with the services required for their continuing operations. SSF ¶ 56. Calamos monitors, supervises, and oversees the third-party service providers who provide services to the Funds, whether through agreements with CIT or through the agreements with Calamos. *Id.* ¶ 57.

*1. The Investment Management Agreement*

CIT has entered into an Investment Management Agreement (the "IMA") dated December 13, 2004, as subsequently amended, appointing Calamos as the Funds' investment advisor. *Id.* ¶ 58. The IMA is subject to annual review and approval by the Independent Trustees. *Id.* ¶ 59. The IMA includes advisory fee schedules. *Id.* ¶ 60. The Fund's advisory fee schedule, which is disclosed in Fund filings with the SEC and in materials sent to Fund shareholders, was as follows from December 2004 through June 2018:

**ADVISORY FEE SCHEDULE**
**Growth Fund**

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Assets up to and including $500 million | 1.00% |
| Next $500 million up to and including $1 billion | 0.90% |
| Next $5 billion up to and including $6 billion | 0.80% |
| Next $5 billion up to and including $11 billion | 0.78% |
| Next $5 billion up to and including $16 billion | 0.76% |
| Next $5 billion up to and including $21 billion | 0.74% |
| Next $5 billion up to and including $26 billion | 0.72% |
| Assets above $26 billion | 0.70% |

*Id.*

The Independent Trustees approved a revised fee schedule for the Fund in July 2018,

which is as follows:

**ADVISORY FEE SCHEDULE**
**Growth Fund**

| Monthly Average Net Assets | Annual Fee Rate |
|---|---|
| Up to and including $500 million ........................... | 1.00% |
| Next $500 million up to and including $1 billion........................................... | 0.90% |
| Next $5 billion up to and including $6 billion........................................... | 0.80% |
| Assets above $6 billion ........................................... | 0.70% |

*Id.* ¶ 61. The revised fee schedule does not reduce the advisory fees or effective fee rates that the Fund currently pays; Fund assets are currently below $2 billion, and the advisory fee rates with respect to the first $6 billion of Fund AUM are identical in both the pre- and post-June 2018 advisory fee rate schedules. Def.'s Resps. to Pls.' Proposed Findings of Fact and Conclusions of Law ("Def.'s Resps.") ¶ 37, Doc. 222.

The effective advisory fee rate paid by the Fund to Calamos for each annual period (ending October 31) between 2007 and 2017, as stated in the Fund's annual prospectuses filed with the SEC in late February or early March each year, were as follows:

| Year<br>(ending Oct. 31) | Effective Advisory Fee Rate as<br>% of Average Daily Net Assets |
|---|---|
| 2007 | 0.79% |
| 2008 | 0.80% |
| 2009 | 0.82% |
| 2010 | 0.81% |
| 2011 | 0.81% |
| 2012 | 0.82% |
| 2013 | 0.83% |
| 2014 | 0.84% |
| 2015 | 0.85% |
| 2016 | 0.87% |
| 2017 | 0.89% |

SSF ¶ 21. For the period from July 1, 2013 through June 30, 2014, the Board required that Calamos accept a five-basis-point reduction to its annual investment advisory fee (approximately 6% of Calamos' fee), at a total cost to Calamos of more than $2.4 million. *Id.* ¶ 35. In February 2017, the Fund's lead portfolio manager was terminated and replaced due to the Fund's continued underperformance. *Id.* ¶ 36.

The Fund's assets under management ("AUM") and advisory fees paid for each year from 2007 through 2017 were as follows:

**Fund AUM and Advisory Fees**
**(in millions)**

| Year | Fund Net Assets<br>(as of Oct. 31) | Advisory Fees Paid<br>(as of Oct. 31) |
|---|---|---|
| 2007 | $17,494 | $128 |
| 2008 | $7,863 | $109 |
| 2009 | $7,988 | $58 |
| 2010 | $8,293 | $66 |
| 2011 | $7,727 | $71 |
| 2012 | $6,392 | $60 |
| 2013 | $4,441 | $41 |
| 2014 | $3,484 | $32 |
| 2015 | $2,726 | $26 |
| 2016 | $1,899 | $19 |
| 2017 | $1,672 | $15 |

*Id.* ¶ 20.

### 2. The Financial Accounting Services Agreement

On behalf of the Funds, CIT also entered into an Amended and Restated Financial

Accounting Services Agreement with Calamos dated December 2004 (the "FASA"). *Id.* ¶ 62.

Pursuant to the FASA, Calamos was appointed the "Fund Accountant" for each of the Funds,

including *the* Fund, and was required to perform certain services for the Funds. *Id.* ¶ 63. The

FASA set forth the following fee schedule:

---

**FEE SCHEDULE**

Each Party shall pay to Calamos for the services contemplated hereunder the
following annual rate based on the daily average net assets of all Parties:

0.0175% on the first $1 billion

0.0150% on the next $1 billion

0.0110% on average net assets in excess of $2 billion.

---

*Id.* ¶ 64.

While the FASA was in operation, each of the Funds paid its pro-rata share of fees under

the FASA based on the proportion of its net assets to total net assets for all the Funds. *Id.* ¶ 66.

In line with this arrangement, the Fund paid the following "financial accounting fees" to

Calamos pursuant to the FASA:

| | Financial Accounting Fees |
|---|---|
| 2014 | $450,484 |
| 2015 | $358,737 |
| 2016 | $252,712 |
| 2017 | $203,202 |

*Id.* ¶ 67. The FASA was terminated in November 2018. *Id.* ¶ 65.

### 3. Other Service Agreements Related to the Fund

Non-party Calamos Financial Services LLC ("CFS") is a registered broker-dealer under

the Securities and Exchange Act of 1934 that serves as sole distributor for the Fund and is an affiliate of Calamos. *Id.* ¶ 4.

U.S. Bancorp Fund Services LLC ("USBFS") serves as Transfer Agent to the Funds pursuant to a January 2014 Transfer Agent Servicing Agreement between USBFS, CIT, and the Calamos Advisors Trust. *Id.* ¶ 71. As Transfer Agent, USBFS is responsible for, among other duties, keeping records of all mutual fund shareholders; opening, maintaining, and servicing fund shareholder accounts; and processing all mutual fund share transactions, including purchases, redemptions, dividend payments and reinvestments. *Id.* ¶ 72.

Calamos has entered into a Services Agreement with Citibank, N.A. ("Citibank") dated August 2009, as subsequently amended. *Id.* ¶ 87. Under the Services Agreement, Citibank provides Calamos with certain account management services. *Id.* ¶ 88.

State Street Bank & Trust ("State Street") serves as Custodian for the Funds pursuant to a September 2009 Master Custodian Agreement between State Street and CIT. *Id.* ¶ 75. Pursuant to the Master Custodian Agreement, State Street, among other duties, holds all cash and securities for the Funds (directly or through a book-entry system); delivers and receives payment for securities sold by the Funds; receives and pays for securities purchased by the Funds; collects income from investments of the Funds; and provides the Funds with certain pricing services, including automated pricing services and fair valuation services. *Id.* ¶ 76. State Street is compensated under the Master Custodian Agreement for serving as Custodian for the Funds. *Id.* ¶ 78.

CIT has entered into a Master Services Agreement dated March 2004 with State Street. *Id.* ¶ 79. Under the Master Services Agreement, State Street provides certain administrative and accounting services to the Funds. *Id.* ¶ 80. These duties include providing daily reconciliation of

cash, trades, and positions; maintaining general ledger and capital stock accounts; preparing daily trial balance; calculating net asset value; providing selected general ledger reports; preferred share compliance; calculating total returns; and providing monthly distribution analysis to the Funds. *Id.* State Street is compensated for the services rendered pursuant to the Master Services Agreement. *Id.* ¶ 82.

Calamos has also entered into a Sub-Administration Agreement with State Street dated October 2009. *Id.* ¶ 83. Under this agreement, State Street provides Calamos with certain administration-related services in exchange for a flat annual fee per Open-End and Closed-End Fund. *Id.* ¶ 84.

State Street also provides securities lending services as one of the Funds' securities lending agents pursuant to a September 2009 Securities Lending Authorization Agreement between State Street and Calamos (on behalf of the Funds). *Id.* ¶ 94. Under this agreement, State Street administers a securities lending program on their behalf and loans out securities held in the Funds' portfolios to earn extra income for such Funds. *Id.* ¶ 95. Citibank provides similar securities lending services to the Funds pursuant to a similar agreement and operates as the Funds' primary securities lending agent. *Id.* ¶ 96.

Deloitte & Touche LLLP ("Deloitte") is CIT's independent auditor. *Id.* ¶ 90. Deloitte audits and reports on the Funds' annual financial statements. *Id.* ¶ 91.

And, finally, the Fund paid between $105,000 and $667,000 each year during the relevant period to the Independent Trustees' counsel and other third-party legal services providers. *Id.* ¶ 93.

### E. The Independent Trustees' Annual 15(c) Review

*1. The 15(c) Process*

Section 15(c) of the ICA requires that the Independent Trustees undertake an annual

review to determine whether to approve the continuation of the IMA — a process known as the Independent Trustees' "15(c) Review." *Id.* ¶ 37. Each year, the Independent Trustees' Counsel — led by Paulita M. Pike of K &L Gates LLP until 2015 and Ropes & Gray LLP afterwards, *id.* ¶¶ 32–33 — issues a letter to Calamos requesting information deemed necessary for the Independent Trustees' 15(c) Review (the "15(c) Request"). *Id.* ¶ 38. The Counsel drafts the 15(c) Request and provides it to the Trustees for their review prior to sending it to Calamos. *Id.* ¶ 39. Pike's team typically sends the 15(c) Request to Calamos in the spring of each year, in advance of the June or July Board meeting where the Trustees vote as to whether to approve the IMA. *Id.* ¶ 40.

Calamos' legal department initially receives the 15(c) Requests and assigns responsibility for preparing responsive materials to personnel in one or more Calamos departments, including Fund Administration, Operations, Trading, and Accounting. *Id.* ¶ 42. Calamos' legal department reviews the draft 15(c) Response materials provided by other Calamos departments. *Id.* ¶ 43. Calamos' legal department then sends the draft 15(c) Response materials to Independent Trustees' Counsel for review and comment. *Id.* ¶ 44. Once the 15(c) Responses are finalized, Calamos provides them to the Independent Trustees for their review in advance of each June or July Board meeting. *Id.* ¶ 45.

### 2. *Fund Comparative Analysis by Third-Party Service Providers*

As part of the Independent Trustees' 15(c) Request, the Independent Trustees also approve Calamos' retention of a third-party service provider to independently compare the Funds' fees and performance against comparable mutual funds. *Id.* ¶ 46. The Independent Trustees approved the retention of Lipper, Inc., to provide the analyses in 2013 (the "Lipper Report"). *Id.* ¶ 47. Morningstar, Inc. conducted the analysis in 2014, 2015, and 2016 (the

"Morningstar Reports"), *id.* ¶ 48, while Strategic Insight conducted it in 2017 and 2018 (the "SI Reports"), *id.* ¶ 49. Together, Lipper, Morningstar, and Strategic Insight are referred to herein as the "Independent Data Providers."

The third-party fee information received by the Independent Trustees compared the Fund's investment advisory fee to multiple different groups of similar mutual funds. Pls.' Resps. ¶ 259. The smallest of these groups is the Fund's "peer group," a set of approximately ten to twenty funds custom-selected by one of the Independent Data Providers, that each Data Provider party considers to be most similar to the Fund. *Id.* A review of this smallest group of comparable funds demonstrates that the Fund's advisory fee was within the range of its peers each year. *Id.* A chart reflecting this data is provided below:

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| **Growth Fund Net Management Fee (basis points)** | 81.7 | 83 | 80 | 85 | 86.9 | 88.6 |
| **Peer Group Median Management Fee (basis points)** | 63.4 | 62 | 60 | 62 | 72.7 | 74.3 |
| **Growth Fund Management Fee vs Peer Group (percentile, high equal to 100%)** | 78% | 88 | 94% | 95% | 80% | 69% |

*Id.*

In addition to showing the small peer group of similar mutual funds, the Lipper and Morningstar reports prepared for the Independent Trustees also compared the Fund's advisory fee to that of a larger group of similar funds (ranging from about seventy to two hundred) known as the "Lipper Expense Universe" or "Morningstar Category," as applicable. As with the Fund's peer group, the Fund's management fee fell within the range of fees in this larger category every year for which data was available:

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| **Growth Fund Net Management Fee (basis points)** | 81.7 | 83 | 80 | 85 | 86.9 | 88.6 |
| **Category Median Management Fee (basis points)** | 73.0 | 69 | 69 | 68 | N/A | N/A |
| **Growth Fund Management Fee vs Category (percentile)** | 70% | 81% | 81% | 83% | N/A | N/A |

*Id.* ¶ 260.

### 3. *Calculating Profitability*

Under *Gartenberg*, the Independent Trustees are directed to consider the adviser's pre-distribution profitability from managing each of the Funds in connection with their consideration of whether to continue the IMA — that is, the profitability the adviser realizes from the Funds before distribution revenues and distribution expenses are considered. *Id.* ¶ 293. Accordingly, for each year within the relevant period, the Independent Trustees requested and considered information concerning Calamos' pre-distribution profitability from the Funds as part of their 15(c) Request. DPF ¶ 294. Each of Calamos' 15(c) Responses contained a presentation titled "Mutual Fund Profitability" (the "15(c) Profitability Presentations") that claimed to depict the profitability to Calamos of serving as adviser to each of the Funds, including the Fund. Pls.' Proposed Findings of Fact and Conclusions of Law ("PPF") ¶ 238, Doc. 217 (citing DX 184-Q, 176-Q, 145-R, 113-S, 61-S, 32-Q). During the relevant period, these presentations were standardized, differing only in specific numbers (as opposed to methods of calculation or manner of presentation). *Id.*

The pre-distribution profitability information requested by the Independent Trustees is not kept by Calamos in the ordinary course of business; nor is this information prepared or used for

any purpose outside of the 15(c) Process.  Pls.' Resps. ¶ 295; Def.'s Resps. ¶ 271.  Accordingly, the information for Calamos' 15(c) Profitability Presentation is prepared through a process overseen by Calamos' accounting department, headed by Helmetag.  DPF ¶ 296.  Multiple people both within and outside the accounting department, along with the Independent Trustees' counsel, review and comment on the Profitability Presentation.  *Id.*  As a result of this annual process, Calamos provides the Independent Trustees with its annual calculation and assessment of its pre-distribution profitability with respect to the Fund through the Profitability Presentation that is part of its 15(c) Response.  *Id.*

The Profitability Presentation, *inter alia*, sets forth the methodology that Calamos uses to calculate its profitability with respect to the Fund.  Pls.' Resps. ¶ 297.  As the Profitability Presentation explains, the profitability calculations reflect the "functional" profitability of the advisory services Calamos provides to the Funds.  *Id.*  Because Calamos and CFS are affiliated, there is not a strict delineation between the two entities with respect to which employees provide advisory services to the Funds as opposed to distribution services.  *Id.*  To account for this, Calamos reports profitability attributable to "adviser" activities and profitability attributable to "distribution" activities on a functional basis — in other words, in a manner that is reflective of the actual services that are being required, without concern for which legal entity or its nominal employees are actually performing the service.  *Id.*  This approach more completely reflects Calamos' profitability from all services provided to the Funds.  *Id.*

Prior to 2012, Calamos allocated indirect costs by utilizing a "time spent" methodology.  DPF ¶ 303.  Plaintiffs did not argue at trial that the "time spent" methodology was inappropriate, nor did they argue that the profitability calculations resulting from that methodology were inaccurate.  *Id.*

Since 2012, Calamos has allocated indirect costs according to average AUM.  Pls.' Resps. ¶ 304.  This indirect cost allocation proceeded in a two-step process.  PPF ¶ 240.  In the first step, a "product-line allocation," Calamos started with the total advisory costs Calamos incurred in advising all of its investment clients and products, and it allocated a portion of those total costs to the Funds (as opposed to other clients, such as the sub-advised or institutional clients) according to the Funds' proportion of Calamos' total AUM.  *Id.*  Thus, for example, if the Funds constituted 86% of Calamos' total AUM, then Calamos would allocate 86% of its total advisory costs to the Fund.  *Id.*  In the second step, after having allocated an amount of advisory costs to the Funds in the aggregate, Calamos then allocated portions of its aggregate Funds-related advisory costs to each of the Funds, again on the basis of AUM (that is, each Fund's proportion of the Funds' aggregate AUM).  *Id.*

### 4.  15(c) Board Meetings

The Independent Trustees annually voted on whether to approve the IMA at the following Board meetings (the "15(c) Board Meetings"):  June 26, 2014; July 16–17, 2015; June 30 and July 1, 2016; and June 21, 2017.  SSF ¶ 52.  At each of these 15(c) Board Meetings, members of Calamos' management presented on various portion of the 15(c) materials to the Independent Trustees.  *Id.* ¶ 53.  Following these presentations, the Independent Trustees met in executive session with their counsel to vote on whether to continue the IMA.  *Id.* ¶ 54.  At each of these 15(c) Board Meetings, the Independent Trustees voted unanimously to approve continuation of the IMA and the relevant Fund advisory fee rate schedule.  *Id.* ¶ 55.

### F.  The Other ACG Accounts' Advisory Fee Rates

In addition to the open- and closed-end U.S.-regulated funds sponsored by Calamos, Calamos also subadvised open-end U.S.-regulated mutual funds sponsored by third-party investment advisors (Calamos' "Subadvised Accounts" or "sub-advisory clients"), and it advised

separately-managed accounts, predominantly for institutional investors (Calamos' "Institutional Accounts" or "institutional clients"). *Id.* ¶¶ 6–7. Some of these accounts used the All Cap Growth strategy, like the Fund. (the "Other ACG Accounts" or "Other ACG Clients"). *Id.* ¶ 98. The Fund's investment performance was substantially similar to the Other ACG Accounts' investment performance. *Id.* ¶ 101.

Calamos does not currently advise Other ACG Accounts, *id.* ¶ 98, and has not advised such accounts since November 2016, Def.'s Resps., ¶ 4. The majority of Other ACG Accounts terminated their relationship with Calamos because of subpar performance. Trial Tr. 87:5–89:17 (Behan).[3]

During the relevant period, Calamos publicly reported in its Form ADV a standard advisory fee rate schedule it offered to its Other ACG Accounts. SSF ¶ 102. The standard fee rate schedule was as follows:

| AUM Range | Rate |
|---|---|
| First $25 million in assets | 0.75% |
| Next $25 million, up to $50 million | 0.70% |
| Next $25 million, up to $75 million | 0.65% |
| Assets greater than $ 75 million | 0.50% |

*Id.* ¶ 103. All of Calamos' Institutional Accounts (totaling 31 of the 36 Other ACG Accounts) paid advisory fees to Calamos in accordance with the schedule above. *See id.* Ex. 1; Def.'s Resps. ¶ 78. The effective fee rates paid by Calamos' Institutional Accounts during the relevant period ranged from 0.62% to 0.82%, with 26 accounts paying Calamos advisory fees 0.76% or below. *See* SSF, Ex. 1.

Calamos prices the services it provides to its Other ACG Clients by referring to the market rates that its competitor investment advisors charge to institutional and sub-advised

---

[3] The trial transcript may be found at ECF Docs. 198, 200, 202, 204, 206, 208, and 210.

accounts. DPF ¶ 214. Calamos' market-based approach for setting institutional and sub-advised account prices is consistent with the pricing approach followed by other investment advisors in the asset management industry. *Id.*

During the relevant period, Calamos' Other ACG Accounts included five Subadvised Accounts: the Nomura Currency Fund – U.S. Growth Equity Fund ("Nomura"); the MD American Growth Fund and the MDPIM US Equity Pool (collectively, "MD American"); Union Bancaire Privée ("UBP"); and Thrivent Financial for Lutherans ("Thrivent"). *See* Def's. Resps. ¶ 72 n.115.[4] These accounts operated on different fee schedules and paid effective advisory fee rates between 0.39% and 0.65%. *Id.* ¶ 77; *see also* SSF, Ex. 1.

### G. Calamos' Witnesses

In a bench trial, credibility determinations are the province of the presiding judge. *See DeGiorgio v. Fitzpatrick*, No. 08 Civ. 6551 (LMS), 2011 WL 10501908, at *7 (S.D.N.Y. Mar. 8, 2011), *report and recommendation adopted*, No. 08 Civ. 6551 (KMK), 2013 WL 978792, at *3 (S.D.N.Y. Mar. 12, 2013); *Haimdas v. Haimdas*, No. 09 Civ. 2034 (ENV), 2010 WL 652823, at *3 (E.D.N.Y. Feb. 22, 2010). Grounds for finding a witness incredible include, *inter alia*, evasive, inconsistent, contradictory or implausible testimony. *See, e.g.*, *Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*, 254 F. Supp. 3d 584, 589–90 (S.D.N.Y. 2017) (finding witness incredible where he could not recall important details, his testimony directly contradicted prior statements, and he evasively answered questions on cross-examination). Moreover, if the Court finds that any portion of a witness's testimony was intentionally untruthful or misleading, the Court can elect, under the doctrine of *falsus in uno falsus in omnibus*, to reject the entirety of the

---

[4] Specifically, the IMAs operative between Calamos and each of these Subadvised Accounts made clear that Calamos was being retained by *another* investment advisor to provide certain investment advisory services to a fund or portfolio sponsored and managed by that investment advisor. PPF ¶ 72 n.5.

witness's testimony. *Hernandez v. NJK Contractors*, Inc., No. 09 Civ. 4812 (RER), 2015 WL 1966355, at *31 (E.D.N.Y. May 1, 2015) (citing *United States v. Foster*, 9 F.R.D. 367, 389 (S.D.N.Y. 1949)); *accord Hyman v. Brown*, 927 F.3d 639, 661–62 (2d Cir. 2019) ("[J]ust as the law permits a factfinder who identifies falsity in part of a witness's testimony to discredit the whole, it also affords a factfinder discretion to credit parts of a witness's testimony despite discrediting others." (citations omitted)).

At trial, both parties put on multiple witnesses, including expert witnesses.[5] The witnesses' backgrounds and testimonies are summarized in part below, as well as their credibility, where applicable and relevant.

### 1. *Deposition Witnesses*

Calamos first offered the deposition testimony of five fact witnesses. Pls.' Resps. ¶ 39. Each of these witnesses has extensive asset management industry experience in his area of specialty. *Id.* Each of Calamos' deposition witnesses testified credibly. *Id.*

**Nimish Bhatt**, Calamos' former Chief Financial Officer, joined Calamos in January 2004 as Head of Operations and became Chief Financial Officer in 2011. *Id.* ¶ 40. Bhatt also served as an Officer of the Funds, in which capacity he reported to the Board. *Id.*

**David Kalis**, who was the portfolio manager for the Fund from approximately November 2014 through 2017, joined Calamos in approximately February 2013. *Id.* ¶ 41. Prior to that time, he held a number of portfolio management positions at other firms. *Id.* In February 2017, Michael Grant replaced Kalis as the head of U.S. growth strategy and portfolio manager of the Fund. SSF ¶ 18.

---

[5] In advance of trial, Plaintiffs filed a set of evidentiary objections to portions of the declarations of Calamos' witnesses, which Calamos submitted in lieu of direct testimony. *See* Pls.' Objs. to Direct Test. of Def.'s Witnesses (Nov. 18, 2018), Doc. 189. Plaintiffs' objections are overruled.

**Mark Mickey** has been the Chief Compliance Officer (the "CCO") for the Funds since 2005. Pls.' Resps. ¶ 42. As Mickey testified, the role of the Fund's CCO is separate from Calamos' CCO in that, as the Funds' CCO, Mickey holds no position at Calamos and reports directly to the Independent Trustees. *Id.* Each year, Mickey provides an annual report to the Board, which is required by Rule 38a-1 under the ICA, confirming that the procedures in place at Calamos and the third-party service providers that Calamos oversees are reasonably designed to prevent violations of the federal securities laws. *Id.* Neither Calamos nor Mickey is required to provide such a report for any of Calamos' All Cap Growth institutional or sub-advisory clients. *Id.*

**Derek Olsen**, who has worked at Calamos since 2001, is currently Calamos' Chief of Investment Risk, Investment Operations, and IT Application Development. *Id.* ¶ 43. Olsen is primarily responsible for managing the Operations department and overseeing IT application development and investment risk. *Id.* In that role, Olsen, among other things, assists the portfolio management team with their assessment and management of risk arising out of the structure and holdings in the Fund's portfolio. *Id.*

**Stephen B. Timbers** is the Lead Independent Trustee of the Board. *Id.* ¶ 45. He has an MBA from Harvard Business School and experience serving on the boards of other investment companies. Timbers also has over thirty years of experience in the asset management industry, including serving as President of Northern Trust Global Investments. *Id.* ¶ 57.

*2. Fact Witnesses*

In addition to the deposition witnesses, Calamos presented six fact witnesses at trial via trial declarations and redirect testimony: Scott Becker, Robert Behan, J. Christopher Jackson, Christian Helmetag, Curtis Holloway, and John Neal. Pls.' Resps. ¶¶ 26–32. The Court finds

that all of Calamos' fact witnesses offered credible testimony, notwithstanding that some of the witnesses have business relationships with Calamos, the Fund or both.

**Scott Becker**, a qualified investment professional who has been with Calamos since 2003, is currently Calamos' Senior Vice President and Senior Portfolio Specialist. *Id.* ¶ 27. His primary responsibility is compiling analyses of the Fund's performance that are shared with Fund investors and their financial advisors, the Board (in both Chief Investment Officer reports and "Focus Fund" presentations), and internally within Calamos' investment team. *Id.* He is also responsible for preparing summaries of and communicating changes to Calamos' investment team as those changes relate to the Fund and the All Cap Growth strategy. *Id.* In his declaration and at trial, Becker explained that his role was "client-facing." Trial Tr. 30:19–20. In other words, Becker's function was to communicate investment products and strategy, microeconomic perspectives, strategy performance, and risk attribution to clients and their representatives. *Id.* 30:12–16.

Becker testified that while the Fund's since-inception performance has been "excellent," there have been times where it has "struggled." *Id.* 101:9–15. During the relevant period, Calamos made several changes to its investment process and investment team to improve. *See* Pls.' Resps. ¶ 106. One such change was Calamos' transformation of its investment team from a "vertical" structure with a "one-team-one-process" approach to a "horizontal" structure with a "team-of-teams" approach. *Id.* Becker explained the goals, costs, and importance of the restructuring in his declaration. *See* Becker Decl. ¶¶ 34–39, 40–43; *see also* Trial Tr. 64:19–68:7 (Becker); *id.* 103:5–105:7 (testimony of Calamos President Robert Behan, corroborating Becker's account).

Becker also offered testimony shedding light on the relative burdens of servicing

institutional accounts versus mutual funds. In particular, Becker stressed that the effort servicing mutual funds far exceeded that of servicing institutional clients:

> Q.: [D]escribe . . . the burden . . . of these institutional account meetings versus the kinds of meetings you're required to have for purposes of management of funds.

> A.: [With respect to] the institutional meetings we certainly wanted to make sure that we were servicing those clients according to their needs, and so we would travel to see them or do quarterly phone calls. But the upside was as their guidelines would be similar to everyone else's guidelines, they were pretty standardized, so most of the presentation materials that we would do and the conversations that we would have would, arguably, be the same . . . . But we had to do the same for our retail or our mutual fund clients through their intermediaries, which would financial advisors. You know, there's thousands here in New York alone. There's multiple thousands across the country, and again, we need to make ourselves available to them with their questions and concerns because we want to keep and maintain their trust as well.

> Q.: So thousands, on the one hand; 36 [institutional clients following the same All Cap Growth strategy as the Fund], on the other hand?

> A.: Correct.

> \* \* \*

> Q.: [C]ompare the burden of those kind of meetings with the burden of preparing for the mutual fund board meetings.

> A.: Yeah. So again, the institutional meetings were fairly similar, recurring. We would organize the presentation much the same. . . . Perhaps we want to talk about the market and what our new review points are; I would make sure that that got entered into that institution's presentation and every presentation thereafter until that changed.

> The mutual fund board, on the other hand, we have quarterly and annual meetings and they had asked us to spend more time and more attention on the growth fund as performance had struggled, so that took quite a bit of time and we wanted to make sure that they got detailed and thorough information. It was formatted so that they could easily, readily understand it and it wouldn't change quarter to quarter so that they knew that they were getting the same thing every time, but if they had additional questions, they would go through outside counsel and back to us. So there was a lot of back-and-forth, and it took quite a bit of time to put those together, as well it should.

*Id.* 72:23–73:23, 74:3–75:4.

Becker also testified that Calamos formerly subadvised an investment product for Nomura — a fund for Japanese investors that broadly followed the same All Cap Growth investment strategy as the Fund. *Id.* 34:15–35:6. Prior to the termination of their business relationship, Nomura was Calamos' largest Institutional ACG account. *Id.* 35:4–6. Becker testified as to how he, along with others, provided extensive individualized service to Nomura. But Becker also explained why Nomura was not a "typical account" for Calamos:

> Q.: Was Nomura a typical account?
>
> A.: Not at all. Nomura was very different. I mean, essentially they were an outside fund distributor overseas who asked us to be the American manager of this American investment strategy for them. And for them to tout to their clients our strength and why they have us, they wanted information from us. So very detailed, very thorough. Their monthly data requests were, again, pretty standardized, but they would say, Did you do everything in the guidelines that we asked you to do, so it was yes every month. But someone in the relationship group had to check and make sure that all those were accurate, etc. And then we agreed to help them once a year to show up locally in order to support, you know, their business as well. But that was -- that was an extreme.
>
> Q.: So if the Court is trying to make sense of the evidence we have today, would you advise the Court to look at the Nomura experience and extrapolate from that experience to other institutional accounts or not?
>
> A.: I wouldn't say that they're quite normal. I would say, you know, that they were the -- they were the exception to the rule.

*Id.* 75:5–76:2.

**Robert Behan**, a qualified investment professional who has been with Calamos since 2007, is currently Calamos' President and Head of Global Distribution. He also serves as a Vice President of the Calamos Investment Trust. Pls.' Resps. ¶ 28. Behan has more than thirty years of experience in the financial services industry. *Id.* Behan has primary responsibility, among other things, for negotiating fee rates that Calamos offers to institutional and sub-advisory

clients, including those that invested in Calamos' All Cap Growth strategy, and for assessing

potential new financial products that Calamos offers, including new mutual funds. Behan has

attended every quarterly Board meeting since 2013, and he regularly presents to the Board on

topics involving industry trends and shareholder services. *Id.*

Behan testified about how Calamos sets its prices for different types of clients. Behan

testified that Calamos used a "market-based approach." Trial Tr. 112:5–7. Behan explained that

Calamos did not set prices for their products merely by adding up the costs of goods sold and

adding a margin; rather, Calamos assessed the competitive landscape's offerings and set its prices

accordingly. *Id.* 112:14–113:2. Behan testified that Calamos was consciously aware that it

charged more to manage the Fund than its Other ACG Accounts. *Id.* 113:5–8.

Behan also credibly testified about an Other ACG Account that had elected to move its

assets to the Calamos-sponsored fund. He testified that the James B. Powell Restated Revocable

Trust (the "Powell Trust) "decided that it would be more convenient for them and easier to be in

a mutual fund and to have the fund negotiate all the services that comes along with trust

bestowing, accounting, etc., and decided to invest in the [F]und," at which point the Powell Trust

was charged the same advisory fee as any other client investing in the Fund. Trial Tr. 115:15–

116:13. Behan previously cited the Powell Trust as an example of a client who, on some

occasions, "prefer[red] the mutual fund offering and [chose] to pay the higher fee that is charged

to mutual fund shareholders [as opposed to the lower fee typically negotiated for institutional

accounts] in exchange for [Calamos]' services as advisor." Behan Decl. ¶ 69.

Instead of cross-examining Behan on this point, Plaintiffs attempted to impeach Behan's

credibility after the fact by submitting a letter to the Court at the end of that day's testimony, in

which it requested (and was subsequently granted) permission to admit a new exhibit into

evidence that Plaintiffs asserted was inconsistent with Behan's testimony.  *See* Pls.' Request to Add and Admit Ex. (Nov. 19, 2018), Doc. 192.  The evidence took the form of an email in which a senior associate at Calamos stated the following:

> This email shall serve as notification the client will be transferring their growth SMA portfolio (~930k) in kind to the Calamos Growth Fund (I share class).  This is an INST best X traded portfolio who, prior to the end of April, had $1.5 million invested.  We can no longer manage this portfolio as a INST SMA any longer.  Dr. Powell needed the cash and does not have plans to bring the account to its previous AUM status.  Instead of losing the assets, the fund was offered and Dr. Powell accepted.

> Bob is on copy (as approval) of exception since the client does not meet the stated minimum for I shares.

PX 487 at 595407.

Plaintiffs contend that Behan's testimony — namely, that the Powell Trust voluntarily chose to close its separately managed account and invest in the Fund as a way to take advantage of the alleged greater services — was "flatly inconsistent with [Calamos'] internal communications, which indicate that the [Powell Trust] had no choice but to close its SMA and transfer its funds into the [Fund], or choose a new investment advisor, because it fell below [Calamos'] minimum AUM threshold for SMAs."  PPF ¶ 310.  The Court disagrees.

As Behan explained (and as the internal communications detail), the Powell Trust *did* choose to move its money into the Fund, when it was otherwise free to take its money elsewhere.  Thus, the Court finds little inconsistency between Behan's statements and the internal Calamos communications proffered by Plaintiffs.  The credible evidence at trial revealed that some institutional clients were not dissuaded by the Fund's advisory fee and instead voluntarily chose to pay the fee and park their money in the Fund.

**J. Christopher Jackson** has served as the General Counsel of Calamos and a number of the other Calamos-related entities since 2010.  Pls.' Resps. ¶ 29.  He is also the Secretary of the

Calamos Funds.  *Id.*  Jackson has practiced law in the asset management industry for over thirty

years, and he has served as an interested trustee for another mutual fund complex.  *Id.*  He

manages and exercises responsibility for Calamos' legal and compliance departments, which

includes providing legal advice and support on a variety of matters concerning the Funds for

which Calamos serves as advisor.  *Id.*

At trial, Jackson credibly explained that the Independent Trustees were informed that the

litigation risks associated with advising mutual funds clients are greater than the litigation risks

associated with non-fund clients.  Trial Tr. 263:11–15.  Moreover, Jackson explained the factual

bases for that conclusion.  Specifically, Jackson explained that Calamos has been involved in

significant litigation with respect to some of its mutual funds in the past, *id.* 264:24–265:25; that

it did not make sense to reduce to a numerical figure the litigation risks faced by Calamos in

advising mutual funds solely by "extrapolat[ing]" on what was spent during prior lawsuits that

contained unique "facts and circumstances," *id.* 266:8–18; that because there are so many rules,

regulations, [and] statutes that are implicated when one is looking after a registered investment

company[,] . . . it is hard to say exactly where that litigation will come from," *id.* 270:16–19; that

the amount Calamos priced into its agreements with the Funds due to the increased litigation

risks associated with advising mutual funds was necessarily subjective, *id.* 265:10–14; and,

consequently, that "as part and parcel of all of the services and items that the [B]oard takes into

account when it is reflecting upon the advisory fee that [Calamos] provide[s], it is fair to take

into account the regulatory environment in which [Calamos] operate[s] and the litigation

exposure to which [Calamos] ha[s]," *id.* 268:21–269:1.

Jackson also testified that while Calamos maintained various insurance policies, each

policy was subject to various definitions of a coverable claim and was subject to various

exclusions such that it was uncertain whether those polices would cover any specific lawsuit. *Id.* 277:2–16.

Plaintiffs contend that Jackson's trial declaration "repeated the false claim that Nomura and the MD Accounts did not cite 'performance' as one of the reasons why they terminated their advisory relationships with Calamos." *See* PPF ¶ 311. On this point, the Court agrees with the Plaintiffs. In his declaration, Jackson averred that Calamos has historically served as sub-adviser to non-U.S. based investment companies, citing Nomura and MD as two examples. Jackson Decl. ¶ 104. Jackson averred that while MD and Nomura terminated their accounts with Calamos in 2016, "[n]either provided any reason for its termination." *Id.* At trial, it was revealed during the cross-examination of Behan that both MD and Nomura cited suboptimum performance as one of their reasons for terminating the business relationships with Calamos. *See* Trial Tr. 82:21–85:7 (Behan). Jackson's declaration to the contrary was therefore inaccurate. But, given the dearth of evidence tending to show that Jackson was aware of MD and Nomura's cited reasons for leaving Calamos *and* Jackson's otherwise credible testimony, the Court finds that Jackson's claims were consistent with his own personal knowledge, rather than any intentional attempt to mislead the Court.

**Christian Helmetag** is the Corporate Controller of Calamos and other Calamos-related entities. He has worked at Calamos since 2011. Pls.' Resps. ¶ 30. As Corporate Controller, Helmetag oversees Calamos' ten-person corporate accounting department. *Id.* Among many other responsibilities, Helmetag and his team are responsible for preparing Calamos' annual profitability presentation to the Independent Trustees as part of Calamos' 15(c) Response. *Id.*

Helmetag's testimony concerned the methodology by which Calamos calculated profitability since at least 2013. Trial Tr. 229:17–230:21. As Helmetag explained, Calamos

would first identify direct revenues by product line — that is, the mutual fund product line versus other Calamos clients — and direct expenses by product line. *Id.* Then, Calamos would allocate indirect expenses following an "average AUM" methodology. *Id.* Jackson explained that indirect expenses are basically "common expense that you [could not] associate or delineate to a specific service or product," or, in other words, "a shared expense." *Id.* 235:1–7. For example, "rent for the building is a shared expense because you can't identify and delineate the cost of rent to a particular service or product;" Helmetag cited salary as another indirect expense. *Id.*

Helmetag explained that the average AUM methodology is a reasonable way to allocate indirect expenses because it can be systematically and consistently applied. *See id.* 235:16–25.

Helmetag testified that Calamos in the past had used a "time-spent" methodology to allocate costs — that is, one where individuals would estimate how long they worked on each product line. *Id.* 236:6–14. Helmetag credibly explained that Calamos shifted from a time-spent methodology to an average AUM methodology because "the nature of time spent is very subjective. You're asking an individual . . . for their best estimate of their time to allocate that across multiple products and multiple services." *Id.* 236:23–237:1. Moreover, as a well-experienced certified public accountant, Helmetag explained that the average AUM methodology is a generally accepted approach to presenting profitability. *Id.* 239:7–12.

**Curtis Holloway**, the Head of Fund Administration at Calamos, has worked in Calamos' Fund Administration Department for 12 years and has more than 20 years of related asset management industry experience. Pls.' Resps. ¶ 31. Holloway and the Fund Administration Department are responsible for providing — either directly or by monitoring and overseeing third-party service providers — many of the "back office" fund administration services required to manage the Fund. *Id.* As Holloway explained at trial, he and his department do not provide

any fund administration services to Calamos' All Cap Growth institutional or sub-advisory clients.  *Id.*

In his declaration and at trial, Holloway credibly described the wide array of services that are provided only for the Fund and not for any institutional or sub-advised account that is invested in the U.S. All Cap Growth Strategy.  Moreover, Holloway testified that while the FASA was in existence, neither he nor his department ever sat down to analyze whether any of the services they provided fell under the IMA or FASA.  Trial Tr. 393:14–394:4.  He testified further that the department continues to have the same amount of — if not more — work now, notwithstanding the termination of the FASA.  *Id.*

**John E. Neal**, an Independent Trustee, also testified at trial.  Pls.' Resps. ¶ 32.  Neal has an MBA from Harvard Business School; he is a partner in a health care private equity company; and he is a Director for a publicly-owned Real Estate Investment Trust, for a private international microfinance company, and for a bank.  *Id.* ¶ 57.  Neal also has over thirty years of experience in the investment management industry — including as President and COO of the investment management group at Kemper Corporation and Kemper Financial Services and as President of the Kemper Funds Group.  *Id.*

At trial, Neal explained that, as a Trustee, he considered the services rendered under the IMA and FASA "collectively" because he believed that Calamos was bound under the IMA to provide *all* the services listed in the FASA, regardless of whether the FASA was in effect or not.  Def.'s Resps. ¶ 317.  This comported with the trial evidence that tended to show that, while the FASA was in place, the Independent Trustees annually reviewed the services Calamos provided and the 1.1 basis point fee charged under that agreement.  The evidence indicated that the Independent Trustees did consider the IMA or FASA collectively, rather than in isolation.  Pls.'

Resps. ¶ 350.

### 3. Expert Witnesses

In addition to fact witnesses, Calamos presented five expert witnesses at trial: Kevin Cronin, R. Glenn Hubbard, Arthur B. Laby, John Lacey, and David Richardson. *Id.* ¶¶ 33–38.

**Kevin Cronin** has an MBA from Boston College's Carroll School of Management and a BA in Economics from Wesleyan University. Pls.' Resps. ¶ 34. During a career exceeding twenty five years in the asset management industry, Cronin developed senior executive-level responsibility for portfolio management on behalf of both mutual funds and institutional clients. This experience has included designing and implementing the restructuring of investment management teams at multiple investment advisors. *Id.* Cronin has had direct responsibility for setting the fees that investment advisors charge to manage both mutual funds and institutional accounts. *Id.*

Calamos hired Cronin to research and opine on whether the investments that Calamos made to enhance the quality of its portfolio management services were a reasonable way of seeking to increase the value of services that Calamos provides to the Fund and its shareholders. Cronin Report ¶ 16. Calamos also asked Cronin to review and opine on portions of the reports presented by Mercer E. Bullard and Steven Pomerantz, Plaintiffs' experts. *Id.* ¶ 17.

In his report, Cronin concludes, among other things, that: (1) Calamos' decision to improve the quality of services it provided to the Fund through its reorganization of its investment approach and management team was a reasonable and appropriate way to benefit the shareholders; (2) contrary to Bullard's report, publicly available information and the materials Calamos provided to the Independent Trustees sufficiently explain Calamos' restructuring efforts as they pertain to the Fund and contain the type of content and level of detail that is consistent

with what other boards of trustees receive in the industry; and (3) contrary to Pomerantz's report, the services that Calamos provides to mutual funds are more extensive and expensive than the services Calamos provides to institutional and sub-advised clients. *Id.* ¶¶ 20, 37–169. At trial, Cronin testified credibly to the same effect.

Plaintiffs challenge Cronin's opinions on multiple grounds. Of note, Plaintiffs contend that Cronin's opinions concerning the benefits of switching investment approaches are irrelevant, do not require specialized knowledge, are aimed at impermissibly bolstering Calamos' lay witness testimony, and are entirely speculative. *See* Pls.' Mem. to Partially Exclude Ops. of Kevin Cronin (Pls.' Mot. to Exclude Cronin) at 4, Doc. 107. The Court rejects each challenge.

Plaintiffs first argue that Cronin's opinions are "entirely irrelevant" because "[w]hether the switch from a vertical to horizontal investment approach was an intended improvement has *nothing* to do with whether [Calamos] should have charged the Fund a lower, non-excessive fee." *Id.* at 5. But evidence of Calamos' reasonable efforts to improve the Fund's performance bears directly on the *Gartenberg* factors focused on the nature and quality of Calamos' services to the Fund, as well as the care and conscientiousness of the Independent Trustees in approving the IMA. For this same reason, Plaintiffs' claim that Cronin's testimony is "unhelpful" is unavailing.

Plaintiffs next claim that Cronin's opinions do not require specialized knowledge and are instead used to bolster the testimony of Calamos' fact witnesses. *Id.* at 6. To the contrary, the opinions in Cronin's report are based on his extensive industry experience — which includes managing a mutual fund portfolio; developing new investment philosophies, teams, and processes to manage securities for institutional clients and mutual funds; and overseeing a team of investment professionals to implement the type of structural changes that Calamos has undertaken in recent years. *See* Cronin Report ¶¶ 6–7. His specialized knowledge in the

industry, as applied to his opinions, aids the Court in determining whether Calamos has breached its fiduciary duty under § 36(b).  *Cf.* Fed. R. Evid. 702.

The Court, however, agrees with Plaintiffs that Cronin's opinions regarding the *purpose* of the reorganization is best left to lay witnesses who are better positioned to recount their reasons for that particular approach.  Pls.' Mem. to Exclude Cronin at 2; *see Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 472 (S.D.N.Y. 2010) ("[T]here is little reason that an expert witness — as opposed to a lay witness with first-hand knowledge — should be used to support [an] assertion" that goes to a lay witness's own recollection).[6]

**R. Glenn Hubbard** is the Dean of the Graduate School of Business at Columbia University and is a professor of finance and economics at both Columbia University's Graduate School of Business and in the Economics Department of the Faculty of Arts and Sciences. Hubbard has a Ph.D. in economics from Harvard University.  Pls.' Resps. ¶ 35.  He has previously taught at Northwestern University, the University of Chicago, and Harvard University.  *Id.*  He has served in the U.S. government as the supervisor of the Office of Tax Policy in the Department of Treasury under President George H.W. Bush and as the White House Economic Advisor under President George W. Bush.  *Id.*  He has published research specifically related to the structure of the mutual fund industry and the effect of competitive forces on mutual fund fees.[7]  *Id.*  He also has served as an independent trustee in charge of supervising

---

[6] The Court notes that Cronin previously served as senior vice president and senior manager of Putnam Investments, where he had oversight of mutual funds.  Around the time he worked at Putnam, the funds he managed were subject to a lawsuit that alleged that Putnam charged those funds excessive advisory fees.  Trial Tr. 609:24–611:6.  Cronin's involvement with the suit may have left him biased against § 36(b) generally, but the Court does not find that Cronin's opinions are infected with bias.

[7] The Court notes that at least one of Hubbard's publications concerning the structure of the mutual fund industry and the effect of competitive forces on mutual fund fees was funded in part by the Investment Company Institute

BlackRock's closed-end fund complex since 2004. *Id.*

At trial, Hubbard credibly explained that from an economic perspective — and based on his industry expertise and experience — Calamos' Other ACG Accounts are inapt comparators when considering what advisory fee would be appropriate to charge the Fund. *Id.* ¶ 217. Moreover, both in his report and at trial, Hubbard persuasively explained that a fund's expense ratio[8] is the more "economically relevant fee" to a mutual fund shareholder, when compared with a sub-component of the expense ratio, such as an investment adviser's annual advisory fee. *See* Expert Report of Glenn Hubbard ("Hubbard Report") ¶¶ 44–47. As Hubbard explained, from a shareholder's perspective, a mutual fund's total expense ratio is the most economically meaningful fee because the expense ratio, and not the advisory fee, is the fee that the shareholder *actually* pays; a shareholder cannot purchase portfolio management services from one adviser and then purchase transfer-agency, custodial, or other services from another adviser. DPF ¶ 269. And, after analyzing both the Fund's expense ratios and advisory fees with what Hubbard considered the Fund's peer mutual funds,[9] Hubbard concluded that the Fund's expense ratios and advisory fees were within the range of its peer funds. Hubbard Report ¶¶ 48–56.

**Arthur B. Laby**, a Professor of Law at Rutgers Law School, has extensive prior

---

("ICI") Mutual Insurance Company — a company that provides insurance to mutual fund advisers, including insurance that covers § 36(b) litigation. *See* Trial Tr. 675:24–676:24.

[8] A fund's expense ratio is calculated as the total operating expenses expressed as a percentage of a fund's average assets over a certain period of time. *See* Hubbard Report ¶ 18.

[9] Hubbard used Lipper data to construct the Fund's "peer groups" for the purpose of comparing total expense ratios and management fees. *See* Hubbard Report at App'x D. In so doing, he identified share classes based on several pertinent criteria (as detailed in the appendix); included only fund share classes that had the same load type and minimum initial investment range as the corresponding Fund share class; excluded share classes with missing, zero, or negative values in the Lipper database over the relevant period related to their total expense ratio, management fee, or non-management fee; employed, at times, size restrictions on the peer groups, such that the peer group was limited to include the ten funds ranked immediately above and the ten funds ranked immediately below the Fund, based on year-end AUM levels; and further restricted the peer group to one fund per Fund Management Company, among other restrictions. *Id.* The Court finds Hubbard's peer group construction reasonable.

experience with mutual fund matters, including as Assistant General Counsel responsible for investment management matters at the SEC, where he provided advice on regulatory and enforcement matters related to mutual funds and investment advisors. *Id.* ¶ 36. Laby also worked in the SEC's Division of Investment Management, which specializes in investment company and investment adviser regulation. *Id.*

Laby was asked by Calamos to evaluate the process employed by the Board in reviewing and approving the IMA each year and to examine the care and conscientiousness of the Board in reviewing and approving it. Trial Tr. 939:23–940:6. As part of his evaluation, Laby examined the quality and thoroughness of the materials the Board requested and reviewed in connection with their 15(c) Review. *Id.* 940:6–10. Laby opined that the Board's processes and structures are generally very strong. *Id.* 955:22–25. He opined that, in evaluating the IMA, the Trustees carefully examined information Calamos provided to them concerning the nature and quality of Calamos' services. *Id.* 956:1–5.

Yet, while Laby testified credibly, the Court affords his opinions less weight than otherwise warranted due to his use of the "business-judgment rule" in analyzing the Trustees' conscientiousness and care. Specifically, at trial, Laby opined that the business judgment rule, "generally speaking," applies to a board of trustees' review and approval of advisory fees. *Id.* 945:5–10. He testified that, in formulating his opinions in this case, he was guided by "the business judgment rule." *Id.* 945:11–17; *see also* Expert Report of Arthur B. Laby ("Laby Report") at 8 ("As I examined the Board's processes, I was guided by the overarching principle that the decision whether to renew a management agreement is committed to a board's business judgment."). But, as Plaintiffs correctly pointed out at trial, the phrase "business-judgement rule" exists nowhere in *Jones*. And while Calamos attempted to walk back Laby's comments,

*see* Def.'s Resps. ¶ 324 ("Professor Laby did not offer the opinion, and [Calamos] is not relying on any opinion, that the business judgment rule applies such that the Court has no review function with respect to the Independent Trustees' decision-making."), the Court concludes that Laby's opinions as to the conscientiousness of the Independent Trustees may be *somewhat* skewed due to his application of the business-judgment rule to this case.[10]

**John Lacey** is a Certified Public Accountant and Professor of Accountancy at California State University, Long Beach. Pls.' Resps. ¶ 37. Lacey also regularly teaches accounting to judges for various judicial education organizations including the Federal Judicial Center and the National Judicial College and at a large international investment management firm with mutual fund and institutional products. *Id.* He earned a PhD at University of California, Los Angeles, with a major in accounting information systems and minors in economics and mathematics; and he has an MBA in quantitative business analysis and a BS in accounting from the University of Southern California. Expert Report of John M. Lacey, Ph.D. ("Lacey Report") ¶ 6.

In his expert report, Lacey opined that: (1) the methods Calamos used to calculate and report fund-level profit margins to the Board were reasonable and adequate for the Board to assess Calamos' profitability associated with providing advisory services to the Fund; (2) the

---

[10] The Court notes that Laby attempted to walk back some of his comments at trial — explaining that, when the business-judgement rule applies, "there is *typically* deference to the board, and sometimes substantial deference, *but that does not completely end the analysis.*" Trial Tr. 947:1–9 (Laby) (emphases added). This understanding of the business-judgment rule seemingly comports with *Jones*, which makes clear that "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions" and instructs courts to refrain from "supplant[ing] the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range." 559 U.S. at 352.

Nevertheless, Laby also opined that "generally speaking," the judicial role typically *ceases* once the business judgment rule is applicable. Trial Tr. 948:2–17. Use of the business-judgment rule in this way seemingly conflicts with § 36(b). *See Fox*, 464 U.S. at 540 (explaining that "Congress decided *not* to rely solely on the fund's directors to assure reasonable adviser fees" (emphasis added)). Consequently, Laby's use of the business-judgment rule in analyzing the conscientious and care of the Independent Trustees renders his opinions somewhat less persuasive to the Court.

cost-allocation methodology Calamos used to estimate fund-level expenses was reasonable and consistent with Generally Accepted Accounting Principles ("GAAP"); (3) there is no single best (or required) method to allocate expenses for purposes of § 36(b); (4) the use of AUM to allocate expenses, as Calamos does, is consistent with managerial accounting principles; and, (5) contrary to Plaintiffs' experts, Calamos' use of AUM as the primary allocation metric did not lead to the reported fund-level profit margin for the Fund being understated or unreasonable. *Id.* ¶ 5. At trial, Lacey's testimony largely conformed with his expert report.

Although Plaintiffs contend that Lacey is "not an expert" on mutual funds,[11] they do not challenge that he is qualified to opine on principles of accounting and cost allocation. *See* Pls.' Mem. to Partially Exclude Ops. of John M. Lacey ("Mot. to Exclude Lacey") at 11, Doc. 116. Rather, Plaintiffs seeks to exclude from consideration Lacey's opinions insofar as Lacey opines (1) that Calamos' AUM-based cost allocation in the 15(c) Profitability Presentations were consistent with GAAP and managerial accounting principles; (2) that Calamos' cost allocation, and the fund-specific profits calculated on that basis, were "reasonable" and "adequate" for the Board's consideration; and (3) that the AUM-based cost allocations are "widely accepted" in the mutual fund industry. *Id.* The Court rejects all three challenges by Plaintiffs.

Plaintiffs primary basis for rejecting Lacey's opinion that AUM-based cost allocation is consistent with GAAP rests on a legal claim for which Plaintiffs have offered no support: that conformity with GAAP is irrelevant to assessing cost allocation under *Gartenberg* because *Gartenberg* somehow displaces traditional accounting principles. *Id.* at 19. As Plaintiffs tell it, because *Gartenberg* requires courts to assess the investment adviser's "cost in providing the

---

[11] The Court notes that Lacey does not hold himself out as an expert in the operations of the mutual fund industry. *See* Trial Tr. 996:9–11 (Lacey).

service" to the mutual fund, *id.* at 3 (quoting *Gartenberg*, 694 F.2d at 930), *Gartenberg* requires a "different and more particular requirement for cost accounting" than GAAP provides, *id.* The Court is unpersuaded. *Gartenberg* does not specify how costs should be allocated; nor does the opinion suggest, in any way, that GAAP-consistent methods are impermissible. *See also Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 489 (2d Cir. 1989) (describing the lack of certainty in calculating profit against product lines).

Next, and relatedly, Plaintiffs assert that *Gartenberg* requires an investment adviser's cost allocation to bear a "cause and effect" relationship that reflects the *actual* costs incurred in advising a particular fund. Mot. to Exclude Lacey at 19–22. Yet Calamos points out that, in Lacey's opinion, an AUM-based cost allocation is appropriate precisely *because* it "is not possible to identify a cause and effect relationship between the Fund and the joint and common costs incurred by [Calamos]." Def.'s Mem. in Opp'n to Motion to Exclude Opinions of John M. Lacey ("Def.'s Opp'n to Mot. to Exclude Lacey") at 11, Doc. 136 (citing Lacey Report ¶¶ 21–31). Consequently, the Court finds Lacey's opinions highly probative on the questions surrounding Calamos' use of an AUM-based cost allocation methodology. Indeed, the Court found Lacey's explanation as to why such an allocation was reasonable and adequate highly credible and persuasive at trial. *See, e.g.*, Trial Tr. 997:17–1000:24, 1003:9–22, 1006:6–1008:23.

Finally, Plaintiffs seek to exclude Lacey's testimony that AUM-based allocation is "widely accepted" in the mutual fund industry because that opinion is unsupported by the data and therefore "plainly inadmissible." Mot. to Exclude Lacey at 4, 23. Specifically, Plaintiffs contend that while Lacey bases his opinion on three sources that list allocation by AUM as one among various permissible methods used to allocate costs, none of those sources purports to identify the extent of any method's use. *Id.* at 24. In response, Calamos does not contest that

Lacey bases his conclusion on three sources that do not in fact establish that AUM is "widely" used. They contend instead that Lacey is entitled to opine on the extent to which AUM is used, without relying on *any* source or experience that actually supports that conclusion. Def.'s Opp'n to Mot. to Exclude Lacey at 15.

The Court agrees with Plaintiffs that the Federal Rules of Evidence require more from Lacey. *See* Fed. R. Evid. 702 (requiring that "testimony is based on sufficient facts or data"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."). Accordingly, while the Court credits Lacey's testimony that cost allocation on the basis of average AUM is a reasonable and adequate method for allocating costs, the Court disregards Lacey's assertion that such a method is "widely used."

Finally, **David Richardson** is an investment professional with over thirty years of asset management industry experience, including with respect to both mutual funds and institutional accounts. Pls.' Resps. ¶ 38. Today, he works for an investment advisor, where he serves on the management team that oversees the provision of services to U.S. mutual funds. *Id.* He has held senior leadership positions with several other investment advisors for which he: (1) has extensively engaged in the management and oversight of investment advisory services provided to both mutual funds and institutional accounts; (2) has managed sales, marketing, business development and shareholder services for institutional investment firms; (3) has managed an adviser's relationships with third parties (such as distributors, trust companies, and fund administrators); and (4) has overseen an adviser's global marketing and client services. *Id.*

At trial, Richardson explained that part of his responsibilities as an expert was to rebut

the opinions of Pomerantz, who, among other things, estimated the maximum costs of what he believed were the additional services provided and risks undertaken by Calamos to the Fund vis-à-vis Calamos' Other ACG Accounts. Trial Tr. 754:3–9. While Richardson acknowledged that Pomerantz estimated that the maximum cost of those additional services and risks were slightly lower than seven basis points (according to Plaintiffs' counsel), Richardson did not offer an opinion as to whether Pomerantz's estimate was accurate. *Id.* 754:15–17. Nor did Richardson offer an opinion as to whether the advisory fee Calamos charges the Fund was reasonable. *Id.* 754:22–24. But Richardson did credibly explain that the additional services that Calamos provided to the mutual funds, like *the* Fund, are consistent with additional services that are provided by other advisors to mutual funds and that the additional fees that Calamos charged for the provision of those services to mutual funds are consistent with the additional fees that the mutual fund industry charges. *Id.* 754:25–755:10. Richardson opined that the differences in services are a part of why Calamos charged a higher fee for provision of services to the Fund vis-à-vis its non-Fund clients. *Id.* 755:21–23.

Plaintiffs do not challenge Richardson's qualifications to render his opinions.[12] They do, however, seek to exclude Richardson's opinions insofar as he opined that Plaintiffs understated the scope of the greater services that Calamos provided the Fund, and, relatedly that the greater fee Calamos charged was justified by the greater services it provided the Fund. Pls.' Mem. to Partially Exclude Richardson Ops. at 1, Doc. 119. In short, Plaintiffs contend that Richardson's opinions on these topics should be excluded because he has failed to independently value the

---

[12] Richardson is the Executive Director and Global Head of Marketing and Client Service for Impax Asset Management, a London-based global equity manager managing both public and private equity strategies for clients located throughout the world. Impax manages approximately $8.5 billion in assets. Richardson Report ¶ 2. Richardson holds a BS in Mechanical Engineering and a Chartered Financial Analyst designation. *Id.* ¶ 5.

cost of the greater services Calamos provided to the Fund and has not stated the additional number of employees or man-hours required to deliver those services. *Id.* at 2. Because of this failure, Plaintiffs contend, Richardson is unable to say whether Pomerantz's estimation of the value of the greater services is too low, rendering baseless his opinion that those greater services account for the fee differential. *Id.* Additionally, Plaintiffs contend that because Richardson has conducted no independent assessment of whether it was reasonable for Calamos or the Board to expect the Fund's shareholders to bear the cost of these additional services, his report and the opinions therein are nothing more than an uncritical acceptance of Calamos' position. *Id.*

The fact that Richardson's opinions are not rooted in quantifiable, scientific analysis is no bar to their admissibility, nor does it render his opinions the province of lay witnesses. He bases his opinions on his "experience working with mutual funds and institutional account clients," Expert Report of David Richardson, CFA ("Richardson Report") ¶ 81; *see also id.* ¶¶ 14, 16–20, 79, and he need not put forward an affirmative quantifiable model to rely on that experience. *See Davis v. Carroll.*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2016) (noting that a court may permit expert testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis") (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999)); *Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 974 (E.D. Mich. 2017) (holding that "opinions about industry practices and customs are not unreliable simply because they have not been 'subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis'" (quoting *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001))).

Richardson also testified that Calamos provided a greater level of services and faced greater risks in advising the Funds vis-à-vis its Other ACG Accounts. Trial Tr. 749:19–22. In

opining on the investment advisory services Calamos provided to the Fund specifically, Richardson combined the services set forth in the IMA and the FASA; in other words, he did not differentiate between services rendered under the FASA and services rendered under the IMA. *Id.* 750:24–751:18. He reasoned that the IMA required Calamos to provide a range of services and operation of the Fund, and the provision of services under the IMA incorporates *all* of the services provided under the FASA. *Id.* 751:8–13.

As Plaintiffs' counsel pointed out during trial, Richardson's trial testimony was somewhat inconsistent with his deposition testimony, during which he stated that he understood the FASA to provide a framework for Calamos' provision of *additional* services beyond the provision of investment management services. *Id.* 751:14–752:20. But Richardson reconciled his statements later, testifying that "[t]he description of the services provided under the FASA are not all contained within the [IMA]. But that doesn't mean that the duties of the [IMA] don't apply to the provision of the services under the FASA." *Id.* 752:24–753:3.

### H. Plaintiffs' Witnesses

Plaintiffs offered trial testimony from Behan, Becker, Helmetag, Holloway, Neal, and Jackson, whom they called as adverse witnesses. Plaintiffs also called two expert witnesses: Mercer Bullard and Steven Pomerantz. Below, the Court evaluates the credibility, expertise, and testimony of Bullard and Pomerantz.

*1. Mercer E. Bullard*

Mercer E. Bullard is a professor of law at the University of Mississippi School of Law, where he teaches courses in corporate finance, securities regulations, economics of the firm, and mutual and hedge fund regulation. *See* Expert Report of Mercer E. Bullard ("Bullard Report") at 78. He holds a JD from the University of Virginia School of Law, an MA in National Security Studies from Georgetown University, and a BA in English and American Studies from Yale

47

College.  *Id.* at 80.  Bullard has published more than fifty commentaries on mutual fund regulatory issues and has testified on more than twenty occasions before the U.S. House and Senate Committees related to the regulation of the financial industry.  *Id.* at 1–2.  Previously, Bullard was an assistant chief counsel in the Division of Investment Management at the SEC, which is a division responsible for regulating investment companies and investment advisors.  *Id.* at 1.

Plaintiffs offered Bullard's expert opinion as to the sixth *Gartenberg* factor — that is, the independence and conscientiousness of the Independent Trustees.  *See id.* at 4–6.[13]  Ultimately, Bullard concluded in the report that

> the [Fund's] agreements with Calamos could not have been negotiated at arms-length because:  (1) Calamos did not provide the information necessary for the Trustees to evaluate profitability, economies of scale or comparative fees, (2) the Trustees did not make reasonable efforts to obtain this information, and (3) the Trustees were not conscientious in evaluating fees, investment performance, profitability, economies of scale or comparative fees.

*Id.* at 7.  In line with his expert report, Bullard offered two primary opinions at trial:  (1) Calamos' method for calculating its profitability for the 15(c) Responses is "per se unreasonable under" *Gartenberg* and (2) the Independent Trustees lacked conscientiousness in their annual evaluation of Calamos' advisory fee.  Pls.' Resps. ¶ 445.

---

[13] Bullard does not offer any expert opinion on the merits of any of the first five *Gartenberg* factors.  *See* Dep. of Mercer E. Bullard ("Bullard Dep.") at 202:17–22 (offering no "expert opinion on the nature and quality of Calamos' noninvestment services to the [Fund]"), 214:22–215:2 (offering no "expert opinion regarding the [Fund's] fees relative to fees paid by the peer mutual funds"), 218:22–25 (offering no "expert opinion regarding the [Fund's] performance"), 465:21-24 (offering no opinion "as to whether Calamos realized economies of scale"), 466:13–20 (offering no opinion "as to whether there were any diseconomies of scale," nor any "opinion on economies of scale one way or the other"), 470:20–471:9, 472:13–473:4 (offering no opinion "on the sharing of economies of scale"), 486:10–13 (offering no expert opinion on fall-out benefits).

a. *Bullard's Opinion Regarding Calamos' Accounting Methodologies*

With respect to Calamos' cost allocation and accounting, Bullard concludes in his report: (1) that allocating portfolio management expenses on the basis of AUM is unreasonable; (2) that in making a profitability estimate, "Calamos did not use a reasonable method of allocating its expenses among advisory accounts . . . . Nor did Calamos provide the Trustees with information with which they could have reasonably estimated Calamos's profitability with respect to the [Fund];" and (3) many of Calamos' expense allocations "could not have been accurate." Bullard Report ¶¶ 50–51, 75–77. Moreover, at trial, Bullard testified that Calamos' AUM-based cost allocation methodology was "per se unreasonable." Trial Tr. 878:4–8 (Bullard). Calamos objects to Bullard's testimony on multiple Rule 702 grounds.

The Court finds that Bullard does not have the qualifications to opine on topics related to accounting or to opine on the reasonableness *vel non* of Calamos' decision to allocate indirect expenses using average AUM. Bullard has no degrees or certifications in accounting, nor has he ever been qualified by any court as an expert on any accounting topic. Pls.' Resps. ¶ 447. He is not an expert in GAAP or managerial accounting. He has no experience in preparing, auditing, or analyzing financial statements. He has never been retained to perform costs accounting or financial accounting services. And he has never received any formal training in mutual fund profitability calculations or cost allocation methodologies. *Id.*

In response, Plaintiffs assert that cost allocation under *Gartenberg* "has nothing to do with 'accounting.'" Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Exclude Ops. of Pls.' Expert Witnesses ("Pls.' Opp'n to Mot. to Exclude") at 17, Doc. 104. Such a statement cannot be squared with common sense. Cost allocation *plainly* is a matter of accounting. Indeed, as Calamos' expert Lacey testified, "calculating profitability is an exercise in accounting." Trial Tr.

1013:23–1014:1 (Lacey).

Plaintiffs attempt to bolster Bullard's credentials by pointing to his experience in the SEC's Division of Investment Management and Mutual Fund Regulation. *See* Pls.' Resps. ¶ 329 (citing Trial Tr. 893:5–896:14 (Bullard)). The Court is unconvinced. Even when given the chance on re-cross, Bullard's described experiences at the SEC shed little light on his experience with cost allocation methodologies or the reasonableness in using one versus another. *See* Trial Tr. 893:5–896:14.

Plaintiffs' final effort is to point out that Bullard is currently pursuing a PhD in finance, *see id.* 874:12–14, and that he was recently appointed as special master "in a Mississippi court" to provide a damages analysis comparing investment returns against a return benchmark. Pls.' Resps. ¶ 329. But the Court finds none of these facts persuasive as to Bullard's qualifications to testify as to the propriety of Calamos' cost allocations in this case.[14] Thus, as Plaintiffs have failed to explain how Bullard is qualified, either in terms of formal training or practical experience, to testify as to cost allocation or accounting, the Court affords no weight to Bullard's testimony as to Calamos' cost allocation and accounting methods and the propriety of the Independent Trustees' reliance thereon.[15]

In any event, even considering Bullard's opinions on the propriety of Calamos' cost allocation methods for calculating profitability, the Court finds that Bullard's opinions lend little

---

[14] The Court notes that Bullard, in his report, never proclaims to base his opinions on his doctoral studies in finance. *See generally* Bullard Report. Moreover, when asked by Plaintiffs' counsel to describe his "professional background with particular emphasis on [his] experience relative to the opinions [he] expressed in this matter," *see* Trial Tr. 892:23–25, Bullard never mentions his doctoral studies, *id.* 893:1–896:17. A similar omission occurred when he was asked by Plaintiffs' counsel to list "any other aspects of [his] teaching or scholarship that [he] believe[s] is pertinent to the opinions [he] expressed in this case." *Compare id.* 896:18–25 *with id.* 896:22–899:19.

[15] Because the Court has determined that Bullard is not qualified to offer accounting-related testimony, the Court need not address Calamos' objections that Bullard's accounting-related opinions are not based on sufficient facts, the product of reliable methods, or helpful to the trier of fact. *See* Def.'s Mot. to Exclude Ops. Pls.' Expert Witnesses at 28, Doc. 88.

support to Plaintiffs' claim of breach of fiduciary duty. At trial, Bullard conceded that 15(c) profitability has very little, if anything, to do with whether a given advisory fee is excessive. In his opinion: (1) an adviser's profitability is a "poor measure" of the excessiveness of its advisory fee; (2) courts have "no business" conducting an analysis of profitability for purposes of determining whether the adviser's fees are excessive; (3) profitability calculations involve cost allocation issues that are subject to dispute and there is no universally accepted methodology for making the analysis; (4) 15(c) profitability calculations are so inherently subjective that evaluating a § 36(b) claim based on profitability "can produce randomness to the second degree;" and (5) an adviser's choice of a cost allocation methodology does not affect whether the advisory fee is excessive. *Id.* ¶ 330.

The Court credits *this* portion of Bullard's opinion, especially given the robust testimony from other witnesses regarding the value of analyzing profitability in determining whether an investment advisory fee is excessive. Thus, while the Court finds Bullard unqualified to opine on the reasonableness of Calamos' cost-allocation approach, if the Court *were* to take Bullard's opinions on Calamos' cost allocations into consideration, the Court would afford little weight to Bullard's opinion insofar as he suggests that Calamos' cost-allocation was unreasonable or unusual or that the Independent Trustees were somehow derelict in their evaluation of Calamos' compensation for advisory services rendered.

b. *Bullard's Opinion Regarding the Conscientiousness of the Independent Trustees*

Bullard ultimately concluded that the Trustees did not exhibit conscientiousness in the review of Calamos' fees because they overly focused on superior performance while downplaying poor performance and because they "sought to justify" Calamos' fees rather than critically examine them. Bullard Report at 62. Calamos disagrees with Bullard's conclusions

and seeks to have them excluded on multiple Rule 702 grounds. Def.'s Mot. to Exclude Ops. Pls.' Expert Witnesses ("Def.'s Mot. to Exclude") at 29–34, Doc. 88.

Turning first to Bullard's qualifications, Calamos asserts that Bullard has no practical experience that would qualify him to opine on the Independent Trustees' conscientiousness and care in evaluating Calamos' investment advisory fee each year. *Id.* at 30. In particular, Calamos notes that Bullard has never served as a mutual fund trustee or investment advisor, has never attended a mutual fund board meeting, or participated in the 15(c) Process. *Id.* Calamos further notes that Bullard conceded in his deposition that his expertise in this area derives "primarily" or in "substantial part" from his work as an expert in previous § 36(b) cases, which alone is an insufficient basis for qualifying an expert. *Id.* (citing *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 WL 5815472, at *13 (S.D.N.Y. Oct. 29, 2013) (noting that "expertise [in] being an expert in plaintiffs' securities cases . . . is not sufficient to qualify . . . an expert" under *Daubert*); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013) (same)).

Plaintiffs counter that Bullard has vast experience with the mutual fund industry as a former SEC official responsible for regulating mutual funds and fund advisors, and in view of Bullard's extensive testimony before Congress. Pls.' Opp'n to Mot. to Exclude Bullard at 11–12. The Court agrees with Plaintiffs. In light of Bullard's extensive practical experience with the SEC and his testimony before Congress, the Court finds that he is qualified to testify about whether the Independent Trustees were conscientious in evaluating the information provided to them during the 15(c) Process. *See* Fed. R. Evid. 702 (stating that an expert witness may be qualified "by knowledge, skill, experience, training, or education"); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (noting that a court must look at the

"totality" of a "witness's background."); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

Next, Calamos contends that Bullard's testimony should be excluded because his opinions are not based on sufficient facts or data, since Bullard only reviewed a portion of the available record, consisting of 15(c) Responses and meeting minutes related to the approval of the IMA at the annual June Board meeting. Def.'s Mem. to Exclude at 31. Yet, as Plaintiffs correctly note, "[a]s a general rule, the factual basis of an expert opinion goes to the *credibility* of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134 (S.D.N.Y. 2015) (emphasis added) (quoting *Boykin v. W. Exp., Inc.*, No. 12 Civ. 7428 (NSR) (JCM), 2015 WL 539423, at *6 (S.D.N.Y. Feb. 6, 2015)).

Finally, Calamos contends that Bullard's opinions regarding the Independent Trustees' conscientiousness are not the product of reliable principles or methods. For support, Calamos clings to Bullard's statement that he "wouldn't call" his approach to evaluating the Independent Trustees' conscientiousness "a methodology." Def.'s Mem. to Exclude at 33 (quoting Bullard Dep. 149:2–10, 150:22–151:2). But the "test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49–50 (S.D.N.Y. 2016). Nor does Bullard's application of his experience to the facts of this case render his opinions mere "factual narratives," as Calamos argues in its papers. It is axiomatic that "an expert might draw a

conclusion from a set of observations based on extensive and specialized experience." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Thus, the Court finds Bullard qualified to opine on the Trustees' conscientiousness.[16]

Notwithstanding that the Court finds Bullard's testimony regarding the Independent Trustees' conscientiousness *admissible*, the Court affords little weight to his testimony.

At the outset, the Court observes that Bullard has never been a trustee for a mutual fund regulated under the ICA, has never reviewed an investment adviser's 15(c) response on behalf of a fund's independent trustees, and has never attended a 15(c) board meeting. Pls.' Resps. ¶ 452. Bullard also lacks experience on the other side of the investment adviser–fund trustee relationship: he has never worked for an investment adviser to a mutual fund, has never held responsibility for managing the investment portfolio for an institutional or sub-advisory account, has never negotiated an administrative or accounting agreement for a mutual fund, and has never performed any mutual fund administration services. *Id.* ¶ 454.

While Plaintiffs are correct in noting that Bullard has "ample indirect experience which provides a reasonable basis for [h]is opinions," *id.* ¶ 452, in determining the level of weight to give Bullard's testimony, the Court does consider Bullard's lack of direct adviser or trustee experience vis-à-vis some of the other witnesses in this case, as well as his lack of direct experience "on the inside" of the 15(c) process.

---

[16] Calamos also advances an omnibus objection to Bullard's opinions on grounds that his work as an expert on behalf of plaintiffs only and his publication of articles critical of § 36(b)'s protective function evinces a bias warranting exclusion of his opinions *in toto*. Def.'s Mem. to Exclude at 24–25. The Court observes that such criticisms likely could be lodged against most experts who frequently appear in securities-related cases. In any event, such credibility challenges go more toward the weight of an expert's testimony than its admissibility. *See DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000); *Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 428 (S.D.N.Y. 2002) (noting that a "defendant may challenge the degree of credibility a trier of fact ought to accord [an expert's] conclusion and present counter-evidence to refute the scientific veracity of [an expert's claims]"). And here, the Court finds that Bullard's work for plaintiffs only and his articles critical of § 36(b) do not substantially impeach the credibility (if any) of his opinions.

The Court also finds that Bullard's factual analysis was based on materially incomplete data. During a critical period of cross-examination by Calamos' counsel, Bullard conceded that although he was aware that Calamos' 15(c) Process is a yearlong process, he did not review materials that were provided to the Independent Trustees outside of the June 15(c) Process during the relevant period, with only limited exception. Trial Tr. 831:13–835:11. Plaintiffs, in their post-trial papers, attempt to downplay the significance of the documents presented to Bullard for the first time at trial. *See* Pls.' Resps. ¶ 247. The Court is not convinced. Even Bullard conceded that some of the materials he failed to review may have reflected on the conscientiousness of the Independent Trustees. *See* Trial Tr. 835:7–20. Thus, the Court does not find credible Bullard's testimony regarding the Independent Trustees' conscientiousness in evaluating Calamos' investment advisory fee.

### 2. Steven Pomerantz

Dr. Steven Pomerantz is the president of his eponymously named economic and financial consulting firm, Steve Pomerantz LLC, located in New York City. Expert Report of Steve Pomerantz, PhD ("Pomerantz Report") at 1. Pomerantz received a PhD in mathematics from the University of California, Berkeley, where his thesis was in the area of "Non-Linear Partial Differential Equations;" and he received a BA in mathematics from Queens College of the City University of New York. *Id.* Ex. 1 at 2. Pomerantz is currently an adjunct professor of mathematics at Queens College. *Id.* ¶ 10.

Over the course of almost thirty-five years, Pomerantz has held positions in research and management for fixed income, equities, derivatives, and alternative investments at major investment firms. *Id.* ¶ 9. In those capacities, Pomerantz has provided portfolio management services both to mutual funds and to institutional accounts. *Id.* He has also served as a portfolio

manager at several firms for both fixed income and equity institutional clients. *Id.* Pomerantz's

sole academic publication is a 2008 article he co-authored in the Oklahoma Law Review entitled

*Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test. Id.* ¶ 11; *id.* Ex. 1

at 3–4.

Plaintiffs retained Pomerantz to analyze the record evidence and opine on whether the

Independent Trustees' approval of the Advisory Fees paid by the Fund satisfies the first five

*Gartenberg* factors — that is, all factors except for that relating to "the independence, expertise,

care and conscientiousness of the [F]und's board in evaluating adviser compensation" — and

damages. *Id.* ¶¶ 3–4, 13. In his expert report, after analyzing all five *Gartenberg* factors,

Pomerantz concludes that "the advisory fees that Calamos charged to the Fund were in violation

of [§] 36(b)" of the ICA. *Id.* ¶¶ 12–13.

Pomerantz also purported to "model[] the expenses incurred by Calamos for each open-

end Calamos fund, including the Fund," and "[f]rom these directly observable Fund-specific

revenues and model-derived Fund-specific costs," Pomerantz "calculate[d] Calamos's Fund-

specific profits." *Id.* ¶ 13. After making his calculations, Pomerantz concludes that the "Fund-

specific profits, in both absolute (gross dollars) and relative (profit margin) terms, were much

greater than the profits that Calamos reported to the Board" and were "further indication that the

Fund's fees were excessive, as well as further indication of the disconnect between services

provided and fees charged [by Calamos]." *Id.* Moreover, in his report Pomerantz concludes that

the advisory fee rates Calamos charged to the Fund "bore no reasonable relationship to the

services provided," and that the quality of the investment management services provided by

Calamos to the Fund has been extremely poor. *Id.* Pomerantz concludes that Calamos has been

realizing substantial economies of scale and fall-out benefits through its advising the Fund, the

benefits of which Calamos has kept entirely for itself. *Id.* Finally, Pomerantz proffered at least four methods to calculate damages.

As with Bullard, Calamos advanced several bases under Rule 702 to exclude Pomerantz's opinions and testimony. *See* Def.'s Mot. to Exclude at 7. Calamos specifically requested that Pomerantz be precluded from offering the following expert testimony:

> a. Pomerantz's "legal" opinions (as Calamos puts it) that (1) Calamos' advisory fees are legally "excessive" under § 36(b), or (2) that certain facts offered by Calamos are "irrelevant" and/or "legally irrelevant" under § 36(b), or (iii) that Calamos must provide the Fund only "de minimis" non-investment-related services pursuant to the terms of the applicable contracts;
>
> b. Pomerantz's accounting and cost allocation opinions, including both his criticisms of Calamos' accounting for Fund profits and his own accounting for Fund costs, on which his profitability and economies of scale calculations are based;
>
> c. Pomerantz's criticism of the Independent Trustees' conscientiousness and decision-making, including his opinions regarding what the Independent Trustees believed or understood; and
>
> d. Pomerantz's purported damage opinions.

*Id.* Calamos renewed their objections following trial. The Court addresses, in turn, each alleged basis for exclusion of Pomerantz's opinions and testimony.

### a. *Pomerantz's Qualifications*

As a preliminary matter, the Court finds Pomerantz wholly unqualified to opine on several matters upon which he was retained to opine. For one thing, Pomerantz holds only a mathematics degree; he does not hold degrees in any other subjects pertinent to his opinions, such as economics, business, accounting, or law. His dissertation does not mention mutual funds or address the asset management industry. Trial Tr. 399:21–25 (Pomerantz). He has never taught a course in economics or accounting; has never served as an economist or accountant; and has never published an article in a peer-reviewed journal of economics or accounting.

With respect to his experience in the mutual fund industry, the Court finds his experience lacking. As Plaintiffs fully admit, to the extent that Pomerantz has experience in the mutual fund industry, that experience is "limited and dated." *See* Pls.' Resps. ¶ 411. He has not been employed in the mutual fund industry in any capacity since 2000. Pomerantz has no mutual fund industry experience in most of the substantive areas that relate to his proffered opinions, and he has never been employed or retained as a consultant at the SEC or any other industry analysts with respect to matters related to mutual funds. *See id.*

As Plaintiffs fully admit, the investment experience that Pomerantz *does* have is "extremely narrow." *Id.* ¶ 412. Years ago, Pomerantz provided "quantitative decision support" for an adviser's portfolio management team. He never served as a portfolio manager himself; nor has he served as or reported directly to (or been personally responsible for fulfilling the functions of) a mutual fund's general counsel, chief compliance officer, CFO, accounting department, compliance department, fund administration department or shareholder servicing department. *Id.* Pomerantz has never negotiated any contract with a third-party fund service provider (e.g., sub-advisor, administrator, transfer agent, auditory, or outside counsel) and has never been responsible for supervising their work. *Id.*

Nor does Pomerantz have any experience with respect to mutual fund independent trustees or with setting a mutual fund adviser's advisory fee. He has never served as an independent trustee (or an interested trustee, for that matter); he has never been responsible for preparing board minutes or 15(c) materials; and he has never regularly attended mutual fund board meetings. Nor has he ever never negotiated an advisory fee on behalf of a mutual fund or its board; supervised or been regularly responsible for a board's 15(c) process; voted on a management agreement; been responsible for analyzing a mutual fund adviser's fee as

reasonable or competitive or appropriate in light of the adviser's costs; or been retained to advise a mutual fund on good governance practices. Pls.' Resps. ¶ 413.

Plaintiffs note that Pomerantz was a member of the Weiss Peck & Greer executive committee which ran and oversaw the operations of the firm, including its role as an advisor to mutual funds and institutional accounts. *See* Pls.' Resps. ¶ 411. In that capacity, employees and third-party service providers performing work on behalf of the firm's mutual funds reported to Pomerantz. *Id.* But these facts do not undercut the inadequate nature of Pomerantz's experience in the mutual fund industry, as detailed above.

Although Plaintiffs assert that Pomerantz's background in mathematics and his role as an adjunct professor of statistics, probability, operations research, and finance qualify him as an expert, it is unclear to the Court what bearing that background has on cost allocation, profitability analysis, or economies of scale. As Calamos correctly puts it, the overwhelming weight of the evidence demonstrates that most of Pomerantz's knowledge and experience related to mutual funds is derived from his career as a plaintiff's litigation expert, as opposed to educational or robust professional experience in the mutual fund industry.

At base, Pomerantz does not have any academic credentials in accounting, finance, economics, business, or law; and yet he nonetheless purports to offer opinions on the legality of the Independent Trustees' decision-making and Calamos' method of cost allocation.[17] Pomerantz has "extremely narrow," "limited," and "dated" mutual fund industry experience, and yet he purports to opine on the Independent Trustees' decision-making and Calamos' method of cost allocation. Moreover, Pomerantz concedes that he is unfamiliar with the major cost accounting

---

[17] Calamos also notes that Pomerantz has never held a tenure-track position at any university or school on any subject. *See* Def.'s Mem to Exclude at 7–8. The Court finds this point irrelevant.

texts and that he has never been responsible for establishing or implementing a cost-allocation methodology for a fund or for calculating a fund's profitability outside of his experience as a hired litigation expert. Dep. of Steve Pomerantz, PhD ("Pomerantz Dep.") 39:17–40:8, 205:2–5 (Sept. 6, 2017). And, going further, although Pomerantz has testified more than one hundred times at deposition and trial, no court has previously ruled that Pomerantz is qualified to offer an expert opinion on cost allocation or accounting matters more generally. Pls.' Resps. ¶ 420.

Accordingly, in evaluating the weight to be afforded to several of Pomerantz's opinions, the Court considers Pomerantz's general lack of experience with mutual fund independent trustees, investment advisers, and the 15(c) Process generally.

b. *Pomerantz's Accounting Opinions*

At trial Pomerantz offered the opinion that Calamos purportedly realized greater than reported profit from advising the Fund. Pls.' Resps. ¶ 415. He further opined that for 2015 in particular, Calamos' profit margin from advising the Fund was 71%, as opposed to the 46% margin that Calamos calculated and presented to the Independent Trustees. *Id.* To arrive at his profit margin figure, Pomerantz used a "linear log-log" function to re-calculate Calamos' costs based solely on the Fund's AUM. *Id.*

As Calamos correctly observes, Pomerantz's opinions on profitability fail to meet the basic admissibility requirements of Rule 702 and *Daubert*; are unreliable, and the Court finds Pomerantz's profitability opinions unpersuasive, regardless of their admissibility.

Pomerantz simply is not qualified to offer admissible expert testimony on the issue of cost allocation and profitability. As detailed above, Pomerantz does not have a degree in accounting or economics; he does not have a CPA license; he has never taught a course in accounting or economics; and he has never published a peer-reviewed article in an accounting or economics

journal. Pls.' Resps. ¶ 418. And he has only dated, limited, and "extremely narrow" experience in the mutual fund industry. Pomerantz has never designed a mutual fund adviser's cost allocation methodology; he has never prepared an adviser's profitability calculation for a mutual fund's board, or even calculated the pre- or post-distribution profitability of any mutual fund adviser outside of the context of litigation. DPF ¶ 419. Indeed, Pomerantz *himself* fully admits that he has never been responsible for fund accounting for a mutual fund or for supervising a fund accountant for a mutual fund. Trial Tr. 405:17–406:4 (Pomerantz).

Of course, it is undoubtedly true that an expert witness may be qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and a court should not exclude otherwise admissible testimony "simply because [it] does not deem the proposed expert to be the *best* qualified or because the proposed expert does not have the specialization that the court considers *most* appropriate." *Bloom v. ProMaxima Mfg. Co.*, 669 F. Supp. 2d 321, 328 (S.D.N.Y. 2009) (emphasis added) (quoting *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593 (3d Cir. 1998)). Here, however, the Court finds that Pomerantz lacks the knowledge, skill, experience, training, *and* education to testify as to accounting matters such as profitability and cost allocation, notwithstanding the liberal standards contained in Rule 702 and *Daubert*. In other words, the Court finds that Pomerantz is unqualified to opine on cost allocation and profitability calculations in the mutual fund context, the issues at the core of this dispute. And while Plaintiffs contend that the analysis under 15(c) "does not implicate economics or accounting," *see, e.g.*, Pls.' Resps. ¶ 408, given the models that Pomerantz proffers in support of his conclusion, the Court disagrees.

In any event, the Court finds that Pomerantz's cost allocation methodology lacks a basis in principles of accounting and misapplies the very economic models on which he purports to

rely. DPF ¶ 421. Pomerantz purported to calculate that Calamos earned a 71% profit margin from advising the Fund. Pls.' Resps. ¶ 415. As the Court witnessed firsthand at trial, and as Calamos thoroughly explains in its post-trial memoranda, the alternative profit margin calculated by Pomerantz is not a viable profitability calculation for a number of reasons.

*First*, as explained above, Pomerantz lacks the qualifications or experience necessary to calculate the profitability of a mutual fund in an expert capacity. Additionally, Pomerantz's answers on cross examination revealed to the Court that Pomerantz lacked familiarity with several basic accounting principles and authoritative works. *See, e.g.*, Trial Tr. 452:22–453:19, 463:11–23, 464:18–23 (Pomerantz) (Q: "I accept that you created an econometric model. What I'm asking you, sir, is whether that model complies with any authoritative criteria for properly accounting for profits under accounting principles?" A: "I can't answer that." Q: "Fair enough.").

*Second*, as Calamos points out, Pomerantz never actually offered the opinion that Calamos *should have* used the cost allocation methodology that he proposes to calculate its profitability from managing the Funds:

> Q: Let's be crystal clear. Let's just start with Calamos. You've been clear already, and I don't think you're equivocating, you have no opinion that Calamos should have used your cost allocation model with a log-log assumption in it, correct?
>
> A: I'm not saying that anybody should use this approach or has to use this approach.

Trial Tr. 465:18–23 (Pomerantz). And, on the stand, Pomerantz could not identify a single mutual fund adviser that has used or uses his cost allocation methodology. *Id.* 466:17–467:16, 468:20–469:6 (Pomerantz). For good reason, too — Pomerantz's methodology suffered from what he himself described as a "time machine dilemma." *See id.* 468:14–469:4. Put simply, Pomerantz's approach to calculating the Funds' profitability requires the use of one year of data

from the present and one year of data from the future.  *See* Pomerantz Dep. 329:15–331:17.

Thus, Pomerantz used 2015 data to allocate costs and calculate profitability for 2014.  *Id.*

231:10–235:3.  Calamos, during Pomerantz's deposition and on cross-examination at trial, drove

home the fact that a mutual fund could not, as a practical matter, employ Pomerantz's

methodology because "to calculate costs and profitability for a year like 2014, they'd have to

wait at least a whole other year to have the data to apply [the] methodology," something no fund

is going to do.  *Id.*; Trial Tr. 467:17–22, 468:14–469:6.

When asked about this issue Pomerantz stated that he was "not proposing a solution to

that."  Pomerantz Dep. 232:13–16.  And when asked whether, "as an ongoing business matter, no

fund would reasonably be expected to use [his] cost allocation methodology because of the time

constraints in the methodology," Pomerantz answered "yeah."  *Id.* 233:3–10.  Thus, it came as no

surprise to the Court that Calamos' expert Lacey — one of the only two accountants at the trial

— credibly testified that he had "never seen anything like [Pomerantz's cost allocation

methodology] in [his] 40-year career teaching accounting and practicing accounting" and that he

could not "imagine how [he] would apply that method in practice."  Trial Tr. 1025:18–1026:2

(Lacey).

*Third*, and finally, Pomerantz's cost allocation methodology incorporates a flawed and

unsupported assumption that the logarithm of Calamos' costs is linearly related to the logarithm

of AUM.  *See* Trial Tr. 460:3–9 (Pomerantz).  As a preliminary matter, the Court notes that

Pomerantz misstated this assumption twice in his report:  on one occasion he stated that the

logarithm of AUM was linearly related to *costs*, rather than to the *logarithm* of costs; and on

another occasion he stated that the logarithm of AUM was linearly related to the logarithm of

*fees*, not costs.  DPF. ¶ 321.  At trial, Pomerantz characterized his varying descriptions of the

assumption as a "semantic issue," *see* Trial Tr. 461:11–16, and, at least with respect to Pomerantz's reference to fees instead of costs, Plaintiffs argue that Pomerantz's descriptions of his assumption was "merely a matter of the *perspective* from which the assumption is being viewed ('fees' viewed from one side are 'costs' viewed from the other)." But the Court is unconvinced.

Pomerantz's misstatements demonstrate a level of inattention and imprecision that raises (additional) questions as to his qualifications (or lack thereof) as an expert and the weight (or lack thereof) to be afforded to his testimony. Indeed, the Court finds that Pomerantz's misstatements reflect his inexperience with economics and accounting. *See also* Trial Tr. 531:9–532:4, 592:22–593:15, 607:11–25 (Pomerantz) (unpersuasively explaining away various "typos" in his opinions and charts).[18] Consequently, the Court finds his opinions fundamentally unreliable.

Turning to the merits of his assumption, Pomerantz could not identify *any* citation in either his initial expert report or his rebuttal report that supported his assumption that the logarithm of Calamos' advisory costs is linearly related to the logarithm of AUM. Pls.' Resps. ¶ 322. And when Pomerantz was asked during his deposition to provide such authority, he identified only an unspecified portion of an unspecified book by an economist, Professor Dale

---

[18] As Calamos rightly points out, this is not the first time a court has found that Pomerantz tendered suspect work product. *See* DPF ¶ 422. In *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11 Civ. 4194 (PGS), 2016 WL 4487857, at *15 (D.N.J. Aug. 2016), the district court found that one of Pomerantz's calculations contained a mathematical error that "showed a lack of proper prior preparation on a critical point in this case" and "undermine[d] his credibility on all issues." And, in *CCM Rochester, Inc. v. Federated Investors*, No. 14 Civ. 3600 (VEC), 2016 WL 11617452, at *7 (S.D.N.Y. Aug. 31, 2016), in excluding certain of Pomerantz's opinions the district court noted that "Pomerantz did not exercise the level of intellectual rigor that characterizes the practice of other experts in his field" and thus concluded that "his asset allocation opinion must therefore be excluded as unreliable under Rule 702." Indeed, the district court found that Pomerantz's calculations contained omissions "sufficiently egregious for the Court to conclude the Pomerantz lacks good grounds for his conclusions." *Id.* (internal quotation marks and ellipses omitted).

Jorgenson.  *Id.*  He also testified at his deposition that he would provide defense counsel with the authority he was relying upon.  *Id.*  Unsurprisingly, at trial, counsel for Calamos represented that Pomerantz never did, in fact, provide counsel with said authority.  Trial Tr. 479:2–22.

Following Pomerantz's deposition, Calamos filed a *Daubert* motion to exclude Pomerantz's opinions, noting that "Pomerantz's report is devoid of any basis or citation whatsoever for [the 'log-log' relationship between Fund assets and Fund costs]," *see* Def.'s Mot. to Exclude at 19.  In response, Pomerantz filed a supplemental declaration in this action that asserted that his "linear log-log" assumption was justified by the "Cobb-Douglas function" and two articles by economists.  Pls.' Resps. ¶ 323.  Notably, Pomerantz's supplemental declaration did not mention any source authored by Professor Jorgenson as a basis for his assumption.  *Id.* And Pomerantz did not mention the Cobb-Douglas function or these economic articles as support for his assumption in either of his expert reports or during his deposition.  *Id.*

In the middle of his trial testimony, Pomerantz provided through Plaintiffs' counsel a citation to a book by Professor Jorgeson as the supposed basis for his assumption that the logarithm of Calamos' advisory costs is linearly related to the logarithm of AUM.  Pls.' Resps. ¶ 324.  Neither Pomerantz nor Plaintiffs' counsel provided the cited material to Calamos or the Court.  *Id.*  And Calamos' expert Hubbard — an *actual* expert in economics — later testified credibly that the citation to Jorgenson's book does not support his assumption that the logarithm of costs is linearly related to the logarithm of AUM.  Trial Tr. 729:13–730:14.  Moreover, Hubbard explained that the two economics articles cited by Pomerantz in his supplemental declaration do *not* support his "linear log-log" assumption regarding Calamos' advisory costs and AUM; these articles instead advocate using a *different* model (called "translog") not used by Pomerantz.  DPF ¶ 323.

Calamos' accounting expert Lacey also testified credibly that Pomerantz's linear log-log relationship lacked any basis in accounting principles, stating that "I can't imagine any circumstances in which we would apply that method as accountants under any circumstance." DPF ¶ 325.

At base, the Court finds Pomerantz's reliance on the flawed assumption that the logarithm of Calamos' advisory costs is linearly related to the logarithm of AUM affects his entire profitability calculation and is inconsistent with both economic and accounting principles. Based on the above findings, the Court gives no weight to Pomerantz's opinions concerning cost allocation and Fund profitability.

Finally, the Court finds that at trial, Pomerantz's testimony was evasive and inconsistent. He was subject to *at least* nine proper impeachments by Calamos throughout his testimony on highly substantive matters,[19] *see* Trial Tr. 406:23–407:24, 408:24–409:16, 439:25–440:24, 441:2–24, 444:2–445:13, 463:11–24, 466:17–467:16, 497:4–498:1, 519:18–521:2, 533:3–21.[20] Consequently, the Court affords his testimony little to no weight in determining whether Calamos breached its fiduciary duty under § 36(b).

## IV.    DISCUSSION[21]

Having made several background findings of fact regarding the Fund, the parties, and the witnesses, the Court now turns to whether Plaintiffs have demonstrated by a preponderance of

---

[19] The Court does not include the several instances during Pomerantz's testimony in which Pomerantz seemed to prevaricate on subjects the Court found insignificant. *E.g.*, Trial Tr. 409:17–410:5, 417:1–16, 434:17–436:16.

[20] Moreover, as Calamos notes and Plaintiffs fully admit, this Court is not alone in rejecting Pomerantz's testimony. Pls.' Resps. ¶ 442 (collecting cases).

[21] Many of the factual findings set forth in Part III, *supra*, are included in the Court's application of *Gartenberg* in the following sections. Insofar as the Court alludes to or applies facts not set forth in Part III, such facts should be construed as additional findings of fact for purposes of Rule 52 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 52(a)(1). Moreover, the Court expressly adopts all of the factual findings set forth in the parties' joint statement of stipulated facts, *see generally* SSF, whether mentioned in this opinion or not.

the evidence that the investment advisory fees Calamos received from the Fund during the relevant period were so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. In evaluating the fees, the Court considers the *Gartenberg* factors, as well as any other relevant factors bearing on this question.

### A. Conscientiousness and Care of the Independent Trustees' 15(c) Review

The Court begins by examining whether the Independent Trustees conscientiously considered the differences in services provided and risks undertaken by Calamos in advising the Fund vis-à-vis Calamos' Other ACG Accounts.

During summary judgment proceedings, the Court concluded that Calamos had failed to point to record evidence indicating that the Independent Trustees engaged in a robust review of the differences in services Calamos rendered to the Fund vis-à-vis Calamos' Other ACG Accounts. *Chill*, 2018 WL 4778912, at *11. Consequently, the Court concluded that "deficiencies surrounding the Trustees' evaluation of the Advisory Fees preclude[d] the Court from affording the Trustees' judgment substantial deference as a matter of law — at least at [that] stage of the litigation." *Chill*, 2018 WL 4778912, at *9; *see also id.* at *3–14.

In so concluding, the Court observed that Calamos, during summary judgement proceedings, relied almost exclusively on the same three slides from the presentation it provided to the Independent Trustees each year, which contained a bulleted list of services Calamos provided to investment companies generally. The Court remarked that "[s]uch information hardly establishe[d] that the Trustees' consideration of the differences in services and risk was robust." *Id.* at *11. The Court noted that "while the ICA does not necessarily ensure fee parity between mutual funds and institutional clients, the lack of evidence indicating that the

Independent Trustees conscientiously considered the differences in services and risk between the Fund and Calamos' other clients suggest[ed] that the Trustees' 15(c) Process was deficient in its evaluation of the Advisory Fees." *Id.* at *12 (internal quotation marks omitted). And the Court found "novel and controversial . . . the notion seemingly advanced by Calamos — that Section 36(b) allows for Independent Trustees to rely *solely* on their business judgment and intuition in approving the Fund's Advisory Fees, without regard to any sort of comparative data between the Fund's fees and non-Fund fees in light of the *actual* differences in risks incurred and services rendered by Calamos." *Id.* at *11 n.10.

Now, following trial, Plaintiffs challenge whether the Trustees were fully apprised of the differences in services Calamos provided to the Fund vis-à-vis its Other ACG Accounts. After review of the credible evidence presented at trial, the Court concludes that the Independent Trustees were so apprised.

To start, the "Management Fee Rates by Product" presentation that Calamos provided as part of the 15(c) Response each year included not only the numerical advisory fee comparison that the Court has already ruled to be sufficient, *see id.* at *10, but also a bullet-point summary of the various differences in services and risks between advising mutual funds as compared to institutional or sub-advisory clients, *see* Decl. of J. Christopher Jackson ("Jackson Decl.") ¶¶ 95–96. As Jackson credibly explained in his declaration and at trial, the summary provided by Calamos was not intended to be an exhaustive recitation of all the differences in services and risks involved in managing the Funds versus institutional and sub-advised clients. *Id.* ¶ 99.

Jackson also explained that the bullet-point summary in the Management Fee Rate Presentation was far from the only information that Calamos provided to the Independent Trustees throughout the year with respect to the difference in services that Calamos performs for

the Fund and the risks that Calamos faced in providing those services. *Id.* ¶ 101. Indeed,

credible trial testimony confirmed that the Independent Trustees regularly received extensive

information at virtually every board meeting concerning the services Calamos provides to the

Funds that are not required for its Other ACG Accounts. *See, e.g.*, Trial Tr. 333:24–334:5

(Jackson); Jackson Decl. ¶¶ 99–101. For example, Holloway stated that he personally briefed

the Independent Trustees on topics relating to services Calamos provides to the Funds, including

compliance with the Internal Revenue Code, reviews of service provider relationships, the

performance of the Transfer Agent, and the state of shareholder services. *See* Holloway Decl.

¶¶ 61–63; *see also* Trial Tr. 394:11–395:6 (Holloway). Neal, a member of the Board,

acknowledged these presentations in his trial declaration and confirmed his understanding of the

differences in services between the Funds and the Other ACG Accounts. *See* Neal Decl. ¶¶ 38,

41, 83–84, 86–87, 97–98, 102; *see also* Trial Tr. 180:12–23, 187:15–188:1 (Neal).

Moreover, it is undisputed that the Independent Trustees have substantial years of

experience in the asset management industry, *see* Pls.' Resps. ¶ 207, and testimony at trial

revealed that at least one of the Independent Trustees relied on his experience in concluding that

comparisons between the Fund and Calamos' Other ACG Accounts are like comparing apples

and oranges. DPF ¶ 207; *see also* Timbers Dep. 111:10–25; Jackson Decl. ¶ 99.

Plaintiffs disagree that the Independent Trustees' experience helped them to fulfill their

duties and point to evidence they believe shows that (1) the Trustees were unaware of the

differences in services provided to funds and non-funds and (2) the amount of litigation risk

Calamos priced into the advisory fees charged to the Fund. *See* PPF ¶¶ 220, 286–87, 313–14,

401–03. Plaintiffs' arguments are unavailing.

*First*, Plaintiffs harp on the fact that Timbers testified in his deposition that he "c[ould]

only guess" what services Calamos provided to its sub-advisory and institutional clients and could not recall whether Calamos provided him with specific information about what services were provided to those clients.[22]  *See* PPF ¶ 286.

But, notwithstanding Timbers' statement that he could only "guess" what services Calamos provided to its non-fund clients, Timbers also testified that he has extensive experience in the mutual fund industry, having been formerly employed as Vice Chairman of Northern Trust Corporation, a trust bank that sponsors a mutual fund, where he was responsible for all investment activities, investment subsidiaries, businesses, and investment organizations. Timbers Dep. 12:21–13:17.  And, in light of his experience in the industry, Timbers credibly explained that he was fully aware of the differences in the services Calamos provided to the Fund vis-à-vis its sub-advisory and institutional clients.  *See* Timbers Dep. 110:18–113:1.[23]  Moreover,

---

[22] The specific colloquy is restated below:

> Q:  And you're familiar with the fact that [Calamos] has institutional clients?
>
> A:  Yes.
>
> Q:  And [Calamos] has subadvisory clients?
>
> A:  Clients or client, yes.
>
> Q:  Okay.  And do you know what services [Calamos] provides to those clients?
>
> A:  I can only guess.
>
> Q:  Okay.  So did the advisor ever provide you with any specific information about what services were provided to those clients?
>
> * * *
>
> A:  Ever provide --I don't remember.

Timbers Dep. 59:10–22.

[23] The specific colloquy is restated below:

> Q.:  Do you recall the substance of [the discussions of reports concerning management fee rates by product presentation]?
>
> A.:  That, you know, it's interesting.  You know, it's a lot of apples and oranges.  These things that are required by mutual fund by regulation, just by practice are so different from that of an institutional separate accounting.  So, you know, there's some similarities.  I used to say well, you know, if you look at an apple and a strawberry, they're both red, that's

at trial, Plaintiffs' counsel asked Calamos' expert Laby to opine as to whether Timbers' deposition testimony was consistent with careful consideration of the services Calamos provided to its sub-advisory and institutional clients. In response, and consistent with the Court's view, Laby answered in the affirmative. Trial Tr. 967:1–10 (Laby).

*Second*, Plaintiffs claim that the Independent Trustees had no idea how much litigation risk Calamos priced into the Fund's yearly advisory fee. As an example, they cite the following testimony from Neal:

> Q.: [A]ccording to Mr. Jackson, [Calamos] faced more significant litigation and regulatory risks for advisory mutual funds; is that correct?
>
> A.: Yes.
>
> Q.: Mr. Jackson further explained that CAL priced these risks into the management agreement with the funds; is that correct?
>
> A.: Yes.

---

about it. So -- and that's what I sort of think of this. There's some aspects that overlap and are the same, but there a lot of things that mutual funds have to do that subadvisors don't.

Q.: So you discussed with your co-trustees the fact that there were additional things that needed to be done with mutual funds?

A.: Absolutely.

Q.: What things did you discuss?

* * *

A.: Just the whole relationship to, you know, maybe a hundred thousand clients of one fund as opposed to the size of the fund, the way you could trade it. In terms of cash flow coming in, you don't usually have any cash coming in on the institutional [ac]counts. You got all these regulatory filings you have to do. You have to maintain daily liquidity. The reporting's different. There's all sorts of things you have to do with a mutual fund which you don't do with an institutional [or] subadvisor[y account].

* * *

Q.: Any of those additional duties that you're describing, would they fall under the investment management agreement?

* * *

A.: Yes, I believe so.

Timbers Dep. 110:18–113:1.

Q.: Is it fair to state you don't know what methodology, if any, [Calamos] used to price the risk Mr. Jackson discussed into the management agreement, right?

A.: I do not.

Q.: You don't know how much of the growth funds advisory fees was attributable to litigation risks for any year from 2013 to the present; isn't that right?

A.: Yes.

Q.: And you never asked for that information either, right?

A.: Correct.

Q.: And to your knowledge, no one on the board asked for that information either?

A.: Correct.

Trial Tr. 135:7–136:1 (Neal).

Plaintiffs' line of questioning implies that the Independent Trustees were *required* to calculate, estimate, or otherwise reduce to a number the litigation risks faced by Calamos as a consequence of advising the Fund. But, as Calamos correctly observes, no such calculation, estimation, or otherwise reduction to a numerical figure is required by the plain text of § 36(b), and no court or regulator has ever held that an adviser must provide a cost breakdown that quantifies in dollars and cents all of the different services and risks entailed in managing a mutual fund as compared to an institutional or sub-advisory account. *See Kennis v. Metro. West Asset Mgmt., LLC*, No. 15 Civ. 8162 (GW), slip op. at 36–37, Doc. 506 (C.D. Cal. Jul. 31, 2019, *adopted* Aug. 5, 2019) (concluding that Independent Trustees received sufficient information from investment adviser regarding fees charged to fund at issue vis-à-vis adviser's sub-advised funds notwithstanding that the adviser "did not provide documentation regarding quantification of" services provided to the sub-advised funds); *In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 Civ. 4318 (LTS), 2019 WL 2896415, at *4, *10 & n.16 (S.D.N.Y. July 2, 2019) (concluding that "a rational factfinder could not conclude that information was withheld from the Board with

respect to the differences between services provided to the Fund and those provided to Subadvised Funds" notwithstanding that the adviser "did not quantify this work in terms of time or money expended"); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11 Civ. 4194 (PGS), 2016 WL 4487857, at *44–45 (D.N.J. Aug. 25, 2016), *aff'd*, 742 F. App'x 604 (3d Cir. 2018) (concluding that the investment adviser "was not required to quantify the risk in order to justify a portion of its fee" and finding that the board of trustees "nonetheless considered the risk that [the adviser] faces, even though there was no specific cost assigned to it"). This Court, in line with the others to have considered this issue, agrees that Calamos need not have "quantified" the differences in services and risks between its clients and that the Independent Trustees need not have asked for such quantifications.

In sum, the amount of evidence presented by Calamos at trial far exceeded that which was presented to the Court at the summary judgement stage, where the Court observed that Calamos had relied "almost exclusively" on the bullet-point summary as proof that the Independent Trustees engaged in a robust review of the differences in services rendered to the Fund vis-à-vis Calamos' non-fund clients. *See Chill*, 2018 WL 4778912, at *11.

The trial record builds on a 15(c) review that this Court found to be "robust and informed in many respects," at summary judgment. *Id.* at *14. Specifically, the Court found beyond genuine dispute that: (1) Calamos presented the Independent Trustees with sufficient information to evaluate the disparity in fees between the Fund and Calamos' institutional and sub-advised clients; (2) the Trustees were "well aware" that Calamos' Other ACG Accounts paid fees almost half those of the Fund; (3) the Trustees were provided detailed fee-comparison data from industry-recognized, third-party sources showing the Fund's fee placement relative to its peers, and thus Plaintiffs' contention that the Trustees did not conscientiously consider peer

information proffered by Calamos was wrong; (4) the Trustees' evaluation of the economies of scale and fall-out benefits realized by Calamos was not deficient; (5) the Trustees were fully informed about Calamos' profitability methodology, thoroughly discussed the impact that methodology would have on the profitability figures Calamos reported vis-à-vis alternative methodologies, and formally approved of Calamos' use of that methodology; and (6) the Trustees did not fail to negotiate with Calamos because they did not have a duty to negotiate. *See id.* at *10–14.

The Court finds that the weight of credible trial evidence makes clear that the Independent Trustees were fully informed, conscientious, and careful in approving Calamos' annual advisory fee under the IMA each year during the relevant period. Consequently, the Court finds that this factor weighs against a conclusion that Calamos breached its fiduciary duty under § 36(b), as substantial deference to the Independent Trustees' decision is warranted.

## B. Comparative Fee Structures

In the opinion granting partial summary judgment to Calamos, the Court credited Plaintiffs' contention that "*Jones* and *Gartenberg* make clear that plaintiffs challenging excessive fees under [§] 36(b) do not need to point to a numerical range of fees per se to establish whether [a] challenged fee is so disproportionately large that it could not have been the product of arm's length bargaining." *Chill*, 2018 WL 4778912, at *15 (citing *Jones*, 559 U.S. at 352 ("In reviewing compensation under § 36(b), the Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining.")). Thus, insofar as Calamos argued that Plaintiffs must proffer a number (or range of numbers) above which the advisory fee charged to the Fund would be "excessive per se," the Court expressly rejected that argument. *Chill*, 2018 WL 4778912, at *15.

Plaintiffs instead seek to use two sets of comparisons to prove excessive advisory fees: a comparison of annual investment advisory fees Calamos charged to the Fund versus fees charged by investment advisors at comparable funds, and a comparison of annual investment advisory fees Calamos charged to the Fund versus fees Calamos' charged to its sub-advised and institutional clients.

1. *Comparison of Fees Charged by Calamos versus*
   *Fees Charged by Advisors at Comparable Mutual Funds*

The Court first finds that a comparison of the fees charged by peer mutual funds does not support a finding that the fees Calamos received from the Fund were so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

As a preliminary matter, the Court reaffirms the following position, as set out in its opinion granting partial summary judgment to Calamos: Nowhere in *Jones* does the Supreme Court state that an investment adviser's fees are insulated from review if the fees fall within the range charged by third-party investment advisers to comparable third-party funds. To the contrary, both *Jones* and *Gartenberg* make clear that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of *all* of the surrounding circumstances." *Jones*, 559 U.S. at 344 (emphasis added) (quoting *Gartenberg*, 694 F.2d at 928). Indeed, the Supreme Court in *Jones* explained that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Jones*, 559 U.S. at 350–51. The Second Circuit in *Gartenberg* similarly expressed skepticism at such comparisons, noting that "[i]f rates charged by the many other advisers were an affirmative competitive criterion,

there would be little purpose in § 36(b)." *Gartenberg*, 694 F.2d at 929; *see also id.* at 929

(expressly rejecting the district court's conclusions that the "market price . . . serves as a standard

to test the fairness of the investment advisory fee," in part because "the existence in most cases

of an unseverable relationship between the adviser-manager and the fund it services tends to

weaken the weight to be given to rates charged by advisers of other similar funds").

Here, the placement of the Fund's fees vis-à-vis the Fund's mutual fund peer group

hardly comprises all the surrounding relevant circumstances. Consequently, while the Court

"do[es] not suggest that rates charged by other adviser-managers to other similar funds are not a

factor to be taken into account," *id.*, the Court again rejects Calamos' argument insofar as it asks

this Court to afford dispositive weight to the placement of the challenged advisory fees among

the range of fees charged by other advisors to other funds.

Turning to the evidence adduced at trial, the Court observes at the outset that Plaintiffs'

own witness, Pomerantz, testified that "an adviser's fee is not excessive simply because it's

above the median fee charged to peer funds;" and that, in Pomerantz's opinion, "peer group fee

comparisons are not even relevant" in his *Gartenberg* analysis. Trial Tr. 514:10–515:10

(Pomerantz). Nevertheless, during the course of preparing his expert report, Pomerantz collected

data to compare the annual investment advisory fee charged to the Fund with similar fees paid by

417 mutual funds in the same Morningstar Large Cap Growth category. *See* Pomerantz Report

¶¶ 291–93. In his report, Pomerantz presented a chart that purportedly showed "the advisory fee

rates paid by, and the net assets held by, the Fund . . . and every other similarly-categorized

mutual fund." *Id.* ¶ 293. The Morningstar data revealed that approximately 20% of the mutual

funds in Pomerantz's data set of "every other similarly-categorized mutual fund" — that is, 80

mutual funds out of the 417 — paid fees equal to or higher than the Fund's annual advisory fee.

Pls.' Resps. ¶ 256.

Calamos contends that this result confirms that the Fund's fee is within the range of an arm's-length bargain, as measured by the Fund's peer mutual funds. DPF ¶ 256. Moreover, as noted in *supra* Part III.E.2, the fee comparison information that the Independent Trustees received from the Third-Party Service Providers showed that the fees charged to the Fund each year, when compared to fees charged to the Fund's peer mutual funds each year, ranged from the 69th percentile to the 95th percentile during the relevant period, based on a set of approximately ten to twenty funds custom selected by the Fund's Third-Party Service Providers that each service provider considered to be similar to the Fund. DPF ¶ 259.

Plaintiffs contend that Calamos' position "simply ignores Dr. Pomerantz's far more relevant comparison that controlled for funds with comparable AUM." Pls.' Resps. ¶ 256. According to Plaintiffs, a comparison of the fees charged to the Fund with the fees charged to the Fund's *true* peer mutual funds — that is, funds with comparable AUM — demonstrates that the Fund's advisory fee is an "outlier" at the very top of the range of fees paid by mutual funds of similar character and size. *Id.*

The Court has determined Pomerantz's testimony to be inadmissible and incredible. *See* Part III.H.2, *supra*. But even without this preliminary determination, the Court would not be persuaded by Pomerantz's argument.

As part of his expert report, Pomerantz opined that "comparing the fees charged by small funds with those charged by large funds amounts to comparing apples with oranges." Pomerantz Report ¶ 297. Consequently, starting with the same 417 Large Cap Growth funds referenced above, Pomerantz compared the advisory fees paid by Large Cap Growth funds with net assets between $1 billion and $10 billion — including the Fund. *Id.* ¶¶ 298–301. According to

Pomerantz, the average fee rate and weighted average fee rate among such funds is 63 basis

points; and the Fund's fee rate is not only well above the average, but specifically ranks at the

93rd percentile — meaning that its fees are higher than 93% of its peers. *Id.* ¶ 302.[24]  Pomerantz

also opined that, of the nine mutual funds with over $1 billion in AUM that pay higher fees than

the Fund, all are "outliers" in that they pay fees "visibly removed from the main mass of other

peer funds." *Id.* ¶ 303.  Yet, notwithstanding Pomerantz's observations, none of the independent

third-party service providers that analyzed the Fund's advisory fee (that is, Lipper, Morningstar,

and Strategic Insight) have referred to the Fund's fee as an "outlier."  Nor does the Court, in

viewing Pomerantz's chart, find that those funds constitute outliers.[25]

Moreover, as noted earlier, Calamos' expert Hubbard conducted a comparative fee

analysis based on the Fund's "peer group" as he defined it, with an emphasis on the peer funds'

expense ratios.  *See* Hubbard Report ¶¶ 52–54.  Hubbard concluded that the Fund's expense

---

[24] During the trial, Pomerantz testified that, of the other peer mutual funds that paid higher advisory fees than the Fund in his peer analysis, four — that is, approximately half — of those funds are advised by American Century Investment Management ("ACIM").  PPF ¶ 142.  Pomerantz opined at trial that ACIM "is relatively unique in that it uses what's called a unified fee.  It does not have an advisory fee and a FASA fee.  It doesn't have a whole sleet of fees that an investor or shareholder pays."  Trial Tr. 563:19–23 (Pomerantz).  He opined further that the ACIM fees reflected in his analysis "actually [are] covering a range of services far beyond just advisory," and, consequently, "they should be thrown out."  *Id.* 564:2–10.

The Court does not credit this opinion.  As noted by Calamos, Plaintiffs did not present any admissible evidence establishing the characteristics of ACIM funds and their fee structures, and Pomerantz's claims regarding the characteristics of such funds are found nowhere in either his initial export report or his rebuttal report.  *See* Def.'s Resps. ¶ 143.  Additionally, Morningstar, one of the Independent Trustees' "Independent Data Providers," included ACIM funds into the Fund's peer group, clearly indicating that it found those funds comparable to the Fund here.  *Id.*  Accordingly, the Court does not credit this portion of Pomerantz's testimony.

[25] Pomerantz also purported to perform a linear regression of Morningstar data, the form of which compared the fee charged to the assets under management for 417 mutual funds classified as Large Growth by Morningstar.  Pomerantz Report ¶ 294.  But, as explained above, like Pomerantz's cost allocation methodology, his regression incorporates a flawed and unsupported assumption that the logarithm of Calamos' costs is linearly related to the logarithm of AUM.  *See* Part III.H.2.b, *supra*; *see also* DPF ¶ 320.  And, at trial, Calamos' expert Hubbard credibly explained why Pomerantz's regression is unpersuasive and unreliable.  *See* Trial Tr. 734:2–736:7 (Hubbard).  Accordingly, the Court finds unreliable Pomerantz's regression and corresponding conclusions.

ratios were within its peer fund's ratios — a conclusion the Court finds credible and persuasive.[26] *See* DPF ¶¶ 269–70. And, like Pomerantz, Hubbard compared the Fund's advisory fees to those of its peers, using the same funds that Hubbard used as peers to evaluate the Fund's expense ratios, to the extent that data on each fund's advisory fees were available. Hubbard Report ¶¶ 52–53. Hubbard concluded that those fees were within the range of fees charged to the Fund's peers, *id.*, notwithstanding that they were undoubtedly on the higher end of the spectrum — a conclusion the Court credits.

In conclusion, although the Supreme Court recognized that peer mutual fund fees are not dispositive in assessing a Section 36(b) claim, courts following the *Gartenberg* standard have uniformly considered the subject fund's fee in comparison to similar mutual funds to be a relevant criterion to assess whether the fee is excessive. Pls.' Resps. ¶ 273. And, as the Court already has explained on summary judgment, although not dispositive, Plaintiffs do concede that the Fund's Advisory Fee is within the range of fees charged to peer mutual funds by other

---

[26] In Pomerantz's report, he opines that

> the Board [of Trustees] appears to have committed a category mistake by prioritizing, in its 15c advisory fee analysis, the Calamos Funds' total expense ratio . . . , rather than the Calamos Funds' advisory fees specifically. . . . But, the 15c context seems to require a more particularized focus from the Board on the payment of advisory fees. Misfocus on total expense ratios can allow for otherwise objectionable advisory fees to be approved without objection . . . ."

Pomerantz Report ¶ 312 n.181. The Court cannot agree.

For one thing, Pomerantz is not qualified to opine as to what the 15(c) Process requires. Second, the Court agrees with Hubbard's report insofar as Hubbard opines that "to meaningfully compare the costs of different funds, it makes economic sense for a potential investor to compare the funds' '*expense ratios*,' which represent the fees that investors pay in exchange for the integrated bundle of services received." Hubbard Report ¶ 44.

At the end of the day, "[w]hen deciding whether to purchase a mutual fund, prospective investors must decide whether to purchase the *integrated* bundle of services that the fund offers. That is, investors cannot select management services from one mutual fund and distribution or transfer agency services associated with another fund." *Id.* And, finally, the Court finds, contrary to Pomerantz's opinion, that the Independent Trustees did not "prioritize[e]" the Fund's total expense ratio in determining whether Calamos' advisory fees were excessive. Rather, the record evidence reveals that the Trustees engaged in a robust and conscientious review of *all* relevant data and factors in approving the fee each year.

investment advisors. *Id.* ¶ 274.

Here, although the Fund's fee was above its peer group and category medians each year that the Independent Trustees approved the IMA, as Plaintiffs fully admit, "[c]harging a fee that is above an industry average does not violate Section 36(b)." *Id.* ¶ 276. The Court recognized this on summary judgment when it explained that Plaintiffs could not prevail by demonstrating *solely* that the fees are higher, even much higher, than those charged by third parties to peer funds. *Chill*, 2018 WL 4778912, at *17. Indeed, as the case law cited by Calamos demonstrates, Section 36(b) does not require that a fund experiencing below-median performance must charge a below-median fee. Pls.' Resps. (citing *Sivolella*, 2016 WL 4487857, at *65, 67 (declining to find fees excessive despite the plaintiffs' arguments that certain funds charged fees above the industry average and underperformed their benchmarks)); *Kasilag v. Hartford Inv. Fin. Servs.*, LLC, No. 11 Civ. 1083 (RMB), 2017 WL 773880, at *8, *12 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018) (declining to find Hartford Balanced Fund's fee excessive despite the fact that it experienced bottom-quartile performance in almost each year and, in some years, had above-median fees)). And, at base, after comparing the Fund's fee with the fees charged to its peers (as defined by the Third-Party Service Providers, Plaintiffs' expert, and Calamos' experts, respectively), the Court concludes that such comparisons do not support Plaintiffs' argument that the fees charged to the Fund were excessive and not reflective of arm's-length bargaining.

> 2. *The Utility of Comparing Fees Charged to the Fund*
> *by Calamos versus Fees Calamos Charged*
> *to Its Institutional and Sub-Advised Clients*

As Calamos correctly notes, the credible evidence demonstrates that the higher fees charged to the Fund vis-à-vis Calamos' Other ACG Accounts reflected the greater services and risks that Calamos experienced in managing the Fund when compared to its Other ACG

Accounts — particularly in areas such as legal, regulatory, and compliance; fund governance; fund administration services; oversight of third-party service providers; portfolio management; and client/shareholder services. PPF ¶ 162. Consequently, the Court finds that the fees charged to Calamos' Other ACG Accounts are inapt comparators to the Fund's fees when considering whether the Fund's advisory fee is excessive.

In addition to setting forth Calamos' responsibility for portfolio management-related services to the Fund, the IMA requires Calamos to "manage, supervise, and conduct the other affairs and business of the Trust and each Fund thereof and matters incidental thereto, subject always to the control of the Trustees." Pls.' Resps. ¶ 166 (quoting JX 5). Under this provision, the IMA requires Calamos to provide, either directly or through third parties subject to its oversight, *all* services necessary to manage the Fund; both of Plaintiffs' experts agreed that the IMA requires Calamos to provide all of the services necessary to operate the Fund. *Id.* ¶ 167. Indeed, Pomerantz testified that Calamos is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and for "providing literally all of the necessary services to operate the trust." *Id.*; *see also* Trial Tr. 487:6–488:2. Similarly, Bullard testified that the IMA requires Calamos to provide or arrange for the complete bundle of services needed to run the Fund. Pls.' Resps. ¶ 167.

In contrast to the terms of the IMA operative between Calamos and the Fund, although Calamos' investment management agreements with its thirty six Other ACG Accounts required it to provide them with certain portfolio management services, none of those thirty six agreements contained a provision that, either in words or substance, required Calamos to "manage, supervise and conduct the other affairs and business" of any of those accounts in the same manner as the IMA requires with respect to the Fund. *Id.* ¶ 168.

At trial, Plaintiffs focused on two of Calamos' Sub-Advised ACG Accounts — Nomura and MD American — in comparing the services and risks undertaken by Calamos in advising its Other ACG Accounts as compared to the Fund. Both Nomura and MD American were non-U.S. based investment companies. Pls.' Resps. ¶ 170. Unlike Calamos' all-encompassing role with respect to managing the Fund, the credible trial evidence reveals that Calamos provided a more limited set of services to Nomura and MD American. Specifically, Calamos' duties were limited to structuring the investment portfolio, picking securities for investments, ensuring compliance with the account's guidelines, and some limited (and "formulaic") reporting responsibilities to the investment adviser or the fund's account's board. *See* DPF ¶ 170. The remainder of the services required to manage those funds were provided by those funds' investment adviser, not Calamos; their investment advisers bore the ultimate responsibility to monitor and supervise Calamos' performance as sub-adviser. *Id.*

And, in a similar fashion to Calamos' Sub-Advised ACG Accounts, Calamos served as an adviser to thirty one Institutional ACG Accounts. The services that Calamos provided to those accounts were generally limited to structuring an investment portfolio, picking securities for investments, ensuring compliance with guidelines, and some limited reporting responsibilities. DPF ¶ 171.

A review of the services and risks undertaken by Calamos in advising the Fund as compared to advising Calamos' Other ACG Accounts, as demonstrated by Calamos at trial, makes clear that Calamos provides substantially more services — and undertakes substantially more risks — in advising the Fund.

a. *Legal, Regulatory, and Compliance Services*

Mutual funds operate in an extensively regulated environment. Pls.' Resps. ¶ 174. As

even Plaintiff's expert Bullard acknowledged, mutual funds are subject to special rules that do not apply to other types of collective investment vehicles, including any of Calamos' Other ACG Accounts. *Id.*; *see also* Trial Tr. 857:22–860:3 (Bullard). More specifically, as Plaintiffs acknowledge, Calamos' management of the Fund requires that it comply with numerous and constantly changing laws, rules, and regulations — including, but not limited to, the entirety of the ICA, many other federal statutory provisions, and numerous SEC rules and regulations — that do not apply at all to its Other ACG Accounts. Pls.' Resps. ¶ 175. As Plaintiffs concede, in advising the Fund, Calamos' legal and regulatory obligations imposed by just the ICA alone are significant. *Id.* ¶ 176. Among other things, Calamos must comply with ICA provisions relating to affiliated underwriting, the use of derivatives, affiliated transactions, and investments in other investment companies. *Id.* Calamos must also stay current with and implement related SEC interpretations and guidance. *Id.* None of these provisions applies to Calamos' services to any of its Other ACG Accounts.

Plaintiffs admits that under SEC Rule 38a-1, the Fund is required to maintain policies and procedures to address its compliance with federal securities laws. *Id.* ¶ 177. Through the Funds' CCO, the Fund is required to and has developed extensive compliance protocols. *Id.* In addition, the Funds' CCO is required to review annually the Funds' compliance policies and procedures and provide a report to the Independent Trustees. *Id.* Neither SEC Rule 38a-1 nor the extensive work of the Funds' CCO applies to any of Calamos' Other ACG Accounts. *Id.* Plaintiffs admit that, in managing the Fund, Calamos must also comply with other federal securities law by, among other things, frequently preparing prospectuses, reports, and a variety of other disclosure documents on behalf of the Fund. *Id.* ¶ 178. Calamos does not have to prepare any of these documents for its Other ACG Accounts.

Furthermore, Calamos' legal department is responsible for the organization of all Board and Committee meetings — as well as preparing and coordinating all agendas and meeting materials incident thereto — in relation with the Board's overseeing of the Funds. *Id.* ¶ 182. None of this work is required for, or for the benefit of, any of Calamos' Other ACG Accounts. *Id.*

And, finally, to meet all of the legal, regulatory, and compliance responsibilities incident to managing the Fund, Calamos creates, implements, and maintains internal processes, procedures, and policies to monitor and ensure that the Fund complies with the many applicable rules and regulations that govern mutual funds. *Id.* ¶ 179. These internal processes, procedures, and policies touch upon every Calamos department and most aspects of the day-to-day work done by those departments. *Id.*

Plaintiffs admit all of the aforementioned. But they nevertheless offer several reasons why the differences in Calamos' legal, regulatory, and compliance services to the Fund vis-à-vis its Other ACG Accounts are not so different as to render a fee comparison between those clients inapt. The Court finds none of Plaintiffs' reasons persuasive.

*First*, Plaintiffs argue that compliance with all securities laws and the Internal Revenue Code is necessary irrespective of client type. PPF ¶ 209. But the evidence before the Court (and Plaintiffs' record citations) does not support Plaintiffs' assertion. *See* Def.'s Resps. ¶ 209. Instead, while it is true that certain aspects of the Internal Revenue Code and some securities laws apply to both the Fund and Calamos' Other ACG Accounts, *see, e.g.*, Mickey Dep. 110:11–124:18, as a general matter, the weight of the trial evidence confirms that these laws impose significantly more obligations on Calamos with respect to advising the Fund.

*Second*, Plaintiffs argue that many of Calamos' third-party providers — who were paid by

the Fund — took on many of the compliance tasks cited by Calamos. *See* Pls.' Resps. ¶ 175. For example, Plaintiffs point out that many of Calamos' regulatory filings were prepared and drafted either entirely or in large part by State Street in exchange for a fee paid by the Fund; certain compliance functions are the responsibility of the Funds' Transfer Agent, also compensated by the Fund separately; and, similarly, outside counsel assisted Calamos' legal department in preparing registration statements and prospectuses in exchange for a fee paid by the Fund. PPF ¶¶ 173, 216. While it is true that certain service providers prepared, assisted in providing information used in, or distributed certain regulatory filings and shareholder prospectuses for Calamos, the trial record demonstrates that *all* providers were subject to Calamos' monitoring, supervision, and oversight. Def.'s Resps. ¶¶ 173, 216. And, as stated above, Calamos remains responsible to the Fund for the activities conducted through service providers; Calamos was responsible to the Fund for identifying, monitoring, and working to mitigate risks arising from these service-provider relationships; and Calamos remains liable to the Fund in the event that a service provider does not correctly perform one of its duties or provides subpar performance. *Id.* Therefore, the Court finds that failing to credit Calamos for its supervision of and responsibility for third-party service providers would grossly understate the realities of Calamos' services to the Fund.

*Third*, Plaintiffs argue that many of the Other ACG Accounts contractually negotiated a level of service similar to that imposed by the Fund. Pls.' Resps. ¶ 175. As an example, Plaintiffs contend that while Calamos' Institutional Accounts did not benefit from the regulatory protections applicable to mutual funds, they nonetheless "built similar protective frameworks" into their investment management agreements with Calamos, and Plaintiffs claim that Calamos was obligated to provide these accounts with frequent and extensive reporting. PPF ¶¶ 210–12.

The Court disagrees.

The credible evidence at trial demonstrates that the legal, regulatory, and compliance services Calamos rendered to its Other ACG Accounts were not "extensive" when compared to the services provided to the Fund. Instead, as Becker credibly explained, these services were "pretty standardized" — for example, the Other ACG Accounts' investor guidelines were similar, the materials presented to those Accounts were similar, the meetings were similar, and many of the reports Calamos was required to submit did not require substantial effort to create or customize. Trial Tr. 73:1–75:4 (Becker); Becker Decl. ¶¶ 128, 130–33. And, as Behan explained, while his department completed due diligence questionnaires on behalf of both mutual fund clients and separately managed accounts, they completed the vast majority of these questionnaires — upwards of 90% — for mutual fund clients. Behan Decl. ¶ 87. Jackson also testified extensively about the effort Calamos expended in monitoring the regulatory landscape for any new developments or risks that may face Calamos in advising mutual funds. Trial Tr. 349:9–350:24 (Jackson). As Jackson explained, Calamos does not face this same risk with regard to the Other ACG Accounts. *Id.* 350:25–351:1.

*Fourth*, and finally, Plaintiffs argue that even assuming Calamos undertakes additional services and greater risks with respect to advising the Fund versus the Other ACG Accounts, the costs associated with those greater services and risks come "nowhere close" to explaining or accounting for the difference in Calamos' advisory fees. PPF ¶ 157. But — without determining whether Plaintiffs' assertion is correct, as explained throughout this opinion — Calamos need not have "quantified" the amount of additional services it provided (and additional risks it undertook) in advising the Fund vis-à-vis its Other ACG Accounts, and any disparity between fees charged to mutual funds versus institutional accounts need not result entirely from the actual

difference in costs and risks an investment adviser incurs in advising the funds versus the institutional accounts. *See supra* Part IV.A; *cf. Jones*, 559 U.S. at 350 ("Even if the services provided and fees charged to an independent fund are relevant, courts should be mindful that the [ICA] does not necessarily ensure fee parity between mutual funds and institutional clients . . . .).

In sum, the Court finds that the legal, regulatory, and compliance obligations (and risks) that Calamos undertook in advising the Fund far exceed the obligations (and risks) Calamos undertook in advising its Other ACG Accounts.

b. *Fund Governance Services*

The Court finds that Calamos also provides extensive fund governance services to the Fund that it did not provide at all, or to anywhere near the same extent, to any of its Other ACG Accounts. DPF ¶ 181. The Calamos Funds Board is responsible for overseeing only the Fund (and the other Calamos-sponsored funds); it is *not* responsible for any of the Other ACG Accounts. *Id.* Consequently, none of the work that Calamos performs for the Board — including the numerous reports or presentations prepared for the Independent Trustees and the continuous work or communication with the Independent Trustees and their Counsel — is for the benefit of any of Calamos' Other ACG Accounts. *Id.*

Moreover, during the 15(c) Process each year, Calamos prepares its extensive 15(c) Response, which requires significant time and effort from Calamos. *Id.* ¶ 183; *see also* Trial Tr. 337:13–340:4 (Jackson). While Plaintiffs dispute that Calamos had to expend a substantial amount of time and effort in preparing the 15(c) Responses, *see* Pls.' Resps. ¶ 87, the Court finds that the weight of credible evidence presented at trial is to the contrary.

In sum, the Court finds that the fund governance obligations (and risks) that Calamos undertook in advising the Fund greatly exceed the limited obligations (and risks) Calamos

undertook in advising its Other ACG Accounts, to the extent Calamos undertook any services.

      c.  *Fund Administration Services*

Through the Fund Administration Department, Calamos provides a wide variety of essential administrative services to the Fund — such as daily NAV calculation, fund accounting, and tax reporting.  DPF ¶ 184.  None of these services was provided to the Other ACG Accounts. *Id.*

Plaintiffs urge this Court not to consider these services because:  (1) NAV calculation and fund accounting were provided by State Street, which was independently compensated by the Funds; (2) Calamos was compensated for tax reporting through the FASA, not the IMA; and (3) the Fund Administration Department's expenses were *de minimis*.  The Court disagrees with all three contentions for the reasons explained *supra*.  In short, the record evidence demonstrates that, pursuant to the IMA, Calamos was responsible for "providing literally all of the necessary services to operate" the Funds.  Trial Tr. 487:6–488:2 (Pomerantz); Pls.' Resps. ¶ 167.

Whether Calamos opted to engage with a third-party service provider to fulfill its obligations to the Fund is of no moment.  As Plaintiffs fully admit, Calamos monitors, supervises, and oversees all of the third-party service providers for the Fund, including the sub-administrator (State Street), transfer agent (U.S. Bancorp Fund Services), custodian (State Street), securities lending agents (State Street and Citibank), and auditor (Deloitte).  Pls' Resps. ¶ 187.  Calamos remained ultimately responsible for all of the work provided by these third-party service providers.  DPF ¶ 187; *see also* Jackson Decl. ¶ 119.  Yet Calamos was not required to, and did not, oversee any of these (or any other) third-party service providers with respect to any of the Other ACG Accounts.  Pls.' Resps. ¶ 188.  In sum, in line with other courts to have considered this issue, the Court finds that the managerial role Calamos played in coordinating

with and supervising the Fund's third-party service providers is far more extensive than Plaintiffs contend, and the Independent Trustees did not err in considering Calamos' managerial role in its 15(c) Review of the IMA.  *Cf. In re BlackRock Mut. Funds Advisory Fee Litig.*, No. 14 Civ. 1165 (FLW), 2019 WL 1387450, at *30 (D.N.J. Feb. 8, 2019); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11 Civ. 4194 (PGS), 2016 WL 4487857, at *46 (D.N.J. Aug. 25, 2016), *aff'd*, 742 F. App'x 604 (3d Cir. 2018); *Kasilag v. Hartford Inv. Fin. Servs.*, LLC, No. 11 Civ. 1083 (RMB), 2017 WL 773880, at *19 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018).

And while Plaintiffs contend that Calamos "operates the Fund Administration department at insignificant cost" because the department's "total annual budget is $2.8 million," *see* PPF ¶ 186, the weight of credible trial evidence demonstrates that the Fund Administration's budget does not cover all of the actual costs of fund administration, given that several other Calamos departments provide fund administration services directly or work alongside the Fund Administration Department in servicing the Fund.  *See* Trial Tr. 388:5–391:4 (Holloway); *see also* Holloway Decl. ¶¶ 9, 54–56.

Moreover, throughout this litigation, Plaintiffs have insisted that the Independent Trustees' evaluation failed to distinguish the services Calamos furnished pursuant to the IMA from the services Calamos furnished pursuant to the FASA, for which it was paid roughly one basis point a year.  *Chill*, 2018 WL 4778912, at *13.  At the summary judgment stage, the Court observed that § 36(b)'s legislative history indicates that the threshold inquiry in evaluating the nature and quality of services provided by the investment advisor is the exact services secured by the challenged fee, *id.* (citing *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14 Civ. 789 (JHL), 2018 WL 1293230, at *10 (N.D. Ill. Mar. 13, 2018)), and subsequently concluded that "Plaintiffs, at the very least, ha[d] raised genuine questions of material fact with respect to whether the

Independent Trustees exhibited a lack of conscientiousness when it evaluated Calamos' services in a 'bundled' fashion." *Chill*, 2018 WL 4778912, at *13.

Now, with the benefit of trial, the Court finds that the Independent Trustees did *not* err in considering the full panoply of advisory services Calamos provided to the Fund, without disregarding the services specifically delineated under the FASA. Over and over again at trial, witnesses from both parties took the stand and testified credibly that Calamos was *required* to provide all services necessary to advise the Fund under the IMA, regardless of whether the FASA was in operation. *See e.g.,* Trial Tr. 132:14–133:16 (Neal), 393:14–394:4 (Holloway), 487:6–488:2 (Pomerantz), 750:8–753:3 (Richardson), Trial Tr. 865:4–866:6 (Bullard), 957:13–958:2 (Laby); Pls.' Resps. ¶¶ 166–67, 346, 348, 352–53. Thus, the Court will not elevate form over substance by drawing lines — divorced from reality — between obligations Calamos had under the IMA as compared to the FASA.[27]

In sum, the Court finds that the fund administration obligations (and risks) that Calamos undertook in advising the Fund greatly exceed the limited obligations (and risks) Calamos undertook in advising its Other ACG Accounts, to the extent Calamos undertook any services.

d. *Portfolio Management Services*

Plaintiffs claim that Calamos provided the Fund and its Other ACG Accounts the same kinds of Portfolio Management Services under their IMAs, contrary to Calamos' representations

---

[27] Throughout their post-trial papers, Plaintiffs assert that the Court had ruled previously, *as a matter of law*, that the Independent Trustees evinced a lack of conscientiousness when they evaluated *all* the services Calamos provided each year during relevant period in approving the IMA, without excluding from their 15(c) Review those services expressly listed in, and purportedly compensated fully by, the FASA. *See, e.g.*, Pls.' Resps. ¶¶ 344, 350, 353. Not so. In its opinion granting partial summary judgment to Calamos, this Court noted only that "Plaintiffs, at the very least, have raised *genuine questions of material fact* with respect to whether the Independent Trustees exhibited a lack of conscientiousness when it evaluated Calamos' services in a 'bundled' fashion." *Chill v. Calamos Advisors LLC*, No. 15 Civ. 1014 (ER), 2018 WL 4778912, at *13 (S.D.N.Y. Oct. 3, 2018) (emphasis added). And those "genuine questions of material fact" have now been resolved in Calamos' favor, as explained *supra*.

to the Trustees in its presentations. PPF ¶ 89–96. According to Plaintiffs, for all of its ACG clients, Calamos was required: (1) to buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities; (2) to establish and deal through accounts with one or more securities broker-dealers or banks as Calamos may select; and (3) to use its best judgment to select broker-dealers to obtain the best price and most favorable execution. *Id*. But, as Calamos correctly explains (and the credible trial evidence confirms), while there are some overlapping portfolio management services that Calamos provided to the Funds and to its Other ACG Accounts, the portfolio management services provided to the Funds are different and greater in scope than those provided to any of its Other ACG Accounts. Def.'s Resps. ¶ 89. Jackson testified at length about these differences, which need not be rehashed in this opinion. *See, e.g.*, Trial Tr. 333:6–334:13; 343:7–346:5.

Plaintiffs contend that the same investment management personnel serviced the Fund and the Other ACG accounts. *See* PPF ¶ 92. That observation, however, is of little consequence. As mentioned above, the trial record demonstrates that the portfolio management services that Calamos provided to the Fund were different from and greater in scope than those that Calamos provided to its Other ACG accounts. *See* DPF ¶¶ 189–92; *see also* Def.'s Resps. ¶¶ 199, 314.

e. *Client and Shareholder Services*

Calamos provides various client and shareholder services for the Fund. Plaintiffs contend that Calamos "lavished" the Other ACG Accounts with an "extraordinary level of attention" when it came to client services. *See* PPF at heading III.B.3.e.i. But the Court finds that the credible weight of the evidence presented at trial paints a different picture than that painted by Plaintiffs.

Among other contentions, Plaintiffs argues that whereas Calamos had six to seven times

the number of full-time Distribution Department personnel servicing the Funds than those servicing the Other ACG Accounts, this proportion roughly parallels the proportion of the Funds' AUM to the Other ACG Accounts' total AUM during the relevant period. PPF ¶ 187. Thus, according to Plaintiffs, the cost-per-dollar of AUM to provide the Funds and the Other ACG Accounts with client services were substantially similar. *Id.* As Calamos correctly argues, however, the number of distribution personnel used to service Calamos' clients says little about the amount of *effort* expended by Calamos to provide client services for Fund shareholders as compared to its Other ACG Accounts. Def.'s Resps. ¶ 187. And indeed, as demonstrated at trial, the amount of effort Calamos expended in servicing the Funds was far greater than that expended in servicing its Other ACG Accounts. *See, e.g.*, Trial Tr. 73:1–23 (Becker) (contrasting Calamos' client services work for thousands of mutual fund clients and their intermediaries with the work done for Calamos' Other ACG Accounts); Behan Decl. ¶ 87 (explaining that over 90% of the due diligence questionnaires completed by Calamos was for the benefit of retail mutual fund clients, with the small remaining balance at the request of the Other ACG Accounts).

Plaintiffs also contend that Calamos provides both the Funds and its Other ACG Accounts with quarterly portfolio reviews customized to their individual portfolios, e-newsletters with market commentary, firm updates, product reviews, and regular in-person portfolio reviews. PPF ¶ 190. This much is true. But, as explained credibly by Becker at trial, Calamos' burden in preparing for mutual fund board meetings (including preparing documents, compiling performance data, and answering questions) was far more extensive than the burdens of preparing for meetings with Calamos' Other ACG Accounts. *See* Trial Tr. 73:1–75:3 (Becker). Calamos also produced evidence demonstrating that its travel burdens were much greater in advising the Funds vis-à-vis its Other ACG Accounts. *See, e.g.*, *id.* 75:5–76:2 (Becker)

(explaining the atypicality of Calamos' relationship with Nomura — its largest institutional account — and noting that the requirement to visit Nomura locally once a year was "extreme" and an "exception to the rule").  And insofar as Plaintiffs rely on Calamos' relationship with Nomura in attempting to demonstrate that the fees charged to Calamos' ACG Accounts are an apt comparator to those charged to the Funds, the Court finds such reliance unpersuasive in light of Becker's extensive credible testimony regarding why Nomura was not a "typical" ACG client. *See* Part III.G.2, *supra*.

In sum, the Court finds that the client services provided to the Fund greatly exceeded the limited client services Calamos provided to its Other ACG Accounts.

### f.  *Calamos' Risks in Advising the Fund vis-à-vis Its Other ACG Accounts*

The weight of credible evidence presented at trial confirms that investment advisors across the industry, including Calamos, take on greater risks in advising mutual funds than they do with respect to their institutional and sub-advisory clients.  As Richardson and Jackson explained, mutual fund advisors assume greater risk advising mutual funds than they do when sub-advising other funds or institutional clients, and insurance does not fully cover these risks. *See* Richardson Report ¶¶ 19, 45, 67–73, 117–25, 128–32; Trial Tr. 262:14–266:18, 346:7–347:6, 348:4–351:5 (Jackson).  Specifically, the Court finds that there is — at the very least — increased

legal and regulatory risk, operational risk,[28] and entrepreneurial risk[29] in advising mutual funds as compared to non-mutual funds. Moreover, Jackson persuasively explained that these risks are "inherent" and "dynamic," and require investment advisors like Calamos to continuously monitor the legal landscape to try and anticipate issues before they arise. Trial Tr. 348:4–349:3, 349:9–351:5 (Jackson).

The Court finds that insurance does not fully cover these greater risks in advising mutual funds vis-à-vis its Other ACG Accounts, *see* DPF ¶ 202, and that Calamos bears these risks even if they have not materialized in the past or have not been quantified, *id.* ¶ 203.

Both Calamos and Plaintiffs' witnesses agree that it is common practice within the mutual fund industry for investment advisors to charge a higher fee to mutual fund clients than they charge to institutional and sub-advisory clients that invest in similar strategies. Pls.' Resps. ¶ 225. And here, Plaintiffs fully admit that no court has *ever* held that the fees charged to an investment adviser's institutional or sub-advised clients constitute a ceiling on fees charged to the adviser's mutual fund clients. Pls.' Resps. ¶ 227. Likewise, to the Court's knowledge, no

---

[28] Again, as mentioned above, the IMA requires Calamos to "manage, supervise and conduct the other affairs and business of the Trust and each Fund thereof and matters incidental thereto, subject always to the control of the Trustees." Pls.' Resps. ¶ 166. Under this provision, Calamos is responsible for ensuring the provision of the entire variety of non-portfolio management services necessary to manage the Fund, such as fund administration and accounting, legal, compliance, and external reporting. *Id.* Indeed, Pomerantz testified that Calamos is "morally responsible" under the IMA for "everything that needs to be done" for the Fund and for "providing literally all of the necessary services to operate the trust." Trial Tr. 487:6–488:2. Similarly, Bullard testified that the IMA requires Calamos to provide or arrange for the complete bundle of services needed to run the Fund. Pls.' Resps. ¶ 167.

In contrast to the terms of the IMA operative between Calamos and the Fund, none of the agreements with Calamos' Other ACG Accounts contained a provision that, either in words or substance, required Calamos to "manage, supervise and conduct the other affairs and business" of any of those accounts in the same manner as the IMA requires with respect to the Fund. *Id.* ¶ 168.

[29] At trial, Plaintiffs attempted to undermine Richardson's opinions by implying that the Fund had ceased experiencing entrepreneurial risks because of its age and level of profitability. *See* Trial Tr. 757:24–758:19 (Richardson). Yet the Court credits Richardson's observation that "entrepreneurial risks continue even after you've obtained a measure of profitability. You don't know that the fund is always going to be profitable going forward." *Id.* 758:24–759:4; *see also* Richardson Report ¶ 128.

court has *ever* held that the fees charged to an investment adviser's institutional or sub-advised accounts are even apt comparators for the fees charged to mutual funds such that a disparity between those fee structures constitutes evidence of a lack of arm's-length bargaining. Rather, as far as the Court can tell, every court to have considered this issue on the merits has come to the exact opposite conclusion. *See, e.g.*, *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 361 (7th Cir. 2015) (concluding upon remand from the Supreme Court that "Plaintiffs have not proffered evidence that would tend to show that [the investment adviser] provided pension funds (and other non-public clients) with the same sort of services that it provided to the [mutual] funds, or that it incurred the same costs when serving different types of clients"); *Gartenberg*, 694 F.2d at 930 n.3 (rejecting comparisons between fees charged by an adviser to a money market fund versus fees it charged to a pension fund and noting that "[t]he nature and extent of the services required by each type of fund differ sharply").[30]

The facts in this case do not counsel a different result. Accordingly, the Court concludes that the fees charged to Calamos' Other ACG Accounts are inapt comparators to the fees charged to the Fund in determining whether the Fund was charged excessive fees. Simply put, the differences in services and risks undertaken by Calamos in advising the Fund vis-à-vis Calamos' Other ACG Accounts are too great for any comparison to be probative on the question of whether

---

[30] District Courts across the country have come to the same conclusions. *See, e.g.*, *Kennis v. Metro. West Asset Mgmt., LLC*, No. 15 Civ. 8162 (GW), slip op. at 41–48, Doc. 506 (C.D. Cal. Jul. 31, 2019, *adopted* Aug. 5, 2019); *In re Blackrock Mut. Funds Advisory Fee Litig.*, No 14 Civ 1165 (FLW), 2019 WL 1387450, at *29–32 (D.N.J. Feb. 8, 2019); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 774 (S.D. Ohio 2018); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11 Civ. 4194 (PGS), 2016 WL 4487857, at *43 (D.N.J. Aug. 25, 2016), *aff'd*, 742 F. App'x 604 (3d Cir. 2018); *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982 (D. Minn. 2007) *rev'd and remanded*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046 (2010), *and order reinstated*, 2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 973 n.38 (S.D.N.Y.), *aff'd*, 835 F.2d 45 (2d Cir. 1987).

the Fund's fees are representative of arm's-length bargaining.[31]

### 3. Comparison of Fees Charged to the Fund by Calamos
###    versus Fees Calamos Charged to Its Institutional and Sub-Advised Clients

Even if such a comparison were to be relevant, the Court notes that Plaintiffs fundamentally misapprehend the importance of comparative fee structures in the *Gartenberg* analysis. According to Plaintiffs, "a fee negotiated at arm's length with [an] institutional or sub-advisory account invested in the same strategy serves as a first-order *baseline* reference for a mutual fund's advisory fee, but mutual funds can validly exceed such a baseline to the extent that mutual funds were provided with greater services." Pls.' Resps. ¶ 428 (emphasis added); *see also id.* ¶ 209 (arguing that § 36(b) and *Jones* requires Calamos to "cost-justify" the Fund's fees). Their expert, Pomerantz, is under the same misapprehension. *See* Trial Tr. 493:9–497:3 (Pomerantz) (testifying that fee differentials between different clients can only be "justified" to the board of trustees on the basis of difference in services rendered).

Plaintiffs are wrong: The Supreme Court in *Jones* made clear that "[e]ven if the services provided and fees charged to an independent fund are relevant, courts should be mindful that *the [ICA] does not necessarily ensure fee parity between mutual funds and institutional clients*." 559 U.S. at 350 (emphasis added). Likewise, the Supreme Court has concluded that "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services *in addition to other evidence that the fee is outside the arm's-length range* will trial be appropriate." *Id.* at 350 n.8 (emphasis added); *see also id.* at 354 (Thomas, J., concurring) (cautioning courts to refrain from "emphasiz[ing] fee 'fairness' and proportionality in a manner that could be read to permit the equivalent of the judicial rate regulation the *Gartenberg* opinions

---

[31] While not discussed in this opinion, the Court rejects Pomerantz's "AUM-weighted average effective fee rate" opinions for the reasons provided by Calamos in its moving papers. *See* Def.'s Resps. ¶ 149.

disclaim" (citation omitted)). Moreover, this Court was clear on this point in its opinion granting partial summary judgment to Calamos, remarking:

> Plaintiffs will be hard-pressed to prevail at trial merely by demonstrating *solely* that the challenged Advisory Fees are higher, even much higher, than those charged to Calamos' comparable institutional and sub-advisory clients . . . . It is neither the province nor the duty of federal courts to "assess the fairness or reasonableness of advisors' fees; the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation."

*Chill*, 2018 WL 4778912, at *17 (quoting *Paskowitz v. Prospect Capital Mgmt. L.P.*, 232 F. Supp. 3d 498, 501 (S.D.N.Y. 2017)).

Here, Plaintiffs have failed to show that the disparity in fees between the Fund and Calamos' Other ACG Accounts cannot be explained by the different services and risks Calamos undertakes in advising the Fund. And, even assuming that Plaintiffs could make such a showing, the Court nevertheless finds that Plaintiffs have failed to show "additional evidence" persuasive enough to convince the Court by a preponderance of the evidence that the Fund's advisory fees are not the product of arm's-length bargaining.

### C. Profitability

The Court finds that the profitability of the Fund to Calamos does not support a conclusion that the advisory fees paid by the Fund to Calamos were excessive.

In its opinion and order granting partial summary judgment to Calamos, the Court found "wholly lacking in merit" Plaintiffs' contention that the Independent Trustees' review of the Fund's profitability was deficient because Calamos' 15(c) presentations to the Board materially understated the Fund's profitability. *Chill*, 2018 WL 4778912, at *12. Instead, the Court concluded that "the Independent Trustees were fully informed about Calamos' profitability methodology, thoroughly discussed the impact that methodology would have on the profitability figures Calamos reported vis-à-vis alternative methodologies, and formally approved of

Calamos' use of that methodology." *Id.* But the Court concluded that there were triable issues of fact surrounding the Fund's actual profitability to Calamos, in substantial part because Calamos failed to provide a meaningful argument as to why Plaintiffs' alternative profitability figures and evidence of calculation flaws did not raise triable issues of material fact. *Id.* at *20–21. The Court did note, however, that it agreed with Plaintiffs' expert, Bullard, who testified during his deposition that "an advisor's profitability is a poor measure of the excessiveness of its fees because there is no necessary correlation between the two." *Id.* at *21 (citing Bullard Dep. 302:2–7).

*1. Profitability Estimates*

The parties proffered two estimates of Calamos' pre-tax, pre-distribution profitability. The Plaintiffs, using a methodology developed by Pomerantz and discussed in Part III.H.2.b, *supra*, estimated that Calamos enjoyed a profit margin of between 61% and 75% from the Fund during the relevant period. Pomerantz Report at ¶ 521. Calamos, relying on its internal methodology, suggested its profitability was much lower: only 29% to 55%. DPF ¶ 342.

A number of district courts have examined advisors' profit margins and concluded that the margin was not excessive. Several of these cases are laid out below:

| Case | Margin Approved |
|---|---|
| *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) | 89% pre-tax, including some distribution expenses |
| *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 979 (S.D.N.Y. 1987) | 77.3% pre-tax, including some sales promotion expenses |
| *In re Davis New York Venture Fund Fee Litig.*, No. 14 Civ. 4318 (LTS), slip op. 11, 31–32 (S.D.N.Y. July 2, 2019), Doc. 164. | 73.33% to 81.43% pre-tax |
| *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11 Civ. 1083 (RMB/KMW), 2017 WL 773880, at *22 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018) | 45.6% to 80.3% pre-tax |
| *Redus-Tarchis v. N.Y. Life Inv. Mgmt. LLC*, No. 14 Civ. 7991 (WHW), 2018 WL 5307546, at *9-10 (D.N.J. Oct. 10, 2018) | 46% to 53%, pre-distribution |

In determining whether Calamos' profits are indicative of excessive fees, "[t]he Court is guided by the notion that it is not a permissible approach under Section 36(b) to argue that the adviser 'just plain made too much money.'" *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11 Civ. 1083 (RMB/KMW), 2017 WL 773880, at *22 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018) (quoting *Kalish* v. *Franklin Advisors, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990)). Yet, that is the *entirety* of Plaintiffs' argument on this point. *See* PPF ¶ 397; Pls.' Resps. ¶ 342.

Given that both Calamos' and Plaintiffs' estimates of profitability fall well within the range of many, if not all of the profitability ranges approved by other courts, and given that there is no other evidence indicating that the profit margins are excessive, this Court determines that neither interpretation of Calamos' profit margin is excessive under the ICA. Keeping in mind the

warnings of the *Gartenberg* court, this Court declines to set fees or impose any cost-plus pricing scheme.  *See* 694 F.2d at 928.

> ### 2.  *The Best Estimate of Calamos' Profitability*

Because the Court has determined that both estimates of profitability fail to support a charge of excessive fees, it may end the profitability analysis there.  But to the extent necessary, it finds Calamos' AUM-allocation method, described in Part III.E.3, *supra*, more appropriate than that used by Pomerantz.[32]

Calculating pre-distribution profitability, like any other profitability calculation, necessarily involves the exercise of discretionary accounting judgments that may affect the overall result.  Pls.' Resps. ¶ 299.  But, as Plaintiffs' note, different methodologies can produce a range of different results that are not equally reasonable, and that, at the extremes, yield absurd results and are not decision-useful.  *Id.*  Particularly when calculating profitability of a subset of the Calamos business, there is no one "true" profitability figure because there are a range of reasonable and acceptable judgments and methodologies that can be used to produce a range of different but equally reasonable results.  *Id.*  As Lacey credibly explained at trial, "[t]here is no single best method [for allocating costs].  It depends on the facts and circumstances and the judgment of management."  *Id.* ¶ 299.

In preparing the Profitability Presentation, Calamos is required to account for not only "direct" expenses, but also "indirect" expenses (sometimes called "joint and common" expenses).  *Id.* ¶ 302.  An indirect expense is an expense that is incurred but cannot be connected solely to a specific cost object, such as rent, insurance, employee salaries, and utilities like

---

[32] The Court has already found Pomerantz's methodology to be unreliable.  *See* Part III.H.2.b, *supra*.  To the extent considering it is still relevant, the Court finds Calamos' methodology to be the more reliable of the two.

electricity or gas heat. *Id.* It is not possible to trace these expenses to the product(s) and fund(s) incurring these costs. *Id.* Therefore, some allocation methodology must be selected so that the expenses can be attributed to the cost object(s) to which the expense is connected. *Id.* A large amount of the advisory expenses are indirect expenses that therefore must be allocated. *Id.*

The AUM allocation approach is "commonly accepted within the industry," as the Court recognized on summary judgment. DPF ¶ 304. The trial witnesses reinforced this conclusion. *Id.* Pomerantz admitted that allocation by AUM is common in the mutual fund industry, and that he is unaware of a single statute, SEC regulation, or any other source of law that prohibits the use of such a methodology. *Id.* In addition, as Neal testified, during his time at Kemper, that investment adviser also utilized the average AUM allocation methodology to calculate mutual fund profitability for its 15(c) response. *Id.*; *see also* Trial Tr. 215:19–25 (Neal) ("Is it the way we did it at Kemper? Yes. Is it the way many advisers and independent boards do it? Yes. And it's the way we did it.").

Thus, contrary to Plaintiffs' representation that "there is *no* record evidence indicating that many, or any, advisers other than [Calamos] allocate effectively *all* advisory costs on the *sole* basis of AUM," see Pls.' Resps. ¶ 301, the record reveals credible testimony that other advisers in fact do so. Moreover, as the only qualified accountants this Court credited at the trial (Helmetag and Lacey) testified, Calamos' manner of calculating Fund-level profitability, including its allocation of indirect costs on the basis of AUM, is consistent both with managerial accounting principles and the principles underlying GAAP. *Id.* ¶ 305. These facts went uncontroverted; Plaintiffs did not offer any competent evidence that Calamos' cost allocation approach is inconsistent with managerial accounting principles or the principles underlying GAAP. *Id.* ¶ 306.

Lacey credibly explained why Calamos' cost allocation method and its concomitant Profitability Presentations could be "decision-useful" to the Independent Trustees:

> It's a reasonable allocation. The larger fund gets a larger benefit from the information. What we're talking about is computing the profitability for the adviser advising a particular fund. So, it's the profitability the adviser — we must allocate these common costs, joint costs, to the different funds. And so, there has to be some mechanism to do so. And where we don't have the cause and effect relationship, we look at benefits received. *Larger funds receive more benefit.*

Trial Tr. 1006:11–19 (Lacey) (emphasis added).

In the ordinary course of business, Calamos' corporate books do not segregate expenses between pre-distribution and post-distribution activities. Pls.' Resps. ¶ 308. Thus, in preparing the pre-distribution profitability requested by the Independent Trustees, Calamos must undertake further calculation and exercise further judgment in seeking to identify pre-distribution expenses and post-distribution expenses. *Id.* During the relevant period, the manner in which Calamos allocated indirect costs between the advisory and distribution functions was fully disclosed to the Independent Trustees, as Bullard acknowledged. *Id.* ¶ 309. Moreover, the trial record firmly establishes that the Independent Trustees found the apportionment of these expenses in this manner both reasonable and decision-useful. DPF ¶ 309; *see also* Neal Decl. ¶ 108.

Some of these apportionment judgments are intuitively clear. For example, the decision to apportion 100% of indirect investment management expenses to the advisory function as opposed to the distribution function is straightforward. Pls.' Resps. ¶ 310. But other apportionment judgments are less clear. For example, Plaintiffs take issue with Calamos apportioning 100% of "Information Services" and "General & Administrative" ("G&A") expenses — which included executive management, legal, compliance, human resources, rent (facilities), and financial department expenses — to the distribution function. *See* Helmetag

Decl. ¶ 52 (citing the 2016 Mutual Fund Profitability Presentation (DX 145-R at 634768)).

Plaintiffs claim that it is unreasonable to allocate 100% of Information Services and G&A expenses to the advisory function and 0% to the distribution function, particularly given that "distribution personnel constitute 23% of Calamos' total headcount and utilize the same IT Services and G&A resources as [Calamos'] advisory personnel."  PPF ¶ 408; *see also* Trial Tr. 253:14–254:12 (Helmetag) (testifying that "distribution comprises about 23 percent of the company in terms of head count").  Plaintiffs' point is well taken.  Bhatt, Calamos' former CFO, could not recall during his deposition whether the Independent Trustees ever asked questions regarding why 100% of Information Services expenses was allocated to the advisory function versus distribution.  Bhatt Dep. 96:15–97:1.  Timbers testified to the same effect.  *See* Timbers Dep. 94:11–95:14.

Neal testified, however, that he believed it was reasonable to allocate all of the expenses for Information Services and G&A to Calamos' advisory function.  Trial Tr. 146:24–147:2, 148:24–149:1.  Neal explained that the Independent Trustees *could* have been more picky about Calamos' allocation methodology, but determined that it was unnecessary because (a) the Trustees were "industry-experienced people" who knew the approximate costs and services related to advising, (b) Calamos' average AUM approach was a reasonable methodology, and (c) profitability information "wasn't the kind of information that's *essential* for approval" of the IMA, but rather "only *a piece* of information."  *Id.* 191:5–192:21 (emphases added); *see also* Timbers Dep. 98:6–8 ("You know, [Calamos] had — all these accountants have their ways of allocating [expenses,] and if it sounds reasonable, it sounds fair, then you're okay.").

Similarly, as Helmetag credibly testified, with respect to the G&A expenses being 100% allocated to the advisory function, given the overall dominance of the advisory function within

the Calamos organization as compared to the distribution function, it was reasonable to estimate that these departments are required in substantial part to support the advisory function. For example, external wholesalers who work to distribute the Funds work remotely and have no need for office space at Calamos, so in this instance it is reasonable to estimate that the advisory function incurs greater rent expense than the distribution function. DPF ¶ 311.

Plaintiffs, of course, disagree. They point out that Calamos' distribution department, which included at least seventy five personnel, was larger than Calamos' investment management department, which included approximately sixty five to seventy five personnel. *See* Pls.' Resps. ¶ 311. But resort to headcount, without more, says little to nothing about the extent of expenses incurred in handling the advisory function versus the distribution function. For example, as Helmetag explained, a number of the distribution personnel are "wholesalers" who work remotely and do not reside in any office of Calamos and, therefore, do not contribute to one of Calamos' largest expenses under the G&A umbrella: rent. *See* Trial Tr. 254:6–255:16. At bottom, "the predominant costs are for the advisory function;" therefore, if one were to have allocated 5% or 10% of G&A to distribution, in Helmetag's opinion, which the Court credits, "it doesn't result in a material difference . . . to the results that are presented in the profitability analysis. It may change the overall profitability by a percent or two." *Id.* 249:17–23. The Court finds that Calamos' allocations — and therefore profit margin estimates of 29% to 55% — were reasonable.

In conclusion, the Fund's profitability to Calamos — and Calamos' methodology for calculating profitability — fail to support Plaintiffs' argument that Calamos breached its fiduciary duty under § 36(b). As the credible evidence at trial revealed: (1) no estimate of Calamos' profitability is excessive; (2) an adviser's choice of cost allocation methodology, if reasonable (as

is Calamos' average AUM methodology) does not meaningfully affect whether an advisory fee is excessive; (3) Calamos' calculation of its profitability as to the Fund necessarily involves the exercise of reasonable discretionary accounting judgments, as Calamos' judgments were; and (4) because there are a range of reasonable and acceptable judgments and methodologies that can be used, and which all will produce a range of different but equally reasonable results, there is no one "true" profitability figure. Thus, in this case, consideration of the Fund's profitability to Calamos does not lend support to Plaintiffs' claim that Calamos violated its fiduciary duty under § 36(b).

### D. The Nature and Quality of Services Calamos Provided to the Fund

#### 1. The Recent Performance of the Fund

The Court now evaluates the nature and quality of services provided to the Fund. Plaintiffs contend that the Fund's performance was exceptionally poor, and they maintain that the Independent Trustees offered only "fig-leaf responses" to Calamos' "continued poor performance" in advising the Fund. PPF Part I.E. In other words, Plaintiffs zero in on the *quality* of services provided by Calamos.[33] Upon review of the trial record, the Court finds that the Fund did underperform for most of the relevant period. But the Court also finds that the Independent Trustees were fully informed about the Fund's performance history — both the positive and the negative; were fully informed about Calamos' efforts to "right the ship;" and ultimately evinced conscientiousness and care in approving the advisory fees charged to the Fund each year during the relevant period, notwithstanding Fund performance.

---

[33] Given the Court's conclusions concerning (1) the propriety of the Independent Trustees' consideration of *all* advisory services provided by Calamos, without attempting to artificially distinguish the services provided by the IMA from the services provided pursuant to the FASA, and (2) the propriety of the Independent Trustees' consideration of Calamos' obligation to supervise and manage the Fund's third-party service providers, any dispute over the *nature* of services provided to the Fund by Calamos has been laid to rest.

Although performance is not an explicit *Gartenberg* factor, boards of trustees and courts alike have considered fund performance in analyzing the "nature and quality of services" provided by an investment adviser. *See In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 Civ. 4318 (LTS), 2019 WL 2896415, at *14 (S.D.N.Y. July 2, 2019). That said, courts have often been "wary about attaching too much significance to a fund's financial performance," *Paskowitz v. Prospect Capital Mgmt.*, 232 F. Supp. 3d 498, 506 (S.D.N.Y. 2017) (quoting *Redus-Tarchis v. N.Y. Life Inv. Mgmt.*, No. 14 Civ. 7991 (WHW), 2015 WL 6525894, at *7 (D.N.J. Oct. 28, 2015)) — and for good reason. As explained by the Fourth Circuit in *Migdal v. Rowe Price-Fleming International, Inc.*:

> Investing is not a risk-free endeavor. Even the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk. Furthermore, investment results are themselves cyclical. An under-achieving fund one year may be an over-achieving fund the next.

248 F.3d 321, 327–28 (4th Cir. 2001). Hewing to *Migdal*'s reasoning, the Second Circuit has held that "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive." *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (quoting *Migdal*, 248 F.3d at 327); *cf. In re Davis*, 2019 WL 2896415, at *15 (observing that "imposing liability based on profits during periods of poor performance" risks "put[ting] the Court in the position of setting fees in a performance-based billing regime").

Calamos urges the Court to examine the Fund's performance in a series of one-year periods:

- During the one-year period prior to the June 2013 Board meeting, the Fund's performance ranked at the 97th percentile[34] of its Morningstar

---

[34] All percentile rankings for performance listed immediately below, as presented by Morningstar, follow this logic: "1 = Best, 100 = Worst." *See, e.g.*, JX 88 at 523996 n.1.

category;

- During the one-year period immediately prior to the June 2014 Board meeting (that is, as of June 2014), the Fund's performance had reached the top quartile of its Morningstar category, ranking in the 20th percentile;[35]

- During the one-year period immediately prior to the July 2015 Board meeting (that is, as of June 2015), the Fund's performance remained in the top third of its Morningstar category, ranking in the 32nd percentile;

- During the one-year period immediately prior to the July 2016 Board meeting (that is, as of June 2016), the Fund's performance was in the bottom quartile of its Morningstar category, ranking in the 86th percentile;

- During the one-year period prior to the June 2017 Board meeting (that is, as of May 2017), the Fund's performance was again in the bottom quartile of its Morningstar category, ranking in the 87th percentile. But, the Fund's year-to-date performance in 2017 — the majority of which time the Fund had been under Michael Grant's supervision following David Kalis' departure from Calamos — had been better relative to peer mutual funds than its one-year performance, ranking in the 58th percentile of its Morningstar category; and

- During the one-year period prior to the June 2018 Board meeting (that is, as of May 2018), the Fund's performance was in the third quartile of its Morningstar category, ranking in the 60th percentile.

Pls.' Resps. ¶ 98.

But, as Plaintiffs are quick to point out, the Fund's comparative investment performance data over three-, five-, and ten-year periods did not look much better, and oftentimes looked worse than the performance figures cited above. *See, e.g.*, PPF ¶¶ 101–02. They also point out

---

[35] As Plaintiffs rightly point out, while the Fund's Morningstar performance ranking for the one-year period ending *June* 2014 was the 20th percentile, the performance ranking for the one-year period ending *March* 2014 (i.e., the traditional period reported in the Independent Data Providers' Reports) was the 32nd percentile. *See* Pls.' Resps. ¶ 98. But this fact has little persuasive value, as both percentiles indicate strong fund performance and, as Hubbard explained, "the relative rank of any fund's returns (especially returns measured over short horizons, such as a one-year period) is sensitive to the discrete 'end' dates selected to measure the fund's returns." Hubbard Report ¶ 113. Additionally, the Independent Trustees were apprised monthly and quarterly of the Fund's performance, *see* SSF ¶ 31; Pls.' Resps. ¶ 122, and were therefore aware of these figures. *See* Becker Decl. ¶¶ 4, 7, 9–11, 18–19, 22–24, 26.

that Calamos' witnesses admitted as much during trial.  *See, e.g.*, *id.* ¶¶ 107–08.

Regardless of the amorphous "end" date selected to measure the Fund's returns, the Court finds that incontrovertible evidence demonstrates that the Fund's performance was often underwhelming during the relevant period.  Accordingly, this factor supports Plaintiffs' contention that Calamos' fees were excessive.

### 2. Mitigating Factors

But it does so weakly.  At base, the credible trial evidence reveals that past performance, whether relative or absolute, is of limited utility in assessing the excessiveness *vel non* of fees charged to a mutual fund under § 36(b).  Investors and boards are typically more concerned with *future* performance, which necessarily entails some speculation; and past performance, whether poor or exceptional, is a weak and unreliable indicator of *future* performance.  DPF ¶¶ 279–80.  Thus, while the Court remains of the opinion that "it seems axiomatic that a mutual fund's persistent underperformance vis-à-vis its peers is the best barometer of the [quality of] services it receives," *see Chill v. Calamos Adivsors LLC*, 175 F. Supp. 3d 126, 142–43 (S.D.N.Y. 2016), it is not unreasonable for a board of trustees — fully apprised of the fund's performance history and its investment adviser's efforts to improve performance — to evaluate (and ultimately credit) the potential of better *future* returns, while also weighing the lackluster *past* returns, in determining whether to approve an IMA.  The Court finds that the Independent Trustees did exactly that in this case.

For example, the Independent Trustees received information at each Board meeting about the Fund's since-inception performance on an absolute basis, relative to benchmark indices, and relative to peer mutual funds, along with information about the Fund's performance during other short-, medium-, and long-term periods.  Pls.' Resps. ¶ 96.  In addition to providing this and

additional performance data to the Independent Trustees, Calamos regularly provided them with its explanation of the investment decisions and market forces that it believed contributed to the Fund's performance and how Calamos planned to adapt to these and other market forces going forward. Pls.' Resps. ¶ 99. The Court also finds that throughout the relevant period, and contrary to Plaintiffs' contentions otherwise (which need not be rehashed in this opinion), Calamos *did* make numerous significant and costly changes to its investment team and investment process, which was not limited to additional personnel hired to service the Funds. *See* DPF ¶¶ 106–20. And the Independent Trustees *did* conscientiously consider these significant and costly changes (along with several other factors) in determining whether to approve Calamos' advisory fee each year during the relevant period. Pls.' Resps. ¶¶ 122–23, 129–31; DPF ¶¶ 127, 133–38, 141–42.[36]

The recent underperformance is further contradicted by the Fund's since-inception performance. As of each annual meeting when the Independent Trustees voted to approve the IMA, the Fund's since-inception annualized return was at least 12.74%, which both ranked between the 2nd and 4th percentiles of its Morningstar category and exceeds the annual returns of all of the Fund's benchmark indices during the same period. Pls.' Resps. ¶ 96. The Fund also has earned positive absolute returns in twelve of the fifteen years leading up through the end of 2017. *Id.* In fact, The Fund's since-inception ranking compared to peer mutual funds actually understates the Fund's relative performance because the peer group only includes mutual funds that survived for the entire time period. *Id.* ¶ 97. In particular, Hubbard's analysis shows that only nine of approximately sixty original peer mutual funds at the time of its inception have survived to the present date. *Id.* The Fund has also experienced substantial periods of

---

[36] Insofar as Plaintiffs' expert Bullard opined otherwise, the Court finds his testimony unpersuasive for the same reasons provided by Calamos. *See* DPF ¶ 125.

outperformance even as compared to these nine surviving funds. *Id.*

Plaintiffs argue that the Fund's long-term performance history is "irrelevant" because the "Fund's since inception performance has nothing to do with [Calamos]'s performance vis-à-vis the [] Fund's shareholders during the [r]elevant [p]eriod." Pls.' Resps. ¶ 96. Plaintiffs are wrong. The Fund's express investment objective is *long-term* capital growth. *See supra* Part III.B. Thus, the Fund's long-term performance is, at the very least, a *somewhat* useful measure of a Fund's success in achieving its investment objective. *See* Hubbard Report ¶ 113 (explaining that "the relative rank of any fund's returns (especially returns measured over short horizons, such as a one-year period) is sensitive to the discrete 'end' dates selected to measure the fund's returns"). Thus, while it certainly is true that the Independent Trustees should *also* consider the Fund's medium- and short-term performance, as well as the Fund's performance relative to its peers, the Court finds unpersuasive Plaintiffs' assertion that the Fund's long-term performance is simply irrelevant. The Court credits trial testimony explaining the utility of such a metric. *See, e.g.*, Trial Tr. 716:20–717:8 (Hubbard).

Finally, the Court finds that Calamos' substantial efforts to improve performance and the Fund's more recent uptick in performance further lessens the importance of the Fund's struggles with performance during the relevant period. *Cf. Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11 Civ. 1083 (RMB), 2017 WL 773880, at *21 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018) ("Dr. Hubbard's unrebutted testimony that the fund was undergoing management changes, and the fact that the Fund performed strongest during the final ten-year period presented to the Court softens the determination that the Fund overall performed weakly.").

### E.  Economies of Scale and Fall-Out Benefits

The Court has already ruled in Calamos' favor as to economies of scale and fall-out

benefits. It has found that the Independent Trustees carefully and conscientiously considered these factors, and the Court has found that Plaintiffs' evidence failed to present a triable issue as to the excessiveness of the Fund's advisory fee. Pls.' Resps. ¶ 253 (citing *Chill*, 2018 WL 4778912, at *12–14, *18–19, *21). There are thus no issues remaining for decision as to these two *Gartenberg* factors. *Id.*

## V.   CONCLUSION

Of the six factors articulated in *Gartenberg* and reaffirmed in *Jones*, only one — the quality of services Calamos provided to the fund — even marginally tends to support Plaintiffs' claim. The other five factors weigh decisively in Calamos' favor. Therefore the Court concludes that Plaintiffs have failed to prove that — at any time during the relevant period — Calamos received from the Fund an advisory fee so disproportionately large that it bore no reasonable relationship to the services rendered and did not reflect the product of arm's-length bargaining.[37] Put simply, Plaintiffs have failed to prove that Calamos breached its fiduciary duty under § 36(b). Plaintiffs' complaint is therefore DISMISSED. The Clerk of Court is respectfully directed to close the case.

It is SO ORDERED.

Dated:    September 27, 2019
          New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[37] Because Plaintiffs failed to make a case for Calamos' liability under § 36(b), the Court need not — and thus does not — express any factual findings or conclusions of law related to damages in this opinion.